UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------------x
                                            :
THE PEOPLE OF THE STATE OF NEW YORK,        :
                                            :          23-cv-3773
            - against -                     :
                                            :
DONALD TRUMP,                               : AFFIIRMATION OF SUSAN R.
                                            : NECHELES IN SUPPORT OF
                        Defendants.         : REMOVAL
                                            :
                                            :
                                            :
                                            :
------------------------------------------------------------------x
```

Susan R. Necheles, a partner at the law firm Necheles Law LLP, duly admitted to practice in the

courts of the State of New York, hereby declare, pursuant to 28 U.S.C. 1746, the following to be

true and correct:

1.      I represent Donald Trump in this matter and submit this declaration in support of

Donald J. Trump's removal of the case *People of the State of New York v. Donald J. Trump*, Ind.

No. 71543/2013 (New York County Supreme Court), to United States District Court for the

Southern District of New York.

2.      I incorporate by reference all factual statements made in the accompanying Notice

of Removal.

3.      Exhibit A is a true and accurate copy of the Indictment in People of the State of

New York v. Donald J. Trump.

4.      Exhibit B is a true and accurate copy of a Morgan Lewis White Paper called

Conflicts of Interest and the President.

5.      Exhibit C is a true and accurate copy of the Motion for a Protective Order filed by the People in *People v. Donald J. Trump*.

6.      Exhibit D is a true and accurate copy of Donald J. Trump's Opposition to the People's Motion for a Protective Order in *People v. Donald J. Trump*.

7.      Exhibit E is a true and accurate copy of the Statement of Facts filed by the People in *People v. Donald J. Trump*.

8.      Exhibits A, C, D, and E are copies of the "process, pleadings, and orders served upon" 28 U.S.C. § 1455(a), Donald J. Trump in *People v. Donald J. Trump*.

Dated: May 4, 2023
      New York, N.Y.

By: _____
      Susan R. Necheles
      NechelesLaw LLP
      1120 6th Ave., 4th Floor
      New York N.Y. 10036
      212-997-7400
      srn@necheleslaw.com

# EXHIBIT A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

----------------------------------------------------------------

THE GRAND JURY OF THE COUNTY OF NEW YORK, by this indictment, accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated February 14, 2017, marked as a record of the Donald J. Trump Revocable Trust, and kept and maintained by the Trump Organization.

SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 842457, and kept and maintained by the Trump Organization.

THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 842460, and kept and maintained by the Trump Organization.

FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about February 14, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump Revocable Trust Account check and check stub dated February 14, 2017, bearing check number 000138, and kept and maintained by the Trump Organization.

FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 16, 2017 through March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated February 16, 2017 and transmitted on or about March 16, 2017, marked as a record of the Donald J. Trump Revocable Trust, and kept and maintained by the Trump Organization.

SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for the Donald J. Trump Revocable Trust, bearing voucher number 846907, and kept and maintained by the Trump Organization.

SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about March 17, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump Revocable Trust Account check and check stub dated March 17, 2017, bearing check number 000147, and kept and maintained by the Trump Organization.


EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about April 13, 2017 through June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated April 13, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.


NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 858770, and kept and maintained by the Trump Organization.

TENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated June 19, 2017, bearing check number 002740, and kept and maintained by the Trump Organization.

ELEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 22, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated May 22, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWELFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 22, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 855331, and kept and maintained by the Trump Organization.

THIRTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about May 23, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated May 23, 2017, bearing check number 002700, and kept and maintained by the Trump Organization.

FOURTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 16, 2017 through June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated June 16, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

FIFTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 858772, and kept and maintained by the Trump Organization.


SIXTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about June 19, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated June 19, 2017, bearing check number 002741, and kept and maintained by the Trump Organization.


SEVENTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated July 11, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

EIGHTEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 861096, and kept and maintained by the Trump Organization.

NINETEENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about July 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated July 11, 2017, bearing check number 002781, and kept and maintained by the Trump Organization.

TWENTIETH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated August 1, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWENTY-FIRST COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 863641, and kept and maintained by the Trump Organization.

TWENTY-SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about August 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated August 1, 2017, bearing check number 002821, and kept and maintained by the Trump Organization.

TWENTY-THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated September 11, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

TWENTY-FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 11, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 868174, and kept and maintained by the Trump Organization.

TWENTY-FIFTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about September 12, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated September 12, 2017, bearing check number 002908, and kept and maintained by the Trump Organization.


TWENTY-SIXTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated October 18, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.


TWENTY-SEVENTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 872654, and kept and maintained by the Trump Organization.

TWENTY-EIGHTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about October 18, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated October 18, 2017, bearing check number 002944, and kept and maintained by the Trump Organization.

TWENTY-NINTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 20, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated November 20, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

THIRTIETH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 20, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 876511, and kept and maintained by the Trump Organization.

THIRTY-FIRST COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about November 21, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J. Trump account check and check stub dated November 21, 2017, bearing check number 002980, and kept and maintained by the Trump Organization.

THIRTY-SECOND COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an invoice from Michael Cohen dated December 1, 2017, marked as a record of Donald J. Trump, and kept and maintained by the Trump Organization.

THIRTY-THIRD COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 1, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, an entry in the Detail General Ledger for Donald J. Trump, bearing voucher number 877785, and kept and maintained by the Trump Organization.

THIRTY-FOURTH COUNT:

AND THE GRAND JURY AFORESAID, by this indictment, further accuses the defendant of the crime of **FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE**, in violation of Penal Law §175.10, committed as follows:

The defendant, in the County of New York and elsewhere, on or about December 5, 2017, with intent to defraud and intent to commit another crime and aid and conceal the commission thereof, made and caused a false entry in the business records of an enterprise, to wit, a Donald J.

Trump account check and check stub dated December 5, 2017, bearing check number 003006, and kept and maintained by the Trump Organization.

ALVIN L. BRAGG, JR.
District Attorney

GJ #8-5

Filed:                                      NA

No.

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

INDICTMENT

FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE, P.L. §175.10, 34 Cts

ALVIN L. BRAGG JR., District Attorney

A True Bill

Foreperson

ADJOURNED TO PART _____ ON _____

# EXHIBIT B

# Morgan Lewis

## WHITE PAPER

### Conflicts of Interest and the President

Background for President-Elect Trump's January 11, 2017 Press Conference
Prepared by Morgan, Lewis & Bockius LLP[1]

## I. OVERVIEW

From President Washington to Vice President Rockefeller to President-Elect Trump, many of this Nation's leaders have been extraordinarily successful businessmen.  Neither the Constitution nor federal law prohibits the President or Vice President from owning or operating businesses independent of their official duties, as a careful textual and historical analysis shows.

Generally speaking, federal conflict-of-interest laws prohibit "officers" or "employees" of the United States from taking positions against the country's interests, maintaining outside employment, receiving an outside salary for official duties, or taking official acts that affect their personal financial interests.[2]

But these laws have historically not applied to the President or Vice President.  As then-Assistant Attorney General Antonin Scalia observed in an Office of Legal Counsel memorandum, the term "officer" typically includes neither the President nor Vice President.[3]  And since 1989, Congress has approved this tradition by expressly excluding the President and Vice President—along with Members of Congress and federal judges—from most conflict-of-interest laws.[4]  The Office of Government Ethics has recently re-affirmed that these conflict-of-interest laws do not apply to the President.[5]

Though Congress has long exempted the President and Vice President from federal conflict-of-interest laws, consistent with a tradition extending back to the Founding, many of these public servants have nevertheless sought to provide extra assurances that their undivided commitment is to the good of the country.  For example, Presidents Johnson and Carter voluntarily stepped away from their broadcasting stations and peanut farms.[6]

Today, President-Elect Trump wishes to announce his own plans to transfer management of his businesses and to voluntarily limit those businesses' ability to engage in transactions that could pose any conflict-of-interest concerns.

---

[1]   Authored by:  Sheri Dillon, Fred F. Fielding, Allyson N. Ho, Michael E. Kenneally, William F. Nelson, and Judd Stone.

[2]   *See generally* 18 U.S.C. §§ 203, 205, 207-09.

[3]   Memorandum from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, to Kenneth A. Lazarus, Associate Counsel to the President, *Applicability of 3 C.F.R. Part 100 to the President and Vice President* (Dec. 1974).

[4]   18 U.S.C. § 202(c) (stating that, unless otherwise provided, "officer" and "employee" do not include President or Vice President).

[5]   Letter from Walter M. Shaub, Jr., Director, Office of Government Ethics, to Senator Thomas R. Carper, at 2 (Dec. 12, 2016) ("[T]he primary criminal conflicts of interest statute, 18 U.S.C. § 208, is inapplicable to the President[.]").

[6]   *See* Megan J. Ballard, *The Shortsightedness of Blind Trusts*, 56 KAN. L. REV. 43, 54-56 (2007).

## II. THE PRESIDENT-ELECT'S PLAN

### Leadership and Management of The Trump Organization

President-Elect Trump will relinquish management of his investment and business assets for the duration of his Presidency.  To accomplish this, all of President-Elect Trump's investment and business assets, commonly known as The Trump Organization—comprised of hundreds of entities—have been or will be conveyed to a Trust, which will be managed for the duration of his Presidency by his sons, Don and Eric, and a Trump executive, Allen Weisselberg.  Collectively—and unanimously—Allen, Don, and Eric will have the authority to manage The Trump Organization and have full decision-making authority for the duration of the Presidency, without any involvement whatsoever by President-Elect Trump.  To implement this transfer, President-Elect Trump will resign from all official positions he holds with The Trump Organization entities.

Further, to ensure that The Trump Organization continues to operate in accordance with the highest ethical standards, President-Elect Trump is appointing an Ethics Advisor to the management team.  Under the terms of the Trust Agreement, written approval of the Ethics Advisor is required for all actions, deals, and transactions that could potentially raise ethics or conflict-of-interest concerns.  President-Elect Trump, as well as Don, Eric, and Allen are committed to ensuring that the activities of The Trump Organization are beyond reproach, and that the Organization avoids even the appearance of a conflict of interest, including through any advantage derived from the Office of the Presidency.

As part of her family's transition to Washington, D.C., President-Elect Trump's daughter, Ivanka Trump will resign from all of her positions in The Trump Organization and the Ivanka Trump brand/fashion business and will have no involvement with the management or operations of either organization.  As she and her husband Jared move their family to D.C. in the coming weeks, Ms. Trump will be focused on settling her children into their new home and schools.

### Status of President-Elect Trump's Investments

President-Elect Trump has already disposed of his investments in publicly traded or easily liquidated investments.  As a result, the Trust will hold only two kinds of assets:  liquid assets, such as cash, obligations of the United States government, and positions in a government-approved diversified portfolio, and the President-Elect's preexisting, illiquid, very valuable business assets.  These include Trump-owned, operated, and branded golf clubs, commercial rental property, resorts, hotels, and rights to royalties from preexisting licenses of Trump marks, productions, books, goods, and similar assets. Examples of these assets include Trump Tower, Mar-a-Lago, Trump International Hotels, and Trump Vineyard Estates.

### Status of The Trump Organization's Deals and Rules for Entering into New Deals

The President-Elect also recognizes that his election was a significant event for the country—and one from which he should not benefit personally.  The President-Elect therefore directed The Trump Organization to terminate all pending deals—over 30 in number—which resulted in an immediate financial loss of millions of dollars, not just for President-Elect Trump but for Don, Ivanka, and Eric as well.

Since then, The Trump Organization has not sought or entered into any new deals.  It has in essence been functioning only as an asset management company, and will continue to do so until after the new management and ethics review structure, as set forth in the Trust Agreement, is in place.  Going forward, the Trust Agreement places severe restrictions on new deals to avoid any possible conflicts of interest or concerns that The Trump Organization is exploiting the Office of the Presidency.

First, the Trust Agreement prohibits—without exception—new foreign deals during the duration of President-Elect Trump's Presidency.  Specifically, the Trust and The Trump Organization will be prohibited at all times during the Presidency from engaging in any new deals with respect to the use of the "Trump" brand or any trademark, trade name, or marketing intangibles associated with The Trump Organization or Donald J. Trump in any foreign jurisdictions.

Second, new domestic deals will go through a rigorous vetting process.  At a minimum, new deals shall require:   (i) the unanimous vote of approval of the Trustees, and (ii) written confirmation from the Ethics Advisor that the proposed transaction is both substantively and procedurally an arm's-length transaction, that it involves an appropriate counterparty, and that it does not raise potential conflicts of interest or similar ethics issues.   President-Elect Trump will have no role in deciding whether The Trump Organization engages in any new deal, and he will be completely sequestered from any information regarding the Organization's decisions; in other words, he will learn about them only through the media, as the American People would.

Third, the Trust Agreement prohibits The Trump Organization from entering into any new transaction or contract with a foreign country, agency, or instrumentality thereof, including a sovereign wealth fund, foreign government official, or member of a royal family, the United States government or any agency or instrumentality thereof, or any state or local government or any agency or instrumentality thereof, other than normal and customary arrangements already undertaken before the President-Elect's election.

**Further Measures Taken to Isolate President-Elect Trump from The Trump Organization**

To further reinforce the President-Elect's separation from The Trump Organization, the Trust Agreement will sharply limit the information that the President-Elect receives regarding the Trust's assets.  Reports transmitted to the President-Elect will only reflect the profit or loss of the Company as a whole.  The reports will not include an accounting of the performance of each individual business within the Company.  Conversely, the President-Elect will not share nonpublic information with The Trump Organization or the Trust, and the Trust will not make use of any nonpublic information, from any governmental source, to engage in financial transactions on the Company's behalf.

