# Exhibit 18

# A Sitting President's Amenability to Indictment and Criminal Prosecution

*The indictment or criminal prosecution of a sitting President would unconstitutionally undermine the capacity of the executive branch to perform its constitutionally assigned functions*

October 16, 2000

MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

In 1973, the Department concluded that the indictment or criminal prosecution of a sitting President would impermissibly undermine the capacity of the executive branch to perform its constitutionally assigned functions. We have been asked to summarize and review the analysis provided in support of that conclusion, and to consider whether any subsequent developments in the law lead us today to reconsider and modify or disavow that determination.[1] We believe that the conclusion reached by the Department in 1973 still represents the best interpretation of the Constitution.

The Department's consideration of this issue in 1973 arose in two distinct legal contexts. First, the Office of Legal Counsel ("OLC") prepared a comprehensive memorandum in the fall of 1973 that analyzed whether all federal civil officers are immune from indictment or criminal prosecution while in office, and, if not, whether the President and Vice President in particular are immune from indictment or criminal prosecution while in office. *See* Memorandum from Robert G. Dixon, Jr., Assistant Attorney General, Office of Legal Counsel, *Re: Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution while in Office* (Sept. 24, 1973) ("OLC Memo"). The OLC memorandum concluded that all federal civil officers except the President are subject to indictment and criminal prosecution while still in office; the President is uniquely immune from such process. Second, the Department addressed the question later that same year in connection with the grand jury investigation of then-Vice President Spiro Agnew. In response to a motion by the Vice President to enjoin grand jury proceedings against him, then-Solicitor General Robert Bork filed a brief arguing that, consistent with the Constitution, the Vice President could be subject to indictment and criminal prosecution. *See* Memorandum for the United States Concerning the Vice President's Claim of Constitutional Immunity (filed Oct. 5, 1973), *In re Proceedings of the Grand Jury Impaneled December 5, 1972:*

---

[1] Since that time, the Department has touched on this and related questions in the course of resolving other questions, *see, e g , The President—Interpretation of 18 U.S.C. §603 as Applicable to Activities in the White House*, 3 Op. O.L.C. 31, 32 (1979); Brief for the United States as Amicus Curiae in Support of Petitioner at 15 n 8, *Clinton v. Jones*, 520 U.S. 681 (1997) (No. 95–1853), but it has not undertaken a comprehensive reexamination of the matter. We note that various lawyers and legal scholars have recently espoused a range of views of the matter *See. e.g , Impeachment or Indictment· Is a Sitting President Subject to the Compulsory Criminal Process· Hearings Before the Subcomm. on the Constitution, Federalism, and Property Rights of the Senate Comm. on the Judiciary*, 105th Cong (1998)

*Application of Spiro T. Agnew, Vice President of the United States* (D. Md. 1973) (No. 73–965) ("SG Brief"). In so arguing, however, Solicitor General Bork was careful to explain that the President, unlike the Vice President, could not constitutionally be subject to such criminal process while in office.

In this memorandum, we conclude that the determinations made by the Department in 1973, both in the OLC memorandum and in the Solicitor General's brief, remain sound and that subsequent developments in the law validate both the analytical framework applied and the conclusions reached at that time. In Part I, we describe in some detail the Department's 1973 analysis and conclusions. In Part II, we examine more recent Supreme Court case law and conclude that it comports with the Department's 1973 conclusions.[2]

## I.

### A.

The 1973 OLC memorandum comprehensively reviewed various arguments both for and against the recognition of a sitting President's immunity from indictment and criminal prosecution. What follows is a synopsis of the memorandum's analysis leading to its conclusion that the indictment or criminal prosecution of a sitting President would be unconstitutional because it would impermissibly interfere with the President's ability to carry out his constitutionally assigned functions and thus would be inconsistent with the constitutional structure.

#### 1.

The OLC memorandum began by considering whether the plain terms of the Impeachment Judgment Clause prohibit the institution of criminal proceedings against any officer subject to that Clause prior to that officer's conviction upon impeachment. OLC Memo at 2. The memorandum concluded that the plain terms of the Clause do not impose such a general bar to indictment or criminal trial prior to impeachment and therefore do not, by themselves, preclude the criminal prosecution of a sitting President. *Id.* at 7.[3]

---

[2] Implicit in the Department's constitutional analysis of this question in 1973 was the assumption that the President would oppose an attempt to subject him to indictment or prosecution. We proceed on the same assumption today and therefore do not inquire whether it would be constitutional to indict or try the President with his consent.

The Department's previous analysis also focused exclusively on federal rather than state prosecution of a sitting President. We proceed on this assumption as well, and thus we do not consider any additional constitutional concerns that may be implicated by state criminal prosecution of a sitting President. *See Clinton v Jones,* 520 U S 681, 691 (1997) (noting that a state criminal prosecution of a sitting President would raise "federalism and comity" concerns rather than separation of powers concerns)

[3] In a memorandum prepared earlier this year, we concluded that neither the Impeachment Judgment Clause nor any other provision of the Constitution precludes the prosecution of a former President who, while still in office, was impeached by the House of Representatives but acquitted by the Senate *See Whether a Former President May*
Continued

The Impeachment Judgment Clause provides:

> Judgment in Cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States: but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law.

U.S. Const. art. I, § 3, cl. 7. The textual argument that the criminal prosecution of a person subject to removal by impeachment may not precede conviction by the Senate arises from the reference to the "Party convicted" being liable for "Indictment, Trial, Judgment and Punishment." This textual argument draws support from Alexander Hamilton's discussion of this Clause in *The Federalist Nos.* 65, 69, and 77, in which he explained that an offender would still be liable to criminal prosecution in the ordinary course of the law after removal by way of impeachment. OLC Memo at 2.[4]

The OLC memorandum explained, however, that the use of the term "nevertheless" cast doubt on the argument that the Impeachment Judgment Clause constitutes a bar to the prosecution of a person subject to impeachment prior to the termination of impeachment proceedings. *Id.* at 3. "Nevertheless" indicates that the Framers intended the Clause to signify only that prior conviction in the Senate would not constitute a bar to subsequent prosecution, not that prosecution of a person subject to impeachment could occur only after conviction in the Senate. *Id.* "The purpose of this clause thus is to permit criminal prosecution in spite of the prior adjudication by the Senate, *i.e.*, to forestall a double jeopardy argument." *Id.*[5]

---

*Be Indicted and Tried for the Same Offenses for Which He Was Impeached by the House and Acquitted by the Senate*, 24 Op O L.C. 111 (2000)

[4] In *The Federalist No 69*, Hamilton explained:

> The President of the United States would be liable to be impeached, tried, and upon conviction . . removed from office, and would *afterwards* be liable to prosecution and punishment in the ordinary course of law. The person of the King of Great Britain is sacred and inviolable: there is no constitutional tribunal to which he is amenable, no punishment to which he can be subjected without involving the crisis of a national revolution

*The Federalist No. 69*, at 416 (Alexander Hamilton) (Clinton Rossiter ed , 1961) (emphasis added). Similarly, in *The Federalist No 65*, he stated

> the punishment which may be the consequence of conviction upon impeachment is not to terminate the chastisement of the offender. *After* having been sentenced to a perpetual ostracism from the esteem and confidence and honors and emoluments of his country, he will still be liable to prosecution and punishment in the ordinary course of law.

*Id.* at 398–99 (emphasis added). Moreover, in *The Federalist No. 77*, he maintained that the President is "at all times liable to impeachment, trial, dismission from office . . . and to the forfeiture of life and estate by *subsequent* prosecution in the common course of law " *Id.* at 464 (emphasis added) In addition, Gouverneur Morris stated at the Convention that "[a] conclusive reason for making the Senate instead of the Supreme Court the Judge of impeachments, was that the latter was to try the President after the trial of the impeachment." 2 *Records of the Federal Convention of 1787*, at 500 (Max Farrand ed., 1974).

[5] In our recent memorandum exploring in detail the meaning of the Impeachment Judgment Clause, we concluded that the relationship between this clause and double jeopardy principles is somewhat more complicated than the 1973 OLC Memo suggests *See Whether a Former President May Be Indicted and Tried for the Same Offenses*

The OLC memorandum further explained that if the text of the Impeachment Judgment Clause barred the criminal prosecution of a sitting President, then the same text would necessarily bar the prosecution of all other "civil officers" during their tenure in office. The constitutional practice since the Founding, however, has been to prosecute and even imprison civil officers other than the President while they were still in office and prior to their impeachment. *See, e.g., id.* at 4–7 (cataloguing cases). In addition, the conclusion that the Impeachment Judgment Clause constituted a textual bar to the prosecution of a civil officer prior to the termination of impeachment proceedings "would create serious practical difficulties in the administration of the criminal law." *Id.* at 7. Under such an interpretation, a prosecution of a government official could not proceed until a court had resolved a variety of complicated threshold constitutional questions:

> These include, *first*, whether the suspect is or was an officer of the United States within the meaning of Article II, section 4 of the Constitution, and *second*, whether the offense is one for which he could be impeached. *Third*, there would arise troublesome corollary issues and questions in the field of conspiracies and with respect to the limitations of criminal proceedings.

*Id.* The memorandum concluded that "[a]n interpretation of the Constitution which injects such complications into criminal proceedings is not likely to be a correct one." *Id.* As a result, the Impeachment Judgment Clause could not itself be said to be the basis for a presidential immunity from indictment or criminal trial.

### 2.

The OLC memorandum next considered "whether an immunity of the President from criminal proceedings can be justified on other grounds, in particular the consideration that the President's subjection to the jurisdiction of the courts would be inconsistent with his position as head of the Executive branch." OLC Memo at 18. In examining this question, the memorandum first considered the contention that the express, limited immunity conferred upon members of Congress by the Arrest and Speech or Debate Clauses of Article I, Section 6 of the Constitution necessarily precludes the conclusion that the President enjoys a broader, implicit immunity from criminal process.[6] One might contend that the Constitution's grant

---

*for Which He Was Impeached by the House and Acquitted by the Senate,* 24 Op. O L C at 128–30. Nothing in our more recent analysis, however, calls into question the 1973 OLC Memo's conclusions.

[6] Article I, Section 6, Clause 1 provides

The Senators and Representatives shall   .   in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going

Continued

of a limited immunity to members of Congress reflects a determination that federal officials enjoy no immunity absent a specific textual grant.

The OLC memorandum determined that this contention was not "necessarily conclusive." OLC Memo at 18. "[I]t could be said with equal validity that Article I, sec. 6, clause 1 does not confer any immunity upon the members of Congress, but rather limits the complete immunity from judicial proceedings which they otherwise would enjoy as members of a branch co-equal with the judiciary." *Id.* Thus, in the absence of a specific textual provision withdrawing it, the President would enjoy absolute immunity. In addition, the textual silence regarding the existence of a presidential immunity from criminal proceedings may merely reflect the fact that it "may have been too well accepted to need constitutional mention (by analogy to the English Crown), and that the innovative provision was the specified process of impeachment extending even to the President." *Id.* at 19. Finally, the historical evidence bearing on whether or not an implicit presidential immunity from judicial process was thought to exist at the time of the Founding was ultimately "not conclusive." *Id.* at 20.

3.

The OLC memorandum next proceeded to consider whether an immunity from indictment or criminal prosecution was implicit in the doctrine of separation of powers as it then stood. OLC Memo at 20. After reviewing judicial precedents and an earlier OLC opinion,[7] *id.* at 21–24, the OLC memorandum concluded that "under our constitutional plan it cannot be said either that the courts have the same jurisdiction over the President as if he were an ordinary citizen or that the President is absolutely immune from the jurisdiction of the courts in regard to any kind of claim." *Id.* at 24. As a consequence, "[t]he proper approach is to find the proper balance between the normal functions of the courts and the special responsibilities and functions of the Presidency." *Id.*

The OLC memorandum separated into two parts the determination of the proper constitutional balance with regard to the indictment or criminal prosecution of a sitting President. First, the memorandum discussed whether any of the considerations that had lead to the rejection of the contention that impeachment must precede criminal proceedings for ordinary civil officers applied differently with respect to the President in light of his position as the sole head of an entire branch of government. *Id.*[8] Second, the memorandum considered "whether criminal pro-

---

to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place

[7] *See* Memorandum from Robert G Dixon, Jr , Assistant Attorney General, Office of Legal Counsel, *Re Presidential Amenability to Judicial Subpoenas* (June 25, 1973).

