# Exhibit 19

# Department of Justice
## Washington, D.C. 20530

September 24, 1973

## MEMORANDUM

Re:  Amenability of the President, Vice
     President and other Civil Officers to
     Federal Criminal Prosecution while in
     Office.

The question whether a civil officer 1/ of the federal
government can be the subject of criminal proceedings while
he is still in office has been debated ever since the
earliest days of the Republic.  This inquiry raises the
following separate although to some extent interrelated
issues.  First, whether the constitutional provisions
governing impeachment, viewed in general terms, prohibit
the institution of federal criminal proceedings prior to
the exhaustion of the impeachment process.  Second, if the
first question is answered in the negative, whether and to
what extent the President as head of the Executive branch
of the Government is amenable to the jurisdiction of the
federal courts as a potential criminal defendant.  Third,
if it be determined that the President is immune from criminal
prosecution because of the special nature of his office,
whether and to what extent such immunity is shared by the
Vice President.

## I.

### Must the Impeachment Process be Completed Before Criminal Proceedings May be Instituted Against a Person Who is Liable to Impeachment?

A.  Textual and Historical Support for Proposition that Impeachment Need Not Precede Indictment.

---

1/ For a discussion of the definition of "civil officer" as
that term is used in Article II, section 4 of the Constitution,
see pp. 8-9 infra.

1.  Views of early commentators.  Article II, section 4 of the Constitution provides:

> "The President, the Vice President and all Civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of Treason, Bribery, or other high crimes and Misdemeanors."

Article I, section 3, clause 7 provides:

> "Judgment in cases of Impeachment shall not extend further than to removal from Office, and disqualification to hold and enjoy any Office of honor, Trust or Profit under the United States; but the Party convicted shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."

The suggestion has been made that Article I, section 3, clause 7 prohibits the institution of criminal proceedings against a person subject to impeachment prior to the termination of impeachment proceedings.2/ Support for this argument has been sought in Alexander Hamilton's description of the pertinent constitutional provision in the Federalist Nos. 65, 69 and 77, which explain that after removal by way of impeachment the offender is still liable to criminal prosecution in the ordinary course of law.

---

2/ We are using the term "termination of the impeachment proceedings" rather than "removal by way of impeachment" in view of the statement in Story, Commentaries on the Constitution of the United States, Vol. I, sec. 782, quoted below, that criminal proceedings may be instituted, either after an acquittal or conviction in the court of impeachment.  The conclusion that acquittal by the Senate does not bar criminal prosecution follows from the consideration that such an acquittal may be based, as discussed infra, on jurisdictional grounds, e.g., that the defendant is not an officer of the United States in the constitutional sense, or on discretionary grounds, e.g., that the defendant no longer is an officer of the United States and unlikely to be reappointed or reelected, or on grounds which are partly jurisdictional and partly substantive, e.g., that the offense was not of an impeachable nature.

- 2 -

Article I, section 3, clause 7, however, does not say
that a person subject to impeachment may be tried only after
the completion of that process.  Instead the constitutional
provision uses the term "nevertheless." 3/  The purpose of
this clause thus is to permit criminal prosecution in spite
of the prior adjudication by the Senate, i.e., to forestall
a double jeopardy argument.

A speech made by Luther Martin--who had been a member
of the Constitutional Convention--during the impeachment
proceedings of Justice Chase shows that Article I, section
3, clause 7 was designed to overcome a claim of double
jeopardy rather than to require that impeachment must pre-
cede any criminal proceedings.  Annals of Congress, 8th Cong.,
2d Sess., col. 432.  Similarly Mr. Justice Story teaches in
his Commentaries on the Constitution:

> "If the court of impeachments is merely to
> pronounce a sentence of removal from office and
> the other disabilities, then it is indispensable
> that provision should be made that the common
> tribunals of justice should be at liberty to
> entertain jurisdiction of the offence for the
> purpose of inflicting the common punishment
> applicable to unofficial offenders.  Otherwise,
> it might be matter of extreme doubt whether,
> consistently with the great maxim above mentioned,
> established for the security of the life and
> limbs and liberty of the citizen, a second trial
> for the same offence could be had, either after
> an acquittal or a conviction, in the court of
> impeachments."  Vol. I, sec. 782.

Rawle, another early commentator, states in his View on
the Constitution of the United States of America (1829) at
p. 215:

_____

3/   This provision was rendered necessary because the Consti-
tution limits the judgment of impeachment to removal and
disqualification, while under English law the House of Lords
did also impose severe criminal sanctions including the
death penalty, in cases of conviction on impeachment.  Story,
op. cit., Vol. I, §§ 784, 785; Rawle, A View of the Consti-
tution, p. 217.

"But the ordinary tribunals, as we shall see,
are not precluded, <u>either before or after an
impeachment</u>, from taking cognizance of the
public and official delinquency."  (Emphasis
added.)

2.  <u>Interpretations of the impeachment clause by
official bodies</u>.  The practical interpretation of the Consti-
tution has been to the same effect.  During the life of the
Republic impeachment proceedings have been instituted only
against 12 officers of the United States.  <u>Congressional
Directory</u>, 93 Cong., 1st Sess., p. 402.  In the same time,
presumably scores, if not hundreds, of officers of the United
States have been subject to criminal proceedings for offenses
for which they could have been impeached.

It may be suggested that it is no answer to say that in
most instances the officer presumably had resigned or been
removed by the time he had been tried.  If it really is
the import of Article I, section 3, clause 7, that an officer
of the United States may be subjected to criminal proceed-
ings only after the conclusion of the impeachment procedure,
the question of whether he is still in office at the time
of the criminal trial can be viewed as immaterial.  The
constitutional text does not contain any express exception
to that effect.  Moreover, resignation or removal arguably
does not terminate the impeachment power as a matter of law. <u>4</u>/
It is true that as a practical matter, the House of Repre-
sentatives and the Senate are reluctant to exercise their time-
consuming impeachment functions after a case has become of
less moment, because the offender is no longer in office,
especially after he had renounced all monetary claims against
the United States. <u>5</u>/  However, because the sanctions for
impeachment include disqualification to hold a federal office,

---

<u>4</u>/ <u>The Constitution of the United States, Analysis and
Interpretation</u>, S. Doc. No. 39, 86th Cong., 1st Sess.,
p. 556; H. Rept. 1639, 79th Cong., 2d Sess., pp. 38-39.

<u>5</u>/ See the dismissal of the proceedings against Senator
Blount and former Secretary of War Belknap, and H. Rept.
1639, <u>supra</u>, pp. 1-2.

- 4 -

as well as removal, an impeachment proceeding instituted
subsequent to completion of the term, resignation, or dismissal,
would not be a bootless act.   And yet it would seem to be an
unreasonable interpretation of the Constitution to move from
the latter proposition to the conclusion--necessary under
the argument that impeachment must precede indictment--that
an offending federal officer acquires a lifetime immunity
against indictment unless the Congress takes time to impeach
him.

    There have been several instances of legislative actions
envisaging the criminal prosecution of persons while still in
office, and of the actual institution of criminal proceedings
against federal officers while in office.

    i.   Section 21 of the Act of April 30, 1790, 1 Stat.
117, provided that a judge convicted of having accepted a
bribe "shall forever be disqualified to hold any office of
honour, trust or profit under the United States."   The dis-
qualification provision of this section thus indicates that
Congress anticipated criminal trials for bribery--an impeach-
able offense--prior to a judgment of the Senate providing for
the removal and disqualification of the offender.   It should
be remembered that this statute was enacted by the First
Congress many members of which had been members of the Consti-
tutional Convention.   Obviously they, and President Washington
who approved the legislation, did not feel that it violated
the Constitution.   The disqualification clause is now a part
of the general bribery statute and applies to every officer
of the United States.   18 U.S.C. § 201(e).

    ii.   In 1796, Attorney General Lee advised the House
of Representatives that if a judge is convicted of a serious
crime his "removal from office may and ought to be a part of
the punishment."   He continued that, since the judicial tenure
is during good behavior, a judge could not be removed unless
lawfully convicted of some official misconduct by way of
"information, or by an indictment before an ordinary court,
or by impeachment before the Senate of the United States."
The Attorney General concluded that while impeachment "seems,
in general cases, to be best suited to the trial of so high
and important an officer" it was not the only method, and in
the particular circumstances he recommended trial of the
judge by information or indictment.   3 Hinds, Precedents of

- 5 -

the House of Representatives 982-983, American State Papers (Misc.) Vol. I, p. 151. The House Committee, to which the matter had been referred, concurred in that recommendation. Hinds, ibid., Annals of Congress, 4th Cong., 2d Sess., col. 2320. Here again it was felt at that early stage of our constitutional life that, at least in regard to judges, impeachment did not have to precede the institution of criminal proceedings. Hence, Congress could provide for removal of a judge for bad behavior, evidenced by a criminal conviction, although it has not done so, except in the instance of a bribery conviction. 6/

iii. Circuit Judge Davis retired in 1939 under the provisions of what is now 28 U.S.C. 371(b). 7/ Borkin, The Corrupt Judge, 116. In 1941 he was indicted for obstructing justice and tried twice. In both cases the jury was unable to agree and the indictment was ultimately dismissed. Id., p. 119. Only then did the Attorney General request Congress to impeach Judge Davis. The latter thereupon resigned from office waiving all retirement and pension rights. Id., at p. 120. This in effect mooted the need for impeachment, but arguably not the power of impeachment. See supra.

iv. Judge Albert W. Johnson was investigated by a grand jury and testified before it prior to his resignation from office. See Finding of Fact #3 in Johnson v. United States, 122 C. Cl. 100, 101 (1952).

v. The Department of Justice concluded in 1970 on the strength of precedents ## i and ii, supra, that criminal proceedings could be instituted against a sitting Justice of the Supreme Court. Shogan, A Question of Judgment, 230-233.

