## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

PEOPLE OF THE STATE OF NEW YORK

-against-                                    23 Civ. 3773 (AKH)

DONALD J. TRUMP,

                    Defendant.

## PEOPLE'S MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR REMAND

# TABLE OF CONTENTS

TABLE OF AFFIDAVITS AND EXHIBITS ................................................................ ii

TABLE OF AUTHORITIES ................................................................................. iv

INTRODUCTION ............................................................................................ 1

STATEMENT OF THE CASE .............................................................................. 2

   I.    Defendant and His Private Business Entities. ................................................ 2

   II.   The Conduct Charged in the People's Indictment. .......................................... 3

ARGUMENT ................................................................................................. 6

   I.    Defendant Fails to Establish That His Alleged Criminal Conduct Arose
       "Under Color of . . . Office." ..................................................................... 8

   II.   Defendant Fails to Allege a Colorable Federal Defense. ................................. 16

      A.   Defendant has not articulated a plausible immunity defense. .................... 17

      B.   Defendant has not articulated a plausible federal preemption defense. ......... 21

   III.  Defendant's Invocation of Protective Jurisdiction Fails. ............................... 26

   IV.  Defendant Is Not a Federal "Officer" Entitled to Seek Removal. ..................... 30

CONCLUSION .............................................................................................. 32

## TABLE OF AFFIDAVITS AND EXHIBITS

The following affidavits and exhibits accompany this motion:

Declaration of Matthew Colangelo dated May 30, 2023 (appending exhibits).

Ex. 1          Sealed Exhibit.

Ex. 2          People's Response to Defendant Donald J. Trump's April 27 Request for a Bill of Particulars, *People v. Donald J. Trump*, Ind. No. 71543-23 (Sup. Ct. N.Y. Cnty. May 12, 2023).

Ex. 3          Sealed Exhibit.

Ex. 4          Donald J. Trump, @realDonaldTrump, Twitter (May 3, 2018, 6:46 AM, 6:54 AM, and 7:00 AM).

Ex. 5          May 4, 2018 Statement from Rudy Giuliani, *reprinted in* Politico Staff, *Full text: Rudy Giuliani issues statement clarifying his earlier remarks*, Politico (May 4, 2018).

Ex. 6          Transcript of Rudy Giuliani interview, *Hannity* (Fox News broadcast May 2, 2018).

Ex. 7          Transcript of Rudy Giuliani interview, *This Week* (ABC News broadcast May 6, 2018).

Ex. 8          Sealed Exhibit.

Ex. 9          Sealed Exhibit.

Ex. 10         Sealed Exhibit.

Ex. 11         Sealed Exhibit.

Ex. 12         Sealed Exhibit.

Ex. 13         Complaint, *Trump v. Cummings*, No. 19-cv-1136 (D.D.C. filed Apr. 22, 2019).

Ex. 14         Complaint, *Trump v. Deutsche Bank AG*, No. 1:19-cv-03826 (S.D.N.Y. filed Apr. 29, 2019).

Ex. 15         U.S. Dep't of Justice, Office of Legal Counsel, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. OLC 214 (1982).

Ex. 16         Brief for United States as Amicus Curiae, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023).

Ex. 17      U.S. Office of Special Counsel, *Federal Hatch Act Advisory: Candidate Visits to Federal Agencies* (Feb. 15, 2018).

Ex. 18      U.S. Dep't of Justice, Office of Legal Counsel, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. OLC 222 (2000).

Ex. 19      U.S. Dep't of Justice, Office of Legal Counsel, *Amenability of the President, Vice President and other Civil Officers to Federal Criminal Prosecution While in Office* (Sept. 24, 1973).

Ex. 20      Decision & Order, *People v. The Trump Corporation*, Ind. No. 1473/2021 (Sup. Ct. N.Y. Cnty. Sept. 6, 2022).

Ex. 21      Information, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018).

Ex. 22      Hearing Transcript, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018).

Ex. 23      Memorandum from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice to Kenneth A. Lazarus, Associate Counsel to the President, *Applicability of 3 C.F.R. Part 100 to the President and Vice President* (Dec. 19, 1974).

Ex. 24      Protective Order, *People v. Donald J. Trump*, Ind. No. 71543-23 (Sup. Ct. N.Y. Cnty. May 8, 2023).

# TABLE OF AUTHORITIES

## FEDERAL CASES

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454 (D.C. Cir. 1995)......................26

*American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40 (1999)......................................11

*Arizona v. Manypenny*, 451 U.S. 232 (1981)........................................................1, 2, 9

*Armstrong v. Thompson*, 759 F. Supp. 2d 89 (D.D.C. 2011) ........................................13

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)..............................................................16

*BDA Inv. Properties LLC v. Sosa,*
    CV 11-03684, 2011 WL 1810634 (C.D. Cal. May 12, 2011) ...............................26

*Bond v. United States*, 572 U.S. 844 (2014) ................................................................1

*Cameron v. Johnson*, 390 U.S. 611 (1968)...............................................................28

*Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022)..........................................................31

*Clinton v. Jones*, 520 U.S. 681 (1997)........................................................9, 14, 19, 21

*Colorado v. Symes*, 286 U.S. 510 (1932)...................................................................8

*County of San Mateo v. Chevron Corp.,*
    32 F.4th 733 (9th Cir. 2022) ...........................................................................7

*Dewald v. Wriggelsworth*, 748 F.3d 295 (6th Cir. 2014) ...........................................24

*Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477 (2010)........................30

*Healy v. Ratta*, 292 U.S. 263 (1934).......................................................................32

*Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129 (D. Mass. 2009) .......................................16

*Idaho v. Horiuchi*, 253 F.3d 359 (9th Cir. 2001)........................................................13

*Imbler v. Pachtman*, 424 U.S. 409 (1976) ................................................................18

*In re Lindsey*, 158 F.3d 1263 (D.C. Cir. 1998)...........................................................15

*Janvey v. Democratic Senatorial Campaign Comm., Inc.,*
    712 F.3d 185 (5th Cir. 2013) ......................................................................24-25

*Jefferson Cnty. v. Acker*, 527 U.S. 423 (1999) ..........................................................15

*Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273 (5th Cir. 1994) ..................................................25

*Kirschner v. Klemons*, 225 F.3d 227 (2d Cir. 2000)....................................................................27

*Kugler v. Helfant*, 421 U.S. 117 (1975)......................................................................................27

*Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020).............................................9

*Lockert v. Faulkner*, 843 F.2d 1015 (7th Cir. 1988)....................................................................17

*Maryland v. Exxon Mobil Corp.*, 352 F. Supp. 3d 435 (D. Md. 2018)..........................................26

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926)...........................................................1, 8, 10, 20

*Matter of Application of Donovan*, 601 F. Supp. 574 (S.D.N.Y. 1985) ...................................11, 13

*Mesa v. California*, 489 U.S. 121 (1989)............................................................................. *passim*

*New York v. De Vecchio*, 468 F. Supp. 2d 448 (E.D.N.Y. 2007) ...........................................13, 17

*New York v. Tanella*, 239 F. Supp. 2d 291 (E.D.N.Y. 2003)...........................................................1

*New York v. Tanella*, 374 F.3d 141 (2d Cir. 2004)..........................................................13, 19, 21

*Nixon v. Fitzgerald*, 457 U.S. 731 (1982).......................................................................9, 18, 19, 20

*North Carolina v. Cisneros*, 947 F.2d 1135 (4th Cir 1991)...........................................................26

*North Carolina v. Ivory*, 906 F.2d 999 (4th Cir. 1990) ............................................. 13-14, 16, 17

*Ohio v. Meade*, No. 21-CV-5587, 2022 WL 486294 (S.D. Ohio Feb. 17, 2022).........................13

*Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020).................................................................25

*Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543 (8th Cir. 1984) ...........................25

*Snodgrass v. Jones*, 957 F.2d 482 (7th Cir. 1992).......................................................................12

*Stern v. Gen. Elec. Co.*, 924 F.2d 472 (2d Cir. 1991)............................................................24, 25

*Tennessee v. Davis*, 100 U.S. 257 (1879) .....................................................................................9

*Texas v. Kleinert*, 855 F.3d 305 (5th Cir. 2017) .............................................................7, 13, 16

*Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448 (1957)..........................................26

*Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022).............................................................20

*Trump v. James*, No. 1:21-cv-1352, 2022 WL 1718951 (N.D.N.Y. May 27, 2022)...................28

*Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020) .............................................................10, 11

*Trump v. Vance*, 140 S. Ct. 2412 (2020) .............................................................................10, 18

*United Food & Comm. Workers Union v.*
    *CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298 (2d Cir. 1994) ...................................7

*United States v. Burr*, 25 F. Cas. 30 (CC Va. 1807).......................................................................14

*United States v. Dupree*, 706 F.3d 131 (2d Cir. 2013) ...................................................................3

*United States v. Moll*, No. 22-cr-00266,
    2023 WL 2042244 (D. Colo. Feb. 16, 2023)...................................................................13

