Exhibit 25

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| BENNIE G. THOMPSON, et al., | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | Civil Case No. 1:21-cv-00400 APM |
| v. | ) | |
| | ) | |
| DONALD J. TRUMP, et al., | ) | |
| | ) | |
| *Defendants.* | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF
## DONALD J. TRUMP'S MOTION TO DISMISS

Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................................II

TABLE OF AUTHORITIES.......................................................................... IV

BACKGROUND ............................................................................................. 2

THE ALLEGATIONS AGAINST PRESIDENT TRUMP .................................... 5

ARGUMENT.................................................................................................. 8

I.   THE CONSTITUTION FORECLOSES THIS COURT FROM EXERCISING JURISDICTION OVER PRESIDENT TRUMP FOR ACTIONS TAKEN DURING HIS PRESIDENCY. ................. 8

   a.   Absolute Immunity bars the claims against President Trump......................8
   b.   The political question doctrine also bars the claims against President Trump. ...........................................................................................................11
   c.   The claims against President Trump are precluded by the Impeachment Judgment Clause, res judicata, and collateral estoppel. ....................................12

II.  PLAINTIFFS LACK STANDING TO BRING THEIR CLAIM AGAINST ANY DEFENDANT 14

   a.   Plaintiffs have not alleged a particularized injury causally connected to Mr. Trump...........................................................................................................15
   b.   Members of Congress lack standing to sue under Section 1985(1)..............15
   a.   Members of Congress do not hold a position of trust or place of confidence with the United States as delineated in § 1985(1)..............................................17

III. WELL ESTABLISHED FIRST AMENDMENT LAW BARS EVERY CLAIM MADE BY PLAINTIFFS. ...............................................................................................18

   a.   The incitement and "true threats" standards protect the speech at issue in this case.........................................................................................................20
   b. Plaintiffs' reading of the federal statutes is so broad and vague as to make them susceptible to a facial challenge............................................................. 21
   c.   President Trump had a First Amendment right to petition the government for redress of grievances. ......................................................................................22
   d.   Prior restraints against speech are presumptively unconstitutional. .........23

IV.  PLAINTIFFS FAILED TO PLAUSIBLY PLEAD A VIOLATION OF § 1985(1). ................25

CONCLUSION ............................................................................................29

CERTIFICATE OF SERVICE .................................................................31

# TABLE OF AUTHORITIES

### CASES

*Alexander v. U.S.*,
  509 U.S. 544 (1993) ------------------------------------------------------- 22
*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) --------------------------------------------------- 24, 25
*Baker v. Carr*,
  369 U.S. 186 (1962) ------------------------------------------------------- 11
*Bancoult v. McNamara*,
  455 F.3d 427 (D.C. Cir. 2006) -------------------------------------------- 11
*Behrens v. Pelletier*,
  516 U.S. 299, 308 (1996) -------------------------------------------------- 9
\* *Brandenburg v. Ohio*,
395 U.S. 444 (1969) ---------------------------------------------------------- 20
*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ----------------------------------------------- 24, 25, 28
*Canlis v. San Joaquin Sheriff's Posse Comitatus*,
  641 F.2d 711 (9th Cir. 1981) --------------------------------------------- 15
*Chastain v. Sundquist*,
  833 F.2d 311, 315 (D.C. Cir. 1987) --------------------------------------- 8
*Clinton v. Jones*,
  520 U.S. 681, 696 (1997) -------------------------------------------------- 8
*County of Santa Clara v. Trump*,
  250 F. Supp.3d 497 (N.D. Cal. 2017) ------------------------------------- 23
*Dalton v. U.S.*,
  71 Ct. Cl. 421 (1931) ----------------------------------------------------- 16
*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
  472 U.S. 749 (1985) --------------------------------------------------- 19, 22
*Franklin v. Massachusetts*,
  505 U.S. 788, 827 (1992) ------------------------------------------------- 10
*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
  561 U.S. 477 (2010) ------------------------------------------------------- 16
*Gometz v. Culwell*,
  850 F.2d 461 (7th Cir. 1988) --------------------------------------------- 25
*Gov't of Rwanda v. Johnson*,
  409 F.3d 368 (D.C. Cir. 2005) ------------------------------------------- 14
*Harlow v. Fitzgerald*,
  457 U.S. 800, 807 (1982) -------------------------------------------------- 8
*Hurd v. District of Columbia*,
  864 F.3d 671 (D.C. Cir. 2017) ------------------------------------------- 25
*Japan Waling Ass'n. v. Am. Cetacean Soc.*,
  478 U.S. 221 (1986) --------------------------------------------------- 11, 24

iv

*Jones v. Kirchner,*
  835 F.3d 74, 84 (D.C. Cir. 2016)----------------------------------------------------------- 10
*Lewis v. News-Press & Gazette,*
  782 F. Supp. 1338 (W.D. Mo. 1992) ---------------------------------------------------- 17
*\* Lujan v. Defenders of Wildlife,*
  504 U.S. 555, 560-61 (1992) -------------------------------------------------------------- 14
*McCord v. Bailey,*
  636 F.2d 606 (D.C. Cir. 1980) ----------------------------------------------------------- 25
*McDonald v. Smith,*
  472 U.S. 479 (1985) --------------------------------------------------------------------------- 22
*McFadden v. U.S.,*
  576 U.S. 186, 196 (2015)-------------------------------------------------------------------- 21
*Members of City Council of City of Los Angeles v. Taxpayers for Vincent,*
  466 U.S. 789 (1984) --------------------------------------------------------------------------- 18
*Menkes v. U.S. Dept. of Homeland Sec.,*
  637 F.3d 319 (D.C. Cir. 2011) ----------------------------------------------------------- 13
*Mills v. Alabama,*
  384 U.S. 214 (1976) --------------------------------------------------------------------------- 18
*Mitchell v. Forsyth,*
  472 U.S. 511, 521 (1985)-------------------------------------------------------------------- 8, 9
*Montana v. United States,*
  440 U.S. 147 (1979) --------------------------------------------------------------------------- 13
*NAACP v. Claiborne Hardware Co.,*
  458 U.S. 886 (1982) --------------------------------------------------------------------------- 22
*Near v. State of Minnesota ex rel. Olson,*
  283 U.S. 697, 732–33 (1931)-------------------------------------------------------------- 23
*Nebraska Press Assn. v. Stuart,*
  427 U.S. 539, 559 (1976)-------------------------------------------------------------------- 23
*New York Times Co. v. U.S.,*
  403 U.S. 713 (1971) --------------------------------------------------------------------------- 22
*Newdow v. Bush,*
  355 F. Supp. 2d 265, 291 n.33 (D.D.C. 2005)-------------------------------------- 23
*\* Nixon v. Fitzgerald,*
  457 U.S. 731, 744 (1982)-------------------------------------------------------------------- 8, 9, 24
*Org. for a Better Austin v. Keefe,*
  402 U.S. 415, 418 (1971)-------------------------------------------------------------------- 23
*Page v. United States,*
  729 F.2d 818 (D.C. Cir. 1984) ----------------------------------------------------------- 13
*Pickering v. Board of Education,*
  391 U.S. 563 (1968) --------------------------------------------------------------------------- 21
*\* R.A.V. v. City of St. Paul, Minn.,*
  505 U.S. 377, 382 (1992)-------------------------------------------------------------------- 18, 19
*Raytheon Co. v. Ashborn Agencies, Ltd.,*
  372 F.3d 451 (D.C. Cir. 2004) ----------------------------------------------------------- 14

