N6RGpeoH

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   PEOPLE OF THE STATE OF NEW
    YORK,
4
                    Plaintiff,
5
                v.                          23 Civ. 3773 (AKH)
6
    DONALD J. TRUMP,
7
                                            Hearing
8                   Defendant.

9   ------------------------------x
                                            New York, N.Y.
10                                          June 27, 2023
                                            2:30 p.m.
11
    Before:
12
                        HON. ALVIN K. HELLERSTEIN,
13
                                            District Judge
14
                            APPEARANCES
15
    NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
16       Attorneys for Plaintiff
    BY:  MATTHEW COLANGELO
17       STEVEN WU
         REBECCA MANGOLD
18       SUSAN D. HOFFINGER

19  BLANCHE LAW
         Attorneys for Defendant
20  BY:  TODD BLANCHE

21  NECHELES LAW LLP
         Attorneys for Defendant
22  BY:  SUSAN NECHELES
         GEDALIA STERN
23
    YUROWITZ LAW PLLC
24       Attorneys for Defendant
    BY:  STEVEN YUROWITZ
25

N6RGpeoH

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, please state your

 3    appearances for the record.

 4              MR. COLANGELO:  Good afternoon, your Honor.  Matthew

 5    Colangelo for the People of the State of New York.

 6              THE COURT:  Let me make some rules here.  When you

 7    speak, take your mask down or off.

 8              MR. COLANGELO:  Yes, your Honor.

 9              Matthew Colangelo for the People.

10              MR. WU:  Steven Wu for the People.

11              MS. MANGOLD:  Becky Mangold for the People.

12              MR. BLANCHE:  Good afternoon, your Honor.  Todd

13    Blanche for President Trump.

14              MS. NECHELES:  Good afternoon, your Honor.  Susan

15    Necheles for President Trump.

16              MR. STERN:  Good afternoon, your Honor.  Gedalia Stern

17    for President Trump.

