UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------- x
                                            :

THE PEOPLE OF THE STATE OF NEW YORK,  :

                -against-             :

DONALD TRUMP,                        :

                         Defendant.    :

                                            :
--------------------------------------------------------------- x

                                **ORDER AND OPINION**
                                **GRANTING MOTION TO**
                                **REMAND**

                                23 Civ. 3773 (AKH)

ALVIN K. HELLERSTEIN, U.S.D.J.:

        Defendant, Donald Trump, previously President of the United States, removed this criminal case from the New York Supreme Court to the United States District Court for the Southern District of New York.  The People of the State of New York (the "People") moved to remand.  The question to be decided, and upon which I write, is whether the governing statute, 28 U.S.C. § 1442(a), authorizes such removal.  Section 1442(a)(1) allows "officers . . . of the United States" to remove a civil or criminal case brought against them in a state court, if the case is "for or relating to any act [performed by or for them] under color of [their] office."  The cases interpreting this statute, discussed later, require also that the officer raise a defense based on federal law.

        The issues have been fully briefed.  I heard arguments and conducted an evidentiary hearing on June 27, 2023.  I hold that there is no subject matter jurisdiction, that § 1442(a) was improperly invoked, and that the case is remanded to the New York Supreme Court for further proceedings in that court.

## BACKGROUND

### I.     Summary of the Indictment

On April 4, 2023, a grand jury in the Supreme Court of New York, New York County, charged Trump with thirty-four counts of Falsifying Business Records in the First Degree in violation of N.Y. Penal Law ("NYPL") § 175.10.  The Indictment alleges that the crimes were committed between February and December 2017, and can be categorized into three types of falsifications of business records kept and maintained by the Trump organizations: eleven counts of false invoices; twelve counts of false ledger entries; and eleven counts of false checks and check stubs, of which nine were signed by Trump personally—all with intent both to defraud and to commit another crime, or aid or conceal the commission thereof.

### II.    Statement of Facts Filed by the People

The Indictment was made more specific in a Statement of Facts filed by the People.  (Notice of Removal ("Notice"), Ex. E ("SOF").)  The People allege that Trump, the beneficial owner of a number of businesses headquartered in New York County, became a candidate for election to become President of the United States in June 2015.  In August 2015, Trump, Michael Cohen—a Trump Organization lawyer and Trump's Special Counsel—and the Chief Executive Officer of American Media, Inc. ("AMI"), met to devise a scheme to suppress negative stories about Trump.  (*Id.* ¶¶ 5–7.)

In October 2016, at the direction of his Chief Executive Officer, the Editor-in-Chief of AMI alerted Cohen that Stephanie Clifford, an adult film actress known as Stormy Daniels, was seeking to publish an account of her sexual liaison with Trump during Trump's marriage.  Cohen met with Clifford's lawyer and the two reached an agreement, with Trump's knowledge, to exchange Clifford's right to publish her account for $130,000.  Trump did not want to make the payment himself.  In discussions with Trump and the Trump Organization's

Chief Financial Officer ("CFO"), Cohen agreed to advance the money and Trump agreed to reimburse him.  Cohen opened a bank account in the name of Essential Consultants, LLC, a shell company that he controlled.  On October 27, 2017, Cohen deposited $131,000 from a personal line of credit into the account and wired $130,000 to Clifford's lawyer.  (*Id.* ¶¶ 17–21.)

In January 2017, Cohen and the Trump Organization CFO met to discuss how to reimburse Cohen.  They agreed that Trump would pay Cohen $420,000: $180,000 to reflect reimbursement for Cohen's $130,000 payment to Clifford's attorney and an additional $50,000 expense, doubled to $360,000 to enable Cohen to treat the reimbursement as income rather than reimbursement of a hush money payment, and an additional $60,000 bonus.  Trump, Cohen, and the CFO then agreed that payment was to be made in monthly installments of $35,000 beginning January 2017.  Cohen was to send an invoice monthly to the Trump Organization for payment pursuant to a "retainer agreement."  The retainer agreement did not exist.  Trump and Cohen confirmed the payment agreement at a meeting in the White House in February 2017.  (*Id.* ¶¶ 24–27.)

On February 14, 2017, Cohen emailed his first invoice to the Controller of the Trump Organization, requesting $35,000 for January and $35,000 for February 2017, "[p]ursuant to the retainer agreement."  (*Id.* ¶ 28.)  The CFO approved payment, and the Controller instructed the Accounts Payable Supervisor to "[p]ost to legal expenses. Put 'retainer for the months of January and February 2017' in the description."  (*Id.*)  The invoice was coded in the general ledger, and maintained in the Trump Organization's electronic accounting system, to reflect a payment for legal expenses.  (*Id.* ¶¶ 30–31.)

Cohen, the CFO, and the Controller followed the same procedure for the ten following months, March to December 2017.  For each payment, the Trump Organization's

Accounts Payable Supervisor prepared a check and check stub notated as payment for legal services. The first two checks, for January and February 2017, were paid by the Donald J. Trump Revocable Trust and signed by two trustees.[1] (*Id.* ¶ 32.) Trump signed the next nine checks, drawn on his personal bank account. Trump then had the signed checks sent back to the Trump Organization in New York City. There, the checks, stubs, and invoices were scanned into the Trump Organization's books and records, and the checks then were mailed to Cohen. (*Id.* ¶ 33.)

