# EXHIBIT F

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,

          - against -

DONALD J. TRUMP,

                      Defendant.

Index No. 71543-23

**MEMORANDUM OF LAW IN SUPPORT OF
PRESIDENT DONALD J. TRUMP'S OMNIBUS MOTIONS**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ......................................................................................... iii

PRELIMINARY STATEMENT ...................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 2

I.    The Investigation: The "Zombie Case" ................................................................. 2

II.   The Indictment ..................................................................................................... 2

LEGAL ARGUMENTS ................................................................................................... 4

I.    PREINDICTMENT DELAY VIOLATED PRESIDENT TRUMP'S DUE PROCESS
      RIGHTS ................................................................................................................ 4

      A.    Relevant Facts ............................................................................................... 4

      B.    Applicable Law .............................................................................................. 6

      C.    Discussion ...................................................................................................... 7

II.   THE CHARGES ARE LEGALLY DEFECTIVE ................................................. 9

      A.    President Trump Did Not Cause False Entries in the Business Records of an
            Enterprise.... ................................................................................................ 10

            1.    Relevant Facts .................................................................................... 10

            2.    Applicable Law ................................................................................... 12

            3.    Discussion .......................................................................................... 13

      B.    The People Have Not Identified A Viable Object Offense Under § 175.10 ................. 14

            1.    Federal Crimes Cannot Serve As Object Offenses .................................... 15

            2.    N.Y. Election Law § 17-152 Is Not An Object Offense ............................ 17

            3.    The People Did Not Establish Intent To Violate N.Y. Tax Law ................. 19

            4.    The People Did Not Establish Intent To Violate Penal Law §§ 175.05 and 175.10 .. 21

      C.    The Grand Jury Was Not Presented With Evidence Of Intent To Defraud ................. 22

      D.    The People Should Be Required To Produce Complete Grand Jury Minutes .............. 24

III.  PRESIDENT TRUMP WAS IMPERMISSIBLY TARGETED FOR PROSECUTION .. 26

      A.    The Equal Protection Clauses Prohibit Selective Prosecution ........................... 26

      B.    Presented Trump Was Selectively Targeted by the DA's Office for Prosecution, the
            Motivations for Which Were Impermissible .............................................................. 29

      C.    The Court Should Order a Hearing on the Issue of Selective Prosecution and Should
            Order DANY to Produce Discovery on this Issue .................................................... 31

IV.   THE CHARGES ARE TIME-BARRED ............................................................. 32

      A.    The Statute of Limitations for Counts 1 Through 34 Has Run ........................... 32

      B.    The Statute of Limitations Was Not Tolled ..................................................... 33

1.    Executive Orders During The COVID-19 Pandemic Cannot Be Interpreted Against President Trump..................................................................................................... 33

2.    CPL § 30.10 (4)(a) Does Not Apply............................................................................ 34

V.    THE MULTIPLICITOUS COUNTS MUST BE DISMISSED ........................................... 35

A.    Applicable Law ............................................................................................................ 35

B.    Discussion .................................................................................................................... 37

VI.    THE COURT SHOULD ORDER THE PEOPLE TO PROVIDE ADDITIONAL PARTICULARS .................................................................................................................... 38

A.    Relevant Facts ............................................................................................................. 38

B.    Applicable Law ............................................................................................................ 39

C.    Discussion .................................................................................................................... 40

VII.    THE COURT SHOULD HOLD A HEARING REGARDING GRAND JURY SECRECY VIOLATIONS ...................................................................................................................... 42

A.    Applicable Law ............................................................................................................ 42

B.    Discussion .................................................................................................................... 43

VIII.    DANY's CERTIFICATES OF COMPLIANCE ARE DEFECTIVE............................ 46

A.    Applicable Law ............................................................................................................ 46

B.    Discussion .................................................................................................................... 47

CONCLUSION.......................................................................................................................... 48

# TABLE OF AUTHORITIES

**Cases**

*303 W. 42nd St. Corp. v. Klein*, 46 N.Y.2d 686 (1979) .......................................................... passim

*Auer v. Smith*, 77 A.D.2d 172 (4th Dept 1980)............................................................... 18

*Bell v. United States*, 349 U.S. 81 (1955) ...................................................................... 37

*Betty-June Sch., Inc. v. Young*, 25 Misc. 2d 909 (Sup. Ct. Nassau Cnty. 1960)........................... 28

*Bousley v. United States*, 523 U.S. 614 (1998)................................................................. 39

*Bower Assoc. v Town of Pleasant Val.*, 2 N.Y.3d 617 (2004) ...................................................... 28

*Bragg v. Jordan*, 2023 WL 2999971 (S.D.N.Y. 2023)........................................................... 7

*Brash v. Richards*, 149 N.Y.S.3d 560 (2d Dep't 2021) ...................................................... 34

*Brown v. Ohio*, 432 U.S. 161 (1977) ............................................................................ 35

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................................ 15

*Chavez v. Occidental Chem. Corp.*, 35 N.Y.3d 492 (2020) ......................................................... 34

*Crowley v. Courville*, 76 F.3d 47 (2d Cir. 1996) .......................................................... 27

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141 (1982) ............................................. 19

*Matter of Consuello v. Pafundi*, 17 Misc. 3d 1108[A] (Sup. Ct, Rensselaer County 2007)......... 18

*Matter of Friedman v. Rice*, 134 A.D.3d 826 (App. Div. 2d Dep't 2015) .................................... 42

*Matter of James v. Donovan*, 130 A.D.3d 1032 (App. Div. 2d Dep't 2015)......................... 42, 43

*Morgenthau v. Khalil*, 902 N.Y.2d 501 (1st Dep't 2010)................................................ 24

*Orloski v. FEC*, 795 F.2d 156 (D.C. Cir. 1986).............................................................. 15

*Penlyn Dev. Corp. v. Incorporated Vil. Of Lloyd Harbor*, 51 F. Supp. 2d 255 (E.D.N.Y. 1999) 28

*People ex rel. Henry v. Nostrand*, 46 N.Y. 375 (1871) ................................................... 17

*People ex rel. Willett v. Quinn*, 150 A.D. 813 (2d Dept 1912).................................................. 18

*People v Montague*, 130 A.D.3d 1100 (App. Div. 3d Dept 2015) ............................................... 7, 9

*People v. Acme Markets*, 37 N.Y.2d 326 (1975) ......................................................... 27

*People v. Adrovic*, 130 N.Y.S.3d 614 (N.Y. Crim. Ct. 2020)...................................... 46

*People v. Allen*, 789 N.Y.S.2d 56 (2d Dep't 2004) ....................................................... 9

*People v. Banks*, 150 Misc. 2d 14 (Sup. Ct. Kings Cnty. 1991)................................... 14

*People v. Barrett*, 13 Misc. 3d 929 (Crim. Ct. N.Y. Cnty. 2006)................................ 34

*People v. Bel Air Equip. Corp.*, 46 A.D.2d 773 (2d Dep't 1974), *aff'd* 39 N.Y.2d 48 (1976)..... 13

*People v. Bergen Beach Yacht Club*, 160 Misc. 2d 939 (N.Y. Crim. Ct. 1994)......................... 31

*People v. Bilus*, 10 Misc. 3d 761 (District Court of Nassau Cnty. 2005) .................................... 18

*People v. Blount*, 90 N.Y.2d 998 (1997)........................................................................ 27

*People v. C.W.*, 72 Misc. 3d 1082 (Sup. Ct. Nassau Cty. 2021)................................................... 15

*People v. Calabria*, 94 N.Y.2d 519 (2000) ..................................................................... 36

*People v. Calogero*, 75 A.D.2d 455 (4th Dept 1980) .................................................... 17

*People v. Casiano*, 117 A.D.3d 1507 (4th Dep't 2014)................................................... 36

*People v. Cousart*, 58 N.Y.2d 62 (1982) ...................................................................... 7, 9

*People v. Duryea*, 76 Misc. 2d 948 (Sup. Ct, N.Y. County 1972) ................................. 18

*People v. Einhorn*, 346 N.Y.S.2d 986 (N.Y. Sup. Ct. 1973) ......................................... 39

*People v. Elliassen*, 20 Misc.3d 1143(A) (Sup. Ct. Richmond Cnty. 2008) ............................... 24

*People v. Faison*, 73 Misc. 3d 900 (Crim. Ct. Kings Cnty. 2021)................................. 46

*People v. Fitzgerald*, 45 N.Y.2d 574 (1978)................................................................. 39

*People v. Goodman*, 31 N.Y.2d 262 (1972) ................................................................. 27

*People v. Green*, 68 N.Y.2d 151 (1986) ....................................................................... 34

*People v. Greene,* 213 A.D.3d 418 (1st Dep't 2023)...................................................... 38

*People v. Horne*, 468 N.Y.S.2d 433 (Sup. Ct. Kings Cnty. 1983) ......................................... 36, 37

*People v. Iannone*, 45 N.Y.2d 589 (1978) ................................................................................ 39

*People v. Jones*, 194 N.Y.S.3d 694 (Sup. Ct. Kings Cnty. 2023)............................................... 8

*People v. Kase*, 431 N.Y.S.2d 531 (1st Dep't 1980), *aff'd* 53 N.Y.2d 989 (1981) ..................... 23

*People v. Keller*, 176 Misc. 2d 466 (Sup. Ct. N.Y. Cnty. 1998) ......................................... 23, 24

*People v. Kisina*, 14 N.Y.3d 153 (2010)................................................................................... 12

*People v. Knobel*, 94 N.Y.2d 226 (1999).................................................................................. 33

*People v. Lancaster*, 69 N.Y.2d 20 (1986)............................................................................... 24

*People v. Martinez*, 83 N.Y.2d 26 (1993)................................................................................. 25

*People v. McKinney*, 71 Misc. 3d 1221 (Crim. Ct. Kings Cty. 2021) ....................................... 48

*People v. Minott*, N.Y.S.2d 499 (Crim. Ct. N.Y. Cnty. 2013)................................................... 33

*People v. Nat'l Rifle Ass'n of Am., Inc.*, 75 Misc. 3d 1000 (Sup. Ct. N.Y. Cnty. 2022). ............ 28

*People v. O'Hara*, 9 Misc 3d 1113[A], 1113A, 2005 NY Slip Op 51516[U] (Sup. Ct. Kings

   Cnty. 2005) ............................................................................................................................ 27

*People v. Papatonis*, 243 A.D.2d 898 (3d Dep't 2009)........................................................ 12, 13

*People v. Quinn,* 103 A.D.3d 1258 (4th Dep't 2013) ................................................................ 38

*People v. Regan*, 39 N.Y.3d 459 (2023)....................................................................... 6, 7, 8, 9

*People v. Rogers*, 8 A.D.3d 888 (App. Div. 3d Dept 2004) ................................................... 8, 9

*People v. Rosario*, 70 Misc. 3d 753 (County Ct. Albany Cty. 2020) ........................................ 48

*People v. Sanchez*, 84 N.Y.2d 440 (1994) ............................................................................... 39

*People v. Sensini*, 196 A.D.2d 376 (2d Dep't 1994)............................................................ 35, 36

*People v. Sergio*, 16 Misc. 3d 1127[A], 1127A (Sup. Ct, Kings Cnty. 2007)............................ 43

*People v. Singer*, 44 N.Y.2d 241 (1978).............................................................................. 6, 7, 8

*People v. Smith*, 113 A.D.2d 905 (2d Dep't 1985) ........................................................ 37

*People v. Sosa-Campana*, 89 N.Y.S.3d 75 (1st Dep't 2018) ......................................... 24

*People v. St. Victor*, 73 Misc. 3d 1204(A) (Sup. Ct. Kings Cnty. 2021) .............................. 25, 26

*People v. Staley*, 41 N.Y.2d 789 (1977) ..................................................................... 6

*People v. Taranovich*, 37 N.Y.2d 442 (1975) ......................................................... 7, 8, 9

*People v. Thomas*, 142 A.D.3d 1191 (2d Dep't 2016) ............................................. 32, 33

*People v. Trump Corp., et al.*, Ind. No. 1472/2021 (2022) ........................................... 47

*People v. Trump*, 2023 WL 4614689 (S.D.N.Y. 2023) ................................................ 19

*People v. Turner*, 5 N.Y.3d 476 (2005) .................................................................... 16

*People v. Wallace*, 26 N.Y.2d 371 (1970) .................................................................. 8

*People v. Weinstein*, 170 N.Y.S. 3d 33 (1st Dep't 2022) ........................................... 35

*People v. Wiggins*, 31 N.Y.3d 1 (2018) ................................................................ 7, 9

*People v. Williams*, 214 A.D.3d 828 (2d Dep't 2023) ................................................ 38

*People v. Witherspoon*, 211 A.D.3d 108 (2d Dep't 2022) ....................................... 15, 16

*Smith v. Jansen*, 85 Misc. 2d 81 (Sup. Ct. Suffolk Cnty. 1975) ................................... 17

