# EXHIBIT G

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

THE PEOPLE OF THE STATE OF NEW YORK

- against –

DONALD J. TRUMP

Defendant

Indictment No.
71543/2023

Decision and Order

JUAN M. MERCHAN, A.J.S.C.:

Defendant's motions are decided as follows:

On September 29, 2023, Defendant Donald J. Trump (hereinafter "Defendant") filed omnibus motions seeking various forms of relief including dismissal of the indictment on the grounds that the charges are legally defective and because of preindictment delay. Defendant also demands a more robust bill of particulars. The People responded on November 9, 2023. Defendant's reply was filed on November 21, 2023 and the People's sur-reply on November 27, 2023[1].

The People presented evidence to the Grand Jury that between August 2015 and December 2017, Michael Cohen ("Cohen"), a lawyer who worked for the Trump Organization and also held the role of Defendant's Special Counsel, paid $130,000 to Stormy Daniels (also known as Stephanie Clifford hereinafter "Daniels") prior to the 2016 presidential election. The payment was part of an agreement between Defendant and Daniels whereby Daniels agreed to not publicize information about a sexual encounter she had with the Defendant. Defendant was concerned about the negative impact that information could have on his campaign for President of the United States.

By way of background, on or about August 2015, Defendant met with Cohen and David Pecker ("Pecker"), then Chairman and Chief Executive Officer of America Media Incorporated

---

[1] The following allegations are taken from a review of the Grand Jury Minutes and accompanying exhibits, Defendant's Memorandum of Law in Support of Donald J. Trump's Omnibus Motion, Defendant's Affidavit in Support of his Omnibus Motion and accompanying exhibits, Defendant's Reply, the People's Memorandum of Law in Opposition to Defendant's Omnibus Motion and accompanying exhibits, the Christopher Conroy Affirmation in Support of the People's Opposition to Defendant's Omnibus Motion, the People's Sur-Reply, and the Statement of Facts accompanying the Indictment.

1

("AMI")². Defendant, Cohen, and Pecker came to an agreement that AMI would assist Defendant with his campaign for president by alerting Cohen if any potentially negative story about the Defendant was discovered so that a plan could be implemented to prevent its publication. The agreement was communicated to Dylan Howard ("Howard"), then AMI's Chief Content Officer and Editor-in-Chief of the National Enquirer.

As agreed, on or about June 2016, Howard alerted Cohen about a woman named Karen McDougal ("McDougal"), who alleged that she had an extramarital relationship with Defendant. Defendant directed Cohen to purchase the information from McDougal to prevent the story's publication. Subsequently, AMI paid McDougal $150,000 with the understanding that Defendant, or the Trump Organization, would reimburse AMI. The payment to McDougal was recorded in AMI's books and records as a promotional expense and paid out of Pecker's AMI budget. This was vital in executing the plan to keep McDougal's information, as well as payment for said information, out of the public's eye. By keeping the payment in the president's budget, Pecker was able to "avoid approval requirements that would have applied had the payment been accurately recorded." People's Opposition to the Defendant's Omnibus Motion (hereinafter "People's Opposition) at pg. 4.

Thereafter, Defendant and Cohen discussed how the rights to the McDougal story could be purchased from AMI and how AMI would be paid. After the conversation, and further discussion with then Trump Organization Chief Financial Officer, Allen Weisselberg ("Weisselberg"), Cohen created a shell company called Resolution Consultants LLC. On or about September 30, 2016, Cohen and Pecker came to an agreement that AMI would be paid $125,000 from Resolution Consultants LLC, in exchange for the rights to McDougal's story. An invoice was created which described this payment as "advisory services."

On or about October 10, 2016, Cohen spoke with Keith Davidson ("Davidson"), then the attorney for Daniels, about Daniels' sexual encounter with Defendant. At Defendant's direction, Cohen and Davidson agreed that Daniels would keep the information about the encounter with Defendant concealed, out of the public's eye, in exchange for $130,000. As with the McDougal agreement, Cohen discussed payment for the Daniels agreement with Weisselberg. After this discussion, Cohen agreed he would pay Ms. Daniels after confirming that Defendant would reimburse him. To execute the transaction, Cohen opened a bank account in the name of Essential

---

² AMI, currently named A360 Media, LLC, was a publisher of magazines, including the National Enquirer.

Consultants LLC. He transferred $131,000 into the account from his personal funds and then wired Davidson $130,000 from the Essential Consultants account.

On or about January 2017, Defendant, Weisselberg and Cohen agreed that Cohen would be paid a total of $420,000 to reimburse him for the payment to Daniels. The total represented a $60,000 year end bonus to Cohen for his work at the Trump Organization in 2016, the $130,000 payment he made to Daniels, a $50,000 payment to Cohen for expenses he claimed he incurred working on Defendant's campaign and an additional $180,000 to ensure Cohen was fully reimbursed after taxes. It was agreed that the $420,000 would be paid in installments on invoices Cohen would periodically send to Defendant through the Trump Organization for alleged legal services rendered. On or about February 2017, the Defendant and Cohen met to formalize this arrangement.

From February 2017 through December 2017, Cohen submitted invoices to the Trump Organization as per the agreement with Defendant. This included eleven invoices that were addressed to Weisselberg. The invoices were assigned a general ledger code and entered into the Trump Organization's detail general ledger. Checks were then generated and sent to Cohen. The first check, which was signed by Weisselberg and Eric Trump, and the second check, which was signed by Weisselberg and Donald Trump Jr., were paid from the Trump Revocable Trust. The remaining nine checks were signed by the Defendant and paid from his personal bank account.

On March 30, 2023, the Defendant was indicted by a Grand Jury on thirty-four counts of Falsifying Business Records in the First Degree in violation of Penal Law § 175.10 (hereinafter "PL"). The invoices, detail general ledger entries and checks form the basis of the thirty-four counts in the indictment.

## I. PRE-INDICTMENT DELAY

Defendant moves to dismiss the indictment on the grounds that he was prejudiced as a result of alleged pre-indictment delay. In the alternative, Defendant seeks a *Singer* hearing to determine whether the delay between the commission of the alleged crimes and his arrest violated his Due Process rights. *People v. Singer*, 44 N.Y.2d 241 [1978]. For the reasons set forth below, this branch of Defendant's motion is denied.

When considering pre-indictment delay, a court must analyze five factors: (1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charges; (4) the length of any pre-trial incarceration; and (5) whether there is any indication that the defense has been impaired

3

by the delay. *People v. Taranovich*, 37 NY2d 442 [1975]; *People v. Wiggins*, 31 NY3d 1 [2018]. A *Singer* hearing can be denied at the discretion of the court when, among other factors, there is no showing of prejudice to the Defendant and the court finds a sufficient basis for the delay. *People v. Lopez*, 15 AD3d 232 [1st Dept 2005]; *People v. McCollough*, 198 AD3d 1023 [3rd Dept 2021].

Defendant contends that the extent of the delay and the purported reasons favor dismissal. He argues that the People's investigation, which began in and around 2018 and culminated with the March 30, 2023 Indictment resulted in such a significant delay that it alone warrants dismissal. Defendant cites *People v. Regan*, 39 NY3d 459 [2023] (a four year delay resulted in dismissal); *Singer*, (a 42 month delay resulted in dismissal); *Wiggins*, (a six year delay resulted in dismissal) and *People v. Cousart*, 58 NY2d 62 [1982] (a five year delay resulted in dismissal). However, these cases are distinguishable.

The first two *Taranovich* factors do not weigh in Defendant's favor. In *Regan*, the court observed that of the four year delay, two years were completely unexplained by the prosecutor. The court noted that it also took the people seven months to obtain the defendant's DNA – a delay the court found difficult to accept. Because the prosecution was unable to offer the court a valid explanation for the majority of the four year delay, the *Regan* court dismissed the indictment. *Singer* involved a defendant who committed two crimes at about the same time. He was arrested for one, and not the other, despite the police possessing evidence for both. Singer was imprisoned in 1970 for the one crime but not indicted on the second until four years later. The investigation had been dormant the entirety of the four years. In vacating the defendant's conviction and ordering a hearing on the reasons for the delay, the *Singer* court held that it was "impossible" to determine what exactly was the explanation for the four years and that a hearing would assist in making that determination.

