# EXHIBIT K

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,

         - against -

DONALD J. TRUMP,

                     Defendant.

Ind. No. 71543-23

**PRESIDENT DONALD J. TRUMP'S REQUESTS TO CHARGE**

# TABLE OF CONTENTS

I.     INTRODUCTION AND OBJECTIONS ............................................................. 1

II.    LIMITING INSTRUCTION: PRESIDENT TRUMP ...................................... 5

III.   LIMITING INSTRUCTION: NON-DISCLOSURE AGREEMENTS AND "HUSH MONEY" ............................................................................................................ 6

IV.    HEARSAY: EVIDENCE NOT OFFERED FOR THE TRUTH ..................... 7

V.     HEARSAY: AGREEMENTS BY AMI AND MICHAEL COHEN ............... 9

VI.    CREDIBILITY OF WITNESSES: BIAS .................................................... 11

VII.   INVOLVEMENT OF COUNSEL ............................................................... 12

VIII.       SPOLIATION ...................................................................................... 13

IX.    ACCOMPLICE AS A MATTER OF LAW ................................................ 14

X.     COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: DEFINITIONS ...................................................................................................... 16

XI.    COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: ACCESSORIAL (ACCOMPLICE) LIABILITY ................................................. 18

XII.   COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: ELEMENTS ........................................................................................................... 20

XIII.       COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: PREDICATE OFFENSE (ELECTION LAW § 17-152) ............................ 21

XIV.        COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: UNLAWFUL MEANS: FECA ............................................................. 24

XV.    CONCLUSION .......................................................................................... 29

## I.    INTRODUCTION AND OBJECTIONS

Pursuant to CPL § 300.10(5), President Donald J. Trump respectfully submits the following requests to charge and objections to DANY's May 12, 2024 requests to charge. These requests are structured based in part on DANY's submission, in which DANY argued that: (1) the only object offense they are relying upon for purposes of Penal Law § 175.10 is Election Law § 17-152; and (2) the alleged "unlawful means" under Election Law § 17-152 are violations of the Federal Election Campaign Act, Penal Law § 175.05, and various "tax laws."

Set forth below is a brief discussion of President Trump's principal objections to DANY's proposals, which are also discussed in the footnotes accompanying the following requests by President Trump.

### A.    Prejudicial Change In Theories

President Trump reserves the right to challenge on any appeal DANY's prejudicial change in their theory of this prosecution. As the Court has recognized, DANY previously argued, including in response to pretrial motions, that there were "four theories" for predicate offenses under Penal Law § 175.10. 2/15/24 Decision and Order at 11; *see also* DANY Motions *In Limine* at 13 ("[T]he People may allege at trial that among the crimes defendant intended to commit, aid, or conceal are violations of the Federal Election Campaign Act ('FECA')"); DANY Opp'n to Def Motions *In Limine* at 4 ("In denying defendant's motion to dismiss the indictment, this Court held that this intent prong could be established in part by evidence of defendant's 'intent to influence the 2016 presidential election by violating FECA, Election Law § 17-152, and New York Tax Laws.'"). President Trump prepared his pretrial motions, motions *in limine* and trial defense based on those representations. However, just prior to the close of DANY's case-in-chief, the prosecutors have notified the Court and the defense that their argument is that there is one Penal

Law § 175.10 predicate—Election Law § 17-152—and three forms of § 17-152 "unlawful activity."

### B. Intent to Defraud

President Trump objects to DANY's proposed instruction regarding Intent to Defraud. While we respectfully disagree with the Court's pretrial ruling that this concept can be extended in this case beyond intent to deprive someone of money or property, we have not raised that issue with the jury and do not plan to do so. Absent a finding by the Court that we have opened the door, it would be improper to expand "intent to defraud" under Penal Law § 175.10 to intent to defraud "the voting public." DANY Requests at 2. None of the cases cited by DANY supports the improper expansion they seek under the circumstances of this case. In fact, the citation to the interpretation of Election Law in *People v. Lang*, 36 N.Y.2d 366 (1975) illustrates how the requested instruction could risk merging the "intent to defraud" requirement with the separate requirement concerning Election Law § 17-152 as a predicate.

### C. Election Law § 17-152 "Unlawful Means": FECA

While President Trump agrees that it is necessary for the Court to provide the jury with instructions regarding FECA, DANY's proposed instructions misstate the law and understate their burden.

First, DANY's proposed instructions conflate the requirement that a payment be made "for the purpose of influencing" an election, 52 U.S.C. §§ 30101(8)(a)(i), 30101(9)(A)(i), with the separate limitation imposed by the FEC's "irrespective of the candidacy" rule, 11 C.F.R. § 113.1(g)(7). As noted below in connection with President Trump's proposed FECA instruction, to avoid First Amendment problems, the "influencing" phrase must be limited to activities that "unambiguously" related to the campaign. *North Carolina Right to Life v. Leake*, 525 F.3d 274,

281 (4th Cir. 2008) ("[A]fter *Buckley*, campaign finance laws may constitutionally regulate only those actions that are 'unambiguously related to the campaign of a particular candidate.'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 80 (1976)). The "irrespective" rule—*i.e.*, that a payment is not a "contribution" if it would have been made "irrespective of the candidacy"—is a distinct limitation on the meaning of the term "contribution" as used in this case.

Second, DANY has not proffered adequate authority to justify instructing the jury that:

> [A] third party's payment of a candidate's expenses will be deemed a contribution when the payment would not have been made but for the candidate's status as a candidate for federal office, even when the payment is used solely for the candidate's personal expenses.

