# EXHIBIT M

Jury Trial/Colloquy

Page 2

1                THE CLERK:  This is The People of the State of

2       New York, against Donald J. Trump, indictment 71543 of '23.

3       Appearances, starting with the People please.

4                MR. STEINGLASS:  Good morning.  For the People,

5       ADA Joshua Steinglass, Susan Hoffinger, Matthew Colangelo,

6       Christopher Conroy, Becky Mangold and Katherine Ellis.

7                THE COURT:  Good morning.

8                MR. BLANCHE:  Good morning, Your Honor.  Todd

9       Blanche.  I am joined at counsel table by my colleagues

10      Emil Bove, Susan Necheles and Gedalia Stern, and with

11      President Trump.  Good morning.

12               THE COURT:  Good morning, Mr. Trump.  The case is

13      on today for the start of jury selection.  There are a

14      couple of loose ends that we need to go over before we can

15      start.  I will go through my list, what I have, and I will

16      hear whatever you have as well.

17               Referring first to the Motion for Recusal as

18      filed by the defense.  On April 3, 2024, the defendant

19      filed a Motion for Recusal.  This Court had denied

20      defendant's first motion in a Decision and Order dated

21      August 11, 2023.

22               The People submitted opposition papers on April

23      5th, and on, or about April 10, 2024, the defendant's

24      motion still pending, the defendant brought an Article 78

25      Petition in the Appellate Division First Department,

Jury Trial/Colloquy

Page 3

1    arguing, among other things, that this Court's refusal to

2    recuse exceeded its authority.

3            The defendant also sought an interim stay of this

4    trial.  The application for the stay was denied by a

5    Justice of the Appellate Division.  That Article 78

6    Petition is now pending.

7            Thus, in essence, the defendant at this moment

8    has two motions for recusal pending simultaneously in two

9    different courts.  For that reason, and because this Court

10   is ultimately bound by the decision of the Appellate

11   Division, this Court will render a short ruling from the

12   bench.

13           Defendant's Motion for Recusal was accompanied by

14   the affirmation of Todd Blanche and contained pages, on

15   pages of screen grafts, articles, social media posts

16   (Check) and a lie, which the defendant claims support the

17   motion.

18           The motion is, essentially, a motion to reargue

19   or renew because it repeated the same claims raised in the

20   defendant's first Motion for Recusal, and for the most

21   part, whatever new exhibits were provided, they existed and

22   were available when the first Motion for Recusal was filed.

23           The defendant generally makes four claims.

24   First, that this Court participated quote, in an interview

25   with the media to discuss this case, closed quote, in

Jury Trial/Colloquy

Page 4

1    violation of the rules governing judicial conduct.

2              The defendant offers no support for the claim

3    that the interview was, in fact, first given to discuss the

4    matter of the People of the State of New York versus Donald

5    Trump rather than to discuss say, the Manhattan Mental

6    Health Court, or the Manhattan Veteran's Treatment Court,

7    to which this Court also presides.

8              The defendant concedes that the Court told the

9    reporter that it would not talk about the Defendant Trump,

10   but he nonetheless refers to several quoted statements in

11   which he claims causes the Court's neutrality to come into

12   question.

13             The statements are:  Getting ready for the trial

14   is intense.  The Court is quote, striving to make sure that

15   I have done everything I could to be prepared and make sure

16   that we dispense justice.  There is no agenda here.  We

17   want to follow the law.  We want Justice to be done.

18   That's all we want.  Those were the allegedly offensive

19   statements.

20             The defendant does not reasonably or logically

21   explain how the statements, which do not mention either

22   party to this action, and which merely emphasize the rule

23   of law, in any way demonstrates a bias or violates

24   defendant's rights.

25             Second, the defendant claims that a 2019 podcast

Jury Trial/Colloquy

Page 5

```
 1    interview with a member of this Court's family disposed
 2    statements by this Court that would show bias towards the
 3    defendant.  The offensive statement from 2019 that defense
 4    counsel refers to is, quote, I hate that politicians use
 5    Twitter.  It's unprofessional.  That's not how a politician
 6    should behave, closed quote.
 7            Again, it is not clear to this Court how that
 8    statement demonstrates bias in favor of, or against either
 9    party, or how under the law it would constitute grounds for
10    recusal.
11            Third, defendant claims that a family member of
12    this Court had allegedly criticized defendant in her
13    Twitter account.  In support of this claim, defense counsel
14    includes several screen drafts of Twitter posts from March
15    2024, which appear to be critical of the defendant.  The
16    defendant suggests that the quotes were made by a member of
17    this Court's family.  This, in spite of acknowledging that
18    the Office of Court Administration, made a statement prior
19    to the filing of the motion explaining that the account did
20    not belong to a family member at the time the posts were
21    made.
22            And fourth, the defendant generally alleges that
23    if family members are employed with a firm that does, among
24    other things, consulting work with political candidates and
25    nonprofit organizations, make this Court impossibly
```

Jury Trial/Colloquy

Page 6

1   compromised because the family member presumably stands to

2   benefit from this Court's rulings, and, therefore, the

3   argument goes, this Court stands to benefit as well.

4        The People in their opposition papers, summarized

5   defendants argument, well, because they would likely be

6   repeated before the Appellate Division when the Article 78

7   motion is argued, there is no need to discuss them in

8   detail now.

9        It is the opinion of this Court that referring to

10  a series of inferences, innuendos and unsupported

11  speculation the defendant relies upon to get from Point A,

12  regarding this Court's family member, to Point Z, that this

13  Court must recuse and that failure to do so is a violation

14  of defendant's rights, to say that these claims are

15  attenuated is an understatement.  The defendant has failed

16  to provide evidence that this Court has quote, any direct,

17  personal, substantial, or peculiarity interest in reaching

18  a particular conclusion, closed quote.

19       People V Alamar, 93 New York 2d, 239 at 246,

20  1999.

21       As the Advisory Committee on Judiciary Ethics

22  found in its opinion on May 4, 2023, the matter presently

23  before this Court, quote, does not involve either the

24  Judge's relative, or the relative's business, or that

25  directly or indirectly, closed quote; and further, because

Jury Trial/Colloquy

Page 7

1      a quote, relative's independent political activities do not

2      provide a reasonable basis to question the Judge's

3      impartiality, closed quote, there is no basis for recusal.

4      See Ethics Opinion, 23 54.

5              Lastly, even if the company in question were

6      involved in fundraising campaigns mentioning this case, it

7      would still be no basis for recusal because, quote, the

8      Judge's relatives remain free to engage in their own bona

9      fide, independent political activities, closed quote.

10             Again, see the opinion of the Ethics Committee,

11     23 54.

12             Defendant's reliance on Judiciary Law Section 14

13     is simply misplaced because that section of law is

14     inapplicable to the facts here.  Recusal is left for the

15     sound discretion of this Court.

16             As this Court previously noted in denying

17     defendant's first Motion for Recusal, quote, a Judge is as

18     much obligated not to recuse himself, when it is not called

19     for as he is obligated to when it is.

20             In re:  Drexel Burnham Lambert, Incorporated, 861

21     Fed 2d, 1307 at 1312, Second Circuit, 1988.

22             For these reasons, defendant's second Motion for

23     Recusal is denied.  The Court will not address this matter

24     further pending the decision of the Appellate Division on

25     the defendant's Article 78.

