# EXHIBIT N

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,                    Index No. 71543-23

               - against -

DONALD J. TRUMP,

                            Defendant.

**PRESIDENT DONALD J. TRUMP'S MOTIONS TO EXCLUDE EVIDENCE AND
FOR AN ADJOURNMENT BASED ON PRESIDENTIAL IMMUNITY**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

DISCUSSION ..................................................................................................................... 5

I.    President Trump Is Immune From State Prosecution Based On Official Acts...................... 5

    A.    The Executive Vesting Clause And Supremacy Clause Require Presidential
Immunity From State Prosecution For Official Acts ................................................ 5

    B.    The Impeachment Judgment Clause Confirms Presidential Immunity........................... 8

    C.    The President's Unique Role Requires Immunity From Prosecution Based On
Official Acts .......................................................................................................... 9

    D.    "The Presuppositions Of Our Political History" Support Presidential Immunity From
Prosecution For Official Acts............................................................................... 10

    E.    Analogous Immunity Doctrines Support Presidential Immunity From Prosecution Based
On Official Acts ................................................................................................... 13

    F.    Public Policy Considerations Support Presidential Immunity From Prosecution.......... 16

II.    The Court Should Adjourn The Trial Until The Supreme Court Decides
*Trump v. United States*........................................................................................... 18

III.    The People Must Be Precluded From Offering Evidence Of President Trump's Official
Acts ....................................................................................................................... 20

    A.    "Official Acts" Include Presidential Decisions On The "Outer Perimeter"................... 20

    B.    The Court Must Preclude Evidence Of Official Acts .................................................. 21

CONCLUSION.................................................................................................................. 24

## INTRODUCTION

President Donald J. Trump respectfully submits this motion (1) for an adjournment of the trial pending review of the scope of the presidential immunity doctrine in *Trump v. United States*, which the Supreme Court agreed to hear on February 28, 2024, and is scheduled to be argued before the Court on April 25, 2024; and (2) to preclude evidence of President Trump's official acts at trial based on presidential immunity.

The Court must preclude the People from offering evidence at trial of President Trump's official acts as the Commander in Chief, which the People have not yet specified as the existing trial date approaches. However, in motions *in limine* recently filed on February 22, 2024, the People argued that they should be permitted to offer evidence at trial concerning a fictitious so-called "pressure campaign" by President Trump in 2018 relating to Michael Cohen. People's MILs at 50. Although the People did not describe the evidence they intend to offer in detail, it appears that the evidence includes public statements by President Trump and posts to his official Twitter account, as well as testimony from unspecified witnesses. *See id.* The People's recent proffer implicates presidential immunity because President Trump was President of the United States at the time of those actions in 2018. He made at least some of the 2018 statements at issue—and potentially all of them, though it is hard to be sure in light of the People's vague *in limine* description—in his official capacity as the nation's Chief Executive. Moreover, while it is clear that the People intend to offer documents and testimony relating to the period in 2017 when President Trump was in office, they have not provided sufficiently specific notice of the nature and extent of that evidence to allow President Trump or the Court to distinguish between personal and official acts.

Such distinctions are necessary and complex, as illustrated by the D.C. Circuit's recent guidance in *Blassingame v. Trump*, where the panel emphasized that President Trump is entitled to "every opportunity" to present this defense.  87 F.4th 1, 22 (D.C. Cir. 2023).  This area of law is evolving in real time.  Specifically, on February 28, 2024, the Supreme Court granted certiorari with respect to the following question: "Whether and if so to what extent does a former President enjoy presidential immunity from criminal prosecution for conduct alleged to involve official acts during his tenure in office."  *Trump v. United States*, 2024 WL 833184 (Feb. 28, 2024).

In addition, on March 4, 2024, a unanimous Supreme Court held that the Colorado Supreme Court had erred by excluding President Trump from Colorado's 2024 presidential primary ballot. *Trump v. Anderson*, 2024 WL 899207, at *2 (Mar. 4, 2024).  The *Anderson* Court reasoned, in part, that states' "power over governance . . . does not extend to *federal* . . . candidates."  *Id.* at *3 (emphasis in original).  The Court's emphasis on federalism principles further supports the timing of this motion, and is relevant to the application of presidential immunity because "any effort . . . to retaliate against a President for official acts" would be "an unconstitutional attempt to 'influence' a superior sovereign 'exempt' from such obstacles."  *Trump v. Vance*, 140 S. Ct. 2412, 2428 (2020) (citing *McCulloch v. Maryland*, 4 Wheat. 316, 417 (1819)).

Therefore, President Trump respectfully submits that an adjournment of the trial is appropriate to await further guidance from the Supreme Court, which should facilitate the appropriate application of the presidential immunity doctrine in this case to the evidence the People intend to offer at trial.  Following the Supreme Court's guidance, and consistent with the remand in *Blassingame*, the Court should hold a hearing outside the presence of the jury to identify and preclude documentary and testimonial official-acts evidence based on presidential immunity.

## BACKGROUND

As far as we can gather from the description of the so-called "pressure campaign" in the People's motions *in limine*, there are several types of evidence that implicate the concept of official acts for purposes of presidential immunity, and therefore must be precluded.

First, President Trump used his Twitter account, which was an official communications channel during his Presidency, to communicate with the public regarding matters of public concern. In 2018, such matters included Michael Cohen after the FBI executed search warrants targeting him. For example:

- On April 21, 2018, President Trump posted messages on his Twitter account that included the following: "Michael is a businessman for his own account/lawyer who I have always liked & respected. Most people will flip if the Government lets them out of trouble, even if . . . it means lying or making up stories. Sorry, I don't see Michael doing that despite the horrible Witch Hunt and the dishonest media." Ex. 1.

