# EXHIBIT V

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,                    Index No. 71543-23

          - against -

DONALD J. TRUMP,

                            Defendant.

**PRESIDENT DONALD J. TRUMP'S POST-TRIAL
PRESIDENTIAL IMMUNITY MOTION**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................. 1

RELEVANT FACTS ............................................................................................................. 4

I.    Pre-Trial Litigation Regarding Presidential Immunity .................................................. 4

    A.    President Trump's Pre-Trial Motion ...................................................................... 4

    B.    President Trump's Article 78 Proceeding .............................................................. 5

    C.    President Trump's Renewed Presidential Immunity Objection ............................. 6

II.    Trial ................................................................................................................................ 8

    A.    Presidential Immunity Objections ......................................................................... 8

    B.    Testimony Of Hope Hicks (White House Communications Director) .................. 9

    C.    Testimony Of Madeleine Westerhout (Special Assistant To The President)........ 11

    D.    Testimony Regarding The Special Counsel's Office And Congressional Investigations And The Pardon Power ................................................................. 12

    E.    Testimony Regarding President Trump's Response To FEC Inquiries ................. 13

    F.    Presidential Twitter Posts And Related Testimony ............................................... 14

    G.    President Trump's Disclosures To The Office Of Government Ethics .................. 16

III.    DANY's Summation ...................................................................................................... 17

APPLICABLE LAW .......................................................................................................... 18

I.    CPL § 330.30 ................................................................................................................ 18

II.    Presidential Immunity ................................................................................................... 19

    A.    *Trump v. United States* ....................................................................................... 20

    B.    The Supremacy Clause .......................................................................................... 23

DISCUSSION ...................................................................................................................... 26

I.    DANY Violated The Federal Constitution By Relying On Official-Acts Evidence ........ 26

    A.    President Trump's Official Communications With Hope Hicks ................... 26

    B.    Westerhout's Observations Of President Trump Exercising Presidential Authority ..... 31

    C.    President Trump's Official Public Statements Via Twitter ............................ 33

    D.    President Trump's Official Acts In Response To FEC Inquiries.................... 37

    E.    Official-Acts Evidence Relating To Investigations By Congress And Prosecutors ...... 39

    F.    President Trump's Official Disclosures On OGE Form 278e........................ 40

II.    Use Of Official-Acts Evidence In Grand Jury Proceedings Requires Dismissal Of The Indictment ................................................................................................................... 41

III.    Use Of Official-Acts Evidence Requires Vacatur Of The Jury's Verdicts .................... 43

    A.    Presidential Immunity Errors Are Never Harmless .................................... 44

i

B.    The Harmless-Error Doctrine Cannot Save The Trial Result ........................................ 46

    1.    DANY's Evidence Was Weak.................................................................. 46

    2.    The Official-Acts Evidence Was Critical To DANY's Trial Presentation.............. 50

    3.    As A Matter Of Law, The Errors Had A Causal Effect On The Jury...................... 51

CONCLUSION.................................................................................................................. 52

## INTRODUCTION

President Donald J. Trump respectfully submits this motion to dismiss the Indictment and vacate the jury's verdicts based on the Presidential immunity doctrine articulated last week by the Supreme Court of the United States and the Supremacy Clause.[1]

No President of the United States has ever been treated as unfairly and unlawfully as District Attorney Bragg has acted towards President Trump in connection with the biased investigation, extraordinarily delayed charging decision, and baseless prosecution that give rise to this motion. These politically motivated actions are prime examples of the type of "factional strife" that "the Framers intended to avoid": one-sided lawfare that risks the "enfeebling of the Presidency and our Government" and the establishment of an "Executive Branch that cannibalizes itself." *Trump v. United States*, 2024 WL 3237603, at \*24 (July 1, 2024). Previously abstract risks of local hostilities giving rise to unethical targeting of federal officials have come to pass in New York County as part of concerted—yet unsuccessful—efforts to hinder President Trump's leading campaign in the 2024 Presidential election and to restrict the constitutionally protected political speech of President Trump and the American people.[2]

"'Haste makes waste' is an old adage. It has survived because it is right so often." *Kusay v. United States*, 62 F.3d 192, 195 (7th Cir. 1995). Like Special Counsel Jack Smith, DANY

---

[1] Due to the significance of the issues raised in this motion, President Trump respectfully requests permission to file a reply to DANY's July 24, 2024 opposition by July 31, 2024.

[2] *See, e.g.*, Gregg Jarrett, *The New York Judge Who Gagged Trump Should Recuse Himself*, Gregg Jarrett L. Blog (Apr. 3, 2024), https://thegreggjarrett.com/the-new-york-judge-who-gagged-trump-should-recuse-himself; Andrew C. McCarthy, *The Injustice of the Trump Gag Order*, Nat'l Rev. (Apr. 2, 2024, 2:47 PM), https://www.nationalreview.com/2024/04/the-injustice-of-the-trump-gag-order; Andrew C. McCarthy, *Trump Goads Judge Merchan into Gagging Him*, Nat'l Rev. (Mar. 30, 2024, 6:30 AM), https://www.nationalreview.com/2024/03/trump-goads-judge-merchan-into-gagging-him; Jonathan Turley, *The Gag and the Goad: Trump Should Appeal Latest Gag Order*, Res Ipsa Loquitur Blog (Mar. 27, 2024), https://jonathanturley.org/2024/03/27/the-gag-and-the-goad-trump-should-appeal-latest-gag-order.

insisted on proceeding on a "highly expedited basis" as part of the election-interference mission driven by President Biden and his associates. *Trump*, 2024 WL 3237603, at *13. Rather than wait for the Supreme Court's guidance, the prosecutors scoffed with hubris at President Trump's immunity motions and insisted on rushing to trial despite the fact that "no court has ever been faced with the question of a President's immunity from prosecution." *Id.* at 23.[3] DANY urged this Court to front-run the Supreme Court on a federal constitutional issue with grave implications for the operation of the federal government and the relationships between state and federal officials. The record is clear: DANY was wrong, very wrong.

Be that as it may, Your Honor now has the authority to address these injustices, and the Court is duty-bound to do so in light of the Supreme Court's decision. Under *Trump*, DANY violated the Presidential immunity doctrine and the Supremacy Clause by relying on evidence relating to President Trump's official acts in 2017 and 2018 to unfairly prejudice President Trump in this unprecedented and unfounded prosecution relating to purported business records. Much of the unconstitutional official-acts evidence concerned actions taken pursuant to "core" Executive power for which "absolute" immunity applies. 2024 WL 3237603, at *8. Overall, the

---

[3] *See, e.g.*, Andrew C. McCarthy, *Judge Merchan Abruptly Labels Trump Case 'Federal Insurrection Matter'*, Nat'l Rev. (Apr. 4, 2024, 9:07 AM), https://www.nationalreview.com/corner/judge-merchan-abruptly-labels-trump-case-federal-insurrection-matter; Andrew C. McCarthy, *Trump's Imminent Criminal Trial: April 15 in Manhattan*, Nat'l Rev. (Mar. 25, 2024, 7:28 PM), https://www.nationalreview.com/corner/trumps-imminent-criminal-trial-april-15-in-manhattan; *see also* Jonathan Turley, *The Constitutional Abyss: Justices Signal a Desire to Avoid Both Cliffs on Presidential Immunity*, Res Ipsa Loquitur Blog (Apr. 26, 2024), https://jonathanturley.org/2024/04/26/free-fall-or-controlled-descent-justices-signal-a-desire-to-avoid-both-cliffs-on-presidential-immunity; David B. Rivkin, Jr., & Elizabeth Price Foley, *What's at Stake in the Trump Immunity Case*, Wall St. J. (Apr. 24, 2024, 5:21 PM), https://www.wsj.com/articles/whats-at-stake-in-the-trump-immunity-case-president-supreme-court-1f00dc9c; Andrew C. McCarthy, *The Biden DOJ Special Counsel's Indifference to Trump's Fair-Trial Rights*, Nat'l Rev. (Mar. 9, 2024, 6:30 AM), https://www.nationalreview.com/2024/03/the-biden-doj-special-counsels-indifference-to-trumps-fair-trial-rights.

impermissible official-acts evidence included President Trump's private conversations with the White House Communications Director; observations by the Director of Oval Office Operations regarding President Trump's preferences and practices in the Oval Office, and with respect to national security matters such as use of Air Force One and Marine One as well as secure calls in the White House Situation Room; allegations of conversations regarding the pardon power; and official communications by President Trump using a Twitter account that has been recognized as a formal channel of White House communication in the Trump Administration.

Because of the implications for the institution of the Presidency, the use of official-acts evidence was a structural error under the federal Constitution that tainted DANY's grand jury proceedings as well as the trial. These transgressions resulted in the type of deeply prejudicial error that strikes at the core of the government's function and cannot be addressed through harmless-error analysis. Even if it were otherwise, DANY's proof could not withstand that test. This case turned on a single witness, Michael Cohen. Clearly concerned about the credibility of Cohen and their other financially motivated star witness, Stormy Daniels—one a serial perjurer with an axe to grind, and the other bent on recasting her fictious narrative in even more nefarious terms—DANY concocted a dubious theory of a 2018 "pressure campaign" by President Trump so that they could falsely claim to the jury that people like Hope Hicks and Madeleine Westerhout provided some measure of corroboration for testimony that the prosecutors themselves struggled to credit. At bottom, the "pressure campaign" theory turned on DANY's efforts to assign a criminal motive to actions that President Trump took in 2018 as the Commander in Chief responsible for the entire Executive Branch. The decision in *Trump* forecloses inquiry into those motives, and the objective inquiry required by the Supreme Court places this evidence squarely within the category of official acts committed to the unreviewable discretion of the President by

Article II of the Constitution, related congressional action, and historical practices.  The Supreme

Court's decision "applies equally to all occupants of the Oval Office, regardless of politics, policy,

or party."  *Trump*, 2024 WL 3237603, at *25.  In order to vindicate the Presidential immunity

doctrine, and protect the interests implicated by its underpinnings, the jury's verdicts must be

vacated and the Indictment dismissed.

**RELEVANT FACTS**

I.    **Pre-Trial Litigation Regarding Presidential Immunity**

A.    **President Trump's Pre-Trial Motion**

On February 28, 2024, the Supreme Court granted certiorari in *Trump v. United States* with

respect to the following question: "Whether and if so what extent does a former President enjoy

presidential immunity from criminal prosecution for conduct alleged to involve official acts during

his tenure in office."  2024 WL 833184 (Feb. 28, 2024).  Less than a week beforehand, DANY

had previewed their intention to present evidence of a so-called "pressure campaign" by President

Trump—while he was in office—in 2018.  Ex. 1 at 50.

On March 7, 2024, just six business days after the Supreme Court's decision to grant

certiorari, President Trump filed a motion to exclude evidence of President Trump's official acts

at trial and for an adjournment so that the Supreme Court could first address the issue in *Trump*.

Ex. 2.  President Trump requested "an evidentiary hearing outside the presence of the jury" and

argued that the Court should "preclude evidence of President Trump's official acts at trial based

on presidential immunity."  *Id.* at 24.  President Trump specifically challenged the admissibility

of the following evidence:

- 2018 social media posts in which President Trump "used his Twitter account, which was
  an official communications channel during his Presidency, to communicate with the public
  regarding matters of public concern."  *Id.* at 3.

