# EXHIBIT W

PART 59   JUL 2 5 2024

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART 59

THE PEOPLE OF THE STATE OF NEW YORK

-against-

DONALD J. TRUMP,

                Defendant.

Ind. No. 71543-23

**PEOPLE'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANT'S POST-TRIAL MOTION**

TABLE OF CONTENTS

Page

TABLE OF CONTENTS...........................................................................................................i

INTRODUCTION ...............................................................................................................1

BACKGROUND ................................................................................................................2

    I. The federal removal proceeding. .................................................................................. 2

    II. This Court's rejection of defendant's untimely pretrial preclusion motion................... 3

    III. Defendant's limited objections at trial. ...................................................................... 4

    IV. The Supreme Court's decision in *Trump v. United States*............................................ 6

    V. Defendant's motion to vacate under CPL § 330.30 ...................................................... 8

ARGUMENT....................................................................................................................8

    I. Defendant's arguments based on official-acts immunity are largely
       unpreserved. .......................................................................................................... 9

    II. The challenged evidence is not required to be precluded under
       *Trump v. United States* ........................................................................................ 12

          A. Defendant's Tweets.................................................................................. 13

          B. Hope Hicks's testimony. ........................................................................... 20

          C. The Office of Government Ethics form. ........................................................ 25

          D. Madeleine Westerhout's testimony............................................................. 26

          E. Cohen's testimony about the FEC investigations............................................ 29

          F. Cohen's testimony about investigations by Congress and prosecutors. ........... 32

    III. Any error in admitting official-acts evidence was harmless. ...................................... 34

          A. The erroneous admission of official-acts evidence is subject to
            harmless-error review. ................................................................................ 34

          B. If official-acts evidence was erroneously admitted at trial, the
            error was harmless in light of the overwhelming evidence of
            defendant's guilt....................................................................................... 38

1. Defendant made or caused false entries in the business
   records of an enterprise. ........................................................................ 39

2. Defendant acted with intent to defraud which included an
   intent to commit or conceal the commission of another crime. ............ 45

C. Defendant's description of the trial record is wrong on the facts and the law. 52

1. The Court should reject defendant's mischaracterizations
   of the trial record. ................................................................................ 52

2. The Court should reject defendant's belated arguments
   regarding legal error .............................................................................. 58

IV. Defendant's challenge to the sufficiency of the indictment is unpreserved
and meritless .................................................................................................... 60

A. Defendant failed to preserve his challenge to the admission of
   purported official-acts evidence in the grand jury. ........................................ 60

B. None of the cited grand jury evidence should be precluded. .......................... 61

C. Even excluding all of the evidence defendant belatedly identifies
   as immune, the grand jury record is easily sufficient to support
   the indictment .................................................................................................. 62

## INTRODUCTION

This Court should reject defendant's request to vacate his conviction and dismiss the indictment on the basis of the Supreme Court's recent ruling on presidential immunity. *Trump v. United States*, 144 S. Ct. 2312 (2024). Contrary to defendant's arguments, that decision has no bearing on this prosecution and would not support vacatur of the jury's unanimous verdict (let alone dismissal of the indictment) even if its reasoning did apply here.

At issue in the Supreme Court's decision was whether defendant could be federally prosecuted "for conduct alleged to involve official acts during his tenure in office." *Id.* at 2324. The criminal charges here, by contrast, exclusively stem from defendant's "unofficial acts"— conduct for which "there is no immunity." *Id.* at 2332. Although the Supreme Court also restricted the consideration of certain evidence of official conduct for which the President is immune, that ancillary holding is also inapplicable here. For one thing, defendant failed to preserve an objection on immunity grounds to most of the evidence that is the subject of his current motion. And, in any event, all of the evidence that he complains of either concerned wholly unofficial conduct or, at most, official conduct for which any presumption of immunity has been rebutted.

The Supreme Court's recent ruling thus has nothing to say about defendant's conviction. But even if that decision required the exclusion of all of the evidence that defendant cites here, there would still need be no basis for disturbing the verdict because of the other overwhelming evidence of defendant's guilt. For all the pages that defendant devotes to his current motion, the evidence that he claims is affected by the Supreme Court's ruling constitutes only a sliver of the mountains of testimony and documentary proof that the jury considered in finding him guilty of all 34 felony charges beyond a reasonable doubt. Under these circumstances, there is no basis for disturbing the jury's verdict, and defendant's motion should be denied.

## BACKGROUND

On March 30, 2023, a New York County grand jury filed an Indictment charging defendant with 34 counts of Falsifying Business Records in the First Degree (Penal Law § 175.10). As this Court is aware, the People alleged that defendant falsified business records to conceal an illegal scheme to suppress negative information about defendant before the 2016 presidential election. The business records that formed the basis for the charges fraudulently stated that certain payments that defendant made after the election to his personal attorney Michael Cohen were for legal expenses pursuant to a retainer, when in fact they were to reimburse Cohen for hush-money payments Cohen paid before the election as part of the criminal conspiracy to corrupt the election. On May 30, 2024, a jury unanimously found defendant guilty as charged.

The following background briefly recounts certain information relevant to defendant's current motion under CPL § 330.30.

## I.    The federal removal proceeding.

On May 4, 2023, defendant removed this criminal action to federal court under 28 U.S.C. § 1442(a)(1). Under that provision, a state criminal prosecution against a federal officer may be removed to federal court if the charges against the federal officer are "for or relating to any act under color of such office." A defendant seeking federal-officer removal must also identify a "colorable federal defense" to the state-court charges. *Mesa v. California*, 489 U.S. 121, 129 (1989). The federal district court held an evidentiary hearing on June 27, 2023. The court issued a decision remanding the matter to this Court on July 19, 2023. *See New York v. Trump*, 683 F. Supp. 3d 334, 342 (S.D.N.Y. 2023).

As relevant here, the district court rejected defendant's claim that the charges were for or related to any action he took under color of federal office. Referring to the reimbursement payments to Cohen, the court held that "[t]he evidence overwhelmingly suggests that the matter

was a purely a personal item of the President—a cover-up of an embarrassing event. Hush money paid to an adult film star is not related to a President's official acts. It does not reflect in any way the color of the President's official duties." *Id.* at 345. The district court found that Cohen had been hired to handle "private matters" and was paid with "private funds," which were recorded through the documents of a "private enterprise." *Id.* Hiring Cohen to manage defendant's "private matters," the court noted, constituted a "private act," not an official duty. *Id.*

The district court also found that defendant had not identified any colorable federal defense to the charges, including on the basis of presidential immunity. *See id.* at 346-50. Defendant had earlier conceded that he was not raising a claim of "absolute presidential immunity against criminal liability." Def.'s Mem. of Law in Opp. to Remand at 21, *New York v. Trump*, No. 23 Civ. 3773 (S.D.N.Y. June 15, 2023), ECF No. 34. Instead, defendant claimed to have a colorable Supremacy Clause defense because he allegedly made the payments to Cohen as part of a purportedly official responsibility to separate his personal and business affairs. *See id.* at 21-25. The district court rejected this claim, holding that "[r]eimbursing Cohen for advancing hush money to Stephanie Clifford cannot be considered the performance of a constitutional duty," and "[f]alsifying business records to hide such reimbursement, and to transform the reimbursement into a business expense for [defendant] and income to Cohen, likewise does not relate to a presidential duty." *Trump*, 683 F. Supp. 3d at 347.

Defendant filed a notice of appeal challenging the district court's decision, but he withdrew that appeal on November 15, 2023. *See People v. Trump*, No. 23-1085, 2023 WL 9380793 (2d Cir. 2023).

## II.    This Court's rejection of defendant's untimely pretrial preclusion motion.

On June 23, 2023, this Court set a schedule requiring defendant to file his omnibus motions on or before September 29, 2023. Defendant timely filed his omnibus motions and asserted a

variety of challenges to the charges against him; he did not, however, raise any challenge based on presidential immunity. By contrast, one week later on October 5, 2023, defendant moved to dismiss the federal charges against him in the District of Columbia based on presidential immunity. *See* Mot. to Dismiss Indictment Based on Presidential Immunity, *United States v. Trump*, No. 23-cr-00257 (D.D.C. Oct. 5, 2023), ECF No. 74.

On December 21, 2023, the Court established a briefing schedule that required the parties to submit their respective pretrial motions *in limine* on February 22, 2024. Defendant timely filed motions *in limine*; he did not seek to preclude evidence of his official acts on immunity grounds.

Two weeks after the deadline for *in limine* motions, on March 7, 2024, defendant filed a motion to delay trial and to preclude the admission of evidence of his official acts as President. *See* Def.'s Mot. to Preclude Evidence & for an Adjournment Based on Presidential Immunity (Mar. 7, 2024). The People opposed the motion, arguing that there was no basis to preclude such evidence; alternatively, the People argued that the motion was untimely and that the Court should "defer any determination on the admissibility of this evidence until trial." People's Opp. to Def.'s Mot. to Exclude Evidence at 4, 9-12 (Mar. 13, 2024). On April 3, 2024, this Court found defendant's request untimely. *See* Decision & Order at 3 (Apr. 3, 2024). The Court expressly declined to "consider whether the doctrine of presidential immunity precludes the introduction of evidence of purported official presidential acts in a criminal proceeding." *Id.* at 6.

III.    **Defendant's limited objections at trial.**

On the first day of trial, pursuant to the Court's *in limine* ruling, the People made an offer of proof regarding the evidence they intended to present about a pressure campaign in 2018 to dissuade Cohen from cooperating with investigations into the payments to McDougal and Stormy Daniels. *See* Decision & Order on People's In Limine Mots. at 12-13 (Mar. 18, 2024); Tr. 41:1-58:14. The People explained that evidence of the pressure campaign would include Tweets from

defendant, as well as phone calls and emails that Cohen would describe in his testimony. *See* Tr. 41:10-46:21. The People argued that this evidence was relevant for three reasons: to explain why Cohen "continued to lie for [defendant] as long as he did"; to establish the personal costs to Cohen of cooperating by documenting the "attack[s] [on] his livelihood"; and to show defendant's consciousness of guilt. Tr. 46:12-14.

Defense counsel opposed the application, noting that they anticipated "putting in a submission soon about the evidentiary admissibility of the Tweets while President Trump was President and in the White House because of presidential immunity." Tr. 53:6-9. As to the pressure campaign more generally, defense counsel argued that it was relevant only to Cohen's credibility and should be permitted, if at all, only on redirect if the defense opened the door during cross-examination by attacking Cohen's credibility in a way that evidence of the pressure campaign would rebut. *See* Tr. 54:16-55:4. The Court precluded the evidence, but explained that it would reconsider that ruling if the defense opened the door by attacking Cohen's credibility in a relevant way. Tr. 57:22-58:14.

Later that night, at 11:07 PM, defendant submitted a letter seeking to preclude the admission at trial of evidence of his official acts. *See* Def.'s Ltr. to Hon. Juan M. Merchan (Apr. 15, 2024). The People responded the next day, urging the Court to adhere to its earlier procedural ruling and to "reserve judgment on defendant's evidentiary objection until trial." People's Ltr. to Hon. Juan M. Merchan (Apr. 16, 2024). The Court denied the request during proceedings on April 19, 2024, stating that "[w]e are going to wait until trial and you can make your objections at that time. Both of you have already made your arguments in the letters, so the Court will decide it at the time of trial when the objection is made." Tr. 802:15-19.

On April 30, 2024, the People renewed their request to admit evidence of the pressure campaign, arguing that the defense had opened the door to that testimony during their opening statement. Tr. 1652:25-1655:13. The Court agreed that the defense had opened the door to evidence of the pressure campaign; however, it ruled that the evidence could be introduced only to show its effect on Cohen's actions, not to show defendant's consciousness of guilt. Tr. 1661:23-1662:12.

As trial proceeded, defendant objected twice to the admission of evidence regarding defendant's purportedly official acts as President. Specifically, on May 3, 2024, before Hope Hicks took the stand, defense counsel requested a sidebar to "put on the record our objection on Presidential immunity grounds" to testimony from Hicks "related to statements by [defendant] while he was President of the United States." Tr. 2121:10-13. The Court overruled the objection. Tr. 2122:13-15. Then, on May 6, 2024, counsel objected to the admission of an Office of Government Ethics ("OGE") Form 278e that defendant submitted in 2018, arguing that he signed the document "as President of the United States" making it "an official act that should not come into evidence." Tr. 2369:21-2370:1. The Court overruled that objection as well. Tr. 2371:7-12.

Defendant did not raise any objection based on his purportedly official acts to the testimony of Michael Cohen or Madeleine Westerhout, *see generally* Tr. 3258-4203 (Cohen), Tr. 2972-3125 (Westerhout); nor did he raise any such objection to the admission of four statements posted to his Twitter account while he was President, *see* Tr. 3168:1-9 (admission into evidence of People's 407-F, 407-G, 407-H, and 407-I).

**IV.    The Supreme Court's decision in *Trump v. United States*.**

On July 1, 2024, the U.S. Supreme Court issued its decision in *Trump v. United States*, 144 S. Ct. 2312 (2024). That case involved federal criminal charges against defendant arising from his role in the January 6, 2021 attack on the U.S. Capitol that occurred while defendant was serving

as President. In that federal prosecution, defendant claimed that he was immune from federal prosecution for the charges in the indictment. The lower courts rejected that claim, but the Supreme Court disagreed in part and remanded the case to the district court for further proceedings consistent with its opinion. *See id.* at 2332-33, 2347.

The Court explained that the scope of a President's immunity from criminal prosecution depended on whether his acts while in office were official or unofficial. "As for a President's unofficial acts, there is no immunity," even if he committed those acts while serving as President. *Id.* at 2332; *see also id.* at 2326. For official acts, the Court distinguished between two categories. First, the President is absolutely immune for conduct "within his exclusive sphere of constitutional authority." *Id.* at 2328. This narrow category of absolute immunity applies only to actions taken pursuant to the President's "conclusive and preclusive" constitutional authority—that is, authority that neither Congress nor the courts have the authority to supervise, such as the President's power to grant reprieves and pardons, to recognize foreign countries, or to remove executive officers. *Id.* Second, the President is presumptively immune for all other official acts taken within the "outer perimeter of his official responsibility." *Id.* at 2331. But that presumption of immunity may be rebutted if a prosecutor can show that "applying a criminal prohibition to that act would pose no 'dangers of intrusion on the authority and functions of the Executive Branch.'" *Id.* at 2331-32 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982)).

In addition to holding that the President may not be directly prosecuted for certain official acts committed during his Presidency, the Court also limited the use of evidence of "official conduct for which the President is immune," "even on charges that purport to be based only on his unofficial conduct." *Id.* at 2341. In the Court's view, admitting such evidence would "heighten the prospect that the President's official decision-making will be distorted" by inviting the jury "to

examine acts for which a President is immune." *Id.* at 2340-41. But the Court made clear that "of course" not all evidence related to an official presidential act was subject to preclusion. *Id.* at 2341 n.3. In particular, a "prosecutor may point to the public record to show the fact that the President performed the official act"; a prosecutor may not, however, "admit testimony or private records of the President or his advisers probing the official act itself." *Id.*

## V.    Defendant's motion to vacate under CPL § 330.30

On July 10, 2024, defendant moved to vacate his conviction under CPL § 330.30(1) based on the allegedly improper admission of certain evidence at trial that he claimed concerned official acts for which he enjoyed presidential immunity. Defendant identified six categories of such evidence. *See* Def.'s Post-Trial Presidential Immunity Mot. ("Def.'s Mem.") 9-16, 26-40. Specifically, defendant objected to the admission of: (1) testimony from Hope Hicks about events that occurred while she was the White House Communications Director; (2) testimony from Madeleine Westerhout about office process and procedures when she worked in the White House; (3) four Tweets posted to defendant's personal Twitter account; (4) testimony from Cohen about why he lied to Congress; (5) testimony from Cohen about conversations he had with other third parties about Federal Election Commission ("FEC") investigations; and (6) defendant's OGE Form 278e. *See id.* at 9-16.

