# EXHIBIT X

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,                    Index No. 71543-23

                - against -

DONALD J. TRUMP,

                           Defendant.

**PRESIDENT DONALD J. TRUMP'S REPLY IN FURTHER SUPPORT OF
POST-TRIAL PRESIDENTIAL IMMUNITY MOTION**

## TABLE OF CONTENTS

I.    The Indictment Must Be Dismissed ................................................................. 2

   A.   There Is No Procedural Bar To Dismissal ................................................. 2

   B.   Dismissal Is Required And In The Interest Of Justice ............................... 2

II.   The Jury's Verdicts Cannot Stand ................................................................ 4

   A.   The Presidential Immunity Objections Are Adequately Preserved ............... 4

   B.   President Trump Did Not "Open The Door" To Presidential Immunity Violations ........ 7

   C.   The Removal Proceedings Are Not Relevant ................................................. 7

   D.   There Is No "Public Record" Exception To Presidential Immunity .............. 8

   E.   DANY Misapprehends The Significance Of *Clinton* .................................. 9

   F.   DANY Impermissibly Offered Official-Acts Evidence At Trial .................... 10

      1.   President Trump's Official Communications With Hicks .................... 10

      2.   Westerhout's Observations Of President Trump's Official Acts ............ 12

      3.   President Trump's Official Public Statements Via Twitter ................... 13

      4.   President Trump's Official Acts In Response To FEC Inquiries ............ 16

      5.   Official-Acts Evidence Relating To Inquiries By Congress And Prosecutors ........ 17

      6.   President Trump's Official Disclosures On OGE Form 278e .................. 18

III.   The Presidential Immunity Errors Were Not And Are Never "Harmless" ...................... 18

IV.   Conclusion ....................................................................................................... 20

The Supreme Court of the United States ruled conclusively and unequivocally that President Trump is protected by immunity for his official acts. In this case, a politically motivated district attorney violated that immunity by using official-acts evidence in grand jury proceedings and at trial. Therefore, the case must be dismissed, and the jury's verdicts must be vacated.

President Trump respectfully submits this reply in further support of his Presidential immunity motion ("Def. Mot.") and in response to DANY's opposition brief ("Opp'n").[1] DANY concedes that *Trump* was an "intervening decision" that resulted in a "newly announced rule." Opp'n at 12, 16 n.3, 22. Because that is true, and because President Trump raised Presidential immunity objections with this Court and the First Department, DANY's preservation arguments are meritless. DANY fought President Trump's pretrial motions and urged the Court to rush ahead to trial. That was wrong. The *Trump* Court made clear that "pretrial review" of these issues was necessary. 144 S. Ct. 2312, 2343 (2024). President Trump is entitled to absolute immunity and disputes that rebuttable presumptive Presidential immunity can ever be "sufficient" to protect the interests at stake, which is an issue the Supreme Court expressly left open. *Id.* at 2327. But in light of DANY's strenuous resistance to the reasonable pre-trial request to wait for the *Trump* decision, they are not entitled to a post-trial rebuttal opportunity. The bell cannot be unrung. DANY's Presidential immunity violations were not "merely" trial errors, and the violations were certainly not "harmless" where DANY's star witness committed perjury before and during the trial. Opp'n at 35. In any event, harmless-error review is an "inadequate safeguard" for these structural Constitutional violations, 144 S. Ct. at 2341, which adversely impacted the "mode of proceedings" mandated by the *Trump* Court and the Constitutional structure that will guide future Presidents.

---

[1] On July 29, 2024, purported *amici curiae* sought leave to file an opposition brief. To the extent the Court authorizes the filing, President Trump respectfully requests two weeks to respond.

1

## I.    The Indictment Must Be Dismissed

### A.    There Is No Procedural Bar To Dismissal

President Trump's dismissal motion was not waived or forfeited. In *Trump*, the Supreme Court addressed first-impression questions of "lasting significance," 144 S. Ct. at 2346, and issued a "newly announced rule," Opp'n at 12, 22.[2] Thus, *Trump* constitutes "good cause" for the timing of the motion, and remedying the pervasive Presidential immunity violations in this case is in the "interest of justice." CPL §§ 210.20(3), 255.20(3); *see also People v. Marte*, 197 A.D.3d 411, 414 (1st Dep't 2021) ("[A]n intervening marked change in the law may arguably provide a reason . . . to allow an otherwise untimely motion . . . .").[3]

The split decision in *Cabrera* does not support DANY's argument. *See* Opp'n at 60. *Cabrera* concerned the distinct issue of *appellate* preservation and did not address the "good cause" or "interest of justice" standards under the CPL. *See* 41 N.Y.3d 35, 44 (2023). Unlike in *Cabrera*, President Trump has presented the argument to this Court so that it can be addressed and an adequate record is created for appellate review, if necessary. Furthermore, the defendant in *Cabrera* relied on a Supreme Court decision that "did not directly address the constitutional questions" he raised. *Id.* at 49. That is not true here.

