# EXHIBIT AA

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

THE PEOPLE OF THE STATE OF NEW YORK,

              - against -

DONALD J. TRUMP,

                      Defendant.

Ind. No. 71543-23

**PRESIDENT DONALD J. TRUMP'S RECUSAL MOTION**

# TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................................. 1

II.   BACKGROUND ................................................................................................................ 3

   A.   Loren Merchan ........................................................................................................... 3

   B.   Authentic's Clients ..................................................................................................... 7

      1.   President Biden And Vice President Harris ......................................................... 8

      2.   Congressman Schiff ............................................................................................ 9

      3.   Congresswoman Underwood ............................................................................ 10

      4.   "Senate Majority PAC" (SMP) ........................................................................ 11

      5.   "House Majority PAC" ..................................................................................... 11

   C.   Fundraising Solicitations Based On The Indictment ............................................... 11

   D.   Fundraising Solicitations Around The Time Of The Arraignment ........................... 13

   E.   Post-Recusal Motion Fundraising Solicitations ....................................................... 16

   F.   The Court's Public Statements Regarding This Case ............................................... 17

III.  APPLICABLE LAW ....................................................................................................... 17

   A.   Constitutional Due Process And Judiciary Law ....................................................... 17

   B.   Court Rules Governing Judicial Conduct ................................................................ 18

IV.   DISCUSSION .................................................................................................................. 19

   A.   The Motion Is Supported By New Evidence And Changed Circumstances .................. 20

   B.   Authentic's Activities Create An Unacceptable Interest In These Proceedings ............. 24

   C.   Authentic's Activities Create An Unacceptable Appearance Of Impropriety ................ 30

V.    CONCLUSION ................................................................................................................ 35

## I.    INTRODUCTION

President Trump respectfully submits this memorandum and accompanying Affirmation[1] in support of his motion for recusal based on due process under the state and federal constitutions, Judiciary Law § 14, as well as 22 NYCRR §§ 100.2 and 100.3.

Your Honor's daughter, Loren Merchan, has a direct financial interest in these proceedings by virtue of her ownership stake and leadership role at Authentic Campaigns, Inc.  Based on public disbursements data, Authentic, which services exclusively Democrat clients, is the #21 ranked vendor in the country in connection with the 2024 election.  In 2019, Ms. Merchan made public statements during a podcast regarding a conversation with Your Honor that reflect bias against President Trump from both speakers in that exchange.  Consistent with that conversation, President Biden and Vice President Harris are long-term clients of Authentic and Ms. Merchan, along with many other politicians and entities who are actively campaigning and advocating against President Trump right now.  At least six of Authentic's clients used fundraising solicitations that referenced this case around the time of the Indictment, President Trump's arraignment, or following the Court's denial of President Trump's recusal motion.  Authentic's clients disbursed more than $18 million to the company between the return of the Indictment and the present.  It is industry practice that Authentic would receive percentages based on funds raised and recipient engagement, and Ms. Merchan has had an ownership stake and leadership role in the company while this case is pending.

In August 2023, the Court ruled that President Trump's recusal motion was based on "remote" and "speculative" arguments.  We dispute that conclusion, and it is clear that this motion

---

[1] "Affirmation," or "Aff.," refers to the April 3, 2024 Affirmation of Todd Blanche submitted in connection with this motion.  "Exhibit," or "Ex.," refers to Exhibits attached to the Affirmation.

cannot reasonably be dispensed of in that fashion.  President Trump is now the presumptive Republican nominee and leading candidate in the 2024 presidential election.  His success in the primaries, which followed the Court's ruling on the previous recusal motion, has cemented his status as a political target of Authentic, Ms. Merchan, and their clients.  While that appears to be consistent with the company's political views, the more important consideration for purposes of this motion is that Authentic benefits reputationally and makes more money by targeting President Trump.  For example, in February and March 2024, Authentic actively marketed its services using connections to President Biden and Vice President Harris, as well as graphics and other content that derided President Trump.

Additional recent developments support the timing and merit of this motion.  Your Honor participated in an interview with the Associated Press and appears to have made statements, at a high-level, about this case and the Court's preparations for trial.  Based on a separate recent statement by the Office of Court Administration, Ms. Merchan apparently "deleted" an X account that contained posts reflecting hostility toward President Trump "last April," the same month that Your Honor solicited an ethics opinion regarding recusal in a letter containing information that the Court declined to disclose to the defense or the public.  The suspicious timing of the alleged decision by Ms. Merchan to "delete" the X account, as well as more recent developments relating to the account, further support this motion.

Your Honor also recently issued and expanded a gag order that improperly restricts President Trump's constitutionally protected campaign speech, which has the effect of shielding the Court and Ms. Merchan from legitimate public criticism based on the evidence discussed in this motion that is relevant to the 2024 election.  The Court has also permitted the People to continue to refrain from publicly filing important submissions, evidence, and substantive email

communications in violation of President Trump's constitutional rights to a public trial and to defend himself. Having been repeatedly assigned to cases relating to President Trump and his businesses since 2022, including two rounds of plea negotiations with Allen Weisselberg and the prosecution of Steve Bannon, the Court is now making extrajudicial statements about this case, permitting the People to proceed under the cover of darkness when it suits their political agenda of election interference, and threatening President Trump with contempt and worse if he points out the Court's familial conflicts. The current situation is patently unjust.

