UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PEOPLE OF THE STATE OF NEW YORK,<br><br>- v. -<br><br>DONALD J. TRUMP,<br><br>                     Defendant. | No. 23 Civ. 3773 (AKH)<br><br>SECOND NOTICE OF REMOVAL<br><br>Removed from:<br><br>New York Supreme Court<br>New York County<br>Ind. No. 71543-23 |

**PRESIDENT DONALD J. TRUMP'S SECOND REMOVAL NOTICE**

# **Table of Contents**

I.     Introduction ............................................................................................................. 1

II.    Relevant Facts ......................................................................................................... 8

  A.   The New York Indictment ................................................................................. 8

  B.   The First Removal Notice And Subsequent Remand ......................................... 9

  C.   Preemption Litigation ..................................................................................... 12

  D.   The New York Jury Instructions ..................................................................... 12

  E.   Presidential Immunity Litigation .................................................................... 15

  F.   Recusal Litigation .......................................................................................... 19

  G.   The Current New York Schedule ..................................................................... 23

III.   Applicable Law ..................................................................................................... 24

IV.    Removal Is Necessary To Protect Important Federal Interests ............................. 26

  A.   President Trump Is An "Officer" Under § 1442(a)(1) ..................................... 26

  B.   DANY's Case "Relat[es] To" Actions Under Color Of The Presidency ......... 27

    1.   Testimony From White House Personnel ................................................. 28

    2.   President Trump's Official Public Statements Via Twitter ...................... 30

    3.   President Trump's Official Acts In Response To FEC Inquiries .............. 31

    4.   Official-Acts Evidence Relating To Investigations By Congress And Prosecutors . 32

    5.   President Trump's Official Disclosures On OGE Form 278e ................... 33

  C.   Colorable Federal Defenses Require Removal And Eventually Dismissal ......... 34

    1.   Presidential Immunity ............................................................................ 34

    2.   Preemption .............................................................................................. 39

  D.   There Is Good Cause For This Second Removal Notice ................................... 46

    1.   The Extraordinary Federal Significance Of Presidential Immunity ......... 47

    2.   Intervening Supreme Court Decisions ..................................................... 48

    3.   DANY's Materially Different Trial Presentation .................................... 50

    4.   Local Hostilities, Political Bias, Conflicts, And Appearances Of Impropriety ........ 51

    5.   Irreparable Harm From Interference With The Impending Election ......... 54

    6.   Inadequate New York Procedures ........................................................... 57

  E.   Section 1653 Amendment Is An Alternative Basis To Effectuate Removal ......... 58

V.     Conclusion ............................................................................................................ 60

**Table of Exhibits**

| Exhibit | Description |
|---------|-------------|
| Ex. A | Indictment (Ex. A to ECF No. 1-1) |
| Ex. B | White Paper (Ex. B to ECF No. 1-1) |
| Ex. C | April 24, 2023 Motion (Ex. C to ECF No. 1-1) |
| Ex. D | May 1, 2023 Memorandum of Law (Ex. D to ECF No. 1-1) |
| Ex. E | April 4, 2023 Statement of Facts (Ex. E to ECF No. 1-1) |
| Ex. F | September 29, 2023 Memorandum of Law (Redacted) |
| Ex. G | February 15, 2024 Decision and Order |
| Ex. H | February 22, 2024 DANY Motions *in Limine* |
| Ex. I | March 18, 2024 Decision and Order |
| Ex. J | May 13, 2024 DANY Proposed Jury Instructions |
| Ex. K | May 14, 2024 President Trump Proposed Jury Instructions |
| Ex. L | May 17, 2024 DANY Response To Proposed Jury Instructions |
| Ex. M | Excerpts of Trial Transcript |
| Ex. N | March 7, 2024 Memorandum of Law (Redacted) |
| Ex. O | March 13, 2024 Memorandum of Law |
| Ex. P | April 3, 2024 Decision and Order |
| Ex. Q | April 15, 2024 Letter |
| Ex. R | April 16, 2024 Letter |
| Ex. S | August 2, 2024 Letter |
| Ex. T | July 1, 2024 Letter |
| Ex. U | July 2, 2024 Letter |
| Ex. V | July 10, 2024 Memorandum of Law (Redacted) |
| Ex. W | July 24, 2024 Memorandum of Law (Redacted) |

| Exhibit | Description |
|---------|-------------|
| Ex. X | July 31, 2024 Memorandum of Law (Redacted) |
| Ex. Y | May 31, 2023 Memorandum of Law |
| Ex. Z | August 11, 2023 Decision (Redacted) |
| Ex. AA | April 3, 2024 Memorandum of Law |
| Ex. BB | April 3, 2024 Affirmation (Without Exhibits) |
| Ex. CC | May 18, 2024 Article |
| Ex. DD | July 31, 2024 Letter |
| Ex. EE | August 1, 2024 Letter |
| Ex. FF | August 5, 2024 Letter |
| Ex. GG | August 13, 2024 Decision |
| Ex. HH | August 14, 2024 Letter |
| Ex. II | DANY Trial Exhibits 407-F through 407-I |
| Ex. JJ | DANY Trial Exhibit 207 (Redacted) |
| Ex. KK | Excerpts of DANY Trial Exhibit 81 |
| Ex. LL | July 15, 2019 Letter (Redacted) |

## I.    Introduction

President Donald J. Trump respectfully submits this Second Removal Notice, pursuant to 28 U.S.C. §§ 1442(a)(1), 1455, and 1653 and Rule 11 of the Federal Rules of Civil Procedure, and for good cause shown, seeking removal of the New York County proceedings in *People v. Trump*, Ind. No. 71543-23.

1.    This "zombie" case should have been dismissed long ago.  The Manhattan District Attorney's Office ("DANY") violated the Presidential immunity doctrine in grand jury proceedings, and again at trial, by relying on evidence of President Trump's official acts during his first term in Office.  The U.S. Supreme Court recently ruled that these types of violations threaten the structure of the federal government and the ability of future Presidents to carry out their vital duties in the way the Framers intended.  DANY's flawed case is also preempted because their Indictment turned on the improper use of state law to try to retroactively police the 2016 Presidential election through non-unanimous jury findings.  The Supremacy Clause violations arising from DANY's overreach are illustrated by the fact that neither federal prosecutors nor the Federal Election Commission ("FEC") proceeded against President Trump based on the allegations that DANY relied upon.

2.    The Supremacy Clause is not the only provision of the Constitution being ignored in connection with the purely political New York County prosecution.  The ongoing proceedings will continue to cause direct and irreparable harm to President Trump—the leading candidate in the 2024 Presidential election—and voters located far beyond Manhattan.  This harm includes First Amendment violations, as Justice Merchan has maintained a post-trial gag order that restricts President Trump from engaging in political advocacy based on valid criticisms of the New York County proceedings.  And an entirely unjust sentencing is currently scheduled to occur on

September 18, 2024, which could result in President Trump's immediate and unconstitutional incarceration and prevent him from continuing his groundbreaking campaign.

3.      Since this Court remanded the proceedings in connection with President Trump's First Removal Notice, three intervening Supreme Court decisions added force to his federal defenses based on Presidential immunity and preemption.  In an opinion that became final less than 30 days ago, the Supreme Court held that President Trump is entitled to immunity from criminal prosecution for his official acts, and—as particularly relevant here—that prosecutors may not use official-acts evidence in connection with a prosecution that they claim arises out of unofficial conduct.  *Trump v. United States*, 144 S. Ct. 2312, 2327, 2340-41 (2024).  In *Trump v. Anderson*, the Supreme Court warned that states' "power over governance . . . does not extend to *federal* . . . candidates."  601 U.S. 100, 111 (2024) (emphasis in original).  In *Loper Bright Enterprises v. Raimondo*, the Supreme Court overruled the *Chevron* decision, which required deference to agency interpretations, and implored courts to rely on their core interpretive competencies when interpreting statutes.  144 S. Ct. 2244, 2254, 2273 (2024).  *Anderson* and *Raimondo* abrogated prior decisions that deferred to the FEC's restrictive interpretation of the preemption clause in the Federal Election Campaign Act ("FECA"), which applies broadly to "any provision of State law with respect to election to Federal office" and therefore voids the New York laws that DANY applied to the 2016 Presidential election to try to manufacture nonexistent crimes. 52 U.S.C. § 30143.

4.      In addition to these binding intervening precedents, removal to federal court is necessary because DANY created a trial record that was materially inconsistent with the representations that they made to this Court in connection with the First Removal Notice.  For example, at a June 27, 2023 hearing, DANY represented to this Court that there could be "no

argument" by President Trump that "anybody" involved in their baseless allegations "was doing anything in carrying out their job as a government actor." At trial, however, DANY violated that representation and the Presidential immunity doctrine under *Trump v. United States* by offering evidence of President Trump's official acts as President.

5. For purposes of federal-officer removal under § 1442(a)(1), the Court must credit— and DANY cannot dispute—President Trump's defense theory that the prosecutors relied on official-acts evidence at trial and in grand jury proceedings. *See, e.g.*, *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 137 (2d Cir. 2008). DANY's official-acts evidence included, for example, testimony from President Trump's White House Communications Director, who testified about confidential conversations that she had with President Trump in the Oval Office relating to matters of public concern. DANY relied on testimony from another aide to President Trump, whose desk was located immediately next to the Oval Office, regarding her observations of President Trump's practices as President with respect to sensitive matters and certain national security issues such as phone systems in the White House Situation Room. DANY also offered evidence of President Trump's official public statements via Twitter in 2018, and official financial disclosures that he made as President pursuant to the requirements of a federal agency housed in the Executive Branch he was running at the time. Lastly, DANY's star witness and serial perjurer, Michael Cohen, testified regarding President Trump's official response to federal investigations he oversaw as President—including testimony regarding an alleged conversation with Attorney General Jeff Sessions and separate references to President Trump's use of the pardon power. DANY relied on similar proof before a grand jury, and that evidence also violated the Presidential immunity doctrine under *Trump v. United States*.

6.      As to preemption, DANY told this Court in connection with the First Removal Notice that their charges "do not relate to the specific disclosures mandated by FECA."  The trial revealed, however, that a critical part of DANY's theory turned on whether there had been violations of FECA's rules regarding individual and corporate campaign contributions.  DANY requested, and Justice Merchan provided, watered-down instructions regarding these complex concepts that required the jurors to moonlight as FEC commissioners.  Despite having told this Court that use of a special verdict form could mitigate the preemption problems President Trump identified in the First Removal Notice, DANY opposed President Trump's request at trial for special interrogatories that would have required the jurors to make unanimous findings relating to these issues.  As to that request, Justice Merchan once again followed DANY's lead and did not require unanimity.  Justice Merchan also refused to allow President Trump to assist the jurors in the monumental and unconstitutional task of applying FECA in a state-law prosecution by precluding crucial aspects of defense testimony from an expert who actually served as an FEC Chairman and Commissioner.  Instead, in violation of the Supremacy Clause and FECA's preemption provision, Justice Merchan asked the jurors to consider on their own, among other things, whether certain payments were made "for the purpose of influencing any election to Federal office."  That is precisely the type of state-law inquiry that FECA preempts.

7.      Post-trial removal is necessary under these circumstances to afford President Trump an unbiased forum, free from local hostilities, where he can seek redress for these Constitutional violations.  Federal-officer removal pursuant to 28 U.S.C. § 1442(a)(1) is not an infringement on state sovereignty.  Rather, § 1442(a)(1) contemplates enforcement of state law in federal court, pursuant to federal procedures and subject to federal defenses, by unelected judges with lifetime tenure who are more insulated from political pressure.  *See Arizona v. Manypenny*,

4

451 U.S. 232, 241-42 (1981).  Immediate access to such a forum is imperative and of the utmost urgency.  Federal institutional interests associated with the Presidency, Congressional and FEC regulation of federal elections, and the integrity of the upcoming 2024 Presidential election are at stake.

8.     President Trump's post-trial motion to dismiss the Indictment and vacate the jury's verdicts based on Presidential immunity is currently pending before Justice Merchan, an acting New York judge facing conflicts of interest and appearances of impropriety who has already forecast his intention to deny the motion by directing the parties to prepare for sentencing in September.  This month, President Trump renewed prior requests for Justice Merchan's recusal based in part on 2019 public statements by Justice Merchan's daughter indicating that he had been critical of President Trump's use of Twitter during his Presidency.  The problem with Justice Merchan's earlier statements is that they confirm judicial bias and hostility towards President Trump's 2018 Tweets, which are a core issue in the pending Presidential immunity motion.  But Justice Merchan denied the recusal motion without even addressing that issue.  He claimed incorrectly that there was nothing "new" about the recusal motion despite the fact that the motion connected evidence of a specific form of judicial bias to President Trump's immunity arguments.

9.     During roughly the same period in 2019, Justice Merchan's daughter was working for the unsuccessful Presidential campaign of Vice President Kamala Harris, who is now President Trump's opponent in the upcoming Presidential election.  Justice Merchan's daughter took a senior executive position and partial ownership of Authentic Campaigns, Inc., a top campaign vendor whose clients have included Vice President Harris, President Biden, and other opponents and adversaries of President Trump.  In 2020, Justice Merchan also made improper contributions to Democrat interests such as "Biden for President" and "Stop Republicans," which violated New

York ethics rules and resulted in a caution by the New York State Commission on Judicial Conduct.  Under the leadership of Justice Merchan's daughter, Authentic has provided services to clients who have solicited political contributions based on developments in the proceedings over which Justice Merchan is presiding.  Since DANY charged President Trump in 2023, Authentic has received tens of millions of dollars from such clients.

