# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THE PEOPLE OF THE STATE OF
NEW YORK,

v.

DONALD J. TRUMP,

*Defendant*.

No. 23 Civ. 3773 (AKH)

**ORAL ARGUMENT SCHEDULED
FOR FEBRUARY 4, 2026**

## POST-REMAND MEMORANDUM OF LAW IN SUPPORT OF PRESIDENT TRUMP'S MOTION FOR LEAVE TO FILE SECOND NOTICE OF REMOVAL

Robert J. Giuffra, Jr.
Matthew A. Schwartz
James M. McDonald
Maxwell F. Gottschall
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
giuffrar@sullcrom.com

Jeffrey B. Wall*
Morgan L. Ratner*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, DC  20006
Tel:  (202) 956-7000

*pro hac vice*

*Counsel for President Donald J. Trump*

December 8, 2025

# TABLE OF CONTENTS

*Page*

**INTRODUCTION** .................................................................................................. 1

**BACKGROUND** .................................................................................................. 4

    A.    The New York Indictment ................................................................ 4

    B.    President Trump's First Removal Notice ........................................ 5

    C.    Trial ................................................................................................ 7

    D.    Post-Trial Proceedings ................................................................... 9

    E.    President Trump's Second Removal Notice .................................. 10

    F.    Sentencing .................................................................................... 10

    G.    The Second Circuit's Decision To Vacate And Remand ............... 11

**ARGUMENT** .................................................................................................... 12

**I.**    **REMOVAL IS AVAILABLE IN THIS CASE UNDER THE FEDERAL-OFFICER REMOVAL STATUTE** .................................. 12

    A.    The Federal-Officer Removal Statute Allows Post-Trial And Post-Judgment Removal For "Good Cause Shown" ...................... 13

    B.    DANY's Counterarguments Are Unpersuasive ............................ 16

**II.**    **PRESIDENT TRUMP HAD GOOD CAUSE TO FILE A SECOND, POST-TRIAL REMOVAL NOTICE** ................................ 20

    A.    The Second Removal Notice Satisfied The Requirements Of The Federal-Officer Removal Statute .......................................... 21

            1.    The prosecution "relates to" President Trump's official acts because DANY used those acts as evidence at trial ................................ 21

            2.    The removal notice asserted colorable federal defenses ............................ 28

B.     President Trump Could Not Have Raised His Current Grounds For Removal Until After Trial ...................................................................................... 31

C.     President Trump Acted With Reasonable Diligence And Without Undue Delay In Seeking Removal ................................................................................ 33

**CONCLUSION** ............................................................................................................ 38

# TABLE OF AUTHORITIES

*Page(s)*

**Cases**

*Arizona* v. *Folio*,
    2019 WL 1643720 (D. Ariz. Apr. 16, 2019) ........................................................................17

*Arizona* v. *Manypenny*,
    451 U.S. 232 (1981) ...................................................................................................15, 19, 35

*AT&T Corp.* v. *Atos IT Sols. & Servs., Inc.*,
    714 F. Supp. 3d 310 (S.D.N.Y. 2024) ..................................................................................34

*Barber* v. *Vance*,
    2019 WL 267874 (D. Or. Jan. 18, 2019) .............................................................................17

*BBAM Aircraft Mgmt. LP* v. *Babcock & Brown LLC*,
    2022 WL 3714597 (D. Conn. Aug. 29, 2022) ......................................................................34

*Boyd* v. *Pinnacle Athletic Campus, LLC*,
    2022 WL 419348 (W.D.N.Y. Feb. 11, 2022) .......................................................................34

*Caterpillar Inc.* v. *Lewis*,
    519 U.S. 61 (1996) ................................................................................................................22

*Clinton* v. *Jones*,
    520 U.S. 681 (1997) ..............................................................................................................26

*Colombo* v. *Suffolk*,
    2010 WL 1459196 (E.D.N.Y. Apr. 8, 2010) .......................................................................17

*Council on Am. Islamic Relations* v. *Ballenger*,
    444 F.3d 659 (D.C. Cir. 2006) .............................................................................................26

*Coventry Health Care of Mo., Inc.* v. *Nevils*,
    581 U.S. 87 (2017) ................................................................................................................23

*EEOC* v. *Hillstone Rest. Grp., Inc.*,
    346 F.R.D. 26 (S.D.N.Y. 2024) ...........................................................................................35

*Enzymotec Ltd.* v. *NBTY, Inc.*,
    754 F. Supp. 2d 527 (E.D.N.Y. 2010) .................................................................................34

*FDIC* v. *Keating*,
    12 F.3d 314 (1st Cir. 1993) ..................................................................................................14

*Granny Goose Foods, Inc.* v. *Bhd. of Teamsters & Auto Truck Drivers*
  *Loc. No. 70*,
  415 U.S. 423 (1974) ...................................................................................................19, 20

*Griffin* v. *Kentucky*,
  479 U.S. 314 ................................................................................................................14

*Harris* v. *U.S. Dep't of Transp. FMCSA*,
  122 F.4th 418 (D.C. Cir. 2024) ................................................................................. *passim*

*Hawaii* v. *Thronas-Kahoonei*,
  2020 WL 118251 (D. Haw. Jan. 10, 2020) ..............................................................17

*Hernandez* v. *Immortal Rise, Inc.*,
  2013 WL 1703529 (E.D.N.Y. Apr. 19, 2013) ........................................................34

*Holtzman* v. *Oliensis*,
  91 N.Y.2d 488 (1998) ...........................................................................................30, 31

*Ingersoll-Rand Co.* v. *McClendon*,
  498 U.S. 133 (1990)....................................................................................................23

*Isaacson* v. *Dow Chem. Co.*,
  517 F.3d 129 (2d Cir. 2008)........................................................................................25

*Jefferson Cnty.* v. *Acker*,
  527 U.S. 423 (1999).................................................................................21, 23, 24, 28

*Johnson* v. *Washington*,
  2007 WL 2377141 (W.D. Wash. Aug. 15, 2007) ..................................................17

*Kassner* v. *2nd Ave. Delicatessen Inc.*,
  496 F.3d 229 (2d Cir. 2007)........................................................................................35

*Knoll, Inc.* v. *Moderno, Inc.*,
  2012 WL 3613896 (S.D.N.Y. Aug. 22, 2012) ........................................................34

*Lamar, Archer & Cofrin, LLP* v. *Appling*,
  584 U.S. 709 (2018)....................................................................................................22

*McGucken* v. *Content IQ LLC*,
  2021 WL 5357473 (S.D.N.Y. Nov. 16, 2021) ........................................................35

*McKay* v. *Triborough Bridge & Tunnel Auth.*,
  2007 WL 3275918 (S.D.N.Y. Nov. 5, 2007) ..........................................................37

*In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*,
    341 F. Supp. 2d 351 (S.D.N.Y. 2004) .................................................................29

*In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*,
    488 F.3d 112 (2d Cir. 2007) ..............................................................................20

*Mesa* v. *California*,
    489 U.S. 121 (1989) ...........................................................................1, 21, 28

*Matter of Meyerland Co.*,
    960 F.2d 512 (5th Cir. 1992) ............................................................................14

*Miller* v. *Louisiana*,
    2019 WL 1293273 (E.D. La. Mar. 1, 2019) ......................................................17

*Missouri* v. *Pate*,
    2024 WL 3518594 (E.D. Mo. Jul. 24, 2024) ....................................................17

*Morales* v. *Trans World Airlines, Inc.*,
    504 U.S. 374 (1992) ...........................................................................22, 23, 24

*New Hampshire* v. *Woodham*,
    2022 WL 1432069 (D. N.H. April 6, 2022) ......................................................17

*New York* v. *Trump*,
    158 F.4th 458 (2d Cir. 2025) ...............................................................................1

*Pantalone* v. *Aurora Pump. Co.*,
    576 F. Supp. 2d 325 (D. Conn. 2008) ...............................................................20

*Permatex, Inc.* v. *Loctite Corp.*,
    2004 WL 1354253 (S.D.N.Y. June 17, 2004) ..................................................34

*Precision Trenchless, LLC* v. *Saertex multiCom LP*,
    2022 WL 807052 (D. Conn. Mar. 16, 2022) ....................................................34

*Putnam* v. *DeRosa*,
    963 F.2d 480 (1st Cir. 1992) ............................................................................14

*Renteria* v. *Lumpkin*,
    2023 WL 7649071 (5th Cir. Nov. 14, 2023) ....................................................17

*In re Savers Fed. Sav. & Loan Ass'n*,
    872 F.2d 963 (11th Cir. 1989) ..........................................................................14

*Scalia* v. *Sarene Servs., Inc.*,
    740 F. Supp. 3d 251 (E.D.N.Y. 2024) ..............................................................34

*SEC* v. *DCI Telecommunications, Inc.*,
  207 F.R.D. 32 (S.D.N.Y. 2002) ........................................................34

*Soroof Trading Dev. Co.* v. *GE Microgen, Inc.*,
  283 F.R.D. 142 (S.D.N.Y. 2012) ......................................................34

*State ex rel. Tong* v. *Exxon Mobil Corp.*,
  83 F.4th 122 (2d Cir. 2023) .......................................................23, 24

*Trump* v. *New York*,
  145 S. Ct. 1038 (2025).....................................................................10

*Trump* v. *United States*,
  603 U.S. 593 (2024)................................................................. *passim*

*United States* v. *Bongiovanni*,
  2023 WL 3723265 (W.D.N.Y. May 30, 2023) ................................34

*United States* v. *Edwards*,
  834 F.3d 180 (2d Cir. 2016)............................................................13

*United States* v. *Eldridge*,
  2014 WL 257224 (W.D.N.Y. Jan. 23, 2014) ..................................34

*Vanguard Dealer Servs., LLC* v. *Bottom Line Driven, LLC*,
  2022 WL 1239951 (D. Conn. Apr. 27, 2022) .................................34

*Walsh* v. *Versa Cret Contracting Co., Inc.*,
  2023 WL 3570699 (E.D.N.Y. May 18, 2023) .................................34

*Weaver* v. *Massachusetts*,
  582 U.S. 286 (2017)........................................................................30

*Willingham* v. *Morgan*,
  395 U.S. 402 (1969).............................................................16, 24, 29

