## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

THE PEOPLE OF THE STATE OF
NEW YORK,

               -against-

DONALD J. TRUMP,

                     Defendant.

No. 23 Civ. 3773 (AKH)

**ORAL ARGUMENT SCHEDULED
FOR FEB. 4, 2026**

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
## MOTION FOR LEAVE TO FILE SECOND NOTICE OF REMOVAL

# TABLE OF CONTENTS

**Page**

TABLE OF AFFIDAVITS AND EXHIBITS ................................................................. iv

TABLE OF AUTHORITIES ............................................................................ v

INTRODUCTION ...................................................................................... 1

QUESTIONS PRESENTED ............................................................................. 4

STATEMENT OF THE CASE ........................................................................... 5

    A.    The Charges in the Indictment .......................................................... 5

    B.    The First Removal Proceeding .......................................................... 6

    C.    The State Jury Trial and Defendant's Conviction ....................................... 8

    D.    *Trump v. United States* ................................................................ 10

    E.    Defendant's Post-Trial Motion to Vacate ............................................. 11

    F.    Defendant's Motion for Leave to File an Untimely, Second Notice of Removal ................................................................................ 13

    G.    Defendant Unsuccessfully Seeks to Stay Sentencing, and the Court Sentences Him on January 10, 2025 .................................................... 15

    H.    Defendant's Appeal to the Second Circuit ............................................. 15

    I.    Defendant's Direct Appeal to the Appellate Division, First Department ............................................................................... 16

POINT I ............................................................................................. 17

    DEFENDANT'S STRATEGIC DELAY AND THE LATE STAGE OF THIS PROCEEDING PRECLUDE ANY FINDING OF GOOD CAUSE FOR A SECOND, UNTIMELY NOTICE OF REMOVAL ............ 17

    A.    Defendant Failed to Act With Reasonable Diligence When He Repeatedly Chose to Litigate His Evidentiary Claim in State Court and Delayed Seeking Removal Until He Believed He Would Lose. ....... 17

    B.    Removal Based on Defendant's Preemption Claims Was Fully Litigated During the First Removal Proceeding, and There Is No Good Cause To Revisit That Issue. ........................................................... 22

    C.    The Late Stage of This Proceeding Also Weighs Heavily Against Removal. ..................................................................................................... 25

POINT II ...................................................................................................... 30

    LEAVE TO REMOVE SHOULD BE DENIED BECAUSE THIS PROSECUTION DOES NOT RELATE TO ANY ACT UNDER COLOR OF FEDERAL OFFICE AND DEFENDANT HAS NOT RAISED A COLORABLE FEDERAL DEFENSE .......................................... 30

    A.    Defendant's Falsification of Private Business Records to Conceal an Extramarital Affair Did Not Relate to Any Acts Under Color of the Presidency. ............................................................................................ 30

    B.    Defendant's Evidentiary Claim Is Not a "Defense." ................................ 36

    C.    Defendant's Evidentiary Claim Is Not "Colorable." ............................... 41

        1.    Defendant's Statements on Twitter ................................................. 43

        2.    Testimony by Hope Hicks ............................................................... 45

        3.    Michael Cohen's Testimony About FEC Investigations ............. 48

    D.    Defendant's Preemption Claim Is Not "Colorable." ............................... 49

POINT III .................................................................................................... 50

    DEFENDANT'S SENTENCING PRECLUDES REMOVAL ..................... 50

CONCLUSION ........................................................................................... 57

## TABLE OF AFFIDAVITS AND EXHIBITS

The following affidavits and exhibits accompany this motion:

Declaration of John T. Hughes, dated January 7, 2026 (appending exhibits).

Ex. A — Excerpts from the Trial Transcript in *People v. Trump*, N.Y. County Ind. No. 71543/2023 (Sup. Ct. N.Y. County 2024) (Juan Merchan, J.)

Ex. B — Letter Granting Adjournment of Sentencing in *People v. Trump*, Sept. 6, 2024

Ex. C — Decision and Order in *People v. Trump*, Nov. 22, 2024

Ex. D — *New York v. Trump*, Order Denying Stay, No. 24-2299 (2d Cir. Sept. 12, 2024)

Ex. E — *People v. Trump*, Order Denying Interim Stay, Ind. No. 71543-2023 (N.Y. App. Div. Jan. 8, 2025)

Ex. F — *Matter of Trump v. Merchan*, Letter Denying Stay Application (N.Y. Jan. 9, 2025)

Ex. G — Sentencing Transcript in *People v. Trump*, Jan. 10, 2025

Ex. H — Defendant's Notice of Appeal, *People v. Trump*, Jan. 29, 2025

Ex. I — Brief for Appellant, *People v. Trump*, Case No. 2025-00648 (N.Y. App. Div. Oct. 27, 2025)

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Allen v. McCurry*, 449 U.S. 90 (1980) ................................................................. 50

*Arizona v. Folio*, No. CR-19-08056-001-PCT-DJH,
2019 WL 1643720 (D. Ariz. Apr. 16, 2019) .................................................. 53

*Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023) ........................................ 43, 46

*Carroll v. Trump*, 66 F.4th 91 (2d Cir. 2023) ................................................... 28

*Cullen v. Fliegner*, 18 F.3d 96 (2d Cir. 1994) ................................................... 21

*D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462 (1983) ....................................... 21

*FDIC v. Keating*, 12 F.3d 314 (1st Cir. 1993) ................................................... 54

*Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197 (1982) ........................ 49

*Georgia v. Meadows*, 692 F. Supp. 3d 1334 (N.D. Ga. 2023) ............................................. 26

*Harris v. U.S. Department of Transportation FMCSA*, 122 F.4th 418 (D.C. Cir. 2024)..... 54

*Hawaii v. Thronas-Kahoonei*, No. CV 19-00683 JAO-KJM,
2020 WL 118251 (D. Haw. Jan. 10, 2020) ................................................. 53

*Hughes v. UPS Supply Chain Solutions, Inc.*, 815 F. Supp. 2d 993 (W.D. Ky. 2011) ........ 20

*In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 488 F.3d 112 (2d Cir. 2007).............. 50

*In re Meyerland Co.*, 960 F.2d 512 (5th Cir. 1992) ................................................. 54

*In re Savers Fed. Sav. & Loan Assoc.*, 872 F.2d 963 (11th Cir. 1989) ................................. 54

*Jefferson County v. Acker*, 527 U.S. 423 (1999) ....................................................... 33

*Johnson v. Washington*, No. C07-0696-MJP,
2007 WL 2377141 (W.D. Wash. Aug. 15, 2007) .......................................... 53

*K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503 (D.C. Cir. 2020) ........................ 33

*Mach v. Triple D Supply, LLC*, 773 F. Supp. 2d 1018 (D.N.M. 2011)............................... 20

*Maryland v. Soper (No. 1)*, 270 U.S. 9 (1926) ................................................. 31, 33

*Miller v. Louisiana*, No. 18-14251,
    2019 WL 1293273 (E.D. La. Mar. 1, 2019) .................................................. 20

*Missouri v. Pate*, No. 4:24-CV-01728-MTS,
    2025 WL 104174 (E.D. Mo. Jan. 15, 2025) ................................................ 26

*New York v. Tanella*, 239 F. Supp. 2d 291 (E.D.N.Y. 2003) ............................... 37

*New York v. Trump*, 158 F.4th 458 (2d Cir. 2025) .... 1, 4, 15-17, 19, 22, 26, 30, 33, 50-51

*New York v. Trump*, 683 F. Supp. 3d 334 (S.D.N.Y. 2023) .... 1, 6-8, 12, 18-19, 36, 44, 47

*Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*,
    865 F.3d 181 (4th Cir. 2017) .......................................................... 2, 20

*Pennsylvania v. Maggitti*, No. 24-1702,
    2025 WL 869493 (3d Cir. Mar. 20, 2025) ................................................ 53

*People v. Trump*, No. 23-1085,
    2023 WL 9380793 (2d Cir. 2023) ...................................................... 8-9, 15

*Renteria v. Lumpkin*, No. 23-70007,
    2023 WL 7649071 (5th Cir. 2023) ....................................................... 55

*Rose v. Clark*, 478 U.S. 570 (1986) ........................................................ 40

*Rosenthal v. Coates*, 148 U.S. 142 (1893) ................................................. 20

*Russello v. United States*, 464 U.S. 16 (1983) ............................................. 52

*Thompson v. Trump*, 590 F. Supp. 3d 46 (D.D.C. 2022),
    *aff'd sub nom. Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023) ................. 47

*Torres v. CBS News*, 854 F. Supp. 245 (S.D.N.Y. 1994) .................................... 37

*Trump v. New York*, 145 S. Ct. 1038 (2025) .......................................... 15, 27, 56

*Trump v. United States*, 603 U.S. 593 (2024) ........................................... *passim*

*United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973) ...................................... 41

*United States v. Johnson*, 383 U.S. 169 (1966) ........................................... 41

*United States v. Kelly*, 128 F.4th 387 (2d Cir. 2025) ....................................... 16

*United States v. Marcus*, 560 U.S. 258 (2010) ....................................................... 40

*Whitley v. Ercole*, 642 F.3d 278 (2d Cir. 2011) ................................................... 27

*Willingham v. Morgan*, 395 U.S. 402 (1969) ....................................................... 30

*Wong v. Doar*, 571 F.3d 247 (2d Cir. 2009) ........................................................ 52

### STATE CASES

*Matter of Trump v. Merchan*, 227 A.D.3d 569 (N.Y. App. Div. 2024) ............................. 28

*People v. Afflick*, 234 A.D.3d 501 (N.Y. App. Div. 2025) ....................................... 55

*People v. Machado*, 90 N.Y.2d 187 (1997) ....................................................... 55

*People v. Seignious*, 41 N.Y.3d 505 (2024) ..................................................... 25

*People v. Trump*, 86 Misc.3d 810 (Sup. Ct. N.Y. County 2024) ...................................*passim*

### FEDERAL STATUTES

18 U.S.C. § 6002 .............................................................................. 37

28 U.S.C. § 1292(b) .......................................................................... 52

28 U.S.C. § 1404 ............................................................................. 52

28 U.S.C. § 1442(a)(1) ...................................................................1, 6, 30

28 U.S.C. § 1446 ............................................................................. 53

28 U.S.C. § 1446(d) .......................................................................... 51

28 U.S.C. § 1447(d) .......................................................................... 52

28 U.S.C. § 1450 ............................................................................. 52

28 U.S.C. § 1455(b)(1) ..................................................................13, 19, 33

28 U.S.C. § 1455(b)(2) .....................................................................13, 22

28 U.S.C. § 1455(b)(4) ....................................................................... 52

28 U.S.C. § 1455(b)(5) ....................................................................... 52

28 U.S.C. § 2112(a)(4) ................................................................................ 52

28 U.S.C. § 2112(a)(5) ................................................................................ 52

28 U.S.C. § 2241(b) .................................................................................... 52

28 U.S.C. § 2241(d) .................................................................................... 52

52 U.S.C. § 30107(a)(6) .............................................................................. 49

52 U.S.C. § 30107(e) ................................................................................... 49

Federal Election Campaign Act .............................................. 8, 22-25, 27, 49

