# Exhibit E

FILED: APPELLATE DIVISION - 1ST DEPT 01/28/2026 04:17 PM
2025-00648
NYSCEF DOC. NO. 87
RECEIVED NYSCEF: 01/28/2026

# New York Supreme Court

## Appellate Division—First Department

THE PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Respondent,*

*against*

DONALD J. TRUMP,

*Defendant-Appellant.*

**Appellate Case No.: 2025-00648**

---

## MOTION FOR LEAVE TO FILE BRIEF OF PROFESSOR JED HANDELSMAN SHUGERMAN AS *AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT

OF COUNSEL:

John L. Reed
Ronald N. Brown, III
R. Craig Martin
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
john.reed@us.dlapiper.com
ronald.brown@us.dlapiper.com
craig.martin@us.dlapiper.com

DLA PIPER LLP (US)

Steven M. Rosato
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
steven.rosato@us.dlapiper.com

*Attorneys for Professor Jed Handelsman Shugerman*

New York County Indictment No. 71543/2023

 COUNSEL PRESS    (800) 4-APPEAL • (389772)

PLEASE TAKE NOTICE that, pursuant to 22 N.Y.C.R.R. §§ 1250.4(f) and 600.4(b), and upon the annexed affirmation of Steven M. Rosato dated January 28, 2026, and the proposed brief attached thereto as Exhibit 1, proposed *amicus curiae* Professor Jed Handelsman Shugerman hereby moves this Court, located at 27 Madison Avenue, New York, New York 10010, on February 9, 2026 at 10:00 a.m., or as soon thereafter as counsel can be heard, for an order granting Professor Shugerman leave to serve and file a brief as *amicus curiae* in support of President Donald J. Trump in the above-captioned appeal, and granting such other and further relief as the Court deems just and proper.

Dated:  New York, New York
        January 28, 2026

DLA PIPER LLP (US)


OF COUNSEL:

John L. Reed
Ronald N. Brown, III
R. Craig Martin
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
john.reed@us.dlapiper.com
ronald.brown@us.dlapiper.com
craig.martin@us.dlapiper.com

By:  */s/ Steven M. Rosato*
      Steven M. Rosato

1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
steven.rosato@us.dlapiper.com


*Attorneys for Professor*
* Jed Handelsman Shugerman*

# New York Supreme Court

## Appellate Division—First Department

———————•—————

THE PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Respondent,*

*against*

DONALD J. TRUMP,

*Defendant-Appellant.*

**Appellate Case No.:
2025-00648**

---

**AFFIRMATION OF STEVEN M. ROSATO IN SUPPORT OF
MOTION FOR LEAVE TO FILE BRIEF OF PROFESSOR JED
HANDELSMAN SHUGERMAN AS *AMICUS CURIAE* IN
SUPPORT OF DEFENDANT-APPELLANT**

---

OF COUNSEL:

John L. Reed
Ronald N. Brown, III
R. Craig Martin
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
john.reed@us.dlapiper.com
ronald.brown@us.dlapiper.com
craig.martin@us.dlapiper.com

DLA PIPER LLP (US)

Steven M. Rosato
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
steven.rosato@us.dlapiper.com

*Attorneys for Professor Jed Handelsman Shugerman*

New York County Indictment No. 71543/2023

 COUNSEL PRESS    (800) 4-APPEAL • (389772)

Pursuant to CPLR 2106, Steven M. Rosato hereby affirms the following to be true under the penalties of perjury:

1.      I am an associate at the law firm DLA Piper LLP (US), counsel for proposed *amicus curiae* Professor Jed Handelsman Shugerman.  I respectfully submit this affirmation in support of Professor Shugerman's motion for leave to file an *amicus curiae* brief in support of President Donald J. Trump in the above-captioned matter.

## INTEREST OF AMICUS

2.      Professor Shugerman is a Professor of Law at Boston University.  He holds a BA, a JD, and a PhD in History from Yale University, and is regarded as an expert on the history of presidential power and prosecutorial power.  He debunks the unitary executive theory in recent academic articles[1] and a forthcoming book, *A Faithful President.*  His historical research was cited in both impeachments of President Trump.[2]  He supported those impeachment proceedings in 2019 and 2021

---

[1] *See, e.g.*, *Venality: A Strangely Practical History of Unremovable Offices and Limited Executive Power*, 100 Notre Dame L. Rev. 213 (2024); *The Indecisions of 1789: Inconstant Originalism and Strategic Ambiguity*, 171 Univ. Penn. L. Rev. 753 (2023); *Vesting*, 74 Stan. L. Rev. 1479 (2022); *Removal of Context: Blackstone, Limited Monarchy, and the Limits of Unitary Originalism*, 33 Yale J. L. & Humanities 125 (2022); Andrew Kent, Ethan J. Leib, & Jed H. Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019).

[2] Quoted and cited in House Impeachment Report, Dec. 16, 2020 (p. 35, 46, 79): https://docs.house.gov/billsthisweek/20191216/CRPT-116hrpt346.pdf; quoted in House Impeachment Opening Statement, Adam Schiff, Jan. 22, 2020. https://twitter.com/jedshug/status/1220466259281817602?s=21

and the federal criminal cases against President Trump.[3]

3.    Nevertheless, Professor Shugerman is deeply concerned about the escalating bi-partisan abuse of prosecutorial power to intimidate political opponents and exact revenge.[4]  He has written extensively about the history of the Department of Justice's independence and the increasing partisanship of AGs and state prosecutors.[5]

4.    Even if there had been criminal activity in this case, Professor Shugerman firmly believes that this was a case for federal enforcement alone.  It is a dangerous precedent for local prosecutors to disregard the law and overreach into federal politics.   Professor Shugerman's interest in this case is a principled commitment to the rule of law.

---

[3] "January 6, Ambiguously Inciting Speech, and the Overt-Acts Rule," 37 *Constitutional Commentary* 275-319 (2023) with Alan Rozenshtein.

[4] Glenn Thrush & Colby Smith, "Federal Prosecutors Open Investigation Into Fed Chair Powell," *NY Times* (Jan. 11, 2026); Devlin Barrett & Jonah Bromwich, "Justice Dept. Will Appeal Dismissal of Comey and James Indictments," *NY Times* (Dec. 19, 2025); Devlin Barrett, Glenn Thrush and Jonah E. Bromwich, "New York Attorney General Letitia James Is Indicted After Trump's Pressure Campaign," *NY Times* (Oct. 9, 2025).

[5] "Professionals, Politicos, and Crony Attorneys General: A Historical Review of the U.S. Attorney General as a Case for Structural Reform," 87 *Fordham Law Review* 1965 (2019); "The Creation of the Department of Justice: Professionalization without Civil Rights or Civil Service," 66 *Stanford Law Review* 121 (2014); "The Rise of the Prosecutor Politicians: Race, War, and the Roots of Mass Incarceration" at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4935067

**THE PROPOSED BRIEF ADDRESSES FEDERAL PREEMPTION ISSUES
THAT ARE CRITICAL TO THE DISPOSITION OF THE APPEAL**

5.      Professor Shugerman respectfully submits that the proposed *amicus curiae* brief attached to this affirmation as Exhibit 1 will be helpful to the Court in its consideration of this appeal.