To assist its employees in operating at the highest level of integrity and ethical standards, The Trump Organization has established the new position of Chief Compliance Officer.  The sole responsibility of the Chief Compliance Officer is to ensure that The Trump Organization businesses are operating at the highest levels of integrity and are not taking any actions that actually exploit, or even could be perceived as exploiting, the Office of the Presidency.  In addition, The Trump Organization has directed that no communications of the Organization, including social media accounts, will reference or otherwise be tied to President-Elect Trump's role as President of the United States or the Office of the Presidency.

In summary, President-Elect Trump is taking these extraordinary steps to ensure that the Office of the Presidency is isolated from The Trump Organization.  President-Elect Trump promised the American People that he would Make America Great Again:  he takes these steps to assure the American People that his sole focus is on that pledge—and that he intends only for the American People to benefit from his term as President.

**III.  THE FOREIGN EMOLUMENTS CLAUSE**

Some commentators have claimed that the Constitution prevents the President-Elect from owning interests in businesses that serve foreign customers.  In particular, they object to the Trump International Hotel in Washington, D.C.

On assuming office, the President-Elect will be bound by—and will scrupulously abide by—his obligations under the Constitution.  That includes the obligations created by the constitutional provision that these

commentators highlight, the Foreign Emoluments Clause.  That provision prohibits an individual holding an "Office of Profit or Trust" under the United States from "accept[ing]" a "present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State" without congressional approval.[7]  But these commentators are wrong to suggest that business in the ordinary course at any of the Trump International Hotels, or at any of the President-Elect's businesses, risks violating this obligation.

The scope of any constitutional provision is determined by the original public meaning of the Constitution's text.[8]  Here that text, understood through historical evidence, establishes that foreign governments' business at a Trump International Hotel or similar enterprises is not a "present, Emolument, Office, or Title."  So long as foreign governments pay fair-market-value prices, their business is not a "present" because they are receiving fair value as a part of the exchange.[9]  It clearly is not an "Office"[10] or a "Title"[11] from that government.  These commentators therefore must rest their argument on the final category of prohibited benefit:  "Emolument."

As shown below, an emolument was widely understood at the framing of the Constitution to mean any compensation or privilege associated with an *office*—then, as today, an "emolument" in legal usage was a payment or other benefit received as a consequence of discharging the duties of an *office.*  Emoluments did not encompass all payments of any kind from any source, and would not have included revenues from providing standard hotel services to guests, as these services do not amount to the performance of an office, and therefore do not occur as a consequence of discharging the duties of an office.

The Constitution's text shows that the word had this more limited meaning.  Apart from the Foreign Emoluments Clause, the term emolument appears twice more in the Constitution, and both times refers to compensation associated with an office.  First, the Incompatibility Clause bars congressmen from assuming "any civil Office . . . the Emoluments whereof shall have been encreased during" the congressman's tenure.  U.S. CONST. art. I, § 6, cl. 2.  Second, the Compensation Clause, which guarantees the President's compensation during his term of office, prohibits him from "receiv[ing] within that Period any other Emolument from the United States, or any of them."  *Id.* art. II, § 1, cl. 7.

Although the Supreme Court has never interpreted the scope of the Foreign Emoluments Clause, it long ago understood "emolument" this way in another context.  The Court explained that "the term *emoluments* . . . embrac[es] every species of compensation or pecuniary profit derived from a discharge of the duties of [an] office."  *Hoyt v. United States*, 51 U.S. 109, 135 (1850).  Other legal experts early in the Nation's history used the word the same way, including Alexander Hamilton and James Madison in *The Federalist Papers*[12] and Attorneys General in numerous formal opinions.[13]

Supporting this understanding is parallel language in the nearly adopted Titles of Nobility Amendment to the Constitution.  In 1810, Congress voted by overwhelming margins to extend the Foreign Emoluments Clause to all citizens, not just federal officials.[14]  The proposed amendment would have prohibited private citizens' acceptance of "any present, pension, office, or emolument, of any kind whatever, from any

---

[7]   U.S. CONST. art. I, § 9, cl. 8.

[8]   *See* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW 78-92 (2012); Antonin Scalia, *Originalism:  The Lesser Evil*, 57 U. CIN. L. REV. 849, 862-64 (1989).

[9]   *See* BLACK'S LAW DICTIONARY (10th ed. 2014) (defining "gift" as "[t]he voluntary transfer of property to another without compensation").

[10]   *See id.* (defining "office" as "[a] position of duty, trust, or authority, esp. one conferred by a governmental authority for a public purpose").

[11]   As suggested by the immediately preceding prohibition on the granting of titles of nobility, U.S. CONST. art. I, § 9, cl. 8, "Title" refers to official titles of honor or distinction.

[12]   *See, e.g.*, THE FEDERALIST 2, 177, 243, 268, 340, 379-80 (G. Carey & J. McClellan eds., 2001).

[13]   *E.g.*, *Salaries of Officers of Arkansas Territory*, 1 Op. Att'y Gen. 310, 310 (1819); *Salaries to Ministers and Consuls*, 2 Op. Att'y Gen. 470, 471 (1831); *Marshal of Florida*, 6 Op. Att'y Gen. 409, 410 (1854).

[14]   20 ANNALS OF CONGRESS 671, 2050-51 (1853).

Emperor, King, Prince, or foreign Power," stripping violators of their citizenship and barring them from state or federal office.[15]   The amendment came within two states of ratification—indeed, because of a publishing mistake, several generations believed it *was* part of the Constitution.[16]

Yet there is no evidence anyone at the time thought the proposed amendment restricted citizens' ability to engage in commerce with foreign nations, their governments, their representatives, or their instrumentalities.  That suggests that the public did not understand the prohibition on accepting foreign emoluments to prohibit commerce with foreign states or their representatives through fair-market-value exchanges—and, by implication, that the Foreign Emoluments Clause does not reach these transactions.  Given the importance of foreign trade in the Nation's early decades, the absence of any indication that the proposed amendment would have had this effect further supports understanding "emolument" not to encompass fair-market-value transactions—consistent with the term's other uses in the Constitution, its common legal use at the Founding, and the Supreme Court's explanation of the term.

There are further problems with understanding "emoluments" to include any kind of benefit an individual might receive.  For one thing, it would have been redundant to list "present" and "Emolument" in the Clause separately, because any present would already qualify as a benefit.  For another thing, it would lead to absurd results.  For example, if the Constitution's Article II prohibition on the President receiving "any other Emolument from the United States, or any of them" refers to *any* benefit, including fair-market-value transactions, then the President violates the Constitution by purchasing Treasury bonds or receiving interest on a retirement account from federal or State bonds.[17]  That cannot be correct.

Commentators who argue for a more expansive understanding of the Clause tend to focus not on the Constitution's original public meaning, but on more subjective conceptions of the policies behind the Clause.  Moreover, while non-judicial opinions provided to guide members of the Executive Branch have suggested that the Clause has a broad scope, none of the published opinions has gone so far as to classify fair-market-value transactions as emoluments.  And the factual circumstances giving rise to opinions finding Foreign Emoluments Clause violations are different from those here.[18]

Other opinions fully accord with the Constitution's original public meaning and are incompatible with the notion that the Constitution prohibits the President-Elect's businesses from renting hotel rooms to foreign governments at fair-value rates.  One opinion, for example, declined to view a pension as an emolument because it was neither a gift nor a salary.[19]  Another reached a similar conclusion about civil damages paid to a victim of Nazi persecution because they were "not paid as profit, gain, compensation, perquisite, or advantage flowing to him as an incident to possession of an office or as compensation for services rendered."[20]  Still another acknowledged that emoluments were "profit[s] arising from office or

---

[15]   *Id.* at 671.

[16]   *See* Gideon M. Hart, *The "Original" Thirteenth Amendment:  The Misunderstood Titles of Nobility Amendment*, 94 Marq. L. Rev. 311, 313-15 (2010); Curt E. Conklin, *The Case of the Phantom Thirteenth Amendment:  A Historical and Bibliographic Nightmare*, 88 Law Libr. J. 121, 126 (1996) ("[T]hree or more generations of Americans grew up assuming that the amendment was law.").

[17]   *See* Andy Grewal, *Should Congress Impeach Obama for His Emoluments Clause Violations?*, Yale J. on Reg.: Notice & Comment (Dec. 13, 2016), http://yalejreg.com/nc/should-congress-impeach-obama-for-his-emoluments-clause-violations/.

[18]   *See, e.g.*, *To the Secretary of the Air Force*, 49 Comp. Gen. 819, 820–21 (1970) (informant for Columbian government); *In re: Major Stephen M. Hartnett, USMC, Retired*, 65 Comp. Gen. 382, 383 (1986) (employment by Royal Saudi Navy); *Application of Emoluments Clause to Part-Time Consultant for the Nuclear Regulatory Commission*, 10 Op. O.L.C. 96, 96 (1986) (work on contract with Taiwanese government); *Authority of Foreign Law Enforcement Agents to Carry Weapons in the United States*, 12 Op. O.L.C. 67, 69 (1988) (foreign law-enforcement agents); *Applicability of the Emoluments Clause to Non-Government Members of ACUS*, 17 Op. O.L.C. 114, 119 (1993) (partnership in law firm that represented foreign government); *Emoluments Clause and World Bank*, 25 Op. O.L.C. 113, 114 (2001) (contractual employment relationship).

[19]   *President Reagan's Ability to Receive Retirement Benefits from the State of California*, 5 Op. O.L.C. 187, 191 (1981).

[20]   *Assistant Comptroller General Weitzel to the Attorney General*, 34 Comp. Gen. 331, 334 (1955).

employment" and generally required services for a foreign government amounting to accepting an office from a foreign state.[21]

In short, the Constitution does not forbid fair-market-value transactions with foreign officials.  To put to rest any concerns, however, the President-Elect is announcing he will donate all profits from foreign governments' patronage of his hotels and similar businesses during his presidential term to the U.S. Treasury.  Historically, when federal officers received a gift or emolument from a foreign state, they surrendered possession of it to the federal government,[22] though they were permitted to retain amounts necessary to offset their business expenses.[23]  Although the Constitution does not require the President-Elect to do the same for profits from his businesses' fair-market-value transactions, he wants to eliminate any distractions by going beyond what the Constitution requires.

---

[21] *To C.C. Gordon, U.S. Coast Guard,* 44 Comp. Gen. 130, 130-31 (1964); *see also Foreign Diplomatic Commission,* 13 Op. Att'y Gen. 537, 538 (1871) ("[A] minister of the United States abroad is not prohibited by the Constitution from rendering a friendly service to a foreign power, even that of negotiating a treaty for it, provided he does not become an officer of that power.").

[22] *E.g.*, 12 ANNALS OF CONGRESS 443 (1851).

[23] REMINISCENCES OF JAMES A. HAMILTON 210 (1869) (officer who received horses as gift from foreign state was entitled to be paid for "expenses incident to their transportation and keeping"); *cf. Applicability of the Emoluments Clause to Non-Government Members of ACUS,* 17 Op. O.L.C. 114, 119 (1993) (objecting to retention of law firm profits, not pre-expense revenues).

# EXHIBIT C

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

--------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK | NOTICE OF MOTION

-against- | Ind. No. 71543-23

DONALD J. TRUMP, | PARTIALLY EX PARTE AND
UNDER SEAL

Defendant.

--------------------------------------------------------------

PLEASE TAKE NOTICE that the People will move this Court, located at 100 Centre

Street, New York, New York on May 4, 2023, at 9:30 a.m., or as soon thereafter as counsel

may be heard for the following relief: the issuance of a protective order pursuant to Criminal

Procedure Law 245.70(1) to restrict or defer, and make such other orders as appropriate,

regarding the discovery and inspection of material and information otherwise discoverable

pursuant to Article 245 of the Criminal Procedure Law in the above-captioned case, and for

such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By: _____

Catherine McCaw
Assistant District Attorney

Dated:      New York, New York
            April 24, 2023

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

--------------------------------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

Defendant.

--------------------------------------------------------------------

PARTIALLY EX PARTE AND
UNDER SEAL

AFFIRMATION AND
MEMORANDUM OF LAW
IN SUPPORT OF A MOTION
FOR A PROTECTIVE ORDER
PURSUANT TO CPL 245.70(1)

Ind. No. 71543-23

Catherine McCaw, an attorney admitted to practice before the courts of this state, affirms under penalty of perjury that:

1.  I am an Assistant District Attorney in the New York County District Attorney's Office. I am assigned to the prosecution of the above-captioned case, and as such I am familiar with the facts and circumstances underlying the case.

2.  I submit this affirmation in support of a motion for a protective order pursuant to CPL 245.70(1).  Article 245 of the Criminal Procedure Law permits the court, for good cause shown, to enter a protective order that grants the Defense access to discovery materials subject to safeguards that will protect the integrity of the materials, avoid disruption of the proceedings, and reduce the risk of harassment to witnesses and participants in these proceedings.  Initially, the People sought to negotiate the terms of a protective order with defense counsel.  Defense counsel has since indicated that they will not consent to a protective order, so the People are now moving for such an order.  As other courts have recognized, and as set forth in more detail below,

2

Defendant Donald J. Trump ("Defendant") has a longstanding and perhaps singular history of attacking witnesses, investigators, prosecutors, trial jurors, grand jurors, judges, and others involved in legal proceedings against him, putting those individuals and their families at considerable safety risk.  See, e.g., Mem. & Order Denying Access to Juror Names, Carroll v. Trump, No. 22-cv-10016, 2023 WL 2871045, at *1 & nn.1-2 (S.D.N.Y. Apr. 10, 2023); Mem. Opinion re Anonymous Jury, Carroll v. Trump, No. 22-cv-10016, 2023 WL 2612260, at *1-2, 4-5 & nn. 7, 15-16 (S.D.N.Y. Mar. 23, 2023) ("Mr. Trump repeatedly has attacked courts, judges, various law enforcement officials and other officials, and even individual jurors in other matters.") (collecting examples).  The People therefore respectfully submit that good cause is shown for the reasonable restrictions requested in this application.