[8] We note that the statements quoted in footnote 4 above from *The Federalist Papers* and Gouverneur Morris, which provide that the President may be prosecuted *after* having been tried by the Senate, are consistent with the conclusion that the President may enjoy an immunity from criminal prosecution while in office that other civil officers do not The quoted statements are not dispositive of this question, however, as the OLC memorandum

ceedings and execution of potential sentences would improperly interfere with the President's constitutional duties and be inconsistent with his status." *Id.*

a.

The OLC memorandum's analysis of the first of these questions began with a consideration of whether the nature of the defendant's high office would render such a trial "too political for the judicial process." OLC Memo at 24. The memorandum concluded that the argument was, as a general matter, unpersuasive. Nothing about the criminal offenses for which a sitting President would be tried would appear to render the criminal proceedings "too political." The only kind of offenses that could lead to criminal proceedings against the President would be statutory offenses, and "their very inclusion in the Penal Code is an indication of a congressional determination that they can be adjudicated by a judge and jury." *Id.* In addition, there would not appear to be any "weighty reason to differentiate between the President and other officeholders" in regard to the "political" nature of such a proceeding "unless special separation of powers based interests can be articulated with clarity." *Id.* at 25.

The memorandum also considered but downplayed the potential concern that criminal proceedings against the President would be "too political" either because "the ordinary courts may not be able to cope with powerful men" or because no fair trial could be provided to the President. *Id.* Although the fear that courts would be unable to subject powerful officials to criminal process "arose in England where it presumably was valid in feudal time," "[i]n the conditions now prevailing in the United States, little weight is to be given to it as far as most officeholders are concerned." *Id.* Nor did the memorandum find great weight in the contention that the President, by virtue of his position, could not be assured a fair criminal proceeding. To be sure, the memorandum continued, it would be "extremely difficult" to assure a sitting President a fair trial, *id.*, noting that it "might be impossible to impanel a neutral jury." *Id.* However, "there is a serious 'fairness' problem whether the criminal trial precedes or follows impeachment." *Id.* at 26. And "the latter unfairness is contemplated and accepted in the impeachment clause itself, thus suggesting that the difficulty in impaneling a neutral jury should not be viewed, in itself, an absolute bar to indictment of a public figure." *Id.*

The OLC memorandum next considered whether, in light of the President's unique powers to supervise executive branch prosecutions and assert executive

recognized. Some statements by subsequent commentators may be read to contemplate criminal prosecution of incumbent civil officers, including the President. *See, e.g.,* William Rawle, *A View of the Constitution of the United States of America* 215 (2d ed. 1829) ("But the ordinary tribunals, as we shall see, are not precluded, either before or after an impeachment, from taking cognizance of the public and official delinquency."). There is also James Wilson's statement in the Pennsylvania ratification debates that "far from being above the laws, he [the President] is amenable to them in his private character as a citizen, and in his public character by *impeachment.*" 2 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 480 (Jonathan Elliot ed., 2d ed. 1836).

privilege, the constitutional balance generally should favor the conclusion that a sitting President may not be subjected to indictment or criminal prosecution. *Id.* at 26. According to this argument, the possession of these powers by the President renders the criminal prosecution of a sitting President inconsistent with the constitutional structure. It was suggested that such powers, which relate so directly to the President's status as a law enforcement officer, are simply incompatible with the notion that the President could be made a defendant in a criminal case. The memorandum did not reach a definitive conclusion on the weight to be accorded the President's capacity to exercise such powers in calculating the constitutional balance, although it did suggest that the President's possession of such powers pointed somewhat against the conclusion that the chief executive could be subject to indictment or criminal prosecution during his tenure in office.

In setting forth the competing considerations, the memorandum explained that, on the one hand, "it could be argued that a President's status as defendant in a criminal case would be repugnant to his office of Chief Executive, which includes the power to oversee prosecutions. In other words, just as a person cannot be judge in his own case, he cannot be prosecutor and defendant at the same time." *Id.* This contention "would lose some of its persuasiveness where, as in the *Watergate* case, the President delegates his prosecutorial functions to the Attorney General, who in turn delegates them [by regulation] to a Special Prosecutor." *Id.* At the same time, the status of the Watergate Special Prosecutor was somewhat uncertain, as "none of these delegations is, or legally can be, absolute or irrevocable." *Id.* The memorandum suggested, therefore, that even in the Watergate matter there remained the structural anomaly of the President serving as the chief executive and the defendant in a federal prosecution brought by the executive branch.[9]

The OLC memorandum also considered the degree to which a criminal prosecution of a sitting President is incompatible with the notion that the President possesses the power to assert executive privilege in criminal cases. The memorandum suggested that "the problem of Executive privilege may create the appearance of so serious a conflict of interest as to make it appear improper that the President should be a defendant in a criminal case." *Id.* "If the President claims the privilege he would be accused of suppressing evidence unfavorable to him. If he fails to do so the charge would be that by making available evidence favorable to him he is prejudicing the ability of future Presidents to claim privilege." *Id.* Ulti-

---

[9] This particular concern might also "lose some of its persuasiveness" with respect to a prosecution by an independent counsel appointed pursuant to the later-enacted Ethics in Government Act of 1978, 28 U.S.C §§ 49, 591 *et seq.*, whose status is defined by statute rather than by regulation. In *Morrison v. Olson,* 487 U S 654 (1988), the Supreme Court rejected the argument that the independent counsel's statutory protection from removal absent "good cause" or some condition substantially impairing the performance of his duties, *id.* at 663, violates the Appointments Clause, U.S Const art. II, § 2, cl. 2, or separation of powers principles more generally, 487 U S. at 685–96. But since the 1973 OLC memorandum did not place appreciable weight on this argument in determining a sitting President's amenability to criminal prosecution, and since we place no reliance on this argument at all in our reconsideration and reaffirmation of the 1973 memorandum's conclusion, *see infra* part IIB, we need not further explore *Morrison's* relevance to this argument

mately, however, the memorandum did not conclude that the identification of the possible incompatibility between the exercise of certain executive powers and the criminal prosecution of a sitting President sufficed to resolve the constitutional question whether a sitting President may be indicted or tried.

**b.**

The OLC memorandum then proceeded to the second part of its constitutional analysis, examining whether criminal proceedings against a sitting President should be barred by the doctrine of separation of powers because such proceedings would "unduly interfere in a direct or formal sense with the conduct of the Presidency." OLC Memo at 27. It was on this ground that the memorandum ultimately concluded that the indictment or criminal prosecution of a sitting President would be unconstitutional.

As an initial matter, the memorandum noted that in the *Burr* case, *see United States v. Burr*, 25 F. Cas. 187 (C.C. D. Va. 1807) (No. 14,694), President Jefferson claimed a privilege to be free from attending court in person. OLC Memo at 27. Moreover, "it is generally recognized that high government officials are excepted from the duty to attend court in person in order to testify," and "[t]his privilege would appear to be inconsistent with a criminal prosecution which necessarily requires the appearance of the defendant for pleas and trial, as a practical matter." *Id.* The memorandum noted, however, that the privilege against personal appearance was "only the general rule." *Id.* The memorandum then suggested that the existence of such a general privilege was not, by itself, determinative of the question whether a sitting President could be made a defendant in a criminal proceeding. "Because a defendant is already personally involved in a criminal case (if total immunity be laid aside), it may be questioned whether the normal privilege of high officials not to attend court in person applies to criminal proceedings in which the official is a defendant." *Id.*

Even though the OLC memorandum suggested that the existence of a general privilege against personal appearance was not determinative, the memorandum did conclude that the necessity of the defendant's appearance in a criminal trial was of great relevance in determining how the proper constitutional balance should be struck. By virtue of the necessity of the defendant's appearance, the institution of criminal proceedings against a sitting President "would interfere with the President's unique official duties, most of which cannot be performed by anyone else." *Id.* at 28. Moreover, "[d]uring the past century the duties of the Presidency . . . have become so onerous that a President may not be able fully to discharge the powers and duties of his office if he had to defend a criminal prosecution." *Id.* Finally, "under our constitutional plan as outlined in Article I, sec. 3, only the Congress by the formal process of impeachment, and not a court by any process should be accorded the power to interrupt the Presidency or oust an incumbent."

*Id*. The memorandum rejected the argument that such burdens should not be thought conclusive because even an impeachment proceeding that did not result in conviction might preclude a President from performing his constitutionally assigned duties in the course of defending against impeachment. In contrast to the risks that would attend a criminal proceeding against a sitting President, "this is a risk expressly contemplated by the Constitution, and is a necessary incident of the impeachment process." *Id*.

As a consequence of the personal attention that a defendant must, as a practical matter, give in defending against a criminal proceeding, the memorandum concluded that there were particular reasons rooted in separation of powers concerns that supported the recognition of an immunity for the President while in office. With respect to the physical disabilities alone imposed by criminal prosecution, "in view of the unique aspects of the Office of the President, criminal proceedings against a President in office should not go beyond a point where they could result in so serious a physical interference with the President's performance of his official duties that it would amount to an incapacitation." *Id*. at 29. To be sure, the concern that criminal proceedings would render a President physically incapable of performing constitutionally assigned functions would not be "quite as serious regarding minor offenses leading to a short trial and a fine." *Id*. But "in more serious matters, *i.e.*, those which could require the protracted personal involvement of the President in trial proceedings, the Presidency would be derailed if the President were tried prior to removal." *Id*.

The OLC memorandum also explained that the "non-physical yet practical interferences, in terms of capacity to govern" that would attend criminal proceedings against a sitting President must also be considered in the constitutional balance of competing institutional interests. *Id*. In this regard, the memorandum explained that "the President is the symbolic head of the Nation. To wound him by a criminal proceeding is to hamstring the operation of the whole governmental apparatus, both in foreign and domestic affairs." *Id*. at 30. In light of the conclusion that an adjudication of the President's criminal culpability would be uniquely destabilizing to an entire branch of government, the memorandum suggested that "special separation of powers based interests can be articulated with clarity" against permitting the ordinary criminal process to proceed. *Id*. at 25. By virtue of the impact that an adjudication of criminal culpability might have, a criminal proceeding against the President is, in some respects, necessarily political in a way that criminal proceedings against other civil officers would not be. In this respect, it would be "incongruous" for a "jury of twelve" to undertake the "unavoidably political" task of rendering judgment in a criminal proceeding against the President. *Id*. at 30. "Surely, the House and Senate, via impeachment, are more appropriate agencies for such a crucial task, made unavoidably political by the nature of the 'defendant.' " *Id*. The memorandum noted further that "[t]he genius of the jury trial" was to provide a forum for ordinary people to pass on

"matters generally within the experience or contemplation of ordinary, everyday life." *Id.* at 31. The memorandum therefore asked whether it would "be fair to such an agency to give it responsibility for an unavoidably political judgment in the esoteric realm of the Nation's top Executive." *Id.*

In accord with this conclusion about the propriety of leaving such matters to the impeachment process, the memorandum noted that "[u]nder our developed constitutional order, the presidential election is the only national election, and there is no effective substitute for it." *Id.* at 32. A criminal trial of a sitting President, however, would confer upon a jury of twelve the power, in effect, to overturn this national election. "The decision to terminate this mandate . . . is more fittingly handled by the Congress than by a jury, and such congressional power is founded in the Constitution." *Id.* In addition, the impeachment process is better suited to the task than is a criminal proceeding because appeals from a criminal trial could "drag out for months." *Id.* at 31. By contrast, "[t]he whole country is represented at the [impeachment] trial, there is no appeal from the verdict, and removal opens the way for placing the political system on a new and more healthy foundation." *Id.*

4.

The OLC memorandum concluded its analysis by addressing "[a] possibility not yet mentioned," which would be "to indict a sitting President but defer further proceedings until he is no longer in office." OLC Memo at 29. The memorandum stated that "[f]rom the standpoint of minimizing direct interruption of official duties — and setting aside the question of the power to govern — this procedure might be a course to be considered." *Id.* The memorandum suggested, however, that "an indictment hanging over the President while he remains in office would damage the institution of the Presidency virtually to the same extent as an actual conviction." *Id.* In addition, there would be damage to the executive branch "flowing from unrefuted charges." *Id.* Noting that "the modern Presidency, under whatever party, has had to assume a leadership role undreamed of in the eighteenth and early nineteenth centuries," the memorandum stated that "[t]he spectacle of an indicted President still trying to serve as Chief Executive boggles the imagination." *Id.* at 30.

The memorandum acknowledged that, "it is arguable that . . . it would be possible to indict a President, but defer trial until he was out of office, without in the meantime unduly impeding the power to govern, and the symbolism on which so much of his real authority rest." *Id.* at 31. But the memorandum nevertheless concluded that

> [g]iven the realities of modern politics and mass media, and the
> delicacy of the political relationships which surround the Presidency

> both foreign and domestic, there would be a Russian roulette aspect
> to the course of indicting the President but postponing trial, hoping
> in the meantime that the power to govern could survive.