---

6/ Commerce Judge Archbald was investigated by the Department of Justice prior to his impeachment in 1912. It is, however, not apparent whether this was a formal grand jury investigation. Carpenter, Judicial Tenure in the United States, 145; Shogan, A Question of Judgment, 232.

7/ A retired judge remains in office; he possesses the right to receive the salary of his office and retains the capacity to perform judicial functions upon designation and assignment. 28 U.S.C. 294.

- 6 -

     vi.  Circuit Judge Kerner was recently subjected to a grand jury investigation, indicted, and convicted while still in office.  The question whether criminal proceedings can precede impeachment has been raised for the first time on appeal.

In sum, the analysis of the text of the Constitution and its practical interpretation indicate that the Constitution does not require the termination of impeachment proceedings before an officer of the United States may be subjected to criminal proceedings.  The caveat is that all of the above instances concerned judges, who possess tenure under Article III only during "good behavior," a provision not relevant to other officers.  However, although this clause may be the basis for a congressional power to remove judges by processes other than impeachment, it is not directly responsive to the question whether impeachment must precede criminal indictment, nor was the clause the basis for the actions in the historic instances noted above.

B.  Troublesome Implications of a Proposition that Impeachment Must Precede Indictment.

The opposite conclusion, viz., that a person who is subject to impeachment is not subject to criminal prosecution prior to the termination of the impeachment proceedings would create serious practical difficulties in the administration of the criminal law.  As shall be documented, infra, every criminal investigation and prosecution of persons employed by the United States would give rise to complex preliminary questions.  These include, first, whether the suspect is or was an officer of the United States within the meaning of Article II, section 4 of the Constitution, and second, whether the offense is one for which he could be impeached.  Third, there would arise troublesome corollary issues and questions in the field of conspiracies and with respect to the limitations of criminal proceedings.  An interpretation of the Constitution which injects such complications into criminal proceedings is not likely to be a correct one.  Indeed, impractical or self-defeating interpretations of constitutional texts must be avoided.  The Framers were experienced and practical men.  This fact, coupled with the purposive spirit of constitutional interpretation set by Chief Justice Marshall,

has been the foundation for the endurance of our constitutional system for 186 years.

1. Definition of "civil officer." If liability to impeachment is a preliminary bar to criminal prosecution the question necessarily arises as to who is a "Civil Officer of the United States" within the meaning of Article II, section 4, of the Constitution. An officer of the United States has been defined as a person appointed by one of the methods provided for in Article II, section 2, clause 2 of the Constitution, i.e., by the President by and with the advice of Senate, or, on the basis of a statutory authorization, by the President alone, the Courts of Law, or a Head of a Department. United States v. Mouat, 124 U.S. 303, 307 (1886).

But as Chief Justice Marshall, while sitting as a Circuit Justice, pointed out in United States v. Maurice, 2 Brock. 96, 103, 26 Fed. Cas. 1211, 1214 (No. 15747)(C.C. Va., 1823) not every public employment is an "office." The latter term "embraces the ideas of tenure, duration, emolument, and duties." United States v. Hartwell, 6 Wall. 385, 393 (1867); United States v. Germaine, 99 U.S. 508, 511-512 (1878); Auffmordt v. Hedden, 137 U.S. 310, 326-328 (1890). The notion of "office" in the constitutional sense thus presupposes a certain degree of continuity, a specification of duties, and of compensation. The most important aspect of this definition appears to be the requirement of tenure and duration. An assignment which envisages the performance of a single specific task, or of occasional and intermittent duties, the ad hoc position, is normally not considered to be an office. United States v. Germaine, supra; Auffmordt v. Hedden, supra; United States v. Maurice, supra; 37 Op. A.G. 204; The Constitution of the United States of America, Analysis and Interpretations, S. Doc. 39, 88th Cong., 1st Sess., pp. 497, 500. 8/

_____

8/ It is questionable whether the usual exception of the ad hoc position from the term "office" is applicable to the impeachment power; this raises the question whether, for instance, a Presidential agent appointed to perform a single diplomatic mission (S. Doc. 39, supra, pp. 499-501) could be impeached for bribery.

- 8 -

The decisions of the Supreme Court defining the term "officer" in the constitutional sense did not involve a further important element, presumably because it was not relevant to the issues raised in them, viz., that an officer in the constitutional sense must also be invested with some portion of the sovereign functions of the government. Mechan, A Treatise on the Law of Public Office and Public Officers, secs. 1, 2, and 4, and the authorities therein cited, H. Rept. 2205, 55th Cong., 3d Sess., pp. 48-54; Cain v. United States, 73 F. Supp. 1019, 1021 (N.D., Ill., 1947); 22 Op. A.G. 187; 26 id. 24, 249 (1907). In the words of H. Rept. 2205, at p. 52, a person employed in the Executive branch is an officer only if he enforces the law in a manner so as to affect the rights of the people. A person employed by the United States who merely performs the duties of an expert, or advises or negotiates without being able to put into effect the result of his advice or suggestions therefore is not an officer in the constitutional sense. The requirement that an officer must be vested with some element of the sovereign power of the United States, necessarily exempts the vast majority of federal employees from the scope of the impeachment jurisdiction. There are only relatively few persons in the federal establishment who actually have the power to make decisions which concern the public, but case-by-case determination could be difficult.

The questions whether the position of a person employed by the Federal Government satisfies the requirements of tenure, duration, emolument, and duties, and whether any elements of the sovereignty of the United States are vested in it, frequently give rise to complex questions of law and fact. Hence, if an officer of the United States cannot be proceeded against criminally prior to the termination of the impeachment proceedings, those difficult issues would be injected into the criminal prosecution of any sitting or former federal employee in order to determine whether or not he is an officer immune from criminal prosecution until trial by the Senate. We seriously question that this is the true import of the Constitution.

- 9 -

2. _Offenses subject to impeachment_. If it were
assumed _arguendo_, despite our own conclusion to the contrary,
that an officer of the United States is not subject to
criminal proceedings prior to the conclusion of impeachment
proceedings, the scope of that immunity necessarily would
be limited to offenses subject to impeachment. Such an
asserted rule automatically would create another difficult-
to-administer jurisdictional defense, _viz_., whether the
offense in question is non-impeachable and therefore, subject
immediately to criminal proceedings.

According to Article II, section 4 of the Constitution,
officers of the United States can be impeached for "Treason,
Bribery and other high Crimes and Misdemeanors." There is
no need to define treason and bribery. But "[a]s there is
no enumeration of offenses comprised under the last two
categories, no little difficulty has been experienced in
defining offenses in such a way that they fall within the
meaning of the constitutional provisions." _The Constitution_
_of the United States, Analysis and Interpretation_, S. Doc.
No. 39, 86th Cong., 1st Sess., p. 556.

Early commentators indicated that "high Crimes and
Misdemeanors" is a term of art intended to reach wrongs of
a political or of a judicial character, neither limited to,
nor encompassing all, indictable offenses. _See_, _e.g._, _Story_,
_Commentaries_, _op_. _cit_., Vol. I, §§ 749, 764. Some writers
stressed the political nature of offenses over which a
tribunal for the trial of impeachments would have jurisdiction.