*United States v. Mouat*, 124 U.S. 303 (1888) ...............................................................................30

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) ...................................................................24

*Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993) .............................................................................24

*Willingham v. Morgan*, 395 U.S. 402 (1969) ................................................................7, 9, 13

*WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) ...................................................................24

*Wyoming v. Livingston*, 443 F.3d 1211 (10th Cir. 2006)...........................................................9, 13

*Younger v. Harris*, 401 U.S. 37 (1971)...........................................................................................27

### STATE CASES

*Matter of 303 W. 42nd St. Corp. v. Klein*, 46 N.Y.2d 686 (1979)...............................................28

*People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105 (2008) ...................................25

*People v. Bloomfield*, 6 N.Y.3d 165 (2006)...................................................................................25

*People v. Blount*, 90 N.Y.2d 998 (1997).......................................................................................28

*People v. Houghtaling*, 79 A.D.3d 1155 (3d Dep't 2010).............................................................23

*People v. Lugo*, 190 A.D.3d 434 (1st Dep't 2021) ........................................................................29

*People v. Mahboubian*, 74 N.Y.2d 174 (1989)..............................................................................23

*People v. McCumiskey*, 12 A.D.3d 1145 (4th Dep't 2004) ...........................................................23

*People v. Myles*, 58 A.D.3d 889 (3d Dep't 2009)..........................................................................29

*People v. Sosa-Campana*, 167 A.D.3d 464 (1st Dep't 2018)........................................................29

*People v. Taveras*, 12 N.Y.3d 21 (2009) ...................................................................23, 29

*People v. Thompson*, 124 A.D.3d 448 (1st Dep't 2015)...........................................23, 29

*People v. Thompson*, 206 A.D.3d 1708 (4th Dep't 2022) ..............................................23

*People v. Trump Org., Inc.*, 205 A.D.3d 625 (1st Dep't 2022) .....................................28

*People v. The Trump Org., Inc.*, No. 451685/2020, 2022 WL 489625
(Sup. Ct. N.Y. Cnty. Feb. 17, 2022) ..........................................................................29

*Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) ...............................................................13

## FEDERAL & STATE LAWS

U.S. Const. art. II, § 1, cl. 1 ..........................................................................................19

Title 18, U.S. Code
§ 202(c) .........................................................................................................................2

Title 28, U.S. Code
§ 1442(a)(1) ........................................................................................................*passim*
§ 1455(a) ....................................................................................................................20
§ 2671.........................................................................................................................31
§ 2679(d)(1) ...............................................................................................................12

Title 52, U.S. Code
§ 30116.......................................................................................................................25
§ 30143(a) ..................................................................................................................22

Fed. R. Evid. 801(d)(2)(D) .............................................................................................3

Removal Clarification Act of 2011,
Pub. L. No. 112-51, 125 Stat. 545 (Nov. 9, 2011)......................................................9

N.Y. Penal Law § 175.10..........................................................................................1, 3, 22

## OTHER AUTHORITIES

Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3726
(rev. 4th ed.)..............................................................................................................31

Jonah E. Bromwich *et al.*, *Trump Judge's Dilemma: Whether to Muzzle
the Former President*, N.Y. Times (Apr. 7, 2023) ....................................................27

## INTRODUCTION

"Perhaps the clearest example of traditional state authority is the punishment of local criminal activity." *Bond v. United States*, 572 U.S. 844, 858 (2014). Given the primacy of state criminal enforcement in our federal system, the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), provides only a narrow exception to the "strong judicial policy against federal interference with state criminal proceedings." *Arizona v. Manypenny*, 451 U.S. 232, 243 (1981) (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 600 (1975)). Because none of the requirements for federal-officer removal are satisfied in this case, the Court should reject defendant Donald J. Trump's effort to remove this prosecution from state court.

On April 4, 2023, defendant was arraigned in Supreme Court, New York County on thirty-four counts of Falsifying Business Records in the First Degree, N.Y. Penal Law § 175.10. These charges arose from defendant's falsification of the business records of various New York-based private enterprises in 2017 to conceal an illegal scheme that was largely perpetrated before defendant became President. On May 4, 2023, defendant filed a Notice of Removal pursuant to 28 U.S.C. § 1442, seeking to remove this prosecution on federal-officer grounds. But defendant has failed to satisfy the legal prerequisites to invoke "so exceptional a procedure," *Maryland v. Soper (No. 1)*, 270 U.S. 9, 35 (1926), that would require that the state criminal charges against him be litigated in a federal forum. This Court should accordingly remand this matter to state court.

Federal-officer removal is available only when (1) a federal officer (2) faces criminal charges for conduct arising under color of his office and (3) identifies a colorable federal defense. *New York v. Tanella*, 239 F. Supp. 2d 291, 294 (E.D.N.Y. 2003), *aff'd*, 374 F.3d 141 (2d Cir. 2004). A defendant's inability to satisfy even one of these prerequisites requires remand. Here, defendant fails to establish all three. Most fundamentally, defendant's alleged criminal conduct had no connection to his official duties and responsibilities as President, but instead arose from his

1

unofficial actions relating to his private businesses and pre-election conduct. Defendant also has invoked no colorable federal defense because there is no plausible basis to invoke official immunity for his unofficial actions, and because no federal law preempts New York's regulation of the record-keeping of private enterprises. And, although the Court need not reach this issue here, there is a serious question about whether the President of the United States is an "officer" entitled to invoke removal at all, since that term typically does not encompass the President when used in federal statutes. *Cf., e.g.*, 18 U.S.C. § 202(c).

In our federal system, the duty of dealing with crime is "pre-eminently a matter for the States." *Manypenny*, 451 U.S. at 243. Because defendant has failed to identify a colorable ground for federal-officer removal, this criminal prosecution should be returned to New York state court.

## STATEMENT OF THE CASE

### I.    Defendant and His Private Business Entities.

Defendant Donald J. Trump is the beneficial owner of a collection of private business entities known by the trade name the Trump Organization. Statement of Facts ¶ 5 (Ex. E).[1] The Trump Organization comprises approximately 500 separate entities that, among other business activities, own and manage hotels, golf courses, commercial real estate, condominium developments, and other properties. Statement of Facts ¶ 5 (Ex. E). Defendant has claimed that, during his presidency, he deliberately separated the Trump Organization from his official presidential functions. *See* Notice of Removal ¶ 19 (ECF No. 1) ("Notice"); Morgan Lewis White Paper 2 (Ex. B).[2]

---

[1] Pursuant to Rule II.C.i.III of this Court's Individual Rules, citations to exhibits marked by letters are to defendant's exhibits filed with the Affirmation of Susan R. Necheles dated May 4, 2023 (ECF No. 01-1). Citations to exhibits marked by numbers are to the People's exhibits filed with the accompanying Declaration of Matthew Colangelo dated May 30, 2023.

[2] In citing the Morgan Lewis White Paper, the People do not concede the truth of every statement in that document. Where cited in the People's motion for the fact that defendant's Trust held the assets of the Trump Organization after he was elected President specifically to manage defendant's

Defendant is the sole beneficiary of the Donald J. Trump Revocable Trust, a trust created under the laws of New York in 2014 for business-succession and estate-planning purposes. Statement of Facts ¶¶ 4-5 (Ex. E). The Trust held the assets of the Trump Organization entities after defendant was elected President. Statement of Facts ¶ 4 (Ex. E); Morgan Lewis White Paper 2 (Ex. B).

From approximately June 2015 to November 2016, defendant was a candidate for the office of President of the United States. On January 20, 2017, he became President of the United States. Statement of Facts ¶ 6 (Ex. E).

## II.  The Conduct Charged in the People's Indictment.

Defendant was indicted by a New York County grand jury on March 30, 2023, on thirty-four felony counts of Falsifying Business Records in the First Degree, in violation of N.Y. Penal Law § 175.10. *See* Indictment (Ex. A). The People allege that defendant fraudulently falsified the business records of his private business entities to conceal criminal conduct during the 2016 presidential election that sought to hide damaging information from the voting public. Indictment (Ex. A); Statement of Facts ¶ 1 (Ex. E); People's Response to Defendant's Request for a Bill of Particulars 5-6 (Ex. 2).

Defendant's falsification of these business records was the culmination of an unlawful scheme that began in August 2015, shortly after defendant announced his candidacy for President. Statement of Facts ¶¶ 2, 8-9, 24-34 (Ex. E). Specifically, the People allege that in August 2015, defendant met in his Trump Tower office with the Chairman and Chief Executive Officer of a media company that owned and published supermarket tabloids (the "AMI CEO"), and Michael

---

personal affairs distinct from official responsibilities, that fact is admissible against defendant as an opposing party's statement under Fed. R. Evid. 801(d)(2)(D). The Court may otherwise consider the White Paper not for its truth but as evidence that the statements in that document were made. *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (citing Fed. R. Evid. 801(c) advisory committee's note).