*Secretary of State of Md. v. Joseph H. Munson Co., Inc.,*
  467 U.S. 947 (1984) ------------------------------------------------------------ 20
*Sessions v. Dimaya,*
  138 S. Ct. 1204 (2018) ------------------------------------------------------- 20
*Simon v. E. Ky. Welfare Rights Org.,*
  426 U.S. 26 (1976) ------------------------------------------------------------ 14
*Snyder v. Phelps,*
  562 U.S. 443 (2011) ----------------------------------------------------------- 19
*Steel Co. v. Citizens for a Better Environment,*
  523 U.S. 83 (1998) ------------------------------------------------------------ 14
*Stern v. U.S. Gypsum, Inc.,*
  547 F.2d 1329 (7th Cir. 1977) --------------------------------------------- 17
*Summers v. Earth Island Inst.,*
  555 U.S. 488 (2009) ----------------------------------------------------------- 14
*Tafuto v. Donald J. Trump for President, Inc.,*
  827 F.App'x. 112 (2d Cir. 2020) ------------------------------------------ 14
*Tah v. Glob. Witness Publ'g, Inc.,*
  991 F.3d 231 (D.C. Cir. 2021) ---------------------------------------------- 25
*Tenney v. Brandhove,*
  341 U.S. 367, 376 (1951) ------------------------------------------------------- 9
*Tory v. Cochran,*
  544 U.S. 734, 738, 125 S. Ct. 2108, 2111, 161 L. Ed. 2d 1042 (2005) ---------------- 23
*Tri-Corp Housing Inc. v. Bauman,*
  826 F.3d 446, 449 (7th Cir. 2016) ---------------------------------------- 23
*Trump v. Vance,*
  140 S. Ct. 2412, 2426 (2020) --------------------------------------------------- 9
*U.S. v. Crews,*
  781 F.2d 826 (10th Cir. 1986) ----------------------------------------------- 19
*United States v. Cruikshank,*
  92 U.S. 542, 552 (1875) ------------------------------------------------------- 21
*United States v. Mouat,*
  124 U.S. 303 (1888) ----------------------------------------------------------- 16
*United States v. Wells Fargo Bank,*
  485 U.S. 351 (1988) ----------------------------------------------------------- 12
* *Virginia v. Black,*
  538 U.S. 343 (2003) --------------------------------------------------------- 18, 19
*West Virginia State Board of Education v. Barnette,*
  319 U.S. 624, 638 (1943) ------------------------------------------------------- 18

## STATUTES

42 U.S.C. § 1983 ------------------------------------------------------------------- 9
42 U.S.C. § 1985(1) ----------------------------------------------------------- passim
U.S. Const. Art. 1, §3, cl. 7 --------------------------------------------------- 12
U.S. Const. Art. I, § 6, cl. 2 ------------------------------------------------- 16

U.S. Const. Art. II, § 2, cl. 2 ------------------------------------------------------- 16
U.S. Const. Art. II, §2, cl. 2 ------------------------------------------------------- 16
28 U.S.C. § 2679(b) ------------------------------------------------------------------ 10

<u>OTHER AUTHORITIES</u>

*"You've Got Your Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 Quinnipiac L. Rev. 209, 279 (2014) ------------------------- 17
147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statement of Reps. Waters) ------------- 3
147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statements of Reps. Waters and Lee) -- 3
151 Cong. Rec. H110 (daily ed. January 6, 2005) (statement by Rep. Lee) ------------- 3
151 Cong. Rec. H110-111 (daily ed. Jan. 6, 2005) (statements by Reps. Nadler and Lee regarding alleged voting irregularities)------------------------------------------- 3
151 Cong. Rec. H127 (daily ed. Jan. 6, 2005) --------------------------------------- 3
163 Cong. Rec. H 186, 187, 189 (daily ed. Jan. 6, 2017) (statements of Reps. Jayapal, Lee, and Waters)------------------------------------------------------------------------- 4
163 Cong. Rec. H187 (daily ed. Jan. 6, 2017) (statement of Rep. Lee) ------------------ 4
167 Cong. Rec. S. 589 (2021) -------------------------------------------------------- 12
167 Cong. Rec. S. 717 (2021) -------------------------------------------------------- 12
2020 Congressional Budge Submission, https://trumpwhitehouse.archives.gov/wp-content/uploads/2019/03/EOP_FY20_Congressional_Budget_Submission.pdf ---- 26
3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833)------------------------------------------------------------------------- 8
Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part of Impeachment Trial*, CNN (February 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial------------------------------------------- 4, 27
Herb Jackson, *What happens when a state can't decide on its electors*, Roll Call, (October 26, 2020), https://www.rollcall.com/2020/10/26/we-the-people-what-happens-when-a-state-cant-decide-on-its-electors ------------------------------------- 4
Kristina Peterson, *Iowa Election Challenge Alarms Some House Democrats*, Wall Street Journal (March 25, 2021), https://www.wsj.com/articles/iowa-election-challengealarms-some-house-democrats-11616677200------------------------------- 2
Restatement (Second) of Judgments § 27 (1982)------------------------------------- 13
Sarah Ferris and Ally Mutnick, *Democrat drops election contest in Iowa house race*, Politico (March 31, 2021), https://www.politico.com/news/2021/03/31/democrat-drops-election-contest-in-iowa-house-race-478736 -------------------------------------- 2
Test Act of 1673, 25 Car. II, c. 2 (U.K.) ------------------------------------------- 17
The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton) ---------------------- 16
Whether a Former President May be Indicted and Tried for the Same Offense for Which He was Impeached by the House and Quitted by the Senate, 24 Opinions of the Office of Legal Counsel 110, 113 (2000)------------------------------------- 13

On January 6, 2021, President Donald Trump addressed supporters at the El-lipse, encouraging them to "peacefully and patriotically make [their voices] heard." The speech concerned electoral challenges to the 2020 presidential election, which were about to be decided by congressional action. In doing so, he was exercising rights firmly entrenched in the First Amendment. Freedom of speech, expression, assembly, and petition are treasured and unique American rights. Political speech may be con-troversial and may upset those that disagree with the message, but Americans are privileged to employ their rights without fear of legal reprisal.

Plaintiffs are all members of Congress; each has engaged in controversial speech. Yet they have chosen to foreswear their oaths to support and defend the Con-stitution by attempting to undermine the First Amendment by bringing this lawsuit, based on their longstanding and public grudges against President Trump. In bringing this suit, they ask the Court to wade into turbulent waters to decide what controver-sial speech should be favored. The Court should firmly reject that invitation.