18              THE COURT:  I am pleased to see you all.  I want to

19    congratulate you all on the high quality of your briefing,

20    which made life a lot easier for my law clerks and for me.  I

21    also want to mention that, although she's not here today, Susan

22    Hoffinger, who was a part of the law team for the People, her

23    late parents and my wife and I were very close friends for a

24    very long time.  I also know Todd Blanche very fondly from his

25    time in the US Attorney's Office.  Neither acquaintance will
```

N6RGpeoH

make any difference to me, I am not biased and I don't think there's an appearance of bias.  If anyone objects, they can make a statement and impose it on the record.

I thought to begin the case, since there is a core of information, that it might be a good idea for me to make a rather long opening statement that would recite where we are, and then we'll begin.

So defendant, Donald Trump, previously President of the United States, removed his criminal case from the New York Supreme Court to the United States District Court of the Southern District of New York.  The People of the State of New York moved to remand.  The question to be decided -- and upon which I will write -- is whether the governing statute, 28, USC, Section 1442(a) authorizes such removal.

Section 1442(a) allows officers of the United States to remove a civil or a criminal case brought against them in a state court if the case is for or related to any act performed by or for them under color of their office, any act for or relating to any act performed by or for them under color of their office.  There also is a requirement that the defense that is relied on is based on federal law.

On April 4, 2023, a grand jury in the Supreme Court of New York County charged defendant with 34 counts of falsifying business records in the first degree in violation of New York Penal Law Section 175.10.  The indictment alleges that the

1   crimes took place between February and December 2017.  They

2   could be categorized into three types of business

3   falsifications:  Those involving business records and a form of

4   invoices take up 11 counts; those in the form of general ledger

5   falsifications take up 12 counts; and those in the form of

6   checks and check stubs take up 12 counts.  All 34 counts allege

7   that defendant made and caused false entries in the business

8   records of the Trump businesses with attempt to defraud and

9   with intent to commit another crime and aid and conceal the

10  commission of such other crime.

11          The indictment is embellished by a statement of facts

12  found in the records of the Supreme Court and removed to this

13  court.  The People allege in that statement that defendant,

14  Donald Trump, is a beneficial owner of the Trump Organization,

15  a collection of business entities headquartered in New York

16  County.  The defendant had announced his candidacy for

17  President of the United States in June 2015.  Then in August

18  2015, two months later, defendant met with Michael Cohen, a

19  lawyer, who had been employed as special counsel to defendant

20  Trump and to the Trump Organization, that there was a meeting

21  between Cohen and the Chief Executive Officer of American Media

22  Inc. and the defendant and that the three agreed to a scheme to

23  suppress negative stories about defendant.  Specifically, the

24  Chief Executive Officer of a company called American Media Inc.

25  agreed to suppress negative stories and to alert Cohen before

1    they were published.

2          In October 2016, American Media became aware of a

3    story regarding a woman named Stephanie Clifford, also known as

4    Stormy Daniels, an adult film actress, who claimed that she had

5    a sexual encounter with defendant while he was married.  The

6    Editor in Chief of American Media contacted Cohen and Cohen and

7    Clifford's lawyer agreed to pay Clifford $130,000 in exchange

8    for her rights to her story.  The statement goes on to allege

9    that Cohen discussed the agreement with Donald Trump and with

10   the Chief Financial Officer of the Trump Organization.

11   Defendant Trump stated that he did not want to make the

12   payments himself.  After discussion between Cohen and the Chief

13   Financial Officer of the Trump Organizations, Cohen agreed to

14   advance the payment with the understanding that he would be

15   reimbursed.

16          Following a conversation between Cohen and defendant

17   Trump on October 26th, 2017, Cohen opened a bank account in

18   Manhattan in the name of a dummy company he created called

19   Essential Consultants LLC.  Cohen deposited $131,000 taken from

20   his personal home equity line of credit in October 2017, wired

21   $130,000 from the account to Clifford's lawyer.

22          The statement goes on, in January 2017, defendant met

23   with Cohen and the Chief Financial Officer to discuss how Cohen

24   would be reimbursed for his payment to Clifford.  They agreed

25   to a payment of $420,000 to Cohen made up to include $180,000

N6RGpeoH

to reimburse Cohen for the $130,000 payment he had made to
Clifford and for another $50,000 expense, then to double that
amount, equal to $360,000 so that Cohen could characterize that
payment on his income taxes as income, rather than as
reimbursement for expenses.

So he was given that $360,000.  He was promised to be
given that $360,000, plus another $60,000 as a year-end bonus
for his services.  Trump was to pay Cohen by 12 monthly
installments of $35,000 each, the equal of $420,000.

Each month, Cohen was to send an invoice to Trump
through the Trump Organization requesting payment of $35,000
for legal services rendered in that month pursuant to a
retainer agreement.  The statement alleges that, in fact, no
retainer agreement between Cohen and Trump existed or between
Cohen and the Trump Organization existed.

On February 14th, 2017 -- and to remind us, Donald
Trump began office as president in January 2017 -- on
February 14th, 2017, Cohen emailed his first invoice to the
controller of the Trump Organization requesting $35,000 for
January and $35,000 for February as his retainer.  Cohen's
statement said, pursuant to the retainer agreement, kindly
remit payment for services rendered for the months of January
and February 2017.  The Chief Financial Officer approved the
payment.  The controller sent the invoice to the Trump
Organization accounts payable supervisor with the instruction

N6RGpeoH

1    to post to legal expenses, put retainer for the months of

2    January and February 2017 in the description.

3            Cohen submitted ten similar invoices to the Trump

4    Organization for each month of 2017 stating that it was being

5    submitted pursuant to the retainer agreement and requesting

6    payment for services rendered that month.

7            According to the statement, the Trump Organization

8    marked each invoice with a general ledger code representing

9    legal expenses, kept the invoices and business records of

10   expenses paid and recorded the payments in its electronic

11   accounting system, describing each payment as legal expense.

12   The accounts payable supervisor of the Trump Organization

13   prepared the check and check stub for approval.

14           The first two checks were paid by the Donald J. Trump

15   Irrevocable Trust, signed by two trustees.  That trust had been

16   created to hold all of Trump's private assets while he was

17   president.  The check stubs recorded the payments as retainer

18   payments.  Defendant Donald Trump signed the remaining checks

19   himself, drawn on his own bank account.  The signed checks and

20   the check stubs were sent from Trump to New York, back to the

21   Trump Organization, where they were scanned, recorded and

22   mailed to Cohen as payments, and thereafter maintained as

23   business records.

24           In August 2018, Cohen pleaded guilty to a felony in

25   connection with his role in American Media's payments.  He

N6RGpeoH

1    stated, on or about October 2016, in coordination with and at

2    the direction of the candidate for federal office, Donald

3    Trump, I arranged to make a payment to a second individual with

4    information that will be harmful to the candidate and to the

5    campaign to keep the individual from disclosing the

6    information.  To accomplish this, I used a company that was

7    under my control to make a payment in the sum of $130,000.  The

8    monies I advanced in my company were later repaid to me by the

9    candidate.  I participated in this conduct, which in part took

10   place in Manhattan, for the principal purpose of influencing

11   the election.

12              On May 4, 2023, defendant Donald Trump removed the

13   case to federal court on the basis of the Federal Officer

14   Removal Statute, 28, USC, Section 1442(a)(1) which I summarized

15   before.  In the notice of removal, defendant maintains that the

16   federal court has subject matter jurisdiction over the case

17   because the indictment, quote, "Charges President Trump for

18   conduct committed while he was President of the United States

19   that was within the color of his office and the charges

20   involved allege federal and state election law violations that

21   have a federal preemption defense."

22              Specifically, the notice of removal of asserts that

23   the charged conduct relates to acts performed under the color

24   of office within the meaning of Section 1442 because Cohen was

25   hired as defendant's personal lawyer.  As a direct result of

N6RGpeoH

1   President Trump's role as President of the United States and

2   his obligations under the Constitution and in order to separate

3   his business affairs from his public duties.  Defendant Trump

4   additionally contends that election-related acts relate to acts

5   performed under color of office because they relate to

6   defendant's position as president.

7          Paragraph 19 of the notice of removal states the

8   federal grounds for removal.  It asserts that, shortly before

9   assuming the office of the presidency and in order to assure

10  the American public that he had separated his personal business

11  from his public duties, as well as to fulfill various

12  constitutional obligations; for example, the foreign Emoluments

13  Clause, Article I, Section 9, Clause 8, which states, in

14  effect, that the compensation of the president shall be fixed

15  and not vary up or down and prevents emoluments from any United

16  States or any other states within the United States in addition

17  to the compensation.

18          The notice also cites the Take Care Clause, Article

19  II, Section 3, which, in effect, requires the president to

20  execute the laws, to take care to execute the laws of the

21  United States.

22          The notice goes on to allege that defendant placed his

23  businesses in a trust and, quote, hired a personal lawyer,

24  Michael Cohen, to handle his personal affairs, close quote.

25  The notice alleges that these steps were taken by the president

N6RGpeoH

1  solely because he was President of the United States.  The

2  notice contends that President Trump's decision to retain

3  Michael Cohen to act as his personal lawyer arose out of his

4  duties as president and therefore gives rise to a federal

5  defense.

6          As a second purported federal defense, Trump asserts

7  that he intends to argue that the indictment's felony charges

8  are predicated on state and federal election laws that are

9  preempted by the Federal Election Campaign Act.

10          Finally, the notice of removal contends that the

11  district court, this district court has protective jurisdiction

12  over the action because the indictment is politically motivated

13  and was brought because a local politician disfavored President

14  Trump's acts and policies as President of the United States and

15  presumably caused this indictment to issue.

16          On May 30, 2023, the People filed the instant motion

17  to remand this case to the state court.  I hold oral argument

18  on this matter today.

19          There are essentially three issues:  One is whether

20  the president is an officer of the United States entitled to

21  remove the case; second is whether the criminal case against

22  him is for or relating to any act under color of his office,

23  for or relating to any act under color of his office; and third

24  is whether he has a federal defense.

25          With that, I will stop and ask Mr. Colangelo to argue

N6RGpeoH

1  in favor of his motion to remand.

2          MR. COLANGELO:  Thank you, your Honor.  Matthew

3  Colangelo for the People.

4          One of the clearest examples of traditional state

5  authority in our constitutional system is the punishment of

6  local criminal conduct.  And for that reason, the Supreme Court

7  emphasized 90 years ago that the federal officer removal

8  provision is an exceptional procedure that should be applied

9  consistent with a strong judicial policy against federal

10  interference in state criminal prosecutions.  The Court should

11  conclude that the defendant has not established by a

12  preponderance of the evidence the facts necessary to show

13  subject matter jurisdiction here for two key reasons:

14          First, he has not shown facts that demonstrate that

15  the conduct for which he's charged in the People's indictment

16  is for or relating to any act under color of his former office

17  as president.  And most critically, no party disagrees that the

18  payments at issue here were personal payments from personal

19  accounts to a personal attorney handling the defendant's

20  personal affairs.  That agreed set of facts alone answers the

21  question in the negative, the defendant was not being charged

22  with any conduct for or relating to any under color of his

23  office.

24          Just as fatal, defendant cannot establish a colorable

25  federal defense.  He can't establish Supremacy Clause immunity

N6RGpeoH

1   because, among other reasons, that ground of immunity requires

2   that he show a duty.  Not only has the defendant not

3   established a duty to separate his official from his unofficial

4   conduct here, your Honor, he expressly disclaims any duty of

5   the kind in the evidence that he's presented to the Court.  The

6   second sentence of the Morgan Lewis white paper itself says,

7   "He has no federal, statutory or constitutional obligation."

8           THE COURT:  That's not in evidence, is it?

9           MR. COLANGELO:  Well, it can certainly be admitted

10   into evidence, your Honor, as a statement of the opposing

11   party.

12           THE COURT:  As a statement of admission?

13           MR. COLANGELO:  Yes, your Honor, and under

14   801(d)(2)(A).

15           THE COURT:  A document prepared for him by a lawyer to

16   the effect that he is not an officer of the United States is an

17   admission against interest?

18           MR. COLANGELO:  Well, the document is he has no duty

19   under the Constitution or federal law.  And yes, that assertion

20   can be admitted against him either as a statement by him or by

21   his attorney --

22           THE COURT:  A lawyer writes a statement to a client,

23   that is not necessarily an adopted statement by the client.

24           MR. COLANGELO:  Depending on the circumstances, your

25   Honor, it can be.  But I will also bring to your attention an

N6RGpeoH

1    exhibit that we alerted the defendant to yesterday, if I may.

2              THE COURT:  That's the brief?

3              MR. COLANGELO:  No, your Honor.

4              As the Court is aware -- and I can hand this up if the

5    Court likes.

6              THE COURT:  I have it.  I read your papers,

7    Mr. Colangelo.

8              MR. COLANGELO:  A document we have not filed, your

9    Honor.  I apologize.

10             THE COURT:  What is the document?

11             MR. COLANGELO:  This is a transcript of the president

12   elect's press conference in January of 2017.

13             THE COURT:  I don't have that.

14             MR. COLANGELO:  Correct, your Honor.

15             We exchanged it with defense counsel yesterday and did

16   not file it.  I can hand it up, if the Court likes.

17             THE COURT:  Which reminds me, how are we going to put

18   all these stipulated facts into the record?  Are you going to

19   read them into the record?

20             MR. COLANGELO:  Yes, your Honor.  I'm happy to put

21   facts into the record.

22             THE COURT:  When would it be opportune to do that?

23             MR. COLANGELO:  At any point the Court prefers, your

24   Honor.  It may make sense as --

25             THE COURT:  Why don't you do 26, and then we'll go and

N6RGpeoH

1   talk about how to make that record here.

2             MR. COLANGELO:  Thank you, your Honor.

3             THE COURT:  The statute for how to proceed requires

4   this to be an evidentiary hearing, under the terms in the

5   statute.  So we'll need, in some fashion, to take evidentiary

6   facts.  Those evidentiary facts relate to a legal question,

7   whether this court has jurisdiction or not.

8             MR. COLANGELO:  Yes, your Honor.  And that's the

9   reason the parties stipulated last week to the admissibility of

10   the documents that we identified in the joint letter.

11             The exhibit I just handed up, your Honor, which the

12   People have identified as Exhibit 26 is a transcript of the

13   president elect's press conference on January 11th, 2017 when

14   he published the Morgan Lewis white paper the defendant has

15   filed in these proceedings.  And if the Court turns to page 10

16   of the document I handed up, this is a quote from the president

17   saying that he turned down a business deal because, quote, "As

18   you know, I have a no conflict situation because I'm

19   president."  Then in the next paragraph he says, "I have a no

20   conflict of interest provision as president" later in the

21   paragraph, so I could actually run my business, I could

22   actually run my business and run government at the same time.

23   I don't like the way that looks, but I would be able to do that

24   if I wanted to.  I would be the only one to be able to do that.

25             So both in the Morgan Lewis white paper and in this

N6RGpeoH

1    press conference, he disclaims, the defendant himself has

2    disclaimed any federal duty.

3          THE COURT:  I don't follow that as relating to the

4    question of 1442(a), is the president an officer entitled to

5    remove.  I don't see the relevance here.

6          MR. COLANGELO:  Your Honor, this goes to the color of

7    office question.

8          So in order to satisfy the removal standard, the

9    defendant has to show that the crimes he's charged with

10   committing were for or relating to any act under color of his

11   office.  Now, he has said that he separated his personal from

12   his official affairs because he had a duty to do so.  The point

13   I'm making is simply that he disclaimed having any such duty.

14   So his conduct can't be related to his official acts if his