In August 2018, Cohen pleaded guilty to campaign finance violations in connection with his $130,000 payment to Clifford. Cohen testified, in connection with his plea:

> [O]n or about October of 2016, in coordination with, and at the direction of, the . . . candidate [for federal office], I arranged to make a payment to a second individual with information that would be harmful to the candidate and to the campaign to keep the individual from disclosing the information. To accomplish this, I used a company that was under my control to make a payment in the sum of $130,000. The monies I advanced through my company were later repaid to me by the candidate. I participated in this conduct, which on my part took place in Manhattan, for the principal purpose of influencing the election.

(*Id.* ¶ 44.)

## III.    Defendant's Notice of Removal

On May 4, 2023, Trump removed the case to the United States District Court on the basis of federal officer removal, 28 U.S.C. § 1442(a)(1). Trump alleges that the district court has subject matter jurisdiction because the Indictment "charges President Trump for conduct committed while he was President of the United States that was within the 'color of his office,' and the charges involve alleged federal and state election law violations that have a federal

---

[1] The Donald J. Trump Revocable Trust, created under the laws of New York, held the Trump Organization entity assets after Trump was elected President. (SOF ¶ 4.)

preemption defense." (Notice ¶ 2.)  He claims that Cohen was hired as his personal attorney "as a direct result of [his] role as President of the United States and his obligations under the Constitution, and in order to separate his business affairs from his public duties."  (*Id.* ¶ 28.) Trump claims also that the conduct for which he was charged "relat[es] to" acts performed under color of office because they relate to his position as President.  (*Id.* ¶ 29.)

Trump alleges further that he has two federal defenses to the charged conduct. He states that "shortly before assuming the Office of the Presidency, and in order to assure the American public that he had separated his personal business from his public duties . . . as well as to fulfill various constitutional obligations, *e.g.*, the Foreign Emoluments Clause, Art. I, sec. 9, cl. 8, and the Take Care Clause, Art. II, sec. 3,"[2]  Trump placed his businesses in a trust and "hired a personal lawyer—Michael Cohen—to handle his personal affairs,"  and that "[t]hese steps were taken solely because he was President of the United States."  (*Id.* ¶ 19.)  Trump argues that since his "decision to retain Michael Cohen to act as his personal lawyer arose out of his duties as President," it "gives rise to a federal [immunity] defense . . . ."  (*Id.* ¶ 20.) Furthermore, Trump argues that because the Indictment's felony charges are predicated on alleged violations of state and federal election laws, they are preempted by the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30143(a).  (Notice ¶¶ 22–24.)

Finally, Trump asserts that the district court has "protective jurisdiction" because the indictment "is politically motivated and was brought because a local politician . . . disfavored President's Trump's acts and policies as President of the United States . . . ."  (*Id.* ¶ 31.)

---

[2] The Foreign Emoluments Clause provides that "no Person holding any Office of Profit or Trust under [the United States], shall, without the Consent of the Congress, accept of any present, Emolument, Office, or Title, of any kind whatever, from any King, Prince, or foreign State."  The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed . . . ."

On May 30, 2023, the People filed a motion to remand to the New York Supreme Court.  (ECF No. 17.)

## IV.    The Evidentiary Hearing

On June 27, 2023, I heard oral arguments and conducted an evidentiary hearing as required by 28 U.S.C. § 1455(b)(5).  At the hearing, the People introduced an October 2016 agreement between Michael Cohen and Stephanie Clifford's attorney pursuant to which Cohen's shell company, Essential Consultants, LLC, would pay $130,000 for the rights to Clifford's account of her encounter with Trump (Colangelo Decl., May 30, 2023 ("Colangelo Decl."), Ex. 3), as well as an October 2016 bank statement showing Cohen's payment of $130,000 (Colangelo Decl., Ex. 8.)  Handwritten notes on the bank statement show that amount was combined with other amounts to reach a total of $420,000, the full amount that was paid to Cohen in association with the business records at issue.  (*Id.*)  The People also introduced a May 3, 2018, tweet from Trump stating that Cohen received a "reimbursement" in connection with his "private contract."  (Colangelo Decl., Ex. 4.)  Also admitted into evidence were eleven invoices corresponding to the eleven counts of the Indictment relating to invoices, twelve ledger entries corresponding to the twelve counts relating to false ledger entries, and eleven checks and check stubs corresponding to the eleven counts relating to checks and check stubs.  (Colangelo Decl., Exs. 9–11.)  Nine of the checks were signed by Donald Trump personally.

The defense introduced two emails from Michael Cohen, dated in January 2017 and January 2018, stating that he had accepted a position as personal counsel to Trump.  (Blanche Aff., Jun. 15, 2023, Ex. B.)  The defense also introduced excerpts from Michael Cohen's published memoir containing Cohen's account of a January 2017 conversation with Trump regarding hiring Cohen as Trump's personal attorney.  Cohen states in his book that he told Trump that "[t]here are still open matters that need to be handled," and that Trump stated

6

that they would consider the $420,000 payment to Cohen "as a retainer for the work [Cohen] will

be doing for [Trump] privately."  Michael Cohen, *Disloyal: A Memoir: The True Story of the

Former Personal Attorney to President Donald J. Trump* 308–310 (2020).[3]

   The defense also called Alan Garten, Chief Legal Officer ("CLO") of the Trump

Organization, as a witness.  Garten testified that the Trump Organization was advised that Trump

had to be separated from his businesses once he took office and that he (Garten) implemented

corporate policies to create that separation.  Garten stated that Cohen separated himself from the

Trump Organization in January 2017 to serve as a personal attorney to Trump.  Garten stated that

Cohen received twelve payments of $35,000 in 2017 "to reimburse him for the payment that he

had made as part of the Clifford settlement agreement and also to compensate him for the work

that -- this role that he was playing as counsel [to Trump]."  (Hr'g Tr., ECF No. 41, at 54:17–20.)