*Sonne v. Bd. of Trustees of Vil. of Suffern*, 67 A.D.3d 192 (2d Dep't 2009) ................... 27, 28

*Troy Pub. Co. v. Dwyer*, 110 A.D.2d 327 (3d Dep't 1985) ......................................... 43

*Trump v. Vance*, 140 S. Ct. 2412 (2020) ................................................................. 43

*United States v. Oaks*, 508 F.2d 1403 (9th Cir. 1974) ............................................... 28

*United States v. Ragland*, 3 F. App'x 279 (6th Cir. 2001) .......................................... 38

*United States v. Silver*, 103 F. Supp. 3d 370 (S.D.N.Y. 2015) .................................... 45

*Yates v. United States*, 354 U.S. 298 (1957) ............................................................ 25

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................... 27

**Statutes**

11 C.F.R. § 108.7 ........................................................................................................... 19

52 U.S.C. § 30101 .................................................................................................... 15, 38

52 U.S.C. § 30143 ........................................................................................................... 19

9 N.Y.C.R.R. § 8.202.8 .................................................................................................. 34

C.P.L. § 190.25 ..................................................................................................... 25, 42, 43

C.P.L. § 200.20 ......................................................................................................... 35, 36

C.P.L. § 210.20 ............................................................................................................... 43

C.P.L. § 210.35 ............................................................................................................... 43

C.P.L. § 245.10 ............................................................................................................... 47

C.P.L. § 245.20 ......................................................................................................... 46, 47

C.P.L. § 245.50 ............................................................................................................... 46

C.P.L. § 245.60 ............................................................................................................... 47

C.P.L. § 245.70 ............................................................................................................... 47

CPL § 1.20 ..................................................................................................................... 33

CPL § 200.50 ................................................................................................................. 39

CPL § 200.95 ................................................................................................................. 38

CPL § 30.10 ............................................................................................................. 32, 34

CPL 160.59 ..................................................................................................................... 16

CPL 200.90 ..................................................................................................................... 42

Judiciary Law § 90 ......................................................................................................... 16

New York Criminal Law § 21:3 ..................................................................................... 18

New York Election Law § 1-102 .................................................................................... 17

New York Election Law § 17-100 ........................................................................................ 17

New York Election Law 17-152 ................................................................................... passim

New York Penal Law § 175.10 ............................................................................................ 15

New York Tax Law § 1801 ........................................................................................... 15, 19

New York Tax Law § 1802 ........................................................................................... 15, 38

New York Tax Law §1802 ................................................................................................... 19

Penal Law § 10.00 ....................................................................................................... 15, 16

Penal Law § 175.00 ..................................................................................................... 12, 13

Penal Law § 175.10 ............................................................................................... passim

Penal Law § 175.35 ............................................................................................................ 23

Penal Law § 195.05 ............................................................................................................ 18

Penal Law § 215.70 ............................................................................................................ 43

Penal Law § 70.06 .............................................................................................................. 16

## Other Authorities

*Federal Practice and Procedure: Criminal* § 130 (5th ed. 2023) ................................. 39

New York Criminal Law (4th Ed.) at §17 ......................................................................... 23

New York State Constitution, Article I § 11 ..................................................................... 26

New York State Constitution, Article I § 6 ....................................................................... 35, 39

United States Consittution, Sixth Amendment .................................................................. 36, 39

United States Consitution, First Amendment .................................................................... 28

United States Constitution, Fifth Amendment ............................................................ 1, 35, 45

United States Constitution, Fourteenth Amendment .................................................... 26, 36, 39

## PRELIMINARY STATEMENT

After a five-year meandering, halting, and roving investigation that entailed inexplicable and unconstitutional delay, the District Attorney's Office filed a discombobulated package of politically motivated charges marred by legal defects, procedural failures, discovery violations, and a stubborn refusal to provide meaningful particulars regarding its theory of the case. The pretrial presumption in favor of the credibility of the prosecution's witnesses has never been stretched as thinly as it is here. Nevertheless, and even while granting DANY the inferences to which it is entitled, this case must be dismissed.

President Trump cannot be said to have falsified business records of the Trump Organization by paying his personal attorney using his personal bank accounts. Knowing so, in an effort to bolster the superficial appearance of the case, but without adding to its substance, DANY brought multiplicitous counts based on the same payments and same course of conduct. New York's business records statute has never been applied in this fashion, and even the most ardent and publicly supportive former prosecutor, Mark Pomerantz, to have worked on the case doubted that DANY's legal theory is viable. The theory is so flawed and the prosecution so politically driven that, when the Federal Election Commission identified similar conduct by Hillary Clinton, DANY did not even issue a subpoena to Clinton or anyone in her orbit. And if there was any question about the severity of the concerns relating to selective prosecution and grand jury leaks in this case, it was laid to rest when the very same former prosecutor invoked the Fifth Amendment in May during questioning by Congress about the investigation.

The prejudice from DANY's actions is severe. The pendency of these proceedings, and the manner in which they were initiated, calls into question the integrity of the criminal justice process, is inconsistent with bedrock due process principles, and is interfering with the campaign

1

of the leading candidate in the 2024 presidential election.  President Trump respectfully requests that the Court dismiss the Indictment.

**STATEMENT OF FACTS**

**I.    The Investigation: The "Zombie Case"**

The charges against President Trump arise from a sprawling on-again, off-again investigation that lasted five years and has cost New Yorkers millions of dollars.  DANY began its investigation in 2018 and presented evidence to a grand jury in 2019.  No indictment was returned until March 2023.

Former Special Assistant District Attorney Mark Pomerantz and his colleagues dubbed the focus of the charges in the indictment the "zombie case" because of how many times they abandoned the theory, only to revive it when other inquiries were even less fruitful.  *See* M. Pomerantz, People vs. Donald Trump: An Inside Account at 200 (2023) ("*Pomerantz Inside Account*").  In Pomerantz's view, the conduct "did not amount to much in legal terms" because "[p]aying hush money is not a crime under New York State law, even if the payment was made to help an electoral candidate," and "creating false business records is only a misdemeanor under New York law."  *Id.* at 40-41.  In a book published weeks before the indictment was returned, Pomerantz argued that the false business records counts could not be elevated to felonies because "there appeared to be no state crime in play."  *Id.*

**II.    The Indictment**

On March 30, 2023, a New York County grand jury returned an indictment charging President Trump with 34 counts of felony falsifying business records, in violation of Penal Law § 175.10.  The People allege that President Trump and his personal attorney, ████████ worked with executives from American Media, Inc. ("AMI") to identify and suppress potential

negative news stories during the runup to the 2016 presidential election.  Even if taken at face value, there was nothing illegal about that strategy.  The case focuses on three such potential stories.

The first potential story involved ███████ a former doorman at Trump Tower, who tried to sell the false claim that President Trump had fathered a child out of wedlock with a staff member.  *See* Statement of Facts ¶¶ 10-11.  The People allege that AMI negotiated and signed an agreement to pay ██████ $30,000 to acquire exclusive rights to the story.

The second potential story involved ███████████ a former Playboy Playmate, who alleged that she had a sexual relationship with President Trump, who denies the allegation.  *See* Statement of Facts ¶¶ 12-15.  The People claim that AMI entered into a contract with ████████ under which she would receive $150,000 and other benefits in exchange for her agreement not to make public allegations relating to President Trump.  According to an AMI executive named ████████ ████████████████████████████████████████████████ ██████████████████████████████    *See* G.J. Testimony of ████████████ at DANYGJ00073819.

The third story involved █████████████ also known as █████████████ who also falsely claimed that she had a sexual encounter with President Trump.  *See* Statement of Facts ¶¶ 16-21.  On October 26, 2016, ████████ wired $130,000 from his personal account to purchase the life rights to ████████ story.

DANY's case is based on President Trump's payments to ██████ in 2017 in connection with the last of these three claims.  The 34 charges are organized into 11 separate groups based on three types of records: ████████ invoices, ledger entries, and the resulting check and stub.  DANY alleges that these records were "false" because they indicate that the payments were part of a

"retainer" for "legal" services by ████—which they were.  DANY then escalated the charges to felonies by alleging, based on a variety of defective legal theories, that President Trump intended "to commit another crime or to aid or conceal the commission thereof" under Penal Law § 175.10.

## LEGAL ARGUMENTS

I. **PREINDICTMENT DELAY VIOLATED PRESIDENT TRUMP'S DUE PROCESS RIGHTS**

DANY charged President Trump more than six years after public reporting regarding the facts at issue, and almost five years after commencing a grand jury investigation and accessing substantially all of the relevant evidence.  The delay has prejudiced President Trump, interfered with his ongoing presidential campaign, and violated his due process rights.  Accordingly, the Court should dismiss the indictment or, in the alternative, conduct a hearing to determine the reason for the delay.

### A.    Relevant Facts

Public reporting on the facts underlying this case began in 2016.  The *Wall Street Journal* published a story about AMI buying ████ story in November 2016.[1]  In January 2018, the *Journal* ran an article about ████ paying ████[2]  In August 2018, ████ pleaded guilty in the Southern District of New York to, *inter alia,* campaign finance violations based on the $280,000

---

[1] *See* Joe Palazzolo, "National Enquirer Shielded Donald Trump From Playboy Model's Affair Allegation," *WSJ* (Nov. 4, 2016), https://www.wsj.com/articles/national-enquirer-shielded-donald-trump-from-playboy-models-affair-allegation-1478309380; *see also* G.J. Testimony of ████ ████ at DANYGJ00073864 ██████████

[2] *See* Joe Palazzolo, "Trump Lawyer Arranged $130,000 Payment for Adult-Film Star's Silence," *WSJ* (Jan. 12, 2018), https://www.wsj.com/articles/trump-lawyer-arranged-130-000-payment-for-adult-film-stars-silence-1515787678; *see also* G.J. Testimony of ████ at DANYGJ00074601 ████████
████

4

in payments.[3]  Around the time of ███████ guilty plea, DANY opened investigation file No. 2018-00403803, titled "Investigation into the Business and Affairs of John Doe," which specifically targeted President Trump.  *See, e.g*, William K. Rashbaum, et al., "The Indictment Stems from a Nearly Five-Year Investigation," *New York Times* (Mar. 30, 2023), https://www.nytimes.com/live/2023/03/30/nyregion/trump-indictment-news#the-indictment-stems-from-a-nearly-five-year-investigation-of-donald-trump.

In March 2019, ██████ claimed to members of DANY ████████████████



(DANYDJT00001051-053).  During that same meeting, ███████████████████



███████████████████ *See id.*

On August 1, 2019, DANY issued a grand jury subpoena to the Trump Organization for all documents related to █████████████ and AMI.  Ex. 1 (DANY4495275).  The Trump Organization made a responsive production on or about August 15, 2019, which included substantially all of the documents at issue in the Indictment, including ███████ invoices, general ledger entries, the checks and stubs, and handwritten notes by ███████████ and Trump Comptroller ███████████

In November 2019, DANY began presenting this case to a grand jury.  The prosecutors referred to the matter as "████████████████████████

---

[3] U.S. Department of Justice, ███████████ Pleads Guilty In Manhattan Federal Court To Eight Counts, Including Criminal Tax Evasion And Campaign Finance Violations (Aug. 21, 2018), https://www.justice.gov/usao-sdny/pr/███████████-pleads-guilty-manhattan-federal-court-eight-counts-including-criminal-tax.

██████████████████████████ By the end of that month, DANY had met with or elicited grand jury testimony from, at least, ██████ (between January and October 2019), ██████ (October 2019), ████████ (November 2019), ████████ (November 2019), ██████ (November 2019), ██████ (August 2019), and ████████ (November 2019).

By the end of 2019, DANY decided that no charges would be brought against anyone in connection with the money paid to ██████ or the invoices by which ████████ had been reimbursed. *Pomerantz Inside Account* at 41. DANY stopped presenting evidence to the grand jury. In January 2023, less than two months after President Trump announced his candidacy for President of the United States, DANY commenced a new grand jury investigation, which led to the Indictment at issue.

### B.    Applicable Law

"New York guarantees criminal defendants the right to a . . . prompt prosecution." *People v. Regan*, 39 N.Y.3d 459, 464 (2023). The Court of Appeals has "long held that unreasonable delay in prosecuting a defendant constitutes a denial of due process of law," and "[a]n untimely prosecution may be subject to dismissal even though, in the interim, defendant was not formally accused, restrained or incarcerated for the offense." *People v. Singer*, 44 N.Y.2d 241, 253 (1978) (internal quotation marks omitted); *accord People v. Staley*, 41 N.Y.2d 789, 791 (1977) ("[U]nreasonable delay in prosecuting a defendant constitutes a denial of due process of law.").

In determining whether "a defendant's rights have been abridged" by a delayed prosecution, New York courts generally consider the following factors:

> (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay.

*People v. Taranovich*, 37 N.Y.2d 442, 445 (1975). "[N]o one factor or combination of the factors is necessarily decisive or determinative." *Wiggins*, 31 N.Y.3d at 24 (cleaned up).