In *Wiggins*, the defendant was arrested and incarcerated for six years before ultimately pleading guilty. The six year gap between arrest and plea included a two and half year delay while the People attempted to persuade another individual to cooperate and testify against the defendant. *Cousart* did not involve pre-indictment delay. Rather, defendant's contention was that the delay between his conviction and the appeal had been prejudiced. The *Cousart* court actually held that the defendant had been accorded a prompt and timely trial. Here, a careful examination of the explanations for the delay provided by ADA Christopher Conroy in his affirmation make clear that the cases cited by Defendant are distinguishable.

First, the People explain that the New York County District Attorney's Office's (hereinafter "DANY") investigation had to be paused shortly after it was started in 2018, because there was an active federal investigation involving Cohen, a key witness in the instant matter. The People submit that it is not unusual to pause an investigation to avoid interfering with another ongoing investigation, such as the one that federal authorities were conducting here. Christopher Conroy's Affirmation in Support of People's Opposition to Defendant's Omnibus Motions (hereinafter "Conroy Affirmation") at ¶ 10-12. The People promptly reopened their investigation into the Defendant once the federal matter concluded, approximately a year later. Immediately after reopening the investigation, the People subpoenaed Defendant's tax records from Mazars USA LLP (the accounting firm for Defendant and the Trump Organization) and the Defendant attempted to block enforcement of the subpoena. This resulted in prolonged litigation over the subpoena's enforcement. Although the People continued their investigation while the dispute unfolded, the litigation lasted over seventeen months. Conroy Affirmation at ¶ ¶ 17-19. Despite the ongoing litigation, the People conducted approximately 40 witness interviews while simultaneously litigating enforcement of the subpoenas seeking Defendant's tax records. *Id* ¶ 20. The People also argue that the investigation uncovered evidence of "other instances of possible criminal conduct" by entities and individuals associated with the Defendant. That led to a separate investigation, which the People proffer, is not an uncommon occurrence in significant white-collar investigations. The spinoff investigation resulted in an indictment, and subsequent criminal trial of the Trump Organization. Conroy Affirmation at ¶ ¶ 16, 25-27. Finally, around October 2022, the People convened another Grand Jury to hear evidence in the instant matter. Some of the evidence was presented to the Grand Jury through witness testimony. This required the issuance of document subpoenas and extensive communications with the witnesses and their attorneys to coordinate their interviews and testimony.

Unlike the cases cited by Defendant, which all involved inexcusable dereliction of duties, the reasons proffered by the People appear reasonable. Further, the People note that the complexity of the investigation and the unique circumstances surrounding the Defendant himself (a then sitting President of the United States) cannot be overlooked. The People have presented legitimate reasons for the delay in indicting Defendant.

Turning to the third *Taranovich* factor, the nature of the underlying charge, Defendant argues that this factor should weigh in his favor because he is only charged with low level Class "E" felonies and because no one suffered physical or financial harm from the alleged crimes. While

5

Defendant is correct that the third factor refers to the crime's severity, the People make the point that the challenges of investigating a crime this complex should also be considered. *See People v. Johnson*, 39 NY3d 92 [2022]; *People v. Shrubsall*, 217 AD3d 1532 [4th Dept 2023]. The Court agrees that the instant matter involved a complex investigation. Further, while it is true that the charges involve the lowest level felony and no one suffered physical harm, it can hardly be said that the allegations are not severe. The People claim that the Defendant paid an individual $130,000 to conceal a sexual encounter in an effort to influence the 2016 Presidential election and then falsified 34 business records to cover up the payoff. In this Court's view, those are serious allegations.

The fourth *Taranovich* factor is not difficult to resolve because Defendant was not subject to *any* preindictment incarceration. The final factor is whether Defendant has suffered prejudice as a result of the delay. Here, Defendant has simply not presented any support for his assertion that he has been prejudiced. Defendant merely advances an uncorroborated claim that his political aspirations have been prejudiced – but he does not explain how or why. In fact, this claim runs contrary to Defendant's repeated assertions that his political campaign for President of the United States has actually been bolstered by the criminal charges. This Court cannot find that Defendant has been prejudiced by the preindictment delay.

After evaluating and balancing the five *Taranovich* factors, this Court finds that the Defendant was not deprived of his Due Process rights. Defendant's motion for dismissal of the Indictment on the grounds of pre indictment delay is therefore denied.

Defendant's request for a *Singer* hearing is denied as well. The mere length of the delay does not entitle the Defendant to a hearing when there has been no showing of prejudice and when "there is no dispute as to the facts showing that the investigation proceeded in good faith." *People v. Brown*, 209 AD2d 233 [1st Dept 1994], *leave denied*, 85 NY2d 860. The Defendant does not appear to challenge the representations of ADA Conroy, as much as he tries to undermine the rationale for actions taken by the People while conducting their investigation. Further, a *Singer* hearing is not necessary when the "record was fully developed for the reason for the delay." *People v. Cesar*, 6 AD3d 547 [2d Dept 2004], *leave* denied, 3 NY3d 638 [2004]. The record developed by the People for their delay in obtaining the Indictment warrants denial of a Singer hearing. The Court finds that the delays were justified and the explanations proffered are not pretextual.

## II. SUFFICIENCY OF THE CHARGES

Defendant's motion to inspect the Grand Jury minutes for legal sufficiency pursuant to Criminal Procedure Law (hereinafter "CPL") § 210.30(2) is granted. The standard that is to be applied on a motion to dismiss an indictment due to legal insufficiency is "whether there was 'competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof.'" *People v. Swamp*, 84 NY2d 725 [1995]. A grand jury may indict a person for an offense when: (a) the evidence before it is legally sufficient to establish that such person committed such offense and (b) competent and admissible evidence before it provides reasonable cause to believe that such person committed such offense. CPL § 190.65(1). When conducting such a review, a court must view all the evidence in the light most favorable to the People. *People v. Bello*, 92 NY2d 523 [1998]. "Legally sufficient means *prima facie*, not proof beyond a reasonable doubt." *People v. Mayo*, 36 NY2d 1002 [1975]. For the reasons set forth below, Defendant's motion to dismiss the Indictment on the grounds that the charges, as presented to the Grand Jury are legally insufficient is denied. Likewise, Defendant's request to review the Grand Jury Minutes in their entirety is denied.

A person is guilty of Falsifying Business Records in the First Degree when he commits the crime of Falsifying Business Records in the Second Degree, and when his intent to defraud includes an intent to commit another crime or to aid or conceal the commission thereof. PL §175.10. Under the "Culpability; definition of terms" section of PL § 15.00, act, voluntary act, omission, conduct, to act, and culpable mental state are defined. "Intent to defraud" is not defined within that section. However, courts in the First Department have interpreted this culpable mental state broadly. *See People v. Kase*, 76 AD2d 532 [1st Dept 1980], *aff'd*, 53 NY2d 989 [1981]; *People v. Sosa-Campana*, 167 AD3d 464 [1st Dept 2018]; *Kisiel*, 73 AD3d at 509. The same approach has been adopted by courts in other departments as well. *See People v. Ramirez*, 99 AD3d 1241 [4th Dept 2012].

Intent to defraud is not constricted to an intent to deprive another of property or money. In fact, "intent to defraud" can extend beyond economic concern. *People v. Headley*, 37 Misc3d 815, 829 [Sup Ct, Kings County 2012]; *People v. Schrag*, 147 Misc 2d 517 [Rockland County Ct. 1990]. "Nor is there any requirement that a defendant intend to conceal the commission of *his own* crime; instead, 'a person can commit First Degree Falsifying Business Records by falsifying records with the intent to cover up a crime committed by somebody else.'" People's Opposition at pg. 22, *citing to People v. Dove*, 15 Misc3d 1134(A), *judgment aff'd*, 85 AD3d 547 1st Dept 2011]; *People v. Fuschino*, 278 AD2d 657 [3rd Dept 2000]. For example, the defendant in *Dove* was acquitted of Grand

Larceny but found guilty of Falsifying Business Records in the First Degree. The court held that the verdict was not repugnant as the charge to the jury did not require a finding that the defendant was the same person who committed the underlying Grand Larceny.