DANY Requests at 5 & n.25 (citing FEC Advisory Opinion 2000-08). In Advisory Opinion 2000-08, the FEC made clear that the proposed payment at issue was to be made "in recognition and support of that person's desire to run for office." Thus, the advisory opinion is a straightforward application of—rather than a corollary or modification to—the "irrespective" rule.

Third, the Court should not provide instructions that require the jury to examine the payor's "motivation" or "purpose in mind." DANY Requests at 6. The FEC has expressly rejected subjective tests.

> [D]etermining whether an expense is primarily related to a campaign or the duties of an officeholder, or instead is primarily related to some other activity, would force the Commission to draw conclusions as to which relationship is more direct or significant. The Commission has been reluctant to make these kinds of subjective determinations in the past. Moreover, any rule that requires these kinds of determinations can result in more ad hoc decisionmaking.

Expenditures; Reports by Policial Committees; Personal Use of Campaign Funds, 60 Fed. Reg. 7862-01, 7864, 1995 WL 49139 (Feb. 9, 1995); *see also Orloski v. FEC*, 795 F.2d 156, 162 (D.C. Cir. 1986) ("We find nothing in the quoted phrase or anywhere else in the Act that prohibits the FEC from adopting an objective test for determining when a corporate donation is made 'for the purposes of influencing any election.' In fact, as the FEC points out, the Act may implicitly

mandate an objective test."). For example, the "irrespective" rule focuses on whether "the obligation would exist even in the absence of the candidacy or even if the officeholder were not in office." *Id.*

### D. Election Law § 17-152 "Unlawful Means": "Tax Laws"

There is not an adequate basis in the record to allow the jury to consider whether an "unlawful means" of the alleged Election Law § 17-152 conspiracy was "tax laws." At most, DANY has adduced evidence of a tax-related conversation between Michael Cohen and Allen Weisselberg in January 2017. *See* Tr. 3484. No rational juror could conclude that any such conversation in January 2017 was part of an agreement to "promote . . . the election of" President Trump, under § 17-152, in connection with the since-concluded November 2016 race.

In addition, in a May 12, 2023 response to President Trump's request for particulars, DANY limited the tax crimes at issue in this case to "New York Tax Law §§ 1801(a)(3) and 1802." The Court has similarly limited its prior analysis to New York's tax laws. *See* 2/15/24 Decision and Order at 12, 16-17. DANY should not now be permitted to expand that disclosure by invoking federal and city tax requirements.

Finally, under New York Tax Law § 1802, there must be a "tax fraud act." The "tax fraud act" specified by DANY is § 1801(a)(3), which implicates one who "knowingly supplies or submits materially false or fraudulent information in connection with any return, audit, investigation, or proceeding or fails to supply information within the time required by or under the provisions of this chapter or any regulation promulgated under this chapter." There has been no evidence at this trial that such conduct was undertaken or contemplated by Cohen.

## II.    LIMITING INSTRUCTION: PRESIDENT TRUMP

Jurors, you will recall that during jury selection you promised the attorneys for President Trump, the prosecution, and this Court that you would set aside any personal opinions or bias you might have in favor of or against President Trump and his family, and that you would decide this case fairly on the evidence and the law.

Again, I direct you, as you have promised, to decide this case on the evidence and the law as it relates to the defendant here on trial, President Trump.  You must set aside any bias or prejudice you might have in favor of or against President Trump and his family and you must not allow any such bias to influence your verdict.[1]

---

[1] Adapted from *Trump Corp.* Tr. 3172.

## III.   LIMITING INSTRUCTION: NON-DISCLOSURE AGREEMENTS AND "HUSH MONEY"

You have heard testimony and seen evidence during the trial relating to non-disclosure agreements and payments made in connection with non-disclosure agreements, which have at times been referred to as "hush money."[2]  There is nothing inherently wrong or illegal about these types of payments and non-disclosure agreements.  It is for you to decide, based on the testimony and other evidence and the instructions that I am going to provide to you, what if any significance to attribute to the agreements and payments at issue in this case.

---

[2] *See, e.g.*, Tr. 1864, 1866.

## IV.    HEARSAY: EVIDENCE NOT OFFERED FOR THE TRUTH

From time to time, you have heard me say that a statement from a witness or a document was admitted for a reason other than for the truth of what it asserts.  I want to provide you with some further instructions for your consideration of that evidence.

The People offered evidence of certain newspaper articles and National Enquirer headlines on People's Exhibits 152, 153-A through 153-C, 180, and 181.  Similarly, the People offered into evidence an invoice from Investor Advisory Services Inc., which was marked People's Exhibit 161.  These exhibits were admitted into evidence for the limited purpose of demonstrating that the articles were published, and the documents were created, on or about a certain date and to provide context.  These exhibits were not admitted for any other purpose, and you may not consider factual assertions or statements in these exhibits as evidence that the underlying events actually occurred.[3]

The People also offered evidence of certain text messages that were admitted based on a similar limitation.  These were the messages between (1) Gina Rodriguez and Dylan Howard, which were marked People's Exhibit 171A; and (2) Michael Cohen and Chris Cuomo, which were marked as People's Exhibit 257.  Evidence of factual assertions and statements by Rodriguez and Cuomo, including in those text messages, was admitted into evidence for the limited purpose of providing context for the responses by Howard and Cohen.  The statements by Rodriguez and Cuomo were not admitted for any other purpose, and you may not consider their factual assertions or statements as evidence that the underlying events they referenced actually occurred.[4]

---

[3] *See, e.g.*, Tr. 1028, 1033, 1155.
[4] *See* Tr. 1224-25.