Jury Trial/Colloquy

Page 42

1          As time went on, Michael Cohen received messages

2     from others who reached out to say in substance, the boss

3     loves you and has your back.

4          Mr. Trump publicly supported Michael Cohen

5     telegraphing to him the importance of staying on message

6     and at the time Mr. Trump was even paying the legal fees

7     for Michael Cohen's attorneys.

8          So as, by way of example, you can see on your

9     screen, Judge, a series of tweets from then President Trump

10    less than two weeks after Michael Cohen's apartment and

11    business were raided.

12         I am not going to read the whole thing, but some

13    of the highlighted portions, going out of their way to

14    destroy Michael Cohen and his relationship with me in the

15    hope that he will flip.  Michael is a fine person with a

16    wonderful family, which is why I have always liked and

17    respect him.  Most people will flip if the government let's

18    them out of trouble.  Sorry, I don't see Michael doing it.

19         Around the same time, Michael Cohen met with

20    attorney Robert Costello to discuss the possibility of

21    retaining him and Costello billed himself as having close

22    ties to Trump's lawyer at the time, Rudy Giuliani, and

23    Costello claimed to have opened up a back channel of

24    communication with President Trump, which was critical to

25    maintain.

PROCEEDINGS

Page 53

1    between the two.

2              Then, a couple of reactions to the tweets and

3    then the Truths:

4              With respect to the tweets that the People

5    proffer, again, to make sure that your Honor is aware, we

6    anticipate putting in a submission soon about the

7    evidentiary admissibility of the tweets while

8    President Trump was President and in the White House

9    because of presidential immunity.  Putting that aside for a

10   moment, they need to be looked at individually.

11             The initial tweet that just talks about Mr. Cohen

12   being a good person and reflecting that he was his lawyer,

13   it's hard -- that was a tweet not sent to Mr. Cohen.  It

14   was when President Trump was President facing a barrage of

15   news media and criticism about what was happening in this

16   case and responding to that.  So, to say, "Well, that was

17   also consciousness of guilt and can be admitted in this

18   trial as consciousness of guilt," goes way too far.  There

19   is no connection.  That's why it can't just be wholesale

20   every tweet comes in or every Truth comes in.  Each one has

21   to be looked at individually.

22             The ones that are more recent, your Honor, the

23   Truths, it's pretty rich that, when there's leaks from the

24   Grand Jury a year-and-a-half ago--and I'm not accusing

25   anybody or saying who leaked that--and then-candidate

PROCEEDINGS

Page 55

1   consciousness of guilt or as part of a pressure campaign.

2          I'll address the more recent ones in connection

3   with the order to show cause, but I think the same argument

4   applies as it relates to coming into evidence at trial.

5          THE COURT:  Regarding your submission you intend

6   to make, I haven't seen it.

7          MR. BLANCHE:  It hasn't been made.

8          THE COURT:  I know.

9          If the argument is that tweets that your client

10  sent out while he was President cannot be used because they

11  somehow constitute an official presidential act, it's going

12  to be hard to convince me that something that he tweeted

13  out to millions of people voluntarily cannot be used in

14  court when it's not being presented as a crime.  It's just

15  being used as an act, something that he did.  But we'll

16  wait until we get that submission.

17         Just to clarify, People, are you looking to

18  introduce this and use this on your direct case or on

19  redirect or on rebuttal?  How is it that you anticipate

20  using this?

21         MR. STEINGLASS:  Well, I anticipate using it on

22  our direct case--there's a lot of different categories

23  here--but I don't think we have to wait until the

24  cross-examination of Michael Cohen to address the argument

25  that they have clearly put forth.  I'm sure they're going

PROCEEDINGS

Page 802

1          People also argue that defendant should have

2     raised these issues in his motion in limine and that he

3     forfeited his right to request a pretrial advisory ruling by

4     not raising them then.

5          This Court's reasoning in the decisions that has

6     been handed down previously remains the same, they are

7     unchanged, the defendant could have raised these arguments

8     at the times that the motions in limine were filed, but did

9     not.  Defense could have raised the argument and still

10    relied upon the Supreme Court's decision on presidential

11    immunity ruling coming after the motions in limine deadline.

12    But because the defendant was already briefing the matter,

13    the defense was already aware of the matter and aware of the

14    issue, for whatever reason chose not to raise it at that

15    time.  We are going to wait until trial and you can make

16    your objections at that time.

17         Both of you have already made your arguments in

18    the letters, so the Court will decide it at the time of

19    trial when the objection is made.

20         So that matter is decided and will not be

21    addressed any further.

22         Second pre-motion letter that I would like to

23    refer to has to do with the limiting instruction regarding

24    Cohen pleads to FECA and AMI non prosecution agreement.

25         The defense filed its pre-motion letter on April

H. Hicks - Direct/Colangelo

2217

1    But, at some point in the aftermath of that story, I spoke

2  to him, I spoke to him about it. And I do remember that.

3    Q    What do you remember about that conversation?

4    A    I remember Michael just, um, saying that this wasn't

5  true, that no payment had been made, and that he had a

6  statement from Stormy Daniels, either personally or her

7  attorney, stating that no relationship had transpired.

8    Q    And --

9    A    And that he had documentation to prove that -- that no

10  payment had been made.

11    Q    I think you testified a minute ago that you also

12  discussed this story with Mr. Trump; is that right?

13    A    Yes.

14    Q    And what did you discuss with Mr. Trump?

15    A    Just how to respond to the story, how he would like a

16  team to respond to the story.

17    Q    Did you relay to him the substance of the conversation

18  you had with Mr. Cohen?

19    A    I don't recall the sequencing, and I believe I spoke

20  to Mr. Cohen after I spoke to Mr. Trump.

21            MR. COLANGELO:  Let's bring up People's 181 in

22      evidence.

23            This can be displayed to everybody.

24            (Whereupon, an exhibit is shown on the screens.)

25    Q    Is this the article we were just discussing?

H. Hicks - Direct/Colangelo

2218

1      A    Yes.

2      Q    Let me direct your attention to the second page of the

3   article.

4              (Whereupon, an exhibit is shown on the screens.)

5      Q    Let's look at the third paragraph, please.

6      A    I see it.

7      Q    Can you go ahead and read that third paragraph,

8   please?

9      A    It says: "These are old, recycled reports, which were

10  published and strongly denied prior to the election, a White

11  House official said, responding to the allegation of a sexual

12  encounter involving Mr. Trump and Ms. Clifford. The official

13  declined to respond to questions about an agreement with

14  Ms. Clifford. It isn't known whether Mr. Trump was aware of any

15  agreement or payment involving her."

16     Q    Are you the White House official quoted in the story?

17     A    No, I'm not.

18     Q    Who was the White House official quoted in the story?

19     A    Um, I can't say for sure. Um -- I can't say for sure,

20  but I -- I think that it was, um, Hogan Gidley.  He was the

21  Deputy Press Secretary.

22     Q    And as the Communications Director at the time --

23  withdrawn.

24     Did you discuss this statement with Mr. Trump before it was

25  issued?

H. Hicks - Direct/Colangelo

2219

1    A    Yes.

2    Q    To your knowledge, did Mr. Trump communicate directly

3  with Mr. Cohen about these reports that Stormy Daniels was paid

4  $130,000 a month before the election to stay silent about her

5  allegations?

6    A    I only know of one instance where they communicated

7  directly with one another, but I can't say about other than

8  that.

9    Q    And for the one instance that you know of, when did

10  that conversation take place?