- On May 3, 2018, President Trump posted messages on his Twitter account that included the following: "Mr. Cohen, an attorney, received a monthly retainer, not from the campaign and having nothing to do with the campaign, from which he entered into, through reimbursement, a private contract between two parties, known as a non-disclosure agreement, or NDA. These agreements are . . . very common among celebrities and people of wealth. . . . Money from the campaign, or campaign contributions, played no rol[e] in this transaction." Ex. 2.

- On August 22, 2018, President Trump posted a message on his Twitter account that included the following: "I feel very badly for Paul Manafort and his wonderful family. 'Justice' took a 12 year old tax case, among other things, applied tremendous pressure on him and, unlike Michael Cohen, he refused to 'break' – make up stories in order to get a 'deal.' Such respect for a brave man." Ex. 3.

Second, President Trump made public statements on official premises and during media appearances. For example:

- On April 5, 2018, during statements to reporters on board Air Force One, President Trump directed reporters to "ask Michael Cohen" regarding the public allegations and added, "Michael is my attorney. And you'll have to ask Michael Cohen." Ex. 4.

3

- On April 26, 2018, during a telephone call aired on *Fox & Friends*, President Trump explained that Cohen "has a percentage of my overall legal work – a tiny, tiny little fraction. But Michael would represent me on some things. . . . [L]ike with this crazy Stormy Daniels deal he represented me. And, you know, from what I see he did absolutely nothing wrong. There were no campaign funds going into this." Ex. 5.

- On August 23, 2018, during an interview on *Fox & Friends*, President Trump stated: "If you look at President Obama, he had a massive campaign violation, but he had a different Attorney General and they viewed it a lot differently, you know. We have somebody that they seem to like to go after a lot of Republicans, but he settled his very easily. In fact I put that out fairly recently. So Obama had it, other people have it, almost everybody that runs for office has campaign violations, but what Michael Cohen pled to weren't even campaign related, they weren't crimes." Ex. 6.

Third, the People seem to want to offer documentary evidence that reflects official acts. This category appears to include a form that President Trump submitted to the U.S. Office of Government Ethics in 2018. Ex. 7.

Fourth, it appears that the People will seek to elicit testimony at trial relating to official acts. For example, ███████ is on the People's witness list as of January 29, 2024. During grand jury testimony, ████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████. Tr. 698. ████████████████ ███████████████████████████████████████████. Tr. 699. ███████████████ ███████████████████████████████████████████████████████ ████████████████████████████████████████. Tr. 704-06. Similarly, ███████████████████████████████████████████████████ ███████████████████████████████████████. Tr. 890-91, 916-17, 919-20. According to ███████████████████████████████████████████████████████ ████████████████████████████. Tr. 919. ████████████████████ ██████████████████████████. Tr. 924.

## DISCUSSION

### I.    President Trump Is Immune From State Prosecution Based On Official Acts

For the reasons set forth below, President Trump is entitled to immunity from prosecution based on evidence of official acts that he undertook during his first term in Office.[1]

### A.    The Executive Vesting Clause And Supremacy Clause Require Presidential Immunity From State Prosecution For Official Acts

Under the Executive Vesting Clause of Article II, § 1, state courts and prosecutors lack authority to sit in judgment over a President's official acts.  The Executive Vesting Clause provides that "[t]he executive Power shall be vested in a President of the United States of America."  U.S. CONST. art. II, § 1, cl. 1.  Just as the Executive Vesting Clause prevents an Article III court from arrogating the "executive power" to itself based on the separation of powers,[2] state authorities

---

[1] The D.C. Circuit recently erred in finding that President Trump was not entitled to presidential immunity in connection with the set of federal criminal charges pending in the District of Columbia.  *See United States v. Trump*, 91 F.4th 1173, 1200 (D.C. Cir. 2024).  The D.C. Circuit's analysis is not persuasive for many of the reasons discussed below and, as noted, will be reviewed by the Supreme Court pursuant to the February 28 grant of certiorari.  *Trump v. United States*, 2024 WL 833184 (Feb. 28, 2024).

[2] *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 719 (1997) (Breyer, J., concurring) (reasoning that there is an "unbroken historical tradition . . . implicit in the separation of powers that a President may not be ordered by the Judiciary to perform particular Executive acts" (cleaned up)); *Chi. & S. Air Lines v. Waterman S.S. Corp.*, 333 U.S. 103, 112 (1948) (reasoning that "whatever of this order emanates from the President is not susceptible of review by the Judicial Department"); *Mississippi v. Johnson*, 71 U.S. 475, 501 (1866) ("[T]his court has no jurisdiction of a bill to enjoin the President in the performance of his official duties."); *In re Trump*, 958 F.3d 274, 297-98 (4th Cir. 2020), *cert. granted, judgment vacated sub nom. Trump v. D.C.*, 141 S. Ct. 1262 (2021) (Wilkinson, J., dissenting) ("Since *Mississippi*, the federal courts have continued this practice *without exception* and have not sustained a single injunction against the President in his official capacity." (italics in original)); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief.") (cleaned up).  This is also the consistent litigation position of the U.S. Department of Justice.  *See, e.g.*, Reply Brief for Pet'r at 4-6, *In re Trump*, No. 18-2486 (4th Cir. Feb. 21, 2019) (invoking "the separation-of-powers principle that 'courts have no jurisdiction of a bill to enjoin the President in the performance of his official duties'" (quoting *Mississippi*, 71 U.S. at 501) (cleaned up); DOJ Mem. at 25, ECF No. 28, *Missouri v. Biden*, No. 21 Civ. 287 (E.D. Mo. June 4, 2021) (same).

purporting to dictate how the President must exercise the executive power violate the Supremacy Clause and federalism principles. *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 691 n.13 (1997) (reasoning that "any direct control by a state court over the President, who has principal responsibility to ensure that those laws are 'faithfully executed,' Art. II, § 3, may implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here," such as under "the Supremacy Clause"); *Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *see also United States v. McLeod*, 385 F.2d 734, 751-52 (5th Cir. 1967) ("Both the Supremacy Clause and the general principles of our federal system of government dictate that a state grand jury may not investigate the operation of a federal agency. . . . [T]he investigation . . . is an interference with the proper governmental function of the United States . . . [and] an invasion of the sovereign powers of the United States of America.").