- President Trump's "public statements on official premises and during media appearances." *Id.*

- "[D]ocumentary evidence that reflects official acts," including the Form 278e Executive Branch Personnel Public Financial Disclosure Report relating to transactions in 2017, which President Trump signed in May 2018 and submitted to the Office of Government Ethics ("OGE"). *Id.* at 4.

- "[T]estimony at trial relating to official acts," including testimony from Hope Hicks and Cohen. *Id.*

As to the timing of the motion, President Trump pointed to the Supreme Court's recent grant of certiorari in the *Trump* matter and the Supreme Court's emphasis on analogous federalism principles in *Trump v. Anderson*, 601 U.S. 100 (2024).

In a March 13, 2024 opposition submission, DANY wrongfully argued that the motion was "untimely" and "meritless." Ex. 3 at 1, 2. Regarding timeliness, DANY cited CPL § 255.20(1). *See id.* at 2. On the merits, DANY argued that (1) "there is no categorical bar to using evidence of immunized conduct in a trial involving non-immunized conduct"; and (2) the evidence at issue did not constitute official acts. *Id.*

The Court denied the motion in a six-page Decision and Order issued on April 3, 2024. Ex. 4. Citing CPL § 255.20(1), the Court "decline[d] to consider whether the doctrine of presidential immunity precludes the introduction of evidence of purported official presidential acts in a criminal proceeding." *Id.* at 6.

### B.    President Trump's Article 78 Proceeding

On April 10, 2024, President Trump filed a Verified Article 78 Petition seeking a writ of prohibition as to, *inter alia*, the Court's April 3, 2024 Decision and Order. *See Trump v. Merchan*, Case No. 2024-02413 (1st Dep't Apr. 10, 2024). On the same day, the First Department denied a related application for a stay of proceedings pending resolution of the Petition. *Id.* NYSCEF Doc. Nos. 7 (application) & 10 (order).

In an April 17, 2024 opposition filing, DANY claimed, *inter alia*, that 

*Id.*

NYSCEF Doc. No. 13 ¶ 45.  DANY argued that

*Id.* ¶ 49.  Finally, DANY asserted

*Id.* ¶ 50 (cleaned up).  All of these claims have now been explicitly rejected by the Supreme Court in *Trump*.

On May 23, 2024, the First Department concluded that "prohibition does not lie" with respect to President Trump's immunity argument.  *Id.* NYSCEF Doc. No. 21 at 3.  In language that has since been contradicted and abrogated by the Supreme Court, the First Department suggested that "direct appeal" was sufficient to protect President Trump's rights on this issue.  *Compare id.*, *with Trump*, 2024 WL 3237603, at *21-22 (reasoning that there is a "need" for "pretrial review" and "appeal[] before trial" of presidential immunity questions).

### C.    President Trump's Renewed Presidential Immunity Objection

On April 15, 2024, the first day of jury selection, DANY made an offer of proof regarding the purported "pressure campaign" evidence referenced in their February 2024 motions *in limine*.  *See* Tr. 41-46; *see also* Ex. 1 (DANY MILs) at 13.  The "first category" consisted of "tweets and communications with Michael Cohen" by "then President Trump," including communications via Robert Costello as "a back channel of communication with President Trump, which was critical to maintain."  *Id.* at 41-42.  DANY argued that "[t]hese are the defendant's own words publicly broadcast, tweeted out for the world to see, and he should not be able to prevent the jury from

hearing them now." *Id.* at 46.  In response, defense counsel notified the Court that we intended to

make an additional submission regarding Presidential immunity.  *Id.* at 53.  The Court responded,

in pertinent part:

> If the argument is that tweets that your client sent out while he was President cannot be
> used because they somehow constitute an official presidential act, it's going to be hard to
> convince me that something that he tweeted out to millions of people voluntarily cannot be
> used in court when it's not being presented as a crime.  It's just being used as an act,
> something that he did.  But we'll wait until we get that submission.

*Id.* at 55.

Following the proceedings on April 15, 2024, President Trump submitted a premotion

letter reiterating the "evidentiary objection" to official-acts evidence based on Presidential

immunity.  Ex. 5.  The letter specifically objected to (1) the OGE Form 278e, which DANY had

marked as GX 81; (2) the 2018 Twitter posts marked GXs 407-F – 407-I; and (3) "witness

testimony regarding President Trump's official acts during his first term in Office."  *Id.*[4]  On the

issue of timeliness, President Trump pointed out that the discretionary deadlines in CPL § 255.20

did not apply because a motion to preclude evidence is not a "pre-trial motion" as defined in CPL

§ 255.10.  Ex. 5.[5]

DANY responded to the premotion letter on April 16, 2024.  Ex. 6.  They incorrectly

claimed that President Trump had "forfeited" the Presidential immunity argument, but made no

serious effort to defend their prior timeliness claim regarding CPL § 255.20.  Ex. 6.  DANY

conceded that President Trump could "make appropriate objections during trial as the evidence

comes in, if merited."  *Id.*  Nevertheless, DANY stubbornly insisted—with tremendous and

---

[4] All trial exhibits cited herein are attached to the July 10, 2024 Affirmation of Todd Blanche.

[5] In addition, the Supreme Court's February 28, 2024 grant of certiorari with respect to an
"unprecedented and momentous" question of "lasting significance," *Trump*, 2024 WL 3237603,
at *13, *24, was "good cause" for the timing of President Trump's initial motion.
CPL § 255.20(3).

unwarranted arrogance, and in great tension with positions taken by several Supreme Court Justices just days later at the oral argument—that Presidential immunity "does not exist," "there is no corresponding evidentiary privilege," and President Trump "was not acting in an official capacity." *Id.*

On April 19, 2024, the Court ruled that its reasoning "remains the same" and was "unchanged." Tr. 802. The Court added:

> . . . . We are going to wait until trial and you can make your objections at that time.
>
> Both of you have already made your arguments in the letters, so the Court will decide it at the time of trial when the objection is made.
>
> So that matter is decided and will not be addressed any further.

Tr. 802.

## II.    Trial

### A.    Presidential Immunity Objections

Defense counsel renewed the Presidential immunity objection at trial multiple times, including prior to Hicks's testimony. Tr. 2121. DANY incorrectly responded that "the rule of inadmissibility that Mr. Bove just described does not exist and is not a rule," and claimed falsely that "analogous" caselaw existed holding "the exact opposite." Tr. 2121-22. The Court responded:

> I believe I ruled on this as well.
>
> So the objection is noted. I don't think you need to object as to each question.

Tr. 2122.

During the testimony of former Trump Organization Assistant Controller Jeff McConney, defense counsel objected on Presidential-immunity grounds to President Trump's OGE Form 278e for 2017, GX 81. Tr. 2370. The following colloquy occurred in response to the objection:

> MR. COLANGELO: So, for the same reasons I believe we briefed and argued previously, there is no evidentiary inadmissibility doctrine for official acts.

And, in any event, the regulations require the filing of the OGE Form 278 for presidential candidates, candidates for Federal office and Federal officials, for reasons including for the purpose of ensuring compliance with the Federal Conflict of Interest Law.

It is not a document entitled to any evidentiary exclusion at all.

THE COURT: I agree.

Tr. 2370; *see also* Tr. 3168 ("MR. BLANCHE: Your Honor, the same objection as discussed last week.").

### B.    Testimony Of Hope Hicks (White House Communications Director)

DANY used its subpoena power to require Hope Hicks to testify about her interactions with President Trump during his first term in office. *See* Tr. 2127.

At the start of President Trump's term, Hicks joined the Administration as President Trump's Director of Strategic Communications. Tr. 2207-08. In that role, Hicks's responsibilities included working to "showcase" President Trump's "accomplishments" and "the agenda of the Administration." Tr. 2208. In August 2017, Hicks became the White House Communications Director. Tr. 2208. Between January 2017 and March 2018, Hicks worked in close proximity to the Oval Office. Tr. 2208-09. She spoke with President Trump "[e]very day." Tr. 2210.

As White House Communications Director, Hicks was responsible for

coordinating all of the communication efforts for the Administration from the White House throughout all of the agencies, and making sure that each of [the] principals of the agencies and the agencies themselves were prioritizing Mr. Trump's agenda, and that we were all working together to maximize the impact of any positive messages that we were trying to get out and share with the American people, and, you know, capitalize on any opportunities to showcase Mr. Trump and his work, the President in a good light.

Tr. 2210.

Hicks testified about her official-capacity communications with President Trump and the press concerning the January 12, 2018 *Wall Street Journal* article that was admitted at trial as

Government Exhibit 181.  *See* Tr. 2215-16.  Hicks explained that the *Wall Street Journal* contacted

either herself or "another press communications team member" prior to publishing the story.  Tr.

2215.  The article included two comments from an unidentified "White House official."  GX 181

at 2, 4.  DANY elicited the identity of the "White House official" and asked Hicks the following:

> Q And as the Communications Director at the time – withdrawn.  Did you discuss this
> statement with Mr. Trump before it was issued?
>
> A Yes.

Tr. 2218-19.  Hicks testified that, after the article was published, she spoke to President Trump

about "how to respond to the story, how he would like a team to respond to the story."  Tr. 2217.

In January 2018, an organization known as Common Cause made a complaint relating to

President Trump and Cohen to the FEC.  *See, e.g.*, GX 201.  In approximately mid-February 2018,

Hicks spoke to President Trump about a *New York Times* article that included a statement from

Cohen "saying that he had, in fact, made this payment, um, without Mr. Trump's knowledge."  Tr.

2219.  Hicks testified that

> . . . President Trump was saying he spoke to Michael, and that Michael had paid
> this woman to protect him from a false allegation, um, and that – you know, Michael felt
> like it was his job to protect him, and that's what he was doing.  And he did it out of the
> kindness of his own heart.  He never told anybody about it.  You know.  And he was
> continuing to try to protect him up until the point where he felt he had to state what was
> true.
>
> [. . .]
>
> He wanted to know how it was playing, and just my thoughts and opinion about
> this story versus having the story – a different kind of story before the campaign had
> Michael not made that payment.

Tr. 2219-21.

Prior to trial, DANY "refreshed" Hicks's memory regarding Karen McDougal's March 20,

2018 lawsuit against AMI.  Tr. 2211.  At trial, DANY offered a March 20, 2018 text exchange

between Hicks and Madeleine Westerhout that included a message from Westerhout purporting to reflect a request from President Trump: "Hey- the president wants to know if you called David pecker again." GX 319; *see also* Tr. 2212-13.

DANY also elicited testimony from Hicks about official-capacity conversations with President Trump regarding McDougal's March 2018 CNN interview around the time McDougal sued AMI. Tr. 2214-15. Hicks testified:

> To be clear, I did speak to Mr. Trump. I was the Communications Director. This was a major interview. Yes. We just spoke about the news coverage of the interview, how it was playing out.

Tr. 2214-15.

### C.    Testimony Of Madeleine Westerhout (Special Assistant To The President)

Madeleine Westerhout served as an aide to President Trump at the White House with a variety of titles during his first term, including Executive Assistant, Director of Oval Office Operations, and Special Assistant to the President. Tr. 2973, 2985.

Like Hicks, DANY used subpoena authority to require Westerhout to testify. Tr. 2974. Ms. Mangold elicited information from Westerhout about the following Presidential practices:

- President Trump "liked speaking with people in person or on the phone." Tr. 2986.