## ARGUMENT

CPL § 330.30(1) authorizes a trial court to set aside a guilty verdict based on "[a]ny ground appearing in the record which, if raised upon an appeal from a prospective judgment of conviction, would require a reversal or modification of the judgment as a matter of law by an appellate court." A trial court may not set aside a verdict based on an alleged error that was not properly preserved at trial. *See, e.g., People v. Everson*, 100 N.Y.2d 609, 610 (2003); *People v. Sudol*, 89 A.D.3d 499,

8

499-500 (1st Dep't 2011); *see also People v. Padro*, 75 N.Y.2d 820, 821 (1990) (making a CPL § 330.30 motion "is not, by itself, ordinarily sufficient to preserve a 'question of law'").

Under these standards, defendant's motion should be denied. Defendant failed to preserve any immunity-based objection to most of the evidence that is the subject of his current motion. His arguments are meritless in any event, since the evidence at issue either concerned unofficial conduct that is not subject to any immunity, or is a matter of public record that is not subject to preclusion. And even if some of this evidence were improperly admitted, any error was harmless in light of other overwhelming evidence of defendant's guilt. Finally, defendant's unpreserved challenge to the grand jury proceeding is beyond this Court's review and fails in any event under the highly deferential standard for reviewing such proceedings.

## I. Defendant's arguments based on official-acts immunity are largely unpreserved.

A trial court "may only grant a CPL § 330.30(1) motion where the error alleged has been preserved by a proper objection at trial." *Sudol*, 89 A.D.3d at 499-500. Defendant's evidentiary arguments based on official-acts immunity are largely unpreserved. Specifically, defendant raised immunity objections to only two of the six categories of evidence that are the basis of his current motion: Hicks's testimony about "statements by [defendant] while he was President of the United States," Tr. 2121:10-13; and the admission of defendant's 2018 OGE Form 278e, *see* Tr. 2369:21-2370:1. Defendant raised no immunity objection to any of the other categories of evidence, or to other testimony by Hicks. This other evidence accordingly provides no basis to set aside the verdict under CPL § 330.30(1).

Before trial, defendant twice sought an advance ruling on the admissibility of evidence of his purportedly official acts based on presidential immunity. *See* Def.'s Mot. to Preclude Evidence & for an Adjournment Based on Presidential Immunity (Mar. 7, 2024); Def.'s Ltr. to Hon. Juan M. Merchan (Apr. 15, 2024). This Court denied both requests as untimely, but instructed defendant

to "wait until trial" to "make [his] objections" and informed him that the Court would "decide [the issue] at the time of trial when the objection is made," Tr. 802:15-19; *see also* Decision & Order 3-5 (Apr. 3, 2024). During trial, defendant raised an objection based on official-acts immunity only twice. First, prior to Hope Hicks's testimony, defendant raised an "objection on Presidential immunity grounds" to "testimony from Ms. Hicks related to statements by [defendant] while he was President of the United States." Tr. 2121:10-13. Second, when the People sought to introduce defendant's OGE Form 278e (People's 81), defendant objected that this document reflected "an official act that should not come into evidence at the trial." Tr. 2369:21-2370:1. This Court overruled those objections.

By contrast, defendant raised no objection based on official-acts immunity to the balance of the evidence he now claims was erroneously admitted. For Westerhout, defendant never raised any objections in pretrial motions; and during her trial testimony, the defense raised only a single general objection to a question about whether Westerhout thought it was "unusual" for defendant to send only one personal message to Allen Weisselberg in 2017—a subject that had nothing to do with any conceivable official act by defendant. Tr. 3009:23-24. During Michael Cohen's testimony, the defense raised several objections, but none of them was based on the current theory that Cohen could not testify about defendant's purportedly official acts. Indeed, as to one of the categories of Cohen testimony at issue in the motion—namely, Cohen's testimony about the FEC investigations—defense counsel not only failed to object, but affirmatively *consented* to the admission of that evidence subject to a limiting instruction that had nothing to do with official-acts immunity. *See* Tr. 3510:19-22. With regard to defendant's social media posts on Twitter, *see* People's 407-F, 407-G, 407-H, and 407-I, the only objection that defense counsel raised was "the same objection as discussed last week," Tr. 3168:3-4—a reference to counsel's earlier hearsay and

10

foundation objections to the admission of other Tweets, *see* People's 407-A, 407-B, 407-C, 407-D, 407-E; Tr. 2106-2107 (May 3, 2024). Finally, while defendant now argues that "[a]ll of Hicks's testimony concerning events in 2018" was "categorically inadmissible," Def.'s Mem. 26, his objection at trial was limited only to Hicks's testimony about "statements by [defendant] while he was President of the United States." Tr. 2121:10-13.

The fact that the Supreme Court issued its decision in *Trump v. United States* after trial does not excuse defendant's failure to preserve an objection based on official-acts immunity. Just last year, the Court of Appeals confirmed that "preservation is essential . . . even if governing law was altered by an intervening Supreme Court decision" that "effect[s] a dramatic change" in the law, *People v. Cabrera*, 41 N.Y.3d 35, 45 (2023)—a reference, in that case, to the Supreme Court's fundamental reshaping of Second Amendment jurisprudence in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). Moreover, as in *Cabrera*, defendant's evidentiary objection here was "not foreclosed by binding precedent from [the Court of Appeals] or the U.S. Supreme Court at the time of trial," 41 N.Y.3d at 46; to the contrary, as the Supreme Court observed in *Trump*, the questions presented in that case were novel and "unprecedented," *Trump*, 144 S. Ct. at 2332. Finally, there was no conceivable excuse for defendant's failure to raise specific objections based on official-acts immunity to all of the categories of evidence that are the basis of his current motion. This Court specifically invited defendant to raise such an objection as appropriate during the trial, Tr. 802:15-16; and defendant in fact raised that objection twice.[1] Defendant's failure to raise a proper objection thus precludes this Court from considering any

---

[1] In addressing the applicability of harmless-error review, defendant quotes a decision that notes that both harmless error and preservation do not apply to so-called "mode of proceedings" errors. Defendant does not meaningfully develop that argument—either in the context of harmless error, or as an excuse for his failure to preserve—and the argument is meritless for the reasons we discuss in Part III.A below.

claim to vacate his conviction on a basis other than the admission of the OGE Form 278e (People's 81) and Hicks's testimony about defendant's statements while serving as President.

## II.    The challenged evidence is not required to be precluded under *Trump v. United States*.

The principal holding of *Trump v. United States* concerns the scope of a former President's immunity from criminal prosecution "for official acts taken during his Presidency." 144 S. Ct. at 2346-47. That holding has no bearing here because, as defendant does not dispute, the charges in this case all involve purely personal conduct, rather than official presidential acts. The U.S. District Court for the Southern District of New York—in addressing the closely related question of whether the charged conduct involved "any act under color of office" for purposes of federal-officer removal, 28 U.S.C. § 1442(a)(1)—rightly concluded that the conduct charged "was purely a personal item of the President—a cover-up of an embarrassing event. Hush money paid to an adult film star is not related to a President's official acts. It does not reflect in any way the color of the President's official duties." *Trump*, 683 F. Supp. 3d at 345. The principal immunity holding of *Trump v. United States* thus is wholly inapplicable here.[2]

Defendant does not contend otherwise. Instead, he relies exclusively on an ancillary holding in *Trump v. United States* that evidence about "official conduct for which the President is immune" may not be introduced at trial "even on charges that purport to be based only on his unofficial conduct." 144 S. Ct. at 2341. By its own terms, however, this newly announced rule applies only when evidence concerns "official acts for which the President is immune" from

_____

[2] Defendant also affirmatively waived reliance on presidential immunity as a defense to the criminal charges here in the federal removal proceeding, *see Trump*, 683 F. Supp. 3d at 346 ("Trump has expressly waived any argument premised on a theory of absolute presidential immunity."), and waived that defense again by failing to raise it in his omnibus motions in this proceeding, *see Carroll v. Trump*, 88 F.4th 418, 429-30 (2d Cir. 2023) (holding that defense of presidential immunity is a waivable defense).

criminal liability; there is no evidentiary bar with respect to unofficial acts by the President (such as the conduct that is the subject of the charges here). *Id.* As for official acts, *Trump v. United States* separated them into two distinct categories. The first, narrow category consists of acts by the President to carry out an explicit constitutional commitment of exclusive authority; for such conduct, the President has absolute immunity. *Id.* at 2327-28. The second category consists of all other acts that a President is authorized to commit; for such conduct, the President is entitled only to presumptive immunity, which can be rebutted by showing that "applying a criminal prohibition to that act would pose no dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 2331-32 (quotation marks omitted). Finally, even as to official acts for which the President is immune, "of course the prosecutor may point to the public record to show the fact that the President performed the official act." *Id.* at 2341 n.3.

In other words, under *Trump v. United States*, evidence about defendant's conduct during his Presidency may be properly admitted if *any* of the following is true: (a) the evidence concerns defendant's unofficial conduct; (b) the evidence concerns official conduct for which the presumption of immunity has been rebutted because reliance on such evidence in a criminal prosecution poses no risk of interference with presidential decision-making; or (c) the evidence consists of a public record of an official act. As explained further below, one or more of these factors applies to each of the categories of evidence that are the subject of defendant's current motion.

A.    **Defendant's Tweets.**

Defendant objects to the admission of four Tweets from his Twitter account. Def.'s Mem. 14-16; *see* People's 407-F, 407-G, 407-H, 407-I. Three Tweets reflected defendant's opinion about Cohen, his personal attorney (People's 407-F, 407-H, 407-I); the fourth contained defendant's observations about "a private contract between two parties," Cohen and Stormy Daniels (People's

407-G). Defendant's objection to the admission of these Tweets is wholly unpreserved (*see supra* Part I). His arguments fail in any event.

*First*, the subject matter of the Tweets consists solely of "unofficial acts" for which "there is no immunity." *Trump*, 144 S. Ct. at 2331. Defendant is wrong to claim that the recent Supreme Court decision would apply "absolute immunity with respect to these Tweets." Def.'s Mem. 33. To the contrary, the Supreme Court specifically recognized that defendant could make public statements—including Tweets—"in an unofficial capacity," such as if he spoke "as a candidate for office or party leader," rather than as the President exercising his Article II powers. *Id.* at 2340. In a closely related context, the U.S. Court of Appeals for the D.C. Circuit likewise rejected defendant's "sweeping" claim "that *all* of a President's speech on matters of public concern, as a categorical rule, is an exercise of official presidential responsibility." *Blassingame v. Trump*, 87 F.4th 1, 15 (D.C. Cir. 2023); *see also Trump*, 144 S. Ct. at 2333 (citing *Blassingame* as authority for distinguishing between official and unofficial conduct). Rather, the question is whether, in making any particular statement, defendant was "act[ing] in an unofficial, private capacity," or instead "carrying out the official duties of the presidency." *Blassingame*, 87 F.4th at 4.

Here, the four Tweets objected to by defendant were all issued in defendant's unofficial capacity. All four Tweets refer to Michael Cohen. The trial record establishes that Cohen was defendant's personal attorney at the time. Tr. 3494:23-3495:1, 3548:13-15, 3583:7-10 (Cohen). Defendant also admitted in the federal removal proceeding, and the district court found, that Cohen at the time was defendant's personal attorney: Cohen was hired "to attend to [defendant's] private matters"; he was "paid . . . from private funds" that "did not depend on any Presidential power for their authorization"; and the records concerning Cohen's work and reimbursements "were maintained by the Trump Organization, a private enterprise, in New York City, not in Washington,

D.C. as official records of the President." *Trump*, 683 F. Supp. 3d at 345. Defendant's Tweets conveying his personal opinion about his private attorney do not bear any conceivable relationship to any official duty of the Presidency.

One of the Tweets also provides defendant's opinion about—in his own words—"a private contract between two parties," namely Cohen and Daniels (People's 407-G). A "private contract" that was signed solely by two non-government officials and that was executed before defendant became President has nothing to do with any official act of the Presidency. Moreover, this "private contract" was an integral part of the hush-money payment scheme that is the subject of the criminal charges here. As the federal district court found, and defendant no longer contests, that entire scheme was "not related to a President's official acts" and did "not reflect in any way the color of the President's official duties." *Trump*, 683 F. Supp. 3d at 345. Defendant was thus "speak[ing] in an unofficial capacity," *Trump*, 144 S. Ct. at 2340, when he commented on a private contract between private individuals that was signed before his Presidency and that had no relationship to any official presidential duty.

The challenged Tweets bear no resemblance to the kinds of public comments that the Supreme Court indicated would qualify as official presidential conduct. Defendant did not "purport[ ] to discharge an official duty" in issuing the Tweets. *Lindke v. Freed*, 601 U.S. 187, 203 (2024). The Tweets did not seek to "persuade Americans" to pursue a pressing policy in the public interest, or respond to a public emergency or tragedy that required a national voice, or advance any particular initiative or public work, or touch on any of the "vast array of activities" of "American life" that Presidents may be expected to address. *Trump*, 144 S. Ct. at 2340; *Blassingame*, 87 F.4th at 15 (suggesting that President acts in official capacity when he "announces his intention to issue an executive order, eulogizes the fallen leader of an ally, or offers the nation's

condolences and support to a community reeling from a tragedy"). To the contrary, the Tweets reflected nothing more than defendant's personal opinion about private individuals or entirely unofficial conduct committed prior to his presidency.

*Second*, even assuming that the Tweets constitute official conduct, they at most give rise to a presumption of immunity that is easily rebutted here.[3] Defendant's assertion that irrebuttable "absolute immunity" applies here, Def.'s Mem. 33, is flatly inconsistent with the Supreme Court's recent decision. The Court described "most of a President's public communications" as being "within the outer perimeter of his official responsibilities," *Trump*, 144 S. Ct. at 2340—a characterization that gives rise only to "a *presumptive* immunity from criminal prosecution," not absolute immunity, *id.* at 2331. That presumption can be rebutted if consideration of these Tweets would not "pose any dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 2337.

There is no such danger here because the subject matter of the Tweets bore no relationship to any official duty of the Presidency. Defendant was not performing, or even describing, any official presidential act in conveying his personal opinions about his personal attorney and a private nondisclosure agreement entered into prior to his Presidency. Consideration of these Tweets thus

_____

[3] Contrary to defendant's claim, the People did not "waive" any opportunity to rebut the presumption of immunity. Def.'s Mem. 19. Because this Court denied defendant's immunity claims altogether, there was never any need for the People to make the type of rebuttal argument contemplated by the Supreme Court's intervening decision. Defendant claims that a waiver arose because the People "rush[ed] to trial over [defendant's] objection." *Id.* No such waiver rule exists. And defendant's claim about a "rush" to trial is factually inaccurate in any event. This Court set the original March 25, 2024 trial date at *defendant's* request. *See* Tr. of Arraignment 18 (Apr. 4, 2023) (requesting a Spring 2024 trial date). And the eventual start of trial on April 15, 2024 was 377 days after defendant's arraignment—slightly longer than the average time from arraignment to trial for white-collar cases in this Office over the past decade. (The average is 361 days from arraignment to trial for the 119 white-collar prosecutions in New York County between January 1, 2013 and February 28, 2020 and between January 1, 2022 and June 30, 2024. COVID-impacted cases are not included in this calculation.)

poses no danger of "distort[ing] Presidential decisionmaking," *id.* at 2331, because no Presidential

decisionmaking was involved. At most, future Presidents may be disinclined to express their

personal opinions about unofficial conduct if they believe such public statements may be used as

evidence in criminal proceedings. *See* Def.'s Mem. 37. But any such effect would not trigger the

concerns raised in *Trump v. United States*. The "justifying purposes" of presidential immunity "are

to ensure that the President can undertake his *constitutionally designated functions* effectively, free

from undue pressures or distortions." *Id.* at 2332 (emphasis added). When, as here, a President's

public statements are "not related to a President's official acts" at all, *Trump*, 683 F. Supp. 3d at 345,

then reliance on such acts as admissible evidence does not interfere with the performance of official

duties.