### B.    Dismissal Is Required And In The Interest Of Justice

"The essence of immunity is its possessor's entitlement not to have to answer for his conduct in court." *Trump*, 144 S. Ct. at 2340. The *Trump* Court rejected the claim that "grand juries will not permit political or baseless prosecutions from advancing in the first place." *Id.* at

---

[2] Unless otherwise noted, all citations are "cleaned up," in that internal quotation marks and citations are removed.

[3] *Accord People v. Hackett*, 166 A.D.3d 1483, 1483 (4th Dep't 2018); *People v. Weaver*, 112 A.D.2d 782 (4th Dep't 1985); *People v. Fox*, 17 Misc. 3d 281, 282 n.1 (Sup. Ct. Kings Cnty. 2007).

2344. Presidential immunity is "necessary" where, as here, a prosecutor "seeks to charge . . . the President himself for his official actions." *Id.* at 2331. DANY violated the Presidential immunity doctrine by presenting official-acts evidence to the grand jury. Therefore, the Indictment must be dismissed pursuant to CPL §§ 210.20(1)(i), 210.35(5).

DANY offers no independent arguments regarding the official-acts evidence that they presented to the grand jury through ████████████ and ████████████ ████. *See* Opp'n at 61; Def. Mot. at 41. For the reasons set forth in the Defense Motion and below, that evidence violated the Presidential immunity doctrine. DANY's mischaracterizations of President Trump's arguments regarding ████████, as "vague and cursory," are not a basis for ignoring additional violations of the Presidential immunity doctrine resulting from official-acts testimony by another one of President Trump's closest White House advisers. Opp'n at 61. The Defense Motion cited to ████████ challenged testimony, which included conversations that ████ had with President Trump during his first term in Office regarding ████████████ ████████. GJ Tr. 754-58, 763-64. Similar to the White House conversations with Hicks, President Trump's statements to ████ were part of discussions in which he was seeking advice from ████████████ GJ Tr. 731, regarding ████████████ ████████████████.

Likely due to the fact that "the President's need for complete candor and objectivity from advisers calls for great deference from the courts," DANY does not even try to rebut any presumption of immunity from the official-acts testimony presented to the jury. *Trump*, 144 S. Ct. at 2330. Sufficiency and harmless-error analysis do not apply to Presidential immunity violations. *See infra* Part III. The requirement that prejudice "may" result from these violations under CPL § 210.35(5) is satisfied, as the Supreme Court explained that Presidential immunity violations

3

create the "likely prospect of an Executive Branch that cannibalizes itself," *Trump*, 144 S. Ct. at 2346. In addition to the harm to President Trump, any failure by the courts to faithfully apply the Presidential immunity doctrine will irreparably damage the "institution of the Presidency." *Id.* at 2341. These violations and the resulting harms to the "welfare of the community" by weakening the Presidency—including damage to future Presidents and the citizens they serve—are "exceptionally serious." CPL §§ 210.40(e), (h). "[A] judgment of conviction would serve no useful purpose," and dismissal would improve "the confidence of the public in the criminal justice system." CPL §§ 210.40(g), (j). Accordingly, the Indictment must be dismissed.

## II. The Jury's Verdicts Cannot Stand

### A. The Presidential Immunity Objections Are Adequately Preserved

DANY does not dispute that the defense adequately lodged trial objections to official-acts testimony from Hicks and the OGE Form 278e, GX 81, but they wrongly contend that President Trump's other challenges to the trial evidence are "largely unpreserved." Opp'n at 9-12.

President Trump raised Presidential immunity objections to DANY's trial proof before and during the trial, including in the Appellate Division. The March 7, 2024 pretrial motion sought preclusion of all official-acts evidence, cited anticipated testimony from Hicks and Cohen as examples, and stated that the same preclusion rule applied to "other witnesses." Def. Mot. Ex. 2 at 23. After the Court erroneously denied the motion based on CPL § 255.20, President Trump sought a writ of prohibition in the First Department. *See Trump v. Merchan*, Case No. 2024-02413 (1st Dep't Apr. 10, 2024). In that Petition, President Trump reiterated objections to ███████████████ ████████████████, ██████████████, and ██████████████████████████████ *Id.* ████████████████████████████████████████████████████████

NYSCEF Doc. No. 5 ¶¶ 241-44. The Court was fully aware of President Trump's arguments in

that proceeding, as counsel for Your Honor entered an appearance and opposed the application. *See id.* NYSCEF Doc. No. 15.