The Court's interest in these proceedings by virtue of the close relationship with an immediate relative, and Ms. Merchan's ongoing receipt of commercial and reputational benefits based on the manner in which Your Honor has conducted these proceedings, requires recusal based on an actual conflict and an unacceptable appearance of impropriety. This is easily illustrated by the fact that it would be completely unacceptable to most New Yorkers if the judge presiding over these proceedings had an adult child who worked at WinRed or MAGA Inc. The logic of this conclusion is further demonstrated by the fact that Ms. Merchan is not simply a salaried employee of Authentic, she is an owner with equity in the enterprise. Personal political views may not be a basis for recusal. But profiting from the promotion of a political agenda that is hostile to President Trump, and has included fundraising solicitations based on this case, must be. Accordingly, President Trump respectfully requests that the Court recuse itself.

## II. BACKGROUND

### A. Loren Merchan

Beginning in at least 2018, Ms. Merchan worked at Authentic as a "director of digital advertising." Aff. ¶ 2. In approximately February 2019, Ms. Merchan appears to have started working as the "Director of Digital Persuasion" for the Presidential campaign of Kamala Harris. *Id.* In approximately February 2019, Authentic made Ms. Merchan a Vice President. *Id.*

Authentic markets itself as a "full-service digital marketing agency for non-profits and campaigns that unleashes the power of the internet to create lasting and inclusive change." *Id*. ¶ 53(a). In connection with the announcement, Authentic stated that Ms. Merchan would "continue to manage our kickass ads team and take on a larger role in managing and growing our company in the coming years." *Id.* ¶ 3.

During a June 2019 podcast, Ms. Merchan attributed the following statement to Your Honor: "I hate that politicians use Twitter . . . It's so unprofessional . . . That's not how a politician should behave themselves." Aff. ¶ 4. Ms. Merchan explained during the podcast that she responded to Your Honor: "Yeah, I think there are a lot of instances where it is not used in – like when our President tweets anything that he thinks, and like, that's not what he should be using it for." *Id.*

After the conclusion of Harris' presidential campaign in approximately December 2019, Authentic made Ms. Merchan "a partner and part-owner." Aff. ¶ 5. Following Ms. Merchan's promotion by Authentic, in 2020, "Campaigns & Elections" named Ms. Merchan a "Rising Star" affiliated with the Democrat party. *Id.* ¶ 6. The write-up concerning the award credited Ms. Merchan with "setting new benchmarks and winning elections," and "doing ground-breaking, historical work for clients like . . . Kamala Harris, Adam Schiff, and others." *Id.* By August 2023, Ms. Merchan had become President of Authentic. Ex. 15.

On January 20, 2021, the X account with username LorenM426, which appears to have been used by Ms. Merchan, posted the following image of President Trump leaving the White House on January 20, 2021, with the caption "Byyyeeeee":



Aff. ¶ 55.  Archived Internet data from around that time contains other X posts by Ms. Merchan that reflect hostility toward President Trump.  *Id.* ¶ 56.

On or about March 27, 2024, the Director of Communications for New York's Office of Court Administration issued a public statement indicating that Ms. Merchan "abandoned" and "deleted" her X account "approximately a year ago."  Aff. ¶ 58.  Around the time of the announcement, the X account indicated that the user joined in "April 2023" and included a picture of President Trump behind bars:



*Id.* ¶ 60.  Within days, the account was modified to include a photograph of Vice President Harris, but it still indicated that the user had "Joined April 2023":



*Id.* ¶ 61.  More recently, the photograph of Vice President Harris was removed, and the account now indicates that the user joined last month, in "March 2024":



*Id.* ¶ 62.

### B.    Authentic's Clients

As of April 2, 2024, the list of "Featured Clients" on Authentic's website included campaigns associated with the following Democrat politicians and entities: President Biden, Vice President Harris, New York Governor Kathy Hochul, Congressman Schiff, Congressman Jeffries, Congressman Goldman, Congresswoman Underwood, Congresswoman Lee, the Democrat-backed "Senate Majority PAC," and the Democrat-backed "House Majority PAC":



Aff. ¶ 53(b).  Based on this work, Authentic was named to the "2023 Political Consultants Power 100" as some of "New York's most effective campaign advisers," including through work for Congressman Jeffries and Governor Hochul.  *Id.* ¶¶ 36, 37.  Currently, in connection with the 2024 election cycle, Authentic is the #21-ranked vendor based on disbursements it has received.  *Id.* ¶ 65.

### 1.    President Biden And Vice President Harris

In connection with the 2020 election, Vice President Harris's presidential campaign paid Authentic $4.86 million, which is far more than the campaign paid any other vendor.  Aff. ¶ 65. Authentic's subsequent work on the campaign of President Biden and Vice President Harris included use of "the strengths of Facebook's expansive platform with the precision and adaptability of conversational AI" to generate "targeted Facebook ads about Joe Biden for president."  Aff. ¶ 53(c).  Ms. Merchan described Authentic's first-of-its-kind use of AI to engage with potential donors, volunteers and voters for both President Biden and Vice President Harris in the 2020 campaign cycle, *id.* ¶ 54, and Authentic summarized this work in a "case study" on its website:



*Id.* ¶ 53(c).  More recently, in mid-March 2024, Authentic promoted its connection to "the Biden

campaign" through a social media post relating to a former employee now acting as the "Director of Paid Digital" for President Biden:



Aff. ¶ 51.

### 2. Congressman Schiff

In 2023 and 2024, Authentic repeatedly promoted its work for Congressman Schiff on social media, including, for example, the following December 2023 post:



Aff. ¶ 44.  Authentic has posted a testimonial from Congressman Schiff on its website, which includes that "[t]hey have helped me build a digital program that has exceeded all my expectations . . . ."  *Id.* ¶ 53(g).