10.     Faced with these facts, backed by public FEC filings and social media posts, Justice Merchan has mischaracterized the conflicts and appearances of impropriety as "speculative" and based on "rumors," without explaining why he takes that view.  Making matters worse, Justice Merchan has insisted on maintaining an unconstitutional gag order that prevents President Trump from addressing these issues in response to political attacks by Vice President Harris, Democrat Vice Presidential nominee Tim Walz, New York Governor Kathy Hochul, and others.  Justice Merchan has continued to violate the First Amendment despite the fact that President Trump would only be commenting on issues that he has already raised in public court filings, and even though extrajudicial statements by President Trump could not possibly impact the integrity of the remaining New York County proceedings because, post-trial, there are no potential jurors or witnesses to be affected.  The continued operation of this unlawful prior restraint is causing irreparable First Amendment harm to President Trump and the American people, and it operates as a wholly inappropriate muzzle on the leading candidate in the 2024 Presidential election while he is on the campaign trail and during any debate against Vice President Harris—with the first such debate currently scheduled to occur in less than two seeks on September 10, 2024.

11.     Justice Merchan has indicated that he plans to decide President Trump's Presidential immunity motion on September 16, 2024, despite his documented bias relating to one of the forms of official-acts evidence central to the motion, and to potentially sentence President

6

Trump just two days later on September 18.  At that potential sentencing, President Trump faces the prospect of immediate and unlawful incarceration under New York law, which could prevent him from continuing to pursue his leading campaign for the Presidency.  Nor does Justice Merchan's current schedule allow adequate time for the interlocutory appellate review of Presidential immunity issues that *Trump v. United States* mandated, and Justice Merchan has not ruled on President Trump's request to adjourn the sentencing until after the election so that President Trump can pursue appropriate appeals and additional election interference can be avoided.

12.     Finally, the timing and content of this Second Removal Notice are supported by "good cause."  28 U.S.C. § 1455(b)(1)-(2).  In the alternative, President Trump should be permitted to amend the First Removal Notice based on the evidence and arguments in this filing.  *See* 28 U.S.C. § 1653.  The groundbreaking Presidential immunity issues arising from *Trump v. United States* are alone a sufficient basis to grant this removal application.  *Anderson* and *Raimondo* are two additional intervening decisions that abrogate authorities the Court relied upon in remanding the case previously.  As noted above, additional removal litigation is warranted because, at the New York County trial this year, DANY relied on evidence and legal theories that were materially different from the representations and arguments that they presented to this Court last year.  The record of those proceedings reveals the type of political bias, conflicts of interest, and appearances of impropriety that have animated the need for federal-officer removal for centuries.  New York procedures have proven inadequate to protect federal interests, and allowing the New York County proceedings to continue unabated will result in further irreparable harm to President Trump, the American people, and the Presidency.

13.     These ongoing harms must be stopped.  The impending election cannot be redone. The currently unaddressed harm to the Presidency resulting from this improper prosecution will adversely impact the operations of the federal government for generations.  Accordingly, President Trump respectfully requests that the Court (i) accept this Second Removal Notice; (ii) confirm that Justice Merchan may not sentence President Trump during litigation over this Second Removal Notice because sentencing would result in a prohibited "judgment of conviction" under 28 U.S.C. § 1455(b)(3); *see also* N.Y. Criminal Procedure Law ("CPL") § 1.20(15) (defining "judgment" to include "a conviction and the sentence"); and (iii) order the case removed, notify Justice Merchan of the removal, and set a motion schedule so that President Trump can seek dismissal of the case and vacatur of the New York County jury's unsupported verdicts, *see* 28 U.S.C. § 1455(b)(5).

## II.    Relevant Facts

### A. The New York Indictment

14.     On March 30, 2023, a New York County grand jury returned an Indictment charging President Trump with 34 violations of falsifying business records in the first degree, in violation of New York Penal Law § 175.10.  *See* ECF No. 1-1 (Ex. A).[1]  The charges elevated the misdemeanor offense under Penal Law § 175.05 to a felony based on the allegation that the "intent to defraud" included "an intent to commit *another crime* or to aid or conceal the commission thereof."  Penal Law § 175.10 (emphasis added).

---

[1] Citations to "ECF No." are to the electronic docket in this case.  Defense Exhibits A – E were submitted to the Court with the May 4, 2023 Affirmation of Susan R. Necheles, ECF No. 1-1, and are incorporated by reference.  Defense Exhibits F – LL are attached to the August 29, 2024 Affirmation of Emil Bove submitted in connection with this Second Removal Notice.  Any redactions to those exhibits were made in connection with the New York County proceedings pursuant to the operative protective order in that case.

15.     "Within DANY," the case "was referred to as the 'zombie' case." *Bragg v. Jordan*,
669 F. Supp. 3d 257, 262 (S.D.N.Y. 2023) (cleaned up).  "Numerous DANY prosecutors were
skeptical about the prosecution of Trump and were referred to internally at DANY as
'conscientious objectors.'"  *Id.*

16.     In a Bill of Particulars, DANY asserted that President Trump was "not entitled" to
specific disclosures regarding their theory of the predicate offense under Penal Law § 175.10—
the "another crime"—that they would rely upon at trial.  ECF No. 18-2 at 5.  DANY added,
"expressly without limiting [their] theory at trial," that the predicate offenses "may include"
violations of New York Election Law ("NYEL") § 17-152, New York Tax Law §§ 1801(a)(3) and
1802, Penal Law §§ 175.05 and 175.10, or the Federal Election Campaign Act ("FECA"), 52
U.S.C. § 30101 *et seq.*  ECF No. 18-2 at 5.

17.     NYEL § 17-152 is a misdemeanor conspiracy offense that has rarely, if ever, been
used in criminal prosecutions, which prohibits conspiracies "to promote or prevent the election of
any person to a public office by unlawful means."

**B.  The First Removal Notice And Subsequent Remand**

18.     On May 4, 2023, President Trump filed the First Notice of Removal pursuant to 28
U.S.C. §§ 1442 and 1455.  ECF No. 1.  In support of removal, President Trump asserted that:

        a.      The Indictment "charges President Trump for conduct committed while he
was President of the United States that was within the 'color of his office'" under 28 U.S.C.
§ 1442(a)(1), ECF No. 1 ¶ 2;

        b.      The prosecution was "based on an alleged violation of election law
pertaining to a federal election," which raised "serious federal preemption issues" under FECA,
ECF No. 1 ¶ 11; *see also id.* ¶ 23;

c.      "President Trump's decision to retain Michael Cohen to act as his personal lawyer arose out of his duties as President," including under the Emoluments Clause, Art. I, § 9, cl. 8, and the Take Care Clause, Art. II, § 3, cl. 5, *see* ECF No. 1 ¶¶ 19-20; and

d.      The Court should exercise protective jurisdiction because the prosecution was politically motivated, ECF No. 1 ¶ 31.

19.     On May 30, 2023, DANY filed a motion to remand the case to New York Supreme Court pursuant to 28 U.S.C. § 1447.  ECF Nos. 17-19.  DANY argued, among other things, that:

a.      There was "no connection" between President Trump's "official duties" and the "alleged criminal conduct," and "no plausible basis to invoke official immunity for his unofficial actions," ECF No. 19 at 1-2; *see also id.* at 20[2];

b.      There was a "serious question about whether a former President can claim absolute presidential immunity against criminal liability at all," and "no clear support" for the defense, ECF No. 19 at 17-18[3];

c.      President Trump's preemption defense "relie[d] on an erroneously narrow characterization of the charges against him," ECF No. 19 at 22; and

d.      The preemption defense would "depend on whether and to what degree the People rely on Election Law § 17-152 at trial," "how the state court instructs the jury," and

---

[2] *Accord* ECF No. 19 at 9 n.4 ("[T]here is no connection or association between the conduct charged in the indictment and defendant's official duties and responsibilities as President."); *id.* at 14 ("Defendant's alleged criminal conduct here is similarly divorced from any official duty or responsibility . . . ."); ECF No. 38 at 5 ("Nothing about this conduct touches, relates to, has a nexus or causal connection between, is associated with, or has any other connection to any official responsibility or authority of the President.").

[3] *Accord* ECF No. 19 at 21 n.9 ("It suffices to resolve this motion in the People's favor that any viable immunity defense would require that the charged conduct arguably serve some official purpose, which defendant has not—and cannot—allege here.").

"whether the jury returns special verdicts or interrogatory responses that could resolve any ambiguity over the basis for its verdict," ECF No. 38 at 14-15.

20.     On June 15, 2023, President Trump opposed DANY's remand motion.  ECF No. 34.

21.      On June 27, 2023, the Court held an evidentiary hearing on DANY's remand motion.  *See* ECF No. 41 (transcript of proceedings).

22.     On July 19, 2023, the Court issued an opinion remanding the case to the New York Supreme Court.  *See New York v. Trump*, 683 F. Supp. 3d 334 (S.D.N.Y. 2023).  Based on DANY's written and oral representations to the Court, the opinion included the following rulings:

        a.     The Court "h[e]ld" that 28 U.S.C. § 1442(a)(1) applies to President Trump despite the fact that he was "not presently a federal officer," *New York*, 683 F. Supp. 3d at 343;

        b.     In "dictum," the Court noted that it "believe[d]" that the position of President fit within the scope of the term "officer," as used in 28 U.S.C. § 1442(a)(1), *New York*, 683 F. Supp. 3d at 343;

        c.     The Court found that DANY's allegations did not involve Presidential acts "under color of such office," 28 U.S.C. § 1442(a)(1), and there was "little or no risk that a state might arrest the operations of the federal government," *New York*, 683 F. Supp. 3d at 346;

        d.     The Court found that President Trump had "waived any argument premised on a theory of absolute presidential immunity," and that immunity was "not a colorable defense" to DANY's charges, *id.* at 346-47 (cleaned up); and

        e.     The Court rejected President Trump's preemption defense by reasoning that "NYEL § 17-152 does not fit into any of the three categories of state law that FECA preempts,"

based on deference to interpretations in the FEC regulations at 11 C.F.R. § 108.7, *New York*, 683 F. Supp. 3d at 350.

### C. Preemption Litigation

23.     On September 29, 2023, President Trump filed omnibus pretrial motions in the New York Supreme Court.  President Trump argued, among other things, that NYEL § 17-152 is preempted by FECA "to the extent the People are attempting to use this section to prohibit conspiracies to violate FECA."  Ex. F at 18; *see also id.* at 19 & n.8.

24.     DANY opposed President Trump's preemption motion by emphasizing this Court's ruling in *New York v. Trump*, and Justice Merchan denied the motion for similar reasons in a February 15, 2024 decision.  *See* Ex. G at 15 (noting that DANY "ask[ed] this Court to follow Judge Hellerstein's ruling").  Although FECA's preemption provision voids "any provision of State law with respect to election to Federal office," 52 U.S.C. § 30143, Justice Merchan referred to the FEC regulations when he asserted that "there is no preemption by FECA in this matter" because FECA "does not affect the states' rights to pass laws concerning voter fraud and ballot theft."  Ex. G at 16; *see also* 11 C.F.R. § 108.7(c)(4).

### D.  The New York Jury Instructions

25.     Prior to trial, DANY filed a motion *in limine* seeking to preclude testimony from President Trump's proffered campaign-finance expert: former FEC Commissioner and Chairman Bradley Smith.  DANY argued, *inter alia*, that the "application of federal campaign finance law" was not "relevant" to "any factual issues."  Ex. H at 8.

26.      Based on DANY's representations, Justice Merchan concluded that the most important features of Smith's proposed testimony were "not relevant."  Ex. I at 3.  As a result,

Justice Merchan precluded Smith from testifying regarding anything but "general background" regarding the FEC and "general definitions and terms." *Id.*

27.    During the trial, on May 13, 2024, DANY submitted proposed jury instructions. Ex. J.

    a.    For the first time, DANY narrowed their predicate theory under Penal Law § 175.10 to focus exclusively on NYEL § 17-152, *see* Ex. J at 3;

    b.    Although DANY represented to this Court that they would proceed on a theory of "general intent" under Penal Law § 175.10, *see, e.g.*, ECF No. 19 at 7-8, they asked Justice Merchan to instruct the jury that "you must conclude unanimously that the defendant conspired to promote or prevent the election of any person to a public office by unlawful means" under NYEL § 17-152, *see* Ex. J at 4;

    c.    With respect to the alleged "unlawful activity" object of the NYEL § 17-152 conspiracy, DANY argued that the jury could select—without a unanimous decision—one or more of alleged FECA violations, tax violations, and third parties' violations of Penal Law §§ 175.05 and 175.10, *see* Ex. J at 4; and

    d.    Contrary to DANY's arguments to this Court and Justice Merchan in pretrial proceedings, DANY sought extensive instructions regarding the elements of NYEL § 17-152 and FECA's restrictions on campaign contributions, *see* Ex. J at 3-6.