**Constitutional and Statutory Provisions**

U.S. Const. art. I, § 6, cl. 1.................................................................16

9 U.S.C. § 205......................................................................................15

12 U.S.C. § 632..............................................................................14, 15

12 U.S.C. § 1789..................................................................................14

12 U.S.C. § 1819..................................................................................14

22 U.S.C. § 282f ...............................................................................................15

28 U.S.C. § 1291 ..............................................................................................20

28 U.S.C. § 1442 .........................................................................................*passim*

28 U.S.C. § 1447 ..............................................................................................18

28 U.S.C. § 1450 ..............................................................................................20

28 U.S.C. § 1455 .........................................................................................*passim*

52 U.S.C. § 30143 .........................................................................................6, 30

N.Y. Election Law § 17-152 ........................................................................*passim*

N.Y. Penal Law § 175.05 ...................................................................................5

N.Y. Penal Law § 175.10 ....................................................................4, 5, 8, 30

N.Y. Tax Law § 1801 .........................................................................................5

N.Y. Tax Law § 1802 .........................................................................................5

Removal Clarification Act of 2011, Pub. L. No. 112-51, 125 Stat. 545........................23

**Other Authorities**

11 C.F.R. § 108.7(b)(3)......................................................................................31

Fed. R. App. P. 42(b) .........................................................................................7

Fed. R. Civ. P. 16(b) ...........................................................................33, 34, 35, 37

Fed. R. Crim. P. 12(c) ...............................................................................33, 34

16 Moore's Federal Practice Civil § 107.141 .............................................................19

## INTRODUCTION

For more than 200 years, Congress has provided a mechanism for federal officers to remove state criminal prosecutions to federal court. The modern removal statute requires a federal officer to show that the state prosecution is "for or relating to any act under color of office," and that he has at least one colorable federal defense. 28 U.S.C. § 1442(a)(1); *Mesa* v. *California*, 489 U.S. 121, 129 (1989). The statute also expressly authorizes removal at any point while the case is "pending," as long as the federal officer shows "good cause" for removing "at a later time" than the initial window of "before trial." 28 U.S.C. § 1455(b).

Last month, the Second Circuit vacated this Court's denial of President Trump's post-trial motion to remove, under the federal-officer removal statute, the unprecedented criminal case against him. *New York* v. *Trump*, 158 F.4th 458; *see* ECF No. 56 (Op.) at 25, 27. The Second Circuit remanded with instructions to "consider the motion anew in light of our opinion," Op. 27, and specifically tasked the Court with deciding (i) whether the federal-officer removal statute permits removal at this stage of the case; and (ii) whether President Trump had "good cause" to file a second, post-trial notice of removal. The answer to both questions is yes.

*First*, the Court should find that removal is available even though the state trial court entered judgment against President Trump earlier this year. The federal-officer removal statute provides that defendants are entitled to remove any "pending" "criminal prosecution . . . not later than 30 days after the arraignment . . . or at any time before trial, whichever is earlier, *except that for good cause shown* the United States district court may enter an order granting the defendant or defendants leave to file the notice *at a later time*." 28 U.S.C. § 1455a, (b)(1) (emphasis added). That provision could not be clearer: while pre-trial removal is as of right, removal is still permitted "at a later time"—including after judgment is entered—upon a showing of "good cause." The timing merely changes the applicable standard. Indeed, in *Harris* v. *U.S. Dep't of Transp. FMCSA*,

122 F.4th 418 (D.C. Cir. 2024), the D.C. Circuit squarely held that "a federal defendant may remove a case" to federal court "from the state appellate court" under the federal-officer removal statute. *Id.* at 424. *Harris* explained that numerous decisions "have interpreted" both the federal-officer removal statute and similarly worded removal statutes "to allow removal after final judgment at the state trial court level," so long as the case is still pending on appeal, as it is here. *Id.* Such removal is only a change in courtroom; it moves a pending appeal from the state appellate courts to the federal appellate courts. *Id.*

*Second*, President Trump's second removal notice establishes "good cause" to remove this case outside the pre-trial window. In remanding for this Court to consider that question, the Second Circuit explained that "good cause" requires a showing of (i) colorable "grounds for removal"; (ii) "that could not reasonably have been raised prior to" President Trump's trial; and (iii) on which President Trump "acted with reasonable diligence and without undue delay" in seeking leave to remove. Op. 18. President Trump's second removal notice satisfies each requirement.

To start, President Trump's removal notice makes clear that there are colorable grounds for removal here. This case counts as one "for or relating to" President Trump's official acts while in office, 28 U.S.C. § 1442(a)(1), because the Manhattan District Attorney (DANY) introduced and heavily relied on evidence of those official acts during his 2024 trial. President Trump has two federal defenses that are not just colorable but compelling: Presidential immunity and federal preemption. DANY violated the Presidential evidentiary immunity recognized by the Supreme Court in *Trump* v. *United States*, 603 U.S. 593, 631 (2024), by introducing at least three categories of official-acts evidence. For example, DANY compelled a former White House senior advisor to testify about what the President said to her, *in the Oval Office*, about her official duties. Further, DANY separately violated principles of federal preemption because its case rests on an application

of New York law that is squarely preempted by the Federal Election Campaign Act (FECA), which regulates the financing of federal elections and contains a sweeping preemption provision that forbids state and local prosecutors from enforcing federal campaign-finance rules.

Next, President Trump could not reasonably have raised these arguments until his second, post-trial notice.  It was not until the middle of his 2024 trial, well after the default window to file the first removal notice, which was filed as appropriate, that the state court judge erroneously permitted the testimony about President Trump's official acts from 2017.  It was not until the very end of trial that DANY finally settled on its state-law theory that is preempted under FECA.  And it was not until a month after trial that the Supreme Court handed down its landmark decision on Presidential immunity, including evidentiary immunity, in *Trump*.  Indeed, DANY has never argued that President Trump could have successfully raised all of his current arguments in his first attempt at removal, filed shortly after indictment.

To the extent that President Trump was able to raise these arguments for removal in his first removal proceeding in 2023, DANY successfully persuaded this Court to deny removal by obscuring the key federal aspects of the case.  DANY told this Court that its prosecution was based solely on private acts and did not "touch[]," "relate[] to," or have "any other connection to" President Trump's official conduct in office.  ECF No. 38 at 5.  DANY also insisted that it would not necessarily target campaign-finance-related conduct regulated by FECA.  On the basis of those representations, this Court found that the case had no necessary relation to official Presidential acts and presented no colorable Presidential immunity or preemption defense.  By the time that the 2024 trial ended, it was clear that DANY's representations to this Court were false:  DANY had invited the jury to scrutinize a number of President Trump's official acts during his first term, and it had presented to the jury a preempted legal theory that squarely targeted alleged violations of

FECA.  DANY's inaccurate pre-trial representations alone provide ample good cause for removal post-trial.

Finally, President Trump acted diligently in coming to this Court to ask permission to remove.  President Trump sought to file the 60-page second removal notice at issue, complete with 38 lengthy exhibits drawn from a voluminous pre-trial and trial record, on August 29, 2024.  That was less than two months after the Supreme Court's decision in *Trump* made clear that this case "relates to" official Presidential acts, and that President Trump has compelling federal defenses.  Dozens of decisions by district courts, including this Court, have concluded that such timing in seeking relief based on new grounds reflects sufficient diligence—and that was in cases presenting far less sensitive and complex questions than here.  *See* cases cited *infra*, pp. 33-35.  Nor did the timing of President Trump's motion for leave to remove cause any prejudice to DANY or the state courts.  DANY has never argued otherwise.

President Trump has a statutory right to have his appeal heard in a federal forum.  In remanding, the Second Circuit held that this Court should freshly consider his arguments for removal.  The Court should now grant President Trump permission to remove, adopt the New York court's judgment of conviction, and—as applicable law and precedent mandate—allow President Trump to pursue his appeal of the criminal conviction before the Second Circuit.  That is where this case, unparalleled in our country's history, now belongs.

## BACKGROUND

### A.    The New York Indictment

On March 30, 2023, a New York grand jury indicted President Trump on 34 counts of falsification of business records under N.Y. Penal Law § 175.10.  ECF No. 49-1 (Second Removal Notice) at 8.  Each count related to one of three kinds of documents—invoices, ledger entries, and checks—associated with payments made throughout 2017 to Michael Cohen, a former Trump

Organization employee.  DANY wrongly alleged that these records were supposedly false because they stated that the payments were for "legal services rendered" pursuant to a "retainer agreement," even though legal services were actually rendered and a retainer agreement was in place.  DANY claimed that the payments were instead intended to reimburse Cohen for a $130,000 payment he had made to Stephanie Clifford (aka Stormy Daniels) as part of a non-disclosure agreement preventing Clifford from discussing an alleged 2006 encounter between her and President Trump. ECF No. 47-1 at 3-4.

Falsification of business records is a misdemeanor under New York law with a two-year statute of limitations, *see* N.Y. Penal Law § 175.05, and any misdemeanor charge against President Trump was time-barred.  To charge President Trump with a felony in this anomalous case, DANY had to allege that he falsified records *and* did so with the intent to "commit another crime or to aid or conceal the commission thereof."  N.Y. Penal Law § 175.10.  But DANY refused to specify during pre-trial proceedings, and throughout nearly all of the trial, what the alleged underlying crime was.  Second Removal Notice 9.  Instead, DANY offered a number of potential predicates: N.Y. Election Law § 17-152, N.Y. Tax Law §§ 1801(a)(3) and 1802, N.Y. Penal Law §§ 175.05 and 175.10, and, finally, FECA.  Second Removal Notice 9.  One of those possible predicates, N.Y. Election Law § 17-152, prohibits conspiring to promote or prevent a person's election to public office by "unlawful means."  DANY also declined to specify what those "unlawful means" might be.