## STATE STATUTES

N.Y. CPL 1.20(15) .................................................................................. 15, 50

N.Y. CPL 1.20(16) .................................................................................. 15, 50

N.Y. CPL 245.10(1) ...................................................................................... 54

N.Y. CPL 255.20(1) ...................................................................................... 54

N.Y. CPL 330.30 ........................................................................................... 54

N.Y. CPL 330.30(1) ...................................................................... 11-12, 27, 38, 42

N.Y. CPL 390.20(1) ...................................................................................... 54

N.Y. Election Law § 17-152 ........................................... 23-24, 26-27, 50, 56

N.Y. Penal Law § 175.05 .............................................................................. 23

N.Y. Penal Law § 175.10 ........................................................ 5, 8, 23-24, 27, 49

## OTHER AUTHORITIES

Black's Law Dictionary (12th ed. 2024) ....................................................... 37

## INTRODUCTION

In 2023, this Court held that defendant Donald J. Trump was not entitled to remove his New York criminal prosecution to federal court under the federal-officer removal statute, 28 U.S.C. § 1442(a)(1), because the state criminal charges against him for falsifying business records were based on wholly private, unofficial conduct and because defendant's proffered federal defenses of presidential immunity and federal preemption were not colorable. *New York v. Trump*, 683 F. Supp. 3d 334, 343-346 (S.D.N.Y. 2023). More than two years later—after being convicted and sentenced, and after initiating his direct appeal in state court—defendant now seeks leave to file a second, untimely notice of removal. Time has not improved defendant's arguments. This Court already found no good cause for defendant to remove this case a second time. It should reach the same conclusion again under the criteria recently outlined by the Second Circuit. *See New York v. Trump*, 158 F.4th 458 (2d Cir. 2025).

First, defendant's lack of reasonable diligence and the extremely late stage of this criminal proceeding weigh heavily against a finding of good cause. Notices of removal must ordinarily be filed within thirty days of arraignment, at the very outset of the state criminal proceeding. But defendant did not move for leave to file a second removal notice until sixteen months after the original deadline, and three months after he had already been convicted.

Defendant cannot excuse his delay by pointing to the Supreme Court's ruling in *Trump v. United States*, 603 U.S. 593 (2024), about the inadmissibility of certain evidence

of a President's official acts. In a pretrial motion filed in state court months before that decision was issued, defendant had already asserted his current claim about the inadmissibility of such evidence—yet he still chose to wait six months before raising that claim as a basis for a second notice of removal. Even after the Supreme Court issued its ruling, defendant waited two months before seeking leave from this Court. And, as defendant conceded at the Second Circuit, he chose to wait, not because he was unable to file his motion sooner, but because he wished to first see if the state court would rule in his favor on this evidentiary claim. Defendant thus engaged in improper "strategic delay . . . in an effort to determine the state court's receptivity to his litigating position." *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 865 F.3d 181, 187 (4th Cir. 2017). That strategic delay precludes any finding of good cause.

The advanced stage of the state proceedings similarly weighs against a finding of good cause. As a matter of state law, the criminal action here terminated with defendant's sentencing nearly a year ago. Removal at this late stage would disrupt a pending state-court appeal and introduce numerous logistical complexities that would be a barrier to merits review of defendant's appellate claims. There is also no pressing need for removal because the state appellate courts—and ultimately the Supreme Court—are perfectly capable of adjudicating his federal claims, and because, as defendant's already-filed appellate brief makes clear, he raises numerous state-law challenges to his conviction, including several that are intertwined with his federal claims.

Second, this Court should also deny leave because the case does not meet the standards for federal-officer removal. As this Court has already held, and defendant does not contest, the state criminal charges were based on entirely private conduct rather than any acts under color of the Presidency. The Second Circuit has now confirmed that federal-officer removal requires a connection between the charged criminal conduct and an act under color of office, and there was no such connection here. Defendant nonetheless insists that he can seek removal because the People purportedly introduced evidence of "official acts" from defendant's time as President. In fact, no such official-acts evidence was introduced, as the state trial court correctly found. More fundamentally, however, defendant's argument ignores the removal statute's critical focus on *charges* based on official acts instead of mere *evidence* of such acts. The mere introduction of evidence, even assuming that it described official presidential acts, does not transform the nature of state charges that are based on wholly unofficial conduct.

This state prosecution also cannot be removed because defendant's evidentiary claim based on *Trump v. United States* is not a "defense" at all. The effect of the claim would simply be to exclude certain evidence, not to dismiss or reduce any of the state charges. Moreover, as the state trial court has already found, defendant's guilt was overwhelmingly proven even without considering any of the contested evidence—meaning that his evidentiary claim would not be a defense to his guilt anyway. Defendant's claim is also not "colorable" because—as the state trial court also found—

none of the trial evidence contravened the evidentiary rule that the Supreme Court announced in *Trump v. United States*. That decision found inadmissible only evidence of a President's official immunized acts, but all of the contested evidence concerned the unofficial conduct of paying hush money to an adult film star that this Court already found had nothing to do with official presidential duties. As for defendant's preemption claim, this Court already found those meritless claims to be not colorable, and nothing that has happened in the interim justifies revisiting that conclusion.

Finally, defendant's sentencing and the end of the state trial proceedings rendered this case unremovable as a statutory matter. As the Second Circuit has now made clear, "statutory procedures for removal are to be strictly construed," and "respect for the limited jurisdiction of the federal courts and the rights of states" compels the resolution of any interpretive doubts "against removability." *New York v. Trump*, 158 F.4th at 465. Here, the removal statute does not contemplate, provide procedures for, or authorize the removal of state criminal matters after sentencing, and defendant cannot identify a single example of a post-sentencing state criminal appeal ever being removed to federal court.

## QUESTIONS PRESENTED

1.      Whether defendant's strategic delay and the late stage of this criminal proceeding preclude a finding of good cause to file a second, untimely notice of removal?

2.      Whether defendant has identified a basis for federal-officer removal when (a) the state criminal charges indisputably arose from wholly unofficial conduct, (b) defendant's evidentiary claim based on *Trump v. United States* is neither a defense to those charges nor a colorable claim, and (c) defendant's federal-preemption claim remains meritless?

3.      Whether federal-officer removal is available at all after a state criminal defendant has been sentenced and the criminal action has thereby been terminated?

## STATEMENT OF THE CASE

### A. The Charges in the Indictment

On March 30, 2023, a New York County grand jury charged defendant with 34 felony counts of Falsifying Business Records in the First Degree, in violation of N.Y. Penal Law § 175.10. ECF 1-1. That provision makes it a felony for any person to make or cause a false entry in the business records of an enterprise with an intent to defraud that includes an intent "to commit another crime or to aid or conceal the commission thereof." Penal Law § 175.10.

With the Indictment, the People filed a Statement of Facts outlining the allegations that formed the basis for the charges against defendant. ECF 1-1 (Def. Ex. E at 1). The Statement alleged that defendant and his coconspirators orchestrated a scheme to interfere with the 2016 U.S. presidential election by suppressing negative information that could damage defendant's presidential campaign. *Id.* at 1. They executed the scheme through a variety of means, including by purchasing the rights to,

and then refusing to publish, a story about an extramarital affair between defendant and Stormy Daniels, an adult film actress. *Id.* at 3-7. To effect this catch-and-kill scheme, defendant's personal attorney, Michael Cohen, paid $130,000 to acquire the publication rights to Daniels' story, and defendant reimbursed Cohen an amount calculated to mask the true nature of the reimbursement. *Id.* at 7-8. Defendant then concealed the reimbursement payments to Cohen by falsely recording them in the records of a New York enterprise as attorneys' fees paid to Cohen for services rendered pursuant to a retainer agreement. *Id.* at 8-10. The characterization of those payments in these records was false because the payments to Cohen were to reimburse him for the payments he made to Daniels, not to pay him for legal services rendered pursuant to a retainer agreement. *Id.*

### B. The First Removal Proceeding

Defendant was arraigned in state court on April 4, 2023. On May 4, 2023, he filed a notice of removal in this Court under the federal-officer removal statute, which allows state criminal proceedings against an "officer" of the United States to be removed to federal district court if the prosecution is "for or relating to any act under color of such [federal] office," 28 U.S.C. § 1442(a)(1), and the defendant has a colorable federal defense. ECF 1. After an evidentiary hearing, this Court issued an order remanding the case to state court because defendant had failed to satisfy the prerequisites for federal-officer removal. *New York v. Trump*, 683 F. Supp. 3d at 337.

First, this Court concluded that the charges against defendant were not "for or relat[ed] to" any act defendant had taken under color of the office of the President. *Id.* at 343-346. This Court credited the hearing evidence "strongly supporting" the People's allegation that the payments to Cohen were reimbursements for the payments he made to Daniels rather than attorneys' fees for legal services rendered. *Id.* at 344. This Court further found that the evidence "overwhelmingly suggests that the matter was a purely … personal item of the President—a cover-up of an embarrassing event." *Id.* at 345. "Hush money paid to an adult film star is not related to a President's official acts" and "does not reflect in any way the color of the President's official duties." *Id.*

Indeed, this Court found that the payments would amount to private and unofficial conduct even if they were attorneys' fees. As the hearing evidence established, defendant hired Cohen to "attend to his private matters"; the payments to Cohen were made from "private funds" that did not "depend on any Presidential power for their authorization"; and the documents recording those payments were maintained by "a private enterprise." *Id.* Thus, this Court concluded that the charges were based on defendant's "private acts," not "acts under the color of his office." *Id.*

Second, this Court concluded that defendant had failed to identify a colorable federal defense. With regard to presidential immunity, this Court explained that defendant had "expressly waived" any defense of "absolute presidential immunity," and that defendant had instead asserted that he was immune because the charges were based on the official acts he took as President of the United States. *Id.* at 346-347. This defense

was not colorable as a factual matter, this Court ruled, because there was "[n]o evidence" that the reimbursements to Cohen constituted an official presidential act. *Id.* There was also no colorable preemption defense: defendant conceded that the Federal Election Campaign Act ("FECA") did not directly preempt Penal Law § 175.10, and this Court rejected defendant's claim that FECA indirectly preempted Penal Law § 175.10 by preempting the crimes that defendant sought to commit or conceal by making the false business records. *Id.* at 347-350.

Defendant filed a notice of appeal from this Court's remand decision but later moved to dismiss his appeal; the Second Circuit granted that motion and dismissed the appeal. *People v. Trump*, No. 23-1085, 2023 WL 9380793 (2d Cir. 2023).

### C. The State Jury Trial and Defendant's Conviction

In state court, the parties engaged in extensive pretrial motion practice. Among other issues, on March 7, 2024, defendant filed a motion seeking "to preclude evidence of President Trump's official acts at trial based on presidential immunity." ECF 47-9 at 1. The prospective evidence discussed in the motion included Hope Hicks's conversations with defendant while she was acting as Communications Director and Counselor to the President; Michael Cohen's conversations with defendant while he was President; and defendant's "social media posts and public statements" while in the White House, including his Twitter posts. ECF 47-9 at 4, 22-23; *People v. Trump*, 86 Misc.3d 810, 823 n.9 (Sup. Ct. N.Y. County 2024). Defendant's motion identified the then-pending Supreme Court case of *Trump v. United States* as relevant to his evidentiary

claims and asked the state court to adjourn the trial until after the Supreme Court issued a decision. ECF 47-9 at 18-19. The state court denied defendant's motion as untimely— thus "declin[ing] to consider whether the doctrine of presidential immunity precludes the introduction of evidence of purported official presidential acts in a criminal proceeding" (ECF 47-11)—but instructed defendant to "wait until trial" to "make [his] objections" and informed him that the court would "decide [the issue] at the time of trial when the objection is made." Ex. A at 802:15-19 (excerpts from *People v. Trump* trial transcript).