6.      The brief explains in detail why the New York District Attorney's ("DANY") criminal prosecution of President Trump was expressly preempted by the Federal Election Campaign Act ("FECA"), which provides, in relevant part, that "the rules prescribed under this Act, supersede and preempt any provision of State law with respect to election to Federal office." 52 U.S.C. § 30143(a).

7.      The brief analyzes FECA's text, traces the legislative history of FECA's original enactment in 1971 and its later amendment in 1974, and concludes that the case that DANY ultimately presented to the jury was plainly preempted by FECA, because it depended directly and solely on an alleged violation of N.Y. Election Law § 17-152 to secure a felony conviction.

8.      Professor Shugerman's proposed *amicus* brief presents an important historical and textual analysis of FECA's preemption clause that he believes will aid the Court's consideration of the trial court's erroneous determination that DANY could proceed with its prosecution of President Trump based on an alleged violation of an expressly preempted New York state election law.

3

9.     Professor Shugerman's participation would not prejudice any party to this appeal.

10.    If the motion is granted, Professor Shugerman will serve and file the requisite number of copies of the brief within the time established by this Court.

11.    In light of the foregoing, Professor Shugerman's motion for leave to file the attached *amicus curiae* brief should be granted.

I affirm this 28th day of January, 2026, under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.

/s/ Steven M. Rosato
Steven M. Rosato

4

# EXHIBIT 1

# New York Supreme Court

## Appellate Division—First Department

THE PEOPLE OF THE STATE OF NEW YORK,

*Plaintiff-Respondent,*

**Appellate
Case No.:
2025-00648**

*against*

DONALD J. TRUMP,

*Defendant-Appellant.*

---

**BRIEF OF PROFESSOR JED HANDELSMAN SHUGERMAN AS
*AMICUS CURIAE* IN SUPPORT OF DEFENDANT-APPELLANT**

---

OF COUNSEL:

John L. Reed
Ronald N. Brown, III
R. Craig Martin
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
john.reed@us.dlapiper.com
ronald.brown@us.dlapiper.com
craig.martin@us.dlapiper.com

DLA PIPER LLP (US)

Steven M. Rosato
1251 Avenue of the Americas
New York, NY 10020
(212) 335-4500
steven.rosato@us.dlapiper.com

*Attorneys for Professor Jed Handelsman Shugerman*

New York County Indictment No. 71543/2023



# **TABLE OF CONTENTS**

**PAGE**

INTEREST OF AMICUS ................................................................. 1

SUMMARY OF ARGUMENT .......................................................... 3

ARGUMENT ................................................................................. 4

    I.     THE FEDERAL ELECTION CAMPAIGN ACT BROADLY PREEMPTS STATE ELECTION LAW .................................. 4

         A.    The Plain Language of the 1974 Amendments Supports Express Preemption of State Laws with Respect to Federal Elections.......................................................... 5

         B.    The Legislative History Leading to the Adoption of the 1974 Amendments Also Shows Congressional Intent to Expressly Preempt State Election Laws ..................................... 12

         C.    The Legislative History of the Original 1971 Enactment Further Establishes Congressional Intent to "Occupy the Field" with Respect to Federal Elections in Enacting the 1974 Amendments ..................................................... 17

    II.    THE CONVICTION NECESSARILY RESTED ON N.Y. ELECTION LAW § 17-152, IN VIOLATION OF FECA'S EXPRESS PREEMPTION PROVISION .............................................. 19

         A.    FECA Expressly Preempts the Prosecution Theory Unveiled by DANY—for the First Time—During Jury Instructions.................................................................. 19

         B.    FECA's Implementing Regulations Confirm That the Statute Preempts DANY's Attempt to Shoehorn Violations of Federal Campaign-Finance Laws into State Criminal Conspiracy Law .................................. 24

CONCLUSION .............................................................................. 29

## TABLE OF AUTHORITIES

<u>**CASES**</u>                                                                                         <u>**PAGE(S)**</u>

*435 Central Park W. Tenant Ass'n v. Park Front Apts., LLC*,
    164 A.D.3d 411 (1st Dep't 2018) ........................................................................5

*Aloha Airlines, Inc. v. Dir. of Tax'n of Haw.*,
    464 U.S. 7 (1983) ...............................................................................................9

*Altria Grp., Inc. v. Good*,
    555 U.S. 70 (2008) ................................................................................8, 10, 22

*Arizona v. Inter Tribal Council of Ariz., Inc.*,
    570 U.S. 1 (2013) ..............................................................................10, 11, 26

*Buckley v. Valeo*,
    424 U.S. 1 (1976) .................................................................................11, 14

*Buckman Co. v. Plaintiffs' Legal Comm.*,
    531 U. S. 341 (2001) ..........................................................................11

*Burlington N. R.R. v. Oklahoma Tax Comm'n*,
    481 U.S. 454 (1987) ...........................................................................5

*Burroughs v. United States*,
    290 U.S. 534 (1934) ...........................................................................11

*Cipollone v. Liggett Grp.*,
    505 U.S. 504 (1992) ...........................................................................10, 26

*Commonwealth of the N. Mariana Islands v. Canadian Imperial Bank of Com.*,
    21 N.Y.3d 55 (2013) ...........................................................................7, 12

*Crawford v. Burke*,
    195 U.S. 176 (1904) ...........................................................................7, 12

*Dig. Realty Tr. v. Somers*,
    583 U.S. 149 (2018) ...........................................................................12

*Duplex Printing Press Co. v. Deering*,
    254 U.S. 443 (1921)...........................................................................................15

*Garcia v. United States*,
    469 U.S. 70 (1984)...........................................................................................12

*Grove City College v. Bell*,
    465 U.S. 555 (1984).........................................................................................15

*Kansas City v. Fed. Pac. Elec. Co.*,
    310 F.2d 271 (8th Cir. 1962), *cert. denied*, 371 U.S. 912 (1962) ......................15

*Malone v. White Motor Corp.*,
    435 U.S. 497 (1978).........................................................................................10

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)...........................................................................................8

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*,
    578 U.S. 374 (2016)......................................................................................7, 12

*N.Y. & Cuba Mail S.S. Co. v. United States*,
    297 F. 158 (2d Cir. 1924) ................................................................................15

*New York v. Trump*,
    158 F.4th 458 (2d Cir. 2025) .................................................................21, 22, 26

*New York v. Trump*,
    683 F. Supp. 3d 334 (S.D.N.Y. 2023) ..............................................20, 21, 26, 27

*People v. Taveras*,
    12 N.Y.3d 21, 878 N.Y.S.2d 642, 906 N.E.2d 370 (2009) ...............................27

*Reeder v. Kansas City Bd. of Police Comm'rs*,
    733 F.2d 543 (8th Cir. 1984) ........................................................................8, 14

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)....................................................................................10, 11

*Riegel v. Medtronic,*
    552 U.S. 312 (2008) ....................................................................................10, 26