3.   Defendant is charged with thirty-four counts of Falsifying Business Records in the First Degree, PL § 175.10.  These charges arise from Defendant's efforts to conceal an illegal scheme to influence the 2016 presidential election.  As part of this scheme, Defendant requested that an attorney who worked for his company pay $130,000 to an adult film actress shortly before the election to prevent her from publicizing an alleged sexual encounter with the Defendant.  Defendant then reimbursed the attorney for the illegal payment through a series of monthly checks.  Defendant caused business records associated with the repayments to be falsified to disguise his and others' criminal conduct including violations of New York Election Law § 17-152 and violations of the individual and corporate campaign contribution limits under the Federal Election Campaign Act, 52 U.S.C. § 30101 et seq.

4.  The statements in this affirmation are made upon information and belief, the sources of which include a review of the records and files of the New York County District Attorney's Office ("DANY"), a review of the grand jury minutes, and a review of publicly available material, including Defendant's social media posts, court filings, and news articles.

5.  I respectfully submit portions of this affirmation and memorandum of law <u>ex parte</u>, and request that the unredacted version of this motion be sealed and remain under seal upon filing.  <u>See</u> <u>People v. Bonifacio</u>, 179 A.D.3d 977, 979 (2d Dept. 2020) ("Article 245 logically and expressly permits a court, when appropriate, to consider evidence and arguments ex parte when considering whether to issue a protective order.").  A redacted version of the People's papers, which does not reveal the nature of sensitive discovery materials in advance of the entry of a protective order, will be provided to the Defense. In the copy of this submission provided to the Court, information that is redacted in the defense copy is highlighted in green. Should witness testimony be necessary, it is further requested that such testimony occur <u>ex parte</u> and <u>in camera</u>, and that the resulting transcript be sealed pursuant to CPL 245.70(1).

## **<u>PROTECTIVE ORDER REQUESTS UNDER CPL 245.70(1)</u>**

6.  The People seek the following restrictions, deferrals, and/or other orders limiting the discovery and inspection of information and materials otherwise discoverable pursuant to Article 245 of the Criminal Procedure Law:

   a.  REQUIRING that any materials and information provided by the People to the Defense in accordance with their discovery obligations as well as any other

documents, materials, or correspondence provided to or exchanged with defense counsel of record on the above-captioned matter ("Defense Counsel"), in any form or component part, with the exception of any materials provided to the People by Defendant, the Trump Organization, or any company owned in part or entirely by Defendant or the Donald J. Trust Revocable Trust (the "Covered Materials") shall be used solely for the purposes of preparing a defense in this matter;

b. REQUIRING that any person who receives the Covered Materials shall not copy, disseminate, or disclose the Covered Materials, in any form or by any means, to any third party (except to those employed by counsel to assist in the defense of the above-captioned criminal proceeding) including, but not limited to, by disseminating or posting the Covered Materials to any news or social media platforms, including, but not limited, to Truth Social, Facebook, Instagram, WhatsApp, Twitter, Snapchat, or YouTube, without prior approval from the Court;

c. DELAYING until the commencement of jury selection disclosure of the names and identifying information of New York County District Attorney's Office personnel, other than sworn members of law enforcement and assistant district attorneys, and permitting the People to redact such names and identifying information from any of the Covered Materials;

5

    d.  REQUIRING that those of the Covered Materials that are designated by the People as limited dissemination (the "Limited Dissemination Materials"), whether in electronic or paper form, shall be kept in the sole possession and exclusive control of Defense Counsel and shall not be copied, disseminated, or disclosed in any form, or by any means, by Defense Counsel, except to those employed by Defense Counsel to assist in the defense of the above-captioned criminal proceeding;

    e.  REQUIRING that Defendant is permitted to review the Limited Dissemination Materials only in the presence of Defense Counsel, but Defendant shall not be permitted to copy, photograph, transcribe, or otherwise independently possess the Limited Dissemination Materials; and

    f.  REQUIRING that forensic images of witness cell phones shall be reviewed solely by Defense Counsel and those employed by Defense Counsel to assist in the defense of the above-captioned criminal proceeding, except that, after obtaining consent from the People, Defense Counsel may show Defendant portions of the forensic images that relate to the subject matter of the case.

7.  Although the People seek limitations before providing the Covered Materials to the Defense, the limitations largely relate to how the Defense must handle the materials and what they may do with them.  In this application, the People seek to defer the Defense only from learning the identity of DANY support staff.  Thus, this application is narrowly tailored to assure the integrity of the discovery materials, the integrity of these proceedings, and witness

6

safety, while still allowing the Defense to use and review the materials to prepare a defense at trial.

## FACTUAL BACKGROUND[1]

8.   Defendant and his associates have been the subject of several investigations during and after his time in office, including a special counsel investigation into allegations that his campaign coordinated with the Russian government, two impeachment inquiries, two additional special counsel investigations into allegations of mishandling of classified documents and concerning the events of January 6, 2021, and a Georgia grand jury investigation into allegations of improper influence on the 2020 Georgia presidential election results. Defendant has posted extensively regarding these investigations on social media and has discussed these investigations in speeches, at political rallies, and during television appearances. His posts have included personal attacks on those involved in the investigation, including witnesses, jurors, and those involved in conducting or overseeing the investigations. In many instances, he has even posted regarding their family members. Defendant has begun to mount similar attacks against those involved in the instant criminal case, publicly disparaging witnesses associated with the case, as well as the District Attorney, District Attorney's Office personnel, and the Court. This pattern, particularly given that Defendant is currently under federal investigation for his handling of classified materials, gives rise to

---

[1] The facts and circumstances of this case are summarized for the specific purpose of establishing good cause for a protective order and do not constitute a comprehensive summary of all facts gathered during the investigation and prosecution of the case.

significant concern that Defendant will similarly misuse grand jury and other sensitive materials here.

## I.     Defendant's History of Attacking Those Associated with Prior Investigations

9.   On May 5, 2017, Robert S. Mueller III ("Mueller") was appointed to serve as Special Counsel to investigate "any links and/or coordination between the Russian government and individuals associated with the campaign of President Donald Trump" and other associated matters, an inquiry that came to be known as the Mueller Investigation. Exhibit 1.  Dep't of Justice Order No. 3915-2017, Appointment of Special Counsel to Investigate Russian Interference with the 2016 Presidential Election and Related Matters.

10.   During the course of the Mueller Investigation, Defendant launched numerous social media attacks on individuals associated with the investigation, ranging from the prominent to the obscure.  He posted frequently regarding James Comey ("Comey"), the former director of the Federal Bureau of Investigation ("FBI"), a witness in the investigation who alleged that Defendant had pressured him to end the FBI's probe into Russian campaign interference.  On April 13, 2018, Defendant referred to Comey as an "untruthful slime ball" in a social media post.[2]  On December 9, 2018, a day after Comey testified before Congress, Defendant stated in another post, "Leakin' James Comey must have set a record for who lied the most to Congress in one day.  His Friday testimony was so untruthful!"

---

[2] All social media posts referenced in this document are collected in Exhibit 2.

11. Less prominent individuals associated with the probe were also the subject of attacks. For example, Defendant repeatedly attacked Bruce Ohr ("Ohr"), a Department of Justice ("DOJ") attorney involved with the investigation into Russian campaign interference. On August 14, 2018, he posted regarding both Ohr and his wife, stating, "Bruce Ohr of the 'Justice' Department (can you believe he is still there) is accused of helping disgraced Christopher Steele 'find dirt on Trump.' Ohr's wife, Nelly, was in on the act big time – worked for Fusian GPS on Fake Dossier." He also regularly posted regarding Lisa Page and Peter Strzok, two FBI employees associated with the investigation. On June 5, 2018, for example, Defendant posted, "Wow, Strzok-Page, the incompetent & corrupt FBI lovers, have texts referring to a counter-intelligence operation into the Trump Campaign dating way back to December, 2015. SPYGATE is in full force! Is the Mainstream Media interested yet? Big stuff!"

12. In September 2019, the United States House of Representatives began an impeachment inquiry into Defendant, based on allegations that Defendant attempted to use military aid to Ukraine as a bargaining chip in return for Ukraine to begin investigations into his political rival, Joseph Biden. Again, Defendant launched public social media attacks on those associated with the investigation, including two public servants who testified in connection with the inquiry, Marie Yovanovitch and Alexander Vindman ("Vindman"). On November 15, 2019, Defendant posted, "Everywhere Marie Yovanovitch went turned bad. She started off in Somalia, how did that go? Then fast forward to Ukraine, where the new Ukrainian President spoke unfavorably about her in my second phone call with him. It is a U.S. President's absolute right to appoint ambassadors." On February 8, 2020, he posted regarding Vindman, "[H]e was very

insubordinate, reported contents of my 'perfect' calls incorrectly & was given a horrendous report by his superior, the man he reported to, who publicly stated that Vindman had problems with judgement [sic], adhering to the chain of command and leaking information.  In other words, 'OUT'."

13. Following the 2020 presidential election, Defendant became the subject of several inquiries involving his response to the election results.  These included an inquiry by the House Select Committee to Investigate the January 6th Attack on the U.S. Capitol (the "House Select Committee") into the events of January 6, 2021; a separate federal criminal investigation into the events of January 6 currently headed by Special Counsel Jack Smith; and a Fulton County, Georgia grand jury investigation into efforts by Defendant and his allies to interfere with the Georgia election results.  In connection with these events, Defendant and his allies repeatedly publicly attacked two Fulton County poll workers, Ruby Freeman ("Freeman") and Wandrea ArShaye Moss, accusing them of election malfeasance.  Freeman was a temporary poll worker who worked to tabulate ballots in Fulton County, including for the 2020 presidential election. Freeman Interview 12:13-17 (May 31, 2022), Exhibit 3.

14. Defendant and his allies accused Freeman and her daughter of election misconduct involving suitcases full of ballots, beginning soon after the election and continuing through this year.  For example, on January 3, 2023, Defendant queried on social media, "What will the Great State of Georgia do with the Ruby Freeman MESS?"  On January 10, 2023, he posted, "Ruby, her daughter, and others who ran back into the counting room, grabbing cases from under the

10

'skirted' table, and then back to their counting machines where they came from prior to hearing 'water main break' (which never happened) have got a lot of explaining to do…"

15. Freeman described to the House Select Committee how these attacks from Defendant and his allies affected her personally.  She stated that on the advice of the FBI, she was forced to vacate her home "for safety" for approximately two months, beginning around January 6, 2021.  Freeman Interview 25:25-26:4 (May 31, 2022), Exhibit 3.  She "received hundreds of racist, threatening, horrible calls and messages."  Freeman Interview 7:23-24.  She even stated that she was afraid to use her name in public:  "Now I won't even introduce myself by name anymore.  I get nervous when I bump into someone I know in the grocery store who says my name.  I'm worried about who's listening.  I get nervous when I have to give my name for food orders.  I'm always concerned about who's around me."  Freeman Interview: 6:17-20.

## II.    Defendant Has Begun to Launch Similar Attacks in this Case

16. In early 2023, press reports began to circulate that a New York County grand jury was conducting an investigation into Defendant.  In response, Defendant began to launch a series of attacks against individuals who may testify at trial, including Stephanie Clifford (a/k/a Stormy Daniels) ("Clifford") and Michael Cohen ("Cohen"), and other personnel associated with this investigation.  On March 15, 2023, he posted to social media, "I did NOTHING wrong in the 'Horseface' [*i.e.*, Clifford] case. . . . She knows nothing about me other than her conman lawyer, Avanatti, and convicted liar and felon, jailbird Michael Cohen, may have schemed up."   On March 27, 2023, he posted, "I won a Federal lawsuit for almost $500,000 against Stormy 'Horseface' Daniels.  Never had an 'affair' with her, and would never have wanted to!"

17. Defendant has also launched attacks against the District Attorney, referring to him on March 23, 2023 as a "SOROS BACKED ANIMAL," and a "degenerate psychopath that truely [sic] hates the USA" on March 24, 2023.  On March 23, 2023, he posted two images side-by-side that gave the appearance that he was taking aim at the District Attorney's head with a baseball bat.  He has directed attacks at the Court and his family after he became aware of the commencement of these proceedings.  Defendant has also repeatedly referenced an Assistant District Attorney assigned to this prosecution in his posts, including on March 16, 2023, March 27, 2023, March 31, 2023, and April 3, 2023.

## III.     Allegations that Defendant Mishandled Classified Materials

18.   According to information publicly filed by the DOJ, after Defendant left office in 2021, the National Archives and Records Administration ("NARA") began to communicate with Defendant's representatives to request the return of documents relating to his presidential administration.  Dep't of Justice Response to Motion filed August 30, 2022, 22-Civ-81294, S.D. Fla, Exhibit 4 at 4.  In response to a request from NARA, Defendant ultimately produced fifteen boxes of materials.  Id.  Upon reviewing materials, officials from NARA referred the matter to DOJ, observing that a review of the materials revealed that "highly classified records were unfoldered, intermixed with other records and otherwise unproperly [sic] identified." Exhibit 4 at 5.  The FBI began an investigation and later obtained a warrant authorizing the search of Defendant's property at Mar-a-Lago for additional documents.  Exhibit 4 at 12.  As a result of the execution of the warrant, the FBI seized thirty-three items consisting mostly of boxes.  Id.  Upon review of the material, investigators concluded that the materials included

more than a hundred unique documents with classification markings.  Exhibit 4 at 13.  Since

the execution of the warrant, the investigation has been referred to Special Counsel Jack Smith.