*Id.* In light of the effect that an indictment would have on the operations of the executive branch, "an impeachment proceeding is the only appropriate way to deal with a President while in office." *Id.* at 32.

In reaching this conclusion regarding indictment, the memorandum noted that there are "certain drawbacks," such as the possibility that the statute of limitations might run, thereby resulting in "a complete hiatus in criminal liability." *Id.* As the statute of limitations is ultimately within the control of Congress, however, the memorandum's analysis concluded as follows: "We doubt . . . that this gap in the law is sufficient to overcome the arguments against subjecting a President to indictment and criminal trial while in office." *Id.*

### B.

On October 5, 1973, less than two weeks after OLC issued its memorandum, Solicitor General Robert Bork filed a brief in the United States District Court for the District of Maryland that addressed the question whether it would be constitutional to indict or criminally try a sitting President. Then-Vice President Agnew had moved to enjoin, principally on constitutional grounds, grand jury proceeding against him. *See* SG Brief at 3. In response to this motion, Solicitor General Bork provided the court with a brief that set forth "considerations based upon the Constitution's text, history, and rationale which indicate that all civil officers of the United States other than the President are amenable to the federal criminal process either before or after the conclusion of impeachment proceedings." *Id.*[10]

### 1.

As had the OLC memorandum, the Solicitor General's brief began by noting that "[t]he Constitution provides no explicit immunity from criminal sanctions for any civil officer." SG Brief at 4. Indeed, the brief noted that the only textual grant of immunity for federal officials appears in the Arrest and Speech or Debate Clauses of Article I, Section 6. In referring to these clauses, the brief rejected the suggestion that the immunities set forth there could be understood to be a partial withdrawal from members of Congress of a broader implicit immunity that all civil officers, including the President, generally enjoyed; indeed, "[t]he intent

---

[10] Unlike the OLC memorandum, the Solicitor General's brief did not specifically distinguish between indictment and other phases of the "criminal process." While explaining that "the President is immune from indictment and trial prior to removal from office," SG Brief at 20, the brief did not specifically opine as to whether the President could be indicted as long as further process was postponed until he left office.

of the Framers was to the contrary." SG Brief at 5.[11] In light of the textual omission of any express grant of immunity from criminal process for civil officers generally, "it would require a compelling constitutional argument to erect such an immunity for a Vice President." *Id.*

In considering whether such a compelling argument could be advanced, the brief distinguished the case of the President from that of the Vice President. Although the Vice President had suggested that the Impeachment Judgment Clause itself demonstrated that "impeachment must precede indictment" for all civil officers, the records of the debates of the constitutional convention did not support that conclusion. *Id.* The Solicitor General argued, in accord with the OLC memorandum, that the "principal operative effect" of the Impeachment Judgment Clause "is solely the preclusion of pleas of double jeopardy in criminal prosecutions following convictions upon impeachments." *Id.* at 7. In any event, the discussion of the Impeachment Judgment Clause in the convention focused almost exclusively on the Office of the President, and "the Framers did not debate the question whether impeachment generally must precede indictment." *Id.* at 6.

To the extent that the convention did debate the timing of impeachment relative to indictment, the brief explained, the convention records "show that the Framers contemplated that this sequence should be mandatory only as to the President." *Id.* Moreover, the remarks contained in those records "strongly suggest an understanding that the President, as Chief Executive, would not be subject to the ordinary criminal process." *Id.* The Framers' "assumption that the President would not be subject to criminal process" did not, however, rest on a general principle applicable to all civil officers. *Id.* Instead, the assumption was "based upon the crucial nature of his executive powers." *Id.* As the brief stated:

> The President's immunity rests not only upon the matters just discussed but also upon his unique constitutional position and powers . . . . There are substantial reasons, embedded not only in the constitutional framework but in the exigencies of government, for distinguishing in this regard between the President and all lesser officers including the Vice President.

*Id.* at 7.

## 2.

In explaining why, as an initial matter, the Vice President could be indicted and tried while still in office, the brief argued that indictment would not effect the de facto removal of that officer. SG Brief at 11. "[I]t is clear from history

[11] In this respect, the Solicitor General's brief more forcefully rejected this suggestion than did the OLC memorandum, which reasoned that the clauses gave rise "with equal validity" to competing inferences on this point *See* OLC Memo at 18

that a criminal indictment, or even trial and conviction, does not, standing alone, effect the removal of an impeachable federal officer." *Id.* at 11–12. The brief noted the past constitutional practice of indicting and even convicting federal judges during their tenure, as well as the fact that Vice President Aaron Burr "was subject to simultaneous indictment in two states while in office, yet he continued to exercise his constitutional responsibilities until the expiration of his term." *Id.* at 12. "Apparently, neither Burr nor his contemporaries considered him constitutionally immune from indictment. Although counsel for the Vice President asserted that Burr's indictments were 'allowed to die,' that was merely because 'Burr thought it best not to visit either New York or New Jersey.' " *Id.* at 12 n* (citations omitted). The brief therefore determined that "[c]ertainly it is clear that criminal indictment, trial, and even conviction of a Vice President would not, *ipso facto*, cause his removal; subjection of a Vice President to the criminal process therefore does not violate the exclusivity of the impeachment power as the means of his removal from office." *Id.* at 13.

The brief did conclude, however, that the "structure of the Constitution" precluded the indictment of the President. *Id.* at 15. In framing the inquiry into whether considerations of constitutional structure supported the recognition of an immunity from criminal process for certain civil officers, the brief explained that the "Constitution is an intensely practical document and judicial derivation of powers and immunities is necessarily based upon consideration of the document's structure and of the practical results of alternative interpretations." *Id.* As a consequence,

> [t]he real question underlying the issue of whether indictment of any particular civil officer can precede conviction upon impeachment — and it is constitutional in every sense because it goes to the heart of the operation of government — is whether a governmental function would be seriously impaired if a particular civil officer were liable to indictment before being tried on impeachment.

*Id.* at 15–16. Given that the constitutional basis for the recognition of a civil officer's immunity from criminal process turned on the resolution of this question, the answer "must necessarily vary with the nature and functions of the office involved." *Id.* at 16.

The brief then proceeded to consider the consequences that criminal prosecutions would have on the performance of the constitutional functions that are the responsibility of various civil officers. As a matter of constitutional structure, Article III judges should enjoy no constitutional immunity from the criminal process because while a "judge may be hampered in the performance of his duty when he is on trial for a felony . . . his personal incapacity in no way threatens the ability of the judicial branch to continue to function effectively." *Id.* at 16.

Similarly, no such immunity should be recognized for members of Congress. The limited immunity in the Arrest and Speech or Debate Clauses reflected

> a recognition that, although the functions of the legislature are not lightly to be interfered with, the public interest in the expeditious and even-handed administration of the criminal law outweighs the cost imposed by the incapacity of a single legislator. Such incapacity does not seriously impair the functioning of Congress.

*Id.* at 16–17.

The brief argued that the same structural considerations that counseled against the recognition of an immunity from criminal process for individual judges or legislators also counseled against the recognition of such an immunity for the Vice President:

> Although the office of the Vice Presidency is of course a high one, it is not indispensable to the orderly operation of government. There have been many occasions in our history when the nation lacked a Vice President, and yet suffered no ill consequences. And, as has been discussed above, at least one Vice President successfully fulfilled the responsibilities of his office while under indictment in two states.

*Id.* at 18 (citation omitted). The brief noted that the Vice President had only three constitutional functions: to replace the President in certain extraordinary circumstances; to make, in certain extraordinary circumstances, a written declaration of the President's inability to discharge the powers and duties of his office; and to preside over the Senate and cast the deciding vote in the case of a tie in that body. *Id.* at 19. None of these "constitutional functions is substantially impaired by [the Vice President's] liability to the criminal process." *Id.*

3.

The Solicitor General's brief explained that recognition of presidential immunity from criminal process, in contrast to the vice presidential immunity, was compelled by a consideration of the constitutional structure. After noting that "[a]lmost all legal commentators agree . . . that an incumbent President must be removed from office through conviction upon an impeachment before being subject to the criminal process," SG Brief at 17, the brief repeated its determination that the Framers assumed "that the nation's Chief Executive, responsible as no other single officer is for the affairs of the United States, would not be taken from duties that only he can perform unless and until it is determined that he

is to be shorn of those duties by the Senate." *Id.* A proper understanding of the constitutional structure reflects this shared assumption; in this regard it is "noteworthy that the President is the only officer of government for whose temporary disability the Constitution provides procedure to qualify a replacement." *Id.* at 18. This provision constituted a textual recognition "that the President is the only officer of government for whose temporary disability while in office incapacitates an entire branch of government." *Id.*

Finally, the brief noted that the conclusion that the Framers assumed that the President would enjoy an immunity from criminal process was supported by other considerations of constitutional structure beyond the serious interference with the capacity of the executive branch to perform its constitutional functions. The "Framers could not have contemplated prosecution of an incumbent President because they vested in him complete power over the execution of the laws, which includes, of course, the power to control prosecutions." *Id.* at 20.

C.

The foregoing review demonstrates that, in 1973, the Department applied a consistent approach in analyzing the constitutional question whether a sitting President may be subject to indictment and criminal prosecution. Both the OLC memorandum and the Solicitor General's brief recognized that the President is not above the law, and that he is ultimately accountable for his misconduct that occurs before, during, and after his service to the country. Each also recognized, however, that the President occupies a unique position within our constitutional order.

The Department concluded that neither the text nor the history of the Constitution ultimately provided dispositive guidance in determining whether a President is amenable to indictment or criminal prosecution while in office. It therefore based its analysis on more general considerations of constitutional structure. Because of the unique duties and demands of the Presidency, the Department concluded, a President cannot be called upon to answer the demands of another branch of the government in the same manner as can all other individuals. The OLC memorandum in particular concluded that the ordinary workings of the criminal process would impose burdens upon a sitting President that would directly and substantially impede the executive branch from performing its constitutionally assigned functions, and the accusation or adjudication of the criminal culpability of the nation's chief executive by either a grand jury returning an indictment or a petit jury returning a verdict would have a dramatically destabilizing effect upon the ability of a coordinate branch of government to function. The Department therefore concluded in both the OLC memorandum and the Solicitor General's brief that, while civil officers generally may be indicted and criminally prosecuted during their tenure in office, the constitutional structure permits a sitting President

to be subject to criminal process only after he leaves office or is removed therefrom through the impeachment process.

## II.

Since the Department set forth its constitutional analysis in 1973, the Supreme Court has decided three cases that are relevant to whether a sitting President may be subject to indictment or criminal prosecution.[12] *United States v. Nixon*, 418 U.S. 683 (1974), addressed whether the President may assert a claim of executive privilege in response to a subpoena in a criminal case that seeks records of communications between the President and his advisors. *Nixon v. Fitzgerald*, 457 U.S. 731 (1982), and *Clinton v. Jones*, 520 U.S. 681 (1997), both addressed the extent to which the President enjoys a constitutional immunity from defending against certain types of civil litigation, with *Fitzgerald* focusing on official misconduct and *Jones* focusing primarily on misconduct "unrelated to any of his official duties as President of the United States and, indeed, occurr[ing] before he was elected to that office." *Id.* at 686.[13]

None of these cases directly addresses the questions whether a sitting President may be indicted, prosecuted, or imprisoned.[14] We would therefore hesitate before

---

[12] We do not consider either *Nixon v Administrator of General Services*, 433 U S. 425 (1977), or *Morrison v. Olson*, 487 U.S 654 (1988), to be directly relevant to this question, and thus we do not discuss either of them extensively. *Nixon v Administrator of General Services* involved a suit brought by former President Nixon to enjoin enforcement of a federal statute taking custody of and regulating access to his Presidential papers and various tape recordings, in part on the ground that the statute violated the separation of powers While the case did analyze the separation of powers claim under a balancing test of the sort we embrace here, *see infra* text accompanying note 17, the holding and reasoning do not shed appreciable light on the question before us

*Morrison v Olson* considered and rejected various separation of powers challenges to the independent counsel provisions of the Ethics in Government Act of 1978, which authorized a court-appointed independent counsel to investigate and prosecute the President and certain other high-ranking executive branch officials for violations of federal criminal laws *Morrison* focused on whether a particular *type* of prosecutor could pursue criminal investigations and prosecutions of executive branch officials, in a case involving the criminal investigation of an inferior federal officer The Court accordingly had no occasion to and did not consider whether the Act could constitutionally be invoked to support an independent counsel's indictment of a sitting President.