In _The Federalist_, No. 65, Alexander Hamilton explained:

"A well-constituted court for the trial of
impeachments is an object not more to be desired
than difficult to be obtained in a government
wholly elective. The subjects of its jurisdic-
tion are those offenses which proceed from the
misconduct of public men, or, in other words,

- 10 -

from the abuse or violation of some public trust.
They are of a nature which may with  peculiar
propriety be denominated POLITICAL, as they relate
chiefly to injuries done immediately to the
society itself."

The following year during the Great Debate on the Removal
Power of the President, James Madison submitted that, if the
President improperly removed--

"from office a man whose merits require that
he should be continued in it * * * he [the
President] will be impeachable by this House
before the Senate for such an act of maladmin-
istration; for I contend that the wanton removal
of a meritorious officer would subject him to
impeachment and removal from his own high trust."
Annals of Congress, 1st Cong., col. 498.

In 1790 and 1791 James Wilson, a signer to the Declaration
of Independence and Associate Justice of the Supreme Court,
in his law lectures, defined the term "high misdemeanors"
as malversation in office 9/ and he asserted:

"In the United States and in Pennsylvania, impeach-
ments are confined to political characters, to
political crimes and misdemeanors, and to politi-
cal punishments."  The Works of James Wilson, Vol.
2, pp. 165, 166.

---

9/ Malversation has been defined as misbehavior in office.
Jowitt, Dictionary of English Law.

- 11 -

Story's detailed discussion of the rules governing
impeachment, op. cit. (Vol. I, secs. 742-813), also stresses
the political nature of impeachable offenses, and assigns
this as the reason why they are to be tried before a tribunal
more familiar with political practices than the courts of
law.  See, e.g., secs. 749, 764-765, 800.  He also points
out that offenses subject to impeachment necessarily cannot
be limited to statutory crimes.10/  He explained that if--

> "the silence of the statute-book [is] to be
> deemed conclusive in favor of the party
> until Congress have made a legislative decla-
> ration and enumeration of the offences which
> shall be deemed high crimes and misdemeanors
> * * * the power of impeachment, except as to
> the two expressed cases, is a complete nullity,
> and the party is wholly dispunishable, however,
> enormous may be his corruption or criminality.

---

10/   Section 800 contains a recapitulation of the numerous
offenses which in English history had been subject to
impeachment.  They included:  Misleading the King with un-
constitutional opinions; attempts to subvert the fundamental
laws, and introduce arbitrary powers; attaching the great
seal to an ignominious treaty; neglect to safeguard the sea
by a lord admiral; betrayal of his trust by an ambassador,
propounding and supporting pernicious and dishonorable measures
by a privy counsellor; the receipt of exorbitant grants and
incompatible employments by a confidential adviser to the
King.  While Story felt that certain impeachments were unduly
harsh and understandable only in the light of their age, such
as giving bad counsel to the king, advising a prejudicial
peace, enticing the king to act against the advice of Parliament,
purchasing offices, giving medicine to the king without advice
of physicians, preventing other persons from giving counsel
to the king except in their presence, and procuring exorbitant
personal grants from the king, he suggested that others were
founded in the most salutary public justice; such as impeach-
ments for malversations and neglects in office, for encouraging
pirates, for official oppression, extortions, and deceits,
and especially for putting good magistrates out of office
and advancing bad ones.

- 12 -

It will not be sufficient to say that, in the cases where any offence is punished by any statute of the United States, it may and ought to be deemed an impeachable offence. <u>It is not every offence that by the Constitution is so impeachable. It must not only be an offence, but a high crime and misdemeanor.</u>" Section 796. (Underscoring supplied).

Yet to cite these commentators and say that impeachments are thought by some to be confined to wrongs of a political character more aptly characterizes the process than defines the offense. In short, it begs the question for a "private" offense, of the sort that a non-officer may also commit, may have gross political ramifications if the perpetrator is a public officer. Is an offense that brings an office into disrepute and renders it dysfunctional a "political" offense?

Disregarding a functional analysis of the impeachment clause suggested by the above question, William Rawle, another early commentator, took a narrow view of the term "impeachable offenses." He would restrict it to offenses committed while performing the duties of the office?

"The legitimate causes of impeachment have been already briefly noticed. They can only have reference to public character and official duty. The words of the text are treason, bribery, and other high crimes and misdemeanors. The treason contemplated must be against the United States. In general those offences which may be committed equally by a private person as a public officer, are not the subjects of impeachment. Murder, burglary, robbery, and indeed all offences not immediately connected with office, except the two expressly mentioned, are left to the ordinary course of judicial proceeding, and neither house can regularly inquire into them, except for the purpose of expelling the member." <u>View on the Constitution of the United States of America</u> (1829) at 215.

- 13 -

Certainly, a case can be made that if impeachment
is a process by which the faith in and integrity and effec-
tiveness of the office of an offending incumbent can be
restored,11/ offenses which tend to bring the office into
disrepute or render it dysfunctional should be impeachable
whether or not committed in an official capacity.  The
constitutional remedy must be commensurate with the consti-
tutional need.  Extortion or forgery committed in private
transactions seemingly has just as enormous an impact on
the office as does bribery.  As the Supreme Court of
Louisiana recently said in a case involving a state impeach-
ment, because there is "a deep and vital interest" in the
office of Judge . . . the official conduct of judges, as
well as their private conduct, is closely observed.  When
a judge, either in his official capacity or as a private
citizen, is guilty of such conduct as to cause others to
question his character and morals, the people not only
lose respect for him as a man but lose respect for the court
over which he presides as well."  In re Haggerty, 241 So. 2d
469 (La. 1970).  See also A. Simpson, Federal Impeachments
50-53.

In confronting this issue, Justice Story in his Commen-
taries chose the safest course and presented the arguments
without resolving the issue whether impeachment should be
confined to official acts:

In the argument upon Blount's impeachment, it
was pressed with great earnestness that there
is not a syllable in the Constitution which con-
fines impeachments to official acts, and it is
against the plainest dictates of common-sense

---

11/ Congressman Summers, Chairman of the House Judiciary Com-
mittee, who was the Manager of the impeachment of district
judge Halsted Ritter in 1936 viewed the impeachment function
as depending on the effect of the offense on the office: "We
do not assume the responsibility . . . of proving that the
respondent is guilty of a crime as that term is known to criminal
jurisprudence.  We do assume the responsibility of bringing
before you a case, proven facts, the reasonable and probable
consequences of which are to cause people to doubt the integrity
of the respondent presiding as a judge." 80 Cong. Rec. 5469,
5602-06 (74th Cong. 2d Sess. 1936).

- 14 -

that such restraint should be imposed upon it.
Suppose a judge should countenance or aid
insurgents in a meditated conspiracy or insur-
rection against the government. This is not
a judicial act, and yet it ought certainly to
be impeachable. He may be called upon to try
the very persons whom he has aided. Suppose
a judge or other officer to receive a bribe not
connected with his judicial office, could he be
entitled to any public confidence? Would not
these reasons for his removal be just as strong
as if it were a case of an official bribe? The
argument on the other side was, that the power
of impeachment was strictly confined to civil
officers of the United States, and this necessar-
ily implied that it must be limited to malconduct
in office.

§805. It is not intended to express any
opinion in these commentaries as to which is
the true exposition of the Constitution on the
points above stated. They are brought before
the learned reader as matters still sub judice,
the final decision of which may be reasonably
left to the high tribunal constituting the court
of impeachment when the occasion shall arise.
Commentaries, op. cit. §§ 804, 805 (1833).

One hundred and forty years later, the question con-
cerning what criminal statutory offenses can be made the
subject of impeachment proceedings remains open. For the
offenses not falling within the impeachment jurisdiction,
the offender/officer could be prosecuted even if the
Constitution precluded the criminal prosecution of impeachable
offenses prior to the conclusion of impeachment. However,
if impeachment were indeed a condition precedent to criminal
prosecution, a person accused of a common offense committed
while in the employment of the United States could plead
that the offense was of a political nature and that he could
not be prosecuted prior to the conclusion of impeachment
proceedings. This would inject into the trial of a criminal
case the delicate issue of what is a political or impeachable
offense, and what constitutes a common non-impeachable crime.

- 15 -

Further, this delicate issue seemingly would be
before the wrong forum (see Story quotation above).  The
actual power to impeach vel non in every instance rests
with the House of Representatives and not with the courts.
And this congressional power -- laying aside the possible
outcome in some future instance of alleged gross abuse --
subsumes within it the threshhold issue of determining
whether an offense is impeachable.  In a criminal proceeding
a judicial conclusion in favor of the impeachable nature
of the offense would of course, not require the House of
Representatives to impeach or the Senate to convict.  In-
deed, a number of considerations might induce nonaction by
the Congress even if an "offense" were held by a court to
be impeachable (and therefore a jurisdictional bar to indict-
ment), e.g., (1) higher legislative priorities for other
business -- legislation, treaty approvals, confirmations
of appointments, investigations, (2) political pressures
not to act, (3) inappropriatness of a political trial for
the given offense, (4) an estimate of ultimate failure to
garner the necessary simple majority in the House and two-
thirds vote in the Senate, thereby precluding the attempt,
(5) a desire not to exacerbate political relations because
of the adverse effect on governmental concerns.