Cohen, a lawyer who then worked for the Trump Organization as Special Counsel to defendant. These individuals agreed that they would take steps to influence the 2016 presidential election by identifying and purchasing negative information about defendant to suppress its publication and benefit defendant's electoral prospects. Statement of Facts ¶¶ 1-3, 7, 9-14, 16-21, 23 (Ex. E).

One of several components of the charged scheme was that, at defendant's request, Cohen used a shell company he created for this purpose to make a covert payment of $130,000 to an adult film actress in October 2016—shortly before the 2016 presidential election—to prevent her from publicizing a sexual encounter with defendant.[3] Statement of Facts ¶¶ 3, 16-21 (Ex. E); Ex. 3 (Sealed Exhibit). Defendant has characterized the nondisclosure agreement that the adult film actress signed in exchange for the $130,000 payment as a "private contract" and "private agreement." Donald J. Trump, @realDonaldTrump, Twitter (May 3, 2018, 6:46 AM, 6:54AM, and 7:00 AM) (Ex. 4). Defendant's attorney at the time, Rudy Giuliani, also stated publicly that "[t]he payment was made to resolve a personal and false allegation . . . ." May 4, 2018 Statement from Rudy Giuliani, *reprinted in* Politico Staff, *Full text: Rudy Giuliani issues statement clarifying his earlier remarks*, Politico (May 4, 2018) (Ex. 5).

The People allege that after the election and before his inauguration as President, defendant and Cohen, in coordination with the Trump Organization's Chief Financial Officer (the "TO CFO"), agreed that defendant would reimburse Cohen for his illegal $130,000 payment through a series of monthly reimbursements that would be falsely characterized as payments for legal

---

[3] For his participation in this scheme, Michael Cohen pleaded guilty in August 2018 to two counts of making unlawful campaign contributions in violation of the Federal Election Campaign Act, which he committed "in coordination with, and at the direction of, a candidate for federal office"— later identified as defendant here—"for the principal purpose of influencing the election." *See* Information ¶¶ 24-44, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 21); Hearing Tr. 23-24, 27-28, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 22); *see also* Statement of Facts ¶¶ 3, 43-44 (Ex. E).

services rendered pursuant to a retainer agreement. Statement of Facts ¶¶ 20, 24-26 (Ex. E). Defendant's lawyer has publicly described these payments as reimbursements for Cohen's pre-election payment of $130,000 to the adult film actress. *See* Transcript 25-26, 28, *Hannity* (Fox News broadcast May 2, 2018) ("[Giuliani]: That was money that was paid by [Cohen] . . . . The president reimbursed that over a period of several months.") (Ex. 6); Transcript 4, *This Week* (ABC News broadcast May 6, 2018) ("[Giuliani]: [E]ven if it was considered a campaign contribution, it was entirely reimbursed out of personal funds") (Ex. 7).

The parties agreed to a repayment amount of $420,000, a figure they reached by adding the $130,000 payoff amount to a separate $50,000 payment for which Cohen also claimed a reimbursement; doubling that amount to $360,000 so Cohen could characterize the payment as income on his tax returns, instead of a reimbursement; and adding $60,000 as a supplemental year-end bonus. Statement of Facts ¶ 25 (Ex. E). Defendant, Cohen, and the TO CFO then agreed that Cohen would be repaid the $420,000 total through twelve monthly payments of $35,000 each over the course of 2017. Statement of Facts ¶ 26 (Ex. E); *see also* Transcript 26, *Hannity* (Fox News broadcast May 2, 2018) ("[Giuliani]: When I heard Cohen's retainer of $35,000 when he was doing no work for the president, I said that's how he's repaying – that's how he's repaying it with a little profit and a little margin for paying taxes for Michael.") (Ex. 6). The TO CFO memorialized these calculations in handwritten notes on a copy of a bank statement showing the $130,000 payment from Cohen's shell company. Statement of Facts ¶¶ 24-25 (Ex. E); Ex. 8 (Sealed Exhibit).

Pursuant to that agreement, Cohen submitted invoices to executives of the Trump Organization each month from February 2017 to December 2017 requesting "payment for services rendered" pursuant to a "retainer agreement," although there was no such retainer agreement and Cohen was not being paid for services rendered in any month of 2017. Indictment (Ex. A);

Statement of Facts ¶¶ 28-29 (Ex. E); Ex. 9 (Sealed Exhibit). Each invoice was processed by the Trump Organization accounting department, which recorded each payment in an electronic accounting system consistent with the Trump Organization's practices for defendant's other unofficial expenses. Statement of Facts ¶¶ 30-33 (Ex. E); Ex. 10 (Sealed Exhibit).

Defendant then reimbursed Cohen through a series of eleven monthly checks that the Trump Organization sent to Cohen each month between February 2017 and December 2017. Indictment (Ex. A); Statement of Facts ¶¶ 28-34 (Ex. E); Ex. 11 (Sealed Exhibit). The monthly payments stopped after the December 2017 payment. Statement of Facts ¶ 34 (Ex. E). The first two checks were paid from the Donald J. Trump Revocable Trust account and signed by trustees of the Trust, and the remaining nine checks were paid from defendant's personal bank account and signed by defendant personally. Indictment (Ex. A); Statement of Facts ¶¶ 4, 32-33 (Ex. E); Ex. 11 (Sealed Exhibit). Defendant's personal account was frequently used to pay many other personal and other unofficial expenditures in 2017. *See* Ex. 12 (Sealed Exhibit).

A New York County grand jury charged defendant with thirty-four felony counts of Falsifying Business Records in the First Degree: eleven counts for the eleven falsified monthly invoices that Cohen submitted via e-mail to the Trump Organization, *see* Ex. 9 (Sealed Exhibit); twelve counts for the twelve entries in the Trump Organization's electronic general ledger falsely characterizing each reimbursement payment as a "legal expense," *see* Ex. 10 (Sealed Exhibit); and eleven counts for the eleven checks and check stubs falsely recording the reimbursement payments to Cohen as "Retainer" for a given month, *see* Ex. 11 (Sealed Exhibit).

## ARGUMENT

Defendant seeks to remove this state criminal prosecution to federal court on the basis of federal-officer removal under 28 U.S.C. § 1442(a)(1). *See* Notice ¶ 14. In relevant part, that statute provides that a state criminal prosecution may be removed to federal court if the prosecution is

against "any officer . . . of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office." 28 U.S.C. § 1442(a)(1). To sustain removal under this provision, a defendant must establish that he was an "officer . . . of the United States"; that the charges against him are "for or relating to any act under color of office"; and that he has a colorable federal defense. *Texas v. Kleinert*, 855 F.3d 305, 311-12 (5th Cir. 2017). The defendant bears the burden of demonstrating by a preponderance of the evidence that removal is proper. *See County of San Mateo v. Chevron Corp.*, 32 F.4th 733, 746 (9th Cir. 2022); *United Food & Comm. Workers Union v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994). And, in contrast to a civil proceeding, a defendant seeking to remove a state criminal proceeding must make a "more detailed showing" of these factors given the "more compelling state interest in conducting criminal trials in the state courts." *Willingham v. Morgan*, 395 U.S. 402, 409 n.4 (1969).

Defendant fails to satisfy these requirements for federal-officer removal. *First*, the criminal charges against defendant do not arise from actions he took under color of the Office of the President. Rather, they concern his unofficial actions to falsify the records of his personal business, while reimbursing his "personal lawyer" (Notice ¶ 19) for a pre-election expenditure, to conceal criminal conduct that largely occurred before his inauguration.

*Second*, defendant has not identified a colorable federal defense to the criminal charges against him. To the extent that defendant's Notice has adequately alleged a defense based on presidential immunity, such immunity would not extend to a President's unofficial actions. And federal preemption is also unavailable because the narrow preemption provision of the Federal Election Campaign Act ("FECA") does not extend to state laws governing fraud or record-keeping—particularly when, as here, the charged offenses require proof only of general intent to

conceal or commit another crime, and do not require the People to specify, let alone obtain convictions for, those other crimes; and the People's theory does not depend solely on underlying violations of federal law in any event.

*Third*, defendant's invocation of the theory of protective jurisdiction also fails. Notice ¶ 31. The Supreme Court declined to adopt that theory for federal-officer removal in *Mesa v. California*, 489 U.S. 121 (1989), and every court that has considered the theory has rejected it.

*Finally*, although this Court need not reach this issue, there is also a serious question about whether defendant was an "officer . . . of the United States" under 28 U.S.C. § 1442(a)(1). The Supreme Court and Executive Branch have long shared the view that references to an "officer of the United States" in federal statutes exclude the President and Vice President unless expressly included, because those positions are elected, not appointed. Defendant's own submission to this Court concedes this point. *See* Morgan Lewis White Paper 1 (Ex. B) ("[T]he term 'officer' typically includes neither the President nor Vice President."). Defendant has thus arguably failed to establish the most basic element of the test for removal.