The claims against President Trump directly contravene the absolute immun-ity conveyed on the President by the Constitution as a key principle of separation of powers. And even while assuming, as we must at this stage, that the averments in the Amended Complaint are true, they fail to plausibly plead any viable conspiracy theory against President Trump. Instead, they continue to repeat the same baseless and misleading allegations rejected by the Senate during the second failed impeach-ment attempt earlier this year. Plaintiffs' efforts evidence a determination to turn an important and historic civil rights statute into a political weapon, which would serve

1

only to weaken critical constitutional and statutory protections. The case should be dismissed.

## BACKGROUND

Donald J. Trump, the 45th President of the United States, is fervent about his love for America. His speeches invoke patriotic themes that have captured the support of millions of Americans; but they have also brought scorn from his political adversaries.

After the 2020 election, President Donald J. Trump and countless others raised serious and important questions about the purported results of elections held in several of the states. Consequently, Mr. Trump and his supporters were engaged in litigation, recounts, and appeals in the weeks and months after the election. During this time, Mr. Trump reached out to his supporters to encourage their continued support as well as donations to support those efforts.

Post-election challenges are not unusual. For months after the election, a Democratic candidate for the U.S. House of Representatives continued to claim that she was the winner of a Congressional seat in Iowa. Ms. Rita Hart pressed her claim that she should be declared the victor of Iowa's 2nd Congressional District contest[1] until

---

[1] Kristina Peterson, *Iowa Election Challenge Alarms Some House Democrats*, Wall Street Journal (March 25, 2021), https://www.wsj.com/articles/iowa-election-challengealarms-some-house-democrats-11616677200.

2

she dismissed that action on April 5, 2021, five months after the election.[2] Ms. Hart's challenge came after a fully certified election and recount under the state laws of Iowa. Nevertheless, Hart lobbied the U.S. House of Representatives to overturn the election.

Democratic members of Congress, including several of the Plaintiffs, contested the certification of electors after the 2000, 2004, and 2016 elections. In 2000, Representatives Maxine Waters and Barbara Lee objected to the counting of Florida's electoral votes. 147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statements of Reps. Waters and Lee). Ms. Waters, in blatant disregard for the rules of procedure, stated "[t]he objection is in writing, and I don't care that it is not signed by a senator." 147 Cong. Rec. H35 (daily ed. Jan. 6, 2001) (statement of Reps. Waters).

In 2004, Representatives Barbara Lee and Jerrold Nadler objected to the electoral votes from Ohio and proceeded, along with Representative Bennie Thompson, to vote for the objection to Ohio's certified electors. 151 Cong. Rec. H110 (daily ed. January 6, 2005) (statement by Rep. Lee); 151 Cong. Rec. H127 (daily ed. Jan. 6, 2005) (Roll call vote results). The Ohio objections were based upon suggestions of voter irregularities. 151 Cong. Rec. H110-111 (daily ed. Jan. 6, 2005) (statements by Reps. Nadler and Lee regarding alleged voting irregularities).

---

[2] Sarah Ferris and Ally Mutnick, *Democrat drops election contest in Iowa house race*, Politico (March 31, 2021), https://www.politico.com/news/2021/03/31/democrat-drops-election-contest-in-iowa-house-race-478736.

Finally, in 2016, Democrats, including three of the plaintiffs in this suit, challenged a total of nine states electoral votes. Representatives Pramila Jayapal, Barbara Lee, and Maxine Waters objected to the electoral votes from Georgia, Michigan, and Wyoming respectively. 163 Cong. Rec. H186, 187, 189 (daily ed. Jan. 6, 2017) (statements of Reps. Jayapal, Lee, and Waters). Ms. Lee objected on the alleged basis of evidence of foreign interference in the election. 163 Cong. Rec. H187 (daily ed. Jan. 6, 2017) (statement of Rep. Lee).

From the 2000 dispute between George W. Bush and Al Gore to the 1960 elector faceoff between John F. Kennedy and Richard Nixon, election disputes are part of the American democratic framework.[3] The challenges to the 2020 election were critically important but hardly unique.

The specific allegations of this Complaint arise largely from a rally at the Ellipse on January 6, 2021. Congressman Bennie Thompson brought an initial complaint filed on February 16, 2021. That Complaint was woefully insufficient, and he subsequently filed an amended complaint in an inadequate attempt to flesh out his baseless conspiracy theories while adding ten additional members of Congress as plaintiffs.

These members of Congress attempt to mislead the Court by selectively quoting President Trump's January 6, 2021 speech and intentionally omitting critical

---

[3] Herb Jackson, *What happens when a state can't decide on its electors*, Roll Call, (October 26, 2020), https://www.rollcall.com/2020/10/26/we-the-people-what-happens-when-a-state-cant-decide-on-its-electors.

passages, including his unambiguous statement to supporters that "everyone here will soon be marching over to the Capitol building to **peacefully and patriotically** make your voices heard"[4] (emphasis added). Simply put, all of Plaintiffs' allegations that President Trump conspired with anyone regarding the unlawful events at the Capitol on January 6, 2021, are patently false and lack any factual support beyond threadbare allegations. Further, Plaintiffs' claims are precluded by the First Amendment on which they all rely in making their own inflammatory statements. The Amended Complaint should be dismissed.

### The Allegations Against President Trump

Plaintiffs seek to weave fictional tales of a conspiracy between Mr. Trump and others based on political speech taken out of context and the actions of independent individuals with whom Mr. Trump never had contact. Plaintiffs' Amended Complaint makes a number of allegations against the Defendants. Their allegations against President Trump, however, are particularly vague and implausible.

Plaintiffs start with broad allegations against all Defendants. *See* Am. Compl. ¶¶ 1, 3-7. They then allege that Mr. Trump engaged in a campaign of misinformation and rhetoric to overturn the election. *See* Am. Compl. ¶¶ 33-45. Plaintiffs hope that the Court will ignore the plain and clear language in President Trump's social media posts, which support neither incitement nor violence. Instead, they attempt to build

---

[4] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part of Impeachment Trial*, CNN (February 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

a façade of pretext by broadly (and falsely) alleging that Mr. Trump endorsed or supported the violent actions of others; however, the only proffered facts consist of political speech and expression, made at the rally, in press statements, and through social media. *See* Am. Compl. ¶¶ 46, 52.

In a clumsy attempt to transition a false media narrative into a lawsuit, Plaintiffs use sweeping allegations and skewed logic to lay the basis of their supposed conspiracy by complaining about protected political speech. *See* Am. Compl. ¶ 52 (describing a tweet that challenged the Georgia election results); ¶ 55 (using supposition to conclude that Mr. Trump's tweet about the January 6 protest was part of a "violent effort"); ¶¶ 82-89 (suggesting that by giving a political speech at the Ellipse rally, a speaker is liable for the subsequent actions of attendees); ¶ 30 (alleging that Mr. Trump endorsed the Proud Boys during the campaign); ¶¶ 67, 106, 118 (mischaracterizing Mr. Trump's tweets by wrongly suggesting that he encouraged a riot).

Plaintiffs use hearsay, obfuscation, and conclusory statements of others to support their aggressive theory. Am. Compl. at ¶ 66 (alleging remarks by a former White House staffer that Mr. Trump encouraged violence); ¶¶ 124-125, 147 (suggesting that statements by President Trump's political adversaries are somehow indicative of culpability); ¶ 122 (alleging that people at the U.S. Capitol claimed to be "listening to Trump").