15   view was that he didn't have any obligation to do it.

16          But, your Honor, I think more directly, even on the

17   facts that the parties agree -- that Mr. Cohen was paid from

18   personal accounts as a personal attorney handling his personal

19   affairs -- that agreement, those agreed facts alone demonstrate

20   that the conduct that Mr. Trump was charged with here is not

21   conduct that relates in any way --

22          THE COURT:  Mr. Colangelo, it's going to be very

23   confusing to run those three arguments together.  Let's take

24   one at a time.  Let's take the argument, and then maybe I'll

25   have Mr. Blanche state his opposition, and then we'll go back

N6RGpeoH

1     to you again on the second point.

2               So the question is:  Is the president an officer

3     entitled to the benefit of the statute?

4               MR. COLANGELO:  Yes, your Honor, happy --

5               THE COURT:  And the argument is, I'm elected,

6     therefore I'm not an officer, that's your argument; right?

7               MR. COLANGELO:  Correct.  The argument is that that

8     particular question, whether the president can be an officer is

9     a difficult question that has not been squarely resolved by any

10    court, that the defendant has himself taken both sides in

11    answering, including in the Morgan Lewis white paper.  And the

12    People's argument is the Court does not have to reach that

13    issue, because there are other grounds for removal here that

14    would be dispositive.

15              THE COURT:  So you prefer not to continue arguing on

16    the first issue, whether the president is an officer entitled

17    to removal?

18              MR. COLANGELO:  Well, your Honor, our argument is that

19    the Court doesn't need to reach the question.  If the Court

20    does reach the question, the answer is that, where there's a

21    traditional constitutional understanding, that executive branch

22    officers are not considered officers if they're elected, that

23    absent some contrary indications in the statute, he should not

24    be considered an officer here.  That's our argument.

25              THE COURT:  Let's say that a widow of a soldier sent

N6RGpeoH

into battle by the president dies and the widow claims against
the president on the grounds that he was sent into battle
without authority -- willfully, maliciously, in all other ways
that people express themselves in a tort action -- that would
have to be removal, wouldn't it?

MR. COLANGELO:  Your Honor, the answer to that
question is yes.  But a tort action against the president would
proceed under the Westfall Act.  And under the Second Circuit's
controlling opinion in Carroll v. Trump, the president is an
employee of the government.  As we explained in our opening
brief --

THE COURT:  But it would have to be removed in the
first instance.  It may be subsequently covered by the Westfall
Act, that is that the state itself, government itself would
have to be answerable for the tort, but the removal could be by
the president, if the president were sued, I would think.  No
case has said this.

So maybe we cut this short, because I think your point
that I don't have to make a ruling on this issue is a good
point and it may not be necessary for the decision here.

Mr. Blanche points out in his paper that there's a
long line of cases where Congressmen, who are also elected,
have removed under the statute without any real objection to
it.  And the hypothetical I posed would suggest that the
president himself would have an ability to remove.  So that

1    would suggest, without my holding, that the president should be

2    considered, for the purpose of this statute, an officer.  But I

3    agree with you, I don't need to hold this point, it's a moot

4    point, it's not necessary to the decision.

5            Unless Mr. Blanche would like to say anything more on

6    this point, we can pass to the next point.

7            MR. BLANCHE:  Your Honor, we agree with the Court that

8    under 1442 and the cases that have addressed this issue, the

9    idea that an elected official does not come under the statute

10   is inconsistent with the law.  There's examples of Congress

11   removing under 1442(a), and the fact that this type of case has

12   never presented itself shouldn't be surprising, given why we're

13   here today, given that the law, what we have asked your Honor

14   to find, that the president does qualify as an officer.  It

15   would be inconsistent with the statute for every federal

16   official to qualify, for every elected official in the United

17   States to qualify, but aw-shucks, the president doesn't.

18   There's no sense, there's no way that --

19           THE COURT:  I'm inclined to agree with the point, but

20   I don't think it's necessary to decide in this case.

21           Thank you, Mr. Blanche.

22           Now, go on the next point, Mr. Colangelo.

23           MR. COLANGELO:  Thank you, your Honor.

24           The second requirement of the test that your Honor

25   identified is the color of office obligation, that the conduct

N6RGpeoH

charged in the People's indictment has to be for or relating to

any act under color of the defendant's office.  I think there

are two key premises that nobody disagrees with that set the

parameters for these discussions.  The first is that the

Supreme Court made clear in Nixon v. Fitzgerald and in Clinton

v. Jones that the president's duties are not all-encompassing.

There is an outer perimeter to his official function.  No

disagreement about that, I don't believe.

       The Supreme Court also made clear in Trump v. Mazars

and Trump v. Vance, that not only can the president have

personal cases, but that the business records of the very

entities involved in this prosecution are themselves the

president's personal papers and the president, as we point out

in our brief, brought those in his personal capacity.

       So we know there's an outer perimeter to the

president's conduct, we know the president can -- even while

he's president -- have personal papers that are not subject to

any executive privilege or other official protection.  Based on

those two principles, your Honor, and the agreed fact that

these payments were personal payments from personal accounts to

a personal lawyer handling personal affairs, it simply doesn't

make sense that those payments are for or relating to any act

under the color of the former president's office.

       The only argument, I believe, the defense makes that

they are is that the president only separated his personal from

N6RGpeoH

1  his official conduct because he was about to become president.

2  As I mentioned, we disagree with that fact.  We don't believe

3  that the defense has supported it with any admissible evidence

4  here.  But the Court doesn't need to decide in order to remand

5  for two reasons:

6       First, any duty the defendant had to take the initial

7  step of separating his personal affairs from his official

8  functions, any duty would terminate once he had taken that

9  step.  And it wouldn't make sense to conclude that subsequent

10  conduct further down the line, after he had accomplished that

11  divorce, were also official.

12       THE COURT:  I need to follow this better.

13       You are saying that the divestment that took place,

14  the divestment of his assets, his personal assets took place

15  before he became president; is that what you are saying?

16       MR. COLANGELO:  Correct, your Honor.

17       THE COURT:  So it was an accomplished fact?

18       MR. COLANGELO:  Correct, your Honor.

19       And once he accomplished that fact --

20       THE COURT:  But the falsifications took place when he

21  was president.

22       MR. COLANGELO:  That's true, your Honor.  But he was

23  not performing an official function.

24       If you were willing to agree -- and again, the People

25  don't --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

N6RGpeoH

1    THE COURT:  What does the divestment have to do with

2    this issue?

3    MR. COLANGELO:  Your Honor, the point is that, even if

4    it is correct that making a decision to separate personal from

5    official is somehow related to his duties, that further

6    personal steps he takes down the road can be related to his

7    official duties, that would defeat the purpose.  He

8    intentionally separated official from unofficial.  So by

9    definition, writing personal checks, even if he did it in the

10   oval office, is not an official act.

11   The second argument the defense makes, your Honor, is

12   that the payments to Mr. Cohen were in fact legal

13   reimbursements.  But again -- obviously, the Court read the

14   allegations in the People's indictment statement of facts,

15   obviously, the People don't concede that point -- but even if

16   true, that would go only to a defense of the state charges.  It

17   wouldn't show that this was official conduct.

18   And I think the Court can see how these points compel

19   the conclusion that his conduct was not official by looking at

20   a couple of cases the People cited.  The first is matter of

21   Donovan, the prosecution of the former labor secretary, where

22   this court held that because the conduct of Secretary Donovan

23   occurred before he became labor secretary, it didn't relate to

24   his official conduct, he didn't have any color of office

25   grounds for removal.  The second case the People cite is a case

N6RGpeoH

1    called Ohio v. Meade, which is a case where a deputy sheriff in

2    Ohio was also cross-designated as a deputy US Marshal on a

3    fugitive task force.  And returning from his duties on task

4    force deployment, he encountered an individual who was

5    ultimately charged with murder under state law as a result of

6    that encounter.  And the Southern District of Ohio said that

7    during the encounter, even though he had a separate role as a

8    federal officer, he was acting in his state role.

9            So it's possible to act in one of two roles.  And the

10   facts here show that the defendant --

11           THE COURT:  It's a perimeter -- you are making the

12   same point, that there's a part of the duties that were

13   official -- and I wouldn't say duties -- that there were

14   official duties and that there were activities, even if a

15   person is in a federal office, that are private.

16           So even though you become a federal official, even if

17   I become a judge, I can still take care of personal matters

18   inside myself; I can write checks for my milk deliveries, I can

19   buy groceries, all those are private acts.

20           MR. COLANGELO:  That's exactly right, your Honor.

21   Even if you write checks for your milk deliveries --

22           THE COURT:  I can defame somebody.

23           MR. COLANGELO:  Pardon me.

24           THE COURT:  I can defame somebody, I can slander and

25   defame someone for something that happened before?

N6RGpeoH

1          MR. COLANGELO:  Yes.

2          THE COURT:  And it would not be a public event, it

3     would be a private one?

4          MR. COLANGELO:  Yes.  The Court is capable of taking

5     private acts.  The president is as well.

6          THE COURT:  That was the case in Carroll?

7          MR. COLANGELO:  Yes, it was.

8          And your Honor, one critical point here is to accept

9     defendant's arguments is to ignore a central through line in

10    every case that violates the color of office standard for

11    federal --

12          THE COURT:  Let me see if I can shorten the argument.

13          Mr. Blanche is arguing that the language of "for or

14    related to" as a preamble to the color of office clause was an

15    amendment in 2011 that broadened the statute and makes academic

16    a number of the cases, if not all the cases, that you cite.

17    And jumping on that, he argues that the president's concern to

18    execute the laws that prevent him from taking emoluments

19    authorize him to hire a private lawyer to sanitize his affairs

20    so that he doesn't breach the constitutional provision.  I

21    think that's his argument.

22          Would you comment on it.

23          MR. COLANGELO:  Yes, your Honor.

24          Assuming it's correct that that was the defendant's

25    intent in hiring a personal lawyer, to sanitize his affairs in

N6RGpeoH

order not to breach any constitutional obligations, I think

that the response to that is the response I gave a minute ago,

which is, once he has accomplished that separation, the private

conduct that he engages in afterwards can't be considered

official because there would have been no reason to make the

separation.  And otherwise, your Honor, the --

THE COURT:  I don't get that.  I can understand that

it continues to be private.  But Mr. Blanche is saying the

private act relates to the public proscription, that because of

the constitutional proscription I hired a private lawyer to

sanitize my life -- that's the argument -- there are no facts

to base this on, but that's the argument.

MR. COLANGELO:  Yes.  So let me give you two

responses, your Honor.

First, if you accepted that argument, it would require

contravening the principle articulated in every Supreme Court

case that addresses this question, I believe, which is that

there is a difference between a defendant's identity as a

federal actor and his duty or his obligations as that federal

actor.  Whatever else the Supreme Court has said, it has said

that an individual's identity as a federal actor alone is not

enough.  And we know that there isn't a president's only rule,

because Clinton v. Jones made clear that it categorically

rejected the granting of any immunity in President Clinton's

identity as president.  So although I believe --

N6RGpeoH

1    THE COURT:  President Clinton wanted immunity for

2    something he had done before he became president and not

3    because of anything he had done while he was president.

4         Mr. Trump wants to say that he hired Mr. Cohen because

5    he was worried about the proscriptions of the Constitution.  So

6    he says that the private act of hiring Cohen and paying him out

7    of my pocket and taking care of something personal to me

8    relates to a proscription of the Constitution.  I think that's

9    the argument.  It sounds a little far-fetched, but that seems

10   to be the argument.

11        MR. COLANGELO:  So, your Honor, let me answer a couple

12   of those questions.

13        The Court is, of course, correct that President

14   Clinton was sued for conduct, or at least the Court considered

15   the aspects of the suit that related to conduct before he

16   became president, but his claim --

17        THE COURT:  President Clinton said, I can't be

18   bothered taking care of this lawsuit against me for something I

19   did before I became president because I'm too busy as

20   president.

21        MR. COLANGELO:  Exactly.

22        THE COURT:  And that was held, too bad, Mr. President,

23   you have to sit for a deposition.

24        MR. COLANGELO:  That's exactly right.  He was not

25   immune from civil process because the Supreme Court said, there

N6RGpeoH

1    is no immunity grounded solely in his identity as president.

2    And the defense's argument here would collapse the federal

3    officer color of office requirement in a way that would violate

4    that ruling of the Supreme Court, your Honor.

5         If the Court has no further questions, I'll move on.

6         THE COURT:  No, let's have Mr. Blanche's view on this,

7    and then we'll take -- before you sit down, you have stipulated

8    to number of facts, and they should be on the record, it seems

9    to me, because the sense of those acts is to show that there is

10   substance behind the allegations and your statement of facts.

11   Since this is supposed to be an evidentiary hearing, I would be

12   taking those evidentiary facts as supporting the proposition

13   stated in your statement of facts.  So let's do that now.

14        MR. COLANGELO:  Thank you, your Honor.

15        The parties stipulated to the admissibility, for

16   purposes of this hearing, of People's Exhibits 3 through 12.

17   And without objection, based on that stipulation, I will move

18   them into evidence, your Honor.

19        THE COURT:  Mr. Blanche, no objection?

20        MR. BLANCHE:  No objection, your Honor.

21        THE COURT:  Received.

22        (Plaintiff's Exhibits 3 - 12 received in evidence)

23        MR. COLANGELO:  Thank you, your Honor.

24        One more note for the record, a number of those

25   exhibits were filed under seal; those are Exhibits 3, 8, 9, 10,

N6RGpeoH

1  11 and 12.  We ask that they remain under seal, notwithstanding

2  that they have been received into evidence.

3          THE COURT:  Well, they are stipulated facts to allow

4  their use, why don't you recite them.

5          MR. COLANGELO:  I'm sorry, your Honor, give me one

6  second to confer with defense counsel.

7          (Conferring)

8          THE COURT:  There's one thing more, I would like as an

9  example one of the checks that was signed by Mr. Trump to be an

10  exhibit as part of the record, even though that's a grand jury

11  record.

12          MR. COLANGELO:  The people don't object, your Honor.

13  And we're happy to confer with the defense, if they have a

14  preference as to which check.

15          (Conferring)

16          MR. COLANGELO:  I don't believe the parties have any

17  objection to one of the checks being --

18          THE COURT:  Why don't you read the stipulated items

19  that could be introduced in evidence.

20          MR. COLANGELO:  So, your Honor, I conferred with

21  defense counsel.  I don't believe the parties have stipulated

22  to any facts.  We have stipulated that the Court may admit

23  those exhibits into evidence and consider them in the Court's

24  ruling.

25          THE COURT:  I have accepted them, but I want a public

N6RGpeoH

1    record.  And you have agreed with Mr. Blanche that certain

2    aspects of these sealed exhibits can be made public and put on

3    the record, subject to my conversation with both of you

4    yesterday.

5             I need a public record, Mr. Colangelo.  And you are

6    using matters that would otherwise be secret because they were

7    considered by a grand jury and maybe for other reasons as well.

8    But since this is a public hearing, I order that, to the extent

9    necessary to create a record here, that they be made public.

10            So go ahead and read what you are allowed to use these

11   for, and I will admit them for purposes of evidence.

12            MR. COLANGELO:  Yes, your Honor.

13            Exhibit 3, the People proffer as evidence that there

14   was a private agreement -- pardon me, your Honor, let me confer

15   with defense counsel.

16            (Conferring)

17            MR. BLANCHE:  Your Honor, the defense position is

18   that, to the extent that your Honor relies on exhibits that

19   have been admitted, even sealed exhibits, to the extent they

20   are part of your Honor's decision, they should not be sealed.

21            THE COURT:  I agree.  But we are unsealing only to the