He also testified that "when matters came in [to the Trump Organization] that were not company

related, but related to the President or the First Lady, . . . those matters would be referred to Mr.

Cohen.  I don't know how many there were."  (*Id*. at 57:12–15.)

   On cross-examination, Garten testified that the Trump Organization would

typically execute written retainer agreements when attorneys were retained to work either for

---

[3] The excerpts were admitted solely as evidence that Cohen made the statements written in the book, not for their truth.  *See United States v. Dupree*, 706 F.3d 131, 136 (2d Cir. 2013) (citing Fed. R. Evid. 801(c) advisory committee's note).  Trump's arguments omitted important context contradicting his contention that Cohen regarded the payments as legal retainer for his services as Trump's personal attorney, rather than a reimbursement of an advance of hush money.  Cohen states in his memoir:

> Trump's maneuver was classic, gangster, the kind of deception that I had to say I appreciated in all its dimensions. Trump was going to pay me for my services with my own money. He'd get the tax deduction for legal fees, almost certainly a criminal offense if any mortal lied on their tax returns about a business expense of nearly half a million dollars . . . . The payments would be spread out over twelve months and look like a perfectly ordinary arrangement for a sitting president devolving the management of his business interests to his two sons, but still in need of an experienced lawyer who knows his affairs—pardon the pun—and who could advise him confidentially.

*Disloyal*, at 311.

Trump personally or for the Trump Organization, that those attorneys would generally submit invoices with details of their work, and that the vast majority of ledger entries for payments to those attorneys included descriptions of their work. (*Id.* at 59–64.) He testified that he was not aware of any retainer agreement with Cohen, that Cohen's invoices did not contain descriptions of the work he did, and that the ledger entries for Cohen similarly did not describe his work. (*Id.* at 61:13–62:1, 65:1–4.) Garten testified that he did not know if Cohen actually worked on any matters referred to him by the Trump Organization. (*Id.* at 62:15–17.) He also testified that although Cohen continued to serve as Trump's personal attorney in 2018, Garten was not aware of any payments to Cohen after 2017. (*Id.* at 65:16–66:15.)

## LEGAL STANDARD

The removal provision at issue, 28 U.S.C. § 1442(a)(1), provides in relevant part:

> (a) A civil action or criminal prosecution that is commenced in a State court and that is against or directed to any of the following may be removed by them to the district court of the United States for the district and division embracing the place wherein it is pending:

> (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office or on account of any right, title or authority claimed under any Act of Congress for the apprehension or punishment of criminals or the collection of the revenue.

Federal officer removal can be traced back over two centuries. *See Willingham v. Morgan*, 395 U.S. 402, 405 (1969) (detailing the history of federal officer removal statutes). Prior to the passage of § 1442, officers could remove to federal court only if their cases fell within specialized grants of removal jurisdiction. *See* Richard H. Fallon, Jr. et al., *Hart & Wechsler's The Federal Courts and the Federal System* 853 (7th ed. 2015). Section 1442,

enacted in 1948 as part of a broader revision of the judicial code, was the first general officer

removal statute allowing federal officers to remove any civil or criminal case against them for

"any act under color of [their] office."  In a 2011 amendment, Congress replaced "for any act

under color of office" with "for or relating to any act under color of office."  Removal

Clarification Act of 2011, Pub. L. No. 112-51, § 2(b), 125 Stat. 545, 545 (Nov. 9, 2011).

   The purpose of federal officer removal "is not hard to discern."  *Willingham*, 395

U.S. at 406.  If a state can force federal officers to stand trial in state court "for an alleged

offense against the law of the State, yet warranted by the Federal authority they possess," there is

a risk that "the operations of the general government may at any time be arrested at the will of

one of its members."  *Tennessee v. Davis*, 100 U.S. 257, 263 (1880).  Federal officer removal

thus aims to prevent individual states from using their laws to hinder the federal government

from exercising its lawful authority.  In pursuit of this aim, the removal statue should be

"liberally construed."  *Colorado v. Symes*, 286 U.S. 510, 517 (1932).  In criminal cases,

however, the Court's liberal construction of the statute should be balanced against a "strong

judicial policy against federal interference with state criminal proceedings" because "preventing

and dealing with crime is much more the business of the States than it is of the Federal

Government."  *Mesa v. California*, 489 U.S. 121, 138 (1989) (quoting *Arizona v. Manypenny*,

451 U.S. 232, 243 (1981)).  Therefore, "a more detailed showing" is necessary for the removal of

a criminal case.  *Willingham*, 395 U.S. at 409 n.4; *see also Application of Donovan*, 601 F. Supp.

574, 578 (S.D.N.Y. 1985).

   To exercise federal officer removal jurisdiction, the district court must determine:

(1) that the removing party is an "officer . . . of the United States," 28 U.S.C. § 1442(a)(1);

(2) that the suit against the officer is "for or relating to any act under color of such office," *id.*;

and (3) that the officer has raised a colorable federal defense, *Mesa*, 489 U.S. at 136. The removing party bears the burden of demonstrating that removal was proper. *See United Food & Comm. Workers Union v. CenterMark Props. Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir. 1994); *Ehrenspeck v. Spear, Leeds & Kellogg*, 389 F. Supp. 2d 485, 488 (S.D.N.Y. 2005). If the non-removing party appropriately challenges the facts as set forth in the notice of removal, the removing party "must support [its factual averments] by competent proof." *United Food & Comm. Workers Union*, 30 F.3d at 301 (quoting *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936)); *see also Curry v. Am. Standard, Inc.*, 2009 WL 308029, at *1 (S.D.N.Y. Feb. 6, 2009) (applying the "competent proof" standard in the context of federal officer removal); *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014) (same).