### C.    Discussion

"[S]ociety, as well as the defendant, has an important interest in assuring prompt prosecution of those suspected of criminal activity," and "the People do not have discretion to indefinitely delay a defendant's trial in order to pursue evidence that would strengthen their case." *People v. Wiggins*, 31 N.Y.3d 1, 6 (2018). The extraordinary delay here supports a reasonable inference that this case is "a manifest abuse of power and nakedly political prosecution, funded (in part) with federal money, that has the potential to interfere with the exercise of presidential duties and with an upcoming federal election." *Bragg v. Jordan*, 2023 WL 2999971, at *12 (S.D.N.Y. Apr. 19, 2023). Therefore, dismissal—or at least a hearing to further develop the record regarding the reason for the delay—is necessary.

The extent of the pre-indictment delay weighs strongly in favor of dismissal. The indictment was filed six years after the conduct at issue, more than four-and-a-half years after DANY began to investigate it, and more than three years after DANY started presenting evidence to a grand jury. For example, *Regan* found a four-year delay to be "considerable," "excessive," and "cause for dismissal of the indictment." 39 N.Y.3d at 466. *Singer* involved a "42-month delay in commencing the prosecution." 44 N.Y.2d at 244; *see also Wiggins*, 31 N.Y.3d at 10 (holding that "there is no question that the six-year delay between the shooting in 2008 and defendant's guilty plea in 2014 was 'extraordinary'"); *People v. Cousart*, 58 N.Y.2d 62, 68 (1982) (holding that a "five-year delay prior to trial raises a presumption of prejudice"); *People v Montague*, 130 A.D.3d 1100, 1103 (App. Div. 3d Dep't 2015) ("The preindictment delay, which lasted nearly four years and 10 months, was clearly extensive.").

The purported reason for the delay also counsels in favor of dismissal. *See, e.g.*, *People v. Regan*, 39 N.Y.3d 459, 468 (2023) ("[W]e have never lightened the prosecution's burden to explain itself merely because the record does not establish the People's bad faith . . . ."); *Singer*, 44 N.Y.2d at 250 ("[A]ll the evidence was actually obtained by May of 1971, and the investigating officers felt that there was sufficient evidence to arrest and charge the defendant at that time, their superiors and the District Attorney apparently thought otherwise, and directed that there be further investigation." (cleaned up)); *People v. Wallace*, 26 N.Y.2d 371, 374 (1970) (dismissal for pre-arraignment delay appropriate where delay "was due solely to the inaction of the District Attorney"); *People v. Rogers*, 69 N.Y.S.3d 384, 389 (3d Dep't 2018) ("Where, as here, the delay is protracted, the burden is on the People to establish good cause."); *People v. Jones*, 194 N.Y.S.3d 694 (Sup. Ct. Kings Cnty. 2023) ("[T]his Court finds that the existence of a backlog of cases, the decision to prioritize other cases ahead of the instant indictment, and a lack of staff for a penumbra of reasons do not constitute good cause for a delay in commencing the instant prosecution.")

There can be no reasonable claim that the delay was based on missing evidence. By 2019, DANY had virtually all of the evidence that it used in the 2023 presentation to a different grand jury. This included the relevant documents from the Trump Organization and access to six of the nine witnesses relied upon in the 2023 grand jury presentation: ██████████████████ ████████████████████████████████ DANY presented three additional witnesses in 2023—████████████████████████—but none of them were significant to the charges and DANY could have subpoenaed all of them in 2019 had it wished.

The third *Taranovich* factor, the nature of the charge, also weighs in favor of President Trump. The charges are E felonies, and there is no suggestion that anyone suffered physical or financial harm from the alleged conduct. This case, then, is nothing like *Taranovich,* where the

defendant "was arrested for attempted murder, a class B felony, and indicted for assault in the first degree, a class C felony." 37 N.Y.2d at 446; *see also Wiggins*, 31 N.Y.3d a 16 ("It is undisputed that the charges against defendant, which included murder in the second degree, were serious."); *Montague*, 130 A.D.3d at 1103 (describing "26 counts of possessing a sexual performance by a child" as "very serious"); *People v. Rogers*, 8 A.D.3d 888, 890 (App. Div. 3d Dep't 2004) ("The charges here, four class B felonies, were serious crimes.).

Finally, under the final *Taranovich* factor, President Trump has been prejudiced by the delay. Indeed, prejudice must be presumed in light of the length of the delay. *See, e.g., Cousart*, 58 N.Y.2d at 68 (holding that a "five-year delay prior to trial raises a presumption of prejudice"); *see also Regan*, 39 N.Y.3d at 471 ("We have repeatedly held that if the first two factors favor defendant, establishment of prejudice is not required to find a due process violation . . . ."); *People v. Allen*, 789 N.Y.S.2d 56, 57 (2d Dep't 2004) (reasoning that, "since the prosecution failed to establish good cause for the delay, the delay was unreasonable and constituted a denial of due process of law . . . even in the absence of prejudice").

And, whether intentional or not, DANY's delayed prosecution—arising from a grand jury investigation that commenced approximately ten weeks after President Trump announced his candidacy—has prejudiced President Trump and the public by interfering with his presidential campaign. Moreover, DANY's delay eroded the memory of numerous witnesses. Accordingly, the Indictment should be dismissed.

## II.    THE CHARGES ARE LEGALLY DEFECTIVE

Pomerantz worried that "there was a big risk that felony charges would be dismissed before a jury could even consider them." *Pomerantz Inside Account* at 41. He was right. The People have failed to adequately plead criminal violations of Penal Law § 175.10, and their allegations

are not supported by the evidence presented to the grand jury.

### A. President Trump Did Not Cause False Entries in the Business Records of an Enterprise

The records forming the basis for Counts 1 through 34 were not business records under § 175.10 because, contrary to DANY's allegations, the records do not relate to the condition or activity of the Trump Organization.

### 1. Relevant Facts

Counts 1 through 34 of the Indictment allege that President Trump, on various dates in 2017, made and caused false entries in the business records of "an enterprise," which were "kept and maintained" by the Trump Organization. *See* Indictment (Counts 1-34). The alleged "business records" forming the basis of the charges fall into one of three categories: (1) invoices submitted by ▮▮▮▮▮▮▮▮▮ seeking payment from President Trump; (2) checks and check stubs drawn to pay ▮▮▮▮▮▮▮▮; and (3) ledger entries reflecting said payments. The accounts associated with those payments were those of President Trump and the Donald J. Trump Revocable Trust.

The first of the payments in question occurred on February 14, 2017. By that time, ▮▮▮▮ had resigned from the Trump Organization and begun a new role as President Trump's personal attorney. *See* G.J. Testimony of ▮▮▮▮▮▮▮▮ at DANYGJ00074643 ▮▮▮▮▮▮▮▮▮▮▮▮



▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ February 14, 2017 email from ▮▮▮▮▮▮▮ to ▮▮▮▮▮▮ (DANY000315-319) (signature line indicating ▮▮▮▮ was "The Personal Attorney to President Donald J. Trump"); *see also* Ex. 2, January 27, 2017 email from ▮▮▮▮▮▮ to "Trump Main Office" distribution list (DANY000121) (". . . I am truly excited to begin my new position as Personal Attorney to President Donald J. Trump. . . . I will very much

miss each and every one of you here at the Trump Organization and I would like to thank all of you for making my years here memorable ones. . . .").

████ invoices to President Trump confirmed that he was working in that capacity and not for the Trump Organization.  *See, e.g.*, July 11, 2017 email from ████████ to ████ ████████ (DANY000335-336) (indicating same).  Upon receipt, the invoices were marked as the records of President Trump and his personal trust.  *See, e.g.,* February 14, 2017 email from ████████ to ████████ (DANY000315-319) (bearing stamp indicating that document was for "DJTREV"); July 11, 2017 email from ████████ to ████████ (DANY000335-336) (bearing stamp indicating that document was for "DJT").

████ confirmed that the payments to ████ related to President Trump's personal expenses.  *See* G.J. Testimony of ████████ at DANYGJ00073981 ████████ ████████████████████████████████████████████████████ ████████████████████████████

████ was paid using the checking accounts of President Trump and his personal trust. *See, e.g.,* Donald J. Trump Revocable Trust account check and check stub dated February 14, 2017 (DANY000313-314); Donald J. Trump account check and check stub dated June 19, 2017 (DANY000367); *see also* G.J. Testimony of ████████ at DANYGJ00073954 ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████

The payments to ████ were also recorded in the ledgers of President Trump and his personal trust.  *See* "Voucher" log (DANY000312) (demonstrating payments were recorded in the ledger accounts of "DJT" and "DJTREV"); *see also* G.J. Testimony of ████████ at

11

DANYGJ00074039 (Q: "█████████████████████████████

████████████████████████ G.J. Testimony of ████████

████ at  DANYGJ00074042 ██████████████████████████

██████████

 Records of the payments were maintained by the Trump Organization, not as Trump

Organization records, but as the personal records of President Trump.  *See* G.J. Testimony of

████████████ at  DANYGJ00074019 ████████████████████████

████████████████████████████████████████████████

████████████████████████████████████ *see also* 2019 G.J.

Testimony  of  ██████████████  at  DANYDJT00018850-851 █████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████

 2.    Applicable Law

 Falsifying business records in the first degree is committed when a person, with the

requisite intent, makes or causes a false entry in the "business records" of an enterprise.  *People v.*

*Kisina*, 14 N.Y.3d 153, 158 (2010) (citing Penal Law §§ 175.10 and 175.05(1)).  A "business

record" is "any writing or article . . . kept or maintained by an enterprise *for the purpose of*

*evidencing or reflecting its condition or activity*."  Penal Law § 175.00(2) (emphasis added).

 A record may be "kept or maintained" in the files of an enterprise without reflecting its

condition or activity.  *See People v. Papatonis*, 243 A.D.2d 898, 900-01 (3d Dep't 2009) (affirming

dismissal where employment application was kept or maintained by a security company but did

not evidence or reflect the condition or activity of the business); *see also People v. Bel Air Equip.*

*Corp.*, 46 A.D.2d 773, 774 (2d Dep't 1974), *aff'd* 39 N.Y.2d 48 (1976) (reversing conviction where corporate defendant generated and then kept or maintained copies of padded vouchers but did not do so *for the purpose* of evidencing or reflecting its condition or activity).

       3.    <u>Discussion</u>

Even if the People can establish that the Trump Organization was an "enterprise,"[4] the records at issue were not "kept or maintained" to reflect the Trump Organization's "condition or activity" under Penal Law § 175.00(2). To the contrary, the payments were made to President Trump's personal lawyer, from President Trump's personal accounts, and documented on President Trump's personal ledgers, effectively his personal checkbook.

Courts have dismissed charges under Penal Law § 175.10 for this reason. In *Papatonis*, for example, the defendant's false application to a security company were not business records of the company because "no such application was 'kept or maintained' for the purpose of evidencing or reflecting the condition or activity of Advance Security." 243 A.D.2d at 900-01. The trial court dismissed the § 175.10 charge and the Third Department affirmed, reasoning that "the Grand Jury evidence failed to establish that element . . . , as indeed it could not." *Id.*; *see also People v. Golb*, 23 N.Y.3d 455, 469 (2014) ("Although defendant sent damning emails in Schiffman's name to NYU addresses, that does not constitute the creation or falsification of an NYU business record that is 'kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity.'"). Similarly, in *People v. Banks*, the court dismissed § 175.10 charges where the false records at issue did not concern the financial condition of the charitable "enterprises" identified in

---

[4] The People have identified "the Trump Organization" as "500 separate entities" known by a single trade name. Statement of Facts at 2. The defense does not concede by this motion that "the Trump Organization" is an enterprise within the meaning of §§ 175.00(1) and 175.10. An "enterprise" is defined as "*any entity* of one or more persons, corporate or otherwise, public or private, engaged in business, commercial, professional, industrial, eleemosynary, social, political or governmental activity." N.Y. Penal Law § 175.00(1) (emphasis added). By its plain meaning, the Trump Organization is not an enterprise.

the Indictment.  150 Misc. 2d 14, 17-19 (Sup. Ct. Kings Cnty. 1991).  Rather, as here, the records related to the financial condition of another entity.  *Id.*  The court reasoned that "[o]nly in the tautological sense that every piece of paper submitted to an enterprise by a person seeking to do business with it reflects the activity of that enterprise do the documents at issue here come within these statutes."  *Id.* at 19

These facts are different from those presented in *People v. Trump Corp., et al.*, Ind. No. 1472/2021*)*.  There, the ledger entry in question related to benefits that were purportedly received as income by ██████████ as the Chief Financial Officer of the Trump Organization.  Decision and Order at 4 (Sept. 6, 2022).  This Court reasoned that the entry, deleted from President Trump's personal ledger, was a business record of the Trump Organization for the purposes of Penal Law § 175.10 because it was both (1) kept and maintained by the Trump Organization and (2) evidenced the Trump Organization's obligations *vis a vis* ██████████ salary. In essence, the charge there was that President Trump was personally paying part of ██████████ salary for the Trump Organization, and therefore those payments reflected the business activity of the Trump Organization.  *Id*.  Here, in contrast, at the time in question ██████ was no longer working for the Trump Organization, the Trump Organization therefore had no obligation to pay ██████ and, in fact, did not make the payments in question.  Instead, paying ██████ was President Trump's personal obligation and he was in fact paid by President Trump personally—as the grand jury evidence confirmed.  Accordingly, the charges must be dismissed.