The term "business records" is defined in PL § 175.00 as "any writing or article, including computer data or a computer program, kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity." PL § 175.00(2). The definition for "business records," is not a narrow one as there are a wide array of factors that courts consider. *People v. Kisina*, 14 NY3d 153 [2010] (court held that fraudulent medical documentation submitted to a no-fault insurance carrier by defendant physician for the purposes of receiving payments for treatments that were unnecessary or underperformed were "business records" for purposes of PL § 175.00(2); *People v. Bloomfield*, 6 NY3d 165 [2006]; *People v. Myles*, 58 AD3d 889 [3d Dept. 2009]. The location where the "business record" is maintained is "merely a factor, not determinative, of its status as a business record under the statute." *Bloomfield*, 6 NY3d 165 at 167. Further, a defendant does not necessarily have to be part of the enterprise to be guilty of Falsifying Business Records. *6 NY Prac., Criminal Law § 17:4 (4th Ed.)*.

"Enterprise" is defined in Article 175 as "any entity of one or more persons, corporate or otherwise, public or private, engaged in business, commercial, professional, industrial, eleemosynary, social, political or governmental activity." This definition encompasses any person or group of persons engaged in any organized activity for which records are kept. *Donnino, Practice Commentary, McKinney's Cons Laws of NY, Book 39, Penal Law § 175.05.*

Falsifying Business Records in the First Degree, requires that a defendant, have the intent to commit "another crime or to aid or conceal the commission thereof." Thus, the statute does not require a defendant to actually be convicted of the "other crime," but merely that he *intend* to commit another crime. *People v. McCumiskey*, 12 AD3d 1145 [2004]. This element of PL § 175.10 is satisfied so long as the Defendant intended to commit *or* conceal the "other crime." *People v. Houghtaling*, 79 AD3d 1155 [3d Dept 2010]. The focus here is on the element of *intent*.

Defendant moves to dismiss all the counts in the indictment on the grounds that: (1) he did not cause false entries in the "business records" of an enterprise, (2) the People have not identified a viable "object offense[3];" and (3) the grand jury was not presented with evidence of

---

[3] The "object offense" referenced by Defendant as well as the terms "other crime" and "another crime" carry equal meaning.

intent to defraud. Finally, Defendant asks this Court to compel the People to produce the complete set of Grand Jury minutes.

## 1. BUSINESS RECORDS

Defendant first argues that the records at the heart of this matter, i.e. the invoices, checks, and general ledgers that were generated to reimburse Cohen, came from Defendant's personal accounts and are not the records of the Trump Organization. Defendant further argues that the mere fact that the records were held at the Trump Organization is of no import. Therefore, the argument follows, there are no business records that reflect a "condition or activity" of an enterprise as required by P.L. § 175.00(1) and (2). To support this position, Defendant cites *People v. Papatonis*, 243 AD2d 898 (3d Dept 2009) and *People v. Banks*, 150 Misc2d 14 [Sup Ct, Kings County 1991]. Defendant further argues that the instant matter is distinguishable from *People v. Trump Organization et al*, Sup Ct, NY County, Sept. 6, 2022, Indictment No. 1473/2021 (hereinafter "*Trump Corp*": "Where, the ledger entry in question related to benefits that were purportedly received as income by Weisselberg as the Chief Financial Officer at the Trump Organization … This Court reasoned that the entry, deleted from President Trump's personal ledger, was a business record of the Trump Organization for the purposes of Penal Law §175.10 because it was both (1) kept and maintained by the Trump Organization and (2) evidenced the Trump Organization's obligations vis a vis Weisselberg's salary for the Trump Organization…" Defendant's Memo at pg 14. Whereas here, Defendant argues, Cohen was paid out of Defendant's own funds for Cohen's work as Defendant's personal employee, and not as a Trump Organization employee.

The People contend that part of Cohen's job while an employee at the Trump Organization was to handle the personal legal matters of the Defendant. They further contend that since the Defendant's personal accounts were used by the Trump Organization at various times for "… Trump Organization business, including to reallocate cash between entities or to advance funds for an entity's bills … and [because] the defendant owned the Trump Organization entities as the sole beneficiary of the Donald J. Trump Revocable Trust," this Court should adopt the reasoning that it applied in the *Trump Corp* matter and hold that the business records at issue here reflect the "enterprise's obligations vis a vis others," and that the invoices, checks, and general ledger entries in this matter reflect the condition or activity of the Trump Organization. People's Opposition at pg. 12. The People also contend that part of the $420,000 payment Cohen received in 2017 derived

9

directly from the work he performed while an employee of the Trump Organization. Specifically, the $60,000 bonus for his work as an employee of the Trump Organization in 2016.

Defendant argues that the business records at issue were not "kept or maintained" to reflect the Trump Organization's "condition or activity." Rather, they reason that the records at issue reflect payments made using the Defendant's own funds. Defendant cites *People v. Papatonis*, 243 AD2d 898 [3d Dept 2009], *People v. Golb*, 23 NY3d 455 [2014], and *People v. Banks*, 150 Misc2d 14 [Sup. Ct. Kings County 1991] for support. The court in *Papatonis* held that "false answers to questions contained in an employment application" submitted to a company, were not business records "kept or maintained" for the purpose of evidencing the condition or activity of the company; the company merely possessed the application and did nothing fraudulent with it. *Banks* involved a fictitious audit of a charity. The court held that the results of the false audit did not constitute business records because the audit did not actually reflect the condition or activity of the charity. *People v. Golb*, involved a defendant that impersonated a New York University ("NYU") Professor and sent emails to NYU students and deans indicating that the professor had plagiarized the work of Professor Gelb, defendant's father. The Court of Appeals held that these emails did not constitute the falsification of an NYU business record "kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity." *Id.*

The cases cited by the Defendant in support of his theory that because Defendant paid Cohen from his own funds, then the business records at issue were not "kept or maintained to reflect the Trump Organization's condition or activity" are not persuasive. *People v. Golb, People v. Papatonis*, and *People v. Banks*, are all inapplicable to the instant matter. As this Court previously reasoned in *Trump Corp, Banks* and *Paptonis* all "involved arrangements which constituted mere possession and nothing more." *Golb* also involved just "possession" as well.

This Court agrees with the People's contention that the invoices, checks, and general ledger entries are in fact "business records" for purposes of the charge of Falsifying Business Records in the First Degree. In *People v. Trump Corp*, this Court held that the "Detail General Ledger became the business record of the Trump Organization once Mr. Weisselberg was paid his salary out of DJT's *personal funds*. Put another way, DJT's Detail General Ledger is the business record of the Trump Organization because the entries evidence the Trump Organizations obligations *vis a vis* Allen Weisselberg's salary." This Court further held "that DJT's Detail General Ledger was a personal record of DJT and not the books and records of a business entity is of no legal consequence." The same rationale applies here. The evidence presented to the Grand Jury

demonstrated that while Cohen was an employee of the Trump Organization, he also handled personal matters for Defendant; that Defendant owned the Trump Organization entities as the sole beneficiary of the Donald J. Trump Revocable Trust, and that $60,000 of the $420,000 repayment to Cohen was for work as a Trump Organization employee in 2016. "Indeed, the payments here exemplify the intermingling of the Trump Organization's business records and Defendant's purportedly personal expenses." People's Opposition at pg. 13. Defendant and the Trump Organization are intertwined to such a degree, that it is of no legal relevance that some of the moneys paid to Cohen came from Defendant's personal funds.

The People's argument that the payments made to Cohen by Defendant in 2017 cannot be viewed in isolation is compelling. The invoices, checks, and general ledger entries created in 2017, that were kept and maintained by the Trump Organization, reflected payments made to Cohen for a scheme that was discussed and implemented by Cohen and the Defendant in 2015 and 2016.

## 2. "OTHER CRIME"

Defendant next argues that the Indictment fails to make out the element of "intent to commit another crime or to aid or conceal the commission thereof." Defendant further argues that the four theories set forth by the People to satisfy the "other crime" element, are not viable and therefore cannot serve as "object offenses" under the statute. The four theories being violations of the: (1) Federal Election Campaign Act ("FECA"); (2) N.Y. Election Law § 17-152; (3) Tax Law §§ 1801(a)(3), 1802; and (4) Defendant's intent to violate PL §§ 175.05 and 175.10 by intending to commit or conceal the falsification of other business records. Defendant's Memo at pgs. 15, 17, 19, and 21.