Finally, you heard testimony from Hope Hicks and Michael Cohen regarding reactions by certain politicians and others to the "Access Hollywood" tape.[5] The factual assertions and statements by those other individuals were offered to provide context. You may not consider what Hicks and Cohen heard or were told for the truth of the words that were said to them. You may consider the words only to provide context for what they did after hearing the statements.[6]

---

[5] *See, e.g.*, Tr. 2161-66, 3374-75.

[6] *See* Tr. 845-86 (similar instruction during the Court's preliminary instructions).

## V.    HEARSAY: AGREEMENTS BY AMI AND MICHAEL COHEN

You heard evidence of certain agreements that AMI and Michael Cohen entered into with government authorities.  First, Davd Pecker testified that AMI entered into a non-prosecution agreement with federal prosecutors in 2018, and that AMI entered into what is called a "conciliation agreement" with the Federal Election Commission in 2021.[7]  AMI did not admit to any violations of law in those agreements.[8]  Second, Cohen testified that he entered into a plea agreement with federal prosecutors in 2018 that required him to plead guilty to, among other things, violations of the campaign finance laws, and that he and his attorneys made submissions to and statements regarding an inquiry by the Federal Election Commission in 2018.[9]

I want to remind you of the limited purpose for which evidence of these documents was admitted at the trial.  Specifically, that evidence was permitted to assist you in assessing the credibility of Pecker and Cohen and to help provide context for surrounding events.  You may consider that evidence for those purposes only.  AMI's non-prosecution agreement and conciliation agreement are not evidence of President Trump's guilt, and you may not consider them in determining whether President Trump is guilty or not guilty of the charged crimes.  Similarly, Cohen's guilty plea, and his submissions and statements to the FEC, are not evidence

---

[7] Tr. 1248-55; Tr. 1261-63.

[8] President Trump respectfully submits that this instruction is warranted in light of (1) DANY's decision to elicit extensive testimony regarding the Statement of Facts attached to the non-prosecution agreement notwithstanding the limited purpose for which the document was admitted, including on re-direct examination, Tr. 1248-55, 1460-62; (2) Mr. Pecker's inaccurate testimony that AMI "admitted" and "agreed" to a "campaign violation" in these agreements, Tr. 1242, 1263; (3) DANY's inaccurate assertion at sidebar that the non-prosecution agreement involved AMI "admit[ing] to a campaign finance violation," Tr. 1243, which suggests that this may become an issue during summations; and (4) Mr. Pecker's inaccurate testimony that he personally joined the conciliation agreement, *see, e.g.*, Tr. 1460-61.

[9] *See, e.g.*, People's Exs. 201-02.

of President Trump's guilt, and you may not consider them in determining whether President Trump is guilty or not guilty of the charged crimes.[10]

---

[10] Tr. 1245; *see also* 3/18/24 Decision and Order on Defendant's Motions *In Limine* at 5 ("Defendant's motion is granted to the extent that the People are precluded from arguing that Cohen's guilty plea to FECA violations is probative of Defendant's guilt in the instant matter."); *id.* at 6 ("The People will be allowed to elicit testimony pertaining to AMI's agreements but they are precluded from arguing that the mere fact there was an agreement is probative of Defendant's guilt.").

## VI.    CREDIBILITY OF WITNESSES: BIAS

*President Trump respectfully requests that the Court add the following language as an additional "Credibility factor" in the Court's standard instruction titled "Credibility of Witnesses":*

**Judge Found Witness Testified Falsely**

You have heard testimony that a judge found that Cohen testified falsely in an unrelated proceeding. That judge's determination is not binding on your determination of Cohen's credibility in this case. You may, however, consider that determination, along with the other evidence in the case, in evaluating the truthfulness and accuracy of Cohen's testimony before you.[11]

---

[11] CJI 2d [NY] Credibility, Judge Found Witness Testified Falsely; *see also United States v. Cohen*, 2024 WL 1193604, at *4 (S.D.N.Y. 2024) ("This testimony is more troubling than the statements that Cohen had previously made in his book and on television . . . because it was given under oath. It gives rise to two possibilities: one, Cohen committed perjury when he pleaded guilty before Judge Pauley or, two, Cohen committed perjury in his October 2023 testimony.").

**VII.     INVOLVEMENT OF COUNSEL**

You have heard evidence that Michael Cohen took certain steps in this case while acting as an attorney for President Trump, including while Cohen worked at the Trump Organization between 2007 and January 2017, and also while Cohen acted as a personal attorney to President Trump in 2017 and 2018.

You may consider these facts, as well as evidence of statements by Cohen to President Trump, when you evaluate whether the People have met their burden of proof with respect to proving beyond a reasonable doubt that President Trump acted with intent to defraud that includes an intent to commit another crime or to aid or conceal the commission of another crime under Penal Law § 175.10.  Specifically, in considering whether President Trump acted in good faith, you may consider whether Cohen's presence, involvement, or advice known to President Trump gave President Trump comfort that he was acting properly.[12]

---

[12] Based on the authorities cited in President Trump's April 15, 2024 pre-motion letter, we respectfully submit that there is an adequate basis in the record for this instruction and related arguments by the defense to the jury.  *See, e.g.*, *United States v. Bankman-Fried*, 2023 WL 6392718, at *3 (S.D.N.Y. 2023) (noting that the defense argument was permitted in *Tagliaferri* where "[t]he defendant's lawyer drafted or reviewed for the defendant documents that provided for the defendant to receive the allegedly concealed kickback").  Cohen not only participated in negotiations relating to the payments at issue as President Trump's attorney, but DANY elicited testimony that Cohen conveyed to President Trump the assurance from David Pecker that AMI's agreement with Karen McDougal was "bulletproof."  Tr. 3323:14-16.  While Cohen offered a different interpretation of the term, Pecker—the relevant speaker—agreed that he used that term "to convey that there [were] no legal ramifications" with the agreement based on legal advice that he had received.  Tr. 1387-89.