11    A    Sometime in the middle of February.

12    Q    How did you learn about it?

13    A    Mr. Trump told me about it.

14    Q    And can you describe the conversation that you had

15  with him about the conversation he had with Mr. Cohen?

16    A    I believe it was the day after -- the morning after

17  Michael had given a statement to The New York Times, saying

18  that he had, in fact, made this payment, um, without

19  Mr. Trump's knowledge.

20      And, um -- so, Mr. Trump was saying that he had spoken to

21  Michael, um -- sorry. This -- President Trump was saying he

22  spoke to Michael, and that Michael had paid this woman to

23  protect him from a false allegation, um, and that -- you know,

24  Michael felt like it was his job to protect him, and that's

25  what he was doing.  And he did it out of the kindness of his

H. Hicks - Direct/Colangelo

2220

1  own heart.  He never told anybody about it. You know.  And he

2  was continuing to try to protect him up until the point where

3  he felt he had to state what was true.

4      Q   And this is what President Trump told you Michael

5  Cohen said to him?

6      A   That's right.

7      Q   How long had you known Michael Cohen by that point?

8      A   Three-and-a-half years.

9      Q   And did the idea that Mr. Cohen would have made a

10  $130,000 payment to Stormy Daniels out of the kindness of his

11  heart, was that consistent with your interactions with him up

12  to that point?

13             MR. BOVE:  Objection.

14             THE COURT:  Overruled.

15      A   I would say that would be out of character for

16  Michael.

17      Q   Why would it be out of character for Michael?

18             MR. BOVE:  Objection.

19             THE COURT:  Overruled.

20      A   I didn't know Michael to be an especially charitable

21  person, um, or selfless person.

22      Um, he's the kind of person who seeks credit.

23      Q   Did Mr. Trump say anything else about this issue when

24  he told you that Michael made the payment?

25      A   Um, just that he thought it was a generous, um, you

H. Hicks - Direct/Cross

2221

1  know, thing to do, and he was appreciative of the loyalty.

2  That's all I remember.

3      Q    Did he say anything about the timing of the news

4  reporting regarding --

5      A    Oh, he -- yes.

6      He wanted to know how it was playing, and just my thoughts

7  and opinion about this story versus having the story -- a

8  different kind of story before the campaign had Michael not

9  made that payment.

10     And I think Mr. Trump's opinion was it was better to be

11 dealing with it now, and that it would have been bad to have

12 that story come out before the election.

13     Q    Thank you.

14             MR. COLANGELO:  No further questions.

15             THE COURT:  Your witness.

16             MR. BOVE:  Thank you.

17             May I inquire?

18             THE COURT:  You may.

19 CROSS-EXAMINATION

20 BY MR. BOVE:

21     Q    Ms. Hicks, I want to start by talking a little bit

22 about your time at The Trump Organization, if that's okay.

23     A    (Nods yes).

24     Q    I think you said you started around October of 2014?

25     A    (Nods yes).  Yes.

S. Daniels - Direct/Hoffinger

2708

1      In April of 2018, did Mr. Avenatti release a sketch of the

2  man who you believed you had that encounter with in 2011?

3      A    Yes.

4      Q    And in response to that sketch, did Mr. Trump tweet

5  that the sketch was essentially a con job?

6      A    Yes.

7      Q    And, to your understanding, was that defamation case

8  filed based only on that tweet about whether the sketch was a

9  con job?

10     A    Yes, it was about the tweet.

11     Q    Did the defamation claim have anything to do with

12  whether or not you were paid for the NDA before the election?

13     A    No.

14     Q    Did the claim of defamation have anything to do with

15  whether or not you had a sexual encounter with Mr. Trump or any

16  other interactions with him?

17     A    No.

18     Q    What is your understanding about whether the Court in

19  that case made any finding with respect to your credibility

20  whatsoever?

21     A    There were none.

22     Q    Is it your understanding that the Court determined in

23  that case that Mr. Trump was free to tweet con job because it

24  was what the Court called rhetorical hyperbole?

25     A    Correct.

S. Daniels - Direct/Hoffinger

2709

1    Q    And is that the reason or something like just an

2  exaggeration?

3    A    Yes.

4    Q    And, as a result of that, the Court's finding that

5  Mr. Trump was entitled to make that tweet, did the Courts in

6  California award Mr. Trump some legal fees?

7    A    Yes.

8    Q    Just as they had awarded you legal fees earlier --

9          MS. NECHELES:  Objection to the leading, your

10   Honor.

11         THE COURT:  Sustained.

12   Q    Is Michael Avenatti still your lawyer?

13   A    No.

14   Q    Why is he not -- why is he not still your lawyer?

15         MS. NECHELES:  Objection, relevance.

16         THE COURT:  Overruled.

17         You can answer.

18   A    Because I fired him and then later he was found guilty

19   of stealing from not just myself, but from several clients and

20   he was disbarred and is in prison.

21   Q    Was he found guilty in the criminal case in which you

22   testified?

23   A    Yes.

24   Q    And were you cross-examined in that case?

25   A    Yes.

Westerhout - Direct/Mangold

2985

1    Schiller?

2        A.    Yes.

3        Q.    Was it your understanding those four individuals had

4    previously worked with Mr. Trump?

5        A.    Yes.

6        Q.    Did you also make an effort to learn Mr. Trump's

7    preferences by observing him while you were sitting in the Outer

8    Oval?

9        A.    Yes.

10       Q.    How long did you end up working in the White House?

11       A.    Until August 2019.

12       Q.    Is that a total of two and a half years?

13       A.    Yes.

14       Q.    Did you have the same job in the White House the whole

15   time?

16       A.    The same job, yes.  But at some point my title changed

17   to Special Assistant to the President and Director of Oval

18   Office Operations.

19       Q.    Did you sit at the same desk in the Outer Oval the

20   entire two and a half years you were in the White House?

21       A.    I switched desks at some point.  Like I said, there

22   were two desks there.  At some point, I switched to the desk

23   that was further away, but it had a line of sight to the

24   Resolute Desk.  That was more helpful to kind -- for the

25   President and I to communicate.

Westerhout - Direct/Mangold

2986

1      Q.   And for those who may not know, what is the Resolute

2  Desk?

3      A.   That is the desk where the President sits in the Oval

4  Office.

5      Q.   After working closely with Mr. Trump for two and a half

6  years, did you develop an understanding of his work habits?

7      A.   I did, yes.

8      Q.   How about list preferences?

9      A.   I hope so.

10      Q.   How about Mr. Trump's relationships and contacts?

11      A.   Yes.

12      Q.   Are you familiar with the way that he used social

13  media?

14      A.   Yes.

15      Q.   Are you familiar with the way that he interacted with

16  others at the White House?

17      A.   Yes.

18      Q.   And are you familiar with the way that he interacted

19  with his family?

20      A.   Yes.

21      Q.   So, turning now to his work habits, what was Mr.

22  Trump's preferred method of communication?

23      A.   He liked speaking with people in person or on the

24  phone.

25      Q.   And about how many calls did Mr. Trump typically take

Westerhout - Direct/Mangold

2987

1  in a day?

2      A.    A lot.

3      Q.    Do you know, approximately, when he started taking

4  calls in the day?

5      A.    I remember times where, you know, I knew he was taking

6  calls as early as 6 in the morning.

7      Q.    And when would he stop taking calls at the end of the

8  day?