In *Marbury v. Madison*, Chief Justice Marshall described the presidential immunity doctrine as foundational and self-evident. "By the constitution of the United States, the President is invested with certain important political powers, in the exercise of which he is to use his own discretion, and is accountable only to his country in his political character, and to his own conscience." *Marbury v. Madison*, 5 U.S. 137, 165-66 (1803). When it comes to the President's official acts, "whatever opinion may be entertained of the manner in which executive discretion may be used, still there exists, and can exist, no power to control that discretion." *Id.* at 166. "[N]othing can be more perfectly clear than that" the President's discretionary "acts are only politically examinable." *Id.* "Questions . . . which are, by the constitution and laws, submitted to the executive, can never be made in this court." *Id.* at 170. The President's official acts, therefore, "*can never be examinable by the courts*." *Id.* at 166 (emphasis added).

The Supremacy Clause prohibits state and local officials from using their powers to "defeat the legitimate operations" of the national government. *McCulloch v. Maryland*, 17 U.S. 316, 427 (1819). States may not impede "the measures of a government created by others as well as themselves, for the benefit of others in common with themselves." *Id.* at 435. The *McCulloch* court reasoned:

> If we apply the principle for which the state of Maryland contends [regarding state taxation], to the constitution, generally, we shall find it capable of changing totally the character of that instrument. We shall find it capable of arresting all the measures of the government, and of prostrating it at the foot of the states.

*Id.* at 432. The *McCulloch* Court rejected that possibility.

In 1833, citing *Marbury*, Justice Story wrote that "[i]n the exercise of his political powers [the President] is to use his own discretion, and is accountable only to his country, and to his own conscience. His decision, in relation to these powers, is subject to no control; and his discretion, when exercised, is conclusive." 3 J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES, ch. 37, § 1563 (1833), https://lonang.com/library/reference/story-commentaries-us-constitution/sto-337. "It is incompatible with his constitutional position that [the President] be compelled personally to defend his executive actions before a court." *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and concurring in the judgment); *cf. Martin v. Mott*, 25 U.S. 19, 32-33 (1827) (Story, J.) (holding that, "[w]hen the President exercises an authority confided to him by law," his official conduct cannot "be passed upon by a jury" or "upon the proofs submitted to a jury"); *see also Johnson v. Maryland*, 254 U.S. 51, 57 (1920) (reasoning that "immunity of the instruments of the United States from state control in the performance of their duties" prohibits prosecution of a post officer for violating a state license law); *Ohio v. Thomas*, 173 U.S. 276, 284 (1899) (prohibiting state criminal prosecution of federal officer for violating food regulations because "in the performance of that duty he was not subject to the

direction or control of the legislature of Ohio"); *In re Tarble*, 80 U.S. 397, 409 (1871) (reasoning that it is "manifest that the powers of the National government could not be exercised with energy and efficiency at all times, if its acts could be interfered with and controlled for any period by officers or tribunals of another sovereignty"); *McClung v. Silliman*, 19 U.S. 598, 605 (1821) (holding that state court cannot mandamus an officer of the United States because that officer's "conduct can only be controlled by the power that created him").

**B.    The Impeachment Judgment Clause Confirms Presidential Immunity**

Presidential immunity from criminal prosecution for official acts draws support directly from the text of the Constitution, as the Impeachment Judgment Clause states that a President cannot be criminally prosecuted unless he is first impeached and convicted by the U.S. Senate.

The Impeachment Judgment Clause provides that "Judgment in Cases of Impeachment shall not extend further than to removal from Office . . . but *the Party convicted* shall nevertheless be liable and subject to Indictment, Trial, Judgment and Punishment, according to Law."  U.S. CONST. art. I, § 3, cl. 7 (emphasis added).  Because the Constitution specifies that only "the Party *convicted*" by trial in the Senate may be "liable and subject to Indictment, Trial, Judgment and Punishment," *id.*, it plainly indicates that a President who is *not* convicted may *not* be subject to criminal prosecution. SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, § 10, at 107 (2012) ("When a car dealer promises a low financing rate to 'purchasers with good credit,' it is entirely clear that the rate is *not* available to purchasers with spotty credit.").

This was the understanding of the Founders.  "James Wilson—who had participated in the Philadelphia Convention at which the document was drafted—explained that . . . the President . . . 'is amenable to [the laws] in his private character as a citizen, and in his public character by impeachment.'"  *Jones*, 520 U.S. at 696 (quoting 2 J. ELLIOT, DEBATES ON THE FEDERAL

CONSTITUTION 480 (2d ed. 1863)) (cleaned up). "With respect to acts taken in his 'public character'—that is, official acts—the President may be disciplined principally by impeachment, not by private lawsuits for damages. But he is otherwise subject to the laws for his purely private acts." *Id.*; *see also* THE FEDERALIST No. 43 (J. Madison); THE FEDERALIST Nos. 65, 69, 77 (A. Hamilton) (Alexander Hamilton explaining in three essays that criminal prosecution of a President can occur only "afterwards," "after," "subsequent" to, and as a "consequence" of impeachment and conviction by the Senate).

As Justice Alito noted in *Vance*, "[t]he plain implication" of the Impeachment Judgment Clause "is that criminal prosecution, like removal from the Presidency and disqualification from other offices, is a consequence that can come about only after the Senate's judgment, not during or prior to the Senate trial." 140 S. Ct. at 2444 (Alito, J., dissenting). "This was how Hamilton explained the impeachment provisions in the Federalist Papers. He wrote that a President may 'be impeached, tried, and, upon conviction . . . *would afterwards be liable to prosecution and punishment in the ordinary course of law.*'" *Id.* (quoting THE FEDERALIST No. 69, p. 416 (C. Rossiter ed. 1961)); *see also* THE FEDERALIST No. 77, p. 464 (C. Rossiter ed. 1961) (A. Hamilton) (arguing that a President is "at all times liable to impeachment, trial, [and] dismission from office," but any other punishment must come only "by subsequent prosecution in the common course of law"); THE FEDERALIST NO. 65.