- President Trump took "[a] lot" of calls each day, "as early as 6 in the morning" until "late into the night." Tr. 2986-87.

- The "complicated process" for calling "the President of the United States," included "[c]alls that were more secure that might need to be on a secure line" conducted via the Situation Room. Tr. 2987-88.

- President Trump did not use a computer or email account in the White House, and "[h]e liked hard copy documents." Tr. 2988.

- President Trump "liked to read" and "moved his working space into a room off of the side of the Oval Office," which was "really his working office," because he "wanted to keep the Resolute Desk very pristine and kind of keep that more for meetings." Tr. 2988-89.

- President Trump used an "organization system" and brought "a lot of papers and often brought things back and forth to his residence or Air Force One or Marine One." Tr. 2989.

- President Trump "preferred to sign things himself," "liked to use a Sharpie or a felt-tip pen," and typically read things before signing them. Tr. 2989-90.

- Regarding social media, Westerhout testified that President Trump and Dan Scavino shared access to the @realdonaldtrump account. Tr. 2991. DANY elicited that President Trump occasionally dictated posts to Westerhout, and asked about President Trump's "particular preferences" for posting. Tr. 2991-92.

DANY also elicited testimony from Westerhout regarding her extensive contacts with Trump Organization personnel, at President Trump's direction, while she was working in the White House. *E.g.*, Tr. 2995-96. For example, DANY offered an email exchange from January 24, 2017, in which Westerhout used her White House email account to ask Rona Graff for contact information for people that President Trump "frequently spoke to." GX 68. Westerhout testified that she made the request because "the President would often ask" her to initiate calls, and she wanted to have a list of "people that he either spoke to often or might want to speak to." Tr. 2999.

Regarding the above-referenced March 20, 2018 text exchange with Hicks, Westerhout testified, like Hicks, that she had "recently been refreshed" by DANY. Tr. 3006.

### D.    Testimony Regarding The Special Counsel's Office And Congressional Investigations And The Pardon Power

By the summer of 2017, the media had reported that Special Counsel Robert Mueller was conducting a far-flung and ultimately fruitless investigation into actions by President Trump, as President, in response to Mueller's investigation of alleged interference by Russia in the 2016 election. *See, e.g.*, Tr. 4075.[6] In April 2018, as noted above, the FBI executed search warrants

---

[6] *See also* 2 Robert S. Mueller, III, DOJ, Report on the Investigation into Russian Interference in the 2016 Presidential Election (2019), https://www.justice.gov/storage/report_volume2.pdf (referring to a "variety of actions" by "the President of the United States" in connection with "the ongoing FBI investigation into Russia's interference in the 2016 presidential election and related matters").

targeting Cohen in a public fashion.  In addition, between August and October 2017, Cohen made false statements in private meetings and public testimony before the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence.

At trial, Cohen claimed that he lied to Congress because he "was staying on Mr. Trump's message that there was no Russia-Russia-Russia and, again, in coordination with the Joint Defense Team, that's what was preferred."  Tr. 3550.  Cohen also testified that he "felt" he "needed" what Ms. Hoffinger described as "the power of the President" to "protect" him in connection with his lies to Congress.  Tr. 3549.

DANY also elicited pardon-related testimony from Cohen in connection with an email that Robert Costello sent Cohen on June 13, 2018, after it was clear that Cohen was being investigated by federal authorities.  GX 207.  Costello wrote to Cohen in the email, in pertinent part: "What you do next is for you to decide, but if that choice requires any discussion with my friends client, you have the opportunity to convey that this evening, but only if you so decide."  GX 207.  Ms. Hoffinger offered Cohen's opinion to the jury on what Costello was referring to, and Cohen testified: "potential pre-pardons, I believe."  Tr. 3603; *see also* Tr. 3835 ("I spoke to my attorney about it because we had seen on television President Trump talking about, potentially, pre-pardoning everybody and putting an end to this, what I deemed to be a nightmare.").

### E.    Testimony Regarding President Trump's Response To FEC Inquiries

On February 6, 2018, Cohen texted a reporter from the *New York Times* that President Trump "just approved me responding to [FEC] complaint and statement.  Please start writing and I will call you soon."  GX 260.  DANY offered evidence of Cohen's subsequent public statement regarding the FEC complaint on February 13, 2018.  GX 202.  Jay Sekulow subsequently texted Cohen that President Trump "says thanks for what you do."  GX 217.  At trial, Cohen explained

that he "was instructed . . . by Mr. Trump, to keep in touch with Jay Sekulow because he was in contact with Mr. Trump." Tr. 3571. Cohen opined that the text message "referred [to] President Donald Trump" and "the statement that [Cohen] was putting out to the press on the FEC." Tr. 3573.

Cohen also testified that he spoke to AMI's Chairman and CEO, David Pecker, regarding a related FEC inquiry. Cohen testified that he told Pecker "that the matter is going to be taken care of and the person, of course, who is going to be able to do it is Jeff Sessions." Tr. 3577. With respect to that conversation, Ms. Hoffinger elicited that President Trump had purportedly "told" Cohen that then-Attorney General Sessions would address the matter. Tr. 3577.

### F.    Presidential Twitter Posts And Related Testimony

DANY offered evidence of five sets of posts from 2018 on President Trump's official White House Twitter account during his first term. *See* GXs 407-F – 407-I.[7]

In the first set of posts that DANY offered, dated April 21, 2018, President Trump criticized the *New York Times* for "going out of their way to destroy Michael Cohen and his relationship with me in the hope that he will 'flip.'" GX 407-F. At trial, Ms. Hoffinger elicited that Cohen was "raided by the FBI" days earlier on April 9. Tr. 3582. Ms. Hoffinger later showed the April 21 posts to Cohen, who opined that the posts were directed "[t]o me" as a message to "[s]tay loyal," "[d]on't flip," "I have you." Tr. 3587-88. DANY also offered evidence of communications between Cohen and attorney Robert Costello on the day of the April 21, 2018 posts. GX 205; Tr. 3598-99. In the email, Costello characterized the post as containing "very positive comments

---

[7] DANY admitted social media posts—over President Trump's objection—through the testimony of a paralegal without first-hand knowledge of the timing of the posts, the appearance of the posts at the time they were authorized and uploaded to the account, or Twitter's records-keeping practices. *E.g.*, Tr. 2091-93.

about you from the White House." GX 205. Cohen testified that he interpreted the email to refer to communications from "the President." Tr. 3599; *see also* Tr. 3600 ("It let me know that I was still important to the team and stay the course, that the President had my back.").

With respect to the second set of Twitter posts, Ms. Hoffinger elicited testimony from Daniels that in April 2018 President Trump characterized a sketch released by Daniels and Michael Avenatti relating to Daniels's alleged encounter with a fictitious assailant in 2011 as "essentially a con job." Tr. 2708. Through a series of leading questions, Ms. Hoffinger then basically testified that Daniels brought a defamation claim against President Trump relating to the post, which was dismissed with costs awarded to President Trump because the court deemed the post "rhetorical hyperbole" or "something like just an exaggeration." Tr. 2708-09.

In the third set of posts, dated May 3, 2018, President Trump explained that Cohen had been paid via "monthly retainer, not from the campaign and having nothing to do with the campaign," in connection with "a private contract between two parties, known as a non-disclosure agreement, or NDA." GX 407-G. The posts included, among other things: "Prior to its violation by Ms. Clifford and her attorney, this was a private agreement. Money from the campaign, or campaign contributions, played no rol[e] in this transaction." *Id.* at 3.

The fourth and fifth posts were both dated August 22, 2018. *See* GXs 407-H, 407-I. The fourth post stated: "If anyone is looking for a good lawyer, I would strongly suggest that you don't retain the services of Michael Cohen!" GX 407-H. The fifth post stated:

> I feel very badly for Paul Manafort and his wonderful family. "Justice" took a 12 year old tax case, among other things, applied tremendous pressure on him and, unlike Michael Cohen, he refused to "break" – make up stories in order to get a "deal." Such respect for a brave man!

GX 407-I. Regarding these posts, DANY asked Cohen the following question:

What, if any, effect did it have on you at the time to have the President of the United States tweeting this about you the day after you pled guilty?

Tr. 3618. Cohen responded that the posts "caused a lot of angst, anxiety." *Id.*

### G. President Trump's Disclosures To The Office Of Government Ethics

During the testimony of Jeffrey McConney, DANY offered President Trump's disclosures on OGE Form 278e for the period in 2017 while he was serving as President. GX 81; *see also* Tr. 2365-76. President Trump signed the form, as President, on May 15, 2018. GX 81 at 1. President Trump made the following disclosure in the Form:

> In the interest of transparency, while not required to be disclosed as 'reportable liabilities' on Part 8, in 2016 expenses were incurred by one of Donald J. Trump's attorneys, Michael Cohen. Mr. Cohen sought reimbursement of those expenses and Mr. Trump fully reimbursed Mr. Cohen in 2017. The category of value would be $100,001 – $250,000 and the interest rate would be zero.

*Id.* at 45.[8] DANY argued that this disclosure was relevant and admissible as an "admission" by President Trump. Tr. 2371.

OGE concluded that President Trump was "in compliance with applicable laws and regulations (subject to any comments below [on the Form])." GX 81 at 1. The Comment box on the Form stated:

> Note 3 to Page 8: OGE has concluded that the information related to the payment made by Mr. Cohen is required to be reported and that the information provided meets the disclosure requirement for a reportable liability.

*Id.*

---

[8] Part 8 of OGE Form 278e calls for disclosure of "your own liabilities and those of your spouse and dependent children," "owed to any creditor that exceeded $10,000, in aggregate, at any time during the reporting period." *See* OGE Form 278e: Part 8 Liabilities, OGE, https://www.oge.gov/web/278eGuide.nsf/Part_8.

### III.    DANY's Summation

During DANY's summation, Mr. Steinglass repeatedly emphasized inadmissible official-acts testimony.  He cited Hicks and Westerhout as examples of witnesses that DANY believed provided "damaging," "utterly devastating" testimony, with "critical pieces of the puzzle," because "they have no motive to fabricate."  Tr. 4598.  Mr. Steinglass later described Hicks and President Trump's "own employees," such as Westerhout, as well as President Trump's "own Tweets," as the "corroborating testimony that tends to connect the Defendant to this crime."  Tr. 4621.

Mr. Steinglass emphasized President Trump's "fascinating conversation with Hope Hicks" following the January 2018 *Wall Street Journal* article, GX 181.  Tr. 4747.  At that point in the summation, he read part of Hicks's testimony to the jury, and argued that it was "devastating" because it came from President Trump's "own Communications Director."  Tr. 4747.  Mr. Steinglass revisited the official-acts testimony toward the end of the summation.  Tr. 4806 ("[W]hen the story finally broke, in 2018, the Defendant explicitly told Ms. Hicks that it's better that the story came out now than before the election.").

Regarding President Trump's attack on Cohen's credibility, Mr. Steinglass argued that Cohen's 2017 "lies" to Congress "had to do with the Mueller Investigation, and it had to do with the investigation into the Russia probe."  Tr. 4610.  Mr. Steinglass argued that Cohen's 2018 public statement regarding the FEC investigation was an effort "to fall on the sword to protect the President," and he characterized Sekulow's text message to Cohen as "recognition for [Cohen's] efforts on the Defendant's behalf."  Tr. 4750.  Mr. Steinglass also made explicit the argument that in February 2018, Sekulow was communicating with Cohen on behalf of "Client/President Trump . . . ."  Tr. 4789.