   *Third*, even if defendant's Tweets were official acts for which defendant would be immune,

they would still be admissible here because the People admitted nothing more than the "public

record" of those Tweets "to show the fact that the President performed the official act"—i.e., that

he made those statements on Twitter. *Trump*, 144 S. Ct. at 2341 n.3. As this Court rightly observed,

defendant "Tweeted out to millions of people voluntarily." Tr. 55:12-13. The admission of those

Tweets at trial did nothing more than give to the jury the same information that had been available

for years to the public; in particular, the People did not "admit testimony or private records of the

President or his advisers probing" the Tweets themselves. *Trump*, 144 S. Ct. at 2341 n.3. Nor was

the jury invited "to inspect the [defendant's] motivations," *id.*—to the contrary, this Court allowed

the Tweets to be introduced only to show their effect on Cohen's actions, not to show defendant's

consciousness of guilt. Tr. 1661:23-1662:12. Under the circumstances, there is no barrier to relying

on a public record of any official conduct that may have taken place through defendant's Tweets.

*Finally*, for three of the four challenged Tweets—People's 407-F, 407-H, and 407-I (as well as Cohen's testimony about his response to congressional investigations, see *infra*)— defendant also opened the door to that evidence and thus cannot complain about its admission now. This Court originally barred the People from presenting this evidence. In doing so, however, it warned defendant that impeaching Cohen about his decision to plead guilty to campaign finance and other charges would open the door to rebuttal evidence from the People about why Cohen ultimately pleaded guilty. *See* Tr. 57:22-58:14. As this Court later correctly found, and defense counsel "mostly concede[d]," defendant's opening statement squarely challenged Cohen's credibility on precisely that ground. *See* Tr. 1661:23-1662:12. It is well-settled that a defendant may open the door to the introduction of otherwise inadmissible evidence if the defendant has provided a characterization of the facts that would be "incomplete and misleading" without a full picture. N.Y. Evid. Rule 4.08(1); *see, e.g.*, *People v. Fardan*, 82 N.Y.2d 638, 641 (1993) (permitting *Sandoval* evidence); *People v. Goodson*, 57 N.Y.2d 828, 829-830 (1982) (permitting un-noticed statements by the defendant). As particularly relevant here, courts routinely rely upon this theory to allow the introduction of evidence that would otherwise be wholly privileged from disclosure. *See, e.g.*, *People v. Mendoza*, 240 A.D.2d 316, 316 (1st Dep't 1997) (attorney-client privilege); *People v. Williams*, 127 A.D.3d 1118, 1119 (2d Dep't 2015) (physician-patient privilege). The defense's strategic choice to attack Cohen's credibility thus supports the admission of the Tweets here even if they would otherwise be inadmissible.

Defendant's contrary arguments are unavailing. *First*, defendant argues that the Tweets were official presidential acts because he was necessarily "communicat[ing] with the American people regarding matters of public concern bearing on [his] credibility as the Commander in Chief." Def.'s Mem. 33-34. But the Supreme Court expressly declined to adopt a rule that would

effectively extend immunity to *all* of a President's statements to the public. To the contrary, the Court expressly held that a President can speak to the public in an unofficial capacity for which no immunity would attach at all. *See Trump*, 144 S. Ct. at 2340; *see also Blassingame*, 87 F.4th at 14. Defendant's sweeping position is thus inconsistent with the very decision that he relies upon.

*Second*, defendant asserts that these Tweets reflected his authority to "comment upon and criticize the conduct of federal prosecutors and regulators exercising Article II authority." Def.'s Mem. 35. But the Tweets say nothing of the sort. They are entirely silent about the federal criminal investigation of Cohen, and instead comment exclusively about Cohen's character and representation of defendant's personal matters. At most, one of the Tweets could be interpreted as implicitly criticizing Cohen for pleading guilty in federal court by comparing him unfavorably to defendant's former campaign manager (People's 407-I), but even that Tweet only describes Cohen's motivations rather than saying anything about the federal criminal proceeding leading up to his guilty plea.

*Third*, defendant cannot find support for his argument in either *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021), or *Lindke v. Freed*, 601 U.S. 187 (2024). *Knight* was vacated as moot by the Supreme Court. *See* 141 S. Ct. 1220.[4] And *Knight*'s reasoning was superseded by *Lindke*, which undercuts rather than supports defendant's position here. Contrary to defendant's categorical approach to a President's public statements,

_____

[4] Defendant's reliance on *Knight* for the proposition that his Twitter account was an official White House account also conflicts with the position that he took in that actual litigation. Indeed, while President, defendant vociferously opposed *Knight*'s holding and reasoning and asked the Supreme Court to reverse that decision on the ground that his "ability to use the features of his personal Twitter account, including the blocking function, are independent of his presidential office." Pet. for a Writ of Certiorari, *Trump v. Knight First Amend. Inst. at Columbia Univ.*, No. 20-197, 2020 WL 4905204, at *14 (Aug. 20, 2020).

*Lindke* squarely held that a public "official does not necessarily purport to exercise his authority simply by posting about a matter" on social media, and that a "fact-specific" analysis of an individual "post's content and function" determines whether an official is exercising official responsibilities or instead "engaging in private speech." 601 U.S. at 203; *see also id.* at 201 ("If the public employee does not use his speech in furtherance of his official responsibilities, he is speaking in his own voice."). Here, as explained, that fact-specific analysis demonstrates that defendant was acting unofficially in posting the Tweets at issue.

### B.    Hope Hicks's testimony.

Defendant next contends that "[a]ll of Hicks's testimony concerning events in 2018" was "categorically inadmissible" because she was "serving as the White House Communications Director" at the time. Def.'s Mem. 26. (Defendant thus raises no challenge to Hicks's extensive testimony about the campaign, including defendant's reaction to the Access Hollywood tape and defendant's public comments during the campaign and at campaign events. *See* Tr. 2146:11-2175:6.)

As discussed above, this argument is at least partially unpreserved because defendant raised an objection on immunity grounds only to Hicks's testimony about "statements by [defendant] while he was President of the United States." Tr. 2121:10-13. Defendant has thus failed to preserve any objection to Hicks's testimony about statements by individuals other than defendant—including Westerhout, Cohen, and journalists. *E.g.*, Tr. 2212:7-2217:10.

In any event, defendant's argument also fails on the merits. As a threshold matter, defendant is wrong to assert that Hicks's testimony categorically "concerned official acts based on core Article II authority for which [defendant] is entitled to absolute immunity" solely because she was acting as the White House Communications Director at the time. Def.'s Mem. 26. The Supreme Court rejected any such categorical approach to absolute immunity based on a

government official's role in its recent immunity decision. For example, the Court held that not all of a President's discussions with his Vice President would qualify as official conduct subject to absolute immunity. *See Trump*, 144 S. Ct. at 2336-37. Likewise, although the Court found that defendant was absolutely immune "for the alleged conduct involving his discussions with Justice Department officials," including the Attorney General, that ruling did not turn on those officials' governmental role alone, but relied as well on the Court's finding that the subject matter of their discussion was the potential exercise of the President's "conclusive and preclusive authority" to investigate and prosecute crimes. *Id.* at 2334 (quotation marks omitted).

If even a President's discussions with a constitutional officer like the Vice President or a cabinet member like the Attorney General are not categorically entitled to absolute immunity, then the same must be true for an official like the White House Communications Director, who is neither mentioned in the Constitution nor formally appointed with the advice and consent of the Senate. Rather, whether immunity attaches at all to any particular discussion involving the Communications Director—and whether any immunity may be rebutted—requires a particularized and "fact specific" analysis of the nature and context of the discussion and the persons involved. *Id.* at 2339. And even assuming that the subject of any discussion is a planned communication to the public (which is not true for the testimony here, as explained below), that analysis may still conclude that the Communications Director engaged in unofficial conduct; after all, if the President can communicate to the public "in an unofficial capacity," *id.* at 2340, then White House personnel who help to facilitate such unofficial communications must necessarily be acting in an unofficial capacity as well.

Here, for a number of reasons, Hicks's testimony was admissible under the Supreme Court's recent ruling. *First*, there was no bar to Hicks's testimony about individuals other than

21

defendant because that testimony simply did not concern "[t]he *President's* immune conduct." *Id.*
at 2341 (emphasis added). For example, Hicks testified about communications with reporters
"describing a story they planned to publish" about Stormy Daniels, Tr. 2215:17-23; and a
conversation with Michael Cohen where he told her that the report "wasn't true" and that "no
payment had been made," Tr. 2217:4-5. Hicks also testified about her own impressions of Cohen.
Tr. 2220:9-22. None of this testimony is affected by the Supreme Court's newly announced rule
concerning the admission of evidence of "official conduct for which the President is immune,"
*Trump*, 144 S. Ct. at 2341, because none of it describes the President's conduct at all, official or
otherwise.

 *Second*, even as to Hicks's testimony about her discussions with defendant in 2018, all of
those discussions related solely to unofficial conduct. The only testimony elicited by the People
concerned discussions between defendant and Hicks about the hush-money scheme that was then
being reported in the press. Tr. 2214:25-2215:3, 2217:11-20, 2218:22-2221:13. But as explained
above, that scheme was entirely personal and largely committed before the election, and it had no
relationship whatsoever to any official duty of the presidency. A President's discussions about a
purely private matter, even with a White House advisor, do not constitute "official acts for which
the President is immune," *Trump*, 144 S. Ct. at 2341, because neither the internal discussions nor
the subject matter has any "connection with the general matters committed by law to his control
or supervision," *Blassingame*, 87 F.4th at 13 (quotation marks omitted).

 Defendant's contrary argument depends on his assertion that Hicks testified about his
efforts "to communicate with the media and the public" about the hush-money scheme. Def.'s
Mem. 28. But that claim is entirely unsupported by the factual record, since Hicks did not in fact
testify about any such specific public-facing conduct by defendant. For example, when asked

"what did you discuss with Mr. Trump" about the new stories coming out, Hicks responded only, "Just how to respond to the story, how he would like a team to respond to the story," without any particulars about public communications that defendant did or did not direct. Tr. 2217:14-16. Hicks also testified about a conversation that defendant described himself having with Cohen, in which Cohen told defendant that he made the payment to Stormy Daniels "out of the kindness of his heart"; and about defendant's statement to her that "it was better to be dealing with [the scandal] now, and that it would have been bad to have that story come out before the election." Tr. 2219:25-2221:12. But there is nothing in Hicks's testimony—or elsewhere in the trial record—that these statements from defendant were about how to "communicate with the media and the public," Def.'s Mem. 28; rather, Hicks described them as private conversations between herself and defendant unconnected to any public statement to "the American people," *Trump*, 144 S. Ct. at 2333. The private and unofficial nature of this conversation is reinforced by the fact that defendant's reference to the period "before the election" appears to be invoking Hicks's prior role as the Press Secretary for defendant's campaign, Tr. 2136-2137, 2146-2150—thus discussing with Hicks a period of time when both were necessarily engaged in unofficial conduct.

In any event, even assuming that Hicks's testimony was about defendant's efforts to speak to the public about the hush-money scheme, that testimony would still be about defendant's unofficial conduct because, as previously explained, a President can "speak[] in an unofficial capacity." *Id.* at 2340. Here, for the reasons given above about the Tweets, any public communication that defendant may have given about the hush-money scheme would concern a subject matter that was "not related to a President's official acts" and did "not reflect in any way the color of the President's official duties." *Trump*, 683 F. Supp. 3d at 345. As the Supreme Court has observed, "Presidents . . . face a variety of demands on their time, . . . some private, some

political, and some as a result of official duty." *Clinton v. Jones*, 520 U.S. 681, 705 n.40 (1997). To the extent that Hicks and defendant were in fact discussing a potential public statement, the unofficial nature of any such statement would be further established by its unofficial subject matter. *See Thompson v. Trump*, 590 F. Supp. 3d 46, 80 (D.D.C. 2022) (President speaks unofficially if, for example, he "falsely and with malice accuses a political opponent . . . of running a child-trafficking operation"), *aff'd sub nom. Blassingame*, 87 F.4th 1.

*Third*, even assuming that Hicks's testimony concerned official acts by the President, any presumption of immunity would be rebutted here because there is no danger that consideration of this testimony would interfere with the authority and functions of the Executive Branch. *Trump*, 144 S. Ct. at 2337. Defendant makes the sweeping claim that a President must be able to discuss *any* subject confidentially with his White House Communications Director. Def.'s Mem. 29-30. But that argument goes too far—the Supreme Court's recent decision instead sought to protect only "the President's official decisionmaking." *Trump*, 144 S. Ct. at 2341. There is no risk of interference with such official decision-making when, as here, the President's discussions with his Communications Director concern a purely private matter, and when the testimony did not describe any discussions about official acts to be done in response to the private matter.

Defendant is wrong to suggest (*see* Def.'s Mem. 28-29), that Hicks's testimony must be precluded because *Clinton v. Jones*, 520 U.S. 681 (1997), held that a President engages in official conduct when he directs White House officials to make public statements about a private sexual affair. In fact, the courts in the *Clinton* case expressly declined to resolve that issue altogether: the U.S. Court of Appeals for the Eighth Circuit found unpreserved any argument about whether "actions alleged to have been taken by [Clinton's] presidential press secretary while [Clinton] was President . . . fall inside the outer perimeter of the President's official responsibility," *Jones v.*

*Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996); and the Supreme Court similarly refused to address the issue, *see Clinton*, 520 U.S. at 686 n.3. Contrary to defendant's assertion here (Def.'s Mem. 29), *Trump v. United States* did not "resolve[]" the issue. Instead, the Court only generally recognized that a President may act in an official capacity by making public statements that "encourage" other people "to act in a manner that promotes the President's view of the public good." *Trump*, 144 S. Ct. at 2338. But the Court did not hold that public messaging by the President and White House officials about purely unofficial conduct always constitutes an official presidential act subject to immunity.

      **C.**     **The Office of Government Ethics form.**

      Defendant incorrectly objects to the admission of the 2018 OGE Form 278e (People's 81) on the ground that his completion of that form constituted an official presidential act entitled to immunity. Def.'s Mem. 40. But the obligation to file this OGE form is not limited to Presidents; it applies to other officials and even to political candidates for federal office. *See* 5 U.S.C. § 13103(b)-(c), (f). Moreover, the information disclosed on the OGE form consists of the official's or candidate's private finances, which are necessarily separate from any official acts. *See id.* § 13104; *see generally* People's 81.