After the First Department denied the Article 78 Petition in a manner that is inconsistent with its own caselaw, *People v. Ohrenstein*, 153 A.D.2d 342 (1st Dep't 1989), as well as *Trump*, the defense renewed the Presidential immunity objections during jury selection and in an April 15, 2024 pre-motion letter. Tr. 53-55; Def. Mot. Ex. 5. On April 19, 2024, the Court acknowledged that the parties had "already made your arguments." Tr. 802. The defense also objected the first time the Presidential immunity issue arose during the trial, in connection with testimony from Hicks. Tr. 2121-22. The Court overruled the objection, warned that "I believe I ruled on this," and explained that defense counsel did not "need to object as to each question." Tr. 2122. In order to make clear that President Trump maintained the immunity objection as to documentary official acts, the defense objected to the OGE Form 278e. Tr. 2370. DANY incorporated by reference their since-rejected arguments challenging the existence of Presidential immunity, and the Court issued a two-word ruling: "I agree." Tr. 2370. For the avoidance of doubt, the defense renewed the objection to the Twitter posts in a manner that was consistent with the Court's prohibition on speaking objections. Tr. 3168; *see also* Tr. 80.

For purposes of a CPL § 330.30 motion, nothing more was required. *See* CPL § 470.05(2). In *People v. Prado*, for example, the Court of Appeals found an issue to be preserved because there was a "general motion to dismiss" and "specific findings" by the trial court such that "the question now on appeal was expressly decided by that court." 4 N.Y.3d 725, 726 (2004). On multiple occasions, this Court "plainly was aware of, and expressly decided"—erroneously—that Presidential immunity did not exist. *People v. Hawkins*, 11 N.Y.3d 484, 493 (2008). "As a general matter, a lawyer is not required, in order to preserve a point, to repeat an argument that the court

has definitively rejected." *People v. Finch*, 23 N.Y.3d 408, 413 (2014).[4] President Trump was not required to "antagonize the court or test its patience even further" by later reiterating the same Presidential immunity objection, such as during Cohen's testimony regarding President Trump's official acts. *People v. Resek*, 3 N.Y.3d 385, 388 n.1 (2004).

DANY once again places heavy reliance on *Cabrera*. *See* Opp'n at 11. In addition to the reasons stated above, *Cabrera* is distinguishable because, unlike here, the defendant in that case "did not raise these constitutional arguments before the trial court." 41 N.Y.3d at 42. The two-judge dissent in *Cabrera* also incorporated by reference a separate dissent that pointed to the established "exception" to "preservation rules when an intervening decision from the United States Supreme Court changes the legal landscape, upending established decisional law." *People v. Garcia*, 41 N.Y.3d 62, 75 (2023) (Rivera, J., dissenting) (citing *People v. Patterson*, 39 N.Y.2d 288, 296 (1976) and *People v. Thomas*, 50 N.Y.2d 467, 474 (1980)); *see also Cabrera*, 41 N.Y.3d at 61 n.3 (Rivera, J., dissenting). That is exactly what happened here.

Finally, Presidential immunity errors are "mode of proceedings" defects for which preservation is not required (and harmless-error review is unavailable). *See* Def. Mot. at 45; *see also infra* Part III. For all of these reasons, DANY has not established any procedural bar to review of their Presidential immunity violations.

---

[4] *See also, e.g.*, *People v. Medina*, 18 N.Y.3d 98, 104-05 (2011) (argument regarding lack of statutory definitions in jury instructions preserved despite not requesting the definitions where counsel "expressed concern" about the "meaning of the phrase" and "requested a particular charge as to intent with regard to that phrase"); *People v. Woody*, 214 A.D.3d 157, 166-67 (1st Dep't 2023) (finding issue preserved where "defendant made a clear objection during the pretrial motion in limine"); *People v. Jean-Baptiste*, 38 A.D.3d 418, 420 (1st Dep't 2007) ("[T]aken as a whole, the motion was sufficiently specific to preserve this issue for our consideration.").

**B.**    **President Trump Did Not "Open The Door" To Presidential Immunity Violations**

DANY wrongly claims that President Trump opened the door to certain official-acts evidence, in the form of three of the 2018 Tweets and testimony from Cohen regarding congressional investigations. Opp'n at 18. The argument fails because President Trump's strategic decisions regarding Cohen's lack of credibility were informed by the dismissive treatment afforded to Presidential immunity throughout the proceedings.

Moreover, the only authority DANY cites is New York Evidence Rule 4.08 and irrelevant caselaw relating to qualified non-Constitutional privileges that can be waived by the privilege holder. The Note to Rule 4.08 acknowledges, however, that the door-opening principle was "limited" by the Supreme Court in *Hemphill v. New York*, 595 U.S. 140, 154 (2022) ("[The Sixth Amendment] admits no exception for cases in which the trial judge believes unconfronted testimonial hearsay might be reasonably necessary to correct a misleading impression."). The Constitutional reasoning in *Hemphill* applies even more forcefully to Presidential immunity, which imposes unwaivable Constitutional requirements based on concerns about harms to future Presidents and the federal Government, as opposed to the individual Constitutional rights of a particular criminal defendant. President Trump did not "open the door" to any such harms.