According to OpenSecrets.org, "Schiff for Congress" paid $9.06 million in disbursements to Authentic during the 2022 election cycle, and has paid an additional $4.88 million, to date, in connection with the 2024 election cycle.  *See* Exs. 18 & 19.  Based on data from the Federal Election Commission ("FEC"), "Schiff for Senate" disbursed $10.27 million to Authentic between March 30, 2023, when the Indictment was filed, and the present.  Ex. 20.

### 3.    Congresswoman Underwood

Authentic's website also includes a "case study" relating to the company's work for Congresswoman Underwood in connection with the 2022 election.  Aff. ¶ 53(f).  The case study indicates that Authentic assisted Underwood with "tailored messaging" in "email and SMS [text message] campaigns" and includes the following graphic:



*Id.* ¶ 53(f).

-10-

According to OpenSecrets.org, "Lauren Underwood for Congress" paid $1.08 million in disbursements to Authentic during the 2022 election cycle, and has paid an additional $159,550, to date, in connection with the 2024 election cycle. *See* Exs. 18 & 19. Based on data from the FEC, "Lauren Underwood for Congress" disbursed $115,050 to Authentic between March 30, 2023, when the Indictment was filed, and the present. Ex. 20.

### 4.    "Senate Majority PAC" (SMP)

With respect to the Democrat-backed Senate Majority PAC, Authentic's website indicates that it "inherited [the PAC's] email program," "worked with IP and spam-based blacklists to refresh [the PAC's] sender reputation," and "optimiz[ed] the email content and subject lines." Aff. ¶ 53(d). The website states that Authentic helped the Senate Majority PAC raise $42.6 million "online," including "763k individual contributions" and a "357% return on ad spend." *Id.*

According to OpenSecrets.org, the Senate Majority PAC paid $6.04 million in disbursements to Authentic during the 2022 election cycle, and has paid an additional $1.66 million, to date, in connection with the 2024 election cycle. *See* Exs. 18 & 19. Based on data from the FEC, the Senate Majority PAC disbursed $998,045 to Authentic between March 30, 2023, when the Indictment was filed, and the present. Ex. 20.

### 5.    "House Majority PAC"

Authentic advertises that it helped "create[] a best in class ads program" for the House Majority PAC in connection with the 2022 election through a partnership with Vocal Media, which Authentic reports resulted in "9M completed video views across influencers (Vocal) and ads (Authentic)" and "1.5M persuadable swing voters reached." Aff. ¶ 53(e).

### C.    Fundraising Solicitations Based On The Indictment

The Indictment in this case was returned on March 30, 2023. Aff. ¶ 7. On the same day, clients of Authentic caused electronic fundraising solicitations to be disseminated that specifically

referenced this case:

- <u>Congressman Schiff</u>: "The Manhattan District Attorney's office has indicted Donald Trump for criminal offenses — the first-ever indictment of a former American president." Ex. 1.

- <u>Senate Majority PAC</u>:  "BREAKING NEWS: Donald Trump indicted by Manhattan grand jury."  Ex. 2.

- <u>House Majority PAC</u>: "Trump Indicted."  Ex. 3.

Also on March 30, 2023, Congressman Schiff caused a post to be made to his X account soliciting contributions based on the Indictment.  Aff. ¶ 11.

The case-related solicitations by Authentic's, and therefore Ms. Merchan's, clients continued on March 31, 2023.  Congressman Schiff caused two more emails to be sent.  One noted that he would be "talking about trump indictment on msnbc at 9:30 then cnn at 10" and asked voters to "chip in a few bucks."  Ex. 4.  The other asserted that "[n]ever before has a President of the United States — current or former — been indicted. . . . Donald Trump will finally have his day in court."  Ex. 5.  Also on March 31, Congresswoman Underwood caused a similar message to be distributed: "For the first time in our nation's history, a previous sitting president is facing criminal charges and plans are underway coordinating his surrender to authorities in Manhattan next week."  Ex. 6.  Congressman Jeffries caused a fundraising email to be sent that referenced President Trump through the overused trope that "no one is above the law."  Ex. 7.

On April 1, 2023, Congresswoman Lee caused a fundraising solicitation to be sent that stated: "Donald Trump may have been indicted by a Manhattan grand jury – but we know that isn't his only crime."  Ex. 8.

### D.    Fundraising Solicitations Around The Time Of The Arraignment

On April 3, 2023—the day before President Trump's arraignment before Your Honor—Congressman Schiff released a barrage of solicitations on Facebook based on this case:



Aff. ¶ 17.

On April 4, 2023, Congressman Schiff caused a fundraising email to be sent that discussed President Trump's arraignment: "It's not a scene I would ever have imagined — a former U.S. president photographed, finger-printed and arraigned in court . . . ." Ex. 9.

Congressman Schiff also initiated a new solicitation via Facebook:



Aff. ¶ 20.

On April 5, 2023, Congressman Schiff caused two videos to be posted to his TikTok account in which he discussed this case:

 

Aff. ¶¶ 21, 22.

Beginning on April 7, 2023, Congressman Schiff caused the release of six additional

case-related solicitations via Facebook:





Aff. ¶¶ 24, 25.

### E.    Post-Recusal Motion Fundraising Solicitations

On May 31, 2023, President Trump filed a motion for recusal based on, *inter alia*, Ms. Merchan's role at Authentic, which the defense learned about from media reports rather than the Court.  Aff. ¶ 27.  The Court denied the motion on August 11, 2023.  Aff. ¶ 30.