28.    President Trump submitted proposed jury instructions on May 14, 2024. Ex. K. President Trump noted that he was prejudiced by DANY's change in theory because he prepared pretrial motions and trial strategy based on DANY's prior representations regarding "four theories" for a felony predicate under Penal Law § 175.10. *Id.* at 1-2. In response to DANY's new theory of a single predicate, President Trump requested clarifying instructions regarding the

13

meaning of the terms "contribution" and "expenditure" under FECA, *id.* at 24-27, and for the jury to be required to "reach a unanimous decision regarding whether the People have established 'unlawful means' [under NYEL § 17-152] and, if so, which 'unlawful means' was or were at issue," *id.* at 23.

29.     In a May 17, 2024 responsive submission, DANY objected to, *inter alia*, the request that the jury be required to make unanimous findings in special interrogatories regarding any findings on "unlawful means" under NYEL § 17-152.  Ex. L at 9.

30.     Notwithstanding DANY's changed theory and the implicit concession in their proposed instructions that FECA concepts were highly relevant, Justice Merchan refused to revisit his limitations on the proposed testimony of defense expert Smith.  Ex. M, Tr. 3972-85.

31.     Despite DANY's suggestion to this Court that special interrogatories would be appropriate, *see* ECF No. 38 at 14-15, they argued to Justice Merchan at the charge conference that he would need to "rewrite the law" in order to require unanimous findings regarding "unlawful activity" under NYEL § 17-152.  Ex. M, Tr. 4404.

32.     Justice Merchan instructed the jury in a manner that was largely consistent with DANY's requests, particularly with respect to their new theory of NYEL § 17-152 as a felony predicate for Penal Law § 175.10.  Ex. M, Tr. 4844-46.  After precluding President Trump from providing the jury with relevant context regarding the FEC's application of pertinent terms, Justice Merchan provided only limited information regarding those definitions.  For example, Justice Merchan refused to describe relevant First Amendment limitations arising from the Supreme Court's decision in *Buckley v. Valeo*, 424 U.S. 1 (1976) and the meaning of the statutory phrase "for the purpose of influencing any election for Federal office," 52 U.S.C. §§ 30101(8)(A)(i), 30101(9)(A)(i).  *See* Ex. K at 24-25 (President Trump's requested instructions).

33.     On May 30, 2024, the jury returned disputed guilty verdicts on the 34 counts in the Indictment.  At that time, Justice Merchan scheduled sentencing for July 11, 2024.

### E.  Presidential Immunity Litigation

34.     Prior to the trial, on March 7, 2024, President Trump filed a motion seeking an adjournment and preclusion of evidence relating to his "official acts" based on the Presidential immunity doctrine.  Based on DANY's disclosures up to that point, President Trump expressed particular concern about their apparent intention to use at trial official public statements via Twitter by President Trump during his first term in Office, other public statements by President Trump during his Presidency, 2018 disclosures by President Trump on U.S. Office of Government Ethics ("OGE") Form 278(e), and testimony from President Trump's close advisers such as former White House Communications Director Hope Hicks.  Ex. N at 3-4.  The motion was based on three developments:

    a.      On February 22, 2024, DANY confirmed in motions *in limine* that they planned to offer evidence of President Trump's official acts at the trial, which they argued was relevant to a so-called "pressure campaign" relating to their star witness Michael Cohen, *see* Ex. H at 50-52;

    b.      On February 28, 2024, the U.S. Supreme Court granted certiorari in *Trump v. United States*, in order to address "[w]hether and if so to what extent does a former President enjoy presidential immunity from criminal prosecution for conduct alleged to involve official acts during his tenure in office," and set an expedited schedule that included oral argument on April 15, 2024, *see* 144 S. Ct. 1027 (2024); and

    c.      On March 4, 2024, the U.S. Supreme Court issued a unanimous decision rooted in federalism concerns in *Trump v. Anderson*, which included the proposition that states'

15

"power over governance . . . does not extend to *federal* . . . candidates," 601 U.S. at 111 (emphasis in original).

35.     In a March 13, 2024 opposition filing, *see* Ex. O, DANY made the following assertions:

a.     DANY argued, wrongly, as explained below, that the motion was untimely under CPL § 255.20(1), *see, e.g.*, Ex. O at 2-3;

b.     Consistent with President Trump's decision not to press "absolute presidential immunity" in the First Removal Notice, *New York*, 683 F. Supp. 3d at 346, DANY conceded that President Trump's evidence-preclusion argument was "dissimilar" to the federal Presidential immunity motion that led to *Trump v. United States*, and that President Trump was not "raising any claim of absolute presidential immunity based on the actual criminal charges here," Ex. O at 2, 5; and

c.     On the merits, DANY argued, wrongly yet again, that "the charged conduct involves unofficial rather than official acts by defendant" and "there is no categorical bar to using evidence of immunized conduct in a trial involving non-immunized conduct," Ex. O at 2, 7.

36.     On April 3, 2024, Justice Merchan denied the Presidential immunity motion by ruling, incorrectly, that the motion was "untimely" under CPL § 255.20(1).  Ex. P at 3, 6.  In addition to being an abuse of discretion given the significance of the Constitutional issues at stake, *see* CPL § 255.20(3), Justice Merchan's reliance on DANY's timeliness argument was erroneous because CPL § 255.20 applies only to "Pre-trial motions," which is a statutory term that expressly did not include President Trump's motion to preclude official-acts evidence.  *See* CPL § 255.10(1).

37.     On April 10, 2024, President Trump filed a Verified Article 78 Petition in New York's Appellate Division, First Department, challenging, *inter alia*, Justice Merchan's denial of

the Presidential immunity motion.  *See Trump v. Merchan*, Case No. 2024-02413 (1st Dep't Apr. 10, 2024).  The First Department dismissed the Petition based in part on the suggestion—which is inconsistent with the U.S. Supreme Court's subsequent decision in *Trump v. United States*—that President Trump should have to wait to challenge the ruling until a "direct appeal."  *Trump v. Merchan*, 227 A.D.3d 569, 571 (1st Dep't 2024).

38.     On April 15, 2024, which was the first day of jury selection, DANY re-raised their request to admit "tweets from then President Trump" during the trial.  Ex. M, Tr. 42.  Defense counsel renewed the Presidential immunity objection and indicated that President Trump would make a written submission on the issue.  Ex. M, Tr. 53.  Justice Merchan responded that it would be "hard to convince me" that President Trump's public statements "somehow constitute an official presidential act."  Ex. M, Tr. 55.

39.     After the close of proceedings on April 15, 2024, President Trump submitted a letter to Justice Merchan renewing the Presidential immunity objection.  Ex. Q.

40.     On April 16, 2024, DANY submitted a responsive letter.  Ex. R.  DANY conceded that President Trump could "make appropriate objections during trial," but insisted that there was "absolutely no basis to preclude evidence" of official acts because, *inter alia*, "presidential immunity from criminal liability does not exist" and "there is no corresponding evidentiary privilege precluding the introduction of immune conduct."  *Id.*  Less than three months later, but after the New York County trial that Justice Merchan refused to postpone, the U.S. Supreme Court explicitly rejected both propositions in *Trump v. United States*.

41.     On April 19, 2024, Justice Merchan stated that his Presidential immunity ruling "remain[ed] the same," and "will not be addressed any further," but that defense counsel could raise Presidential immunity objections during the trial.  Ex. M, Tr. 802.

17

42.     During the trial, Justice Merchan permitted DANY to offer at least five categories of official-acts evidence over President Trump's objection.  DANY's improper official-acts evidence is discussed in detail below in Part IV.

43.     After the jury's unsupported verdicts, on July 1, 2024, the U.S. Supreme Court issued a decision recognizing the application of the Presidential immunity doctrine to criminal cases in *Trump v. United States*, 144 S. Ct. 2312 (2024).  Pursuant to Supreme Court Rule 45, the decision became final on August 2, 2024.  Ex. S.  The Supreme Court held, *inter alia*, that:

a.      President Trump is entitled to "immunity from criminal prosecution for official acts during his tenure in office," *Trump v. United States*, 144 S. Ct. at 2327;

b.      Presidential immunity is absolute "with respect to the President's exercise of his core constitutional powers," and "at least a *presumptive* immunity from criminal prosecution for a President's acts within the outer perimeter of his official responsibility," *id.* at 2327, 2331 (emphasis in original);

c.      There is a "need for pretrial review" of Presidential immunity arguments, and "a district court's denial of immunity would be appealable before trial," *id.* at 2343; and

d.      It would "eviscerate" the immunity recognized in *Trump v. United States* if prosecutors could—as DANY did at President Trump's trial—"invite the jury to examine acts for which a President is immune from prosecution to nonetheless prove his liability on any charge," including "generally applicable criminal laws."  *Id.* at 2340-41.

44.     On the same day as the Supreme Court's decision in *Trump v. United States*, defense counsel notified Justice Merchan that President Trump intended to seek relief based on DANY's violations of the recognized Presidential immunity doctrine.  Ex. T.

45.     On July 2, 2024, in light of the anticipated motion, Justice Merchan adjourned President Trump's sentencing from July 11, 2024 until September 18, 2024.  Ex. U.

46.     On July 10, 2024, President Trump moved to dismiss the Indictment and vacate the jury's verdicts based on the Presidential immunity doctrine and DANY's use of official-acts evidence in grand jury proceedings and at trial, including five of President Trump's Tweets from 2018.  Ex. V.  DANY opposed the motion on July 24, 2024.  Ex. W.  President Trump submitted a reply in further support of the motion on July 31, 2024.  Ex. X.

### F. Recusal Litigation

47.     President Trump has asked Justice Merchan to recuse himself three times.  Despite apparent conflicts and obvious appearances of impropriety that are escalating as the 2024 Presidential election approaches, Justice Merchan has refused each time.

48.     In the first motion, on May 31, 2023, President Trump argued that recusal was necessary because of conflicts and appearances of impropriety arising from (i) Justice Merchan's political contributions to Democrat Party interests, and (ii) Justice Merchan's daughter being an executive at Authentic Campaigns, Inc., a company engaged in electioneering work for President Biden, Vice President Harris, and other political adversaries of President Trump, who therefore stood to benefit from DANY's efforts to prosecute and incarcerate President Trump.  *See* Ex. Y.

49.     On August 11, 2023, Justice Merchan denied President Trump's recusal motion.  Justice Merchan afforded only conclusory and dismissive treatment to President Trump's arguments.  According to Justice Merchan, the concerns about Justice Merchan's daughter and Authentic were "speculative and hypothetical," not "concrete, or even realistic."  Ex. Z at 3.  He declined to explain why he believes that to be true.

50.     On April 3, 2024, President Trump renewed the recusal motion.  Ex. AA (memorandum of law); Ex. BB (evidentiary affirmation without underlying exhibits).  President Trump renewed his argument based upon on evidence that:

a.      Citing public disclosures relating to the 2024 Presidential election, clients of Authentic—where Justice Merchan's daughter is a senior executive and partner—were actively advocating against President Trump and soliciting political contributions based on Justice Merchan's proceedings, *see, e.g.*, Ex. AA at 1;

b.      Authentic clients, including those soliciting political contributions based on developments in the New York County proceedings, had disbursed more than $18 million to the company since Justice Merchan began presiding over the case, Ex. AA at 1, 29;

c.      Authentic was actively marketing itself based on services to President Trump's opponents and attacks on President Trump, Ex. BB ¶ 53;

d.      Justice Merchan's daughter had worked on Vice President Harris's 2020 Presidential campaign and made social media posts critical of President Trump when he left the White House, Ex. BB ¶¶ 2, 54-56; and

e.      In a 2019 podcast, Justice Merchan's daughter discussed a conversation that she had with Justice Merchan in which they were critical of President Trump's use of Twitter during his first term in Office, Ex. BB ¶ 4.

51.     On April 15, 2024, Justice Merchan denied the second recusal motion in a ruling from the bench.  Ex. M, Tr. 2-7.  Justice Merchan once again asserted in a conclusory fashion that President Trump's arguments were based on "innuendos and unsupported speculation."  *Id.*, Tr. 6. He did not address the evidence that Authentic, and his daughter, had obtained financial and commercial benefits by soliciting donations for President Trump's adversaries based, at least in

part, on developments in the case.  Despite the ongoing dispute regarding the relevance and admissibility of President Trump's Tweets, Justice Merchan also claimed that it was "not clear" to him how the critical statements regarding President Trump's use of Twitter attributed to him by his daughter "demonstrates bias." *Id.*, Tr. 5.

52.     In light of the impending trial date, President Trump sought relief from the First Department while the recusal motion was pending with Justice Merchan in the same Article 78 petition in which he raised Presidential immunity arguments.  During the trial, on May 23, 2024, the First Department dismissed the recusal-related arguments in the petition based largely on the claim that President Trump's concerns could be addressed in any direct appeal. *See Merchan*, 227 A.D.3d at 570.

53.     During the trial, it was also publicly reported that the New York State Commission on Judicial Conduct issued a caution letter to Justice Merchan based on 2020 political contributions to President Trump's opponents and adversaries, including "Biden for President" and "Stop Republicans," while President Trump was campaigning.  Ex. CC.  Justice Merchan's contributions violated New York's Rules Governing Judicial Conduct.   22 NYCRR § 100.5(A)(1)(h) (prohibiting New York judges from "indirectly engag[ing] in any political activity," such as "making a contribution to a political organization or candidate").