### B.    President Trump's First Removal Notice

On May 4, 2023, President Trump filed a notice of removal in this Court under the federal-officer removal statute, 28 U.S.C. § 1442.  ECF No. 1.  That motion complied with the statute's default timing provision that a "notice of removal of a criminal prosecution shall be filed not later

than 30 days after the arraignment in the State court, or at any time before trial, whichever is earlier." 28 U.S.C. § 1455(b)(1). The notice of removal explained that President Trump had at the relevant times been an "officer . . . of the United States," *id.* § 1442(a)(1), that the prosecution was "for or relating to" his official acts as President, *id.*, and that he had multiple colorable federal defenses to the New York charges. Among them, President Trump argued that he had a preemption defense to any charge based on alleged violations of FECA, as FECA has a broad preemption provision that "supersede[s] and preempt[s] any provision of State law with respect to election to Federal office," 52 U.S.C. § 30143(a).

DANY moved to remand. ECF No. 17. As relevant here, DANY claimed in this Court that nothing about this prosecution "touches, relates to," "is associated with, or has any other connection to" official Presidential acts. ECF No. 38 at 5. DANY also argued in this Court that President Trump had no colorable FECA preemption defense because "the crimes that defendant is alleged to have intended to commit or conceal here are not limited to violations of New York Election Law § 17-152 and FECA," ECF No. 19 at 22, and "the People have alleged that defendant intended to conceal or commit multiple other crimes for which defendant has raised no preemption argument whatsoever." ECF No. 38 at 14. DANY represented to this Court that it might not "rely on Election Law § 17-152 at trial," and argued that "the mere possibility that a verdict [could] rely on Election Law § 17-152" was "simply too speculative a basis on which to rest a finding of pre-emption." ECF No. 38 at 14-15 (internal quotation marks omitted). If needed, DANY noted, it might ask the jury to "return[] special verdicts or interrogatory responses that could resolve any ambiguity" about the specific predicates at issue. *Id.* at 14. DANY also claimed in this Court that the "charges here do not relate to the specific disclosures mandated by FECA." *Id.* at 12. All of these representations would wind up being wrong.

DANY made similar inaccurate statements during an evidentiary hearing before this Court. *See* ECF No. 41.  For example, counsel for DANY stated that "the election law violation [Section 17-152] is only one of several available crimes that the defendant, according to the People's allegations, intended to conceal or commit.  So even if the election law charges were preempted, [or] the election law was preempted, there are other nonpreempted crimes at play here."  *Id*. at 76:12-17.  DANY likewise represented to this Court that "even if you take the election law out of the picture, the People have alleged that the intent to conceal the commission of other crimes have nothing to do with the election law."  *Id*. at 80:8-11.

On July 19, 2023, this Court granted DANY's motion to remand.  ECF No. 43.  The Court found that President Trump was an "officer . . . of the United States" within the meaning of the federal-officer removal statute.  ECF No. 41 at 11.  But on the basis of DANY's representations, the Court held that the prosecution was not "'for or relat[ing]' to acts taken under color of federal office," *id.* at 15, and that there was no colorable preemption defense, *id.* at 24.  President Trump appealed, but later voluntarily dismissed the appeal pursuant to Fed. R. App. P. 42(b).  *See* ECF No. 45.

### C.    Trial

President Trump's trial before the New York trial court began on April 22, 2024.  Over the next six weeks, DANY introduced significant testimony and documentary evidence that invited the jury to scrutinize President Trump's actions while serving as President.  That evidence included (i) testimony from President Trump's White House Communications Director and also from his Director of Oval Office Operations about how they performed their duties, including conversations with the President in the Oval Office about the White House's press strategy; (ii) several official statements on matters of public concern made by President Trump on a Twitter account that he

consistently used for official communications; and (iii) testimony concerning an alleged discussion between President Trump and Attorney General Jeff Sessions regarding the federal government's handling of a pending FEC complaint.  *See* Second Removal Notice 29-31.

At the end of trial, in its proposed jury instructions, DANY finally revealed the purported predicate crime it was using to manufacture a felony charge—the "[]other crime" President Trump had supposedly intended to commit, aid, or conceal under N.Y. Penal Law § 175.10.  Despite DANY's earlier representation to this Court that its case would stand up "even if you take the election law out of the picture," ECF No. 41 at 80:8-9, DANY asked the trial court to instruct the jury only that "the other crime the defendant intended to commit, aid, or conceal is a violation of New York Election Law [S]ection 17-152."  ECF No. 47-5 at 3; *see* ECF No. 47-7 at 7-8.  As for the "unlawful means" required under Section 17-152, DANY put forward three different possibilities, but it focused almost exclusively on what it claimed were violations of FECA, including the $130,000 payment from Cohen to Clifford.  ECF No. 47-5 at 4-7; *see* Declaration of Matthew A. Schwartz, Ex. A at 65-71 (DANY's summation).  DANY argued that the Cohen payment qualified as a campaign contribution to a federal candidate (President Trump) in excess of the $2,700 limitation imposed by FECA.

Thus, DANY's ultimate theory of liability in this case went as follows.  President Trump allegedly falsified certain business records.  Although ordinarily a misdemeanor, DANY made it into a felony by claiming that President Trump had the alleged intent to commit or conceal "another crime."  That "[]other crime" was itself a misdemeanor:  an alleged agreement to influence an election by some other "unlawful means."  And that "unlawful means," in turn, was an alleged violation of any one of three further laws, principally FECA's prohibition on excessive campaign contributions.  Violations of federal law therefore formed the base of DANY's pyramid,

underscoring President Trump's preemption defense.  Yet, despite DANY's earlier representation to this Court that "special verdicts or interrogatory responses" would be appropriate to clarify matters, ECF No. 38 at 14-15, DANY later opposed President Trump's request that the jury be required to record their votes on the different "unlawful means" predicates put forward by DANY. *See* ECF No. 47-6 at 23; ECF No. 47-7 at 9.  DANY instead sought a general verdict of guilt that legally could have been—and practically, almost certainly was—based on the theory that President Trump had somehow conspired to accept illegal campaign contributions under FECA.  On May 30, 2024, the jury returned a verdict of guilty.  Second Removal Notice 15.

### D.    Post-Trial Proceedings

Just over one month later, on July 1, 2024, the U.S. Supreme Court issued its landmark decision in *Trump* v. *United States*, holding that a former President is at least presumptively immune from prosecution for all official acts.  603 U.S. at 606.  The Supreme Court also held that Presidential immunity not only protects former Presidents from being "indicted based on conduct for which they are immune from prosecution," but unequivocally bars any "use of evidence about such conduct, even when [the] indictment alleges only unofficial conduct."  *Id.* at 630-631.

That same day, President Trump informed the state trial court that he intended to move to set aside the verdict and dismiss the indictment, citing the evidentiary immunity recognized in *Trump*.  Second Removal Notice 18.  On July 10, President Trump filed that motion, explaining that DANY had impermissibly introduced a great deal of evidence of his official acts as President. *Id.* at 19.  That motion was fully briefed by July 31.  On August 5, the trial court announced that it would rule on September 16, only two days before the sentencing date of September 18, which the court warned would "remain[] unchanged."  *Id.* at 24.  That timing made clear that the trial court intended to deny the motion.  President Trump then moved to adjourn sentencing to allow

9

for sufficient time for an interlocutory appeal of the trial court's decision. *Id.* On August 19, the

trial court informed the parties that it would not rule on that request until September 5. *Id.* at 24.

### E.    President Trump's Second Removal Notice

Ten days later, on August 29, 2024, President Trump sought to file a second notice of

removal before this Court. ECF No. 46. The clerk rejected the filing, noting that President Trump

had not sought leave to file. Under the federal-officer removal statute, a federal court "may enter

an order granting the defendant . . . leave to file the notice at a later time" than the initial statutory

window, which in a criminal prosecution is "not later than 30 days after the arraignment in the

State court, or at any time before trial, whichever is earlier." 28 U.S.C. § 1455(b)(1). President

Trump filed a motion for leave to file the second removal notice on September 3, 2024. ECF No.

48.

This Court issued a short order that same day denying President Trump leave. ECF No.

50. The Court first held that it lacked "jurisdiction to hear Mr. Trump's arguments" under the

*Rooker-Feldman* doctrine. *Id.* at 2. The Court then explained that "[n]othing in the Supreme

Court's opinion" in *Trump* v. *United States* "affect[ed] [its] previous conclusion" that this case

involves "private, unofficial acts, outside the bounds of executive authority." *Id.* at 3. The Court

thus held that "[g]ood cause ha[d] not been shown, and leave to remove the case [was] not

granted." *Id.* at 4. President Trump appealed.

### F.    Sentencing

While that removal-related appeal was pending, President Trump applied to the U.S.

Supreme Court for a stay of sentencing, citing the evidentiary immunity the Court had recognized

in *Trump*. Application for a Stay of Criminal Proceedings, *Trump* v. *New York*, 145 S. Ct. 1038

(2025) (No. 24A666). In denying a stay, the Supreme Court emphasized that "the alleged

evidentiary violations at [the] state-court trial can be addressed in the ordinary course on appeal." *Trump* v. *New York*, 145 S. Ct. 1038, 1038 (2025) (mem.).  Notably, four Justices dissented and would have granted the application to stay sentencing pending resolution of an immediate interlocutory appeal regarding Presidential immunity.  *Id.*

On January 10, 2025, the state trial court sentenced President Trump to a term of unconditional discharge and entered judgment against him.  Addendum for Appellee 112, *New York* v. *Trump*, No. 24-2299 (2d Cir. Jan. 13, 2025), Dkt. 59.  President Trump has since appealed that judgment to the intermediate New York appellate court.  That appeal remains in its early stages.  President Trump filed his opening brief on October 27, 2025.  *See* Dkt. 102, *Trump*, No. 24-2299.  Under the current schedule, briefing will not be completed in the Appellate Division until mid-March 2026, Schwartz Decl., Ex. B, and DANY has indicated that it may seek further extensions to that schedule.

## G.    The Second Circuit's Decision To Vacate And Remand

On November 6, 2025, the Second Circuit vacated this Court's order and remanded for reconsideration of President Trump's motion for leave to file the second removal notice.  The Second Circuit first held that the *Rooker-Feldman* doctrine does not apply in these circumstances. Op. 19-20.  It then held that this Court did not "appear to have adequately considered whether *Trump* v. *United States* represented a change in controlling law that could support a finding of good cause."  *Id.* at 20.  The Second Circuit also noted that this Court "did not address whether" President Trump "acted diligently" in seeking to remove, which is relevant to the "good cause" question.  *Id.* at 25-26.