On April 15, 2024, defendant's trial commenced with jury selection. *People v. Trump*, 86 Misc.3d at 811. During trial, defendant raised an objection to testimony about purportedly official acts only twice. First, prior to Hope Hicks's testimony, defendant raised an "objection on Presidential immunity grounds" to "testimony from Ms. Hicks related to statements by [defendant] while he was President of the United States." Ex. A at 2121:10-13. Second, when the People sought to introduce defendant's OGE Form 278e (ECF 47-32), defendant objected that this document reflected "an official act that should not come into evidence at the trial." Ex. A. at 2369:21-2370:1.[1] The state court overruled those objections. By contrast, defendant raised no objection based on official-acts immunity to testimony from Madeleine Westerhout or from Michael Cohen.

---

[1] Defendant no longer raises any evidentiary objection to the introduction of OGE Form 278e.

On May 30, 2024, the jury unanimously found defendant guilty of all 34 felony counts. *People v. Trump,* 86 Misc.3d at 811. Defendant's sentencing was originally scheduled for July 11, 2024. *Id.*

### D. *Trump v. United States*

On July 1, 2024—after the jury verdict, but before defendant's scheduled sentencing—the Supreme Court decided *Trump v. United States*, which addressed the scope of presidential immunity from criminal prosecution for a President's official acts committed during his tenure as President. 603 U.S. at 601-602. The Supreme Court held that the President is at least presumptively immune for "acts within the outer perimeter of his official responsibility," and that he "is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority." *Id.* at 609, 614-615. However, the Court confirmed that the "President enjoys no immunity for his unofficial acts, and not everything the President does is official." *Id.* at 642.

Separately, the Supreme Court held that certain evidence relating to a President's official acts may be inadmissible at trial, even as to charges based on unofficial conduct. *Id.* at 630-632. In particular, the Court concluded that prosecutors could "point to the public record to show the fact that the President performed [an] official act," but they could not "admit testimony or private records of the President or his advisers probing the official act itself" because allowing "that sort of evidence would invite the jury to inspect the President's motivations for his official actions and to second-guess their propriety." *Id.* at 632 n.3.

10

### E. Defendant's Post-Trial Motion to Vacate

On July 1, 2024—the same day the Supreme Court decided *Trump v. United States*—defendant requested the trial court's permission to file a post-trial motion to dismiss the indictment and vacate the jury's verdict pursuant to N.Y. Criminal Procedure Law ("CPL") 330.30(1), which the trial court granted. ECF 47-15, 47-16. The trial court set a briefing schedule for that motion and adjourned defendant's sentencing—"if such is still necessary"—to September 18, 2024. ECF 47-16.

On July 10, 2024, defendant filed his CPL 330.30(1) motion, which included a 52-page memorandum of law. ECF 47-17. In that motion, defendant argued that the People had improperly introduced evidence of official presidential acts in violation of *Trump v. United States*. As relevant here, defendant's claim pertained to certain testimony by three witnesses: Hope Hicks, Michael Cohen, and Madeleine Westerhout. His claim also related to his postings on social media. ECF 47-17. The People opposed the motion. ECF 47-18. On July 31, 2024, defendant filed a 20-page reply. ECF 47-19.

On August 5, 2024, the trial court indicated it would issue its decision on the CPL 330.30(1) motion by September 16 and reiterated that the sentencing was scheduled for September 18. ECF 47-27. However, on September 6, 2024, the trial court granted defendant's motion to adjourn sentencing until after the presidential election to "avoid any appearance—however unwarranted—that the proceeding has been affected by or seeks to affect the approaching Presidential election in which the Defendant is a candidate." Ex. B (Sept. 6, 2024 letter). The trial court ultimately stayed

decision on defendant's CPL 330.30(1) application in light of other motion practice. Ex. C (Nov. 22, 2024 decision and order).

On December 16, 2024, the trial court denied defendant's CPL 330.30(1) motion. *People v. Trump*, 86 Misc.3d at 857-858. As an initial matter, the court found that defendant had failed to preserve his objections based on official acts to any of the challenged evidence except testimony about certain conversations between Hope Hicks and defendant and four tweets from defendant referencing Michael Cohen. *Id.* at 821-828. In any event, on the merits, the court found that none of the disputed proof constituted a "core official act," nor did any of it "fall within the outer perimeter" of defendant's "official duties" under *Trump v. United States. Id.* at 828-851. In the alternative, the court found that even if defendant's Tweets, or certain communications testified to by Westerhout, Hicks, or Cohen, fell within the "outer perimeter" of defendant's presidential authority, "other, non-privileged trial testimony provided ample non-motive related context and support to rebut a presumption of privilege" and to demonstrate "that Defendant was acting in his personal capacity and not pursuant to his authority as President." *Id.* Similarly, this evidence posed "no danger of intrusion on the authority and function of the Executive Branch." *Id.*

Finally, the court ruled that even if any of the disputed evidence amounted to proof of "official acts under the auspices of the *Trump* decision," the court would still deny defendant's motion because any error was "harmless in light of the overwhelming evidence of guilt" from the extensive "evidence the jury heard and considered, separate

and apart from that evidence and select testimony which Defendant challenges on Presidential immunity grounds." *Id.* at 852, 855.

### F. Defendant's Motion for Leave to File an Untimely, Second Notice of Removal

Under 28 U.S.C. § 1455(b)(1), a "notice of removal of a criminal prosecution shall be filed not later than 30 days after the arraignment in the State court . . . except that for good cause shown the United States district court may enter an order granting the defendant . . . leave to file the notice at a later time." Likewise, "a second notice [of removal] may be filed only on grounds not existing at the time of the original notice," but a district court "may grant relief" from this limitation "[f]or good cause shown." *Id.* § 1455(b)(2).

On August 29, 2024—several weeks after the state trial court indicated that it would proceed with sentencing on September 18 after issuing a decision on defendant's immunity motion on September 16—defendant purported to file a second notice of removal with this Court, relying again on federal-officer removal. ECF 46. This Court rejected that filing, noting that the "Court's leave ha[d] not been granted" for an untimely, second notice of removal under 28 U.S.C. § 1455(b)(1)-(2), and that "the order granting permission to file the pleading was not attached" to the removal notice. ECF 46.

Five days later, on September 3, 2024, defendant filed a motion for leave to file a second notice of removal. ECF 48. This motion was thus filed sixteen months after

§ 1455(b)(1)'s deadline for a timely notice of removal; almost six months after defendant first objected to the introduction of evidence of purportedly official acts in a pretrial motion; three months after the jury found defendant guilty on all charges; and two months after the Supreme Court issued its decision in *Trump v. United States*; and nearly two months after defendant had asked the state court to dismiss his criminal charges due to the Supreme Court's decision. In his motion, defendant argued that the Supreme Court's intervening decision in *Trump v. United States* supplied good cause for the second, untimely notice of removal, and that events that occurred at trial—including the evidence that the People had presented and their theory of the case—were changed circumstances that also supplied good cause for defendant's late filing. ECF 49.

This Court denied the motion. ECF 50. The Court found that *Trump v. United States* had not altered or affected the court's "previous conclusion that the hush money payments were private, unofficial acts, outside the bounds of executive authority." *Id.* at 3. This Court thus concluded that "[g]ood cause has not been shown, and leave to remove the case is not granted." *Id.* at 4.

Defendant filed a notice of appeal and moved this Court to stay its decision denying leave. ECF 51-53. On September 6, 2024, this Court denied defendant's stay application. ECF 54. Defendant also sought a stay from the Second Circuit, which denied that application on September 12, 2024. Ex. D (order denying stay).

### G. Defendant Unsuccessfully Seeks to Stay Sentencing, and the Court Sentences Him on January 10, 2025.

On November 5, 2024, defendant was reelected as President of the United States. In the week leading up to his sentencing on January 10, 2025, defendant filed applications to stay his sentencing with the Appellate Division, First Department; the New York Court of Appeals; and the U.S. Supreme Court. All those courts rejected defendant's stay applications. Exs. E (Appellate Division order denying stay), F (New York Court of Appeals order denying stay); *Trump v. New York*, 145 S. Ct. 1038 (2025). When the Supreme Court denied defendant's stay request, it noted that "the alleged evidentiary violations … can be addressed in the ordinary course on appeal." *Id.*

On January 10, 2025, the trial court sentenced defendant to an unconditional discharge, thereby concluding the state criminal action. Ex. G (*People v. Trump* sentencing transcript). *See* CPL 1.20(15), (16).

### H. Defendant's Appeal to the Second Circuit

Defendant appealed this Court's order denying leave to file a second, untimely notice of removal. On November 6, 2025, the Second Circuit vacated this Court's order and remanded for reconsideration of the motion consistent with its opinion. *New York v. Trump*, 158 F.4th at 461. The Second Circuit instructed that on remand, this Court "should consider the factors relevant to determining good cause." *Id.* at 469. Those factors included (a) "reviewing the three categories of evidence that [defendant] claims relate to official acts"—specifically, certain testimony from Hope Hicks and Michael

Cohen, and defendant's social media posts on Twitter—to "determin[e] whether in fact the State's use of such evidence means that his prosecution relates to acts taken under color of the Presidency as contemplated by *Trump v. United States*," *id.* at 467, 469; (b) evaluating "both whether [defendant] has a colorable federal defense and whether he diligently sought removal," *id.* at 469; and (c) determining "whether removal under § 1442(a)(1) and § 1455(b)(1) is even available at this stage of the state court proceedings," *id.* Beyond these identified factors, the Second Circuit emphasized that good cause "reflects 'a flexible standard that requires consideration of all interests in the particular case.'" *Id.* at 466 (quoting *United States v. Kelly*, 128 F.4th 387, 420 (2d Cir. 2025)).

## I. Defendant's Direct Appeal to the Appellate Division, First Department

On January 29, 2025, defendant filed a notice of appeal in state court from the judgment of conviction. Ex. H (Notice of Appeal). On October 27, 2025, defendant perfected his direct appeal to the Appellate Division, First Department. Ex. I (Brief for Appellant). Defendant's direct appeal is currently scheduled to be heard by the Appellate Division during its forthcoming March 2026 term.

## POINT I

## DEFENDANT'S STRATEGIC DELAY AND THE LATE STAGE OF THIS PROCEEDING PRECLUDE ANY FINDING OF GOOD CAUSE FOR A SECOND, UNTIMELY NOTICE OF REMOVAL

The good-cause factors that the Second Circuit has asked this Court to consider include "whether [defendant] diligently sought removal" and any other "interests in the particular case." *New York v. Trump*, 158 F.4th at 466, 469. Here, those factors weigh decisively against any finding of good cause, regardless of the nature of defendant's current claims.