*Rubin* v. *United States,*
    449 U.S. 424 (1981) ..............................................................................................5

*Stern v. Gen. Elec. Co.,*
    924 F.2d 472 (2d Cir. 1991) ...............................................................................8

*Weber v. Heaney,*
    793 F. Supp. 1438 (D. Minn. 1992),
    *aff'd,* 995 F.2d 872 (8th Cir. 1993) .................................................8, 14, 15, 16

*Weinberger v. Rossi,*
    456 U.S. 25 (1982) .............................................................................................12

*Zuber v. Allen,*
    396 U.S. 168 (1969) ...........................................................................................13

## **STATUTES**

52 U.S.C. § 30143(a) ...................................................................................*passim*

Act of Aug. 19, 1911, ch. 33, 37 Stat. 25 (1911) ......................................................17

Corrupt Practices Act § 316, 43 Stat. 1074 (1925) ..................................................17

N.Y. Penal Law § 175.05 ............................................................................ *passim*

N.Y. Penal Law § 175.10 ...............................................................................*passim*

NY Election Law § 17-152 ..............................................................................*passim*

Pub. L. No. 92-225, 86 Stat. 3 § 403 (1972) ........................................................5, 17

# **CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 4...............................................................................................10

# **OTHER AUTHORITIES**

11 C.F.R. § 108.7 ...............................................................................................24, 25

117 Cong. Rec. 29019 (bound ed. Aug. 3, 1971)
    (statement of S. Mathias) ...................................................................................18

118 Cong. Rec. 321 (bound ed. Jan. 19, 1972)
    (statement of Rep. Springer)..............................................................................18

120 Cong. Rec. 27461 (bound ed. Aug. 8, 1974)
    (statement of Rep. Hays) ...................................................................................16

2 Singer, Sutherland Statutory Construction § 48.14 (Supp. 1992) .......................15

*About: Committee on House Administration*, Comm. on H. Admin.
    https://cha.house.gov/about (last visited Jan. 22, 2026)....................................13

*H.R. 16090 -- Federal Election Campaign Act Amendments*,
    https://www.congress.gov/bill/93rd-congress/house-bill/
    (last visited Jan. 22, 2026) ................................................................................13

H.R. Rep. No. 93-1239 (1974).......................................................................13, 14

James Brudney and Ethan J. Leib,
    "*Any*", 49 B.Y.U. L. Rev. 465 (2023) ...............................................................23

Lisa Babish Forbes,
    *Federal Election Regulation and the States:*
    *An Analysis of the Minnesota and New Hampshire Attempts to*
    *Regulate Congressional Elections*,
    42 Case W. Res. L. Rev. 509 (1992) ................................................11, 14, 17, 18

*Mission and History*, Fed. Election Comm'n,
    https://www.fec.gov/about/mission-and-history/
    (last visited Jan. 22, 2026) ..................................................................................7

Rachel Premack, *FEC Takes Shape Under Hays' Watchful Eyes*,
    Investigative Reporting Workshop (Sept. 30, 2021), *available at*
    https://tinyurl.com/ymcm9f68 (last visited Jan. 22, 2026) ................................. 14

S. Conf. Rep. No. 93-1237, 2d Sess. 1, 69
    (reprinted in 1974 U.S.C.C.A.N. 5618, 5638) .................................................... 14

Sam Levor, Note, *The Failures of Federal Campaign Finance*
    *Preemption*, 20 N.Y.U. J. Legis. & Pub. Pol'y 523 (2017) ........................ 5, 6, 10

## INTEREST OF AMICUS[1]

*Amicus Curiae* Jed Handelsman Shugerman is a Professor of Law at Boston University.  He holds a BA, a JD, and a PhD in History from Yale University, and is an expert on the history of presidential power and prosecutorial power.  He debunks the unitary executive theory in recent academic articles[2] and a forthcoming book, *A Faithful President.*  His historical research was cited in both impeachments of President Trump.[3]  He supported those impeachment proceedings in 2019 and 2021 and the federal criminal cases against President Trump.[4]

Nevertheless, he is deeply concerned about the escalating bi-partisan abuse of prosecutorial power to intimidate political opponents and exact revenge.[5]  He has

---

[1] No counsel for any party authored this brief in whole or in part, and no person other than Amicus and his counsel made a monetary contribution intended to fund the preparation or submission of this brief.

[2] *See, e.g.*, *Venality: A Strangely Practical History of Unremovable Offices and Limited Executive Power*, 100 Notre Dame L. Rev. 213 (2024); *The Indecisions of 1789: Inconstant Originalism and Strategic Ambiguity*, 171 Univ. Penn. L. Rev. 753 (2023); *Vesting*, 74 Stan. L. Rev. 1479 (2022); *Removal of Context: Blackstone, Limited Monarchy, and the Limits of Unitary Originalism*, 33 Yale J. L. & Humanities 125 (2022); Andrew Kent, Ethan J. Leib, & Jed H. Shugerman, *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111 (2019).

[3] Quoted and cited in House Impeachment Report, Dec. 16, 2020 (p. 35, 46, 79): https://docs.house.gov/billsthisweek/20191216/CRPT-116hrpt346.pdf; quoted in House Impeachment Opening Statement, Adam Schiff, Jan. 22, 2020. https://twitter.com/jedshug/status/1220466259281817602?s=21

[4] "January 6, Ambiguously Inciting Speech, and the Overt-Acts Rule," 37 *Constitutional Commentary* 275-319 (2023) with Alan Rozenshtein.

[5] Glenn Thrush & Colby Smith, "Federal Prosecutors Open Investigation Into Fed Chair Powell," *NY Times* (Jan. 11, 2026); Devlin Barrett & Jonah Bromwich, "Justice Dept. Will Appeal Dismissal of Comey and James Indictments," *NY Times* (Dec. 19, 2025); Devlin Barrett, Glenn Thrush and Jonah E. Bromwich, "New York Attorney General Letitia James Is Indicted After Trump's Pressure Campaign," *NY Times* (Oct. 9, 2025).

written extensively about the history of the Department of Justice's independence and the increasing partisanship of AGs and state prosecutors.[6]  Even if there had been criminal activity, this was a case for federal enforcement alone.  It is a dangerous precedent for local prosecutors to disregard the law and overreach into federal politics.  Professor Shugerman's interest in this case is a principled commitment to the rule of law.

---

[6] "Professionals, Politicos, and Crony Attorneys General: A Historical Review of the U.S. Attorney General as a Case for Structural Reform," 87 *Fordham Law Review* 1965 (2019); "The Creation of the Department of Justice: Professionalization without Civil Rights or Civil Service," 66 *Stanford Law Review* 121 (2014); "The Rise of the Prosecutor Politicians: Race, War, and the Roots of Mass Incarceration" at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4935067

## SUMMARY OF ARGUMENT

The Federal Election Campaign Act ("FECA") plainly states that the "rules prescribed under this Act, *supersede and preempt any provision of State law with respect to election to Federal office*." 52 U.S.C. § 30143(a) (emphasis added). The case brought by the New York District Attorney ("DANY") against President Donald J. Trump was based upon a provision of State law with respect to election to Federal Office, from the start and especially at the finish. From the start, DANY relied on two state statutes: N.Y. Penal Law § 175.05 for a misdemeanor, and N.Y. Penal Law § 175.10 for the felony upgrade. But even if, *arguendo*, one assumes FECA's preemption clause only bars the application of state election law to federal campaigns, DANY concluded its case by relying *solely* on NY Election Law § 17-152, a state election conspiracy "umbrella," for the felony upgrade. It is no defense to preemption to point to the government's other interests *in addition* to the federal election violation. The alleged federal election violation was at the core of DANY's case.