Recent press reports relay that the investigators have been asking witnesses about allegations

that Defendant displayed a map with sensitive information to "aides and visitors."  Exhibit 5.

IV.    **Procedural History**

19. In the days leading up to Defendant's April 4, 2023 arraignment, the People

reached out to Defense Counsel in an attempt to negotiate the terms of a protective order on

consent.  Both sides spoke on the phone on several occasions, and the People made several

modifications to their original proposed order in response to the Defense Counsel's requests.

On the afternoon before Defendant's arraignment, the parties reached an agreement in

principle.  Following the arraignment, the People learned that  Defense Counsel would not

consent to a protective order.

20. On April 12, 2023, Defendant filed a civil complaint in Florida against Cohen, eight

days after Defendant was arraigned in this case.  Exhibit 6.  The complaint alleges that Cohen,

an attorney formerly employed by Defendant's business, damaged Defendant by speaking about

matters including the allegations that gave rise to the instant criminal case, alleging causes of

action including breach of fiduciary duty and breach of contract.  E.g., Exhibit 6, ¶¶ 111-14.  He

also alleges conversion with respect to a portion of the payment that related to the falsified

business records in this case.  Exhibit 6, ¶¶ 161-65.

21. The protective order that the People now seek is substantially similar to the order

that the parties agreed to in principle, with a couple of important modifications.  The parties

13

had originally agreed that they would litigate separately the issue of how to handle the public filing of references to discovery materials.  The People are now of the view that whatever protective order the Court enters will govern the filing of materials on the public docket.  In addition, Defendant's subsequently-filed suit against Cohen heightens the risk that Defendant will use the Covered Materials for purposes other than a defense of this case.  The People therefore seek additional limitations regarding who may be present when Defendant views the materials and additional protections for the contents of witness cell phones.

22. The People anticipate turning over a substantial number of materials in discovery. These materials include grand jury minutes, grand jury exhibits, materials received in response to grand jury subpoenas, materials obtained voluntarily from witnesses, and other materials relating to the case.  These materials also include forensic images of two cellular telephones obtained from a witness.

## MEMORANDUM OF LAW

Criminal Procedural Law Article 245 provides that, upon a showing of "good cause," the court may "at any time order that discovery or inspection of any kind of material or information . . . be denied, restricted, conditioned or deferred, or make such other order as is appropriate." CPL 245.70(1). It is well-settled that "[g]ood cause determinations are necessarily case-specific and therefore fall within the discretion of the trial court." People v. Linares, 2 N.Y.3d 507, 510 (2004). As the Court of Appeals has explained, "By its very nature, good cause admits of no universal, black-letter definition. Whether it exists, and the extent of disclosure that is appropriate, must remain for the courts to decide on the facts of each case."

14

In re Linda F.M., 52 N.Y.2d 236, 240 (1981). The judicial interpretation of "good cause" varies based upon the context in which it is used. See Matter of Molloy v. Molloy, 137 A.D.3d 47, 52-53 (2d Dept. 2016) ("Good cause should be read in context by considering the statute as a whole [and] should also be interpreted in accordance with legislative intent, as expressed in the legislative history").

CPL 245.70(4) sets forth a flexible list of factors that bear on the Court's determination of good cause, including, for example, danger to the safety of a witness and risk of witness intimidation or harassment, as well as lesser impositions such as "unjustified annoyance or embarrassment," risk of an "adverse effect on the legitimate needs of law enforcement," and whether the defendant has a history of witness intimidation or tampering. CPL 245.70(4). The statute is non-exhaustive, and also authorizes the Court to consider the "nature of the stated reasons" for the relief sought and other "similar factors" that "outweigh the usefulness of the discovery" to the defense. Id. Thus, at its core, the protective order statute embodies a discretionary balancing test that asks the Court to weigh the prosecutorial and public safety interests raised by the People in support of a protective order with the utility to the Defense of the subject information and materials.

Given the plain language of CPL 245.70 and its stated purpose in the legislative history, the statute's good cause requirement should be broadly interpreted and protective orders should be liberally granted. Regarding the plain language, a comparison of the factors listed in CPL 245.70(4) and the former CPL 240.50(1) confirms that the statute expands the use of protective orders to protect witnesses and the integrity of the criminal justice system. Both

sections list factors to consider in determining whether good cause exists; however, CPL 245.70(4) incorporates the factors included in the predecessor section while simultaneously reducing the threshold for determining risk to others and expanding the list of relevant factors. For example, while former CPL 240.50(1) authorized the Court to consider "a <u>substantial</u> risk of physical harm, intimidation, economic reprisal, bribery, or unjustified annoyance or embarrassment to any person," CPL 245.70(4) omits the word "substantial" and includes "harassment"—a fairly low level of impact—as a relevant factor. And, while the current and predecessor statutes each authorize the Court to consider "danger to the integrity of physical evidence," CPL 245.70(4) also authorizes the Court to consider "danger to the . . . safety of a witness."

It is clear from the text of CPL 245.70(4), which expands the non-exhaustive list of factors that may be considered by the Court in weighing good cause, that the statute imposes a more favorable standard on the movant than its predecessor. The legislative history confirms that such a result was intended by the statute's drafters. During floor debates, Senator Jamal Bailey, who served as a leader of the discovery reform efforts, noted that "there is a broader protective order under this bill than there is in the [then] current law." Senate Debate Transcript of Senate Print 1509C, Mar. 31, 2019, at 2602. Senator Bailey further stated that a protective order could be obtained under CPL Article 245 for good cause shown, which he described as a "very reasonable and . . . [l]enient standard." <u>Id.</u> at 2604. This language evinces an obvious intent on the part of the Legislature to establish an expanded protective order practice to counterbalance the statute's otherwise liberal discovery obligations in cases where

16

the non-exhaustive factors in CPL 245.70(4) outweigh the benefit of early disclosure. Cf.

People v. Phillips, 67 Misc.3d 196, 201 (Sup. Ct., Bronx Co. 2020) ("[I]t seems that the

legislature eased the 'good cause' showing required where a risk of witness safety or

harassment is alleged in part to balance the new requirement that witness names and contact

information and other sensitive discovery [such as grand jury testimony] be provided long

before a trial begins").[3]

The People seek a protective order that grants the Defense access to the Covered

Materials, while employing certain safeguards to protect the integrity of those materials and of

the proceedings.  Specifically, the People seek to shield the identity of DANY support staff to

prevent them from experiencing public harassment.  The People seek to prevent the Defense

from discussing or disseminating the Covered Materials publicly.  The People seek to prevent

Defense Counsel from leaving materials designated as Limited Dissemination Materials with the

Defendant.  And finally, the People seek to make forensic images of witness cell phones viewable

only to Defense Counsel in the first instance.  There is good cause to grant this motion under

CPL 245.70.  At bottom, the Defense will have near-complete access to the People's discovery

---

[3] As one appellate justice has observed on expedited review, the presumption of openness found in CPL 245.20(7) does not apply to protective order motions. People v. Bonifacio, 179 A.D.3d 977, 978 (2d Dept. 2020). The presumption, by its own terms, applies exclusively to CPL 245.10 (setting forth the timing of the parties' automatic disclosures), 245.20(1) (setting forth the scope of automatic disclosures), and 245.25 (pertaining to disclosures prior to guilty pleas). It does not apply to CPL 245.70, which is the section of the statute that deals with protective orders. On the contrary, CPL 245.70 was designed to offset the presumption of openness and serve a broad license for a court to limit the People's discovery obligations when factors such as witness safety outweigh the benefit of early disclosure. The fact that the main proponent of the new legislation described CPL Article 245 as embracing a more "lenient" standard for protective orders confirms that the omission of the protective order section from the presumption of openness is an intentional feature of the statute.

17

materials pursuant to the People's proposed protective order.  This access will allow the Defense to defend this matter in Court, while still safeguarding against the improper use of the materials.

## I.     The People Seek Permission to Shield the Identities of DANY Support Staff

The People request that they be allowed to delay disclosure of the names and identifying information for DANY personnel, other than sworn members of law enforcement and assistant district attorneys, until the commencement of jury selection and that they be permitted to redact such names and identifying information from any of the discovery materials.  As described above, Defendant has an extensive history of publicly attacking individuals with connections to investigations into his conduct, including some who are only tangentially related.

Freeman's moving testimony highlights how Defendant's use of his bully pulpit can completely upend the lives of ordinary private citizens who were simply doing their jobs. When Defendant posts on social media, he commands a large audience, and certain of his followers have been willing to take action against those Defendant mentions online.  Freeman, a temporary poll worker, had to leave her home upon the advice of the FBI for two months, so great was the risk posed by Defendant's followers.  Indeed, in recognition of the unique risks posed by Defendant's "repeated" attacks against "courts, judges, various law enforcement officials and other public officials, and even individual jurors in other matters," Judge Lewis A. Kaplan, presiding over the civil trial between Defendant and E. Jean Carroll, took the unusual step of preventing even attorneys assigned to the case from learning the identities of potential jurors.  Mem. Opinion re Anonymous Jury, <u>Carroll v. Trump</u>, No. 22-cv-

10016, 2023 WL 2612260, at *2 & n.7 (S.D.N.Y. Mar. 23, 2023); see also Mem. & Order Denying

Access to Juror Names, Carroll v. Trump, No. 22-cv-10016, 2023 WL 2871045 (S.D.N.Y. Apr.

10, 2023).

      DANY support staff includes its dedicated paralegals.  For many DANY paralegals,

this is their first job after graduating from college.  While lawyers and sworn members of law

enforcement who work for the Office must do their work in public, there is no corresponding

need for its support staff to be identified to the world and potentially subject to Defendant's

attacks.  Courts routinely grant protective orders delaying disclosure of witness information

where there is a risk of harassment or intimidation, and appellate courts have even held that

to deny such a request by the People is an abuse of discretion.  See, e.g., People v. Brown, 180

A.D.3d 1107, 1109 (2d Dept. 2020).

      Further, the prejudice to the Defense of granting such a request is minimal.  The

identities of support staff relate to the subject matter of the case only in limited ways.  ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████  Paralegals also identify themselves as notetakers within witness notes,

but the identity of the paralegal as notetaker only becomes relevant to the extent that a witness

testifies at trial in a manner that is inconsistent with these notes.  If the Defense receives this

information upon commencement of jury selection, they will have ample time to make use of

this information in preparation for trial.  Given the risks posed by the Defendant's behavior and the minimal prejudice to the Defendant, the People request that the Court enter a protective order shielding the identity of DANY support staff in the form proposed by the People.

## II.    Defendant and the Defense Should Be Limited in the Ways They Use the Covered Materials

The People seek an order that Defendant and the Defense Counsel shall use the Covered Materials solely for the purposes of preparing a defense in this case and shall be prohibited from disclosing the materials to third parties or posting them on social media.  At the outset, it is important to note that the People are not at this time seeking a gag order in this case.  Defendant has a constitutional right to speak publicly about this case, and the People do not seek to infringe upon that right.  That said, neither Defendant nor  Defense Counsel have a First Amendment right to speak publicly regarding materials they receive through discovery.   See Seattle Times Co. v. Rhinehart, 467 U.S. 20, 33-34 (1984) (upholding a protective order preventing public disclosure of discovery materials in a civil case against a First Amendment challenge); see also United States v. Caparros, 800 F.2d 23, 25 (2d Cir. 1986) (following Seattle Times and holding the same in the context of criminal discovery); In re Ctr. on Priv. & Tech. v. New York City Police Dep't, 181 A.D.3d 503, 504 (1st Dep't 2020), recalled and vacated (Apr. 29, 2021) (following Seattle Times in the context of civil discovery).[4]

---

[4] This opinion was recalled and vacated upon the petition of the parties after the parties reached a settlement regarding the treatment of the underlying documents.  It does not appear that the vacatur was based on the merits of the case.  See Exhibit 7.

As the United States Supreme Court emphasized in upholding the protective order at issue in <u>Seattle Times</u>, "As the Rules authorizing discovery were adopted by the state legislature, the processes thereunder are a matter of legislative grace." 467 U.S. at 33. As described above, the People's ability to seek protective orders is integral to the functioning of Article 245. The law now requires the People to disclose a great deal of highly sensitive information shortly after arraignment, including grand jury testimony, material obtained by means of a grand jury subpoena, and victim name and contact information, to name just a few. There are strong public policy reasons why grand jury materials should be kept secret prior to trial, including "prevention of subornation of perjury and tampering with prospective witnesses at the trial" and "assurance to prospective witnesses that their testimony will be kept secret so that they will be willing to testify freely." <u>People v. Di Napoli</u>, 27 N.Y.2d 229, 235 (1970). Unlike the People, neither the Defendant nor Defense Counsel is bound by the requirements of grand jury secrecy, nor can they be prosecuted for Unlawful Grand Jury Disclosure, P.L. § 215.70. For these reasons, courts have routinely entered orders preventing defendants and their counsel from using discovery materials for purposes other than preparing a defense and from disseminating the materials to third parties.