[13] The Court noted that Jones's state law claim for defamation based on statements by "various persons authorized to speak for the President," 520 U S. at 685, "arguably may involve conduct within the outer perimeter of the President's official responsibilities" *Id.* at 686 For purposes of this memorandum, we use the phrase "unofficial conduct," as did the Court, *see id.* at 693, to refer to conduct unrelated to the President's official duties. *Compare Nixon v. Fitzgerald*, 457 U S. at 756 (recognizing "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility").

[14] *See United States v. Nixon*, 418 U S. at 687 n 2 (expressly reserving the question whether the President can constitutionally be named an unindicted co-conspirator). *See also Jones v. Clinton*, 36 F Supp 2d 1118, 1134 n.22 (E D Ark 1999) ("[T]he question of whether a President can be held in criminal contempt of court and subjected to criminal penalties raises constitutional issues not addressed by the Supreme Court in the *Jones* case.") As a matter of constitutional practice, it remains the case today that no President has ever so much as testified, or been ordered to testify, in open court, let alone been subject to criminal proceedings as a defendant. *Clinton v. Jones*, 520 U.S at 692 n 14.

In the reply brief for the United States in *United States v Nixon*, in response to President Nixon's argument that a sitting President was constitutionally immune from indictment and therefore immune from being named an unindicted co-conspirator by a grand jury, Watergate Special Prosecutor Leon Jaworski argued that it was not settled as a matter of constitutional law whether a sitting President could be subject to indictment. *See* Reply Brief for the United States, *United States v. Nixon*, 418 U S. 683 (1974) (No 73–1766). He therefore argued that the Court
Continued

concluding that judicial statements made in the context of these distinct constitutional disputes would suffice to undermine the Department's previous resolution of the precise constitutional question addressed here. In any event, however, we conclude that these precedents are largely consistent with the Department's 1973 determinations that (1) the proper doctrinal analysis requires a balancing between the responsibilities of the President as the sole head of the executive branch against the important governmental purposes supporting the indictment and criminal prosecution of a sitting President; and (2) the proper balance supports recognition of a temporary immunity from such criminal process while the President remains in office. Indeed, *United States v. Nixon* and *Nixon v. Fitzgerald* recognized and embraced the same type of constitutional balancing test anticipated in this Office's 1973 memorandum. *Clinton v. Jones*, which held that the President is not immune from at least certain judicial proceedings while in office, even if those proceedings may prove somewhat burdensome, does not change our conclusion in 1973 and again today that a sitting President cannot constitutionally be indicted or tried.

### A.

### 1.

In *United States v. Nixon*, the Court considered a motion by President Nixon to quash a third-party subpoena duces tecum directing the President to produce certain tape recordings and documents concerning his conversations with aides and advisers. 418 U.S. at 686. The Court concluded that the subpoena, which had been issued upon motion by the Watergate Special Prosecutor in connection

---

should not rely on the assumption that a sitting President is immune from indictment in resolving the distinct question whether the President could be named an unindicted co-conspirator In so arguing, the Special Prosecutor rejected the President's contention that either the historical evidence of the intent of the Framers or the plain terms of the Impeachment Judgment Clause foreclosed the indictment of a sitting President as a constitutional matter *See id.* at 24 ("nothing in the text of the Constitution or in its history    . imposes any bar to indictment of an incumbent President"), *id* at 29 ("[T]he simple fact is that the Framers never confronted the issue at all ") The Special Prosecutor then argued, as the Department itself had concluded, that "[p]rimary support for such a prohibition must be found, if at all, in considerations of constitutional and public policy including competing factors such as the nature and role of the Presidency in our constitutional system, the importance of the administration of criminal justice, and the principle that under our system no person, no matter what his station, is above the law." *Id.* at 24–25. The Special Prosecutor explained that the contention that the President should be immune from indictment because the functioning of the executive branch depends upon a President unburdened by defending against criminal charges "is a weighty argument and it is entitled to great respect." *Id.* at 31. He noted, however, that "our constitutional system has shown itself to be remarkably resilient" and that "there are very serious implications to the President's position that he has absolute immunity from criminal indictment." *Id* at 32 In particular, the Special Prosecutor argued that to the extent some criminal offenses are not impeachable, the recognition of an absolute immunity from indictment would mean that "the Constitution has left a *lacuna* of potentially serious dimensions " *Id.* at 34. The Special Prosecutor ultimately concluded that "[w]hether these factors compel a conclusion that as a matter of constitutional interpretation a sitting President cannot be indicted for violations of federal criminal laws is an issue about which, at best, there is presently considerable doubt." *Id.* at 25. He explained further that the resolution of this question was not necessary to the decision in *Nixon*, because the Court confronted only the question whether the President could be named an unindicted co-conspirator—an event that "cannot be regarded as equally burdensome." *Id* at 20.

with the criminal prosecution of persons other than the President, satisfied the standards of Rule 17(c) of Federal Rules of Criminal Procedure.[15] The Court therefore proceeded to consider the claim "that the subpoena should be quashed because it demands 'confidential conversations between a President and his close advisors that it would be inconsistent with the public interest to produce.'" *Id.* at 703 (citation omitted).

In assessing the President's constitutional claim of privilege, the Court first considered the relevant evidence of the Framers' intent and found that it supported the President's assertion of a constitutional interest in confidentiality. *Id.* at 705 n.15. The Court also rejected the suggestion that the textual omission of a presidential privilege akin to the congressional privilege set forth in the Arrest and Speech or Debate Clauses was "dispositive" of the President's claim. *Id.* at 705 n.16. Considering the privilege claim in light of the constitutional structure as a whole, the Court concluded that,

> [w]hatever the nature of the privilege of confidentiality of Presidential communications in the exercise of Art. II powers, the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties. Certain powers and privileges flow from the nature of enumerated powers; the protection of the confidentiality of Presidential communications has similar constitutional underpinnings.

*Id.* at 705–06 (footnote omitted). Such a privilege must be recognized, the Court said, in light of "the importance of . . . confidentiality of Presidential communications in performance of the President's responsibilities." *Id.* at 711. The interest in the confidentiality of Presidential communications was "weighty indeed and entitled to great respect." *Id.* at 712.

The Court next considered the extent to which that interest would be impaired by presidential compliance with a subpoena. The Court concluded that it was quite unlikely that the failure to recognize an absolute privilege for confidential presidential communications against criminal trial subpoenas would, in practical consequence, undermine the constitutional interest in the confidentiality of such communications. "[W]e cannot conclude that advisers will be moved to temper

---

[15] In response to an earlier subpoena, President Nixon had asserted that, as a constitutional matter, he was absolutely immune from judicial process while in office. The United States Court of Appeals for the District of Columbia Circuit rejected that contention. *See Nixon v. Sirica*, 487 F.2d 700 (D.C. Cir. 1973). The D.C. Circuit explained that the President's constitutional position could not be maintained in light of *United States v. Burr*, 25 F. Cas. 187 (C.C.D. Va. 1807) (No. 14,694), and it rejected the contention that the Supreme Court's decision in *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1866), was to the contrary. 487 F.2d at 708–12. We note that the Department's 1973 analysis did not depend upon a broad contention that the President is immune from all judicial process while in office. Indeed, the OLC memorandum specifically cast doubt upon such a contention and explained that even Attorney General Stanbery had not made such a broad argument in *Mississippi v. Johnson. See* OLC Memo at 23 ("Attorney General Stanbery's reasoning is presumably limited to the power of the courts to review official action of the President.")

239

the candor of their remarks by the infrequent occasions of disclosure because of the possibility that such conversations will be called for in the context of a criminal prosecution." *Id.* Finally, the Court balanced against the President's interest in maintaining the confidentiality of his communications "[t]he impediment that an absolute, unqualified privilege would place in the way of the primary constitutional duty of the Judicial Branch to do justice in criminal prosecutions." *Id.* at 707. The Court predicated its conclusion on the determination that "[t]he need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts." *Id.* at 709.

The assessment of these competing interests led the Court to conclude that "the legitimate needs of the judicial process may outweigh Presidential privilege," *id.* at 707, and it therefore determined that it was "necessary to resolve those competing interests in a manner that preserves the essential functions of each branch." *Id.* Here, the Court weighed the President's constitutional interest in confidentiality, *see id.* at 707–08, against the nation's "historic commitment to the rule of law," *id.* at 708, and the requirement of "the fair administration of criminal justice." *Id.* at 713. The Court ultimately concluded that the President's generalized interest in confidentiality did not suffice to justify a privilege from all criminal subpoenas, although it noted that a different analysis might apply to a privilege based on national security interests. *Id.* at 706.

2.

In *Nixon v. Fitzgerald*, the Supreme Court considered a claim by former President Nixon that he enjoyed an absolute immunity from a former government employee's suit for damages for President Nixon's allegedly unlawful official conduct while in office. The Court endorsed a rule of absolute immunity, concluding that such immunity is "a functionally mandated incident of the President's unique office, rooted in the constitutional tradition of the separation of powers and supported by our history." 457 U.S. at 749.

The Court reviewed various statements by the Framers and early commentators, finding them consistent with the conclusion that the Constitution was adopted on the assumption that the President would enjoy an immunity from damages liability for his official actions. *Id.* at 749, 751 n.31. The Court once again rejected the contention that the textual grant of a privilege to members of Congress in Article I, Section 6 precluded the recognition of an implicit privilege on behalf of the President. *See id.* at 750 n.31.

But as in *United States v. Nixon*, the Court found that "the most compelling arguments arise from the Constitution's separation of powers and the Judiciary's historic understanding of that doctrine," *Id.* at 752 n.31. It emphasized that "[t]he

*A Sitting President's Amenability to Indictment and Criminal Prosecution*

President occupies a unique position in the constitutional scheme . . . as the chief constitutional officer of the Executive Branch." *Id.* at 749–50. Although other government officials enjoy only qualified immunity from civil liability for their official actions, "[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government." *Id.* at 751. Such lawsuits would be likely to occur in considerable numbers since the "President must concern himself with matters likely to 'arouse the most intense feelings.'" *Id.* at 752. Yet, the Court noted, "it is in precisely such cases that there exists the greatest public interest in providing an official 'the maximum ability to deal fearlessly and impartially' with the duties of his office." *Id.* (citations omitted). The Court emphasized that the "visibility" of the President's office would make him "an easily identifiable target for suits for civil damages," and that "[c]ognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* at 753.

The Court next examined whether the constitutional interest in presidential immunity from civil damages arising from the performance of official duties was outweighed by the governmental interest in providing a forum for the resolution of damages actions generally, and actions challenging the legality of official presidential conduct in particular. The Court concluded that it was appropriate to consider the "President's constitutional responsibilities and status as factors counseling judicial deference and restraint." *Id.* at 753. As the Court explained,

> [i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States. But our cases also have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch.

*Id.* at 753–54 (citations omitted). In performing this balancing, the Court noted that recognition of a presidential immunity from such suits "will not leave the Nation without sufficient protection against misconduct on the part of the Chief Executive," in light of other mechanisms creating "incentives to avoid misconduct" (including impeachment). *Id.* at 757. The Court concluded that the constitutional interest in ensuring the President's ability to perform his constitutional functions outweighed the competing interest in permitting civil actions for unlawful official conduct to proceed.

### 3.

In *Clinton v. Jones*, the Court declined to extend the immunity recognized in *Fitzgerald* to civil suits challenging the legality of a President's unofficial conduct. In that case, the plaintiff sought to recover compensatory and punitive damages for alleged misconduct by President Clinton occurring before he took federal office. The district court denied the President's motion to dismiss based on a constitutional claim of temporary immunity and held that discovery should go forward, but granted a stay of the trial until after the President left office. The court of appeals vacated the order staying the trial, while affirming the denial of the immunity-based motion to dismiss. The Supreme Court affirmed, permitting the civil proceedings to go forward against the President while he still held office.

In considering the President's claim of a temporary immunity from suit, the Court first distinguished *Nixon v. Fitzgerald*, maintaining that "[t]he principal rationale for affording certain public servants immunity from suits for money damages arising out of their official acts is inapplicable to unofficial conduct." *Clinton v. Jones*, 520 U.S. at 692–93. The point of immunity for official conduct, the Court explained, is to "enabl[e] such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability." *Id.* at 693. But "[t]his reasoning provides no support for an immunity for *unofficial* conduct." *Id.* at 694. Acknowledging *Fitzgerald*'s additional concern that " '[b]ecause of the singular importance of the President's duties, diversion of his energies by concern with private lawsuits would raise unique risks to the effective functioning of government,' " the Court treated this prior statement as dictum because "[i]n context . . . it is clear that our dominant concern" had been the chilling effect that liability for official conduct would impose on the President's performance of his official duties. *Id.* at 694 n.19 (quoting *Nixon v. Fitzgerald*, 457 U.S. at 751).