For the above reasons, a rule that impeachment must
precede indictment could operate to impede, if not bar,
effective prosecution of offending civil officers.  The
sensible course, as a general proposition, is to leave to
the judiciary the trial of indictable criminal offenses,
and to Congress the scope of the overlapping impeachment
jurisdiction.  The gross impracticalities of a rigid rule
that impeachment precede indictment demonstrate that it
would be an unreasonable, and improper construction of
the Constitution.

3.  Problems presented by corollary issues.  There
are also reasons of a corollary nature which counsel
against the conclusion that impeachment proceedings must
be completed before a civil officer may be subjected to
criminal proceedings.

(a)  During a grand jury investigation, it may
appear for instance, that one of several co-con-
spirators is an officer of the United States

- 16 -

as was the case in Johnson v. United States, supra.
It would seriously interfere with the investigation
if it had to be suspended in respect to that officer,
or indeed as to the other co-conspirators, until
the termination of impeachment proceedings.  The
alternative is equally unappealing.  If evidence
were nonetheless presented in respect to the other
co-conspirators, serious charges would inevitably
be levied against the civil officer who would not
have the opportunity in a judicial tribunal to
clear himself.  Further, if the civil officer actually
is involved in the conspiracy, his nonparticipation
at trial could impede prosecution of the co-conspirators.

(b)  A similar consideration is presented by the
statute of limitations.  If an officer cannot be
prosecuted prior to impeachment, the criminal statute
of limitations could easily run in his favor.  If
his immunity blocked effective prosecution of co-
conspirators, the statue of limitations might run
in their favor too.  The Criminal Code does not con-
tain and, to our knowledge, never has contained a
section providing for the suspension of the statute
of limitations in the case of an officeholder until
the termination of impeachment proceedings.  The
absence of such provision suggests Congress has
considered such a rule to be unnecessary.  Such
practical interpretation of the Constitution is en-
titled to great consideration.  Stuart v. Laird, 1
Cranch 299, 309 (1803); Field v. Clark, 143 U.S. 649,
691 (1892); United States v. Midwest Oil Co., 236
U.S. 459, 472-473 (1915); United States v. Curtiss-
Wright Corp., 299 U.S. 304, 328-329 (1936).

In sum, an interpretation of the Constitution which
requires the completion of impeachment proceedings before
a criminal prosecution can be instituted would enable
persons who are or were employed by the Government to raise
a number of extremely technical and complex defenses.  It
also would pressure Congress to conduct a large number of
impeachment proceedings which would weigh heavily on its
limited time.  Such an interpretation of the Constitution
is prima facie erroneous.

- 17 -

## II.

### Is the President Amenable to Criminal Proceedings While in Office?

This part of the memorandum deals with the question whether and to what extent the President is immune from criminal prosecution while he is in office. It has been suggested in the preceding part that Article I, sec. 3, clause 7 of the Constitution does not require the exhaustion of the impeachment process before an officer of the United States can be subjected to criminal proceedings. The question therefore arises whether an immunity of the President from criminal proceedings can be justified on other grounds, in particular the consideration that the President's subjection to the jurisdiction of the courts would be inconsistent with his position as head of the Executive branch.

It has been indicated above that there is no express provision in the Constitution which confers such immunity upon the President. Inasmuch as Article I, sec. 6, clause 1 expressly provides for a limited immunity of the members of the legislative branch, it could be argued that, e contrario, the President is not entitled to any immunity at all. 12/ This proposition, however, is not necessarily conclusive; it could be said with equal validity that Article I, sec. 6, clause 1 does not confer any immunity upon the members of Congress, but rather limits the complete immunity from judicial proceedings which they otherwise would enjoy as members of a branch co-equal with the judiciary.

12/ In his speech of March 5, 1800 on the floor of the Senate, Senator Pickney, a former Member of the Constitutional Convention, suggested that the failure to provide for a Presidential immunity was deliberate. Annals of Congress, 6th Cong., col. 74; Farrand, Records of the Federal Convention Vol. III, pp. 384, 385.

- 18 -

Further, as indicated by statements of Alexander Hamilton in The Federalist, No. 69, 13/ it could be said that the immunity of the President to criminal indictment and trial during his office may have been too well accepted to need constitutional mention (by analogy to the English Crown), and that the innovative provision was the specified process of impeachment extending even to the President.

Hamilton's comments were made in the context of calming fears about Executive power and distinguishing the President from the English king.  Regarding criminal liability, his strongest statement would have been to suggest that the President was subject to criminal liability before or after impeachment, yet on the occasion when he made the comparison he spoke only of criminal liability after impeachment.  To be sure, there are strong statements by others to the point that the Convention did not wish to confer privileges on the

---

13/ The Federalist, No. 69:
"The President [unlike the King] would be liable to be impeached, tried, and upon conviction * * * removed from office; and would afterwards be liable to prosecution and punishment in the ordinary course of law."
See also the following from Hamilton.  The Federalist, No. 65:
"The punishment, which may be the consequence of conviction upon impeachment, is not to terminate the chastisement of the offender.  After having been sentenced to perpetual ostracism * * *; he will still be liable to prosecution and punishment in the ordinary course of law."
The Federalist, No. 77:
"The President is at all times liable to impeachment, trial, dismission from office * * * and to the forfeiture of life and estate by subsequent prosecution in the common course of law."

- 19 -

President, but these were made in most general terms, and
did not refer to the question now in issue. 14/ Further,
despite these statements an early Congress did recognize one
form of privilege in the Executive in at least one instance. 15/
The historical evidence on the precise point is not conclusive.

A.  Ambiguities in a Doctrinal Separation of
Powers Argument.

Any argument based on the position or independence of
one of the three branches of the Government is subject to
the qualification that the Constitution is not based on a
theory of an airtight separation of powers, but rather on a
system of checks and balances, or of blending the three powers.
The Federalist, Nos. 47, 48 (James Madison). We must therefore
proceed case-by-case and look to underlying purposes. This
facet of any reasoning based on the doctrine of the separation
of powers is necessarily stressed by those who oppose indepen-
dence or immunity in a given instance. Examples include two
dissenting opinions of Mr. Justice Holmes.

---

14/  The Framers of the Constitution made it abundantly clear
that the President was intended to be a Chief Executive,
responsible, subject to the law, and lacking the prerogatives
and privileges of the King of England. See, e.g., James
Wilson's statements that the prerogatives of the British
monarch were not to be a proper guide in defining Executive
powers (Farrand, Records of the Federal Convention Vol. I,
p. 65) and that the President would not be above the law, nor
have a single privilege annexed to his character. 2 Elliot's
Debates 480.  In the North Carolina Convention, James Iredell
contrasted the position of the King of England who holds his
authority by birthright, has great powers and prerogatives, and
can do no wrong, with that of the President who is no better
than his fellow citizens and can pretend no superiority over
the meanest man in the country. 4 Elliot's Debates 109.

15/  See, e.g., President Washington's refusal in 1794 to submit
to the Senate those parts of a diplomatic correspondence which
in his "judgment for public considerations, ought not to be
communicated." 1 Richardson, Messages and Papers of the
Presidents 152; 1 Senate Executive Journal 147. See Attorney
General Randolph's note to President Washington that the message
"appears to have given general satisfaction.  Mr. M--d--n, in
particular thinks it will have good effect." The Writings of
George Washington (Bicentennial Edition) Vol. 33 p. 282 fn 8.

In *Springer* v. *Philippine Islands*, 277 U.S. 189, 209-210 (1928), he gave graphic expression to the extent which the blending element in the Constitution has blunted the principle of the separation of powers:

> "The great ordinances of the Constitution do not establish and divide fields of black and white. Even the more specific of them are found to terminate in a penumbra shading gradually from one extreme to the other. * * * When we come to the fundamental distinctions it is still more obvious that they must be received with a certain latitude or our government could not go on."

And again in *Myers* v. *United States*, 272 U.S. 52, 177 (1926), he warns that any legal arguments drawn merely from the Executive power of the President, his duties to appoint officers of the United States and to commission them, and to take care that the laws be carefully executed seem to him "spider's webs inadequate to control dominant facts."