## I.     Defendant Fails to Establish That His Alleged Criminal Conduct Arose "Under Color of . . . Office."

A defendant's actions are "under color of . . . office" for purposes of federal-officer removal when the state criminal charges are "based on or arise[] out of the acts he did under authority of federal law in the discharge of his duty and only by reason thereof." *Soper (No. 1)*, 270 U.S. at 33. It is thus not enough that the defendant was a federal official at the time of the alleged crime. *Cf. Colorado v. Symes*, 286 U.S. 510, 518 (1932) ("Federal officers and employees are not, merely because they are such, granted immunity from prosecution in state courts for crimes against state law."). Rather, the conduct underlying the state criminal prosecution must have occurred "while [he

was] performing [his] duties" under federal law. *Willingham*, 395 U.S. at 409; *see also Manypenny*, 451 U.S. at 241 (federal-officer removal "to raise a defense arising out of his official duties").[4]

This limitation is consistent with the historic purpose of federal-officer removal: to prevent states from interfering with the implementation of unpopular federal laws. *See Willingham*, 395 U.S. at 405-06 (describing statute's history). Protecting the effective "operations of the [federal] government" justifies securing a federal forum for disputes involving federal officials who are "acting . . . within the scope of their authority" and engaged in conduct "warranted by the Federal authority they possess." *Tennessee v. Davis*, 100 U.S. 257, 263 (1879). But this rationale is inapplicable to a federal official's *unofficial* conduct, which does not implement any federal policy or vindicate any federal interest. *See Mesa*, 489 U.S. at 138-39; *cf. Wyoming v. Livingston*, 443 F.3d 1211, 1219 (10th Cir. 2006) (asking, in related context of Supremacy Clause immunity, whether "the federal officer [was] reasonably discharging his authorized federal duties").

The principle that federal-officer removal must be carefully limited to cases involving the exercise of federal authority applies equally to suits against a former President. Not every action taken by a President constitutes an official act. There exists an "outer perimeter" to presidential responsibilities beyond which a President engages in "unofficial conduct." *Clinton v. Jones*, 520 U.S. 681, 693 (1997) (cleaned up); *see Nixon v. Fitzgerald*, 457 U.S. 731, 755-56 (1982). And, as particularly relevant here, the Supreme Court has already recognized that this defendant, while

---

[4] Congress amended the federal-officer removal statute in 2011 to make removal available in actions "for *or relating to*" a federal official's conduct under color of federal office. *See* Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b), 125 Stat. 545, 545 (Nov. 9, 2011) (inserted material italicized). Courts have not applied this amendment uniformly. *See, e.g., Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020) (noting different interpretations of this language). But even under the broadest reading of "relating to," removal is appropriate only if a federal officer's actions are "*connected* or *associated*, with acts under color of federal office." *Id.* Here, as explained below, there is no connection or association between the conduct charged in the indictment and defendant's official duties and responsibilities as President.

acting as President, had "personal papers" involving the Trump Organization, Donald J. Trump Revocable Trust, and similar entities that were distinct from his "official documents" and that were thus not subject to any executive privilege or other auspices of the Presidency. *Trump v. Vance*, 140 S. Ct. 2412, 2429 (2020); *see also Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2033 (2020) (emphasizing "distinctions between privileged and nonprivileged information, between official and personal information").

Here, the state-law criminal charges against defendant are not based on "acts done by him under color of federal authority and in enforcement of federal law." *Soper (No. 1)*, 270 U.S. at 33. Rather, defendant is charged with falsifying the records of his private enterprises—in the course of making payments to his "personal lawyer" Michael Cohen (Notice ¶ 19) to reimburse him for a pre-election expenditure—in order to conceal criminal conduct that was largely committed before his inauguration. Statement of Facts ¶¶ 3, 8-21, 24-26 (Ex. E). For several reasons, this alleged conduct concerns only defendant's unofficial acts, even though the relevant business records were falsified while he was President.

*First*, the objective of the alleged conduct had nothing to do with defendant's duties and responsibilities as President. Instead, the falsified business records at issue here were generated as part of a scheme to reimburse defendant's personal lawyer for an entirely unofficial expenditure that was made before defendant became President—namely, Michael Cohen's October 2016 payment of $130,000 to an adult film actress, in exchange for her signing of a nondisclosure agreement regarding her sexual encounter with defendant. Statement of Facts ¶¶ 3, 16-21, 24-34 (Ex. E); Ex. 3 (Sealed Exhibit); Transcript 28, *Hannity* (Fox News broadcast May 2, 2018) (defendant's lawyer, Rudy Giuliani, describing these payments as reimbursement) (Ex. 6); Transcript 4, *This Week* (ABC News broadcast May 6, 2018) (same) (Ex. 7).

There is no question that Cohen's payment to the adult film actress was made before defendant became President, and defendant himself has characterized the nondisclosure agreement as a "private contract" and "private agreement." Donald J. Trump, @realDonaldTrump, Twitter (May 3, 2018, 6:46 AM, 6:54 AM, and 7:00 AM) (Ex. 4); *cf. American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct" (quotation marks omitted)). Moreover, although defendant did not repay Michael Cohen until after he became President, his counsel has publicly confirmed that the 2017 payments to Cohen were reimbursements for Cohen's pre-election expenditure (Ex. 6; Ex. 7), and defendant has conceded in his filings here that Cohen was acting purely as defendant's "personal lawyer" handling his "personal affairs" (Notice ¶ 19) after the inauguration. Defendant's post-inauguration reimbursement of an illegal, pre-inauguration expenditure made by his personal lawyer for an unofficial and criminal purpose has nothing to do with the official duties of the presidency. *See Matter of Application of Donovan*, 601 F. Supp. 574, 579 (S.D.N.Y. 1985) (criminal charges based on actions taken before the defendant became Secretary of Labor precluded a finding that those actions were taken under color of the defendant's federal office).

*Second*, the manner by which defendant made these payments and generated the associated business records confirms their unofficial nature. As the Supreme Court has already recognized, the papers held by the private enterprises here—including the Trump Organization and Donald J. Trump Revocable Trust—are defendant's "personal" or "private" papers, as distinguished from official "Executive Branch" documents, *Mazars*, 140 S. Ct. at 2033; and the allegedly falsified records documenting these payments were created and maintained by corporate employees of these enterprises, not federal officials, *see* Statement of Facts ¶¶ 2-4, 24-34 (Ex. E).

Moreover, all of the payments here drew from accounts that were also unofficial in nature. The Donald J. Trump Revocable Trust, from which the first two payments were made, was created in 2014—well before defendant became President—and the Trust held the assets of the entities constituting the Trump Organization after the election specifically to manage defendant's continued personal affairs as distinct from his official responsibilities, as defendant concedes. *See* Notice ¶ 19; Morgan Lewis White Paper 1-2 (Ex. B). The remaining payments were made from defendant's personal bank account, which was used to pay many other personal and unofficial expenditures in 2017. *See* Ex. 12 (Sealed Exhibit). The payments and associated false business records here were thus executed like many other indisputably unofficial transactions that defendant continued to make from his unofficial accounts even after becoming President. *Cf. Snodgrass v. Jones*, 957 F.2d 482, 485 (7th Cir. 1992) (holding that FBI agent was not acting within the scope of his employment under the Westfall Act while "hanging out with other law enforcement officials" at a bar).[5]

*Finally*, defendant's Notice of Removal identifies no official duty or responsibility that defendant was fulfilling, or official authority that defendant was invoking, when he made the payments and falsified the business records at issue in this criminal proceeding. None of the payments from defendant's personal accounts here relied for their authorization on defendant's presidential powers; and the business records here were generated in the course of the Trump Organization's usual course of operations, not by dint of any federal authority. Statement of Facts ¶¶ 30-33 (Ex. E). Under comparable circumstances, courts have declined to find that federal employees were engaged in official conduct for purposes of various immunity-related doctrines.

---

[5] The Westfall Act provides that when a tort action is brought against a federal employee in his individual capacity, the Attorney General may certify that the employee "was acting within the scope of his office or employment at the time of the incident out of which the claim arose," at which point the United States is substituted as defendant in place of the employee. 28 U.S.C. § 2679(d)(1).

*See, e.g.*, *Armstrong v. Thompson*, 759 F. Supp. 2d 89, 94 (D.D.C. 2011) (under Westfall Act, federal employee's "conduct was not of the kind she was employed to perform"); *cf. Trump v. Carroll*, 292 A.3d 220, 232 (D.C. 2023) ("there must still be some relationship or nexus between the tortious conduct and the [federal] employee's responsibilities").