In sum, Plaintiffs do not make a single direct allegation that Mr. Trump engaged in a conspiracy or caused injury to any person. Rather, the Plaintiffs use broad

out of context language to suggest that the President of the United States engaged in a wild conspiracy.

The Amended Complaint added little in the way of additional material allegations. In paragraphs 70 and 71, Plaintiffs cryptically claim that someone associated with the White House communicated with the Proud Boys, without specifying who. They also try guilt by association. They claim to show a conspiracy to incite the January 6 riot by suggesting that at the "end of December" President Trump communicated with Roger Stone, who they then allege also communicated with members of the Proud Boys. Am. Compl. ¶ 71. Of course, they do not allege what conspiratorial statements were supposedly exchanged between any of the parties, other than to say that Mr. Stone met with Mr. Trump to ensure he "continues as our president." Plaintiffs incredibly and without any detail also claim that Mr. Trump "knew" of the planning of the violence at the U.S. Capitol because of statements by supporters found on the dark corners of the Internet, seeking to implausibly impute his awareness of those statements. *Id.* at ¶¶ 66, 56-62.

Finally, Plaintiffs seek to sweep aside decades of Supreme Court precedent regarding the Freedom of Speech and the First Amendment. Should they be successful, they may find themselves on the wrong end of a similar lawsuit given their own statements that proceeded violence.

## ARGUMENT

I.   **The Constitution Forecloses This Court from Exercising Jurisdiction Over President Trump for Actions Taken During His Presidency.**

   a.   **Absolute Immunity bars the claims against President Trump.**

Presidents must be decisive. When making critically important decisions, often of historic proportions, it is imperative that their discretion not be colored, or their actions chilled, by a fear that their presidential actions will result in civil liability—ripening either during or after their presidential term.[5] Consequently, courts have long held that presidents are covered by absolute immunity, which is grounded in the principle of separation of powers and entrenched in precedent dating back to common law traditions. *See Mitchell v. Forsyth*, 472 U.S. 511, 521 (1985); *Nixon v. Fitzgerald*, 457 U.S. 731, 744 (1982); 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833) (reasoning that the President "must be deemed, in civil cases at least, to possess an official inviolability."). It is based on considerations of the official function, the nature of the task in question, and the practical need to insulate the official's decision making from second guessing by the courts. *See Harlow v. Fitzgerald*, 457 U.S. 800, 807 (1982) (holding that absolute immunity extends to "legislators, in their legislative functions," "judges, in their judicial functions," members of the executive branch who perform prosecutorial or

---

[5] Likewise, it is equally important that Court not step from their Article III adjudication role into an executive decision-making role, reserved to the President alone. Plaintiffs encourage the Court to do just that, however, by seeking prior restraints, such as inunctions and declarations, based upon presidential actions. Part III(d) discusses the strong presumption against the constitutionality of prior restraints. Here the danger is not only to the First Amendment, however. It is also a direct afront to the separation of powers.

adjudicative functions, and the President); *Mitchell*, 472 U.S. at 521 (explaining that the Court looks to the "historical or common-law basis for the immunity in question").

Immunity covers the President's conduct up to the "outer perimeter" of his duties. *See Chastain v. Sundquist*, 833 F.2d 311, 315 (D.C. Cir. 1987) (holding that presidential immunity "is absolute, . . . subject only to the requirement that [his] actions fall within the outer perimeter of [his] official duties."); *Clinton v. Jones*, 520 U.S. 681, 696 (1997) (finding no immunity for purely private acts or acts outside of official duties). Indeed, decisions where a President has been found subject to suit for an action taken during his presidency are non-existent in the various circuit courts of appeal.

Immunity is the right not just to avoid standing trial, but also to avoid pretrial burdens, which can be disruptive to effective governance. *See Mitchell*, 472 U.S. at 526; *Behrens v. Pelletier*, 516 U.S. 299, 308 (1996). Precluding civil litigation against the President is vital to ensuring a functioning executive branch—the absence of immunity would incentivize lawsuits that would make the President hesitant to exercise his discretion "even when the public interest required bold and unhesitating action." *Nixon*, 457 U.S. at 744–45. *See also Pierson v. Ray*, 386 U.S. 547, 554 (1967) (explaining that immunity serves the public interest in preserving the independence and decisiveness necessary of government officials). Even when a plaintiff alleges that a president's actions exceed his legal authority, the privilege still prohibits litigation. Otherwise, the rule would be swallowed whole by the exception; litigation would

constantly test whether a particular "action was unlawful[] or was taken for a forbidden purpose." *Nixon*, 457 U.S. at 756.

The dominant concern motivating the Court's reasoning regarding immunity is the possibility of "distortion of the Executive's 'decisionmaking process' with respect to official acts that would stem from 'worry as to the possibility of damages.'" *Trump v. Vance*, 140 S. Ct. 2412, 2426 (2020). For this reason, the defense of immunity extends beyond traditional actions at common law to civil cases for monetary damages. *See Tenney v. Brandhove*, 341 U.S. 367, 376 (1951) (holding that despite not explicitly providing the defense of immunity, 42 U.S.C. § 1983 does not abrogate the defense, which is "so well grounded in history and reason"). Presidential immunity also extends to suits seeking declaratory and injunctive relief. *See Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring) (explaining that the Court's reasoning in *Nixon* "appl[ies] with equal, if not greater, force to requests for declaratory or injunctive relief in official-capacity suits that challenge the President's performance of executive functions"). It is clear that claims attempting to hold the President civilly liable for a speech, rally, and petitioning activity would irreparably distort his decision-making process in a way that the Court recognizes is unacceptable.

Plaintiffs invite this Court to forge new territory and adopt a new rule, which would be subjective in nature and would encourage political opponents to take their disputes out of the public square and the halls of Congress and into courtrooms to

10

punish a president for his disfavored speech. The President's absolute immunity fore-

closes the jurisdiction of this Court.[6]

### b. The political question doctrine also bars the claims against President Trump.

Closely akin to absolute immunity is the political question doctrine, which "ex-

cludes from judicial review those controversies which revolve around policy choices

and value determinations constitutionally committed for resolution to the halls of

Congress or the confines of the Executive Branch." *Japan Whaling Ass'n. v. Am. Ce-*

*tacean Soc.,* 478 U.S. 221, 230 (1986). There are several instances when the doctrine

makes a case nonjusticiable, including when there is a "textually demonstrable con-

stitutional commitment of the issue to a coordinate political department" and when

it is impossible to decide an issue without making "an initial policy determination of

a kind clearly for nonjudicial discretion." *Bancoult v. McNamara,* 455 F.3d 427, 432

(D.C. Cir. 2006) (citing *Baker v. Carr*, 369 U.S. 186, 217 (1962)).