22   extent that they can be used.  There may be other things in

23   those exhibits that I don't need as part of this record, and

24   I'm not unsealing those.

25            MR. COLANGELO:  Thank you, your Honor.

N6RGpeoH

1          And apologies if we misunderstood.  My understanding

2     following the colloquy we had with you and Mr. Blanche

3     yesterday was, to the extent either party asked the Court to

4     rely on specific facts from the sealed exhibits, we would

5     identify them when referencing those facts in the course of the

6     argument.

7          THE COURT:  No.  You have Exhibit 3.

8          MR. COLANGELO:  Yes, your Honor.

9          THE COURT:  What of Exhibit 3 do you wish for me to

10    consider?

11         MR. COLANGELO:  Thank you, your Honor.

12         For Exhibit 3, I would like you to consider that it's

13    a nondisclosure agreement that involved the payment of $130,000

14    to Stephanie Clifford by Michael Cohen through Essential

15    Consultants.

16         THE COURT:  Date?

17         MR. COLANGELO:  One moment, your Honor.  The agreement

18    is dated October 28th, 2016.

19         THE COURT:  Anything else in this exhibit you want me

20    to consider?

21         MR. COLANGELO:  No, your Honor.

22         THE COURT:  Any objection, Mr. Blanche?

23         Does your microphone work?

24         MR. BLANCHE:  My microphone is not working.

25         THE COURT:  Can't that be made to work,

N6RGpeoH

1      Mr. Technician.  It worked yesterday when we tested the room.

2                  THE COURT:  Use that mic, Mr. Blanche.

3                  MR. BLANCHE:  Your Honor, with respect to the exhibits

4      that are being offered by the People, these exhibits are sealed

5      because of the existing protective order in the state

6      proceeding.  Most of these exhibits are already publicly

7      available because of congressional investigation.  To the

8      extent that your Honor or the People have relied on them, they

9      of course should be part of the record.

10                 THE COURT:  I am not relying on anything other than

11     the record in this case.  I am not relying on anything put

12     before Congress or anything written --

13                 MR. BLANCHE:  Agreed.

14                 THE COURT:  So that's why I want Mr. Colangelo to

15     state what he wants me to consider.  And he's done that.

16                 And the question to you is whether you have any

17     objection.

18                 MR. BLANCHE:  Yes, we agree with that, your Honor.

19                 THE COURT:  No objection.  That's received.

20                 MR. COLANGELO:  Thank you, your Honor.

21                 Exhibit 8, People's Exhibit 8 is a sealed exhibit.  We

22     ask the Court to consider that this is a bank statement from

23     First Republic Bank for Essential Consultants LLC, the shell

24     corporation that Mr. Cohen established to accomplish the

25     payment to Ms. Clifford through her lawyer.  We ask the Court

N6RGpeoH

1   to consider that it shows a transfer out of $130,000.  We also

2   ask the Court to consider the handwritten notes on the

3   left-hand side of the statement, which show the conversion of

4   that $130,000 payment, combined with other obligations, to the

5   $420,000 reimbursement amount that the People allege is the

6   basis of the falsified business records counts in this case.

7              THE COURT:  Those were the calculations, as stated

8   before, in summarizing this page?

9              MR. COLANGELO:  Yes, your Honor.

10             THE COURT:  Mr. Blanche, objection?

11             MR. BLANCHE:  We don't object to it being part of the

12  record, your Honor.  As I'll address in a moment, we don't

13  agree --

14             THE COURT:  The problem is that --

15             MR. BLANCHE:  Sorry, your Honor.

16             We don't object to it being part of the record.  As

17  I'll say in a moment, your Honor, we object the notes reflected

18  are accurate, but we don't object to that being part of the

19  record.

20             THE COURT:  Mr. Colangelo is just reading the notes as

21  they appear on that document.  It's not making any statement

22  about the notes, when they were written or why, just that those

23  notes appear.

24             MR. COLANGELO:  Your Honor, Exhibit 9 filed under

25  seal, we ask the Court to consider only --

N6RGpeoH

1          THE COURT:  Are we finished with 8?

2          MR. BLANCHE:  Pardon me?

3          THE COURT:  Anything else you want to bring out in 8?

4          MR. COLANGELO:  No, your Honor.  Nothing for the

5  People.

6          THE COURT:  Mr. Blanche, anything else under 8?

7          MR. BLANCHE:  No, your Honor.

8          THE COURT:  I didn't ask you about 3.  Anything about

9  3 you want to add?

10          MR. BLANCHE:  No, your Honor.

11          THE COURT:  Next, Mr. Colangelo.

12          MR. COLANGELO:  Your Honor, for Exhibit 9, we only ask

13  the Court to consider that this exhibit reflects the 11

14  invoices that correspond to the 11 counts for falsifying

15  business records in the indictment that the Court described as

16  relating to invoices.  I would ask that if the Court intends,

17  following this hearing, to unseal any of these exhibits, we

18  have an opportunity to review them for material that can't be

19  disclosed publicly.

20          THE COURT:  No, I'm not intending to do that.

21          MR. COLANGELO:  Thank you, your Honor.

22          THE COURT:  Eleven invoices times 35,000 comes to

23  385,000?

24          MR. COLANGELO:  That's correct, your Honor.  One of

25  the invoices, the one submitted in February 2017, was for two

N6RGpeoH

months, and it was for $70,000.

THE COURT:  That would add up to 420, okay.

MR. COLANGELO:  Your Honor, Exhibit 10 is a sealed exhibit.  The People ask the Court to consider only that this exhibit contains the 12 general ledger entries that correspond to falsifying business records that relate to false entries in the general ledger.

THE COURT:  Objection?

MR. BLANCHE:  No objection.

THE COURT:  Received.

MR. COLANGELO:  Your Honor, Exhibit 11 is a sealed exhibit.  The People ask the Court to consider only that this exhibit includes the 11 checks and check stubs that correspond to the 11 counts in the indictment for falsifying business records that relate to false entries in the check and check stubs.

THE COURT:  Objection, Mr. Blanche?

MR. BLANCHE:  No objection.

THE COURT:  Received.

MR. COLANGELO:  Your Honor, Exhibit 12 is the final sealed exhibit.  The People ask the Court to consider this exhibit for the demonstration it makes that the accounts at issue in this prosecution were used for other personal expenses, in other words, that it was a personal account.

THE COURT:  Meaning, the account on which Mr. Trump

N6RGpeoH

1    drew his checks was used also for telephone expenses,

2    electricity, travel, entertainment, medical, dental and other

3    expenses for his children?

4              MR. COLANGELO:  Correct.  Yes, your Honor.

5              THE COURT:  Objection, Mr. Blanche?

6              MR. BLANCHE:  No objection.

7              THE COURT:  Received.

8              MR. COLANGELO:  That concludes the sealed exhibits,

9    your Honor.

10             THE COURT:  Any other exhibits that you wish me to

11   consider?

12             MR. COLANGELO:  Yes, your Honor.

13             We ask the Court to consider Exhibit 4.  This is not

14   sealed.  This exhibit displays three tweets by Donald J. Trump

15   from the Twitter handle @realDonaldTrump all on May 3rd, 2018.

16   The People ask the Court to consider this exhibit for the

17   statement from Mr. Trump that Mr. Cohen received a, quote,

18   reimbursement in connection with, quote, a private contract

19   between two parties.

20             THE COURT:  Objection?

21             MR. BLANCHE:  No objection.

22             THE COURT:  Received.

23             MR. COLANGELO:  Your Honor, Exhibit 5, not sealed,

24   this is the text of a statement issued by Rudy Giuliani on

25   May 4th, 2018 --

N6RGpeoH

1          THE COURT:  How do we know that there is attribution

2     to the president?

3          MR. COLANGELO:  Your Honor, we can establish

4     attribution through the next exhibits.

5          THE COURT:  These are all statements by Giuliani?

6          MR. COLANGELO:  Your Honor, Exhibits 5, 6 and 7 are

7     all statements by Mr. Giuliani, yes.

8          THE COURT:  An agent can't establish his own

9     authority.

10          Do you object, Mr. Blanche?

11          MR. BLANCHE:  No, we don't object.

12          THE COURT:  They're received.

13          MR. COLANGELO:  Thank you, your Honor.

14          Those, I believe -- and then, in addition, your Honor,

15     we move --

16          THE COURT:  So Giuliani said what?

17          MR. COLANGELO:  Sorry, your Honor.

18          In Exhibit 5, Mr. Giuliani is saying, quote, the

19     payment was made to resolve a personal and false allegation in

20     order to protect the president's family.

21          In Exhibit 6, Mr. Giuliani says, that was money that

22     was paid by his lawyer.  The president reimbursed that over a

23     period of several months.

24          And for Exhibit 7 -- pardon me, your Honor, I need to

25     find the page cite -- at page 4 of Exhibit 7, Mr. Giuliani

N6RGpeoH

1  says, even if it was considered a campaign contribution, it was

2  entirely reimbursed out of personal funds.

3       THE COURT:  Received without objection.

4       MR. COLANGELO:  Thank you, your Honor.

5       And then to the extent I did not do this earlier, the

6  People also move in Exhibit 26, the transcript of the president

7  elect's press conference on January 11th, 2017.

8       THE COURT:  I don't think 26 helps anything.  It's a

9  long exhibit and -- is there objection?

10      MR. BLANCHE:  Can we have one moment, your Honor,

11 please.

12      (Conferring)

13      MR. BLANCHE:  Your Honor, we don't object to that

14 coming into evidence.

15      THE COURT:  I'll admit that which you want to be used,

16 not the rest.

17      MR. COLANGELO:  Thank you, your Honor.

18      The passages the People rely on are pages 10, 11 and

19 12 of that exhibit.

20      THE COURT:  Received.

21      (Plaintiff's Exhibit 26 received in evidence)

22      MR. COLANGELO:  Let me confer with my colleagues and

23 make sure I don't have any other exhibits to move in.

24      (Conferring)

25      MR. COLANGELO:  Thank you, your Honor.  Nothing

N6RGpeoH

1   further.

2           THE COURT:  Mr. Blanche.

3           MR. BLANCHE:  Your Honor, would you like the defense

4   to offer the few exhibits that we have agreed to as well at

5   this point before I argue?

6           THE COURT:  Yes.

7           MR. BLANCHE:  It's just Exhibit A and B to our

8   declaration -- sorry, two of our declarations, your Honor, both

9   from the original notice of removal and the opposition.

10          Exhibit A from our opposition, your Honor, your Honor

11  read from earlier today, the statement of facts.  Exhibit B are

12  a series of emails --

13          THE COURT:  Let me catch up with you, please.

14          MR. BLANCHE:  -- from Mr. Cohen.

15          THE COURT:  Let me catch up with you, please.

16          Exhibit A is a grand jury indictment.

17          MR. BLANCHE:  Pardon me, your Honor?

18          THE COURT:  Exhibit A is the grand jury indictment.

19          MR. BLANCHE:  One moment.

20          So I can start, your Honor, with the affirmation of

21  Ms. Necheles and the notice of removal.  Exhibit A is just a

22  copy of the indictment from New York.

23          THE COURT:  I don't think I have the document you're

24  referring to.

25          MR. BLANCHE:  I can pass it up, your Honor.

N6RGpeoH

| | |
|---|---|
| 1 | THE COURT:  I have lots of paper already. |
| 2 | Exhibit A to Ms. Necheles' information is a grand jury |
| 3 | indictment, is that what you want to offer into evidence. |
| 4 | MR. BLANCHE:  Exhibit A should be a copy of the |
| 5 | indictment in state court, this is from our filing, your Honor |
| 6 | on May 4th. |
| 7 | THE COURT:  I accept the indictment as evidence, I can |
| 8 | take judicial notice. |
| 9 | MR. BLANCHE:  And then Exhibit B, your Honor, is the |
| 10 | Morgan Lewis white paper, which was referenced earlier as well. |
| 11 | MR. COLANGELO:  Your Honor, as to the -- |
| 12 | THE COURT:  I admitted it for what it's worth. |
| 13 | MR. COLANGELO:  Thank you, your Honor. |
| 14 | And the People note the evidentiary objection we |
| 15 | identified at page 2, note 2 of our memorandum supporting -- |
| 16 | THE COURT:  What's the objection? |
| 17 | MR. COLANGELO:  That the Court can consider the white |
| 18 | paper for the fact that the statements in the white paper were |
| 19 | made, not for the truth. |
| 20 | THE COURT:  That's the only consideration I'm making. |
| 21 | MR. COLANGELO:  Thank you, your Honor. |
| 22 | MR. BLANCHE:  And then, your Honor, the other exhibits |
| 23 | that we offer -- first, is a copy of the statement of facts, |
| 24 | which you made reference to in your Honor's opening statement |
| 25 | that accompany the indictment. |

N6RGpeoH

| | |
|---|---|
| 1 | THE COURT:  That's all part of the record, that's part |
| 2 | of the record that was brought over.  It's already in the |
| 3 | record in this case. |
| 4 | MR. BLANCHE:  Thank you, your Honor. |
| 5 | And then the last two -- well, there's three other |
| 6 | things we offer -- one is an email from Mr. Cohen to several |
| 7 | individuals announcing his departure from the Trump |
| 8 | Organization, that's attached as Exhibit B to the Blanche |
| 9 | affirmation that was filed on June 15th, and a separate email |
| 10 | from Mr. Cohen to several individuals, his departure email from |
| 11 | the Trump Organization, that is attached as Exhibit B to the |
| 12 | Blanche affirmation of June 15th. |
| 13 | THE COURT:  What are you offering, just B? |
| 14 | MR. BLANCHE:  Exhibit B to the Blanche affirmation, |
| 15 | your Honor. |
| 16 | THE COURT:  Effective January 20, 2017, I'm accessible |
| 17 | as personal counsel to Donald J. Trump.  Emails should be |
| 18 | directed to -- blank -- and all future calls should be directed |
| 19 | to -- blank. |
| 20 | MR. BLANCHE:  That is the one. |
| 21 | THE COURT:  Any objection? |
| 22 | MR. COLANGELO:  No, your Honor. |
| 23 | THE COURT:  Received. |
| 24 | (Defendant's Exhibit B received in evidence) |
| 25 | MR. BLANCHE:  And then the next email -- which I can |

N6RGpeoH

1    read into the record if your Honor would like —- from Mr. Cohen

2    to several individuals, which is his departure email from the

3    Trump Organization.

4              Do you want me to read it into the record, your Honor?

5              THE COURT:  Go ahead.

6              Any objection?

7              MR. COLANGELO:  No, your Honor.

8              THE COURT:  Go ahead and read it.

9              MR. BLANCHE:  Dear all, I cannot express how difficult

10   it is for me to write this email.  Ten years ago, when

11   Mr. Trump offered me my position at the Trump Organization, I

12   distinctly remember the indescribable feeling as I took my

13   place in Ivanka's old office.  As I am now cleaning out my

14   office to embark on this new journey, that feeling has

15   returned, but this time with a degree of sadness included.

16   Over these ten years, we have shared as a company, as friends,

17   as family so many joyous occasions together, and unfortunately,

18   some sad ones as well.  I will be in and out of the office with

19   my final day to say good-bye this Tuesday.  We all know too

20   well how the liberal media and the anti-Trump advocacy groups

21   intend on attacking our boss.  It is for this reason that I am

22   truly excited to begin my new position as personal attorney to

23   President Donald J. Trump.  It is an incredible honor for me,

24   and I look forward to productive and exciting times with

25   President Trump.  However, I will very much miss each and every

1    one of you here at the Trump Organization, and I would like to

2    thank all of you for making my years here memorable ones.  You

3    have all been fantastic.  And I know you will continue to be so

4    with Don and Eric.  If anyone should need me, or just to drop a

5    note telling me how quiet the 26th floor is now that I'm gone,

6    I will be maintaining my cellular number and effective Tuesday

7    my new email address is -- redacted -- yours, Michael Cohen.

8              And then, finally, your Honor, from page 22 of our

9    brief in opposition filed on June 15th, 2023, we quote excerpts

10   from Mr. Cohen's book Disloyal, specifically pages 308 to 310,

11   where Mr. Cohen describes and agrees that at the time that

12   Mr. Cohen would work for President Trump as his personal

13   attorney, he would receive a $420,000 retainer for the work

14   that he would be doing for President Trump while he was

15   president.  So we would offer pages 308 to 310 from Disloyal.

16             THE COURT:  What page in your brief?

17             MR. BLANCHE:  Your Honor, it's from page 22 from our

18   brief filed on June 15th.  The ECF page number is 28 out of 34,

19   your Honor.

20             THE COURT:  Mr. Colangelo?

21             MR. COLANGELO:  Your Honor, no objection, on the same

22   ground that we identified before, we don't object to it being

23   taken as proof that the statements were made, not --

24             THE COURT:  That Mr. Cohen wrote this in his book.

25             MR. COLANGELO:  Yes, your Honor.

N6RGpeoH

1          THE COURT:  Received in evidence, then.

2          MR. BLANCHE:  Your Honor, I just want to address

3     specifically the point that your Honor and the People spent the

4     most time on today, which is whether Mr. Cohen, acting as

5     President Trump's personal attorney, qualifies as conduct for

6     or relating to any act under federal office.  I think there has

7     been some dismissive positions taken by the People, perhaps for

8     good reasoning because we've never been in a position where we

9     are today, with a president being charged for conduct that

10    occurred while he was in office.  So I just want to take a

11    minute to step back and flush out what happened in the time of

12    Mr. Cohen becoming President Trump's personal attorney.

13          As has been discussed, in the days and weeks leading

14    up to President Trump taking office, he made a decision to

15    separate himself from his very vast business empire that was

16    very complicated and took a lot of work, as has been publicly

17    discussed and as was discussed here today.  Mr. Cohen, up until

18    that time -- and as we just read in the emails -- served and

19    worked at the Trump Organization.  But when President Trump and

20    Mr. Cohen were discussing what he would do next, it did not

21    make sense, for obvious reasons, for Mr. Cohen to remain at the

22    Trump Organization because the president had separated himself

23    from the Trump Organization.

24          However, the Constitution puts a very special

25    responsibility and unique responsibility on the President of

N6RGpeoH