## DISCUSSION

### I.   Federal Officer

The parties assume, and I hold, that Trump, although not presently a federal officer, can remove a case otherwise qualified for removal. It would make little sense if this were not the rule, for the very purpose of the Removal Statute is to allow federal courts to adjudicate challenges to acts done under color of federal authority.

The more difficult question is whether a President is an "officer . . . of the United States" within the meaning of § 1442(a)(1). The People argue that the Supreme Court has interpreted federal statutes referring to an "officer of the United States" to include appointed, but not elected, officers. *See Free Enter. Fund v. Public Co. Acct. Oversight Bd.*, 561 U.S. 477, 497–98 (2010) ("The people do not vote for the 'Officers of the United States.'" (quoting U.S. Const. art. II, § 2, cl. 2)); *United States v. Mouat*, 124 U.S. 303, 307 (1888) ("[A] person in the service of the government" who does not "hold[] his place by virtue of an appointment . . . is not, strictly speaking, an officer of the United States."). Trump notes that the D.C. Circuit previously

10

allowed him to remove a civil action to federal court under § 1442 while in office, *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 505 (D.C. Cir. 2020), and cites to several cases permitting federal officer removal for elected members of Congress, *see Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 412–415 (D.C. Cir. 1995); *Williams v. Brooks*, 945 F.2d 1322, 1324 n.2 (5th Cir. 1991); *Richards v. Harper*, 864 F.2d 85, 86 (9th Cir. 1988).

I believe that the President should qualify as a "federal officer" under the removal statute but, as is evident from the discussion below, the proposition is dictum, unnecessary for the decision that I reach.

## II.    Acts Under Color of Office

To exercise officer removal jurisdiction, a suit against an officer must be "for or relating to any act under color of such office."  28 U.S.C. § 1442(a)(1).  The acts must be either "vested with, or appear to be vested with, the authority entrusted to that office."  *Color of Office*, *Black's Law Dictionary* (11th ed. 2019).  The Supreme Court has articulated the following test for the "under color of office" requirement:

> There must be a causal connection between what the officer has done under asserted official authority and the state prosecution.  It must appear that the prosecution of him, for whatever offense, has arisen out of the acts done by him under color of federal authority and in enforcement of federal law, and he must by direct averment exclude the possibility that it was based on acts or conduct of his not justified by his federal duty.

*Mesa*, 489 U.S. at 131–32 (quoting *Maryland v. Soper*, 270 U.S. 9, 32 (1926)).  The "hurdle" of the requirement of causation is "quite low."  *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008).

Trump contends that Congress' 2011 amendment to § 1442, which replaced "for any act under color of office" with "for or relating to any act under color of office," eliminated the requirement of a causal connection.  All that is required, Trump argues, is that the action

11

against the federal officer is "connected" to or "associated" with acts taken under color of federal office.  (Def.'s Br. 12–14.)

Clearly, Congress broadened the Act to cover actions "not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office." *See Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020).  The Third, Fourth, Fifth, Seventh, and Eleventh circuits have adopted this view.[4]  Other Circuits, including the Second Circuit, continue to apply the requirement of a "causal connection" without addressing the question whether the 2011 amendment to § 1442 practically changes anything in light of a defendant's "low hurdle" when removing a case from state court.  *See Veneruso v. Mount Vernon Neighborhood Health Ctr.*, 586 F. App'x 604, 608 (2d Cir. 2014).

Whatever the standard, and whether it is high or low, Trump fails to satisfy it. Trump claims he had a retainer agreement with Cohen that was not in writing, unlike the majority of others made by the Trump Organization.  (Hr'g Tr. at 46–47, 59–60.)  There was no memorandum evidencing it, and there is no evidence of anything Cohen did, or was asked to do, under the retainer; certainly none that related to an act under color of the Presidential office.  The invoices and general ledger entries associated with the payments to Cohen contain no description of Cohen's services.  According to Alan Garten—CLO of the Trump Organization and the only witness presented by Trump—Cohen was paid to be reimbursed for paying Clifford and for services as private counsel to Trump, services which Garten could not describe.  (*Id.* at 54:17–20, 62:6–20.)  Garten testified also that although Cohen continued as a private attorney to Trump

---

[4] *See Baker v. Atl. Richfield Co.*, 962 F.3d 937, 944 (7th Cir. 2020); *Latiolais*, 951 F.3d at 292; *Caver v. Cent. Alabama Elec. Coop.*, 845 F.3d 1135, 1144 (11th Cir. 2017); *Sawyer v. Foster Wheeler, L.L.C.*, 860 F.3d 249, 258 (4th Cir. 2017); *In re Commonwealth's Motion to Appoint Counsel Against or Directed to Defender Ass'n of Phila.*, 790 F.3d 457 (3d Cir. 2015).

in 2018, the payments to him stopped in December 2017 when Trump's reimbursement obligation to Cohen was completed.  (*Id.* at 65–66.)