### B.    The People Have Not Identified A Viable Object Offense Under § 175.10

An essential element of the crime of Falsifying Business Records in the First Degree is that the business records were falsified with the "intent to commit another crime or to aid or conceal the commission thereof."  Penal Law § 175.10.  The People proffered four potential object offenses

in response to President Trump's request for a Bill of Particulars: the Federal Election Campaign Act ("FECA"), 52 U.S.C. § 30101 *et seq*.; New York Election Law § 17-152; New York Tax Law §§ 1801(a)(3) and 1802; and New York Penal Law §§ 175.05 and 175.10.  For the reasons set forth below, each of these theories is invalid.  Accordingly, the charges must be dismissed.

1.    <u>Federal Crimes Cannot Serve As Object Offenses</u>

The Federal Election Campaign Act ("FECA") is not a viable object offense because a federal offense is not a "crime" as that term is used in § 175.10.[5]

Under the Penal Law, the word "crime" means "a misdemeanor or a felony."  Penal Law § 10.00(6).  The definitions of "misdemeanor" and "felony," in turn, are restricted to "offense[s]."  Penal Law §§ 10.00(4)-(5).  An "offense" is

> conduct for which a sentence to a term of imprisonment or to a fine is provided by [1] any law of this state or [2] by any law, local law or ordinance of a political subdivision of this state, or [3] by any order, rule or regulation of any governmental instrumentality authorized by law to adopt the same.

Penal Law § 10.00(1) (emphasis added).

Like the first two clauses of Penal Law § 10.00(1), the third clause refers to instrumentalities of New York.  But, even if it did not, the federal statute at issue "is a law and cannot fairly be characterized as an order, rule, or regulation."  *People v. C.W.*, 72 Misc. 3d 1082, 1084 n.2 (Sup. Ct. Nassau Cty. 2021); *see also People v. Witherspoon*, 211 A.D.3d 108, 115 (2d Dep't 2022) (rejecting argument "that the definition of 'offense' in Penal Law § 10.00 (1) does not require the conduct to have resulted in a conviction in New York").  In *Witherspoon*, the Second

---

[5] Even if the Court concludes that federal crimes can serve as object offenses under § 175.10, the evidence does not establish that the payments violated FECA.  Under FECA, the third-party payments were not "contributions" or "expenditures" associated with President Trump's campaign because they were not made for the purpose of influencing an election and would have been made irrespective of the candidacy.  *See Buckley v. Valeo*, 424 U.S. 1, 80 (1976); *Orloski v. FEC*, 795 F.2d 156, 162-63 (D.C. Cir. 1986); 11 C.F.R. § 113.l(g)(6).  President Trump reserves the right to make these arguments, if necessary, at trial and in connection with any challenges to the sufficiency of the evidence and fairness of future proceedings.

Department analyzed Penal Law § 10.00(1) and found that, "[b]y clear and unambiguous language, 'any crime' in CPL 160.59(3)(f) does not include crimes under the laws of another state."[6]

      To our knowledge, no New York court has ever held otherwise with respect to § 175.10. *See Pomerantz Inside Account* at 41 ("[T]o charge Trump with something other than a misdemeanor, DANY would have to argue that the intent to commit or conceal a federal crime had converted the falsification of the records into a felony. No appellate court in New York had ever upheld (or rejected) this interpretation of the law."). And the New York Legislature is well aware of how to incorporate other jurisdictions' criminal offenses into a statute. *See e.g.*, Penal Law § 70.06(b)(i) ("For the purpose of determining whether a prior conviction is a predicate felony conviction . . . [t]he conviction must have been in this state of a felony, or in any other jurisdiction of an offense for which a sentence to a term of imprisonment in excess of one year or a sentence of death was authorized and is authorized in this state irrespective of whether such sentence was imposed"); Judiciary Law § 90(4)(e) ("[T]he term felony shall mean any criminal offense classified as a felony under the laws of this state or any criminal offense committed in any other state, district, or territory of the United States and classified as a felony therein which if committed within this state, would constitute a felony in this state."). To the extent the definition of "crime" under § 175.10 is ambiguous—and we submit that it is not—these other statutes expressly incorporating federal crimes, as well as the Rule of Lenity, require that § 175.10 be interpreted in President Trump's favor.

---

[6] The *Witherspoon* court noted that its "holding is limited to the construction of 'any crime' in CPL 160.59(3)(f)." 211 A.D.3d at 120. But the reasoning of the decision makes clear that the term "crime," as used in the Penal Law, is limited to offenses under the laws of New York and local instrumentalities within the State. As there is no contrary First Department precedent, this Court is bound by *Witherspoon*. *See People v. Turner*, 5 N.Y.3d 476, 482 (2005).

For all these reasons, the Court should hold that a federal crime cannot be the object crime under § 175.10.

>   2.      N.Y. Election Law § 17-152 Is Not An Object Offense

N.Y. Elec. Law § 17-152 is not a viable object offense.

First, campaign finance violations are addressed under Article 14 rather than Article 17 of the Election Law.

Second, N.Y. Election Law § 17-152 does not cover elections relating to federal positions. Rather, the statute is limited to elections for a "public office." The term "public officer" is defined by reference to jobs "of the state," including its subdivisions. N.Y. Elec. Law § 17-100(4); *see also Smith v. Jansen*, 85 Misc. 2d 81, 84 (Sup. Ct. Suffolk Cnty. 1975) ("The primary, necessary and fundamental test of a public office is that it should involve the exercise of some portion of the sovereign power of the State." (quoting *People ex rel. Henry v. Nostrand*, 46 N.Y. 375 (1871))).[7] Although Election Law § 1-102 contemplates parts of the Election Law chapter applying to federal elections under certain circumstances, that provision provides: "Where a specific provision of law exists in any other law which is inconsistent with the provisions of this chapter, such provision shall apply . . . ." Election Law §§ 17-100(4) and 17-152 are such "provision[s] of law," and they are "inconsistent" with § 1-102. Thus, the narrower scope of § 17-152, which is limited to state and local elections, governs.

Given the definition of "public officer," it is not surprising that the handful of reported cases that mention Election Law § 17-152 and its predecessor involve state elections. *See People v. Calogero*, 75 A.D.2d 455, 458 (4th Dep't 1980) ("New York State Assemblyman"); *Auer v.*

---

[7] The term "election" in § 17-152 is arguably broader, but the broader interpretation is cabined by the nearby term "public office," which only relates to elections for positions in New York.

17

*Smith*, 77 A.D.2d 172, 176 (4th Dep't 1980) ("Onondaga County Republic Committee"); *Matter of Consuello v. Pafundi*, 17 Misc. 3d 1108[A], *1 (Sup. Ct, Rensselaer County 2007) ("primary election in the City of Troy"); *People v. Duryea*, 76 Misc. 2d 948, 950 (Sup. Ct, N.Y. County 1972) ) (case under then-Election Law § 446 where the charge was a "conspir[acy] to promote the election of certain candidates to the Assembly"); *People ex rel. Willett v. Quinn*, 150 A.D. 813, 814 (2d Dep't 1912) (case under then-Penal Law § 773 where the election was a "Judicial convention held in and for the Second Judicial Department"). Similarly, the term "public servant" in Penal Law § 195.05 has been defined to limit the application of the bribery statute to "conduct which obstructs the functions of *state* and *local* government offices and officers," but not federal officers. *People v. Bilus*, 10 Misc. 3d 761, 766 (District Court of Nassau Cnty. 2005) (emphases in the original); *see also id.* at 766-67 (rejecting "the People's interpretation . . . that an officer or agent of a foreign government is a public servant and that such person could be prosecuted under the relevant Penal Law section for accepting a bribe"); *cf.* Hon. Martin Marcus, *et al.*, New York Criminal Law § 21:3 n.9 ("Even if the term 'public servant' could be interpreted to include federal officials and employees, the question may also arise whether the federal interest in prosecuting federal corruption preempts its prosecution in state court.").

Because the term "public office" is limited to state and local positions—and for reasons similar to those driving the conclusion that "crime" under § 175.10 does not apply to federal offenses—the term "unlawful means" in § 17-152 does not reach federal crimes such as violations of FECA.

Third, § 17-152 is preempted by federal law to the extent the People are attempting to use this section to prohibit conspiracies to violate FECA. "[T]he provisions of [FECA], and of rules prescribed under this Act, supersede and preempt any provision of State law with respect to

18

election to Federal office." 52 U.S.C. § 30143(a); *see also* 11 C.F.R. § 108.7(b) ("Federal law supersedes State law concerning the . . . [d]isclosure of receipts and expenditures by Federal candidates and political committees; and [l]imitation on contributions and expenditures regarding Federal candidates and political committees.").[8]  In this case, as a result of this preemption, § 175.10 is a nullity with no effect.  *See, e.g.*, *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("[W]here Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law.").  For this additional reason, § 17-152 cannot, as a matter of law, be the object crime.

3.    The People Did Not Establish Intent To Violate N.Y. Tax Law

The People's third theory is that the object crime was Tax Law §§ 1801(a)(3) and 1802, which jointly provides that it is a tax crime when a person "knowingly supplies or submits materially false or fraudulent information in connection with any return, audit, investigation, or proceeding . . . ."  Tax Law § 1801(a)(3). Although the People have refused to elaborate, this theory appears to be based on the fact that, according to ███████ instead of being reimbursed the $180,000 ██████ was supposedly owed, ███████ agreed to "gross up" this amount to $360,000 so that, after paying taxes on the whole amount, he would still be left with the $180,000.  *See, e.g.*,

---

[8] In the removal litigation, Judge Hellerstein ruled that "NYEL § 17-152 does not fit into any of the three categories of state law that FECA preempts," "[n]or is the conduct prohibited by NYEL § 17-152 covered by any other provision of FECA." *People v. Trump*, 2023 WL 4614689, at *11-12 (S.D.N.Y. 2023).  But that holding was premised on his finding that § 17-152 "does not define the range of 'unlawful means' that can be the object of the conspiracy." *Id.* In other words, Judge Hellerstein held that § 17-152 was not facially preempted as to federal elections because it could be applied to non-preempted things "such as voter fraud and ballot theft." But even assuming that is correct, and we respectfully disagree with his decision and are in the process of appealing it, Judge Hellerstein did not address President Trump's preemption argument here: § 17-152 is preempted where the "unlawful means" is a FECA campaign contribution violation. Indeed, Judge Hellerstein acknowledged that "election law[s] that directly target campaign contributions and expenditures . . . are preempted."  2023 WL 4614689, at *11.  Because that is how the People are seeking to use § 17-152 in this prosecution, that application of the statute is preempted.



G.J. Testimony of ███████████ at DANYGJ00074578-79.  In other words, ██████████ and ███ allegedly decided that ██████ would misreport the entire $360,000 as income on his tax returns and thereby *overpay* his taxes, instead of accurately reporting it as a mixture of income and reimbursement.  *See id.* at DANYGJ00074578 ████████████████████ ████████████████.

There was insufficient evidence before the grand jury to support this theory for two reasons. First, there was no evidence in the grand jury that the alleged overstatement of income on ██████ state tax return was "materially false or fraudulent information."  Indeed, the People did not present ████████ tax returns to the grand jury—likely because the returns would have shown that █████ did not take the $180,00 reimbursement as taxable income.

Second, there was insufficient evidence that President Trump knew about the alleged "grossing up."  ██████ testified that ████████████████████████████████ ██████████████████████  *see* G.J. Testimony of ██████████████ at DANYGJ00074578, and ██ ████████████████████████████████████████████████████ *see, e.g.*, *see* G.J. Testimony of ████████████ at DANYGJ00074581. But ███████ never testified that President Trump was aware of the "grossing up."  And there was no basis for the grand jury to infer President Trump's awareness of this crucial fact.  The alleged lie at the heart of the People's theory—which never came to pass because it was against ████████ top priority, *i.e.*, his personal interests—involved ██████ overpaying his taxes by approximately $180,000.  This is not a case where the other crime was self-evident or apparent to the defendant charged with falsifying business records.

Because the People did not establish that the payment involved a tax crime and that President Trump was aware of it, they did not meet their burden in the grand jury.

4.    The People Did Not Establish Intent To Violate Penal Law §§ 175.05 and 175.10

The People also contend that Penal Law §§ 175.05 and 175.10 can serve as object offenses for Counts 1 through 34. They have refused to elaborate on this theory, but it appears from the grand jury minutes that it is based on AMI business records relating to the ███████ payment. The People did not present evidence to the grand jury, however, that President Trump was aware of the falsity of the entries at issue.