The People's primary contention with Defendant's argument is that the statute does not require that the "other crime" *actually* be committed. Rather, all that is required is that defendant have the intent. That is, he acted with a conscious aim and objective to commit another crime. The People rely on *People v. Thompson*, 124 AD3d 448 1st Dept 2015] and *People v. McCumiskey*, 12 AD3d 1145 [4th Dept 2004]. In *Thompson*, the defendant was convicted of Falsifying Business Records in the First Degree for making a false entry on a form. The court upheld the conviction finding that the prosecution did not have to establish that defendant committed or was convicted of the crime he intended to conceal. *McCumiskey* also held that evidence of *intent* to commit a crime is sufficient to satisfy the requirements of PL §175.10 even if defendant was not convicted of the "other crime."

11

As is clear from the plain reading of PL § 175.10, it is not necessary for a defendant to be convicted of the "other crime," it is his *intent* to commit those other crimes that carries the day. *McCumiskey*, 12 AD3d at 1146; *See People v. Mahboubian*, 74 NY2d 174 [1989]; *See People v. Holley*, 198 AD3d 1351 [4th Dept 2021]; *People v. Hightaling*, 79 AD3d 1155 [3d Dept 2010].

The People's four theories are discussed below in greater detail:

(1) The People allege that Defendant "violated federal election laws because the payoffs to both McDougal and Daniels violated FECA's restrictions on corporate and individual contributions." People's Opposition pg. 24. The People presented evidence to the Grand Jury that Cohen pled guilty in the Southern District of New York to violating FECA for engaging in the very acts which are at issue here, i.e. making unlawful campaign contributions and that he did so at the direction of, and in coordination with, "a candidate for federal office," later identified as Donald J. Trump – the Defendant herein.

(2) Under the second theory, the People allege that Defendant intended to violate N.Y. Election Law § 17-152 by conspiring to "promote the election of any person to a public office...by entering a scheme specifically for purposes of influencing the 2016 presidential election; and that they did so by 'unlawful means,' including by violating FECA through the unlaw individual and corporate contributions by Cohen, Pecker, and AMI; and...by falsifying the records of other New York enterprises and mischaracterizing the nature of the repayment for tax purposes." People's Opposition at pg. 25.

(3) Under the third theory, the People allege that the Defendant intended to violate New York Tax Law §§ 1801(a)(3) and 1802. This theory is premised on evidence introduced to the Grand Jury that when Cohen was reimbursed for the $130,000 payment he made to Daniels, the amount he received was "grossed up" to compensate him for taxes he would have to pay on the reimbursement.

(4) The People's final theory is that in the "course of carrying out defendant's scheme, several of the participants made and caused false entries in the business records of multiple entities in New York." People's Opposition at pg. 41. This includes "...numerous business records related to AMI's payments for ... McDougal's story ..." i.e. AMI mischaracterized the purchase of this story as a promotional expense rather than an editorial expense so that spending caps could be circumvented by Pecker,

Cohen forming a company "called Essential Consultants LLC as a conduit for the Daniels payment." *Id* at 41, 42.

The Court has considered the respective arguments of the parties and finds that the evidence presented to the Grand Jury for the first three theories was legally sufficient to support the intent to commit the "other crime" element of Falsifying Business Records in the First Degree. However, the Court cannot make the same finding as to the fourth theory. The People are therefore precluded from arguing this fourth theory to the jury. Nonetheless, the People are permitted to present evidence at trial that stems from the fourth theory, to the extent that the evidence advances any one or more of the first three theories.

### (a) Federal Election Campaign Act

Defendant argues that the "crime" element in PL §175.10 must have occurred in New York. Therefore, an out of state crime or federal crime such as a violation of FECA cannot satisfy this element of the charge. Defendant largely relies on *People v. Witherspoon*, 211 AD3d 108 (2nd Dep. 2022) to support his argument that a restrictive reading of "another crime" is required. The issue addressed by *Witherspoon* was whether CPL § 160.59(3)(f) "requires a court to summarily deny a defendant's motion to seal an eligible offense where the defendant subsequently has been convicted of a crime under the laws of another state." Defendant acknowledges that *Witherspoon* limited its construction of the term "other crime" to the context of CPL § 160.59. Nonetheless, Defendant argues, that the rationale of the decision "makes clear that the term 'crime,' as used in the Penal Law, is limited to offenses under the laws of New York and local instrumentalities within the State." Defendant's Memo at pg. 16 footnote 6.

The People disagree that a FECA violation cannot satisfy the "other crime" element and submit that Defendant's reliance on *Witherspoon* is misplaced. The People stress that *Witherspoon* expressly limited its holding to the construction of the phrase "any crime" within the context of CPL Section 160.59. This Court agrees and further finds that CPL section 160.59(3)(f) has no application to the issue presently before this Court.

The People submit that courts in New York have considered out of state offenses as "other crimes" when necessary to satisfy an element of an offense. As examples, the People cite *People v. Kulakov*, 278 AD2d 519 [3d Dept 2000] and *People v. Cornish*, 104 Misc2d 72 [Sup. Ct. Kings County 1980]. In *Kulakov*, the defendant was charged with Criminal Possession of a Weapon in the Third Degree, in violation of PL § 265.02(1), an element of which is that the accused have "been

13

previously convicted of any crime[.]" That court held that it was permissible for the jury to consider defendant's prior conviction in Vermont as evidence of "any crime."

The People identify *People v. Goldstein*, Sup Ct, NY County, indictment No. 03765-2009 and *People v. Marshall*, Sup Ct, NY County, indictment 6044-2007 as two other matters brought by their office that also invoked federal crimes in satisfaction of the "other crime" element of Falsifying Business Records in the First Degree[4]. *Goldstein* involved a defendant who allocuted to intending to commit federal crimes in satisfaction of the "other crimes" element of PL §170.10. In *Marshall*, the judge presiding over the trial, when charging the jury on PL §175.10, instructed them that "with respect to the other crimes you may consider, … it is a crime for any person to willfully attempt in any manner to evade or defeat any tax imposed by the Federal Internal Revenue Code." People's Opposition at pg. 30. The People also rely on *People v. Ditta*, 52 NY2d 657 [1981] which they argue supports the position that when reading PL § 175.10, "…reliance on a federal object crime is also consistent with the purposes of the statute and the Court of Appeals's direction to avoid "hypertechnical or strained interpretations" of the Penal Law." People's Opposition at pg. 27. Finally, the People reiterate their overall argument that there has to be only an intent to commit the "other crime."

This Court finds that there was legally sufficient evidence presented to the Grand Jury of the Defendant's intent to violate FECA. It is a crime under FECA for any person to make contributions to any candidate seeking election to federal office, and his authorized political committees, which exceeds $2,000 during a single calendar year. FECA also establishes a $25,000 limit on contributions made by corporations. The evidence before the Grand Jury was legally sufficient to show that the Defendant, along with Cohen and Pecker, among others, planned to promote Defendant's presidential campaign by purchasing and suppressing information that could negatively impact Defendant's campaign. The amount Pecker and Cohen paid exceeded allowable federal limits as established by FECA. Indeed, Cohen pled guilty to violating FECA and served a prison term as a result of his involvement in this scheme. Likewise, the Federal Election Commission ("FEC") found that AMI and Pecker also violated FECA as a result of these payments. Evidence presented to the Grand Jury that the Defendant discussed the above plan with Cohen and then reimbursed Cohen for his payment to Daniels is legally sufficient to establish the requisite *intent* to commit another crime, i.e. FECA.

---

[4] See People's Exhibits 21 and 22.

### (b) N.Y. Election Law § 17-152

Defendant next argues that N.Y. Election Law § 17-152 is limited to elections for state and local offices and cannot be used to address alleged wrongdoing related to federal elections. Pursuant to N.Y. Election Law § 17-152, "Any two or more persons who conspire to promote or prevent the election of any person to a public office by unlawful means and which conspiracy is acted upon by one or more of the parties thereto, shall be guilty of a misdemeanor." P.L. § 17-152. As more fully explained below, Defendant cites N.Y. Election Law § 1-102 as support to limit the language of § 17-152. Finally, Defendant argues, as he did before Judge Alvin K. Hellerstein in the Southern District of New York, that even if N.Y. Election Law § 17-152 is not limited to state and local offenses, it is pre-empted by FECA and therefore, cannot serve as the "other crime" for P.L. § 175.10 purposes. *People v. Trump*, 2023 WL 4614689 [S.D.N.Y 2023].