**VIII.      SPOLIATION**

You heard testimony from David Daus that data was deleted from one of Michael Cohen's phones, through a "factory reset," in October 2016.[13]  If you find that Cohen destroyed or obliterated data that he knew would be relevant to a contested issue in this case and knew at the time he did so that there was a potential for prosecution, then you may infer (but are not required to infer) that the contents of the destroyed evidence were unfavorable to Michel Cohen.[14]

---

[13] *See* Tr. 2062-63.

[14] Judge D. Brock Hornby's 2012 Revisions to Pattern Criminal Jury Instructions For the District Courts of the First Circuit § 2.13 ("Spoliation"), *available at* https://www.prd.uscourts.gov/sites/default/files/2012%20Revisions%20to%20Pattern%20Criminal%20Jury%20Instructions.pdf.

**IX.      ACCOMPLICE AS A MATTER OF LAW**

Under our law, Michael Cohen is an accomplice because there is evidence that he participated in  a crime based upon conduct involved in the allegations here against President Trump.

Our law is especially concerned about the testimony of an accomplice who implicates another in the commission of a crime, particularly when the accomplice has received, expects or hopes for a benefit in return for his/her testimony.

 Therefore, our law provides that a defendant may not be convicted of any crime upon the testimony of an accomplice unless it is supported by corroborative evidence tending to connect the defendant with the commission of that crime.

In other words, even if you find the testimony of Cohen to be believable, you may not convict the defendant solely upon that testimony unless you also find that it was corroborated by other evidence tending to connect the defendant with the commission of the crime.

The corroborative evidence need not, by itself, prove that a crime was committed or that President Trump is guilty.  What the law requires is that there be evidence that tends to connect the defendant with the commission of the crime charged in such a way as may reasonably satisfy you that the accomplice is telling the truth about the defendant's participation in that crime.

In determining whether there is the necessary corroboration, you may consider whether there is material, believable evidence, apart from the testimony of Cohen, which itself tends to connect President Trump with the commission of the crime.

You may also consider whether there is material, believable evidence, apart from the testimony of Cohen, which, while it does not itself tend to connect President Trump with the commission of the crime charged, it nonetheless so harmonizes with the narrative of the

accomplice as to satisfy you that the accomplice is telling the truth about President Trump's participation in the crime and thereby tends to connect the defendant to the commission of the crime.

**X.    COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: DEFINITIONS**

The first count is Falsifying Business Records in the First Degree.

I will instruct you first on the definition of the crime of Falsifying Business Records in the First Degree.  Then I will define for you when a defendant may be found guilty of a crime on the basis of accessorial liability.  Finally, I will put both definitions together and list for you the elements you must find have been proven beyond a reasonable doubt in order to find President Trump guilty of that crime.  The same instructions will apply to each of the remaining counts in the Indictment.[15]

Under our law, a person is guilty of Falsifying Business Records in the First Degree when, with intent to defraud that includes an intent to commit another crime or to aid or conceal the commission thereof, that person makes or causes a false entry in the business records of an enterprise.[16]

The following terms used in that definition have a special meaning:

**ENTERPRISE** means any entity of one or more persons, corporate or otherwise, public or private, engaged in business, commercial, professional, industrial, eleemosynary, social, political or governmental activity.[17]

**BUSINESS RECORD** means any writing or article, including computer data or a computer program, kept or maintained by an enterprise for the purpose of evidencing or reflecting its condition or activity.[18]

---

[15] Adapted from *Trump Corp.* Tr. 3225-26.

[16] CJI 2d [NY] Penal Law § 175.10, Falsifying Business Records 1.

[17] CJI 2d [NY] Penal Law § 175.10, Falsifying Business Records 1.

[18] CJI 2d [NY] Penal Law § 175.10, Falsifying Business Records 1.

**INTENT** means conscious objective or purpose.  Thus, a person acts with intent to defraud when his or her conscious objective or purpose is to lead another into error or to disadvantage.[19]

---

[19] *See* Hon. William C. Donnino, *Practice Commentaries*, Penal Law § 15.00 ("Although a significant number of penal statutes require an 'intent to defraud,' there is no Penal Law definition of that culpable mental state.  It has been suggested that an intent to defraud should be 'for the purpose of leading another into error or to disadvantage.'" (quoting *People v. Briggins*, 50 N.Y.2d 302, 309 (1980) (Jones, J., concurring))).  President Trump (1) objects, as noted above, to DANY's proposed instruction regarding intent to defraud because there is no basis for suggesting to the jury that allegedly false records created in 2017 on the private books of the Trump Organization were intended to defraud "the government" or "the voting public"; and (2) respectfully preserves his prior argument that, under the circumstances of this case, the term "intent to defraud" should be limited to intentions to cheat or deprive another person of property, a thing of value, or a right, *see* 9/29/23 Def. Omnibus Mot. at 22-24.