9      A.    Again, it depended.  I recall times he would be on the

10  phone late into the night after I went to bed, so I always felt

11  guilty about that.

12      Q.    How did you call the President at work?  Can anybody

13  call the President of the United States.  Is this a more

14  complicated process?

15      A.    There is a rather complicated process.  If the

16  President is in the Oval Office and someone calls in and they

17  had my desk phone number, they could just call that number.  If

18  the President was available, I would patch them through.

19          If someone was calling in, John Smith, you know, off

20  the street and just calling 1-800 White House, obviously, they

21  wouldn't be patched through to the Oval Office.

22          But there were operators that took calls and then kind

23  of determined if that person was someone that needed to get

24  patched through either to myself or other members of the

25  President's staff.

Westerhout - Direct/Mangold

2988

1          There were also calls made by the situation room.

2   Calls that were more secure that might need to be on a secure

3   line.  People might call through the situation room.

4      Q.   Once the White House operators had screened calls, did

5   you see the calls that came to you after that?

6      A.   I am sorry.

7      Q.   Let me say that again.

8          After the calls were screened, did they typically come

9   to you before going to Mr. Trump?

10     A.   If he was in the Oval Office, yes.

11     Q.   So you were able to see much of the many people that he

12  spoke to while he was there in 2017?

13     A.   Yes.

14     Q.   Did Mr. Trump use a computer?

15     A.   Not to my knowledge.

16     Q.   Did Mr. Trump have an email account?

17     A.   Not to my knowledge.

18     Q.   Did Mr. Trump prefer electronic documents or hard copy

19  documents?

20     A.   He liked hard copy documents.

21     Q.   And did Mr. Trump like to read?

22     A.   Yes.

23     Q.   Did his role in 2017 require a lot of reading?

24     A.   It did, yes.

25     Q.   Where did he actually do his work?

Westerhout - Direct/Mangold

2989

1    A.   After a few weeks, he kind of moved his working space

2    into a room off of the side of the Oval Office, known as the

3    dining room.  He really just, I remember, wanted to keep the

4    Resolute Desk very pristine and kind of keep that more for

5    meetings.

6         Then he spent most of the time when he was working,

7    reading, going over documents in the dining room.  And that was

8    really his working office.

9    Q.   Were the hard copy documents that he liked to review

10   kept in the dining room?

11   A.   Yes.

12   Q.   Was there an organization system there?

13   A.   To my understanding, the President knew where things

14   were and he kept it organized.  But he did have a lot of papers

15   and often brought things back and forth to his residence or Air

16   Force One or Marine One.  I thought he always knew where things

17   were.

18   Q.   In general, is he the type of person who would pay

19   attention to details?

20   A.   In my experience, yes.

21   Q.   How about his signature practices?  Did he have to sign

22   things that you saw in that first year in 2017?

23   A.   He did.

24   Q.   Did he use an automated signature or prefer to sign

25   himself?

Westerhout - Direct/Mangold

2990

1      A.   He preferred to sign things himself.

2      Q.   That was signing by hand?

3      A.   Yes.

4      Q.   Was there a particular style of pen he liked to use?

5      A.   My recollection is he liked to use a Sharpie or a

6   felt-tip pen.

7      Q.   Based on working with him for two and a half years, can

8   you recognize Mr. Trump's signature?

9      A.   Yes.

10      Q.   Did Mr. Trump have to review and sign a lot of

11   documents that year in 2017?

12      A.   Yes.

13      Q.   In your experience, did he typically read things before

14   signing them?

15      A.   Yes.

16      Q.   Do you know if Mr. Trump used social media while he was

17   in the White House?

18      A.   He did, yes.

19      Q.   What was the primary social media platform that he

20   used?

21      A.   Twitter.

22      Q.   Is that now called something else?

23      A.   X.

24      Q.   Do you know what Mr. Trump's Twitter handle was in

25   2017?

Westerhout - Direct/Mangold

2991

 1      A.   @realdonaldtrump.

 2      Q.   Did Mr. Trump post tweets himself using that Twitter

 3  handle?

 4      A.   He did, yes.

 5      Q.   Did anyone else have access to the @realdonaldtrump

 6  Twitter account in 2017?

 7      A.   It's my understanding that Dan Scavino had access to

 8  it.

 9      Q.   Was there anybody other than Mr. Trump and Mr. Scavino?

10      A.   Not to my knowledge.

11      Q.   In the two and a half years when you worked with Mr.

12  Trump, did you ever see Mr. Scavino post a tweet without Mr.

13  Trump's approval?

14      A.   I did not see Dan post, I didn't see the President or

15  Dan ever post a single tweet.  Not to my knowledge.

16          If there was a video recap of an event or something

17  that might have gone out without the President's approval, it's

18  my understanding and recollection that the President did like to

19  see the tweets that went out.

20      Q.   Do you know if that account was password protected?

21      A.   I believe so, yes.

22      Q.   Did you ever work directly with Mr. Trump on his

23  Twitter posts?

24      A.   Once in a while, if Dan wasn't available, the President

25  would call me and dictate a tweet to me.  I would quickly

Westerhout - Direct/Mangold

2992

1   scribble it down and then go back to my computer and type it up

2   so that the President could actually read it because he wasn't

3   able to read my handwriting.  Sometimes print it back out, give

4   it to him so he could look over it.  It just depended if he put

5   it out or held onto it or made edits to.  That was the extent of

6   it.

7        Q.   He would dictate a tweet to you, then you would go type

8   it up on your computer?

9        A.   Yes.

10       Q.   Then you would print a hard copy document?

11       A.   Yes.

12       Q.   And take that in for him to review?

13       A.   Yes.

14       Q.   Would he then edit sometimes the hard copy printout?

15       A.   Sometimes, yes.

16       Q.   Would he ask you to make additional changes and then

17   show it to him?

18       A.   Sometimes.

19       Q.   Did he have any particular preferences when it came to

20   the way that he wrote social media posts?

21       A.   My recollection is that there were certain words that

22   he liked to capitalize.  Words like "country."  And he liked to

23   use exclamation points.

24       Q.   Did he also periodically correct other punctuation,

25   like commas or comma locations?

Westerhout - Direct/Mangold

2993

1      A.   It's my understanding that he liked to use the Oxford

2   comma.

3      Q.   Now, during that first year in the White House in 2017,

4   would you describe that as a transition period, that first year

5   that Mr. Trump was in the White House?

6      A.   Yes.  I think, you know, the first year of any

7   administration is a transition year.  We were all trying to

8   learn our way around and, you know, do the best work we could

9   for the American people.

10     Q.   And you and others were doing things for the first time

11  that year?

12     A.   Yes.

13     Q.   And was Mr. Trump busy that year?

14     A.   Yes.

15     Q.   Was he constantly being pulled in a lot of different

16  directions?

17     A.   Yes.

18     Q.   Based on your experience, were there things he

19  overlooked or forgot during that period?  Was he still attentive

20  to the things that were brought to his attention?

21     A.   My understanding is he was attentive to things that

22  were brought to his attention.

23     Q.   During that first year in the White House, in 2017,

24  when things were in transition, did you coordinate with The

25  Trump Organization?

Westerhout - Direct/Mangold

2994

1      A.    On some things, yes.

2      Q.    Did you ever have questions for employees at The Trump

3  Organization?

4      A.    Yes.

5      Q.    And did Trump Organization employees ever have

6  questions for you?