### C.    The President's Unique Role Requires Immunity From Prosecution Based On Official Acts

"The President occupies a unique position in the constitutional scheme." *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982). Under Article II, § 1 of the Constitution, the President is "the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity." *Id.* at 749-50. "Nor can the sheer prominence

of the President's office be ignored." *Id.* at 752-53. "In view of the visibility of his office and the effect of his actions on countless people, the President would be an easily identifiable target for" criminal prosecution in countless federal, state, and local jurisdictions across the country. *Id.* at 753. "Cognizance of this personal vulnerability frequently could distract a President from his public duties, to the detriment of not only the President and his office but also the Nation that the Presidency was designed to serve." *Id.* This "unique status under the Constitution distinguishes him from other executive officials." *Id.* at 750. As a result of "the singular importance of the President's duties," "diversion of his energies by concern with" criminal prosecution administered by the judicial branch "would raise unique risks to the effective functioning of government." *Id.* at 751; *see also* Brett Kavanaugh, *Separation of Powers During the Forty-Fourth Presidency and Beyond*, 93 MINN L. REV. 1454, 1461 (2009) ("[A] President who is concerned about an ongoing criminal investigation is almost inevitably going to do a worse job as President").

Without immunity from criminal prosecution based on official acts, the President's political opponents will seek to influence and control his or her decisions via *de facto* extortion or blackmail with the threat, explicit or implicit, of indictment by a future, hostile Administration, for acts that do not warrant any such prosecution. This threat will hang like a millstone around every future President's neck, distorting Presidential decisionmaking, undermining the President's independence, and clouding the President's ability "to deal fearlessly and impartially with the duties of his office." *Fitzgerald*, 457 U.S. at 752 (cleaned up).

### D.    "The Presuppositions Of Our Political History" Support Presidential Immunity From Prosecution For Official Acts

"[T]he presuppositions of our political history," including "tradition[s] so well grounded in history and reason," help to define the scope of presidential immunity. *Fitzgerald*, 457 U.S. at 745. This history dates back to the founding and was upheld in *Marbury v. Madison*, as discussed

10

above. There, Charles Lee, who served as Attorney General under Presidents Washington and Adams, "declare[d] it to be [his] opinion, grounded on a comprehensive view of the subject, that the President is not amenable to *any court of judicature for the exercise of his high functions*, but is responsible only in the mode pointed out in the constitution," *i.e.*, by impeachment. *Marbury*, 5 U.S. at 149 (emphasis added).

Indeed, in 234 years from 1789 to 2023, no president was ever prosecuted for his official acts. "Such a lack of historical precedent is generally a telling indication of a severe constitutional problem with the asserted power." *Trump v. Anderson*, 2024 WL 899207, at *5 (Mar. 4, 2024) (cleaned up); *see also Seila Law, LLC v. CFPB*, 140 S. Ct. 2183, 2201 (2020) ("Perhaps the most telling indication of [a] severe constitutional problem . . . is [a] lack of historical precedent to support it." (cleaned up)).

The unbroken tradition of not exercising the supposed formidable power of criminally prosecuting a President for official acts—despite ample motive and opportunity to do so, over centuries—implies that the power does not exist. *See id.*; *see also, e.g.*, *NFIB v. OSHA*, 595 U.S. 109, 119 (2022) (per curiam); *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 505 (2010)). "[T]he longstanding 'practice of the government,' can inform our determination of 'what the law is.'" *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 525 (2014) (first quoting *McCulloch*, 17 U.S. at 401, and then quoting *Marbury*, 5 U.S. at 177). "That principle is neither new nor controversial," and this Court's "cases have continually confirmed [this] view." *Id.* (citing *Mistretta v. United States*, 488 U.S. 361, 401 (1989), and eight other cases from 1803 to 1981).

American history abounds with examples of presidents who were accused by political opponents of committing crimes through their official acts—yet none was ever prosecuted, until last year. These include, among many others, John Quincy Adams' alleged "corrupt bargain" in

appointing Henry Clay as Secretary of State;[3] President George W. Bush's allegedly false claim to Congress that Saddam Hussein possessed stockpiles of "weapons of mass destruction," which led to war in which thousands of Americans were killed;[4] and President Obama's alleged authorization of a drone strike that targeted and killed a U.S. citizen abroad (and his teenage son, also a U.S. citizen).[5]  They also include, among many other examples, President Clinton's last-minute pardon of fugitive financier Marc Rich,[6] President Clinton's repeated use of airstrikes in the Middle East in August and November 1998 in an alleged attempt to distract attention from the Monica Lewinsky scandal,[7] President Biden's egregious mismanagement of the United States' border security, and President Biden's alleged "material support for terrorism" through both the funding of the UNRWA despite its documented history of direct support for terrorism, and release

---

[3] *See, e.g.*, Jessie Kratz, *The 1824 Presidential Election and the "Corrupt Bargain"*, NAT'L ARCHIVES (Oct. 22, 2020), https://prologue.blogs.archives.gov/2020/10/22/the-1824-presidential-election-and-the-corrupt-bargain.

[4] *See, e.g.*, Gary L. Gregg II, *George W. Bush: Foreign Affairs*, UVA MILLER CENTER, https://millercenter.org/president/gwbush/foreign-affairs; Tim Arango, *Ex-Prosecutor's Book Accuses Bush of Murder*, N.Y. TIMES (July 7, 2008), https://www.nytimes.com/2008/07/07/business/media/07bugliosi.html.