17

Mr. Steinglass asserted that the substance of an April 2018 call between Cohen and President Trump consisted of: "Don't worry.  I'm the President of the United States.  There is nothing here.  Everything is going to be okay.  Stay tough.  You are going to be okay."  Tr. 4755. With respect to President Trump's April 2018 Twitter post, GX 407-F, Mr. Steinglass reminded the jury of Cohen's opinion that President Trump "was communicating with him, without picking up the phone directly at this point, to send [Cohen] the message: Stay in the fold.  Don't flip."  Tr. 4756.  DANY also called attention to President Trump's May 3, 2018 Twitter post, GX 407-G, and linked the post with the disclosure in the OGE Form 278e that President Trump signed on May 15, 2018, GX 81.  Tr. 4790.

Finally, Mr. Steinglass argued, incorrectly, that the "clear message" from President Trump's official-act Tweets in August 2018, GX 407-H and 407-I, was "Cooperate, and you will face the wrath of Donald Trump."  Tr. 4766.

## APPLICABLE LAW

### I.    CPL § 330.30

Pursuant to CPL § 330.30(1), "[a]t any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict" based on "[a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court."  The Presidential immunity arguments discussed herein are appropriately before the Court under this provision because they would warrant relief "if raised upon an appeal from a prospective judgment of conviction."  *Id.*; *see also People v. Hardy*, 4 N.Y.3d 192, 197 (2005) ("Because this appeal was not yet final at the time the Supreme Court decided *Crawford*, defendant is entitled to invoke *Crawford*, and we are compelled to apply it."); *People v. Favor*, 82 N.Y.2d 254, 260-61 (1993) ("Traditional common-law methodology contemplates that cases on direct

18

appeal will generally be decided in accordance with the law as it exists at the time the appellate decision is made.").

"[U]nless the proof of the defendant's guilt, without reference to the error, is overwhelming"—which it was not here, as explained below—"there is no occasion for consideration of any doctrine of harmless error." *People v. Crimmins*, 36 N.Y.2d 230, 241 (1975). Moreover, "[c]onstitutional error may be harmless only if it is harmless beyond a reasonable doubt, that is, there is no reasonable possibility that the erroneously admitted evidence contributed to the conviction." *People v. Hamlin*, 71 N.Y.2d 750, 756 (1988). This standard requires consideration of "the quantum and nature of the evidence" and "the causal effect the error may nevertheless have had on the jury." *Id.*

## II.    Presidential Immunity

As explained below in Part I.A, the Supreme Court held in *Trump* that prosecutors cannot use evidence of a former President's official acts in a criminal prosecution. This prohibition forbids the use of official-acts evidence even where the *actus reus* of the crime at issue is unofficial. Presidential immunity is absolute with respect to a President's exercise of core powers arising from the Constitution, and it is *at least* presumptive as to official acts within the outer perimeter of Presidential power, *i.e.*, actions that are not palpably beyond a President's authority. Where presumptive immunity applies, prosecutors bear the burden of rebutting the presumption by showing that a criminal prosecution involving evidence of the official act would pose no dangers of intrusion on the Executive Branch.

In this case, however, DANY waived the right to seek to rebut the official-acts presumption by rushing to trial over President Trump's objection. The purpose of the Presidential immunity doctrine is to ensure that Presidents can perform their extremely demanding functions without fear

19

of a future criminal prosecution.  The *Trump* Court addressed the separation-of-powers concerns arising from a federal court reviewing a President's official acts through the prism of generally applicable criminal statutes enacted by Congress.  In this state prosecution, as discussed below in Part II.B, concerns about encroachment on the institution of the Presidency under the Supremacy Clause are even greater where a local elected prosecutor seeks to investigate, prosecute, and convict a former President based in part on evidence of his official acts.  As a result, the harms caused by DANY's course of action are irreparable.  The appropriate remedy is dismissal.

>    **A.    *Trump v. United States***

The Supreme Court held in *Trump* that the purpose of Presidential immunity is "to ensure that the President can undertake his constitutionally designated functions effectively, free from undue pressures or distortions."  2024 WL 3237603, at \*12 (citing *Clinton v. Jones*, 520 U.S. 681, 694 & n.19 (1997)).  Based on that imperative, a former President "may not be prosecuted for exercising his core constitutional powers, and he is entitled, *at a minimum*, to a presumptive immunity from prosecution for all his official acts."  *Id.* at \*25 (emphasis added); *see also id.* at \*8 ("[T]he nature of Presidential power requires that a former President have some immunity from criminal prosecution for official acts during his tenure in office.").

Contrary to arguments DANY made prior to and during the trial, the Presidential immunity doctrine recognized in *Trump* forbids prosecutors from using evidence of a President's official acts at any stage.  "[E]ven on charges that purport to be based only on his unofficial conduct," prosecutors may not "invite the jury to examine acts for which a President is immune from prosecution to nonetheless prove his liability on any charge."  2024 WL 3237603, at \*19.  The reason for this rule is that use of official-acts evidence would "eviscerate the immunity" that the Supreme Court "recognized," and would unacceptably "heighten the prospect that the President's

official decisionmaking will be distorted." *Id.* Furthermore, "[a]llowing prosecutors to ask or suggest that the jury probe official acts for which the President is immune would . . . raise a unique risk"—which was fully and unconstitutionally realized at trial in this case—"that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Id.* at *20.

The *Trump* Court discussed immunity based on two categories of a President's official acts: actions pursuant to the President's "core" powers under the Constitution, and actions within the "outer perimeter" of a President's discretionary authority. *See* 2024 WL 3237603, at *8. The President's "core powers," to which "absolute" immunity attaches, are those that that are based on "'the Constitution itself.'" *Id.* at *9 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)); *see also id.* ("[T]he President is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority."). "The exclusive constitutional authority of the President disables the Congress from acting upon the subject." *Id.* (cleaned up). "When the President exercises such [core] authority, he may act even when the measures he takes are incompatible with the expressed or implied will of Congress." *Id.* (cleaned up).

The second category of official acts discussed in *Trump* are those within the "outer perimeter" of the President's "official responsibility." 2024 WL 3237603, at *12; *see also Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982) ("In view of the special nature of the President's constitutional office and functions, we think it appropriate to recognize absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility."). The outer perimeter extends to all Presidential actions that "are not manifestly

or palpably beyond his authority," and includes actions that are "not obviously connected to a particular constitutional or statutory provision." *Trump*, 2024 WL 3237603, at *13 (cleaned up).

For official acts within the "outer perimeter," the President is "at least" entitled to "*presumptive* immunity from criminal prosecution." *Trump*, 2024 WL 3237603, at *12 (emphasis in original). The *Trump* Court expressly did "not decide" whether outer-perimeter immunity "must be absolute, or instead whether a presumptive immunity is sufficient," and instead remanded the case to the federal district court to address that issue in the first instance. *Id.* at *8. "It is ultimately the Government's burden to rebut the presumption of immunity." *Id.* at *16. Where the presumption applies, "[a]t a minimum, the President must therefore be immune from prosecution for an official act unless the Government can show that applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Id.* at *12 (quoting *Fitzgerald*, 457 U.S. at 754).

Here, however, any efforts by DANY to rebut the presumption would be untimely. This is so because "[q]uestions about whether the President may be held liable for particular actions . . . must be addressed at the outset of a proceeding." *Trump*, 2024 WL 3237603, at *22. Having rushed the case to trial over President Trump's objection, while these very issues were under review in Supreme Court proceedings that now require this litigation, District Attorney Bragg should not be permitted to try to clean up the mess he created after the fact. The harm resulting from DANY's actions is irreparable because it will cause future Presidents to be "unduly cautious in the discharge of his official duties" and to fear "[v]ulnerability to the burden of a trial and to the inevitable danger of its outcome." *Id.* (cleaned up). Under these circumstances, the only appropriate remedy is dismissal.

Finally, even if the Court is inclined to address matters of first impression by allowing DANY to try to rebut the presumption of immunity, the *Trump* decision placed important limitations on that inquiry. In *Trump*, the Supreme Court remanded for further determinations on "[c]ritical threshold issues" regarding "how to differentiate between a President's official and unofficial actions." 2024 WL 3237603, at *13. The Court made clear, however, that "courts may not inquire into the President's motives." *Id.* at *14; *see also id.* ("[W]e must not confuse 'the issue of a power's validity with the cause it is invoked to promote,' but must instead focus on the 'enduring consequences upon the balanced power structure of our Republic.'" (quoting *Youngstown*, 343 U.S. at 634 (Jackson, J., concurring)). "Such an inquiry would risk exposing even the most obvious instances of official conduct to judicial examination on the mere allegation of improper purpose, thereby intruding on the Article II interests that immunity seeks to protect." *Id.* "Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law." *Id.* at *14. "Otherwise, Presidents would be subject to trial on every allegation that an action was unlawful, depriving immunity of its intended effect." *Id.* (cleaned up).

**B.    The Supremacy Clause**

The "justifying purposes" of the Presidential immunity doctrine recognized in *Trump* are "to ensure that the President can undertake his constitutionally designated functions effectively, free from undue pressures or distortions." 2024 WL 3237603, at *12. *Trump* arose in the context of a federal prosecution, where the "undue pressures or distortions" on the President's Article II powers arose in the context of review by Article III courts of allegations relating to generally applicable criminal laws enacted by Congress. In this prosecution under state law, the justifying purposes of Presidential immunity under the *Trump* decision apply with even greater force based on the Supremacy Clause.

23

Although *Clinton* arose in the context of federal civil litigation, the Supreme Court noted that "any direct control by a state court over the President, who has principal responsibility to ensure that those laws are 'faithfully executed,' Art. II, § 3, may implicate concerns that are quite different from the interbranch separation-of-powers questions addressed here."  520 U.S. at 691 n.13.  In that regard, the Court reasoned that a President facing litigation in a "state forum" would "presumably rely on federalism and comity concerns" and "the interest in protecting federal officials from possible local prejudice."  *Id.* at 691; *see also Trump v. Vance*, 140 S. Ct. 2412, 2428 (2020) ("We recognize, as does the district attorney, that harassing subpoenas could, under certain circumstances, threaten the independence or effectiveness of the Executive."); *Willingham v. Morgan*, 395 U.S. 402, 405 (1969) (reasoning that, "[o]bviously, the [first] removal provision was an attempt to protect federal officers from interference by hostile state courts," and "periods of national stress spawned similar enactments").  "If a sitting President is intensely unpopular in a particular district—and that is a common condition—targeting the President may be an alluring and effective electoral strategy. But it is a strategy that would undermine our constitutional structure."  *Vance*, 140 S. Ct. at 2447 (Alito, J., dissenting).

The concerns referenced in *Clinton* and *Vance* derive from the federal Constitution, which "guarantees the entire independence of the General [federal] Government from any control by the respective States."  *Anderson*, 601 U.S. at 111 (cleaned up); *see also Mayo v. United States*, 319 U.S. 441, 445 (1943) ("[T]he activities of the Federal Government are free from regulation by any state."); *In re Tarble*, 80 U.S. 397, 401 (1871) ("[W]henever any conflict arises between the enactments of the two sovereignties, or in the enforcement of their asserted authorities, those of the national government have supremacy until the validity of the different enactments and authorities are determined by the tribunals of the United States."); *M'Culloch v. Maryland*, 17 U.S.