      Even assuming that the OGE form nonetheless reflects official conduct, the form here would be a quintessential "public record to show the fact that the President performed the official act." *Trump*, 144 S. Ct. at 2341 n.3. Moreover, in admitting the form, the People did not rely on "testimony or private records of the President or his advisers probing the official act itself." *Id.* To the contrary, the form was admitted through the testimony of Jeffrey McConney, a Trump Organization employee (not a government official), who prepared the form for defendant in his capacity as a private employee and stored it in the records of the Trump Organization. Tr. 2366:21-2369:13. And McConney's testimony consisted largely of a description of the content from the

face of the form, Tr. 2371:15-2376:9, not any commentary about defendant's "motivations." *Trump*, 144 S. Ct. at 2341 n.3. This form thus fits squarely within the type of public-record evidence that the Supreme Court has expressly allowed.

Defendant contends otherwise based on his assertion that the OGE form constituted an official act of "speaking to . . . the American people." Def.'s Mem. 40. Defendant did not preserve any such claim at trial.[5] It is patently meritless in any event. There is no evidence whatsoever in the trial record that defendant completed the OGE form in an effort to communicate with the public at large. And although the OGE is statutorily required to make filings publicly available, *see* 5 U.S.C. § 13107(a); *see also id.* §§ 13101(18)(D), 13122(b)(1), there is a night-and-day difference between a President merely filing a form with a government agency, and a President using the power of "the office's 'bully pulpit' to persuade Americans . . . in ways that the President believes would advance the public interest." *Trump*, 144 S. Ct. at 2340.

**D.    Madeleine Westerhout's testimony.**

Defendant objects to testimony from Westerhout about a variety of "Presidential practices," such as White House procedures and defendant's work habits, Def.'s Mem. 11-12, which he claims reflect his "exercise of Article II authority in the Oval Office," *id.* at 31. This wholly unpreserved claim fails for several reasons.

*First*, much of Westerhout's testimony involved details about how she helped defendant handle his private affairs—unofficial conduct that is not subject to any claim of immunity. For example, Westerhout testified about working with Trump Organization personnel to handle

---

[5] Although defendant preserved an objection based on official-acts immunity to the admission of the OGE form, his argument at trial was that the form constituted an official presidential act because defendant "signed [it] in 2018 as President of the United States." Tr. 2369:23-24. Defendant's separate argument that the form represented defendant's effort to "speak[ ] to . . . the American people" was never raised during trial and is thus unpreserved.

defendant's "personal affairs." Tr. 3036:10-17. She testified that defendant handled his personal expenses by check, and that she received FedEx deliveries from the Trump Organization containing personal checks for him to sign. *See* Tr. 3010:15-3013:3. Westerhout testified about specific instances in which she worked with Rhona Graff and other Trump Organization employees to handle personal matters for defendant, such as to generate a list of the personal contacts defendant frequently called, *see* Tr. 2995:20-3002:7, to suspend defendant's membership at the Winged Foot Golf Club, *see* Tr. 3016:9-3019:5, and to purchase a Tiffany's frame he requested, Tr. 3019:9-3021:16. None of this testimony had anything to do with official presidential acts or duties and thus does not raise any concerns about admitting "evidence concerning the President's official acts." *Trump*, 144 S. Ct. at 2340.

*Second*, Westerhout also testified about basic work habits like the process by which calls were "patched through," Tr. 2987:18; where defendant preferred to work, Tr. 2989:3-5; and how he composed Tweets, Tr. 2991:19-2992:24. Some of this testimony did not involve a description of defendant's conduct at all and thus triggers no concerns about official-acts immunity. For example, her description of the "rather complicated process" for making phone calls to the Oval Office described the work of "operators" who received and directed calls, including to and from "the situation room." Tr. 2987:19-2988:10. That testimony describes no conduct by the President, let alone "official conduct for which the President is immune." *Trump*, 144 S. Ct. at 2341.

Westerhout's general descriptions of defendant's work practices also do not trigger any concerns about official-acts immunity because she provided no testimony about any particular official act of the President, let alone any specific "exercise of Article II authority in the Oval Office." Def.'s Mem. 31. Such testimony about general practice is not subject to the evidentiary bar announced in *Trump v. United States*. The purpose of presidential immunity is to prevent

"diversion of the President's attention during the decisionmaking process caused by needless worry as to the possibility of [criminal liability] stemming from any particular official decision." *Trump*, 144 S. Ct. at 2329 (quoting *Clinton*, 520 U.S. at 694 n.19). But Westerhout did not testify as to "any particular official decision," and it is difficult to imagine criminal liability stemming from general work practices. *Id.* If criminal liability is unavailable, then immunity is also unnecessary. Westerhout's testimony thus does not concern any particular "official conduct for which the President is immune." *Trump*, 144 S. Ct. at 2340.

Defendant's claims to the contrary vastly exaggerate Westerhout's testimony. For example, Westerhout was asked whether defendant had a system for organizing papers in "the dining room" ("a room off the side of the Oval Office"); she responded by saying, "To my understanding, the President knew where things were and he kept it organized. But he did have a lot of papers and often brought things back and forth to his residence or Air Force One or Marine One." Tr. 2989:6-14. From this solitary and unsolicited reference to the President's methods of air transportation, defendant claims that Westerhout testified about defendant's "practices with respect to Air Force One, Marine One" and that she observed him "exercising his Article II authority," Def.'s Mem. 32, but in fact she said nothing of the sort.

*Third*, even if Westerhout's testimony about defendant's general work practices described official conduct for which the President would be presumptively immune, that presumption would be rebutted here. The purpose of this testimony was to lay a foundation for establishing that defendant received personal papers directed to his attention. But what mattered was only the fact that defendant received the personal papers, not the specific manner in which he did so. In other words, nothing in this case turned on the precise manner in which defendant received and handled his personal papers, so long as he in fact did receive and handle them—which presumably every

President does. Given that the specifics of defendant's work practices did not have any direct bearing on his criminal liability for unofficial conduct, the introduction of evidence about those general practices is unlikely to influence any decision that he (or a future President) makes.

  E. **Cohen's testimony about the FEC investigations.**

  Defendant objects to two pieces of evidence regarding Cohen's responses to FEC investigations into whether the hush-money payments to McDougal and Daniels violated campaign finance laws. First, the People presented a text message from Cohen to a New York Times reporter stating that defendant had "approve[d]" Cohen's written response to an FEC civil complaint related to the Stormy Daniels payment (People's 260), and a text message from Jay Sekulow (whom defendant concedes was a "private attorney," Def.'s Mem. 38) to Cohen reporting that defendant was grateful for the statement that Cohen had issued. *See* Tr. 3566:10-3567:25, 3573:1-3574:19 (Cohen); People's 217. Second, Cohen testified that he had told Pecker that defendant had told him that the FEC investigation of AMI was "going to be taken care of" by then-Attorney General Jeff Sessions. Tr. 3575:13-3578:11.

  Neither piece of testimony involved an official act to which presidential immunity attaches. For one, each of the FEC investigations at issue arose out of conduct that defendant concedes was entirely personal and that involved no official act—i.e., the pre-election hush-money payments to McDougal and Daniels to suppress their stories before the election. *See* Tr. 1262:11-1264:4, 1460:20-1464:7 (Pecker); Tr. 3564:3-3565:25 (Cohen). Moreover, aside from defendant, all of the relevant actors mentioned in this evidence—Cohen, Sekulow, and Pecker—were not acting in any official capacity; indeed, Cohen was acting as defendant's personal attorney at the time specifically so he could act independently from defendant's official presidential duties. *See* Tr. 3494:23-3495:1, 3548:13-3548:15, 3583:7-3583:10 (Cohen); *Trump*, 683 F. Supp. 3d at 345, 346-47. At oral argument in the Supreme Court immunity case, defendant "appeared to concede" that acts

"involving 'private actors' . . . entail 'private' conduct." *Trump*, 144 S. Ct. at 2338; *see also* Tr. of Oral Argument at 29, *Trump v. United States*, No. 23-939 (Apr. 25, 2024) ("Justice Barrett: Petitioner turned to a private attorney who was willing to spread knowingly false claims of election fraud to spearhead his challenges to the election results. Private? . . . . [Defense Counsel]: —that sounds private to me.").

In addition, the President has no clear statutory or constitutional authority to interfere with an administrative investigation by the FEC—thus further weighing against any claim of absolute immunity here and rebutting any presumptive immunity that may apply. *See Trump*, 144 S. Ct. at 2337. Unlike the Department of Justice, which is subject to presidential supervision through the appointment of the Attorney General, the FEC "is an independent administrative agency vested with exclusive jurisdiction over civil enforcement of the [Federal Election Campaign Act ("FECA")]." *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 199 n.2 (1982). As relevant here, the FEC has "exclusive jurisdiction with respect to the civil enforcement" of FECA, 52 U.SC. § 30106(b)(1), which is not "subject to control of the Attorney General," *Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 92 n.1 (1994) (citing 28 U.S.C. §§ 516, 519). And although the President appoints the commissioners to the FEC, the commissioners' terms are staggered, and its balanced political composition is fixed by statute, in order to confer greater independence on the agency. *See* 52 U.S.C. § 30106(a); *Fed. Election Comm'n v. NRA Political Victory Fund*, 6 F.3d 821, 826 (D.C. Cir. 1993) (indicating that FECA "likely" limits President to for-cause removal). These factors further support the conclusion that defendant was not exercising any official presidential duty in becoming involved with a private person's response to the FEC's civil inquiry. At minimum, even if there were some official duty involved to which presumptive immunity attached, that presumptive immunity would be rebutted because official

presidential decision-making is unlikely to be affected by judicial scrutiny of a President's gratuitous involvement in an independent federal agency's exclusive civil enforcement.[6]

Defendant's counterarguments are unavailing. As to the texts showing that defendant approved of Cohen's response to the FEC (People's 217, 260), defendant claims that he was exercising an official duty when he used "a private attorney (Sekulow) to coordinate a public statement by another private attorney (Cohen)." Def.'s Mem. 38. This characterization of the evidence basically refutes defendant's own argument by making clear that the text messages involved communications between purely private parties about a purely private matter. But defendant's argument is also absurd on another level: the "public statement" here was *by Cohen*, not by defendant or any Executive Branch employee, and at no point did the statement even attribute any of its claims to defendant. *See* People's 202. If not even all of a President's *own public statements* constitute official conduct, *see Trump*, 144 S. Ct. at 2340, then it is even less plausible that a President engages in official conduct by secretly directing a public statement attributed solely to a private person regarding an independent government investigation into a private affair.

Defendant attempts to find support in *Clinton v. Jones*, but that argument (again) fails. As explained above, no court in that litigation actually resolved whether the conduct at issue was part of an official duty. And although part of the underlying claims concerned the then-President's use of a private attorney, the only allegation that the Eighth Circuit considered (but did not resolve) to be even arguably within the "outer perimeter" of a President's official duties involved "actions alleged to have been taken by Mr. Clinton's presidential press secretary while Mr. Clinton was

---

[6] Because neither the President nor the Attorney General has authority to interfere with an FEC investigation, this situation is distinct from one in which the President, for allegedly corrupt reasons, directs the Attorney General to initiate a prosecution or investigation, or take some other action that the Attorney General has authority to take and whose supervision comes within the President's "'conclusive and preclusive' authority." *Trump*, 144 S. Ct. at 2334.

President." *Jones*, 72 F.3d at 1359 n.7. Defendant thus simply mischaracterizes that litigation in claiming that any court found "President Clinton's use of a private attorney to make public statements denying the allegations by Paula Jones" to be official conduct. Mem. 38.

As to Cohen's testimony that he told Pecker that then-Attorney General Sessions would "take[] care of" the FEC investigation, defendant claims that this reference implicated his "conclusive and preclusive authority" to pursue federal criminal investigations. Def.'s Mem. 38. But defendant has not identified any plausible presidential duty that he could have been exercising in communicating with the then-Attorney General to interfere with an independent agency's investigative decisions over which neither the President nor Attorney General had any direct supervisory authority. *See Trump*, 144 S. Ct. at 2337 (noting that immunity may not attach to the President's discussions with the Vice President where "the President plays no direct constitutional or statutory role" in the subject of discussion). Moreover, defendant does not even acknowledge whether he ever actually spoke to the then-Attorney General—meaning that the only "conduct" at issue here would appear to be an empty promise from defendant to reassure his private attorney about an independent agency's investigation into private affairs. That conduct reflects no exercise of actual presidential responsibilities whatsoever.

### F.    Cohen's testimony about investigations by Congress and prosecutors.

Defendant further objects to two pieces of testimony from Cohen that he inaccurately describes as "relating to [defendant's] public responses to investigations by Congress and federal prosecutors, and his deliberations relating to the pardon power." Def.'s Mem. 39. Defendant's arguments are meritless.

First, contrary to defendant's characterization, Cohen in fact offered no testimony "relating to [defendant's] public responses to investigations by Congress and federal prosecutors" involving Russian interference. Def.'s Mem. 39. Rather, Cohen testified solely about *his own* reasons for

lying to Congress; in doing so, he explained that he lied to Congress during its investigation of Russian interference with the 2016 presidential election because he wanted to "stay[] on [defendant's] message" denying any Russian involvement. Tr. 3551:13-16. But Cohen did not identify any specific conduct or statement by defendant; instead, he described only his own motivations, based on his perception of defendant's preferences. The Supreme Court's rule precluding admission of evidence of a President's immune official acts simply does not apply to a private individual's explanation of the reasons for his own personal, non-official actions, even if they are based on the individual's personal beliefs about a President's wishes.

Second, there was also no testimony by Cohen about defendant's "deliberations relating to the pardon power." Def.'s Mem. 39. Defendant's argument refers to Cohen's testimony about an email exchange between Cohen and Costello in which Costello offered to ask Rudy Giuliani to ask defendant to issue a pardon. Tr. 3604:2-18. But defendant was not a party to that email exchange; the participants did not say that they had lodged the pardon request with defendant; the exchange did not attribute any comments to defendant; and defendant never pardoned Cohen. Indeed, as defense counsel argued during trial, "[t]here is zero evidence that anything that Mr. Costello said to Mr. Cohen came from President Trump." Tr. 52:11-13. A private conversation between two private individuals about a pardon they never requested from defendant and that defendant never granted is not testimony about any official presidential act.

*     *

The Supreme Court has long recognized that a President can act in an unofficial, personal capacity. Nothing in the Court's recent immunity decision changes that basic fact. *Trump*, 144 S. Ct. at 2332. This case involved evidence of defendant's personal conduct, not his official acts.

33

III.    **Any error in admitting official-acts evidence was harmless.**

Even assuming that the evidence in question should not have been admitted, any error was harmless. And harmless error cannot be a basis for setting aside a verdict because it would not "require a reversal . . . as a matter of law by an appellate court." CPL § 330.30(1); *see People v. Ortiz*, 250 A.D.2d 372, 375 (1st Dep't 1998).

A.    **The erroneous admission of official-acts evidence is subject to harmless-error review.**

Defendant argues that harmless-error analysis is unavailable here under the Supreme Court's recent immunity ruling, Def.'s Mem. 43-45, but he is wrong. In fact, the Supreme Court expressly endorsed a form of harmless-error analysis regarding the indictment in that case. After finding that some of the federal indictment's allegations concerned official acts for which defendant was immune from prosecution, the Court remanded so that the parties and the lower court could "ensure that sufficient allegations support the indictment's charges without such conduct." *Trump*, 144 S. Ct. at 2340. Such a review parallels the harmless-error inquiry, which turns on whether an "error can be found to have been rendered harmless by the weight and the nature of the other proof." *People v. Crimmins*, 36 N.Y.2d 230, 241 (1975).