**C.**    **The Removal Proceedings Are Not Relevant**

DANY repeatedly relies on inapposite removal proceedings in *New York v. Trump* that have no bearing on this motion. *E.g.*, Opp'n at 12, 15, 17. There is no authority for DANY's argument that a defendant waives defenses by not raising them in a removal proceeding, and the assertion is particularly ridiculous when the defense at issue is—as DANY concedes—based on a new Supreme Court rule announced in an intervening decision. *E.g.*, Opp'n at 12 n.2. In addition, the court did not address "official acts" and instead construed the statutory phrase "act under color

of such office," 28 U.S.C. § 1442(a)(1). *See* 683 F. Supp. 3d 334, 343-44 (S.D.N.Y. 2023). Thus, the court's reasoning is irrelevant, and the disputed fact-finding in the removal proceeding adds no force to DANY's efforts to rebut any presumptive Presidential immunity.

### D.    There Is No "Public Record" Exception To Presidential Immunity

DANY misreads footnote 3 of the *Trump* decision to argue that Presidential immunity does not apply to evidence that "consists of a public record of an official act." Opp'n at 13. This made-up "public record" exception is refuted by the *Trump* opinion and common sense. Indeed, DANY elsewhere recognized that there are "public comments that the Supreme Court indicated would qualify as official presidential conduct." Opp'n at 15.

DANY claims that they did not violate the Presidential immunity doctrine by offering President Trump's Tweets because they "admitted nothing more than the 'public record' of those Tweets." Opp'n at 17; *see also id.* at 25-26. Were that the case, the Supreme Court would not have devoted an entire subsection of *Trump* to analyzing public statements (including Tweets), invoked the Presidential "bully pulpit," and referenced a President's "extraordinary power to speak to his fellow citizens and on their behalf." *Trump*, 144 S. Ct. at 2339-40.

The language DANY seized upon in footnote 3 of *Trump* cannot be generalized. In that portion of the opinion, the Supreme Court addressed a specific concern from Justice Barrett regarding bribery prosecutions under 18 U.S.C. § 201(c). *See Trump*, 144 S. Ct. at 2354 (Barrett, J., concurring in part). Bribery has a unique Constitutional status, *see* Art. II, § 4, and Congress has assigned a narrow meaning to the term "official act" for that offense, 18 U.S.C. § 201(a)(3).[5]

---

[5] The Supreme Court restricted the statutory definition of "official act" in a decision cited in *Trump*. *See McDonnell v. United States*, 579 U.S. 550, 569-72 (2016). In another decision that cabins footnote 3 of *Trump*, the Supreme Court held that the analogous concept of legislative immunity restricts the scope of "official acts" in a federal bribery prosecution by foreclosing "any

Thus, at most, footnote 3 of *Trump* stands for the proposition that federal prosecutors could "point to the public record" in a bribery prosecution of a former President as proof of a § 201 "official act." 144 S. Ct. at 2341 n.3. There is no basis for DANY's efforts to stretch that narrow proposition to permit prosecutors to probe the content of a President's public statements as supposed proof of the President's state of mind or motivations, which is exactly what DANY did in this case.

### E.    DANY Misapprehends The Significance Of *Clinton*

DANY whiffs at a strawman in response to President Trump's reliance on *Clinton*, which confirms that public statements on behalf of a sitting President regarding pre-Presidency matters are within the "outer perimeter" of Presidential authority—even when the statements are issued by private parties regarding private matters. *Compare* Opp'n at 24-25, *with* Def. Mot. at 28, 36-37.

In *Clinton*, the Supreme Court reasoned that a state-law defamation claim "arguably may involve conduct within the outer perimeter of the President's official responsibilities." 520 U.S. 681, 686 (1997). The defamation claim was based on responses by President Clinton to allegations from Paula Jones, which were issued by White House aides, a White House Spokeswoman, and a private attorney. *See* Def. Mot. at 29 n.10. The fact that the eight Justices who joined the *Clinton* opinion believed that public statements by White House personnel and a private party responding to Jones's allegations of a pre-Presidency sexual assault were "arguably" within the outer perimeter demonstrates that President Trump's Tweets and conversations with advisers regarding allegations of pre-Presidency matters are not "manifestly" or "palpably" beyond Presidential authority, which is the boundary of the "outer perimeter" under *Trump*. 144 S. Ct. at 2333. Even if the language from *Clinton* could be considered dicta, which we do not concede, "dicta from the

---

showing of how" a member of Congress "acted, voted, or decided." *United States v. Brewster*, 408 U.S. 501, 527 (1972).

Supreme Court is not something to be lightly cast aside." *Schwab v. Crosby*, 451 F.3d 1308, 1325 (11th Cir. 2006). Therefore, *Clinton* provides powerful support for President Trump's arguments that DANY's proof in the grand jury and at trial involved evidence of official acts.