Following the ruling, on August 22, 2023, Congressman Schiff caused a post to be made on his TikTok account in which he made inaccurate factual claims regarding the People's allegations: "[T]he man was sitting in the Oval Office writing hush money payment checks to a porn star . . . and that's probably his least transgression . . . ."  Aff. ¶ 31.

On August 31, 2023, the "Senate Majority PAC" sent an email that referenced the Indictment in this case as well as other unfounded charges against President Trump:

91 charges.  That's how many felonies Donald J. Trump is charged with. . . . No president has been charged with a crime before Donald Trump. Now, in the span of just a few months, Trump has racked up indictments in four different jurisdictions (and counting).

Ex. 16.

**F.    The Court's Public Statements Regarding This Case**

On March 17, 2024, the Associated Press published an article disclosing that the Court had participated in an interview with the media "last week."  Ex. 22.  According to reports of the interview, Your Honor indicated that the Court "wouldn't talk about the case," but did so anyway. *Id.*  Your Honor reportedly stated that (1) "getting ready for the historic trial is 'intense'"; (2) the Court is "striving 'to make sure that I've done everything I could to be prepared and to make sure that we dispense justice'"; and (3) "'There's no agenda here . . . . We want to follow the law.  We want justice to be done. . . . That's all we want.'"  *Id.*

In addition, as noted above, the Office of Court Administration issued a statement concerning Ms. Merchan's X account on or about March 27, 2024.  Aff. ¶ 58.

**III.    APPLICABLE LAW**

**A.    Constitutional Due Process And Judiciary Law**

"The right of every person accused of crime to have a fair and impartial trial before an unbiased court and an unprejudiced jury is a fundamental principle of criminal jurisprudence." *People v. De Jesus*, 42 N.Y.2d 519, 523 (1977) (quoting *People v. McLaughlin*, 150 N.Y. 365, 375 (1896)).  "[T]he floor established by the Due Process Clause clearly requires a fair trial in a fair tribunal, before a judge with no actual bias against the defendant or interest in the outcome of his particular case."  *Bracy v. Gramley*, 520 U.S. 899, 904-05 (1997) (cleaned up); *see also People v. Novak*, 30 N.Y.3d 222, 225 (2017) ("The right to an impartial jurist is a 'basic requirement of due process.'" (quoting *In re Murchison*, 349 U.S. 133, 136 (1955))).

The "root meaning" of impartiality "guarantees a party that the judge who hears his case

will apply the law to him in the same way he applies it to any other party." *Republican Party of Minnesota v. White*, 536 U.S. 765, 775-76 (2002). "This is the traditional sense in which the term is used," and it "assures equal application of the law." *Id.* at 776. "Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law." *Tumey v. Ohio*, 273 U.S. 510, 532 (1927). "The alleged bias and prejudice to be disqualifying must stem from an extrajudicial source and result in an opinion on the merits on some basis other than what the judge learned from his participation in the case.'" *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966).

Similarly, pursuant to § 14 of the Judiciary Law, "[a] judge shall not sit as such in, or take any part in the decision of, an action . . . in which he is interested . . . ." To be disqualified, a judge must have an interest in "the subject matter of the suit." *Matter of Est. of Sherburne*, 124 Misc. 2d 708, 710 (Sur. Ct. Queens Cnty. 1984). "The interest need not be large, but it must be real." *Id.*; *see also People v. Whitridge*, 144 A.D. 493, 498 (1st Dept. 1911).

**B.    Court Rules Governing Judicial Conduct**

"Not only must judges actually be neutral, they must appear so as well." *Novak*, 30 N.Y.3d at 226. Thus, "[a] judge shall avoid impropriety and the appearance of impropriety in all of the judge's activities." 22 NYCRR § 100.2. This includes an obligation to "act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." *Id.* § 100.2(A). "Integrity denotes probity, fairness, honesty, uprightness and soundness of character." *Id.* § 100.0(T). "Impartiality denotes absence of bias or prejudice in favor of, or against, particular parties or classes of parties, as well as maintaining an open mind in considering issues that may come before the judge." *Id.* § 100.0(R). In this regard, a judge must not "allow family . . . or other relationships to influence the judge's judicial conduct or judgment," or "lend the prestige of

-18-

judicial office to advance the private interests of . . . others." *Id.* § 100.2(B), (C).

A judge "shall disqualify himself" from "a proceeding in which the judge's impartiality might reasonably be questioned." 22 NYCRR § 100.3(E)(1). Circumstances where a judge's impartiality might reasonably be questioned "include[e], but are not limited to instance where" the judge knows that a close relative "has an interest that could be substantially affected by the proceeding." *Id.* § 100.3(E)(1)(d)(iii). "A judge's conduct is under a sterner microscope than other members of the public, as there is no higher order of fiduciary responsibility than that assumed by a Judge." *In re Feinberg*, 5 N.Y.3d 206, 215-16 (2005) (cleaned up); *see also Putorti v. New York State Comm'n on Jud. Conduct*, 40 N.Y.3d 359, 367 (2023) ("Judges must observe higher standards of conduct than members of the general public, so that the integrity of the judiciary will be preserved.").

## IV.    DISCUSSION

In light of recent developments and new evidence, this recusal motion is timely filed and meritorious. Authentic has drawn on its deep connections to President Biden, Vice President Harris, Congressman Schiff, and others to develop business from clients who have solicited donations using electronic communications that specifically referenced this case. Authentic is paid by these clients, in part, based on the success of the communications using metrics such as contributions received and/or engagement with the advertising.