54.     After the trial, President Trump's opponents—including clients of Authentic and Justice Merchan's daughter—used the jury's verdicts in political attacks:

        a.     On May 31, 2024, President Biden discussed the trial during remarks in the White House State Dining Room, claiming incorrectly that President Trump "was given every

opportunity to defend himself" and that it would be "reckless" and "dangerous" to criticize the verdicts[4];

    b.    When Vice President Harris replaced President Biden as the Democrat nominee in late-July 2024, she immediately framed her candidacy with a specific false reference to DANY's case as a contest of "prosecutor vs. convicted felon"[5];

    c.    At his first campaign rally in August 2024, Minnesota Governor—and Vice President Harris's running mate—Tim Walz criticized President Trump based on this case[6]; and

    d.    In a speech at the Democratic National Convention, New York Governor Kathy Hochul claimed falsely that President Trump "hasn't spent much time in New York lately . . . [e]xcept, that is, to get convicted of 34 felonies" in this case.[7]

55.    On July 31, 2024, President Trump renewed the recusal motion for a third time. President Trump argued that recusal was necessary because, *inter alia*, (i) the 2019 comments attributed to Justice Merchan criticizing President Trump's Tweets reflected bias with respect to an issue that was central to the Presidential immunity motion, and (ii) the conflicts and appearances of impropriety arising from the commercial and financial interests of Authentic and Justice

---

[4] Remarks by President Biden on the Middle East, The White House (May 31, 2024), https://www.whitehouse.gov/briefing-room/speeches-remarks/2024/05/31/remarks-by-president-biden-on-the-middle-east-2.

[5] Elaina Plott Calabro, *The Prosecutor vs. the Felon*, The Atlantic (Jul. 25, 2024), https://www.theatlantic.com/politics/archive/2024/07/kamala-harris-prosecutor-president/679226.

[6] Aila Slisco, *Tim Walz Takes 'Crime' Jab at Donald Trump in First Campaign Rally*, Newsweek (Aug. 6, 2024, 8:27 pm), https://www.newsweek.com/tim-walz-takes-crime-jab-donald-trump-first-campaign-rally-1935566.

[7] Kathy Hochul, *Remarks at the 2024 Democratic National Convention – Aug. 19, 2024*, Iowa State Univ. Archives of Women's Political Communication (Aug. 19, 2024), https://awpc.cattcenter.iastate.edu/2024/08/20/remarks-at-the-2024-democratic-national-convention-aug-19-2024-5.

Merchan's daughter were greatly exacerbated by the fact that Vice President Harris had emerged as President Trump's direct opponent in the 2024 Presidential election and was campaigning based on this case.  Ex. DD.

56.　　On August 1, 2024, the House Judiciary Committee requested information regarding these matters from Authentic and Justice Merchan's daughter, citing "oversight of politically motivated prosecutions" and "Justice Merchan's conflicts of interest and biases in the case against President Trump."  Ex. EE.  Authentic has resisted Congress's requests and refused to fully address them.  The Judiciary Committee responded with a subpoena to Authentic on August 28, 2024.[8]

57.　　On August 5, 2024, Justice Merchan denied President Trump's request to submit a reply in further support of the third recusal motion.  Ex. FF at 2.

58.　　On August 13, 2024, Justice Merchan denied the third recusal motion.  Ex. GG.  He again claimed that President Trump's concerns were based on "innuendo" and asserted—remarkably—that the second motion did not include "new facts," and the third motion was "nothing new."  Ex. GG at 1, 3.  At no point did Justice Merchan address the significance of his 2019 Twitter-related comments to the issues in the recently filed—and therefore undisputedly "new"—Presidential immunity motion.

### G.  The Current New York Schedule

59.　　On August 5, 2024, Justice Merchan indicated that he would rule on President Trump's Presidential immunity motion by September 16, 2024, rather than September 5 as he indicated previously, and forecast his intention to deny the motion by warning the parties to "keep

---

[8] Ella Lee and Rebecca Beitsch, *Jim Jordan Subpoenas Company of Trump Judge's Daughter*, The Hill (Aug. 28, 2024, 3:21 p.m.), https://thehill.com/regulation/court-battles/4852218-jim-jordan-trump-hush-money-judge-subpoena.

. . . in mind" that the September 18, 2024 sentencing date "*remains unchanged*."  Ex. FF at 2 (emphasis in original).

60.    On August 14, 2024, President Trump filed a motion to adjourn the sentencing until after the 2024 Presidential election.  In addition to the need to avoid the use of the New York proceedings to interfere with the national election, President Trump argued that the current schedule does not allow sufficient time for interlocutory appellate review of any denial of the Presidential immunity motion, in violation of the Supreme Court's reasoning in *Trump v. United States*.  Ex. HH.

61.    On August 19, 2024, Justice Merchan informed the parties that he would not issue a decision on the adjournment request until "on or before" September 5, 2024.

## III.   Applicable Law

62.    "Obviously," 28 U.S.C. § 1442(a)(1) is "an attempt to protect federal officers from interference by hostile state courts."  *Willingham v. Morgan*, 395 U.S. 402, 405 (1969).  "Federal officers or agents, including Members of Congress, should not be forced to answer for conduct asserted within their Federal duties in a state forum that invites 'local interests or prejudice' to color outcomes."  H.R. Rep. No. 112-17(I) (2011), 2011 WL 692207, at *3.  "This does not mean Federal officers can break the law; it just means that these cases are transferred to U.S. district court for consideration."  *Id.*

63.    Where § 1442(a)(1) applies, "[f]ederal involvement is necessary in order to insure . . . an impartial setting is provided in which the federal defense of immunity can be considered during prosecution under state law."  *Manypenny*, 451 U.S. at 242.  "Section 1442, although dealing with individuals, vindicates also the interests of government itself; upon the principle that it embodies 'may depend the possibility of the general government's preserving its own

existence.'" *Bradford v. Harding*, 284 F.2d 307, 310 (2d Cir. 1960) (quoting *Tennessee v. Davis*, 100 U.S. 257, 262 (1879)).

64.    Federal-officer removal is *not* an "invasion of the sovereignty of a State." *Davis*, 100 U.S. at 266. "The act of removal permits a trial upon the merits of the state-law question free from local interests or prejudice." *Manypenny*, 451 U.S. at 241-42. "[T]he federal court conducts the trial under federal rules of procedure while applying the criminal law of the State." *Id.* at 241. These removal procedures "safeguard officers and others acting under federal authority" from the "peril of punishment for violation of state law or obstruction or embarrassment by reason of opposing policy on the part of those exerting or controlling state power." *Colorado v. Symes*, 286 U.S. 510, 517 (1932).

65.    There are three elements to federal-officer removal. The pending prosecution must: (i) target a federal "officer," 28 U.S.C. § 1442(a)(1); (ii) be "for or relating to any act under color of such office," *id.*; and (iii) involve "the allegation of a colorable federal defense," *Mesa v. California*, 489 U.S. 121, 129 (1989). Section § 1442(a)(1) is to be construed "liberally," and each requirement applied "broadly." *Badilla v. Midwest Air Traffic Control Serv., Inc.*, 8 F.4th 105, 120 (2d Cir. 2021); *see also Watson v. Philip Morris Cos.*, 551 U.S. 142, 147 (2007) ("[T]he statute must be liberally construed." (cleaned up)).

66.    In a criminal case, removal procedures are governed by 28 U.S.C. § 1455. A defendant can file a second removal notice, including where the notice is submitted more than 30 days after arraignment, upon a showing of "good cause." *Id.* § 1455(b)(1)-(2). Courts are to examine the notice "promptly." *Id.* § 1455(b)(4). Unless "summary remand" is appropriate— which is not the case here in light of the significance of the issues presented—the court "shall order

an evidentiary hearing to be held promptly and, after such hearing, shall make such disposition of the prosecution as justice shall require." *Id.* § 1455(b)(5).

## IV.   Removal Is Necessary To Protect Important Federal Interests

### A.   President Trump Is An "Officer" Under § 1442(a)(1)

67.   The Court has already "h[e]ld" that President Trump, as a former President of the United States, is an "officer" for purposes of 28 U.S.C. § 1442(a)(1). *New York*, 683 F. Supp. 3d at 343.   There is no basis for departing from that holding, which is the law of the case.

68.   Previously, DANY incorrectly argued that the term "officer" in § 1442(a)(1) has the same meaning as that term in the Constitution. *See New York*, 683 F. Supp. 3d at 343.   The Court "believed" that argument was wrong, and for good reason. *Id.*   The U.S. Code's Historical and Revision Notes to § 1442(a)(1) confirm Congressional intent that the statute has been "extended to apply to all officers and employees of the United States or any agency thereof." Consistent with that language, courts have repeatedly applied § 1442(a)(1) and its predecessors to a variety of federal employees and elected officials, including President Trump. *E.g.*, *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 505 (D.C. Cir. 2020); *see also* H.R. Rep. No. 112-17(I) (2011), 2011 WL 692207, at *5 (Congressional Budget Office describing 1442 as applying to "Federal employees").[9]   The cases cited by DANY interpreted the Constitution's Appointments Clause, which has been applied differently because it has an entirely different history. Accordingly, President Trump is within the class of persons who may appropriately access § 1442(a)(1).

---

[9] *See also, e.g.*, *Manypenny*, 451 U.S. at 233-34 (applying § 1442(a)(1) to a Border Patrol Agent and referring to him as a "federal officer"); *Mesa*, 489 U.S. at 123 (applying § 1442(a)(1) to "United States Postal Service employees"); *Maryland v. Soper*, 270 U.S. 9, 22 (1926) (applying § 1442(a)(1) predecessor statute to "federal prohibition agents").

## B.  DANY's Case "Relat[es] To" Actions Under Color Of The Presidency

69.     Notwithstanding prior misrepresentations to this Court, DANY's trial presentation confirmed that this is a prosecution "relating to" official acts by President Trump "under color" of his Executive power pursuant to Article II of the Constitution and related Presidential authorities. 28 U.S.C. § 1442(a)(1).

70.     This Court already observed that, "[c]learly," in 2011 Congress "broadened" § 1442(a)(1) to "cover actions 'not just *causally* connected, but alternatively *connected* or *associated*, with acts under color of federal office.'"  *New York*, 683 F. Supp. 3d at 344 (quoting *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 292 (5th Cir. 2020)) (emphasis in original). Even before the 2011 amendments, the Second Circuit found a sufficient causal connection for purposes of § 1442(a)(1) where the challenged acts "occurred while" defendants performed "their 'official' duty."  *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 140 (2d Cir. 2008).

71.     In *Trump v. United States*, the Supreme Court discussed two types of official Presidential acts.  First, Presidents are entitled to "absolute" immunity "with respect to the President's exercise of his core constitutional powers."  144 S. Ct. at 2327; *see also id.* at 2328 ("Congress cannot act on, and courts cannot examine, the President's actions on subjects within his 'conclusive and preclusive' constitutional authority.").  Second, Presidents have an "outer perimeter" of official responsibility, which "cover[s] actions so long as they are 'not manifestly or palpably beyond [his] authority.'"  *Id.* at 2333 (quoting *Blassingame v. Trump*, 87 F.4th 1, 13 (D.C. Cir. 2023)).

72.     For purposes of federal-officer removal, it would be sufficient if DANY relied on "any act" by President Trump, 28 U.S.C. § 1442(a)(1)—a single official act—to make their case. DANY did much more than that at trial.  The local prosecutors presented five *categories* of such

27

evidence.  When determining whether removal is appropriate, the Court must "credit [President Trump's] theory of the case."  *Isaacson*, 517 F.3d at 137 (citing *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 432 (1999)).  For present purposes, that theory includes President Trump's position that the conduct described below constituted official acts of Executive power, and was therefore subject to Presidential immunity, under *Trump v. United States*.  We explain our positions below, and DANY may dispute them in post-removal motion practice, but for purposes of whether removal is appropriate these positions must be accepted as accurate.

### 1.  Testimony From White House Personnel

73.     DANY sought to prove their charges using testimony from two witnesses who served as advisers to President Trump during his first term in Office: Hope Hicks and Madeleine Westerhout.  As President, President Trump relied on these advisers to assist him in exercising Article II authority under the Constitution.  *See Myers v. United States*, 272 U.S. 52, 117 (1926) ("The vesting of the executive power in the President was essentially a grant of the power to execute the laws.  But the President alone and unaided could not execute the laws.  He must execute them by the assistance of subordinates."); *see also* 3 U.S.C. § 105(a)(1) (authorizing Presidents "to appoint and fix the pay of employees in the White House Office without regard to any other provision of law regulating the employment or compensation of persons in the Government service"); *Trump v. United States*, 144 S. Ct. at 2327 ("Domestically, he must 'take Care that the Laws be faithfully executed,' § 3, and he bears responsibility for the actions of the many departments and agencies within the Executive Branch.").

74.     DANY elicited testimony from Hicks concerning private conversations with President Trump regarding matters of public concern relating to Cohen and his activities,[10] which occurred in the Oval Office while she served as White House Communications Director.  *See, e.g.*, Ex. M, Tr. 2217-21.  President Trump's Executive power to "supervise" someone who was "wield[ing] executive power on his behalf" is an authority that "'follows from the text of Article II.'" *Trump v. United States*, 144 S. Ct. at 2328 (quoting *Seila Law LLC v. CFPB*, 591 U.S. 197, 204 (2020)); *United States v. Nixon*, 418 U.S. 683, 708 (1974) ("A President and those who assist him must be free to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express except privately.").[11]

75.     DANY forced Westerhout to provide details of how President Trump operated the Executive Branch based on observations that she made while working for President Trump, including those made from her desk situated immediately outside the Oval Office.  Ex. M, Tr. 2985-96.  The elicited testimony, including details regarding national security matters such as President Trump's practices with respect to Air Force One, Marine One, and the Situation Room, concerned President Trump's Commander In Chief power, *see* Art. II, § 2, cl. 1, and constituted another unwarranted intrusion on the confidentiality of White House activities, his "supervisory"

---

[10] "Speech deals with matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.  The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up).