The Second Circuit thus remanded and directed this Court to "consider the motion" for leave to remove "anew in light of [its] opinion."  Op. 27.  The court of appeals provided specific

guidance on the questions this Court should consider on remand, tracking the elements of the federal-officer removal statute:

> Specifically, on remand, the District Court should consider the factors relevant to determining good cause . . . . This presumably would entail closely reviewing the three categories of evidence that Trump claims relate to official acts and determining whether in fact the State's use of such evidence means that his prosecution relates to acts taken under color of the Presidency as contemplated by *Trump v. United States*. If the District Court finds that the prosecution is related in this way, it should evaluate both whether Trump has a colorable federal defense and whether he diligently sought removal. The District Court should also determine whether removal under § 1442(a)(1) and § 1455(b)(1) is even available at this stage of the state court proceedings.

*Id.*

## ARGUMENT

The Second Circuit's remand roadmap leads to only one conclusion: President Trump is entitled to invoke his statutory right to a federal forum in this case. Removal is legally available at this stage of the case, President Trump has shown good cause for removal now, and President Trump has acted diligently in seeking to remove. This Court should accordingly grant President Trump leave to remove and allow President Trump to pursue the appeal of his erroneous conviction before the Second Circuit, rather than before the New York appellate courts.

## I.    REMOVAL IS AVAILABLE IN THIS CASE UNDER THE FEDERAL-OFFICER REMOVAL STATUTE.

The Second Circuit instructed this Court first to determine "whether a federal officer defendant can ever remove a state criminal prosecution to federal court under [28 U.S.C.] § 1442(a)(1) and § 1455(b)(1) after he has been tried and a judgment entered," and the case is pending on appeal. Op. 15-16 (emphasis omitted). The answer is yes. Under the federal-officer removal statute, a federal officer may remove an appropriate suit at any time that it is still pending, including after trial and the entry of judgment. A later removal simply changes the standard: pre-

trial removals are as of right, whereas later removals require a showing of "good cause."  The statutory text makes that clear, and precedent and policy confirm it.  DANY's contrary argument that the trial court's entry of judgment against President Trump precludes removal is wrong as a matter of law.

###### A.    The Federal-Officer Removal Statute Allows Post-Trial And Post-Judgment Removal For "Good Cause Shown."

1.    Section 1455 governs the procedures for federal-officer removal in criminal cases. That provision states that defendants are entitled to remove any "pending" "criminal prosecution . . . not later than 30 days after the arraignment . . . or at any time before trial, whichever is earlier, *except that for good cause shown* the United States district court may enter an order granting the defendant or defendants leave to file the notice *at a later time*."  28 U.S.C. § 1455(a), (b)(1) (emphasis added).  By its plain terms, the statute permits a defendant to seek leave to remove based on "good cause" after trial has begun—*i.e.*, "at a later time" than the default window of "before trial."  The statute imposes no limit on the back end, including any bar on removal after a trial court has entered judgment.  That decides the issue.  *See United States* v. *Edwards*, 834 F.3d 180, 192 (2d Cir. 2016) ("Where the statutory text is unambiguous, no further inquiry is necessary.").

The only court of appeals to address this question has held that "a federal defendant may remove a case" to federal court "from state appellate court," after the state trial court has entered judgment.  *Harris*, 122 F.4th at 424.  Although *Harris* was a civil case, not a criminal case, the D.C. Circuit interpreted the same federal-officer removal statute that is at issue here, 28 U.S.C. § 1442(a), which authorizes removal of any "pending" "civil action or criminal prosecution that is commenced in a State court and that is against or directed to" a federal officer and meets certain additional criteria.  As the D.C. Circuit explained, "no statutory language expressly requires a case removed under section 1442(a)(1) to be pending in the court in which it commenced."  122 F.4th

at 422.  Under the "plain meaning of the word," a state action is "pending" and "therefore removable" "as long as the parties are still actively contesting the case in the state court system," regardless of whether they are "contesting the case in the state trial court or on appeal." *Id.* at 422-423 (citations omitted); *see Griffin* v. *Kentucky*, 479 U.S. 314, 321-322 & n.6 (contrasting cases that are "pending" with those in which "judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied").

2.    Decisions from other courts of appeals interpreting parallel federal removal statutes unanimously support the availability of post-judgment removal under the federal-officer removal statute.  For example, 12 U.S.C. § 1819(b)(2)(B) provides that the FDIC may "remove any action, suit, or proceeding from a State court" that meets certain criteria "to the appropriate United States district court" within 90 days after "the [FDIC] is substituted as a party."  Three courts of appeals have held, without disagreement, that this statutory language "permit[s] appellate removal," as its "plain language . . . does not limit removable actions to those that have not yet reached a state trial court judgment."  *Matter of Meyerland Co.*, 960 F.2d 512, 515, 516-517 (5th Cir. 1992); *see FDIC* v. *Keating*, 12 F.3d 314, 316 (1st Cir. 1993); *In re Savers Fed. Sav. & Loan Ass'n*, 872 F.2d 963, 966 (11th Cir. 1989) (predecessor statute).  Applying the same reasoning, courts have similarly construed 12 U.S.C. § 1789(a)(2), which authorizes the National Credit Union Administration to remove "any . . . action, suit, or proceeding from a State court."  *See Putnam* v. *DeRosa*, 963 F.2d 480, 483 (1st Cir. 1992).

By contrast, when Congress "intend[s] to limit the removal power . . . to suits pending before a state trial court," it knows how to "explicitly state[] as much."  *Savers*, 872 F.2d at 966. For example, the Federal Reserve removal statute allows removal of a qualifying case "any time

*before the trial thereof*."  12 U.S.C. § 632 (emphasis added).  Several other statutes contain the same limitation.  *See, e.g.*, *id.* § 1452(f) (cases in which Freddie Mac is a party); 9 U.S.C. § 205 (cases in which "subject matter" "relates to an arbitration agreement or award falling under" the New York Convention); 22 U.S.C. § 282f (cases against the International Finance Corporation).  That kind of limiting language is not present in Section 1442(a) or Section 1455, because Congress did not impose such a limit on federal officers seeking to remove a criminal prosecution.  Instead, Congress expressly contemplated that removals could occur "at a later time" than "before trial," provided there is "good cause shown."  28 U.S.C. § 1455(b)(1).

3.    Finally, interpreting the federal-officer removal statute to permit post-judgment removal also reflects the fundamental purpose of that statute:  to "ensure a federal forum" so that "the contours of federal power [are] determined by federal courts," *Harris*, 122 F.4th at 423 (citations omitted), "free from local interests or prejudice," *Arizona* v. *Manypenny*, 451 U.S. 232, 242 (1981).  If the need for a federal forum becomes clear only during or after trial, that federal forum must be available then.

As this case illustrates, not every federal defense is evident before trial.  The prosecution might change its theory of liability during trial in a way that gives rise to a new (or previously rejected) federal defense, as occurred here, *see infra*, pp. 30-31.  The Supreme Court might issue a decision during or after trial with new rules or guidance relevant to a possible federal defense, as also occurred here, *see infra*, pp. 31-32.  Or Congress might enact a new statute to similar effect.  Congress intended that federal officers in these kinds of unusual circumstances should be able to avail themselves of the same statutory right to access a federal forum.

Consider a hypothetical that is close to this case:  a state prosecutes a Member of Congress for alleged conduct that it claims was not official, but then introduces at trial evidence of the

Member's statements on the House floor in arguable violation of the Member's Speech and Debate Clause immunity, *see* U.S. Const. art. I, § 6, cl. 1.  The introduction of that evidence would give rise to a federal defense that was not available before trial.  The whole point of federal-officer removal is that a federal court, not a state court, should be adjudicating that question of federal constitutional immunity.

The ongoing availability of that safety valve is also critical to avoid gamesmanship by state and local prosecutors intent on avoiding federal jurisdiction in cases brought against federal officers.  If, as DANY argues, removal is flatly unavailable once judgment is entered—even in cases where, as here, the defendant sought leave to remove prior to sentencing—a prosecutor could defeat any chance at removal by manipulating the timing of evidentiary submissions or obscuring key elements of the theory of liability until the last possible minute.  Congress could not have intended that result.  After all, Congress created federal-officer removal to guard against the unfortunate reality that state and local prosecutors sometimes act out of "hostil[ity]" to federal policies and officers, particularly during "periods of national stress."  *Willingham* v. *Morgan*, 395 U.S. 402, 405 (1969).  In such cases, "Congress has decided that federal officers, and indeed the Federal Government itself, require the protection of a federal forum."  *Id.* at 407.  As the Supreme Court put it, that "policy should not be frustrated by a narrow, grudging interpretation" of the removal statute.  *Id.*

### B.    DANY's Counterarguments Are Unpersuasive.

1.    In the Second Circuit, DANY had no answer to the plain language of the federal-officer removal statute and the circuit authority just discussed.  Instead, DANY pointed to a series of district court cases—nine in total—which DANY claims "concluded" that "entry of a judgment of conviction precludes removal" under Section 1442 and 1455, and thus somehow bars removal

while a case is on appeal.  Brief for Appellee 21, *Trump*, No. 24-2299 (2d Cir. Jan. 13, 2025), Dkt. 58 (DANY 2d Cir. Br.); *see* Supplemental Brief for Appellee 4, *Trump*, No. 24-2299 (2d Cir. May 12, 2025), Dkt. 94.  But not one of DANY's cases actually says that.  Five of the nine, inapposite, cases involved attempts to remove by a defendant after (often decades after) *all* criminal proceedings, including the appeal, had terminated, meaning that there was no "pending" prosecution to remove under the federal-officer removal statute.[1]  In two others, the status of the underlying state prosecution is unclear from the court's opinion.[2]  And the final two decisions did not conduct any legal analysis relevant to whether the federal-officer removal statute allows post-judgment removal.  Rather, both cases simply noted in a single sentence, without ever mentioning the concept of "good cause," that removal was "time-barred" because the defendant had not removed "before trial."[3]  None of these cases is authority, let alone *persuasive* authority, for the incorrect proposition that Section 1455 flatly forbids post-judgment removal.