### A. Defendant Failed to Act With Reasonable Diligence When He Repeatedly Chose to Litigate His Evidentiary Claim in State Court and Delayed Seeking Removal Until He Believed He Would Lose.

To establish good cause for an untimely notice of removal, defendant must show both that "circumstances outside of his control, including new grounds for removal that could not reasonably have been raised" earlier "prevented him from timely seeking relief"; and second, that "he acted with reasonable diligence and without undue delay to remove the case." *Id.* at 466. Here, defendant cannot establish good cause under these factors because of his concededly strategic delays.

As an initial matter, defendant asserts that he could not have raised his current "federal defense of Presidential evidentiary immunity" before trial because the Supreme Court did not decide *Trump v. United States* until after his conviction. Defendant's Memorandum of Law ("Def. Mem."), ECF 69 at 31. That claim is belied by the fact

17

that defendant actually *did* raise this evidentiary claim more than a month before the start of the trial: on March 7, 2024, defendant filed a pretrial motion seeking "to preclude evidence of President Trump's official acts at trial based on presidential immunity," ECF 47-9 at 1, and identified the same categories of evidence that are the subject of his current motion. *People v. Trump*, 86 Misc.3d at 823 n.9. Defendant thus knew enough about the evidence to be presented at trial to raise the same evidentiary claim based on presidential immunity that he raises now—yet he chose not to seek leave to remove at that time, and instead deliberately submitted the evidentiary claim to the state court and decided to proceed with the state jury trial.

The fact that the Supreme Court had not yet issued its decision in *Trump v. United States* did not excuse defendant's delay in seeking removal on the evidentiary issue. Indeed, under similar circumstances, a district court has held that there was not good cause for just a 48-day delay in filing a notice of removal—let alone the delay of nearly six months that is at issue here. In *Arizona v. Meadows*, defendant Mark Meadows sought to remove a state-court prosecution for attempting to illegally overturn the results of the 2020 presidential election in Arizona, but he did not file his notice of removal until 48 days after his arraignment in order to "await[ ] the United States Supreme Court's decision in *Trump*." No. 24-02063, 2024 WL 4198384, at *4 (D. Ariz. Sept. 16, 2024). The district court found no good cause for this delay: regardless of whether "the Supreme Court's holding in *Trump* . . . strengthen[ed] Mr. Meadow's claim," "he was aware of [the] existence" of an immunity defense much earlier because "he in fact

contemplated raising immunity before the opinion in *Trump* issued." *Id.* So too here: defendant plainly was aware of his evidentiary claim as early as March 7, 2024, and in fact raised it in the state-court proceeding before trial. His "voluntary delay" in seeking federal removal based on that claim thus "cannot constitute good cause under § 1455(b)(1)." *Id.*

In any event, even assuming that defendant could be excused from seeking removal until after the Supreme Court decided *Trump v. United States*, defendant still did not act with reasonable diligence because he waited more than two months after that decision was issued on July 1 to file his initial motion for leave in this proceeding—and did so for concededly strategic reasons. Given that more than a year had already elapsed from the deadline specified in 28 U.S.C. § 1455(b)(1), defendant should have filed his motion promptly after the Supreme Court's ruling. There was no barrier to doing so: during oral argument before the Second Circuit, defendant acknowledged that "he could have sought removal immediately following the Supreme Court's decision." *New York v. Trump*, 158 F.4th at 468. But defendant deliberately chose not to because he sought first to have the state court judge dismiss the criminal case on the basis of *Trump v. United States*. As defendant admitted, it was "only after the state trial court suggested that it was likely to reject [the] immunity argument and proceed to sentencing" that defendant "sought removal to federal court" for the second time. *Id.*

Defendant's deliberate strategic decision to present his evidentiary claim based on *Trump v. United States* to the state court in the first instance weighs heavily against

19

any finding of good cause here. The purpose of removal is to make a *threshold* choice about the forum to resolve federal defenses—not to serve as a form of pseudo-interlocutory federal appeal of a state court's initial adverse rulings. *See Rosenthal v. Coates*, 148 U.S. 142, 147 (1893) (the removal statutes "do not contemplate that a party may experiment on his case in state court, and, upon an adverse decision, then transfer it to the Federal court"); *Miller v. Louisiana*, No. 18-14251, 2019 WL 1293273, at *2 (E.D. La. Mar. 1, 2019), *report and recommendation adopted*, 2019 WL 1277522 (E.D. La. Mar. 20, 2019). As defendant himself notes, the "whole point of federal-officer removal is that a federal court, not a state court, should be adjudicating" the relevant federal defense in the first instance. Def. Mem. at 16. Here, however, rather than seeking an *alternative* forum, defendant instead delayed filing his motion so he could take two bites at the apple on his evidentiary claim: one in state court, and a second in federal court.

Under similar circumstances, federal courts have found that civil defendants have affirmatively waived their "right to removal by demonstrating a 'clear and unequivocal' intent to remain in state court," such as by "engaging in 'substantial defensive action' in state court before filing a notice of removal." *Northrop*, 865 F.3d at 186; *Mach v. Triple D Supply, LLC*, 773 F. Supp. 2d 1018, 1033-1034 (D.N.M. 2011); *Hughes v. UPS Supply Chain Solutions, Inc.*, 815 F. Supp. 2d 993, 997-998 (W.D. Ky. 2011). Courts have found waiver from such strategic choices because the "removal rules do not permit . . . strategic delay interposed by a defendant in an effort to determine the state court's receptivity to his litigating position." *Northrop*, 865 F.3d at 186 (internal quotation marks

omitted). This same reasoning would support a finding of no good cause here: defendant chose to test the waters in state court—both before and after the Supreme Court's decision—and sought to file his second, untimely notice of removal only after realizing that he was about to lose in state court.

Defendant bizarrely claims that his choice to litigate the evidentiary claim in state court and to delay seeking removal was an attempt "to *avoid* prejudicing the state trial court." Def. Mem. at 36. But the upshot of defendant's strategy was to treat the state court's disposition of his claim as meaningful only if the court ruled in his favor—and to run to federal court the moment that "the state court had all but rejected the immunity defense." *Id.* That lack of respect for the state court's careful consideration of defendant's legal arguments ignored "the premise that ordinarily a state proceeding provides an adequate forum for the vindication of federal constitutional rights," *Cullen v. Fliegner*, 18 F.3d 96, 103 (2d Cir. 1994), and improperly treated the state court as merely a stepping-stone to federal-court review, *contra D.C. Ct. of Appeals v. Feldman*, 460 U.S. 462, 482 (1983) ("a United States District Court has no authority to review final judgments of a state court").

Defendant cannot credibly claim that there was any other reason to delay seeking removal until two months after the Supreme Court's ruling. Although defendant now asserts that "he was in the final leg of a hotly contested presidential election" (Def. Mem. at 35), his legal team was perfectly capable of filing extensive papers during that time, including a 52-page memorandum of law on the import of *Trump v. United States*

just 10 days after the Supreme Court issued its opinion, ECF 47-17; a 20-page reply on the same subject on July 31, 2024, ECF 47-19; a motion to recuse on July 31, 2024, ECF 47-25; and, on August 14, 2024, a motion to adjourn sentencing, ECF 47-29. There was thus plainly no practical barrier to defendant filing legal papers promptly after the Supreme Court's decision, including on the impact of that ruling. Instead, defendant's delay in seeking removal reflected a deliberate choice to focus on litigating in the state trial court first—a strategy that precludes a finding of good cause.

### B. Removal Based on Defendant's Preemption Claims Was Fully Litigated During the First Removal Proceeding, and There Is No Good Cause To Revisit That Issue.

Defendant also asserts that there is good cause to remove based on his second federal defense of FECA preemption, Def. Mem. at 32, but his arguments are meritless. The parties fully briefed removal based on FECA preemption during the first removal proceeding, *see* ECF 19, 34, 38; this Court issued a detailed ruling finding that defendant's preemption argument lacked any "colorable basis," ECF 43; and defendant abandoned his appeal from that ruling, *New York v. Trump*, 158 F.4th at 462. Under these circumstances, defendant's attempt to remove on preemption grounds again is barred by the general rule that "a second notice may be filed only on grounds not existing at the time of the original notice." 28 U.S.C. § 1455(b)(2).

Defendant does not assert that any intervening Supreme Court decision has fundamentally altered the law of preemption in a way that would support a second, untimely notice of removal. Instead, his only argument for good cause is that he was

assertedly "prevented" from raising FECA preemption as a basis for removal because the People purportedly misrepresented their trial theory to this Court. Def. Mem. at 32. Specifically, defendant claims that the People "obscur[ed] the FECA-based theory of [Election Law] Section 17-[1]52" that was ultimately submitted to the jury; that the People misled this Court by saying that the prosecution might not rely on Election Law § 17-152 at trial; and that this Court "relied on" the People's claim that the "charges here do not relate to the specific disclosures mandated by FECA." Def. Mem. at 39. Every single one of these claims is wrong; and even if they were not, defendant would still not have established good cause.

First, the People never "obscur[ed]" the relationship between Election Law § 17-152 and FECA. To the contrary, as the People accurately explained to this Court, defendant was charged with 34 counts of first-degree falsifying business records in violation of N.Y. Penal Law § 175.10, which penalizes the creation of false entries in business records with intent to "commit another crime or to aid or conceal the commission thereof"; and a Bill of Particulars served just weeks after the indictment (on May 12, 2023) identified the "another crime[s]" as Election Law § 17-152, FECA, provisions of New York Tax Law, and N.Y. Penal Law §§ 175.05 and 175.10. ECF 18-2 at 5; ECF 19 at 22.

Second, although the People did (correctly) argue that defendant's preemption claim was speculative because it would depend on whether and to what degree the People relied on Election Law § 17-152 at trial, the People also directly opposed

defendant's claim that FECA would preempt reliance on Election Law § 17-152. *See* ECF 19 at 22-24; ECF 38 at 15. This Court also rejected defendant's preemption argument directly, without reliance on the People's arguments about speculation. Specifically, this Court held that the Indictment did not "intrude on FECA's domain" because FECA preempted neither the first-degree falsifying business records statute nor Election Law § 17-152; "the mere fact that [defendant] is alleged to have engaged in fraudulent conduct with respect to a federal election is not a basis for preemption." ECF 43 at 24. This Court's thorough decision thus squarely addressed and rejected defendant's FECA preemption argument, rather than basing its ruling on uncertainty about the People's theory at trial.

Third, there was no error in the People's argument that "the charges here do not relate to the specific disclosures mandated by FECA," ECF 38 at 12. As this Court correctly found, "violations of FECA . . . are not elements of the crime charged," because first-degree falsifying business records under Penal Law § 175.10 requires proof only of "falsification of business records, an intent to defraud, and an intent to commit or conceal another crime"—not the actual commission of the other crime. ECF 43 at 21. Moreover, this Court was also correct to find that Election Law § 17-152 does not "directly target campaign contributions and expenditures," because the plain text of that statute makes it a crime to engage in a conspiracy to "promote or prevent the election of any person to a public office by unlawful means." ECF 43 at 22-23. Defendant may disagree with this conclusion, but that disagreement is not a basis to file a second,

untimely notice of removal on the ground that this Court already thoroughly considered and rejected.