The argument is a relatively simple syllogism:

1) FECA preempts "any provision of state law with respect to election to federal office." 52 U.S.C. § 30143(a);

2) DANY's entire case was based on three provisions of state law (including one state election law) with respect to election to federal office; and

3) Ergo, FECA preempted DANY's entire case, especially the felony upgrade.

3

**ARGUMENT**

**I.    THE    FEDERAL    ELECTION    CAMPAIGN    ACT    BROADLY
PREEMPTS STATE ELECTION LAW**

There are two broad categories of preemption: express and implied.  Under implied preemption, there are three sub-categories: field preemption, conflict preemption (obstacle), and conflict preemption (impossibility).  Implied preemption balances many factors (such as regulations), but express preemption focuses more clearly on a single source (the statute) with two closely related questions: What does the statutory text say?  And what was congressional intent?

With the enactment of FECA in 1971, Congress intended to preempt enforcement of state laws and regulations in the conduct of campaigns for election to federal office.  The legislative background of FECA and its preemption clause, as originally enacted, raised questions of field and conflict preemption.  But as this brief shows, Congress rewrote FECA's preemption clause in 1974 (the "1974 Amendments") to move decisively in favor of express preemption.  The legislative history and plain language of the statute establish that Congress adopted the 1974 Amendments with a clear desire to increase federal authority over federal elections and to preempt state law.

## A.     The Plain Language of the 1974 Amendments Supports Express Preemption of State Laws with Respect to Federal Elections

"Unless exceptional circumstances dictate otherwise, 'when we find the terms of a statute unambiguous, judicial inquiry is complete.'" *Burlington N. R.R. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 461 (1987) (quoting *Rubin* v. *United States*, 449 U.S. 424, 430 (1981)).

Before the 1974 Amendments, the original 1971 enactment of FECA contained two relevant preemption clauses in section 403.  Pub. L. No. 92-225, 86 Stat. 3 § 403 (1972); *see* Sam Levor, Note, *The Failures of Federal Campaign Finance Preemption*, 20 N.Y.U. J. Legis. & Pub. Pol'y 523, 525 (2017).  The first clause related to conflict preemption, which "arises when either compliance with both federal and local laws is physically impossible or when the local laws stand as an obstacle to the accomplishment of the full congressional purposes and objectives."  *435 Central Park W. Tenant Ass'n v. Park Front Apts., LLC*, 164 A.D.3d 411, 413 (1st Dep't 2018) (quotations omitted).  That clause provided as follows:  "Nothing in this Act shall be deemed to invalidate or make inapplicable any provision of any State law, except where compliance with such provision of law would result in a violation of a provision of this Act."  Pub. L. No. 92-225, 86 Stat. 3 § 403(a) (1972).  In other words, in the event of a conflict between a provision of state law and a provision of FECA, FECA would control.

The second clarified that federal law would prevail over state law, but did not preempt state law entirely: "Notwithstanding subsection (a), no provision of State law shall be construed to prohibit any person from taking any action authorized by this Act or from making any expenditure (as such term is defined in section 301(f) of this Act) which he could lawfully make under this act." *Id.* § 403(b).

In 1974, however, amendments to FECA changed the language regarding preemption. The 1974 Amendments reflect both the current state of the law and the state of the law as it existed during the time period relevant to this matter. In contrast to section 403(a) of the original enactment, the analogous provision in the 1974 Amendments now broadly states that, "[s]ubject to subsection (b), the provisions of this Act, and of rules prescribed under this Act, *supersede and preempt any provision of State law with respect to election to Federal office*." 52 U.S.C. § 30143(a) (emphasis added).

The referenced subsection (b) contains a minor carveout, permitting "a State or local committee of a political party" to, "subject to state law, use exclusively funds that are not subject to the prohibitions, limitations, and reporting requirements of the Act for the purchase or construction of an office building for such State or local committee." *Id.* § 30143(b). The 1974 Amendments were a response to the Watergate scandal and concerns regarding financial abuse in the 1972 presidential election. *See* Levor, 20 N.Y.U. J. Legis. & Pub. Pol'y at 525;

*Mission and History*, Fed. Election Comm'n, https://www.fec.gov/about/mission-and-history/ (last visited Jan. 22, 2026).

This change in language—in particular, the adoption of the broad phrasing "supersede and preempt any provision of State law with respect to election to Federal office"—indicates Congressional intent "to convey a different meaning[]" than the narrower language in original section 403(a).  *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Manning*, 578 U.S. 374, 398 (2016); *see, e.g.*, *Crawford v. Burke*, 195 U.S. 176, 190 (1904) ("Our own view, however, is that *a change in phraseology creates a presumption of a change in intent*, and that Congress would not have used such different language in section 17 [of the bankruptcy act of 1898] from that used in section 33 of the act of 1867, without thereby intending a change of meaning." (emphasis added)); *Commonwealth of the N. Mariana Islands v. Canadian Imperial Bank of Com.*, 21 N.Y.3d 55, 61 (2013) ("It is a well settled tenet of statutory construction that the Legislature, by enacting an amendment of a statute changing the language thereof, is deemed to have intended a material change in the law.") (cleaned up).

While the "express pre-emption clause" contained in § 30143(a) is facially broader than the conflict-preemption clause contained in original section 403(a), that "does not immediately end the inquiry" into whether Congress intended to preempt the field entirely, "because the question of the substance and scope of Congress'

displacement of state law still remains.  Pre-emptive intent may also be inferred if the scope of the statute indicates that Congress intended federal law to occupy the legislative field, or if there is an actual conflict between state and federal law." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76-77 (2008); *see Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) ("The purpose of Congress is the ultimate touchstone in every pre-emption case." (citation modified)).

Before the Supreme Court's decision in *Altria*, various lower courts had found ambiguity in the scope of preemption intended by § 30143, concluding that the phrase "with respect to election to Federal office" could be interpreted to mean that Congress "did not intend to preempt state regulation with respect to non-election-related activities." *Weber v. Heaney*, 793 F. Supp. 1438, 1447-48 (D. Minn. 1992), *aff'd*, 995 F.2d 872 (8th Cir. 1993); *see also Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475 (2d Cir. 1991) ("The preemption provision of the FECA, however, relates only to state-law provisions 'with respect to election to Federal office.'  The narrow wording of this provision suggests that Congress did not intend to preempt state regulation with respect to non-election-related activities."); *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 545 (8th Cir. 1984) ("Certainly a law prohibiting certain people from contributing to campaigns for federal office can be considered a 'law with respect to election to Federal office.'  But that is not the end of the matter.  The statute can also be read to refer primarily to the behavior of

candidates . . . and to supersede state laws on permissible contributions only to the extent that federal law expressly forbids certain kinds of contributions . . . .").  But regardless of the precise scope of preemption intended by § 30143, there is no reasonable dispute that, at a minimum, the statute preempts state laws purporting to regulate actions taken by a candidate (or by his or her campaign or agents acting on his behalf) "with respect to election to Federal office."  52 U.S.C. § 30143(a).