The risk that this Defendant will use the Covered Materials inappropriately is substantial. Defendant has a long history of discussing his legal matters publicly—including by targeting witnesses, jurors, investigators, prosecutors, and judges with harassing, embarrassing, and threatening statements on social media and in other public forums—and he has already done so in this case. Further, Defendant may seek to use the Covered Materials

21

to advance his recently-filed lawsuit against Cohen.  The legislature did not mandate broad disclosures by the People in advance of trial so that the People's discovery materials could be used for these purposes.  Rather, the purpose of the discovery reforms was to allow defendants to make informed decisions about whether to plead guilty in criminal cases.  See, e.g., Press Release, Governor Andrew Cuomo, In 9th State of the State Address, Governor Advances Agenda to Ensure the Promise of Full, True Justice for All, Exhibit 8 ("Defendants will also be allowed the opportunity to review whatever evidence is in the prosecution's possession *prior to pleading guilty to a crime*.") (emphasis added); Donnino, Practice Commentary, McKinney's Cons. Laws of N.Y., N.Y. Crim. Pro. CPL 245.10 ("Broader pre-trial discovery enables the defendant to make a more informed plea decision, minimizes the tactical and often unfair advantage to one side, and increases to some degree the opportunity for an accurate determination of guilt or innocence.") (quoting People v. Copicotto, 50 N.Y.2d 222, 226 (1980)).  The proposed order will in no way prejudice Defendant in his ability to mount a defense to the allegations in court or to determine whether to plead guilty.  By the very terms of the order, Defendant and  Defense Counsel will be allowed to use the materials freely— with certain safeguards discussed, infra—in order to prepare a defense or consider any plea decision.  The People therefore request that the Court enter the proposed order permitting Defendant and  Defense Counsel to use the discovery materials solely for the purpose of preparing a defense in this matter and limiting their ability to provide the materials to third parties, including the press, or to post them to social media platforms.

### III.   Defendant Should be Permitted to Review Certain Discovery Materials Only in the Presence of Defense Counsel

The People seek the ability to mark certain materials as "Limited Dissemination Materials" and that such materials shall be kept solely in the possession of Defense Counsel, that Defendant may view these materials only in the presence of Defense Counsel, and that Defendant will not be allowed to copy, photograph, transcribe, or otherwise independently possess the materials.  The People seek to apply this designation to any materials other than (1) materials that the People received from Defendant or any company owned in part or entirely by Defendant or the Donald J. Trump Revocable Trust or (2) third-party records that relate to an account that is in Defendant's name or in the name of a company that is owned in part or entirely by Defendant or the Donald J. Trump Revocable Trust.

These restrictions are reasonable and necessary to protect the discovery materials. Many of the materials the People will provide in discovery are highly sensitive in nature. Defendant is currently under a separate criminal investigation for mishandling classified materials.  Investigators are also reportedly looking into whether Defendant improperly shared these materials with individuals who were not entitled to see them.  Given these allegations, the restrictions the People propose are reasonable to prevent Defendant from mishandling the discovery materials.  Further, these restrictions will have minimal impact on Defendant's ability to prepare a defense.  He will have full access to these materials, so long as he is in the presence of Defense Counsel.  This access will afford him ample opportunity to prepare a defense.  See People v. Olivieri, 2022 WL 402744, at *4 (Sup. Ct., N.Y. Co. February 9, 2022)

(Statsinger, J.) (granting a protective order that allowed only defense counsel to watch certain videos and only in the prosecutor's office and further observing that while the proposed process might be "more inconvenient than simply viewing the videos along with his client, it will certainly be sufficient to allow counsel and the defendant to prepare a defense").

## IV.    The People Seek Additional Protections for Forensic Images of Witness Cell Phones

The People are prepared to disclose full forensic images of two cell phones belonging to a witness.[5]  Only a fraction of materials contained in these images relate to the subject matter of the case, and much of the content is highly personal in nature, including text messages with friends and family, vacation photos, and other materials that would be invasive for others to see.  See Riley v. California, 573 U.S. 373, 395 (2014) ("[I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate.").  Defendant has an antagonistic relationship with witnesses in this case, referring to Clifford in social media posts as "horseface" and to Cohen as a "liar" and "jailbird."  Exhibit 2.  Under these circumstances, it would be highly inappropriate to grant Defendant unfettered access to a witness's most personal materials.  See People v. Cole, 2020 NYLJ LEXIS 537, at *14 (Sup. Ct., Queens Co. 2020) ("Legislative debate concerning the enactment of the new

[5] ████████████████████████████████████████

discovery rules indicates that the ability to obtain a protective order was considered an important safeguard for the safety and privacy of victims and civilian witnesses.").

Nonetheless, the People acknowledge that these forensic images do contain materials that relate to the subject matter of the case and that the Defendant should be entitled to review such materials.  The People therefore propose that only Defense Counsel will be authorized to view the full forensic images.  Should Defense Counsel wish to share certain portions of the forensic images with the Defendant, they should first notify the People and may share the materials with the Defendant only if the People do not object.  This procedure strikes a fair balance between the People's interest in protecting the private information of a witness with the Defendant's interest in preparing a defense.  See People v. Olivieri, 2022 WL 402744, at *4.

## V.  The People Request that Defendant be Advised on the Record of the Terms of Any Protective Order the Court Enters

Should Defendant violate the terms of any protective order issued by the Court, the People may seek to enforce its terms by initiating a prosecution for Criminal Contempt in the Second Degree, P.L. § 215.50(3).  In advancing such a prosecution, the People will be required to show that Defendant had knowledge of the contents of the order.  "Notice of the contents of, and therefore of the conduct prohibited by, [a mandate of the court] may be given either orally or in writing or in combination."  People v. Clark, 95 N.Y.2d 773, 775 (2000).  The People request, therefore, that Defendant be advised on the record of the terms of any protective order the Court enters.  Such a proceeding would also permit the Court to

determine on its own whether any future noncompliance with a protective order is sanctionable under Judiciary Law § 750(A).

## **CONCLUSION**

Criminal Procedure Law 245.70 expressly permits broad restrictions and limitations of discovery materials and information upon a showing of good cause. The facts set forth above establish good cause to conclude that a protective order, in the form proposed above, is appropriate. The requested limitations are reasonable, narrowly written, and necessary to protect witnesses' safety and privacy interests and the legitimate needs of law enforcement.

No application for this or similar relief, other than that described herein, has been made in any court.

WHEREFORE, the People respectfully request that a protective order be granted pursuant to CPL 245.70, in the form annexed, and that the Court grant such other and further relief as it may deem just and proper.

Respectfully submitted,

_____

Catherine McCaw
Assistant District Attorney

Dated:      New York, New York
            April 24, 2023

26

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK | PROTECTIVE ORDER |
| -against- | Ind. No. 71543-23 |
| DONALD J. TRUMP,<br><br>                              Defendant. | |

The Court, being satisfied based upon the application of Assistant District Attorney Catherine McCaw, dated April 24, 2023 that good cause exists for an order to restrict, defer, and make such other order as is appropriate with respect to disclosure and inspection of discoverable materials and information, pursuant to Section 245.70 of the Criminal Procedure Law, it is hereby:

ORDERED that any materials and information provided by the People to the Defense in accordance with their discovery obligations as well as any other documents, materials, or correspondence provided to or exchanged with defense counsel of record on the above-captioned matter ("Defense Counsel"), in any form or component part, with the exception of any materials provided to the People by Defendant, the Trump Organization, or any company owned in part or entirely by Defendant or the Donald J. Trust Revocable Trust (the "Covered Materials") shall be used solely for the purposes of preparing a defense in this matter; it is further

ORDERED that any person who receives the Covered Materials shall not copy, disseminate, or disclose the Covered Materials, in any form or by any means, to any third party (except to those employed by counsel to assist in the defense of the above-captioned criminal

proceeding) including, but not limited to, by disseminating or posting the Covered Materials to any news or social media platforms, including, but not limited, to Truth Social, Facebook, Instagram, WhatsApp, Twitter, Snapchat, or YouTube, without prior approval from the Court; it is further

ORDERED that disclosure of the names and identifying information of New York County District Attorney's Office personnel, other than sworn members of law enforcement and assistant district attorneys, shall be delayed until the commencement of jury selection and permitting the People to redact such names and identifying information from any of the Covered Materials; it is further

ORDERED that those of the Covered Materials that are designated by the People as limited dissemination (the "Limited Dissemination Materials"), whether in electronic or paper form, shall be kept in the sole possession and exclusive control of Defense Counsel and shall not be copied, disseminated, or disclosed in any form, or by any means, by Defense Counsel, except to those employed by Defense Counsel to assist in the defense of the above-captioned criminal proceeding; it is further

ORDERED that Defendant is permitted to review the Limited Dissemination Materials only in the presence of Defense Counsel, but Defendant shall not be permitted to copy, photograph, transcribe, or otherwise independently possess the Limited Dissemination Materials; it is further

ORDERED that forensic images of witness cell phones shall be reviewed solely by Defense Counsel and those employed by Defense Counsel to assist in the defense of the above-

2

captioned criminal proceeding, except that, after obtaining consent from the People, Defense Counsel may show Defendant portions of the forensic images that relate to the subject matter of the case; it is further

ORDERED that, in the event Defendant seeks expedited review of this protective order under CPL 245.70(6)(a), any obligation that would exist on the part of the People to produce the information and materials that are the subject of this order is held in abeyance pending the determination of the intermediate appellate court; and it is further

ORDERED, that the portions highlighted in green in People's Motion in Support of a Protective Order dated April 24, 2023, and any accompanying documents, exhibits, or transcripts, are sealed pursuant to CPL 245.70(1).

DATED:      New York, New York
            _____


            So Ordered:

                        _____
                                Justice of the Supreme Court

SUPREME COURT OF THE STATE OF NEW YORK
**COUNTY OF NEW YORK**

**THE PEOPLE OF THE STATE OF NEW YORK**

**-against-**

DONALD J. TRUMP,

**Defendant.**

**MOTION FOR PROTECTIVE ORDER**

Indictment No. 71543-23

**Alvin L. Bragg, Jr.**
**District Attorney**
**New York County**
**One Hogan Place**
**New York, New York 10013**
**(212) 335-9000**

# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

----------------------------------------------------------------x
                       :

THE PEOPLE OF THE STATE OF NEW     :
YORK,                         :

                         :      Ind. No. 71543-23
       - against -          :

                         :

DONALD J. TRUMP,         : **MEMORANDUM OF LAW IN**

                        : **OPPOSITION TO THE**

           Defendant.  : **PEOPLE'S MOTION FOR A**

                        : **PROTECTIVE ORDER**

                        :

                        :
----------------------------------------------------------------X

## INTRODUCTION

After the District Attorney's Office of New York ("DANY") held a press conference accusing President Donald J. Trump of criminal conduct, both charged and uncharged, issued a press release regarding those allegations, released a "Statement of Facts" that detailed numerous factual allegations separate and apart from the substantive charges in the indictment,[1] stood back and did nothing as a former employee wrote a purported tell-all book about the investigation of President Trump,[2] and oversaw a grand jury process that repeatedly leaked to media outlets like the *New York Times*,[3] DANY now seeks to limit President Trump's ability to talk about the

---

[1] Attached as Exhibit A.

[2] *See* Opinion Denying Motion for an Injunction, *Bragg v. Jordan,* 2023 WL 2999971 at *11 (SDNY Apr. 19, 2023) ("There is no evidence that DANY took *any action* before the book was published . . . . Similarly, after publication, DANY *again* took no action.  It did not request a gag order, seek an injunction, pursue Pomerantz for money damages, refer Pomerantz for an ethics inquiry, or even raise any concerns about the publication with Pomerantz." *Emphasis in original*)

[3] *See Bragg v. Jordan*, 2023 WL  2999971 at *9 n. 11 ("The Court notes that the secrecy of the grand jury proceedings in the pending criminal case was compromised before an indictment was even announced.").

evidence against him and prepare his own defense by asking this Court to impose an unduly restrictive Protective Order (the "People's Proposed Protective Order").

President Trump is the leading Republican candidate for President of the United States. To state the obvious, there will continue to be significant public commentary about this case and his candidacy, to which he has a right and a need to respond, both for his own sake and for the benefit of the voting public.  The People's justification for seeking such an extraordinarily broad protective order is that President Trump has a history of "attacking" individuals involved in legal proceedings against him.  (People's Affirmation and Memorandum of Law in Support of a Motion for a Protective Order (the "Motion"), at 2.  This "history," according to the People, justifies an extremely restrictive protective order that, if entered, would severely hamper President Trump's ability to publicly defend himself and prepare for trial.

Upon analysis, however, the People have failed to establish good cause for the extreme protective order they seek.  The Affirmation submitted by the People mainly cites President Trump's conduct in other investigations where he has called witnesses or prosecutors names.  With respect to *this case*, however, the People's allegations are limited to allegations that President Trump made disparaging statements about two witnesses, Michael Cohen and Stephanie Clifford (a/k/a "Stormy Daniels"), and the District Attorney. People's Affirmation, ¶15-16.  Missing from the People's Affirmation, however, is the fact that these two witnesses have engaged in inflammatory conduct towards President Trump, both during the investigation and since the indictment, in attacking President Trump and discussing at length their version of the facts of the case, and that both the District Attorney and a lead former Assistant District Attorney have also made disparaging and obnoxious comments about President Trump and have also discussed at length the evidence and the facts of this case.

Thus, to date, the two witnesses in this case who the People complain that President Trump has attacked, Michael Cohen and Stormy Daniels, have over the course of the past five years continuously made extensive derogatory comments to the media and the public about President Trump that are at least as insulting as any statements which President Trump has made about them. For example, in one of Michael Cohen's books, he repeatedly calls President Trump disparaging names, including stating that President Trump was "a cheat, a liar, a fraud, a bully, a racist, a predator, a con man." *See* https://www.cbsnews.com/news/michael-cohen-memoir-says-trump-is-guilty-of-the-same-crimes-that-sent-him-to-prison/. Stormy Daniels also engages in extensive name calling and belittling of President Trump in the book she published, *Full Disclosure*.