After determining that the historical evidence of the Framers' understanding of presidential immunity was either ambiguous or conflicting and thus could not by itself support the extension of presidential immunity to unofficial conduct, *see id.* at 695–97, the Court considered the President's argument that the "text and structure" of the Constitution supported his claim to a temporary immunity. The Court accepted his contention that "the doctrine of separation of powers places limits on the authority of the Federal Judiciary to interfere with the Executive Branch," *id.* at 697–98, and conceded that the powers and obligations conferred upon a single President suggest that he occupies a " 'unique position in the constitutional scheme.' " *Id.* at 698 (quoting *Nixon v. Fitzgerald*, 457 U.S. at 749). But "[i]t does not follow . . . that separation-of-powers principles would be violated by allowing this action to proceed." *Id.* at 699.

Rather than claiming that allowing the civil suit would either aggrandize judicial power or narrow any constitutionally defined executive powers, the President

argued that, as an inevitable result of the litigation, "burdens will be placed on the President that will hamper the performance of his official duties," *id.* at 701, both in the *Jones* case and others that might follow. The Court first rejected the factual premise of the President's claim, asserting that the President's "predictive judgment finds little support in either history or the relatively narrow compass of the issues raised in this particular case." *Id.* at 702. "As for the case at hand," the Court continued, "if properly managed by the District Court, it appears to us highly unlikely to occupy any substantial amount of petitioner's time." *Id.* The Court emphasized at the outset that it was not "confront[ing] the question whether a court may compel the attendance of the President at any specific time or place," *id.* at 691, and it "assume[d] that the testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that will accommodate his busy schedule, and that, if a trial is held, there would be no necessity for the President to attend in person." *Id.* at 691–92.

Moreover, the Court explained, "even quite burdensome interactions" between the judicial and executive branches do not "necessarily rise to the level of constitutionally forbidden impairment of the Executive's ability to perform its constitutionally mandated functions." *Id.*; *see also id.* at 703 ("that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the Chief Executive is not sufficient to establish a violation of the Constitution"). Noting that courts frequently adjudicate civil suits challenging the legality of official presidential actions, the Court also observed that courts occasionally have ordered Presidents to provide testimony and documents or other materials. *Id.* at 703–05 (citing *United States v. Nixon* as an example). By comparison, the Court asserted, "[t]he burden on the President's time and energy that is a mere byproduct of [the power to determine the legality of his unofficial conduct through civil litigation] surely cannot be considered as onerous as the direct burden imposed by judicial review and the occasional invalidation of his official actions." *Id.* at 705.

Finally, the Court agreed with the court of appeals that the district court abused its discretion by invoking its equitable powers to defer any trial until after the President left office, even while allowing discovery to continue apace. The Court observed that such a "lengthy and categorical stay takes no account whatever of the respondent's interest in bringing the case to trial," *id.* at 707, in particular the concern that delay "would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party." *Id.* at 707–08. On the other hand, continued the Court, assuming careful trial management, "there is no reason to assume that the district courts will be either unable to accommodate the President's [scheduling] needs or unfaithful to the tradition — especially in matters involving national security — of giving 'the utmost deference to Presidential responsibilities.'" *Id.* at 709 (quoting *United States v. Nixon*, 418 U.S. at 710–11). On this

basis, the Court determined that a stay of any trial pending the President's leaving office was not supported by equitable principles.[16]

## B.

We believe that these precedents, *United States v. Nixon*, *Nixon v. Fitzgerald*, and *Clinton v. Jones*, are consistent with the Department's analysis and conclusion in 1973. The cases embrace the methodology, applied in the OLC memorandum, of constitutional balancing. That is, they balance the constitutional interests underlying a claim of presidential immunity against the governmental interests in rejecting that immunity. And, notwithstanding *Clinton*'s conclusion that *civil* litigation regarding the President's unofficial conduct would not unduly interfere with his ability to perform his constitutionally assigned functions, we believe that *Clinton* and the other cases do not undermine our earlier conclusion that the burdens of *criminal* litigation would be so intrusive as to violate the separation of powers.

### 1.

The balancing analysis relied on in the 1973 OLC memorandum has since been adopted as the appropriate mode of analysis by the Court. In 1996, this Office summarized the principles of analysis for resolving separation of powers issues found in the Court's recent cases. *See The Constitutional Separation of Powers Between the President and Congress*, 20 Op. O.L.C. 124, 133–35 (1996). As noted there, " 'the proper inquiry focuses on the extent to which [a challenged act] pre-

---

[16] One final recent precedent merits brief mention. the federal district court's decision to hold President Clinton in civil contempt for statements made in the course of a deposition taken in the *Jones* case and to order him to pay expenses (including attorneys' fees) to the plaintiff and costs to the court. *See Jones v. Clinton*, 36 F Supp 2d 1118 (E.D. Ark 1999) This decision was not appealed, and for purposes of our analysis here we assume arguendo that it is correct But a court order citing a sitting President for civil contempt does not support the proposition that a sitting President can be subject even to criminal contempt sanctions, let alone indictment and criminal prosecution. Civil contempt differs from criminal contempt because the former is designed to ensure compliance with court orders or to remedy harms inflicted upon another litigant, while criminal contempt is intended to punish the commission of a public wrong *See United Mine Workers v Bagwell*, 512 U.S 821, 826–30 (1994) A civil contempt proceeding is thus not likely to be either as consuming of the defendant's time or as detrimental to the defendant's public standing as a criminal contempt proceeding; that is particularly true when the civil contempt sanction takes the form of an award of costs to the court or other litigant. Significantly, the district court that imposed the contempt citation emphasized the narrow scope of its decision. *See Jones*, 36 F Supp. 2d at 1125 (explaining that "the Court recognizes that significant constitutional issues could arise were this Court to impose sanctions against the President that impaired his decision-making or otherwise impaired him in the performance of his official duties," and emphasizing that "[n]o such sanction will be imposed") The court further noted that, while "the power [upheld by the Supreme Court in *Clinton v. Jones*] to determine the legality of the President's unofficial conduct includes with it the power to issue civil contempt citations and impose sanctions for his unofficial conduct which abuses the judicial process," *id*, the Supreme Court's decision did not imply the existence of any authority to impose criminal sanctions on the President, *id.* at 1134 n.22 ("the question of whether a President can be held in criminal contempt of court and subjected to criminal penalties raises constitutional issues not addressed by the Supreme Court in the *Jones* case") For these reasons, this district court decision does not affect our analysis of the soundness of the Department's 1973 conclusion that it would be unconstitutional to indict or prosecute a President while he remains in office

vents the Executive Branch from accomplishing its constitutionally assigned functions.' " *Id.* at 133 (quoting *Administrator of General Services*, 433 U.S. at 443). The inquiry is complex, because even where the acts of another branch would interfere with the executive's "accomplishing its functions," this "would not lead inexorably to" invalidation; rather, the Court "would proceed to 'determine whether that impact is justified by an overriding need to promote' " legitimate governmental objectives. *Id.* (quoting *Administrator of General Services*, 433 U.S. at 443).

These inquiries formed the basis for the Court's analysis in *United States v. Nixon*, where the Court employed a balancing test to preserve the opposing interests of the executive and judicial branches with respect to the President's claim of privilege over confidential communications. The Court's resort to a balancing test was quite explicit. *See e.g.*, 418 U.S. at 711–12 ("In this case we must weigh the importance of the general privilege of confidentiality of Presidential communications in the performance of the President's responsibilities against the inroads of such a privilege on the fair administration of criminal justice."). In *Nixon v. Fitzgerald*, the Court's recognition of an absolute presidential immunity from civil suits for damages concerning official conduct also reflected a balance of competing interests. As the Court explained, "[i]t is settled law that the separation-of-powers doctrine does not bar every exercise of jurisdiction over the President of the United States. But our cases also have established that a court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." 457 U.S. at 753–54. And in *Clinton v. Jones*, the Court again acknowledged that " '[e]ven when a branch does not arrogate power to itself . . . the separation-of-powers doctrine requires that a branch not impair another in the performance of its constitutional duties.' " 520 U.S. at 701 (quoting *Loving v. United States*, 517 U.S. 748, 757 (1996)).[17]

We now explain why, in light of the post-1973 cases, we agree with the 1973 conclusions that indicting and prosecuting a sitting President would "prevent the executive from accomplishing its constitutional functions" and that this impact cannot "be justified by an overriding need" to promote countervailing and legitimate government objectives.

---

[17] Although the Court in *Clinton v Jones* did not explicitly use the language of "balancing" to weigh the President's interests against those of the civil litigant, the Court did assess both what it saw as the rather minor disruption to the President's office from defending against such civil actions as well as the interests in the private litigant in avoiding delay in adjudication *See id.* at 707–08 In any event, the Court may not have explicitly invoked the second part of the analysis (weighing the intrusions on the executive branch against the legitimate governmental interests opposed to immunity), because it found the burdens of civil litigation insufficiently weighty to warrant an extended inquiry. *See Administrator of General Services*, 433 U S at 443 (emphasis added) (explaining that when there is a potential for disruption of presidential authority, "the proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions     *Only where the potential for disruption is present* must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress." ), *cited with approval in Clinton v Jones*, 520 U.S. at 701

2.

Three types of burdens merit consideration: (a) the actual imposition of a criminal sentence of incarceration, which would make it physically impossible for the President to carry out his duties; (b) the public stigma and opprobrium occasioned by the initiation of criminal proceedings, which could compromise the President's ability to fulfill his constitutionally contemplated leadership role with respect to foreign and domestic affairs; and (c) the mental and physical burdens of assisting in the preparation of a defense for the various stages of the criminal proceedings, which might severely hamper the President's performance of his official duties. In assessing the significance of these burdens, two features of our constitutional system must be kept in mind.

First, the Constitution specifies a mechanism for accusing a sitting President of wrongdoing and removing him from office. *See* U.S. Const. art. II, § 4 (providing for impeachment by the House, and removal from office upon conviction in the Senate, of sitting Presidents found guilty of "Treason, Bribery or other high Crimes and Misdemeanors"). While the impeachment process might also, of course, hinder the President's performance of his duties, the process may be initiated and maintained only by politically accountable legislative officials. Supplementing this constitutionally prescribed process by permitting the indictment and criminal prosecution of a sitting president would place into the hands of a single prosecutor and grand jury the practical power to interfere with the ability of a popularly elected President to carry out his constitutional functions.

Second, "[t]he President occupies a unique position in the constitutional scheme." *Fitzgerald*, 457 U.S. at 749. As the court explained, "Article II, § 1 of the Constitution provides that '[t]he executive Power shall be vested in a President of the United States . . . .' This grant of authority establishes the President as the chief constitutional officer of the Executive branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id.* at 749–50. In addition to the grant of executive power, other provisions of Article II make clear the broad scope and important nature of the powers entrusted to the President. The President is charged to "take Care that the Laws be faithfully executed." *See* U.S. Const. art. II, § 3. He and the Vice President are the only officials elected by the entire nation. *See id.* art. II, § 1. He is the sole official for whose temporary disability the Constitution expressly provides procedures to remedy. *See id.* art. II, § 1, cl. 6; *id.* amend. XXV. He is the Commander in Chief of the Army and the Navy. *See id.* art. II, § 2, cl. 2. He has the power to grant reprieves and pardons for offenses against the United States. *See id.* He has the power to negotiate treaties and to receive Ambassadors and other public ministers. *See id.* art. II, § 2, cl. 2. He is the sole representative to foreign nations. He appoints all of the "Judges of the supreme Court" and the principal officers of the government. *See id.* art. II, § 2, cl. 2. He is the only constitutional officer

empowered to require opinions from the heads of departments, *see id.* art. II, § 2, cl. 1, and to recommend legislation to the Congress. *See id.* art. II, § 3. And he exercises a constitutional role in the enactment of legislation through the presentation requirement and veto power. *See id.* art. I, § 7, cls. 2, 3.