Whether or not one agrees with Holmes or the full thrust of his rhetoric, most scholars would concede that there are few areas under the Constitution to which a single branch of the Government can claim a monopoly. An argument based on the separation of powers must be illuminated therefore by constitutional practice.

The difficulty of developing clear rules regarding the various possible facets of Presidential immunity is demonstrated by the limited and ambivalent case law developed in the fields of the amenability *vel* *non* of the President to civil litigation and to the judicial subpoena power. Much of this precedent has been discussed in our memorandum dated June 25, 1973, regarding Presidential Amenability to Judicial Subpoena.

In the *Burr* treason trial, Chief Justice Marshall at first concluded that since the President is the first magistrate of the United States, and not a King who can do no wrong, he was subject to the judicial subpoena power. *United States* v. *Burr*, 25 Fed. Cas. 30, 34, No. 14,692 (C.C.D. Va., 1807). In the *Burr* misdemeanor trial, however, which took

place only a few months later, the Chief Justice had to
qualify significantly his claim of the subpoena power over
the President by conceding that the courts are not required

"to proceed against the President as against
an ordinary individual." United States v.
Burr, 25 Fed. Cas. 187, 190, No. 14,694
(C.C.D. Va., 1807). 16/

And by acquiescing in the privilges claimed by President
Jefferson of not attending court in person and of withholding
certain evidence for reasons of State, Chief Justice Marshall
recognized that the power of the judiciary to subpoena the
President is subject to limitations based on the needs of the
Presidential office.

Marshall's recognition of the special character of the
Presidential office was expanded in Kendall v. United States
ex rel. Stokes, 12 Pet. 524, 610 (1838), where the Court
seemed to deny that it had any jurisdiction over the President:

"The executive power is vested in a presi-
dent; and so far as his powers are derived from
the constitution, he is beyond the reach of any
other department, except in the mode prescribed
by the constitution through the impeachment."

It is significant that this apparent total disclaimer of
any judicial authority over the President also was qualified
by adding the clause "so far as his powers are derived from
the constitution."

---

16/  See also Chief Justice Marshall's statement in the Burr
treason trial "to issue a subpoena to a person filling the
exalted position of the chief magistrate is a duty which
would be dispensed with more cheerfully than it would be
performed." Id. at p. 34.

- 22 -

There have been countless examples in which courts have assumed jurisdiction to scrutinize the validity of Presidential action, such as proclamations, Executive orders, 17/ and even direct instructions by the President to his subordinates.  18/  It is true that, as a matter of convention the party asserting the validity of the Presidential action (whether plaintiff or defendant) is usually a party other than the President, such as his subordinate, or the custodian of the res. 19/  Nevertheless there have been recent dicta that when this convention is inadequate to protect the citizen, i.e., where the President alone can give the requested relief, the courts may assume jurisdiction over the litigation.  See the June 25, 1973 memorandum, Appendix iii-iv.

Again, Attorney General Stanbery's famous oral argument in Mississippi v. Johnson, 4 Wall. 475; 481-491(1867), on which the Brief in Opposition by the Attorneys for the President in In Re Grand Jury Subpoena Duces Tecum, etc., D.C. Misc. 47-73, relies so heavily, 20/ is prefaced by the statement that the case made against President Johnson "is not made against him as an individual, as a natural person, for any acts he intends to do as Andrew Johnson the man, but altogether in his official capacity as President of the United States."  Hence, Attorney General Stanbery's reasoning is presumably limited to the power of the courts to review official action of the President, 21/ and does not pertain to the question whether or not the courts lack the authority to deal with the President "the man" with respect to matters

17/ See, e.g., United States v. Curtiss-Wright, 299 U.S. 304 (1936) (Embargo Proclamation); United States v. Bush, 310 U.S. 371 (1940) (Customs Proclamation).

18/ Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579 (1952) (Steel Seizure).

19/ It may well be that under the normally operative procedural rules the President would be considered the real party in interest or a necessary party.

20/ 9 Weekly Compilation of Presidential Documents 961, 963, 970.

21/ In the eyes of the Court, the dismissal of the proceedings was based on the ground that it lacked jurisdiction over the subject matter rather than over the person of the President. This is shown by its dismissal of similar proceedings brought by the State of George against Secretary of War Stanton and General Grant.  6 Wall. 50 and 451 (1867).

which have no relation to his official responsibility.

Thus it appears that under our constitutional plan it cannot be said either that the courts have the same jurisdiction over the President as if he were an ordinary citizen or that the President is absolutely immune from the jurisdiction of the courts in regard to any kind of claim.  The proper approach is to find the proper balance between the normal functions of the courts and the special responsibilities and functions of the Presidency.

B.   Competing Interests.

An assessment designed to determine the extent to which the status of the Presidency is inconsistent with giving the courts plenary criminal jurisdiction over the President may be divided into two parts.  First, the applicability vel non to the Presidency of any of the considerations which in Part I of this memorandum led to rejection of the proposition that impeachment must precede criminal proceedings, and, second, whether criminal proceedings and execution of potential sentences would improperly interfere with the President's constitutional duties and be inconsistent with his status.

1.   Is court trial of a President too political for the judicial process?  Part I of this memorandum, for a variety of reasons, concluded that the considerations which led to the establishment of the congressional impeachment jurisdiction, e.g., that the courts were not well equipped to handle (a) political offenses and (b) crimes committed by high office-holders, were insufficient to exempt every officer of the United States from criminal prosecution for statutory offenses prior to the termination of the impeachment proceedings.  The question to be examined here is whether these reasons are so much stronger in the case of the President as to preclude his prosecution while in office.

a.   Political offenses.  Political offenses subject to indictment are either statutory or nonstatutory offenses.  The courts, of course, cannot adjudicate nonstatutory offenses. With respect to statutory political offenses their very inclusion in the Penal Code is an indication of a congressional determination that they can be adjudicated by a judge and jury,

- 24 -

and there appears to be no weighty reason to differentiate
between the President and other officeholders, unless special
separation of powers based interests can be articulated with
clarity.

It should be noted that it has been well established in
civil matters that the courts lack jurisdiction to reexamine
the exercise of discretion by an officer of the Executive branch.
Marbury v. Madison, 1 Cranch 137, 166 (1803); Decatur v. Paulding,
14 Pet. 497, 514-517 (1840); Panama Canal Co. v. Grace Line, Inc.,
365 U.S. 309, 318 (1958). By the same token it would appear that
the courts lack jurisdiction in criminal proceedings which have
the effect of questioning the proper exercise of the President's
discretion. This conclusion, of course, would involve a lack of
jurisdiction over the subject matter and not over the person.

    b.  <u>Intrinsically political figures</u>.  The second reason
for the institution of impeachment, viz., the trial of political
men, presents more difficulties.  The considerations here
involved are that the ordinary courts may not be able to cope
with powerful men, and second, that it will be difficult to
assure a fair trial in criminal prosecutions of this type.

    <u>i</u>.  The consideration that the ordinary courts of law
are unable to cope with powerful men arose in England where it
presumably was valid in feudal time.  In the conditions now
prevailing in the United States, little weight is to be given
to it as far as most officeholders are concerned.  (See Rawle,
op. cit., supra, at 211).

    <u>ii</u>. We also note Alexander Hamilton's point that in
well-publicized cases involving high officers, it is virtually
impossible to insure a fair trial. 22/  In Part I we assumed
without discussion that this point was not of sufficient
importance to require impeachment prior to indictment with
respect to every officeholder.  Undoubtedly, the consideration
of assuring a fair criminal trial for a President while in
office would be extremely difficult.  It might be impossible
to impanel a neutral jury.  To be sure there is a serious

---

22/ "The prosecution of them [i.e., political crimes committed
by political men] for this reason, will seldom fail to agitate
the passions of the whole community, and to divide it into
parties more or less friendly or inimical to the accused.  In
                               (continued)

"fairness" problem whether the criminal trial precedes or
follows impeachment. However, the latter unfairness is
contemplated and accepted in the impeachment clause itself,
thus suggesting that the difficulty in impaneling a neutral
jury should not be viewed, in itself, an absolute bar to
indictment of a public figure.