The facts here thus contrast sharply with cases where federal officers were prosecuted while performing their official duties or exercising their official authority.[6] *See Willingham*, 395 U.S. at 409 (federal defendants' "relationship to [plaintiff] derived solely from their official duties"). Absent such a connection to federal office, federal courts have appropriately remanded criminal prosecutions back to state court. For example, in *Matter of Application of Donovan*, 601 F. Supp. 574 (S.D.N.Y. 1985), the district court concluded that a state prosecution could proceed against the Secretary of Labor based on criminal charges arising from his construction company's fraudulent procurement of a subway contract prior to his federal appointment. *Id.* at 578-79. In *New York v. De Vecchio*, 468 F. Supp. 2d 448 (E.D.N.Y. 2007), a state criminal prosecution was remanded when defendant, an FBI agent, identified no authority for passing information to a confidential informant that led to several murders. *Id.* at 462. In *Ohio v. Meade*, No. 21-CV-5587, 2022 WL 486294 (S.D. Ohio Feb. 17, 2022), the district court granted a motion to remand after it found that a special deputy U.S. marshal was acting under his state authority, not his federal authority, when he pursued a criminal suspect. *Id.* at *6-*7. And in *North Carolina v. Ivory*, 906

---

[6] *See, e.g.*, *Kleinert*, 855 F.3d at 312-13 (local police officer pursued and arrested robbery suspect while deputized to work for an FBI task force); *Livingston*, 443 F.3d at 1216 (U.S. Fish and Wildlife Service employees entered private ranch while tracking gray wolves); *New York v. Tanella*, 374 F.3d 141, 146 (2d Cir. 2004) (federal Drug Enforcement Agent apprehended target of a federal buy-and-bust operation); *Idaho v. Horiuchi*, 253 F.3d 359, 364 (Federal Bureau of Investigation agent involved in the law enforcement action at Ruby Ridge), *vacated as moot*, 266 F.3d 979 (9th Cir. 2001); *United States v. Moll*, No. 22-cr-00266, 2023 WL 2042244, at *6-*7 (D. Colo. Feb. 16, 2023) (inspector for U.S. Postal Inspection Service charged for actions taken while responding to the scene of an arson at the direction of his supervisor in an official government car).

F.2d 999 (4th Cir. 1990), the Fourth Circuit remanded the criminal prosecution of a military driver who had violated local traffic laws when he was under no official duty to do so. *Id.* at 1002.

Defendant's alleged criminal conduct here is similarly divorced from any official duty or responsibility: the pre-election scheme and $130,000 payment to an adult film actress predated defendant's inauguration, and his post-inauguration actions all derived from this pre-inauguration conduct, rather than any presidential duty, because defendant sought to conceal facts and to reimburse payments that preceded his time in office. Under these circumstances, defendant has failed to establish that the criminal conduct alleged here related to any acts performed under color of the Office of the President.

Defendant's contrary arguments are unavailing. Defendant principally claims that the payments to Michael Cohen at issue here were official in character because he retained Cohen as a "personal lawyer" "solely because he was President of the United States." Notice ¶ 19; *see also id.* ¶ 28. That argument is self-refuting. As discussed, the President of the United States, despite his immense official responsibilities, continues to have a personal capacity through which he can engage in unofficial actions—his duties are not so "unremitting" as to "demand his whole time for national objects."[7] *United States v. Burr*, 25 F. Cas. 30, 34 (No. 14692D) (CC Va. 1807) (Marshall, C.J.); *cf. Clinton*, 520 U.S. at 695 ("Petitioner's effort to construct an immunity from suit for unofficial acts grounded purely in the identity of his office is unsupported by precedent."). Defendant's admission that he "hired a personal lawyer—Michael Cohen—to handle his personal

---

[7] Defendant himself has admitted as much. In the litigation that led to the Supreme Court's opinion in *Trump v. Mazars*, defendant, while serving as President, sued the House Committee on Oversight and Reform to enjoin enforcement of a congressional subpoena for personal records "solely in his capacity as a private citizen." *See* Compl. ¶¶ 8-10, 13, *Trump v. Cummings*, No. 19-cv-1136 (D.D.C. filed Apr. 22, 2019) (Ex. 13); *see also* Compl. ¶¶ 13, 17-18, 23, *Trump v. Deutsche Bank AG*, No. 1:19-cv-03826 (S.D.N.Y. filed Apr. 29, 2019) ("President Trump brings this suit solely in his capacity as a private citizen.") (Ex. 14).

affairs" (Notice ¶ 19) firmly places his relationship with Cohen on the unofficial side of the line. *See In re Lindsey*, 158 F.3d 1263, 1283 (D.C. Cir. 1998) (noting that President's official counsel "is in a fundamentally different position" from his personal counsel). Thus, even "credit[ing] [defendant's] theory of the case," *Jefferson Cnty. v. Acker*, 527 U.S. 423, 432 (1999), the Notice makes clear that the charges against defendant do not arise from his federal office.

For similar reasons, defendant cannot support removal by asserting (Notice ¶¶ 19-20) that, after being elected, he took steps to transition into his eventual official role as President, including by placing his businesses into a preexisting trust and hiring a personal lawyer. For one thing, all of these transitional actions took place *before* defendant became President, when he was merely anticipating federal office and not yet acting under color of that office. In addition, the criminal charges here do not arise out of these transitional actions—for example, the Morgan Lewis White Paper (Ex. B) does not mention Michael Cohen, the payment to the adult film actress, the agreement to reimburse Cohen for that payment, or the subsequent payments and associated business records that are the actual subjects of the Indictment, *see* Statement of Facts ¶¶ 24-26 (Ex. E). And most fundamentally, as just discussed, defendant's transitional actions make clear that he sought to separate his personal life—including all operations of the Trump Organization and Donald J. Trump Revocable Trust—from his official actions as President. Defendant can hardly claim that actions undertaken in an area that he has expressly carved out as unofficial somehow qualify as being under color of the Office of the President.

Finally, defendant claims that any actions he took during the election "relate to" the official duties of the office he was seeking (Notice ¶ 29), but that claim is also meritless. Even in the context of a sitting President, authorities recognize that electioneering activities are categorically distinct from the President's official duties. For instance, the Executive Branch has recognized that

electioneering activities are not among the President's official functions. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. OLC 214, 216 (1982) (Ex. 15); Brief for United States as Amicus Curiae 21-22, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023) ("A President . . . does not act within the outer perimeter of his office when he takes a variety of actions connected with his reelection campaign, such as hiring and directing his campaign staff.") (Ex. 16). And Hatch Act restrictions on electioneering by federal employees on federal property distinguish between a candidate's campaign activities and his official conduct and apply only to the former. *See* U.S. Office of Special Counsel, *Federal Hatch Act Advisory: Candidate Visits to Federal Agencies* 1-2 (Feb. 15, 2018) (Ex. 17). If an elected official's political campaign activities do not amount to official conduct, then the campaign activities of a person who has not yet been elected to a federal office do not amount to official conduct either.

## II.    Defendant Fails to Allege a Colorable Federal Defense.

Removal here independently fails because defendant has not identified a "colorable federal defense." *Mesa*, 489 U.S. at 129. At the removal stage, a federal defense need only be "plausible, not 'clearly sustainable.'" *Kleinert*, 855 F.3d at 313 (quoting *Jefferson Cnty.*, 527 U.S. at 432). But judicial review is still meaningful: because the presence of a colorable federal defense "alone confers Article III jurisdiction, the 'colorable' standard requires that a federal court carefully weigh the plausibility of the proffered defense." *Holdren v. Buffalo Pumps, Inc.*, 614 F. Supp. 2d 129, 140 (D. Mass. 2009). To be plausible, the facts alleged in a defendant's notice of removal must state a theory that is more than "possible" or "merely consistent with" a federal defense. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see, e.g.*, *Ivory*, 906 F.2d at 1002 (reversing district court's removal order).

Here, defendant proffers two potential federal defenses: a defense that the charged conduct purportedly arose in part out of defendant's duties as President (Notice ¶¶ 19-20); and federal preemption (Notice ¶¶ 2, 11, 21-24). Neither defense is colorable.

**A.      Defendant has not articulated a plausible immunity defense.**

Defendant asserts a defense based on personal "steps taken solely because he was President" or a personal "decision [that] arose out of his duties as President." Notice ¶¶ 19-20. The Notice, however, does not actually identify what such a defense would be. Defendant's failure to articulate a legal defense waives any basis for removal on this ground. In *Ivory*, the Fourth Circuit reversed the district court's removal order because the defendant "did not aver a federal defense," explaining that the defendant was required to "allege[] a defense of federal immunity" and that simply tracking the language of the removal statute "is insufficient to satisfy *Mesa*'s requirement that a federal defense be averred in the removal petition." *Ivory*, 906 F.2d at 1000-01 & n.4. Defendant's ambiguous reference here to an unnamed federal defense based on acts that "arose out of his duties as President" (Notice ¶ 20) likewise fails to aver a federal defense for this Court to consider. *See also De Vecchio*, 468 F. Supp. 2d at 462 (holding that FBI agent's "general claim that everything he did was in the context of the discharge of his federal duties . . . simply cannot satisfy the more stringent requirements for [removal of] criminal cases").

If the People were to speculate, *but cf. Lockert v. Faulkner*, 843 F.2d 1015, 1019 (7th Cir. 1988) ("A district judge should not have to guess what arguments an objecting party depends on when reviewing a magistrate's report."), the language in the Notice is gesturing at a defense based on absolute presidential immunity. Even ignoring waiver, however, any such claim would not be a colorable basis for removal here.