Here, Plaintiffs seek a declaration and an injunction against Mr. Trump based

on actions taken while he was President of the United States. Am. Compl. at 62. Aside

---

[6] Even if President Trump was not covered by absolute immunity, as a governmental actor, the claims against him would also be foreclosed by immunity under the West-fall Act 28 U.S.C. § 2679(b). The allegations arose out of his allegations of political speech, clearly within the scope of his employment, (*i.e.,* ensuring the faithful execution of the laws and carrying out his other Constitutional duties. Moreover, even if those doctrines did not apply, he would be protected by qualified immunity, as no Court has previously held a President liable for political speech. *See Jones v. Kirchner*, 835 F.3d 74, 84 (D.C. Cir. 2016). These immunities, of course, are narrower than the dispositive absolute immunity arising directly from the Constitution.

from the other obvious problems with this prior restraint against speech, the adjudication of any injunction or declaration based upon the words or action of the President would improperly regulate the executive department, in violation of Article II, § 1 which requires that the executive power be exercised solely by the President.

Moreover, the adjudication of all the allegations against President Trump would require the Court to make a value determination about what is or is not proper for the President to say during a political speech when advocating for governmental action. As previously discussed, such value determinations are not of the type appropriate for the judiciary. Instead, such questions are solely left to the discretion of the political branches. The impeachment managers chosen by the House of Representatives, of which all Plaintiffs are members, had a full and fair opportunity to make their case at impeachment. They failed; President Trump was acquitted by the United States Senate sitting as a court of impeachment.

     c.   **The claims against President Trump are precluded by the Impeachment Judgment Clause, res judicata, and collateral estoppel.**

The United States Senate held a trial, pursuant to their constitutional mandate to try impeachment cases, and acquitted President Trump of allegations that he participated in a riot at the U.S. Capitol on January 6, 2021. 167 Cong. Rec. S. 717, 1 (2021). On January 11, 2021, Democratic leadership brought Articles of Impeachment, which on January 13, 2021, were approved by the House of Representatives. On February 9, 2021, the Senate took up the trial. 167 Cong. Rec. S. 589, 1 (2021). The Senate trial lasted four days on the charge of "Incitement of Insurrection." On February 13, 2021, the Members of Congress by the rules established under the

Constitution of the United States acquitted Mr. Trump of these charges. 167 Cong. Rec. S. 717, 17 (2021).

The Constitution provides that after impeachment proceedings a "party **convicted** shall nevertheless be liable and subject to Indictment, Trial, **Judgment** and Punishment, according to Law." U.S. Const. Art. 1, §3, cl. 7 (emphasis added). Because the founders specifically limited this exception to those **convicted** of impeachment, it necessarily forbids further litigation of the same claims by those **acquitted** by the Senate, pursuant to the well-known statutory construction canon of *expressio unius est exclusio alterius. See United States v. Wells Fargo Bank,* 485 U.S. 351, 357 (1988).

The clause creates an exception to the general rule prohibiting multifarious litigation over the same subject matter arising from the same transaction or occurrence. *See* Whether a Former President May be Indicted and Tried for the Same Offense for Which He was Impeached by the House and Quitted by the Senate, 24 Opinions of the Office of Legal Counsel 110, 113 (2000) (specifically discussing how criminal liability is an exception).[7]

This action is also precluded by collateral estoppel and res judicata. Plaintiffs, all of whom voted for the impeachment and elected managers to represent their interest in the trial before the Senate, are now seeking to have this Court intervene and relitigate a matter that was properly litigated before the United States Senate as an impeachment court.

---

[7] The memorandum exclusively discusses the *criminal* liability of an acquitted president rather than civil liability, ultimately concluding that it is a close call but that such liability is not precluded by the impeachment trial. There is little or no scholarship on the issue of civil liability, probably because lawsuits like this are not reasonably foreseeable because of the robust absolute immunity of the President previously discussed.

Res judicata precludes further claims by the same parties or their privies after a final judgment on the merits. *Montana v. United States*, 440 U.S. 147, 153 (1979). This not only bars identical claims from being re-litigated in subsequent proceedings but also claims arising from the same transaction or occurrence with parties that had an interest in the previous proceeding. *See Page v. United States*, 729 F.2d 818, 820 (D.C. Cir. 1984). As members of the House of Representatives, Plaintiffs brought Articles of Impeachment and chose managers to stand in their stead and argue their case. Like res judicata, collateral estoppel (*i.e.*, issue preclusion) applies when a factual or legal issue is "litigated and determined by a valid and final judgment." *Menkes v. U.S. Dept. of Homeland Sec.*, 637 F.3d 319, 334 (D.C. Cir. 2011) (quoting Restatement (Second) of Judgments § 27 (1982)). Even if Plaintiffs are not privies of the House of Representatives, collateral estoppel applies because "issue preclusion does not require mutuality of parties." *Id.* (quoting *Gov't of Rwanda v. Johnson,* 409 F.3d 368, 375 (D.C. Cir. 2005)). A trial already occurred on Plaintiffs' allegations. The Senate acquitted President Trump. Undoubtedly, Plaintiffs were disappointed with that result, but it does not give them a second bite at the apple to relitigate the issues here. These claims are precluded.

## II.    Plaintiffs Lack Standing to Bring Their Claim Against Any Defendant

Standing is a threshold issue to the initiation and continuation of litigation. *Raytheon Co. v. Ashborn Agencies, Ltd.*, 372 F.3d 451, 453 (D.C. Cir. 2004) (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 96-102 (1998)). To establish standing, a plaintiff must demonstrate three things: (1) an injury in fact that is concrete and particularized, (2) a causal connection between the injury suffered and the conduct of the defendant complained of, and (3) that the remedy asked for is likely to redress that grievance. *See Tafuto v. Donald J. Trump for President, Inc.,* 827 F.App'x. 112, 114 (2d Cir. 2020) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555

14

(1992)). When a Defendant moves to dismiss a claim for lack of subject matter juris-
diction, the burden is on the Plaintiff to establish standing. *See Summers v. Earth
Island Inst.*, 555 U.S. 488 (2009).

### a. Plaintiffs have not alleged a particularized injury causally connected to Mr. Trump.

In *Lujan*, the Supreme Court elaborated upon the second element of stand-
ing, requiring that a plaintiff establish a causal connection between the injury suf-
fered and the actions of the defendant. The Court determined that the injury has to
be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e]
result [of] the independent action of some third party not before the court." *Lujan*,
504 U.S. at 560 (quoting *Simon v. E. Ky. Welfare Rights Org.,* 426 U.S. 26 (1976)).

Here, Plaintiffs allege that the Defendants in this case interfered with the per-
formance of their official duties as members of Congress, as well as the duties of their
fellow Representatives and Senators. ¶¶ 1-5. They further allege that this was done
as part of the larger scheme to prevent the President-elect and Vice President-elect
from being approved by Congress. *Id.* This argument must fail, however, as Plaintiffs
did not properly allege a conspiracy and members of Congress are not persons pro-
tected under this statute.

### b. Members of Congress lack standing to sue under Section 1985(1).

Plaintiffs allege that the Defendants in this case interfered with the perfor-
mance of their official duties as members of Congress, as well as the duties of their
fellow Representatives and Senators. Pl. Am. Compl. ¶¶ 1-5. Plaintiffs further allege

that this was done as part of the larger scheme to prevent Joseph Biden and Kamala

Harris from being certified by Congress. *Id.* at ¶ 5.