```
1    the United States that's different from any other office in the
2    land.  The Supreme Court has said -- and this is in our
3    brief -- that the president is the only person, he is the only
4    person who alone composes a branch of government.  And as a
5    result, there is not always a clear line between his personal
6    and official affairs, that's unique to that position.  Your
7    Honor, I would say that's different than the example your Honor
8    gave, a judge who is taking the bench, it's different from any
9    other officer that would try to remove a case.  There's not a
10   clear line between his personal and official affairs.  The
11   United States Constitution talks about the various clauses that
12   prevent a president from taking any money or anything of value
13   from a state or from a foreign government.  And President
14   Trump, because of his holdings, was very concerned, as
15   different articles have described, about not violating his oath
16   and his duty under the Constitution when he's president.
17           So what he did is he agreed for Michael Cohen to
18   become his personal attorney.  Nobody disputes any of that.
19   But what the People do then is they stop and say, we're done,
20   he takes office, he has a personal attorney, and there can be
21   no connection between an act of a federal officer arising out
22   of color of the president's job and Mr. Cohen acting as his
23   personal attorney.  That is completely false.  And the reason
24   for that --
25           THE COURT:  Mr. Cohen was paid out of President
```

N6RGpeoH

Trump's pocket?

            MR. BLANCHE:  Without a doubt.  Your Honor --

            THE COURT:  He wasn't paid outside the retainer

agreement?

            MR. BLANCHE:  He was paid --

            THE COURT:  $35,000 a month?

            MR. BLANCHE:  $35,000 a month as a retainer --

            THE COURT:  And then it stops?

            MR. BLANCHE:  Pardon?

            THE COURT:  And then it stops?

            MR. BLANCHE:  Correct.  And then it --

            THE COURT:  November 2017, it stops?

            MR. BLANCHE:  At the end of 2017, it stopped, and it

was no longer --

            THE COURT:  Mr. Trump was no longer concerned about

mixing public and private affairs?

            MR. BLANCHE:  He no longer needed Mr. Cohen, your

Honor.

            But think about the alternative position, which the

People have put forward and which they're charging across the

street, which is that all of this money that was paid during

that year to Michael Cohen all comes out of the Stormy Daniels

payment.  So Stormy Daniels is paid $130,000.  Michael Cohen is

paid by President Trump $420,000.  And presumably, Mr. Cohen is

going to -- I don't know what he's going to say when he

N6RGpeoH

testifies, because he says something different every day -- but

presumably, what he is going to say is there was some

formula --

       THE COURT:  What he would say is of no concern to me.

       MR. BLANCHE:  Pardon me?

       THE COURT:  It's of no concern what he would say.

He's not here, you didn't bring him here.

       MR. BLANCHE:  Well, the People just relied on it in

their argument in saying there was a formula where Mr. Cohen

was going to be paid --

       THE COURT:  The People relied on a document.

       MR. BLANCHE:  Correct.

       THE COURT:  A document that recorded or made an

explanation for the $420,000.

       MR. BLANCHE:  Correct.  And that's --

       THE COURT:  And that's support for their contention.

       You have given no record support for anything you are

saying.  There's not a single affirmation of anybody who has

knowledge, not a single declaration, not a single affidavit.

And the only person who knows what Cohen was hired for is the

president, and he's not declaring anything, or Cohen, and he's

not here.  He's said things and we've had quotations from what

he said, including his plea of guilty, but there's no record

basis for anything else than what we have gotten, all of which

shows private work.

N6RGpeoH