The People have put forth evidence strongly supporting their allegations that the money paid to Cohen was reimbursement for a hush money payment.  Exhibit 8, introduced without objection, shows a handwritten notation by someone in the Trump Organization, likely the CFO, calculating how much Cohen was to be repaid for advancing the $130,000 payment to Stephanie Clifford, and how the payment to him was to be disguised as income rather than reimbursement.  Trump himself, in a May 2018 tweet, described Cohen's "monthly retainer" as a "reimbursement" in connection with a "private contract[.]"  (Colangelo Decl., Ex. 4.)

Given the People's evidence challenging Trump's account, Trump bears the burden of supporting his factual averments with competent proof.  *See United Food & Comm. Workers Union*, 30 F.3d at 301; *Curry*, 2009 WL 308029, at *1.  Trump has failed to carry this burden.  Trump contends that Cohen was hired "as a direct result of President Trump's role as President of the United States and his obligations under the Constitution, and in order to separate his business affairs from his public duties," but offers no evidence to support that contention. Trump chose not to testify and chose not to call Cohen or any other witness having knowledge of Trump's purpose in hiring Cohen.  Cohen's invoices are the only indication of a retainer, but no one testified to the existence of any retainer agreement or what legal services, if any, Cohen did other than to advance hush money to Clifford.  The evidence overwhelmingly suggests that the matter was a purely a personal item of the President—a cover-up of an embarrassing event. Hush money paid to an adult film star is not related to a President's official acts.  It does not reflect in any way the color of the President's official duties.

Even if I accept Trump's allegations in the Notice that the payments to Cohen were compensation for his services as Trump's personal attorney, the requirement that the removing party demonstrate a relationship to an official act is not satisfied.  Not every act of or on behalf of a federal officer is an act under color of office.  For example, in *New York v. De Vecchio*, 468 F. Supp. 2d 448, 462 (E.D.N.Y. 2007), an FBI agent was indicted in state court on four counts of second-degree murder for disclosing information to a mafioso that led to four killings.  In support of removal, De Vecchio argued that his conversations with the mafioso were "in furtherance of [his] duties and responsibilities as a special agent of the FBI." *Id.* at 454.  The district court remanded the case to the state court from which it had been removed, holding that De Vecchio's "general claim that everything he did was in the context of the discharge of his federal duties" did not justify removal. *Id.* at 462.

*Clinton v. Jones*, 520 U.S. 681 (1997) presents another example.  There, the President sought immunity from having to give testimony while President about a private, embarrassing act done before he became President.  While distinguishable from the present case, which concerns Trump's conduct while in office, the concept that a President is not entitled to immunity for "unofficial acts grounded purely in the identity of his office" applies to this case as well. *Id.* at 693.  There is an "outer perimeter" to a President's authority and responsibilities beyond which he engages in private conduct. *Id.*  The Supreme Court has affirmed this principle as applied to Trump himself, finding that Trump's personal papers were distinct from his official documents and were thus not entitled to a heightened standard for subpoena. *See Trump v. Vance*, 140 S. Ct. 2412, 2429 (2020).

Trump conceded in his Notice that he hired Cohen to attend to his private matters. (Notice ¶ 19.)  Cohen's invoices and their associated records were maintained by the Trump

Organization, a private enterprise, in New York City, not in Washington, D.C. as official records of the President.  Trump paid Cohen from private funds, and the payments did not depend on any Presidential power for their authorization.  Trump offered no evidence regarding what Cohen did as Trump's personal attorney.  Neither the Constitutional prohibition barring the President from taking compensation beyond that fixed by Congress, nor the Constitutional obligation to take care to execute the laws, converts the President's private acts into acts under the color of his office.

I hold that Trump has failed to meet his burden of showing that the prosecution filed by the People in the New York Supreme Court is "for or relat[es]" to acts taken under color of federal office.  Because Trump was not acting "within the scope of [his] authority," nor has he been charged "for an alleged offence . . . warranted by [his] Federal authority[,]" there is little or no risk that a state might arrest the operations of the federal government.  *See Davis*, 100 U.S. at 263.

## III.   Colorable Federal Defense

To remove a case under § 1442, the defendant also must raise a "colorable federal defense."  *Mesa*, 489 U.S. at 136; *see also Isaacson*, 517 F.3d at 135.  The defense "need not be 'clearly sustainable.'"  *Isaacson*, 517 F.3d at 139 (quoting *Willingham*, 359 U.S. at 406–07).  Rather, the defense need only be "colorable" in law and fact; the defendant must show, at least, "the underpinnings of a valid federal defense."  *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *4 (S.D.N.Y. Oct. 21, 2011).  The defendant bears the burden of showing that this standard has been met.  *See United Food & Comm. Workers Union*, 30 F.3d at 301.  Trump raises two federal defenses—immunity and preemption—neither of which is colorable.

A.       **Immunity**

Trump first raises an immunity defense.  Trump has expressly waived any argument premised on a theory of absolute presidential immunity.  (Def.'s Br. 21.)  Instead, he argues that he is immune from prosecution under the Supremacy Clause[5] because his conduct "w[as] taken solely because he was President of the United States" and, "[a]s such, [his] decision to retain Michael Cohen to act as his personal lawyer arose out of his duties as President." (Notice  ¶¶ 19–20; *see also* Def.'s Br. 21.)  Trump has not raised a colorable immunity defense.