███████ testified in the grand jury that ████████████████████████ ██████ AM-NYDA-008368, ███████████████████████ AM-NYDA-008369, ██████ ████████████████████████████████████ G.J. Testimony of ██████ ██████ at DANYGJ00074752-53. ██████ explained that ██████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ *Id.* at DANYGJ00074753; *see also id.* at DANYGJ00074759-60 ███████████████████[9] ██████ testified that ████████████████████████████████████████████ █████████████████████████████████ *Id.* at 1087.

_____

[9] ██████ also testified briefly ██████████████████████████████████ ████████████████████████████████████████████████ *See* G.J. Testimony of ██████████████████ at DANYGJ00074744-750. ██████████ testified that ████████████████ ████████████████ *Id.* at DANYGJ00074748. This document was not sufficient to establish an object offense in the grand jury. First, it was merely a draft that was never actually used. *Id.* at DANYGJ00074749-750. Second, there was no evidence before the Grand Jury that President Trump or ██████ was even aware of ████████████████ let alone that President Trump was aware that it was falsified and acted with intent to conceal that fact. Third, this document was not properly admitted into evidence in the grand jury, as no foundation was laid for its admittance as a business record. *Compare id.* at DANYGJ00074745 ██████████████████████████ DANYGJ00073773, ███████████████████████████████████████ *with id.* at DANYGJ00074750-751 ████████████████████ AM-NYDA-008368 and AM-NYDA-008369 ████████████████████████████

These allegedly falsified records of AMI could not have established the required object crime. These records were allegedly falsified in Augst 2016, prior to the timeframes charged in the Indictment. President Trump could not have falsified his records in 2017 with the intent to "commit" or "aid" the alleged AMI falsification that occurred the previous year. Nor did the People establish that President Trump acted to "conceal" the AMI records; there was no evidence that President Trump, ▓▓▓▓▓▓▓ or anyone at the Trump Organization was even aware of the issue. *See People v. Bloomfield*, 815 N.Y.S 572, 574 (1st Dep't 2006) ("[T]here is simply no evidence in the record that [defendant] knew that the purpose of the letter was to mislead the SEC . . . . the mere fact that the letters stated that a figurehead was the beneficial owner of 16 companies would not necessarily lead defendant Bloomfield to the conclusion that a crime was being committed."). Finally, for similar reasons, there was no evidence of "intent to defraud" by ▓▓▓▓ ▓▓▓▓ with respect to AMI records.

### C.    The Grand Jury Was Not Presented With Evidence Of Intent To Defraud

The indictment must be dismissed for the additional reason that there was insufficient evidence that President Trump acted with intent to defraud.

The People do not contend, nor does their evidence before the grand jury reflect, that President Trump intended to defraud anyone out of money, property, or something of pecuniary value. Rather, as reflected in the Statement of Facts, the People's theory of fraudulent intent appears to be that President Trump "caused his entities' business records to be falsified to disguise his and others' criminal conduct" in connection with the 2016 presidential election. Statement of Facts ¶ 4; *see also id.* ¶ 1; Bill of Particulars at 5-6 (referencing certain allegations from the Statement of Facts that "may" relate to the People's theory of fraudulent intent at trial). This defective theory cannot sustain the indictment.

Under Penal Law § 175.05, "intent to defraud" means "to cheat or deprive another person of property [or a thing of a value] [or a right]." 2 CJI N.Y. Penal Law § 175.05(1) at 1177 (1979).[10] In *People v. Keller*, the defendants were charged with submitting fraudulent records to American Express in connection with their escort service, which claimed that the charges were for "limousine services." 176 Misc. 2d 466, 469 (Sup. Ct. N.Y. Cnty. 1998). The court dismissed the charge, reasoning that there was no intent to defraud American Express of money or property because the only "intentional targets" of the deceit were the spouses or business associates of the defendants' customers. *Id.* The court distinguished other authorities by explaining:

> In each of those cases, the false form submitted was either intended to deprive the recipient of a benefit it was to receive from the form, imposed a detriment on the recipient which the truthful submission of the form was intended to prevent, or eviscerated the efficacy of the form itself.

*Id.* (emphasis added). The documents at issue in this case did none of those things. There was no evidence before the grand jury that President Trump intended to cheat anyone out of money or property through the allegedly falsified entries.

Moreover, DANY cannot expand "intent to defraud" under Penal Law § 175.05 by reference to the felony false filing statute, Penal Law § 175.35(1), which penalizes conduct undertaken "with intent to defraud the state or any political subdivision." *See People v. Kase*, 431 N.Y.S.2d 531, 537-38 (1st Dep't 1980), *aff'd* 53 N.Y.2d 989 (1981). Under Penal Law § 175.05, "intent to defraud" only reaches efforts to obstruct or impede a public function where the "enterprise" that received the records at issue is a government agency, or where a government agency is the intentional target of the falsification. *See, e.g., People v. Sosa-Campana*, 89

---

[10] The quoted language comes from the print version of the CJI. The on-line second edition of the CJI omits this language. "The omission was apparently not intended to be substantive." New York Criminal Law (4th Ed.) at §17:5 at 982 n.3.

N.Y.S.3d 75 (1st Dep't 2018) (impeded "enterprise" was police department responsible for traffic stop); *People v. Elliassen*, 20 Misc.3d 1143(A) (Sup. Ct. Richmond Cnty. 2008) (impeded "enterprise" was police department responsible for juvenile log and stop-and-frisk report); *Morgenthau v. Khalil*, 902 N.Y.2d 501, 510 (1st Dep't 2010) (defendants intended to evade reporting requirements and thus to impede regulators responsible administering anti-money laundering programs and Currency Transaction Reports). These authorities are inapposite here. There is no evidence of intent to defraud a government actor through the allegedly false documents at issue, *i.e.*, invoices, a general ledger, and checks all relating to a private individual. Because these documents had no connection to a government agency, DANY cannot rely on a theory that President Trump sought to impede a public function to prove "intent to defraud." As a result, and as in *Keller*, the grand jurors did not have "reasonable cause" to believe that President Trump acted with fraudulent intent.[11]

### D.    The People Should Be Required To Produce Complete Grand Jury Minutes

President Trump should be permitted to review the grand jury minutes in their entirety, including the People's arguments and discussions of the evidence, legal instructions, and responses to juror questions.

"The prosecutor's duty of fair dealing extends not only to the submission of evidence, but also to instructions on the law, for, by statute, responsibility for instructing the Grand Jury on the law rests solely with the court and the prosecutor, and the Grand Jury may not seek legal advice from any other source." *People v. Lancaster*, 69 N.Y.2d 20, 26 (1986). Specifically,

---

[11] To the extent the People seek to satisfy this element by claiming, as they do in their Statement of Facts, that the defendant sought to conceal "damaging information from the voting public during the 2016 presidential election" (Statement of Facts at ¶1), the Court can reject that argument. Such reasoning is both logically and legally flawed as the election that President Trump allegedly intended to influence took place on November 8, 2016, several months *before* his alleged falsification of records.

> [t]he legal advisors of the grand jury are the court and the district attorney, and the grand jury may not seek or receive legal advice from any other source. Where necessary or appropriate, the court or the district attorney, or both, must instruct the grand jury concerning the law with respect to its duties or any matter before it, and such instructions must be recorded in the minutes.

C.P.L. § 190.25(6); *see also, e.g.*, *People v. St. Victor*, 73 Misc. 3d 1204(A) (Sup. Ct. Kings Cnty. 2021) (dismissing indictment where prosecutor "made several fatal errors, . . . failing to deliver an adequate charge on the applicable law").

The indictment does not provide sufficient notice of the object-offense theories that the People relied upon to urge the grand jury to return felony charges against President Trump. *Cf. People v. Martinez*, 83 N.Y.2d 26, 32 (1993) ("[A] general verdict of guilt must be set aside where the jurors in reaching their verdict may have relied on an illegal ground or on an alternative legal ground and there is no way of knowing which ground they chose."); *Yates v. United States*, 354 U.S. 298, 312 (1957) (holding that "the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected."). It appears that the People may not have identified any specific offense to the grand jury as the object offense, and instead relied on the argument that President Trump had the general intent to commit another crime when allegedly falsifying his records.

There are also some indications that the People presented extraneous information to the grand jury. For example, the People elicited from ███████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████  *See* G.J. Testimony of ███████████ at DANYGJ00074758. But AMI's decision to

25

adopt that language in the context of an extremely favorable disposition of the federal investigation is not competent evidence as to President Trump. *See St. Victor*, 73 Misc. 3d 1204(A) (dismissing indictment where prosecutor's "fatal errors" included "proffering legally inadmissible evidence before the Grand Jury"). There is also evidence that the People proceeded based on views about the "venal and sordid nature of this conduct and the former president's willingness to engage in it," which are not a substitute for admissible evidence that establishes required elements of the crimes. *See Pomerantz Inside Account* at 192.[12]  Therefore, President Trump should be permitted to review all of the grand jury minutes to ensure that the grand jurors received accurate instructions on the law and were not urged to return a true bill based on improper considerations.

## III. PRESIDENT TRUMP WAS IMPERMISSIBLY TARGETED FOR PROSECUTION

The charges should also be dismissed because President Trump was impermissibly targeted for prosecution in violation of the Equal Protection Clauses of both the United States and New York Constitution.  At the very least, the information available at this time warrants further discovery and a hearing for a determination on President Trump's motion.

### A.    The Equal Protection Clauses Prohibit Selective Prosecution

The Equal Protection Clauses of the United States Constitution (Fourteenth Amendment) and the New York State Constitution (Article I, § 11) forbid a public authority from enforcing the laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances." *303 W. 42nd St. Corp. v. Klein*, 46

---

[12] Similarly, Pomerantz wrote with respect to this case that "I viewed it as serious criminal conduct, even though it seemed we could not thread the needle of NY's antiquated Penal Law to find an appropriate felony charge that was immune from legal challenges." *Pomerantz Inside Account* at 61; *see also* Ryan Goodman, *Pomerantz vs. Pomerantz: An Annotation of His Leaked Resignation Letter in Manhattan DA Trump Investigation*, Just Security, Feb. 7, 2023 ("It is difficult to fathom what those statements mean coming from an experienced defense lawyer and prosecutor.  The investigators thought Trump committed crimes, but they didn't know whether it fit the penal code? That is what defines criminal conduct.").

N.Y.2d 686, 693 (1979) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 373-374 (1886)).  Courts in this State have recognized this principle in cases involving the prosecution of New York law.  *Id.* (citing *People v. Acme Markets*, 37 N.Y.2d 326 (1975); *People v. Goodman*, 31 N.Y.2d 262 (1972)); *see also People v. O'Hara*, 9 Misc 3d 1113[A], 1113A, 2005 NY Slip Op 51516[U] (Sup. Ct. Kings Cnty. 2005).

To succeed on a motion to dismiss for selective prosecution, a defendant must show that the law was enforced with both an "unequal hand" and an "evil eye"—to wit, "there must be not only a showing that the law was not applied to others similarly situated but also that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification."  *People v. Blount*, 90 N.Y.2d 998, 999 (1997) (quoting *Klein*, 46 N.Y.2d at 693; *see also Crowley v. Courville*, 76 F.3d 47, 52-53 (2d Cir. 1996) ("A violation of equal protection by selective enforcement arises if: (1) the person, compared with others similarly situated, was selectively treated; and (2) . . . such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious  or bad faith intent to injure a person.").  The reason for dismissal is that "conscious discrimination by public authorities taints the integrity of the legal process to the degree that no court should lend itself to adjudicate the merits of the enforcement action." *Klein*, 46 N.Y.2d at 694; *see also Pomerantz Inside Account* at 262 ("Once prosecutors start handicapping the historical and political impact of their decisions, they start forfeiting their own legitimacy, and eroding confidence in the rule of law that is supposed to be their touchstone.")

In determining whether persons are similarly situated, "[t]he test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent." *Sonne v. Bd. of Trustees of Vil. of Suffern*, 67 A.D.3d 192, 203 (2d Dep't 2009) (citing *Penlyn Dev. Corp. v.*

*Incorporated Vil. Of Lloyd Harbor*, 51 F. Supp. 2d 255, 264 (E.D.N.Y. 1999). "Exact correlation is neither likely nor necessary." *Id.*; *see also People v. Nat'l Rifle Ass'n of Am., Inc.*, 75 Misc. 3d 1000, 1008 (Sup. Ct. N.Y. Cnty. 2022).