The People contend that the plain language of N.Y. Election Law § 1-102 applies not only to state and local elections, but to federal elections as well. Addressing Defendant's preemption claim, the People ask this Court to follow Judge Hellerstein's ruling that the conduct prohibited by the N.Y. Election Law at issue here is not covered by any provision of FECA. Finally, the People argue that the evidence before the Grand Jury satisfies the two elements of N.Y. Election Law § 17-152 in that: (1) Defendant entered into an agreement with Cohen and Pecker to violate campaign contribution limits via payments to McDougal and Daniels and by mischaracterizing the payments; and (2) intended to conceal the commission of these offenses through unlawful means, i.e. the invoices, checks, and general ledger entries. People's Opposition at pg. 25.

Defendant's argument that N.Y. Election Law § 17-152 is not an object offense under PL § 175.10 fails. Specifically, Defendant claims that because the allegation is that he tampered with the 2016 *presidential* election, then N.Y. Election Law § 17-152 is not applicable because its application is limited to elections for "public office," a term which Defendant claims does not include federal elections.

New York Election Law § 1-102, titled "Applicability of Chapter," explicitly states "[T]his chapter shall govern the conduct of *all* elections at which voters of the state of New York may cast a ballot for the purpose of electing an individual to any party position or nominating or electing an individual to any federal, state, county, city, town or village office…" (emphasis added). It is clear from the text of § 1-102 that the New York Election Law applies to ballots cast for any election, including federal. The "principal objective of the Election Law is to give the electorate a full and

fair opportunity to express its choice among the candidates presented." *Limpert v. Brandt*, 165 AD3d 1469 [3d Dept 2018] *citing to Reda v. Mehile*, 197 AD.2d 723 [1993]. This Court is hard pressed to find and indeed cannot, that federal elections are not included in the statute's principal objective.

Defendant's next argument, that N.Y. Election Law § 17-152 is pre-empted by federal law, is also unsuccessful. As Judge Hellerstein reasoned in *People v. Trump*, 2023 WL 4614689 [S.D.N.Y 2023] when he was presented with the same argument by this Defendant, N.Y. Election Law § 17-152 "does not fit into any of the three categories of state law that FECA preempts." *People v. Trump*, 2023 WL 4614689 at 11. This Court agrees and follows Judge Hellerstein's decision. Since FECA does not affect the states' rights to pass laws concerning voter fraud and ballot theft, there is no preemption by FECA in this matter. *Id.*

### (c) Tax Law §§ 18001(a)(3), 1802

Defendant next argues that there is no evidence that he intended to violate any tax laws because (1) Cohen's tax returns were not presented to the Grand Jury and (2) Defendant was not aware of the purported "grossing up scheme" that Cohen and Weisselberg concocted. Defendant also claims that the alleged violation is of no consequence because the State was not financially harmed by the "grossing up" and instead would wind up collecting more tax revenue.

The People submit that there is sufficient evidence before the Grand Jury that the Defendant knew he was paying Cohen, not for legal services, but as reimbursement for the payoff to Daniels. This evidence was presented in the form of Cohen's testimony; Weisselberg's handwritten notes that the payment to Cohen would be "grossed up" to twice its amount to account for tax purposes; testimony from McConney that the reimbursement was doubled to account for taxes and that McConney was not aware of any other instance where the Trump Organization had doubled up an expense reimbursement for tax purposes. The People further argue that it is irrelevant that Cohen's tax returns were not presented to the Grand Jury because again, the People need only demonstrate an intent to commit a crime – not that the intended crime was actually completed. In this instance, the intended crime was a violation of New York's tax laws.

Defendant's argument is not persuasive. The Grand Jury minutes demonstrate that Cohen was paid $420,000 as reimbursement for money he paid Daniels pursuant to the terms of the agreement with Defendant. The $420,000 represented the original $130,000 payment to Daniels, a $60,000 bonus for Cohen's work at the Trump Organization, $50,000 payment for tech services,

and the remaining $180,000 to ensure that Cohen would be made whole after adjusting for income taxes payable.

The evidence before the Grand Jury was legally sufficient to establish that Defendant knew the amount being paid to Cohen was not for legal services but rather, as reimbursement for the Daniels payoff. Weisselberg's handwritten notes demonstrated the intent and purpose behind the "grossing up" strategy. Together with the witness testimony, the Grand Jury could infer that Defendant knew about the grossing up scheme and its purpose.

This Court is not persuaded by Defendant's argument that the People did not meet their burden because Cohen's tax returns were not introduced to the Grand Jury. Similarly, this Court disagrees that the alleged New York State tax violation is of no consequence because the State of New York did not suffer any financial harm. This argument does not require further analysis.

#### (d) Intent to Violate Penal Law §§ 175.05 and 175.10

As to the People's fourth theory of "other crime," Defendant argues that there is no evidence that he knew that AMI invoices were being falsified and that this alleged falsification occurred in August 2016, long before the time frame charged in the indictment. Defendant claims that there was no evidence presented to the Grand Jury that Defendant acted to conceal these records, nor was there evidence that Pecker held an "intent to defraud." Lastly, Defendant argues that the McDougal invoice should not have been introduced into evidence before the Grand Jury because the People failed to lay the proper business record foundation.

It is the People's position that Defendant knew about AMI's falsification of its records. Specifically, that AMI mischaracterized the purchase of the McDougal and Daniels stories as promotional expense rather than editorial expenses so that Pecker could circumvent spending caps. They also claim that Defendant knew Cohen had created a shell corporation to facilitate and conceal the transaction and therefore, that this too could serve as the "other crime.

Without the Court deciding whether the Defendant knew about the falsification of AMI's records and Cohen's creation of the shell company, the Court is not convinced that this particular theory fits into the "other crime" element of PL § 175.10, but it does seem that it is intertwined and advances the other three theories discussed *supra*. For example, in support of this fourth theory, the People argue that "the participants in defendant's election fraud scheme also caused the falsification of other New York business records to help defendant execute and conceal the scheme." People's Opposition at pg. 42. It appears that such an argument goes to the People's

N.Y. Election Law § 17-152 and FECA theories, which both directly involve the Defendant's intent to violate those particular statutes.

In deciding this branch of Defendant's motion, the legal standard this Court must apply is whether the evidence presented to the Grand Jury was legally sufficient to make out the charges, not whether the People have proven the charges beyond a reasonable doubt. Through that lens, the People's first three theories clearly satisfy their burden as to the "other crime" element of the charges. However, the Court cannot make the same finding as to the fourth theory and the People are therefore precluded from arguing this fourth theory to the jury.

## 3. "INTENT TO DEFRAUD"

Finally, Defendant argues that he did not intend "to cheat anyone out of money or property through the allegedly false entries" Defendant's Memo at pg. 23. and that because the alleged falsification of business records occurred in 2017, any evidence pointing towards an alleged intent to defraud in 2016 is not relevant.

The People respond that "intent to defraud" does not require that any particular person or entity lose money, property or something of value. For purposes of the charges, it is sufficient to harbor a general intent to defraud any person. In support, the People cite *People v. Dallas*, 46 AD3d 489 [1st Dept. 2007] and *People v. Coe*, 131 Misc2d 807 [Sup Ct, NY County 1986]. In *Dallas*, the First Department held "...the law is clear that the statutory element of intent to defraud does not require an intent to defraud any particular person; a general intent to defraud any person suffices." *Dallas*, 46 AD3d at 491. The court in *Coe* also clarified that although the statute requires an expressed intent to defraud, the target need not be set forth.

The People also contend that Defendant's actions in 2017, namely creation of the invoices, daily general ledger, and checks cannot be analyzed in a vacuum and must instead be viewed for what it is, the culmination of a scheme Defendant concocted in 2015 and 2016. As a result, Defendant's intent to defraud prior to 2017 is relevant.

The People submit that Defendant's "intent to defraud" was established in the Grand Jury by evidence that Defendant sought to suppress disclosure of information that could have negatively impacted his campaign for President of the United States and that he made "false entries in the relevant business records in order to prevent public disclosure of both the scheme and the underlying information." People's Opposition at pg. 17. In substance, the People argue the

Defendant's *intent* to influence the 2016 presidential election by violating FECA, Election Law § 17-152, and New York Tax Laws satisfies the "intent to defraud" prong of PL § 175.10.