## XI.    COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: ACCESSORIAL (ACCOMPLICE) LIABILITY

Our law recognizes that two or more individuals can act jointly to commit a crime, and that in certain circumstances, each can be held criminally liable for the acts of the others.  In that situation, those persons can be said to be "acting in concert' with each other.

Our law defines the circumstances under which one person may be criminally liable for the conduct of another.  That definition is as follows:

When one person engages in conduct which constitutes an offense, another is criminally liable for such conduct when, acting with the state of mind required for the commission of that offense, he or she solicits, requests, commands, importunes, or intentionally aids such person to engage in such conduct.

Under that definition, mere presence at the scene of a crime, even with knowledge that the crime is taking place, (or mere association with a perpetrator of a crime,) does not by itself make a defendant criminally liable for that crime.

Thus, in order for President Trump to be held criminally liable for the conduct of others which constitutes an offense, you must find beyond a reasonable doubt:

(1) That President Trump solicited, requested, commanded, importuned, or intentionally aided other people to engage in that conduct, and

(2) That President Trump did so with the state of mind required for the commission of the offense charged in Count One, that is, that he acted with intent to defraud that includes an intent to commit another crime or to aid or conceal the commission thereof.[20]

_____

[20] CJI 2d [NY] Accessorial (Accomplice) Liability.  President Trump objects to DANY's request for the additional instruction that: "A person causes a false entry when, even if he does not prepare the relevant business record himself, the creation of a false entry in the business record is a

-18-

---

reasonably foreseeable consequence of his conduct." The concept of a "reasonably foreseeable consequence" accounts for only part of the appropriate instruction regarding accessorial liability, and would improperly draw the jury's attention away from the related mens rea requirement mandated by the pattern instruction and applicable law.

## XII.    COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: ELEMENTS

In order for you to find President Trump guilty of the crime charged in Count One, the People are required to prove beyond a reasonable doubt, from all of the evidence in the case, each of the following two elements:

1.    That on or about February 14, 2017, in the county of New York and elsewhere, President Trump, personally or by acting in concert with another person or persons, made or caused a false entry in the business records of an enterprise, specifically, an invoice from Michael Cohen dated February 14, 2017, marked as a record of the Donald J. Trump Revocable Trust, and kept and maintained by the Trump Organization;

2.    That President Trump did so with intent to defraud that included an intent to commit another crime or to aid or conceal the commission of another crime.[21]  Thus, for this second element, the People must establish beyond a reasonable doubt two separate intents: the intent to defraud and indent to aid or conceal the commission of another crime, which I will define for you shortly.[22]

---

[21] President Trump objects to DANY's requested supplemental instruction regarding "Intent to Commit or Conceal Another Crime."  Absent a finding that a defense argument is necessary to clarify a misimpression, instructions regarding what DANY believes it "need not prove" risk impermissible burden shifting.

[22] *See* Hon. William C. Donnino, *Practice Commentaries*, Penal Law § 175.05 ("It should be emphasized that for the first-degree crime there must be two separate intents in that the 'intent to defraud' must include 'an intent to commit another crime or to aid or conceal the commission thereof.'"); *see also People v. Flynn*, 79 N.Y.2d 879, 881 (1992) ("It is well settled that all the elements of an indicted crime which are not conceded by defendant or defendant's counsel must be charged.")

## XIII.    COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: PREDICATE OFFENSE (ELECTION LAW § 17-152)

As I mentioned, the second element of Count One requires the People to prove beyond a reasonable doubt that President Trump acted with intent to defraud that included an intent to commit another crime or to aid or conceal the commission thereof.  The People contend that the "other" alleged crime at issue was a violation of Election Law § 17-152.[23]

Section 17-152 makes it a misdemeanor for "[a]ny two or more persons who conspire to promote or prevent the election of any person to a public office by unlawful means and which conspiracy is acted upon by one or more of the parties thereto."  I will now describe two concepts relating to § 17-152: conspiracy and "unlawful means."

### A.  Conspiracy

Under our law, a person participates in a conspiracy when, with intent that conduct be performed that would promote or prevent the election of a person to public office by unlawful means, he or she agrees with one or more persons to engage in or cause the performance of such conduct.[24]

Knowledge of a conspiracy does not by itself make the defendant a coconspirator.  The defendant must intend that conduct be performed that would promote or prevent the election of a person to public office by unlawful means.  Intent means conscious objective or purpose.  Thus, a

---

[23] President Trump respectfully preserves his prior argument that Election Law § 17-152 is not a valid object offense for purposes of the violations of Penal Law § 175.10 alleged in this case.  *See* 9/29/23 Def. Omnibus Mot. at 15-19.