7      A.    Yes.

8      Q.    Who was your main point of contact at The Trump

9  Organization in 2017?

10     A.    Rhona Graff.

11     Q.    And, again, that was Mr. Trump's Trump Organization's

12  Executive Assistant?

13     A.    Yes.

14     Q.    And she remained at The Trump Organization after

15  Mr. Trump moved to Washington D.C.?

16     A.    Yes.

17     Q.    When Trump Organization employees had questions for

18  Mr. Trump, did you pass those along?

19     A.    Yes, sometimes.

20     Q.    Were there ever times that you didn't pass along

21  something you were asked to?

22     A.    No, but it could have been they asked somebody else.

23     Q.    When Mr. Trump had questions for Trump Organization

24  employees, did you pass those along?

25     A.    Yes.

Westerhout - Direct/Mangold

2995

1    Q.   What types of things did you coordinate with Ms. Graff

2   on during that year in 2017.  Did you coordinate on Mr. Trump's

3   contacts?

4    A.   Yes, we did.

5    Q.   How about calls to and from Mr. Trump?

6    A.   Yes.

7    Q.   How about Mr. Trump's calendar?

8    A.   Yes.

9    Q.   Mr. Trump's travel schedule?

10    A.   Yes.

11    Q.   Mr. Trump's golf schedule?

12    A.   Yes.

13    Q.   How about the First Family's travel?

14    A.   Yes.

15    Q.   Personal mail for Mr. Trump?

16    A.   Yes.

17    Q.   What other logistical issues?

18    A.   Such as?

19    Q.   For example, if there was an issue getting through on a

20   particular number or other things that were lost in translation,

21   anything like that?

22    A.   Sure.  Yes.

23    Q.   Overall, how frequently were you in touch with The

24   Trump Organization in 20127?

25    A.   Especially the first few months, I think Rhona and I

Westerhout - Direct/Mangold

2996

1  spoke at least weekly.  Sometimes daily.  But that trickled off
2  as I kind of grew in the role and the contacts kind of shifted
3  over to more of the White House side.
4      Q.   And, in total, how many communications would you say
5  you had with The Trump Organization in 2017, a rough estimate?
6           Is it fair to say it was dozens of communications?
7      A.   Dozens.
8      Q.   Now, one of the things you just mentioned was
9  Mr. Trump's contacts; right?
10     A.   Yes.
11     Q.   And did you get guidance from Ms. Graff on contacts
12  that were important to Mr. Trump?
13     A.   Yes.
14           MS. MANGOLD:  Can we show the jury what is in
15       evidence as People's Exhibit 68.  And can we blow up the
16       top portion of the page.  All of the portions.
17           (Displayed.)
18     Q.   Ms. Westerhout, do you recognize this?
19     A.   Yes.
20     Q.   What is this?
21     A.   It's an email exchange between Rhona and myself.
22     Q.   And looking at the bottom-most email on the chain, who
23  is that from?
24     A.   From me to Rhona.
25     Q.   What is date of that email?

M. Cohen - Direct/Hoffinger

3549

1    A    I did.

2    Q    And who was paying for that attorney?

3    A    The Trump Organization.

4    Q    Was that important to you at the time that The Trump

5    Organization was paying for your attorney?

6    A    Very much so.

7    Q    Was your attorney also part of something called a Joint

8    Defense Agreement?

9    A    Yes, ma'am.

10   Q    Can you explain a little bit to the jury what that is?

11   A    So the Joint Defense Agreement is when there is several

12   different lawyers representing, obviously, different people and

13   they are all working together for a common goal.

14   Q    At the time, what, if anything, did you feel about

15   wanting the power of the President to protect you in this

16   matter?

17   A    I felt I needed it.  It was extremely important to me.

18   Q    Did you make false statements to Congress in 2017 in

19   connection with the written statement that you submitted and

20   your testimony?

21   A    I did.

22   Q    Generally, what did those false statements relate to?

23   A    They dealt with The Trump Tower Moscow real estate

24   project, specifically the number of times that I claimed to have

25   spoken to Mr. Trump about the project, as well as the time

M. Cohen - Direct/Hoffinger

3550

1    period for those conversations.

2       Q    What, essentially, did you communicate to Congress in

3    terms of the time period?

4       A    I told them that it was a truncated time period and

5    that I had only spoken to Mr. Trump about this project three

6    times.

7       Q    And, in truth, how many times had you?

8       A    Ten times.

9       Q    And did you also communicate to them that it was --

10   that those communications stopped at an earlier date than they

11   actually did?

12      A    Yes.

13      Q    Why did you make those false statements to Congress?

14      A    Because I was staying on Mr. Trump's message that there

15   was no Russia-Russia-Russia and, again, in coordination with the

16   Joint Defense Team, that's what was preferred.

17      Q    Now, let me direct your attention to the early months

18   of 2018.

19      Did you continue to lie about Mr. Trump's involvement in the

20   Stormy Daniels payoff?

21      A    Yes.

22      Q    And did you continue to pressure other people, for

23   example, like Keith Davidson, to lie about the payoffs to Karen

24   McDougal and to Stormy Daniels?

25      A    Yes.

M. Cohen - Direct/Hoffinger

3573

1      everyone and blow up the communication on February 19th of

2      2018?

3                      (Displayed.)

4      Q     Can you read that communication?

5            Who was that communication from?

6      A     This is from me to Jay Sekulow.

7            I apologize, from Jay Sekulow to me.

8      Q     Was this after you sent him the public statement that

9      you were going to be making about the FEC Complaints?

10     A     Yes.  Yes.

11     Q     Can you read in what Mr. Sekulow wrote to you?

12     A     He says:  Client says thanks for what you do.

13     Q     And what is your understanding about who he was

14     referring to when he was referring to, client?

15     A     Client here is referred as President Donald Trump.

16     And, for what you do, that dealt with the statement that I was

17     putting out to the press on the FEC.

18     Q     You're denying his involvement?

19     A     Yes, ma'am.

20     Q     Now, also in February of '18, 2018, did you --

21     withdrawn.

22           Around the same time in February of 2018, did The Wall

23     Street Journal reach out to you about an article they were

24     going to write concerning AMI's payoff of Karen McDougal?

25     A     Yes, ma'am.

M. Cohen - Direct/Hoffinger

3576

 1          previously instructed them upon why the AMI evidence came

 2          in and that instruction still applies.

 3                       THE COURT:  Okay.

 4                          (Discussion at sidebar concluded, and the

 5                       following occurred in open court.)

 6                       THE COURT:  So, Jurors, you may recall that I

 7          previously gave you an instruction regarding AMI.

 8                       The testimony that you just heard now is

 9          consistent with my previous instructions that that evidence

10          was permitted to assist you, the jury, in assessing David

11          Pecker's credibility and to help provide context for some

12          other surrounding events.

13                       You may consider that testimony and what you just

14          heard for those purposes only.

15                       Mr. Blanche, is that satisfactory?

16                       MR. BLANCHE:  Thank you, your Honor.

17     BY MS. HOFFINGER:

18          Q    Mr. Cohen, just getting back to where we left off in

19     my questions.

20               In terms of the substance of your conversation with

21     David Pecker about his receipt of the Complaint from the FEC,

22     did you tell him that someone in particular in the

23     administration would be able to assist in that manner?

24          A    Yes.

25          Q    What did you tell him?

M. Cohen - Direct/Hoffinger

3577

1       A    I told him that the matter is going to be taken care

2   of and the person, of course, who is going to be able to do it

3   is Jeff Sessions.