[5] *See, e.g.*, Spencer Ackerman, *US Cited Controversial Law in Decision to Kill American Citizen by Drone*, THE GUARDIAN (June 23, 2014), https://www.theguardian.com/world/2014/jun/23/us-justification-drone-killing-american-citizen-awlaki.

[6] Andrew C. McCarthy, *The Wages of Prosecuting Presidents for their Official Acts*, NAT'L REV. (Dec. 9, 2023), https://www.nationalreview.com/2023/12/the-wages-of-prosecuting-presidents-over-their-official-acts.

[7] *See, e.g.*, *World Media Troubled by Clinton's Timing in Airstrikes*, CNN (Dec. 18, 1998), http://edition.cnn.com/WORLD/meast/9812/18/iraq.press/; Francis X. Clines and Steven Lee Myers, *Attack on Iraq; The Overview; Impeachment Vote in House Delayed As Clinton Launches Iraq Air Strike, Citing Military Need to Move Swiftly*, N.Y. TIMES (Dec. 17, 1998), https://www.nytimes.com/1998/12/17/world/attack-iraq-overview-impeachment-vote-house-delayed-clinton-launches-iraq-air.html.

of billions of dollars to Iran's terror-sponsoring regime.[8]  Despite numerous examples of presidents committing allegedly "criminal" behavior in their official acts throughout American history, none was ever prosecuted in 234 years before 2023.  The "presuppositions of our political history," *Fitzgerald*, 457 U.S. at 745, thus confirm that prosecutors and courts lack authority to prosecute and place a President on trial for official acts.

**E.    Analogous Immunity Doctrines Support Presidential Immunity From Prosecution Based On Official Acts**

Analogous immunity doctrines strongly favor the conclusion that absolute presidential immunity extends to immunity from criminal prosecution for official acts.  *See Vance*, 140 S. Ct. at 2426 (noting the *Fitzgerald* Court's "careful analogy to the common law absolute immunity of judges and prosecutors").

In their common-law origins, immunity doctrines extended to both civil and criminal liability: "The immunity of federal executive officials began as a means of protecting them in the execution of their federal statutory duties from criminal or civil actions based on state law."  *Butz v. Economou*, 438 U.S. 478, 489 (1978) (citation omitted).  Common-law immunity doctrines

---

[8] *See, e.g.*, Jason Willick, *The Eyebrow-Raising Line in the Trump Immunity Opinion*, WASH. POST (Feb. 7, 2024), https://www.washingtonpost.com/opinions/2024/02/07/trump-immunity-decision-disclaimer; Andrew C. McCarthy, *Thoughts on Biden's Funding of Terror-Sponsoring UNRWA and D.C. Circuit's Delay on Trump Immunity*, NAT'L REVIEW (Jan. 31, 2024), https://www.nationalreview.com/corner/thoughts-on-bidens-funding-of-terror-sponsoring-unrwa-and-d-c-circuits-delay-on-trump-immunity ("When President Biden insisted on restarting funding for UNRWA, to the tune of over $1 billion since 2021, there was abundant, well-known evidence, going back decades, that UNRWA provides material support to terrorism.  It was not just a hypothetical possibility that Biden's funding might end up facilitating Hamas's operations.  There were notorious cases over the years of UNRWA terror support."); The Editorial Board, *Hamas Was Right Under Unrwa's Nose*, WALL ST. J. (Feb. 11, 2024), https://www.wsj.com/articles/hamas-was-right-under-unrwas-nose-tunnels-gaza-israel-war-f715d219?mod=opinion_lead_pos2 ("Israel has provided evidence that 12 Unrwa employees took part in the Oct. 7 massacre, and that 1,200 are affiliated with or members of Hamas and Islamic Jihad.").

encompass the "privilege . . . to be free from arrest or civil process," *i.e.*, criminal and civil proceedings alike. *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951).

Members of Congress are immune from criminal prosecution for acts within the scope of their legislative duties. *See United States v. Johnson*, 383 U.S. 169, 179 (1966) ("The legislative privilege, protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the 'practical security' for ensuring the independence of the legislature."). Speech and debate immunity resembles presidential immunity because it serves a unique role in preserving the separation of powers in our constitutional structure. *See Tenney*, 341 U.S. at 376. "[I]t is apparent from the history of the [Speech and Debate] clause that the privilege was not born primarily of a desire to avoid private suits . . . , but rather to *prevent intimidation by the executive and accountability before a possibly hostile judiciary*." *Johnson*, 383 U.S. at 180-81 (emphasis added). Thus, *Johnson* held that criminal prosecution for official acts—not civil liability—was the "chief fear" that led to the adoption of legislative immunity. *Id.* at 182; *see also Gravel v. United States*, 408 U.S. 606, 624 (1972) (reasoning that acts "within the sphere of legitimate legislative activity" "may not be made the basis for a civil or criminal judgment against a Member"). Presidential immunity serves no less important a role in "our scheme of government," *Tenney*, 341 U.S. at 377, than legislative immunity.

Likewise, absolute judicial immunity protects state and federal judges from criminal prosecution, as well as civil suits, based on their official judicial acts—excepting cases involving judicial bribery and extortion, which have long been held not to constitute judicial acts. *See Spalding v. Vilas*, 161 U.S. 483, 494 (1896) ("The doctrine which holds a judge exempt from a civil suit or indictment for any act done or omitted to be done by him, sitting as judge, has a deep root in the common law." (cleaned up)); *see also Alvarez v. Snyder*, 264 A.D.2d 27, 34 (1st Dep't

2000) ("[F]ew doctrines were more solidly established at common law than the immunity of judges from liability for damages for acts committed within their judicial jurisdiction." (cleaned up)); *Weitzner v. New York City Dep't of Soc. Servs.*, 212 A.D.2d 414, 414 (1st Dep't 1995) ("[I]mmunity is absolute where the conduct is judicial or quasi-judicial in nature.").