316, 427 (1819) ("It is of the very essence of supremacy, to remove all obstacles to its action within its own sphere, and so to modify every power vested in subordinate governments, as to exempt its own operations from their own influence.").

As relevant here, "[t]he Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties." *Vance*, 140 S. Ct. at 2428. The Supreme Court has applied the Supremacy Clause in that fashion to unelected federal employees since the 1800s. *See Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920) ("[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of the United States."); *Ohio v. Thomas*, 173 U.S. 276, 283 (1899) ("The government is but claiming that its own officers, when discharging duties under federal authority pursuant to and by virtue of valid federal laws, are not subject to arrest or other liability under the laws of the state in which their duties are performed."); *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) ("[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the state of California."); *Tennessee v. Davis*, 100 U.S. 257, 258 (1879) (reasoning that federal officials cannot be "arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess . . . .").

Consistent with these Supremacy Clause authorities—before the political motivations driving this case overtook basic prosecutorial ethics—the former District Attorney recognized in *Vance* that there is a "prohibition on state investigation of *official* presidential conduct." Ex. 7 at 10 (emphasis in original). Echoing the purpose of the Presidential immunity recognized in *Trump*

*v. United States*, DANY recognized that the Supremacy Clause "precludes the States from directly interfering with a President's (and other federal officials') *official* acts." *Id.* at 14 (emphasis in original). "[S]uch immunity turns on whether a State is attempting to dictate how a federal officer carries out an official function." *Id.* at 15. In *Vance*, DANY conceded that "stigmatic burdens" could arise from a prosecution of a President based on official acts:

> An "indictment and criminal prosecution," the Moss Memo reasoned, creates a "distinctive and serious stigma" that would "threaten the President's ability to act as the Nation's leader in both the domestic and foreign spheres."

*Id.* at 28 (Randolph D. Moss, Asst. Atty. Gen., *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 O.L.C. Op. 222, 254 (Oct. 16, 2000)). "When a State attempts to regulate a federal official's exercise of federal powers, its actions necessarily conflict with supreme federal authority, and the Supremacy Clause resolves the conflict in favor of the federal government." *Id.* at 16.

## DISCUSSION

### I.    DANY Violated The Federal Constitution By Relying On Official-Acts Evidence

In grand jury proceedings and at trial, DANY violated the Presidential immunity doctrine recognized in *Trump* and the Supremacy Clause by relying on evidence of President Trump's official acts.

#### A.    President Trump's Official Communications With Hope Hicks

All of Hicks's testimony concerning events in 2018, when she was serving as the White House Communications Director, concerned official acts based on core Article II authority for which President Trump is entitled to absolute immunity. *Trump* specifically forbids prosecutors from offering "testimony" from a President's "advisers" for the purpose of "probing the official act." 2024 WL 3237603, at *20 n.3. Thus, Hicks's testimony was categorically inadmissible in

both grand jury proceedings and at trial, and this evidence violated the Presidential immunity doctrine.

As the White House Communications Director, Hicks was one of the key subordinates who President Trump relied upon to help him exercise Article II authority under, *inter alia*, the Executive Vesting Clause and the Take Care Clause. *See Myers v. United States*, 272 U.S. 52, 117 (1926) ("The vesting of the executive power in the President was essentially a grant of the power to execute the laws. But the President alone and unaided could not execute the laws. He must execute them by the assistance of subordinates."); *see also Trump*, 2024 WL 3237603, at *8 ("Domestically, he must 'take Care that the Laws be faithfully executed,' § 3, and he bears responsibility for the actions of the many departments and agencies within the Executive Branch."). President Trump's 2018 conversations with Hicks also involved efforts by President Trump to "supervise" someone who was "wield[ing] executive power on his behalf," which is an authority that "'follows from the text of Article II.'" *Trump*, 2024 WL 3237603, at *9 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020)). As a result of the multiple sources of constitutional authority upon which President Trump's interactions with his White House Communications Director were based, he is entitled to absolute immunity with respect to that evidence. *See id.* at *13 ("Certain allegations . . . are readily categorized in light of the nature of the President's official relationship to the office held by that individual.").

Because President Trump's interactions with Hicks were based on core authorities, where Presidential immunity is absolute, no further inquiry is necessary or permitted. However, it is equally clear that President Trump's discussions with Hicks relating to 2018 media coverage of Daniels, McDougal, and an FEC inquiry relating to Cohen fit comfortably within the outer-perimeter Presidential authority of "speaking to . . . the American people." *Trump*, 2024 WL

3237603, at *13; *see also id.* at *15 (recognizing that official acts include efforts "to advance the President's agenda in Congress *and beyond*" (emphasis added)); *see also Trump v. Hawaii*, 585 U.S. 667, 701 (2018) ("The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf.").

In 2018, President Trump was working to communicate with the media and the public—as President—regarding the issues discussed in the *Wall Street Journal* and *New York Times* articles that Hicks addressed at trial. During that timeframe, President Trump was also providing guidance and information to Hicks so that she could facilitate those efforts by speaking on behalf of the President. Hicks confirmed this at trial when she explained that her job responsibilities as Communications Director included "coordinating all of the communication efforts for the Administration from the White House throughout all of the agencies," "shar[ing] with the American people" information concerning President Trump's "work," and portraying the President "in a good light." Tr. 2210.

This testimony concerned efforts by President Trump to work with Hicks to use the "long-recognized aspect of Presidential power" known as the "bully pulpit" to "persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Trump*, 2024 WL 3237603, at *18.[9] In *Clinton*, the Supreme Court recognized that statements by "various persons authorized to speak for the President publicly," during Clinton's Presidency, "arguably may involve conduct within the outer perimeter of the President's official responsibilities." 520 U.S. at 685-86. The Court recognized that proposition

---

[9] The term "bully pulpit" was "coined by President Theodore Roosevelt to denote a President's excellent (*i.e.*, 'bully') position (*i.e.*, his 'pulpit') to persuade the public." *Murthy v. Missouri*, 2024 WL 3165801, at *31 (June 26, 2024) (Alito, J., dissenting).

notwithstanding the fact that President Clinton's governmental and private "agents"[10] had "publicly branded [Paula Jones] a liar by denying that the incident had occurred." *Id.* at 685. Although the *Clinton* Court did not address the outer-perimeter question, *see id.* at 686 n.3, the *Trump* Court largely resolved it: "[E]ven when no specific federal responsibility requires his communication," the President can "encourage" others "to act in a manner that promotes the President's view of the public good." 2024 WL 3237603, at *17; *cf. Barr v. Matteo*, 360 U.S. 564, 575 (1959) ("[T]he same considerations which underlie the recognition of the privilege as to acts done in connection with a mandatory duty apply with equal force to discretionary acts at those levels of government where the concept of duty encompasses the sound exercise of discretionary authority.").

Even if the Court had strained to give DANY the benefit of applying only "presumptive immunity" to the official-acts testimony from Hicks—which would find no support in *Trump*—DANY could not meet its "burden" of rebutting the presumption. *Trump*, 2024 WL 3237603, at *12, *16. In that analysis, the Court "may not inquire into the President's motives." *Id.* at *14. "Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law." *Id.* Rather, what matters for purposes of presumptive Presidential immunity is that "[a]pplying a criminal prohibition" to intrude on a President's sensitive internal communications with a confidential adviser such as the White House Communications Director

---

[10] Paula Jones alleged that President Clinton, "through his White House aides, stated that her account of the hotel room incident was untrue and a 'cheap political trick,' and that Dee Dee Myers, then-White House Spokeswoman, said of plaintiff's allegations, 'It's just not true.'" *Jones v. Clinton*, 974 F. Supp. 712, 717-18 (E.D. Ark. 1997) (quoting civil complaint); *see also Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996). Jones also alleged that President Clinton "hired an attorney who, as the President's agent, said that her account 'is really just another effort to rewrite the results of the election' and 'distract the President from his agenda,' and who asked rhetorically, 'Why are these claims being brought now, three years after the fact?'" 974 F. Supp. at 718.

must plainly pose "no dangers"—none—"of intrusion on the authority and functions of the Executive Branch." *Id.* at *12 (cleaned up).  That could not be said in this instance.

"[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated." *Cheney v. U.S. Dist. Ct.*, 542 U.S. 367, 385 (2004); *see also Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("This Article II right to confidential communications attaches not only to direct communications with the President, but also to discussions between his senior advisers.").  Recognizing that President Trump's communications with Hicks were official acts is a "sound application of a principle that makes one master in his own house." *Humphrey's Executor v. United States*, 295 U.S. 602, 630 (1935).  A President must be able to provide information to, and seek advice from, his Communications Director in order to address matters of public concern.  *See United States v. Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.").  Holding the "pall of potential prosecution" over those types of Presidential communications would result in the President being "chilled from taking the bold and unhesitating action required of an independent Executive." *Trump*, 2024 WL 3237603, at *11 (cleaned up); *see also Clinton*, 997 F.2d at 909 ("The ability to discuss matters confidentially is surely an important condition to the exercise of executive power.  Without it, the President's performance of any of his duties—textually explicit or implicit in Article II's grant of executive power—would be made more difficult."); Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 Willamette L. Rev. 701, 716 (2009) (reasoning that without the Executive Office of the President, "the President would be greatly weakened in his struggle to instantiate his

preferences within the executive branch"). Therefore, whether the immunity is absolute or presumptive, DANY should have been barred from using evidence of President Trump's interactions with Hicks.

### B.    Westerhout's Observations Of President Trump Exercising Presidential Authority

DANY violated the Presidential immunity doctrine by offering testimony from Westerhout regarding President Trump's exercise of Article II authority in the Oval Office, including with respect to national security matters, and her work on his behalf.

Presidential authority under the Executive Vesting Clause includes "supervisory" responsibilities and the "management of the Executive Branch." *Fitzgerald*, 457 U.S. at 750. Westerhout was, in the words of Mr. Steinglass, President Trump's "loyal White House Assistant." Tr. 4737. The "assistance of close aides" such as Westerhout is necessary the functioning of the Presidency to address "extraordinary administrative complexity and near-incalculable presidential responsibilities." Elena Kagan, *Presidential Administration*, 114 Harv. L. Rev. 2245, 2273 (2001). Congress has authorized Presidents to rely upon such aids, including pursuant to 3 U.S.C. § 105(a)(1), which permits Presidents "to appoint and fix the pay of employees in the White House Office without regard to any other provision of law regulating the employment or compensation of persons in the Government service."[11]

DANY forced Westerhout to provide details of how President Trump operated the Executive Branch, including as to national security matters, based on observations that she made while sitting outside the Oval Office. *See* Tr. 2985 ("Did you also make an effort to learn Mr. Trump's preferences by observing him while you were sitting in the Outer Oval?"). This invasive

---

[11] The highest-ranking staff are commissioned with the titles "Assistant to the President," "Deputy Assistant to the President," and "Special Assistant to the President," in that order.

compelled testimony included information regarding President Trump's official-capacity "work habits," "preferences," "relationships and contacts," and "social media" practices at the White House.  Tr. 2986.  For example, Ms. Mangold elicited testimony from Westerhout regarding (1) President Trump's transportation of documents between the Oval Office, the White House "residence," "Air Force One," and "Marine One," Tr. 2989; and (2) calls via "a secure line" in the "[S]ituation [R]oom," Tr. 2988; and (3) President Trump's work with Scavino to use the @realdonaldtrump Twitter account for official White House communications, Tr. 2991-92.