The availability of harmless-error analysis also follows from the fact that defendant's only claim here is that certain evidence of purportedly official acts should not have been admitted. "Typically, harmless error analysis is applied to trial errors, where evidence, argument, or instruction was improperly presented to, or improperly precluded from, the jury during trial." *People v. Flores*, 153 A.D.3d 182, 194 (2d Dep't 2017), *aff'd*, 32 N.Y.3d 1087 (2018). Here, defendant's complaint is that "evidence . . . was improperly presented to . . . the jury during trial." *Id.* at 195; *see* Def.'s Mem. 26-41. Like New York's courts, the U.S. Supreme Court "repeatedly has held" that "errors such as mistaken admission of evidence" are not "immune from harmless-

error analysis." *Rose v. Clark*, 478 U.S. 570, 582 n.11 (1986) (citing cases). And, as particularly relevant here, the Supreme Court has applied harmless-error review even when the improperly admitted evidence involved "conduct that was not criminal when the defendant engaged in that conduct." *United States v. Marcus*, 560 U.S. 258, 263 (2010). If a reviewing court can determine whether it was harmless to introduce evidence of conduct for which a defendant could not have been prosecuted because it was not a crime, then the same must be true for evidence of conduct for which a defendant could not have been prosecuted because of immunity.

Under both New York and federal law, harmless-error analysis is unavailable for only extremely narrow categories of errors—none of which include the erroneous introduction of evidence. Defendant points to New York's "mode of proceedings" doctrine and the Supreme Court's "structural errors" doctrine, Def.'s Mem. 45, but neither is applicable here. A "mode of proceedings" error is one that "goes to the general and over-all *procedure* of the trial," altering "mandated procedural, structural, and process-oriented standards." *People v. Gray*, 86 N.Y.2d 10, 21 (1995) (emphasis in original). But errors that merely "affect the substance" of the trial— including essentially all errors regarding the proof presented at trial—do not qualify as mode-of-proceedings errors and thus are amenable to harmless-error review. *People v. Hawkins*, 11 N.Y.3d 484, 492 n.2 (2008); *see Gray*, 86 N.Y.2d at 22 ("[A]n assertion that an element is missing from the proof required goes to substance and not to the mode of proceedings."). Similarly, under federal law, a "structural defect affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991); *see also Neder v. United States*, 527 U.S. 1, 8 (1999). But evidentiary defects—such as any "error which occurred during the presentation of the case to the jury"—are trial errors rather than structural errors and "may therefore be quantitatively assessed in the context of other evidence presented in

order to determine whether its admission was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 307-08; *see Brecht v. Abrahamson*, 507 U.S. 619, 629 (1993).

Defendant's arguments to the contrary are meritless. *First*, defendant claims that "the jury lacked authority to 'adjudicate' this case because DANY framed the trial proof in a manner that 'examine[d] . . . Presidential actions.'" Def.'s Mem. 44 (quoting *Trump*, 144 S. Ct. at 2328). But, as already explained—and as defendant does not and cannot dispute—the conduct for which he was tried constituted private acts for which no immunity applies. Thus, the jury plainly did have authority to "adjudicate this case." The only issue is whether the jury heard some evidence that should not have been admitted. But that issue is no different from innumerable other evidentiary challenges that defendants raise and that are routinely subject to harmless-error review.

*Second*, defendant appears to suggest that harmless-error analysis is unavailable because of the importance or constitutional nature of official-acts immunity. But neither factor makes any evidentiary error here unique. Many evidentiary privileges derive from important public-policy concerns.[7] Yet the Court of Appeals has applied harmless-error analysis even to extremely important evidentiary privileges.[8] Likewise, courts routinely apply harmless-error review when evidence has been wrongly admitted in violation of a constitutional right or privilege: for example,

---

[7] *See, e.g.*, *People v. Rivera*, 25 N.Y.3d 256, 262-63 (2015) (physician-patient privilege should be afforded a broad construction to carry out its policy of "encouraging full disclosure by patients so that they may secure treatment"); *People v. Carmona*, 82 N.Y.2d 603, 608-09 (1993) (cleric-congregant privilege recognizes "the urgent need of people to confide in, without fear of reprisal, those entrusted with the pressing task of offering spiritual guidance," and is aimed at all religious ministers who perform counseling "which may involve disclosure of sensitive matters" (citations omitted)); *People v. Edney*, 39 N.Y.2d 620, 626 (1976) (attorney-client privilege is grounded in policy of encouraging clients "to disclose freely the facts in reference to which they seek advice, without fear that such facts will be made public to their disgrace or detriment by their attorney" (citation omitted)).

[8] *See Rivera*, 25 N.Y.3d at 265 (physician-patient privilege); *Carmona*, 82 N.Y.2d at 608, 614-15 (cleric-congregant privilege); *People v. Fediuk*, 66 N.Y.2d 881, 884 (1985) (marital privilege); *People v. Glenn*, 52 N.Y.2d 880, 881 (1981) (attorney-client privilege).

testimony that violates the privilege against self-incrimination, *People v. Ventimiglia*, 52 N.Y.2d 350, 356 n.1 (1981) (summation comment regarding defendants' privilege not to testify was harmless); *People v. Perez*, 160 A.D.2d 637, 638 (1st Dep't 1990) (cross-examination of defendant in violation of privilege against self-incrimination harmless); testimony that violates a defendant's rights under the Confrontation Clause, *Cotto v. Herbert*, 331 F.3d 217, 253 (2d Cir. 2003); and evidence that was admitted despite a defendant's use immunity. *See People v. Shu*, 216 A.D.2d 46, 47 (1st Dep't 1995).

*Third*, defendant claims that harmless-error review is inconsistent with the availability of immediate "interlocutory appeal of an adverse Presidential immunity determination." Def.'s Mem. 43. That argument is a non sequitur. The Supreme Court held that "[q]uestions about whether the President may be held *liable* for particular actions, consistent with the separation of powers, must be addressed at the outset of a proceeding." *Trump*, 144 S. Ct. at 2344 (emphasis added). But here, the actual criminal charges do not concern official acts for which defendant could claim immunity. Thus, unlike in the federal prosecution, there is no question here that defendant *could* be tried for the charges based on his unofficial conduct; the only question presented now is whether certain evidence was properly admitted to support those charges.

In any event, the mere fact that the admissibility of certain evidence of purportedly official acts could have been resolved before trial does not mean that the erroneous introduction of such evidence requires automatic reversal regardless of prejudice. After all, the admissibility of unconstitutionally or illegally obtained evidence is routinely litigated before trial so that the defendant is not "forced . . . to litigate [the] evidence at trial." Def.'s Mem. 45; *see* CPL §§ 710.20, 710.40(3). But if a court wrongly admits evidence at trial that should have been suppressed before trial, harmless-error analysis is still available. *See, e.g.*, *People v. Johnson*, 31 N.Y.3d 942, 943

(2018); *United States v. Ponds*, 454 F.3d 313, 329 (D.C. Cir. 2006); *United States v. Yousef*, 327 F.3d 56, 128 (2d Cir. 2003). Here, too, even if the evidence defendant now challenges should have been reviewed and precluded prior to trial, harmless-error analysis is still available.

**B.    If official-acts evidence was erroneously admitted at trial, the error was harmless in light of the overwhelming evidence of defendant's guilt.**

To the extent the Court concludes that any evidence of official presidential acts was improperly admitted at trial, defendant's request to set aside the verdict should be rejected on harmless-error grounds because the trial record contains overwhelming evidence of defendant's guilt.[9] *See People v. Lee*, 214 A.D.3d 457, 458 (1st Dep't 2023) ("[A]ny error was harmless in light of the overwhelming evidence of defendant's guilt.") (citing *Crimmins*, 36 N.Y.2d at 237). In addition, because the narrow categories of evidence that defendant complains about here were all cumulative of extensive other evidence that is not even colorably subject to the Supreme Court's recent immunity ruling, there is no reasonable possibility that the limited evidence discussed above (even assuming that it should have been excluded) meaningfully contributed to his conviction. *See People v. Hamlin*, 71 N.Y.2d 750, 758-59 (1988) (finding that jury was not likely to have been affected by erroneous admission of codefendants' statements when defendant's guilt was proven by other corroborating evidence); *People v. Shaw*, 68 A.D.3d 507, 508 (1st Dep't 2009) (improperly admitted evidence harmless when it was "cumulative to unchallenged declarations made to other persons").

Defendant is wrong to claim that the Supreme Court's recent ruling compels the conclusion that *any* admission of purportedly official acts is automatically prejudicial. Def.'s Mem. 51-52.

---

[9] The citations to the trial record in the discussion that follows are necessarily selective in the interest of brevity. The People incorporate by reference the entirety of the trial testimony and evidence admitted at trial (exclusive of the limited evidence defendant opposes on immunity grounds). That evidence was described more fully in the People's summation. Tr. 4589-4811.

Although the Supreme Court referred to the "unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office," *Trump*, 144 S. Ct. at 2341, the mere existence of potential prejudice does not require a categorical finding that a trial error improperly affected the jury's verdict. To the contrary, prejudice from improperly admitted evidence can be "quantitatively assessed in the context of other evidence presented," *Fulminante*, 499 U.S. at 307-08, and reviewing courts routinely consider such prejudice in assessing whether a trial error was harmless overall, *see, e.g.*, *Hamlin*, 71 N.Y.2d at 758; *see also Brecht*, 507 U.S. at 636 ("State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process"). More fundamentally, the particular evidence at issue in this case minimizes the possibility that the jury would have been prejudiced by their personal "views of the President's policies and performance while in office." *Trump*, 144 S. Ct. at 2341. None of the evidence that defendant objects to here said anything whatsoever about defendant's presidential policies or political positions. And this Court not only allowed extensive individualized questioning during voir dire to ensure that the jurors were not politically biased, but also carefully instructed the jury not to let their personal or political opinions of defendant affect their consideration of the evidence. Tr. 4819-4820.

Thus, neither the Supreme Court's decision nor the particular record in this case supports defendant's assertion that prejudice should be automatically presumed here. And, as the following examination of the record in this case demonstrates, defendant was not in fact prejudiced by admission of any of the evidence at issue, even assuming that it should have been excluded.

       **1.**      **Defendant made or caused false entries in the business records of an enterprise.**

As this Court properly charged the jury, there are two elements to establish falsifying business records in the first degree: first, that defendant made or caused a false entry in the business

records of an enterprise; and second, that defendant did so with intent to defraud that included an intent to commit another crime or to aid or conceal the commission thereof. Tr. 4838:7-12; *see* PL § 175.10. The first element—that defendant made or caused false entries in the business records of an enterprise—is overwhelmingly established by the trial record without reference to any of the evidence defendant objects to on immunity grounds.

*1.* Beginning with falsity, the evidence establishes beyond a reasonable doubt that the invoices, general ledger entries, and checks with check stubs contain false entries. The invoices request payment for services rendered for a given month pursuant to a retainer agreement. *See* People's 1, 5, 8, 11, 14, 17, 20, 23, 26, 29, 32. The general ledger entries also record payments pursuant to a retainer for a given month. *See* People's 2, 3, 6, 9, 12, 15, 18, 21, 24, 27, 30, 33. And the signed checks with check stubs likewise record that the payments were made pursuant to a retainer. *See* People's 4, 7, 10, 13, 16, 19, 22, 25, 28, 31, 34.

Those entries are false. There was no retainer agreement; Cohen was not paid for legal services rendered; and the $420,000 payments were instead a reimbursement. Among other evidence, People's 35 and People's 36—Weisselberg's handwritten notes on the shell company bank statement grossing up the $130,000 expense to a $420,000 repayment, and McConney's notes calculating how the total $420,000 obligation was to be repaid based on future invoices—establish that the $420,000 Cohen received was not payment for legal services rendered in a given month pursuant to a retainer, but was instead a reimbursement for the wire to Keith Davidson for the Stormy Daniels payoff, plus the Red Finch expense, the extra bonus, and the grossed-up additional amount to cover for taxes. People's 35, 36; Tr. 2290:11-2307:24 (McConney). Jeff McConney testified that he understood the payments were reimbursements, as People's 35 and People's 36 show. Tr. 2290:11-2291:16, 2299:6-9, 2302:9-13, 2304:4-7. McConney also testified that he never

40

saw a retainer agreement and did not get approval from the Trump Organization's legal department to reimburse Cohen, as would be typical if the Trump Organization were actually paying a legal expense instead of a reimbursement. Tr. 2316:10-11, 2317:18-22. Cohen likewise testified that there was no retainer agreement, and that the payments totaling $420,000 that he received in 2017 were not for services rendered in a given month but were instead a grossed-up reimbursement for the Daniels payoff and the other expenses.[10] *See* Tr. 3442:3-6, 3495:14-19, 3500:24-3501:2, 3518:15-16, 3520:17-20, 3521:22-25, 3523:11-13, 3525:11-15, 3526:1-7, 3527:7-12, 3527:25-3528:3, 3528:19-3529:2, 3529:12-18, 3530:6-11, 3531:12-15, 3532:7-14, 3533:2-5, 3533:22-3534:1, 3535:3-8, 3535:21-24, 3536:12-14, 3537:1-4, 3537:19-25, 3538:15-18, 3539:8-12, 3540:4-7, 3541:2-14, 3959:20-23.

This evidence is corroborated by testimony that Cohen performed some personal legal services for defendant in 2018 but was never paid for those services. Tr. 2357:5-13, 2359:24-2360:4 (McConney); Tr. 3546:10-18, 4134:15-23 (Cohen); People's 43–45, 54, 55. It is further corroborated by testimony from both Pecker and Davidson that Cohen complained to them in December 2016 that defendant had not yet reimbursed him for the Stormy Daniels payoff. Tr. 1208:9-1209:3 (Pecker); Tr. 1855:17-1857:1 (Davidson). And the evidence of falsity is further supported by defendant's concession in court papers in civil litigation involving Stormy Daniels that he reimbursed the $130,000 payment in 2017. *See* Tr. 2913:1-16 (Daniels). The additional admissions that defendant claims should not have been admitted on immunity grounds—People's 81 (the OGE Form) and People's 407-G (the May 3, 2018 Tweet)—are merely cumulative of this extensive trial evidence fully establishing the falsity of these entries. The falsehoods in defendant's

---

[10] Making the falsehood crystal clear, some of the invoices were even sent and approved on the first day of the month for the *next* month's payment, purportedly compensating Cohen for legal services he could not possibly have performed yet. *See* People's 37-G, 37-K; Tr. 4735:23-4736:2.

records are proven far beyond a reasonable doubt by evidence having nothing to do with the documents defendant now argues were inadmissible.

2. Next, the stamped invoices, general ledger entries, and checks with check stubs are all business records of an enterprise. These documents are business records because they were kept or maintained by the Trump Organization and they reflect its condition and activity. PL § 175.00(2). Specifically, the invoices reflect an obligation to pay, and the Trump Organization required invoices for that exact purpose. Tr. 2280:22-24, 2295:25-2296:3 (McConney); Tr. 2426:7-11, 2429:22-2431:10 (Tarasoff); Tr. 2924:22-2925:7 (Manochio); *see People v. Kisina*, 14 N.Y.3d 153, 159-60 (2010); *People v. Dove*, 85 A.D.3d 547, 548 (1st Dep't 2011). The general ledger entries reflect that a payment had been made to Cohen for a purported retainer for a particular month or months in 2017. Tr. 2319:14-21, 2360:12-25, 2362:1-3 (McConney); Tr. 2447:18, 2449:21, 2456:24, 2462:11, 2467:4, 2475:4 (Tarasoff); *see Kisina*, 14 N.Y.3d at 159-60. And the signed checks and check stubs were maintained in the Trump Organization's files to reflect its satisfaction of its repayment obligations. Tr. 2451:4-8 (Tarasoff); Tr. 2285:4-6 (McConney); *see Kisina*, 14 N.Y.3d at 159-60. McConney further testified that these business records—and in particular, the general ledger entries—were examined by the Trump Organization's outside accounting firm at tax time to determine the appropriate tax treatment. Tr. 2275:5-13, 2320:9-2321:10 (McConney).