### F.    DANY Impermissibly Offered Official-Acts Evidence At Trial

#### 1.  President Trump's Official Communications With Hicks

DANY elicited testimony from Hicks regarding official acts by President Trump. Specifically, Hicks testified about her conversations with President Trump, while she was the White House Communications Director, regarding (1) a January 2018 *Wall Street Journal* article (GX 181), Tr. 2217; (2) a February 2018 *New York Times* article, Tr. 2219-21; and (3) a March 2018 CNN interview, Tr. 2214-15. *See* Def. Mot. at 9-11. President Trump's conversations addressed then-existing statements and allegations—levied during the Presidency—by Cohen, Daniels, and the FEC. Thus, DANY cannot escape the Presidential immunity doctrine by claiming that the "subject matter" of the discussions related to events that occurred prior to President Trump's first term. Opp'n at 22.

As with ███████, President Trump spoke about these topics with Hicks, a close adviser, pursuant to his "core constitutional powers." *Trump*, 144 S. Ct. at 2327. He did so as part of his efforts to supervise Hicks's work, and to ensure that Hicks and her staff were prepared to address questions as she communicated with the media and the public on behalf of the White House regarding President Trump's priorities and agenda. The absolute immunity that attaches to these conversations is not based entirely "on a government official's role." Opp'n at 20-21. Rather, the immunity derives from the nature of the authority President Trump was exercising.

In this regard, DANY did not address President Trump's citations to the Executive Vesting Clause, the Take Care Clause, *Myers*, and the discussion of *Seila Law* in *Trump*. Def. Mot. at 27.

These provisions establish Presidents' "long-recognized . . . power" to "us[e] the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Trump*, 144 S. Ct. at 2340. Presidents can exercise this Constitutional authority individually or through Executive Branch personnel they "supervise," which also "follows from the text of Article II." *Id.* at 2328. This Presidential authority is "conclusive and preclusive," because Congress cannot limit a President's ability to speak to the public, and is therefore subject to "absolute" immunity. *Id.* at 2327.

DANY's suggestion that a President's internal communications with White House advisers are "palpably" or "manifestly" outside even the outer perimeter of Presidential authority is brazenly inaccurate. *Trump*, 144 S. Ct. at 2333. Their argument proceeds by ignoring Hicks's trial description of her job responsibilities, which included "'coordinating all of the communication efforts for the Administration'" and efforts to "'showcase . . . the President in a good light.'" Def. Mot. at 9 (quoting Tr. 2210). When compared to that testimony, DANY's citation to *Thompson v. Trump* is frivolous. Opp'n at 24. Each of the "scenarios" posited by the *Thompson* court involved a President involved in campaign-related activities, such as "a party fundraising event." 590 F. Supp. 3d 46, 80 (D.D.C. 2022). President Trump did not speak to Hicks about these topics in 2018 as a candidate; he spoke to her as President.

Although it is true that the demands on a President's time may include "some private" matters, *Clinton*, 520 U.S. at 705 n.40, the testimony at issue related to conversations based largely on media inquiries that were routed to Hicks and ultimately President Trump through the White House. As part of the response to those formal inquiries and related coverage on CNN, President Trump spoke with Hicks to prepare her to do her job at the White House and "act in a manner that promotes the President's view of the public good" by providing context for the allegations. *Trump*,

144 S. Ct. at 2338. President Trump's statements to Hicks in connection with these activities were part of his official responsibilities, well within the outer perimeter, and DANY's conclusory efforts to recast the testimony as unofficial "private conversations" has no record support. Opp'n at 23.

DANY has not met any "burden to rebut the presumption of immunity." *Trump*, 144 S. Ct. at 2337. If the presumption exists, it applies despite a hostile prosecutor's conclusory assertion that official-acts evidence would not impact "the President's official decisionmaking." Opp'n at 24. To rebut the presumption, DANY must establish that using the evidence "would pose *no dangers* of intrusion on the *authority and functions* of the Executive Branch." 144 S. Ct. at 2331-32 (emphasis added). With respect to official internal interactions between Presidents and White House advisers such as Hicks (as well as Westerhout and ███████), the Supreme Court has recognized "the need to protect 'communications between high Government officials and those who advise and assist them in the performance of their manifold duties.'" *Trump*, 144 S. Ct. at 2330 (quoting *United States v. Nixon*, 418 U.S. 683, 705, 708 (1974)). Whereas the *Nixon* Court addressed a subpoena calling for evidence of such interactions, "[c]riminally prosecuting a President for official conduct undoubtedly poses a far greater threat . . . ." *Id.* at 2331. Therefore, DANY cannot rebut presumptive immunity as to Hicks's testimony.

### 2. Westerhout's Observations Of President Trump's Official Acts

DANY acknowledges, as they must, that the challenged portions of Westerhout's testimony concerned President Trump's "basic work habits" and "work practices" as President, as well as national security procedures involving the Situation Room and "methods of air transportation" using official White House aircraft. Opp'n at 27-28.