Authentic—and Ms. Merchan, as President, "partner," and "part-owner"—will gain even more as the trial proceeds from both financial and reputational perspectives. This is demonstrated by, for example, Authentic's efforts in February and March 2024 to market itself using social media posts that derided President Trump and promoted the company's connections to President Biden and Vice President Harris. It is improper for the Court to preside over these proceedings

while Ms. Merchan benefits, financially and reputationally, from the manner in which this case is interfering with the campaign of the leading candidate in the 2024 presidential election and the chief political rival of Authentic's key clients.  Under these circumstances, recusal is required and appropriate in order to maintain the integrity of these proceedings, as well as the public's trust in them.

### A.    The Motion Is Supported By New Evidence And Changed Circumstances

Several developments since the Court's denial of President Trump's first recusal motion require that this issue be revisited, including President Trump's status as the presumptive Republican nominee in the 2024 presidential election, recent events relating to the X account used by Ms. Merchan, and recent extrajudicial statements by the Court.

The extent to which these proceedings are interfering with the 2024 election is no longer, as the Court put it previously, "remote, speculative, 'possible or contingent.'"  Ex. 13 at 2 (quoting *Kilmer v. Moseman*, 124 A.D.3d 1195 (3rd Dep't 2015)).  In *Kilmer*, the Third Department rejected an argument that the plaintiff's attorney's wife worked for an official who "could . . . conceivably cause difficulties for Justice Dowd following his retirement if he sanctioned or otherwise ruled against" the attorney.  124 A.D.3d at 1198.  In contrast, the current recusal issue does not arise from what "conceivably" could happen or a "possible or contingent" event.

Since the Court's recusal ruling, President Trump has become the presumptive Republican nominee and the leading candidate in the 2024 Presidential election.  The trial that the Court has scheduled will impede President Trump's efforts to campaign against President Biden and Vice President Harris—whose status Authentic actively markets to generate new business—and to support the campaigns of other politicians who are direct opponents of Authentic's clients.  As discussed in more detail below, Authentic's clients have already solicited donations based

specifically on this case, and have paid Authentic millions of dollars since the Indictment was filed.

In light of these considerations, the May 4, 2023 ethics opinion relating to the Court's recusal inquiry, which the Court declined to disclose to the defense, relied on a factually inaccurate premise. Specifically, the digest of Opinion 23-54 assumed that Ms. Merchan has "no interests that could be substantially affected by [this] proceeding." Ex. 13 at 9. The Opinion stated: "We see nothing in the inquiry to suggest that the outcome of the case could have any effect on the judge's relative, the relative's business, or any of their interests." *Id.* at 11. However, it is now quite clear that Authentic has made money by assisting clients who have solicited donations using communications that specifically reference this case. The Court's future rulings stand to further benefit those clients by harming President Trump, while Authentic and Ms. Merchan make money in the process.

Recent public developments relating to an X account used by Ms. Merchan raise additional, serious questions about appearances of impropriety that must be addressed. Archived Internet data demonstrates that Ms. Merchan used the "LorenM426" X account to post messages that reflect hostility toward President Trump. *See* Aff. ¶¶ 55-57. The defense is currently unable to access the full historical contents of the account, but the archived data includes telling examples. *See id.* Thus, even accepting that Ms. Merchan "deleted" the account in April 2023, *see* Aff. ¶ 58, one fair inference from that claim is that she took those steps to destroy public evidence of animus toward President Trump around the time that "this Court wrote to the Advisory Committee on Judicial Ethics to seek a formal opinion," "[o]n or about April 14, 2023," regarding recusal, *see id.* Ex. 13 at 1 n.2. That timing, and the appearance of impropriety that it creates, cannot be ignored.

The X account in question previously included a re-post of Authentic's January 2020 announcement of Ms. Merchan's promotion to "partner" and "part-owner." Aff. ¶ 5. The post is no longer public. Around the time of the Court's March 27, 2024 public statement regarding control of the account, *id.* ¶ 58, the photograph associated with the account was changed from a picture of President Trump (behind prison bars) to a picture of Vice President Harris (as a child), which raises further questions about appearances associated with the public statement and who was controlling the account, *see id.* ¶¶ 60, 61. The photograph of Vice President Harris was subsequently removed while public scrutiny of these issues increased, and the Court issued a public statement regarding the account. *Id.* ¶ 58. The public-facing version of the account now states that the user "Joined" in "March 2024." *Id.* ¶ 62.

In addition to the Court's public statement regarding Ms. Merchan's X account, the Associated Press published an article on March 17, 2024, which disclosed that Your Honor had participated in an interview with the media "last week." Ex. 22. Your Honor reportedly indicated that the Court "wouldn't talk about the case," but did so anyway. *Id.* Your Honor reportedly stated that (1) "getting ready for the historic trial is 'intense'"; (2) the Court is "striving 'to make sure that I've done everything I could to be prepared and to make sure that we dispense justice'"; and (3) "'There's no agenda here . . . . We want to follow the law. We want justice to be done. . . . That's all we want.'" *Id.* Based on these reported remarks, the Court appears to have discussed its approach to preparing for the trial in this case, and to have tried to vouch for itself to the public—and disclaimed any bias—by describing plans to "dispense justice." The statements attributed to Your Honor raise questions about compliance with 22 NYCRR § 100.3(B)(8), which requires that "[a] judge shall not make any public comment about a pending or impending proceeding . . . ."