[11] *Accord Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 385 (2004) ("[S]pecial considerations control when the Executive Branch's interests in maintaining the autonomy of its office and safeguarding the confidentiality of its communications are implicated."); *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 909 (D.C. Cir. 1993) ("The ability to discuss matters confidentially is surely an important condition to the exercise of executive power.  Without it, the President's performance of any of his duties—textually explicit or implicit in Article II's grant of executive power—would be made more difficult.").

responsibilities as President, and the "management of the Executive Branch." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

## 2. President Trump's Official Public Statements Via Twitter

76.     DANY presented evidence of five official statements by President Trump in 2018, via Twitter, regarding matters of public concern. *See* Ex. V at 14-16, 33-37; Ex. II; Ex. M, Tr. 2708-09.

77.     The account from which DANY obtained the posts "and the webpage associated with it [bore] all the trappings of an official, state-run account." *Knight First Amend. Inst. at Columbia Univ. v. Trump*, 928 F.3d 226, 231 (2d Cir. 2019), *vacated on other grounds sub nom. Biden v. Knight First Amend. Inst. at Columbia Univ.*, 141 S. Ct. 1220 (2021).

78.     The Supreme Court recognized that President Trump's "communications in the form of Tweets," using the same account, were consistent with the President's "'extraordinary power to speak to his fellow citizens.'" *Trump v. United States*, 144 S. Ct. at 2339 (quoting *Trump v. Hawaii*, 585 U.S. 667, 701 (2018)). This "long-recognized aspect of Presidential power" arises from the Executive Vesting Clause and the Take Care Clause of the Constitution. *Id.*

79.     In addition to those core constitutional authorities, the Supreme Court recognized that "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump v. United States*, 144 S. Ct. at 2340.[12] He addressed matters of public concern "in a manner that promote[d] the President's view of the

---

[12] In *Clinton v. Jones*, the Supreme Court noted in dicta that President Clinton's use of White House staff and a private third party to respond to sexual assault allegations by Paula Jones *during the Presidency* "arguably may involve conduct within the outer perimeter of the President's official responsibilities." *Clinton v. Jones*, 520 U.S. 681, 685-86 (1997). Because President Clinton's public statements regarding Jones were "arguably" within the outer perimeter of Executive power, *id.*, President Trump's public statements cannot be said to have been "manifestly" outside that boundary, *Trump v. United States*, 144 S. Ct. at 2333.

public good" and that President Trump "believe[d] would advance the public interest." *Id.* at 2338-40. Thus, the Tweets DANY used at trial reflected official acts by President Trump exercising recognized Presidential authorities.

### 3. President Trump's Official Acts In Response To FEC Inquiries

80. DANY offered official-acts testimony and evidence from Cohen regarding President Trump's strategy and response relating to FEC inquiries, including a text message indicating that President Trump had "approved" a 2018 public statement by Cohen regarding an FEC complaint and testimony that President Trump "told" Cohen that the FEC inquiry would be "taken care of" by then-Attorney General Jeff Sessions. Ex. M, Tr. 3573, 3576-77.

81. It does not matter that DANY claims these steps were taken for "an improper purpose." *Trump v. United States*, 144 S. Ct. at 2335; *see also id.* at 2334 ("Nor may courts deem an action unofficial merely because it allegedly violates a generally applicable law."). President Trump's actions in response to an investigation by the FEC—an Executive Branch agency he was responsible for overseeing—were part of his core Presidential power to "decide which crimes to investigate and prosecute, including with respect to allegations of election crime." *Id.* at 2334 (cleaned up).[13]

82. The existence of this core Presidential power is particularly clear with respect to alleged conversations between President Trump and Attorney General Sessions, which President Trump does not concede occurred but DANY insisted on presenting to the jury through a witness with a documented history of perjury. *See Trump v. United States*, 144 S. Ct. at 2335 ("The President may discuss potential investigations and prosecutions with his Attorney General and

---

[13] *Accord Seila Law*, 591 U.S. at 213 ("As Madison explained, '[I]f any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws.'" (quoting 1 Annals of Cong. 463 (1789))).

other Justice Department officials to carry out his constitutional duty to 'take Care that the Laws be faithfully executed.'  Art. II, § 3.").[14]

83.     Finally, President Trump's public statements regarding these matters, including any statements that he authorized Cohen to make, were consistent with his Presidential authority to address the public.

### 4.  Official-Acts Evidence Relating To Investigations By Congress And Prosecutors

84.     DANY presented official-acts evidence relating to President Trump's public responses to investigations by Congress and federal prosecutors, and his deliberations relating to the pardon power under Art. II, § 2, cl. 4.  Specifically, Cohen testified: (i) about President Trump's public position in response to the investigations by Congress and Special Counsel Mueller; (ii) that Cohen was seeking the "power of the President" in 2017 to protect him in connection with the congressional investigations; and (iii) that a June 2018 email referred to "potential pre-pardons," which Cohen and his attorney discussed after President Trump allegedly referenced the concept through a "back channel communication to the President."  Ex. M, Tr. 3549-50, 3594; Ex. JJ.

85.     President Trump's actions in response to inquiries from prosecutors working for Special Counsel Mueller were part of his duties under the Take Care Clause, and related public statements during the Presidency were well within the outer perimeter of Presidential authority. *See Trump v. United States*, 144 S. Ct. at 2335.

---

[14] "The DANY prosecution team discussed Michael Cohen's credibility as being one of the difficulties in the case."  *Bragg*, 669 F. Supp. 3d at 263 (cleaned up).  Prior to the New York County trial, Judge Furman concluded that Cohen committed perjury, yet again, in the fall of 2023 in connection with the New York Attorney General's case targeting President Trump.  *See United States v. Cohen*, 2024 WL 1193604, at *4 (S.D.N.Y. 2024).

86.     President Trump's actions in response to the congressional investigation were part of his authority to engage in the "hurly-burly, the give-and-take of the political process between the legislative and the executive." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 859 (2020) (cleaned up).

87.     DANY's evidence relating to alleged pardon-related activities was squarely within President Trump's core official powers: "To the executive alone is intrusted the power of pardon." *United States v. Klein*, 80 U.S. 128, 147 (1871).

### 5.  President Trump's Official Disclosures On OGE Form 278e

88.     DANY also offered evidence relating to President Trump's disclosures on OGE Form 278e, which related to financial activities during the Presidency in 2017 and President Trump signed in 2018 as "President of the United States of America."  Ex. KK.

89.     President Trump made these disclosures pursuant to the requirements of the Ethics in Government Act, which were being administered by OGE—another Executive Branch agency he was overseeing at the time.  One of the purposes of the Form is "to ensure confidence in the integrity of the Federal Government by demonstrating that they are able to carry out their duties without compromising the public trust."  5 C.F.R. § 2634.104(a).  Thus, President Trump's submission of the Form was part of the "Presidential conduct" that involved "speaking to . . . the American people," which the Supreme Court acknowledged "certainly can qualify as official . . . ."  *Trump v. United States*, 144 S. Ct. at 2333.  President Trump's submission of the Form was certainly not "palpably beyond" that authority, and was therefore within the outer perimeter of Presidential power.  *Id.* (cleaned up).

### C. Colorable Federal Defenses Require Removal And Eventually Dismissal

90.     Through this Second Removal Notice, President Trump is seeking an unbiased federal forum to litigate at least two dispositive federal defenses:  Presidential immunity and FECA preemption.  *Mesa*, 489 U.S. at 136.

91.     "An officer's federal defense need be only colorable to assure the federal court that it has jurisdiction to adjudicate the case."  *Kircher v. Putnam Funds Tr.*, 547 U.S. 633, 644 n.12 (2006).   "In construing the colorable federal defense requirement," the Supreme Court has "rejected a narrow, grudging interpretation of the statute, recognizing that one of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court."  *Jefferson Cnty., Ala. v. Acker*, 527 U.S. 423, 431 (1999) (cleaned up).  As a result, "courts have imposed few limitations on what qualifies as a colorable federal defense."  *Badilla*, 8 F.4th at 120 (cleaned up).

92.     The defendant "need not win his case before he can have it removed."  *Willingham*, 395 U.S. at 407.  President Trump need only establish "'the underpinnings of a valid federal defense.'"  *New York*, 683 F. Supp. 3d at 346 (quoting *Albrecht v. A.O. Smith Water Prods.*, 2011 WL 5109532, at *4 (S.D.N.Y. 2011)).

93.     While criminal cases arguably require a "more detailed showing" by a removing party, *see Willingham*, 395 U.S. at 409 n.4, the trial record created by DANY provides more than enough specifics regarding the manner in which these local prosecutors ran roughshod over the Supremacy Clause—as related to Presidential immunity and preemption—in their desperate efforts to obtain an unsupported conviction.

#### 1. Presidential Immunity

94.     President Trump is entitled to a federal forum for his Presidential immunity defense based on the Supreme Court's decision in *Trump v. United States*.  That decision demonstrates that

34

the defense is much more than colorable.  After this case is properly removed, President Trump will establish that the charges must be dismissed.  Specifically, the Presidential immunity doctrine recognized in *Trump v. United States* pertains to *all* "criminal proceedings," including grand jury proceedings when a prosecutor "seeks to charge" a former President using evidence of official acts.  144 S. Ct. at 2331.[15]   DANY violated the doctrine by presenting evidence of President Trump's official acts in grand jury proceedings and at trial.  *See, e.g.*, Ex. V at 26-43.  Thus, the Presidential immunity doctrine is dispositive.

95.    The First Removal Notice included a defense sounding in Presidential immunity but could not have anticipated the subsequent federal developments culminating in *Trump v. United States*.  ECF No. 1 ¶¶ 19-20, 28.  A local prosecutor's decision to charge a federal official in a case relating to federal activities during the official's service necessarily implicates federalism and state-federal comity principles.  Thus, President Trump described the defense with reference to the Supremacy Clause.  *E.g.*, ECF No. 34 at 14 (referring to "Supremacy Clause immunity"); *see also Clinton*, 520 U.S. at 691 (reasoning that a President facing litigation in a "state forum" would "presumably rely on federalism and comity concerns" and "the interest in protecting federal officials from possible local prejudice"); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004) ("The Supremacy Clause has been held to protect federal officers from state prosecution under certain circumstances.").[16]

---

[15] *Accord United States v. McLeod*, 385 F.2d 734, 751-52 (5th Cir. 1967) ("Both the Supremacy Clause and the general principles of our federal system of government dictate that a state grand jury may not investigate the operation of a federal agency. . . . [T]he investigation . . . is an interference with the proper governmental function of the United States . . . [and] an invasion of the sovereign powers of the United States of America." (cleaned up)).

[16] *Accord Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920) ("[E]ven the most unquestionable and most universally applicable of state laws, such as those concerning murder, will not be allowed to control the conduct of a marshal of the United States acting under and in pursuance of the laws of

96. At the June 27, 2023 hearing, defense counsel confirmed that the defense required consideration of whether Cohen's work for President Trump "was *in any way related* to the office and part of his duties as [P]resident." ECF No. 41 at 72 (emphasis added). DANY's response was broad and proved to be inaccurate based on the subsequent trial record they created: "There's no argument that anybody here was doing anything in carrying out their job as a government actor." *Id.* at 78; *see also id.* at 11 (arguing that President Trump "has not shown facts that demonstrate that the conduct for which he's charged in the People's indictment is for or *relating to* any act under color of his former office as president" (emphasis added)). To the contrary, in violation of *Trump v. United States*, DANY presented extensive evidence at trial relating to President Trump "carrying out [his] job as a government actor."

97. At the time of the First Removal Notice, and still to this day, no court had addressed Supremacy Clause immunity as applied to a former President in a criminal prosecution. Courts analyzing the issue in the context of other types of federal employees tended to analyze this form of immunity under *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) and its progeny. *Tanella*, 374 F.3d at 147 (describing *Neagle* as the "seminal case"). This Court proceeded similarly in connection with the First Removal Notice. *See New York*, 683 F. Supp. 3d at 346-47. However,

---

the United States."); *Ohio v. Thomas*, 173 U.S. 276, 283 (1899) ("The government is but claiming that its own officers, when discharging duties under federal authority pursuant to and by virtue of valid federal laws, are not subject to arrest or other liability under the laws of the state in which their duties are performed."); *Cunningham v. Neagle*, 135 U.S. 1, 75 (1890) ("[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the state of California."); *Davis*, 100 U.S. at 258 (reasoning that federal officials cannot be "arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess . . . .").

the decision in *Trump v. United States* established a Presidential immunity doctrine that abrogates

immunity under *Neagle* in cases involving former Commanders in Chief.  For example:

      a.     *Neagle* limited immunity to federal employees "held in the state court to

*answer for an act which he was authorized to do* by the law of the United States."  135 U.S. at 75

(emphasis added).  Presidential immunity under *Trump v. United States* is broader.  Prosecutors

may not rely on evidence of a President's official acts "even on charges that purport to be based

only on his unofficial conduct."  *Trump v. United States*, 144 S. Ct. at 2341.  A President's official

acts are *not* "subject to examination by a jury on the basis of generally applicable criminal laws."