       2.       In addition to citing inapposite cases, DANY has offered a hodgepodge of structural inferences, abstention doctrines, and preclusion principles to try and support its argument that sentencing categorically bars removal.  All of those attempts fail, as DANY's arguments are

---

    [1]    *Colombo* v. *Suffolk*, 2010 WL 1459196 (E.D.N.Y. Apr. 8, 2010) (removal request over 20 years after guilty plea); *Renteria* v. *Lumpkin*, 2023 WL 7649071 (5th Cir. Nov. 14, 2023) (removal request 12 years after state appeal concluded); *Missouri* v. *Pate*, 2024 WL 3518594 (E.D. Mo. July 24, 2024) (removal request nine years after state appeal concluded); *Miller* v. *Louisiana*, 2019 WL 1293273, (E.D. La. Mar. 1, 2019), *adopted*, 2019 WL 1277522 (E.D. La. Mar. 20, 2019) (removal request 16 years after state appeal concluded); *New Hampshire* v. *Woodham*, 2022 WL 1432069 (D. N.H. Apr. 6, 2022), *adopted*, 2022 WL 1423608 (D.N.H. May 4, 2022) (removal request one year after criminal case was dismissed in lieu of civil commitment proceedings).

    [2]    *Barber* v. *Vance*, 2019 WL 267874 (D. Or. Jan. 18, 2019); *Johnson* v. *Washington,* 2007 WL 2377141 (W.D. Wash. Aug. 15, 2007).

    [3]    *Hawaii* v. *Thronas-Kahoonei*, 2020 WL 118251, at *2 (D. Haw. Jan. 10, 2020); *see Arizona* v. *Folio*, 2019 WL 1643720, at *1 (D. Ariz. Apr. 16, 2019).

simply an effort to distract from the plain language of the federal-officer removal statute, and none has merit.

*First*, DANY has pointed to 28 U.S.C. § 1455(b)(3), which allows a state prosecution to proceed in state court after the filing of a removal notice "except that a judgment of conviction shall not be entered [by the state court] unless the prosecution is first remanded." DANY has claimed that this "automatic stay of the entry of a final criminal judgment would be pointless and superfluous if such a judgment did not meaningfully affect the availability of removal." DANY 2d Cir. Br. 22. But that does not follow. Congress can simultaneously allow for removal at any stage and still recognize that a particular stage—judgment of conviction against a criminal defendant—requires additional guardrails. After all, such judgment may result in something as significant as an immediate incarceration. Requiring that a then-pending removal notice be resolved before such a significant moment has no bearing on whether a removal notice might also be filed after that moment.

*Second*, DANY has invoked 28 U.S.C. § 1447(c), which requires district courts to remand any removed case "if at any time *before final judgment* it appears that the district court lacks subject matter jurisdiction." DANY 2d Cir. Br. 23 (emphasis added). That provision is a red herring. Section 1447(c) is referring to the *federal district court's* jurisdiction and judgment. Obviously, a federal district court may remand a case only until the moment it enters a final judgment, at which point its jurisdiction ends. That suggests nothing about whether removal is available after the *state trial court* enters judgment.

*Third*, DANY has suggested that it would be odd for a federal appellate court to resolve a "defendant's state-law objections regarding his state criminal conviction." DANY 2d Cir. Br. 26. It would not be odd at all. Federal appellate review of state-law issues is a built-in feature of all

removal statutes, including the federal-officer removal statute. After a criminal removal, the federal court "appl[ies] the criminal law of the State"—just as it does with the civil law of the State in a diversity case. *Manypenny*, 451 U.S. at 241.

*Fourth*, DANY has claimed that "principles of *res judicata* . . . support precluding removal after the entry" of the state trial court's judgment. DANY 2d Cir. Br. 23-24. Not so. *Res judicata* requires a federal court to give effect to a state-court judgment. But it does not require that such judgment be given "*more* than the force and effect" it "would have had in state court" absent removal. *Granny Goose Foods, Inc.* v. *Bhd. of Teamsters & Auto Truck Drivers Loc. No. 70*, 415 U.S. 423, 436 (1974) (emphasis added). A state trial court's judgment is subject to review and reversal on appeal in state court. So too, such a judgment is reviewable and reversible on appeal after proper removal to federal court. That is why *Harris*, and the other cases cited above, saw no conflict between *res judicata* and removal of a case currently on appeal in a state court.[4]

*Fifth*, and relatedly, DANY has argued that it would be "anomalous" to "transfer[]" President Trump's "direct appeal of his criminal conviction from state court to the federal district court." DANY 2d Cir. Br. 26. But that is not what President Trump seeks to have happen, or what any court that has approved post-judgment removal has thought should happen. Under the *res judicata* principles just discussed, a case that is removed while pending in a state *appellate* court belongs in the relevant federal *appellate* court. That is what federal appellate courts have unanimously concluded. *See Harris*, 122 F.4th at 428 (Henderson, J., concurring) (citing cases); 16 Moore's Federal Practice Civil § 107.141 (same). Applied here, that means this case—

---

[4]    To be clear, *res judicata* principles *do* preclude any argument that the state trial court's judgment of conviction is itself void solely on jurisdictional grounds. President Trump does not seek to nullify the judgment on the ground that the state court retroactively lacked jurisdiction; he seeks to overturn the judgment on appeal, but in a federal, rather than state, appellate forum.

currently in the early stages of appeal before the Appellate Division of the New York Supreme Court—would move from that state court to the Second Circuit.

As Judge Henderson explained in her concurrence in *Harris*, this Court would play only a brief facilitating role for that federal appeal after it grants President Trump's motion for leave. Specifically, the Court would "adopt the state court's judgment as its own." *Harris*, 122 F.4th at 426; *see* 28 U.S.C. § 1450 (after removal, federal district court has authority to determine whether prior orders by state court remain in effect). At that point, President Trump would be entitled to file a notice of appeal from that "final decision[] of the district court[]." 28 U.S.C. § 1291. The Second Circuit would then do what federal courts always do "[a]fter removal," which is "take[] the case up where the State court left it off." *Granny Goose Foods*, 415 U.S. at 436. The result would be to move the current appellate proceedings from the state appellate courts to the Second Circuit.

## II.    PRESIDENT TRUMP HAD GOOD CAUSE TO FILE A SECOND, POST-TRIAL REMOVAL NOTICE.

Because removal remains available, the next question is whether President Trump has established "good cause to permit filing of a second removal notice." Op. 13. The answer is yes. As the Second Circuit explained, "good cause" requires (i) that there are "new grounds for removal"; (ii) "that could not reasonably have been raised prior to" President Trump's trial; and (iii) that President Trump "acted with reasonable diligence and without undue delay" in seeking leave to remove. Op. 18. "The propriety of removal under the statute should be considered at the time of removal"—here, when President Trump sought to file the second removal notice in late August 2024. *Pantalone* v. *Aurora Pump. Co.*, 576 F. Supp. 2d 325, 329 (D. Conn. 2008) (citing *In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 488 F.3d 112, 124 (2d Cir. 2007)).

President Trump's motion for leave to remove satisfied all three requirements. *First*, his removal notice set forth "grounds for removal" under the federal-officer removal statute. *Second*, those grounds were "new" and "could not have reasonably been raised" before trial. *Third*, President Trump acted with reasonable diligence in seeking removal.

### A.     The Second Removal Notice Satisfied The Requirements Of The Federal-Officer Removal Statute.

Under 28 U.S.C. § 1442(a)(1), a federal officer may remove any prosecution "for or relating to any act under color of [federal] office." Supreme Court precedent also requires that the defendant put forward a "colorable defense under federal law." *Mesa*, 489 U.S. at 129. President Trump's second removal notice satisfied both requirements.

### 1.     The prosecution "relates to" President Trump's official acts because DANY used those acts as evidence at trial.

The federal-officer removal statute imposes a low bar: the officer must make only "an adequate threshold showing that the suit is" "for or relating to any act" taken under color of federal office. *Jefferson Cnty.* v. *Acker*, 527 U.S. 423, 431-432 (1999); *see* 28 U.S.C. § 1442(a)(1). In evaluating that question, the Court must "credit [President Trump's] theory of the case" so long as it is "colorable." *Acker*, 527 U.S. at 431. That is because "[d]emanding an airtight case on the merits" to establish removability would "defeat the purpose of the removal statute." *Id.* The point is to "give officers a federal forum in which to litigate" their federal defenses, *id.* at 447 (Scalia, J., concurring in part and dissenting in part), not require the officer "virtually to win his case before he can have it removed," *id.* at 431 (majority op.) (internal quotation marks omitted). Under the

appropriate standard, DANY's prosecution of President Trump more than plausibly qualifies as "for or relating to any act" that he took "under color" of the Presidency.[5]

> **a.    A prosecution "relates to" a President's official acts if the government uses such acts as evidence.**

The federal-officer removal statute applies to cases in which the prosecution uses "any act under color of [the President's] office" as evidence at a criminal trial of the President.  28 U.S.C. § 1442(a)(1).  By using such evidence, the prosecution makes the case into one "relating to" official Presidential acts, and thus entitles the defendant to a federal forum to press any colorable federal defense he may have.

Consider the plain language of the statute.  In ordinary English, a state prosecution that uses a federal officer's official acts against him as evidence is a prosecution "relating to" those official acts.  "[W]hen asked to interpret statutory language including the phrase 'relating to,'" the Supreme Court "has typically read the relevant text expansively."  *Lamar, Archer & Cofrin, LLP* v. *Appling*, 584 U.S. 709, 717 (2018) (collecting cases).  The "ordinary meaning" of "relating to" "is broad":  it means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with."  *Morales* v. *Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992).  Congress thus "characteristically employs the phrase to reach any subject that

---

[5]    This Court already held, in its original remand order in this case, that federal officers "can remove a case otherwise qualified for removal," even if they are not in office at the time of removal, so long as they were in office at the time the relevant acts took place.  Dkt. 43 at 10.  As the Court explained, it "would make little sense if this were not the rule."  *Id.*  That is especially so for the President, given the Supreme Court's holding in *Trump* that the "nature of Presidential power requires that a *former President*" be immune "from criminal prosecution for his official acts *during his tenure in office*."  *Trump*, 603 U.S. at 606 (emphasis added).  Regardless, President Trump is a federal officer now, and the usual rule is that a defect (which does not actually exist here) in an otherwise validly removed case may be cured any time before final judgment.  *See Caterpillar Inc.* v. *Lewis*, 519 U.S. 61, 73, 77 (1996).  DANY has also forfeited any argument on this inapplicable score by failing to raise it either (i) before this Court in opposing President Trump's first attempt at removal or (ii) in its opening brief before the Second Circuit.

has a connection with" the object. *Coventry Health Care of Mo., Inc.* v. *Nevils*, 581 U.S. 87, 96 (2017) (internal quotation marks omitted). For example, a state law "'relates to' an employee benefit plan" if it has any effect on such plans, "even if the law is not specifically designed to affect such plans, or the effect is only indirect." *Ingersoll-Rand Co.* v. *McClendon*, 498 U.S. 133, 139 (1990). Mapping that definition onto the language here, a criminal prosecution "relates to" official acts whenever such acts are used as evidence, because that use creates the necessary connection between the prosecution and the acts.