Finally, even if it were true that this Court somehow misunderstood the People's theory of liability, defendant would still not have good cause for his lengthy delay in seeking leave to file a second notice of removal on FECA preemption grounds. By the time of his conviction on May 30, 2024, defendant knew precisely the People's theory of criminal liability, which was repeated throughout the trial; was discussed extensively by the parties at the charge conference; and was crystallized in both summations and the state court's instructions to the jury.[2] Defendant has offered no reason for waiting three more months until September 3 to seek leave from this Court. That unexplained and unreasonable delay precludes any finding of good cause.

### C. The Late Stage of This Proceeding Also Weighs Heavily Against Removal.

The advanced stage of the state proceedings also warrants denial of leave. A late-breaking legal development alone does not compel a district court to allow a defendant to file an untimely notice of removal, particularly when, as here, the post-sentencing posture of a criminal prosecution provides multiple other compelling reasons to channel a defendant's federal defenses through the ordinary state-court appellate

---

[2] To be clear, defendant is wrong in asserting that the People impermissibly shifted their theory of liability during trial. But any such shift would not have been problematic in any event, since the Court of Appeals has squarely held that prosecutors may tailor the theory of criminal liability presented to the jury based on the proof presented at trial. *See People v. Seignious*, 41 N.Y.3d 505 (2024).

process. *See Missouri v. Pate*, No. 4:24-CV-01728-MTS, 2025 WL 104174, at *2 (E.D. Mo. Jan. 15, 2025) (noting that the defendant "has already been tried, convicted, and sentenced, and there is no basis to find good cause to allow removal now."). Because good cause is a "flexible standard that requires consideration of all interests in the particular case," *New York v. Trump*, 158 F.4th at 466, this Court can and should take these reasons into account in deciding defendant's motion.

For one thing, defendant's criminal appeal raises multiple state-law issues, such as the definition of intent to defraud; whether the jury had to agree unanimously on a specific "unlawful means" with respect to Election Law § 17-152; and whether the trial court properly declined to recuse itself. Ex. I at 67-95. Those issues, if resolved in defendant's favor, could potentially be outcome-dispositive, eliminating any need to resolve questions about defendant's purported federal defenses. Moreover, were defendant's state appeal to be removed, the Second Circuit may elect to certify some or all of those state-law questions to the New York Court of Appeals. The fact that defendant's appeal concerns several state-law issues provides compelling reason to allow his appeal to proceed as normal through the state courts, rather than through the federal courts. *See Georgia v. Meadows*, 692 F. Supp. 3d 1334, 1340 (N.D. Ga. 2023) (noting that "the federal and state interests at issue" at issue in a criminal case "actually favor the resolution of his case in the State Court, rather than federal court").

Even defendant's purported federal defenses are intertwined with state-law issues that would weigh heavily against removal at this late stage. For example, as the

state trial court noted in its decision on defendant's CPL 330.30(1) motion, defendant failed to preserve many of his federal claims about the alleged inadmissibility of purported official-acts evidence, and any error in that regard was harmless in any event. *People v. Trump*, 86 Misc.3d at 821-855. Preservation is a matter of state law, *cf. Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (failure to preserve is an independent and adequate state ground), and an appellate ruling on either lack of preservation or harmless error would avoid a ruling on the merits on defendant's evidentiary claim— thus eliminating any justification for a federal forum.

Similarly, defendant's federal preemption claim—that a FECA violation could not constitute "unlawful means" under Election Law § 17-152—is intertwined with at least one state-law question: namely, whether the jury was required to be unanimous on the specific "unlawful means" referred to in Election Law § 17-152 when it serves as the object crime for the charged offenses of falsifying business records under Penal Law § 175.10. Ex. I at 69 (defendant arguing that "New York law requires that the jury unanimously agree on the 'unlawful means'"). The fact that a state-law issue may obviate or fundamentally affect the resolution of this asserted federal defense provides further ground for finding lack of good cause for removal here.

Removal at this late stage would also be unnecessarily cumbersome as a procedural matter—especially when, as the Supreme Court has already recognized, defendant's challenges to his conviction "can be addressed in the ordinary course on appeal" in the state courts, *Trump v. New York*, 145 S. Ct. at 1038. Removal now would

defer a ruling on the merits of defendant's claims and interpose a host of additional procedural issues. This briefing on good cause is just one example; even if this Court were to find good cause, the People would then be entitled to file a remand motion, the disposition of which would itself be subject to potential interlocutory appeals; and if the Second Circuit were to consider this removed case, the parties would have to engage in additional briefing over certification of state-law issues both in the circuit and in the New York Court of Appeals. *Cf. Carroll v. Trump*, 66 F.4th 91, 92-93 (2d Cir. 2023) (describing complex procedural history of certified questions in a removed case). All of this additional procedure is simply unnecessary when defendant has already raised all of his federal defenses in his pending direct appeal to the Appellate Division.

Finally, although defendant and the United States cite the general principle that federal removal should be available in light of potential hostility by state courts to federal policies or federal defendants (Def. Mem. at 16; ECF 70 at 9), they identify no basis whatsoever for finding that any such hostility has been present in this case—including in the state trial court's carefully reasoned post-trial decision rejecting defendant's evidentiary claim based on *Trump v. United States*. To the contrary, the state trial and appellate courts have bent over backwards to accommodate defendant, his invocation of federal interests, and his desire to litigate his federal defenses. For example, before trial, defendant was able to pursue emergency litigation in the Appellate Division on, among other issues, his request to "to exclude evidence based on the doctrine of presidential immunity." *Matter of Trump v. Merchan*, 227 A.D.3d 569, 571

(N.Y. App. Div. 2024). After the Supreme Court decided *Trump v. United States*, the state trial court adjourned sentencing to allow defendant to file a motion based on that decision. When defendant sought a further adjournment in light of the presidential election, the trial court granted that request. After the trial court scheduled sentencing for January 10, 2025, defendant was able to pursue emergency litigation to stay that sentencing in the Appellate Division, New York Court of Appeals, and Supreme Court. And when the trial court ultimately imposed sentence, it expressly acknowledged that the "extraordinary legal protections afforded by the Office of the Chief Executive is a factor that overrides all others" and accordingly imposed a sentence of an unconditional discharge in order to avoid "encroaching upon the highest office in the land." Ex. G at 21-23. The complete absence of any hostility to federal interests by the New York courts provides yet more reason to decline to find good cause to allow an untimely, second notice of removal here and to require defendant to pursue his arguments through the state-court system that has already proven willing and able to responsibly address his arguments.

## POINT II

### LEAVE TO REMOVE SHOULD BE DENIED BECAUSE THIS PROSECUTION DOES NOT RELATE TO ANY ACT UNDER COLOR OF FEDERAL OFFICE AND DEFENDANT HAS NOT RAISED A COLORABLE FEDERAL DEFENSE

In addition to the factors discussed above, the Second Circuit also directed this Court to consider whether the prosecution here "relates to acts taken under color of the Presidency as contemplated by *Trump v. United States*" and whether defendant "has a colorable federal defense." *New York v. Trump*, 158 F.4th at 469. These issues can and should be more fully briefed upon the People's motion to remand, if this Court finds good cause. Nonetheless, this Court should deny defendant leave to remove because, as this Court previously found, this case does not qualify for federal-officer removal.

### A. Defendant's Falsification of Private Business Records to Conceal an Extramarital Affair Did Not Relate to Any Acts Under Color of the Presidency.

Defendant may only remove this state-court proceeding if, among other things, the prosecution is "for or relating to any act under color" of the office of the Presidency. 28 U.S.C. § 1442(a)(1); *see New York v. Trump*, 158 F.4th at 467. This test requires a "causal connection between the charged conduct and asserted official authority," including under the 2011 amendments to § 1442(a)(1). *Id.* at 467 (quoting *Willingham v. Morgan*, 395 U.S. 402, 409 (1969)) (cleaned up). A defendant's actions are thus "under color of . . . office" for purposes of federal-officer removal when the state criminal charges are "based on or arise[ ] out of the acts he did under authority of federal law in

the discharge of his duty and only by reason thereof." *Maryland v. Soper (No. 1)*, 270 U.S. 9, 33 (1926).

Here, the state prosecution never "relat[ed] to" any act under color of the Presidency because there is no nexus between the relevant criminal conduct and any asserted official authority. Defendant was charged with and convicted of creating false entries in the business records of a private enterprise to conceal an illegal pre-election scheme designed to suppress information about a private sexual affair. ECF 1-1 (Def. Ex. E at 3-7). Much of the charged conduct took place before defendant became a federal official, and all of it related to a private scheme unrelated to any official duty. ECF 43 at 11-15. As for the charged conduct that did occur while defendant was President—signing personal checks that drew on personal accounts, and creating non-governmental records maintained by a private corporation—all of it related to defendant's personal conduct and personal affairs, not to his duties as President. *Id.*; *see Trump v. United States*, 603 U.S. at 642 ("not everything the President does is official").

Indeed, during the first removal proceeding, defendant *admitted* that, during his presidency, he made the 2017 payments to "Mr. Cohen as his personal lawyer"—who, at the time, was charged with "handl[ing] [defendant's] personal affairs," ECF 1 at 5-6—"for services rendered to President Trump as his personal attorney . . . while he was President." ECF 34 at 22; ECF 43 at 17. The unofficial nature of the 2017 payments to Cohen was further supported by other facts never contested by defendant, including that the business records at issue in this prosecution were held by private enterprises

31

having nothing to do with the presidency, and that the payments were drawn from accounts that were entirely unofficial in nature. ECF 1-1 (Def. Ex. E at 1-10). Throughout this lengthy litigation, defendant has never identified *any* official duty or responsibility that he was fulfilling, or official authority that he was invoking, when he made the payments and falsified the business records at issue in this criminal proceeding. None of the payments from defendant's personal accounts relied for their authorization on defendant's presidential powers; and the business records here were generated in the course of a private enterprise's usual course of operations, not by dint of any federal authority.

In light of defendant's admissions and the uncontested evidence in the record, this Court rightly found that this "matter was a purely . . . personal item" of defendant's. ECF 43 at 13 ("[h]ush money paid to an adult film star is not related to a President's official acts," nor did it "reflect in any way the color of the President's official duties"). That conclusion is as true today as it was in 2023. The fact that defendant's crimes involved purely personal matters divorced from any presidential duty is dispositive to the good-cause analysis: there cannot be "good cause" for a second, untimely notice of removal when the relevant state prosecution remains ineligible for removal.

Defendant has never disputed that the actual charged conduct here is wholly unrelated to any official duty. Instead, he asserts that removal is available any time a state prosecution "uses 'any act under color of [the President's] office' as evidence at a criminal trial." Def. Mem. at 22. As an initial matter, and as discussed in greater detail

*infra*, none of the evidence here involved "any act under color of [the President's] office."