The Supreme Court's decision in *Aloha Airlines, Inc. v. Dir. of Tax'n of Haw.*, 464 U.S. 7 (1983), is instructive.  There, the Court held that, "[w]hen a federal statute unambiguously forbids the States to impose a particular kind of tax on an industry affecting interstate commerce, courts need not look beyond the plain language of the federal statute to determine whether a state statute that imposes such a tax is preempted."  *Id.* at 12.

For some kinds of preemption, like field preemption or implied preemption, courts may apply a presumption against preemption unless Congress has made clear its intent to supersede state law, in order to protect the states' police power. However, where a federal statute explicitly provides that it supersedes and preempts state law—as FECA's preemption clause does—that presumption is weak, and if it applies at all, it applies only to the scope of the express preemption clause:

> When Congress has considered the issue of pre-emption and has included in the enacted legislation a provision explicitly addressing that issue, and when that provision provides a reliable indicium of congressional intent with

9

> respect to state authority, there is no need to infer congressional intent to pre-empt state laws from the substantive provisions of the legislation.

*Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992) (cleaned up); *see Riegel v. Medtronic*, 552 U.S. 312, 331 (2008) ("[I]t is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed[.]"); *see Altria*, 555 U.S. at 102 (In light of *Riegel*, there is no authority for invoking the presumption against pre-emption in express pre-emption cases.") (Thomas, J., dissenting); *see also Malone v. White Motor Corp.*, 435 U.S. 497, 505 (1978); Levor, 20 N.Y.U. J. Legis. & Pub. Pol'y at 535 (citing *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

Notably, the FECA preemption clause applies to "any" state law with respect to elections to federal office, so the text is not only an express preemption clause, but also an expressly broad preemption clause. Even if a "presumption against preemption" were to apply here, it would not get further beyond the text, because the clarity of the text overcomes any plausible presumption.

There is arguably a presumption *in favor of preemption* when the subject is a federal election and when the basis of Congress' legislative authority is the Elections Clause, U.S. Const. art. I, § 4. *Id.* at 536 (citing *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013)).

Writing for the *Inter Tribal Council* majority, Justice Scalia explained:

> Because the power the Elections Clause confers is none other than the power to pre-empt, the reasonable assumption is that the statutory text [of the National Voter Registration Act] accurately communicates the scope of Congress's pre-emptive intent. Moreover, the federalism concerns underlying the presumption in the Supremacy Clause context are somewhat weaker here. Unlike the States' "historic police powers," *Rice*, 331 U.S. at 230, the States' role in regulating congressional elections—while weighty and worthy of respect—has always existed subject to the express qualification that it "terminates according to federal law." *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U. S. 341, 347 (2001). In sum, there is no compelling reason not to read Elections Clause legislation simply to mean what it says.

*Inter Tribal Council*, 570 U.S. at 14-15. While *Inter Tribal Council* focuses on congressional elections under Article I, the rationale should apply with equal weight to presidential elections under Article II. *Cf. Buckley v. Valeo*, 424 U.S. 1, 132 (1976) ("This Court has also held that it has very broad authority to prevent corruption in national Presidential elections."); *Burroughs v. United States*, 290 U.S. 534, 547 (1934) ("The power of Congress to protect the election of President and Vice President from corruption being clear, the choice of means to that end presents a question primarily addressed to the judgment of Congress.").

Therefore, the shift in language from the original FECA of 1971 to the 1974 Amendments should be presumed to reflect a change of Congress' intent to expressly preempt state election laws. *See* Lisa Babish Forbes, *Federal Election Regulation*

*and the States: An Analysis of the Minnesota and New Hampshire Attempts to Regulate Congressional Elections*, 42 Case W. Res. L. Rev. 509, 515 (1992) ("In addition, FECA Amendments included an express preemption provision which may have rendered congressional regulation of federal elections exclusive."); *see also Merrill Lynch*, 578 U.S. at 398; *Crawford*, 195 U.S. at 190; *Commonwealth of the N. Mariana Islands*, 21 N.Y.3d at 61.  Solely on the basis of the statutory text, FECA preempts—at a minimum—all state election laws "with respect to election to Federal office."  52 U.S.C. § 30143(a).

**B.    The Legislative History Leading to the Adoption of the 1974 Amendments Also Shows Congressional Intent to Expressly Preempt State Election Laws**

Even if the plain language of § 30143(a) were not dispositive, the legislative history with respect to the 1974 Amendments conclusively establishes that FECA was intended to preempt the field of election law with respect to federal elective office.  While "[t]he contemporaneous remarks of a sponsor of legislation are certainly not controlling in analyzing legislative history," *Weinberger v. Rossi*, 456 U.S. 25, 35 n.15 (1982), "[c]ommittee reports . . . are a particularly reliable source to which we can look to ensure our fidelity to Congress' intended meaning."  *Dig. Realty Tr. v. Somers*, 583 U.S. 149, 170 (2018) (Sotomayor, J., concurring); *see Garcia v. United States*, 469 U.S. 70, 76 (1984) ("In surveying legislative history we have repeatedly stated that the authoritative source for finding the Legislature's

intent lies in the Committee Reports on the bill, which 'represen[t] the considered and collective understanding of those Congressmen involved in drafting and studying proposed legislation'" (quoting *Zuber v. Allen*, 396 U.S. 168, 186 (1969))).

Rep. Wayne Hays of Ohio was the main sponsor of the 1974 Amendments. *H.R. 16090 -- Federal Election Campaign Act Amendments*, https://www.congress.gov/bill/93rd-congress/house-bill/ (last visited Jan. 22, 2026), He also was the Chair of the House Administration Committee, the committee responsible for overseeing election reform. *See About: Committee on House Administration*, Comm. on H. Admin. https://cha.house.gov/about (last visited Jan. 22, 2026).

The July 30, 1974, Committee Report on the 1974 Amendments is clear: "It is the intent of the Committee to *preempt all state and local laws*. . . . It is the intent of the committee to make certain that the Federal law is construed to *occupy the field with respect to elections to Federal office and that the Federal law will be the sole authority under which such elections will be regulated*."  H.R. Rep. No. 93-1239, at 10-11 (1974) (emphasis added); *see also id.* at 155 (supplemental views of Rep. Frenzel) ("Sections 104 and 301 preempt State law.  This is a welcome change which will insure that election laws are consistent and uniform and that candidates for Federal office do not bear the burden of complying with several different sets of laws and regulations.").  The report continues to discuss criminal sections specifically:

"Federal law is intended to be the *sole source* of criminal sanctions for offenses involving political activities in connection with Federal elections." *Id.* at 10-11 (emphasis added). While "Congress later repealed the criminal preemption provision [of FECA] in response to *Buckley*," *Weber*, 793 F. Supp. at 1450, its express intent was nonetheless clear in 1974, *see* Forbes, 42 Case W. Res. L. Rev. at 521 ("Although Congress amended FECA extensively . . . in response to *Buckley*, the amendments did not affect section 453.").