The prosecutors note in their motion papers that President Trump previously called District Attorney Bragg an "animal," but fail to point out that the prosecutors in this case have similarly publicly made extensive derogatory statements about President Trump. For example, even before District Attorney Bragg was elected, he told the press that President Trump was guilty of criminal conduct (even though President Trump had never been charged with a crime) which he got away with because he was "a rich old white man:" District Attorney Bragg stated: "So, yeah, you are right, we got two standards of justice. Harvey Weinstein. Jeffrey Epstein. Being a rich old white man has allowed you to evade accountability in Manhattan. That includes [President] Trump and his children – they were engaged in fraud in a SoHo real estate deal with his children." https://www.politifact.com/article/2023/apr/12/heres-what-manhattan-district-attorney-alvin-bragg/. Former ADA Mark Pomerantz published a book entitled *People v. Donald Trump* in which he repeatedly likens President Trump to a mafia boss and worse.

Notably, the People's Proposed Protective Order does not, by its terms, prevent President Trump or any witness from continuing to comment negatively about each other on social media. Instead, what the People's Proposed Protective Order does is restrain President Trump from publicly commenting on the *evidence*.

However, in addition to calling President Trump names, the witnesses and the District Attorney's Office have repeatedly and extensively publicly discussed the *evidence* in this case, and the People's Proposed Protective Order would not stop them from doing so in the future. Michael Cohen and Stormy Daniels have made a living discussing the facts of this case in books, interviews, podcasts and on Twitter. Indeed, since the date of the indictment Stormy Daniels was featured on the front page of New York Magazine in an extensive interview discussing the facts of this case. Daniels previously wrote and published an entire book about the facts underlying her role in this case and discussed the facts with Michael Cohen on a podcast. Cohen has similarly opined on the instant case and other investigations involving President Trump repeatedly on podcasts, in his two books, on Twitter, and during countless interviews and questioning by the press. For every social media post the People cite and/or attach to their Motion, there are vile and dangerously inappropriate social media posts, podcasts or interviews by Cohen and Daniels.

With respect to the District Attorney's Office, former ADA Pomerantz discussed the facts of the instant prosecution in his book, *People v. Donald Trump*, prompting one federal court judge to find that if ever there was a work-product privilege with respect to the subject-matter of the book "the protection has been *waived* by DANY" based on its complete inaction both before and after publication in seeking to prevent Pomerantz's conduct. *Bragg v. Jordan*, 2023 WL  2999971 at *11. And immediately following the indictment of this case District Attorney Bragg released to the public an extensive "Statement of Facts" which reveals and quotes from grand jury material,

including evidence that does not in any way underlie the false business record charges in the indictment, and gave a press conference, in which he further discussed the grand jury evidence.

Given the conduct by the District Attorney's Office and its witnesses to date, imposing the People's Proposed Protective Order, which would restrain President Trump from discussing the very evidence which the witnesses and the District Attorney have repeatedly discussed publicly and which they would not be restrained from discussing in the future, would not be justified by "good cause" nor consistent with the goals of C.P.L. § 245.70, and would also be unconstitutional.

The Defense does not object to an appropriately fashioned protective order, consistent with C.P.L. § 245.70, but the People's Proposed Protective Order must be rejected.  The Court should instead impose the protective order submitted by the Defense (the "Defense's Proposed Protective Order"), attached as Exhibit B, which is sufficient to achieve the goals underlying §245.70, while still allowing President Trump to effectively defend himself and prepare for trial.

## I.        FACTUAL BACKGROUND

Prior to the unsealing of the Indictment, attorneys for the defense and the prosecution had several productive discussions about an appropriate protective order in this case.  The People had drafted a proposed protective order and the parties were close to an agreement, with one of the disagreements (which defense counsel believed would be worked out) being the defense's belief that the protective order must apply to both the defense and the prosecution.  During these conversations, however, the People failed to disclose to the defense that: (1) the People intended to publicly release—and post to their website—an extensive Statement of Facts describing and quoting grand jury evidence, including evidence that had nothing to do with the falsifying business records violations charged in the indictment but instead concerned alleged "other bad acts," (2) that the People gratuitously intended to discuss the evidence at length in open court at

arraignment; and (3) that the District Attorney Bragg intended to give an extensive televised press conference—covered by all the major networks and by media all over the world— in which the District Attorney would lay out his version of the facts, based in part on grand jury evidence and then post a summary of his statement, including charts, to DANY's website.

After reviewing the Statement of Facts and the public statements and actions by the District Attorney, all of which would have violated the People's Proposed Protective Order if engaged in by President Trump or his attorneys,[4] defense counsel had further discussions with the prosecutors about an appropriate protective order.  Those discussions did not result in an agreement.  Surprisingly, the People apparently believe that New York law allows the District Attorney's Office and its witnesses to freely speak and quote from grand jury evidence, but not President Trump or his counsel.  But President Trump cannot be the only interested party in this case whose speech about the evidence in the case is restricted by the Court.  Recognizing the need to have appropriate guardrails in place, the Defense's Proposed Protective Order applies to both the People and President Trump and prohibits both parties from improperly using discovery or grand jury materials produced by the People, but would not prohibit (only) President Trump

---

[4] The "Statement of Facts" and the press release describe a "Scheme" whereby President Trump and "others agreed to identify and suppress negative stories about him" and describes extensive meetings and communications over five pages that, quite plainly, have nothing to do with the 34 counts of the indictment Exhibit A, pg. 2-7.  Within this story, the People quote witness statements and rely on other evidence that most certainly is rooted in grand jury materials.  *See also* Exhibit D (Transcript of Press Conference of District Attorney Alvin Bragg (Apr. 4, 2023)) Exhibit E (District Attorney, New York County, Press Release: District Attorney Bragg Announces 34-Count Felony Indictment of Former President Donald J. Trump (Apr. 4, 2023), https://manhattanda.org/district-attorney-bragg-announces-34-count-felony-indictment-of-former-president-donald-j-trump/.  The District Attorney in his press conference referenced the purported evidence against President Trump derived from its grand jury investigation—evidence it now wants to bar President Trump from commenting on.  If President Trump issued a "Statement of Facts" in similar fashion to what the People issued, relying on grand jury evidence and other materials provided by the People, he would be in violation of the People's Protective Order. We respectfully submit that this is patently unfair and inappropriate.

from engaging in the same type of public speech about the evidence which the District

Attorney's Office and its witnesses have engaged in, both before and after the indictment.

Specifically, the Defense objects to the following aspects of the People's Proposed

Protective Order:

- To the extent it does not apply to the People;

- To the extent that it prevents President Trump from talking about the evidence
  produced by the People (the Defense does not object to that portion of the
  People's Proposed Protective Order that prevents public posting of the evidence
  or other material provided by the People);

- To the extent that it delays identifying personnel employed by the District
  Attorney's Office who will be called by the People in their case-in-chief as
  witnesses or who were witnesses in the grand jury (the Defense does not object to
  delaying disclosure of the names of support staff, such as paralegals, who
  participated in witness interviews);

- Finally, to the extent that it requires consent from the People prior to showing
  any of the forensic images of witness cell phones to President Trump.

A red-line version comparing the People's Proposed Protective Order with the Defense's

Proposed Protective Order is attached as Exhibit C.


## II.    ARGUMENT

The People's motion for such a restrictive protective order should be denied for several

reasons. First, the People have failed to show "good cause" for the imposition of their extensive

and draconian proposed protective order, as required by § 240.75.  Second, the proposed protective

order would violate President Trump's First Amendment rights insofar as (a) it permits others,

particularly DANY and key prosecution witnesses, to discuss the evidence in the case but not him,

and (b) it interferes with his campaign for President of the United States because it prevents him

from discussing with the public his qualifications for federal office. Third, the proposed protective

order violates federalism principles by transforming this Court into an arbiter of what a candidate for President may say to prospective voters.  Fourth, it limits President Trump's ability to prepare his defense by limiting his access to certain documents and interferes with his relationship with his counsel by requiring prior approval of the People before he may be given access to certain materials.

Instead of the overly broad and overly restrictive protective order offered by the People, President Trump proposes a reasonable alternative protective order that appropriately addresses legitimate privacy concerns but is consistent with President Trump's rights as both a charged defendant a candidate for the Office of President of the United States.

### A. The People Have Failed to Show That "Good Cause" Exists for the Proposed Protective Order

Criminal Procedure Law § 245.70 requires any party who seeks a protective order to establish that "good cause" exists for the restrictions included in such an order**.**  In determining whether good cause exists, the statute directs that courts should consider numerous factors including constitutional rights or limitations.

Here, the People's proffered good cause is primarily an allegation that President Trump publicly attacked the credibility of two expected witnesses, Stormy Daniels and Michael Cohen. Separately, the People attach and cite several examples of President Trump criticizing individuals he views as being dishonest, unjustly political, or acting in a way inconsistent with their duties. Notably, even though the People refer to numerous investigations into, and lawsuits against, President Trump, *they fail to point to even one instance where President Trump has misused discovery that was obtained by him or his lawyers.*  Rather, the People claim "good cause" exists for their extreme proposed protective order because President Trump has a purported history of

calling other people names.  Furthermore, the People's motion fails to address the significant fact that the two witnesses in this case about whom the People complain that President Trump has made derogatory comments have themselves made extensive and derogatory comments about President Trump, as well as the facts of this case in the public,[5] and are free to continue to do so without President Trump being allowed to impeach their false statements with evidence, as necessary. Similarly, the People relying on an on-going investigation by the Special Counsel in Washington, D.C. involving potentially classified materials is irrelevant as there has been no finding of wrongdoing, nor can there be a comparison between President Trump's rights to respond to public statements against him by the People and others and what the Special Counsel is investigating in Washington, D.C.

Thus, the People's "good cause" boils down to the fact that President Trump and two specific witnesses, who have thrust themselves into the public sphere by seeking out publicity and earning a living by attacking President Trump, are trading barbs and calling each other names. These facts do not establish a basis for the People's request that President Trump should be the only person in this case who is prohibited from discussing the evidence in this case.

### B. The Proposed Protective Order Infringes Upon the President's First Amendment Right to Discuss His Character and Qualifications for Federal Office and the First Amendment Right to the Public to Hear President Trump's Views

The People have proposed what would be an unprecedented and extraordinarily broad muzzle on a leading contender for the presidency of the United States.  Prohibiting President Trump from publicly discussing the evidence against him, especially to the extent it relies on

---

[5] *See* pages 3-4 above.  Notably, when the Court requested that the People "speak to [their] witnesses" about not making public comments about the case, the People responded that "there is only so much we can do." Transcript of Arraignment at 12–13.

Cohen and Gifford, infringes on President Trump's constitutional right to make his case to the American people for why he should be elected President.  Further exacerbating this constitutional infirmity, the People propose that this restriction apply only to President Trump, not to themselves or to their witnesses.

The People blithely cast aside concerns about the constitutional implications of their proposed protective order, asserting that "neither Defendant nor Defense Counsel have a First Amendment right to speak publicly regarding materials they receive through discovery."  Motion at 20.  To be sure, President Trump does not object to a reasonable protective order that accomplishes the goals of C.P.L. § 245.70, but the People's broad position overreads their primary case, *Seattle Times Co. v. Rhinehart*¸467 U.S. 20 (1984).  Contrary to how it is portrayed by the People, Justice Brennan noted in *Seattle Times* that "[t]he Court today recognizes that pretrial protective orders, designed to limit the dissemination gained through the civil discovery process, are subject to scrutiny under the First Amendment."  *Seattle Times*, 467 U.S. at 37 (Brennan, J., concurring).  And the Supreme Court subsequently made clear that *Seattle Times* applied intermediate scrutiny to First Amendment claims relating to discovery, indicating that there is a First Amendment interest in speaking publicly about discovery materials.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568 (2011) ("In *Seattle Times*, this Court applied heightened judicial scrutiny before sustaining a trial court order prohibiting a newspaper's disclosure of information it learned through coercive discovery."); *see also* Dustin B. Benham, *Dirt Secrets: The First Amendment in Protective-Order Litigation*, 35 Cordozo L. Re. 1781 (2014) (discussing a split in subsequent judicial interpretations of *Seattle Times*).  Moreover, the Court has a statutory obligation to consider constitutional rights in assessing whether there is good cause.  *See.* §

245.70(4) ("In determining good cause under this section the court may consider: constitutional rights or limitations[.]").

The People's Proposed Protective Order infringes upon President Trump's First Amendment right to freely discuss his own character and qualifications for federal office and the First Amendment rights of the American people to hear President Trump's side of the story. President Trump's ability to speak freely is particularly important in this case, which many "view as a manifest abuse of power and nakedly political prosecution … that has the potential to interfere with the exercise of presidential duties and with an upcoming federal election." *Bragg v. Jordan*, 2023 WL 2999971, at *12 (SDNY Apr. 19, 2023).

It is not surprising then that the Supreme Court has repeatedly emphasized "[t]he First Amendment 'has its fullest and most urgent application to speech uttered during a campaign for political office.'" *Citizens United v. Federal Election Commission*, 558 U.S. 310, 339 (2010) (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 223 (1989) (cleaned up);[6] *see also Federal Election Commission v. Cruz*, 142 S. Ct. 1638, 1650 (2022) ("The First Amendment 'has its fullest and most urgent application precisely to the conduct of campaigns for political office.'") (quoting *Monitor Patriot v. Roy*, 401 U.S. 265, 272 (1971)).  "In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation."  *Buckley v. Valeo*, 424 U.S. 1, 14-15 (1971). "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it."  *Citizens United*, 558 U.S. at

---

[6] This Court made this exact point at arraignment, noting that free speech rights "apply doubly to Mr. Trump, because he is a candidate for the presidency of the United States. So, those First Amendment rights are critically important, obviously." Tr. at 12.