Moreover, the practical demands on the individual who occupies the Office of the President, particularly in the modern era, are enormous. President Washington wrote that "[t]he duties of my Office * * * at all times * * * require an unremitting attention," Brief for the United States as Amicus Curiae in Support of the Petitioner at 11, *Clinton v. Jones*, 520 U.S. 681 (1997) (No. 95–1853) (quoting Arthur B. Tourtellot, *The Presidents on the Presidency* 348 (1964)). In the two centuries since the Washington Administration, the demands of government, and thus of the President's duties, have grown exponentially. In the words of Justice Jackson, "[i]n drama, magnitude and finality [the President's] decisions so far overshadow any others that almost alone he fills the public eye and ear." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 653 (1952) (Jackson, J., concurring). In times of peace or war, prosperity or economic crisis, and tranquility or unrest, the President plays an unparalleled role in the execution of the laws, the conduct of foreign relations, and the defense of the Nation. As Justice Breyer explained in his opinion concurring in the judgment in *Clinton v. Jones*:

> The Constitution states that the "executive Power shall be vested in a President." Art. II, § 1. This constitutional delegation means that a sitting President is unusually busy, that his activities have an unusually important impact upon the lives of others, and that his conduct embodies an authority bestowed by the entire American electorate. . . . [The Founders] sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many.

520 U.S. at 711–12. The burdens imposed on a sitting President by the initiation of criminal proceedings (whether for official or unofficial wrongdoing) therefore must be assessed in light of the Court's "long recogni[tion of] the 'unique position in the constitutional scheme' that this office occupies." *Id.* at 698 (quoting *Nixon v. Fitzgerald*, 457 U.S. at 749).

a.

Given the unique powers granted to and obligations imposed upon the President, we think it is clear that a sitting President may not constitutionally be imprisoned. The physical confinement of the chief executive following a valid conviction

would indisputably preclude the executive branch from performing its constitutionally assigned functions. As Joseph Story wrote:

> There are . . . incidental powers, belonging to the executive department, which are necessarily implied from the nature of the functions, which are confided to it. Among these, must necessarily be included the power to perform them, without any obstruction or impediment whatsoever. The president cannot, therefore, be liable to arrest, imprisonment, or detention, while he is in the discharge of the duties of his office . . . .

3 Joseph Story, *Commentaries on the Constitution of the United States* 418–19 (1st ed. 1833) (*quoted in Nixon v. Fitzgerald*, 457 U.S. at 749).[18]

To be sure, the Twenty-fifth Amendment provides that either the President himself, or the Vice-President along with a majority of the executive branch's principal officers or some other congressionally determined body, may declare that the President is "unable to discharge the powers and duties of his office," with the result that the Vice President assumes the status and powers of Acting President. *See* U.S. Const. amend. XXV, §§ 3, 4. But it is doubtful in the extreme that this Amendment was intended to eliminate or otherwise affect any constitutional immunities the President enjoyed prior to its enactment. None of the contingencies discussed by the Framers of the Twenty-fifth Amendment even alluded to the possibility of a criminal prosecution of a sitting President.[19] Of course, it might be argued that the Twenty-fifth Amendment provides a mechanism to ensuring that, if a sitting President were convicted and imprisoned, there could

---

[18] *See also* Alexander M. Bickel, *The Constitutional Tangle,* The New Republic, Oct 6, 1973, at 14, 15 ("In the presidency is embodied the continuity and indestructibility of the state It is not possible for the government to function without a President, and the Constitution contemplates and provides for uninterrupted continuity in that office. Obviously the presidency cannot be conducted from jail, nor can it be effectively carried on while an incumbent is defending himself in a criminal trial ").

[19] The Framers of the Twenty-fifth Amendment were primarily concerned with the possibility that a sitting President might be unable to discharge his duties due to incapacitation by physical or mental illness *See generally Hearings on Presidential Inability Before the Subcomm. on Constitutional Amendments of the Senate Comm on the Judiciary,* 88th Cong. (1963), *Hearings on Presidential Inability and Vacancies in the Office of Vice President Before the Subcomm. on Constitutional Amendments of the Senate Comm. on the Judiciary,* 88th Cong. (1964); *Hearings on Presidential Inability Before the House Comm on the Judiciary,* 89th Cong. (1965), *Hearings on Presidential Inability and Vacancies in the Office of Vice President Before the Subcomm on Constitutional Amendments of the Senate Comm. on the Judiciary,* 89th Cong. (1965) ("1965 Senate Hearings"); *Selected Materials on the Twenty-Fifth Amendment,* S. Doc. No 93–42 (1973) which includes Senate Reports Nos 89–1382 and 89–66 But the amendment's terms "unable" and "inability" were not so narrowly defined, apparently out of a recognition that situations of inability might take various forms not neatly falling into categories of physical or mental illness *See. e.g.,* 1965 Senate Hearings at 20 ("[T]he intention of this legislation is to deal with any type of inability, whether it is from traveling from one nation to another, a breakdown of communications, capture by the enemy or anything that is imaginable. The inability to perform the powers and duties of the office, for any reason is inability under the terms that we are discussing ") (statement of Sen Bayh); John D Feerick, *The Twenty-fifth Amendment* 197 (1976) ("Although the terms 'unable' and 'inability' are nowhere defined in either Section 3 or 4 of the Amendment (or in Article II), this was not the result of an oversight. Rather, it reflected a judgment that a rigid constitutional definition was undesirable, since cases of inability could take various forms not neatly fitting into such a definition."). Thus, while imprisonment appears not to have been expressly considered by the Framers as a form of inability, the language of the Twenty-fifth Amendment might be read broadly enough to encompass such a possibility

be a transfer of powers to an Acting President rather than a permanent disabling of the executive branch. But the possibility of Vice-Presidential succession "hardly constitutes an argument in favor of allowing other branches to take actions that would disable the sitting President." [20] To rationalize the President's imprisonment on the ground that he can be succeeded by an "Acting" replacement, moreover, is to give insufficient weight to the people's considered choice as to whom they wish to serve as their chief executive, and to the availability of a politically accountable process of impeachment and removal from office for a President who has engaged in serious criminal misconduct.[21] While the executive branch would continue to function (albeit after a period of serious dislocation), it would still not do so as the people intended, with their elected President at the helm.[22] Thus, we conclude that the Twenty-fifth Amendment should not be understood *sub silentio* to withdraw a previously established immunity and authorize the imprisonment of a sitting President.

### b.

Putting aside the possibility of criminal confinement during his term in office, the severity of the burden imposed upon the President by the stigma arising both from the initiation of a criminal prosecution and also from the need to respond to such charges through the judicial process would seriously interfere with his ability to carry out his constitutionally assigned functions. To be sure, in *Clinton v. Jones* the Supreme Court rejected the argument that a sitting President is constitutionally immune from civil suits seeking damages for unofficial misconduct. But the distinctive and serious stigma of indictment and criminal prosecution imposes burdens fundamentally different in kind from those imposed by the initiation of a civil action, and these burdens threaten the President's ability to act as the Nation's leader in both the domestic and foreign spheres. *Clinton*'s reasoning does not extend to the question whether a sitting President is constitutionally immune from criminal prosecution; nor does it undermine our conclusion that a proper balancing of constitutional interests in the criminal context dictates a presidential immunity from such prosecution.

---

[20] 1 Laurence H. Tribe, *American Constitutional Law* § 4–14, at 755 n.5 (3rd ed. 2000)

[21] If the President resists the conclusion that he is "unable" to discharge his public duties, a transition of power to the Vice President as Acting President depends on the concurrence of both Houses of Congress by a two-thirds vote But this ultimate congressional decision does not transform the process into a politically accountable one akin to impeachment proceedings, for the situation forcing Congress's hand would have been triggered by the decision of a single prosecutor and unaccountable grand jury to initiate and pursue the criminal proceedings in the first place

[22] Although we do not consider here whether an elected President loses his immunity from criminal prosecution if and while he is temporarily dispossessed of his presidential authority under either § 3 or § 4 of the Twenty-fifth Amendment, structural considerations suggest that an elected President remains immune from criminal prosecution until he permanently leaves the Office by the expiration of his term, resignation, or removal through conviction upon impeachment

The greater seriousness of criminal as compared to civil charges has deep roots not only in the Constitution but also in its common law antecedents. Blackstone distinguished between criminal and civil liability by describing the former as a remedy for "public wrongs" and the latter as a response to "private wrongs." 4 William Blackstone, *Commentaries* *5. As he explained, "[t]he distinction of public wrongs from private, of crimes and misdemeanors from civil injuries, seems principally to consist in this: that private wrongs, or civil injuries, are an infringement or privation of the civil rights which belong to individuals, considered merely as individuals; public wrongs, or crimes and misdemeanors, are a breach and violation of the public rights and duties due to the whole community, considered as a community, in its social aggregate capacity." *Id.* This fundamental distinction explains why a criminal prosecution may proceed without the consent of the victim and why it is brought in the name of the sovereign rather than the person immediately injured by the wrong. The peculiar public opprobrium and stigma that attach to criminal proceedings also explain, in part, why the Constitution provides in Article III for a right to a trial by jury for all federal crimes, *see Lewis v. United States*, 518 U.S. 322, 334 (1996) (Kennedy, J. concurring), and provides in the Sixth Amendment for a "speedy and public trial," U.S. Const. amend. VI, *see Klopfer v. North Carolina*, 386 U.S. 213, 222 (1967) (pendency of an indictment "may subject [the defendant] to public scorn" and "indefinitely prolong[ ] this oppression, as well as the 'anxiety and concern accompanying public accusation' ") (citation omitted).[23]

The magnitude of this stigma and suspicion, and its likely effect on presidential respect and stature both here and abroad, cannot fairly be analogized to that caused by initiation of a private civil action. A civil complaint filed by a private person is understood as reflecting one person's allegations, filed in court upon payment of a filing fee. A criminal indictment, by contrast, is a public rather than private allegation of wrongdoing reflecting the official judgment of a grand jury acting under the general supervision of the District Court. Thus, both the ease and public meaning of a civil filing differ substantially from those of a criminal indictment. *Cf. FDIC v. Mallen*, 486 U.S. 230, 243 (1988) ("Through the return of the indictment, the Government has already accused the appellee of serious wrongdoing.").[24] Indictment alone risks visiting upon the President the disabilities that

---

[23] In *Klopfer*, the Supreme Court held that the Sixth Amendment right to a speedy trial is violated by the practice of having a prosecutor indefinitely suspend a prosecution after a grand jury returns an indictment. One of the purposes of the speedy trial right is to enable the defendant to be freed, as promptly as reasonably possible, from the "disabling cloud of doubt and anxiety that an overhanging indictment invariably carries with it." 1 Laurence H Tribe, *American Constitutional Law* §4–14, at 756. *Cf In re Winship*, 397 U.S. 358, 363 (1970) ("The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction ").

[24] In *Mallen*, for example, the Court rejected a due process challenge to a statute authorizing the immediate suspension for up to 90 days, without a pre-suspension hearing, of a bank officer or director who is indicted for a felony involving dishonesty or breach of trust. In describing the significance of indictment for purposes of the due process calculus, the Court observed as follows

> The returning of the indictment establishes that an independent body has determined that there is probable
> cause to believe that the officer has committed a crime   .   This finding is relevant in at least two

*A Sitting President's Amenability to Indictment and Criminal Prosecution*

stem from the stigma and opprobrium associated with a criminal charge, under-mining the President's leadership and efficacy both here and abroad. Initiation of a criminal proceeding against a sitting President is likely to pose a far greater threat than does civil litigation of severely damaging the President's standing and credibility in the national and international communities. While this burden may be intangible, nothing in the Supreme Court's recent case law draws into question the Department's previous judgment that "to wound [the President] by a criminal proceeding is to hamstring the operation of the whole governmental apparatus, both in foreign and domestic affairs." OLC Memo at 30.

c.

Once criminal charges are filed, the burdens of responding to those charges are different in kind and far greater in degree than those of responding to civil litigation. The Court in *Clinton v. Jones* clearly believed that the process of defending himself in civil litigation would not impose unwieldy burdens on the President's time and energy. The Court noted that "[m]ost frivolous and vexatious litigation is terminated at the pleading stage or on summary judgment, with little if any personal involvement of the defendant." 520 U.S. at 708. Moreover, even if the litigation proceeds all the way to trial, the Court explicitly assumed that "there would be no necessity for the President to attend in person, though he could elect to do so." *Id.* at 692.