2.  Would criminal proceedings against a President be
ineffective and inappropriate because of his powers regarding
(a) prosecution, (b) Executive privilege, and (c) pardons? The
Presidency, however, creates a special situation in view of the
control of all criminal proceedings by the Attorney General who
serves at the pleasure and normally subject to the direction of
the President and the pardoning power vested in the President.
See Reply Brief filed by Attorneys for the President in In Re
Grand Jury Subpoena, etc.  (see supra), 9 Weekly Compilation of
Presidential Documents 999-1000, and the authorities there
cited.  Hence, it could be argued that a President's status as
defendant in a criminal case would be repugnant to his office
of Chief Executive, which includes the power to oversee prose-
cutions.  In other words, just as a person cannot be judge in
his own case, he cannot be prosecutor and defendant at the same
time.  This objection would lose some of its persuasiveness
where, as in the Watergate case, the President delegates his
prosecutorial functions to the Attorney General, who in turn
delegates them to a Special Prosecutor.  Reply Brief, supra, at
1000, fn. 1.  However, none of these delegations is, or legally
can be, absolute or irrevocable.

Further, the problem of Executive privilege may create
the appearance of so serious a conflict of interest as to make
it appear improper that the President should be a defendant in
a criminal case.  If the President claims the privilege he would
be accused of suppressing evidence unfavorable to him.  If he
fails to do so the charge would be that by making available
evidence favorable to him he is prejudicing the ability of
future Presidents to claim privilege.  And even if all other
hurdles are surmounted, he would still possess the pardoning power.

----

22/  (Continued)
many cases it will connect itself with the pre-existing factions,
and will enlist all their animosities, partialities, influence,
and interest on one side or on the other; and in such cases
there will always be the greatest danger that the decision will
be regulated more by the comparative strength of parties than
by the real demonstrations of innocence or guilt."  The Federalist,
No. 65 (Hamilton).

3. Would criminal proceedings unduly interfere in a direct or formal sense with the conduct of the Presidency?

a. Personal attendance. It has been indicated above that in the Burr case, President Jefferson claimed the privilege of not having to attend court in person. And it is generally recognized that high government officials are exempted from the duty to attend court in person in order to testify. See our memorandum of June 25, 1973, supra, pp. 7-8. This privilege would appear to be inconsistent with a criminal prosecution which necessarily requires the appearance of the defendant for pleas and trial, as a practical matter.

It should be noted that the exemption of high government officials from personal appearance is only the general rule. In Peoples v. United States Department of Agriculture, 427 F.2d 561, 567 (C.A. 1970) the court cautioned that "subjecting a cabinet officer to oral deposition is not normally countenanced * * *." (Underscoring supplied). The quashing of a subpoena addressed to the NASA Administrator in Capital Vending Co. v. Baker, 36 F.R.D. 45, 46 (D.C. D.C., 1964), was predicated on the circumstance that the Administrator had no personal knowledge of the event. Personal attendance of high officials has been required in several exceptional cases where the official was directly and personally involved in the events underlying the litigation. Union Savings Bank of Patchogue v. Saxon, 209 F. Supp. 317 (D.C. D.C. 1962), (Comptroller of the Currency); Virgo Corporation v. Paiewonsky, 39 F.R.D. 9, (D.C. V.I., 1965) (Territorial Governor); D.C. Federation of Civic Association v. Volpe, 316 F. Supp. 754, 760 fn. 12 (D.C. D.C., 1970), reversed on other grounds 459 F. 2d 1231 (C.A. D.C., 1972) certiorari denied 405 U.S. 1031 (1973) (Secretary of Transportation).

Because a defendant is already personally involved in a criminal case (if total immunity be laid aside), it may be questioned whether the normal privilege of high officials not to attend court in person applies to criminal proceedings in which the official is a defendant.

b.  Direct interference with official duties.  A
necessity to defend a criminal trial and to attend court in
connection with it, however, would interfere with the
President's unique official duties, most of which cannot be
performed by anyone else.  It might be suggested that the
same is true with the defense of impeachment proceedings;
but this is a risk expressly contemplated by the Constitution,
and is a necessary incident of the impeachment process.  The
Constitutional Convention was aware of this problem but
rejected a proposal that the President should be suspended  23/
upon impeachment by the House until acquitted by the Senate.

During the past century the duties of the
Presidency, however, have become so onerous that a President
may not be able fully to discharge the powers and duties of
his office if he had to defend a criminal prosecution.  This
might constitute an incapacitation so that under the provisions
of the Twenty-fifth Amendment, Sections 3 or 4, the Vice
President becomes Acting President.  The same would be true,
if a conviction on a criminal charge would result in incarcer-
ation.  However, under our constitutional plan as outlined
in Article I, sec. 3, only the Congress by the formal process
of impeachment, and not a court by any process should be
accorded the power to interrupt the Presidency or oust an
incumbent.24/

---

23/That decision was based in part on the consideration that
a simple majority of the House should not be able to suspend
the President.  2 Farrand, Records of the Federal Convention
612.  Tucker's Blackstone, Vol. I, App., pp. 347-348, which,
having been published in 1803, did not have the benefit of
the Madison papers, presumed that a President would be
instantly incapacitated when actually impeached.
24/
See Story, op. cit., sec. 786.

This would suggest strongly that, in view of the unique aspects of the Office of the President, criminal proceedings against a President in office should not go beyond a point where they could result in so serious a physical interference with the President's performance of his official duties that it would amount to an incapacitation. [The non-physical yet practical interferences, in terms of capacity to govern, are discussed infra as the "fourth question."] The physical interference consideration, of course, would not be quite as serious regarding minor offenses leading to a short trial and a fine. It has been shown in the June 25, 1973 Memorandum, supra, Appendix, p. i, fn., that Presidents have submitted to the jurisdiction of the courts in connection with traffic offenses. However, in more serious matters, i.e., those which could require the protracted personal involvement of the President in trial proceedings, the Presidency would be derailed if the President were tried prior to removal.

A possibility not yet mentioned is to indict a sitting President but defer further proceedings until he is no longer in office. From the standpoint of minimizing direct interruption of official duties--and setting aside the question of the power to govern--this procedure might be a course to be considered. One consideration would be that this procedure would stop the running of the statute of limitations. (For details see pp. 13-14 of Part I of this memorandum.) It is uncertain whether a constitutional conclusion that the President could not be indicted while in office would be viewed as tolling the federal statutes of limitations. While this approach may have a claim to be considered as a solution to the problem from a legalistic point of view, it would overlook the political realities. As will be shown presently, an indictment hanging over the President while he remains in office would damage the institution of the Presidency virtually to the same extent as an actual conviction. To be sure, there could also be damage flowing from unrefuted charges. It also may be noted that the possibility that a President may escape all prosecution by the running of the statute of limitations is not a constitutional matter. The policy regarding statutes of limitation is within legislative control.

4.  Would initiation or prosecution of criminal proceedings, as a practical matter, unduly impede the power to govern, and also be inappropriate, prior to impeachment, because of the symbolic significance of the Presidency?  In Mississippi v. Johnson, supra, Attorney General Stanbery made the following statement:

> "It is not upon any peculiar immunity that
> the individual has who happens to be President;
> upon any idea that he cannot do wrong; upon any
> idea that there is any particular sanctity be-
> longing to him as an individual, as is the case
> with one who has royal blood in his veins; but
> it is on account of the office that he holds
> that I say the President of the United States
> is above the process of any court or the juris-
> diction of any court to bring him to account as
> President."

This may be an overstatement, but surely it contains a kernel of truth, namely that the President is the symbolic head of the Nation.  To wound him by a criminal proceeding is to hamstring the operation of the whole governmental apparatus, both in foreign and domestic affairs.  It is not to be for-gotten that the modern Presidency, under whatever party, has had to assume a leadership role undreamed of in the eighteenth and early nineteenth centuries.  The spectacle of an indicted President still trying to serve as Chief Executive boggles the imagination.

Perhaps this thought is best tested by considering what would flow from the reverse conclusion, i.e., an attempted criminal trial of the President.  A President after all is selected in a highly complex nationwide effort that involves most of the major socio-economic and political forces of our whole society.  Would it not be incongruous to bring him down, before the Congress has acted, by a jury of twelve, selected by chance "off the street" as Holmes put it?  Surely the House and Senate, via impeachment, are more appropriate agencies for such a crucial task, made unavoidably political by the nature of the "defendant."

- 30 -

The genius of the jury trial has been that it provides
a forum of ordinary people to pass on matters generally within
the experience or contemplation of ordinary, everyday life.
Would it be fair to such an agency to give it responsibility
for an unavoidably political judgment in the esoteric realm
of the Nation's top Executive?

In broader context we must consider also the problems of
fairness, and of acceptability of the verdict.  Given the
passions and exposure that surround the most important office
in the world, the American Presidency, would the country in
general have faith in the impartiality and sound judgment of
twelve jurors selected by chance out of a population of more
than 200 million?  If based on "some" evidence it is unlikely
a guilty verdict would be reversible on appeal (assuming no
procedural error), and yet it could be tantamount to removal
and probably would force a resignation.  Even if there were
an acquittal, would it be generally accepted and leave the
President with effective power to govern?