As an initial matter, there is a serious question about whether a former President can claim absolute presidential immunity against criminal liability at all. Although the President is immune

from civil suits for damages based on his official conduct, *Fitzgerald*, 457 U.S. at 749, a majority

of the Court took pains to emphasize in *Fitzgerald* that this "immunity is limited to civil damages

claims," *id.* at 759 (Burger, C.J., concurring), and that "immunity from damages actions carries no

protection from criminal prosecution," *id.* at 780 (White, J., dissenting); *see also Imbler v.*

*Pachtman*, 424 U.S. 409, 429 (1976) ("This Court has never suggested that the policy

considerations which compel civil immunity for certain governmental officials also place them

beyond the reach of the criminal law.").[8] The Supreme Court has also made clear—in a case

involving this defendant—that a sitting President is subject to both federal and state criminal

process, including "when the President is under investigation," and that "state grand juries are free

to investigate a sitting President with an eye toward charging him after completion of his term,"

as has occurred here. *Vance*, 140 S. Ct. at 2426-27; *see also Fitzgerald*, 418 U.S. at 706. And

although the Department of Justice has long taken the position that a President cannot be criminally

prosecuted while in office, it has also emphasized that this temporary immunity "would not

preclude such prosecution once the President's term is over." U.S. Dep't of Justice, Office of Legal

Counsel, *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. OLC

222, 255 (2000) (Ex. 18); *see also* U.S. Dep't of Justice, Office of Legal Counsel, *Amenability of*

*the President, Vice President and other Civil Officers to Federal Criminal Prosecution While in*

*Office* 32 (Sept. 24, 1973) (Ex. 19). There is thus no clear support for a former President claiming

immunity against criminal charges for his conduct while in Office.

---

[8] The United States has likewise taken the position in other litigation that the absolute immunity
standard "concerns only a President's liability in a 'private suit for damages.'" Brief for United
States as Amicus Curiae 3 n.1, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023)
(quoting *Fitzgerald*, 457 U.S. at 754) (Ex. 16).

At most, however—and, again, assuming that defendant's Notice adequately raises this defense—any immunity would go no further than the President's immunity from civil damages liability, or the related Supremacy Clause immunity of federal employees facing state prosecution for acts performed when carrying out their federal duties. Both of these immunity doctrines are limited to actions by a federal official that are plausibly within his official responsibilities. Thus, in *Fitzgerald*, the Supreme Court held that the President possesses "absolute immunity from damages liability predicated on his official acts," which extends to "acts within the 'outer perimeter' of his official responsibility." 457 U.S. at 749, 756. But there is "no support for an immunity for *unofficial* conduct"—*i.e.*, conduct "beyond the scope of any action taken in an official capacity." *Clinton*, 520 U.S. at 694-95 (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)). Similarly, under the analogous doctrine of Supremacy Clause immunity, courts have recognized that federal officials may be immune from state criminal prosecutions, but only when (1) the official was performing an act he was authorized by federal law to do as part of his duty, and (2) in doing so, he did "no more than what was necessary and proper for him to do." *Tanella*, 374 F.3d at 147 (quoting *In re Neagle*, 135 U.S. 1, 75 (1890)).

Here, to the extent that there is presidential immunity from criminal prosecution at all, defendant has not raised any colorable immunity defense because he has failed to identify any official purpose for the charged conduct. First, defendant's Notice alleges a federal defense based exclusively on steps defendant took *before* becoming President. The Notice alleges that "shortly before assuming the Office of the Presidency," defendant, "in an abundance of caution, placed his businesses in a Trust" and "hired a personal lawyer . . . to handle his personal affairs." Notice ¶ 19. Whatever the scope of a President's official responsibility, decisions and actions taken before he becomes President cannot, by definition, constitute official acts. *See* U.S. Const. art. II, § 1, cl. 1

(incumbent President is vested with all executive power under the Constitution). Defendant's Notice does not identify any official act *after* he became President that would support a claim of immunity, notwithstanding his obligation to allege a "short and plain statement of the grounds for removal." 28 U.S.C. § 1455(a). The Notice's exclusive focus on pre-presidential conduct is thus "not sufficiently informing and specific to make a case for removal," *Soper (No. 1)*, 270 U.S. at 34, based on official immunity.

Defendant's claim to have anticipated a *future* need to "fulfill various constitutional obligations" (Notice ¶ 19) cannot plausibly shield him from prosecution for alleged crimes committed in transacting his personal businesses. Because "[t]he Office of the President has no preference for who occupies it," *Thompson v. Trump*, 590 F. Supp. 3d 46, 82 (D.D.C. 2022), steps taken to become or to prepare to become President have no official purpose. *See id.* ("A function of the presidency therefore is *not* to secure or perpetuate incumbency."). The Executive Branch has long agreed. *See* U.S. Dep't of Justice, Office of Legal Counsel, *Payment of Expenses Associated with Travel by the President and Vice President*, 6 Op. OLC 214, 216 (1982) (partisan electioneering activities are not among the President's official functions) (Ex. 15).

Second, for the reasons described in Point I above, there is no genuine dispute that defendant was engaged in unofficial—not official—conduct when he undertook allegedly criminal conduct during his time in office. In *Fitzgerald*, the Supreme Court granted the President absolute immunity from civil liability only because the damages claim there was premised on the exercise of "the President's constitutional and statutory authority to prescribe the manner in which the Secretary will conduct the business of the Air Force." 457 U.S. at 757. Defendant has identified no similar connection between the falsification of business records alleged here and any official duty and responsibility. This case is thus more similar to *Clinton*, where the Court denied immunity

20

when the challenged conduct—an alleged assault before the defendant became President, and defamatory statements made after the defendant became President—had no relation to any exercise of presidential authority. *See* 520 U.S. at 684-86, 694. And the United States recently took the position that defendant would not enjoy absolute immunity from damages claims based on injuries sustained during the assault on the Capitol on January 6, 2021, because "[n]o part of a President's official responsibilities includes the incitement of imminent private violence." Brief for United States as Amicus Curiae 16, *Blassingame v. Trump*, No. 22-5069 (D.C. Cir. filed Mar. 2, 2023) (Ex. 16). So too here, even the "outer perimeter" of the President's official responsibility does not include falsifying private business records, while reimbursing a personal attorney for a pre-election expenditure, in order to cover up criminal conduct preceding the inauguration. Nor were such falsifications acts that defendant was authorized by federal law to do as part of his presidential duties. *See Tanella*, 374 F.3d at 147.

The Supreme Court has long made clear that the President "is otherwise subject to the laws for his purely private acts." *Clinton*, 520 U.S. at 696. Defendant's vague allegation that he has a federal defense based on pre-presidency steps that "arose out of his duties as President" (Notice ¶ 20) does not amount to plausible grounds for removing any federal defense to this court for adjudication.[9]

**B.       Defendant has not articulated a plausible federal preemption defense.**

To be convicted of falsifying business records in the first degree, the People must establish that defendant made or caused a false entry in the business records of an enterprise, and that he did

---

[9] Because defendant does not raise a colorable federal defense under any conceivable test for potential presidential immunity from state criminal prosecution, this Court need not determine the precise contours of any such immunity. It suffices to resolve this motion in the People's favor that any viable immunity defense would require that the charged conduct arguably serve some official purpose, which defendant has not—and cannot—allege here.

so with intent to defraud that included "an intent to commit another crime or to aid or conceal the commission thereof." N.Y. Penal Law § 175.10. Defendant claims that the "another crime" that he is charged with intending to commit or conceal includes "violations of New York Election Law § 17-152" and FECA's campaign-contribution limitations, and that those "predicate charges" are preempted by FECA. Notice ¶¶ 21-22. That statute contains an express preemption provision that states that FECA and its implementing regulations "supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a).

Defendant fails to identify a colorable preemption defense for several reasons. First, defendant's preemption argument relies on an erroneously narrow characterization of the charges against him. As the People articulated in response to defendant's request for a Bill of Particulars, the crimes that defendant is alleged to have intended to commit or conceal here are not limited to violations of New York Election Law § 17-152 and FECA—the only "predicate charges" that defendant claims would be preempted—but also include "New York Tax Law §§ 1801(a)(3) and 1802" and "New York Penal Law §§ 175.05 and 175.10."[10] People's Response to Defendant's Request for a Bill of Particulars 5 (Ex. 2); *see also* Statement of Facts ¶ 2 (Ex. E). Defendant's Notice identifies no grounds on which these additional criminal laws are preempted, thus undercutting the starting premise of his claimed preemption defense.