      Plaintiff relies upon 42 U.S.C. § 1985(1) which provides:

> If two or more persons in any State or Territory conspire to pre-
> vent, by force, intimidation, or threat, any person from accepting
> or holding any office, trust, or place of confidence under the
> United States, or from discharging any duties thereof; or to in-
> duce by like means any officer of the United States to leave any
> State, district, or place, where his duties as an officer are required
> to be performed, or to injure him in his person or property on ac-
> count of his lawful discharge of the duties of his office, or while
> engaged in the lawful discharge thereof, or to injure his property
> so as to molest, interrupt, hinder, or impede him in the discharge
> of his official duties.

42 U.S.C. § 1985(1). A claim under § 1985(1) is only available to specific federal offi-

cials. *See Canlis v. San Joaquin Sheriff's Posse Comitatus,* 641 F.2d 711, 718 (9th

Cir. 1981) (explaining that Section 1985(1) is only applicable to federal officers). Spe-

cifically, standing is conveyed only on officers of the United States and those holding

an office, trust, or place of confidence under the United States. Members of the U.S.

House of Representatives are not covered by any of these categories. Consequently,

Plaintiffs lack standing to bring this lawsuit.

### 1. Members of Congress are not officers under the United States, nor do they hold office under the United States.

      "[U]nless a person in the service of the government, therefore, holds his place

by virtue of an appointment by the president, or of one of the courts of justice or heads

of departments authorized by law to make such an appointment, he is not, strictly

speaking, an officer of the United States." *United States v. Mouat*, 124 U.S. 303, 307

(1888). Additionally, as the Supreme Court explained in 2010, "[t]he people do not vote for the 'Officers of the United States.' U.S. Const. Art. II, § 2, cl. 2. They instead look to the President to guide the 'assistants or deputies . . . subject to his superintendence.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 498 (2010) (*quoting*, The Federalist No. 72, p. 487 (J. Cooke ed. 1961) (A. Hamilton)). Furthermore, the Appointments Clause makes it clear that the President appoints the Officers of the United States. *See* U.S. Const. Art. II, §2, cl. 2.

The Constitution provides that members of Congress are not office holders "under . . . the United States." The Ineligibility Clause specifically states that "no person holding any Office under the United States, shall be a member of either House during his Continuance in Office." U.S. Const. Art. I, § 6, cl. 2. Ergo, a member of Congress is not in an office under the United States, otherwise the Constitution would state that they could not hold more than one such office. In defining an office of the United States, the United States Court of Claims defined it as a "public station or employment established or authorized by Congress and conferred by appointment of the Government." *Dalton v. U.S.*, 71 Ct. Cl. 421, 425 (1931).

### a. Members of Congress do not hold a position of trust or place of confidence with the United States as delineated in § 1985(1).

Section 1985(1) also gives standing to individuals who hold a position of trust or a place of confidence under the United States. Again, members of Congress fall into neither category. The Constitution specifically delineates between senators, representatives, and those holding an office of trust or profit under the United States when it prohibits any of the above from serving as electors. U.S. Const. Art. II, § 1. In common law, an office of trust or profit referred exclusively to those in the employ in the executive, judiciary, or the church. *See* Benjamin Cassady, *"You've Got Your*

*Crook, I've Got Mine": Why the Disqualification Clause Doesn't (Always) Disqualify*, 32 Quinnipiac L. Rev. 209, 279 (2014). English statutes applied the term to offices conferred by the Crown, not by Parliament. *Id.* (citing Test Act of 1673, 25 Car. II, c. 2 (U.K.)).

There are few examples of those who hold a place of confidence under the United States. A district court has applied that term to state court judges since they decide federal constitutional issues and are bound by federal law. *See Lewis v. News-Press & Gazette,* 782 F. Supp. 1338, 1342 (W.D. Mo. 1992). Other authority suggests that all the categories listed in Section 1 are limited to those who carry out and apply the law. *See Stern v. U.S. Gypsum, Inc.,* 547 F.2d 1329, 1337 (7th Cir. 1977) (explaining the statutory history of § 1985(1) and concluding that the purpose of the legislation was to protect the "federal interest in the carrying out of federal functions"). One thing is clear, the Congress that adopted the statute could very well have clearly made it applicable to themselves and their successors. They declined to do so. Plaintiffs are not of a class of individuals who have standing to bring a claim under § 1985(1).

### III.   Well Established First Amendment Law Bars Every Claim Made by Plaintiffs.

The factual allegations Plaintiffs have raised against President Trump involve conduct that is fully protected by the First Amendment of the United States Constitution. The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech . . . or the right of the people to peaceably assemble, and to petition the Government for redress of grievances."

The hallmark of the protection of free speech is to allow "free trade in ideas"— even ideas that a majority of people might find distasteful or discomforting. *Virginia v. Black*, 538 U.S. 343, 358 (2003). As the Supreme Court has continually recognized,

"[t]he very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied by the courts." *West Virginia State Board of Education v. Barnette*, 319 U.S. 624, 638 (1943).

Among these protections removed from reach are "[o]ne's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights" which "may not be submitted to vote; they depend on the outcome of no elections." *Id.* Thus, the First Amendment "ordinarily" denies "the power to prohibit dissemination of social, economic and political doctrine" even when politically unpopular. *Black*, 538 U.S. at 358. The First Amendment generally prevents government from proscribing speech or even expressive conduct, because of disapproval of the ideas expressed. *See R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377 (1992). Content-based regulations are presumptively invalid. *Id.*

Plaintiffs are members of Congress, sworn to support and defend the Constitution. They know that the First Amendment decisively bars their claims and that the political speech of which they complain is at the dead center of the constitutional protections of speech. *See Mills v. Alabama*, 384 U.S. 214, 218 (1976) ("[T]here is practically universal agreement that a major purpose of the [First Amendment] was to protect the free discussion of governmental affairs."). Indeed, "political speech is entitled to the fullest possible measure of constitutional protection." *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 816 (1984).

"[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" *Snyder v. Phelps*, 562 U.S. 443, 451-52 (2011) (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985)). The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder*, 562 U.S. at 452. That is because "speech concerning public affairs is more than self-expression; it

19

is the essence of self-government." *Id.* Accordingly, "speech on public issues occupies the highest rung of the hierarchy of First Amendment values and is entitled to special protection." *Id.*

The First Amendment protects Defendants' rights to speech, expression, assembly, and to petition for redress of grievances. Limitations to these rights are narrow. *Black,* 538 U.S. at 366 (holding that speech and expression in the political context is deserving of expanded constitutional protections) (citing *R.A.V. v. St. Paul,* 505 U.S. 377, 402 n.4).

### a.   The incitement and "true threats" standards protect the speech at issue in this case.

Plaintiffs seek to weaken important protections found in *Brandenburg v. Ohio* when they argue that the alleged statements at issue somehow incited violence and therefore were outside the protection of the First Amendment. 395 U.S. 444 (1969). Speech only loses its First Amendment protection when there is an incitement to imminent lawless action, rather than mere advocacy. *See Brandenburg,* 395 U.S. at 449.