```
1          Is the private work related to the public work?  You
2   say so, but how do I know?
3          MR. BLANCHE:  Your Honor, we introduce evidence about
4   what he said in his book about what it was for and that he went
5   to the oval office --
6          THE COURT:  That's hearsay.
7          MR. BLANCHE:  Your Honor --
8          THE COURT:  If he had something to say, you could
9   bring him here.
10          MR. BLANCHE:  Your Honor, if the Court wants to hear
11   from Mr. Cohen directly, that's fine with the defense, your
12   Honor.
13          THE COURT:  You should have done that today.  Today is
14   the evidentiary hearing.
15          MR. BLANCHE:  In the defense's view, your Honor, it's
16   not necessary, because the record contains enough evidence to
17   show exactly what our defense will be at trial and that's --
18          THE COURT:  What it shows is that Cohen was hired
19   privately to do something privately.  That's what it shows.
20          MR. BLANCHE:  Not to do something, your Honor; to help
21   the president deal with his constitutional obligations under
22   the --
23          THE COURT:  How do I know that?  Is it written in the
24   retainer agreement?  Is there a retainer agreement?
25   Mr. Blanche, was there a retainer agreement?
```

N6RGpeoH

1          MR. BLANCHE:  The checks, the fact that there's

2     $35,000 monthly checks --

3          THE COURT:  Was there a retainer agreement?

4          MR. BLANCHE:  Pardon me?

5          THE COURT:  Was there a retainer agreement?

6          MR. BLANCHE:  The retainer, it's recorded in an

7     invoice, a monthly invoice from Mr. Cohen to the president,

8     it's recorded on the --

9          THE COURT:  It's not a retainer agreement.  It's an

10    invoice that says, pay me $35,000 for services rendered.  We

11    don't know what, if any, services were rendered.

12         MR. BLANCHE:  Your Honor, a retainer agreement in New

13    York isn't required.  I'm not aware of a retainer agreement

14    being signed.

15         THE COURT:  Of course it's not required.  But you are

16    saying it's a specific purpose retainer, it's done to help the

17    president separate private from public.  I don't see anything

18    to that effect.

19         MR. BLANCHE:  Your Honor, may I just have a moment,

20    please.

21         THE COURT:  Sure.

22         (Conferring)

23         MR. BLANCHE:  Your Honor, if the Court believes that

24    the evidence that has been offered and accepted, including the

25    checks and the invoice and the recorded ledger on the books of

N6RGpeoH

1    President Trump's private books underneath the umbrella of the

2    Trump Organization isn't enough, we can agree with the People

3    to call a witness.  We also have a witness today that we could

4    call, your Honor, that could further discuss what we believe is

5    not necessary given the evidence in this case, your Honor,

6    which is that these checks were for a retainer and an attorney

7    agreement between President Trump and Michael Cohen.  It lasted

8    while he was president, and it was for good reason, your Honor.

9    So this wasn't a hypothetical problem that the president

10   thought he might encounter.

11           THE COURT:  You have a witness you want to call?

12           MR. BLANCHE:  He was sued --

13           THE COURT:  You have a witness you want to call?

14           MR. BLANCHE:  Your Honor, if we could take a

15   two-minute recess and discuss, yes, I do.

16           THE COURT:  Two minutes.

17           MR. BLANCHE:  Thank you.

18           (Recess)

19           THE COURT:  Mr. Blanche.

20           MR. BLANCHE:  Your Honor, we call Alan Garten.

21           MR. COLANGELO:  Your Honor, one request from the

22   People.  As the Court knows, the parties stipulated last week

23   that no party intended to call a live witness at this

24   proceeding.  We don't object to Mr. Garten's direct testimony

25   being taken today.  Given that we had no notice until

N6RGpeoH                    Garten - Direct

1    Mr. Blanche mentioned it from the podium a few minutes ago that

2    there was the possibility of a witness, we would ask that

3    cross-examination be scheduled for tomorrow morning.  We think

4    we could do it in less than an hour.

5              THE COURT:  Let's see what he has to say first.

6              Go ahead, Mr. Garten.

7    ALAN GARTEN,

8         called as a witness by the Defendant,

9         having been duly sworn, testified as follows:

10   DIRECT EXAMINATION

11   BY MR. BLANCHE:

12   Q.  Good afternoon, Mr. Garten.

13             Where do you work?

14   A.  The Trump Organization.

15   Q.  What is your position with the Trump Organization?

16   A.  Chief Legal Officer.

17   Q.  And did you have that position -- well, have you had that

18   position since 2016?

19   A.  I've been a lawyer there since 2007.  I have had that

20   position since January 2017.

21   Q.  What was your position prior to January of 2017?

22   A.  General counsel.

23   Q.  You have been here today during the hearing, have you not?

24   A.  Yes, I have.

25   Q.  So are you familiar with an individual named Michael Cohen?

N6RGpeoH                        Garten - Direct

1    A.   Yes.

2    Q.   How are you familiar with him?

3    A.   He was employed at the Trump Organization as an attorney

4    for -- I believe since 2007 until January of 2017,

5    approximately.

6    Q.   And so January of 2017, approximately, Mr. Cohen left the

7    Trump Organization.  Do you have an understanding as to why?

8    A.   He left the organization to serve as a personal attorney to

9    President Trump.

10   Q.   And as far as you know, did he in fact assume that role as

11   personal attorney to Donald Trump?

12   A.   Yes.

13            THE COURT:  You can object, Mr. Colangelo, if you

14   want.  You can object, you know.

15            MR. COLANGELO:  Yes, your Honor.

16            Let me make a record that one of my colleagues, Susan

17   Hoffinger, will enter an appearance and will handle the --

18            MS. HOFFINGER:  Good afternoon, your Honor.

19            THE COURT:  You will be conducting the

20   cross-examination?

21            MS. HOFFINGER:  If appropriate, I will, your Honor.

22            THE COURT:  Are there any objections?

23            MS. HOFFINGER:  Not so far, your Honor.

24            THE COURT:  You are going to handle the objections?

25            MS. HOFFINGER:  I will.

N6RGpeoH                    Garten - Direct

1              THE COURT:  Why don't you change places with

2    Mr. Colangelo.

3              MS. HOFFINGER:  Okay.

4              THE COURT:  My policy is that, whether it's a jury or

5    nonjury case, the rules of evidence apply.

6              MS. HOFFINGER:  Thank you.

7              THE COURT:  Go ahead, Mr. Blanche.

8              MR. BLANCHE:  Thank you, your Honor.

9    BY MR. BLANCHE:

10   Q.  Do you have an understanding as to whether Mr. Cohen

11   actually assumed the duties as personal attorney to President

12   Trump?

13             MS. HOFFINGER:  Objection.

14             THE COURT:  Sustained.

15   BY MR. BLANCHE:

16   Q.  So when Mr. Cohen left in approximately January 2017, do

17   you know what he did?

18   A.  He took on the role of personal attorney to President

19   Trump.

20   Q.  And how do you know that?

21   A.  I know that from my experience at the organization that

22   this was something that was openly discussed and that

23   Mr. Cohen, I know, was very vocal about his new position and --

24             THE COURT:  Is this hearsay you are telling me?  It's

25   all hearsay.  You don't know yourself.  You know what was said

1    in the office.

2                THE WITNESS:  No, I do know myself because --

3                THE COURT:  What's your personal knowledge?

4                THE WITNESS:  My personal knowledge is conversations

5    with Mr. Cohen.  And also, when matters would come in that

6    previously may have been dealt with by the organization, but

7    that were now related -- were not corporate related, but

8    related to President Trump or the first lady, those matters

9    would be sent to Mr. Cohen.

10   BY MR. BLANCHE:

11   Q.  And when you are talking about in time, you are saying

12   after Mr. Cohen left in January 2017 through the rest of the

13   year when he was serving as counsel to President Trump?

14   A.  That's my recollection, yes.

15   Q.  And do you know why Mr. Cohen left the Trump Organization

16   to go become private attorney for President Trump?

17               MS. HOFFINGER:  Objection.

18               THE COURT:  Sustained.

19               MR. BLANCHE:  May I ask the reason for sustaining the

20   objection, your Honor.

21               THE COURT:  Hearsay.

22               MR. BLANCHE:  Well, your Honor --

23               THE COURT:  Lay a better foundation.

24   BY MR. BLANCHE:

25   Q.  Mr. Garten, were you present or did you have discussions

N6RGpeoH                         Garten - Direct

1   with Mr. Cohen about him leaving the Trump Organization?

2                MS. HOFFINGER:  Objection.

3                THE COURT:  Sustained -- withdrawn.

4                You may answer that question.

5                THE WITNESS:  My office was right next to Mr. Cohen's

6   for many years, so we had a lot of conversations, and this is

7   going back to late 2016, early 2017, so my memory is certainly

8   not perfect there.  But certainly, I do know that once

9   Mr. Cohen took on the role of attorney for the president, there

10  were discussions about the need for him to have to leave --

11               MS. HOFFINGER:  Objection.

12               THE WITNESS:  -- the company.

13               THE COURT:  These were discussions between you and

14  Cohen?

15               THE WITNESS:  Correct.

16               THE COURT:  Overruled.

17               THE WITNESS:  If I could just finish.  In order to --

18               THE COURT:  Don't say what it is.  You had

19  discussions.

20               Go ahead, next question.

21  BY MR. BLANCHE:

22  Q.  Mr. Garten, was it your understanding, did you believe

23  Mr. Cohen needed to leave -- did you believe that Mr. Cohen

24  needed to leave the Trump Organization in order to fulfill his

25  duties to President Trump?

N6RGpeoH                    Garten - Direct

1            MS. HOFFINGER:  Objection.

2            THE COURT:  Sustained.

3    BY MR. BLANCHE:

4    Q.  Do you have an understanding, Mr. Garten, about whether

5    Mr. Cohen was paid for the work that he did for President Trump

6    after he left the Trump Organization?

7    A.  I know he was paid 400 and -- I don't know the exact

8    amounts -- 35 payments -- I'm sorry, 12 payments of $35,000.

9    Q.  And what's the basis of your knowledge of that?

10   A.  I just -- I can't point to anything specific, other than my

11   role at the company.

12   Q.  Let me ask it another way.

13            Do you have personal knowledge of that fact?

14   A.  I knew he was being -- those payments were made to

15   Mr. Cohen in 2017, yes.

16   Q.  And do you know why those payments were made to Mr. Cohen?

17   A.  My understanding was to reimburse him for the payment that

18   he had made as part of the Clifford settlement agreement and

19   also to compensate him for the work that -- this role that he

20   was playing as counsel.

21   Q.  Mr. Garten, going back to the time period between when

22   President Trump was elected and the time that he took office

23   in -- so late 2016 to early 2017 -- were you involved in the

24   discussions about separating President Trump from the Trump

25   Organization while he was president?

1   A.  To some degree, yes.

2   Q.  And what was the reason for separating President Trump from

3   the Trump Organization?

4                MS. HOFFINGER:  Objection.

5                THE COURT:  Overruled.

6                THE WITNESS:  We were generally advised, I think, as

7   is reflected in the white paper, that there had to be a

8   separation once he took office, that President Trump had to be

9   separated from the company.  And so the company then

10  implemented policies to -- in addition to the white paper,

11  which is drafted by Morgan Lewis, the company implemented its

12  own policies to create that separation so that people at the

13  company were not reaching out to President Trump or

14  communicating, things like that.  There are documents that I

15  can certainly provide.  There were corporate policies that were

16  issued creating the separation.

17  BY MR. BLANCHE:

18  Q.  And was it you that made the decision to separate Mr. Cohen

19  from the Trump Organization, given what his role would be with

20  President Trump?

21  A.  Not alone.  But when I learned that Mr. Cohen would serve

22  as personal attorney, I did provide advice that he needed to

23  exit the company.

24  Q.  Why?

25  A.  Because if he's going to serve as personal counsel, then it

N6RGpeoH                    Garten - Direct

1  would be inconsistent with all the policies that we implemented

2  to separate the president from the company.

3  Q.  Was one of the reasons that Mr. Cohen separated from the

4  Trump Organization, was one of the reasons because of President

5  Trump's constitutional duties that he would take on as

6  President of the United States?

7          MS. HOFFINGER:  Objection, leading.

8          THE COURT:  Sustained.

9  BY MR. BLANCHE:

10  Q.  Mr. Garten, you said that you were part of the discussions

11  to have Mr. Cohen leave the Trump Organization.

12          What were the reasons that you believed it was

13  appropriate and necessary for him to leave the Trump

14  Organization, given his new role?

15  A.  That's what we were advised after he -- after President

16  Trump was elected, that's what we were -- we were advised that

17  that was legally required.

18          THE COURT:  That was the white paper by Morgan Lewis?

19          THE WITNESS:  Correct.

20          THE COURT:  The Trump Organization engaged Morgan

21  Lewis to provide legal services?

22          THE WITNESS:  I'm not sure if the organization did or

23  President Trump did.

24          THE COURT:  And in response to that, Morgan Lewis

25  delivered a white paper?

1           THE WITNESS:  Correct.

2           THE COURT:  That's in evidence, right, Mr. Blanche?

3           MR. BLANCHE:  It is, your Honor.

4           Just a few more questions.

5   BY MR. BLANCHE:

6   Q.  I believe you mentioned earlier that you were also part of

7   the -- you know that Mr. Cohen actually took on the role as

8   private counsel to President Trump; correct?

9           MS. HOFFINGER:  Objection, leading.

10          THE COURT:  Overruled.

11          THE WITNESS:  I know that matters that there -- that

12  there were -- when matters came in that were not company

13  related, but related to the president or the first lady, I do

14  know that those matters would be referred to Mr. Cohen.  I

15  don't know how many there were.  I know that it took place,

16  yes.

17  BY MR. BLANCHE:

18  Q.  Understood.

19          Are you familiar with the emoluments clause of the

20  Constitution?

21  A.  Very generally.  I don't know that anybody is really

22  familiar with the emoluments clause, but yes.

23  Q.  Do you have an understanding as to whether -- one of the

24  reasons that Mr. Cohen served in the Trump Organization --

25          THE COURT:  He's not here as an expert, is he?  If you

N6RGpeoH                          Garten - Cross

1    want to bring out instructions that he gave, advice that he

2    gave, go ahead.  But we're not hearing him as an expert.

3              MR. BLANCHE:  One moment, your Honor.

4              (Conferring)

5    BY MR. BLANCHE:

6    Q.  Mr. Garten, did you have a specific concern that Mr. Cohen

7    needed to leave the Trump Organization because of President

8    Trump's constitutional duties when he assumed the office of

9    president?

10             MS. HOFFINGER:  Objection.

11             THE COURT:  Sustained.

12             MR. BLANCHE:  Sorry, did you sustain the objection?

13             THE COURT:  Sustained, yes.

14             I think you are finished, Mr. Blanche.

15             MR. BLANCHE:  Yes, I think I am, your Honor.

16             MS. HOFFINGER:  Your Honor, we renew our request --

17             THE COURT:  No, do it now.

18   CROSS-EXAMINATION

19   BY MS. HOFFINGER:

20   Q.  Good afternoon, Mr. Garten.

21   A.  Good afternoon.

22   Q.  Mr. Garten, you said you were general counsel of the Trump

23   Organization; is that correct?

24   A.  Correct.

25   Q.  And for many years; is that right?

N6RGpeoH                    Garten – Cross

1   A.   Different legal positions during my tenure; assistant

2   general counsel, general counsel and chief legal officer.

3   Q.   And as your role as general counsel or chief legal officer

4   for the Trump Organization, did you handle payments for

5   attorneys who worked either for the Trump Organization or for

6   Donald Trump?

7   A.   When you say "handled" --

8   Q.   Withdrawn.  Let me ask a more specific question.

9           When attorneys were retained to work either for

10  Mr. Trump personally or for the Trump Organization, what was

11  the process of them being retained and paid at the Trump

12  Organization?

13          MR. BLANCHE:  Objection.

14          THE COURT:  Overruled.

15          THE WITNESS:  The lawyers would be engaged and the

16  documentation would be processed and sent over to accounting to

17  make whatever payments were required.

18  BY MS. HOFFINGER:

19  Q.   Well, let's talk about some of the documentation.

20          When you say that the lawyers were retained, was there

21  a retainer agreement for attorneys who were working either for

22  Donald Trump in his personal capacity or for the Trump

23  Organization?

24  A.   I would say, typically, yes.  Not necessarily in every case

25  or every matter, but typically, yes.

N6RGpeoH                          Garten - Cross

Q.  Typically would be in the vast majority of matters; is that

correct?

            MR. BLANCHE:  Objection, misstates testimony.

            THE COURT:  Overruled.

            THE WITNESS:  More often than not.

BY MS. HOFFINGER:

Q.  So, for example, when the law firm Vinson Elkins was

retained to do work personally for Donald J. Trump in his tax

matters, was there a retainer agreement in that?

A.  I'm not familiar with that representation.  But I'm

certainly not arguing that the practice is to have a written

retainer --

            THE COURT:  I think you have gotten that.

            MS. HOFFINGER:  I'll move on, your Honor.

BY MS. HOFFINGER:

Q.  Was it a fact that those retainer agreements were reviewed

by your office, as legal counsel, as part of the retention?

A.  Generally, yes.

Q.  And would those lawyers who were retained by Donald Trump

personally or by the Trump Organization, would they submit

invoices with details of their work?

A.  Generally, yes.

Q.  And were those reviewed by your office, the office of legal

counsel or general counsel, of the Trump Organization?

A.  That's the general practice, yes.

N6RGpeoH                         Garten - Cross

Q.  And were those amounts that were paid to those law firms

pursuant to retainer agreements also recorded in the general

ledgers of Donald J. Trump personally, as well as the Trump

Organization?

A.  Yeah, they would be recorded in whichever -- yeah,

whichever -- the ledger of whichever entity was retaining that

lawyer or --

            THE COURT:  Ms. Hoffinger, this is not a discovery

matter.

            MS. HOFFINGER:  I'll try to get to the points that I

can.

BY MS. HOFFINGER:

Q.  Now, in the case of Michael Cohen, when he left the Trump

Organization and he became a personal attorney to President

Trump, was there a retainer agreement that covered that

retention?

A.  I'm not aware of a written retainer agreement.

Q.  Does that mean that there was no retainer agreement, sir?

A.  Not that I've ever seen, no.

Q.  And were invoices submitted by Mr. Cohen that detailed the

work that he performed for Donald Trump in 2017?

A.  From what I have seen, they were just summary -- I would

call them summary invoices, but no detail.

Q.  In other words, with just the monthly amount, no detail?

A.  Correct, I think for services rendered or something to

N6RGpeoH                          Garten - Cross

1    that -- and then just a flat amount.

2    Q.  And that was unusual, was it not, for the Trump

3    Organization, with relation to the Trump Organization records

4    related to lawyers?

5    A.  Not typical, but -- but it does happen.

6    Q.  As you sit here, do you have any idea of the personal work