"[I]mmunity does not attach merely because state criminal prosecutions are based upon acts that happen during the scope of a federal officer's employment," and not everything a President does is "in the context of the discharge of his federal duties."  *De Vecchio*, 468 F. Supp. 2d at 460, 462; *see also North Carolina v. Ivory*, 906 F.2d 999, 1003 (4th Cir. 1990) (holding that immunity does not provide federal officers "carte blanche . . . to proceed as they please" in carrying out every act within the scope of their employment).  Rather, Supremacy Clause immunity requires the defendant to show both that he was performing "an act which he was authorized to do by the law of the United States" and that, in performing that authorized act, "he did no more than what was necessary and proper for him to do."  *In re Neagle*, 135 U.S. 1, 75 (1890); *see also New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).  The standard is more stringent than the color of office test: "the acts themselves must of necessity be required in the discharge of the officer's duties."  *De Vecchio*, 468 F. Supp. 2d at 460.

Trump argues that his "decision to separate his personal business from his public duties derived from his position as President" and was "rooted in constitutional concerns."

___

[5] The Supremacy Clause reads: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

(Def.'s Br. 24.) Trump's argument is conclusory. No evidence was presented to support it, and Trump has not explained how hiring and making payments to a personal attorney to handle personal affairs carries out a constitutional duty. Reimbursing Cohen for advancing hush money to Stephanie Clifford cannot be considered the performance of a constitutional duty. Falsifying business records to hide such reimbursement, and to transform the reimbursement into a business expense for Trump and income to Cohen, likewise does not relate to a presidential duty. Trump is not immune from the People's prosecution in New York Supreme Court. His argument of immunity is not a colorable defense.

**B.     Preemption**

Trump argues that the Indictment is preempted by the Federal Election Campaign Act, 52 U.S.C. § 30143(a). Trump argues that the Act preempts two of the crimes that he is charged with intending to commit or conceal by falsifying business records—crimes under New York Election Law ("NYEL") § 17-152, and crimes under FECA, 52 U.S.C. § 30101 *et seq.* (Notice ¶¶ 22–24; Def.'s Br. 18–20.) Trump further asserts that the Indictment is preempted because it alleges, essentially, that he intended to defraud "the voting public" during a federal election. (Def.'s Br. 20–21.) Trump's arguments are without merit; there is no colorable basis to them.

FECA's general language, purporting to preempt "any provision of State law with respect to election to Federal office," 52 U.S.C. § 30143(a), is defined by FECA's implementing regulation, and the caselaw. Three specific categories of state law are preempted:

(1) State laws "concerning the . . . [o]rganization and registration of political committees supporting federal candidates;"

(2) State laws "concerning the . . . [d]isclosure of receipts and expenditures by Federal candidates and political committees; and"

(3) State laws "concerning the . . . [l]imitation on contributions and expenditures regarding Federal candidates and political committees."

11 C.F.R. § 108.7(b); *see also WinRed, Inc. v. Ellison*, 59 F.4th 934, 942 (8th Cir. 2023) ("[The] FEC regulation defines the statute's scope.").  The regulations provide that FECA does not preempt state laws concerning the "[m]anner of qualifying as a candidate or political party organization"; "[d]ates and places of elections"; "[v]oter registration"; "[p]rohibition of false registration, voting fraud, theft of ballots, and similar offenses"; "[c]andidate's personal financial disclosure"; and "[a]pplication of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35."  11 C.F.R. § 108.7(c).

There is a "strong presumption against pre-emption" that applies with equal force to FECA.  *Weber v. Heaney*, 995 F.2d 872, 875 (8th Cir. 1993).  Thus, "even with respect to election-related activities, courts have given [FECA] a narrow preemptive effect . . . ."  *Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475 n.3 (2d Cir. 1991) (citing *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 546 (8th Cir. 1984)); *see also WinRed, Inc.*, 59 F.4th at 943–44; *Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200–01 (5th Cir. 2013); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280 & n.18 (5th Cir. 1994) (collecting cases).

In *Stern*, for example the Second Circuit held that FECA did not preempt a derivative action against corporate directors for using corporate funds to contribute to political action committees in connection with a federal election.  924 F.2d at 474–76.  The court of appeals ruled that FECA's preemption provision is read "narrow[ly]," even when a state law is applied to "election-related activities," and that FECA "d[id] not preclude New York from pursuing its independent interest in ensuring that corporate directors exercise sound judgment in the expenditure of corporate funds."  *Id.* at 475 & n.3.

18

In *WinRed*, a political action committee focused on electing federal legislators sought to enjoin state Attorneys General from investigating potential violations of state consumer protection laws in its fundraising activities.  The investigations were centered on WinRed's use of pre-checked boxes, in fine print, to "steer[] supporters into unwitting [recurring] donations." 59 F.4th at 936–37.  WinRed argued that because it was engaged only in federal elections, FECA preempted the application of state consumer-protection law to WinRed's federal fundraising conduct.  *Id.* at 938–39.  The Eight Circuit denied WinRed's motion for injunction.  The court of appeals held that FECA is to be narrowly construed, and that the states' investigation in furtherance of consumer protection is not preempted even if solicitations for a federal election are involved.  *Id.* at 943–44.  Furthermore, the court of appeals ruled that Minnesota's consumer-protection law, which became the focus of the case, was covered by FECA's regulations providing that state "prohibition[s] on fraudulent voting, registration, and 'similar offenses'" are not preempted.  *Id.* at 942–43.  The court of appeals added that WinRed's argument, if upheld, would result in an improper "immuniz[ation] . . . from many generally applicable state laws."  *Id.* at 944.