A defendant must also show that he has been singled out for an impermissible motive not related to legitimate governmental objectives. *Sonne*, 67 A.D.3d at 203. This can include "personal or political gain, or retaliation for the exercise of constitutional rights." *Id.* (citing *Bower Assoc. v Town of Pleasant Val.*, 2 N.Y.3d 617, 631 (2004); *Klein*, 46 N.Y.2d at 693). Certainly, the targeting of a defendant for prosecution based on his protected speech or political views is impermissible. *Klein*, 46 N.Y.2d at 697-98 (remanding case for a hearing on the merits of the selective enforcement where defendant alleged discrimination involving the exercise of 1st Amendment rights); *see also United States v. Oaks*, 508 F.2d 1403, 1404 (9th Cir. 1974) (holding that "a policy of selective prosecution which purposefully discriminates against persons choosing to exercise their First Amendment rights is impermissible").

Impermissible animus may be shown "when officials acknowledge uneven enforcement against a class that has been selected for some reason apart from effective regulation." *Klein*, 46 N.Y.2d at 695 (emphasis added); *see also Betty-June Sch., Inc. v. Young*, 25 Misc. 2d 909, 912 (Sup. Ct. Nassau Cnty. 1960) (granting judgment for schools where official admitted even enforcement building code and zoning ordinance between public and private schools). Even lacking such admissions, proof of intent may appear from a convincing showing of a grossly disproportionate incidence of nonenforcement against others similarly situated in all relevant respects save for that which furnishes the basis of the claimed discrimination. *Klein*, 46 N.Y.2d at 695. The more convincing the demonstration of the prosecution's "unequal hand"—*i.e.*, the grosser the disparity of enforcement and the greater the similarity between those prosecuted and

those not prosecuted—the stronger will be the inference of illicit motive. *Id.* Conscious discrimination may then stand out as the only reasonable explanation for the pattern of enforcement. *Id.*

### B. Presented Trump Was Selectively Targeted by the DA's Office for Prosecution, the Motivations for Which Were Impermissible

Beginning in 2018, DANY scoured every aspect of President Trump's life, both personal and professional, in the hopes of finding some legal basis to prosecute him. The Office was determined to pursue a case notwithstanding the facts—however far-fetched and novel—and now it has. Pomerantz, as one of the drivers of the investigation, confessed to being motivated to charge President Trump because "Trump was different," "[h]is behavior made me angry, sad, and even disgusted." *Pomerantz Inside Account* at 176. Suffice it to say that there were dissenting views about President Trump, including within DANY. They were known as "conscientious objectors." *Id.* at 194. By choosing to charge President Trump after a public dispute about the case involving its own personnel, DANY has violated President Trump's rights, called its integrity into question, and eroded confidence in the rule of law.

The charges are extraordinary and unprecedented, based upon a convoluted theory that by allegedly mis-booking payments to his personal attorney from his personal accounts, President Trump falsified the business records of the Trump Organization. Rarely has DANY prosecuted a case under any comparable strategy.[13] And in at least one notable instance, the Office declined to proceed on similar facts. Notwithstanding findings by the Federal Election Commission that

---

[13] *See* Ben Protess, Kate Christobek, Jonah E. Bromwich, William K. Rashbaum and Sean Piccoli, "In Trump Case, Bragg Pursues a Common Charge With a Rarely Used Strategy," *New York Times* (May 7, 2023), https://www.nytimes.com/2023/05/07/nyregion/trump-indictment-bragg-strategy.html.

Hillary Clinton's Manhattan-headquartered presidential campaign[14] improperly booked campaign expenses as legal payments in connection with the hiring of a research firm to prepare the so-called "Steele Dossier," DANY did not send a single subpoena to investigate.[15]  This is evidence of an "unequal hand."  *Klein*, 46 N.Y.2d at 693.

Although DANY declined to investigate, much less charge, Clinton, District Attorney Bragg campaigned on pursuing President Trump.  He reminded voters frequently that he, unlike his political opponents, had sued President Trump's administration "more than a hundred times."[16] He boasted that this track record was a significant reason why he was most qualified to serve as District Attorney: "I have investigated Trump and his children and held them accountable for their misconduct with the Trump Foundation. . . . I know how to follow the facts and hold people in power accountable."  *Id*.  His challengers acknowledged the obvious—Bragg took "political advantage" of his cases against President Trump at every available opportunity.  *Id*.

Ultimately, after District Attorney Bragg was elected as the new District Attorney, he was faced with serious concerns from his rank-and-file staff about weaknesses in the evidence. According to Pomerantz, District Attorney Bragg conceded that those around him—those from whom he sought counsel—had advised him against bringing any case against President Trump. *See Pomerantz Inside Account* at 229.  The evidence was simply too weak; the prospects of success

---

[14]  *See* FEC Form 3P, Hillary for America, Federal Election Commission (Nov. 23, 2016), https://www.fec.gov/data/committee/C00575795/?tab=about-committee (providing a Manhattan address for Hillary for America).

[15]  *See* Charlie Savage, "Democrats Agree to Pay $113,000 to Settle Campaign Spending Inquiry," *New York Times* (Mar. 30, 2022), https://www.nytimes.com/2022/03/30/us/politics/hillary-clinton-democrats-campaign-spending.html; *see also See* Hillary for America, Federal Election Commission, https://docquery.fec.gov/cgi-bin/com_detail/C00575795 (last visited Sept. 29, 2023)

[16] Jonah E. Bromwich, Benjamin Weiser and Maggie Haberman, "2 Leading Manhattan D.A. Candidates Face the Trump Question," *New York Times* (updated June 22, 2021), https://www.nytimes.com/2021/06/02/nyregion/manhattan-district-attorney-trump.html.

too uncertain.  At one point, District Attorney Bragg "commented that he 'could not see a world' in which [DANY] would indict Trump and call ███████████ as a prosecution witness."  *Id.* at 227.  Pomerantz believed that District Attorney Bragg had decided not to charge President Trump, and that he wanted to use the ruse of an ongoing investigation to deflect questions about the lack of charges.  *See id.* at 242.

When Pomerantz and others were unable to convince District Attorney Bragg that they had a valid legal theory for a criminal case against President Trump, they resigned.  Before leaving, Pomerantz warned District Attorney Bragg that his resignation was going to reflect poorly on him in the court of public opinion.  Pomerantz's resignation, his leaked resignation letter, and his tell-all book led to extraordinary public pressure on District Attorney Bragg, an elected official, to pursue charges against President Trump.  Because of the unprecedented nature of the charges, and the evidence that they resulted from political pressure rather than an unbiased assessment of the evidence in furtherance of a commitment to do justice, the charges against President Trump must be dismissed.

### C.    The Court Should Order a Hearing on the Issue of Selective Prosecution and Should Order DANY to Produce Discovery on this Issue

At a minimum, the public evidence and Pomerantz's book require that the Court authorize discovery and hold a hearing to resolve President Trump's selective-prosecution argument based on a developed record.

Where a party asserting a selective prosecution claim demonstrates a "reasonable probability" of success on the merits, "an evidentiary hearing before a judicial tribunal is mandated."  *Klein*, 46 N.Y.2d at 690; *see also People v. Bergen Beach Yacht Club*, 160 Misc. 2d 939, 944 (N.Y. Crim. Ct. 1994) (granting a hearing on a selective prosecution claim).  The burden of demonstrating a selective prosecution violation must not be so heavy as to preclude any realistic

opportunity for success, and "[l]atitude should be allowed in this complex area of proof." *Id.* at 695; *see also id.* (holding that "a strong inference of illicit motive will be all that can be expected because admission of intentional discrimination is likely to be rare; law enforcement officials are unlikely to avow that their intent was to practice constitutionally proscribed discrimination.").

In considering whether a defendant is entitled to a hearing, the court must recognize that the "difficulties in obtaining detailed knowledge of unprosecuted violators in order to meet the burden of demonstrating similarity are likely to be great." *Klein*, 46 N.Y.2d at 695.  Here, however, DANY's decision not to even investigate Ms. Clinton based on exceedingly similar facts—much less bring charges—serves as sufficient evidence of at least one "unprosecuted violator." Therefore, President Trump respectfully requests that the Court hold a hearing as to whether the charges in this case should be dismissed because of selective prosecution, grant discovery on this issue,[17] and dismiss the Indictment at the conclusion of the hearing.

## IV.    THE CHARGES ARE TIME-BARRED

### A.    The Statute of Limitations for Counts 1 Through 34 Has Run

Felony falsification of business records cases are subject to a five-year statute of limitations under CPL § 30.10(2)(b)  and must be commenced within five years of the commission of the alleged crime.  *See, e.g.*, *People v. Thomas*, 142 A.D.3d 1191, 1191 (2d Dep't 2016).[18]  A criminal

---

[17] This discovery provided by the DA's Office in anticipation of the hearing discovery should include: (1) communications and other documents from District Attorney Bragg and DANY, including Office-wide statistics, that describe the circumstances in which the Office has investigated potential violations of §§ 175.05 and 175.10; (2) documents relating to analysis of political implications of investigating or charting President Trump; (3) documents and communications of District Attorney Bragg and DANY relating to any outside pressure or advocacy in support of charging President Trump; (4) documents and communications of District Attorney Bragg and DANY concerning political speech and views of President Trump; and (5) documents and communications relating to the conduct that led to the FEC findings regarding Hillary Clinton.

[18] The applicable state of limitations for misdemeanors is two years.  *People v. Thomas*, 142 A.D.3d 1191, 1191 (2d Dep't 2016) (applying CPL § 30.10(2)(c) to misdemeanor charge for falsifying business records

action "commences with the filing of an accusatory instrument . . . in a criminal court." *Id.* (quoting CPL § 1.20(16)(a)).  DANY has not charged a continuing offense. *See, e.g., id.* at 1192 (falsifying business records not a continuing offense).  Thus, the crimes were complete when the alleged acts requisite to the criminal violation occurred. *See id.*; *see also People v. Minott*, N.Y.S.2d 499, 503 (Crim. Ct. N.Y. Cnty. 2013) ("For most offenses, identifying the date of commission is straightforward; the offense is committed on the date of occurrence.").

These principles compel the dismissal of all counts.  Each count is premised on conduct that was completed more than five years before the date the Indictment was filed in this Court, *i.e.*, April 4, 2023.  Any crimes that were allegedly completed before April 4, 2018, are untimely and must be dismissed.  The most recent alleged false business entry in the Indictment is charged in Count 34 and occurred in December 2017.  Accordingly, all of the charges are untimely.

## B.   The Statute of Limitations Was Not Tolled

Where a defendant "raise[s] a facially viable statute of limitations defense . . . the burden . . . shift[s] to the People to prove beyond a reasonable doubt that the statute of limitations was tolled or otherwise inapplicable." *People v. Thomas*, 142 A.D.3d 1191, 1191 (2d Dep't 2016).   Unless the People can establish that at least a part of that period was tolled, prosecution of the case is time-barred. *People v. Knobel*, 94 N.Y.2d 226, 229 (1999).  They cannot do so here.

### 1.   Executive Orders During The COVID-19 Pandemic Cannot Be Interpreted Against President Trump

Executive Orders issued during the COVID-19 pandemic were ambiguous and therefore cannot be interpreted against President Trump to toll the statute of limitations.

---

in the second degree).   Should the Court appropriately reduce the charges in the Indictment to a misdemeanor violation of Penal Law § 175.05, those counts must necessarily fail.

On March 20, 2020, then-Governor Andrew Cuomo issued an Executive Order relating to legal deadlines under New York law.  *See* 9 N.Y.C.R.R. § 8.202.8. The Order used the phrase "temporarily suspend or modify" twice, and it used the word "toll" once.  *Id.*  The distinction is important, as a "toll" excludes time from calculation under the statute of limitations but a "suspension" does not.  *See, e.g.*, *Chavez v. Occidental Chem. Corp.*, 35 N.Y.3d 492, 505 n.8 (2020). Governor Cuomo extended the Order nine times, and "most of the subsequent executive orders did not use the word 'toll.'"  *Brash v. Richards*, 149 N.Y.S.3d 560, 562 (2d Dep't 2021).

Courts have interpreted these Executive Orders to toll applicable deadlines in civil cases. *See, e.g.*, *id.*  To our knowledge, however, no appellate court has applied the Executive Orders to permit an otherwise-time-barred criminal prosecution to proceed.  Generally speaking, because of the Orders' ambiguous use of mixed language, the rule of lenity and fair-notice principles require that the Order be interpreted in favor of defendants such as President Trump.  *See People v. Green*, 68 N.Y.2d 151, 153 (1986); *People v. Barrett*, 13 Misc. 3d 929, 935 (Crim. Ct. N.Y. Cnty. 2006). That interpretation is particularly important in this case, where the People continued the investigated unhampered by pandemic, as evidenced by Pomerantz's account of the investigation. *See, e.g., Pomerantz Inside Account* at 97.

### 2.    CPL § 30.10 (4)(a) Does Not Apply

C.P.L.  §  30.10  provides that,  in  calculating  the  time  limitation  applicable  to commencement of a criminal action, the time calculated shall not include "[a]ny period following the commission of the offense during which the defendant was continuously outside this state." C.P.L. § 30.10(4)(a)(i).  The "statutory purpose  . . . emphasizes the difficulty of apprehending a defendant who is outside the State . . . the criminal without regard to a showing of any specific

intent of the defendant to thwart the prosecution by fleeing or hiding." *People v. Weinstein*, 170 N.Y.S. 3d 33 (1st Dep't 2022) (cleaned up).