This Court finds that legally sufficient evidence was presented to the Grand Jury to satisfy this element of the crimes charged. The term "intent to defraud" carries a broad meaning and is not limited to the causing of financial harm or the deprivation of money or property. *People v. Sosa-Campana*, 167 AD3d at 464. To reiterate, controlling authority holds that the People need not demonstrate intent to cause financial harm to prove that Defendant had the requisite intent to defraud under the Falsifying Business Records statutes. *See Kase*, 53 NY2d at 989 [1981]; *Khalil*, 73 AD3d 509 at 510. The Defendant's argument to the contrary is unavailing and contrary to settled law. *Headley*, 37 Misc3d at 829; *Schrag*, 147 Mis.2d at 517. A long line of cases not only within the First Department but in other departments as well, have so held. Evidence presented to the Grand Jury demonstrated that Defendant, starting in 2015, intended to pay Daniels and McDougal a sum of money to prevent the publication of information that could have adversely affected his presidential aspirations. The payments were made through Cohen who was reimbursed by Defendant in the form of payments through the Trump Organization. The Grand Jury, when viewing this evidence, could find reasonable cause that an offense was committed and that the defendant committed it, namely that Defendant possessed the requisite intent to defraud either the voting public, the government, or both.

## 4. "PRODUCTION OF LEGAL INSTRUCTIONS TO GRAND JURY"

Defendant moves this Court to compel the People to produce the full set of Grand Jury minutes, including but not limited to, the instructions given to the jurors and responses to juror questions. This motion is denied.

"A party seeking disclosure of grand jury minutes must establish a compelling and particularized need for them." *People v. Robinson*, 98 NY2d 755 [2002]. If that burden is met, the reviewing court must then balance various factors to determine whether disclosure is appropriate. *Id.* The decision is in the reviewing court's discretion. *Id.* Defendant argues that production is warranted as the Indictment "does not provide sufficient notice of the object-offense theories that the People relied upon" in seeking the Indictment against the Defendant. Defendant's Memo pg. 25. Defendant also argues that the People improperly introduced evidence related to AMI's non-prosecution agreement with the United States Attorney's Office regarding the payment to McDougal. Defendant's Memo pg. 25.

19

Defendant's argument and case law in support are not persuasive. Defendant relies on *People v. St. Victor*, 73 Misc3d 1204(A) [Sup. Ct. Kings County 2021] but the underlying facts of that matter are inapplicable to those before the Court. The court in *St. Victor* held that the prosecution's presentation to the grand jury was rife with errors, in terms of hearsay elicited, leading questions asked, and introduction of evidence without proper authentication. Further, the *St. Victor* court pointed out that the prosecution even failed to properly identify the decedent in the homicide presentation.

As Defendant has failed to establish a compelling and particularized need for disclosure, the Court does not need to address the second prong of the analysis. Defendant's motion is denied.

## III. SELECTIVE PROSECUTION

Defendant moves to dismiss the indictment on the grounds that DANY allegedly targeted him for prosecution in violation of the Equal Protection Clause of both the United States and New York State Constitutions. In the alternative, Defendant argues that he has made a sufficient showing of animus and disparate treatment to require this Court to order the People to provide discovery and grant a hearing on their claims of selective prosecution. Although Defendant argues that he has been impermissibly targeted, he is not clear as to the underlying theory *why* he is purportedly being targeted[5]. For the reasons stated below, this portion of Defendant's motion is denied, including his request for a hearing.

The burden on a defendant who makes a claim of selective prosecution is significant. *Matter of 303 W. 42nd St. v. Klein*, 46 NY2d at 695 *internally citing United States v. Falk*, 479 F.2d 616, 620 [7th Cir. 1973] 46 NY2d 686, 694 [1979]. A presumption exists that "enforcement of the laws is undertaken in good faith without discrimination." *Id.* It is well settled that public authorities are forbidden from enforcing "valid law with an evil eye and an unequal hand, so as to practically make unjust and illegal discriminations between persons in similar circumstances." *Id.* However, a defendant raising a claim of selective prosecution must show that he was "selectively treated, compared with others similarly situated…" *Bowers Assoc. v. Town of Pleasant Val.*, 2 NY3d 617 [2004]. To succeed on a motion to dismiss for selective prosecution, there must be a showing that the

---

[5] For example, in *People v. The Trump* Corporation et al, Index No. 1473/2021, defendant explicitly stated that they were being selectively prosecuted on the basis of Donald J. Trump's political views and in an effort to stop him from exercising his free speech rights. Defendant in the instant matter has not clearly made any such argument or representation.

selective application of the law was deliberately exercised upon an impermissible standard such as race, religion or some other arbitrary classification. *People v. Blount*, 90 NY2d 998 [1997]. In essence, there are two prongs that the Defendant must fulfil to succeed on this claim. He must demonstrate: (1) that he was selectively treated when compared to others similarly situated and (2) that such treatment was based on impermissible considerations. *People by James v. Nat'l Rifle Ass'n of Am., Inc.*, 75 Misc3d 1000, 1007-08 [Sup Ct, NY County 2022], *aff'd sub nom, People v. Nat'l Rifle Ass'n of Am.*, No. 1026-28, 2023 WL 8939462 [N.Y. App. Div. Dec. 28, 2023].

In attempting to satisfy the first prong, Defendant provides only one other situation for comparison. Defendant claims that DANY sat idly and did nothing after the Federal Election Commission ("FEC") made findings that the "Manhattan-headquartered presidential campaign [of Hillary Clinton] improperly booked campaign expenses as legal payments in connection with the hiring of a research firm to prepare the so-called 'Steele Dossier...'" Defendant provides no basis for his suggestion that it was Hillary Clinton ("Clinton") who was the target of the investigation rather than her campaign. Defendant nonetheless presents this incident as the lone comparator. This attempt simply does not satisfy Defendant's burden under the first prong of the test. When examining this comparison, the Court agrees with the People that "no prudent person, looking objectively at the [two] incidents, would think them roughly equivalent." People's Opposition at pg. 60 citing to *Bower Assocs v. Town of Pleasant Valley*, 2 NY3d 617 [2004].

Defendant has failed to carry the burden of demonstrating disparate treatment as his claims are devoid of evidence that the law has not been applied to other similarly situated individuals prosecuted by DANY. Further, the Court finds that the People have demonstrated that they have previously commenced actions where the accused was charged with PL § 175.10 violations for falsifying business records with the intent to commit or conceal the commission of another crime. In fact, the People note that their Office has brought "approximately 437 cases charging violations of PL § 175.10." People's Opposition at pg. 61.

Assuming arguendo, that the Court did find that the Defendant has proffered an acceptable similarly situated individual, the Defendant's motion would still be denied because he failed to demonstrate that the People proceeded on an impermissible standard. The Defendant relies primarily on the comments of former DANY Special Assistant District Attorney, Mark F. Pomerantz ("Pomerantz") which suggested that "The Office was determined to pursue a case notwithstanding the facts"" Defendant's Memo at pg. 29. This was because "Pomerantz, as one of the drivers of the investigation, confessed to being motivated to charge President Trump because

'Trump was different.'" *Id.* Pomerantz worked for a period of time on DANY's investigation into Defendant's case. He resigned before Defendant was indicted and later released a book on that experience. Defendant's Memo at pg. 2, 31. Defendant alleges that the comments Pomerantz made to District Attorney Alvin Bragg ("DA Bragg") that his resignation would "reflect poorly on [Bragg] in the court of public opinion" put pressure on Bragg to commence his prosecution against Defendant. Essentially, Defendant argues that his rights were violated because DANY went ahead and charged the Defendant despite being engaged in a public dispute about the case with former member of his staff. *Id.*

Defendant's allegation here strain credulity. The People have demonstrated that the investigation and ensuing prosecution commenced following public reporting of Defendant's ties to criminal conduct that took place in New York prior to the 2016 presidential election. The public reporting was tied specifically to Cohen having pled guilty to several crimes on August 21, 2018, including violations of federal campaign finance laws "at the direction of, a candidate for federal office." Conroy Affirmation at 6-7. The "candidate" was later determined to be Defendant.

Defendant has failed to demonstrate a reasonable probability of success on the merits of these claims and therefore his application for a hearing and additional discovery on the issue of selective prosecution is denied. *Klein,* 46 N.Y.2d at 695 *internally citing United States v. Falk,* 479 F.2d 616, 620 [7ᵗʰ Cir. 1973] 46 N.Y.2d 686, 694 [1979]; *People v. Barnwell,* 143 Misc2d 922 [N.Y. County Crim Court]. The Defendant has not overcome the presumption that the People's prosecution of this matter was undertaken in good faith and without discrimination.