[24] Adapted from CJI 2d [NY] Penal Law Article 105, Conspiracy to commit a crime.

person acts with the intent that conduct constituting a crime be performed when the person acts willfully, with a conscious objective or purpose that such conduct be performed.[25]

Evidence that President Trump was present when others agreed to engage in the performance of a crime does not by itself show that President Trump personally agreed to engage in the conspiracy.[26]

Proof of separate or independent conspiracies is not sufficient. In determining whether or not any single conspiracy has been shown by the evidence in the case you must decide whether common goals or objectives existed which served as the focal point for the efforts and actions of any members to the agreement. In arriving at this decision, you may consider the length of time the alleged conspiracy existed, the mutual dependence or assistance between various persons alleged to have been its members, and the complexity of the goal or objective.[27]

---

[25] Adapted from CJI 2d [NY] Penal Law Article 105, Conspiracy to commit a crime. Because DANY alleges that one form of "unlawful means" involved violations of FECA—which requires evidence of willfulness, *see* 52 U.S.C. § 30109(d)—the mens rea necessary to join an Election Law § 17-152 conspiracy is also willfulness. *See People v. Caban*, 5 N.Y.3d 143, 149 (2005) ("It is the individual who is prosecuted [for conspiracy] and necessarily it is the individual who must have the prescribed mens rea. The requisite intent is to join with others to commit a substantive crime."); *see also People v. Ozarowski*, 38 N.Y.2d 481, 489 (1976) ("The inference of intent under the conspiracy doctrine presents special problems, however. As the United States Supreme Court has recently noted: We scrutinize the record for evidence of such intent with special care in a conspiracy case for, as we have indicated in a related context, charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning . . . a dragnet to draw in all substantive crimes." (cleaned up)).

[26] CJI 2d [NY] Penal Law Article 105, Conspiracy to commit a crime.

[27] Kevin F. O'Malley et al., Federal Jury Practice and Instructions § 31.09 (6th ed. 2023); *see also United States v. Parrilla*, 2014 WL 3784116, at 29-32 (S.D.N.Y. 2014) (proposed multiple conspiracies charge); *People v. Leisner*, 73 N.Y.2d 140, 150 (1989) ("Like the Federal courts, we believe that because the clarity of the charge is so crucial in these complex conspiracy trials, a charge must be given explicitly recognizing the possibility of multiple conspiracies and directing an acquittal in the event that the jury concludes that something other than a single integrated conspiracy was proven. Such a charge is required whenever the possibility of more than one conspiracy is supported by a reasonable view of the evidence.").

-22-

**B. "Unlawful Means"**

As I mentioned, § 17-152 requires proof that the goal of the conspiracy was to promote the election of a person "by unlawful means."  The People allege that the unlawful means at issue involved (1) violations of the Federal Election Campaign Act, or FECA; and (2) the falsification of other business records.[28]

You must reach a unanimous decision regarding whether the People have established "unlawful means" and, if so, which "unlawful means" was or were at issue.  I will provide you with a verdict form so that you can indicate your conclusions on these issues.[29]

---

[28] For the reasons set forth above, President Trump respectfully submits that "violation of tax laws" should not be submitted to the jury as an alleged "unlawful means" for purposes of Election Law § 17-152.

[29] *Ring v. Arizona*, 536 U.S. 584, 602 (2002) ("If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." (citing *Apprendi v. New Jersey*, 530 U.S. 466, 482-83 (2000))).

XIV.    **COUNT 1: FALSIFYING BUSINESS RECORDS IN THE FIRST DEGREE: UNLAWFUL MEANS: FECA**

The People contend that AMI's payment to Karen McDougal and Michael Cohen's payment to Stormy Daniels were unlawful campaign contributions under FECA.  To apply that standard, I am going to give you guidance on three issues: the definition of the term "contribution," FECA's "Press Exemption," and the requirement under FECA that any criminal violation of the statute be "willful."

A.    **"Contribution"**

Under FECA, individuals may not make a contribution to any candidate with respect to any election for federal office which, in the aggregate, exceeds a certain limit.[30]  In 2015 and 2016, that limit was $2,700.  During that period, there was no limit on a candidate's ability to contribute personal funds to his or her campaign.[31]

A third party's expenditure constitutes a "contribution" under FECA *only* if two conditions are met: (1) the payment must have been made in cooperation, consultation, or concert with the candidate, or at the request or suggestion of the candidate,[32] and (2) the payment must have been made "for the purpose of influencing any election for Federal office."[33]  The phrase "the purpose

---

[30] 52 U.S.C. § 30116(a)(1)(A).

[31] "Candidate contributions to their own campaigns are not subject to any limits.  They must, however, be reported."  https://www.fec.gov/help-candidates-and-committees/candidate-taking-receipts/using-personal-funds-candidate.

[32] 52 U.S.C. § 30101(9)(A) (defining "expenditure"); *id.* § 30116(a)(7)(B)(i) (treating a coordinated "expenditure" as an in-kind "contribution").  In contrast, "independent expenditures" by a third party are not "contributions" under FECA.  *See* 52 U.S.C. § 30101(17).

[33] 52 U.S.C. § 30101(8)(A) (limiting definition of "contribution" to payments made "for the purpose of influencing any election for Federal office"); *id.* § 30101(9)(A) (imposing same limitation on definition of "expenditure"); *see also Orloski v. FEC*, 795 F.2d 156, 163 (D.C. Cir. 1986) ("[FECA] itself does not define the key phrases—'for the purposes of influencing any election' or 'in connection with any election.'  Indeed, the Supreme Court has observed that the

of influencing any election" requires proof that the activity clearly and unambiguously related to

President Trump's 2016 campaign.[34]

A third party's payment of a candidate's "personal expenses" is not a contribution if the

payment would have been made "irrespective of the candidacy."[35]  There are a number of issues

---

phrases 'for the purposes of influencing any election' and 'relative to any clearly-identified candidate' are ambiguous." (citing *Buckley*, 424 U.S. at 40-41)).