4       Q    Who was Jeff Sessions at the time?

5       A    The Attorney General.

6       Q    Why did you tell him that?

7       A    Because that was post my conversation with the

8   President.

9       Q    And when you say, post, had you previously been told

10  that by President Trump?

11      A    Yes, ma'am.

12      Q    Now, I know you mentioned previously the work that you

13  did on the Temporary Restraining Order related to Stormy

14  Daniels.

15          Do you remember that testimony?

16      A    Yes, ma'am.

17      Q    Did there come a time when, as a result of some of the

18  public statements you were making about your being the only one

19  involved in the payment, and the fact that -- withdrawn.  That

20  is a long sentence -- a long question.

21          Did there come a time around this time period that you

22  made certain statements to news reporting, indicating that only

23  you had made the payment and that, in fact, no sexual encounter

24  had occurred?

25      A    Yes.

M. Cohen - Direct/Hoffinger

3594

1    A.    He also stated to me that this would be a great way to

2    have a back channel communication to the President in order to

3    ensure that you're still good and that you're still secure.

4    Q.    During that meeting, did you tell Mr. Costello the

5    truth about what Mr. Trump's role was in the payoff to Stormy

6    Daniels?

7    A.    No.

8    Q.    Why not?

9    A.    First, I wasn't sure that I was going to hire him.

10   There was something really sketchy and wrong about him.  He

11   came with a Retainer Agreement, and I said, "I'm not going to

12   pay that right now.  I am still speaking to other lawyers."

13        So I certainly wasn't going to expose anything to, one,

14   someone I didn't know, and two, I was having trouble connecting

15   with.

16   Q.    Did you understand that if you provided that

17   information to him about Mr. Trump's involvement in the Stormy

18   Daniels matter, that that information might go somewhere else?

19   A.    I was also concerned, again, when he started talking

20   about his incredibly close relationship to Rudy, that anything I

21   said to him was going to be spoken and told to Rudy Giuliani.

22   And, of course, because Rudy Giuliani at the time was so

23   proximate to Mr. Trump, President Trump, that anything that I

24   said would get back to him.

25   Q.    Did Mr. Costello mention anything to you about

Proceedings

3972

         battle of the experts on some of these issues.

1

2              THE COURT:  That's fine.

3              You understand that at this point those are just

4       requests.  I haven't ruled on any/either request.

5              MR. BOVE:  Of course, Judge.  And that's why we

6       just wanted to flag this.

7              And, if I could, I would proffer the scope of what

8       we would be seeking to do through Mr. Smith.

9              THE COURT:  Sure.

10             MR. BOVE:  So what we would like to do is touch

11      upon basic statutory definitions, and I will discuss those

12      more specifically; and then there are phrases within those

13      definitions that we think it's important, that one way or

14      another the jury gets some guidance on, whether that is

15      through the competing experts that have been noticed or your

16      Honor.

17             I can talk about the ones that we are focused on;

18      and one of them is the meaning of the phrase "For the

19      Purpose of Influencing An Election For Federal Office."

20             The meaning of that --

21             THE COURT:  Just give me one second.

22             MR. BOVE:  Yes.

23             (Pause.)

24             THE COURT:  Can you repeat that again?

25             MR. BOVE:  The phrase "For the Purpose of

Lisa Kramsky,
Senior Court Reporter

Proceedings

3973

1    Influencing An Election For Federal Office."

2           And that's a statutory phrase.

3           And then both parties have requested instructions

4    regarding what I will describe as "The Irrespective Rule."

5    And that's from the FEC's regulations.

6           And then the third issue is "The Press Exemptions"

7    where we've requested an instruction.

8           I don't think that there is a competing request,

9    and we would be seeking to elicit testimony regarding that

10   exemption from Mr. Smith.

11          So, for basic statutory definitions, I think your

12   Honor has seen those in the parties' proposals,

13   "contribution," "relative individual contribution limits,"

14   the term "expenditure," and the term "coordinated

15   expenditure" are, I think, what would be the focus.

16          And within a couple of those definitions the

17   statute lays out that phrase "For The Purpose of Influencing

18   an Election."

19          And so that's why we think -- we would seek to

20   elicit from Mr. Smith an interpretation of what that phrase

21   means.

22          And, really, what we would be seeking to do through

23   him, Judge, is sort of track what is in the request that

24   we've submitted to your Honor.

25          So by tracking that phrase is giving content by the

Lisa Kramsky,
Senior Court Reporter

Proceedings

3974

1    Supreme Court's decision in Buckley, that the test is an

2    objective one -- excuse me, an objective one under the D.C.

3    Circuit's ruling in Orloski.

4          We would seek to have Mr. Smith describe the facts

5    of Orloski a little bit so that the jury can understand what

6    it means to have an objective test for the concept of "For

7    The Purpose of Influencing an Election."

8          And then describe the -- then you are relating to

9    the Congressman Jim Moran 5141 that's cited in our papers,

10   again, describing some facts, to give the jury a sense of a

11   situation where the FEC has applied that term and how they

12   have done it.

13         Then "The Irrespective Rule" --

14         THE COURT:  You are referring to past decisions

15   and/or hypotheticals?

16         MR. BOVE:  Not hypotheticals, Judge.

17         Just the past decisions that are cited in our

18   request to charge.

19         So that's "For The Purpose of Influencing The

20   Election."

21         Next, I mentioned "The Irrespective Rule," which is

22   set out in the FEC's regulations and cited, I think, by both

23   parties in their request to charge.

24         It's at 11 CFR 113 -- I'm sorry.  .1(g).

25         And so, we seek to have Mr. Smith discuss that

Proceedings

3975

1    rule, and discuss the focus on whether an expense would

2    exist irrespective of the candidate's campaign, which we

3    think is an important issue for the jury to consider with

4    respect to whether the payments at issue could be considered

5    expenditures and/or contributions.

6            And then talk about a little bit how that

7    regulation was developed beginning in 1995.

8            We've cited for your Honor our request for the

9    Federal Register Provisions that discuss the FEC's thinking

10   about that.

11           And, again, through Mr. Smith, what we're doing is

12   trying to give the jury a sense of what the requirements are

13   for this term and how the FEC has applied them.

14           And so, we would walk through a couple more of the

15   MURs that are cited in our request, 7025, 4944.

16           And there is an advisory opinion we cite from 203.

17   Not hypotheticals, but just seeking, again, to give the jury

18   a sense of applications and how the agency then administers

19   the regulation that it created and applies it in practice.

20           And then the last issue that I mentioned that we

21   would be seeking to cover with Mr. Smith is the "Press

22   Exemptions."

23           And that sort of has a basis in both the statute as

24   well as the FEC's regulations.

25           And we have also cited an advisory opinion in our

Proceedings

3976

1    request to charge that, alternatively, we would have

2    Mr. Smith describe, again, just to give the jury a little

3    bit of content around these terms.

4         And I say that, and make this whole proffer with a

5    little bit of concern that we don't want to be treading on

6    your Honor's legal instructions.

7         These are things that, coming into the trial,

8    based on the in limine ruling, we had hoped to do through

9    Mr. Smith.

10         Now, you have these two competing jury instructions

11    and so there is a little bit of tension here, and so we

12    wanted to --

13         THE COURT:  So you believe that the biggest impetus

14    to this is to ask this Court about -- to argue that we now

15    have two competing instructions, not the facts of the case

16    or that the testimony has changed, just the request for the

17    instructions?