"This immunity applies even when the judge is accused of acting maliciously and corruptly." *Pierson v. Ray*, 386 U.S. 547, 554 (1967); *see also Fitzgerald*, 457 U.S. at 745-46; *Moskovits v. New York*, 206 A.D.3d 535, 536 (1st Dep't 2022) ("[T]he court correctly held the claim is barred by the doctrine of judicial immunity, which extends to all [j]udges and encompasses all judicial acts, even if such acts are in excess of their jurisdiction and are alleged to have been done maliciously or corruptly." (cleaned up)).  In the few cases where prosecutors have brought criminal charges against judges for their judicial acts, courts have rejected them.  *See, e.g.*, *United States v. Chaplin*, 54 F. Supp. 926, 928 (S.D. Cal. 1944) (holding that judicial immunity barred the criminal prosecution of a judge who was "acting in his judicial capacity and within his jurisdiction in imposing sentence and probation upon a person charged with an offense in his court to which the defendant has pleaded guilty").  Reviewing many authorities, *Chaplin* concluded that absolute immunity shielded the judge from criminal prosecution as well as civil suit.  *Id.* at 934 (holding that criminal prosecution of judges for judicial acts "would . . . destroy the independence of the judiciary and mark the beginning of the end of an independent and fearless judiciary"); *cf. Salomon v. Mahoney*, 271 A.D. 478, 479-80 (1st Dep't 1946) ("The immunity of judges for statements made and acts done in their judicial capacity is for sound reasons of public interest and policy a fundamental principle of our jurisprudence on which rests the independence of the administration of justice.").  The exact same reasoning applies to President Trump and all Presidents.

F. **Public Policy Considerations Support Presidential Immunity From Prosecution**

In considering presidential immunity, the Supreme Court "has weighed concerns of public policy, especially as illuminated by our history and the structure of our government." *Fitzgerald*, 457 U.S. at 747-48 (citations omitted). Here, public policy overwhelmingly supports a finding of immunity from prosecution based on evidence of official acts.

First, robust immunity is appropriate for officials who have "especially sensitive duties." *Fitzgerald*, 457 U.S. at 746. The President's duties are "highly sensitive." *Id.* at 756.

Second, immunity is most appropriate for officials from whom "bold and unhesitating action" is required. *Fitzgerald*, 457 U.S. at 745.[9] "[T]o submit all officials, the innocent as well as the guilty, to the burden of a trial and to the inevitable danger of its outcome would dampen the ardor of all but the most resolute, or the most irresponsible, in the unflinching discharge of their duties," and subject them "to the constant dread of retaliation." *Barr v. Matteo*, 360 U.S. 564, 571-72 (1959) (quoting *Gregoire v. Biddle*, 177 F.2d 579, 581 (2d Cir. 1949) (Hand, J.)); *see also id.* at 571 (expressing concern that suits would "inhibit the fearless, vigorous, and effective administration of policies of government"). In *Vance*, the Supreme Court noted this concern was central to its adoption of absolute immunity for the President, holding that *Fitzgerald* "conclud[ed]

_____

[9] Similarly, in the context of immunity under the Speech or Debate Clause, which includes criminal immunity, "[t]here is little doubt that the instigation of criminal charges against critical or disfavored legislators by the executive in a judicial forum was the chief fear prompting the long struggle for parliamentary privilege in England and, in the context of the American system of separation of powers, is the predominate thrust of the Speech or Debate Clause. In scrutinizing this criminal prosecution, then, we look particularly to the prophylactic purposes of the clause." *Johnson*, 383 U.S. at 182. The Supreme Court has thus emphasized that criminal as well as civil immunity is essential for a legislator to have the freedom to exercise bold and unhesitating action in his or her legislative acts, which is itself essential to preserving the legislative "independence" required by the separation of powers: "The legislative privilege, protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary, is one manifestation of the 'practical security' for ensuring the independence of the legislature." *Id.* at 179.

16

that a President . . . must deal fearlessly and impartially with the duties of his office—not be made unduly cautious in the discharge of [those] duties by the prospect of civil liability for official acts." 140 S. Ct. at 2426 (cleaned up).  The threat of criminal prosecution poses a greater risk of deterring bold and unhesitating action than the threat of civil suit.

Third, "[f]requently acting under serious constraints of time and even information," a President inevitably makes many important decisions, and "[d]efending these decisions, often years after they were made, could impose unique and intolerable burdens . . . ."  *Imbler v. Pachtman*, 424 U.S. 409, 425-26 (1976).  The President's "focus should not be blurred by even the subconscious knowledge" of the risk of future prosecution.  *Id.* at 427.  And "[t]here is no question that a criminal prosecution holds far greater potential for distracting a President and diminishing his ability to carry out his responsibilities than does the average civil suit."  *Vance*, 140 S. Ct. at 2452 (Alito, J., dissenting).  Far more than civil liability, the threat of criminal prosecution undermines the President's "maximum ability to deal fearlessly and impartially with the duties of his office."  *Fitzgerald*, 457 U.S. at 752 (citation and quotation marks omitted).

Fourth, another key purpose of immunity for senior officials is to "prevent them being harassed by vexatious actions."  *Spalding*, 161 U.S. at 495 (quotation omitted); *see also Vance*, 140 S. Ct. at 2452 (Alito, J., dissenting) (expressing concern that the subpoena "threaten[ed] to impair the functioning of the Presidency and provides no real protection against the use of the subpoena power by the Nation's 2,300+ local prosecutors").  The President, as the most high-profile government official in the country, is most likely to draw politically motivated ire, and most likely to be targeted for harassment by vexatious actions.  *See Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 369 (2004) (recognizing "the paramount necessity of protecting the Executive Branch from vexatious litigation that might distract it from the energetic performance of its

constitutional duties."). The rationale of *Vance*, 140 S. Ct. at 2426, provides additional support for a finding of official immunity—as *Fitzgerald*, *Spalding*, *Butz*, *Imbler*, and similar cases held. Without immunity from criminal prosecution based on official acts, the presidency will cease to function and that will erode the bedrock of our republic.