Westerhout described work that she did to collect contact information so that she could assist President Trump more efficiently.  Tr. 2995-96.  The list of contacts that DANY offered into evidence included individuals who later served in the Trump Administration, including Steven Mnuchin (Treasury Secretary), Carl Icahn (Special Advisor to the President), and Pam Bondi (White House communications staff).  *See* GX 69.  Finally, DANY "refreshed" both Westerhout and Hicks regarding a March 2018 text message that they exchanged as White House advisers working on behalf of President Trump: "Hey- the president wants to know if you called David pecker again."  GX 319; Tr. 2212-13, 3006-08.  Not surprisingly, Westerhout explained that it was not "unusual" during that period for her to communicate with Hicks on behalf of President Trump regarding those types of issues.  Tr. 3008.  Indeed, communications between President Trump's aides and advisers was necessary to the orderly functioning of the Presidency.

Westerhout's description of President Trump's practices with respect to Air Force One, Marine One, and the Situation Room concerned the "core" Commander In Chief power, Art. II, § 2, cl. 1, for which "absolute" immunity applies.  *See Trump*, 2024 WL 3237603, at *8.  President Trump was "at least" entitled to "presumptive immunity" with respect to Westerhout's testimony regarding her work with President Trump and her observations of him exercising his Article II

32

authority. *Id.* at *12. The testimony described official acts by and on behalf of President Trump that fit comfortably within the outer perimeter of Presidential power. None of these details regarding President Trump's Administration involved actions that were "manifestly or palpably beyond his authority," which is the boundary of that perimeter. *Id.* at *13 (cleaned up). Nor would DANY have been able to rebut any presumption that was deemed appropriate, had the question been addressed as *Trump* requires, because the prospect of biased local prosecutors using official-acts testimony regarding a President's personal preferences during his or her administration, and his or her communications with confidential assistants, presents an unacceptable risk of "undue pressures or distortions" to a President's work on behalf of the American people. *Id.* at *12.

## C. President Trump's Official Public Statements Via Twitter

DANY improperly used official-acts evidence relating to Tweets attributed to President Trump in 2018, which were posted to a Twitter account that President Trump used as an official channel of White House communication. *See* GXs 407-F – 407-I; Tr. 2708-09.

The *Trump* Court recognized that President Trump's "communications in the form of Tweets," using the same account that DANY put at issue in this case, were consistent with the President's "'extraordinary power to speak to his fellow citizens.'" 2024 WL 3237603, at *18 (quoting *Hawaii*, 585 U.S. at 701). This "long-recognized aspect of Presidential power" arises from the Executive Vesting Clause and the Take Care Clause, and President Trump is therefore entitled to absolute immunity with respect to these Tweets. *Id.*

During discussion relating to President Trump's Twitter account, in addition to *Hawaii*, the Supreme Court also cited the recent decision in *Lindke v. Freed*. *See Trump*, 2024 WL 3237603, at *18. In *Lindke*, the Supreme Court reasoned that "context can make clear that a social-media account purports to speak for the government." 601 U.S. 187, 202 (2024). Here, that

context conclusively supports President Trump's position. "The public presentation of the [@realDonaldTrump Twitter] Account and the webpage associated with it bear all the trappings of an official, state-run account." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021). President Trump used the account as "one of the White House's main vehicles for conducting official business." *Id.* at 232.

In addition to the appearance of the account and the official manner in which President Trump was using it in 2018, the official-acts conclusion is further supported by the fact that President Trump relied on a White House employee to help him operate the account. *See Trump*, 2024 WL 3237603, at *19 ("Knowing, for instance, . . . who was involved in transmitting the electronic communications . . . could be relevant to the classification of each communication."); *Lindke*, 601 U.S. at 203 ("[A]n official who uses government staff to make a post will be hard pressed to deny that he was conducting government business."). Specifically, Scavino, the White House Director of Social Media, was a "staff member" and "one of the President's very trusted advisors," who was authorized to make posts on the account subject to President Trump's approval. Tr. 2172, 2983. Scavino "did a lot of the President's communications, and especially helped the President get tweets out and other statements." Tr. 2983-84.

At trial, DANY relied on false opinions from Cohen and Daniels to try to suggest that these tweets were directed at them, individually, rather than what they objectively were: communications with the American people regarding matters of public concern bearing on President Trump's credibility as the Commander in Chief. The opinions of Cohen and Daniels are entitled to no weight in the official-acts analysis required by the Presidential immunity doctrine. *See Trump*, 2024 WL 3237603, at *14 ("In dividing official from unofficial conduct, courts may

not inquire into the President's motives."). The objective context is that each Tweet followed a public event that President Trump addressed through public statements via an official communications channel "in a manner that promote[d] the President's view of the public good" and that President Trump "believe[d] would advance the public interest." *Id.* at \*17, \*18; *see also Snyder v. Phelps*, 562 U.S. 443, 453 (2011) ("Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public. The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." (cleaned up)).

For example, Ms. Hoffinger used Cohen to connect President Trump's April 21, 2018 Twitter post to the FBI's search targeting Cohen on April 9, 2018. Tr. 3582; *see also* GX 407-F. Ms. Hoffinger used Daniels to position the second post in April 2018 as a response to Daniels' false public claims that President Trump and his associates had sent someone to intimidate her in 2011. Tr. 2708. On their face, the May 3, 2018 posts addressed public allegations at issue in ongoing investigations by, at least, DOJ and the FEC. GX 407-G. With respect to the posts on August 22, 2018, Ms. Hoffinger emphasized the official nature of the public communications by inquiring about the irrelevant "effect" on Cohen of having "the President of the United States tweeting this," and used Cohen to connect the posts to Cohen's guilty plea on August 21. Tr. 3617-18; GXs 407-H, 407-I. While that timing is undisputed, so too should be the authority of the President of the United States to comment upon and criticize the conduct of federal prosecutors and regulators exercising Article II authority that he delegated to them.

In other words, like the other official-acts evidence that DANY used, President Trump's Twitter posts fall well within the core authority of the Nation's Chief Executive. "Investigative and prosecutorial decisionmaking is 'the special province of the Executive Branch,' and the Constitution vests the entirety of the executive power in the President, Art. II, § 1." *Trump*, 2024 WL 3237603, at *15 (quoting *Heckler v. Chaney*, 470 U.S. 821, 832 (1985)). In *Heckler*, the Court sourced the President's authority over prosecutorial decisionmaking to the Take Care Clause. *See* 470 U.S. at 832. Thus, the Vesting Clause and the Take Care Clause served as independent sources of "core" authority for these official acts, and President Trump is entitled to absolute immunity with respect to this evidence.

Finally, even if—counter-factually—the Tweets are divorced from President Trump's authority to comment on the federal inquiries that were being undertaken in his Executive Branch at the time, "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 2024 WL 3237603, at *18. Attendant to the "bully pulpit" Presidential power is an "expect[ation] to comment on those matters of public concern that may not directly implicate the activities of the Federal Government . . . ." *Id.*

In *Jones*, President Clinton was alleged to have authorized White House personnel and a private attorney, during his Presidency, to state publicly that sexual assault allegations by Paula Jones were "not true" and a "cheap political trick" that was "really just another effort to rewrite the results of the election." *Jones*, 974 F. Supp. at 717-18 (cleaned up). The Supreme Court believed those public comments "arguably may involve conduct within the outer perimeter of the President's official responsibilities . . . ." 520 U.S. at 686. Given that logic, it cannot be said that

36

President Trump's posts were "palpably beyond" that "outer perimeter." *Trump*, 2024 WL 3237603, at *13 (cleaned up).[12]

The only evidence DANY would have had to rebut the "at least" presumptive outer-perimeter immunity for the social media posts is lay-witness opinions from two witnesses with grave credibility problems, Cohen and Daniels. Those implausible opinions address President Trump's motivations in making the posts, which is a "highly intrusive" inquiry that the Supreme Court has foreclosed. *Trump*, 2024 WL 3237603, at *14 (cleaned up). More broadly, permitting prosecutors to use a President's public statements on matters of public concern in criminal proceedings would chill the President's willingness and ability to communicate with the public. That would result in an impermissible "intrusion on the authority and functions of the Executive Branch" and the "enfeebling of the Presidency." *Id.* at *16, *24.

### D. President Trump's Official Acts In Response To FEC Inquiries

DANY also relied on two types of official-acts evidence relating to President Trump's 2018 response to investigations by the FEC.

First, DANY presented a February 2018 text message from Cohen indicating that President Trump had "approved" Cohen addressing the FEC complaint, both formally and through a public statement. GX 260; *see also* GX 202 (Cohen's statement). DANY also offered a text message to Cohen from Sekulow (an attorney for President Trump), which Cohen testified reflected a

---

[12] Prior to the Supreme Court's ruling in *Trump*, Judge Kaplan rejected President Trump's Presidential immunity defense to allegedly defamatory Tweets. *See Carroll v. Trump*, 680 F. Supp. 3d 491, 505 (S.D.N.Y. 2023). *Trump* abrogates the reasoning in *Carroll* for several reasons, including that (1) Judge Kaplan did not define the "outer perimeter" of Presidential power as that which is "palpably beyond his authority," *Trump*, 2024 WL 3237603, at *13; (2) Judge Kaplan did not apply the "presumption of immunity" to outer-perimeter acts, as required by *Trump*, *id.* at 16; and (3) Judge Kaplan impermissibly took into account the plaintiff's allegations of President Trump's motive in making posting the challenged Tweets—an exercise forbidden by *Trump*, *id.* at *14.

statement of gratitude by President Trump regarding Cohen's "statement . . . on the FEC." Tr. 3573. These communications involved President Trump using a third-party (Cohen) to make "public communications" that "are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 2024 WL 3237603, at *18. Once again: if President Clinton's use of a private attorney to make public statements denying the allegations by Paula Jones was "arguably" within the "outer perimeter of the President's official responsibilities," 520 U.S. at 686, then President Trump's use of a private attorney (Sekulow) to coordinate a public statement by another private attorney (Cohen) cannot have been "palpably beyond" President Trump's outer-perimeter authority, *Trump*, 2024 WL 3237603, at *13.

Second, Cohen testified that President Trump "told" him that the FEC inquiry would be "taken care of" by then-Attorney General Jeff Sessions, and that Cohen conveyed that information to Pecker. Tr. 3576-77. Assuming this conversation happened, which we do not concede, Cohen's testimony included information regarding President Trump's "conclusive and preclusive authority" to "decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Trump*, 2024 WL 3237603, at *14 (cleaned up).

> The President may discuss potential investigations and prosecutions with his Attorney General and other Justice Department officials to carry out his constitutional duty to "take Care that the Laws be faithfully executed." Art. II, § 3. And the Attorney General, as head of the Justice Department, acts as the President's "chief law enforcement officer" who "provides vital assistance to [him] in the performance of [his] constitutional duty to preserve, protect, and defend the Constitution."

*Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 520 (1985)). "As Madison explained, '[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'" *Seila Law*, 591 U.S. at 213 (quoting 1 Annals of Cong. 463 (1789)).

As in *Trump*, DANY's suggestion that President Trump spoke to Attorney General Sessions "for an improper purpose do[es] not divest the President of exclusive authority over the investigative and prosecutorial functions of the Justice Department and its officials." *Trump*, 2024 WL 3237603, at *15. And, as in *Trump*, President Trump is "absolutely immune" from DANY's efforts to use this evidence against him. *Id.*

### E.    Official-Acts Evidence Relating To Investigations By Congress And Prosecutors

DANY presented official-acts evidence relating to President Trump's public responses to investigations by Congress and federal prosecutors, and his deliberations relating to the pardon power.

Cohen sought to justify his perjury before Congress by reference to President Trump's public position in response to the investigations by Congress and Special Counsel Mueller that "there was no Russia-Russia-Russia." Tr. 3550. President Trump's public statements in response to the congressional and Special Counsel investigations were part of his outer-perimeter authority to address the American people. Moreover, Presidential power includes the authority to engage in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (cleaned up). For both of these reasons, evidence relating to President Trump's responses to these investigations are "at least" entitled to "presumptive immunity." *Trump*, 2024 WL 3237603, at *12.

DANY also elicited testimony from Cohen suggesting that he was seeking the "power of the President" in 2017 to protect him in connection with the congressional investigations. Tr. 3549. Cohen was more explicit with respect to 2018 communications with Costello, which he described as a means of "back channel communication to the President." Tr. 3594. Specifically, Cohen told the jury that a June 13, 2018 email, GX 207, referred to "potential pre-pardons" that

Cohen and Costello discussed after President Trump allegedly referenced the concept. "The President's authority to pardon," established in Article II, § 2, cl. 4, is one of the "core" constitutional powers "invested exclusively in [the President] him by the Constitution." *Trump*, 2024 WL 3237603, at *8-9.

### F.     President Trump's Official Disclosures On OGE Form 278e

President Trump's submission of the Office of Government Ethics (OGE) Form 278e in 2018 reflected an official act for which he is entitled to immunity. *See* GX 81.

Following a dialogue with OGE, President Trump signed the Form in May 2018 and accurately listed his relevant position as "President of the United States of America." GX 81 at 1. President Trump caused the form to be submitted to OGE, which was part of the Executive Branch that President Trump was running when he signed the document.[13] The Form disclosed information regarding President Trump's financial activities in 2017—also while he was President.

According to OGE, one of the purposes of the Form is "to ensure confidence in the integrity of the Federal Government by demonstrating that they are able to carry out their duties without compromising the public trust." 5 C.F.R. § 2634.104(a). Thus, President Trump's submission of the Form was part of the "Presidential conduct" that involved "speaking to . . . the American people," which the *Trump* Court recognized "certainly can qualify as official . . . ." 2024 WL 3237603, at *13. President Trump's submission of the Form was certainly not "palpably beyond" that authority. *Id.* (cleaned up).

Nor could DANY meet its burden of rebutting any presumption that attaches to the immunity. President Trump was required to make the disclosures on the Form in his official

---

[13]     *See* U.S. Office of Government Ethics, Our History, https://www.oge.gov/web/OGE.nsf/about_our-history.

capacity as President.  In addition, the Form reflects an "Agency Ethics Official's Opinion" that President Trump was "in compliance with applicable laws and regulations."  GX 81 at 1.  By using this document in a criminal prosecution, DANY invited the type of "second-guessing" of President Trump's official acts that "would threaten the independence [and] effectiveness of the Executive." 2024 WL 3237603, at *20 n.3 (cleaned up).

## II.    Use Of Official-Acts Evidence In Grand Jury Proceedings Requires Dismissal Of The Indictment

DANY violated the Presidential immunity doctrine by using similar official-acts evidence in the grand jury proceedings that gave rise to the politically motivated charges in this case. Because an Indictment so tainted cannot stand, the charges must be dismissed.



The official-acts evidence that DANY presented to the grand jury contravened the holding in *Trump* because Presidents "cannot be indicted based on conduct for which they are immune from prosecution."  2024 WL 3237603, at *19.  The Presidential immunity doctrine recognized in *Trump* pertains to *all* "criminal proceedings," including grand jury proceedings when a prosecutor "seeks to charge" a former President using evidence of official acts.  *Id.* at *12.  Indeed, DANY

previously acknowledged to the Supreme Court in *Vance*, in connection with an investigation targeting President Trump, that there is a "prohibition on state investigation of *official* presidential conduct." Ex. 7 at 10 (emphasis in original); *see also, e.g.*, *United States v. McLeod*, 385 F.2d 734, 751-52 (5th Cir. 1967) ("Both the Supremacy Clause and the general principles of our federal system of government dictate that a state grand jury may not investigate the operation of a federal agency. . . . [T]he investigation . . . is an interference with the proper governmental function of the United States . . . [and] an invasion of the sovereign powers of the United States of America." (cleaned up)).

DANY's concession in *Vance* is consistent with the First Department's application of New York's Speech and Debate Clause in *People v. Ohrenstein*, 153 A.D.2d 342 (1st Dep't 1989). In *Ohrenstein*, the First Department denied Article 78 relief to the government relating to the dismissal of charges based on allegations of "theft, fraud and filing of a false instrument" against New York Senate employees, where "there was evidence presented to the Grand Jury" relating to activities that "clearly f[e]ll within the ambit of legislative acts that are covered by the Speech or Debate Clause." *Id.* at 347, 356. The court reasoned that an "indictment cannot be legally sufficient if it is based on Grand Jury testimony which may require inquiry into legislative acts or the motivation for legislative acts." *Id.* at 356 (citing *United States v. Brewster*, 408 U.S. 501, 512 (1972)). "Although the general rule is to view the Grand Jury evidence in the light most favorable to the People, that rule does not apply where the constitutional rights protected by the Speech or Debate are affected." *Id.* at 356-57. In that setting, "[t]he obligation is on the prosecutor to show that no privileged legislative act would be implicated." *Id.* at 357. On remand following review by the Court of Appeals, *see* 77 N.Y.2d 38 (1990), the trial judge dismissed additional charges based on the finding that two of the remaining defendants were "prejudiced by the

erroneous theory" presented to the grand jury. *See People v. Ohrenstein*, 151 Misc. 2d 512, 519-20 (Sup. Ct. N.Y. Cty. 1991) (reasoning that "the court cannot find with confidence that the People's erroneous theory had no bearing on the grand jury's decision to vote these counts").

The decisions in *Ohrenstein* are consistent with the Supreme Court's reasoning in *Trump*. Allowing presentation of official-acts evidence in grand jury proceedings creates a "[v]ulnerability to the burden of a trial." *Trump*, 2024 WL 3237603, at *22 (cleaned up). That vulnerability is constitutionally unacceptable, as it "would dampen the ardor of all but the most resolute" occupants of the Oval Office. *Id.* (cleaned up). "The Constitution does not tolerate such impediments to the effective functioning of government." *Id.* (cleaned up). The grand jury proceedings in this case created just such an impediment, and the charges must be dismissed.

## III.  Use Of Official-Acts Evidence Requires Vacatur Of The Jury's Verdicts

The trial in this case was, to put it mildly, similarly tainted. In light of the federal constitutional doctrine articulated in *Trump* and DANY's use of official-acts evidence at trial, the jury's verdicts cannot stand. The Supreme Court's decision does not allow for an "overwhelming evidence" or "harmless error" exception to the profound institutional interests at stake. Indeed, *Trump* contemplates a pretrial interlocutory appeal of an adverse Presidential immunity determination precisely because even the prospect of such a trial is constitutionally unacceptable. It necessarily follows that the results of a trial conducted in breach of these holdings is invalid. The verdicts reflect a threat to the principles articulated by the Supreme Court and the concerns that animate the Supremacy Clause. In any event, because of the "peculiar constitutional concerns" presented, the jury's verdicts could not withstand constitutional harmless error analysis under New York law even if it were to apply.

## A.    Presidential Immunity Errors Are Never Harmless

The jury's verdicts must be vacated because the use of official-acts evidence at trial violated the Presidential immunity doctrine.

The Court and the jury lacked authority to "adjudicate" this case because DANY framed the trial proof in a manner that "examine[d] . . . Presidential actions." *Trump*, 2024 WL 3237603, at *9.  The prosecution of a former President, such as President Trump, presents "peculiar constitutional concerns" that requires enhanced protections for "the institution of the Presidency." *Id.* at *20.

> [I]f a former President's official acts are routinely subjected to scrutiny in criminal prosecutions, the independence of the Executive Branch may be significantly undermined. The Framers' design of the Presidency did not envision such counterproductive burdens on the vigor and energy of the Executive.

*Id.* at *11 (cleaned up).  In this setting, the "tools" that are typically used to protect a defendant's rights at trial, such as "evidentiary rulings" and "jury instructions," "are unlikely to protect adequately the President's constitutional prerogatives." *Id.* at *20 (cleaned up).

To protect against these burdens on the Presidency, states may not even subject former Presidents to "the burdens of broad-reaching discovery," much less "'the costs of trial,'" through the use of allegations or evidence relating to official acts.  *Trump*, 2024 WL 3237603, at *14 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 817-18 (1982)).  Irrespective of the quality of other evidence, it is the "the possibility of an extended proceeding alone" that animates Presidential immunity.  *Id.*  "Inquiries of this kind can be peculiarly disruptive of effective government." *Harlow*, 457 U.S. at 817-18.

The *Trump* Court specifically rejected the argument that "as-applied challenges in the course of the trial suffice to protect Article II interests," and found no comfort in the government's suggestion that Presidential immunity challenges could be "deferred until after trial."  *Trump*, 2024

WL 3237603, at *21.  Instead, the Supreme Court cited *Mitchell v. Forsyth*, where the Court reasoned that "qualified immunity is in part an entitlement *not to be forced to litigate* the consequences of official conduct," 472 U.S. 511, 527 (1985) (emphasis added).  *See id.* at *21. This federal constitutional reasoning forecloses harmless-error analysis under New York law in a manner similar to the treatment of "structural errors" and "mode of proceedings errors."  *See People v. Mairena*, 34 N.Y.3d 473, 482 (2019); *People v. Mack*, 27 N.Y.3d 534, 540 (2016) ("Mode of proceedings errors are immune not only from the rules governing preservation and waiver but also from harmless error analysis."); *see also, e.g.*, *Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993) (reasoning that "structural defects in the constitution of the trial mechanism . . . defy analysis by harmless-error standards" because those errors "infect the entire trial process" (cleaned up)).

Here, DANY wrongfully and unconstitutionally forced President Trump to litigate official-acts evidence at trial.  They did so proudly and unapologetically, in a manner that speaks to the political motivations driving the elected local official responsible for this unjust prosecution on behalf of President Biden.  For example, referring to contested official-acts evidence now plainly subject to Presidential immunity under *Trump*, DANY promised the First Department that it planned to offer such proof as evidence of President Trump's supposed ███████████████ ███████  NYSCEF Doc. No. 13 ¶ 50, *Trump v. Merchan*, Case No. 2024-02413 (1st Dep't Apr. 17, 2024).  That is exactly what happened at this trial, in violation of *Trump*.  The result is an affront to, among other things, core constitutional interests central to the functioning of the federal government.  Accordingly, the jury's verdicts must be vacated.