The evidence also shows beyond a reasonable doubt that the Trump Organization is an enterprise because it was a conglomerate of nearly 500 entities engaged in real estate, property management, leisure, and other commercial and business activities. Tr. 2260:20-2262:5 (McConney); *see* PL § 175.00(1). The Trump Organization's accounting staff of ten managed the general ledger and bank accounts for the "DJT" account, which was used as the main operating

42

account to reallocate cash between Trump Organization entities and to advance funds to pay an entity's bills. Tr. 2270:5-9, 2277:3-2278:19 (McConney); Tr. 2431:18-24 (Tarasoff). And although not necessary to support the conviction, the Donald J. Trump Revocable Trust is also an enterprise. *See* People's 86; Tr. 2263:1-2267:6 (McConney).

Literally none of the evidence defendant claims was erroneously admitted at trial has anything to do with the trial proof establishing well beyond any doubt that the records defendant was convicted of falsifying are business records of an enterprise.

*3.* Finally, defendant made or caused the false entries in his business records. Defendant himself personally signed every one of the nine falsified checks from the DJT account, and therefore clearly made those false entries. People's 10, 13, 16, 19, 22, 25, 28, 31, 34; Tr. 2468:11-16, 2470:10-13, 2473:11-14, 2475:19-22, 2480:25-2481:3, 2482:18-21, 2484:20-21, 2486:20-23 (Tarasoff); Tr. 3528:6-23, 3530:12-18, 3531:25-3532:3, 3533:13-17, 3534:19-24, 3536:3-7, 3537:8-15, 3538:22-3539:4, 3540:17-22 (Cohen). As to the false entries in the remaining business records, the trial evidence proved beyond a reasonable doubt that defendant made or caused those entries as well. As a matter of law, a person "causes" a false entry when, even if he does not prepare the relevant business record himself, the creation of a false entry in the business record is a reasonably foreseeable consequence of his conduct. *People v. Barto*, 144 A.D.3d 1641, 1643 (4th Dep't 2016); *see also People v. Park*, 163 A.D.3d 1060, 1063 (3d Dep't 2018); *People v. Myles*, 58 A.D.3d 889, 892 (3d Dep't 2009). The trial record proved that defendant set the fraudulent repayment scheme in motion, and that the creation of business records to carry out that scheme was a predictable consequence of his decision. Tr. 3418:9-19, 3421:1-10, 3431:20-3432:23, 3491:14-3494:22, 3514:1-18 (Cohen); Tr. 2282:5-18 (McConney); Tr. 2430:16-2431:10, 2434:4-17 (Tarasoff); People's 256, 349.

Again, this evidence is overwhelming without any recourse to the evidence defendant opposes on immunity grounds. Contrary to defendant's argument, Def.'s Mem. 50, testimony from Madeleine Westerhout was not remotely necessary to establish defendant's "detail-oriented manner" or that defendant knew what he was signing: the trial record included extensive evidence on that front, including defendant's *own admission* that he reviewed and signed checks carefully, both for the purpose of "seeing what's really going on inside your business" and because "if people see your signature at the bottom of the check, they know you're watching them, and they screw you less because they have proof that you care about the details." People's 414-F at xii. David Pecker also personally saw defendant reviewing invoices before he signed his checks. Tr. 1009:7-21. And there was a parade of other evidence proving both that defendant paid careful attention to his finances and that he was a micromanager. Tr. 1010:3-11, 1117:24-1118:7 (Pecker); Tr. 1784:10-11 (Davidson); Tr. 2130:15-18 (Hicks); Tr. 2279:6-2280:4 (McConney); Tr. 2427:24-2428:1, 2430:16-2431:10, 2435:8:19, 2436:23-2437:3, 2441:4-17 (Tarasoff); Tr. 3279:21-25 (Cohen); People's 71, 75, 413-B, 414-A, 414-B, 414-C, 414-D, 414-F, 415-A.

The trial evidence establishing that defendant made or caused false entries in the business records of an enterprise was overwhelming without reference to any purported official-acts evidence; and given that the minimal evidence defendant now opposes on immunity grounds—People's 81 (the OGE Form), People's 407-G (the May 3, 2018 Tweet), and Westerhout's generalized testimony about defendant's attention to detail—were "merely cumulative" of other trial evidence, *People v. Jones*, 63 A.D.3d 1643, 1644 (4th Dep't 2009), there is "no reasonable

possibility" that this evidence improperly contributed to his conviction.[11] *Crimmins*, 36 N.Y.2d at 237.

> **2.    Defendant acted with intent to defraud which included an intent to commit or conceal the commission of another crime.**

The second element of falsifying business records in the first degree—that defendant acted with an intent to defraud that included the intent to commit, aid, or conceal the commission of another crime—is also overwhelmingly established by the trial record without any consideration of the evidence defendant now claims was erroneously admitted at trial.

*1.* Regarding intent to defraud, there is overwhelming evidence that defendant intended the false business records to obscure the repayment to Cohen for the Stormy Daniels payoff. People's 35 and People's 36 alone are likely dispositive of this point; those documents conclusively show that the $420,000 payments were to reimburse Cohen for the wire to Keith Davidson, contrary to how the payments were then recorded in the Trump Organization's business records. People's 35, 36; Tr. 2290:11-2307:24 (McConney). And the evidence of the Trump Tower conspiracy and the steps taken to effectuate it—established by testimony from David Pecker, Keith Davidson, Stormy Daniels, Michael Cohen, and Gary Farro, as well as by the dozens of emails, text messages, phone calls, recorded conversations, business documents, and other records that corroborate that testimony—prove that hiding information and concealing the underlying conspiracy was the entire point of the scheme. *See, e.g.*, Tr. 1019:4-1026:4, 1091:21-1092:20, 1133:8-13, 1146:11-18,

---

[11] Any error in admitting Westerhout's testimony was harmless for the separate reason that it was "beneficial to both the People and defendant." *People v. Perez*, 183 A.D.3d 934, 936-37 (3d Dep't 2020). Defendant elicited extensive testimony from Westerhout about defendant's practices in the White House, including that he was very busy and often multitasking, and that she claimed to see him "signing checks without reviewing them." Tr. 3114:10-18 (Westerhout). To the extent any of Westerhout's testimony was improperly admitted, it "was probative of both the People's case and defendant's . . . defense," and "did not affect the verdict." *Perez*, 183 A.D.3d at 937.

1194:4-7, 1199:16-1200:12 (Pecker); Tr. 1743:21-1744:3 (Davidson); Tr. 2275:5-13, 2320:9-2321:10 (McConney); Tr. 2913:9-16 (Daniels); Tr. 3294:23-3296:1, 3492:4-3493:24, 3514:1-18, 3615:14-20 (Cohen); Tr. 1558:10-19, 1562:16-21, 1565:22-1566:7, 1570:16-1572:19 (Farro); People's 35, 36, 81, 156, 157, 161, 162, 164, 182, 202, 248, 260, 265, 276, 364, 366, 368, 369, 376.

Of course, there was also abundant and damning evidence—much of it in defendant's own words—proving beyond any doubt that he was motivated to conceal the sexual encounter with Stormy Daniels because he was concerned that its public disclosure would damage his standing with female voters and harm his chances for election, particularly after the release of the Access Hollywood Tape. *See, e.g.*, Tr. 1180:3-1185:7 (Pecker); Tr. 1755:13-1758:16 (Davidson); Tr. 2146:11-2175:6, 2203:10-12 (Hicks); Tr. 2651:24-2654:4 (Daniels); Tr. 2976:4-17, 3122:22-3123:10 (Westerhout); Tr. 3367:10-3381:8, 3953:2-6, 4049:15-18 (Cohen); People's 167, 176-A, 218, 404-C, 407-A, 407-B, 407-C, 407-D, 407-E, 409-A, 409-B, 409-C.

All of this evidence overwhelmingly proves that defendant intended to conceal information from government regulators, tax professionals, or the voting public. *See, e.g.*, *People v. Lang*, 36 N.Y.2d 366, 371 (1975); *Morgenthau v. Khalil*, 73 A.D.3d 509, 510 (1st Dep't 2010); *People v. Pymm*, 151 A.D.2d 133, 135, 141 (2d Dep't 1989), *aff'd*, 76 N.Y.2d 511 (1990); *People v. Kase*, 76 A.D.2d 532, 537-38 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 989 (1981). And none of the evidence regarding defendant's intent to defraud relies at all on the documents and testimony he claims was erroneously admitted.

*2.* Regarding the intent to conceal another crime, the admissible evidence established beyond a reasonable doubt that defendant intended to conceal the conspiracy to promote his election by unlawful means. Testimony from Pecker and Cohen establishes that a conspiracy to

influence the election was formed in August 2015 in Trump Tower. Tr. 1019:4-1026:4 (Pecker); Tr. 3294:23-3296:1 (Cohen). That testimony is supported by the documentary evidence of the Sajudin, McDougal, and Daniels transactions, as well as by testimony from Davidson regarding the execution of that conspiracy. *See, e.g.*, People's 154–158, 160, 162–164, 276; Tr. 1709:12-1800:24, 1836:10-1850:17 (Davidson). The testimony from Hope Hicks that defendant claims was improperly admitted—that defendant told her in February 2018 that it would have been bad for the Stormy Daniels story to come out before the election, Tr. 2221:10-12—was merely confirmatory of the mountain of other evidence proving beyond any doubt that defendant sought to conceal both the fact of his sexual encounter with Daniels and the broader Trump Tower conspiracy.[12] *See, e.g.*, Tr. 1091:19-1092:23, Tr. 1112:21-1115:18, 1199:6-1200:12, 1211:18-1219:11, 1228:7-1231:25, 1237:4-1239:20, 1241:1-16 (Pecker); Tr. 2205:8-2205:20 (Hicks); Tr. 3431:20-3433:5, 3465:13-3466:2, 4189:13-4190:3 (Cohen); People's 179, 259.

The evidence also proves that the participants intended to and ultimately did advance that conspiracy by unlawful means, including through violations of FECA, the falsification of other business records, and violations of tax laws. Tr. 4843:9-4846:15 (jury charge).

As a threshold matter, defendant's arguments incorrectly assume that, for purposes of this element, the People were required to establish beyond a reasonable doubt that defendant employed

---

[12] Defendant claims that because the People described this testimony as "devastating" on summation, the exclusion of this evidence would somehow undermine the guilty verdict. Def.'s Mem. 51. But evidence can be both devastating and cumulative. For example, even the erroneous admission of an unconstitutionally obtained confession by a defendant—which has been described as "the most probative and damaging evidence that can be admitted against" a defendant, *Fulminante*, 499 U.S. at 296 (quotation marks omitted)—can be harmless error where it is cumulative of other properly admitted evidence. *See People v. Krom*, 61 N.Y.2d 187, 201 (1984); *see also People v. Sanders*, 56 N.Y.2d 51, 66-67 (1982) (improper admission of defendant's statement admitting involvement in a criminal conspiracy, taken in violation of his right to counsel, was harmless error because it was cumulative of other evidence).

a particular unlawful means. But the Election Law does not require the jury to identify any specified or particular unlawful means, *see People v. Mackey*, 49 N.Y.2d 274, 279 (1980) (reaching same conclusion regarding burglary statute); and under New York law, it is well-established that the jury need not be unanimous about alternative means of accomplishing a single offense, *see People v. Mateo*, 2 N.Y.3d 383, 407 (2004). And the first-degree falsifying business records offense does not require that the underlying object crime itself be successfully completed—criminal culpability is a question of defendant's intent. *See People v. Taveras*, 12 N.Y.3d 21, 27 (2009) ("[F]alsifying business records in the second degree is elevated to a first-degree offense on the basis of an enhanced intent requirement . . . not any additional actus reus element."); *see also People v. Thompson*, 124 A.D.3d 448, 449 (1st Dep't 2015); *People v. Houghtaling*, 79 A.D.3d 1155, 1157-58 (3d Dep't 2010); *People v. McCumiskey*, 12 A.D.3d 1145, 1145 (4th Dep't 2004). Thus, the relevant question here is whether defendant's fraudulent intent included the intent to conceal a conspiracy to promote the election of any person to a public office by unlawful means in general—not whether there was overwhelming evidence of any particular unlawful means.

In any event, whether taken individually or as a whole, the evidence of unlawful means was overwhelming. As to the evidence of FECA violations, the evidence was more than sufficient to establish that the $150,000 payment to Karen McDougal was a prohibited corporate contribution that violated FECA. Tr. 1133:8-13, 1146:2-25 (Pecker); People's 182. The evidence also proves that the $130,000 payment to Stormy Daniels was an excessive individual contribution by Michael Cohen in violation of FECA, because it was the payment of a candidate's personal expenses that he would not have made irrespective of defendant's candidacy. Tr. 3614:21-23, 3446:19-25 (Cohen). Defendant does not claim that proof of the FECA violations relies on official-acts evidence at all; instead, he argues simply that the evidence does not support a willful FECA

violation as to the McDougal payoff. Def.'s Mem. 49. But Pecker testified that his principal purpose in entering into the non-disclosure agreement with Karen McDougal was to suppress her story so as to prevent it from influencing the election; that he did so because of the Trump Tower conspiracy; that he knew at the time that corporate expenditures in coordination with or at the request of a candidate were unlawful; and that he only made the payments on the understanding that defendant would reimburse him. *See, e.g.*, Tr. 1114:22-1115:1, 1115:18-1116:11, 1119:22-1120:20, 1124:17-1128:16, 1132:5-1133:13, 1144:4-14, 1146:2-25, 1148:13-20, 1456:13-1457:13 (Pecker); Tr. 3311:7-14, 3318:11-3320:15, 3327:4-3328:23 (Cohen). And defendant's argument ignores entirely that Cohen also willfully violated FECA when he made the hush money payment to Stormy Daniels—he made a $130,000 payment to Daniels on the eve of the election to bury her account of her sexual interaction with defendant, and he did so at defendant's direction and for the principal purpose of influencing the election. *See, e.g.*, Tr. 1190:12-17, 1483:1-25 (Pecker); Tr. 1775:23-1777:10, 1784:14-25, 1841:23-1842:1, 1855:2-8, 1975:15-24 (Davidson); Tr. 2691:14-22 (Daniels), Tr. 3389:6-3392:8, 3432:9-3433:4, 4193:7-18 (Cohen); People's 63–65, 176-A, 177-A, 178-A, 265, 267, 276, 281–285, 361–379. So even without AMI's violation of FECA in connection with the McDougal payment, the evidence clearly supports a criminal Election Law conspiracy based on the illegal Stormy Daniels payoff alone.

The unlawful means also include the falsification of other business records committed in the course of the conspiracy, including:

- the invoice from Investor Advisory Services to Resolution Consultants, falsely describing the expected payment as "'flat fee' for advisory services," *see* People's 161; Tr. 1154:3-1158:2 (Pecker); Tr. 3362:18-3363:22 (Cohen);

- false statements in bank records that accompanied Cohen's request to open a bank account for Resolution Consultants LLC around October 13, 2016, *see* People's 366; Tr. 1562:4-1567:5 (Farro); Tr. 3405:6-3407:4 (Cohen);

`

- false statements in the account opening paperwork for the Essential Consultants LLC account on October 26, 2016, *see* People's 368; Tr. 1569:9-1572:22 (Farro); Tr. 3434:18-3435:24 (Cohen);

- false statements in the wire transfer form authorizing the wire to Keith Davidson the next day, *see* People's 376; Tr. 1604:9-1609:7 (Farro); Tr. 3440:25-3442:15 (Cohen); and

- false statements in the 1099 Forms that the Trump Organization prepared and submitted to the IRS as a record of payments to Cohen that were falsely described as income when in fact they were reimbursements, *see* People's 93; Tr. 2363:7-2365:17 (McConney).