There is no *de minimis* exception to "trigger" Presidential immunity, and DANY does not address President Trump's argument that the immunity at issue is absolute because President

Trump's activities were undertaken pursuant to his "core" Commander in Chief authority. Opp'n at 27; Def. Mot. at 32. DANY finds it "difficult to imagine criminal liability stemming from general work practices," but that is exactly the type of evidence that Special Counsel Jack Smith relied on, impermissibly, in a since-dismissed prosecution. Opp'n at 28.[6] Apart from that feigned lack of imagination, DANY does not seriously dispute that President Trump's decisions about how to run the White House were at least within the outer perimeter of his official responsibilities.

As to rebuttal, DANY offers irrelevant assertions about the "purpose" of Westerhout's testimony and "what mattered" to the prosecutors. Opp'n at 28. DANY cannot rebut presumptive immunity concerning invasive testimony about a President's daily activities by claiming that the testimony was "unlikely to influence any decision that . . . a future President . . . makes." Opp'n at 29. "Unlikely" is not enough. DANY must establish through evidence that "no dangers" of intrusion arise from the use of this evidence. *Trump*, 144 S. Ct. at 2331. They cannot do so because the prospect of future testimony at a post-Presidency criminal trial regarding the President's management practices in the Oval Office would "render him unduly cautious in the discharge of his official duties." *Trump*, 144 S. Ct. at 2329.

### 3. President Trump's Official Public Statements Via Twitter

DANY relied on evidence of five official Tweets that President Trump issued as part of his "conclusive and preclusive" authority to communicate with the public about matters of public concern. Even if the Court extends *Trump* to recognize presumptive immunity for outer-perimeter official acts, DANY has not rebutted the presumption described by the Supreme Court.

---

[6] *See, e.g.*, Superseding Indictment ¶ 2, *United States v. Trump*, 23 Cr. 80101 (S.D. Fla. July 27, 2023) (allegation regarding President Trump's document-handling practices "[o]ver the course of his presidency"); *see also id.* ¶ 20 (alleging that President Trump "received intelligence briefings").

Contrary to DANY's claim, there is no requirement that a President's public statement "purport to discharge an official duty" in order to be an official act. Opp'n at 15. Public statements "certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision." *Trump*, 144 S. Ct. at 2333. In any event, two of the Tweets specifically referenced ongoing investigations and therefore did, in fact, relate to the President's core official duties. *See* GX 407-F ("Government"); GX 407-I ("Justice," *i.e.*, DOJ). These Tweets touched on "[i]nvestigative and prosecutorial decisionmaking," which is the "special province" of the President. *Trump*, 144 S. Ct. at 2335. Thus, President Trump is entitled to absolute, unrebuttable immunity with respect to, at least, GXs 407-F and 407-I.

"[C]ontext" also matters. *Trump*, 144 S. Ct. at 2340. For each of the challenged 2018 Tweets, President Trump used an official communications channel of the White House—aided by White House employees Westerhout and Scavino, Tr. 2991-92—to address "matters of public concern." *Trump*, 144 S. Ct. at 2340. Thus, President Trump's position is supported by *Lindke* and the Second Circuit's decision in *Knight*, which was only vacated due to a change in Presidential administrations. *See* Opp'n at 19-20; *see also Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220, 1221 (2021) (Thomas, J., concurring); *Lindke v. Freed*, 601 U.S. 187, 203 (2024) ("[A]n official who uses government staff to make a post will be hard pressed to deny that he was conducting government business.").

The fact that the Tweets referenced Cohen and Daniels did not render the communications unofficial. Opp'n at 14-15. "[M]ost of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities," especially where they address *current* matters of "public concern." *Trump*, 144 S. Ct. at 2340. Daniels described an April 2018 Tweet by President Trump in response to false public claims that Daniels and others made

for the first time in 2018. Tr. 2707-08. GX 407-F related to a widely covered FBI search targeting Cohen in April 2018. GX 407-G addressed public allegations that were being investigated at the time in May 2018 by DOJ and the FEC, both federal agencies that President Trump oversaw. GXs 407-H and -I related to Cohen's August 2018 guilty plea. Similar to the media activities that President Trump discussed with Hicks, even if the underlying historical allegations were private and pre-Presidential, these public Tweets concerned developments that arose while President Trump was the Commander in Chief. Nothing in *Trump* supports DANY's suggestion that Presidents' "extraordinary power to speak to his fellow citizens and on their behalf, *Trump*, 144 S. Ct. at 2339, is limited to circumstances of "pressing policy," "public emergency or tragedy," or a prosecutor's *ex-post* determination that a "national voice" was not needed at the time. Opp'n at 15. The Tweets are within the "arguably" outer perimeter for public statements in *Clinton*, and thus not "palpably" outside the outer-perimeter boundary defined in *Trump*.