-22-

There is not an exception to § 100.3(B)(8), as the People suggested in their pre-motion letter, for "acknowledging 'intense' preparation." 4/2/24 Ltr. at 1.

The Court has also denied President Trump's motion for discovery sanctions based on evidentiary submissions that are still not public, despite President Trump's constitutional right to a public trial, and has permitted *ex parte* submissions by the People in connection with that motion practice without specifying the basis for that procedure. *See* 22 NYCRR § 100.3(B)(6) (restricting *ex parte* communications). Permitting the People to operate in a modern Star Chamber in order to suit their politically-motivated objectives is even more problematic when compared to the recent gag orders in this case. Specifically, on April 1, 2024, the Court expanded its recent gag order, which now operates as an unlawful prior restraint and prevents President Trump from criticizing the Court regarding these issues and addressing some of the topics that the Court has spoken about publicly.

Under these circumstances, where President Trump is seeking to defend himself in contested proceedings, the People are wrong that the Court's reported extrajudicial statements were an expression of "broad commitment to impartiality." 4/2/24 Ltr. at 1. The Court's statements are relevant not only to appearances of impropriety, but also to President Trump's now-pending adjournment motion, as the statements arguably included efforts by the Court to position itself favorably with potential jurors and augmented any concerns that potential jurors might have about whether jury service in this case will be "intense."

For all of these reasons, constitutional due process, applicable rules, and ethical considerations require the Court to revisit the recusal issue and, as discussed below, to recuse itself.

-23-

**B.      Authentic's Activities Create An Unacceptable Interest In These Proceedings**

Ms. Merchan is a "partner," "president," and "part-owner" of Authentic.  Aff. ¶¶ 5, 32. Authentic is the #21-ranked vendor in the country in connection with the 2024 election cycle, based on expenditures by candidates, parties, PACs and others reported to the FEC.  *Id.* ¶ 65. Authentic provides consulting services to these clients, all Democrats and thus political opponents and rivals of President Trump, including in connection with solicitations that reference this case. Authentic has made millions of dollars from clients who are vocal opponents of President Trump, and will continue to make more money on that basis as the case proceeds.  As a result, the Court has a prohibited interest in these proceedings in violation of President Trump's due process rights, Judiciary Law § 14, and 22 NYCRR § 100.3(E)(1)(d)(iii).

Authentic's website confirms that the company's clients consist almost exclusively of politicians and entities associated with the Democrat party and opponents of President Trump, including "Biden Harris," "Kamala Harris for President," "Governor Kathy Hochul," "Adam Schiff For Senate," "Rep. Barbara Lee," "Minority Leader Hakeem Jeffries," "Rep. Lauren Underwood," the "Senate Majority PAC," and the "House Majority PAC."  Aff. ¶ 53(b); *see also* Ex. 13 at 10 (noting that Authentic "works exclusively with one political party's candidates").

Ms. Merchan has worked with President Biden since at least 2020, and Ms. Merchan's work for Vice President Harris dates back to at least 2019.  *See, e.g.*, *id.* ¶¶ 2, 6.  That work has continued during the pendency of this case.  For example, between July 2023 and November 2023, Authentic has received $211,035.00 from the "Fight Like Hell PAC," which Michigan Governor Gretchen Whitmer has declared to be "focus the next two years on supporting President Biden and Vice President Harris' re-election campaign."  *Id.* ¶ 68 & Ex. 20.  In addition, the "client" list on Authentic's website includes "Priorities USA."  Aff. ¶ 53(b).  In April 2023, *i.e.*, the same month

as President Trump's arraignment, Priorities USA announced that it would pledge "$75 million towards digital mobilization and persuasion programming in six battleground states" in order to "support President Biden and Vice President Kamala Harris on their path to reelection in 2024 and bolster Democrats' presence to diverse audiences of voters online." *Id.* ¶ 73. Priorities USA has also stated that its "plan" is "to remind voters of President Biden's impact and contrast his record with the agenda of dangerous MAGA Republicans" by "reaching voters where they are: online." *Id.*

Between October 2021 and December 2023, "Friends for Kathy Hochul" paid Authentic $689,974.35, which includes $138,500 since the People filed the Indictment charging President Trump. Ex. 21. Between August 2023 and December 2023, Authentic also received $27,000 from the "DAGA PAC," which is associated with the Democratic Attorneys General Association, where New York Attorney General Leticia James—who has brought a separate unlawful and politically motivated case against President Trump—is a member. Aff. ¶ 69; Ex. 20. While Authentic provided consulting services to Governor Hochul and the DAGA PAC, Governor Hochul and James have used criticism of President Trump to advance their political agenda. During the fall 2023 trial relating to the biased and meritless claims brought by James, Governor Hochul attacked President Trump while he was testifying by referring to him as a "disgrace," describing his testimony as "far from telling the truth" despite her lack of first-hand knowledge of the events at issue, and expressing "full confidence" that Justice Engoron would make President Trump "accountable" in those lawless proceedings, which is a sentiment that could only have been based on the Governor's faith that Justice Engoron's bias would blind him to the deficiencies of James' case. Aff. ¶ 71.