*Id.*; *see also id.* at 2328 ("Neither may the courts adjudicate a criminal prosecution that examines

such Presidential actions.").

      b.     *Neagle* required that immunity derive from a "law of the United States."

135 U.S. at 75.  In *Trump v. United States*, the Supreme Court recognized that "some Presidential

conduct . . . certainly can qualify as official"—and, thus, be subject to immunity—"even when not

obviously connected to a particular constitutional or statutory provision."  144 S. Ct. at 2333.

      c.     *Neagle* includes a proportionality element, *i.e.*, whether a federal

employee's official actions entailed "no more than what was necessary and proper for him to do."

135 U.S. at 75.  Under *Trump v. United States*, however, a President's official actions do not lose

applicable immunity simply because a prosecutor or a court deems the actions to be

disproportionate to the matter at hand.  The Supreme Court left open the possibility that prosecutors

could rebut presumptive immunity for official acts within the "outer perimeter" of Presidential

power, but only where prosecutors can establish that use of the official-acts evidence "would pose

no dangers of intrusion on the authority and functions of the Executive Branch."  *Trump v. United

States*, 144 S. Ct. at 2331-32.

d.      The Second Circuit has also applied *Neagle* to require examination of whether the federal employee "subjectively believe[d] that his action is justified" and whether "that belief must be objectively reasonable." *Tanella*, 374 F.3d at 147. The Supreme Court forbid that type of inquiry: "courts may not inquire into the President's motives." *Trump v. United States*, 144 S. Ct. at 2333. "Such an inquiry would risk exposing even the most obvious instances of official conduct to judicial examination on the mere allegation of improper purpose, thereby intruding on the Article II interests that immunity seeks to protect." *Id.*

98.      In response to the First Removal Notice, DANY relied on *Neagle* and existing limitations under § 1442(a)(1) that are no longer good law in the context of Presidential immunity. For example:

a.      DANY argued that President Trump's immunity defense was not colorable because their charges were not "based on" and did not "arise out of" President Trump's official acts. ECF No. 19 at 10, 15. Under *Trump v. United States*, prosecutors cannot use official-acts evidence to "help secure his conviction, even on charges that purport to be based only on his unofficial conduct." 144 S. Ct. at 2341.

b.      DANY argued that President Trump was required to proffer an "official *purpose*" for the charged conduct. ECF No. 19 at 19 (emphasis added). As noted above, that type of motive inquiry is impermissible under *Trump v. United States*. *See* 144 S. Ct. at 2333-34.

99.      Having argued that "the objective of the alleged conduct had nothing to do with defendant's duties and responsibilities as President" in order to secure a remand, ECF No. 19 at 10, DANY violated the Presidential immunity doctrine by presenting extensive official-acts evidence at trial as discussed above. This evidence included testimony from Hicks regarding her conversations with President Trump as the White House Communications Director, testimony

38

from Westerhout regarding her observations of President Trump's practices as President, evidence of President Trump's official statements via Twitter, testimony and evidence from Cohen regarding President Trump's response to investigations by prosecutors, the FEC, and Congress, and testimony from Cohen relating to alleged discussions with the Attorney General and regarding the President's pardon power.

100.  "One of the primary purposes of the removal statute" is "to have the validity of the defense of official immunity tried in a federal court." *Willingham*, 395 U.S. at 407.  This is necessary, at least in part, because "[s]tate-court proceedings may reflect local prejudice against unpopular federal laws or officials." *Watson*, 551 U.S. at 150 (cleaned up).  "Allowing prosecutors to ask or suggest that the jury probe official acts for which the President is immune"—as DANY did at trial—"raise[d] a unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Trump v. United States*, 144 S. Ct. at 2341.  Thus far, DANY evaded appropriate judicial review of these issues by misrepresenting the scope of the official-acts evidence at issue.  The Supreme Court's decision in *Trump v. United States* establishes that President Trump should have been permitted to remove the prosecution so that he could litigate the defense in federal court.

### 2.  Preemption

101.  President Trump's preemption defense is an additional basis for removal in light of the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo* and DANY's decision to ask a New York County jury to apply FECA's contribution restrictions.

102.  Through this prosecution, DANY sought to use a generally applicable statute, Penal Law § 175.10, to regulate the "2016 presidential election" through criminal sanctions.  ECF No. 1-1 (Ex. E ¶ 1).  Notwithstanding the fact that neither federal prosecutors nor the FEC used this theory to proceed against President Trump, DANY claimed that their charges "ar[o]se" from an

"an illegal scheme to influence the 2016 presidential election." Ex. H ¶ 3. Indeed, after the Court remanded the case, the District Attorney stated publicly that his prosecution of President Trump was "about conspiring to corrupt a presidential election and then lying in New York business records to cover it up."[17]

103. The Supremacy Clause "invalidates" charges relying on that federal-election theory based on two separate forms of preemption: express and field. *Air Transp. Ass'n of Am., Inc. v. Cuomo*, 520 F.3d 218, 220 (2d Cir. 2008); *see also* ECF No. 1 ¶ 22-24; ECF No. 34 at 18-21.

　　　　a.　　Express Preemption: FECA's express preemption clause "supersede[s] and preempt[s] any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a). Courts "'do not invoke any presumption against pre-emption' when a statute contains an express-preemption clause." *Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023) (quoting *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016)). "When federal law expressly preempts nonfederal law, the nonfederal law and any claims thereunder are ousted." *Id.* at 501.

　　　　b.　　Field Preemption: As the Court already recognized, "FECA 'occupies the field' with respect to regulations of federal campaign contributions and expenditures." *New York*, 683 F. Supp. at 350 (cleaned up). "[T]he States are precluded from regulating conduct in a field that Congress, acting within its proper authority, has determined must be regulated by its exclusive governance." *Arizona v. United States*, 567 U.S. 387, 399 (2012). State laws that purport to impose obligations in such an area "must . . . give way"; those laws are "displace[d]" by federal law. *Id.*; *see also Capron v. Off. of Att'y Gen. of Massachusetts*, 944 F.3d 9, 21 (1st Cir. 2019)

---

[17] Ben Protess, Johah E. Bromwich, and William K. Rashbaum, *Manhattan's District Attorney Is Quietly Preparing for a Trump Trial*, N.Y. Times (Jan. 25, 2024), https://www.nytimes.com/2024/01/25/nyregion/trump-hush-money-trial-stormy-daniels.html.

("[F]ield preemption ousts state law measures even if no evidence shows that they would conflict with the federal regulatory scheme either by frustrating its purposes and objectives . . . .").

104.   Under both express and field preemption, the Supremacy Clause voids generally applicable laws to the extent the laws are applied to areas that Congress has reserved for federal regulation. *Kermani v. N.Y. State Bd. of Elections*, 487 F. Supp. 2d 101, 104 n.4 (N.D.N.Y. 2006) (reasoning that "this decision only addresses New York Election Law § 2-126 as it applies to restrictions of political party, political party organization and political party committee expenditures during State primary elections . . . since the provisions of [FECA] preempt State laws that purport to regulate activities in Federal election").

105.   New York's "power over governance . . . does not extend to *federal* officeholders and candidates." *Anderson*, 601 U.S. at 111 (emphasis in original).  Because DANY tried to use Penal Law § 175.10 to regulate the 2016 Presidential election, the charges are void under the Supremacy Clause, 52 U.S.C. § 30143(a), and FECA's field preemption.  As applied by DANY to the same federal election, NYEL § 17-152 is likewise void based on the same authorities.  *See, e.g.*, *Rest. L. Ctr. v. City of New York*, 90 F.4th 101, 118 (2d Cir. 2024) ("[N]othing would prohibit a successor from raising the preemption issue in a future as-applied challenge."); *New York State Comm'n on Cable Television v. FCC*, 669 F.2d 58, 62 (2d Cir. 1982) ("[T]he Supreme Court has instructed courts to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written." (cleaned up)); *see also Arizona*, 567 U.S. at 415 ("This opinion does not foreclose other preemption and constitutional challenges to the law as interpreted and applied after it goes into effect.").

106.   Under these circumstances, the appropriate remedy with respect to Penal Law § 175.10 and NYEL § 17-152 is to "enjoin the application" of the generally applicable law when

it is applied to "federal elections." *Minnesota Chamber of Com. v. Choi*, 2023 WL 8803357, at *11 n.2 (D. Minn. 2023); *see also Cent. Maine Power Co. v. Maine Comm'n on Governmental Ethics & Election Pracs.*, 2024 WL 866367, at *6 (D. Me. 2024) (holding that "FECA likely expressly preempts the [state] Act insofar as the [state] Act covers foreign spending in elections for federal office"); *Republican Party of New Mexico v. King*, 850 F. Supp. 2d 1206, 1215 (D.N.M. 2012) ("Taking into consideration the language of the Act and of FECA, and also Defendants' concession, the Court determines that the Act does not impose limits on contributions of money directed to candidates for federal elective offices, and that if it did it would be preempted by FECA."); *New Hampshire Att'y Gen. v. Bass Victory Comm.*, 166 N.H. 796, 805 (2014) (holding that state law, "as applied to election to federal office, falls within the scope of the preemption provision").

107.    To avoid this defense in connection with the First Removal Notice, DANY cited an FEC regulation purporting to restrict the facially broad scope of FECA's preemption clause and caselaw affording *Chevron* deference to the regulation notwithstanding the statute's text. *See, e.g.*, ECF No. 19 at 24-25; ECF No. 38 at 12 & n.8 (citing 11 C.F.R. § 108.7).  The Court relied on DANY's citations and similar authorities, and cited the FEC regulation for the proposition that only "[t]hree specific categories of state law are preempted" by FECA's preemption clause.  *New York*, 683 F. Supp. 3d at 347 (citing 11 C.F.R. § 108.7).  For example, DANY and the Court cited *WinRed, Inc. v. Ellison*, where the Eighth Circuit deemed "the FEC's category-based preemption regulation as *definitive evidence* of the scope of FECA's preemption clause." 59 F.4th 934, 942 (8th Cir. 2023) (emphasis added).  In connection with the First Removal Notice, the Court quoted *Ellison* for the proposition that the "FEC regulation defines the statute's scope." *New York*, 683 F. Supp. 3d at 347 (cleaned up).

108.    In light of a subsequent decision by the Supreme Court, that is no longer a viable means of interpreting FECA's preemption provision because courts must define the statute's scope based on the words chosen by Congress.  Specifically, after the trial in this case, the Supreme Court overruled *Chevron* and advised that "courts need not and under the [Administrative Procedure Act] may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024).  "Congress expects courts to handle technical statutory questions," and "the basic nature and meaning of a statute does not change when an agency happens to be involved."  *Id.* at 2267, 2271.

109.    The intervening decision in *Raimondo* made clear that the Court must apply the unambiguously broad text of FECA's preemption clause.  Without limitation, FECA preempts "any provision of State law with respect to election to Federal office."  52 U.S.C. § 30143(a).  The phrase "with respect to" is "synonymous with" the phrase "relating to." *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 129 (2d Cir. 2001); *see also Lamar, Archer & Cofrin, Llp v. Appling*, 584 U.S. 709, 710 (2018) ("Use of the word 'respecting' in a legal context generally has a broadening effect, ensuring that a provision's scope covers not only its subject but also matters relating to that subject").  The text of FECA's preemption provision is categorically broader than the FEC regulation cited by DANY, which is not sufficiently anchored in the statutory text.

110.    As applied by DANY in this case to the 2016 federal Presidential election, Penal Law § 175.10 and NYEL § 17-152 fall within the scope of that provision and are therefore "ousted." *Buono*, 78 F.4th at 501.  In other words, "[u]nder the Supremacy Clause," because these state laws "trespass[] on a field occupied by federal law," they "must yield," "no matter how admirable or unrelated the purpose" of those laws. *Teper v. Miller*, 82 F.3d 989, 995 (11th Cir. 1996).  Therefore, insofar as DANY's federal election theory is concerned, those state statutes are

preempted.  They cannot be applied and effectively do not exist as DANY sought to use them—not as a books and records charge targeting a federal election, and not as a New York Election Law conspiracy requiring application of FECA to demonstrate culpable intent under Penal Law § 175.10.

111.    In addition to the intervening decision in *Raimondo*, DANY's late-disclosed legal theory based on FECA's contribution provisions added additional force to President Trump's preemption defense.  Prior to the trial, DANY misled this Court and Justice Merchan regarding issues relating to preemption:

a.    In connection with the First Removal Notice, DANY represented to this Court that the charges "do not relate to the specific disclosures mandated by FECA."  ECF No. 38 at 12.  DANY suggested that they may not even "rely on [NYEL] § 17-152 at trial," that "special verdicts or interrogatory responses" could mitigate legal risks to President Trump's rights, and that President Trump's preemption defense was "simply too speculative" in light of "these contingencies."  *Id.* at 14-15 (cleaned up); *see also* ECF No. 19 at 22, 24 (suggesting that DANY would rely on "other" crimes as alternatives to NYEL § 17-152 to escalate the Penal Law § 175.10 charges); ECF No. 38 at 14 (referring to "multiple other crimes").

b.    At the June 27, 2023 hearing, DANY conceded that President Trump "could be right on the election law argument," but contended that they "could still establish the defendant's guilt at trial on any of a number of other showings I just described."  ECF No. 41 at 76-77; *see also id.* at 76 (referring to "other nonpreempted crimes at play here").

c.    In motions *in limine,* DANY argued to Justice Merchan that the "application of federal campaign finance law" was not "relevant" to "any factual issues" in the case.  Ex. H at

8.  DANY relied on that argument to avoid damaging testimony from President Trump's campaign finance expert, which was inconsistent with the story they wanted to tell the jury and the public.