The history of the federal-officer removal statute confirms that point. In 2011, Congress added the "*or relating to*" language; before that, the statute had allowed removal only in cases against "any officer of the United States . . . *for* any act under color of such office." Removal Clarification Act of 2011, Pub. L. No. 112-51, § 2(b)(1)(A), 125 Stat. 545 (emphasis added). A prosecution is "for" an official act if there is some "nexus" "between the charged conduct" itself "and asserted official authority." *Acker*, 527 U.S. at 431. The 2011 amendment broadened the removal statute beyond cases in which the official acts are the basis for or connected to the criminal charges—the statute now includes cases that "relat[e] to" the official acts. That is a lower bar for removal. A prosecution is one "relating to" official acts if it has some other kind of "association with or connection with" official acts, *Morales*, 504 U.S. at 383, such as where official acts are introduced as evidence by the prosecution at trial.[6]

---

[6]    In its remand decision, the Second Circuit noted that it has "rejected the assertion" that Congress's 2011 amendments to the federal-officer removal statute eliminated the need to show a "causal connection" "between the charged conduct and asserted official authority." Op. 21-22 (quoting *State ex rel. Tong* v. *Exxon Mobil Corp.*, 83 F.4th 122, 145 n.7 (2d Cir. 2023)) (alteration omitted). But the unexplained footnote in *Tong* does not answer the question here. That is why the Second Circuit expressly directed this Court to determine "whether admitting [official-acts] evidence transformed the State's case against" President Trump "into one that relat[es] to acts taken under color of the Presidency within the meaning of the amended removal statute." Op. 22.

The connection is particularly obvious in the specific context here, where a former (and current) President raises the federal defense that certain "act[s] under color of [his] office," 28 U.S.C. § 1442(a)(1), were impermissibly "scrutinized to help secure his conviction," requiring reversal under the evidentiary immunity rule recognized by the Supreme Court in *Trump*, 603 U.S. at 63. *See infra*, pp. 25-28. That defense theory, which this Court must "credit" at this stage, *Acker*, 527 U.S. at 432, brings DANY's prosecution "into association with or connection with" the asserted official Presidential acts, *Morales*, 504 U.S. at 383, and thus justifies removal. Indeed, the statute's "relating to" language tracks the Presidential evidentiary immunity recognized in *Trump*.

Again, "one of the most important reasons for removal" of state prosecutions against federal officers "is to have the validity of the defense of official immunity tried in a federal court." *Willingham*, 395 U.S. at 407. Under *Trump*, a former President has a "defense of official immunity," *id.*, protecting him not only from being "indicted based on conduct for which [he is] immune," but also from the use of such acts as "evidence" at trial. *Trump*, 603 U.S. at 631-632. That evidentiary immunity bars the use of official-acts evidence to "prove [a President's] liability on *any* charge," even "charges that purport to be based only on his unofficial conduct." *Id.* at 631 (emphasis added). As the Supreme Court emphasized, even the "[u]se of evidence about [official] conduct" would impermissibly "raise [the] unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Id.* at 631-

---

To the extent *Tong* is relevant, it is distinguishable. *Tong* involved an attempt by a former federal contractor to remove a civil suit against it despite no obvious relationship between the case and the performance of any federal contract. That is worlds away from a criminal prosecution of a former President in which that President's own official acts are introduced as key evidence. Such meaningful reliance on official acts satisfies whatever "nexus" or "connection" may be required to transform the case into one that "relates to" those acts.

632, 640.  A former President has a right to a federal forum to adjudicate that special evidentiary immunity defense.  By the same token, a state prosecutor ultimately controls whether that forum ever becomes available in cases where the charged conduct does not itself involve official acts. The prosecution can generally avoid triggering the right to remove by steering clear of introducing any evidence at trial that colorably implicates the Presidential evidentiary immunity.

    **b.**    **DANY used President Trump's official acts as evidence at trial.**

Here, DANY did not steer clear of introducing such official-acts evidence; it did the opposite.  DANY introduced immunized "evidence concerning [President Trump's] official acts," *Trump*, 603 U.S. at 630, and thus made this case removable.  Indeed, significant categories of DANY's trial evidence—including testimony about President Trump's Oval Office communications with the Attorney General and the White House Communications Director about their official responsibilities—clearly fall on the official-act side of the line.  At a minimum, President Trump has made the threshold showing that his arguments are colorable and is thus entitled to removal.  The point of the federal-officer removal statute is that questions about "the scope of [a] Defendant['s] official duties" are "for the federal—not state—courts to answer," *after* the case has been removed.  *Isaacson* v. *Dow Chem. Co.*, 517 F.3d 129, 138 (2d Cir. 2008).

    **i.**    **Discussions With The White House Communications Director**.  DANY subpoenaed Hope Hicks, White House Communications Director during the first Trump Administration, to testify about certain conversations she had with President Trump in the Oval Office in early 2018.  Second Removal Notice 29.  Hicks testified that she had discussed with the President "how he would like a [White House] team to respond to" a forthcoming article in the Wall Street Journal about the Clifford NDA.  ECF No. 47-8 at 12.  She testified that she discussed with the President the content of specific statements to appear in the story from a "White House

official." *Id.* at 13.  Hicks also testified that she and President Trump discussed how a different New York Times article "was playing," as well as Hicks's "thoughts and opinion about th[e] story." *Id.* at 16.

All of this testimony is prohibited by *Trump*, which squarely holds that a President's "discussions with" government officials about "their official responsibilities," or that "concern [the official's] role," "are readily categorized" as "official conduct."  603 U.S. at 617, 622-624, 637.  Discussions between the President and the White House Communications Director concerning coverage of the President's fitness for office, and the White House's official response, plainly pertained to Ms. Hicks's official role as White House Communications Director.  Indeed, the Supreme Court has stated that when "persons authorized to speak for the President publicly . . . deny[]" allegations of misconduct occurring before the President took office, such denials "may involve conduct within the outer perimeter of the President's official responsibilities." *Clinton* v. *Jones*, 520 U.S. 681, 686 (1997); *see Council on Am. Islamic Relations* v. *Ballenger*, 444 F.3d 659, 664-666 (D.C. Cir. 2006) (finding "clear nexus between [a] congressman answering a reporter's question about the congressman's personal life and [his] ability to carry out his representative responsibilities effectively," bringing such statements within the scope of his official employment).  In light of these precedents, Ms. Hicks's Oval Office conversations with the President are, at the very least, *colorably* protected by Presidential immunity.  So too is the testimony of Madeleine Westerhout, former Director of Oval Office Operations, concerning her observations of President Trump's practices in discharging his official duties, including about calls made by the situation room to the President.

**ii.    Official Presidential Statements On Twitter**.  DANY also introduced several sets of posts by President Trump, made while in office, on a Twitter (now known as "X") account that

he consistently used for official White House communications.  Second Removal Notice 30.  One

post in April 2018 criticized The New York Times for "going out of their way to destroy Michael

Cohen and his relationship with [President Trump] in the hope that he will 'flip.'"  ECF No. 47-

30 at 3.  Another was a May 2018 post in which President Trump reported to the public facts that

he had learned about the Clifford NDA and the way in which Cohen had been reimbursed.  *Id.* at

4-7.  Two other posts criticized Cohen in connection with his decision to falsely accuse President

Trump of wrongdoing.  *Id.* at 9, 11.

 *Trump* makes clear that these statements were official acts:  "most of a President's public

communications," including "*in the form of Tweets*," "are likely to fall comfortably within the

outer perimeter of his official responsibilities."  603 U.S. at 629 (emphasis added).  Although the

format, content, and style of these statements may have differed from official statements made by

Presidents who served before social media, that is irrelevant.  President Trump used an official

communications channel of the White House to "speak[] forcefully or critically, in ways that [he]

believe[d] would advance the public interest."  *Id.*  That is more than enough to make the argument

colorable and thus to trigger removal.

 **iii.    The President's Alleged Discussion With The Attorney General**.  Finally,

DANY elicited testimony from Michael Cohen about a conversation he had with David Pecker,

then-publisher of the National Enquirer, whose company had received an FEC complaint alleging

violations of FECA.  Second Removal Notice 31.  According to Cohen, he assured Pecker that

"the matter is going to be taken care of."  ECF No. 47-8 at 34-35.  Cohen then elaborated that "the

person . . . who [was] going to be able to do it [was] Jeff Sessions," and that President Trump had

supposedly told Cohen that the FEC complaint would "be taken care of" by Attorney General

Sessions.  *Id.* at 35.  To be clear, President Trump denies any such interaction with then-Attorney

General Sessions about a pending FEC complaint.  The point here, however, is that DANY introduced evidence that such immunized official conduct did occur.  Under *Trump*, Presidential evidentiary "immunity extends to official discussions between the President and his Attorney General." 603 U.S. at 637.  Such purported discussions, whatever their motivation, were clearly— let alone colorably—evidence of alleged official conduct.  Cohen's testimony "plainly implicate[d]" President Trump's "conclusive and preclusive authority" under the Constitution "to decide how to prioritize and how aggressively to pursue legal actions against defendants who [allegedly] violate the law."  *Id.* at 620 (internal quotation marks omitted).