More fundamentally, a state prosecution of a federal officer based on conduct concededly unrelated to his federal office would not become removable simply because an official act by that officer was referenced at some point during the trial. Rather, as the Second Circuit made clear, the question remains whether there is a connection between *the charged conduct* and official authority. *New York v. Trump*, 158 F.4th at 467. The relevant focus is thus the conduct that forms the basis for the criminal charges, not the nature of the trial evidence. The removal statute reflects this focus: defendants are required to file removal petitions before trial, 28 U.S.C. § 1455(b)(1), at a time when a defendant will only have notice of the charges but not of the trial evidence. And case law confirms that the relevant inquiry is about the nature of the conduct underlying the criminal charges. *See, e.g.*, *Jefferson County v. Acker*, 527 U.S. 423, 433 (1999) (noting that this aspect of the jurisdictional inquiry turns on "[t]he circumstances that gave rise to the [state] liability"); *Soper*, 270 U.S. at 33 (querying the connection between federal authority and "the basis . . . of the state prosecution"); *K&D LLC v. Trump Old Post Off. LLC*, 951 F.3d 503, 507 (D.C. Cir. 2020) ("the circumstances that gave rise to the liability must encompass the defendant's conduct in office") (cleaned up).

Nothing in *Trump v. United States* changed this analysis. That decision clarified the scope of presidential immunity and created an evidentiary rule regarding the admissibility of certain evidence regarding a President's official acts. But it did not

address, let alone alter, any of the procedural or substantive requirements for federal-officer removal. Nor did anything in that decision call into question this Court's finding about the fundamentally private nature of the charged conduct for which defendant was convicted. To the contrary, the Supreme Court reaffirmed the principle that a sitting President can continue to engage in unofficial conduct and that, "[a]s for a President's unofficial acts, there is no immunity." 603 U.S. at 615.

The nature of the purportedly "official acts" evidence here underscores the absence of any connection between the charged conduct and an official presidential responsibility. As discussed in more detail below, defendant's social media statements all involved his comments on unofficial acts—namely, his views on his personal attorney and on a private contract. And the testimony from Hope Hicks was about the hush-money scheme that, as defendant has never contested, involved entirely unofficial conduct. In other words, although the contested evidence here arose at a time when defendant was President, his statements and conversations all concerned past or present private conduct, not any official duty. The fact that defendant was President at the time was basically incidental to the relevance of this evidence to the charges based on his unofficial conduct.

Defendant's argument that removal is warranted any time a state prosecution involves evidence of official acts would have absurd consequences. For example, there should be no dispute that federal removal would be unavailable for a postal employee who commits a residential burglary while off the job. Under defendant's position,

however, that state prosecution would be removable if the evidence for that burglary included a confession that the employee made to his supervisor during a performance review—even though the setting for that confession would not alter the basic fact that the burglary lacked any connection to the employee's federal job.

Finally, defendant's claim that the People made "false" "representations to this Court" in the first removal proceeding that the criminal charges were "based solely on private acts," Def. Mem. at 3, is flatly incorrect. In the portion of the People's reply papers that defendant cites, Def. Mem. at 6, the People argued that "[n]othing about" the private financial transactions involving Michael Cohen "touches, relates to, has a nexus or casual nexus connection between, is associated with, or has any other connection to any official responsibility or authority of the President." ECF 38 at 4-5. That statement was true in 2023, and it is true today. The People's argument has always been that the criminal charges here were based on defendant's private, unofficial conduct, and the People were always extremely clear about the fact that portions of that criminal conduct occurred during defendant's presidency. ECF 19 at 20-21. Indeed, the Statement of Facts that the People filed in state court at defendant's arraignment— which defendant himself filed with this Court accompanying his first notice of removal (ECF 1-1)—describes in detail the many steps in defendant's criminal conduct that occurred during his presidency, including that defendant met with Michael Cohen in the Oval Office to confirm the repayment arrangement and that defendant signed every check falsely recording the repayments as payments for a retainer in Washington, D.C.

35

while serving as President. And the Indictment itself, which was also filed with this Court (ECF 1-1), alleges in each of the thirty-four counts that the charged conduct occurred on a specified date between February 2017 and December 2017, all while defendant was serving as President. There is no merit to defendant's claim that the People made any misrepresentations to this Court, or that the Court was fooled into a misunderstanding of the People's allegations.

**B. Defendant's Evidentiary Claim Is Not a "Defense."**

Defendant also fails to establish that the Supreme Court's opinion in *Trump v. United States* afforded him a federal "defense" sufficient to support removal.

In *Trump v. United States*, the Supreme Court issued two rulings relevant here. First, the Court held that the President has a defense of absolute immunity "from criminal prosecution for conduct within his exclusive sphere of constitutional authority," and presumptive immunity for "acts within the outer perimeter of his official responsibility." 603 U.S. at 609, 614-615. Second, the Court held that certain evidence relating to a President's official acts may be inadmissible at trial, even as to charges based on unofficial conduct. *Id.* at 630-632.

Here, defendant does not claim that the charged conduct triggered either absolute or presumptive immunity under *Trump v. United States*, and indeed he "expressly waived any argument premised on a theory of absolute presidential immunity" in the first removal proceeding. *New York v. Trump*, 683 F. Supp. 3d at 346. Rather, his only

36

federal claim concerns the portion of *Trump v. United States* that addressed the inadmissibility of certain evidence of a president's official acts.

That evidentiary claim is not a "defense" at all for purposes of federal-officer removal. *See* Black's Law Dictionary (12th ed. 2024) (defining "defense" as a "defendant's stated reason why the plaintiff or prosecutor has no valid case"). The sole effect of defendant's evidentiary claim, if accepted, would be to prevent certain evidence from being admitted at trial. But excluding that evidence would not, by itself, lead to the dismissal or reduction of any of the charges against defendant or otherwise finally dispose of the state action in the manner that a true defense would, such as self-defense or a claim of immunity from prosecution. *Compare New York v. Tanella*, 239 F. Supp. 2d 291, 296 (E.D.N.Y. 2003) (criminal defendant in homicide prosecution asserted self-defense and immunity from criminal liability pursuant to the Supremacy Clause); *Torres v. CBS News*, 854 F. Supp. 245, 247-248 (S.D.N.Y. 1994) (Congressman asserted immunity from suit).

For this reason, at least one federal court has refused to allow removal when a defendant's federal claim would lead only to the exclusion or suppression of evidence. In *New York v. De Vecchio*, the defendant (an FBI agent) sought removal because he claimed that a federal statute, 18 U.S.C. § 6002, required the suppression of certain inculpatory testimony he had given. The district court rejected this argument, finding that this evidentiary claim was "not a federal defense supporting Article III removal jurisdiction; rather, it is simply a vehicle for the suppression of immunized evidence or

the dismissal of an indictment based on such evidence, be it in a federal or state criminal proceeding." 468 F. Supp. 2d 448, 462-464 (E.D.N.Y. 2007). By contrast, defendant has not cited a single case where a court found that an evidentiary claim like the one he relies on here constituted a federal "defense" for the purposes of removal.

Even if an evidentiary claim could theoretically provide grounds for removal, defendant's particular claims here would not because, as the state trial court found, any error in admitting the purported official-acts evidence was "harmless in light of the overwhelming evidence of guilt." *People v. Trump*, 86 Misc.3d at 820. That harmless-error ruling means that defendant's evidentiary claim based on *Trump v. United States* is no defense at all because it would not provide a basis for reversing the jury's guilty verdict on appeal.

The state trial court's harmless-error finding is well-supported by the record. As the People explained in detail in their response to defendant's CPL 330.30(1) motion (ECF 47-18 at 40-57), and as the trial count found, the People proved defendant's guilt by introducing "invoices, general ledger entries, recorded phone conversations, text messages, emails, Mr. Weisselberg's handwritten notes, and video footage," in addition to the testimony of "Mr. Cohen, Ms. Daniels, Mr. McConney, Keith Davidson, Mr. Pecker, and Gary Farro," all of which was still just "a fraction of the evidence the jury heard and considered, separate and apart from that evidence and select testimony which defendant challenges on presidential immunity grounds." *People v. Trump*, 86 Misc.3d at 854-855. At bottom, the few pieces of evidence that are the subject of defendant's

current evidentiary claim pale in comparison to the extensive other evidence of his guilt. And not a single element of the criminal charges against defendant depended solely on the challenged evidence, which was largely duplicative of other evidence that is not even colorably subject to the Supreme Court's decision in *Trump v. United States*. There is thus no reasonable possibility that any of the challenged evidence was necessary for defendant's conviction.

Defendant barely engages with the extensive evidence at trial that is entirely unaffected by the evidentiary claim that is the focus of his current motion. Instead, defendant makes the sweeping claim that harmless-error review is simply unavailable for an evidentiary claim under *Trump v. United States*. Def. Mem. at 29. But the Supreme Court did not so hold. 603 U.S. at 630-632. To the contrary, the Supreme Court expressly endorsed a form of harmless-error analysis regarding the indictment in that case. After finding that some of the federal indictment's allegations concerned official acts for which defendant was immune from prosecution, the Court remanded so that the parties and the lower court could "ensure that sufficient allegations support the indictment's charges without such conduct." *Id.* at 630. Such a review parallels the harmless-error inquiry.

Defendant claims (Def. Mem. at 29-30) that the Supreme Court implicitly foreclosed harmless-error review by rejecting the federal government's contention that "'evidentiary rulings' and 'jury instructions'" would suffice to avoid separation-of-powers concerns. *Id.* at 631. But the federal government's brief made clear that the

"rulings" and "instructions" it was referring to were essentially limiting instructions asking the jury to consider official-acts evidence only for certain limited purposes and not for others. *See* Br. for United States, *Trump v. United States*, 2024 WL 1592669, at *48 (Apr. 8, 2024). Neither the federal government's brief nor the Supreme Court's decision mentions, let alone dispenses with, harmless-error review, which is conducted by courts rather than juries and thus does not implicate the "unique risk that the jurors' deliberations will be prejudiced by their views of the President's policies and performance while in office." *Trump*, 603 U.S. at 631.

There is no reason to exempt evidentiary claims under *Trump v. United States* from the harmless-error analysis applicable to all other evidentiary violations. The Supreme Court "repeatedly has held" that "errors such as mistaken admission of evidence" are not "immune from harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 582 n.11 (1986) (citing cases). And, as particularly relevant here, the Supreme Court has applied harmless-error review even when the improperly admitted evidence involved "conduct that was not criminal when the defendant engaged in that conduct." *United States v. Marcus*, 560 U.S. 258, 263 (2010). If a reviewing court can determine whether it was harmless to introduce evidence of conduct for which a defendant could not have been prosecuted because it was not a crime, then the same must be true for evidence of conduct for which a defendant could not have been prosecuted because of immunity.

Moreover, evidentiary violations are subject to harmless-error review even when they implicate important constitutional rights that protect institutional as well as

personal interests. For example, federal courts have explicitly considered the prejudice from the improper introduction of legislative-act evidence. *See, e.g.*, *United States v. Johnson*, 383 U.S. 169, 185-186 (1966) (noting that the lower court had found that improper legislative-act evidence "was prejudicial" regarding certain "other counts as well" and therefore ordered a new trial for those charges); *United States v. Dowdy*, 479 F.2d 213, 227 (4th Cir. 1973) (considering whether evidence adduced in violation of Speech or Debate Clause prejudiced defendants on particular counts). The existence of harmless-error review for legislative-act evidence rebuts defendant's claim that "violations of the Presidential evidentiary immunity require *per se* reversal" because that immunity protects broader interests. Def. Mem. at 29. Legislative-act immunity also protects broader interests than those of the individual legislative defendant; yet courts still review errors under that doctrine for harmlessness. The fact that any evidentiary error in this case would be harmless thus further demonstrates that defendant has failed to raise a "defense" warranting federal-officer removal.