The Conference Report reflects a similar understanding of the 1974 Amendments' impact on criminal law:

> The provisions of the conference substitute make it clear that the Federal law occupies the field with respect to criminal sanctions relating to limitations on campaign expenditures, the sources of campaign funds used in Federal races, the conduct of Federal campaigns, and similar offenses, but does not affect the States' rights to prohibit false registration, voting fraud, theft of ballots, and similar offenses under State law.

S. Conf. Rep. No. 93-1237, 2d Sess. 1, 69 (reprinted in 1974 U.S.C.C.A.N. 5618, 5638). Reading the final portion in a manner similar to the Eighth Circuit's approach in *Reeder*, "false registration, voting fraud, theft of ballots, and similar offenses," can be understood to relate to the voting public, not the candidates. *See Reeder*, 733 F.2d at 545.

Notably, "[n]early each component of the amendments were the House decisions, which leaned away from being the sort of bill that might eliminate big money and existing power structures from influencing politics."  Rachel Premack, *FEC Takes Shape Under Hays' Watchful Eyes*, Investigative Reporting Workshop (Sept. 30, 2021), *available at* https://tinyurl.com/ymcm9f68 (last visited Jan. 22, 2026).  Therefore, legislative debate from the floor of the House is "at least probative of legislative intent . . . ." *See Weber*, 793 F. Supp. at 1450 (citing *Grove City College v. Bell*, 465 U.S. 555, 566-67 (1984)).

Rep. Hays spoke in the debates, and as the committee chairman, his statements "are regarded as being like supplemental committee reports, because the chair has the duty to defending the bill on the legislative floor and is presumed to have familiarized himself with its terms and its potential effect."  *Id.* (citing 2 Singer, Sutherland Statutory Construction § 48.14, at 361 (Supp. 1992)).  "These statements should therefore be afforded the same weight as formal committee reports."  *Id.* at 1450-51 (citing *Kansas City v. Fed. Pac. Elec. Co.*, 310 F.2d 271, 280 (8th Cir. 1962), *cert. denied*, 371 U.S. 912 (1962)); *see also N.Y. & Cuba Mail S.S. Co. v. United States*, 297 F. 158, 162 (2d Cir. 1924) ("Where a report of a committee is supplemented by the spokesman of the House committee who has had the bill in charge when it was under consideration by the House, it is regarded as an expression

of the legislative intent in a case where the meaning of the statute may be obscure.");

*Duplex Printing Press Co. v. Deering*, 254 U.S. 443, 475 (1921).

On the floor, Hays "advanced the view that Congress should occupy the field of federal elections" (although he also "believed that states could encourage voluntary expenditure limits in spite of complete preemption"). *Weber*, 793 F. Supp. at 1451; 120 Cong. Rec. 27461 (bound ed. Aug. 8, 1974) (statement of Rep. Hays) ("I think if we are going to preempt State laws—and if there was any one thing that nearly every Member of this body asked us to do, that was to preempt State laws so that all candidates would know where they stood, and live under one set of regulations and have one set of laws to go by."). Hays continued to explain it colorfully: "So, on the subject of preemption, it seems to me that it is a little bit like pregnancy—you either are or you are not; you cannot be part way. I just think that if we are going to preempt State laws—and I think it is vital that we do, so that we have some orderly kind of procedure—that we have one set of standards for all the States all the way through for Federal elections." 120 Cong. Rec. 27461 (statement of Rep. Hays). When combined with the plain language of the amended statute— "*supersede and preempt any provision of State law* with respect to election to Federal office," 52 U.S.C. § 30143(a) (emphasis added)—Hays's statements support an express intent to preempt the entire federal election field.

16

**C.    The Legislative History of the Original 1971 Enactment Further Establishes Congressional Intent to "Occupy the Field" with Respect to Federal Elections in Enacting the 1974 Amendments**

Finally, the legislative history of FECA as originally enacted in 1971 further supports the conclusion that Congress intended the 1974 Amendments to completely preempt state election laws with respect to elections to federal office.

Prior to the 1974 Amendments, FECA's language regarding state preemption was a simple confirmation of the Supremacy Clause's import. *See* Forbes, 42 Case W. Res. L. Rev. at 519-20.  At the time, this was the norm in federal election legislation:  "[T]he 1971 FECA included section 403, a provision strikingly similar to those in the 1911 and 1925 acts regarding their effect on state laws.  Although somewhat confusing, the gist of section 403 seems consistent with earlier provisions—states were permitted to continue operating in the field of federal election law so long as state law was not in direct contravention of FECA."  *Id.* at 520; *compare* 86 Stat. 3 § 403(a) ("Nothing in this Act shall be deemed to invalidate or make inapplicable any provision of any State law, except where compliance with such provision of law would result in a violation of a provision of this Act.") *with* Act of Aug. 19, 1911, ch. 33, 37 Stat. 25, 29 (1911) ("This Act shall not be construed to annul or vitiate the laws of any State, not directly in conflict herewith, relating to the nomination or election of candidates for the offices herein named, or to exempt any such candidate from complying with such State laws.") *and* Corrupt Practices

17

Act § 316, 43 Stat. 1074 (1925) ("This title shall not be construed to annul the laws of any State relating to the nomination or election of candidates, unless directly inconsistent with the provisions of this title, or to exempt any candidate from complying with such State laws.").

Until 1972, no other substantive federal law regulated federal elections in any significant manner. *See* Forbes, 42 Case W. Res. L. Rev. at 520. It seems that during the initial 1971 drafting, the only passing concern regarding preemption was broadcasting expenditures and the need for the FCC to be involved. 117 Cong. Rec. 29019 (bound ed. Aug. 3, 1971) (statement of S. Mathias) ("But I would raise the constitutional question of instructing a Federal agency, the FCC, to determine the applicability of the laws of one of the States of the Union. I would suggest . . . that we leave the question of determination to the States and to the judicial system. I can see that there might be some tendency on the part of the States—which have also labored, as we are working here, for electoral reform—to resent this preemption in the effort to get some uniformity in the election laws."); *see also* 118 Cong. Rec. 321 (bound ed. Jan. 19, 1972) (statement of Rep. Springer) ("Since the thrust of this entire bill is the improvement of campaign practices in Federal elections, State laws are preempted only insofar as they would frustrate the operation of the Federal law for the purposes included.").

In 1974, by contrast, Congress was expressly focused on achieving broad preemption of state law in passing the 1974 Amendments. This shift in focus over such a short period further buttresses the conclusion that Congress intended to preempt the field of election law with respect to federal elections.