340 (2010).   Accordingly, "[d]iscussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution" and "[t]he First Amendment affords the broadest protection to such political expression." *Buckley v. Valeo*, 424 U.S. 1, 14 (1976).

The Sixth Circuit's opinion in *United States v. Ford* is instructive on this point.  830 F.2d 596 (6th Cir. 1987).  *Ford* concerned a judicial limit on extrajudicial statements by a sitting U.S. Congressman who was also soon to be a candidate for reelection.  In this context, the court noted that "[a] criminal defendant awaiting trial in a controversial case has the full power of the government arrayed against him and the full spotlight of media attention focused upon him.  The defendant's interest in reply to the charges and to the associated adverse publicity, thus, is at a peak." *Ford*, 830 F.2d at 599.  The court went on to declare that the defendant "[was] entitled to attack the political motives of the [opposite party] administration which he claims is persecuting him because of his political views . . ." and "[was] entitled to fight the obvious damage to his political reputation in the press and in the court of public opinion, as well as in the courtroom and on the floor of Congress," even if "[o]ne may strongly disagree with the political view he expresses." *Ford*, 830 F.2d at 600-601.  The court further expressed concern that the defendant's "opponents will attack him as an indicted felon" and "[h]e will be unable to inform his constituents of his point of view. And reciprocally, his constituents will have no access to the views of their congressman on this issue of undoubted public importance" if the court's order were allowed to stand.  *Ford*, 830 F.2d at 601.  *See also United States v. Brown*, 218 F.3d 415, 430 (5th Cir. 2000) (upholding an order limiting extrajudicial commentary that "made special allowances for [the defendant's] re-election campaign by lifting most of the order . . . for the duration of the

campaign," allowing the defendant "to answer, without hindrance, the charges of his opponents regarding his indictment throughout the race.").

The People have implicitly sought to distinguish their motion by claiming that "the People are not at this time seeking a gag order in this case." Motion at 20. But effectively they are. The People's proposed order is incredibly broad. It prohibits the President from publicly discussing *any* materials obtained through discovery that are not already in the President's possession. At the same time, the People have spoken and written freely in public about their case and the strength of their evidence, including by speaking to the press, giving press conferences, and a former ADA writing a nearly 300-page book on the investigation into President Trump, a book which discusses the facts of this case, extolls as a truthteller the People's main witness in this case, and disparages President Trump for his alleged conduct. Now, after attempting to damage his reputation in the eyes of the public with their characterizations of the facts of this case, the People seek to prevent President Trump from telling the American people about the many weaknesses of the People's case and the exculpatory evidence obtained in the discovery process. This is, in practice, an attempt to gag a leading candidate for the Presidency of the United States and it is a clear infringement upon the First Amendment rights of the President Trump and the American electorate.

Worse, the People's proposed protective order would *only* apply to the defense. The People have pointedly refused to create a judicially enforceable order that applies to both parties and the People's witnesses. This violates the principle that government cannot distinguish between speakers based on their identity. *See Citizens United*, 558 U.S. at 898 ("Prohibited, too, are restrictions distinguishing among different speakers, allowing speech by some but not others.").

13

Finally, we submit that, given the People's extensive discussion of grand jury materials, before there was a protective order in place, and then, only after they were satisfied that they had made all the public statements that they wanted to make, asking for a protective order which would prevent the defendant from responding and publicly discussing discovery material, the People have "dirty hands" and should therefore not be entitled to ask for this relief from this Court. *Levy v. Braverman*, 24 AD2d 430, 430 (2nd Dep't 1965) ("The doctrine of 'clean hands' is a fundamental principle of equity as well as of public policy. Where a litigant has himself been guilty of inequitable conduct with reference to the subject matter of the transaction in suit, a court of equity will refuse him affirmative aid.").

### C.    The Proposed Protective Order Raises Serious Federalism Concerns

The Constitution assigns the power to elect the President to the duly appointed electors of each state.  U.S. Const., art.2, § 1, cl. 2.  A state judicial order limiting the ability of a leading presidential candidate to discuss his own character and qualifications would improperly interpose the state court in the middle of a campaign for federal office.

The court in *Ford* recognized analogous concerns, holding "the doctrine of separation of powers—a unique feature of our constitutional system designed to ensure that political power is divided and shared—would be undermined if the judicial branch should attempt to control political communications between a congressman and his constituents."  *Ford*, 830 F.2d at 601.  Similar concerns apply to a state court protective order in the context of a presidential campaign.  Limiting the substance of what a Presidential candidate can say about discovery materials—particularly after extensive pre-trial publicity by the People and the People's primary witnesses—would effectively makes a state court a player in a federal election.  That would undermine the federal basis of our presidential election system.

14

**D.  The People's Proposed "Additional Protections" for Forensic Images of Witness Cell Phones are a Dramatic and Unjustified Intrusion into the Attorney-Client Relationship.**

The People's Proposed Protective Order requires Defense counsel to obtain permission— *from the People*—before sharing any portion of forensic images of cell phones that the People themselves acknowledge are relevant to the indictment and the defense of the case. If this restriction were imposed, the Defense would be required to share with the People the portions of evidence they believe strategically important to review with the client and allow the People to object or otherwise have an insider's view into the defense strategy.  This is an unprecedented and unjustified intrusion into the attorney-client relationship. *See People v. Clarke*, 186 A.D.3d 1707, 1708–09 (App. Div. 2nd Dept, 2020) (holding "that the Supreme Court improvidently exercised its discretion in requiring defense counsel to seek approval of the court before exhibiting the subject recordings to investigators or others employed by counsel. Under the particular circumstances of this case, the court should have permitted defense counsel to disclose the recordings to those employed by counsel or appointed to assist in the defense, without prior approval from the Supreme Court.").

As a threshold matter, Defense counsel has no intention of spending any time or energy on the contents of cell phones of witnesses that have nothing to do with our defense of President Trump.  Similarly, President Trump has no interest in the contents of cell phones of witnesses that have nothing to do with his defense.  But requiring Defense counsel to inform the People which portions of a forensic image they intend to share with President Trump inappropriately inserts the People into the inner deliberations of the President Trump's legal team.  Mere knowledge of which materials Defense Counsel believe to be significant or warrant discussion with the client has the potential to reveal information protected by the attorney-client privilege and attorney-work product

15

privilege.  This creates a risk of the People reverse engineering Defense Counsel's trial strategy based on the information that Defense Counsel chooses to share with the client.  It would further serve as a deterrent to Defense Counsel sharing information with their client, in an effort to avoid such consequences.  There are countless possible examples of the harm this proposed restriction would entail, for example, if Defense Counsel identify communications between the witness and other individuals who could be potential witnesses for the Defense and would be required to provide those communications to the People and seek their "permission" to share those communications with our client.  That is untenable.

This proposed requirement, that the People essentially exercise a veto over Defense Counsel's ability to share information with their client, is a gross violation of President Trump's right to review the evidence against him and the Defense team's right to prepare a vigorous defense.  Defense Counsel should be able to share and discuss the information with their client that *they* believe is necessary to prepare an adequate defense.  They should not have to ask permission from the prosecutor to do so.

A more reasonable restriction, if one is required at all, is reflected in the Defense's Proposed Protective Order, would be to require Defense counsel to provide the Court *ex parte* and *in camera* with any forensic materials it seeks to show President Trump that is not related to (1) President Trump, (2) the Trump Organization, (3) the efforts by witnesses to cooperate with law enforcement, or (4) the charges in the indictment.  Such a limitation surely addresses the People's concern that Defense Counsel limit what forensic evidence they show to President Trump to the evidence that is significant to preparing a defense in this case.

**CONCLUSION**

The People's proposed protective order is not supported by "good cause," is inappropriately restrictive and, if agreed to by the Court, would represent a dramatic infringement

on the First Amendment rights of the President and the American people and the Sixth Amendment Rights of President Trump.   There is no good cause justifying the objected-to restrictions. Accordingly, the Court should reject the People's Proposed Protective Order and sign the Defense's Proposed Protective Order.

Dated:   New York, New York
         May 1, 2023

Respectfully submitted,

Todd Blanche
Blanche Law
99 Wall Street, Suite 4460
New York NY 10005
212-716-1250
toddblanche@blanchelaw.com

Susan R. Necheles
NechelesLaw LLP
1120 Sixth Avenue, 4th Floor
New York, NY 10036
212-997-7400
srn@necheleslaw.com

Joseph Tacopina
Tacopina Seigel & DeOreo
275 Madison Avenue, 35th Floor,
New York, New York 10016
212-227-8877
jtacopina@tacopinalaw.com

Attorneys for Donald J. Trump

# EXHIBIT E

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK

               -against-

DONALD J. TRUMP,

                         Defendant.

STATEMENT OF FACTS
IND-71543-23

## INTRODUCTION

1.     The defendant DONALD J. TRUMP repeatedly and fraudulently falsified New York business records to conceal criminal conduct that hid damaging information from the voting public during the 2016 presidential election.

2.     From August 2015 to December 2017, the Defendant orchestrated a scheme with others to influence the 2016 presidential election by identifying and purchasing negative information about him to suppress its publication and benefit the Defendant's electoral prospects. In order to execute the unlawful scheme, the participants violated election laws and made and caused false entries in the business records of various entities in New York.  The participants also took steps that mischaracterized, for tax purposes, the true nature of the payments made in furtherance of the scheme.

3.     One component of this scheme was that, at the Defendant's request, a lawyer who then worked for the Trump Organization as Special Counsel to Defendant ("Lawyer A"), covertly paid $130,000 to an adult film actress shortly before the election to prevent her from publicizing a sexual encounter with the Defendant.  Lawyer A made the $130,000 payment through a shell corporation he set up and funded at a bank in Manhattan.  This payment was illegal, and Lawyer A has since pleaded guilty to making an illegal campaign contribution and

1

served time in prison.  Further, false entries were made in New York business records to effectuate this payment, separate and apart from the New York business records used to conceal the payment.

4.      After the election, the Defendant reimbursed Lawyer A for the illegal payment through a series of monthly checks, first from the Donald J. Trump Revocable Trust (the "Defendant's Trust")—a Trust created under the laws of New York which held the Trump Organization entity assets after the Defendant was elected President—and then from the Defendant's bank account.  Each check was processed by the Trump Organization, and each check was disguised as a payment for legal services rendered in a given month of 2017 pursuant to a retainer agreement.  The payment records, kept and maintained by the Trump Organization, were false New York business records.  In truth, there was no retainer agreement, and Lawyer A was not being paid for legal services rendered in 2017.  The Defendant caused his entities' business records to be falsified to disguise his and others' criminal conduct.

## BACKGROUND

5.      The Defendant is the beneficial owner of a collection of business entities known by the trade name the Trump Organization.  The Trump Organization comprises approximately 500 separate entities that, among other business activities, own and manage hotels, golf courses, commercial real estate, condominium developments, and other properties.  The Trump Organization is headquartered at 725 Fifth Avenue in New York County.

6.      From approximately June 2015 to November 2016, the Defendant was a candidate for the office of President of the United States.  On January 20, 2017, he became President of the United States.

## THE SCHEME

### I.    The Catch and Kill Scheme to Suppress Negative Information

7.    During and in furtherance of his candidacy for President, the Defendant and others agreed to identify and suppress negative stories about him.  Two parties to this agreement have admitted to committing illegal conduct in connection with the scheme.  In August 2018, Lawyer A pleaded guilty to two federal crimes involving illegal campaign contributions, and subsequently served time in prison.  In addition, in August 2018, American Media, Inc. ("AMI"), a media company that owned and published magazines and supermarket tabloids including the *National Enquirer*, admitted in a non-prosecution agreement that it made a payment to a source of a story to ensure that the source "did not publicize damaging allegations" about the Defendant "before the 2016 presidential election and thereby influence that election."

####    A.    The 2015 Trump Tower Meeting

8.    In June 2015, the Defendant announced his candidacy for President of the United States.

9.    Soon after, in August 2015, the Defendant met with Lawyer A and AMI's Chairman and Chief Executive Officer (the "AMI CEO") at Trump Tower in New York County.  At the meeting, the AMI CEO agreed to help with the Defendant's campaign, saying that he would act as the "eyes and ears" for the campaign by looking out for negative stories about the Defendant and alerting Lawyer A before the stories were published.  The AMI CEO also agreed to publish negative stories about the Defendant's competitors for the election.

####    B.    Suppressing the Doorman's Story

10.    A few months later, in or about October or November 2015, the AMI CEO learned that a former Trump Tower doorman (the "Doorman") was trying to sell information regarding a child that the Defendant had allegedly fathered out of wedlock.  At the AMI CEO's

direction, AMI negotiated and signed an agreement to pay the Doorman $30,000 to acquire exclusive rights to the story.  AMI falsely characterized this payment in AMI's books and records, including in its general ledger.  AMI purchased the information from the Doorman without fully investigating his claims, but the AMI CEO directed that the deal take place because of his agreement with the Defendant and Lawyer A.

11.    When AMI later concluded that the story was not true, the AMI CEO wanted to release the Doorman from the agreement.  However, Lawyer A instructed the AMI CEO not to release the Doorman until after the presidential election, and the AMI CEO complied with that instruction because of his agreement with the Defendant and Lawyer A.

**C.    Suppressing Woman 1's Account**

12.    About five months before the presidential election, in or about June 2016, the editor-in-chief of the *National Enquirer* and AMI's Chief Content Officer (the "AMI Editor-in-Chief") contacted Lawyer A about a woman ("Woman 1") who alleged she had a sexual relationship with the Defendant while he was married.  The AMI Editor-in-Chief updated Lawyer A regularly about the matter over text message and by telephone.  The Defendant did not want this information to become public because he was concerned about the effect it could have on his candidacy.  Thereafter, the Defendant, the AMI CEO, and Lawyer A had a series of discussions about who should pay off Woman 1 to secure her silence.