These statements are palpably inapposite to criminal cases. The constitutional provisions governing criminal prosecutions make clear the Framers' belief that an individual's mental and physical involvement and assistance in the preparation of his defense both before and during any criminal trial would be intense, no less so for the President than for any other defendant. The Constitution con-templates the defendant's attendance at trial and, indeed, secures his right to be present by ensuring his right to confront witnesses who appear at the trial. *See* U.S. Const. amend. VI; *Illinois v. Allen*, 397 U.S. 337, 338 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."); *see also* Fed. R. Crim. P. 43(a); *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (Due Process Clause also protects right to be present). The Constitution also guarantees the defendant a right to counsel, which is itself premised on the defend-ant's ability to communicate with such counsel and assist in the preparation of

---

important ways First, the finding of probable cause by an independent body demonstrates that the suspen-sion is not arbitrary Second, the return of the indictment itself is an objective fact that will in most cases raise serious public concern that the bank is not being managed in a responsible manner.
486 U S at 244–45.

his own defense. *See* U.S. Const. amend. VI.[25] These protections stand in stark contrast to the Constitution's relative silence as to the rights of parties in civil proceedings, and they underscore the unique mental and physical burdens that would be placed on a President facing criminal charges and attempting to fend off conviction and punishment. These burdens inhere not merely in the actual trial itself, but also in the substantial preparation a criminal trial demands.

It cannot be said of a felony criminal trial, as the Court said of the civil action before it in *Clinton v. Jones*, that such a proceeding, "if properly managed by the District Court, . . . [is] highly unlikely to occupy any substantial amount of petitioner's time." *Clinton*, 520 U.S. at 702.[26] The Court there emphasized the many ways in which a district court adjudicating a civil action against the President could and should use flexibility in scheduling so as to accommodate the demands of the President's constitutionally assigned functions on his time and energy. *See id.* at 706 (noting that a district court "has broad discretion to stay proceedings as an incident to its power to control its own docket").[27] The Court explicitly "assume[d] that the testimony of the President, both for discovery and for use at trial, may be taken at the White House at a time that will accommodate his busy schedule." *Id.* at 691–92. The Court thus concluded that "[a]lthough scheduling problems may arise, there is no reason to assume that the district courts will be . . . unable to accommodate the President's needs." *Id.* at 709.[28]

Although the Court determined in *Clinton v. Jones* that "[t]he fact that a federal court's exercise of its traditional Article III jurisdiction may significantly burden the time and attention of the chief Executive is not sufficient to establish a violation of the Constitution," 520 U.S. at 703, this determination must be understood in light of the Court's own characterizations of the manageable burdens imposed

---

[25] In theory, of course, the President could decline to appear at his own criminal trial, notwithstanding the strong Anglo-American tradition against trials *in absentia* But availability of this option says little about the constitutional issue, there is no evidence that the Framers intended that the President waive an entire panoply of constitutional guarantees and risk conviction in order to fulfill his public obligations.

[26] With respect specifically to concerns about mental preoccupation, the Court in *Clinton v. Jones* "recognize[d] that a President, like any other official or private citizen, may become distracted or preoccupied by pending litigation," 520 U.S at 705 n.40, but likened this distraction to other "vexing" distractions caused by "a variety of demands on their time, . . . some private, some political, and some as a result of official duty." *Id* As a "predictive judgment," *id.* at 702, however, the level of mental preoccupation entailed by a threat of criminal conviction and imprisonment would likely far exceed that entailed by a private civil action

[27] In his opinion concurring in the judgment, Justice Breyer further emphasized the Court's assumptions with respect to the scheduling flexibility properly due the President by the district court He explained that he agreed "with the majority that the Constitution does not automatically grant the President an immunity from civil lawsuits based upon his private conduct " 520 U S. at 710. Nevertheless, he emphasized that

> once the President sets forth and explains a conflict between judicial proceeding and public duties, the matter changes At that point, the Constitution permits a judge to schedule a trial in an ordinary civil damages action (where postponement normally is possible without overwhelming damage to a plaintiff) only within the constraints of a constitutional principle — a principle that forbids a federal judge in such a case to interfere with the President's discharge of his public duties.

*Id.*

[28] The Court added that, "[a]lthough Presidents have responded to written interrogatories, given depositions, and provided videotaped trial testimony, no sitting President has ever testified, or been ordered to testify, in open court " *Id.* at 692 n 14. In criminal litigation, as compared to civil litigation, however, the presence of the accused is a *sina qua non* of a valid trial, absent extraordinary circumstance.

by civil litigation. By contrast, criminal proceedings do not allow for the flexibility in scheduling and procedures upon which *Clinton v. Jones* relied. Although the Court emphasized that "our decision rejecting the immunity claim and allowing the case to proceed does not require us to confront the question whether a court may compel the attendance of the President at any specific time or place," *id.* at 691, a criminal prosecution would require the President's personal attention and attendance at specific times and places, because the burdens of criminal defense are much less amenable to mitigation by skillful trial management. Indeed, constitutional rights and values are at stake in the defendant's ability to be present for all phases of his criminal trial. For the President to maintain the kind of effective defense the Constitution contemplates, his personal appearance throughout the duration of a criminal trial could be essential. Yet the Department has consistently viewed the requirement that a sitting President personally appear at a trial at a particular time and place in response to judicial process to raise substantial separation of powers concerns. *See* Memorandum for Arthur B. Culvahouse, Jr., Counsel to the President, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutional Concerns Implicated by Demand for Presidential Evidence in a Criminal Prosecution* (Oct. 17, 1988).[29]

In contrast to ordinary civil litigation, moreover, which the Court in *Clinton v. Jones* described as allowing the trial court to minimize disruptions to the President's schedule, the Sixth Amendment's guarantee to criminal defendants of a "speedy and public trial," U.S. Const. amend. VI, circumscribes the trial court's flexibility. Once a defendant is indicted, his right to a speedy trial comes into play. *See United States v. Marion*, 404 U.S. 307 (1971) (defendant's speedy trial right is triggered when he is "accused" by being indicted). In addition, under the federal Speedy Trial Act, the trial judge's discretion is constrained in order to meet the statutory speedy trial deadlines. *See* 18 U.S.C. §§ 3161–3174 (1994). While a defendant may waive his speedy trial rights, it would be a peculiar constitutional argument to say that the President's ability to perform his constitutional

---

[29] The Kmiec memorandum explained that "it has been the rule since the Presidency of Thomas Jefferson that a judicial subpoena in a criminal case may be issued to the President, and any challenge to the subpoena must be based on the nature of the information sought rather than any immunity from process belonging to the President." *See* Memorandum for Arthur B. Culvahouse, Jr., Counsel to the President, from Douglas W. Kmiec, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutional Concerns Implicated by Demand for Presidential Evidence in a Criminal Prosecution* at 2 (Oct. 17, 1988). However, the memorandum proceeded to explain, "[a]lthough there are no judicial opinions squarely on point, historical precedent has clearly established that sitting Presidents are not required to testify in person at criminal trials." *Id.* at 3 (reviewing precedents) The memorandum noted in particular that Attorney General Wirt had advised President Monroe in 1818 that "[a] subpoena ad testificandum may I think be properly awarded to the President of the U.S .    But if the presence of the chief magistrate be required at the seat of government by his official duties, I think those duties paramount to any claim which an individual can have upon him, and that his personal attendance on the court from which the summons proceeds ought to be, and must, of necessity, be dispensed with .    " *Id* at 4 (quoting Opinion of Attorney General Wirt, January 13, 1818, *quoted in* Ronald D. Rotunda, *Presidents and Ex-Presidents as Witnesses. A Brief Historical Footnote*," 1975 U. Ill L. F. 1, 6) The memorandum concluded that "the controlling principle that emerges from the historical precedents is that a sitting President may not be required to testify in court at a criminal trial because his presence is required elsewhere for his 'official duties'—or, in the vernacular of the time, required at 'the seat of government.' " *Id* at 6 (citations and footnote omitted).

duties should not be considered unduly disrupted by a criminal trial merely because the President could, in theory, waive his personal constitutional right to a speedy trial. The Constitution should not lightly be read to put its Chief Executive officer to such a choice.

In sum, unlike private civil actions for damages — or the two other judicial processes with which such actions were compared in *Clinton v. Jones* (subpoenas for documents or testimony and judicial review and occasional invalidation of the President's official acts, *see* 520 U.S. at 703–05) — criminal litigation uniquely requires the President's *personal* time and energy, and will inevitably entail a considerable if not overwhelming degree of mental preoccupation.[30] Indictment also exposes the President to an official pronouncement that there is probable cause to believe he committed a criminal act, *see, e.g., United States v. R. Enterprises, Inc.*, 498 U.S. 292, 297–98 (1991), impairing his credibility in carrying out his constitutional responsibilities to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, and to speak as the "sole organ" of the United States in dealing with foreign nations. *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 319–20 (1936); *see also Chicago & Southern Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948) (describing the President "as the Nation's organ for foreign affairs"); *United States v. Louisiana*, 363 U.S. 1, 35 (1960) ("The President . . . is the constitutional representative of the United States in its dealings with foreign nations."). These physical and mental burdens imposed by an indictment and criminal prosecution of a sitting President are of an entirely different magnitude than those imposed by the types of judicial process previously upheld by the Court.

It is conceivable that, in a particular set of circumstances, a particular criminal charge will not in fact require so much time and energy of a sitting President so as materially to impede the capacity of the executive branch to perform its constitutionally assigned functions. It would be perilous, however, to make a judgment in advance as to whether a particular criminal prosecution would be a case of this sort. Thus a categorical rule against indictment or criminal prosecution is most consistent with the constitutional structure, rather than a doctrinal test that would require the court to assess whether a particular criminal proceeding is likely to impose serious burdens upon the President.[31]

---

[30] While illustrating the potentially burdensome nature of judicial review of Presidential acts with the "most dramatic example" of *Youngstown Sheet & Tube Co. v Sawyer*, 343 U S 579 (1952) (invalidating President Truman's order directing the seizure and operation of steel mills), the Court mentioned "the substantial time that the President must necessarily have devoted to the matter as a result of judicial involvement" *Clinton v Jones*, 520 U S at 703. Of course, it is most frequently the case that the President spends little or no time *personally* engaged in such confrontations, with the task of defending his policies in court falling to subordinate executive branch officials *See, e g.,* Maeva Marcus, *Truman and the Steel Seizure Case* 102–77 (1977) (describing in detail Department of Justice attorneys' involvement in the steel seizure litigation without discussing any role played personally in the litigation by President Truman). Such a routine delegation of responsibilities is unavailable when the President personally faces criminal charges

[31] *Cf. Clinton v Jones*, 520 U S at 706 ("Indeed, if the Framers of the Constitution had thought it necessary to protect the President from the burdens of private litigation, we think it far more likely that they would have

3.

Having identified the burdens imposed by indictment and criminal prosecution on the President's ability to perform his constitutionally assigned functions, we must still consider whether these burdens are "justified by an overriding need to promote" legitimate governmental objectives, *Administrator of General Services*, 433 U.S. at 443, in this case the expeditious initiation of criminal proceedings. *United States v. Nixon* underscored the legitimacy and importance of facilitating criminal proceedings in general. Although Nixon did not address the interest in facilitating criminal proceedings against the President, it is fair to say that there exists an important national interest in ensuring that no person — including the President — is above the law. *Clinton v. Jones* underscored the legitimacy and importance of allowing civil proceedings against the President for unofficial misconduct to go forward without undue delay. Nevertheless, after weighing the interests in facilitating immediate criminal prosecution of a sitting President against the interests underlying temporary immunity from such prosecution, considered in light of alternative means of securing the rule of law, we adhere to our 1973 determination that the balance of competing interests requires recognition of a presidential immunity from criminal process.

Recognizing an immunity from prosecution for a sitting President would not preclude such prosecution once the President's term is over or he is otherwise removed from office by resignation or impeachment.[32] The relevant question, therefore, is the nature and strength of any governmental interests in *immediate* prosecution and punishment.

With respect to immediate punishment, the legitimate objectives of retribution and specific deterrence underlying the criminal justice system compete against a recognition of presidential immunity from penal incarceration. The obvious and overwhelming burdens that such incarceration would impose on the President's ability to perform his constitutionally assigned functions, however, clearly support the conclusion that a sitting President may not constitutionally be imprisoned upon a criminal conviction. *See supra* note 18 and accompanying text. The public's general interest in retribution and deterrence does not provide an "overriding need" for immediate as opposed to deferred incarceration.