A President who would face jury trial rather than resign
could be expected to persist to the point of appealing an
adverse verdict.  The process could then drag out for months.
By contrast the authorized process of impeachment is well-
adapted to achieving a relatively speedy and final resolution
by a nation-based Senate trial.  The whole country is repre-
sented at the trial, there is no appeal from the verdict, and
removal opens the way for placing the political system on a
new and more healthy foundation.

To be sure it is arguable that despite the foregoing
analysis it would be possible to indict a President, but defer
trial until he was out of office, without in the meantime
unduly impeding the power to govern, and the symbolism on
which so much of his real authority rests.  Given the reali-
ties of modern politics and mass media, and the delicacy of
the political relationships which surround the Presidency
both foreign and domestic, there would be a Russian roulette
aspect to the course of indicting the President but postponing
trial, hoping in the meantime that the power to govern could
survive.

- 30 -

A counter-argument which could be made is that the
indictment alone should force a resignation, thus avoiding the
trauma either of a trial during office, or an impeachment pro-
ceeding.  This counter-argument, however, rests on a predic-
tion concerning Presidential response which has no empirical
foundation.  The reasons underlying the Founding Fathers'
decision to reject the notion that a majority of the  House
of Representatives could suspend the President by impeaching
him (see fn. 23, supra) apply with equal force in a scheme
that would permit a majority of a grand jury to force the
resignation of a President.  The resultant disturbance to our
constitutional system would be equally enormous.  Indeed, it
would be more injudicious because the grand jury, a secret
body, could interrupt Presidential succession without affording
the incumbent the opportunity for a hearing to voice his defense.

A further factor relevant here is the President's role as
guardian and executor of the four-year popular mandate expres-
sed in the most recent balloting for the Presidency.  Under
our developed constitutional order, the presidential election
is the only national election, and there is no effective sub-
stitute for it.  Different electorates and markedly different
voting patterns produce the Senate and the House of Represent-
atives.  Because only the President can receive and continuously
discharge the popular mandate expressed quadrennially in the
presidential election, an interruption would be politically
and constitutionally a traumatic event.  The decision to termin-
ate this mandate, therefore, is more fittingly handled by the
Congress than by a jury, and such congressional power is
founded in the Constitution.

In suggesting that an impeachment proceeding is the only
appropriate way to deal with a President while in office, we
realize that there are certain drawbacks, such as the running
of a statute of limitations while the President is in office,
thus preventing any  trial for such offenses.  25/
In this difficult area all courses of action have costs and
we recognize that a situation of the type just mentioned could
cause a complete hiatus in criminal liability.  We doubt,
however, that this gap in the law is sufficient to overcome
the arguments against subjecting a President to indictment
and criminal trial while in office.

---

25/As shown above, the statute of limitations problem could be
obviated by a specific statutory provision suspending the run-
ning of the criminal statute of limitations in favor of the
President while he is in office.

III.

## Is the Vice President Amenable to Criminal Proceedings While in Office?

In the first part of this memorandum we concluded that as a general proposition the Constitution does not require that an officer of the United States be impeached before criminal proceedings may be instituted against him. In the second part we concluded that by virtue of his unique position under the Constitution the President cannot be the object of criminal proceedings while he is in office. In this third part we are concerned with the question whether there is anything in the position of the Vice President that is equally inconsistent with his amenability to criminal proceedings.

We begin by discussing the case of Aaron Burr. Eight months before the expiration of his term, he was indicted for murder in both the New Jersey and New York courts for fatally wounding Alexander Hamilton in a duel on July 11, 1804. B. Mitchell, Alexander Hamilton, 537 (1962). The proceedings in New Jersey were quashed after the Jeffersonians, who became his partisans during the impeachment trial of Judge Samuel Chase over which Burr presided, prevailed upon the New Jersey Governor. Id. at 541. In New York, the grand jury changed the charge from murder to the misdemeanor of sending a challenge and Burr was tried on this charge after his term was over. 26/ These facts show one more understanding nearly contemporaneous to the making of the Constitution to the effect that impeachment need not precede indictment. Surely, had it been thought that a sitting Vice President could not be federally indicted prior to impeachment, on the ground that his duties could be so interrupted, the principle of federal supremacy would have imposed a similar restraint on the states. 27/ And yet, while the indictment was strenuously resisted, no claim was made that criminal proceedings were barred until the conclusion of impeachment proceedings.

---

26/ He remained a fugitive from the courts of New York during the remainder of his term as Vice-President. Mitchell, supra, at 541.

27/ In Tennessee v. Davis, 100 U.S. 257 (1879), the Supreme Court upheld the constitutionality of a statute removing to federal courts state criminal prosecutions of federal employees for acts committed under color of office.

- 33 -

We resort then to an analysis similar to that made with respect to the amenability of the President to criminal proceedings. We based the President's immunity from criminal proceedings essentially on two grounds. First, that the person who controls criminal prosecutions as the head of the Executive branch, controls part of the evidence as holder of the power of Executive privilege, and is vested with the pardoning power under Article II, section 2, clause 1 of the Constitution, cannot at the same time be a defendant in a criminal case. This set of considerations obviously is not applicable to the Vice President. (See II-B-2).

The second reason was the effect of a criminal prosecution on the President's office. (See II-B-3 and 4.) In that context we examined the unique nature of the President's duties and the symbolic attributes of his office. The questions now to be examined are (a) whether the Vice President in his own right is vested with constitutional and statutory duties so unique and important that they may not be disturbed by a criminal prosecution and (b) whether such prosecution would do irreparable harm to the institution of the Presidency because the Vice President may at any time become President; _i.e._, a theory of Vice Presidential immunity derivative from Presidential immunity. In making that evaluation we start out from the premise that immunity from prosecution is basically contrary to the spirit of the Constitution and it may be resorted to only if the considerations leading to it are irrefutable.

A.  Duties of the Vice President pursuant to Statute, Reorganization Plan, or Executive Order.

The Vice President serves on a number of Boards and Commissions pursuant to statute, Reorganization Plan or Executive order. He is a member of the Establishment of the Smithsonian Institution, a Regent thereof, and presides over certain meetings of the members of the Institution in the absence of the President. 20 U.S.C. 41, 42, 45. He is the Chairman of the National Council on Marine Resources and Engineering Development (33 U.S.C. 1102), 28/ and a member

---

28/  33 U.S.C. 1102(c) authorizes the President to designate one of the members of the Council to preside over its meetings during the absence, disability, or unavailability of the Chairman.

of the National Security Council (50 U.S.C. 402). In addition, he is a member of the Cabinet Committee on Economic Policy (Executive Order No. 11453); Chairman of the National Council on Indian Opportunity (Executive Order No. 11399, as amended by Executive Order No. 11551); and Chairman of the President's Council on Youth Opportunity (Executive Order No. 11330, as amended by Executive Order No. 11547). He has "immediate supervision" over the Office of Intergovernmental Relations (Executive Order No. 11455), and is a member of the Domestic Council (Reorganization Plan No. 2 of 1970, sec. 201).

The operations of none of those governmental entities would be jeopardized if the Vice President could not attend them. Regarding such functions the role of the Vice President can be analogized to that of a cabinet officer.

B.  Duties of the Vice President under the Constitution.

Under the Constitution the Vice President has the following duties:

i.  He shall be President of the Senate. Article I, section 3, clause 4. The Senate, however, shall elect a President pro tempore to act as President of the Senate in the event the Vice President is absent or exercises the Office of the President. (Article I, section 3, clause 5).

ii.  Break a tie if the Senate is evenly divided. (Article I, section 3, clause 4).

iii.  Become President in the case of the removal, death or resignation of the President (Twenty-fifth Amendment, section 1).

iv.  Become Acting President in the event that the President is unable to discharge the powers and duties of his office (Twenty-fifth Amendment, secs. 3 and 4).

The Vice President's functions as President of the Senate clearly are not unique. The Constitution specifically provides

- 35 -

for a substitute in the person of the President pro tempore
of the Senate.  With respect to his responsibility as tie
breaker his immunity from criminal prosecution should be
analogized to that of Members of Congress under Article I,
section 6, clause 1 of the Constitution.  That congressional
immunity from arrest does not extend to treason, felony, and
breach of the peace, i.e., virtually the entire spectrum of
criminal proceedings.  The mere possibility that the Vice
President may have to cast a tie-breaking vote would therefore
not justify his immunity from criminal proceedings.