Second, defendant's preemption argument also fundamentally misunderstands the elements of the crime of falsifying business records in the first degree under Penal Law § 175.10. Defendant appears to assume that, if FECA preemption prevents the People from *directly* pursuing

---

[10] In responding to defendant's request for a Bill of Particulars, the People stated that their identification of particular crimes that defendant may have intended to commit or to aid or conceal was "expressly without limiting the People's theory at trial." People's Response to Defendant's Request for a Bill of Particulars 5 (Ex. 2). The People adhere to this express reservation of rights here.

charges under New York Election Law § 17-152 and FECA, then the People also may not pursue charges under Penal Law § 175.10 for falsifying business records with intent to commit or conceal these (and other) crimes. This assumption relies on a misunderstanding of New York law. When, as here, a criminal statute requires proof of intent to commit or conceal another crime, there is "no requirement that the People allege or establish what particular crime was intended, or that the intended crime actually be committed." *People v. Mahboubian*, 74 N.Y.2d 174, 193 (1989) (citing *People v. Mackey*, 49 N.Y.2d 274, 278-81 (1980)). Rather, the People need only establish "general intent to commit a crime . . . not [defendant's] intent to commit a specific crime." *People v. Thompson*, 206 A.D.3d 1708, 1708 (4th Dep't 2022); *see also People v. Taveras*, 12 N.Y.3d 21, 27 (2009) (first-degree falsification of business records includes "an enhanced intent requirement . . . not any additional actus reus element" over the second-degree offense); *People v. Thompson*, 124 A.D.3d 448, 449 (1st Dep't 2015) (for conviction under Penal Law § 175.10, "[t]he People were not required to establish that defendant committed, or was convicted of, the crime he intended to conceal"). For this reason, courts have upheld convictions under Penal Law § 175.10 even when the defendant was *acquitted* of the crimes that he intended to commit or conceal, so long as the evidence showed that, notwithstanding the acquittal, defendant falsified business records with the requisite general intent. *See, e.g.*, *People v. Houghtaling*, 79 A.D.3d 1155, 1157-58 (3d Dep't 2010); *see also People v. McCumiskey*, 12 A.D.3d 1145, 1145 (4th Dep't 2004) ("The jury could therefore convict defendant of falsifying business records if the jury concluded that defendant had the intent to commit or conceal another crime, even if he was not convicted of the other crime."). Thus, even assuming that FECA would preempt any effort to directly prosecute defendant for violations of New York Election Law § 17-152 or FECA, that would be immaterial because

preemption would not preclude the People from establishing, as a matter of fact, defendant's general intent to commit or conceal those crimes (as well as others).

Under comparable circumstances, courts have recognized that federal prosecutors may pursue mail or wire fraud claims that are predicated on state-law violations, even when Congress would lack the power to directly regulate those violations. *See United States v. Sawyer*, 85 F.3d 713, 722-23 (1st Cir. 1996) ("Congress may protect the integrity of the interstate mails and wires by forbidding their use in furtherance of schemes to defraud a state and its citizens, whether or not it can forbid the scheme itself."). By the same token, preemption of what defendant calls a "predicate" crime would not preclude defendant's conviction for falsifying business records in the first degree when preemption would not preclude the People from establishing defendant's general intent to commit or conceal some crime as a matter of fact.

Finally, defendant has no viable argument that FECA directly preempts New York's criminal laws against falsifying business records—nor does the Notice identify any such argument. Courts recognize a "strong presumption against [FECA] preemption" and have long applied the statute "narrowly" to preserve general state laws targeting fraud, deception, and the like, even when those laws are applied in the context of a federal election or federal campaign contributions. *E.g.*, *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993); *see Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475 n.3 (2d Cir. 1991) ("[C]ourts have given [FECA] a narrow preemptive effect in light of its legislative history."). Thus, courts have concluded that FECA does not prevent the enforcement of state consumer-deception laws against a political action committee raising money for federal elections, *WinRed, Inc. v. Ellison*, 59 F.4th 934, 942-44 (8th Cir. 2023); state criminal laws prohibiting fraud as applied to solicitations for a presidential campaign, *see Dewald v. Wrigglesworth*, 748 F.3d 295, 302-03 (6th Cir. 2014); state fraudulent-transfer claims brought to

recover funds transferred to political action committees, *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200-01 (5th Cir. 2013); and state-law provisions prohibiting the waste of corporate assets, *see Stern*, 924 F.2d at 474-75.[11]

New York's criminal laws prohibiting falsification of business records easily survive preemption under these precedents. That result makes sense, given that the two regimes target different conduct and serve different interests. New York's statute enforces a general obligation for all New York enterprises—including but not limited to those contributing to federal campaigns or reimbursing campaign contributions—to engage in honest record-keeping. *See, e.g.*, *People v. Bloomfield*, 6 N.Y.3d 165, 171 (2006). By contrast, FECA is more narrowly focused on limiting the size and nature of federal campaign contributions. *See* 52 U.S.C. § 30116 *et seq.* The state and federal laws simply do not cover the same domains: for example, a person would not violate the falsifying-business-records statute if he honestly maintained records of excessive campaign contributions, even though those contributions would violate federal law. Thus, as the New York Court of Appeals has decided in closely analogous contexts, the narrow requirements of FECA do not supplant New York's distinct requirement that businesses "refrain from fraud" in their business records. *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 115 (2008) (federal disclosure requirements under the Truth in Lending Act do not preempt New York's anti-fraud statutes).

---

[11] Courts have likewise found no FECA preemption even beyond the context of state anti-fraud laws. *See Priorities USA v. Nessel*, 978 F.3d 976, 984 (6th Cir. 2020) (FECA likely does not preempt state ban on paid voter transportation); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280-81 (5th Cir. 1994) (FECA does not preempt state corporations law); *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 546 (8th Cir. 1984) (FECA does not preempt state law prohibiting police officers from making political contributions).

### III.  Defendant's Invocation of Protective Jurisdiction Fails.

Defendant claims that this Court has "so-called 'protective jurisdiction'" because the criminal indictment against him was "politically motivated" and was brought "because a local politician—here D.A. Bragg—disfavored [defendant's] acts and policies as President." Notice ¶ 31. This claim fails because "protective jurisdiction" does not exist as a recognized basis for federal court jurisdiction, and because defendant could not satisfy the predicates for invoking that theoretical basis for federal court jurisdiction even if it did exist.

At its broadest, the theory of protective jurisdiction posits that Congress may create a federal forum for any case involving a federal officer, even if there is no colorable federal defense. No court has ever endorsed such a theory for removal. In the Supreme Court's only decision to address the theory directly, a majority of the Court believed that endorsing it would pose "grave constitutional problems." *Mesa*, 489 U.S. at 137; *see also Textile Workers Union of Am. v. Lincoln Mills*, 353 U.S. 448, 474 (1957) (Frankfurter, J., dissenting) (asserting that protective jurisdiction "cannot be justified under any view of the allowable scope to be given to Article III"). And lower courts that have addressed the theory have rejected it outright. *See A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1461 (D.C. Cir. 1995); *North Carolina v. Cisneros*, 947 F.2d 1135, 1140 & n. (4th Cir 1991); *see also Maryland v. Exxon Mobil Corp.*, 352 F. Supp. 3d 435, 448 (D. Md. 2018); *BDA Inv. Properties LLC v. Sosa*, CV 11-03684, 2011 WL 1810634, at *3-*4 (C.D. Cal. May 12, 2011). There is simply no foundation for defendant's assertion that protective jurisdiction provides a basis for removal here.

Nevertheless, defendant contends that the Supreme Court "has never definitively decided" whether protective jurisdiction is permissible. Notice ¶ 31. But *Mesa* did definitively decide that Congress did not intend to confer protective jurisdiction through 28 U.S.C. § 1442(a)(1). Interpreting the statute to include such a theory, the Court explained, "would eliminate the

substantive Art. III foundation of § 1442(a)(1) and unnecessarily present grave constitutional problems." *Mesa*, 489 U.S. at 137.

In any event, there would be no basis for invoking protective jurisdiction here even if it were available as a statutory or constitutional matter. Justice Brennan's concurrence in *Mesa* suggested that protective jurisdiction might be appropriate in cases involving "local hostility to federal authority" akin to the "widespread resistance by state and local governmental authorities to Acts of Congress and to decisions of this Court in the areas of school desegregation and voting rights." 489 U.S. at 140 (Brennan, J., concurring). The majority remarked that any such factual predicates for invoking the theory were absent, since in that case there was no evidence of "hostile state prosecutors and collaborationist state courts interfering with federal officers." *Id.* at 138.

Those factual predicates are also missing here. First, defendant has not established, or even alleged, that the New York State courts are incapable of impartially adjudicating his defenses in this criminal prosecution—including, if he chooses to raise it, any claim of selective prosecution. "[O]rdinarily a pending state prosecution provides the accused a fair and sufficient opportunity for vindication of federal constitutional rights." *Kugler v. Helfant*, 421 U.S. 117, 124 (1975); *see Younger v. Harris*, 401 U.S. 37, 45 (1971). And although defendant has made public statements critical of the trial court judge presiding over his criminal case, *see* Jonah E. Bromwich *et al.*, *Trump Judge's Dilemma: Whether to Muzzle the Former President*, N.Y. Times (Apr. 7, 2023), at A13, "[m]ere conclusory allegations of bias are insufficient" to warrant federal-court intervention in state-court proceedings, *Kirschner v. Klemons*, 225 F.3d 227, 236 (2d Cir. 2000).