Similarly, speech can be stymied when it announces a "true threat," meaning that the speech contains a serious expression of an intent to commit an unlawful act of violence to a particular individual or group of individuals." *Black,* 538 U.S. at 359. Such speech must convey a gravity of purpose and likelihood of execution to constitute speech beyond the pale of protected vehement, caustic, unpleasantly sharp attacks on government and public officials. *See U.S. v. Crews,* 781 F.2d 826, 832 (10th Cir. 1986).

Given that Donald J. Trump was the President of the United States it is difficult to imagine speech cloaked with more constitutional protection than the alleged expressive conduct—tweets, press conferences, speeches, and meetings with government officials—that Plaintiffs seem to assert violates § 1985(1). Turning district

courts into the arbiters of campaign speech would be a particularly troubling precedent.

By Plaintiffs' logic, Congresswoman Maxine Waters was far more culpable for inciting violence when she encouraged people to harass Trump Administration appointees, and when she recently encouraged rioters to "get more confrontational" if her favored verdict was not returned in the *State v. Chauvin* case in Minnesota. While Americans may disagree with the tone and language used by their political adversaries, turning courts loose to police that speech is forbidden by the First Amendment, except in the most severe circumstances, which are not present here.

### b. Plaintiffs' reading of the federal statutes is so broad and vague as to make them susceptible to a facial challenge.

Plaintiffs suggest that this Court read § 1985(1) so broad as to allow it to declare that tweets, statements, and speeches made by politicians can be overt acts in an unlawful conspiracy. If they are right (they are not), and the statutes are that broad and vague (they are not), then it would make these important statutes susceptible to facial challenges due to overbreadth and vagueness.

The overbreadth doctrine allows facial challenges to boundless statutes to prevent the chilling of First Amendment speech. *See Secretary of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 958 (1984). The void for vagueness doctrine ensures that citizens are on notice of what a statute proscribes and also guards against arbitrary or discriminatory enforcement. *See Sessions v. Dimaya,* 138 S. Ct. 1204, 1212 (2018).

Should Plaintiffs' construction of §1985 be adopted, it would lead to a boundless statute that would essentially hold politicians vicariously liable for the actions of their supporters, substantially chilling critically important political speech. Moreover, the broad and vague prescriptions of the statute would encourage selective

21

enforcement, inevitably based upon the political affiliations of the *enforcer.* Simply put, Plaintiffs' proposed interpretation of the statute provides no way to draw clear lines, requiring that they be stuck down as facially invalid.

But this historic statute need not be endangered. Using the constitutional avoidance canon, the Court should recognize that § 1985 only regulates conspiracies where there is an agreement to perform an overt act that extends beyond protected political speech. *See McFadden v. U.S.,* 576 U.S. 186 (2015) (requiring that avoidance be used only when courts must choose between competing plausible interpretations).

> ### c. President Trump had a First Amendment right to petition the government for redress of grievances.

In addition to the rights to free speech and assembly, President Trump has a First Amendment right to petition the government for redress of grievances. When the petition involves matter of public concern, the effort to legally influence lawmakers and government officials enjoys an even higher presumption of protection; our republic depends upon the "free and unhindered debate on matters of public importance." *Pickering v. Board of Education*, 391 U.S. 563, 573 (1968).

To make it more likely that one's concerns receive consideration and a response, the people can peaceably assemble to make their voices louder when seeking redress. *See United States v. Cruikshank*, 92 U.S. 542 (1875) ("The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances . . . is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States."). The First Amendment is meant to protect the "unfettered interchange of ideas for bringing about the political and social changes desired by the people." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985). "[T]he Court has frequently reaffirmed that speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is

entitled to special protection." *Id.* (citing *NAACP v. Claiborne Hardware Co.,* 458 U.S. 886, 913 (1982)).

But just because the right to petition for a redress of grievances is important, that does not mean it is necessarily comfortable:

> exercise of the right to petition 'may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials' . . . The First Amendment requires that we extend substantial 'breathing space' to such expression, because a rule imposing liability whenever a statement was accidently or negligently incorrect would intolerably chill 'would–be critics of official conduct . . . from voicing their criticism.'

*McDonald v. Smith*, 472 U.S. 479, 480 (1985) (Brennan, J., concurring) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 272 (1964)).

Elections are often hotly contested, and they are certainly a matter of public concern. As Congress is given the duty of deciding whether to certify the votes of electors, Defendants had a constitutionally protected right to advocate for their preferred outcome.

### d.   Prior restraints against speech are presumptively unconstitutional.

In addition to seeking monetary damages for their alleged emotional harm, Plaintiffs also seek an injunction, requiring Mr. Trump not to engage in any violations of 42 U.S.C. § 1985(1) in the future, a clear attempt at a prior restraint on speech. Any prior restraint bears a heavy presumption against constitutional validity. *New York Times Co. v. U.S.,* 403 U.S. 713 (1971). A prior restraint is an administrative or judicial order, such as an injunction, restraining specific communications when issued in advance of when the communication is to occur. *See Alexander v. U.S.*, 509 U.S. 544, 549 (1993). Courts should be hesitant to consider claims seeking injunctive relief that involves speech and conduct protected by the First Amendment. *See Newdow v. Bush*, 355 F. Supp. 2d 265, 291 n.33 (D.D.C. 2005). An "injunction, so far as it

imposes prior restraint on speech . . ., constitutes an impermissible restraint on First Amendment rights." *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971) (citing *Near v. State of Minnesota ex rel. Olson*, 283 U.S. 697, 732–33 (1931)). "As such, the Constitution forbids it." *Tory v. Cochran*, 544 U.S. 734, 738, 125 S. Ct. 2108, 2111, 161 L. Ed. 2d 1042 (2005) ("'[P]rior restraints on speech . . . are the least tolerable infringement on First Amendment rights.'") (quoting *Nebraska Press Assn. v. Stuart,* 427 U.S. 539, 559 (1976)).

It is well recognized that rousing and controversial speeches are a key function of the presidency. This is especially true when, as is the case here, the President is advocating for or against congressional action. "Speech is a large part of any elected official's job, in addition to being the means by which the official gets elected (or re-elected). Teddy Roosevelt called the presidency a 'bully pulpit,' and all public officials urge their constituents and other public bodies to act in particular ways." *Tri-Corp Housing Inc. v. Bauman*, 826 F.3d 446, 449 (7th Cir. 2016); *see also, County of Santa Clara v. Trump*, 250 F. Supp.3d 497 (N.D. Cal. 2017) (recognizing "the President certainly has the right to use the bully pulpit to encourage his policies").

Indeed, the speech in this case could not be more protected, as it was made at a political rally with the intention of petitioning the government for redress of grievances. Plaintiffs' claim is based on the content of the President's speech, but "courts do not concern themselves with the truth or validity" of the speech in question. *Keefe*, 402 U.S. at 418. Mr. Trump was free to advocate for the appointment and certification of electors, just as he was entitled to advocate for the passage or defeat of a constitutional amendment, or the reconsideration of a congressional act over his veto. The courts are not the branch constitutionally tasked with making "policy choices and value determinations," and they cannot serve to second-guess the President's judgments. *Japan Whaling Ass'n v. Am. Cetacean Soc.*, 478 U.S. 221, 230 (1986).