7    that Michael Cohen did in 2017 for Donald Trump?

8    A.  I certainly know, because I did it, when matters that would

9    come in -- I'm not saying -- I don't know how many matters

10   there are -- but there was occasion when matters that would

11   come in would be brought to my attention that I did not believe

12   were corporate matters, things that involved the corporate

13   business of the organization, that involved the president or

14   the first lady, those I would send to Mr. Cohen.

15   Q.  And you don't know if Mr. Cohen actually did work on those

16   matters, though, do you?

17   A.  No.

18   Q.  And he didn't provide invoices detailing work on those

19   matters; is that right?

20   A.  No, just the summary bill he would send.

21   Q.  And again, that was different from any other lawyer or law

22   firm who did work at the Trump Organization or --

23             THE COURT:  I think you made that point.

24             MS. HOFFINGER:  I'll move on, your Honor.

25   BY MS. HOFFINGER:

N6RGpeoH                         Garten - Cross

1    Q.  I asked you a question about the general ledger and whether

2    the general ledger generally recorded the work of lawyers, for

3    the Donald Trump general ledger, are you aware of that?

4    A.  The ledger would record payments to -- in the case of

5    lawyers, yeah, it would -- if President Trump engaged a law

6    firm or lawyer, then that would typically be paid out of his

7    personal account and recorded on his personal ledger.

8    Q.  And in fact, those general ledgers, his personal general

9    ledgers would actually also describe the type of work that each

10   of those law firms did; correct?

11   A.  Correct.  There would be a code, and the code corresponds

12   to -- like, for example, legal expenses has a code or something

13   else had a different code.

14   Q.  In addition to the legal code, there would be actual

15   description of the matter that was worked on by that law firm

16   or those lawyers; isn't that correct?

17   A.  That, I'm not sure about.

18          MS. HOFFINGER:  If it's okay, your Honor, I'm going to

19   hand up some pages from the Donald Trump personal general

20   ledger.  I'd like to show it to defense counsel first.

21          THE COURT:  It seems to me that you are more focused

22   on discovery for your case.

23          MS. HOFFINGER:  I'm sorry, your Honor, I just wanted

24   to show him one page of the general ledger and have him confirm

25   that in every other case there's a description of the type of

1    matter that that law firm performed.

2           THE COURT:  Go ahead.

3           MS. HOFFINGER:  Thank you.

4    BY MS. HOFFINGER:

5    Q.  So I'm handing up, sir, just as an example, the Donald J.

6    Trump detailed general ledger -- it's DANY 136744 -- and it's

7    account legal expense, and it's for the months of February of

8    2017 and March of 2017, April of 2017 as an example.

9           MS. HOFFINGER:  Would it be all right if I handed that

10   to the witness, your Honor.

11          THE COURT:  You may.

12   BY MS. HOFFINGER:

13   Q.  I ask you, sir, to just take a look at this page and the

14   page following.  Take a moment and just see if there's a

15   description for every law firm and every lawyer of the type of

16   work that is engaged, but in fact there's no such description

17   for Michael Cohen.

18          MR. BLANCHE:  Objection, misstates the --

19          THE COURT:  Sustained.

20   BY MS. HOFFINGER:

21   Q.  Is it a fact that the general ledger entries in the vast

22   majority of cases show the type of work, the type of engagement

23   of those lawyers?

24   A.  In the vast majority -- not all, in fairness -- but the

25   vast majority, yes.

N6RGpeoH                     Garten - Cross

Q.  And would you turn to the next page for the one for Michael

Cohen, where it's circled, and is there a description there for

the work of Michael Cohen?

A.  There's no description.

       MS. HOFFINGER:  Thank you.

Q.  Now, sir, just a question, Michael Cohen's title before he

left the Trump Organization was special counsel to Donald J.

Trump, was it not?

A.  Correct.

Q.  And when he left, he had a similar title, personal attorney

to the president, though, in that case?

A.  Yes.

Q.  Now, in 2017, you said he was paid a total of about

$420,000; is that right?

A.  Yes.

Q.  And as far as you know, after 2017, he continued to be the

personal attorney for Donald J. Trump; is that right?

A.  I believe so, yes.

Q.  And in fact, however, he was not paid anything by either

Donald J. Trump personally or the Trump Organization in 2018;

is that correct?

A.  Not that I'm aware of, no.

Q.  Now, you mentioned, sir, the white paper, which is in

evidence here.  And you mentioned that Mr. Cohen --

       THE COURT:  Let me get that straight.

N6RGpeoH                      Garten - Cross

1              Cohen continued to work for Trump in 2018?

2              THE WITNESS:  I know he -- I believe so.  I know he

3     represented -- certainly was representing himself -- what work

4     he was doing, I couldn't really tell you, but it's probably for

5     the whole of 2017 as well, but --

6              THE COURT:  Without payment?

7              THE WITNESS:  I don't know of any payments that were

8     made to him.  I know he was certainly on TV representing

9     himself as personal attorney, but I do not know of any payments

10    made to him in 2018.

11    BY MS. HOFFINGER:

12    Q.  In fact, all payments stopped at the end of 2017 when the

13    $420,000 had been fully paid; is that correct?

14    A.  Yeah, I'm not -- I'm not aware of any payments in 2018,

15    correct.

16    Q.  Now, you mentioned that it was your understanding that it

17    was part of the work of Morgan Lewis & Bockius, perhaps Sheri

18    Dillon that led to the white paper and the separating of the

19    business of the Trump Organization from President Trump?

20    A.  Yes.  It was Sheri Dillon, and there was a lawyer who I am

21    blanking on, who I think was a former White House counsel, but

22    I could be wrong.  I'm blanking on his name.

23    Q.  You said it was your understanding that the separation of

24    Michael Cohen, the need to separate him from the Trump

25    Organization was part of that work of Morgan Lewis which

1  resulted in the white paper; is that right?

2  A.  No.  I don't believe the need to separate Mr. Cohen

3  emanated from Morgan Lewis.

4  Q.  Who did it emanate from?

5  A.  Myself and Eric Trump.

6  Q.  You said you got advice that it was appropriate for Michael

7  Cohen to leave the company as a result of Donald Trump being

8  president, did you not?

9          MR. BLANCHE:  Objection, misstates his testimony.

10          THE COURT:  Overruled.

11          The witness can clarify if he wishes to.

12          THE WITNESS:  I don't recall saying that.  If I did, I

13  misspoke.

14          But I don't recall getting advice from Morgan Lewis

15  about the need to separate -- this is going back years, so my

16  memory, admittedly, could be wrong.  I don't remember -- I

17  certainly don't remember getting advice from Morgan Lewis on

18  that.  If I said that earlier, I apologize, I misspoke.

19  BY MS. HOFFINGER:

20  Q.  Have you had occasion to read the white paper that's in

21  evidence here?

22  A.  Not in quite a while.

23  Q.  Does Michael Cohen appear anywhere in the white paper as

24  being part of the separation --

25          THE COURT:  Stop right there.  We have it.

N6RGpeoH                    Redirect - Garten

1              MS. HOFFINGER:  Your Honor, a moment to speak with my

2    colleagues.

3              (Conferring)

4              MS. HOFFINGER:  Nothing further, your Honor.  Thank

5    you for your patience.

6              THE COURT:  Thank you.

7              Mr. Blanche, redirect.

8              MR. BLANCHE:  Briefly, your Honor.

9    REDIRECT EXAMINATION

10   BY MR. BLANCHE:

11   Q.  Mr. Garten, you were asked some questions on

12   cross-examination about the general ledger accounts for various

13   law firms and attorneys, whether there's any detail and

14   expenses associated with that ledger.

15             Do you remember those questions?

16             THE COURT:  Was there any detail about services.

17             MR. BLANCHE:  About services provided by the law

18   firms, correct.

19   BY MR. BLANCHE:

20   Q.  Do you remember those questions?

21   A.  Yes.

22             MR. BLANCHE:  May I approach, your Honor, and show him

23   the ledger that was showed to him before.  May I approach, your

24   Honor.

25             THE COURT:  Yes.

BY MR. BLANCHE:

Q.  Mr. Garten, can you take a look at the handful of pages
from the general ledger that you were previously shown and look
at the -- focusing on the ones that are highlighted in pen.

A.  Yeah, I see it.

Q.  So are there in fact several entries for law firms where no
description for services is included on the general ledger?

A.  Yup, yeah --

            THE COURT:  To sum up this point, for the large
majority of instances where law firms delivered services, they
gave details.  But in some instances, they didn't give details.
Is that correct?

            THE WITNESS:  That's accurate.

            THE COURT:  I think I have that very fascinating
point.

BY MR. BLANCHE:

Q.  For example, do you see the name John Dowd on that ledger?

            THE COURT:  I have it, I have it.  The vast majority,
one way; sometimes the other way, Mr. Blanche.

            MR. BLANCHE:  Yes, your Honor.

            THE COURT:  That's going to make the whole case.

BY MR. BLANCHE:

Q.  Mr. Garten, you can put that to the side.

            Is one reason that there would be a lack of
description is if an attorney was just paid a flat fee every

1    month?

2    A.   It could be.  I can't say definitively, I'm not the person

3    recording, I'm in the legal department.  This is generated by

4    the accounting department.

5              THE COURT:  I don't --

6              THE WITNESS:  I can't say.

7              THE COURT:  Can we go to another interesting point.

8              MR. BLANCHE:  Yes, your Honor.

9              So just one more question, if I could just have one

10   moment, your Honor.

11             (Conferring)

12   BY MR. BLANCHE:

13   Q.   You were asked some questions about whether payments were

14   made to Mr. Cohen in 2018.

15             Do you recall those questions?

16   A.   Yes.

17   Q.   Do you recall whether Mr. Cohen was -- whether his

18   residence was searched by the FBI in early, mid 2018?

19   A.   I recall that, yes.

20   Q.   Is it your understanding that one of the reasons why

21   President Trump stopped paying Mr. Cohen was because of his

22   legal troubles?

23             MS. HOFFINGER:  Objection.

24             THE COURT:  If you know.

25             THE WITNESS:  I can't say definitively.

1          MR. BLANCHE:  Thank you.  No further questions.

2          MS. HOFFINGER:  Just one question, your Honor.  I can

3    do it from here.

4          THE COURT:  Yes.

5    RECROSS EXAMINATION

6    BY MS. HOFFINGER:

7    Q.  Mr. Blanche asked you about John Dowd, who was an attorney

8    who was retained to work for Mr. Trump; is that right?

9    A.  He did, yes.

10   Q.  Do you know what Mr. Dowd did for Mr. Trump?

11         MR. BLANCHE:  Objection, your Honor.  It was

12   sustained.

13         THE COURT:  Sustained.

14   BY MS. HOFFINGER:

15   Q.  There was in fact a retainer agreement between Mr. Dowd --

16   was there --

17         MR. BLANCHE:  Objection.

18         THE COURT:  Sustained.

19         Thank you very much, Mr. Garten.

20         THE WITNESS:  Thank you.

21         THE COURT:  Next, Mr. Blanche, still on the topic of

22   color of office.

23         MR. BLANCHE:  Your Honor, thank you.

24         So picking up where I left off, your Honor, the

25   question is whether the work that Mr. Cohen was doing in his

1    personal capacity for President Trump was in any way related to

2    the office and part of his duties as president.  And the

3    reality is, this was an extraordinarily complicated

4    arrangement, because you have a very successful businessman who

5    had businesses all over the world who was immediately

6    challenged upon winning the election with issues surrounding

7    payments from foreign governments and from states that would

8    potentially violate the Constitution and violate his duties

9    under the Constitution.

10          And these challenges weren't just hypothetical, your

11   Honor.  There were multiple cases filed, as your Honor knows,

12   while President Trump was in office accusing him of violating

13   the various constitutional clauses that would prevent him from

14   profiting from other states.  So the fact that he made the

15   decision to hire Mr. Cohen as his personal attorney and paid

16   him a retainer, which is our defense, and which we will

17   establish at trial, is certainly related to the office of

18   president.

19          THE COURT:  I have two questions on this.

20          If it's a federal function, why wasn't a federal

21   official performing the function?  And the second is, if

22   Mr. Cohen was brought over to the White House to conduct

23   personal affairs, it doesn't lower the suspicion, rather, it

24   raises the suspicion that there was a mixture of public and

25   private business.

1          MR. BLANCHE:  As the Supreme Court says, there's not a

2     clear line between his personal and --

3          THE COURT:  That was one of the criticisms that was

4     made.  Okay.  I got it.

5          MR. BLANCHE:  Your Honor, respectfully, the reason why

6     the president believed he needed a personal counsel is because

7     the Trump Organization lawyers were loyal to the corporation

8     when there was a separation, and the White House counsel

9     lawyers did not represent the president in his personal

10    capacity, they represent the office of the presidency.  Again,

11    when you look at the -- so the reality --

12         THE COURT:  So if Cohen is a private lawyer working on

13    private matters for the president, how does that become related

14    to any color of office?

15         MR. BLANCHE:  Because of the unique position of the

16    president of United States.  It is the only office in this land

17    where he is the entire Executive Branch and where there will be

18    times -- and indeed there were times -- where there would be

19    challenges to his private business affairs and whether he was

20    violating the United States Constitution, which, at the end of

21    the day, is what he was sworn to uphold because of actions he

22    took or was considering taking.

23         THE COURT:  Does the office of legal counsel, the

24    Department of Justice address such questions?

25         MR. BLANCHE:  Well, your Honor, there was the White

1    House counsel's office that certainly represented the office of

2    the president.  But as we know happened, President Trump was

3    sued along the way repeatedly for violating the Constitution

4    and for violating obligations under the Constitution --

5          THE COURT:  Where it was appropriate for the public to

6    respond to those allegations, they did with federal officials,

7    and where it wasn't, it did it through private officials.  I

8    think I have this point.  Let's move on to preemption.

9          MR. BLANCHE:  Your Honor, thank you.  Just one final

10   point, and then I'll move on.

11         One of the challenges that they're talking about with

12   the emoluments clause and whether he violated it, still present

13   challenges.  I mean, the circuits dismissed two of the cases

14   shortly after President Trump left office, so this was a

15   general real concern that still is not settled.

16         The third question, your Honor, is whether there's a

17   colorable defense.  We've raised several in our brief.  I don't

18   think it's necessary to spend a lot of time on them this

19   afternoon.  The one is the one we've been talking about for the

20   majority of this argument, which is that one is that the

21   payments made to Mr. Cohen were in fact for services provided

22   while President Trump was in office, occupying the office of

23   the presidency.

24         The second and just as significantly, the fraud

25   statute that the People -- even the misdemeanor fraud statute

1    requires an intent to defraud, your Honor.  And the only intent

2    to defraud that's applicable here -- and this is from the

3    district attorney's statement of facts itself -- is a violation

4    of the federal election laws.

5            THE COURT:  That's the preemption argument.

6            MR. BLANCHE:  Pardon?

7            THE COURT:  That's the next argument we're going to

8    get into.

9            So we'll start with Mr. Colangelo.  The motion to

10   remand is because there's no federal defense; right?

11           MR. COLANGELO:  Yes, your Honor.

12           There's no colorable federal defense.  And the

13   defendant has to establish every element of the test.  This is

14   just one of the elements on which the Court could remand.

15           Mr. Blanche just said one of their arguments regarding

16   a colorable federal defense is the possibility of federal

17   preemption.  Their preemption argument really is that the

18   People couldn't bring charges under state election law 17-152

19   on these facts.  But the defendant is not charged on that

20   statute.

21           For the charge the People did bring, the 34 counts of

22   falsifying business records, that statute functionally has two

23   components; conduct and intent.  There's no argument that the

24   conduct, falsifying entries in the business records, there's no

25   argument that the conduct is preempted by the Federal Election

1    Campaign Act.  The argument is that the People are somehow

2    precluded from establishing the intent element from the state

3    law violation because of preemption.  And that's not right for

4    a couple of reasons.

5              First, it mischaracterizes state law.  The penal law

6    violation the defendant is charged with committing here, the

7    general intent statute, does not require proof regarding any

8    particular crime.  So there's no -- and there can't be --

9    preemption based on a criminal offense that the People did not

10   charge and don't have to establish as any element of the

11   charges they did in fact bring.

12             But separately, the election law violation is only one

13   of several available crimes that the defendant, according to

14   the People's allegations, intended to conceal or commit.  So

15   even if the election law charges were preempted, the election

16   law was preempted, there are other nonpreempted crimes at play

17   here; tax law violations, state falsification of business

18   records violations.  And if the defense is right that the

19   election law is preempted, that would necessarily mean, because

20   it conflicts with the Federal Election Campaign Act, there's a

21   federal violation the defendant intended to commit as well.

22             So preemption is not a colorable federal offense,

23   because it's not a defense.  They could be right on the

24   election law argument.  The People could still establish the

25   defendant's guilt at trial on any of a number of the other

1    showings I just described.

2              The second argument as to colorable federal defense,

3    your Honor, is an argument about Supremacy Clause immunity.

4    Unless the Court has questions on the preemption argument, I'll

5    turn to Supremacy Clause.  The argument as to why that defense

6    is not colorable, overlaps with the argument that the defendant

7    was not acting under color of his office.  And I think the

8    testimony we just heard establishes that, at least part of the

9    $420,000 reimbursement, was reimbursement for the Stephanie

10   Clifford payment.  There's no documentation of any legal

11   services that were in fact performed, no documentation or

12   testimony regarding --

13             THE COURT:  There's no competent evidence that

14   anything was done by Cohen as special counsel to the president.

15             MR. COLANGELO:  That's right, your Honor.

16             And so where nothing --

17             THE COURT:  All we have are the invoices.

18             MR. COLANGELO:  That's correct.

19             And so, your Honor --

20             THE COURT:  Is that right?  The only thing we have are

21   the invoices, no proof of what he did?

22             MR. COLANGELO:  So even on --

23             THE COURT:  Am I right?

24             MR. COLANGELO:  That's certainly the People's