The Fifth Circuit also has held that state laws of general applicability are not preempted, even when applied to cases involving contributions to a federal election campaign. In *Janvey*, the perpetrators of a Ponzi scheme could be prosecuted under Texas law, even though they contributed a portion of their fraudulently-obtained funds to political campaigns.  712 F.3d at 188, 200–02.  Citing authority from several circuits—including the Second Circuit's decision in *Stern*—the court of appeals ruled that FECA was "construed . . . narrowly" in the context of "general state law[s] that happen[] to apply to federal [elections] in [a given] case."  *Id.* at 200–01.  The court of appeals then concluded that the Texas statute was such a general law, not one

that "specifically regulate[s] federal campaign finance," and that it therefore was not preempted by FECA. *Id.*; *see also Dewald v. Wriggelsworth*, 748 F.3d 295, 301–03 (6th Cir. 2014) (holding that state-law fraud claims concerning election-related activity were not preempted under clearly established law); *Thornburgh*, 39 F.3d at 1280 (holding that FECA did not preempt state law as to a candidate's liability for campaign debts); *Teper*, 82 F.3d at 995 (collecting cases in which courts concluded that FECA did not preempt "state laws that are more tangential to the regulation of federal elections").

Cases holding that FECA preempts state law typically involve statutes that regulate conduct specifically covered by FECA. In *Teper v. Miller*, for example, a state statute barred state legislators from accepting campaign contributions during the legislative session, including when done in connection with a federal election. 82 F.3d 989 (11th Cir. 1996). The court of appeals held that FECA does not permit such limitations, which "intru[ded]" on the domain covered by FECA's substantive provisions. *Id.* at 993–99. The state statute at issue in *Republican Party of New Mexico v. King* similarly imposed limitations on campaign contributions and was therefore held preempted as applied to federal elections. 850 F.Supp. 2d 1206, 1215 (D.N.M. 2012), *aff'd on other grounds*, 741 F.3d 1089 (10th Cir. 2013); *see also N.H. Att'y Gen. v. Bass Victory Comm.*, 166 N.H. 181 (2014) (holding that FECA preempted state law requiring the disclosure of funding when conducting certain polls for a federal election); *Janvey*, 712 F.3d at 201.

NYPL § 175.10 is a law of general applicability, prohibiting the falsification of business records for a fraudulent purpose. *Cf. People v. Bloomfield*, 844 N.E.2d 296, 300 (N.Y. 2006). A violation is a misdemeanor. NYPL § 175.05. A violation with intent to commit, aid, or conceal another crime is a felony. *Id.* § 175.10. Any fraudulent falsification, along with an

intention to commit, conceal, or aid the commission of any other crime, proves the felony.  The law does not target, or make an exception for, election-related activities.  There is no mention of disclosures of campaign contributions or spending, elections, or election laws, state or federal.

Trump concedes that FECA does not preempt § 175.10 on its face.  He argues that the provision of NYPL § 175.10 that raises falsification of business records to a felony if there is an intent to commit, aid, or conceal another crime is preempted if the crime involves federal elections.  But violations of FECA and NYEL § 17-152 are not elements of the crime charged.  The only elements are the falsification of business records, an intent to defraud, and an intent to commit or conceal another crime.  The People need not establish that Trump or any other person actually violated NYEL § 17-152 or FECA.  *People v. Taveras*, 12 N.Y.3d 21, 27 (2009) (holding that the only "relevant actus reus [under § 175.10] is the creation of a false entry in a business record," which is "elevated to a first-degree offense on the basis of an enhanced intent requirement . . . .").  Trump can be convicted of a felony even if he did not commit any crime beyond the falsification, so long as he intended to do so or to conceal such a crime.  *People v. Houghtaling*, 79 A.D.3d 1155, 1157–58 (3d Dep't 2010) (upholding conviction under § 175.10 even where the defendant was acquitted of the secondary crime); *People v. Holley*, 198 A.D.3d 1351 (4th Dep't 2021) (same); *People v. Dove*, 2007 WL 1376283, at *6 n.6 (N.Y. Sup. Ct. Apr. 27, 2007) (holding that a defendant can be convicted under § 175.10 when a jury concludes that he falsified business records "with the intent to cover up a crime committed by somebody else.").

The Indictment does not intrude on FECA's domain.  NYPL § 175.10 is a general law, not one that "specifically regulate[s]" federal elections.  *Janvey*, 712 F.3d at 201.  And the People's theory of intent under that law does not have the effect of limiting or otherwise

interfering with federal regulation of elections.  FECA preemption does not apply.  *See, e.g.*,
*Stern*, 924 F.2d at 475 & n.3; *WinRed*, 59 F.4th at 942–44; *Janvey*, 712 F.3d at 200–01.

Next, Trump asserts a preemption defense stemming from the People's reliance
on NYEL § 17-152 as one of the crimes that Trump intended to commit, aid, or conceal by his
falsifications of business records.  Trump argues that this allegation amounts to a charge of
"conspiracy to promote or prevent a presidential election," and that the charge "is simply not a
crime" because NYEL § 17-152 is preempted when applied to federal elections.  (Def.'s Br. 19–
20.)  Trump adds, "there can be no . . . intent to commit a non-existent crime."  (Def.'s Br. 20.)
Again, Trump's argument is without merit.