This tolling statute should not apply in this case because President Trump was not "continuously" absent from the State and was not—and could not be—difficult to apprehend. Unlike a criminal defendant who evades prosecution by fleeing or hiding, President Trump's whereabouts have been and continue to be well known. Throughout the five-year statute of limitations, President Trump's time outside of the State remained intermittent, even as he resided in the White House and established permanent residence in Florida. He returned frequently to and maintained significant ties with the State of New York. He owned properties and businesses inside the State, and he was one of the single most tracked persons in the world. For these reasons, the Court should not apply the tolling statute.

## V.    THE MULTIPLICITOUS COUNTS MUST BE DISMISSED

The Indictment groups sets of charges based on the same alleged payments to ███. Insofar as multiple charges are based on the same payment, the charges are multiplicitous and must be dismissed.

### A.    Applicable Law

An indictment is multiplicitous when "two separate counts charg[e] what amounts to one single crime." *People v. Sensini*, 196 A.D.2d 376 (2d Dep't 1994). Multiplicitous counts are barred by the Double Jeopardy Clause of the Fifth Amendment and by New York's constitutional analog, N.Y. Const. art. I, § 6. These constitutional provisions "assure that the court does not exceed its legislative authorization by imposing multiple punishments for the same offense." *Brown v. Ohio*, 432 U.S. 161, 165 (1977). Moreover, a multiplicitous pleading is prohibited by C.P.L. § 200.20(1) ("An indictment must charge at least one crime and may, in addition, charge in

35

separate counts one or more *other* offenses" (emphasis added)); *see also People v. Horne*, 468 N.Y.S.2d 433, 437 (Sup. Ct. Kings Cnty. 1983) (use of the word "other" in § 200.20(1) serves to prevent "the charging of the same offense in separate counts").

Finally, a multiplicitous pleading violates an accused's Sixth Amendment right to a fair trial and Fourteenth Amendment right to due process, as well as New York's constitutional analogs.  N.Y. Const. art. I, § 6; *People v. Calabria*, 94 N.Y.2d 519 (2000).  A multiplicitous pleading implicates these fundamental rights because artificially dividing and charging a single crime in multiple counts "creates the risk that a defendant will be punished for, or stigmatized with a conviction of, more crimes than he actually committed."  *People v. Casiano*, 117 A.D.3d 1507 (4th Dep't 2014).  Moreover, "the prolix pleading may have some psychological effect upon a jury by suggesting to it that defendant has committed not one but several crimes."  *Horne*, 468 N.Y.S.2d at 437.

*Sensini* sets forth the standard New York test for prohibited multiplicity.  The defendant in *Sensini* was charged with, *inter alia*, two counts of second-degree manslaughter relating to a single incident.  Both counts were based on the same subdivision prohibiting recklessly causing the death of another person.  The first count charged the defendant with acting recklessly "while engaged in an illegal speed contest," while the second count alleged recklessness "while driving . . . at an excessive rate of speed."   In finding the two counts multiplicitous, the Appellate Division explained:

> Both count[s] . . . were premised on the same subdivision of the same statute . . . and, insofar as they applied to [the defendant], they differed only in that they were each supported by a different specification of recklessness.  They both related to the same mental state, the same act, the same course of conduct, and the same victim . . . [T]he second count is multiplicitous and subject to dismissal for this reason alone.

610 N.Y.S.2d at 546.

Any doubt as to whether counts are multiplicitous "must be resolved against turning a single transaction into a multiple offense." *Horne*, 468 N.Y.S.2d at 437; *see also Bell v. United States*, 349 U.S. 81, 83-84 (1955). And when a court determines that counts are multiplicitous, the remedy is dismissal of the multiplicitous counts. *People v. Smith*, 113 A.D.2d 905, 908 (2d Dep't 1985).

### B.    Discussion

The 34 counts in the Indictment are divided into 11 groupings relating to the initial payment to ▮▮▮ of $70,000 and the subsequent 10 payments to him of $35,000.[19]  Each group relates to a transaction during the charged course of conduct, and is broken down into charges relating to three types of documents: ▮▮▮▮ invoice, related entries in the general ledger system, and the check and check stub used for payment. In many cases, all three of these events occurred on the same day. ▮▮▮▮▮▮▮ the accounts payable clerk, described to the grand jury ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* G.J. Testimony of ▮▮▮▮▮▮ at DANYGJ00073897; G.J. Testimony of ▮▮▮▮▮▮ at DANYGJ00074070.

Under these circumstances, it is improper to proceed on multiple charges relating to each alleged payment to ▮▮▮ because the charges within the group are the product of the same

---

[19] The 11 groups are as follows: Counts 1-4 (paperwork and payment for January and February invoice); Counts 5-7 (paperwork and payment for March invoice); Counts 8-10 (paperwork and payment for April invoice); Counts 11-13 (paperwork and payment for May invoice); Counts 14-16 (paperwork and payment for June invoice); Counts 17-19 (paperwork and payment for July invoice); Counts 20-22 (paperwork and payment for August invoice); Counts 23-25 (paperwork and payment for September invoice); Counts 26-28 (paperwork and payment for October invoice); Counts 29-31 (paperwork and payment for November invoice); and Counts 32-34 (paperwork and payment for December invoice).

allegedly criminal act.  *See People v. Greene*, 213 A.D.3d 418, 418 (1st Dep't 2023) (finding perjury counts multiplicitous where the statements "were each made during the course of defendant's grand jury testimony and involved the circumstances under which defendant came into possession of the victim's phone") (citing *United States v. Ragland*, 3 F. App'x 279, 284 (6th Cir. 2001)); *People v. Williams*, 214 A.D.3d 828 (2d Dep't 2023) (finding three attempted rape counts multiplicitous because based on "an uninterrupted course of conduct occurring during the same time frame and at the same location"); *People v. Quinn,* 103 A.D.3d 1258, 1259 (4th Dep't 2013) (vacating one of two counts charging offering a false instrument for filing where charges were "based on the same [false] instrument").  As a result, the offending counts should be dismissed.

## VI.   THE COURT SHOULD ORDER THE PEOPLE TO PROVIDE ADDITIONAL PARTICULARS

President Trump seeks further particulars regarding the pending charges so that he can prepare his trial defense.

### A.   Relevant Facts

Pursuant to CPL § 200.95(3), defense counsel served the People with a bill of particulars request on April 27, 2023. Ex. 3 at 9-10.  In response, the People refused to provide most of the information requested.  *See* Ex. 3 at 1-7.  The letter identified four crimes that may constitute "another crime" for the charges under Penal Law § 175.10:  "New York Election Law § 17-152; New York Tax Law §§ 1801(a)(3) and 1802; New York Penal Law §§ 175.05 and 175.10; or violations of the Federal Election Campaign Act, 52 U.S.C. § 30101 et seq."  However, the letter also stated that the disclosures were made "expressly without limiting the People's theory at trial." Ex. 3 at 5.

### B.    Applicable Law

A defendant is entitled to "fair notice of the accusation made against him, so that he will be able to prepare a defense." *People v. Iannone*, 45 N.Y.2d 589, 594 (1978).  "[T]he indictment and bill of particulars must provide . . . information identifying the charged crime to satisfy statutory and constitutional requirements." *People v. Sanchez*, 84 N.Y.2d 440, 446 (1994).  Those statutory and constitutional requirements include sufficient notice of the charges to permit a defendant to investigate and prepare a defense to the charges, to raise the bar of double jeopardy to any subsequent prosecution in the event of conviction or acquittal of the charged offenses, and to ensure that the charges upon which the defendant is to be tried have been found by the grand jury, and not simply made up by the prosecutor to meet the exigencies of trial. *See* U.S. Const. amends. VI, XIV; N.Y. Const. art. I, § 6; CPL § 200.50(7); *Bousley v. United States*, 523 U.S. 614, 618 (1998) (defendant's receipt of "real notice of the true nature of the charges against him [is] the first and most universally recognized requirement of due process").

The purpose of a bill of particulars "is to give the defendant notice of the essential facts supporting the crimes and thus avoid prejudicial surprise at trial."  Wright & Miller, *Federal Practice and Procedure: Criminal* § 130 (5th ed. 2023).  Since "the defendant is presumed to be innocent and may in fact be innocent of the charge, he should also be presumed to be ignorant of the facts on which the charges are based."  *Id.*; *see also People v. Einhorn*, 346 N.Y.S.2d 986, 995 (N.Y. Sup. Ct. 1973) (explaining that defendant "is entitled to such particulars regarding the nature and character of the crime as may be necessary for his defense"); *see also People v. Fitzgerald*, 45 N.Y.2d 574, 580 (1978) (defendant has a "right" to be informed of the means by which his alleged conduct violated the criminal negligence statute, including "what conduct on his part involved a

substantial and unjustifiable risk of death or injury and a gross deviation from the standard of reasonable care" (internal quotation marks omitted)).

### C.    Discussion

To date, the People have proceeded as vaguely as possible. Whatever the strategic purpose behind that approach may be—whether to obscure legal infirmities or hide the ball—it is no longer viable as the trial date looms.

The Court should require the People to provide a bill of particulars addressing all President Trump's initial requests. This relief is required because the following issues, among others, remain unclear:

- Final and conclusive notification of the object "crimes" relied upon as predicates for felony charges under Penal Law § 175.10;

- If the People continue to rely on Election Law § 17-152 as an object offense, the "unlawful means" alleged;

- If the People continue to rely on Tax Law §§ 1801(a)(3) and 1802 as an object offense, whose tax records were intended to be falsified and how;

- If the People continue to rely on Penal Law §§ 175.05 and 175.10 as an object offense, the particular enterprise and records that were allegedly falsified; and

- The factual basis for the People's "intent to defraud" allegations with respect to each count.

In response to our request for particulars, DANY relied on *People v. Mackey* for the proposition that "the People need not prove intent to commit or conceal a particular crime." 49 N.Y.2d 274, 277-79 (1980). DANY has not cited a case applying *Mackey* to § 175.10, and its reasoning is not persuasive. *See* 49 N.Y.2d at 283 ("[C]onfronted with the precise question in the context of similarly worded burglary statutes, most courts have held indictments themselves insufficient for failure to specify the particular crime intended upon entry." (Fuchsberg, J., dissenting in part)).

40

*Mackey* related to second degree burglary, in violation of Penal Law § 140.25, which is committed when a person, *inter alia*, "knowingly enters or remains unlawfully in a building with *intent to commit a crime* therein." *Id.* (emphasis added). The "general intent" element discussed in *Mackey* is what makes an unauthorized entry a burglary; that level of intent is required for all forms of burglary under New York law, which is a "form of attempt crime" with a unique history entirely distinct from that of Penal Law § 175.10. *People v. Gaines*, 74 N.Y.2d 358, 361 (1989). In contrast, § 175.10 elevates falsification of business records to a felony where "intent to defraud *includes* an *intent to commit another crime* or to aid or conceal the commission thereof." Unlike burglary, this additional *mens rea* is what distinguishes between the second-degree version of the crime in § 175.05. And, unlike burglary, there is already an elevated *mens rea* in both §§ 175.05, 175.10 —"intent to defraud"—that is not consistent with the "general intent" reasoning in *Mackey* (including the case's policy arguments). For example, whereas *Mackey* applied emphasis to the article, "a," preceding "crime" in Penal Law § 140.25 to conclude that the statute requires general criminal intent, the reference to "another" crime in § 175.10 suggests that the Legislature intended to require more. *See* 49 N.Y.2d at 278. Consistent with that interpretation, the operative phrase here—"intent to commit another crime"—is an add-on to "intent to defraud" under § 175.10. Where a defendant is already proven to have acted with the "intent to defraud," requiring only general criminal intent with respect to "another crime" would not differentiate § 175.05 from § 175.10. Thus, especially in light of the risk that the jury could impermissibly rely on evidence of intent to commit a federal crime under the circumstances of this case, DANY must disclose more details regarding its legal theory to avoid prejudice to President Trump. And DANY must be bound by those disclosures at trial.

The *Mackey* court also noted that, "[h]ad defendant's motion for particulars demanded the basis upon which the People would contend that he intended to commit a crime its denial may have been error (CPL 200.90)." *Id.* at 280. This is especially true where the additional information would "affect[t]" the "defendant's trial strategy." *Id.* at 281. Our particulars request seeks a description of "the substance" of President Trump's "conduct" as to each count charged in the Indictment. Thus, even if the Court declines to require the People to specify the "[]other crimes" by name, they should be ordered to provide "the basis upon which the People w[ill] contend that [President Trump] intended to commit" the charged crimes. This will prevent unfair surprise at trial.