## IV. DISMISSING THE INDICTMENT AS TIME-BARRED UNDER THE STATUTE OF LIMITATIONS

Defendant moves to dismiss the Indictment on the grounds that the charges are time barred. The People contend that an executive order issued by Governor Andrew Cuomo during the height of the Covid pandemic extended the deadline for the filing of these (and all criminal) charges. Specifically, the People refer to Executive Order 202.8 issued by the Governor on March 20, 2020, later extended by Executive Order 202.101 on April 6, 2021. Further, the People invoke CPL § 30.10(4)(a)(i) which provides that "any period following the commission of the offense during which (i) the defendant was continuously outside this state or (ii) the whereabouts of the defendant were continuously unknown and continuously unascertainable by the exercise of reasonable diligence," should not be included when calculating "speedy trial" time. *Id.* The People

22

claim Defendant was "continuously outside this state" while serving as President, as well as when he left Office and therefore that period of time should not be included for speedy trial purposes. People's Opposition at pg. 50. The People argue that it is the Defendant's burden to show which dates he was in the state during the relevant period to stop the toll, which he fails to do here. People's Opposition at pg. 50-51; *People v. Knobel*, 94 NY2d 226 [1999]. Defendant responds that he was never "continuously absent" from the State during his time as President and that his "whereabouts have been and continue to be well known." Defendant's Memo at pg. 35. For the following reasons, Defendant's motion to dismiss the Indictment on speedy trial grounds is denied.

Pursuant to CPL § 30.10(2)(b), a prosecution for a felony "must be commenced within five years after the commission thereof." Governor Cuomo's Executive Orders tolled the time limitations prescribed by the procedural laws of this state including the CPL *See People ex rel. Nevins v. Brann*, 67 Misc3d 638, 640-642 [Sup. Ct. Queens Co. 2020]. The indictment was filed on March 30, 2023. Although conduct described in the Indictment occurred more than five years prior to the filing of the Indictment, the Governor's Orders tolled "any specific time limit for the commencement" of any felony through May 6, 2021. Thus, the deadline for the prosecution of the alleged conduct was extended by one year and 47 days. In other words, this felony prosecution had to be commenced within 6 years and 47 days from when the crimes were allegedly committed. The earliest conduct described in the Indictment allegedly occurred on February 14, 2017. The tolled period or extension for commencing the action thus brought the conduct described in the Indictment within the prescribed five-year time limit.

Since the Court finds the Indictment was timely brought as a result of the tolling occasioned by the Governor's Executive Orders, it declines to address the People's other theory pursuant to CPL § 30.10(4)(a)(i), that the filing deadline was also extended because Defendant was continuously out of New York.

## V. MULTIPLICITOUS COUNTS

Defendant moves to dismiss counts[6] in the Indictment as multiplicitous, on the theory that the Indictment "groups sets of charges based on the same alleged payments to Cohen." Defendant

---

[6] This Court notes that the Defendant does not explicitly state which counts in the Indictment should be dismissed as multiplicitous. Defendant provides an overview of each charge in the Indictment and how the documents that have allegedly been falsified related to each charge. For example, Counts 8-10 in the Indictment pertain to the April 2017 payment to Cohen and each count is related to one record, i.e. the check/check stub, invoice, and General Ledger.

argues that it is improper to attribute multiple charges related to each payment Cohen received since each grouping (i.e. the invoices, checks, and daily general ledger entries) are the product of the same alleged criminal act.

An indictment is "multiplicitous when a single offense is charged in more than one count." *People v. Alonso*, 16 NY3d 257 [2011]. Each count of an indictment may charge one offense only. CPL § 200.30(1).

The People contend that each count in the Indictment is based on separate, allegedly false entries in the business records of the Trump Organization. Specifically, the Indictment contains one count for each of the eleven invoices, one count for each of the twelve detail general ledger entries, and one count for each of the eleven checks that were issued as a result. These documents were generated in connection to the initial payment to Cohen of $70,000 and the subsequent ten payments to him of $35,000. Defendant's Memo at pg. 37. The People allege that each document "constitutes a separate entry in the records of an enterprise, and each served a distinct purpose: the invoices generated the false rationale for the payments; the ledger entries created a false accounting of the expenditures; and the checks effected the false payments." People's Opposition at pg. 75.

The Court agrees that each document in the indictment is an alleged separate false entry that can support a separate count. The Court is satisfied that the Indictment adequately describes and charges 34 discrete crimes. Defendant's reliance on *People v. Quinn* is misplaced. In *Quinn*, the court held, and the People there conceded, that two counts of Offering a False Instrument for Filing in the First Degree were multiplicitous because each count was based on the *same* instrument and that instrument was offered for filing only once. *People v. Quinn*, 103 AD3d 1258 [4th Dept 2013] (emphasis added). That is simply not the case here.

Defendants motion to dismiss counts in the Indictment on the grounds that they are multiplicitous is denied.

## VI. MOTION TO COMPEL THE PEOPLE TO PROVIDE ADDITIONAL PARTICULARS

Defendant seeks further particulars regarding the pending charges. Specifically, Defendant seeks additional information as follows: (1) Final and conclusive notification of the object "crimes" relied upon as the predicates for felony charges under Penal Law § 175.10; (2) If the People continue to rely on Election Law § 17-152 as an object offense, the "unlawful means" alleged; (3) If the People continue to rely on Tax Law §§ 1801(a)(3) and 1802 as an object offense, whose tax records were intended to be falsified and how; (4) if the People continue to rely on Penal Law §§

24

175.05 and 175.10 as an object offense, the particular enterprise and records that were allegedly falsified; and (5) the factual basis for the People's intent to defraud with respect to each count Defendant's Memo at pg. 40. For the reasons set forth below, Defendant's motion is granted in part and denied in part.

On April 27, 2023, Defendant served the People with a request for a bill of particulars. The People responded on May 12, 2023. In the response, the People represented to Defendant that he was not entitled to certain information, namely the "other crimes" the People were relying upon to support the charge of Falsifying Business Records in the First Degree. Instead, they provided the four "other crime" theories referred to above. The People directed Defendant to the Statement of Facts which accompanied the Indictment, as well as pending discovery for a more thorough explanation of each of the four theories. In response, Defendant asked the People to identify the person or persons that Defendant allegedly intended to defraud. The People declined to provide that information, citing *Khalil*, 73 AD3d at 510 for the proposition that they are not required to establish that a defendant "acted with intent to defraud a particular person or business entity."

To date, the People have provided well over one million pages of discovery to the Defendant. In addition to the Statement of Facts, the discovery includes all Grand Jury testimony, the entirety of the exhibits produced to the Grand Jury, audio recordings, tax materials, various financial documents and documents received in response to subpoenas issued to varies entities including AMI. The People have also represented that the exhibits introduced in the Grand Jury will be introduced at trial.

The purpose of a bill of particulars is to "'define more specifically the crime or crimes charged in the indictment, or, in other words, to provide clarification' by furnishing information as to the substance of the factual allegations." Peter Preiser, Practice Commentary, McKinney's Cons Law of NY, CPL 200.95. A defendant must be provided with fair notice of the accusation against him in order to prepare a defense. *People v. Iannone*, 45 NY2d 589 [1978]. A defendant is entitled to information regarding the factual circumstances underlying the accusation – this is to ensure the defendant is not surprised [at trial] and so they are aware of precisely what it is they are to defend against. Peter Preiser, Practice Commentary, McKinney's Cons Law of NY, CPL 200.95. Pursuant to CPL § 200.95, when the prosecutor has refused defendant's request for a bill of particulars, the burden is on the defendant to satisfy a two part test: (1) the item of factual information requested must be one that is appropriate for a bill of particulars and (2) the information must be necessary to enable the defendant to adequately prepare or conduct a defense. *Id.*

25

The point of contention between Defendant and the People appears to come down to the application of *People v. Mackey*, 49 NY2d 274 [1980]. The defendant in *Mackey* was accused of committing the crime of Burglary in the Second Degree, in violation of PL § 140.25, which requires the People to prove that the Defendant entered a building "with the intent to commit a crime therein." The court held that, the prosecution did not have to identify the "crime" the defendant intended to commit. *Mackey* at 278.