[34] *See North Carolina Right to Life v. Leake*, 525 F.3d 274, 281 (4th Cir. 2008) ("[A]fter *Buckley*, campaign finance laws may constitutionally regulate only those actions that are 'unambiguously related to the campaign of a particular candidate.'" (quoting *Buckley v. Valeo*, 424 U.S. 1, 80 (1976)); *see also Orloski v. FEC*, 795 F.2d 156, 162 (D.C. Cir. 1986) ("We find nothing in the quoted phrase or anywhere else in the Act that prohibits the FEC from adopting an objective test for determining when a corporate donation is made 'for the purposes of influencing any election.' In fact, as the FEC points out, the Act may implicitly mandate an objective test."); *FEC v. Wisc. Right To Life, Inc.*, 551 U.S. 449, 468, 470 (2007) (rejecting "intent-based standard" and finding that "a court should find that an ad is the functional equivalent of express advocacy only if the ad is susceptible of no reasonable interpretation other than as an appeal to vote for or against a specific candidate"); *FEC v. Mass. Citizens for Life, Inc.*, 479 U.S. 238, 249 (1986) ("We therefore hold that an expenditure must constitute 'express advocacy' in order to be subject to the prohibition of [the former corporate expenditure prohibition]").

Chief Justice Roberts has cautioned against "amorphous considerations of intent and effect" in order to "safeguard this liberty" under the First Amendment. *Wisc. Right To Life*, 551 U.S. at 469. For the definitions of "expenditure" and "contribution," FECA's use of "the" in the phrase "the purpose of influencing any election" reflects congressional intent to require that the sole purpose of the payment be to influence the election. *See, e.g., Am. Bus. Ass'n v. Slater*, 231 F.3d 1, 5 (D.C. Cir. 2000) ("[I]t is a rule of law well established that the definite article 'the' particularizes the subject which it precedes.  It is a word of limitation as opposed to the indefinite or generalizing force of 'a' or 'an.'" (cleaned up)).

[35] 11 C.F.R. § 113.1(g)(7); *see also* Factual & Legal Analysis at 6, MUR 7025 (Friends of Mike Lee) (Mar. 23, 2016) ("The [FEC's] regulations provide that a third party's payment of a candidate's personal expense shall be a contribution 'unless the payment would have been made irrespective of the candidacy.'"  (quoting 11 C.F.R. § 113.1(g)(7)), attached as Exhibit 1; Statement of Reasons at 4, Comm'rs Mason, Sandstrom, McDonald, Smith, Thomas & Wold, MUR 5141 (James Moran) (April 17, 2002) (reasoning that "although Section 113.1(g)([7]) of the [FEC's] regulations treats some third party payments as contributions, it provides that payments made irrespective of the candidacy are not to be so treated."), attached as Exhibit 2.

In MUR 5141, the FEC concluded that a lobbyist's unsecured $25,000 personal loan to the candidate, for the purpose of paying legal expenses related to the candidate's divorce, was not a "contribution" because it was not linked sufficiently to the campaign—despite evidence that a campaign manager was involved in the transaction. Ex. 2 at 4 n.3. Despite the fact that the divorce

arising from a candidate's personal situation that may become campaign issues, but expenses

arising from such controversies are not necessarily campaign expenses.[36]

The political impact of legal issues on a campaign will not, by itself, justify the treatment

of any legal expenses as campaign related.[37]  Legal expenses are not campaign related merely

because the underlying legal activities have some impact on the campaign.[38]  If the payment would

---

proceedings could have impacted the candidate's reputation as an officeholder, the FEC did not take issue with the use of the funds to pay for this "personal mater." *Id.* at 5.

[36] Statement of Reasons at 2 n.2, Comm'rs McDonald, Mason, Sandstrom, Smith & Thomas, MUR 4944 (Hillary Rodham Clinton) (Aug. 28, 2001) ("[T]here are a number of issues arising from a candidate's personal situation (divorce, whether children attend public or private schools, business disputes, criminal actions against family members) that may become campaign issues, but the [FEC] will not necessarily therefore deem expenses arising from such controversies to be campaign expenses."), attached as Exhibit 3; *see also* Statement of Reasons at 10, Comm'rs Petersen, Bauerly, Hunter, McGahn & Weintraub, MUR 6200 (John Ensign) (Nov. 17, 2010) (dismissing complaint where senator's parents paid mistress $96,000 where there was no evidence that the payment fulfilled an obligation of the campaign); *cf.* 11 C.F.R. § 113.1(g)(7)(ii) ("Examples of payments considered to be irrespective of the candidacy include, but are not limited to, situations where . . . . [t]he payment is made from funds that are the candidate's personal funds . . . .").

[37] FEC Advisory Opinion 1995-23 (Shays), 1995 WL 437686, at *1 (July 20, 1995) (quoted verbatim above); *see also FEC v. Craig for Senate*, 816 F.3d 829, 838 (D.C. Cir. 2016) (reasoning that if legal work is "not related to campaign activities or duties as a Federal officeholder," then the use of campaign funds to pay related legal expense is an impermissible conversion to personal use regardless of any impact on campaign); FEC Advisory Opinion 2003-17 (Treffinger), 2003 WL 21894954, at *4 (July 25, 2003) ("While some of the benefit of the 'scheme and artifice' alleged in the indictment may have inured, or may been intended to inure, to Mr. Treffinger's campaign, the primary wrong alleged in the indictment is the defrauding of the non-Federal polity (*i.e.*, the county and its citizens).  Thus, these counts are not directly related to campaign activity.").