18         MR. BOVE:  The reason that I'm making the proffer,

19    your Honor, if the instructions had not come in, in the way

20    that they had, meaning that if the parties were not in

21    agreement at least with respect to the question of should

22    the Court give instructions about FECA and these terms, we

23    understand -- we think we understand what your Honor's in

24    limine ruling says and we were going to abide by that

25    through Mr. Smith.

Proceedings

3977

1          We are now making this proffer to your Honor so

2     that everybody sort of has eyes wide open coming into

3     Monday, when I think it's very possible this testimony could

4     come in, that there is a little bit of tension right now

5     between the pending request and what we would cover from --

6     through Mr. Smith.

7          We are sensitive to that, and we don't want to have

8     him up on the stand and give the impression that we are

9     encroaching on your Honor's province.

10         THE COURT:  Thank you.

11         MR. COLANGELO:  Your Honor, I think 95 percent of

12    the proffered testimony that was just described flies

13    directly in the face of your extremely clear March 18th

14    Order, which expressly said that Mr. Smith may not testify

15    regarding the interpretation and application of Federal

16    Campaign Finance Laws.

17         You specifically held that he could identify

18    general definitions, but not interpretation or application.

19         So as to each of the three terms of art in the

20    Federal Campaign Finance Law that Mr. Bove just described,

21    "For The Purpose of Influencing," "Irrespective of the

22    Candidacy," and "Press Exemption," I think he just walked

23    your Honor through a very long list of Federal Case Law,

24    Supreme Court and D.C. Circuit Case Law, as well as Agency

25    Advisory Opinions and Agency Adjudications interpreting

Lisa Kramsky,
Senior Court Reporter

Proceedings

3978

1     those terms.

2            That is -- that kind of testimony from an expert is

3     precisely the reason that there is a general and broadly

4     followed prohibition on testimony by an expert witness on

5     legal matters.

6            And, your Honor, I think there are two compounding

7     problems here.

8            One is that, as Mr. Bove noted, we have also

9     retained an expert witness who, if necessary, would be

10    prepared to testify as to the same issues.

11           But then -- and we anticipate that he would say,

12    based on what we've seen in the defendant's briefing, that

13    the way the defense is interpreting the application of those

14    statutes is inconsistent with how the Agency and how Federal

15    Courts have done the same.

16           But then we've got three people telling the jury

17    what the law is, when there should be only one.

18           It should be your Honor exclusively instructing the

19    jury on how the law applies.

20           I mean, by analogy this would be like calling an

21    expert witness to opine on whether the intent to defraud in

22    the Penal Law definition does or does not -- is or is not

23    limited to a pecuniary financial motive only.

24           That's a brief -- we have briefed it.  It's

25    identified in the charge.  Your Honor has ruled on it.  And

Proceedings

3979

1    that should be the end of it.

2         The -- in fact, the very fact that this is a

3    contested legal issue in the parties proposed instructions

4    to the jury is even more reason why this should be resolved

5    through argument before your Honor at pre-charge conference,

6    not something that we should be putting in expert

7    testimony -- expert testimony to discuss.

8         I think there are two other problems.

9         First, and unless I'm missing it somewhere, the

10   possibility of any testimony on the "Press Exemption" has

11   never been included in any of the defense's disclosures

12   regarding this witness, either before or after your Honor's

13   motion in limine.

14        So there is a serious notice problem with the

15   "Press Exemption" proposal from the outset.

16        And then there is a broader notice problem, your

17   Honor, which is that it's, as you know, dating back to last

18   November, we tried for months to compel the defendant to

19   disclose reciprocal discovery, including this expert

20   testimony.

21        We had to move the Court to compel reciprocal

22   discovery in November.

23        Your Honor granted that motion.

24        We didn't get the defense expert disclosure until

25   January, and then the entire point of pretrial notice of

Proceedings

3980

1      proffered expert testimony is so the parties can prepare.

2                  We filed a motion in limine to exclude their

3      expert testimony.

4                  Your Honor largely granted it.

5                  And we have prepared a potential rebuttal witness

6      based on the language in your Honor's -- the Court's

7      March 18th Order.

8                  So to expand Mr. Smith's testimony at this point,

9      just a few days before he may take the stand, presents a

10     significant notice problem as well because our witness, in

11     reliance on the Court's Order, we have not prepared him to

12     talk about the facts about a D.C. Circuit case or the

13     Orloski case or the Buckley versus the Valeo Supreme Court

14     decision or how it applies.

15                 So, your Honor, what Mr. Bove just described is

16     totally outside and way beyond both what your Honor already

17     ruled and any recognized exception to the general

18     prohibition on legal testimony from an expert.

19                 MR. BOVE:  We are not seeking to have three people

20     at this trial instruct the jury about these issues, Judge,

21     and that's exactly why I'm raising this -- why we're raising

22     this right now, which is that the changed circumstance, from

23     our perspective, is:  I don't think there was a -- to our

24     understanding, there was not an agreement prior to the start

25     of this trial that your Honor would provide instructions to

Proceedings

3981

1     the jury regarding these issues.

2           And, as you noted, there is still -- it's still not

3     clear that the Court will.

4           Judge, as a matter of just basic fairness, given

5     the way that the People have now structured their theory of

6     the case, the jury has to be provided instructions one way

7     or another -- or I will say information, one way or another,

8     about how to apply these principles.

9           And so, what I have proffered is from our

10    standpoint what I think are the very basics and the bare

11    minimum that would be required for the jury to make an

12    analysis of whether or not any of these things were unlawful

13    contributions, which is a necessary showing here, at least

14    that there was a conspiracy with that intent.

15          I think we've been clear in pretrial motion

16    practice and from the start that we don't think this jury

17    here should be evaluating a FECA violation.

18          We understand that before your Honor we've lost

19    that fight.

20          What we're saying now is that just basic fairness

21    requires that they understand what the principles are in a

22    fair way.

23          And I think on the "Press Exemption" question in

24    particular, I don't think there could be any reasonable

25    dispute that that was absolutely central to both AMI's

Proceedings

3982

1    defense and the FEC's analysis of whether or not there was a

2    campaign contribution both in the Non-Prosecution Agreement

3    and in the Conciliation Agreement.

4         And so --

5         THE COURT:  People, anything else?

6         MR. COLANGELO:  Yes, your Honor.

7         Just two quick points and one to correct the

8    record.

9         My recollection is that Ms. Necheles said to your

10   Honor at a bench conference last week, before any of the

11   proposed jury instructions were in, that they intended to

12   raise with your Honor, to question what their expert would

13   be permitted to testify to.

14        So I'm not sure that we can credit the

15   characterization that this proffer and these instructions

16   are necessitated by differences of opinion regarding the law

17   in the proposed jury instructions.

18        And then, second, on the press exemption, as you

19   know, your Honor, we haven't yet responded to the submission

20   that the defense put in the other day.

21        I'm not sure, as I stand here right now, that we

22   will oppose the exclusion of the language in the charge to

23   define the "Press Exemption," but the "Press Exemption" is

24   why this entire undertaking is way beyond what any witness

25   should testify to.

Proceedings

3983

1        The statutes and the regulations combined contain

2    about 20 words of texts on the "Press Exemption."

3        That entire concept is developed almost entirely

4    through additional case law in courts and through agency

5    application.