## II.    The Court Should Adjourn The Trial Until The Supreme Court Decides *Trump v. United States*

While the concept of presidential immunity is firmly established, the doctrine's scope presents a "serious and unsettled question of law." *Fitzgerald*, 457 U.S. at 743. Therefore, the Court should adjourn the trial until the Supreme Court resolves *Trump v. United States* for several reasons.

While adjournments are "ordinarily committed to the sound discretion of the trial court," "in particular situations, when the protection of fundamental rights has been involved in requests for adjournments, that discretionary power has been more narrowly construed." *People v. Spears*, 64 N.Y.2d 698, 699-700 (1984); *see also People v. Foy*, 32 N.Y.2d 473, 477 (1973) (recognizing that "mere inconvenience is not sufficient ground for denying an adjournment when to do so would abridge a basic right"). Because of the importance of the Presidency in the constitutional order, as well as the Supremacy Clause and related federalism principles implicated here, the adjournment is warranted to ensure proper adjudication of the presidential immunity defense and to prevent improper evidence of official acts from being used in the unprecedented fashion apparently contemplated by the People.

Waiting to try the case until after the Supreme Court addresses the question before it—following oral argument just next month—will likely simplify the application of the defense to evidentiary issues raised by the People's motions *in limine*. *See Mook v. Homesafe Am., Inc.*, 144 A.D.3d 1116, 1117 (2d Dep't 2016) ("[A] prior determination in the criminal proceeding could

have collateral estoppel effect in this action, thereby simplifying the issues."). Specifically, as discussed below, the scope of "official acts" for purposes of applying presidential immunity is a developing area of the law that the Supreme Court is expected to address, at least to a certain extent, in *Trump v. United States*. *See Gen. Aniline & Film Corp. v. Bayer Co.*, 305 N.Y. 479, 485 (1953) (reasoning that "considerations of comity and orderly procedure" are relevant to stay application); *cf. Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 63 n.18 (1997) (explaining that "in the interest of uniformity and to discourage forum shopping, the Arizona appeals court decided to defer to the federal litigation, forgoing independent analysis," including "stay[ing] proceedings pending our decision in this case"); *Aquino v. United States*, 2020 WL 1847783, at *1 (S.D.N.Y. Apr. 13, 2020) (noting that defendant's "motion has been the subject of judicial stays pending decisions of appellate courts").

The adjournment would also "avoid[] the unnecessary risk of inconsistent adjudications as to the defenses asserted" by President Trump in state and federal courts relating to the presidential immunity doctrine. *Goodridge v. Fernandez*, 121 A.D.2d 942, 945 (1st Dep't 1986); *Belopolsky v. Renew Data Corp.*, 41 A.D.3d 322, 322 (1st Dep't 2007) (finding no abuse of discretion in stay, "[u]pon due consideration of the goals of judicial economy, orderly procedure and the prevention of inequitable results," where "the determination of the prior action may dispose of or limit issues which are involved in the subsequent action"); *Schneider v. Lazard Freres & Co.*, 159 A.D.2d 291, 293-94 (1st Dep't 1990) ("[W]e stay the New York action because the Delaware action raises numerous possibilities for the application of collateral estoppel . . . .").

Finally, the adjournment would mitigate the risk that an error in the application of this complex federal-law issue could require the Court, the parties, the State, the City, and the County to expend the resources necessary to re-try the case.

### III.    The People Must Be Precluded From Offering Evidence Of President Trump's Official Acts

The Court should preclude the People from offering evidence at trial that Your Honor determines, following a hearing outside the presence of the jury, constituted an "official act" during President Trump's first term in Office.

#### A.    "Official Acts" Include Presidential Decisions On The "Outer Perimeter"

The presidential immunity doctrine is "capacious by design." *Blassingame*, 87 F.4th at 12. President Trump is entitled to immunity "for acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756 (quoting *Barr*, 360 U.S. at 575). This "outer perimeter" includes presidential actions that "can reasonably be understood as the official actions of an office-holder," where it is "reasonable to think he was exercising his official responsibilities as President." *Blassingame*, 87 F.4th at 30. "The decisions from which [*Fitzgerald*] drew the outer-perimeter test make evident that a President's official responsibilities encompass more than just those acts falling within the office's express constitutional and statutory authority," and also include even "discretionary acts" within the "concept of duty" associated with the Presidency. *Id.* at 13 (cleaned up).

> Put somewhat differently: an act lies within the outer perimeter of an official's duties if it is the kind of act not manifestly or palpably beyond [the official's] authority, but rather having more or less connection with the general matters committed by law to his control or supervision.

*Id.* (cleaned up).

"[T]he President's actions do not fall beyond the outer perimeter of official responsibility merely because they are unlawful or taken for a forbidden purpose." *Blassingame*, 87 F.4th at 14. The Supreme Court has so held, repeatedly. *See, e.g.*, *Fitzgerald*, 457 U.S. at 756 (rejecting a rule that would permit "an inquiry into the President's motives" as "highly intrusive"); *Pierson v. Ray*, 386 U.S. 547, 554 (1967) (reasoning that judicial "immunity applies even when the judge is

accused of acting maliciously and corruptly"); *Barr*, 360 U.S. at 575 ("The claim of an unworthy purpose does not destroy the privilege."); *Spalding*, 161 U.S. at 498 (holding that immunity does not turn on "any personal motive that might be alleged to have prompted his action"); *Bradley v. Fisher*, 80 U.S. 335, 354 (1871) (holding that immunity "cannot be affected by any consideration of the motives with which the acts are done").

### B.    The Court Must Preclude Evidence Of Official Acts

President Trump is entitled to "every opportunity" to prevent official-acts evidence from being used against him at trial, and the Court must preclude such evidence. *Blassingame*, 87 F.4th at 22.