### B.    The Harmless-Error Doctrine Cannot Save The Trial Result

The Supreme Court's constitutional analysis in *Trump* forecloses harmless-error analysis. In any event, in light of the exceedingly weak evidence that DANY presented at trial and the since-recognized extreme risks of unfair prejudice resulting from the use of official-acts evidence, it cannot be said that "there is no reasonable possibility that the error might have contributed to defendant's conviction." *People v. Mairena*, 34 N.Y.3d 473, 485 (2019).

### 1.   DANY's Evidence Was Weak

Cohen's testimony was the only connection between President Trump and the charged violations of Penal Law § 175.10.  Cohen's multiple felonies, including for fraud crimes and perjury, cannot be overlooked in this analysis.  *See, e.g.*, *People v. Simmons*, 75 N.Y.2d 738, 739 (1989) ("[T]he prosecution's case was less than overwhelming.  It rested on the testimony of the complainant whose credibility was impugned by his extensive criminal history.").  Based on Cohen's plea allocution and fall 2023 testimony against President Trump in another proceeding, a federal judge concluded that Cohen had committed perjury yet again prior to the trial in this case. *See United States v. Cohen*, 2024 WL 1193604, at *5 (S.D.N.Y. Mar. 20, 2024) (reasoning that Cohen's "October 2023 testimony . . . was either perjurious or confirms that he committed perjury before this Court").

DANY relied on Cohen's false claims, alone, to connect President Trump to Cohen's alleged conversations in 2017 with Allen Weisselberg and Weisselberg's purported notes, GX 35. *See* Tr. 3490.  DANY conceded that they made no effort to present information from Weisselberg to the jury.  *See* Tr. 3246-47.  Given all of the resources District Attorney Bragg put into this case, the only reasonable inference to draw from that decision is that Weisselberg's recollection is not consistent with Cohen's.

46

Moreover, Cohen's testimony regarding the supposed meeting with President Trump and Weisselberg was tenuous at best. Cohen claimed that Weisselberg "turned around" during the meeting to relay information from President Trump and thus effectively conceded that he was not a direct participant in the conversation. Tr. 3491. As another example, Cohen falsely claimed to have discussed the purported scheme with President Trump in the Oval Office on February 8, 2017, including details regarding payments he said were due for January and February of that year. Tr. 3512-13. Days later, however, he asked McConney: "Please remind me of the monthly amount?" GX 1 at 3.

Ms. Hoffinger repeatedly asked Cohen to describe the substance of telephone conversations with President Trump in 2016 and 2017, at least seven years before the trial. Given the numerous reasons that Cohen had to be in contact with President Trump during that time frame, toll records relating to those calls did not corroborate the false and salacious details that Cohen attributed to them during his recent and ongoing political crusade. This reality came to pass during the trial when the defense demonstrated that Cohen lied, emphatically, about having discussed the details of the scheme with President Trump during a call to Keith Schiller on October 24, 2016, when in fact he spoke to Schiller about harassing phone calls from a teenager. *E.g.*, Tr. 3896-97. Through this false testimony, Cohen himself demonstrated that DANY's desperate attempts to corroborate his fictious account using phone records was little more than a prosecutorial parlor trick that is deserving of no weight in any harmless-error analysis.

DANY also tried unsuccessfully to corroborate and rehabilitate their serial-perjurer star witness through a purported recording that Cohen claimed to have made of President Trump on September 6, 2016, in blatant violation of Cohen's ethical obligations. *See* GXs 246 (audio), 248 (transcript). Cohen lied to the jury several times about the substance and circumstances of the call.

For example, Cohen claimed that the recording ended because he "received an incoming call," and Ms. Hoffinger tried to suggest that such a call was reflected on Cohen's cellphone records. Tr. 3343-44. However, the phone records demonstrated that (1) Cohen did not answer the call identified by Ms. Hoffinger because it went straight to voicemail, *see* Tr. 3145-47; and (2) the call isolated by Ms. Hoffinger in the phone records went to a different physical cellphone device, with a different IMEI number, than the device that Cohen claimed to have used to make the recording, *see* Tr. 3939-40, 4578-79.

When the September 2016 recording cut off, President Trump was in the process of asking Cohen to "check" on details that were not captured on the audio file. *See* GX 248. On cross-examination, Cohen tried to explain that away by claiming falsely—and contrary to the attributions in DANY's own transcript, GX 248—that "I used the word . . . check" because "[w]e needed to do it by check." Tr. 3939. Finally, even if all of the problems with the recording could be ignored—which they cannot—DANY's theory of the substance of the discussion did not corroborate Cohen's testimony regarding the business records at issue. DANY argued that the recording related to Karen McDougal. It had nothing to do with Cohen's $130,000 payment to Daniels, and there is no factual connection between the recording and the $420,000 that the Trump Organization paid Cohen in 2017.

DANY's case was equally flawed, if not more so, with respect to the Election Law § 17-152 conspiracy that they relied upon to escalate the unfounded and time-barred business records misdemeanors to non-existent felonies. These evidentiary weaknesses were exacerbated by the fact that DANY hid the ball regarding the theory they put to the jury until they submitted their proposed jury instructions, and by the Court's failure to require the jury to make a unanimous finding with respect to DANY's theories of "unlawful activity" objects for the Election Law § 17-

152 conspiracy predicate: the Federal Election Campaign Act ("FECA"), tax crimes, and underlying business-records violations.[14]

As to FECA, notwithstanding after-the-fact rationalizations by a variety of actors faced with ulterior motives, there was no admissible evidence that any alleged participant acted with *willful intent* to make an illegal campaign contribution. *See* Tr. 4844-45 (jury instruction regarding willfulness). Pecker said just the opposite during the trial, and he submitted a sworn declaration to the FEC to that effect at the time of these events. Tr. 1445-48.[15]

DANY's tax theory also required criminal intent. Tr. 4847. There was no such evidence. Regarding the "grossed up" theory, Cohen testified: "I didn't know. And, to be honest, I didn't really even think about it." Tr. 3490. Similarly, McConney testified: "I don't know exactly what it meant." Tr. 2299. In fact, McConney testified that "nobody" but Weisselberg "would know" that Weisselberg meant by that. Tr. 2397. Cohen and McConney went on to speculate, after the fact, about the notion in the notes. But there was no evidence that any of these men harbored criminal intent at the time of the agreement in 2017.

---

[14] Although the Court observed that unanimity on this issue is "not ordinarily required" when the charge at issue is a conspiracy, unanimity was critical as a constitutional safeguard in this case where DANY used the Election Law conspiracy to elevate the misdemeanor business-record charges to felonies with corresponding increases in the penalties associated with those charges. *See* Tr. 4402-04.

[15] On July 9, 2024, the campaign-finance expert whose potential testimony the Court improperly restricted at trial explained during testimony before the House Judiciary Committee why it was "incorrect as a matter of law" to characterize Cohen's payment to Daniels as a campaign contribution. *Hearing on the Weaponization of the Federal Government Before the H. Comm. on the Judiciary*, 118th Cong. 7 (2024) (statement of Bradley A. Smith, Chairman, Institute for Free Speech), https://judiciary.house.gov/sites/evo-subsites/republicans-judiciary.house.gov/files/evo-media-document/Smith%20Testimony.pdf. Smith, a former FEC commissioner, also explained how DANY "abused" the campaign finance aspects of the trial, and he concluded that the resulting decisions "place in danger the entire enforcement scheme designed by Congress when it passed the FECA." *Id.* at 13.

49

Finally, DANY's embedded business-records theory was speculative and unsupported. There was no evidence whatsoever that anyone but Michael Cohen knew about the contents of the records he submitted to First Republic Bank in October 2016. Thus, there was no evidence to support the conclusion that the agreement at issue in the Election Law conspiracy predicate included an objective to use Cohen's business records as "unlawful means." Pecker testified that AMI's records were not false, and there was no evidence that he acted with the required intent to defraud. Tr. 1386, 4846 (jury instructions). Finally, as to the Form 1099s that the Trump Organization issued to Cohen, there was no evidence of a falsehood. *See* GX 93. The Form 1099s reflected "Nonemployee compensation" to Cohen and did not distinguish between income and reimbursement; it was incumbent upon Cohen to draw that distinction in his own tax filings. Tr. 2406-07. DANY intentionally avoided asking McConney any questions about the veracity of the representations in the documents, and instead invited counter-factual speculation from the jury that was not supported by the record. *See* Tr. 2364-65.

### 2. The Official-Acts Evidence Was Critical To DANY's Trial Presentation

Any harmless-error analysis would also have to account for the fact that the unconstitutional official-acts evidence was crucial to DANY's case-in-chief.

DANY sought to bolster Cohen and address the glaring holes in their case through the official-acts evidence. Perhaps most problematic was DANY's reliance on Hicks's testimony regarding 2018 conversations with President Trump to argue that President Trump was aware of Cohen's payment to Daniels at the time it was made. But that is not all. DANY presented Westerhout's testimony regarding the detail-oriented manner in which President Trump ran the country to argue falsely that details relating to their bogus charges could not have escaped him. DANY relied on President Trump's official-acts Tweets to the public in 2018 as purported

"consciousness of guilt" evidence to try to convince the jury that President Trump was seeking to coerce silence from star witnesses who were not credible.  DANY relied on the OGE Form 278e to try to corroborate Cohen's reimbursement-related testimony.

The prosecutor's own summation illustrates how important the unconstitutional official-acts evidence was to DANY's case. *Hardy*, 4 N.Y.3d at 199.  Mr. Steinglass referred to Hicks and Westerhout as examples of witnesses that provided "damaging," "utterly devastating" testimony that operated—in DANY's warped view—as "critical pieces of the puzzle."  Tr. 4598.  Mr. Steinglass specifically referred to Hicks, twice, and in one instance re-read a portion of her official-acts testimony to the jury.  Tr. 4747, 4806.  Mr. Steinglass also called attention to President Trump's "own Tweets" as important corroboration for Cohen's false narrative, Tr. 4621, and argued that President Trump used the posts to communicate directly with Cohen, Tr. 4756.  The summation included specific discussion of several of the official-acts Tweets, as well as President Trump's OGE Form 278e.  Tr. 4766, 4790.

### 3.  As A Matter Of Law, The Errors Had A Causal Effect On The Jury

Constitutional harmless error analysis requires consideration of "the causal effect the error may nevertheless have had on the jury." *Hamlin*, 71 N.Y.2d at 756.  The *Trump* Court identified specific and unacceptable risks arising from the extreme prejudicial impact that official-acts evidence would have on jurors.  Specifically, "[a]llowing prosecutors to ask or suggest that the jury probe official acts for which the President is immune would thus raise a unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Trump*, 2024 WL 3237603, at *20.  As was evident from jury selection, "Presidential acts frequently deal with matters likely to arouse the most intense feelings." *Id.* (cleaned up).  The unique risks of prejudice arising from the presentation of official-acts evidence

make it even clearer that the jury's verdicts could not withstand constitutional harmless error analysis.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Indictment and vacate the jury's verdicts based on violations of the Presidential immunity doctrine and the Supremacy Clause.

Dated:      July 10, 2024
             New York, N.Y.

By: /s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, NY 10005
212-716-1250
toddblanche@blanchelaw.com

*Attorneys for President Donald J. Trump*