Defendant again makes no argument that any of this evidence should have been excluded on immunity grounds; instead, he argues vaguely that the evidence of other falsified business records was "speculative and unsupported." Def.'s Mem. 50. But that characterization simply flies in the face of the actual facts and evidence, as cited above. More fundamentally, defendant's argument that "there was no evidence" that the Trump Tower conspiracy included an objective to lie in any business records ignores that the *entire purpose* of the months-long catch-and-kill effort was to conceal negative information about defendant that could have affected the election; and given that that was the express agreement the conspirators made in the Trump Tower meeting, it would have made no sense to accurately record the illegal steps in that conspiracy. *See, e.g.*, Tr. 4680:14-16 (summation) ("Cohen couldn't very well say, I'm opening this account so a presidential nominee can pay off a porn star."); Tr. 1536:3-1537:10, 1592:1-1593:25 (Farro).

Finally, the evidence of unlawful means also includes evidence of federal, state, and city tax law violations. Again, evidence entirely independent of the narrow categories that are the subject of defendant's current motion overwhelmingly establishes these tax law violations as well. Defendant agreed to gross up the reimbursement to Cohen so it could be disguised as income. *See* People's 35, 36; Tr. 2299:6-16 (McConney); Tr. 3484:18-3486:12, 3488:23-3489:2, 3490:4-3494:228 (Cohen). The Trump Organization then followed through on that deception and reported the repayment to the IRS as compensation to Cohen on two 1099 Forms. *See* People's 93; Tr.

2363:5-6, 2365:15-17 (McConney). Under federal law, it is unlawful to submit false or fraudulent documents or to aid anyone in doing so; and under New York State and City law, it is unlawful to submit false information in connection with any tax return. *See* 26 U.S.C. §§ 7206(1), 7206(2); Tax Law §§ 1801(a)(3), 1802; Tr. 4846:5-15. Defendant yet again does not contend that any of this evidence should be excluded as an official presidential act; instead, he argues that there was no evidence of criminal intent in this tax fraud scheme. Def.'s Mem. 49. But Cohen explained that the reimbursement was grossed up specifically so it could be described as income, and that defendant approved that repayment plan.[13] *See* Tr. 3484:18-3486:12, 3488:23-3489:2, 3490:4-3494:228 (Cohen); People's 35. And even without this testimony and Weisselberg's handwritten notes corroborating it, the evidence of falsity described in Part III.B.1 above establishes that defendant knew he was intentionally disguising an expense reimbursement as income in the form of legal fees.

In short, even excluding entirely the claimed official-acts evidence, the trial record overwhelmingly establishes every element of first-degree falsifying business records and supports defendant's guilt on all thirty-four counts. Because there is "no reasonable possibility that the error might have contributed to defendant's conviction" in light of this overwhelming evidence, any error was "harmless beyond a reasonable doubt." *Crimmins*, 36 N.Y.2d at 237.

---

[13] Defendant takes out of context Cohen's answer that he "didn't know" why Weisselberg grossed up the reimbursement, *see* Tr. 3491:6-9, to claim that there was no criminal intent at the time of the agreement. Def.'s Mem. 49. In fact, Cohen explained repeatedly and in detail that the reimbursement was grossed up "because I was taking it as income" and "in order to get back the 180, you need to actually double it because of tax purposes." Tr. 3485:1-18; *see also* Tr. 3486:3-12. Defendant also mischaracterizes McConney's testimony by misleadingly quoting only part of his response. Def.'s Mem. 49. When asked "What does 'grossed up' mean?", McConney's full answer was: "I don't know exactly what it meant, but he probably meant – so for tax purposes, if Michael recorded $360,000 income he would net, assuming a 50 percent tax rate, $180,000." Tr. 2299:13-16.

C.   **Defendant's description of the trial record is wrong on the facts and the law.**

Defendant presents a smattering of other factual and legal arguments in an effort to counter the mountain of evidence described above. Defendant's arguments do not undermine the jury's unanimous verdict of guilt on all thirty-four felony counts.

1.   **The Court should reject defendant's mischaracterizations of the trial record.**

Defendant focuses nearly all of his harmless-error argument on an effort to discredit Michael Cohen's trial testimony. Def.'s Mem. 46-48. The credibility of witness testimony is for the jury to determine, as the Court properly instructed. *People v. Mays*, 197 A.D.2d 425, 426 (1st Dep't 1993); Tr. 4829:3-4834:6. At trial, as in his post-trial brief, defendant sought at great length to impeach Cohen's credibility—it was the focus of defendant's days-long cross-examination of Cohen, Tr. 3652:2-3969:18, 4024:23-4128:23 (Cohen cross); it was the entirety of the defense case, *see* Tr. 4205:14-4209:23 (Sitko), Tr. 4228:19-4259:12 (Costello); and it was the centerpiece of defense counsel's summation. *E.g.*, Tr. 4579:1-2. The jury was not persuaded by defendant's strenuous efforts to malign Cohen, and none of the evidence defendant challenges materially affected that determination.

In addition, defendant's motion vastly overstates the importance of Cohen's testimony. As the People argued on summation, the evidence supported defendant's guilt beyond a reasonable doubt even if the jury disregarded Cohen's testimony. Tr. 4620:1-4623:4. And as demonstrated in the overview of the evidence in Part III.B above, that argument is clearly correct: on every salient point on which Cohen testified, the point was amply proven by other testimonial and documentary evidence. Thus, even if the admitted evidence should have been precluded—and even if its preclusion could somehow have altered the jury's assessment of Cohen's credibility—that would have had no effect on the jury's ultimate verdict.

In any event, defendant's specific efforts to undercut Cohen's credibility rely on mischaracterizations of the trial record and speculation about possible facts that appear nowhere in evidence. First, defendant claims that Cohen committed perjury in October 2023 during his testimony in the New York Attorney General's fraud lawsuit against Trump and other defendants. Def.'s Mem. 46. But the federal court opinion defendant cites to describe Cohen's state court testimony was not admitted as evidence at this trial, and was not a subject of defense counsel's cross-examination of Cohen. Indeed, defendant made a strategic calculation not to seek to admit that court opinion or to elicit testimony from Cohen or any other witness about it. The People specifically noted during a sidebar with the Court during Cohen's cross-examination that if defense counsel sought to admit the federal court decision, the People would object; and if admitted, the People would seek to admit judicial findings to the contrary. Tr. 3746:15-3747:1. The Court asked defense counsel if he intended to bring out the federal decision, and defense counsel responded "No." Tr. 3751:11-13. Based on defendant's strategic choice, no evidence was admitted at this trial purporting to show that a federal court believed Cohen lied in his October 2023 state-court trial testimony. And if such evidence had been admitted, the People would have rebutted it by seeking to admit evidence that Justice Engoron—sitting as the finder of fact in the New York Attorney General's civil fraud trial—expressly found that "Michael Cohen told the truth" and that "the Court found his testimony credible." Decision & Order After Non-Jury Trial 43, *People by James v. Trump*, Index No. 452564/2022, NYSCEF Doc. No. 1688 (Sup. Ct. N.Y. Cnty. Feb. 16, 2024). Defendant's claim that Cohen lied during that trial in October 2023 should thus be rejected because it has no support in the trial record. *See People v. Wolf*, 98 N.Y.2d 105, 119 (2002) ("The factual assertions concerning [the purported error] were outside the record and for that reason could not be considered in a CPL 330.30(1) motion.").

Next, defendant asks the Court to draw a negative inference regarding Cohen's credibility based on the People's decision not to call Allen Weisselberg as a witness at trial. Def.'s Mem. 46. But defendant did not request a missing witness charge, and would not have satisfied the requirements for such an instruction in any event. *See People v. Smith*, 33 N.Y.3d 454, 458-59 (2019) (citing *People v. Gonzalez*, 68 N.Y.2d 424, 427-28 (1986)). Because defendant decided not to request a missing witness charge at trial, there is no basis whatsoever for his post-trial request that the Court draw any adverse inference from the absence of Weisselberg's trial testimony.

Third, defendant's claim that Cohen lied about an October 24, 2016 telephone conversation with defendant using Keith Schiller's telephone, Def.'s Mem. 47, should also be rejected. On cross examination, Cohen firmly rejected defense counsel's assertion that Cohen lied about speaking to defendant on that call, and testified that "[b]ased upon the records that I was able to review, in light of everything that was going on, I believe I also spoke to Mr. President Trump and told him everything regarding the Stormy Daniels matter was being worked on and it's going to be resolved." Tr. 3896:9-3898:8. This testimony was corroborated both by photographic evidence of Schiller standing next to defendant mere minutes before the phone call in question, *see* People's 417-B; Tr. 4187:8-14 (Cohen), and by testimony from Cohen and other witnesses that they sometimes contacted Schiller in order to reach defendant by phone. Tr. 3276:2-10, 3313:21-24 (Cohen); Tr. 1008:14-18 (Pecker); Tr. 2141:1-8 (Hicks). Notably, the defense offered no testimonial or other evidence to rebut Cohen's testimony that he in fact spoke with defendant about the Daniels payoff on that October 24, 2016 call.

In any event, the October 24 call was not necessary to establish defendant's guilt. The call was just one update of many that Cohen communicated to defendant regarding the Daniels matter. Tr. 3389:6-15, 3400:18-21 (Cohen); People's 349. During the October 2016 time period, Cohen

estimated that he had more than twenty conversations with defendant about the Stormy Daniels matter—some in person, some by phone. Tr. 4187:21-4188:10 (Cohen). And the October 24 call was not defendant's final approval for Cohen to pay off Stormy Daniels—that came two days later, on October 26, 2016. *See* Tr. 3431:14-3433:4 (Cohen); People's 349. And the October 24 call was not defendant's final approval for Cohen to pay off Stormy Daniels—that came two days later, on October 26, 2016. *See* Tr. 3431:14-3433:4 (Cohen); People's 349. The defense vigorously argued to the jury that the October 24 call demonstrated that Cohen was lying. However that evidence was considered by the jury, nothing in defendant's instant motion warrants this Court to reevaluate the jury's determination of Cohen's credibility, and defendant's argument cannot possibly serve as a basis to set aside the jury's guilty verdicts.

Finally, defendant's claim that Cohen lied about the "substance and circumstances" of the recorded conversation between himself and defendant on September 6, 2016, Def.'s Mem. 47-48, should also be rejected as baseless. As an initial matter, defendant's vague reference to "all the problems with the recording," *id.* at 48, is inconsistent with the actual evidence at trial. Doug Daus, the Supervising Computer Forensic Analyst who extracted and analyzed the data from Cohen's cell phone, testified that the metadata he extracted for the recording of the September 6 conversation reflected that the audio file was never modified after the date it was made. Tr. 2070:23-2071:14; People's 246, 247. Daus further testified that he identified no evidence of tampering or manipulation on any data related to that recording. Tr. 2085:9-2087:10. That testimony was uncontested. Indeed, on re-cross, defense counsel made clear he was not asking Daus about any evidence of affirmative tampering, but only whether there could be *risks* of tampering. Tr. 2088:17-19. But a risk of tampering is not the same as evidence of tampering—of which there was none.

Defendant's assertion that Cohen falsely claimed to have ended the recording because of an incoming phone call, Def.'s Mem. 48, is also completely unsubstantiated. Defendant argues that Cohen could not have answered the incoming call because the phone records show it went to voicemail. *Id.* But Cohen testified that he did not recall whether the incoming call connected or went to voicemail when he tried to answer it. Tr. 3345:23-3346:3. And whether he answered the incoming call or not, there is no evidence rebutting his testimony that he ended the recording because of an incoming call—which phone records reflect having come in at about the same time that the recorded conversation cuts off. People's 400 at DANYGJ00002726; Tr. 3211:18-3212:15, 3234:1-20, 3236:1-16 (Jarmel-Schneider).

Defendant's assertion that the phone records indicate the incoming call went to a different physical device than the phone from which the recording was later retrieved is misleading and immaterial. The call detail records show the incoming call went to the same cell phone number that was assigned to the device from which the audio recording was extracted, and the subscriber records confirm that that cell phone number belonged to Cohen at that time. People's 400 at DANYGJ00000038, DANYGJ00002726; Tr. 1988:9-19 (Daus). The records further showed that an entire backup had previously been restored to the device, and that the recording on the device collected by DANY retained metadata confirming both that it was created on September 6, 2016, and that it was not altered after that date. Tr. 2006:22-25, 2070:23-2071:14, 2063:24-2065:12, 2085:9-2087:10 (Daus); Tr. 3210:18-3211:21, 3234:22-3235:2 (Jarmel-Schneider); People's 247. Defense counsel's lengthy excursion into IMEI numbers shows nothing more than that Cohen got a new phone at some point after he recorded the conversation with defendant, kept the same phone number, and restored a complete backup to the phone that was later produced to the People and the defendant.

Nor should the Court credit defendant's claim that when the September 6 recording ended, defendant "was in the process of asking Cohen to 'check' on details that were not captured on the audio file." Def.'s Mem. 48. That assertion is entirely invented. The audio recording actually reflects that defendant said "pay with cash"; Cohen responded, "No, no, no, no, no"; and defendant then said "check." People's 246, 248. Cohen testified, logically, that "check" meant the payment should be made by check after he rejected defendant's suggestion to pay with cash. Tr. 3344:2-9. The defense proffered no evidence that "check" meant "check on details" or was anything other than a reference to how the payment should be made, and a CPL § 330.30 motion may not be based on made-up facts. *See Wolf*, 98 N.Y.2d at 119.

The Court should likewise reject defendant's effort to discount the significance of the September 6 recording by claiming it "had nothing to do with" Cohen's payment to Daniels. Def.'s Mem. 48. It is correct that on September 6, 2016, Cohen and defendant were discussing the McDougal hush money payment, not the Daniels hush money payment. But the recorded conversation is compelling evidence that supports defendant's guilt because it corroborates Pecker's and Cohen's testimony about defendant's personal involvement in the Trump Tower conspiracy and his knowledge of and participation in the steps to execute the illegal conspiracy: it proves that defendant knew Pecker had paid $150,000 to purchase McDougal's life rights to secure her silence before the 2016 presidential election, and it shows defendant plotting surreptitious steps to reimburse Pecker for that illegal payment. Tr. 1115:18-1116:11, 1117:20-1118:7, 1119:22-1120:20, 1146:21-1148:20, 1153:20-1158:10, 1464:16-19 (Pecker); Tr. 3319:15-3320:2, 3327:4-3328:23, 3338:18-3339:5, 3365:3-9 (Cohen). That it related to a different part of the Election Law conspiracy than the Daniels payment is completely beside the point.