Although the immunity attaching to these Tweets is absolute, DANY's efforts to rebut any presumptive immunity are deeply flawed. *See* Opp'n at 16-17. The presumption would apply *because* President Trump issued the Tweets pursuant to his official authority to comment on matters of public concern—a type of Executive power that the Supreme Court has recognized in *Trump*, *Hawaii*, and elsewhere. It is therefore a legally inaccurate non-sequitur to claim, as DANY does, that the Tweets "bore no relationship to any official duty of the Presidency." Opp'n at 16. The "dangers of intrusion" on the Presidency are apparent from DANY's own observation that future Presidents will be concerned that their "public statements may be used as evidence in criminal proceedings." *Id.* at 16-17. Those future Presidents could take no solace in the fact that DANY casually reduced President Trump's statements to "personal opinions." *Id.* at 17. Their argument boils down to a claim that the Tweets were *motivated* by a private purpose, which is a

position that *Trump* forecloses. Thus, even if the Presidential immunity relating to the Tweets could be deemed presumptive, DANY has failed to carry its rebuttal burden.

### 4. President Trump's Official Acts In Response To FEC Inquiries

DANY offered evidence relating to the manner in which President Trump acted pursuant to his exclusive authority under the Take Care Clause to address "[i]nvestigative and prosecutorial decisionmaking" by the FEC and the Justice Department, which were two of the "many departments and agencies within the Executive Branch" that he administered pursuant to Article II. *Trump*, 144 S. Ct. at 2327, 2335. DANY blatantly ignores the Supreme Court's decision by arguing—three separate times—that President Trump's actions in connection with FEC inquiries were not official because, in their view, President Trump intended to "interfere" with the investigations. Opp'n at 30, 31 n.6, 32. These false characterizations of President Trump's motives and intentions are irrelevant. *See Trump*, 144 S. Ct. at 2334-35.

The text messages involving Cohen and Sekulow reflected decisions by President Trump in response to the FEC inquiries that fell within the outer perimeter of Presidential authority pursuant to the *Clinton* dicta discussed above. *See* Def. Mot. at 37-38. In addition, DANY (and Cohen) plainly wanted the jury to infer that President Trump spoke to the Attorney General about the FEC's investigation. The inference DANY pursued related to an "absolutely immune" official act within President Trump's "core" constitutional authority. *See* Def. Mot. at 38-39. No part of the *Trump* decision places a burden on President Trump to "acknowledge whether he ever actually" did so. Opp'n at 32. The mere suggestion of such a defense burden is further evidence of DANY's reckless and untenable approach to these issues and this case. Whether or not the Attorney General conversation happened, Cohen's testimony suggesting that it did violated

Presidential immunity because that evidence concerned the manner in which President Trump "control[ed] those who execute the laws." *Seila Law LLC v. CFPB*, 591 U.S. 197, 213 (2020).

To the extent the Court applies presumptive immunity to the FEC-related evidence, DANY makes almost no effort to rebut it. *See* Opp'n at 31. Similar to Westerhout's testimony, DANY misstates their burden by speculating about what is "unlikely" to impact "presidential decision-making." *Id.* Compounding that error, DANY again invokes impermissible arguments regarding motive and intent through the baseless argument that President Trump's official acts were "gratuitous." *Id.* The prospect of prosecutors seeking to imprison a former President using evidence of the President's exercise of discretion to guide criminal and regulatory investigations within the Executive Branch he is charged with operating would impermissibly intrude on that discretion because—as with the risks arising from DANY's subjective judgments about the intent and motive behind President Trump's public statements—Presidents would have valid concerns that their decisions could be twisted in the future by politically-motivated local prosecutors devoted to a revisionist account of history and interference with the election process.

### 5. Official-Acts Evidence Relating To Inquiries By Congress And Prosecutors

Cohen testified regarding President Trump's public "message" in response to congressional investigations: "[T]here was no Russia-Russia-Russia." Tr. 3550-51. DANY did not address the explicit recognition of Presidential authority to engage with Congress in a "political process" in *Mazars*. *See* Def. Mot. at 39. Nor is the Presidential immunity violation excused by DANY's argument that Cohen only brought this up because he was trying to justify "his own reasons for lying to Congress." Opp'n at 32-33. In addition, through Cohen's reference to "pre-pardons," Tr. 3603, DANY sought a highly prejudicial and inaccurate inference relating to alleged use of Constitutional pardon authority covered by absolute immunity under *Trump*. The suggestion

that the activities were "proposed for an improper purpose do[es] not divest the President of exclusive authority . . . ." *Trump*, 144 S. Ct. at 2335. Even if this evidence was entitled to presumptive rather than absolute immunity, DANY did not even try to rebut the presumption. *See* Opp'n at 31-32.

<h3 style="text-align:center">6. President Trump's Official Disclosures On OGE Form 278e</h3>

DANY's defense of their decision to rely on the OGE Form 278e rests almost entirely on the unsupported "public records" exception that they invented in their opposition brief. *See* Opp'n at 25-26. It is of no moment that "other officials" and "political candidates" are required to complete the Form. *Id.* President Trump completed the Form as President, and he disclosed financial information relating to activities during his first term in 2017. Such disclosures, required by statute and administered by an Executive Branch agency President Trump oversaw, were official acts that were not "palpably" or "manifestly" outside Executive authority. Because the immunity attaching to the document is at least presumptive, DANY cannot meet its rebuttal *burden* by arguing that "[t]here is no evidence whatsoever in the trial record" on the issue. Opp'n at 26. To the extent the rebuttal option is available to DANY at all, it is incumbent upon them to point to facts and evidence supporting their position. The fact that they offered the document through McConney is not enough.