In late-February 2024, Governor Hochul falsely claimed—in terms that obviously

implicate this case as well as Justice Engoron's flawed decisions—that she, personally, had "long known, as has everyone in the State of New York . . . that Donald Trump had unethical business practices." Aff. ¶ 72.  Around the same time, James used the official X account of the New York Attorney General in a highly unprofessional manner to taunt President Trump with purported interest calculations relating to Justice Engoron's illegal judgment. *Id.* ¶ 70.  These examples from Governor Hochul and James illustrate the type of political advocacy that Authentic's consulting services yields.  As accepted as this rhetoric has become in the political sphere, it has no place being driven by an immediate relative of the judge presiding over pending criminal charges against President Trump, who is obviously a political and commercial target of Ms. Merchan and Authentic.

As another example, Authentic and Ms. Merchan have worked for Congressman Schiff since at least 2020.  *See* Aff. ¶¶ 6, 54.  Congressman Schiff led unconstitutional and failed impeachment proceedings against President Trump in 2019, aided by Authentic client and now-Congressman Dan Goldman.  Congressman Schiff rarely lets a week pass without reminding his constituents about that unjust impeachment effort.  He is also one of at least six Authentic clients who have solicited donations using electronic communications that referenced this case, including communications around the time of the Indictment, the arraignment, and following the Court's denial of President Trump's recusal motion.

Between March 30 and April 1, 2023, Congressman Schiff, Congressman Jeffries, Congresswoman Underwood, Congresswoman Lee, the Senate Majority PAC, and the House Majority PAC sent electronic fundraising solicitations that referenced the Indictment in this case via email and X.  *See* Exs. 1-8.  For example, on March 30, 2023, in a post marked "PAID FOR BY SCHIFF FOR SENATE," which is the entity listed as a client on Authentic's website, the

following was posted to Congressman Schiff's X account:



Aff. ¶ 11.

Beginning on April 3, 2023, the day before the arraignment, Congressman Schiff disseminated a barrage of solicitations via Facebook, which referenced this case and were marked "Paid for by SCHIFF FOR SENATE," *i.e.*, Authentic's direct client. Aff. ¶ 17. On the day of President Trump's arraignment, Congressman Schiff caused an email solicitation to be sent that described his opinion of the "scene" at the arraignment, Ex. 9, and Congressman Schiff initiated another case-specific solicitation via Facebook, Aff. ¶ 20. Congressman Schiff also caused videos to be posted to his TikTok account on April 5, 2023, and new solicitations to be disseminated via Facebook on April 7, all of which included discussion of this case. *Id.* ¶¶ 21-22, 24.

After the Court denied President Trump's recusal motion, Congressman Schiff caused another TikTok video to be posted in which he mischaracterized the People's allegations against President Trump. Aff. ¶ 31. On August 31, 2023, the Senate Majority PAC sent an email

solicitation that referenced "91 charges" and "indictments in four different jurisdictions," including this case.  *Id.* ¶ 33.

These Authentic clients used the same services that Authentic developed while working for President Biden and Vice President Harris, among others, and Authentic is actively marketing these services to others on its website.  For example, Authentic touts its use of "Facebook's expansive platform," Aff. ¶ 53(c), and "best in class ads program," *id.* ¶ 53(e), which the company has worked with Congressman Schiff and others to capitalize on.  *See, e.g.*, *id.* ¶ 17.  Authentic also promotes its work on the Senate Majority PAC's "email program," including "optimizing the email content and subject lines" of communications, and the company's "tailored messaging" on behalf of Congresswoman Underwood.  *Id.* ¶¶ 53(d), 53(f).  All six of the Authentic clients that transmitted case-specific email solicitations benefitted from this aspect of Authentic's experience.

To state the obvious, these clients paid for Authentic's services, and Ms. Merchan benefited directly from those payments as one of the owners and the President of the company.  According to publicly available data from OpenSecrets.org, Authentic received over $29 million in disbursements from Democrat-affiliated and left-leaning political entities between 2021 and 2022, including the following:

| Entity | Amount |
|---|---|
| Schiff for Congress | $9.06 million |
| Senate Majority PAC (SMP) | $6.04 million |
| Jeffries for Congress | $1.2 million |
| Lauren Underwood for Congress | $1.08 million |
| Barbara Lee for Congress | $562,420 |
| **Total** | $29.66 million |

Ex. 18.  Additional data from OpenSecrets.org indicates that Authentic has received almost $15

million in disbursements, to date, in connection with the 2024 cycle:

| Entity | Amount |
|---|---|
| Schiff for Congress | $4.88 million |
| Senate Majority PAC (SMP) | $1.66 million |
| Lauren Underwood for Congress | $159,550 |
| Barbara Lee for Congress | $19,661 |
| Jeffries for Congress | $35 |
| **Total** | $14.93 million |

Ex. 19.

FEC data reflects a total of $18.43 million in disbursements to Authentic between the filing

of the Indictment on March 30, 2023 and the present, including:

| Entity | Amount | Sample Description |
|---|---|---|
| Schiff for Congress | $10.27 million | "Digital Advertising" |
| Senate Majority PAC (SMP) | $998,045 | "Digital Consulting Services" |
| Lauren Underwood for Congress | $115,050 | "Digital Consulting Services" |
| Barbara Lee for Congress | $19,661 | "Software" |
| Jeffries for Congress | $35 | "Website Expense" |
| **Total** | $18.43 million | |

Ex. 20.