112.    DANY did not abide by any of these representations when they proposed jury instructions to Justice Merchan.  The only crime that DANY relied upon to escalate the Penal Law § 175.10 charges was NYEL § 17-152.  *See* Ex. J at 3-4.  Having convinced Justice Merchan to restrict the testimony of President Trump's campaign-finance expert to such an extent that it entirely neutralized that aspect of the defense, DANY requested—and obtained—extensive instructions regarding FECA's campaign-finance provisions.  *Id.* at 4-6.  When President Trump sought the type of special verdict form that DANY had suggested to this Court would make sense, DANY convinced Justice Merchan that "the jury need not agree on which unlawful means were employed" for purposes of NYEL § 17-152 and suggested that it was "wishful thinking" for President Trump to seek unanimity on the issue.  Ex. L at 9.

113.    Based on DANY's positions at the conclusion of the trial, it was not at all "speculative" that the jury would apply NYEL § 17-152 to a federal election in violation of FECA's preemption clause.  To the contrary, based on the instructions requested by DANY, that was the only way the jurors could reach the verdicts that they returned.  Moreover, based on DANY's requests, Justice Merchan instructed the jury to consider FECA's definitions of the terms "contribution" and "expenditure," federal contribution limits on individuals and corporations in 2015 and 2016, and the "Press Exemption" from FECA's definition of "contribution."  Ex. M, Tr. 4844-46.

114.    DANY's trial strategy was in direct conflict with federal determinations by the FEC and the U.S. Attorney's Office not to seek to penalize President Trump in any way in connection with the payments at issue in DANY's case.  Specifically, in response to complaints against

President Trump in connection with these issues, the FEC declined further investigation and imposed no sanctions in connection with the federal regulatory process established by Congress under FECA. *See* Ex. H at 19-22. Federal prosecutors in the Southern District of New York closed their investigation without charges against President Trump by 2019. Ex. LL at 1 n.1; *see also Bragg*, 669 F. Supp. 3d at 262 ("Federal prosecutors previously looked into the [Stormy Daniels] 'hush money payment' and did not move forward with the prosecution." (cleaned up)). DANY violated the Supremacy Clause by asking the jury to revisit those conclusions, and to find President Trump guilty by alleged association with Cohen and others who—unlike President Trump— federal authorities found culpable in connection with these events.

115.    In sum, once the FEC's restrictive interpretation of FECA's preemption clause is appropriately rejected under *Raimondo*, and the Court considers the theory of the case that DANY actually presented to the jury, it is clear that President Trump has a viable preemption defense to the charges. Through this Second Removal Notice, President Trump seeks an unbiased federal forum in which to seek vacatur of the jury's verdicts and dismissal of the charges based on that defense.

### D.  There Is Good Cause For This Second Removal Notice

116.    There is "good cause" for the timing of this Second Removal Notice and its contents under 28 U.S.C. § 1455(b), including the significance of Presidential immunity, intervening Supreme Court decisions, DANY's trial presentation, evidence of local hostilities, the need to avoid additional interference with the upcoming Presidential election, and the inadequacy of New York's procedures to address the issues raised herein.

### 1. The Extraordinary Federal Significance Of Presidential Immunity

117. There is good cause for the timing of this Second Removal Notice because of the extraordinary significance of the Presidential immunity doctrine recently articulated by the Supreme Court in *Trump v. United States*.

118. "[O]ne of the most important reasons for removal is to have the validity of the defense of official immunity tried in a federal court." *Willingham*, 395 U.S. at 407; *see also Trump v. Vance*, 140 S. Ct. 2412, 2428 (2020) ("[F]ederal law allows a President to challenge any allegedly unconstitutional influence in a federal forum"). The Presidential immunity defense established by the Supreme Court, and violated by DANY in grand jury proceedings and at the trial, presents "peculiar constitutional concerns" and "question[s] of lasting significance." *Trump v. United States*, 144 S. Ct. at 2341, 2346. Litigation of the defense will have "enduring consequences upon the balanced power structure of our Republic." *Id.* at 2326 (cleaned up).

119. Presidential immunity "applies equally to all occupants of the Oval Office, regardless of politics, policy, or party." *Trump v. United States*, 144 S. Ct. at 2347. Recourse to this defense is necessary to "ensure that the President's decisionmaking is not distorted by the threat of future litigation stemming from those actions . . . ." *Id.* at 2332. That is not some sort of personal courtesy afforded to the Nation's Chief Executive. "[T]he interests that underlie Presidential immunity seek to protect not the President himself, but the institution of the Presidency." *Id.* at 2341. Those protections are necessary for the public good. "There . . . 'exists the greatest public interest' in providing the President with 'the maximum ability to deal fearlessly and impartially with' the duties of his office." *Id.* at 2329 (quoting *Fitzgerald*, 457 U.S. at 752). "The Constitution does not tolerate such impediments to the effective functioning of government." *Id.* at 2344 (cleaned up).

120.    In this case, the Presidential immunity defense also presents unprecedented questions under the Supremacy Clause that should be resolved in federal court. "The Supremacy Clause prohibits state judges and prosecutors from interfering with a President's official duties." *Vance*, 140 S. Ct. at 2428. In *Vance*, DANY conceded that "harassing subpoenas could, under certain circumstances, threaten the independence or effectiveness of the Executive." *Id.* Unlike the related DANY subpoena at issue in *Vance*, "[c]riminally prosecuting a President for official conduct undoubtedly poses a far greater threat of intrusion on the authority and functions of the Executive Branch than simply seeking evidence in his possession . . . ." *Trump v. United States*, 144 S. Ct. at 2330. Subjecting current and former Presidents to this type of "harassing litigation in the State courts" will lead to a federal government "of pitiable weakness, and would wholly fail to meet the ends which the framers of the Constitution had in view." *Mayor & Aldermen of City of Nashville v. Cooper*, 73 U.S. 247, 253 (1867). Therefore, the recent decision in *Trump v. United States*, and the significance of the issues implicated by that decision, are good cause for this Second Removal Notice.

## 2.  Intervening Supreme Court Decisions

121.    In addition to the groundbreaking substance of *Trump v. United States*, the fact of intervening decisions by the Supreme Court of the United States since the First Removal Notice also supports a finding of good cause under § 1455. *See Discovision Assocs. v. Fuji Photo Film Co.*, 2007 WL 5161825, at *4 n.5 (S.D.N.Y. 2007) ("A leading treatise notes that if subsequent pleadings or conduct by the parties or various other circumstances brings a case that was not previously removable within the removal jurisdiction of the federal courts, a second notice of removal is permissible." (cleaned up)); *Fritsch v. Swift Transp. Co. of Arizona, LLC*, 899 F.3d 785, 789 (9th Cir. 2018) ("An intervening change in the law that gives rise to a new basis for subject-

48

matter jurisdiction qualifies as a subsequent event that justifies a successive removal petition." (cleaned up)).

122.    The *Trump v. United States* opinion became final under Supreme Court Rule 45 fewer than 30 days ago.  *See* Ex. S; *cf.* 28 U.S.C. § 1446(b)(3).[18]  In addition to *Trump v. United States*, two other intervening Supreme Court decisions—*Raimondo* and *Anderson*—are relevant to the evaluation of the defenses set forth in this Second Removal Notice and abrogated decisions that the Court relied upon in connection with the First Removal Notice.

123.    *Trump v. United States* sets forth a dispositive defense to this prosecution that must be addressed in an unbiased federal forum in order to avoid the "prospect of an Executive Branch that cannibalizes itself, with each successive President free to prosecute his predecessors, yet unable to boldly and fearlessly carry out his duties for fear that he may be next."  144 S. Ct. at 2346.  *Anderson* emphasized federalism principles that are necessary to the application of the Supremacy Clause in connection with federal-officer removal.  Namely, because New York's "power over governance . . . does not extend to *federal* officeholders and candidates," DANY's flawed theory of unlawful influence in  the 2016 Presidential election cannot be adjudicated under state law.  *Anderson*, 601 U.S. at 111 (emphasis in original).  *Raimondo* further abrogated key authorities that are central to President Trump's preemption defense.  Because federal agencies "have no special competence in resolving statutory ambiguities," no deference is appropriate for

---

[18] *See Doe v. Am. Red Cross*, 14 F.3d 196, 200 (3d Cir. 1993) (finding second civil removal petition permissible under 28 U.S.C. § 1446(b) based on an "intervening order of the highest court in the land"); *see also Green v. R.J. Reynolds Tobacco Co.*, 274 F.3d 263, 267-68 (5th Cir. 2001) (applying the Third Circuit's holding in *Doe*); *Guddeck v. SmithKline Beecham Corp.*, 957 F. Supp. 2d 622, 625 (E.D. Pa. 2013) (permitting second removal notice where an intervening appellate decision demonstrated that the court had "erroneously remanded the action to the state court" in connection with first removal notice).

the FEC's limiting regulatory interpretation of FECA's facially broad preemption provision. *Raimondo*, 144 S. Ct. at 2266.

124.    These three Supreme Court decisions "are as conclusive as the laws of Congress made in pursuance of the Constitution."  *Cooper*, 73 U.S. at 253.  Treating them as such—by authorizing removal and permitting appropriate dismissal ligation in this District—is "essential to the peace of the nation, and to the vigor and efficiency of the government."  *Id.*

### 3.  DANY's Materially Different Trial Presentation

125.    There is good cause for the Second Removal Notice because DANY's trial record is "materially different" from what they represented to the Court last year.  *Fritzlen v. Boatmen's Bank*, 212 U.S. 364, 373 (1909).  DANY's change in course is the type of "conduct by the parties" that Judge Crotty suggested could justify a second removal petition.  *Discovision*, 2007 WL 5161825, at *4 n.5 (cleaned up); *see also Fritsch*, 899 F.3d at 789 ("[A] defendant who fails in an attempt to remove on the initial pleadings can file a removal petition when subsequent pleadings or events reveal a new and different ground for removal." (cleaned up)); *Pennsylvania v. Collins*, 1986 WL 1228, at *1 (E.D. Pa. 1986) ("Inasmuch as the alleged grounds for removal did not arise until after the first trial had commenced, I conclude that this would be an appropriate case for permitting a later removal petition.").

126.    Specifically, as discussed above, DANY represented to the Court that their case would not involve evidence of President Trump's official acts.  That proved to be not true.  They also represented to the Court that their legal theory did not require consideration of FECA-related disclosures.  That was not true, either.  Therefore, federal-officer removal must be reevaluated based on the record DANY created instead of the inaccurate and politically motivated arguments they used to avoid removal the first time.

### 4. Local Hostilities, Political Bias, Conflicts, And Appearances Of Impropriety

127.    Good cause for this Second Removal Notice is further supported by the fact that it has become increasingly clear based on intervening events that the fair litigation of important federal interests required by *Cooper*, *Manypenny*, and other caselaw cannot be accomplished in New York County.  The bias, conflicts of interest, and appearances of impropriety reflected in the New York County proceedings demonstrates exactly the type of local hostility toward federal interests—including a former President of the United States and the leading candidate in the 2024 Presidential election—that the Supremacy Clause was intended to guard against.

128.    The Supremacy Clause "protects against local political machinations interposed as an obstacle to the effective operation of a federal constitutional power." *Vance*, 140 S. Ct. at 2430 (cleaned up).  Based on developments since the First Removal Notice, this case presents a situation where federal protective jurisdiction is warranted because President Trump is being prosecuted based on "local hostility to his function." *Mesa*, 489 U.S. at 140 (Brennan, J., concurring).  Even if the Court declines to exercise that type of jurisdiction, as it did previously, these considerations serve as good cause for the more traditional removal theories set forth in this Second Removal Notice.  There is an unacceptable risk that "local interests" and "prejudice" will "color outcomes" and cause irreparable harm.  H.R. Rep. No. 112-17(I) (2011), 2011 WL 692207, at *3 (cleaned up).

129.    The District Attorney "is an elected prosecutor in New York County with constituents, some of whom wish to see [him] wield the force of law against the former President . . . ." *Bragg*, 669 F. Supp. 3d at 276.  The District Attorney campaigned for that position by touting prior efforts to target President Trump, claiming that he had "more experience" pursuing

President Trump "than most people in the world" and could "convict" him.[19]  In March 2022, more

than one year before the Indictment was returned (and before locking her Twitter account), the

District Attorney's wife re-posted on social media that there was, "[f]inally, a bit of good news in

the Manhattan DA criminal case against Donald Trump" because DANY "ha[d] Trump nailed on

felonies."[20]

130.    During a 2019 podcast, Justice Merchan's daughter explained that she "had a

couple conversations with my Dad recently," in which Justice Merchan said "I hate that politicians

use Twitter," "It's so unprofessional," and "That's not how a politician should behave themselves."