### 2.    The removal notice asserted colorable federal defenses.

President Trump's second removal notice also "allege[d] a colorable defense under federal law." *Mesa*, 489 U.S. at 129.  Again, the Court must "credit" President Trump's "theory of the case for purposes of" its limited "jurisdictional inquiry." *Acker*, 527 U.S. at 432.  Here, at least two federal defenses—Presidential immunity and FECA preemption—are at least colorable and indeed meritorious.

### a.    President Trump has an immunity defense.

To start, because DANY introduced evidence at trial concerning President Trump's official acts, the second removal notice stated a more-than-colorable defense of Presidential immunity.  To overcome that presumptive immunity, DANY had to show that using the relevant evidence "pose[d] no dangers of intrusion on the authority and functions of the Executive Branch." *Trump*, 603 U.S. at 615 (internal quotation marks omitted).  But the state trial court erroneously did not require DANY to make such a showing before allowing the evidence.  President Trump's second removal notice therefore plausibly "rais[ed] . . . a federal question," *Mesa*, 489 U.S. at 136:

whether the state court violated the Constitution by "adjudicat[ing] a criminal prosecution that examine[d]" actions protected by Presidential immunity. *Trump*, 603 U.S. at 609.

DANY has claimed that President Trump's immunity arguments are meritless because they were somehow not preserved and because any violation of the Presidential evidentiary immunity was harmless. But both those responses, in addition to being wrong, are for the merits stage on appeal; they cannot defeat removal at the jurisdictional plausibility threshold. Again, a federal officer "need not win his case before he can have it removed." *Willingham*, 395 U.S. at 407. Regardless, both of DANY's arguments are wrong. On preservation, the state trial court found that President Trump properly objected to much of the evidence at issue, including testimony from White House Communications Director Hope Hicks and President Trump's official Presidential statements on Twitter. *See* Addendum for Appellee 38-45, 58, *Trump*, No. 24-2299. Although the court did rule that President Trump failed to preserve any objection to Michael Cohen's testimony regarding Attorney General Sessions, *id.* at 42-53, that is irrelevant to whether the case is removable, as the other categories of official-acts evidence at issue each independently trigger removal. *See In re Methyl Tertiary Butyl Ether Prods. Liability Litig.*, 341 F. Supp. 2d 351, 359 (S.D.N.Y. 2004) (proper federal-officer removal "give[s] the federal court subject matter jurisdiction over the entire case"). In any event, President Trump did in fact preserve his objection to Cohen's testimony. The trial court's contrary ruling was wrong, and is precisely the kind of decision that a federal appeals court would review after removal.

As for harmless error, the Supreme Court in *Trump* made clear that violations of the Presidential evidentiary immunity require *per se* reversal and are not subject to a harmlessness analysis. *See, e.g.*, 603 U.S. at 631-632 (normal evidentiary rules "are an inadequate safeguard"); *compare id.* at 632 (immunity "protect[s] not the President himself, but the institution of the

Presidency"), *with Weaver* v. *Massachusetts*, 582 U.S. 286, 295 (2017) (errors are structural and require *per se* reversal where "the right at issue is not designed to protect the defendant" himself "but instead protects some other interest").  Moreover, DANY's official-acts evidence was not harmless at all, as shown by prosecutors' repeated, emphatic references in closing arguments to that evidence as "devastating," "damaging," and "critical pieces of the puzzle" that supposedly "put the nail in the coffin" of President Trump.  ECF No. 47-17 at 17; Schwartz Decl., Ex. A, at 10.  DANY cannot now claim that official-acts evidence was *harmless*, when it repeatedly told the jury that the evidence was *harmful*.

### b.    President Trump has a preemption defense.

To transform President Trump's alleged falsification of business records from a misdemeanor into a felony, DANY had to identify "another crime" that President Trump allegedly intended to "conceal" or "commit."  N.Y. Penal Law § 175.10.  Only at the very end of trial did DANY finally settle on such a predicate crime:  N.Y. Election Law § 17-152, which prohibits conspiracies to "promote or prevent the election of any person to a public office by unlawful means."  According to DANY, such "unlawful means" included a violation of FECA's prohibition on contributions to Presidential candidates in excess of $2,700.  ECF No. 47-5 at 4-6; ECF No. 47-8 at 52.  DANY's far-fetched theory was that President Trump had falsified business records to conceal the fact that Cohen's $130,000 payment to Stormy Daniels was, in reality, an "unlawful means" of affecting the 2016 Presidential election under N.Y. Election Law § 17-152, because it was an unlawful contribution under FECA.  *See* ECF No. 47-6 at 1-4; ECF No. 47-18 at 48-49.

FECA preempts that application of Section 17-152.  By its terms, FECA expressly "preempt[s] *any* provision of State law with respect to election to Federal office."  52 U.S.C. § 30143(a) (emphasis added).  That broad language plainly covers any state "regulation of the

conduct and financing of campaigns for Federal elective office." *Holtzman* v. *Oliensis*, 91 N.Y.2d 488, 495 (1998); *see* 11 C.F.R. § 108.7(b)(3) (similar interpretation by FEC). If making a contribution prohibited by FECA amounts to an "unlawful means" of influencing an election under N.Y. Election Law § 17-152, then Section 17-152 necessarily "regulate[s] . . . the conduct and financing of [federal] campaigns" and is therefore preempted. *Holtzman*, 91 N.Y.2d at 495. Were it otherwise, any district attorney in New York (or any other State) could prosecute any alleged violation of FECA by packaging it as a violation of a state law like Section 17-152, even where, as here, federal authorities declined to pursue the alleged violation. That is what FECA's broad preemption clause expressly bars.

### B. President Trump Could Not Have Raised His Current Grounds For Removal Until After Trial.

The above arguments are "new grounds for removal" that President Trump could not "reasonably have raised" prior to trial, Op. 24, so he had "good cause" for raising them for the first time in the motion for leave to remove post-trial.

1.    Before trial, President Trump could not have made the same argument he makes now that his prosecution "relates to" official acts. Nor could he have raised the federal defense of Presidential evidentiary immunity. Both arguments stemmed from the Supreme Court's post-trial decision in *Trump*. Even DANY has recognized that *Trump* "announced *new rules* for determining whether a President is immune from criminal prosecution," DANY 2d Cir. Br. 32 (emphasis added), which included new "guidance on" the "unprecedented and momentous question[]" of how to separate a President's "official from unofficial actions," 603 U.S. at 616-617. And both arguments did not crystallize into a basis for removal until the trial itself, when DANY was permitted (over President Trump's objection) to improperly introduce and probe his official acts. By definition, before trial, there could have been no violation of President Trump's "entitlement

not to have to answer for his" official acts as evidence at trial. *Id.* at 630.  Given the "peculiar constitutional concerns implicated" by "[a]llowing [DANY] to ask or suggest that the jury probe official acts," the state court's failure to prevent that harm to the "institution of the Presidency," *id.* at 631-632, was good cause for removal to federal court.

2.    Circumstances "outside of [President Trump's] control" likewise "prevented him" from successfully removing based on the defense of FECA preemption during the initial pre-trial removal window.  Op. 18.  President Trump argued in his first removal notice, filed in May 2023 (only a few weeks after his indictment), that DANY's possible reliance on N.Y. Election Law § 17-152 as a predicate created a preemption defense.  ECF No. 1 at 6-7.  But DANY persuaded this Court to reject that argument by obscuring the FECA-based theory of Section 17-52 that DANY eventually submitted to the jury.  DANY represented to this Court that it might not "rely on Election Law § 17-152 at trial," and argued that "the mere possibility that a verdict here [could] rely on Election Law § 17-152" was "simply too speculative a basis on which to rest a finding of pre-emption."  ECF No. 38 at 14-15 (internal quotation marks omitted).  DANY also represented that the "charges here do not relate to the specific disclosures mandated by FECA."  *Id.* at 12.  This Court relied on DANY's incorrect representations, explaining that Section "17-152 [was] not preempted by FECA" because its "application" by DANY in these circumstances did not "target campaign contributions and expenditures."  ECF No. 43 at 22-24.  But that is exactly the application of Section 17-152 that DANY later sprang at trial in 2024 to secure President Trump's unlawful conviction.  President Trump therefore had good cause to return to this Court after DANY finally laid its cards on the table.

32

**C.      President Trump Acted With Reasonable Diligence And Without Undue Delay In Seeking Removal.**

President Trump "acted diligently and without undue delay to remove the case based on th[e]se new grounds." Op. 24. President Trump sought to file his 60-page second removal notice (plus 38 exhibits) on August 29, 2024, less than two months after the Supreme Court issued its decision in *Trump* on July 1, which provided a substantial new basis for arguing that this case "relates to" official acts and therefore is subject to removal. Dozens of decisions from district courts in this Circuit have held, in analogous contexts, that seeking relief within less than two months of learning of new grounds for relief demonstrates diligence and is therefore consistent with "good cause." There is no reason to treat President Trump differently here, which may be why this Court said nothing about diligence in its earlier decision denying President Trump leave to remove. Indeed, to the extent there are unusual circumstances here—such as the fact that President Trump was simultaneously in the home stretch of a campaign for President or that DANY has never articulated any prejudice from the supposed delay—they cut *in favor of* finding good cause and allowing President Trump to remove.

1.      In "defining 'good cause' within the meaning of § 1455(b)(1)," the Second Circuit saw "no reason to diverge from . . . past interpretations of the same term in analogous contexts." Op. 16, 18. As relevant here, the Court "dr[e]w on" two "similar 'good cause' provisions in the federal rules," Op. 16.: Federal Rule of Civil Procedure 16(b), which permits amendments of the pleadings after a court-ordered deadline "for good cause," and Federal Rule of Criminal Procedure 12(c), which permits a district court to hear an untimely pre-trial motion "if the party shows good cause."