### C. Defendant's Evidentiary Claim Is Not "Colorable."

Removal is also not warranted based on defendant's evidentiary claim because defendant has no "colorable" claim that the People introduced evidence at trial in violation of the Supreme Court's holding in *Trump v. United States*. By its own terms, the Supreme Court's holding about the admission of official-acts evidence applies only when that evidence concerns "official acts for which the President is immune" from criminal liability; there is no evidentiary bar with respect to unofficial acts by the

President. 603 U.S. at 631. As for official acts, this Court separated them into two categories. The first, narrow category consists of acts by the President to carry out an explicit constitutional commitment of exclusive authority; for such conduct, the President has absolute immunity. *Id.* at 607-609. The second category consists of all other acts that a President is authorized to commit; for such conduct, the President is entitled only to presumptive immunity, which can be rebutted by showing that "applying a criminal prohibition to that act would pose no dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 615 (quotation marks omitted). Finally, even as to official acts for which the President is immune, "of course the prosecutor may point to the public record to show the fact that the President performed the official act." *Id.* at 632 n.3. Thus, in a bribery prosecution, the prosecutor could "admit evidence of what the President allegedly demanded, received, accepted, or agreed to receive or accept in return for being influenced in the performance of the act." *Id.* But a prosecutor cannot "admit testimony or private records of the President or his advisers probing the official act itself." *Id.*

In other words, under *Trump v. United States*, evidence about defendant's conduct during his Presidency may be properly admitted if *any* of the following is true: the evidence concerns defendant's unofficial conduct; the evidence concerns official conduct for which the presumption of immunity has been rebutted; or the evidence consists of a public record of an official act. As described below, and as argued in greater detail in the People's response to defendant's CPL 330.30(1) motion (ECF 47-18), one

or more of these factors applies to all of the evidence that defendant challenged after trial.

### 1. Defendant's Statements on Twitter

Defendant objected to the admission of four statements ("Tweets") from his Twitter account. Three Tweets reflected defendant's opinion about Cohen, his personal attorney; the fourth contained defendant's observations about "a private contract between two parties." ECF 47-30.

The subject matter of these Tweets consisted solely of "unofficial acts" for which "there is no immunity" and thus no bar to admission of evidence. *Trump*, 603 U.S. at 615. The Supreme Court specifically recognized that defendant, even while serving as President, could make public statements—including Tweets—"in an unofficial capacity," such as if he spoke "as a candidate for office or party leader," rather than as the President exercising his Article II powers. *Id.* at 629; *see also Blassingame v. Trump*, 87 F.4th 1, 15 (D.C. Cir. 2023) (rejecting defendant's "sweeping" claim "that *all* of a President's speech on matters of public concern, as a categorical rule, is an exercise of official presidential responsibility"). Here, the four Tweets objected to by defendant were all issued in defendant's "unofficial, private capacity," rather than as part of "carrying out the official duties of the presidency." *Id.* at 4. All four of the challenged Tweets referred to Cohen, defendant's personal attorney at the time; and one provided defendant's opinion about—in his own words—"a private contract" between Cohen and Stormy Daniels. ECF 47-30. Defendant was thus "speak[ing] in an unofficial

capacity," *Trump*, 603 U.S. at 629, when he commented on a private contract between private individuals that was signed before his presidency and that had no relationship to any official presidential duty.

Even assuming that the Tweets constitute official conduct, they at most give rise to a presumption of immunity that is easily rebutted here. The Court described "most of a President's public communications" as being "within the outer perimeter of his official responsibilities," *Trump*, 603 U.S. at 629—a characterization that gives rise only to "a *presumptive* immunity from criminal prosecution," not absolute immunity, *id.* at 614. That presumption can be rebutted if consideration of these Tweets would not "pose any dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 624-625. There is no such danger here because the subject matter of the Tweets bore no relationship to any official duty of the Presidency. Defendant was not performing, or even describing, any official presidential act in conveying his personal opinions about his personal attorney and a private nondisclosure agreement entered into prior to his Presidency. Consideration of these Tweets thus posed no danger of "distort[ing] Presidential decisionmaking," *id.* at 613, because no such decisionmaking was involved. The "justifying purposes" of presidential immunity "are to ensure that the President can undertake his *constitutionally designated functions* effectively, free from undue pressures or distortions." *Id.* at 615 (emphasis added). When, as here, a President's public statements are "not related to a President's official acts" at all, *Trump*, 683 F. Supp. 3d at 345, then

reliance on such acts as admissible evidence does not interfere with the performance of official duties.

Finally, even if the Tweets were official acts for which defendant would be immune, they were admissible because the People admitted nothing more than the "public record" of those Tweets "to show the fact that the President performed the official act"—i.e., that he made those statements on Twitter. *Trump*, 603 U.S. at 632 n.3. The admission of those Tweets at trial did nothing more than give to the jury the same information that had been available for years to the public; in particular, the People did not "admit testimony or private records of the President or his advisers probing" the Tweets themselves. *Id.* Nor was the jury invited "to inspect the [defendant's] motivations," *id.*—to the contrary, the state trial court allowed the Tweets to be introduced only to show their effect on Cohen's actions, not to show defendant's consciousness of guilt. Under the circumstances, there was no barrier to relying on a public record of any official conduct that may have taken place through defendant's Tweets.

### 2. Testimony by Hope Hicks

There was no error in the admission of testimony from former White House employee Hope Hicks. The mere fact that she was acting as White House Communications Director or Counselor to the President at the time is not dispositive: indeed, the Supreme Court held that not even all of a President's discussions with his Vice President or Attorney General would qualify as official conduct subject to absolute

immunity. *See Trump v. United States*, 603 U.S. at 623-624. And if, as the Supreme Court held, the President can communicate to the public "in an unofficial capacity," *id.* at 630, then it stands to reason that White House personnel who help to facilitate such unofficial communications must necessarily be acting in an unofficial capacity as well. The question, then, is whether the subject matter of any discussion between defendant and Hicks involved the potential exercise of the President's "conclusive and preclusive constitutional authority." *Id.* at 609 (quotation marks omitted).

Here, the only testimony that the People elicited from Hicks regarding her conversations with defendant while he was President related solely to unofficial conduct—namely, discussions between defendant and Hicks about the hush-money scheme that was then being reported in the press. *People v. Trump*, 86 Misc.3d at 830-835. As defendant has long conceded, that scheme was entirely personal and largely committed before the election, and it had no relationship whatsoever to any official duty of the presidency. A President's discussions about a purely private matter, even with a White House advisor, do not constitute "official acts for which the President is immune," *Trump v. United States*, 603 U.S. at 631, because neither the internal discussions nor the subject matter have any "connection with the general matters committed by law to his control or supervision," *Blassingame*, 87 F.4th at 13 (quotation marks omitted).

Defendant's contrary argument depends on his assertion that Hicks testified about his efforts to communicate with the public about the hush-money scheme. Def. Mem. at 25-26. But that claim is entirely unsupported by the factual record, since Hicks

46

did not in fact testify about any such specific public-facing conduct by defendant. For example, when asked "what did you discuss with Mr. Trump" about the news stories coming out, Hicks responded only, "Just how to respond to the story, how he would like a team to respond to the story." ECF 47-8 at 2217:14-16. Hicks did not actually describe the substance of any directions defendant provided about public communications. And even assuming that Hicks's testimony pertained to defendant's efforts to speak to the public about the hush-money scheme, that testimony was still about defendant's unofficial conduct because, as noted above, a President can "speak[ ] in an unofficial capacity." 603 U.S. at 598. Thus, any public communications about the hush-money scheme concerned a subject unrelated to a President's "official acts" and did "not reflect in any way the color of the President's official duties." *New York v. Trump*, 683 F. Supp. 3d at 345; *see also Thompson v. Trump*, 590 F. Supp. 3d 46, 80 (D.D.C. 2022) (President speaks unofficially if, for example, he "falsely and with malice accuses a political opponent . . . of running a child-trafficking operation"), *aff'd sub nom. Blassingame*, 87 F.4th 1.

Finally, even assuming that Hicks's testimony concerned official acts by the President, any presumption of immunity would be rebutted here because there is no danger that consideration of this testimony would interfere with the authority and functions of the Executive Branch. *Trump v. United States*, 603 U.S. at 623-24. The presidential immunity recognized in the Supreme Court's recent decision sought to protect only "the President's official decisionmaking." *Id.* at 631. There is no risk of

interference with such official decision-making when, as here, the President's discussions with his Communications Director concern a purely private matter, and when the testimony did not describe any discussions about official acts to be done in response to the private matter.

### 3. Michael Cohen's Testimony About FEC Investigations

Defendant has also presented no colorable defense regarding the challenged testimony from Michael Cohen. First, and as the trial court already found, defendant failed to preserve his evidentiary claims to this testimony. *People v. Trump*, 86 Misc.3d at 825-827. This lack of preservation means that defendant's claims are likely to fail on appeal regardless of the merits of his underlying objection—confirming that his evidentiary claim on this score is not colorable as a basis of appellate reversal.

Second, and in any event, evidence regarding Cohen's responses to FEC investigations into whether hush-money payments violated campaign finance laws, *id.* at 843-847, was unrelated to any official act because the pre-election hush-money payments had no connection to any official duty of any federal office. All of the relevant actors mentioned in this evidence were private parties and/or not acting in any official capacity. The Supreme Court recognized that defendant himself "appeared to concede" at the *Trump v. United States* oral argument that acts "involving 'private actors' . . . entail 'private' conduct." 603 U.S. at 626.

Defendant argues that Cohen's testimony about the Attorney General "tak[ing] care of" an FEC investigation related to defendant's authority to direct what violations

of the law to address. Def. Mem. at 27-28. But the FEC is an independent administrative agency that is not supervised by the Attorney General. 52 U.S.C. § 30107(a)(6), (e); *see Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 199 n.2 (1982). And because defendant denies that he actually spoke with the Attorney General about this issue, Def. Mem. at 27-28, the only "conduct" at issue here would appear to be an empty promise from defendant to reassure his private attorney about an independent agency's investigation into private affairs. That conduct reflects no exercise of actual presidential responsibilities.[3]

### D. Defendant's Preemption Claim Is Not "Colorable."

This Court previously held, in a detailed opinion, that there was "no colorable basis" to defendant's claims based on FECA preemption. ECF 43 at 17-24. Defendant's cursory analysis, Def. Mem. at 30-31, does not engage with or even acknowledge this Court's explanation for why FECA does not preempt either Penal Law § 175.10 or

---

[3] In just a single, unelaborated sentence, defendant also claims that the trial court should not have admitted testimony from Madeleine Westerhout, former Director of Oval Office Operations. Def. Mem. at 26. That claim is also unpreserved. *People v. Trump*, 86 Misc.3d at 828. In any event, Westerhout's testimony is not subject to evidentiary immunity under *Trump v. United States*. Westerhout simply described her assistance in handling defendant's private affairs, including her receipt of personal checks from a purely private enterprise, the Trump Organization, for defendant to sign. *People v. Trump*, 86 Misc.3d at 835-839. That testimony thus described unofficial conduct that is not subject to any claim of immunity. S*ee Trump v. United States*, 603 U.S. at 629. Moreover, Westerhout's general descriptions of defendant's work practices—such as his receipt of calls from the "situation room"—did not trigger any concerns about official-acts immunity because she provided no testimony about any particular official act of the President, let alone testimony essential to the criminal charges here.