## II. THE CONVICTION NECESSARILY RESTED ON N.Y. ELECTION LAW § 17-152, IN VIOLATION OF FECA'S EXPRESS PREEMPTION PROVISION

### A. FECA Expressly Preempts the Prosecution Theory Unveiled by DANY—for the First Time—During Jury Instructions

Throughout the prosecution of this case, DANY's precise theory, including whether it depended on a violation of New York election law, remained opaque until the reading of the jury instructions. It was only then—to my surprise and the surprise of many other legal observers—that DANY revealed that, to elevate the misdemeanor business records charge from a misdemeanor under N.Y. Penal Law § 175.05 to a felony under N.Y. Penal Law § 175.10, it was relying _solely_ on an alleged violation of N.Y. Election Law § 17-152 as "the other crime the defendant intended to commit, aid or conceal . . . ." _See_ Jury Instructions at 43.[7]

The original structure of the case—and the only one that DANY presented to the U.S. District Court for the Southern District of New York in successfully persuading that court to remand this case back to the state trial court, _see_

---

[7] The jury instructions were made publicly available on the nycourts.gov website. _See_ People v. DJT Jury Instructions and Charges FINAL 5-23-24.pdf.

*New York v. Trump*, 683 F. Supp. 3d 334, 349 (S.D.N.Y. 2023)—was a more open-ended and flexible mix of state and federal tax law.  In order to upgrade the misdemeanor to a felony under N.Y. Penal Law § 175.10, DANY had to prove the cover-up of another crime.  DANY had initially offered multiple options as the alleged underlying crime: 1) a violation of FECA; 2) a federal tax violation; 3) a state tax violation; 4) some other business filing misdemeanor (e.g., Michael Cohen's tax filings); and 5) a state election conspiracy (NY Election Law § 17-152).

However, under the final jury instructions, DANY offered only *one* category of underlying crime: NY Election Law § 17-152.  The jury instructions explicitly stated "that the other crime the defendant intended to commit, aid, or conceal is a violation of New York Election Law section 17-152."  Jury Instructions at 30.  The jury still had a range of options as to what constituted the *conspiracy* in violation of state law, but no options as to what constituted the "other crime."  On the last day, the state election law suddenly became the only "other crime," the *sole* avenue to reach the felony conviction.

Section 17-152 provides:  "Any two or more persons who conspire to promote or prevent the election of any person to a public office *by unlawful means* and which conspiracy is acted upon by one or more of the parties thereto, shall be guilty of misdemeanor."  N.Y. Election Law § 17-152 (emphasis added).  The potential "unlawful means," the trial court instructed the jury, could be any one of the

20

following: FECA violations; secondary falsification of other business records; and violation of unspecified federal, state, and local tax laws.  Jury Instructions at 44-47.

Both the 2023 pre-trial case and the 2024 final trial case started with the misdemeanor (N.Y. Penal Law § 175.05), plus the felony upgrade for "intent to commit or conceal another crime" (*id.* § 175.10).  The crucial change is the exclusive new role of N.Y. Election Law § 17-152.  As noted, in 2023, the federal district court reviewed only the legality of the first structure, but not the final structure and its exclusive reliance on a state election law for the felony upgrade.  *See Trump*, 683 F. Supp. 3d at 349 (describing alleged violation of N.Y. Election Law § 17-152 as just "one of the crimes that Trump intended to commit, aid or conceal by his falsifications of business records").

Three months ago, the Second Circuit recognized the legal significance of this switch and its implications upon a federal preemption defense when it held, in vacating the district court's order denying President Trump leave to file a second notice of removal, that the district court must consider on remand "whether *changes in the State's theory of prosecution* might restore Trump's purported federal defense based on the preemption provision of the Federal Election Campaign Act, 52 U.S.C. § 30143(a)."  *New York v. Trump*, 158 F.4th 458, 468 (2d Cir. 2025) (emphasis added).

The case that ultimately went to the jury had a fundamental FECA preemption problem: In relying on an alleged violation of N.Y. Election Law § 17-152 as the basis to sustain a felony conviction, DANY was directly enforcing a state election law against a candidate for federal office—regardless of the nature of the "unlawful means" underlying the alleged section 17-152 violation. Put differently, the government alleged that President Trump intended to "commit or conceal" a state election-law crime (i.e., section 17-152), and the jury had to conclude that President Trump intended that state election-law crime to convict President Trump of a felony violation of the business records statute. Again, no federal court has ruled on and permitted this final structure, and the Second Circuit explicitly raised the validity of this preemption question. *Trump*, 158 F.4th at 468 (vacating the district court's order and remanding to review a heightened preemption problem).

As already discussed, FECA broadly provides that its provisions "supersede and preempt *any provision of state law with respect to election to federal office*." 52 U.S.C. § 30143(a) (emphasis added). Where "a federal law contains an express pre-emption clause," it "displace[s]" state law falling within the clause's scope. *Altria*, 555 U.S. at 76. For federal elections, therefore, FECA "supersedes and preempts" New York state election laws—including N.Y. Election Law § 17-152. In this case, the jury instructions show beyond a shadow of a doubt that the keystone of the prosecution's case expressly was an alleged violation of state election law, in

direct violation of § 30143(a). This fundamental defect alone requires reversal of the conviction.

The State's reliance on N.Y. Election Law § 17-152 is a sufficient basis to overturn the felony conviction, but the State's reliance on N.Y. Penal Law §§ 175.05 and 175.10 raises additional preemption problems that should be addressed. Nothing in the text of FECA's preemption clause limits its preemption to state election laws; the text plainly and broadly states that it "supersede[s] and preempt[s] *any provision of state law with respect to election to federal office*." 52 U.S.C. § 30143(a) (emphasis added). On the one hand, there is no bright-line canon of statutory interpretation that the word "any" has the broadest possible meaning (i.e., universal meaning); *see generally* James Brudney and Ethan J. Leib, *Any*, 49 B.Y.U. L. Rev. 465 (2023). Nevertheless, the text plus the legislative history point to a broad meaning that would plainly apply to New York's election laws and to other non-electoral state laws when a prosecutor tries to use them "with respect to election to federal office." DANY's core allegations were clear: the underlying crime was violation of federal election laws, and the prosecution based on New York business records requirements was inextricably related to those alleged crimes. FECA preempts the use of those state business statutes when the substantive crime is "with respect to election to federal office." Thus, even a misdemeanor conviction based on N.Y. Penal Law §175.05 is similarly preempted and invalid.

**B.**     **FECA's Implementing Regulations Confirm That the Statute Preempts DANY's Attempt to Shoehorn Violations of Federal Campaign-Finance Laws into State Criminal Conspiracy Law**

Federal preemption of DANY's use of an alleged violation of N.Y. Election Law § 17-152 to win a conviction is further confirmed by FECA's implementing regulations.  Those regulations provide as follows:

(a)     The provisions of the Federal Election Campaign Act of 1971, as amended, and rules and regulations issued thereunder, supersede and preempt any provision of State law with respect to election to Federal office.