13.    AMI ultimately paid $150,000 to Woman 1 in exchange for her agreement not to speak out about the alleged sexual relationship, as well as for two magazine cover features of Woman 1 and a series of articles that would be published under her byline.  AMI falsely characterized this payment in AMI's books and records, including in its general ledger.  The AMI CEO agreed to the deal after discussing it with both the Defendant and Lawyer A, and on

4

the understanding from Lawyer A that the Defendant or the Trump Organization would reimburse AMI.

14.     In a conversation captured in an audio recording in approximately September 2016 concerning Woman 1's account, the Defendant and Lawyer A discussed how to obtain the rights to Woman 1's account from AMI and how to reimburse AMI for its payment.  Lawyer A told the Defendant he would open up a company for the transfer of Woman 1's account and other information, and stated that he had spoken to the Chief Financial Officer for the Trump Organization (the "TO CFO") about "how to set the whole thing up."  The Defendant asked, "So what do we got to pay for this?  One fifty?" and suggested paying by cash.  When Lawyer A disagreed, the Defendant then mentioned payment by check.  After the conversation, Lawyer A created a shell company called Resolution Consultants, LLC on or about September 30, 2016.

15.     Less than two months before the election, on or about September 30, 2016, the AMI CEO signed an agreement in which AMI agreed to transfer its rights to Woman 1's account to Lawyer A's shell company for $125,000.  However, after the assignment agreement was signed but before the reimbursement took place, the AMI CEO consulted with AMI's general counsel and then told Lawyer A that the deal to transfer the rights to Lawyer A's shell company was off.

### D.     Suppressing Woman 2's Account

16.     About one month before the election, on or about October 7, 2016, news broke that the Defendant had been caught on tape saying to the host of *Access Hollywood*: "I just start kissing them [women].  It's like a magnet.  Just kiss.  I don't even wait.  And when you're a star, they let you do it.  You can do anything. . . .  Grab 'em by the [genitals].  You can do anything."  The evidence shows that both the Defendant and his campaign staff were concerned that the tape would harm his viability as a candidate and reduce his standing with female voters in particular.

17.     Shortly after the *Access Hollywood* tape became public, the AMI Editor-in-Chief contacted the AMI CEO about another woman ("Woman 2") who alleged she had a sexual encounter with the Defendant while he was married.  The AMI CEO told the AMI Editor-in-Chief to notify Lawyer A.

18.     On or about October 10, 2016, the AMI Editor-in-Chief connected Lawyer A with Woman 2's lawyer ("Lawyer B").  Lawyer A then negotiated a deal with Lawyer B to secure Woman 2's silence and prevent disclosure of the damaging information in the final weeks before the presidential election.  Under the deal that Lawyer B negotiated, Woman 2 would be paid $130,000 for the rights to her account.

19.     The Defendant directed Lawyer A to delay making a payment to Woman 2 as long as possible.  He instructed Lawyer A that if they could delay the payment until after the election, they could avoid paying altogether, because at that point it would not matter if the story became public.  As reflected in emails and text messages between and among Lawyer A, Lawyer B, and the AMI Editor-in-Chief, Lawyer A attempted to delay making payment as long as possible.

20.     Ultimately, with pressure mounting and the election approaching, the Defendant agreed to the payoff and directed Lawyer A to proceed.  Lawyer A discussed the deal with the Defendant and the TO CFO.  The Defendant did not want to make the $130,000 payment himself, and asked Lawyer A and the TO CFO to find a way to make the payment.  After discussing various payment options with the TO CFO, Lawyer A agreed he would make the payment.  Before making the payment, Lawyer A confirmed with the Defendant that Defendant would pay him back.

21.     On or about October 26, shortly after speaking with the Defendant on the phone,

Lawyer A opened a bank account in Manhattan in the name of Essential Consultants LLC, a new

shell company he had created to effectuate the payment.  He then transferred $131,000 from his

personal home equity line of credit ("HELOC") into that account.  On or about October 27,

Lawyer A wired $130,000 from his Essential Consultants LLC account in New York to Lawyer

B to suppress Woman 2's account.

### E.     Post-Election Communications with AMI CEO

22.     On November 8, 2016, the Defendant won the presidential election and became

the President-Elect.  Thereafter, AMI released both the doorman and Woman 1 from their non-

disclosure agreements.

23.     The Defendant was inaugurated as President on January 20, 2017.  Between

Election Day and Inauguration Day, during the period of the Defendant's transition to his role as

President, the Defendant met with the AMI CEO privately in Trump Tower in Manhattan.  The

Defendant thanked the AMI CEO for handling the stories of the Doorman and Woman 1, and

invited the AMI CEO to the Inauguration.  In the summer of 2017, the Defendant invited the

AMI CEO to the White House for a dinner to thank him for his help during the campaign.

## II.     The Defendant Falsified Business Records

24.     Shortly after being elected President, the Defendant arranged to reimburse

Lawyer A for the payoff he made on the Defendant's behalf.  In or around January 2017, the TO

CFO and Lawyer A met to discuss how Lawyer A would be reimbursed for the money he paid to

ensure Woman 2's silence.  The TO CFO asked Lawyer A to bring a copy of a bank statement

for the Essential Consultants account showing the $130,000 payment.

25.     The TO CFO and Lawyer A agreed to a total repayment amount of $420,000.

They reached that figure by adding the $130,000 payment to a $50,000 payment for another

expense for which Lawyer A also claimed reimbursement, for a total of $180,000.  The TO CFO then doubled that amount to $360,000 so that Lawyer A could characterize the payment as income on his tax returns, instead of a reimbursement, and Lawyer A would be left with $180,000 after paying approximately 50% in income taxes.  Finally, the TO CFO added an additional $60,000 as a supplemental year-end bonus.  Together, these amounts totaled $420,000.  The TO CFO memorialized these calculations in handwritten notes on the copy of the bank statement that Lawyer A had provided.

26.    The Defendant, the TO CFO, and Lawyer A then agreed that Lawyer A would be paid the $420,000 through twelve monthly payments of $35,000 over the course of 2017.  Each month, Lawyer A was to send an invoice to the Defendant through Trump Organization employees, falsely requesting payment of $35,000 for legal services rendered in a given month of 2017 pursuant to a retainer agreement.  At no point did Lawyer A have a retainer agreement with the Defendant or the Trump Organization.

27.    In early February 2017, the Defendant and Lawyer A met in the Oval Office at the White House and confirmed this repayment arrangement.

28.    On or about February 14, 2017, Lawyer A emailed the Controller of the Trump Organization (the "TO Controller") the first monthly invoice, which stated: "Pursuant to the retainer agreement, kindly remit payment for services rendered for the months of January and February, 2017."  The invoice requested payment in the amount of $35,000 for each of those two months.  The TO CFO approved the payment, and, in turn, the TO Controller sent the invoice to the Trump Organization Accounts Payable Supervisor (the "TO Accounts Payable Supervisor") with the following instructions: "Post to legal expenses.  Put 'retainer for the months of January and February 2017' in the description."

29.     Lawyer A submitted ten similar monthly invoices by email to the Trump Organization for the remaining months in 2017.  Each invoice falsely stated that it was being submitted "[p]ursuant to the retainer agreement," and falsely requested "payment for services rendered" for a month of 2017.  In fact, there was no such retainer agreement and Lawyer A was not being paid for services rendered in any month of 2017.

30.     The TO Controller forwarded each invoice to the TO Accounts Payable Supervisor.  Consistent with the TO Controller's initial instructions, the TO Accounts Payable Supervisor printed out each invoice and marked it with an accounts payable stamp and the general ledger code "51505" for legal expenses.  The Trump Organization maintained the invoices as records of expenses paid.

31.     As instructed, the TO Accounts Payable Supervisor recorded each payment in the Trump Organization's electronic accounting system, falsely describing it as a "legal expense" pursuant to a retainer agreement for a month of 2017.  The Trump Organization maintained a digital entry for each expense, called a "voucher," and these vouchers, like vouchers for other expenses, became part of the Trump Organization's general ledgers.

32.     The TO Accounts Payable Supervisor then prepared checks with attached check stubs for approval and signature.  The first check was paid from the Defendant's Trust and signed by the TO CFO and the Defendant's son, as trustees.  The check stub falsely recorded the payment as "Retainer for 1/1-1/31/17" and "Retainer for 2/1-2/28/17."  The second check, for March 2017, was also paid from the Trust and signed by two trustees.  The check stub falsely recorded the payment as "Retainer for 3/1-3/31/17."

33.     The remaining nine checks, corresponding to the months of April through December of 2017, were paid by the Defendant personally.  Each of the checks was cut from the

Defendant's bank account and sent, along with the corresponding invoices from Lawyer A, from the Trump Organization in New York County to the Defendant in Washington, D.C.  The checks and stubs bearing the false statements were stapled to the invoices also bearing false statements. The Defendant signed each of the checks personally and had them sent back to the Trump Organization in New York County.  There, the checks, the stubs, and the invoices were scanned and maintained in the Trump Organization's data system before the checks themselves were detached and mailed to Lawyer A for payment.

34.    The $35,000 payments stopped after the December 2017 payment.

### III.    The Investigation into Lawyer A and the Defendant's Pressure Campaign

35.    On or about April 9, 2018, the FBI executed a search warrant on Lawyer A's residences and office.  In the months that followed, the Defendant and others engaged in a public and private pressure campaign to ensure that Lawyer A did not cooperate with law enforcement in the federal investigation.

36.    On the day of the FBI searches, Lawyer A called to speak with the Defendant to let him know what had occurred.  In a return call, the Defendant told Lawyer A to "stay strong."

37.    On or about April 21, 2018, the Defendant publicly commented on Twitter encouraging Lawyer A not to "flip," stating, "Most people will flip if the Government lets them out of trouble, even if . . . it means lying or making up stories. Sorry, I don't see [Lawyer A] doing that . . . ."

38.    In mid-April 2018, Lawyer A was also approached by an attorney ("Lawyer C"), who offered to represent him in the interest of maintaining a "back channel of communication" to the Defendant.  On or about April 21, 2018, Lawyer C emailed Lawyer A, highlighting that he had a close relationship with the Defendant's personal attorney ("Lawyer D") and stating, "[T]his could not be a better situation for the President or you."  Later that day, Lawyer C

emailed Lawyer A again, writing, "I spoke with [Lawyer D]. Very Very Positive. You are 'loved.' . . . [Lawyer D] said this communication channel must be maintained. . . . Sleep well tonight, you have friends in high places."

39.     On or about June 14, 2018, Lawyer C emailed Lawyer A a news clip discussing the possibility of Lawyer A cooperating, and continued to urge him not to cooperate with law enforcement, writing, "The whole objective of this exercise by the [federal prosecutors] is to drain you, emotionally and financially, until you reach a point that you see them as your only means to salvation."  In the same email , Lawyer C, wrote, "You are making a very big mistake if you believe the stories these 'journalists' are writing about you.  They want you to cave.  They want you to fail.  They do not want you to persevere and succeed."

40.     On August 21, 2018, Lawyer A pleaded guilty in the federal investigation.  The next day, on or about August 22, 2018, the Defendant commented on Twitter, "If anyone is looking for a good lawyer, I would strongly suggest that you don't retain the services of [Lawyer A]!"  Later that day, the Defendant posted to Twitter again, stating, "I feel very badly for" one of his former campaign managers who had been criminally charged, saying, "[U]nlike [Lawyer A], he refused to 'break' – make up stories in order to get a 'deal.'"

### IV.     Lawyer A and AMI Admit Guilt in Connection with Payoffs of Woman 1 and Woman 2

41.     Ultimately, other participants in the scheme admitted that the payoffs were unlawful.

42.     In or about September 2018, AMI entered into a non-prosecution agreement with the United States Attorney's Office for the Southern District of New York in connection with AMI's payoff of Woman 1, admitting that "[a]t no time during the negotiation or acquisition of [Woman 1's] story did AMI intend to publish the story or disseminate information about it

publicly."   Rather, AMI admitted that it made the payment to ensure that Woman 1 "did not publicize damaging allegations" about the Defendant "before the 2016 presidential election and thereby influence that election."

43.    In August 21, 2018, Lawyer A pleaded guilty to a felony in connection with his role in AMI's payoff to Woman 1, admitting in his guilty plea that he had done so at the Defendant's direction:

> [O]n or about the summer of 2016, **in coordination with, and at the direction of, a candidate for federal office**, I and the CEO of a media company at the request of the candidate worked together to keep an individual with information that would be harmful to the candidate and to the campaign from publicly disclosing this information.  After a number of discussions, we eventually accomplished the goal by the media company entering into a contract with the individual under which she received compensation of $150,000.  I participated in this conduct, which on my part took place in Manhattan, for the principal purpose of influencing the election.

(emphasis added).

44.    Lawyer A also pleaded guilty to a felony in connection with his payoff of Woman 2 to secure her silence, again at the Defendant's direction.  Lawyer A admitted as part of his guilty plea:

> [O]n or about October of 2016, **in coordination with, and at the direction of, the same candidate,** I arranged to make a payment to a second individual with information that would be harmful to the candidate and to the campaign to keep the individual from disclosing the information.  To accomplish this, I used a company that was under my control to make a payment in the sum of $130,000.  The monies I advanced through my company were later repaid to me by the candidate.  I participated in this conduct, which on my part took place in Manhattan, for the principal purpose of influencing the election.

(emphasis added).[1]

---

[1] This Statement of Facts contains certain of the information that is relevant to the events described herein, and does not contain all facts relevant to the charged conduct.

DATED:      New York, New York
            April 4, 2023

                              ALVIN L. BRAGG, JR.
                              *District Attorney*
                              *New York County*