With respect to immediate prosecution, we can identify three other governmental interests that might be impaired by deferring indictment and prosecution

---

adopted a categorical rule than a rule that required the President to litigate the question whether a specific case belonged in the 'exceptional case' subcategory ")

[32] The temporary nature of the immunity claimed here distinguishes it from that pressed in *Nixon v. Fitzgerald*, which established a permanent immunity from civil suits challenging official conduct. The temporary immunity considered here is also distinguishable from that pressed by the President but rejected in *United States v. Nixon*, since the claim of executive privilege justifying the withholding of evidence relevant to the criminal prosecution of other persons would apparently have suppressed the evidence without any identifiable time limitation The asserted privilege might therefore have forever thwarted the public's interest in enforcing its criminal laws *See United States v. Nixon*, 418 U.S at 713 ("Without access to specific facts a criminal prosecution may be totally frustrated.").

until after the accused no longer holds the office of President: (1) avoiding the bar of a statute of limitations; (2) avoiding the weakening of the prosecution's case due to the passage of time; and (3) upholding the rule of law. We consider each of these in turn.

The interest in avoiding the statute of limitations bar by securing an indictment while the President remains sitting is a legitimate one. However, we do not believe it is of significant constitutional weight when compared with the burdens such an indictment would impose on the Office of the President, especially in light of alternative mechanisms to avoid a time-bar. First, a President suspected of the most serious criminal wrongdoing might well face impeachment and removal from office before his term expired, permitting criminal prosecution at that point. Second, whether or not it would be appropriate for a court to hold that the statute of limitations was tolled while the President remained in office (either as a constitutional implication of temporary immunity or under equitable principles[33]), Congress could overcome any such obstacle by imposing its own tolling rule.[34] At most, therefore, prosecution would be delayed rather than denied.

Apart from concern over statutes of limitations, we recognize that a presidential immunity from criminal prosecution could substantially delay the prosecution of a sitting President, and thereby make it more difficult for the ultimate prosecution to succeed.[35] In *Clinton v. Jones*, the Court observed that—notwithstanding the continuation of civil discovery—"delaying trial would increase the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts, or the possible death of a party." 520 U.S. at 707–08.

---

[33] Federal courts have suggested that, in proper circumstances, criminal as well as civil statutes of limitation are subject to equitable tolling. *See, e.g., United States v. Midgley*, 142 F.3d 174, 178–79 (3d Cir 1998) ("Although the doctrine of equitable tolling is most typically applied to limitation periods on civil actions, there is no reason to distinguish between the rights protected by criminal and civil statutes of limitations.") (internal quotation omitted); *cf United States v. Levine*, 658 F.2d 113, 119–21 (3d Cir 1981) (noting that criminal statutes of limitations have a primary purpose of providing fairness to the accused, but are "perhaps not inviolable" and are subject to tolling, suspension, and waiver). Equitable tolling, however, is invoked only sparingly, in the "rare situation where [it] is demanded by sound legal principles as well as the interests of justice." *Alvarez-Machain v. United States*, 107 F.3d 696, 701 (9th Cir 1996) (tolling two-year limitation period for FTCA actions where plaintiff had been incarcerated for two years)

[34] *See, e.g.*, 18 U.S.C. § 3287 (1994) (suspension of criminal statutes of limitation for certain fraud offenses against the United States until three years after the termination of hostilities); *United States v. Grainger*, 346 U.S. 235 (1953) (applying this statutory suspension). We believe Congress derives such authority from its general power to "make all Laws which shall be necessary and proper for carrying into Execution . . . all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S. Const. art I, § 8, cl. 18. *Cf. Clinton v. Jones*, 520 U.S. at 709 ("If Congress deems it appropriate to afford the President stronger protection, it may respond with appropriate legislation."). Indeed, without deciding the question, we note that Congress may have power to enact a tolling provision governing the statute of limitations for conduct that has already occurred, at least so long as the original statutory period has not already expired. *Cf United States v. Powers*, 307 U.S. 214 (1939) (rejecting *Ex Post Facto* challenge to a prosecution based on a statute extending the life of a temporary criminal statute before its original expiration date); *cf., e.g., United States v Grimes*, 142 F.3d 1342, 1350–51 (11th Cir. 1998) (collecting decisions rejecting *Ex Post Facto* challenges to statutes extending the limitations period as applied to conduct for which the original period had not already run), *cert denied*, 525 U.S. 1088 (1999)

[35] In theory, the delay could be as long as 10 years, for a President who originally assumes the office through ascension rather than election and then fully serves two elected terms. *See* U.S. Const. amend. XXII, § 1 Given quadrennial elections and the possibility of impeachment, however, it seems unlikely that a President who is seriously suspected of grave criminal wrongdoing would remain in office for that length of time

The Court considered this potential for prejudice to weigh against recognition of temporary immunity from civil process. We believe that the costs of delay in the criminal context may differ in both degree and kind from delay in the civil context.[36] But in any event it is our considered view that, when balanced against the overwhelming cost and substantial interference with the functioning of an entire branch of government, these potential costs of delay, while significant, are not controlling. In the constitutional balance, the potential for prejudice caused by delay fails to provide an "overriding need" sufficient to overcome the justification for temporary immunity from criminal prosecution.

Finally, recognizing a temporary immunity would not subvert the important interest in maintaining the "rule of law." To be sure, as the Court has emphasized, "[n]o man in this country is so high that he is above the law." *United States v. Lee*, 106 U.S. 196, 220 (1882). Moreover, the complainant here is the Government seeking to redress an alleged crime against the public rather than a private person seeking compensation for a personal wrong, and the Court suggested in *Nixon v. Fitzgerald* that "there is a lesser public interest in actions for civil damages than, for example, in criminal prosecutions," 457 U.S. at 754 n.37; *see id.* (describing *United States v. Nixon* as "basing holding on special importance of evidence in a criminal trial and distinguishing civil actions as raising different questions not presented for decision"). However, unlike the immunities claimed in both *Nixon* cases, *see supra* note 32, the immunity from indictment and criminal prosecution for a sitting President would generally result in the delay, but not the forbearance, of any criminal trial. Moreover, the constitutionally specified impeachment process ensures that the immunity would not place the President "above the law." A sitting President who engages in criminal behavior falling into the category of "high Crimes and Misdemeanors," U.S. Const. art. II, § 4, is always subject to removal from office upon impeachment by the House and conviction by the Senate, and is thereafter subject to criminal prosecution.

4.

We recognize that invoking the impeachment process itself threatens to encumber a sitting President's time and energy and to divert his attention from

---

[36] On the one hand, there may be less reason to fear a prejudicial loss of evidence in the criminal context. A grand jury could continue to gather evidence throughout the period of immunity, even passing this task down to subsequently empaneled grand juries if necessary. *See* Fed. R. Crim. P. 6(e)(3)(C)(iii). Moreover, in the event of suspicion of serious wrongdoing by a sitting President, the media and even Congress (through its own investigatory powers) would likely pursue, collect and preserve evidence as well. These multiple mechanisms for securing and preserving evidence could mitigate somewhat the effect of a particular witness's failed recollection or demise. By contrast, many civil litigants would lack the resources and incentives to pursue and preserve evidence in the same comprehensive manner.

On the other hand, the consequences of any prejudicial loss of evidence that does occur in the criminal context are more grave, given the presumptively greater stakes for both the United States and the defendant in criminal litigation. *See United States v. Nixon*, 418 U.S. at 711–13, 713 (in emphasizing the importance of access to evidence in a pending criminal trial, giving significant weight in the constitutional balance to "the fundamental demands of due process of law in the fair administration of criminal justice").

his public duties. But the impeachment process is explicitly established by the Constitution. While in some circumstances an impeachment and subsequent Senate trial might interfere with the President's exercise of his constitutional responsibilities in ways somewhat akin to a criminal prosecution, "this is a risk expressly contemplated by the Constitution, and it is a necessary incident of the impeachment process." OLC Memo at 28. In other words, the Framers themselves specifically determined that the public interest in immediately removing a sitting President whose continuation in office poses a threat to the Nation's welfare outweighs the public interest in avoiding the Executive burdens incident thereto.

The constitutionally prescribed process of impeachment and removal, moreover, lies in the hands of duly elected and politically accountable officials. The House and Senate are appropriate institutional actors to consider the competing interests favoring and opposing a decision to subject the President and the Nation to a Senate trial and perhaps removal. Congress is structurally designed to consider and reflect the interests of the entire nation, and individual Members of Congress must ultimately account for their decisions to their constituencies. By contrast, the most important decisions in the process of criminal prosecution would lie in the hands of unaccountable grand and petit jurors, deliberating in secret, perhaps influenced by regional or other concerns not shared by the general polity, guided by a prosecutor who is only indirectly accountable to the public. The Framers considered who should possess the extraordinary power of deciding whether to initiate a proceeding that could remove the President — one of only two constitutional officers elected by the people as a whole — and placed that responsibility in the elected officials of Congress. It would be inconsistent with that carefully considered judgment to permit an unelected grand jury and prosecutor effectively to "remove" a President by bringing criminal charges against him while he remains in office.

Thus, the constitutional concern is not merely that any *particular* indictment and criminal prosecution of a sitting President would unduly impinge upon his ability to perform his public duties. A more general concern is that permitting such criminal process against a sitting President would affect the underlying dynamics of our governmental system in profound and necessarily unpredictable ways, by shifting an awesome power to unelected persons lacking an explicit constitutional role vis-a-vis the President. Given the potentially momentous political consequences for the Nation at stake, there is a fundamental, structural incompatibility between the ordinary application of the criminal process and the Office of the President.

For these reasons we believe that the Constitution requires recognition of a presidential immunity from indictment and criminal prosecution while the President is in office.

5.

In 1973, this Department concluded that a grand jury should not be permitted to indict a sitting President even if all subsequent proceedings were postponed until after the President left office. The Court's emphasis in *Clinton v. Jones* on the interests of Article III courts in allowing ordinary judicial processes to go forward against a sitting President, and its reliance on scheduling discretion to prevent those processes from interfering with performance of the President's constitutional duties, might be thought to call this aspect of the Department's 1973 determination into question. We have thus separately reconsidered whether, if the constitutional immunity extended only to criminal prosecution and confinement but not indictment, the President's ability to perform his constitutional functions would be unduly burdened by the mere pendency of an indictment against which he would need to defend himself after leaving office.

We continue to believe that the better view of the Constitution accords a sitting President immunity from indictment by itself. To some degree, indictment alone will spur the President to devote some energy and attention to mounting his eventual legal defense.[37] The stigma and opprobrium attached to indictment, as we explained above, far exceed that faced by the civil litigant defending a claim. Given "the realities of modern politics and mass media, and the delicacy of the political relationships which surround the Presidency both foreign and domestic," there would, as we explained in 1973, "be a Russian roulette aspect to the course of indicting the President but postponing trial, hoping in the meantime that the power to govern could survive." OLC Memo at 31.[38] Moreover, while the burdens imposed on a sitting President by indictment alone may be less onerous than those imposed on the President by a full scale criminal prosecution, the public interest in indictment alone would be concomitantly weaker assuming that both trial and punishment must be deferred, and weaker still given Congress' power to extend the statute of limitations or a court's possible authority to recognize an equitable tolling.

Balancing these competing concerns, we believe the better view is the one advanced by the Department in 1973: a sitting President is immune from indictment as well as from further criminal process. Where the President is concerned,

[37] *Cf Moore v. Arizona,* 414 U.S. 25, 27 (1973) (indictment with delayed trial "may disrupt [a defendant's] employment, drain his financial resources, curtail his associations, subject him to public obloquy, and create anxiety in him, his family and his friends") (citations omitted) Indeed, indictment coupled with temporary immunity from further prosecution may even magnify the problem, since the President would be legally stigmatized as an alleged criminal without any meaningful opportunity to respond to his accusers in a court of law

[38] Our conclusion would hold true even if such an indictment could lawfully be filed, and were filed, under seal. Given the indictment's target it would be very difficult to preserve its secrecy *Cf United States v Nixon,* 418 U.S. at 687 n.4 (noting parties' acknowledgment that "disclosures to the news media made the reasons for continuance of the protective order no longer meaningful," with respect to the "grand jury's immediate finding relating to the status of the President as an unindicted co-conspirator") Permitting a prosecutor and grand jury to issue even a sealed indictment would allow them to take an unacceptable gamble with fundamental constitutional values

only the House of Representatives has the authority to bring charges of criminal misconduct through the constitutionally sanctioned process of impeachment.

## III.

In 1973, the Department of Justice concluded that the indictment and criminal prosecution of a sitting President would unduly interfere with the ability of the executive branch to perform its constitutionally assigned duties, and would thus violate the constitutional separation of powers. No court has addressed this question directly, but the judicial precedents that bear on the continuing validity of our constitutional analysis are consistent with both the analytic approach taken and the conclusions reached. Our view remains that a sitting President is constitutionally immune from indictment and criminal prosecution.

RANDOLPH D. MOSS
*Assistant Attorney General*
*Office of Legal Counsel*