This leaves the question whether the responsibilities
and the position of the Vice President as potential President
or Acting President are inconsistent with his amenability to
criminal proceedings, so that on a derivative basis he would
share the President's immunity.  As in the case of the Presidency,
this issue will be analyzed (a) in terms of the direct inter-
ference with the performance of his duties and functions, and
(b) with the symbolic impact on the dignity of the Presidency.

1.  Direct or formal interference with the conduct of
the Vice Presidency.  The issue here is whether immediate
availability of the Vice President to assume the duties of
the President or Acting President is so important that he
should not be even temporarily incapacitated by trial or possible
incarceration.  (The Vice President would become President in
event of death, resignation or removal of the President, and
would become Acting President in the event the President were
found under the Twenty-fifth Amendment to be incapacitated.)
The principal responsibility of the Vice President is to be
ready to serve as President or Acting President should the
occasion arise, thereby avoiding any interruption in the
continuity of the office of the President.  This duty "to stand
and wait" is of the highest constitutional and institutional
importance.  Judicial proceedings which could interfere with
readiness to serve therefore require careful scrutiny.

At the same time we must note the highly contingent
nature of the possibility that the Vice President would be
called to assume the office of President or Acting President.

- 36 -

Moreover, it has not been the custom to sequester the Vice
President to make certain that he is always available to
assume his potential Presidential duties at a moment's notice.
The Vice President is frequently absent from the capital,
possibly in remote and inaccessible parts of the country,29/
or even abroad on ceremonial functions.  Nothing, of course,
can prevent him from being sick or otherwise temporarily
incapacitated.

Under such a practical interpretation of the extent of
the Vice President's immediate availability, it appears as a
general proposition that his duty to stand and wait does not
necessarily require his total immunity from criminal prose-
cution.  If the Office of the Presidency was vacated while a
criminal proceeding was being conducted against the Vice
President, the process could be halted at once.  Whether or
not impeachment proceedings would then ensue against the
former Vice President, now President, would depend on the will
of Congress.  The situation then would be exactly the same as
if the Vice President had been President when the allegations
of criminality first surfaced -- no better, no worse.  Thus,
a criminal indictment against a Vice President need not abrogate
in any way his constitutional duty to stand and wait.  This
duty, therefore, does not afford a basis for granting to a
Vice President immunity from criminal prosecution.

As a further practical observation, it may be noted that
if a trial of the Vice President proceeded to a sentence of
imprisonment, and were sustained in what might be expected
to be an expeditious appeal, the Vice President might well
resign.  He could be replaced under the Twenty-fifth
Amendment's procedure for filling a "vacancy" in the office
of Vice President.  Thus, the uninterruptibility of the
Presidency would be preserved.  There is, of course, no
provision in the Constitution (other than impeachment and
removal) for determining that a Vice President is incapacitated.
The Constitution contains such incapacity-determination
process only for the Presidency.

---

29/  Note the delay in reaching Vice President Coolidge on his
father's farm after President Harding's death.

Institution of criminal proceedings against the Vice President could, however, inject uncertainties into the Presidential succession.  If a Vice President is under indictment or sentence of imprisonment, it could be claimed that he is incapacitated to succeed to the Presidency, and that the Speaker of the House of Representatives is next in line of succession.  In that event the political stability of the nation could be seriously disrupted as the result of the failure of the Constitution to provide a procedure to resolve that question.  The matter would come to a head if an actual vacancy in the Presidency should then occur.  No one can foresee all of the contingencies which might arise in this situation.  It might be reasonable to speculate that the Congress might claim an authoritative power in itself to resolve the matter, but if it did so by any vote falling short of the two-thirds Senate vote required to remove by the impeachment process, further uncertainties could ensue.  Alternatively, the situation might give rise to a modern analogy to the Electoral Commission which was set up to resolve the Hayes-Tilden dispute.

To be sure, any action which could cast a doubt on the Vice President's capacity to succeed to the Presidency poses a serious question.  Nevertheless, there are hazards also in having unresolved criminal charges hanging over the head of a Vice President, and the foregoing set of difficult scenarios is highly contingent.  We suggest, therefore, that the rather remote possibility that the Vice President's capacity might be questioned would not justify a conclusion that the Vice President is immune from criminal prosecution.

2.  Practical interference with the power to govern and
the symbolic significance of the Vice Presidency.--Turning
now from the question of direct and formal interferences to
the issue of symbolic and other practical interferences with
the power to govern (as discussed in Part II-B-4), it may be
observed that if it is felt these latter considerations are
germane for the President, they are also germane for the
Vice President, although possibly to a lesser degree.  Clearly
the authority of the Presidency would suffer immeasurably
were it to pass to a Vice President under indictment or
to one "taken from criminal custody by a set of curious
chances," to paraphrase the Mikado.  But the damage could be
similar--or even more serious--if the Presidency passed to
a Vice President against whom serious charges were in every-
one's mouth and who could neither be brought to justice nor
given an opportunity to clear himself.

Again, because of the contingent nature of Vice Presi-
dential succession to the Presidency, we feel that the
potential problems in this area too should be faced and
solved by political [or other] means as they occur, rather
than be ignored under a theory of total immunity from
criminal prosecution.  If, for example, actual or threatened
criminal prosecution should result in a resignation, the
Vice Presidential office could be refilled by the procedures
of the Twenty-fifth Amendment.

3.  Evaluation.--There is one fundamental recurring
problem in the above discussion.  Should the Vice President
be treated as if he were the President himself or his alter
ego, because he is only one heart beat away from taking that
position?  Alternatively, should the stress be placed on the
contingent nature of his assumption of the Presidential
office?  A reasonable approach toward the solution of this
dilemma would be the consideration that the criminal prose-
cution would not directly and immediately interfere with
the performance of the Presidential duties and with the
Presidential office itself, but rather with the Vice
President's ability to succeed to the Presidency and the
effect thereof on that institution.

- 39 -

As indicated above, the prosecution of a Vice President would not legally or actually preclude his assumption of the Presidential duties because the proceedings could always be interrupted in that event. The problem therefore is basically of a political nature, viz., whether a Vice President against whom criminal charges have been made, who perhaps has been indicted, and who perhaps has been convicted can effectively perform the duties of the President. This political question is not solved by providing for immunity from criminal prosecution. Even if there were no indictment and trial, the very existence of those charges would hamper the Vice President in the performance of his Presidential duties almost as much as if he were tried and convicted. Indeed, he might be in a better position if he were able to vindicate himself before a court while he is Vice President.30/

In sum, although one cannot entirely be free from doubt in this unprecedented area, it is, nevertheless, concluded that the case for granting the Vice President immunity from criminal prosecution has not been made.

Having established the proposition that the Vice President does not share the immunity suggested for the President, because the various considerations which support such immunity do not relate directly to the Vice President, the public interest in going forward with investigation and possible indictment of the Vice President is supported strongly by two additional factors.

### a.  The alleged presence of co-conspirators

We understand that there are allegations to the effect that the Vice President was a member of a conspiracy. If true, there is a substantial public interest in including the Vice President in the on-going investigation and possible indictment proceedings. Failure to do so might not only preclude the opportunity to bring co-conspirators to justice, but also

30/ To recapitulate we conclude that the President must be denied that opportunity to vindicate himself because that would interfere with the performance of his official duties, and inevitably be inconsistent with his control of the prosecution and the pardoning power.

prejudice the Vice President.

The prosecution also would be severely hampered by the withholding from the grand jury of those elements of the alleged conspiracy linked to the Vice President.  As a result the activities of the alleged co-conspirators could not be fully disclosed and evaluated, which might redound unfairly to their benefit.  At the same time, the Vice President might be unfairly linked by innuendo or incomplete disclosure of facts to the alleged conspiracy.  In short any resultant delay in the proceedings would benefit the co-conspirators, hamper the prosecution, and postpone a possible exoneration of the Vice President.

      b.   <u>The statute of limitations problem</u>

Another circumstance counselling prompt presentation of evidence to the grand jury is that the statute of limitations is about to bar the prosecution of the alleged offenders with respect to some or all of the offenses.  The problem presented by the statute of limitations would be avoided by an indictment within the statutorily specified period.

After indictment, the question whether the Government should press for immediate trial or delay prosecution until the expiration of the Vice President's duties involves questions of trial strategy (<u>e.g.</u>, relation to possible co-conspirators as just discussed) and criminal procedure (<u>e.g.</u>, right to a speedy trial) which other Divisions may be more competent to evaluate in the light of all of the facts.

                              Robert G. Dixon, Jr.
                       Assistant Attorney General
                        Office of Legal Counsel