Second, defendant's bare assertion that "the instant indictment is politically motivated" (Notice ¶ 31) falls far short of plausibly alleging that the criminal charges against him were initiated or pursued for any improper purpose. Establishing a claim of bad faith sufficient to warrant federal-

court intervention in a state-court criminal proceeding would require, at minimum, a showing that the People's enforcement was undertaken "with no expectation of convictions but only to discourage exercise of protected rights," *Cameron v. Johnson*, 390 U.S. 611, 621 (1968)—a standard that defendant does not even allege here. And to the extent Defendant's claim of political motivation is intended to state a defense of selective prosecution, the burden to substantiate such a claim is "a weighty one," given the presumption that "the enforcement of laws is undertaken in good faith and without discrimination." *Matter of 303 W. 42nd St. Corp. v. Klein*, 46 N.Y.2d 686, 694 (1979).

Nor could defendant sustain such a claim if this Court were to entertain it. New York law requires a defendant alleging selective prosecution to establish both (1) that the law was not applied to others similarly situated, and (2) that the selective application of the law was "deliberately based upon an impermissible standard." *Id.* at 693; *see also People v. Blount*, 90 N.Y.2d 998, 999 (1997). Here, defendant has not credibly alleged either of these requirements—and courts have routinely rejected his conclusory allegations of improper political motivation in lawsuits or prosecutions involving him and his corporate entities. *See* Decision & Order 7, *People v. The Trump Corporation*, Ind. No. 1473/2021 (Sup. Ct. N.Y. Cnty. Sept. 6, 2022) (rejecting selective-prosecution claim by defendant's business entities) (Ex. 20); *People v. Trump Org., Inc.*, 205 A.D.3d 625, 626-27 (1st Dep't 2022) (rejecting claims of selective prosecution in civil investigation into defendant's business), *appeal dismissed*, 38 N.Y.3d 1053 (2022); *Trump v. James*, No. 1:21-cv-1352, 2022 WL 1718951, at *4 (N.D.N.Y. May 27, 2022) (dismissing claims under 42 U.S.C. § 1983 alleging that civil investigation was based on unconstitutional political retaliation).

Contrary to defendant's assertions (Notice ¶¶ 11-13), this prosecution involves neither the suggestion of an impermissible motivation nor a "novel theory." The investigation here was instigated by widely publicized evidence of potential criminal conduct in New York. In August

2018, Michael Cohen pleaded guilty in this Court to, among other crimes, two counts of making unlawful campaign contributions "in coordination with, and at the direction of" defendant "for the principal purpose of influencing the election." *See* Information ¶¶ 24-44, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 21); Hearing Tr. 23-24, 27-28, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 22). The federal government's Information further alleged that Cohen made one of the unlawful payments through a shell corporation funded with his personal funds; that Cohen sent invoices for reimbursement to defendant through executives of the Trump Organization; and that defendant reimbursed Cohen a total of $420,000 through a series of monthly payments that were falsely accounted for in various business records as legal expenses. *See* Information ¶¶ 32-35, 37-40, 43-44, *United States v. Cohen*, No. 18-cr-602 (S.D.N.Y. Aug. 21, 2018) (Ex. 21). On their face, these facts indicated the possibility that defendant or others may have violated New York's criminal prohibition on falsifying business records. The district attorney's decision to follow up on this evidence hardly suggests an impermissible motivation; to the contrary, for the district attorney "not to have investigated" in light of these facts "would have been a blatant dereliction of duty." *People v. The Trump Org., Inc.*, No. 451685/2020, 2022 WL 489625, at *5 (Sup. Ct. N.Y. Cnty. Feb. 17, 2022).

In addition, the alleged offenses here—felony counts for falsifying business records to commit or conceal another crime—are charges that this Office brings routinely, based on a wide variety of underlying crimes.[12] The Notice purports to identify unique aspects of this prosecution,

---

[12] *See, e.g.*, *Taveras*, 12 N.Y.3d at 23-24 (defendant allegedly doctored records putting young boys on the payroll of a summer program to induce them into sexual activity); *People v. Lugo*, 190 A.D.3d 434 (1st Dep't 2021) (defendant allegedly falsified records in order to hide a sexual assault); *People v. Sosa-Campana*, 167 A.D.3d 464, 464 (1st Dep't 2018) (defendant allegedly used a fraudulent driver's license to conceal the fact that he was engaged in unlicensed driving); *Thompson*, 124 A.D.3d at 448-49 (defendant allegedly falsely filled out a firearm disposal form to disguise his continued unlawful possession of a firearm); *see also People v. Myles*, 58 A.D.3d 889,

but any such aspects stem from the unique nature of defendant's alleged crime: no other President has falsified the business records of his private enterprises while in office as part of an unlawful scheme to pay off an adult film actress during the election, concealing election law, tax law, and honest book-keeping crimes along the way. The unusual facts are thus of defendant's making, not evidence of selective prosecution. For this reason too, defendant fails to identify any basis for removal based on protective jurisdiction.

## IV.     Defendant Is Not a Federal "Officer" Entitled to Seek Removal.

The arguments above defeat defendant's attempt to remove this state criminal prosecution and require remanding this matter to state court. Although this Court need not go further, remand would also be independently mandated by defendant's failure to establish that he was an "officer . . . of the United States" entitled to invoke removal at all under 28 U.S.C. § 1442(a)(1).

In construing a variety of other constitutional and statutory provisions, the Supreme Court has long interpreted "officer" to exclude the President and Vice President because those officials are elected to their positions rather than appointed. *See Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 497-98 (2010) ("The people do not vote for the 'Officers of the United States.'" (quoting U.S. Const. art. II, § 2, cl. 2)); *United States v. Mouat*, 124 U.S. 303, 307 (1888) ("[A] person in the service of the government" who does not "hold[] his place by virtue of an appointment . . . is not, strictly speaking, an officer of the United States.").

The Executive Branch shares this view. *See, e.g.*, Memorandum from Antonin Scalia, Assistant Attorney General, Office of Legal Counsel, U.S. Dep't of Justice to Kenneth A. Lazarus, Associate Counsel to the President, *Applicability of 3 C.F.R. Part 100 to the President and Vice*

---

892 (3d Dep't 2009) (defendant convicted of falsifying the business records of a utility company to steal electricity where he applied jumper cables to a meter box in order to make the meter record less electricity than he was actually using).

*President* 2 (Dec. 19, 1974) ("[W]hen the word 'officer' is used in the Constitution, it invariably refers to someone *other than* the President or Vice President. . . . This use of the word 'officer' in the Constitution has led the Department of Justice consistently to interpret the word in other documents as not including the President or Vice President unless specifically stated.") (Ex. 23).

Defendant's own filings with this Court concede the point. The Morgan Lewis White Paper—which defendant cites as part of the basis for removal (Notice ¶ 19)—itself takes the position that "the term 'officer' typically includes neither the President nor Vice President." Morgan Lewis White Paper 1 (citing 1974 Scalia Memorandum) (Ex. B). The Court should therefore conclude—consistent with the views of the Supreme Court, the Executive Branch, and defendant himself—that the President is not an "officer" of the United States, and thus may not invoke federal-officer removal under 28 U.S.C. § 1442(a)(1).[13]

---

[13] The Second Circuit recently determined that the President is an "employee" of the federal government for purposes of the Westfall Act. *See Carroll v. Trump*, 49 F.4th 759, 767 (2d Cir. 2022). Although some sources have analogized this inquiry to the under-color-of-office requirement for federal-officer removal, *see* Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 3726 (rev. 4th ed.), the statutory language is distinct, and the Second Circuit's reasoning in *Carroll* would support a different result for the term "officer." Specifically, the Westfall Act defines an "employee" as, inter alia, an "officer[] . . . of any federal agency." 28 U.S.C. § 2671. But the Second Circuit conspicuously declined to find that the President was such an "officer[]," instead concluding that the Act's listing of potential federal "[e]mployee[s]" merely provided non-exhaustive "examples of who are covered by that term." 49 F.4th at 768.

## CONCLUSION

Defendant was charged by a New York County grand jury with New York crimes for falsifying the business records of private New York enterprises while reimbursing his personal lawyer for a pre-election expenditure. He does not plausibly meet the required elements to justify removal to federal court under 28 U.S.C. § 1442(a)(1). "Due regard for the rightful independence of state governments, which should actuate federal courts, requires that they scrupulously confine their own jurisdiction to the precise limits which the statute has defined." *Healy v. Ratta*, 292 U.S. 263, 270 (1934). The People's motion for remand should accordingly be granted.

DATED: May 30, 2023            Respectfully submitted,

ALVIN L. BRAGG, JR.
*District Attorney*
*New York County*

By: */s/ Matthew Colangelo*
Matthew Colangelo
Steven C. Wu
Philip V. Tisne
New York County District Attorney's Office
1 Hogan Place
New York, NY 10013
212-335-9000
colangelom@dany.nyc.gov

*Attorneys for the People of the State of New York*