The speech and activity involved in this claim—the President questioning whether election procedures comported with the Constitution and holding a rally for those who also were concerned with fair process—are in fact Presidential duties as the Constitution requires that the President "preserve, protect, and defend the Constitution of the United States," U.S. Const. Art. II, § 1, and take "Care that the Laws be faithfully executed[.]" U.S. Const. Art. II, § 3.

Plaintiffs come to the Court seeking to limit a political opponent's rallies and events. This remarkable request is unique and unprecedented because it flies in the face of critical First Amendment protections. It must be dismissed out of hand.

## IV.    Plaintiffs Failed to Plausibly Plead a Violation of § 1985(1).

Plaintiffs are charged with pleading their Amended Complaint so that it plausibly lays out a legally recognized case against Defendants. *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 549 (2007). While they need not include "detailed factual allegations," they must do more than state an unadorned "the-defendant-unlawfully-harmed-me" accusation. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). A pleading that offers "labels and conclusions" or "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 555. Nor does a complaint suffice if it tenders "naked assertion[s]" devoid of "further factual enhancement." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. Moreover, Plaintiffs' conspiracy allegations must be pled with particularity. *See Gometz v. Culwell*, 850 F.2d 461, 464 (7th Cir. 1988); *McCord v. Bailey,* 636 F.2d 606 (D.C. Cir. 1980).

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. This standard requires more than a sheer possibility that a defendant has acted unlawfully. *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "'entitlement to relief.'"" *Iqbal,* 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Although for the purposes of a motion to dismiss the court must take the factual allegations in the complaint as true, the court is not bound to accept as true a legal conclusion couched as a factual allegation. *Iqbal*, 556 U.S. at 679. Moreover, the Court can consider facts extrinsic to the Complaint if they are not reasonably subject to dispute. *Hurd v. District of Columbia*, 864 F.3d 671, 686 (D.C. Cir. 2017).

Because Plaintiffs are public officials and because the facts underlying the allegations in the Amended Complaint are of public concern, Plaintiffs must plausibly plead that Defendants acted with actual malice. *See Tah v. Glob. Witness Publ'g, Inc.,* 991 F.3d 231, 240 (D.C. Cir. 2021). Their allegations, however, fall woefully short of the mark.

To succeed in a claim under § 1985(1), Plaintiffs must plausibly plead (1) a conspiracy (2) to prevent by force, intimidation, or threat, (3) a covered federal official,[8] (4) either from discharging official duties, by inducing the official to leave post,

---

[8] As previously explained, *infra*, Plaintiffs have failed to allege that as members of Congress, they are covered officials pursuant to Section 1985(1).

or by injuring the official on account of the lawful discharge of duties. 42 U.S.C. § 1985(1).

Plaintiffs failed to plead with particularity (or even plausibly) any agreement to obstruct Congress from conducting its business. It is insufficient to allege that President Trump made political statements on social media at a rally meant to persuade political officials. Instead, they were required to plausibly plead an agreement intended to obstruct the business of Congress in certifying the votes of electors.

Their cryptic and implausible allegation that someone "associated with the Trump White House" had a telephone conversation with a member of the Proud Boys is insufficient. The White House is one of the most prestigious—and largest—office buildings in Washington, D.C. Approximately 1,675 people worked for the Executive Office of the President in 2020.[9] Attempting to connect President Trump to a conspiracy based upon a single phone call by an unknown individual at the White House about an unknown topic falls well far short of alleging a conspiracy with particularity. It smacks of desperation.

An agreement to make statements to persuade politicians to act is insufficient. If the law stated otherwise, every lobbyist, whip, and advocacy organization would constantly be sued for violating the statute. Instead, the agreement must be to affect

---

[9] *See* 2020 Congressional Budge Submission, https://trumpwhitehouse.ar-chives.gov/wp-content/uploads/2019/03/EOP_FY20_Congressional_Budget_Submis-sion.pdf.

an official function by "force, intimidation, or threat." Plaintiffs can point to no such agreement.

Plaintiffs' advance unfounded claims regarding Mr. Trump's political activity, including his speeches, debate performance, and tweets. They ask this Court to read into Mr. Trump's *political speech* and find that he thereby entered into a conspiracy to interfere with the performance of official actions. Such action by this Court or any other would have the effect of drastically chilling political speech and cluttering the dockets of district courts nationwide with political lawsuits seeking to damage opponents.

Not only is this theory far-fetched, but it is also in direct opposition to many of the statements made by Mr. Trump at the very rally. For example, Mr. Trump stated in his speech at the rally in the District of Columbia on January 6, 2021, that "everyone here will soon be marching over to the Capitol building to **peacefully and patriotically** make your voices heard."[10] (emphasis added). Mr. Trump further implored the crowd, "[w]e're going to walk down to the Capitol, and we're going to cheer on our brave Senators, and Congressmen and women."[11] These are not the words of incitement, but the words of a person seeking political support for their cause and entreating their supporters to compel other politicians to hear their voices.

---

[10] Brian Naylor, *Read Trump's Jan. 6 Speech, A Key Part of Impeachment Trial*, CNN (February 10, 2021), https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

[11] *Id.*

Plaintiffs' attempt to invoke Roger Stone fairs no better. They fail to plead any specific, including which Proud Boy member met with Mr. Stone, the supposed topics discussed, or the date and place of the conversation. Likewise, they failed to plead any particulars regarding the time, place, or subject matter of any conversation between the President and Mr. Stone, except to say that the latter claimed that the meeting involved Mr. Trump continuing to serve as President. Suggesting that such facts meet the heightened pleading standard of alleging a conspiratorial agreement with particularity stretches logic far past any limits.

It is not enough that an allegation be consistent with conspiracy if it is "just as much in line with a wide swath" of legitimate activities. *Twombly,* 550 U.S. at 554. In *Twombly,* the Court noted that, while the allegations there were consistent with an illegal conspiracy, they were also consistent with legal actions based on unchoreographed free-market behavior. Here, the out-of-context snippets from speeches, debates, phone calls, and tweets cited by Plaintiffs are well short of the high hurdle required to sustain a conspiracy claim.

## CONCLUSION

Plaintiffs' claims are but another in a series of baseless attacks made by the political opponents of Donald J. Trump. Plaintiffs' Amended Complaint is an abuse of the legal system and an improper attempt to harass and malign a political opponent. Donald J. Trump respectfully requests that this Court dismiss Plaintiffs' Amended Complaint in its entirety as Plaintiffs lack standing, and the Amended Complaint fails to state a claim upon which relief may be granted.

Dated: May 26, 2021                                Respectfully submitted,


                                                   /s/_____
                                                   Jesse R. Binnall (VA022)
                                                   BINNALL LAW GROUP, PLLC
                                                   717 King Street, Suite 300
                                                   Alexandria, VA 22314
                                                   Tel: (703) 888-1943
                                                   Fax: (703) 888-1930
                                                   jesse@binnall.com
                                                   *Attorney for Donald J. Trump*

## CERTIFICATE OF SERVICE

I certify that on May 26, 2021, a copy of the foregoing was filed with the
Clerk using the Court's CM/ECF system, which will send a copy to all counsel of rec-
ord.

/s/
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 300
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
*Attorney for Donald J. Trump*