25   understanding, yes.

1    So even on the most generous reading of the facts in

2    the record, those facts dispose of the argument for the reasons

3    we've discussed; these were personal payments to a personal

4    lawyer handling his personal affairs.

5    And by contrast, your Honor, cases where courts find

6    that there is Supremacy Clause immunity, those are cases where

7    the federal actors were doing their jobs as government actors:

8    The DEA agent in New York v. Tanella in a buy and bust case;

9    the deputized FBI agent in Texas v. Kleinert, who was pursuing

10   a robbery suspect; it was the wildlife service officers

11   collaring gray wolves during an animal reintroduction in

12   Wyoming v. Livingston.

13   There's no argument that anybody here was doing

14   anything in carrying out their job as a government actor.  So

15   for that reason as well the Supremacy Clause is just not a

16   colorable defense in this case.  Unless the Court has

17   questions.

18   THE COURT:  We have a statute that deals with

19   falsification of business records when committed with an intent

20   to commit another crime or to aid or conceal the commission,

21   Section 175.10.

22   Now, if the intent is to commit another crime that is

23   preemptive, is the intent requirement satisfied?

24   MR. COLANGELO:  So your Honor, I think, in this case,

25   the answer is yes, because the necessary consequence of the

1    crime being preempted is that there is a different, another

2    crime that the defendant could have intended to commit or

3    conceal; the Federal Election Campaign Act violation.  So in

4    other words, the only argument that the election law violation

5    is preempted is that FECA expressly pre-empts it.  Well, if

6    FECA expressly pre-empts that conduct --

7              THE COURT:  You believe that it does?

8              MR. COLANGELO:  No, your Honor.  We don't believe that

9    FECA pre-empts the election law violation.  We didn't argue it

10   in our papers because it's not at all necessary for the Court

11   to reach that conclusion in order to determine --

12             THE COURT:  That's because the requirement of intent

13   is not subject to preemption?

14             MR. COLANGELO:  Yes, that's one reason why the intent

15   element of the false business records offense can't be granted.

16   Yes, your Honor.

17             If this were a prosecution for the election law

18   offense, which it isn't, there are strong arguments that the

19   election law --

20             THE COURT:  So you are not prosecuting Mr. Trump for

21   violating the election law?

22             MR. COLANGELO:  Correct, your Honor.

23             THE COURT:  If you were prosecuting him for intending

24   to violate the election law, would it be preempted?

25             MR. COLANGELO:  No.

N6RGpeoH                          Recross - Garten

1              THE COURT:  And why not?

2              MR. COLANGELO:  Well, for three reasons:  First, there

3    are -- under New York Law, he doesn't have to have effectively

4    committed or aided the commission of another crime.  It's a

5    general intent to commit crime.

6              THE COURT:  He could be acquitted for the other crime?

7              MR. COLANGELO:  Exactly.

8              Second, even if you take the election law out of the

9    picture, the People have alleged that the intent to conceal the

10   commission of other crimes have nothing to do with the election

11   law.

12             THE COURT:  What is the conceivable tax crime?

13             MR. COLANGELO:  The conceivable tax crime, your Honor,

14   would be falsely mischaracterizing the reimbursement in order

15   to disguise the true nature of the repayment.

16             THE COURT:  There's no harm to the state.

17             MR. COLANGELO:  For certain violations of the tax law,

18   your Honor, pecuniary harm to the state is not required to

19   violate the tax law.  That's described in our response to the

20   bill of particulars request that the defense submitted.

21             Your Honor, the final reason is that, if there were an

22   election law violation, then defendant, the People would

23   allege, intended to conceal or commit violations of federal

24   law.  And we know there are violations of federal law, because

25   a federal judge in this courthouse accepted a guilty plea from

1   Michael Cohen for committing two counts of FECA violations.

2   THE COURT:  Mr. Blanche.

3   MR. COLANGELO:  Thank you, your Honor.

4   MR. BLANCHE:  Your Honor, the People skipped a step.

5   The statute that President Trump has been indicted under

6   requires an intent to defraud.  And the intent to defraud can

7   only be a violation of --

8   THE COURT:  This says with intent to commit another

9   crime.

10  MR. BLANCHE:  That's the next clause.

11  The underlying crime is falsifying business records in

12  the first degree.  You have to commit that crime with an intent

13  to defraud, even if it's just a misdemeanor, even if it's the

14  underlying misdemeanor.  And the question is whether --

15  THE COURT:  Let me get this straight.  The idea of

16  falsifying business records is intending to defraud?

17  MR. BLANCHE:  Requires an intent to defraud, yes, your

18  Honor, absolutely.  And when you think about --

19  THE COURT:  What's federal about that?

20  MR. BLANCHE:  Well, the intent to defraud -- I'll read

21  from the very first paragraph of the statement of facts from

22  the grand jury across the street -- "The defendant, Donald J.

23  Trump repeatedly and fraudulently falsified New York business

24  records to conceal criminal conduct that hid damaging

25  information from the voting public during the 2016 presidential

election."  That's not my words; that's their words.  So the

intent to defraud, the falsifying of business records, the

reason why that was done, according to the People, in the very

first paragraph of their statement of facts, is to hide

damaging information from the voting public during the 2016

presidential election.

          And moving on to the felony, they then -- to the

felony kicker that's part of the statute -- they then say,

well, maybe we're going to prove some kind of tax fraud, maybe

we're going to prove state election fraud.  That's not the case

and that's not going to happen.  This is all about purported

federal election violations that Mr. Cohen pled guilty to,

obviously, and nobody else.  And recall, as Mr. Colangelo just

noted that a federal judge in this district did accept

Mr. Cohen's guilty plea, but the Southern District of New York,

US Attorney's Office, refused to move forward with charges

against anyone else, as, frankly, did the district attorney for

several years.

          So there's no doubt that the 2016 election is the

reason for these 34 counts against President Trump.  And the

papers and everything that the People put in their argument to

the contrary are just -- they're wrong.  And they're wrong

because you can look at the statement of facts, they're wrong

because you can look at the evidence that they offered to the

grand jury as part of the statement of facts.  And that's why

N6RGpeoH                    Recross - Garten

1  there's preemption.  Because we would prove, and we have a

2  right to have a federal judge decide and hear, whether there

3  was any election law violation.

4          (Conferring)

5          MR. BLANCHE:  Your Honor, my colleague just pointed

6  out something that is worth noting.  The People want this both

7  ways; on the one hand they rely on the purported federal

8  election violations in the statement of facts, in the overall

9  conduct that they charge in the indictment itself, but then

10 turn around in the bill of particulars and say, well, we may

11 prove something else, we may prove other crimes.  And so while

12 we rely on the fact that there's a federal election violation,

13 we don't really have to.  And they can't have that both ways.

14 They can't do that.

15         THE COURT:  There are cases that I have just been

16 looking for, which say that if you commit fraud in the context

17 of an election, that's still a state crime.  The case is

18 *WinRed v. Ellison.*  WinRed was a conduit political action

19 committee, which collected centralized donations for Republican

20 affiliated candidates and committee.

21         MR. BLANCHE:  But, Judge, the only fraud that they're

22 alleging is the failure of Mr. Cohen to --

23         THE COURT:  It says, "As a federal PAC, WinRed must

24 comply with the Federal Election Campaign Act or FECA," which

25 is what we're talking about here, but they committed a fraud.

1   And because they committed a fraud, they were not entitled to

2   FECA --

3          MR. BLANCHE:  Your Honor, if there's no federal

4   election violation, there can be no intent to defraud.  There's

5   no defrauding, right.  And so the underlying intent to defraud

6   has to do, supposedly, with Mr. Cohen's obligation to report

7   the campaign contribution that he made when he made the payment

8   to Ms. Daniels.  We contest whether that was a federal election

9   violation at all.

10          But if there was no federal election violation, then

11   there is no crime.  Because, again, the general statute, the

12   general false business records statute that President Trump has

13   been charged with requires an intent to defraud.  So if there

14   was no underlying federal election violation, there's no crime.

15   And that is exactly why it belongs in this courthouse and not

16   across the street.  Because determining whether it's a federal

17   election violation is something that this court should do, not

18   the state.

19          THE COURT:  In the WinRed case I just mentioned, which

20   is a decision of the Eighth Circuit, 59 F.4th 934 decided in

21   2023, the state attorney general was conducting an

22   investigation on fraud conducted by a regulated PAC, regulated

23   under FECA.  Nevertheless, the Court held that the state fraud

24   laws would still apply.

25          And similarly, here, the fact that there was a

1  falsification for the purpose of committing elections fraud

2  doesn't mean necessarily that the falsification itself is

3  preempted.  It's a matter of state law, according to the WinRed

4  case.  And I think that's sound law.

5         What we have here is a statute that says falsification

6  with intent, the falsifying of books and records is the crime,

7  and the intent to commit another crime -- whatever that crime

8  is -- makes it a heightened crime in the first degree.  That's

9  the statute.

10         MR. BLANCHE:  Agreed, your Honor.

11         But even before you get to the heightened crime, the

12  underlying business records violation still requires an intent

13  to defraud.  It's not merely the fact that there's something

14  false --

15         THE COURT:  Do you agree with that, Mr. Colangelo?

16         MR. COLANGELO:  Yes, your Honor.  Falsifying business

17  records in the second degree requires an intent to defraud,

18  yes.

19         MR. BLANCHE:  So the issue is, if you write something

20  down in your --

21         THE COURT:  That means deceit.  You are falsifying the

22  books to deceive somebody, cover something up; right?

23         MR. COLANGELO:  Yes, your Honor.

24         And there's case law from the New York Court of

25  Appeals that --

1          THE COURT:  It doesn't make any difference what

2     purpose you have for deception.

3          MR. COLANGELO:  Correct.  And it doesn't have to be

4     economic fraud.

5          THE COURT:  It can be any deception at all.

6          MR. BLANCHE:  But that's where the People's theory has

7     to matter, your Honor.  We're stuck with what the People have

8     said to us, as is the Court.  And the statement of facts makes

9     plain exactly what intent to defraud President Trump engaged in

10    throughout the statement of facts, but certainly in the first

11    paragraph.  And that's where -- I say, again, if there's no

12    election violation, there can be no underlying intent to

13    defraud by writing legal representation instead of something

14    else in the books and records of his private records held by

15    the Trump Organization.

16         And so skipping immediately to the felony kicker of

17    intent to conceal another crime, you don't even get there.  I

18    mean, you can stop with the intent to defraud.  But even if you

19    did get there, this is where the People are, in short, playing

20    games.  Because they recognize that they face challenges with

21    the federal election law violation and the fact that SDNY

22    didn't move forward, the fact that the last district attorney

23    didn't move forward.  So what they have done is they said,

24    well, maybe we'll prove a different crime, maybe we'll prove

25    some kind of tax fraud.  We don't know what the evidence could

possibly be.  We have seen no evidence of such.  We know of no

evidence that there were any taxes that were filed that were

wrong or inaccurate or misstated income.  And then there's

state election violations that, again, are preempted by federal

law and that we expect we would be able to show by federal law.

        And so what you really are left with is a federal

election violation that's been repackaged as false business

records by the district attorney in order to indict President

Trump.

        And again, just now ending, your Honor, that's exactly

why we belong in this court, because there's no doubt that --

while this has been categorized as a false business record --

and remember what the proof is, your Honor, is that while

President Trump was in the oval office sitting as president,

somebody at the Trump Organization wrote in the ledgers "legal

representation."  And again, I believe we have shown through

the testimony of Alan Garten today and the legal records, that

that's an accurate depiction.  It's not false.  And Alan Garten

testified that he knows for certain that work was being done by

Mr. Cohen in his personal capacity when he left, because he

sent him things, he sent him documents.

        THE COURT:  He sent him things, but he doesn't know

what happened.  He doesn't know the end result of sending.

        MR. BLANCHE:  Why does that matter, respectfully, your

Honor?  It doesn't matter whether Mr. Cohen did a good job or a

1   bad job.

2              THE COURT:  It matters what work he did.

3              I think I get the picture.

4              Anything else, Mr. Blanche?

5              MR. BLANCHE:  Not unless your Honor has any questions.

6              THE COURT:  Mr. Colangelo.

7              MR. COLANGELO:  No, your Honor.  Thank you.

8              THE COURT:  Thank you all very much.

9              Well, I have read the papers.  I have read the

10  extensive papers in this case, taken evidence, I have read the

11  briefs, and I have heard oral arguments.  I intend to write and

12  hopefully issue a decision within two weeks.  But it's been my

13  habit as judge to let the parties know what my present

14  attitudes are, and I thought to do that here.

15             First, on the issue whether the president is an

16  officer who can remove within the meaning of Section 1442(a) --

17  and for the reasons soon to be discussed, I decline to make a

18  firm ruling on this issue -- it seems to me that the answer has

19  to be yes, that the president is someone who can remove for the

20  reasons discussed earlier; the lines of cases that allow other

21  elected officials, for example, Congressmen and the like, who

22  were not officials, but nevertheless considered officers, to

23  remove.  And the absurdity of having the president sued in a

24  way that attacked what he did without being able to remove to a

25  federal court and create a defense I think all argue in favor

1    of the president being such an officer.  But as I say, it's not

2    necessary for me to involve myself in that particular issue,

3    because I think the argument is very clear that the act for

4    which the president has been indicted does not relate to

5    anything under color of his office or on account of any right,

6    title or authority claimed under the act of Congress or the

7    apprehension of punishment of criminals or the collection of

8    the revenue, those being the words of Section 1442 here.

9         What we have, basically, if the indictment is to be

10   believed -- and for the purposes of this case and since the

11   support given by the stipulated facts entered into the record,

12   there is substance to believe those statements and state a

13   prima facie case at least.

14        The president is charged with, in effect, hush

15   payments and the money being advanced by Cohen and the money

16   being repaid to Cohen by the president through the means of

17   these retainer statements, that's the allegation.  I take those

18   as good-faith allegations, which can be denied and disproved

19   and which are subject to proof beyond a reasonable doubt at a

20   trial.  But for the purposes of this jurisdictional issue,

21   those are the grounds of the indictment.

22        The statement in the notice of removal by the

23   defendant states an alternative means of payment of this

24   retainer calling it a retainer agreement, calling it the

25   services rendered and the like, which, in effect, is the

1    disputed issue of the trial.  There's no evidence to base any

2    of this on.  There's no evidence that Cohen did anything under

3    his retainer, there's no evidence that he in fact was paid for

4    services rendered from checking accounts, except in the form of

5    the hush payment to Ms. Clifford.  But even taking the facts

6    stated in this averment by the defendant in the notice to

7    remove, there nevertheless is no relationship to any official

8    act of the president.  Cohen was hired as a private matter.  He

9    was hired as a private matter by a public official, but he was

10   hired as a private matter to take care of private matters.  It

11   is said that the president hired Cohen to make sure that his

12   private affairs were not mixed with his public affairs.  That

13   very definition suggests that Cohen was hired privately, not

14   under color of any presidential office or relating to it.  The

15   fact that it was the president who made that private hiring

16   does not change the facts or the legal principles to be derived

17   from the facts.

18            With respect to the issue of the federal defense, I

19   find that there is no colorable defense.  The indictment is for

20   falsification for purposes of fraud with an intention to commit

21   another crime.  None of those things necessarily involve

22   anything covered by the federal elections law or the

23   regulations under the federal regulations law.

24            The defendant also has not raised colorable federal

25   defenses within his notice of removal.  Defendant's asserted

N6RGpeoH                        Recross – Garten

immunity defense suffers the same defect as his arguments on

color of office.  Even accepting defendant's version of the

facts as true, he has not drawn a plausible connection between

Cohen's services and the discharge of his official duties as

president.

         And largely, the argument to protective law because of

an evil state purpose has not been -- very much by the defense.

I'm not so sure to what extent they rely on it, but there's no

reason to believe that an equal measure of justice could not be

rendered by the state court as in the federal court.

         These are my present attitudes as to my rulings, but

the rulings themselves will be made in the course of my

opinion.  The opinion will be the findings, and what I say now

is intended as a preview of that, but not necessarily binding

on what I will do.

         Thank you all for your attention.  Thank you for the

high quality legal work.

         (Adjourned)

1                          INDEX OF EXAMINATION

2     Examination  of:                               Page

3     ALAN GARTEN

4     Direct By Mr. Blanche  . . . . . . . . . . .50

5     Cross By Ms. Hoffinger . . . . . . . . . . .59

6     Redirect By Mr. Blanche  . . . . . . . . . .69

7     Recross By Ms. Hoffinger . . . . . . . . . .72

8                          PLAINTIFF EXHIBITS

9     Exhibit No.                                Received

10     3 - 12  . . . . . . . . . . . . . . . . . .27

11     26    . . . . . . . . . . . . . . . . . . .37

12                          DEFENDANT EXHIBITS

13    Exhibit No.                                Received

14     B   . . . . . . . . . . . . . . . . . . . .40

15

16

17

18

19

20

21

22

23

24

25