NYEL § 17-152 makes it a misdemeanor to conspire to "promote or prevent the
election of any person to a public office by unlawful means" if at least one conspirator acts upon
the conspiracy.  The statute makes no distinction between state and federal elections and does not
define the range of "unlawful means" that can be the object of the conspiracy.  NYEL § 17-152
does not fit into any of the three categories of state law that FECA preempts: "law[s] concerning
the . . . [o]rganization and registration of political committees supporting federal candidates;"
"law[s] concerning the . . . [d]isclosure of receipts and expenditures by Federal candidates and
political committees;" and "law[s] concerning the . . . [l]imitation on contributions and
expenditures regarding Federal candidates and political committees."  11 C.F.R. § 108.7(b); *see
also WinRed, Inc.*, 59 F.4th at 942 ("[The] FEC regulation defines the statute's scope.").  Nor is
the conduct prohibited by NYEL § 17-152 covered by any other provision of FECA.  *See* 52
U.S.C. §§ 30104 (reporting requirements); *id.* § 30114 (uses of campaign contributions); *id.* §§
30116, 30118–19, 30121–23, 30126 (caps and other restrictions on campaign contributions and

expenditures); *id.* §§ 30120, 30124 (election communications); *id.* § 30125 (soft money solicitations and expenditures).

NYEL § 17-152 is distinct from other provisions of New York's election law that directly target campaign contributions and expenditures, and which, therefore, are preempted.  In *Seltzer v. New York State Democratic Comm.*, for example, the New York Appellate Division held that FECA preempted the provision of NYEL that limited the expenditure of party funds as applied to federal elections, since FECA already "regulates the conduct and financing of campaigns for Federal elective office." 743 N.Y.S.2d 565, 568 (2d Dep't 2002) (internal quotation marks omitted); *see also Kermani v. New York State Bd. of Elections*, 487 F. Supp. 2d 101, 104 n.4 (N.D.N.Y. 2006) (collecting cases and FEC advisory opinions regarding other preempted provisions of NYEL).  FECA "occupies the field" with respect to regulations of federal campaign contributions and expenditures.  F.E.C. Advis. Op. 1995–41 (Dec. 7, 1995). But FECA has not preempted state law entirely regarding elections, and "does not affect the States' rights" to pass laws generally concerning "other areas" of federal elections, "such as voter fraud and ballot theft."  F.E.C. Advis. Op. 1995–41 (Dec. 7, 1995) (quoting H.R. Rep. No. 93-1438, 93d Cong., 2d Sess. 69 (1974)); *see also WinRed, Inc.*, 59 F.4th at 942–43; *Reeder*, 733 F.2d at 546; *Dewald*, 748 F.3d at 301–03.  NYEL § 17-152 is thus not preempted by FECA.

Finally, Trump argues that FECA preempts any "misdemeanor or felony [falsification] charges" brought against him because the Indictment requires the People to prove that Trump had an intent to defraud "the voting public" during a federal election.  (Def.'s Br. 20 (internal quotation marks omitted); *see also* Hr'g Tr. 81:4–87:21.)  Trump's argument is not part of his Notice, *see* ¶¶ 21–24; it arose only in his brief and at oral argument.  Although all grounds of removal must be stated in the notice of removal, and Trump's argument is therefore

susceptible to statutory waiver, 28 U.S.C. § 1455(b)(2), it is preferable to address Trump's argument substantively, rather than to parse his Notice. And, substantively, Trump's additional argument for preemption fails for the same reasons discussed previously: FECA does not preempt the application of a general state law to conduct related to a federal election except if the law, or its application, constitutes a specific regulation of conduct covered by FECA. *Janvey*, 712 F.3d at 200–01; *WinRed*, 59 F.4th at 942–43. The mere fact that Trump is alleged to have engaged in fraudulent conduct with respect to a federal election is not a basis for preemption.

There is no colorable basis to support a federal preemption defense.

## IV.    Protective Jurisdiction

Trump argues that the indictment "is politically motivated" and is the product of "state hostility," and is removable under "protective jurisdiction." Notice ¶ 31. No case supports Trump's argument; none has been cited and none has been found. Indeed, a unanimous Supreme Court in *Mesa*—addressing the government's argument that a federal officer could remove a case from state court under 28 U.S.C. § 1442 irrespective of whether he raised a colorable federal defense—indicated that the theory poses "grave constitutional problems." *Mesa*, 489 U.S. at 137.

Trump argues, citing Justice Brennan's concurrence in *Mesa*, that a federal officer could remove a case from state court if he could show "local hostility to federal authority." *Id.* at 140. However, Trump has not shown such local hostility. Trump argues that a "politically motivated" district attorney who "disfavored [Trump's] acts and policies as President" caused the grand jury to indict. Notice ¶ 31. Trump fails to show, however, that the grand jury lacked a rational basis for the indictment, or that there was "widespread resistance by state and local governmental authorities to Acts of Congress and to decisions of [the Supreme] Court." Justice Brennan's concurrence hypothesized that if such factors were to exists, protective jurisdiction

24

might be appropriate. *Mesa*, 489 U.S. at 140.  But there is no reason to believe that the New

York judicial system would not be fair and give Trump equal justice under the law.  Trump fails

to make a case of protective jurisdiction.

## CONCLUSION

Trump has failed to show that the conduct charged by the Indictment is for or

relating to any act performed by or for the President under color of the official acts of a

President.  Trump also has failed to show that he has a colorable federal defense to the

Indictment.  For either or both of these reasons, the People's motion to remand the case is

granted.  The Clerk shall remand the casefile to the New York Supreme Court, New York

County.


SO ORDERED.

Dated:      July 19, 2023
            New York, New York                          ALVIN K. HELLERSTEIN
                                                        United States District Judge