## VII.    THE COURT SHOULD HOLD A HEARING REGARDING GRAND JURY SECRECY VIOLATIONS

Leaked information regarding grand jury proceedings relating to the investigation has prejudiced President Trump by creating political pressure on the prosecutors and grand jurors to indict him. A hearing is warranted to determine the extent of the leaks, the intent behind them, and the resulting prejudice. President Trump respectfully submits that the hearing will provide alternative basis for dismissal of this case.

### A.    Applicable Law

"Grand jury proceedings are secret." C.P.L. § 190.25(4)(a). "New York case law recognizing the sanctity of grand jury secrecy dates as far back as the year 1825, and the predecessor statute of CPL 190.25 dates back from at least 1881." *Matter of James v. Donovan*, 130 A.D.3d 1032, 1036 (App. Div. 2d Dep't 2015); *see also Matter of Friedman v. Rice*, 134 A.D.3d 826, 829 (App. Div. 2d Dep't 2015) "([S]ecrecy has been an integral feature of Grand Jury proceedings since well before the founding of our Nation."). The secrecy requirements prohibit disclosure of "the nature or substance of any grand jury testimony," or "any decision, result or

other matter attending a grand jury proceeding." C.P.L. § 190.25(4)(a); Penal Law § 215.70. The

reasons are several and include "protection of an innocent accused from unfounded accusations if

in fact no indictment is returned." *Troy Pub. Co. v. Dwyer*, 110 A.D.2d 327, 329 (3d Dep't 1985).

"So strong are the principles of grand jury secrecy and the policies underlying it that

unauthorized disclosure of grand jury evidence is a felony in New York." *Matter of James*, 130

A.D.3d at 1036; *see also Trump v. Vance*, 140 S. Ct. 2412, 2427 (2020) ("But those who make

unauthorized disclosures regarding a grand jury subpoena do so at their peril." (citing Penal Law

§ 215.70)). Violations of grand jury secrecy rules can warrant dismissal of an indictment. *See*

C.P.L. §§ 210.20(1)(c), 210.35(5), 210.40. One relevant factor is whether the "disclosure" was

"in the form of a stealthy leak designed to gain tactical advantage over an adversary or to

manipulate the press or public opinion." *People v. Sergio*, 16 Misc. 3d 1127[A], 1127A (Sup. Ct,

Kings Cnty. 2007).

### B.    Discussion

Public reporting, including the *Pomerantz Inside Account*, strongly suggests that grand jury

information was leaked to the public during the investigation of President Trump. For example:

- In May 2021, the *Washington Post* and *Associated Press* reported that DANY had convened a special grand jury to investigate President Trump. The *Associated Press* story was attributed to a "person familiar with the matter [who] was not authorized to speak publicly and did so on condition of anonymity."[20]

- On November 24, 2021, the *New York Times* ran an article, "Trump Investigation Enters Crucial Phase as Prosecutor's Term Nears End." The article referenced grand jury subpoenas for records, disputes over document production and sealed litigation on that topic, and a recent Deutsche Bank interview. The *Times* reported that the developments, as described by "people with knowledge of the matter," showed that the Manhattan prosecutors had shifted away from investigating

---

[20] Michael R. Sisak, New "Grand Jury Seated for Next Stage of Trump Investigation," *Associated Press* (May 25, 2021), https://apnews.com/article/donald-trump-trump-investigations-business-government-and-politics-80592eae7ba9ca508a3161e085a0fec6.

President Trump's taxes.   Rather, they were refocusing their three-year investigation on President Trump's statements about the value of his assets.[21] According to Pomerantz, this article prompted him to consider whether there was a leak.  *Pomerantz Inside Account* at 178-179.

- By February 2022, as District Attorney Bragg reached a conclusion against bringing charges, Pomerantz and others at DANY knew that the *New York Times* was preparing to publish the story that the grand jury was on "pause."  *Pomerantz Inside Account* at 239.  By his own account, Pomerantz threatened District Attorney Bragg that the *Times* would learn of his and Carey Dunne's resignations "very quickly" and suggested they may also learn that District Attorney Vance had previously directed the team to push forward with charges.  *Pomerantz Inside Account* at 244-245.  The *Times* ran the story on February 24, 2022, reporting that District Attorney Bragg's serious doubts about the case had caused Pomerantz and Dunne to leave.[22]

- 11 months later, in January 2023, NPR reported that DANY was once again presenting evidence to a grand jury.  Citing a "person familiar with the investigation," NPR wrote that DANY was presenting evidence that President Donald Trump committed crimes in connection with payments made to ███████ ███████[23]

- In March 2023, the *New York Times* reported that DANY signaled to President Trump's lawyers that he could face criminal charges.  According to sources, DANY offered President Trump the option to testify.  The *Times* described the development as "the strongest indication yet that prosecutors are nearing an indictment of the former president."[24]

- And in the days leading to President Trump's indictment, *Politico* reported that the Manhattan grand jury examining this case was not expected to hear evidence for several weeks, pushing any indictment to late April.[25]  *Business Insider* similarly

---

[21] Ben Protess, William K. Rashbaum, Jonah E. Bromwich and David Enrich, "Trump Investigation Enters Crucial Phase as Prosecutor's Term Nears End," *New York Times* (Nov. 24, 2021), https://www.nytimes.com/2021/11/24/nyregion/trump-investigation-cyrus-vance.html.

[22] Corey Kilgannon, "A Blow to the Manhattan Case Against Trump," *New York Times* (Feb. 24, 2022), https://www.nytimes.com/2022/02/24/nyregion/trump-criminal-investigation-manhattan.html.

[23] Andrea Bernstein, "Manhattan DA Presenting Evidence in Trump-██████ Investigation to Grand Jury," *NPR* (Jan. 30, 2023), https://www.npr.org/2023/01/30/1152610050/manhattan-da-presenting-evidence-in-trump-██████-investigation-to-grand-.

[24] William K. Rashbaum, Ben Protess and Jonah E. Bromwich, "Prosecutors Signal Criminal Charges for Trump Are Likely," *New York Times* (Mar. 9, 2023, last updated Apr. 4, 2023), https://www.nytimes.com/2023/03/09/nyregion/trump-potential-criminal-charges-bragg.html.

[25] Erica Orden, "Manhattan Trump Grand Jury Set to Break for a Month," *Politico* (March 29, 2023), https://www.politico.com/news/2023/03/29/manhattan-trump-grand-jury-set-to-break-for-a-month-00089422.

reported that the grand jury would not revisit the investigation until the week of April 24 at the earliest. The article noted, however, that a source indicated that it was "entirely possible" that the grand jury had already voted.[26]

The evidence of grand jury leaks throughout the investigation of President Trump is so serious that Pomerantz invoked the Fifth Amendment when testifying before Congress regarding these issues in May 2023.[27]

The full extent and nature of DANY's unauthorized disclosures to the press, and the scope of the prejudice it caused to the defendants in this case, cannot be fully known based on the present record. In order to discover the exact extent and nature of these disclosures, we therefore respectfully submit that the Court:

1.    Order that unredacted copies of all emails between members of DANY and members of the press, as well as all emails memorializing conversations between members of the DANY and members of the press, be turned over to the defense; and

2.    Order that a hearing be held where DANY personnel who participated in the investigation testify about the nature and content of conversations with the press, as well as all interactions between DANY and the press regarding these grand jury investigations.

After a review of the unredacted emails, as well as hearing testimony from relevant witnesses, the Court, with the assistance of further briefing, can determine the appropriate sanction for DANY's unauthorized disclosure of grand jury testimony and matters. *See United States v. Silver*, 103 F. Supp. 3d 370, 380-81 (S.D.N.Y. 2015) (holding that "dismissal might be appropriate in instances where the defendant can show . . . misconduct, spanning several cases, that is … systematic and pervasive." (quotations omitted)).

---

[26] Natalie Musumeci, Jacob Shamsian, and Laura Italiano, "The Trump Grand Jury is Taking a Weekslong Break, Clouding When Potential Charges Could be Filed Against the Former President," *Business Insider* (Mar. 29, 2023), https://www.businessinsider.com/donald-trump-hush-money-grand-jury-weeks-long-break-report-2023-3.

[27] Amee Latour, "Former Trump Probe Prosecutor Invokes the Fifth at Deposition," *The Hill* (May 12, 2023), https://thehill.com/newsletters/evening-report/4002472-former-trump-probe-prosecutor-invokes-the-fifth-at-deposition/.

**VIII.    DANY's CERTIFICATES OF COMPLIANCE ARE DEFECTIVE**

DANY is not in compliance with their discovery obligations under C.P.L. § 245.50.

**A.    Applicable Law**

Pursuant to C.P.L. § 245.50(1), DANY must affirm that "after exercising due diligence and making reasonable inquiries to ascertain the existence of material and information subject to discovery, the prosecutor has disclosed and made available all known material and information subject to discovery." *Id.*  The district attorney's obligation is thus twofold: (1) it must exercise due diligence to ascertain the existence of material subject to discovery, and then (2) it must produce all material subject to discovery to the defendant. *See People v. Adrovic*, 130 N.Y.S.3d 614, 620 (N.Y. Crim. Ct. 2020) (striking certificate of compliance where prosecutor failed to exercise due diligence to identify discoverable materials).

The term "material subject to discovery" requires disclosure of "all items and information that relate to the subject matter of the case and are in the possession, custody or control of the prosecution or persons under the prosecution's direction or control," and includes 21 non-exhaustive categories of materials that must be produced.  C.P.L. § 245.20(1)(a)-(u).

As relevant here, C.P.L. § 245.20(1)(o) provides that the "prosecution shall disclose to the defendant . . . [a]ll tangible property that relates to the subject matter of the case, along with a designation of which items the prosecution intends to introduce in its case-in-chief at trial or a pre-trial hearing." *See People v. Faison*, 73 Misc. 3d 900, 907 (Crim. Ct. Kings Cnty. 2021) ("Similarly, by providing that the People must disclose 'all tangible property that relates to the subject matter of the case, along with a designation of which items the prosecution intends to introduce in its case-in-chief,' the text of CPL 245.20 (1)(o) expresses that the subject matter of a case is broader than what the People intend to use at trial.").  C.P.L. § 245.20(1)(o) also provides that:

If in the exercise of reasonable diligence the prosecutor has not formed an intention within the time period specified in subdivision one of section 245.10 of this article that an item under this subdivision will be introduced at trial or a pre trial hearing, the prosecution shall notify the defendant in writing, and the time period in which to designate items as exhibits shall be stayed without need for a motion pursuant to subdivision two of section 245.70 of this article; but the disclosure shall be made as soon as practicable and subject to the continuing duty to disclose in section 245.60 of this article.

## B.    Discussion

DANY filed Certificates of Compliance relating to its statutory discovery obligations on July 24, 2023, July 27, 2023, August 4, 2023, August 11, 2023, and September 22, 2023.  The Court should strike these certificates and order DANY to comply with its discovery obligations for two reasons.

First, DANY listed 33 books in its July 24, 2023 Addendum A to the Automatic Discovery Form.  *See* Ex. 4.  DANY did not produce these books in discovery, and it has not specified the specific parts of the books that the prosecutors believe are relevant and will be used at trial.  The Court should order DANY to disclose those specifications.

Second, and more generally, DANY is not in compliance with C.P.L. § 245.20 (1)(o).  For the books and the rest of the discovery, the prosecutors have not designated any documents that they plan to use in their case-in-chief.  This deficiency is particularly prejudicial in light of the fact that the discovery in this case contains more than 1.6 million records spanning over more than 10 million pages.  Moreover, DANY's deficiency is inexcusable in light of the fact that the Court ordered DANY in a related case to "identify which exhibits they intend to introduce in their case in chief."  Aug. 12, 2022 Tr. 8, *People v. Trump Corp., et al.*, Ind. No. 1472/2021.

For both of these reasons, the Court should strike the certificates of compliance and order DANY to comply forthwith with its discovery obligations.  *See, e.g., People v. McKinney*, No.

CR-019208-20KN, 71 Misc. 3d 1221(A), at *5 (Crim. Ct. Kings Cty. May 9, 2021) ); *People v. Rosario*, 70 Misc. 3d 753, 758-59, 766-67 (County Ct. Albany Cty. Nov. 20, 2020) ).

## CONCLUSION

For the foregoing reasons, the Indictment should be dismissed or, in the alternative, the Court should hold hearings on President Trump's motions regarding preindictment delay, selective prosecution, and grand jury secrecy. If the case proceeds, the Court should order DANY to provide a bill of particulars.

Dated:      September 29, 2023
            New York, N.Y.

Susan R. Necheles                              By: /s/ Todd Blanche
Gedalia Stern                                  Todd Blanche
Steven Yurowitz (of Counsel)                   Emil Bove
NechelesLaw LLP                                Stephen Weiss
1120 Sixth Avenue, 4th Floor                   Blanche Law PLLC
New York, NY 10036                             99 Wall Street, Suite 4460
212-997-7400                                   New York, NY 10005
srn@necheleslaw.com                            212-716-1260
                                               toddblanche@blanchelaw.com

                                               *Attorneys for President Donald J. Trump*