Defendant correctly points out that the People have not cited a case that applies *Mackey* to PL § 175.10. Defendant also directs this Court's attention to the dissent in *Mackey* where Judge Fuchsberg expressed concern that the majority's ruling would place a defendant at a significant disadvantage at trial, as they would be exposed to unfair surprise by the prosecution. The People rely upon the plain reading of both PL § 140.25 which requires an "intent to commit a crime," and PL § 175.10, which requires an "intent to commit another crime." Essentially, neither statute requires proof that a defendant committed or was convicted of the "intended" crime nor does it require identification of said crime.

As discussed in Section II *supra*, there is consensus that there is no requirement that the prosecution allege or establish what particular crime was intended to be committed. *See People v. Mahboubian*, 74 NY2d 174 [1989]; *People v. Thompson*, 206 AD3d 1708 [4th Dept 2022]. Nor is there a requirement that there be an intent to defraud any particular person. *See People v. Dallas*, 46 AD3d 489 [1st Dept 2007]. A plain reading of PL § 175.10 demonstrates that it is nearly identical to PL § 140.25 and the elements required to prove each offense are the same. Thus, in this Court's view, the People are not required to specify the "other crime." Nonetheless, the People have identified four theories which they intend to present at trial. Specifically, that Defendant *intended* to violate FECA, Election Law § 17-152, Tax Law §§ 1801(a)(3), and that Defendant "intended to commit or conceal the falsification of other business records." People's Opposition at pg. 41. In fact, the People have not only informed Defendant of several "other crime" theories, but as previously stated, they have supplemented that with a detailed Statement of Facts and voluminous discovery in support of those theories. This Court finds that the People have far exceeded the requirements of CPL § 200.95.

Regarding, Defendant's first request, seeking "final and conclusive notification of the 'object crimes,'" *Mackey* provides, and this Court agrees, that a Defendant is entitled to information that will enable him to prepare an adequate defense. In a complex matter such as this, it would be unfair to require the Defendant to conform mid-trial to a new, novel or previously undisclosed

26

legal theory. Therefore, the People will be limited to only those theories which they have already identified and are hereby precluded from introducing any new or different "other crime" theories at trial.

## VII. ALLEGED GRAND JURY SECRECY VIOLATIONS

Defendant claims that the rules regarding Grand Jury secrecy have been violated and that information leaked to the press has prejudiced Defendant to such degree, that it warrants dismissal of the Indictment.

Defendant points to several news articles that he contends contain information which only the Grand Jury and those appearing before the Grand Jury would know. For example, there have been reports that a grand jury was convened to investigate the Defendant and that the same Grand Jury paused its proceedings for a time. Defendant refers to an article that presumably detailed that prosecutors had signaled to Defendant's lawyers that he could face criminal charges. Defendant argues that because the extent of the unauthorized disclosures is not known, a hearing, at minimum, is warranted and he is entitled to all written communication between DANY personnel and members of the press regarding the instant matter. For the reasons set forth below, this branch of Defendant's motion is denied.

The People contend that the information set forth in each of Defendant's examples was available from sources not bound by Grand Jury secrecy. For example, the People point to a May 25, 2021, article about the Grand Jury proceeding that covered such topics as the Trump Organization's financial practices. The People note that McConney had testified only days prior and that he had no secrecy obligations. The People also note that some of the alleged leaked information that Defendant references was not even accurate. For example, the People maintain that information contained in articles dated March 29, 2023, referencing grand jury scheduling was simply wrong and, therefore, cannot possibly reflect inappropriate disclosure of grand jury information, as claimed by Defendant.

Grand Jury proceedings are secret subject to limited exceptions. CPL § 190.25(4)(a). A public prosecutor may not disclose the nature or substance of any Grand Jury testimony, evidence or any decision. *People v. Sergio*, 16 Misc3d 1127[A] [Sup. Ct. Kings County. 2007]. However, dismissal of an indictment for impairment of the integrity of a Grand Jury proceeding is an extraordinary remedy which requires the moving party to meet a very high and exacting standard. *People v. Jones*, 239 AD2d 234 [1st Dept 1997]. There is a presumption of regularity that attaches to

Grand Jury proceedings. *People v. Grant*, 215 AD2d 114 [1st Dept. 1995]; *People v. Nash*, 69 AD3d 1113 [3d Dept. 2010]. Grand jurors, prosecutors, grand jury stenographers, grand jury interpreters, police or peace officer guarding a witness in a grand jury proceeding, clerks, wardens and other public servants having official duties in or about a grand jury chamber or proceeding are bound by CPL § 215.70 secrecy provisions. However, others such as witnesses, are exempt from the statute. Donnino Practice Commentary CPL 215.70.

This Court has considered the arguments of the respective parties in tandem with careful examination the Grand Jury minutes and finds that Defendant's claims are without merit.

## VIII. PEOPLE'S CERTIFICATES OF COMPLIANCE

Defendant asks this Court to strike the People's Certificates of Compliance and to direct the People to comply with its discovery obligations. Specifically, Defendant requests that the Court order the People to identify the exhibits they intend to introduce at trial in their case in chief. Defendant argues that the People produced a list of 33 books in their Automatic Discovery Form ("ADF") but did not turn over the books, nor have they identified the specific sections of the books that will be referred to at trial. Defendant claims that this discovery violation will unfairly prejudice Defendant.

The People's ADF contained Addendum A, which listed books and other materials. The People note that the first page of the ADF contains language to the effect that counsel should contact the "undersigned assistant" should they wish to inspect, copy, photograph, or test any document or item listed in the ADF. The People also argue that they informed Defendant in their first discovery production dated May 23, 2023, that they intend to introduce all of the Grand Jury exhibits at trial. The list of exhibits was included in their May 23, 2023, disclosure.

As this Court discussed in Section VI *supra*, the Defendant has a right to prepare defenses. It is only fair that the People should inform Defendant which of the documents produced in discovery they intend to introduce at trial, particularly in a case such as this which involves voluminous discovery. Here, the People have informed Defendants that they intend to use the Grand Jury exhibits as their exhibits at trial. They have also informed Defendant that they will "update the defense as soon as practicable" as additional exhibits are identified. Given the rapidly approaching trial date, the sheer amount of discovery produced thus far and as required by CPL § 245.20(1)(o), the People are hereby directed to identify the remaining exhibits, if any, that will be offered into evidence in their case in chief by March 15, 2024.

Finally, this Court is aware of the recent Court of Appeals decision in *People v. Bay*, 2023 N.Y. Slip Op. 06407 (2023), which was rendered after the parties had completed briefing on the instant matter. After reviewing *Bay*, this Court does not believe its holding impacts upon the issues here.

THEREFORE, it is hereby

ORDERED that Defendant's motion to dismiss the charges on the basis of pre-indictment delay or, in the alternative, that a *Singer* hearing be ordered is denied; and it is further

ORDERED that Defendant's motion to inspect the Grand Jury Minutes is granted, but is denied as to Defendant's request to dismiss the Indictment for legal insufficiency; and it is further

ORDERED that Defendant's motion for production of the legal instructions to the Grand Jury and for production of the complete set of Grand Jury Minutes is denied; and it is further

ORDERED that Defendant's motion for dismissal of the Indictment on the grounds of selective prosecution is denied; and it is further

ORDERED that Defendant's motion to dismiss the Indictment due to the alleged violation of the statute of limitations pursuant to CPL 30.10(2)(b) is denied; and it is further

ORDERED that Defendant's motion to dismiss counts in the indictment on the grounds that they are multiplicitous is denied; and it is further

ORDERED that Defendant's motion for this Court to order the People to provide a more robust bill of particulars is denied in part and granted in part; and it is further

ORDERED that Defendant's motion to conduct a hearing regarding Grand Jury secrecy violations is denied; and it is further

29

ORDERED that Defendant's motion to strike the People's certificates of compliance is denied; and it is further

ORDERED that the People are to identify to Defendant no later than March 15, 2024, the rest of the exhibits they intend to introduce at trial.

The foregoing constitutes the decision and order of the Court.

Dated: February 15, 2024
New York, New York

FEB 15 2024
TTA

Juan M. Merchan
Judge of the Court Claims
Acting Justice of the Supreme Court

HON. J. MERCHAN