[38] Expenditures; Reports by Policial Committees; Personal Use of Campaign Funds, 60 Fed. Reg. 7862-01, 7868, 1995 WL 49139 (Feb. 9, 1995) ("[L]egal expenses will not be treated as though they are campaign or officeholder related merely because the underlying legal proceedings have some impact on the campaign or the officeholder's status.  Thus, legal expenses associated with a divorce or charges of driving under the influence of alcohol will be treated as personal, rather than campaign or officeholder related.").

have been made even in the absence of the candidacy, the payment should not be treated as a contribution.[39]

### B. Press Exemption

FECA's definition of "contribution" does not include costs incurred in covering or carrying a news story, commentary, or editorial by any magazine or periodical publication,[40] or other normal press functions."[41]    Therefore, when considering whether AMI's payment to Karen McDougal constituted a "contribution" that violated FECA, you may consider whether AMI was carrying out a normal press function by negotiating and conducting the activities described in the agreements between AMI and McDougal that have been admitted into evidence.

### C. Willfully

---

[39] Expenditures; Reports by Policial Committees; Personal Use of Campaign Funds, 60 Fed. Reg. 7862-01, 1995 WL 49139 (Feb. 9, 1995) (quoted verbatim above).  The FEC specifically rejected an "alternative definition" of "personal use" that would have included "any use of funds that confers a benefit on a present or former candidate or a member of the candidate's family that is not primarily related to the candidate's campaign or the ordinary and necessary duties of a holder of Federal office."

[40] 11 C.F.R. § 100.73; *see also* 52 U.S.C. § 30101(9)(B)(i); *Reader's Digest Ass'n, Inc. v. FEC*, 509 F. Supp. 1210, 1215 (S.D.N.Y. 1981) (reasoning that "research" relating to publication is one of the "exempt functions").

[41] *FEC v. Phillips Pub. Inc.*, 517 F. Supp. 1308, 1313 (D.D.C. 1981); *see also FEC v. Massachusetts Citizens for Life, Inc.*, 479 U.S. 238, 251 n.5 (1986) (noting findings by "some lower courts" that the Press Exemption also covers "normal business activity of a press entity"); FEC Advisory Opinion 2011-11 (Colbert), 2011 WL 2662412, at *5 (June 30, 2011) (confirming that application of Press Exemption requires consideration of "[w]hether the entity is acting as a press entity in conducting the activity at issue (i.e., whether the press entity is acting in its 'legitimate press function'"); *cf. First Nat. Bank of Bos. v. Bellotti*, 435 U.S. 765, 801 (1978) ("The very task of including some entities within the 'institutional press' while excluding others . . . is reminiscent of the abhorred licensing system of Tudor and Stuart England—a system the First Amendment was intended to ban from this country.") (Burger, C.J., concurring).  The "normal press functions" instruction is particularly appropriate in light of Cohen's testimony that Pecker told him repayment of $150,000 was not necessary because AMI "made a lot of money" on McDougal's publications.  Tr. 3363.

-27-

Finally, even if you conclude that the People have demonstrated beyond a reasonable doubt that a payment by AMI or Cohen constituted a "contribution," such a contribution only constituted "unlawful means" to the extent the payor of the contribution acted "willfully."[42] This requires proof that someone acting on behalf of AMI, or Cohen, acted with the knowledge that their course of conduct was unlawful, with the intent to do something the law forbids, and in conscious disregard of a known statutory duty or prohibition.[43]

---

[42] The term "unlawful," as used in Election Law § 17-152, is limited to criminal offenses. *See* Black's Law Dictionary (11th Ed. 2019) (defining "unlawful" as "not authorized by law; illegal," "Criminally punishable," and "Involving moral turpitude"); *see also* 2/15/24 Decision and Order at 14 (describing a "crime under FECA" as valid predicate). That is why DANY cited to criminal violations of the federal tax code, which also require a showing of willfulness, in footnote 29 of their proposed instructions. As a result, in order for campaign-contribution violations to constitute "unlawful means" for purposes of § 17-152, willfulness is required. *See* 52 U.S.C. § 30109(d).

[43] *See Federal Prosecution of Election Offenses* at 135 (7th ed. May 2007), attached as Exhibit 4 at 135 ("In the context of a regulatory scheme such as is involved here, these words of specific criminal intent require proof that the offender was aware of what the law required, and that he or she violated that law notwithstanding that knowledge, *i.e.*, that the offender acted in conscious disregard of a known statutory duty or prohibition."); *see also United States v. Curran*, 20 F.3d 560, 569 (3d Cir. 1994) ("The pertinent case law convinces us that a proper charge for willfulness in cases brought under sections 2(b) and 1001 in the federal election law context requires the prosecution to prove that defendant knew of the treasurers' reporting obligations, that he attempted to frustrate those obligations, and that he knew his conduct was unlawful." (citing *Ratzlaf v. United States*, 510 U.S. 135, 138 (1994))).

President Trump respectfully submits that, at minimum, a FECA violation requires proof of willfulness under the alternative formulation set forth in *Bryan v. United States*, 524 U.S. 184 (1998), and its progeny. Under *Bryan*, in order to establish willfulness, prosecutors must prove beyond a reasonable doubt that a person acted with the knowledge that his course of conduct was unlawful and with the intent to do something the law forbids. *See id.* at 190.

## XV.    CONCLUSION

President Trump respectfully submits that there is an adequate basis in the record for the foregoing instructions and requests, pursuant to CPL § 300.10(5), that the Court provide these instructions to the jury at the appropriate time.

Dated:        May 14, 2024
              New York, New York

By: /s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, NY 10005
212-716-1260
toddblanche@blanchelaw.com

*Attorneys for President Donald J. Trump*