6        So, it's exactly the kind of thing that has been

7    developed through the adjudicative and agency determination

8    process and that the parties can discuss with you and that

9    you should decide, your Honor, not an expert, certainly not

10    competing experts instructing the jury.

11        THE COURT:  All right.

12        Thank you.

13        Mr. Blanche, just give me a second, all right.

14        MR. BLANCHE:  Yes, your Honor.

15        (Pause.)

16        THE COURT:  I don't think that the fact that each

17    of you has submitted proposed jury charges necessarily

18    changes my ruling or my decision to the motions in limine.

19        To direct your attention specifically to the area

20    that dealt with this, I direct your attention to Pages 1, 2

21    and 3 of the Court's decision.

22        And I will read from the very last, next to last

23    paragraph of the Court's decision:

24        "The People's motion is granted to the extent that

25    Smith may not testify as a lay fact witness, offer opinion

Lisa Kramsky,
Senior Court Reporter

Proceedings

3984

1    testimony regarding the interpretation and application of

2    Federal Campaign Finance Laws and how they relate to the

3    facts in the instant matter, nor may Smith testify or offer

4    an opinion as to whether the alleged conduct in this case

5    does or does not constitute a violation of the Federal

6    Election Campaign Act (FECA).

7          However, Smith will be permitted to testify

8    generally as to the following:

9          General background as to what the Federal Election

10   Campaign Commission is; background as to who makes up the

11   FEC; what the FEC's function is; what laws, if any, the FEC

12   is responsible for enforcing; and general definitions and

13   terms that relate directly to this case; such as, for

14   example, campaign contribution.

15         As I listen to your presentation, Mr. Bove, it

16   sounds to me like what you are asking is that I enlarge this

17   decision quite a bit.

18         When I hear you use words like "interpretation,"

19   "past decisions," "advisory opinions," that does sound an

20   awful lot like what would normally be called opinions on the

21   law.

22         And, in fact, you used the term, "a battle of the

23   experts."

24         The only reason we would get into "a battle of the

25   experts" is if your expert got on the stand and testified as

Lisa Kramsky,
Senior Court Reporter

Proceedings

3985

 1    to some sort of expert opinion not only about FECA, but

 2    possibly the law and then the People would put on their

 3    expert to rebut that; and then I would have to instruct the

 4    jury.

 5            We are definitely not going to go there.

 6            What I'm going to do, in fairness to you, because I

 7    would like to digest both submissions further, I will take

 8    some time this weekend to do that, to read and study both

 9    sets of submissions.

10            I would also like to read the minutes from what has

11    just happened here.

12            But until you hear differently from me, my ruling

13    has not changed.

14            It's going to be limited to the very, very general

15    definitions and very general background information.

16            I also do agree with the People that they had asked

17    for a very long period of time for disclosure and notice

18    regarding the expert witness, and despite the repeated

19    efforts to get that, it didn't come until, finally, very

20    late in the game.  It was offered, but in a manner to

21    suggest that the witness would actually testify as a fact

22    witness, and you know what my ruling was on that, an expert

23    can't testify as a fact witness because they don't know the

24    facts of the case.

25            So, at that point, the purpose of your expert was

Lisa Kramsky,
Senior Court Reporter

Charge Conference

4404

1        We think it's important under the circumstances
2    of this case and think it's in your Honor's discretion to
3    make clear the record here.
4        MR. COLANGELO:  The importance of the law is not
5    deviating from the law; it's to apply the law as
6    consistently as possible, as the Court would do in every
7    other case.
8        That is, there's no reason to rewrite the law for
9    this case.
10       THE COURT:  I agree.
11       I think I understand what you're saying, what you
12   mean when you're saying it's an important case.
13       What you're asking me to do is change the law,
14   and I'm not going to do that.
15       Looking at Paragraphs 2 and 3, those seem very
16   similar to me.
17       What's the difference between those two
18   paragraphs?
19       MR. COLANGELO:  So, your Honor, we have a couple
20   of concerns with Defense proposal.
21       The first is that it refers to a requirement that
22   there be proof that the goal of the conspiracy was to
23   promote the election of a person by unlawful means.
24       And, as we've discussed, the -- the actual
25   commission of the predicate crime does not need to be

Jury Charge

4844

1                    *******

2              (The following proceedings are continued from the

3        preceding page.)

4              THE COURT:   (Continuing.)

5              Although you must conclude unanimously that the

6    Defendant conspired to promote or prevent the election of

7    any person to a public office by unlawful means, you need

8    not be unanimous as to what those unlawful means were.

9              In determining whether the Defendant conspired to

10   promote or prevent the election of any person to a public

11   office by unlawful means, you may consider the following:

12              One, violations of the Federal Election Campaign

13   Act, again, otherwise known as FECA;

14              Two, the falsification of other business records;

15        or, three, violation of tax laws.

16              The first of the People's theories of "unlawful

17   means," which I will now define for you is the Federal

18   Election Campaign Act.

19              Under the Federal Election Campaign Act, it is

20   unlawful for an individual to willfully make a contribution

21   to any candidate with respect to any election for Federal

22   office, including the office of President of the United

23   States, which exceeds a certain limit.

24              In 2015 and 2016, that limit was $2,700.

25              It is also unlawful under the Federal Election

Lisa Kramsky,
Senior Court Reporter

Jury Charge

4845

 1   Campaign Act for any corporation to willfully make a

 2   contribution of any amount to a candidate or candidate's

 3   campaign in connection with any Federal election, or for any

 4   person to cause such a corporate contribution.

 5         For purposes of these prohibitions, and expenditure

 6   made in cooperation, consultation or concert with, or at the

 7   request or suggestion of, a candidate or his agents shall be

 8   considered to be a contribution to such candidate.

 9         The terms "contribution" and "expenditure" include

10   anything of value, including any purchase, payment, loan, or

11   advance, made by any person for the purpose of influencing

12   any election to Federal office.

13         Under Federal law, a third party's payment of a

14   candidate's expenses is deemed to be a contribution to the

15   candidate, unless, the payment would have been made

16   irrespective of the candidacy.

17         If the payment would have been made even in the

18   absence of the candidacy, the payment should not be treated

19   as a contribution.

20         FECA's definitions of "contribution" and

21   "expenditure" do not include any cost incurred in covering

22   or carrying a news story, commentary, or editorial by a

23   magazine, periodical publication, or similar press entity so

24   long as such activity is a normal, legitimate press

25   function.

4846

1          This is called the Press Exemption.

2          For example, the term "legitimate press function"

3    includes solicitation letters seeking new subscribers to a

4    publication.

5          The second of the People's theories of "unlawful

6    means," which I will define for you now is the falsification

7    of other business records.

8          Under New York Law, a person is guilty of

9    Falsifying Business Records in the Second Degree when with

10   intent to defraud, he or she makes or causes a false entries

11   in the business records of an enterprise.

12         I previously defined for you the terms enterprise,

13   business records and intent to defraud.

14         For purposes of determine whether Falsifying

15   Business Records in the Second Degree was an unlawful means

16   used by a conspiracy to promote or prevent an election here,

17   you may consider:

18         One, the bank records associated with Michael

19   Cohen's account formation paperwork for Resolution

20   Consultants -- for Resolution Consultants LLC and Essential

21   Consultants LLC accounts;

22          Two, the bank records associated with Michael

23   Cohen's wire to Keith Davidson;

24         Three, the invoice from Investor Advisory Services,

25   Inc., to Resolution Consultants LLC;