In assessing whether immunity applies, the Court must look to the "nature of the act itself." *Stump v. Sparkman*, 435 U.S. 349, 362 (1978). "[T]here is not always a clear line between [the President's] personal and official affairs." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020). The issue is whether the action can "reasonably be understood" as official. *Blassingame*, 87 F.4th at 21 (quoting *Trump v. Hawaii*, 585 U.S. 667, 705 (2018)). "[T]he inquiry does not consist of trying to identify speech that would benefit a president politically." *Id.* at 22 (cleaned up). "When an appropriately objective, context-specific assessment yields no sufficiently clear answer in either direction, the President, in our view, should be afforded immunity." *Blassingame*, 87 F.4th at 21.

In the current procedural posture, *Blassingame* and other immunity authorities require the Court to preclude the People from offering evidence at trial of President Trump's official acts. For example, in *Johnson*, the Supreme Court held that, in a case involving "a criminal statute of general application," the prosecutors could "not draw in question the legislative acts of the defendant member of Congress or his motives for performing them" under the Speech or Debate Clause. 383 U.S. at 185. "[A]ll references to this aspect of the conspiracy" had to be "eliminated" so that the case was "wholly purged of elements offensive to the Speech or Debate Clause." *Id.*

Under these appropriate standards, President Trump's social media posts and public statements—while acting as President and viewed in context—fell within the outer perimeter of his Presidential duty, to which communicating with the public on matters of public concern was central. *See, e.g.*, Exs. 1-6; *Hawaii*, 585 U.S. at 701 ("The President of the United States possesses an extraordinary power to speak to his fellow citizens . . . ."); *see also Council on Am. Islamic Rels. v. Ballenger,* 444 F.3d 659, 665-666 (D.C. Cir. 2006) ("A Member's ability to do his job as a legislator effectively is tied, as in this case, to the Member's relationship with the public and in particular his constituents and colleagues in the Congress. In other words, there was a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively. To that extent, service in the United States Congress is not a job like any other." (cleaned up)); *see also Pleasant Grove City v. Summum*, 555 U.S. 460, 467-68 (2009) ("A government entity has the right to speak for itself. . . . . [I]t is entitled to say what it wishes, and to select the views that it wants to express." (cleaned up)); *Barr*, 360 U.S. at 574-75 (finding agency head immune from libel suit where commenting on, *inter alia*, "his own integrity in his public capacity," which "had been directly and severely challenged in charges made on the floor of the Senate and given wide publicity"); JEFFREY K. TULIS, THE RHETORICAL PRESIDENCY 4 (2017) ("Today it is taken for granted that presidents have a *duty* constantly to defend themselves publicly . . . And for many, this presidential 'function' is not one duty among many, but rather the heart of the presidency— its essential task.") (emphasis in original).

President Trump's April 5, 2018 statement from Air Force One is a powerful example of the manner in which the context of the statement—here, the location—bears on the analysis. *See* Ex. 4; *Blassingame*, 87 F.4th at 22 ("[S]everal objective considerations strongly suggest that the

speech was—and was treated by the President and executive branch as—part of an official event, regardless of whether what was said or how it was conceived might have borne some subjective connection to enhancing President Trump's re-election prospects.").

With respect to President Trump's social media posts, *e.g.*, Exs. 1-3, the official-acts conclusion is supported by the fact that his Twitter account was "one of the White House's main vehicles for conducting official business." *Knight First Amend. Inst. v. Trump*, 928 F.3d 226, 232 (2d Cir. 2019), *judgment vacated as moot*, 141 S. Ct. 1220 (2021); *see also Blassingame*, 87 F.4th at 21 (reasoning that "if an activity is organized and promoted by official White House channels," "it is more likely an official presidential undertaking"). Indeed, the Second Circuit held "that the evidence of the official nature of the Account is overwhelming." *Knight First Amend. Inst.*, 928 F.3d at 234.

The Office of Government Ethics ("OGE"), "established by the Ethics in Government Act of 1978, provides overall leadership and oversight of the executive branch ethics program, which is designed to prevent and resolve conflicts of interest."[10] Because OGE regulates Executive Branch personnel, President Trump's communications with OGE during his first term were also official acts and are therefore also inadmissible at trial. *See, e.g.*, Ex. 7.

Finally, there is no constitutionally significant distinction to be drawn between documents and testimony for purposes of presidential immunity. Thus, the Court must preclude the People from eliciting testimony relating to official-acts communications by President Trump, such as those disclosed in grand jury testimony by █████ and █████. The same rule applies, to the extent President Trump's statements were official in nature, for other witnesses.

---

[10] U.S. OFFICE OF GOV'T ETHICS, OGE AGENCY PROFILE 4 (2020), https://www.oge.gov/web/OGE.nsf/0/0DCB095C47EB209D85258610005CA2D3/$FILE/2020%20OGE%20Profile%20Book%20(Final).pdf.

**CONCLUSION**

For the foregoing reasons, the Court should (1) adjourn the trial pending Supreme Court review of the scope of the presidential immunity doctrine in *Trump v. United States*, which is scheduled to be argued before the Supreme Court on April 25, 2024; and (2) following an evidentiary hearing outside the presence of the jury, preclude evidence of President Trump's official acts at trial based on presidential immunity.

Dated:        March 7, 2024
                   New York, N.Y.

| | By: /s/ Todd Blanche |
|---|---|
| Susan R. Necheles | Todd Blanche |
| Gedalia Stern | Emil Bove |
| NechelesLaw LLP | Stephen Weiss |
| 1120 Sixth Avenue, 4th Floor | Blanche Law PLLC |
| New York, NY 10036 | 99 Wall Street, Suite 4460 |
| 212-997-7400 | New York, NY 10005 |
| srn@necheleslaw.com | 212-716-1260 |
| | toddblanche@blanchelaw.com |

*Attorneys for President Donald J. Trump*

24