2. **The Court should reject defendant's belated arguments regarding legal error.**

Defendant raises a number of claims of legal error as well, purportedly as part of his harmless-error argument. Def.'s Mem. 48. Specifically, defendant contends both that the People "hid the ball" regarding the Election Law charging theory, and that the Court erred in instructing the jury that it did not have to be unanimous as to the "unlawful means" for the Election Law object crime. Def.'s Mem. 48. To the extent the Court considers these untimely arguments, both should be rejected.[14]

Defendant's claim of surprise is frivolous. He himself acknowledged in sworn court filings more than a year ago that he was on notice of the Election Law charging theory. In his notice of removal to federal court—filed on May 4, 2023, just one month after he was arraigned—defendant wrote that "the felony charges in this case are predicated on an alleged intent to violate New York Election Law § 17-152 and the Federal Election Campaign Act, 52 U.S.C. § 30101." Notice of Removal ¶ 21, *New York v. Trump*, No. 23 Civ. 3773 (S.D.N.Y. May 4, 2023), ECF No. 1. Indeed, the Election Law predicate was the basis for defendant's unsuccessful preemption argument in federal court. *See Trump*, 683 F. Supp. 3d at 347 ("Trump argues that the [Federal Election Campaign] Act preempts two of the crimes that he is charged with intending to commit or conceal by falsifying business records," including "crimes under New York Election Law § 17-152"). And the reason defendant was on notice of the Election Law predicate is that the People clearly identified it for him a year before trial. *See* People's Mot. for Protective Order 3 ¶ 3 (Apr. 24,

---

[14] Neither argument is related to the official-acts immunity issue that defendant sought leave to address, and neither argument has anything to do with the Court's harmless-error analysis. Both arguments are therefore untimely, *see* Tr. 4958:6-8 (directing that all post-trial motions be filed by June 13, 2024), and the Court would be justified in disregarding these arguments for that reason alone. The People nonetheless respond to these arguments to the extent the Court considers it necessary to address them.

2023) ("Defendant caused business records associated with the repayments to be falsified to disguise his and others' criminal conduct including violations of New York Election Law § 17-152 . . . ."); *see also* People's Response to Def.'s Request for a Bill of Particulars 5-6 (May 12, 2023). If more were needed to rebut his claim of surprise—which it is not—the People explained the Election Law predicate in their opposition to defendant's omnibus motion in November 2023, as the Court expressly recognized in its February 2024 Order denying defendant's omnibus motions:

> [T]he People allege that Defendant intended to violate N.Y. Election Law § 17-152 by conspiring "to promote the election of any person to a public office . . . by entering [into] a scheme specifically for the purposes of influencing the 2016 presidential election; and that they did so by 'unlawful means,' including by violating FECA through the unlaw[ful] individual and corporate contributions by Cohen, Pecker, and AMI; and . . . by falsifying the records of other New York enterprises and mischaracterizing the nature of the repayment for tax purposes."

Decision & Order Denying Def.'s Omnibus Mots. 12 (Feb. 15, 2024) (quoting People's Mem. Opp. Omnibus Mots. 25 (Nov. 9, 2023)).

Defendant's objection to the Court's "unlawful means" instruction is equally meritless. As noted above, the jury need not be unanimous about alternative means of accomplishing a single offense. *See Mateo*, 2 N.Y.3d at 407; *see also People v. Watson*, 284 A.D.2d 212, 213 (1st Dep't 2001) ("A conviction of larceny, whether by false promise or false pretense, constitutes only one offense. Thus, juror unanimity is not required as to the particular method by which the larceny was committed."). Indeed, the statute does not require the jury to identify any specified or particular unlawful means at all. *Mackey*, 49 N.Y.2d at 279. Thus, the Court correctly instructed the jury that it need not agree on which unlawful means were employed, so long as the jury did unanimously agree that the defendant conspired to promote or prevent the election of any person to a public office by unlawful means. Tr. 4937:4-7. And in any event, defendant waived any complaint he might have had regarding the Court's instructions when he expressly agreed during the pre-charge

conference that a unanimity instruction as to "unlawful means" was not required, but should instead be considered solely as an exercise of the Court's discretion. Tr. 4403:7-4404:3; *see People v. Capella*, 180 A.D.3d 498, 499 (1st Dep't 2020); *People v. James*, 35 A.D.3d 762, 762 (2d Dep't 2006).

IV.    **Defendant's challenge to the sufficiency of the indictment is unpreserved and meritless.**

Defendant's request that the Court not only vacate the jury verdict but also dismiss the indictment based on the use of official-acts evidence in the grand jury, Def.'s Mem. 41-43, should be rejected because he failed to preserve the argument in his pretrial motions to dismiss, and because it is wrong on the merits in any event.

A.    **Defendant failed to preserve his challenge to the admission of purported official-acts evidence in the grand jury.**

As noted above, CPL § 330.30(1) does not authorize the Court to set aside a jury verdict based on an alleged error unless that error was properly preserved. *See, e.g.*, *Everson*, 100 N.Y.2d 610; *Sudol*, 89 A.D.3d 499-500; *People v. Quinones*, 228 A.D.2d 190, 190-91 (1st Dep't 1996). Here, defendant never sought to dismiss the indictment on the ground that the People improperly presented official-acts evidence to the grand jury, despite raising other arguments about the presentation of allegedly inadmissible evidence during that proceeding in his omnibus motions. *See* Def.'s Mem. Supp. Omnibus Mots. at 25-26 (Sept. 29, 2023).

The fact that *Trump v. United States* was decided after trial does not excuse this failure. First, as described in Part I above, defendant's other pretrial motions and trial objections establish that he knew how to object to the admission of evidence on immunity grounds before trial. Second, preservation is required "even if governing law was altered by an intervening Supreme Court decision." *Cabrera*, 41 N.Y.3d at 45. Having failed to seek dismissal of the indictment on this

basis within the time required by CPL § 255.20 and the Court's scheduling orders, defendant may not seek relief under CPL § 330.30(1) now.

**B.    None of the cited grand jury evidence should be precluded.**

If the Court nonetheless considers the sufficiency of the grand jury evidence notwithstanding defendant's failure to preserve the argument, the Court should deny defendant's request to dismiss the indictment.

As an initial matter, the evidence defendant claims was erroneously presented to the grand jury is not entitled to any protection on a claim of presidential immunity. The grand jury testimony from Hicks, Pecker, and Cohen, as well as the four Tweets defendant issued while serving as President, all reflect unofficial conduct and are admissible for the reasons described in Part II above.

Defendant further objects to grand jury testimony from ████████████, who was not called as a witness at trial, regarding ██████████████████████████ Def.'s Mem. 41 (citing GJ Tr. 731-764). This vague and cursory reference to the witness's testimony does not adequately present any claim of immunity, and the Court should reject defendant's argument without more. Regardless, the bulk of the cited testimony relates exclusively to ██ ██████████████████████ which has nothing to do with "*the President's* immune conduct." *Trump*, 144 S. Ct. at 2341 (emphasis added). And the handful of passing references to ████████████████████████ ██████████. The witness testified that ████████████████ ████████████████████████ ████████████████████████ ████████████ GJ Tr. 763 ████. As a federal court already held in considering this exact conduct, "[h]ush money paid to an adult film star," as "a cover-up of an

embarrassing event," "is not related to a President's official acts. It does not reflect in any way the color of the President's official duties." *Trump*, 683 F. Supp. 3d at 344-45. Indeed, the witness specifically told the grand jury that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ GJ Tr. 754 ▮▮▮▮▮.

The witness's testimony was admissible.

### C. Even excluding all of the evidence defendant belatedly identifies as immune, the grand jury record is easily sufficient to support the indictment.

Excluding the evidence defendant opposes does not undermine the indictment in any event, because the grand jury record without the purported official-acts evidence far exceeds the required *prima facie* showing on every element of first-degree falsifying business records. *See Trump*, 114 S. Ct. at 2340 (recognizing that indictment could be sustained if "sufficient allegations support the indictment's charges without [immune] conduct").

"[T]he submission of some inadmissible evidence during the [grand jury presentation] is held to be fatal only when the remaining legal evidence is insufficient to sustain the indictment." *People v. Avant*, 33 N.Y.2d 265, 271 (1973); *see also People v. Huston*, 88 N.Y.2d 400, 409 (1996). "Legally sufficient evidence" is defined as "competent evidence which, if accepted as true, would establish every element of an offense charged and the defendant's commission thereof." CPL § 70.10(1). In the grand jury context, "legal sufficiency means prima facie proof of the crimes charged, not proof beyond a reasonable doubt." *People v. Bello*, 92 N.Y.2d 523, 526 (1998) (citing *People v. Mayo*, 36 N.Y.2d 1002, 1004 (1975)). The standard for the Court's review is therefore "'whether the facts, if proven, and the inferences that logically flow from those facts supply proof of every element of the charged crimes,' and whether 'the Grand Jury could rationally have drawn the guilty inference.'" *Id.* (quoting *People v. Deegan*, 69 N.Y.2d 976, 979 (1987)).

62

Contrary to defendant's suggestion, Def.'s Mem. 42-43, the First Department's opinion in *People v. Ohrenstein*, 153 A.D.2d 342 (1st Dep't 1989), does not change the Court's standard of review in this context. The charges in *Ohrenstein* were dismissed because the indictment there was "based on" evidence that was inadmissible pursuant to Speech or Debate Clause immunity under the New York Constitution. 153 A.D.2d at 356. Nothing in *Ohrenstein* creates a different rule for legal sufficiency of an indictment when evidence related to immune acts is improperly presented to the grand jury; rather, on the facts of that case, there was insufficient admissible evidence to support the charges. *See id.* at 357 ("[T]he People failed to meet their obligation of showing that the prosecution [of certain counts] could proceed without touching upon the specifics of . . . privileged legislative assignments."). But as described below, the indictment in this case was not "based on" any evidence of immune conduct, and the overwhelming grand jury record supports a *prima facie* showing of defendant's guilt without any reliance whatsoever on any official-acts evidence.

*1.* The grand jury evidence establishes that the records defendant falsified are all records of an enterprise. An "enterprise" is "any entity of one or more persons, corporate or otherwise, public or private, engaged in business, commercial, professional, industrial, eleemosynary, social, political or governmental activity." PL § 175.00(1). The Trump Organization is a collection of approximately 500 separate entities that own and manage hotels, golf courses, commercial real estate, condominium developments, and other properties. GJ Tr. 108, 110, 118-121 ▮▮▮▮▮▮; GJ Tr. 230, 235, 239-241 ▮▮▮▮▮. The Trust owns all of the entities that collectively comprise the Trump Organization. GJ Tr. 119-121, 146-148 ▮▮▮▮▮. Defendant is the sole beneficiary of the Trust and the beneficial owner of the entities that make up the Trump Organization. GJ Tr.

120 ▓▓▓▓▓▓ . All three entities maintain records of their business activities. GJ Tr. 122-131, 196 ▓▓▓▓▓▓ ; GJ Tr. 287-297 ▓▓▓▓▓▓ .

2. The grand jury record also establishes that the falsified invoices, general ledger entries, and checks with check stubs are "business records." PL § 175.00(2). The invoices were addressed to ▓▓▓▓▓▓ (then the Trump Organization's Chief Financial Officer); were "kept or maintained" by an enterprise; and evidence its "condition"—namely, its obligation to reimburse the payee as described in the invoice. GJ Tr. 184-213 ▓▓▓▓▓▓ ; GJ Tr. 292-295, 317-319, 361-364 ▓▓▓▓▓▓ ; GJ Tr. 891-908 ▓▓▓▓▓▓ ; GJ-20. The same is true of the general ledger entries recording the Cohen repayments, which the Trump Organization maintained as records that a payment had been made to Cohen for a retainer. GJ Tr. 363-364 ▓▓▓▓▓▓ ; GJ-21. And the signed checks and check stubs were maintained in the Trump Organization's files to reflect its satisfaction of its repayment obligations. GJ Tr. 261-262, 295, 319-323, 363-364 ▓▓▓▓▓▓ ; GJ-22.

3. The business records all contain false entries. They record that Cohen billed and was paid for services rendered pursuant to a retainer agreement. GJ-20; GJ-21; GJ-22. There was no retainer agreement, and Cohen was not paid for services rendered during any month of 2017. GJ Tr. 882-908 ▓▓▓▓▓▓ . Instead, the grand jury evidence establishes—through witness testimony, ▓▓▓▓▓▓ handwritten notes on the shell company bank statement grossing up the $130,000 expense to a $420,000 repayment (GJ-5), and ▓▓▓▓▓▓ notes recording how that obligation would be repaid (GJ-6)—that the payments to Cohen in 2017 were monthly reimbursements for the Daniels payoff (plus the Red Finch expense and a supplemental 2016 bonus). GJ Tr. 152-177, 215-217 ▓▓▓▓▓▓ ; GJ Tr. 514-519, 530-532 ▓▓▓▓▓▓ ; GJ Tr. 619-643 ▓▓▓▓▓▓ ; GJ Tr. 882-908, 957-958 ▓▓▓▓▓▓ ; GJ-5; GJ-6; GJ-43; GJ-63.

*4.* Defendant made or caused the false entries. He personally signed nine of the eleven falsified checks. GJ-22; GJ Tr. 274-275, 340 ▮▮▮▮; GJ Tr. 897, 899-900, 902-908 ▮▮▮▮. Other employees of the Trump Organization created the remaining false records, and the evidence shows that defendant set the repayment scheme in motion, and that the creation of business records to carry out that scheme was a predictable consequence of defendant's decision to reimburse Cohen through monthly checks that disguised the reimbursement. GJ Tr. 27-29, 53-57, 65, 83-91 ▮▮▮; GJ Tr. 145, 169, 199 ▮▮▮; GJ Tr. 271-277, 288-290 ▮▮▮; GJ Tr. 866-870, 888-891 ▮▮▮; GJ-5; GJ-6; GJ-22.

*5.* Defendant acted with intent to defraud. The grand jury evidence established that defendant sought to purchase and suppress information that could have affected his presidential campaign, and made and caused false entries in the relevant business records in order to prevent public disclosure of both the scheme and the underlying information. GJ Tr. 31-37, 83-85, 88-93 ▮▮▮; GJ Tr. 297-361 ▮▮▮; GJ Tr. 668, 681-687 ▮▮▮; GJ Tr. 577-590 ▮▮▮; Tr. 854-857, 865-871, 875, 888-891 ▮▮▮. The grand jury record also supports the conclusion that defendant concealed information with the intent to defraud the government, including election regulators, based on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See* GJ Tr. 838-839, 843-845, 871-872 ▮▮▮; GJ-71.

*6.* Defendant's intent to defraud included the intent to commit or conceal other crimes, including violations of Election Law § 17-152. The grand jury evidence is sufficient to support the conclusion that defendant and others "conspire[d] to promote" the "election of any person to a

public office" by entering into a scheme to influence the 2016 presidential election by unlawful means—including by violating FECA through unlawful individual and corporate contributions by Cohen, Pecker, and AMI; and by falsifying the records of other New York enterprises and mischaracterizing the nature of the repayment for tax purposes. *See generally* People's Mem. Opp. Omnibus Mots. 3-8, 23-25, 37-44 (citing grand jury record).

The extensive grand jury evidence cited above far exceeds the required *prima facie* showing of every element of falsifying business records in the first degree. *See Bello*, 92 N.Y.2d at 526; PL § 175.10. And no part of the grand jury record described above relies on any official-acts evidence. Because the indictment is overwhelmingly supported by admissible evidence, *see Avant*, 33 N.Y.2d at 271, defendant's belated and unpreserved effort to dismiss the indictment should be rejected.

DATED:     July 24, 2024                Respectfully submitted,

                                        ALVIN L. BRAGG, JR.
                                        *District Attorney, New York County*

                                        By: */s/ Matthew Colangelo*
Steven C. Wu                            Matthew Colangelo
Alan Gadlin                             Christopher Conroy
Philip V. Tisne                         Susan Hoffinger
 *Of Counsel*                           Becky Mangold
                                        Joshua Steinglass
                                          *Assistant District Attorneys*
                                        New York County District Attorney's Office
                                        1 Hogan Place
                                        New York, NY 10013