<h2>III.  The Presidential Immunity Errors Were Not And Are Never "Harmless"</h2>

Self-serving explication of the trial record cannot save DANY from the fact that their case turned on Cohen's credibility, which was severely lacking. DANY concedes that the official-acts evidence was presented to bolster this very weakness, *e.g.*, Opp'n at 18, and that is why they emphasized official-acts evidence in summations, *see* Def. Mot. at 51. The Supreme Court warned that official-acts evidence "raise[s] a unique risk that the jurors' deliberations will be prejudiced

by their views of the President's policies and performance while in office." *Trump*, 144 S. Ct. at 2341. Jury selection conclusively demonstrated that to be a severe risk in this case. Therefore, it cannot be said that the Presidential immunity errors in the grand jury and at trial were harmless.

More fundamentally, harmless-error analysis is not available to DANY. Presidential immunity violations are "structural" errors that also fit within New York's "mode of proceedings" exception. These violations impact "all [future] occupants of the Oval Office," and retrospective review is the type of "evidentiary ruling[]" that does not "protect adequately the President's constitutional prerogatives." *Trump*, 144 S. Ct. at 2341, 2347. The risk that prosecutors could violate the doctrine, and later defend the error by claiming that other evidence was overwhelming, is the type of "danger" that would lead Presidents to "be chilled from taking the bold and unhesitating action required of an independent Executive." *Id.* at 2330-31. Harmless-error review would "eviscerate the immunity" that the Supreme Court "recognized." *Id.* at 2340.

The Presidential immunity doctrine implicates each of the "three broad rationales" for deeming errors structural. *Weaver v. Massachusetts*, 582 U.S. 286, 295 (2017). Presidential immunity is not just an individual right; the concept also "protects some other interest." *Id.* Specifically, "the interests that underlie Presidential immunity seek to protect not the President himself, but the institution of the Presidency." *Trump*, 144 S. Ct. at 2341; *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995) ("[T]he doctrine of separation of powers is a structural safeguard rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified."). For this reason, DANY's comparisons to individual Constitutional rights and qualified privileges that lack a Constitutional basis are inapt and meritless. *See* Opp'n at 36-37.[7]

---

[7] *United States v Marcus* is even further far afield. *See* Opp'n at 35. *Marcus* addressed the distinct issue of plain error under federal law. 560 U.S. 258, 260 (2010). The *Marcus* court "reject[ed]"

Presidential immunity errors are also "too hard to measure," *Weaver*, 582 U.S. at 295, because they pose a "unique risk" of prejudice, *Trump*, 144 S. Ct. at 2341. Presidential immunity violations "always result[] in fundamental unfairness." *Weaver*, 582 U.S. at 295. President Trump was subjected to fundamentally unfair proceedings that invited jurors to examine official-acts evidence based on "their views of the President's policies and performance while in office." *Trump*, 144 S. Ct. at 2341. This fundamental unfairness also harms the public because of the adverse impact of these violations on the work of future Presidents to serve the American people.

Based on these same rationales, Presidential immunity violations are "mode of proceedings" errors because they violate "mandated procedural [and] structural" standards established in *Trump. People v. Agramonte*, 87 N.Y.2d 765, 769 (1996). The trial was "irreparably tainted" as a result of these errors. *People v. Mack*, 27 N.Y.3d 534, 541 (2016). That is why even the extraordinary remedy of a writ of prohibition, which President Trump sought in a pretrial Article 78 proceeding, should have been available to address DANY's harm to a "coordinate branch's functions." *Ohrenstein*, 153 A.D.2d at 348. "[F]ocusing on 'transient results'"—by reference to the quantum of evidence in a particular case—would "have profound consequences for the separation of powers and for the future of our Republic." *Trump*, 144 S. Ct. at 2347. Therefore, harmless-error analysis cannot save this case.

## IV.    Conclusion

For the reasons set forth in the Defense Motion and herein, the Court should dismiss the Indictment and vacate the jury's verdicts based on violations of the Presidential immunity doctrine and the Supremacy Clause.

---

the argument that there was a Constitutional "*Ex Post Facto Clause* violation," referred to "jury instruction[s]" as a mitigating consideration, and found only a "tiny risk" of prejudice. *Id.* at 264-66. The *Trump* Court reasoned in the opposite fashion on each of those issues.

Dated:      July 31, 2024
            New York, N.Y.

By: /s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, NY 10005
212-716-1250
toddblanche@blanchelaw.com

*Attorneys for President Donald J. Trump*