In order "to prevent even the probability of unfairness," "no man is permitted to try cases

where he has an interest in the outcome." *In re Murchison*, 349 U.S. at 136. "That interest cannot be defined with precision. Circumstances and relationships must be considered." *Id.*; *see also Novak*, 30 N.Y.3d at 225-26 ("Under federal constitutional jurisprudence, courts evaluate whether a "serious risk of actual bias, based on objective perceptions and considering all the circumstances alleged, rises to an unconstitutional level."). Here, Authentic has clients who are opponents and rivals of President Trump, and those clients appear to have paid the company (and thus Ms. Merchan) for services used in connection with case-specific fundraising solicitations. The Court's close relationship with Ms. Merchan as an immediate relative, as evidenced by the use of the Court's facilities to address public scrutiny on Ms. Merchan's X account, supports the conclusion that the Court "has an interest that could be substantially affected by the proceeding." 22 NYCRR § 100.3(E)(1)(d)(iii). This is one of the situations where the Court "shall disqualify" itself. *Id.* § 100.3(E)(1). The commercial and reputational benefits to Ms. Merchan from the Court's rulings, including requiring the case to proceed to trial during an election that President Trump is currently winning, are manifest. Those benefits inure to the Court, at the very least in a tangible reputational sense. Therefore, recusal is required as a matter of due process, Judiciary Law § 14, and § 100.3(E)(1).

### C.    Authentic's Activities Create An Unacceptable Appearance Of Impropriety

Even if the Court concludes that recusal is not required by the state and federal constitutions, Judiciary Law § 14, § 100.3(E)(1), as it should, recusal is appropriate under 22 NYCRR §§ 100.2 and 100.3 based on the appearances of impropriety arising from the foregoing facts and the additional reasons set forth below. While recusal may not be required based on political affiliations and opinions, Ms. Merchan has informed the public that the Court shares some of her bias against President Trump. *See* Aff. ¶ 4. In addition, recusal is necessary because Authentic and Ms. Merchan are marketing and monetizing those opinions through a strategy of

emphasizing connections with President Trump's rivals and criticizing President Trump. *See* Aff. ¶ 53(a)-(h). This strategy has already been lucrative. It is based in part on communications that are specific to this case. And in this case Your Honor is currently wielding enormous power that the People hope the Court will use, unjustly and improperly, to incarcerate and incapacitate the chief political rival of several "featured clients" of Authentic, including President Biden. *Id.* ¶ 53(b).

While promoting her own work, Ms. Merchan has disclosed statements by the Court that reflect bias toward President Trump. Specifically, during a 2019 podcast, Ms. Merchan described a conversation with Your Honor that included discussion of President Trump. Aff. ¶ 4. Ms. Merchan recalled that Your Honor stated that the Court "hate[s] that politicians use Twitter" because the Court believes that it is "unprofessional" and "not how a politician should behave themselves." *Id.* Ms. Merchan confirmed that she discussed with the Court that when President Trump "tweets anything that he thinks," "that's not what he should be using [Twitter] for." President Trump was a part of the group of politicians the Court referenced, the People intend to offer evidence of President Trump's social media posts at trial, and Ms. Merchan's comments attribute a public, biased view of that evidence from the Court that will be called upon to determine whether it is relevant, unduly prejudicial, and otherwise admissible.

Authentic is also actively promoting its connections to President Trump's opponents and rivals, including President Biden and Vice President Harris. For example, in separate posts during the fall of 2023, Authentic wished each of them "Happy Birthday":

 

Aff. ¶¶ 38-39.  Authentic called attention to the fact that the company had been "part of" President Biden's "journey to the White House," and sought to demonstrate its clout to like-minded potential clients by posting a video of Vice President Harris visiting the company's "DC office to celebrate the launch of her presidential campaign in 2019," which Ms. Merchan worked on as well.  *Id.* ¶ 2; *see also id.* ¶ 54.

By December 2023, following repeated case-specific emails, Facebook advertisements, and TikTok posts, Authentic was actively promoting a communications strategy of "incorporate[ing] salient political players," including those Authentic viewed as "negative," in order to "gin up interest in our work."  Aff. ¶ 41.  One of the graphics that Authentic used in the piece was telling of the company's strategy of seeking to leverage bias against President Trump:



*Id.*

Within the last two months, Authentic has marketed itself through posts that were critical of President Trump.  In February 2024, the company posted the following to its Instagram account:

 

*Id.* ¶¶ 45-46.  In early March 2024, Authentic's CEO mischaracterized President Trump as "an actor who fundamentally doesn't care about our democracy & is just trying to sow civil unrest," and wrongly argued that President Trump was more dangerous than a run-of-the-mill bad-faith actor." *Id.* ¶ 47.  Around the same time, Authentic called further attention to Congressman Schiff's work on TikTok and efforts to raise money by criticizing President Trump:



Aff. ¶ 50.

The manner in which Authentic and Ms. Merchan are marketing the company, and making money, through expressions of animus toward President Trump has created a prohibited appearance of impropriety.  22 NYCRR § 100.2.  This appearance is made worse by Ms. Merchan's public statements regarding a conversation with the Court reflecting additional bias against President Trump.  Authentic's clients have sought to use the "prestige of judicial office" associated with this case to "advance [their] private interests."  *Id.*  Finally, the evidence outlined above does not "promote[] public confidence in the integrity and impartiality of the judiciary."  *Id.* § 100.2(A).  The appearance of impropriety is unacceptable under these circumstances.  Therefore, recusal is appropriate.

## V.    CONCLUSION

For the reasons described above, President Trump respectfully submits that the Court must

recuse itself as a matter of constitutional due process and Judiciary Law § 14, and that recusal is

also appropriate in light of appearances of impropriety.

Dated:       April 3, 2024
             New York, New York

By: /s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, NY 10005
212-716-1260
toddblanche@blanchelaw.com

*Attorneys for President Donald J. Trump*