Ex. BB ¶ 4.  Justice Merchan's daughter said that she agreed and "explained" to Justice Merchan

that "when our President tweets anything that he thinks, . . . that's not what he should be using it

for."  *Id.*  Thus, Justice Merchan apparently "hate[s]" Twitter-using politicians like President

Trump.  Justice Merchan apparently finds the types of Tweets that are central to President Trump's

Presidential immunity defense to be "unprofessional" and "not how a politician should behave,"

as informed by his daughter's view that President Trump should not have been "using" Twitter to

communicate with the American people in the way that he did as President (and still does).  But

he nevertheless plans to pass on whether the 2018 Tweets were official acts under *Trump v. United

States*.  Given the federal institutional interests at stake, that poses an intolerable risk of local bias

under the Supremacy Clause.

---

[19] Corinne Ramey and James Fanelli, *Trump Indictment Places Manhattan DA Alvin Bragg in Spotlight*, Wall St. J. (Mar. 30, 2023, 6:56 pm), https://www.wsj.com/articles/trump-probe-places-manhattan-d-a-alvin-bragg-in-spotlight-8bf038bb.

[20] Paul Sperry (@paulsperry_), X (Mar. 23, 2023, 1:48 pm), https://twitter.com/paulsperry_/status/1638960892149891072?lang=en; Jessica McBride, *Jamila Ponton Bragg, Alvin Bragg's Wife: 5 Fast Facts You Need to Know*, Heavy (Apr. 4, 2023, 2:53 pm), https://heavy.com/news/jamila-ponton-bragg-alvin-bragg-wife.

131.    Around the time of the 2019 podcast, Justice Merchan's daughter was acting as the "Director of Digital Persuasion" for the ultimately-unsuccessful Presidential campaign of Vice President Harris, President Trump's current opponent.  Ex. BB ¶ 2.  By 2020, Justice Merchan's daughter was elevated to "part-owner" and "partner" in Authentic, having been credited with "ground-breaking, historical work" for Vice President Harris and others, and providing services to the Biden-Harris campaign and other like-minded politicians such as Governor Hochul—a vocal critic of President Trump, including at the recent Democratic National Convention.  *Id.* ¶¶ 5-6, 53(b)-(c), 54.  Between 2021 and 2022, Authentic received over $29 million in disbursements from Democrat-affiliated and left-leaning political entities.  Ex. AA at 28.

132.    In 2020, while President Trump was in Office, Justice Merchan made improper political contributions to "Biden for President," "Stop Republicans," and "Progressive Turnout Project."  Ex. CC.  He was subsequently cautioned by New York ethics authorities for those violations of New York's Rules Governing Judicial Conduct.  *See id.*  Thus, at a time when President Trump was still wielding the Executive power that—in the absence of removal—Justice Merchan will evaluate as part of a first-impression Presidential immunity motion, Justice Merchan was improperly supporting President Trump's political opponents and a group seeking to "Stop" President Trump and his political party.

133.    During the pendency of this case, on October 20, 2023, Authentic posted an image of Vice President Harris to its Instagram account with the caption: "Happy Birthday to the MVP of MVPs.  @KamalaHarris!  Here's a little throwback to when she stopped by our DC office to celebrate the launch of her presidential campaign in 2019.  How far we've come." Ex. BB ¶ 38. Beginning with the return of the Indictment on March 30, 2023, Authentic clients such as Congressman Adam Schiff solicited political contributions based on this case, which Justice

Merchan was administering.  *See* Ex. AA at 11-17.  FEC data reflects a total of at least $18.43 million in disbursements to Authentic between the filing of the Indictment and the trial, which includes profits from fundraising pitches that *referenced the developments in this case*, presided over by Justice Merchan.  *Id.* at 29.  It is inconceivable that those disbursements did not benefit Justice Merchan's daughter, who is a part owner of Authentic.  As a result, Justice Merchan has likewise benefited, at least indirectly, from his own rulings driving the case through trial and toward sentencing in a manner that interferes with President Trump's campaign and has assisted the campaigns of his opponents.  The Supreme Court has made it "sufficiently clear" that "those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes." *Gibson v. Berryhill*, 411 U.S. 564, 579 (1973).  These circumstances rise to the level of due process violations, and Justice Merchan has repeatedly refused to address them.

134.    For all of the foregoing reasons, President Trump's concerns about conflicts and appearances of impropriety are not "speculative" or "hypothetical," and they are not based on "innuendo."  Ex. M, Tr. at 6; Ex. Z at 3.  Justice Merchan's August 13, 2024 refusal to recuse himself despite his bias against President Trump's Twitter-related Presidential immunity arguments, as evidenced by his daughter's 2019 statements, is a particularly acute and recent illustration of the untenable problem.  *See* Ex. GG.  Thus, untenable conflicts, bias, and hostility from Justice Merchan also support removal pursuant to the Second Removal Notice.

### 5.  Irreparable Harm From Interference With The Impending Election

135.    The Supremacy Clause problems arising from local hostility toward President Trump are exacerbated by the fact that this case has been used to interfere with President Trump's ability to campaign for the Presidency.  Justice Merchan is poised to incarcerate President Trump in the final weeks of the campaign, and he has maintained an unwarranted and unconstitutional

prior restraint on President Trump's ability to respond to political attacks by criticizing the New York County proceedings.

136.    "[I]n the context of a Presidential election, state-imposed restrictions implicate a uniquely important national interest." *Anderson v. Celebrezze*, 460 U. S. 780, 794-95 (1983). "Court orders affecting elections . . . can themselves result in voter confusion and consequent incentive to remain away from the polls." *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). "As an election draws closer, that risk will increase." *Id.* at 5. Thus, "[t]he Supreme Court has repeatedly instructed courts to carefully consider the importance of preserving the status quo on the eve of an election." *Veasey v. Perry*, 769 F.3d 890, 892 (5th Cir. 2014). "[O]nce the election occurs, there can be no do-over and no redress" for the voters. *League of Women Voters of N. Carolina v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014).

137.    Justice Merchan is scheduled to sentence President Trump on September 18, 2024. Justice Merchan's most recent guidance is that the date "*remains unchanged*." Ex. FF at 2 (emphasis in original). Under New York law, absent emergency appellate relief, President Trump "must forthwith be committed to the custody" of New York if Justice Merchan imposes a term of incarceration. CPL § 430.20(1). Although such a sentence would be wholly unwarranted based on the law and the facts, the risk of such an order and its impact on the national election cannot be ignored in light of the existing evidence of hostility and indications that Justice Merchan plans to unlawfully deny the Presidential immunity motion.

138.    Moreover, in yet another example of a New York County ruling with grave national consequences, Justice Merchan has imposed a gag order that is currently causing irreparable harm to the First Amendment rights of President Trump and the American people. Like President Biden before her, Vice President Harris's Presidential campaign—including allies and surrogates—is

using this case to mount inaccurate attacks on President Trump's candidacy. However, despite the fact that President Trump's arguments regarding the politically motivated nature of this case and Justice Merchan's biases are laid out in public court filings, Justice Merchan has insisted on a post-trial gag order that unconstitutionally prevents President Trump from making responsive arguments to the American people about these issues. While President Trump does not concede that Justice Merchan's gag order was ever appropriate, the New York County trial concluded months ago. There are no potential jurors or witnesses subject to influence by President Trump's extrajudicial statements. Therefore, there is no basis for the claim that President Trump's constitutionally protected political advocacy could impact the purported integrity of Justice Merchan's post-trial proceedings.

139.    The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office." *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 (1971). "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (cleaned up). The gag order is also inflicting First Amendment harms on the tens of millions of American voters who have a right to hear President Trump's campaign advocacy, including arguments regarding and responses to public claims based on developments in this case. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976) (reasoning that the First Amendment's "protection afforded is to the communication, to its source and to its recipients both"); *see also Packingham v. North Carolina*, 582 U.S. 98, 104 (2017) (recognizing the right to "speak and listen, and then . . . speak and listen once more," as a "fundamental principle of the First Amendment").

140.    The potential for this case to result in additional irreparable harm to voters as the election nears serves as yet another reason to authorize removal pursuant to this Second Removal Notice and § 1455.  Removal will empower this Court to put an end to future similar injuries relating to the election.  *See* 28 U.S.C. § 1450 (providing that local "orders . . . shall remain in full force and effect *until dissolved or modified by the district court*" (emphasis added)).

### 6.  Inadequate New York Procedures

141.    Removal is also necessary, and supported by good cause at this point, because New York's procedures have been applied in a way that conflicts with the Supreme Court's guidance regarding Presidential immunity.

142.    Under *Trump v. United States*, there is a "need for pretrial review" of Presidential immunity issues.  144 S. Ct. at 2343.  "Questions about whether the President may be held liable for particular actions, consistent with the separation of powers, must be addressed at the outset of a proceeding."  *Id.* at 2344.  Goaded by DANY to rely on defective procedural reasoning under CPL § 255.20, Justice Merchan refused to conduct that review prior to the trial.  *See* Ex. P.  He chose that course notwithstanding the Supreme Court's grant of certiorari on the issue and the expedited schedule that the Court set to resolve it.  *See Trump v. United States*, 144 S. Ct. 1027 (2024).  The disrespect for binding federal precedent based on critically important Constitutional interests could not be plainer.

143.    Furthermore, pretrial review is necessary because a "denial of [Presidential] immunity would be appealable before trial."  *Trump v. United States*, 144 S. Ct. at 2343. Interlocutory review is required because "the possibility of an extended proceeding alone may render [the President] unduly cautious in the discharge of his official duties."  *Id.* at 2344 (cleaned up).  Where Presidential immunity is implicated, "[v]ulnerability to the burden of a trial and to the

inevitable danger of its outcome" must be avoided. *Id.* (cleaned up). In contrast to that intervening guidance from the Supreme Court, DANY strongly opposed President Trump's efforts to seek interlocutory pretrial review of his Presidential immunity arguments through an Article 78 proceeding in the First Department. Justice Merchan was so dismissive of interlocutory review that he refused to even pause the proceedings while the First Department considered that Article 78 petition. The First Department concluded, wrongly, that Presidential immunity could be adequately addressed in any "direct appeal" rather than on an interlocutory basis. *Merchan*, 227 A.D.3d at 571. The Supreme Court directly contradicted that ruling, in *Trump v. United States*, less than two months later. But Justice Merchan has largely ignored that reality, and his current schedule allows for only a single day between his Presidential immunity decision and the date scheduled for sentencing.

144. The inadequacy of these procedures, as applied to President Trump in the context of Presidential immunity litigation, is yet another basis for a good-cause finding under 28 U.S.C. § 1455.

### E.  Section 1653 Amendment Is An Alternative Basis To Effectuate Removal

145. In the alternative, for all of the foregoing reasons, this Second Removal Notice should be deemed a valid amendment to the First Removal Notice that serves as a basis for federal-officer removal. *See* 28 U.S.C. § 1653.

146. "As applied to removal petitions, section 1653 allows parties to clarify pleadings after filing." *Ryan v. Dow Chem. Co.*, 781 F. Supp. 934, 939 (E.D.N.Y. 1992). The Second Circuit has "consistently recognized that section 1653 should be construed liberally to permit the action to be maintained if it is at all possible to determine from the record that jurisdiction does in fact exist." *Advani Enters., Inc. v. Underwriters at Lloyds*, 140 F.3d 157, 161 (2d Cir. 1998) (cleaned

up).  "Such amendments will be freely permitted where necessary to avoid dismissal on purely technical grounds. . . . [And u]nless the record clearly indicates that the complaint could not be saved by any truthful amendment, . . . [courts] generally afford an opportunity for amendment." *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 55 (2d Cir. 2019) (quoting *Canedy v. Liberty Mut. Ins. Co.*, 126 F.3d 100, 103 (2d Cir. 1997)); *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 388-89 (2d Cir. 2021) ("[I]t is well-understood that a plaintiff may cure defective jurisdictional allegations, unlike defective jurisdiction itself, through amended pleadings"); *Barrera v. Bethel*, 2023 WL 8483022, at *3 (S.D.N.Y. 2023) ("Defendants' amendment of the Notice of Removal cured the technical defect in their pleading by properly alleging the parties' citizenship, which is permissible.").

## V.    Conclusion

147.    For the foregoing reasons, President Trump respectfully requests that the Court (i) promptly order *People v. Trump* removed to the Southern District of New York, pursuant to 28 U.S.C. §§ 1442(a)(1), 1455, and 1653; (ii) confirm that Justice Merchan may not sentence President Trump during litigation over this removal because sentencing would result in a prohibited "judgment of conviction" under 28 U.S.C. § 1455(b)(3); CPL § 1.20(15) (defining "judgment" to include "a conviction and the sentence"); and (iii) order the case removed, notify Justice Merchan of the removal, and set a motion schedule so that President Trump can seek dismissal of the case and vacatur of the New York County jury's unsupported verdicts, *see* 28 U.S.C. § 1455(b)(5).

Dated:      August 29, 2024
            New York, N.Y.

By: /s/ Todd Blanche / Emil Bove
Todd Blanche
Emil Bove
Blanche Law PLLC
99 Wall Street, Suite 4460
New York, NY 10005
212-716-1250
toddblanche@blanchelaw.com

*Attorneys for President Donald J. Trump*

60