Applying both rules, courts in this Circuit "commonly find" that "a party acts diligently if it seeks leave to amend within approximately two months of acquiring information" that provides

good cause to seek relief. *AT&T Corp.* v. *Atos IT Sols. & Servs., Inc.*, 714 F. Supp. 3d 310, 326 n.14 (S.D.N.Y. 2024) (Rule 16(b)); *see United States* v. *Bongiovanni*, 2023 WL 3723265, at *1-2 (W.D.N.Y. May 30, 2023) (Rule 12(c)) (two months to draft motion to suppress was "a reasonable amount of time after receiving the underlying search warrant application").[7]   In *Knoll, Inc.* v. *Moderno, Inc.*, 2012 WL 3613896 (S.D.N.Y. Aug. 22, 2012) (Hellerstein, J.), for example, the defendants (who were also counterclaimants) sought to amend their pleadings to incorporate "alleged tortious conduct" that "occurred after the [court-ordered] amendment deadline." *Id.* at *2.   This Court found "sufficient good cause" to amend under Rule 16(b) because the

---

[7]   *See, e.g.*, *Infinity Headwear & Apparel, LLC* v. *Jay Franco & Sons*, Inc., 2016 WL 5372843, at *5 (S.D.N.Y. Sept. 26, 2016) (plaintiff was diligent when it sought leave to amend within two months of discovering new information); *Soroof Trading Dev. Co.* v. *GE Microgen, Inc.*, 283 F.R.D. 142, 149 (S.D.N.Y. 2012) ("Soroof filed this motion less than two months later. Thus, Soroof moved with adequate dispatch in its quest to amend."); *Permatex, Inc.* v. *Loctite Corp.*, 2004 WL 1354253, at *3 (S.D.N.Y. June 17, 2004) (plaintiff sought leave to amend "less than two months" after learning new information in deposition); *SEC* v. *DCI Telecommunications, Inc.*, 207 F.R.D. 32, 34-35 (S.D.N.Y. 2002) (allowing amendment four months after plaintiff learned relevant supporting facts); *Scalia* v. *Sarene Servs., Inc.*, 740 F. Supp. 3d 251, 277 (E.D.N.Y. 2024) ("The Acting Secretary has demonstrated diligence in seeking leave to amend within less than two months of learning the [relevant] facts."); *Walsh* v. *Versa Cret Contracting Co., Inc.*, 2023 WL 3570699, at *5 (E.D.N.Y. May 18, 2023) (plaintiff acted with "diligence" when it requested leave to amend "about two months" after completing its investigation into basis for amendment); *Hernandez* v. *Immortal Rise, Inc.*, 2013 WL 1703529, at *4 (E.D.N.Y. Apr. 19, 2013) ("[P]laintiffs were sufficiently diligent when they requested leave to amend the complaint" "less than two months after they learned of Mercury's role; therefore, there was no undue delay."); *Enzymotec Ltd.* v. *NBTY, Inc.*, 754 F. Supp. 2d 527, 537 (E.D.N.Y. 2010) ("[F]iling a motion to amend within two months of acquiring the information is sufficient to show diligence."); *Boyd* v. *Pinnacle Athletic Campus, LLC*, 2022 WL 419348, at *4 (W.D.N.Y. Feb. 11, 2022) (delay of three months); *United States* v. *Eldridge*, 2014 WL 257224, at *2 (W.D.N.Y. Jan. 23, 2014) (three-and-a-half-month delay in filing motion for evidentiary hearing under Rule 12(c)); *Vanguard Dealer Servs., LLC* v. *Bottom Line Driven, LLC*, 2022 WL 1239951, at *3 (D. Conn. Apr. 27, 2022) (plaintiff acted with "diligence" when it moved to amend "just over two months after it became aware of the bases for its proposed amendment"); *Precision Trenchless, LLC* v. *Saertex multiCom LP*, 2022 WL 807052, at *2 (D. Conn. Mar. 16, 2022) ("just over two months" after "having learned of the bases for amendment"); *BBAM Aircraft Mgmt. LP* v. *Babcock & Brown LLC*, 2022 WL 3714597, at *4 (D. Conn. Aug. 29, 2022) ("BBAM has acted with diligence [in] mov[ing] to amend the complaint within two months after it had discovered" new information).

counterclaimants sought to amend "less than two months after the alleged tortious conduct" took place.  *Id*.  Similarly, in *EEOC* v. *Hillstone Rest. Grp., Inc.*, 346 F.R.D. 26, 32 (S.D.N.Y. 2024), the court held that a defendant had "acted with sufficient diligence" under Rule 16(b) when it sought leave to amend its answer "59 days" after it first "received the specific information relevant to its laches defense."

Under these precedents, President Trump acted with more than sufficient diligence and speed in seeking removal less than two months after the Supreme Court's decision in *Trump*.  That would have been true of any litigant in a typical case, and President Trump was no ordinary litigant. In the nearly two months between July 1 and August 29, 2024, he was in the final leg of a hotly contested presidential election that was repeatedly upended by shocking events, including President Trump being hit by an assassin's bullet and President Biden's exit from the race. Especially in light of those unique circumstances, there is no justification for fashioning an unwritten "good cause" deadline for President Trump that has not been applied to other litigants. That treatment would in fact run counter to the Supreme Court's repeated instruction to courts not to "frustrate[]" the goals of the federal-officer removal statute with a "narrow, grudging interpretation."  *Manypenny*, 451 U.S. at 242.

2.    The short window at issue here also caused no prejudice to either DANY or the New York courts, another "relevant factor[]" in assessing good cause.  *Kassner* v. *2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007) (interpreting Rule 16(b)); *see McGucken* v. *Content IQ LLC*, 2021 WL 5357473, at *1 (S.D.N.Y. Nov. 16, 2021) (Hellerstein, J.) ("District courts in this Circuit have held that they have discretion to grant" Rule 16(b) motions "even where the moving party has not shown diligence . . . where the amendment is not prejudicial.") (collecting cases).  The timing of President Trump's motion for leave did not prejudice DANY—a point

DANY has never contested.  It had no impact on the substantive issues in this case.  And it did not affect the state court proceedings in any respect.

Indeed, President Trump went out of his way here to *avoid* prejudicing the state trial court by giving that court a reasonable chance to address the impact of the Supreme Court's decision in *Trump*.  After all, that court had already considered the parties' (pre-*Trump*) briefing and arguments on Presidential evidentiary immunity, and was familiar with the contours and impact of the official-acts evidence that it had erroneously permitted to be introduced at trial.  President Trump thus filed a motion before the state trial court to set aside the jury's verdict in light of *Trump* on July 10, 2025, nine days after that decision came down.  ECF No. 47-17.  On August 5, the trial court informed the parties that it would decide President Trump's motion on September 16, only two days before the sentencing date of September 18, which the court warned would "remain[] unchanged."  ECF No. 45 at 23.  That warning strongly implied that the trial court would deny the motion.  President Trump then moved to adjourn at least the September 18 sentencing date to allow for sufficient time for an interlocutory appeal on immunity.  *Id.*  The court effectively denied that request on August 19.  *Id.* at 24.

It was only at that time—after the state court had all but rejected the immunity defense—that President Trump prepared his 60-page second removal notice, which he filed in this court ten days later.  If taking two months to seek removal is generally diligent regardless of the reason for the short delay, it is surely diligent where the delay was the result of accommodating the state court—especially where giving that court an opportunity to address a new federal defense undisputedly caused no prejudice to the prosecution and had no other effect on the litigation.  The fact that the removal notice was filed long before the twice-delayed sentencing date of September 18th makes any claim of prejudice impossible.

36

3.      The only prejudice at play here is that DANY has prevented President Trump from vindicating his statutory right to a federal forum by obscuring critical federal-law  aspects of its prosecution during the initial removal dispute in this case.  That too supports a finding of good cause.  *See* Op. 18 (noting that "good cause" is a "flexible standard that requires consideration of all interests in the particular case"); *McKay* v. *Triborough Bridge & Tunnel Auth*., 2007 WL 3275918, at *1 (S.D.N.Y. Nov. 5, 2007) ("in assessing good cause" under Rule 16(b), a court should also consider "bad faith *vel non*" of the opposing party).  For example, in *United States* v. *Elias*, a criminal defendant attempted to file an untimely motion to suppress evidence after his earlier, timely motion was denied as moot because the government "led the defense and the court to believe" that it would not introduce the evidence.  2022 WL 805334, at *4-5 (E.D.N.Y. Mar. 16, 2022).  The court found "good cause" "[g]iven the circumstances" for the defendant's motion, noting that it was "troubled by the government's representations in this case, which ha[d] been unfortunately imprecise."  *Id.* at *5.

DANY's representations to this Court in the initial remand proceedings in 2023 were more than "unfortunately imprecise."   DANY successfully urged this Court to remand President Trump's first removal notice by falsely claiming that (i) nothing about this prosecution "touche[d], relate[d] to," "[was] associated with, or ha[d] any other connection to" official Presidential acts, ECF No. 38 at 5; and (ii) that its "application" of N.Y. Election Law § 17-152 in this case would not "target campaign contributions and expenditures" and thus would not trigger FECA preemption.  ECF No. 43 at 23-24.  Both representations turned out to be false.  DANY made this case one "associated with" President Trump's conduct in office by relying heavily on evidence of his official acts, and its application of Section 17-152 in this case turned on alleged violations of

FECA.  The mismatch between DANY's earlier statements to thwart removal to federal court and its actions once the case was back in state court is itself a compelling ground for removal.

## CONCLUSION

For the foregoing reasons, the Court should grant President Trump's motion for leave to file his second removal notice.  The Court should then immediately adopt the state court judgment to enable President Trump to file a notice of appeal and seek reversal of the judgment in the Second Circuit.

Dated:  December 8, 2025

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*
Robert J. Giuffra, Jr.
Matthew A. Schwartz
James M. McDonald
Maxwell F. Gottschall
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  (212) 558-4000
giuffrar@sullcrom.com

Jeffrey B. Wall*
Morgan L. Ratner*
SULLIVAN & CROMWELL LLP
1700 New York Avenue, N.W.
Washington, DC  20006
Tel:  (202) 956-7000

*Counsel for President Donald J. Trump*

*\*pro hac vice*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of December, 2025, I electronically filed the foregoing Memorandum of Law, and the accompanying Declaration of Matthew A. Schwartz, with the Clerk of the Court using the CM/ECF system.  I certify that service will be accomplished by the CM/ECF system for all participants in this case who are registered CM/ECF users.

Respectfully submitted,

/s/ *Robert J. Giuffra, Jr.*

December 8, 2025