Election Law § 17-152. Since defendant did not appeal from this Court's prior ruling on the subject, and because he does not identify any intervening law that would alter this Court's analysis, he is barred from simply relitigating the Court's prior conclusion. *See Allen v. McCurry*, 449 U.S. 90, 94 (1980). Even if this Court were to reconsider this issue, it should simply adhere to its prior holding.

## POINT III

### DEFENDANT'S SENTENCING PRECLUDES REMOVAL

Finally, the Second Circuit instructed the Court to consider whether removal "is even available at this stage of the state court proceedings." *New York v. Trump*, 158 F.4th at 469. The answer to that question is no.

The trial court sentenced defendant on January 10, 2025. Final judgment has been entered, and the state criminal action has terminated. *See* CPL 1.20(15), (16). Removal is thus unavailable because the procedural rules for removal neither contemplate nor authorize removal after entry of judgment in a state criminal matter. Although defendant interprets the absence of a provision explicitly forbidding removal at this late stage as tacit authorization, that assertion runs counter to the Second Circuit's instruction that "statutory procedures for removal are to be strictly construed" out of "respect for the limited jurisdiction of the federal courts and the rights of states," and any interpretative doubts in that regard must be resolved "against removability." *New York v. Trump*, 158 F.4th at 465 (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*,

488 F.3d 112 (2d Cir. 2007)). Thus, although the removability of concluded state criminal trials is an "open question" in the Second Circuit, *id.* at 464, this Court should answer that question the same way that multiple other federal district courts already have: namely, by concluding that removal is no longer available after the entry of final judgment.

The removal statutes contain multiple indicia that Congress intended for removal of criminal cases to happen before sentencing. The statutes consistently assume that post-removal proceedings will take place in federal district court, prior to a final criminal judgment, and they contain no provision that contemplates, provides procedures for, or authorizes removal after sentencing.

For example, unlike in removed civil cases, *see* 28 U.S.C. § 1446(d), criminal cases may proceed in state court even after a notice of removal has been filed, "except that a judgment of conviction shall not be entered unless the prosecution is first remanded." *Id.* § 1455(b)(3). This stay provision assumes that the initial step of the removal process—the threshold decision of whether to remand the case, *see id.* §§ 1455(b)(4) (notice must be reviewed "promptly"), 1447(c) (remand motion must be filed within thirty days)—is completed before a judgment of conviction is entered. By contrast, § 1455 provides no similar directions to state appellate courts if a case is removed after final judgment. The absence of such a provision would allow for anomalous outcomes: for example, nothing would prevent the state courts from fully resolving a defendant's appeal—such that the state case is no longer "pending"—before a federal district court

51

can rule on a motion to remand. The absence of any backstop to prevent such a result strongly suggests that Congress did not anticipate removal of criminal cases after sentencing at all. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (cleaned up).

That interpretation is further supported by the fact that the removal statutes are conspicuously silent about critical procedural questions unique to the post-sentencing context. For example, although defendant argues that, following removal, this Court could simply transfer the case to the Second Circuit, no statutory provision explicitly authorizes such novel transfer authority. *Compare* 28 U.S.C. §§ 1292(b) (procedure for certifying interlocutory orders for appeal), 1404 (explicitly authorizing district court transfers for change of venue), 2112(a)(4)-(5) (explicitly authorizing court of appeals transfers in multi-district litigation), 2241(b), (d) (explicitly authorizing transfers of habeas petitions). Such a transfer would also be inconsistent with the removal statute's plain intent for the removal proceedings to conclude before entry of judgment. *See id.* §§ 1450, 1455(b)(4)-(5); *see also id.* § 1447(d) (limiting appellate review of remand orders). Defendant's anything-goes approach to post-sentencing removal procedures conflicts with Congress' presumably deliberate decision not to legislate in this area at all. *See Wong v. Doar*, 571 F.3d 247, 260 (2d Cir. 2009) ("we are not inclined to infer from statutory silence a congressional intent to have no rules whatsoever apply").

It is therefore unsurprising that every district court that has confronted a notice to remove a post-sentencing state criminal appeal concluded that removal was no longer available. *See Hawaii v. Thronas-Kahoonei*, No. CV 19-00683 JAO-KJM, 2020 WL 118251, at *2 (D. Haw. Jan. 10, 2020) (even if the defendant qualified for federal officer removal, "he would be time-barred, as judgment entered in the criminal prosecution and the matter is on appeal"); *Arizona v. Folio*, No. CR-19-08056-001-PCT-DJH, 2019 WL 1643720, at *1 (D. Ariz. Apr. 16, 2019) ("Defendant has not identified any *ongoing* state criminal proceeding. Instead, it appears that Defendant is trying to remove his state criminal appeal to this court, which is improper.") (emphasis in original); *Johnson v. Washington*, No. C07-0696-MJP, 2007 WL 2377141, at *2 (W.D. Wash. Aug. 15, 2007) ("the removal statute clearly does not apply to an appeal or petition for postconviction relief"). And defendant fails to identify a single example of a state criminal appeal ever being removed to federal court after the defendant had already been sentenced.

Rather than identifying any criminal cases reaching the opposite result, defendant instead relies on cases that address the removal of civil matters. Those cases are not controlling here because they do not address the distinct procedural requirements and statutory language applicable to the removal of state criminal prosecutions. *See Pennsylvania v. Maggitti*, No. 24-1702, 2025 WL 869493, at *1 (3d Cir. Mar. 20, 2025) (unpublished) (where petitioner "sought removal of a criminal prosecution, not a civil action," her "citing of 28 U.S.C. § 1446 and our case law interpreting that removal statute in the civil context is unavailing").

53

If anything, the cases cited by defendant highlight how the unique features of civil litigation may justify post-final-judgment removal in ways that do not translate to the distinctive context of criminal prosecutions. For example, in defendant's principal case, *Harris v. U.S. Department of Transportation FMCSA*, 122 F.4th 418 (D.C. Cir. 2024), the state court had sua sponte dismissed the complaint before the defendant federal agency had even been served, and the agency sought to remove the pending appeal still within the original thirty-day deadline for filing a notice of removal. *Id.* at 423. No New York criminal case could proceed from arraignment to sentencing with such haste. *See, e.g.*, CPL 245.10(1) (pretrial discovery), 255.20(1) (pretrial motions), 330.30 (post-trial motions), 390.20(1) (pre-sentence investigation). Similarly, in the cited cases involving the Federal Deposit Insurance Corporation, the federal agency only substituted as a party after the state courts had entered final judgment. *See FDIC v. Keating*, 12 F.3d 314, 315 (1st Cir. 1993); *In re Meyerland Co.*, 960 F.2d 512, 513 (5th Cir. 1992); *see also In re Savers Fed. Sav. & Loan Assoc.*, 872 F.2d 963, 964 (11th Cir. 1989). No such substitution is available for individual criminal defendants.

Defendant asserts that post-sentencing removal is necessary because "not every federal defense is evident before trial" and because defendants with a federal defense must have access to a federal forum, no matter when such a defense arises. Def. Mem. at 15. But there is no logical stopping point to this reasoning. Defendant and the United States admit as much when they maintain that removal is available "at any time," as long as the state appeal is "pending." Def. Mem. at 12-13; ECF 70 at 8 (arguing that removal

is available until "the time for a petition for certiorari elapsed or a petition for certiorari finally denied"). Under defendant's rationale, removal would be available even if a state appeal takes years to resolve, *e.g.*, *People v. Afflick*, 234 A.D.3d 501, 501 (N.Y. App. Div. 2025) (deciding the direct appeal of a 2006 criminal conviction 19 years after the fact); even after a ruling by a state's intermediate appellate court; even after a ruling by a state's *highest* court, when ordinarily only United States Supreme Court review would be available, ECF 70 at 10; and potentially even during a collateral attack on a conviction, which in New York can be filed before exhausting direct appellate review. *Cf. People v. Machado*, 90 N.Y.2d 187, 189 (1997); *contra Renteria v. Lumpkin*, No. 23-70007, 2023 WL 7649071, at *3 (5th Cir. 2023) (unpublished) (removal unavailable for collateral proceedings).

Allowing removal in such circumstances would raise its own procedural puzzles. In addition to those outlined *supra*, questions could also arise about whether, for example, the Second Circuit could review a ruling by the New York Appellate Division or the New York Court of Appeals, or whether the Second Circuit would at that point be obligated to transfer the case to the United States Supreme Court. And post-sentencing removal without restriction would be enormously disruptive, replacing the ordinary channels of state-court appellate review with a novel opportunity for a federal-court do-over. Here, for example, defendant has already filed his appellate brief with the Appellate Division. There is no good reason to disrupt the state appellate proceedings midstream.

Defendant and the United States also claim that the unavailability of removal after sentencing would risk incentivizing state and local prosecutors to manipulate trial dates and the timing of evidentiary submissions to avoid removal. Def. Mem. at 16; ECF 70 at 9-10. But New York's criminal procedures make it effectively impossible for a case to rush to sentencing, and in the modern era, it is rare in any jurisdiction for a criminal trial to begin within a month of arraignment. A defendant also has the option of requesting that sentencing be adjourned—as defendant repeatedly did here, including so he could brief the impact of the Supreme Court's intervening decision in *Trump v. United States*. And, failing that, a defendant can also seek state-court and federal-court stays of sentencing—as defendant again did here, without success. *Trump v. New York*, 145 S.Ct. at 1038. Given these protections, defendant vastly overstates the risk that prosecutors will be able to avoid federal removal by manipulating the sentencing date.[4] Absent those concerns, there is no pressing need to recognize the availability of post-sentencing removal for criminal cases when Congress has not expressly authorized such removal.

---

[4] To the extent that defendant is suggesting that, in this case, the People either "manipulate[d] the timing of evidentiary submissions" or "obscure[ed] key elements of the theory of liability" to frustrate defendant's ability to seek removal, Def. Mem. at 16, such an argument would be specious. Defendant was well aware from the outset of this case that the evidence against him included proof of actions he took while serving as President and that one of the People's potential theories of the case implicated Election Law § 17-152. Also, after the Supreme Court decided *Trump v. United States*, sentencing was adjourned for months to enable defendant to move for relief based on that intervening decision, both in state and federal court.

## CONCLUSION

For the foregoing reasons, the Court should deny defendant leave to file a second, untimely notice of removal.

Respectfully submitted,

ALVIN L. BRAGG, JR.
District Attorney
New York County

BY: _____
JOHN T. HUGHES
hughesj@dany.nyc.gov

STEVEN C. WU (SW1735)
  Chief, Appeals Division
JOHN T. HUGHES (5323514)
  Assistant District Attorney
    Of Counsel

January 7, 2026