(b)     Federal law supersedes State law concerning the—

(1)     Organization and registration of political committees supporting Federal candidates;

(2)     *Disclosure of receipts and expenditures by Federal candidates and political committees*; and

(3     *Limitation on contributions and expenditures regarding Federal candidates and political committees*.

(c)     The Act does not supersede State laws which provide for the—

(1)     Manner of qualifying as a candidate or political party organization;

(2)     Dates and places of elections;

(3)     Voter registration;

(4)     Prohibition of false registration, voting fraud, theft of ballots, and similar offenses;

(5)     Candidate's personal financial disclosure; or

(6)     Application of State law to the funds used for the purchase or construction of a State or local party office building to the extent described in 11 CFR 300.35.

11 C.F.R. § 108.7 (emphasis added).

N.Y. Election Law § 17-152—targeting unlawful conspiracies "to promote or prevent the election of any person to a public office"—plainly fits under section 108.7(a), which echoes the broad preemption language of 52 U.S.C. § 30143(a). But more importantly, the theory on which DANY sought to convict President Trump falls squarely under section 108.7(b)(3), as it explicitly relied on the premise that President Trump exceeded the "[l]imitation on contributions" to his presidential campaign, and it also implicated section 108.7(b)(2) on the disclosure of receipts and expenditures (e.g., Michael Cohen's election-related transactions). *See* 11 C.F.R. §§ 108.7(b)(2)-(3). In fact, the trial court specifically instructed the jury about the elements of a FECA violation, explaining how the terms "contributions" and "expenditures" are defined in the statute, and further explaining that "it is unlawful for an individual to willfully make a contribution" to a presidential campaign in excess of $2,700. Jury Instructions at 31. There can be no reasonable dispute that FECA's text and regulations preempt the use of N.Y. Election Law § 17-152 to prosecute alleged crimes concerning violations of federal election contribution limits. Yet that is exactly what DANY did.

DANY may have felt empowered to transgress these clear statutory and regulatory boundaries as a result of the Southern District of New York's July 2023 remand decision. But as already noted, that decision was reached on the basis of

DANY's initial case structure, before DANY reorganized its case to focus centrally on a campaign-finance conspiracy. For that reason alone, the decision is of little persuasive value, *see Trump*, 158 F.4th at 468, but its preemption analysis was mistaken in any event.

To begin, the decision appears to have analyzed the preemption question through the lens of implied field preemption—not express preemption—in stating that "FECA *occupies the field* with respect to regulations of federal campaign contributions." *Trump*, 683 F. Supp. 3d at 350 (internal quotations omitted; emphasis added). Compounding the error, the court emphasized the "presumption against preemption" as the framework for its analysis, *id.* at 347, but the court never acknowledged the doctrinal difference between express preemption and implied preemption generally, despite a long line of cases that—at the very least—weaken the role of any such presumption, if not eliminate it. *See supra* at 9-11 (citing, *inter alia*, *Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1, 14 (2013)); *Cipollone v. Liggett Grp.*, 505 U.S. 504, 517 (1992); *Riegel v. Medtronic*, 552 U.S. 312, 331 (2008)).

Nor did the court acknowledge the clarity of the statutory text ("*any* provision of State law") or mention the legislative history confirming congressional intent for broad preemption of state law with respect to federal elections. And notably, the

court mentioned the implementing regulations only briefly to set the stage for its restrictive interpretation of the scope of FECA preemption.

The court's erroneous doctrinal analysis of express preemption under FECA led the court to permit DANY's use of N.Y. Election Law § 17-152 to allege merely a conspiracy based upon intent, rather than to prove a FECA violation directly, thereby permitting section 17-152 to go beyond the scope of the federal statute and to broaden the reach of state law, and replacing federal standards with state standards of intent:

> The People need not establish that Trump or any other person actually violated NYEL § 17-152 or FECA. *People v. Taveras*, 12 N.Y.3d 21, 27, 878 N.Y.S.2d 642, 906 N.E.2d 370 (2009) (holding that the only "relevant actus reus [under § 175.10] is the creation of a false entry in a business record," which is "elevated to a first-degree offense on the basis of an enhanced intent requirement ."). Trump can be convicted of a felony even if he did not commit any crime beyond the falsification, so long as he intended to do so or to conceal such a crime.

*Trump*, 683 F. Supp. 3d at 349. This interpretation replaced federal election law with a combination of broadened state election conspiracy law and broadened state criminal doctrine on *mens rea*, *actus reus*, concealment, and the like. There was already a gap between the criminal and civil enforcement of federal election law. This broader use of state criminal law and state election law—instead of the body of federal law—is precisely what the text of FECA preempts. And DANY's switch from FECA to a more prosecution-friendly strategy under N.Y. Election

Law § 17-152 is precisely the kind of loose cherry-picking from state and federal law that Congress intended to prevent with FECA's preemption clause.

Compare the district court's analysis in 2023 not only to the unambiguous text of FECA's broad clause superseding and preempting "any" provision of state law, 52 U.S.C. § 30143(a), but also to the legislative history discussed above—including, for example, the Committee Report on the 1974 Amendments and the statements of the main sponsor of the bill on the House floor. *See supra* at 13-16.  The court erred when it invited conflicting standards, confusing layers, and multiple options for prosecutors to expand criminal liability under state law from conduct that may have not have been criminal under federal law.

In summary, this is a case of express preemption—Congress expressly included broad preemptive language in the statute to prohibit state prosecutors from using state election law against federal candidates.  Both the federal district court and the court below erred in permitting DANY to proceed on an expressly preempted theory of prosecution.  This court should apply the proper doctrine of express preemption and its emphasis on statutory text and congressional intent.

## **CONCLUSION**

Under FECA's express preemption provision, states are barred from enforcing state election laws against candidates for federal office. This case explicitly was an effort to enforce New York state election law against a presidential candidate. Because federal election law preempts the field "with respect to election to federal office[,]" 52 U.S.C. 30143(a), the trial court erred in permitting this prosecution to go forward.

Dated:  New York, New York
        January 28, 2026

DLA PIPER LLP (US)

OF COUNSEL:

John L. Reed
Ronald N. Brown, III
R. Craig Martin
DLA PIPER LLP (US)
1201 North Market Street, Suite 2100
Wilmington, DE 19801
john.reed@us.dlapiper.com
ronald.brown@us.dlapiper.com
craig.martin@us.dlapiper.com

By:  */s/ Steven M. Rosato*
        Steven M. Rosato

1251 Avenue of the Americas
New York, New York 10020
(212) 335-4500
steven.rosato@us.dlapiper.com

*Attorneys for Professor*
*Jed Handelsman Shugerman*

29

## <u>PRINTING SPECIFICATION STATEMENT</u>

### Pursuant to 22 NYCRR § 1250.8(j)

This computer-generated brief was prepared using a proportionally spaced typeface.

|                      |                 |
|----------------------|-----------------|
| Name of typeface:    | Times New Roman |
| Point size:          | 14              |
| Line spacing:        | Double          |

The total number of words in the brief, inclusive of point headings and footnotes and exclusive of pages containing the table of contents, table of citations, proof of service, certificate of compliance, or any authorized addendum is 6,860.