FILED: APPELLATE DIVISION - 1ST DEPT 07/29/2026 02:57 PM    2025-00648

NYSCEF DOC. NO. 100    RECEIVED NYSCEF: 07/29/2026

*To be argued by*
STEVEN C. WU
(15 MINUTES REQUESTED)

# New York Supreme Court

### Appellate Division, First Department

Ind. No. 71543/2023
Appellate Case No. 2025-00648

---

**THE PEOPLE OF THE STATE OF NEW YORK**,

*Respondent,*

*- against -*

**DONALD J. TRUMP**,

*Defendant-Appellant.*

**On Appeal from the Supreme Court of the
State of New York, New York County**

---

## BRIEF FOR RESPONDENT

---

ALVIN L. BRAGG, JR.
 *District Attorney*
 *New York County*
 One Hogan Place
 New York, NY 10013
 (212) 335-9000
 danyappeals@dany.nyc.gov

STEVEN C. WU
 *Chief, Appeals Division*
JOHN T. HUGHES
 *Deputy Chief, Appeals Division*
DAVID GAGNE
 *Assistant District Attorney*

JULY 29, 2026

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................ vi

INTRODUCTION............................................................................... 1

QUESTIONS PRESENTED .................................................................. 6

STATEMENT OF THE CASE .............................................................. 7

    A.    Factual Background................................................................ 7

        1.    The Trump Tower meeting in August 2015.................................... 7

        2.    The catch-and-kill scheme ................................................. 9

            a.    The conspirators catch and kill Dino Sajudin's false story about defendant having an illegitimate child, paying him $30,000. ................................................. 9

            b.    The conspirators catch and kill Karen McDougal's true story about her affair with defendant, paying her $150,000............................................................... 11

            c.    At a particularly vulnerable moment in defendant's campaign, the conspirators catch and kill Stormy Daniels's true story of a sexual encounter with defendant, paying her $130,000. ........................................... 18

        3.    The public revelation of the McDougal payment.......................... 25

        4.    The cover-up of the Daniels payment and the creation of false business records held by the Trump Organization.............. 27

            a.    The plan to secretly reimburse Michael Cohen .................. 28

            b.    The creation of 34 false business records .......................... 31

        5.    The public revelation of the hush-money payment to Daniels........................................................................... 36

6.      AMI's and Cohen's admissions about making illegal campaign contributions, and defendant's efforts to prevent Cohen from cooperating with law enforcement ............................ 39

7.      Testimony regarding Robert Costello ............................................. 43

B.    Procedural Background ................................................................................. 46

1.      The first federal removal proceeding ............................................. 46

2.      Pre-trial motion practice .................................................................. 48

3.      The jury trial ...................................................................................... 49

        a.      Defendant's objections on grounds of presidential immunity .................................................................................. 49

        b.      The jury charge ..................................................................... 50

        c.      The verdict ............................................................................. 51

4.      Relevant post-trial proceedings ...................................................... 51

        a.      *Trump v. United States* ........................................................ 51

        b.      Defendant's post-trial motion to vacate ............................ 52

        c.      Defendant's motion to file a second, untimely notice of removal in federal court ...................................... 54

        d.      Defendant unsuccessfully seeks to stay sentencing, and the trial court sentences him on January 10, 2025 .................................................................................. 54

        e.      Defendant's appeal to the Second Circuit in the second removal matter ........................................................ 55

ARGUMENT ..................................................................................................... 55

POINT I ............................................................................................................. 55

PRESIDENTIAL IMMUNITY FOR OFFICIAL ACTS DOES NOT
SHIELD DEFENDANT FROM CRIMINAL LIABILITY FOR HIS
WHOLLY UNOFFICIAL MISCONDUCT ........................................................ 55

    A.    Many of Defendant's Immunity Challenges Are Unpreserved. ............. 57

    B.    The Challenged Testimony Was Admissible. ........................................... 61

        1.    Defendant's statements on Twitter ................................................ 61

        2.    Testimony by Hope Hicks ................................................................ 65

        3.    Testimony by Michael Cohen ........................................................... 70

        4.    Testimony by Madeleine Westerhout ............................................. 73

    C.    Any Error in Admitting Official-Acts Evidence Was Harmless. ............ 75

        1.    Harmless-error review is available. .................................................. 76

        2.    Defendant does not dispute that there was overwhelming
            evidence that he made or caused false entries in the business
            records of an enterprise. ................................................................... 80

        3.    Independent evidence likewise overwhelmingly established
            that defendant acted with intent to defraud, which included
            an intent to commit or conceal the commission of another
            crime. ................................................................................................ 81

POINT II ........................................................................................................... 88

FEDERAL PREEMPTION POSES NO BARRIER TO
DEFENDANT'S CONVICTIONS ..................................................................... 88

    A.    Federal Law Does Not Preempt Penal Law § 175.10, the Statute
        Under Which Defendant Was Actually Convicted. ................................. 90

    B.    Defendant's Preemption Challenge to Election Law § 17-152 Is
        Both Meritless and Immaterial to His Convictions Under Penal
        Law § 175.10. .............................................................................................. 97

1.    FECA preemption did not prevent the jury from finding facts relevant to defendant's culpable intent for a state-law crime. ...................................................................... 97

2.    Election Law § 17-152 is not preempted in any event. ............... 104

POINT III ................................................................................................ 107

THE TRIAL COURT CORRECTLY INSTRUCTED THE JURY THAT IT DID NOT NEED TO UNANIMOUSLY AGREE ON THE PARTICULAR "UNLAWFUL MEANS" OF THE UNCHARGED ELECTION LAW CONSPIRACY .................................................. 107

A.    Defendant's Unanimity Claim Is Unpreserved and Waived. ................. 108

B.    The Particular "Unlawful Means" of the Uncharged Election Law Conspiracy Was Not an Element of Penal Law § 175.10 and Thus Did Not Require Juror Unanimity. ........................................... 111

C.    In Any Event, the Particular "Unlawful Means" Is Not a Separate Element of Election Law § 17-152 Requiring Juror Unanimity. ........... 116

1.    Defendant's unpreserved statutory argument is meritless. ......... 116

2.    Defendant's unpreserved due process argument is meritless. .................................................................. 120

POINT IV ................................................................................................ 122

THE EVIDENCE AMPLY ESTABLISHED DEFENDANT'S INTENT TO DEFRAUD ................................................................ 122

A.    The Intent to Defraud Under Penal Law § 175.10 Is Not Limited to an Intent to Deprive Another of Property or Money. ....................... 123

B.    The Evidence Overwhelmingly Established Defendant's Intent to Defraud. ................................................................................ 128

POINT V ................................................................................................ 133

THE TRIAL JUDGE PROVIDENTLY EXERCISED HIS DISCRETION WHEN HE DECLINED TO RECUSE HIMSELF ............ 133

A.    The Relevant Record ....................................................................... 134

iv

B.      The Trial Court's De Minimis Political Contributions Years Before the Indictment Did Not Provide Any Basis for Recusal. ........................ 136

C.      The Employment of the Trial Judge's Daughter Provided No Grounds Upon Which to Reasonably Question the Court's Impartiality. ................................................................................. 138

D.      The Trial Court's Proper Conduct During Allen Weisselberg's Plea Negotiations in a Different Case Did Not Provide a Basis for Recusal. ...................................................................................... 141

POINT VI .................................................................................................... 143

DEFENDANT RAISES MULTIPLE OTHER BASELESS COMPLAINTS BUT DOES NOT SEEK REVERSAL ON ANY OF THESE GROUNDS .................................................................................. 143

A.      Defendant's Perfunctory Complaints about Various Pre-Trial Rulings Are Not Properly Presented Here and Are Meritless in Any Event. ........................................................................................ 144

B.      The People Gave Adequate Notice of the Charges against Defendant. ................................................................................. 144

C.      Defendant's Allegations of Improper Prosecutorial Motivation Are Specious. .................................................................................... 146

CONCLUSION ........................................................................................... 150

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ....................................................61, 79, 86

*Arkansas State Conference NAACP v. Arkansas Bd. of Apportionment*,
    578 F. Supp. 3d 1011 (E.D. Ark. 2022) ...................................................... 137

*Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320 (2015) ........................... 99

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 119

*Blassingame v. Trump*, 87 F.4th 1 (D.C. Cir. 2023) ....................................... 62, 66

*Brody v. President & Fellows of Harvard Coll.*, 664 F.2d 10 (1st Cir. 1981) ....................... 140

*Bunning v. Kentucky*, 42 F.3d 1008 (6th Cir. 1994) ................................................. 93

*Burson v. Freeman*, 504 U.S. 191 (1992) .................................................................. 106

*California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272 (1987) ...................................... 89

*Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009) ......................................... 137

*Clinton v. Jones*, 520 U.S. 681 (1997) ............................................................. 66-67, 75

*Close v. Sotheby's, Inc.*, 909 F.3d 1204 (9th Cir. 2018) ........................................... 99

*Cook v. Gralike*, 531 U.S. 510 (2001) ..................................................................... 106

*Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) ............. 67

*Dekom v. New York*, No. 12-CV-1318, 2013 WL 3095010
    (E.D.N.Y. June 18, 2013), *aff'd*, 583 F. App'x 15 (2d Cir. 2014)............................ 137

*Dewald v. Wriggelsworth*, 748 F.3d 295 (6th Cir. 2014)...................................92-93, 96, 105

*Drew v. Thaw*, 235 U.S. 432 (1914) ..................................................................... 119

*Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197 (1982) ........................ 73

*Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88 (1994) ........................ 73

*Gas Utils. Co. of Alabama v. S. Nat. Gas Co.*, 996 F.2d 282 (11th Cir. 1993)................. 140

*Griffin v. United States*, 502 U.S. 46 (1991) ........................................................ 104

*Hammerschmidt v. United States*, 265 U.S. 182 (1924) ....................................... 127

*Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440 (1960) ........................... 89

*Iannelli v. United States*, 420 U.S. 770 (1975) ...................................................... 104

*In re Placid Oil Co.*, 802 F.2d 783 (5th Cir. 1986) ................................................. 140

*Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185
    (5th Cir. 2013) ........................................................................... 92-94, 105

*Jones v. Clinton*, 72 F.3d 1354 (8th Cir. 1996) ....................................................... 67

*Kansas v. Garcia*, 589 U.S. 191 (2020) ............................................................89, 100

*Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273 (5th Cir. 1994) ........................................ 92

*Kousisis v. United States*, 605 U.S. 114 (2025) ..................................................... 127

*Lindke v. Freed*, 601 U.S. 187 (2024) ............................................................ 62, 64

*MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33 (2d Cir. 1998) ....................... 137

*McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185 (2014) ........................................... 91

*McMillan v. Pennsylvania*, 477 U.S. 79 (1986) ...................................................... 120

*McPherson v. Blacker*, 146 U.S. 1 (1892) ........................................................... 106

*New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ...................................................................... 89

*New York v. Trump*, 158 F.4th 458 (2d Cir. 2025) ..................................................... 55

*New York v. Trump*, 683 F. Supp. 3d 334 (S.D.N.Y. 2023) ........................................*passim*

*OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518 (4th Cir. 2017) ...................... 95

*People v. Trump*, No. 23-1085, 2023 WL 9380793 (2d Cir. Nov. 15, 2023) ................... 48

*Priorities USA v. Nessel*, 978 F.3d 976 (6th Cir. 2020) ............................................ 92

*Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543 (8th Cir. 1984) ...................... 92

*Richardson v. United States*, 526 U.S. 813 (1999) .................................................... 117, 119-120

*Ring v. Arizona*, 536 U.S. 584 (2002) .......................................................50, 108, 111

*Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032 (9th Cir. 2008) ....................................... 95

*Rose v. Clark*, 478 U.S. 570 (1986) ..................................................................... 76

*Schad v. Arizona*, 501 U.S. 624 (1991) ..................................... 114-115, 117-118, 120-122

*Smiley v. Holm*, 285 U.S. 355 (1932)..................................................................... 106

*Stern v. Gen. Elec. Co.*, 924 F.2d 472 (2d Cir. 1991) .................................88, 90-92, 97, 105

*Storer v. Brown*, 415 U.S. 724 (1974)..................................................................... 106

*Teper v. Miller*, 82 F.3d 989 (11th Cir. 1996)........................................................... 93

*Trump v. Clinton*, 161 F.4th 671 (11th Cir. 2025) ..................................................... 149

*Trump v. James*, No. 1:21-CV-1352, 2022 WL 1718951
     (N.D.N.Y. May 27, 2022) .......................................................................... 149

*Trump v. New York*, 145 S. Ct. 1038 (2025) .........................................................54-55

*Trump v. United States*, 603 U.S. 593 (2024) ..................................................*passim*

*Trump v. Vance*, 977 F.3d 198 (2d Cir. 2020),
     *stay denied*, 141 S. Ct. 1364 (2021) .............................................................. 149

*Turner v. United States*, 396 U.S. 398 (1970) ......................................................... 104

*U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Alabama*,
     104 F.3d 1453 (4th Cir. 1997) ..................................................................... 95

*United States v. Aiyer*, 33 F.4th 97 (2d Cir. 2022).................................................... 119

*United States v. Diaz*, 176 F.3d 52 (2d Cir. 1999) .................................................... 143

*United States v. Dowdy*, 479 F.2d 213 (4th Cir. 1973) ............................................... 77

*United States v. Johnson*, 383 U.S. 169 (1966) ....................................................... 77

*United States v. Kukushkin*, 61 F.4th 327 (2d Cir. 2023)............................................. 103

*United States v. Marcus*, 560 U.S. 258 (2010) ........................................................ 76

*United States v. Mason*, 118 F. App'x 544 (2d Cir. 2004) ..................................................... 143

*United States v. Moon*, 718 F.2d 1210 (2d Cir. 1983) ......................................................... 146

*United States v. Morrison*, 529 U.S. 598 (2000) ................................................................ 101

*United States v. Ponds*, 454 F.3d 313 (D.C. Cir. 2006) ......................................................... 79

*United States v. Requena*, 980 F.3d 29 (2d Cir. 2020) .......................................................... 111

*United States v. Sawyer*, 85 F.3d 713 (1st Cir. 1996) ........................................................... 101

*United States v. Shabani*, 513 U.S. 10 (1994) ...................................................................... 120

*United States v. Swindall*, 971 F.2d 1531 (11th Cir. 1992) ..................................................... 78

*Watson v. Republican Nat'l Comm.*, 2026 WL 1855462 (U.S. June 29, 2026) .................. 106

*Watters v. Wachovia Bank, N.A.*, 550 U.S. 1 (2007) .............................................................. 95

*Weber v. Heaney*, 995 F.2d 872 (8th Cir. 1993) ................................................................... 93

*WinRed, Inc. v. Ellison*, 59 F.4th 934 (8th Cir. 2023) ...................................... 88, 92-93, 105

*Wisconsin v. Mitchell*, 508 U.S. 476 (1993) ........................................................................ 99

## STATE CASES

*American Intl. Specialty Lines Ins. Co. v. Allied Capital Corp.*,
  35 N.Y.3d 64 (2020) ........................................................................................................ 91

*Anderson v. Belke*, 80 A.D.3d 483 (1st Dep't 2011) ...................................................136-137

*Clarke v. Town of Newburgh*, No. 84, 2025 WL 3235042 (N.Y. Nov. 20, 2025) ............ 102

*Diegelman v. City of Buffalo*, 28 N.Y.3d 231 (2016) .......................................................... 125

*In re Jose C.*, 198 P.3d 1087 (Cal. 2009) ............................................................................ 101

*In re Raab*, 100 N.Y.2d 305 (2003) .................................................................................... 138

*Langdon v. Town of Webster*, 270 A.D.2d 896 (4th Dep't 2000) ...................................... 140

*Matter of 303 W. 42nd St. Corp. v. Klein*, 46 N.Y.2d 686 (1979) ...................................... 146

*Matter of Holtzman v. Oliensis*, 91 N.Y.2d 488 (1998) ........................................................ 91

*Matter of Off. of Att'y Gen. of State of New York*, 269 A.D.2d 1
(1st Dep't 2000) ................................................................................ 95

*Matter of Petralia v. New York State Dep't of Lab.*, 191 A.D.3d 1466
(4th Dep't 2021).............................................................................. 88

*Matter of Trump v. Merchan*, 227 A.D.3d 518 (1st Dep't 2024)....................................... 144

*Matter of Trump v. Merchan*, 227 A.D.3d 569 (1st Dep't 2024)................................135, 139

*Morgenthau v. Khalil*, 73 A.D.3d 509 (1st Dep't 2010) ....................................................... 123

*People by James v. Nat'l Rifle Ass'n of Am., Inc.*, 75 Misc. 3d 1000
(Sup. Ct. N.Y. County 2022), *aff'd*, 223 A.D.3d 84 (1st Dep't 2023) .................... 148

*People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105 (2008) ...........................95-96

*People ex rel. Spitzer v. Grasso*, 11 N.Y.3d 64 (2008)................................................................ 94

*People v. Allen*, 36 N.Y.3d 1033 (2021)................................................................................. 128

*People v. Alomar*, 93 N.Y.2d 239 (1999)...........................................................................136, 139

*People v. Arroyo*, 93 N.Y.2d 990 (1999)................................................................................ 105

*People v. Balls*, 69 N.Y.2d 641 (1986) ..................................................................................... 59

*People v. Barnes*, 50 N.Y.2d 375 (1980) .........................................................................112-113

*People v. Barto*, 144 A.D.3d 1641 (4th Dep't 2016) .............................................................. 131

*People v. Bloomfield*, 6 N.Y.3d 165 (2006) ............................................................................. 94

*People v. Cabrera*, 41 N.Y.3d 35 (2023) ................................................................................. 61

*People v. Cabus*, 40 A.D.3d 540 (1st Dep't 2007)................................................................... 58

*People v. Caridi*, 47 A.D.3d 944 (2d Dep't 2008) .................................................................. 101

*People v. Carmona*, 82 N.Y.2d 603 (1993) .............................................................................. 77

*People v. Carpio*, 39 A.D.3d 433 (1st Dep't 2007)................................................................. 108

*People v. Coe*, 131 Misc.2d 807 (Sup. Ct. N.Y. County 1986),
*aff'd*, 126 A.D.2d 436 (1st Dep't 1987), *aff'd*, 71 N.Y.2d 852 (1988)...................... 124

*People v. Conroy*, 53 A.D.3d 438 (1st Dep't 2008) ............................................................ 116

*People v. Crimmins*, 36 N.Y.2d 230 (1975) ....................................................... 80, 87

*People v. Dallas*, 46 A.D.3d 489 (1st Dep't 2007) ............................................. 129

*People v. Eades*, 198 A.D.2d 905 (4th Dep't 1993) ............................................. 59

*People v. Edney*, 39 N.Y.2d 620 (1976) .................................................................. 77

*People v. Elliassen*, 20 Misc.3d 1143(A) (Sup. Ct. Richmond County 2008)...........124-125

*People v. Federated Radio Corp.*, 244 N.Y. 33 (1926)........................................... 126

*People v. Fernandez*, 64 A.D.3d 307 (1st Dep't 2009) ........................................ 128

*People v. Fontanez*, 241 A.D.3d 1169 (1st Dep't 2025)...................................... 108

*People v. Gray*, 86 N.Y.2d 10 (1995).......................................................60, 111

*People v. Green*, 104 A.D.3d 126 (1st Dep't 2013) ............................................ 128

*People v. Hawkins*, 11 N.Y.3d 484 (2008) ........................................................... 60

*People v. Headley*, 37 Misc.3d 815 (Sup. Ct. Kings County 2012) .................................. 124

*People v. Hemmings*, 304 A.D.2d 502 (1st Dep't 2003) .................................... 121

*People v. Houghtaling*, 79 A.D.3d 1155 (3d Dep't 2010) ....................................... 98

*People v. Johnson*, 31 N.Y.3d 942 (2018) ............................................................. 79

*People v. Keller*, 176 Misc.2d 466 (Sup. Ct. N.Y. County 1998)...................................... 127

*People v. Kelly*, 5 N.Y.3d 116 (2005) ..................................................................... 60

*People v. Krom*, 61 N.Y.2d 187 (1984) ................................................................. 86

*People v. Lang*, 36 N.Y.2d 366 (1975)................................................................. 124

*People v. Lappe*, 169 A.D.3d 927 (2d Dep't 2019) ............................................. 127

*People v. Lee*, 214 A.D.3d 457 (1st Dep't 2023)................................................... 76

*People v. Lesson*, 241 A.D.3d 1051 (3d Dep't 2025) ......................................... 147

*People v. Mack*, 27 N.Y.3d 534 (2016) ...................................................................60-61

*People v. Mackey*, 49 N.Y.2d 274 (1980).....................................112, 114-115, 121

*People v. Mahboubian*, 74 N.Y.2d 174 (1989) ............................................... 98

*People v. Martin*, 50 N.Y.2d 1029 (1980)......................................................... 111

*People v. Martinez*, 83 N.Y.2d 26 (1993)....................................................103-104

*People v. Mateo*, 2 N.Y.3d 383 (2004) ......................................100, 117-118, 122

*People v. McCumiskey*, 12 A.D.3d 1145 (4th Dep't 2004)................................... 98

*People v. Moore*, 246 A.D.3d 528 (1st Dep't 2026).....................................109-110

*People v. Moreno*, 70 N.Y.2d 403 (1987) ...................................................... 136

*People v. Muhammad*, 34 N.Y.3d 1152 (2020).................................................. 109

*People v. Myles*, 58 A.D.3d 889 (3d Dep't 2009) ............................................. 146

*People v. Park*, 163 A.D.3d 1060 (3d Dep't 2018) ............................................. 81

*People v. Patterson*, 39 N.Y.2d 288 (1976),
    *aff'd sub nom. Patterson v. New York*, 432 U.S. 197 (1977)............................ 60

*People v. Pymm*, 151 A.D.2d 133 (2d Dep't 1989),
    *aff'd*, 76 N.Y.2d 511 (1990) ................................................................... 131

*People v. Pymm*, 76 N.Y.2d 511 (1990) ......................................................... 101

*People v. Reyes*, 69 A.D.3d 537 (1st Dep't 2010) ............................................. 125

*People v. Rivera*, 25 N.Y.3d 256 (2015)......................................................76-77

*People v. Sanders*, 56 N.Y.2d 51 (1982)........................................................ 86

*People v. Saporita*, 132 A.D.2d 713 (2d Dep't 1987) ....................................... 127

*People v. Schrag*, 147 Misc.2d 517 (County Ct. Rockland County 1990).................124-125

*People v. Seignious*, 41 N.Y.3d 505 (2024)..................................................... 145

*People v. Sinclair*, 208 A.D.2d 573 (2d Dep't 1994) .................................124, 127

*People v. Sosa-Campana*, 167 A.D.3d 464 (1st Dep't 2018) ....................................123, 146

*People v. Stuart*, 100 N.Y.2d 412 (2003) .........................................................120-121

*People v. Taveras*, 12 N.Y.3d 21 (2009).......................................98, 112-113, 146

*People v. Taveras*, 46 A.D.3d 399 (1st Dep't 2007),
    *aff'd*, 12 N.Y.3d 21 (2009) ........................................................................ 111

*People v. Thompson*, 124 A.D.3d 448 (1st Dep't 2015).................................98, 146

*People v. Trump Org.*, 205 A.D.3d 625 (1st Dep't 2022).............................148-149

*People v. The Trump Org., Inc.*, No. 451685/2020, 2022 WL 489625 (Sup. Ct. N.Y.
    County Feb. 17, 2022), *aff'd in part*, 205 A.D.3d 625,
    *appeal dismissed*, 38 N.Y.3d 1053 (2022) .............................................148-149

*People v. Tyler*, 62 A.D.2d 146 (2d Dep't 1978),
    *aff'd*, 46 N.Y.2d 264 (1978) ...................................................................... 126

*People v. Ventimiglia*, 52 N.Y.2d 350 (1981) ......................................................... 76

*People v. Watson*, 284 A.D.2d 212 (1st Dep't 2001) ........................................... 117

*People v. Williams*, 237 A.D.3d 548 (1st Dep't 2025) ........................................ 109

*People v. Wilson*, 238 A.D.3d 909 (2d Dep't 2025) ............................................. 126

*Rumsey v. Niebel*, 286 A.D.2d 564 (4th Dep't 2001) .......................................... 136

*State v. Chappell*, 939 N.E.2d 1234 (Ohio 2010) ................................................ 99

*Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) ...................................................... 67

## FEDERAL STATUTES

11 C.F.R. § 108.7 .................................................................................................. 88

11 C.F.R. § 108.7(b)........................................................................................93, 105

11 C.F.R. § 108.7(b)(2)......................................................................................... 96

11 C.F.R. § 108.7(c)(4) ....................................................................................93, 105

11 C.F.R. § 109.20 ................................................................................................ 11

80 Fed. Reg. 5750 (Feb. 3, 2015) .................................................................. 25

18 U.S.C. § 371.................................................................103, 119, 127-128

52 U.S.C. § 30116 .................................................................................. 94

52 U.S.C. § 30116(a)(1)(A) ...................................................................... 25

52 U.S.C. § 30116(a)(7)(B)(i) ................................................................... 11

52 U.S.C. § 30118(a).......................................................................... 11, 39

52 U.S.C. § 30143(a)........................................................................... 88, 91

## STATE STATUTES

CPL 330.30(1) ...................................................................................52-53

Election Law § 17-114 ........................................................................... 117

Election Law § 17-118 ........................................................................... 117

Election Law § 17-150 ........................................................................... 117

Election Law § 17-152 ........................................................................*passim*

Judiciary Law § 14................................................................................135, 139

Judiciary Law § 212(2)(*l*)(iv) .................................................................. 138

Penal Law § 10.00(6) ............................................................................. 147

Penal Law § 15.00................................................................................. 124

Penal Law § 105.00................................................................................119-120

Penal Law § 140.05................................................................................ 147

Penal Law § 140.20................................................................................ 147

Penal Law § 140.25................................................................................ 112

Penal Law § 175.00(1) ............................................................................ 125

Penal Law § 175.05................................................................................ 112

Penal Law § 175.05(1) ..................................................................................... 2, 126

Penal Law § 175.10................................................................................................*passim*

Penal Law § 265.03(1) ........................................................................................ 121

### OTHER AUTHORITIES

Black's Law Dictionary ........................................................................................ 126

2 CJI N.Y. Penal Law § 175.05(1) (1979) .................................................... 126

CJI 2d [N.Y.] Penal Law § 175.10, Falsifying Business Records in the First Degree,
https://www.nycourts.gov/ judges/cji/2-PenalLaw/175/175.10.pdf.................. 126

*Object*, Merriam-Webster Dictionary, Online Edition, https://www.merriam-
webster.com/dictionary/object .............................................................................. 118

Opinion of the Advisory Committee on Judicial Ethics, Op. 91-146 (1991)............. 137

**INTRODUCTION**

From 2015 to 2017, defendant Donald J. Trump orchestrated a conspiracy to defraud the American public and government regulators and then covered up that crime by repeating a series of lies in the business records of the Trump Organization. The conspiracy involved a "catch and kill" scheme to influence the presidential election by buying and suppressing negative stories about defendant. One such story was an account by an adult film actress about a sexual encounter with defendant. At defendant's request, his lawyer Michael Cohen covertly paid $130,000 to the actress to buy her silence—just weeks before the 2016 presidential election, when the campaign was desperate to avoid additional bad publicity in the wake of the *Access Hollywood* tape. To set up this hush-money payment, Cohen made multiple false bank filings that disguised the purpose of the payment and its connection to defendant. The payment itself also violated federal campaign-finance laws; indeed, Cohen ultimately pleaded guilty to making an illegal campaign contribution and served time in prison.

Because Cohen had made the $130,000 payment on defendant's behalf and for defendant's benefit, defendant planned to reimburse him. But he could not reimburse Cohen openly; doing so would have undermined the entire point of the conspiracy. Instead, defendant repaid Cohen by making a series of monthly payments that purported to be for legal services rendered pursuant to a retainer agreement. Every payment was a lie: there was no retainer agreement, and Cohen was not being paid for legal services. These lies were repeated month after month in the records of the Trump

Organization, furthering defendant's goal of concealing both the payment to the adult film actress and the catch-and-kill conspiracy to keep the public in the dark about his personal history. And, continuing the pattern of illegality, the false records contributed to tax-law violations as well, since falsely characterizing these payments as income to Cohen rather than reimbursements had material tax consequences.

A jury unanimously found defendant guilty of 34 counts of falsifying business records in the first degree, in violation of Penal Law § 175.10. In reaching that verdict, the jury necessarily found that defendant "ma[de] or cause[d] a false entry in the business records of an enterprise," Penal Law § 175.05(1), and that he did so with "intent to defraud" that "include[d] an intent to commit another crime or to aid or conceal the commission thereof," *id.* § 175.10. The "[]other crime" here was a violation of Election Law § 17-152, which prohibits "two or more persons" from "conspir[ing] to promote or prevent the election of any person to a public office by unlawful means." Here, the false business records were a total of 34 invoices, checks and check stubs, and entries in a general ledger maintained by the Trump Organization; each record was false because it repeated the lie about Cohen being paid for legal services rendered pursuant to a retainer, when he was in fact being reimbursed for his hush-money payment to an adult film actress; and defendant caused the entries of those false records to hide the catch-and-kill conspiracy and the hush-money payments made to benefit his campaign.

This Court should affirm the jury's finding of guilt and reject defendant's meritless challenges to the verdict below.

First, the jury's verdict is unaffected by the U.S. Supreme Court's subsequent recognition of immunity for official presidential acts in *Trump v. United States*, 603 U.S. 593 (2024). The criminal charges here arose from defendant's unofficial, non-presidential conduct—as multiple courts have already found, and defendant now concedes. Defendant complains that the immunity doctrine was violated because the People introduced evidence of official acts during the trial, but he is wrong. As the Supreme Court recognized, a President can engage in unofficial actions, and all of the evidence that is the subject of defendant's current complaints arises from his unofficial actions during his presidency. In any event, any error in admitting this evidence was harmless: a mountain of evidence unaffected by any claim of official presidential immunity overwhelmingly established defendant's guilt.

Second, defendant's conviction is not expressly preempted by the Federal Election Campaign Act (FECA). Defendant's preemption claim wrongly focuses on Election Law § 17-152, but he was not convicted under that statute. Instead, he was convicted under Penal Law § 175.10. And defendant has no argument—indeed, he never made the argument below—that FECA preempts New York's prohibition on falsifying business records. To the contrary, in rulings that defendant ignores, courts have repeatedly found that FECA does not disable states from enforcing general anti-fraud statutes like Penal Law § 175.10, even as applied to federal campaigns. Here, as in these other cases, New York's prohibition on falsifying business records does not duplicate or otherwise intrude on FECA's distinct and narrower regulations on

3

campaign contributions. To the extent that FECA violations were relevant here, they established only the nature of the Election Law conspiracy that defendant intended to conceal or commit by falsifying the Trump Organization's records. But federal preemption did not prevent the People from establishing the fact of defendant's culpable intent for misconduct that was squarely within the state's power to regulate.

Third, there is no basis for vacating this conviction based on the trial court's instruction that the jury did not have to unanimously agree on any particular "unlawful means" in determining whether defendant intended to conceal or commit a violation of Election Law § 17-152. As an initial matter, defendant failed to preserve and indeed waived this objection below, when his counsel expressly *agreed* that the law did not require unanimity and asked the court only to exercise its discretion to give a unanimity charge. In any event, defendant's argument is meritless. Unanimity was required only for the elements of falsifying business records in the first degree, not for the elements of Election Law § 17-152. And even as to the Election Law offense, the Court of Appeals and the U.S. Supreme Court have held that a jury need not be unanimous about multiple means of accomplishing a crime. That reasoning applies to the "unlawful means" underlying any finding of an Election Law violation.

Fourth, the trial court properly instructed the jury on the "intent to defraud" element of Penal Law § 175.10, and overwhelming evidence established defendant's fraudulent intent. As defendant concedes, this Court has already squarely held that "intent to defraud" is not limited to an intent to deprive others of money or property;

4

and the Court of Appeals has already held that fraudulent intent can be directed at the electoral public or government regulators. The trial evidence fulsomely established such fraudulent intent here: indeed, the openly stated purpose behind the Election Law conspiracy and the doctored business records here was to shield from public scrutiny facts that defendant thought would be harmful to his campaign.

Finally, as this Court has already found, there was no basis for the trial judge to recuse himself due to his years-old and de minimis ($35 in aggregate) contributions to candidates and organizations affiliated with the Democratic Party. The Advisory Committee on Judicial Ethics has already found that recusal was not required, and basic principles of judicial ethics support this conclusion. Recusal was also not warranted based on defendant's unfounded attacks on the trial judge's daughter, a private citizen with no connection to the parties or allegations in this case. Aside from being blatantly meritless, defendant's arguments irresponsibly disregarded the human cost of painting a public target on the family member of a judge—costs that forced the judge to impose a gag order to prevent defendant from persisting in his baseless public attacks on not only the judge's daughter but other family members of trial participants.

For these reasons, and as more fully discussed below, this Court should affirm.[1]

---

[1] In addition to these arguments, defendant's brief makes a number of other meritless contentions for which he does not seek reversal. Although this Court need not address these arguments at all, Point VI responds to these contentions.

## QUESTIONS PRESENTED

1.      Whether the doctrine of immunity for official presidential acts precludes the admission of evidence of largely private conduct to establish defendant's criminal liability for concededly unofficial acts?

Supreme Court answered in the negative.

2.      Whether the Federal Election Campaign Act expressly preempts state-law fraud charges when defendant's convictions arose from falsification of business records and evidence of federal campaign violations was just one of several pieces of evidence establishing defendant's culpable intent?

Supreme Court answered in the negative.

3.      Whether the jury had to unanimously agree on the particular "unlawful means" pursued by the conspiracy in violation of Election Law § 17-152 when defendant was not charged under that statute; the statute does not require the jury to identify any particular unlawful means; and well-established precedent holds that a jury need not agree on multiple means to accomplish a charged crime?

Supreme Court declined to exercise its discretion to give the jury a unanimity instruction on Election Law § 17-152 after defendant agreed below that the law did not require the jury to be unanimous on this aspect of the charges.

4.      Whether "intent to defraud" under Penal Law § 175.10 is limited to an intent to deprive another of money or property; whether there was sufficient proof of

6

defendant's intent to defraud; and whether the jury's verdict comported with the weight of the evidence?

Supreme Court answered that "intent to defraud" is not so limited; the jury convicted defendant on all charges.

5.      Whether the trial judge was required to recuse himself based on de minimis political contributions made years before this case, his daughter's employment at a digital marketing agency, or his involvement in plea negotiations in a separate case?

Supreme Court answered in the negative.

**STATEMENT OF THE CASE**

## A. Factual Background

### 1. The Trump Tower meeting in August 2015

In June 2015, defendant announced his candidacy for the 2016 presidential election (DAVID PECKER: A4084-A4085).[2] In August 2015, defendant met in Trump Tower with his attorney MICHAEL COHEN and his friend David Pecker—the President, Chairman, and CEO of American Media Inc. (AMI), which owned the *National Enquirer* and other publications. The purpose of the meeting was to discuss how Pecker and his publications could help defendant's presidential campaign (Pecker: A3981-A3982, A4073-A4074, A4085-A4087; *see also* Cohen: A6361-A6363).

---

[2] Numerical citations in parentheses preceded by "A" refer to defendant's appendix. Appendix citations preceded by a name refer to the trial testimony of a witness; "PX" refers to a People's exhibit; and "DX" refers to a defense exhibit.

One aspect of the agreement between the three men was that Pecker would publish positive stories about defendant and negative stories about defendant's opponents (Pecker: A4086-A4087, A4538-A4539; *see also* Cohen: A6362-A6364). But the key component of the agreement was to pursue what would later be known as "catch and kill": buying damaging information about defendant and then burying it so it would never be revealed to the public (Pecker: A4548-A4549). This agreement—to promote defendant's candidacy through a catch-and-kill scheme that was shot through with illegality—was the Election Law conspiracy that defendant sought to conceal or commit by falsifying the business records of the Trump Organization.

Under the catch-and-kill scheme, Pecker agreed to serve as defendant's "eyes and ears"; if Pecker "hear[d] anything negative about" defendant, including "anything about women selling stories" about defendant, Pecker would tell Cohen; and Cohen would then arrange to have the stories "killed"—i.e., to arrange for their purchase or otherwise prevent their publication through non-disclosure agreements and the like (Pecker: A4086-A4088, A4540-A4541; *see also* Cohen: A6362). The agreement to "catch and kill" negative stories about defendant was intended solely to benefit defendant's campaign; it did not benefit the *Enquirer*, which could have seen staggering sales from publishing these explosive stories about a presidential candidate (Pecker: A4092, A4137, A4429, A4537, A4543). Indeed, Pecker had never previously bought the rights to a story regarding defendant to *prevent* its publication (Pecker: A4092, A4540).

8

It was critical for the three men to keep the details of this catch-and-kill scheme secret (Pecker: A4093-A4094). Pecker did explain the scheme to his colleague Dylan Howard—AMI's Chief Content Officer and Editor-in-Chief of the *Enquirer*—so that Howard could tell AMI's bureau chiefs to vet any stories they encountered about defendant and bring those stories directly to Pecker (Pecker: A4093). But Pecker stressed to Howard that the pact "to try to help the campaign" was "highly, highly confidential" (*id.*).

### 2. The catch-and-kill scheme

Pecker and Cohen kept in regular contact during defendant's presidential campaign so that Pecker and the *Enquirer* could hold up their end of the deal (Pecker: A4088-A4090, A4094-A4106). With defendant's knowledge and approval, the two men applied the catch-and-kill component to three potentially damaging stories.

### a. The conspirators catch and kill Dino Sajudin's false story about defendant having an illegitimate child, paying him $30,000.

In October 2015, Dylan Howard told Pecker about a tip that Dino Sajudin, a doorman at Trump Tower, was attempting to sell a story that defendant had fathered a girl with a maid who worked in the building (Pecker: A4132). Pursuant to the catch-and-kill agreement, Pecker immediately called Michael Cohen (Pecker: A4132-A4134; *see also* Cohen: A6369-A6370). Pecker then asked Howard to prepare a source agreement whereby the *Enquirer* would obtain the exclusive rights to Sajudin's story, but Pecker would hold the story until after the election (Pecker: A4134-A4138).

Pecker, through his company AMI, ultimately agreed to pay $30,000 to Sajudin in order to take his story "off the market" (Pecker: A4135-A4144; PX154: A8357-A8359; PX155: A8360; *see also* Cohen: A6370-A6372). At Cohen's suggestion, the agreement also included a liquidated damages clause: if Sajudin violated the agreement, he would owe AMI $1 million (Pecker: A4145; PX155: A8360; *see also* Cohen: A6372-A6375).

Many aspects of this agreement were unusual. The *Enquirer* typically did not pay a source before a story was published; the typical sums were between $250 and $10,000; and the *Enquirer* had never paid a source to prevent a story about defendant from coming out (Pecker: A4092, A4137, A4142-A4145, A4540). Again, the sole purpose of this unusual arrangement was to benefit defendant's campaign. Pecker acknowledged that publishing Sajudin's story would have led to "the biggest sale[s] of the *National Enquirer* since the death of Elvis Presley" (Pecker: A4092, A4137-A4138, A4429-A4430). But he nonetheless sacrificed those financial interests and elected to pay an outsized sum to prevent defendant and his campaign from being publicly embarrassed—exactly what he had agreed to do in the Trump Tower meeting (Pecker: A4092, A4137, A4142-A4145).

Defendant was well aware of the steps undertaken by his co-conspirators. After Sajudin's story was purchased, Cohen told Pecker that defendant "would be very pleased" (Pecker: A4136; *see also* Cohen: A6369-A6370, A6375). Later, Cohen indicated to Pecker that he had spoken to defendant about the Sajudin story; Cohen said the

Sajudin story was "absolutely not true" (Pecker: A4136-A4137). Howard also concluded that Sajudin's story was untrue (Pecker: A4142, A4152). Nonetheless, Pecker agreed to delay releasing Sajudin from the exclusivity agreement until after the election (Pecker: A4152-4154, A4246-A4247).

AMI's $30,000 payment to Sajudin was an unlawful corporate contribution to defendant's campaign that violated FECA (A7705, A7870 (People's summation); A17750-A17751 (jury instructions))—and thus served as one of the circumstances that would support the jury's finding that the Trump Tower conspiracy sought to use unlawful rather than lawful means to promote defendant's candidacy. Federal law forbids a corporation from making a contribution of any amount to a candidate's campaign in connection with a federal election. *See* 52 U.S.C. § 30118(a). An expenditure made in cooperation, consultation, or concert with, or at the request or suggestion of, a candidate or his agents shall be considered to be a contribution to such candidate or his campaign. *See* 52 U.S.C. § 30116(a)(7)(B)(i); 11 C.F.R. § 109.20. AMI's $30,000 payment was a prohibited corporate contribution because it was made in close coordination with defendant and his agent Michael Cohen to influence defendant's electoral prospects.

### b. The conspirators catch and kill Karen McDougal's true story about her affair with defendant, paying her $150,000.

In June 2016, Dylan Howard informed Pecker that Karen McDougal, a former *Playboy* model, was selling a story about her year-long affair with defendant (Pecker:

11

A4155, A4178). McDougal was represented by attorney KEITH DAVIDSON, who was one of Howard's "major sources" (Pecker: A4179; Davidson: A4769-A4778).

After speaking to Cohen, Pecker dispatched Dylan Howard to California to interview McDougal and investigate further (Pecker: A4156-A4157, A4159-A4160; Cohen: A6375-A6376). Cohen called Pecker about the matter frequently and seemed increasingly anxious, since defendant was regularly pressing Cohen for updates (Pecker: A4160-A4162, A4176-A4177; *see also* Cohen: A6379, A6389-A6390, A6432-A6433).

Howard interviewed McDougal and concluded that her story was true (Pecker: A4160, A4176; Davidson: A4779-A4781). ABC News was interested in publishing McDougal's story (Pecker: A4159, A4178; Davidson: A4783-A4784, A4798-A4799, A4814-A4815). Pecker knew that the publication of the story would be "very embarrassing" to both defendant and his campaign and thus, after speaking to Cohen, sought to reach a deal with McDougal to keep the story quiet (Pecker: A4176-A4182; *see also* Cohen: A6376). McDougal's attorney, Davidson, understood that selling her story to AMI instead of ABC News would help defendant's presidential campaign by keeping the story of the affair out of the public (Davidson: A4791-A4792).

Later that month, defendant called Pecker personally, saying that Cohen had "told [him] about Karen," whom he called "a nice girl" (Pecker: A4158-A4159, A4180, A4437). Pecker advised defendant to buy McDougal's story to take it "off the market" (Pecker: A4159, A4179-A4182). Defendant at first demurred, but then said he would "think about it" and have Cohen call back in a few days (Pecker: A4159, A4182, A4438).

12

When Cohen called back, he instructed Pecker to purchase McDougal's story (Pecker: A4182; *see also* Cohen: A6377-A6387).

Under the deal negotiated between Howard and Davidson, AMI would pay McDougal $150,000 for the lifetime rights to her story about her affair with defendant. In exchange, McDougal would, with the assistance of a ghost writer, write columns for AMI publications and appear on magazine covers (Pecker: A4185-A4186, A4195-A4203; PX156: A8361-A8363).

The purpose of the agreement was to suppress McDougal's story and prevent it from influencing the election (Pecker: A4199, A4211, A4213, A4523; *see also* Cohen: A6375-A6377 (defendant instructed Cohen to "[m]ake sure" McDougal's story did not "get released")). Even though publishing the story would have been "*National Enquirer* gold" and led to increased sales, Pecker had no intention of releasing it (Pecker: A4201, A4211, A4543). AMI included the provisions about McDougal writing columns and appearing on magazine covers to disguise the true purpose of the contract and to provide "plausible deniability" for the $150,000 payment (Pecker: A4199-A4200, A4522). Based on his conversations with Cohen, Pecker understood that defendant knew about the agreement (Pecker: A4204; *see also* Cohen: A6376-A6379 (Cohen updated defendant "frequently" regarding the "progress with Karen McDougal"), A6389-A6391 (when Cohen told defendant about the agreement, defendant replied, "Fantastic. Great job.")).

13

After arriving at the price of $150,000, Pecker asked Cohen who would pay for it (Pecker: A4186). Cohen replied, "The Boss will take care of it," which Pecker understood to mean that either defendant or the Trump Organization would reimburse him (Pecker: A4183, A4187; *see also* Cohen: A6395). Pecker knew from past experience that Cohen was not authorized to spend the Trump Organization's money, and that doing so required defendant's approval (Pecker: A4184-A4185).

After AMI paid $150,000 to McDougal, Pecker repeatedly asked Cohen about being reimbursed; each time, Cohen told Pecker that defendant would "take care of it" (Pecker: A4214-A4215; *see also* Cohen: A6394-A6395). Consistent with this promise, on September 6, 2016, Cohen discussed the reimbursement in a recorded conversation with defendant (PX246: A8488; PX248: A8490-A8491; *see also* Cohen: A6395-A6407).[3] On that recording, defendant asked Cohen, "So, what do we got to pay for this? One-fifty?" (PX248: A8490)—confirming his awareness of the precise amount of the McDougal payment and the need to reimburse Pecker. Defendant also suggested paying in "cash," but after Cohen replied, "No," "I got it," defendant said, "Check" (PX248: A8491). On the recording, Cohen mentioned that he "need[ed] to open up a company" to complete the transaction with "our friend, David [Pecker]," and that he had "spoken

---

[3] The actual audio recording of this conversation is PX246 and has been provided to this Court by defendant. The transcript of the conversation is PX248: A8490-A8491.

14

to Allen Weisselberg" (the Trump Organization's Chief Financial Officer) "about how to set the whole thing up" (PX248: A8490).

To provide the reimbursement that defendant had agreed to make, Cohen proposed to Pecker that defendant would pay to acquire the rights to McDougal's story from AMI (Pecker: A4216-A4217). Pecker agreed, offering to transfer the rights to defendant in return for $125,000 (the original $150,000 minus what he deemed to be the $25,000 value of McDougal's columns and cover appearances) (Pecker: A4217; *see also* Cohen: A6427). However, Pecker did not want a payment from the Trump Organization to go through AMI's finance department, since such a payment "would raise a lot of questions and issues and be communicated to the rest of the editors" (Pecker: A4222-A4223). Instead, Pecker decided to funnel the $125,000 reimbursement through Daniel Rotstein, a former AMI employee who owned a company called Investment Advisory Services (Pecker: A4221-A4222; *see also* Cohen: A6418-A6421).

On the other end of the transaction, as Cohen had discussed with defendant, Cohen "open[ed] up a company" to facilitate the $125,000 payment—and in doing so created a set of falsified business records that would disguise the nature of the deal with McDougal and defendant's involvement in particular. Specifically, Cohen created a shell company called "Resolution Consultants" to prevent defendant or the Trump Organization from being identified as the payer of the $125,000 (PX215: A8474-A8476;

15

PX363: A17424-A17428; *see also* Cohen: A6420-A6424).[4] The paperwork that opened the company's First Republic bank account falsely described it as a consulting company (First Republic Bank Senior Managing Director GARY FARRO: A4629-A4633; PX364: A17429-A17439; PX366: A17440-A17450; *see also* Cohen: A6425-A6426, A6472-A6474). Cohen also falsely indicated to First Republic that the company had no association with political fundraising; that misrepresentation avoided triggering additional review before the bank would open the account (Farro: A4633-A4634; PX366: A17447).

Pecker and Cohen planned for Rotstein to bill Resolution Consultants $125,000; then, after Rotstein received the funds, he would reimburse AMI (Pecker: A4222; *see also* Cohen: A6418-A6431). Rotstein submitted an invoice requesting payment for a "'flat fee' for advisory services" (PX161: A8370). That business record was also false: no advisory services had been rendered, and the payment was to obtain the rights to McDougal's story (Pecker: A4224-A4225; *see also* Cohen: A6429-A6431).[5]

Pecker prepared the agreement to transfer the rights to McDougal's story to defendant (PX162: A8371), but it was ultimately never executed because Pecker had

---

[4] In an earlier conversation with Cohen, Weisselberg had pointed out that involving "a Trump entity" in the transaction would "defeat[] the purpose" because the whole point was to avoid having "the Trump name" connected to the transaction (Cohen: A6418). Cohen told Weisselberg he would create an "LLC" to keep the transaction separate from defendant (Cohen: A6418-A6419).

[5] In late September 2016, Cohen apprised defendant of the McDougal deal's progress and told him the agreement would be signed soon (Cohen: A6428-A6429).

misgivings (Pecker: A4225-A4228). From the outset, Pecker knew that AMI was subject to federal campaign-finance laws, and he knew that expenditures by corporations to influence an election, made in coordination with or at the request of a candidate or campaign, were illegal (Pecker: A4191-A4196, A4211, A4213). After speaking to AMI's general counsel, Pecker decided that he "no longer wanted to be reimbursed" for the $150,000 that AMI had paid to McDougal (Pecker: A4226-A4227, A4531-A4532). Cohen became angry; he screamed at Pecker that defendant was "going to be very angry at you" (Pecker: A4227).[6] Cohen said, "I am a lawyer. I am your friend. I don't understand why you are so concerned." Pecker replied, "I am very concerned, and I am not going forward, period" (Pecker: A4228). Ultimately, Cohen agreed to void the agreement, and AMI was not reimbursed for the money it paid to McDougal (Pecker: A4228, A4433; Cohen: A6431-A6432). AMI also did not report the $150,000 McDougal payment to the Federal Election Commission (FEC) (Pecker: A4213).

Pecker's concerns were justified. AMI's payment to McDougal, like the payment to Sajudin, was an unlawful corporate contribution to defendant's campaign. AMI later admitted to all of these facts, as well as its awareness of the applicability of federal campaign-finance laws, in a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of New York (PX182: A8439-A8443).

---

[6] In fact, when Cohen reported to defendant that he no longer had to pay Pecker $125,000, defendant responded that "[i]t was great" that he would not have to pay that money (Cohen: A6432).

### c. At a particularly vulnerable moment in defendant's campaign, the conspirators catch and kill Stormy Daniels's true story of a sexual encounter with defendant, paying her $130,000.

In October 2016, about a month before the presidential election, the *Washington Post* released the *Access Hollywood* tape—a seismic event that the campaign immediately viewed as "a crisis" (HOPE HICKS: A5224; *see also* Pecker: A4247-A4248; Davidson: A4822-A4824; MADELEINE WESTERHOUT: A6044). While talking about a woman, the tape showed defendant saying that he "did try and fuck her," and that he "moved on her like a bitch" (PX218: A8481-A8482). Defendant also remarked, "You know I'm automatically attracted to beautiful—I just start kissing them. It's like a magnet. Just kiss. I don't even wait. And when you're a star they let you do it. You can do anything. . . . Grab them by the pussy. You can do anything" (*id.*).

The *Access Hollywood* tape was "very embarrassing" and "very damaging" to defendant's presidential campaign, which was "very concerned" about its impact on the election, particularly with respect to female voters (Pecker: A4247-A4248; Davidson: A4822-A4824; Hicks: A5214-A5224; *see also* Cohen: A6438, A6443-A6444). In the 36 hours after its release, the media reaction was intense, and other prominent Republican politicians condemned defendant's remarks (Hicks: A5228-A5233; Westerhout: A6044; *see also* Cohen: A6440-A6443).

Soon, even more reports about defendant's behavior with women began to surface. Defendant became concerned that those stories would also hurt his standing with voters (Hicks: A5237-A5239). On October 15, 2016, defendant posted a message

on Twitter, saying, "Nothing ever happened with any of these women. Totally made up nonsense to steal the election. Nobody has more respect for women than me!" (PX407C: A17498). The next day, defendant posted another message that said, "Polls close, but can you believe I lost large numbers of women voters based on made up events THAT NEVER HAPPENED. Media rigging election!" (PX407D: A17499; *see also* Hicks: A5242).

In the midst of this crisis, defendant, Cohen, and Pecker became aware that adult film actress STORMY DANIELS was interested in selling her story about a sexual encounter with defendant in July 2006.[7] That encounter occurred during a celebrity golf tournament in Lake Tahoe, Nevada, for which Daniels's film company, Wicked, was a sponsor (Daniels: A5641-A5642, A5648; PX227: A8485). Defendant and Daniels met and spoke during the tournament (Hicks: A5243-A5244; Daniels: A5642-A5647; PX226: A8484). Later, Daniels agreed to meet defendant in his hotel room (Daniels: A5648-A5655). After speaking for two hours—during which defendant told Daniels that she should appear on his show, *The Apprentice*, and told her not to "worry about" his wife (Daniels: A5655-A5672)—defendant and Daniels had sex on the bed (Daniels: A5676-A5683).

---

[7] Although she preferred to be called Stormy Daniels, she had also been known as Stephanie Clifford (Daniels: A5628).

Defendant and Daniels kept in touch regularly afterward. In the months after the tournament, defendant called Daniels about once a week (Daniels: A5692-A5693). Defendant invited Daniels to a party in January 2007, where he introduced her to Karen McDougal (Daniels: A5697-A5700). In March 2007, Daniels visited defendant at Trump Tower in Manhattan, where defendant introduced Daniels to other people in the office (Daniels: A5700, A5702-A5703; RHONA GRAFF: A4576). In the summer of 2007, defendant met Daniels at the Beverly Hills Hotel, where they spoke for one or two hours (Daniels: A5703-A5706). At some point, Daniels stopped answering defendant's calls, and he stopped calling (Daniels: A5707).

In the years after the Lake Tahoe encounter, some media outlets pursued the story, but the most that resulted was a 2011 publication on a gossip website, *TheDirty*, that was ultimately taken down (Davidson: A4764-A4765, A4821-A4822; Daniels: A5708-A5711, A5715-A5717; *see also* Cohen: A6448-A6452). After the release of the *Access Hollywood* tape in October 2016, however, interest in Daniels's story spiked (Davidson: A4821-A4823; Daniels: A5720). Through Gina Rodriguez—a talent manager who was acting as Daniels's agent—Daniels began communicating with news outlets about potentially going public with a description of her encounter with defendant (Daniels: A5710, A5720-A5721, A5816, A5843).

Dylan Howard of AMI learned that the *Daily Mail* and *Good Morning America* had extended offers to Daniels and informed Pecker (Pecker: A4255, A4468). Pecker was uninterested in purchasing Daniels's story because he had already paid money to Sajudin

20

and McDougal, but Pecker thought defendant and Cohen should take Daniels's story "off the market" because it "could be very damaging" (Pecker: A4257). Howard accordingly told Cohen about the story so the latter could "take it from there and handle it" without any further involvement from AMI (Pecker: A4256-A4259, A4550; Davidson: A4826-A4829; PX178A: A8421; *see also* Cohen: A6447-A6452).

Defendant became angry when he learned that Daniels's story had resurfaced (Cohen: A6456). Defendant told Cohen that, were the Daniels story publicized, it would be a "total disaster"; "Women are going to hate me"; and, although "[g]uys may think it's cool," it would be "a disaster for the campaign" (Cohen: A6457). Defendant instructed Cohen to "get control over it" and "stop" it from "getting out" (Cohen: A6457-A6458).

On October 11, 2016—with Cohen representing defendant, and Keith Davidson (who had previously represented Karen McDougal) representing Daniels—defendant and Daniels reached an agreement: defendant would pay Daniels $130,000 by October 14, 2016, for the lifetime rights to Daniels's account of their affair; Daniels would sign a non-disclosure agreement (NDA); and Daniels would be subject to liquidated damages of $1 million if she violated the terms of the agreement (Davidson: A4830-A4837, A4851; Daniels: A5723-A5730; PX63: A8152-A8172). The agreement used pseudonyms for defendant and Daniels to hide the fact of their involvement. A separate, "side letter agreement"—which was attorneys' eyes only—identified

defendant and Daniels as the real parties to the contract (Davidson: A4833-A4836; Daniels: A5727-A5730; PX63: A8152-A8172).

October 14 came and went, but Daniels did not receive the agreed-upon payment (Davidson: A4837; Daniels: A5730-A5731). On October 17, Davidson told Cohen that Daniels intended to cancel the agreement if defendant did not provide the agreed-upon payment by the end of the day (Davidson: A4839-A4841; PX281: A17217). No payment materialized, so Davidson told Cohen that Daniels deemed the agreement "cancelled and void ab initio" (Davidson: A4844; Daniels: A5753-A5755; PX282: A17218; *see also* Cohen: A6476-A6477). Daniels had a "backup deal" with another media outlet waiting "in the wings," such that if the deal with defendant fell apart, Daniels's story would be publicized and elicit a "tremendous" amount of press coverage (Davidson: A4850; Daniels: A5755, A5856-A5857).

On October 25, 2016, Pecker and Howard spoke to Cohen (Pecker: A4260-A4263, A4551). During the call, Howard was "very aggressive" with Cohen "for not paying" because Cohen's failure risked ruining Howard's reputation with his sources; Cohen replied that Pecker "should pay" instead (Pecker: A4260, A4551; *see also* Cohen: A6493-A6494). Pecker refused, telling Cohen that he should buy the story and take it off the market "because if you don't, and it gets out, I believe [defendant] will be very angry with you" (Pecker: A4260-A4261, A4551-A4552).

The delay in paying Daniels was intentional. Defendant had instructed Cohen to try to stall and avoid paying Daniels until after the election; defendant explained to

Cohen, "[I]f I win, it has no relevance, I will be President. If I lose, I don't even care" (Cohen: A6458). When Cohen asked defendant how the Daniels story would impact defendant's wife, defendant said "don't worry" and that he would not be "on the market" for very long—confirming that his focus was on the story's impact on the election (Cohen: A6458-A6459). Eventually, Cohen advised defendant that he could not stall any longer without risking the story being published before the election. At that point, defendant instructed Cohen to pay the $130,000, telling him, "Just do it. Go meet up with Allen Weisselberg and figure this whole thing out" (Cohen: A6485). In accordance with defendant's instructions, Cohen spoke to Weisselberg, who assured Cohen that defendant would reimburse him (Cohen: A6486-A6487). Then, Weisselberg and Cohen talked to defendant together and laid out their plan for Cohen to front the $130,000. Defendant was appreciative, and he promised Cohen, "Don't worry about it. You will get the money back" (Cohen: A6487-A6488). With defendant's approval, Cohen finally committed to pay the agreed-upon $130,000 to Daniels (Cohen: A6494, A6496-A6497).

As with the (planned) payment to McDougal, Cohen falsified a series of business records to effect this payment. On October 26—after calling defendant again and confirming his approval (Cohen: A6498-A6500; PX349: A17419)—Cohen opened a First Republic Bank checking account for another shell company called "Essential Consultants, LLC" (Farro: A4635-A4640, A4649-A4658; PX368: A17452-A17455; PX369: A17456-A17457). As with his prior shell company, none of the paperwork

23

indicated that the company would be used to make a payment on behalf of a presidential candidate, which would have triggered additional scrutiny and possibly delay (Farro: A4658-A4660; PX368: A17453). Instead, Cohen submitted paperwork falsely representing that Essential Consultants was a "consulting" firm (Farro: A4639, A4652; PX368: A17453; PX371: 17461; *see also* Cohen: A6501-A6504). Cohen transferred $131,000 to Essential Consultants by taking out a second mortgage on his home (Farro: A4661-A4671, A4678-A4680; PX372: A17468-A17469; PX373: A17470). Finally, on October 27, Cohen wired $130,000 from Essential Consultants to Keith Davidson's attorney escrow account; in the wire transfer paperwork, Cohen falsely indicated that the "purpose" of the wire was to pay pursuant to a "retainer" (Farro: A4671-A4681; Davidson: A4905-A4909; PX285: A17222; PX376: A17474-A17476; PX377: A17477).

Daniels, Davidson, and Cohen signed a new version of the agreement between Daniels and defendant; the terms were largely the same as the prior version, but the name of the entity funding the deal changed from "Resolution Consultants" to "Essential Consultants" (Davidson: A4909-A4917; Daniels: A5755-A5759; PX276: A17188-A17206). Like the prior version, the revised agreement used pseudonyms for defendant and Daniels (PX276: A17188-A17203, A17206), with their real names identified in a secret side letter agreement (Davidson: A4913-A4915; Daniels: A5755-A5759; PX276: A17204-A17205). Following the agreement's execution, Cohen informed defendant that the deal was complete (Cohen: A6512-A6513, A6518).

24

Cohen's payment to Daniels was an unlawful individual contribution under FECA. Federal law prohibits an individual from making a contribution to any candidate with respect to any election for federal office that, in the aggregate, exceeds certain limits—$2,700, at the time of the payment here. *See* 52 U.S.C. § 30116(a)(1)(A); 80 Fed. Reg. 5750, 5752 (Feb. 3, 2015). The $130,000 vastly exceeded this contribution limit. Cohen ultimately pleaded guilty to violating FECA by making an excessive individual contribution with this payment (Cohen: A6679-A6682; *see also* A618, A623, A649 (attachments to People's response to defendant's omnibus motion)).

### 3. The public revelation of the McDougal payment

On November 4, 2016, Hope Hicks—then the press secretary for defendant's presidential campaign—received an inquiry from a *Wall Street Journal* reporter, asking whether defendant or his campaign knew that the *National Enquirer* had purchased a story from Karen McDougal (Hicks: A5243-A5249; PX316: A17391-A17392). When Hicks asked Cohen about the inquiry, he "feigned" that he did not know what Hicks was talking about (Hicks: A5250-A5251). Pecker likewise falsely told Hicks that AMI had paid McDougal only in connection with a contract "for magazine covers and fitness columns," and that it was "all very legitimate" (*id.*). Pecker told defendant that he would tell the *Journal* the same thing he had told Hicks (Hicks: A5254-A5255).

Defendant approved a press statement that called the allegations "totally untrue" and falsely claimed that defendant did not know anything about the "deal" with McDougal (Hicks: A5255). AMI also falsely told the *Journal* that "AMI had not paid

25

people to kill damaging stories" about defendant; Pecker authorized that false statement to protect himself, AMI, and defendant (Pecker: A4268).

Later on November 4, the *Journal* published its article about AMI paying for the rights to McDougal's story about her affair with defendant (Pecker: A4264-A4266; Davidson: A4918-A4919; Hicks: A5243; PX180: A8430-A8434). Following the article's publication, Cohen called Davidson, told him that defendant was upset, and threatened to sue McDougal (Davidson: A4919-A4920).

The *Journal* article also noted that Stormy Daniels had been in discussions with *Good Morning America* about a potential public disclosure of a "past relationship" with defendant, but Daniels had "cut off contact" with the network "without telling her story" (PX180: A8433). The article noted that Daniels did not respond to requests for comment (Hicks: A5266; Daniels: A5759-A5761; PX180: A8433). The article included a statement from Hicks—which defendant had directed her to include—that the allegation of Daniels and defendant having "had a relationship" was "absolutely, unequivocally untrue" (Hicks: A5256, A5266-A5267; PX180: A8430-A8434).

The day after the article was published, defendant called Pecker. Defendant— who was "very upset" and "very agitated"—asked Pecker, "[H]ow could this happen, I thought you had this under control" (Pecker: A4266). Defendant accused Pecker or one of his "people" of having "leaked the story"; Pecker denied the accusation (Pecker: A4266-A4267). Defendant was sufficiently irritated with Pecker that he abruptly and atypically ended the call without saying goodbye (Pecker: A4267).

### 4. The cover-up of the Daniels payment and the creation of false business records held by the Trump Organization

On November 8, 2016, defendant was elected as President of the United States (Daniels: A5761). As the initial election results came in, and knowing that his efforts had promoted defendant's campaign, Davidson texted Howard, "What have we done?" (Davidson: A4921-A4922; PX176A: A8414).

On January 6, 2017, Pecker met defendant at Trump Tower (Pecker: A4278-A4280). Defendant thanked Pecker for handling the McDougal and Sajudin "situation[s]" (Pecker: A4280-A4282, A4478-A4479). Defendant commented that those stories could have been "very embarrassing to him, his family, and the campaign" (Pecker: A4282). However, during all of Pecker's other conversations with defendant about these stories, defendant had "never mentioned" his family; Pecker believed that defendant's primary concern had been the potential effect of the stories on his campaign (Pecker: A4282, A4285-A4286).

There was one important piece of unfinished business: the $130,000 that Cohen had paid Daniels to keep her quiet. In the weeks after making that payment, Cohen had complained to Pecker and Davidson that he had not been reimbursed (Pecker: A4275-A4277; Davidson: A4923-A4924). In January 2017, a scheme was put in place to secretly pay Cohen back while concealing the true nature of this reimbursement.

27

### a. The plan to secretly reimburse Michael Cohen

In mid-January 2017, Cohen met with Weisselberg, the Chief Financial Officer of the Trump Organization, to discuss his reimbursement for the payment to Daniels (Trump Organization Controller JEFFREY McCONNEY: A5336; Cohen: A6548-A6549, A6564-A6565). Weisselberg reported directly to defendant and had worked for him for a long time; they were close and spoke frequently (McConney: A5335-A5337; Trump Organization Accounts Payable Supervisor DEBORAH TARASOFF: A5495; Trump Organization Junior Bookkeeper REBECCA MANOCHIO: A5992; Westerhout: A6076-A6077). Weisselberg ran the company's significant financial decisions by defendant (McConney: A5336-A5337; Tarasoff: A5495-A5499; Cohen: A6416). Indeed, defendant (or one of his sons) had to approve all invoices in excess of $10,000 (Tarasoff: A5498-A5499). And the Trump Organization not only processed the company's business expenses, but also defendant's personal expenses (McConney: A5386-A5387; Manochio: A5993-A5994).

Weisselberg had Cohen bring a First Republic bank statement showing the $130,000 transfer from Cohen's shell company, Essential Consultants, to Davidson (Cohen: A6548-A6549; PX35: A8067). Cohen made some handwritten notes on that statement, and Weisselberg added others of his own (Cohen: A6550; PX35: A8067).

Weisselberg told Cohen that he would add together the $130,000 reimbursement for the Daniels payment and a separate $50,000 reimbursement for a different expense (a payment to a company called Red Finch), for a subtotal of $180,000 (Cohen: A6551-

28

A6555). Weisselberg told Cohen that, rather than characterizing the payments as reimbursements, Cohen would instead receive the payment as "income"; furthermore, because Cohen paid about 50% of his income in taxes, Weisselberg would "gross up" the $180,000 to $360,000, so that, after taxes, Cohen would receive the full $180,000 that he was owed (Cohen: A6551-A6556; *see also* PX93: A8341-A8342). Finally, Weisselberg added an additional $60,000 bonus to address Cohen's complaints about a prior bonus being too low, resulting in a total of $420,000 (Cohen: A6555-A6557).

Weisselberg's handwritten notes on the bottom of the bank statement (PX35: A8067) recorded these details. Weisselberg began with a subtotal of "$180,000": the $130,000 Daniels payment plus the $50,000 Red Finch payment (McConney: A5365-A5366; PX35: A8067). Weisselberg then "grossed up" that $180,000 figure to "$360,000" (McConney: A5366-A5368; PX35: A8067) in order "to offset taxes" so that Cohen could actually pocket $180,000 after taxes (McConney: A5367). After the "grossed-up" figure of $360,000, Weisselberg wrote that Cohen should receive an "Add'l Bonus" of "$60,000," for a total of "$420,000" (McConney: A5368-A5369; PX35: A8067). Weisselberg divided that total by 12, which resulted in a figure of "$35,000 per/mo[nth] eff[ective] 2/1/17" (McConney: A5366-A5370; PX35: A8067).

Next, Weisselberg and Cohen went together to defendant's office, annotated bank statement (PX35: A8067) in hand, to discuss the repayment (Cohen: A6557-A6559). In front of defendant, Weisselberg told Cohen that they would pay him "over 12 months" (Cohen: A6559-A6560). Cohen said he would prefer "one lump sum," but

29

defendant said, "[N]o, it's better … to do it over the 12 months" (Cohen: A6559-A6561). Weisselberg said Cohen would be repaid as "legal services rendered," or as a "retainer for legal services" in light of the fact that Cohen had recently been named Personal Attorney to the President (*id.*).[8] Defendant approved Weisselberg's repayment proposal (Cohen: A6560-A6561). Weisselberg instructed Cohen to submit invoices each month "for legal services rendered pursuant to the agreement," and then the Trump Organization would issue Cohen a check (Cohen: A6566).

Later that month, Weisselberg arranged Cohen's reimbursement with Jeffrey McConney, a senior vice president and controller at the Trump Organization who reported directly to Weisselberg (McConney: A5327, A5336, A5358). In that meeting, Weisselberg and McConney reviewed the First Republic Bank statement reflecting Cohen's $130,000 payment to Davidson through Essential Consultants (PX35: A8067), and McConney took his own notes on the reimbursement scheme (McConney: A5358-A5363; PX36: A8068).

McConney's notes confirmed the details of this scheme (McConney: A5362-A5364, A5370-A5375; PX36: A8068). Cohen would be paid $180,000, but that payment would be doubled to offset his anticipated taxes ("X 2 for taxes") (PX36: A8068). After adding an additional bonus—which McConney wrote down "incorrect[ly]" as $50,000,

---

[8] There would be no compensation attached to Cohen's role as Personal Attorney to the President, nor was there a retainer agreement (Cohen: A6567-A6568).

but was in fact $60,000 (McConney: A5369, A5372-A5373)—Cohen would be paid a total of $420,000, split into twelve equal payments of "35,000/mo[nth]" (PX36: A8068). That payment would be "wire[d] monthly from DJT" (*id.*)—a reference to defendant's "personal account, which was used to wire money from" defendant (McConney: A5371-A5372, A5375).

Taken together, these notes—reproduced in People's Exhibits 35 and 36 (A8067-A8068)—are direct and compelling evidence of the agreement to hide the true nature and purpose of defendant's reimbursements to Cohen. As explained below, the $35,000 monthly payments appearing in both sets of notes would later show up on the falsified invoices, general ledger entries, and checks and check stubs (PX1-34: A8028-A8066). These notes provided conclusive proof that these monthly payments were reimbursements for Cohen's payment to Daniels—not, as the business records falsely represented, payments for legal services pursuant to a retainer.

### b. The creation of 34 false business records

To trigger the 12 payments of $35,000, Cohen would invoice the Trump Organization each month—as McConney's handwritten notes indicated (McConney: A5371-5372, A5375; PX36: A8068 ("Mike to invoice us")). On February 6, 2017, McConney emailed Cohen, asking him to submit the invoice that Cohen had "spoke[n] to Allen about" (McConney: A5376-A5377; PX37A: A8071-A8072). Cohen asked McConney to "remind" him "of the monthly amount"; McConney replied, "$35,000 per month" (McConney: A5383; PX37A: A8070-A8071; *see also* Cohen: A6583-A6586).

31

On February 8, 2017, Cohen visited defendant at the White House (Cohen: A6580-A6582; PX253: A8496; PX254: A8497). They discussed the reimbursement payments: defendant asked whether Cohen needed money, and Cohen said no (Cohen: A6581). Defendant told Cohen he would get a single check for January and February; defendant also said, "just make sure you deal with [Weisselberg]" (Cohen: A6581).

On February 14, 2017, Cohen sent McConney an invoice that read, "Dear Allen, [p]ursuant to the retainer agreement, kindly remit payment for services rendered for the months of January and February, 2017," and listed $35,000 for each month (McConney: A5383-A5384; PX1: A8028-A8032; *see also* Cohen: A6583-A6586). This invoice was the first falsified business record for which defendant was ultimately convicted (A27 (indictment)). Nearly every aspect of this invoice was false. There was no retainer agreement; Cohen had rendered no relevant legal services (indeed, he was not even working for the Trump Organization in February 2017); and, as reflected in People's Exhibits 35 and 36, these payments were not compensation for legal "services rendered," but instead a reimbursement for Cohen's payment to Daniels (among other, less significant expenditures) (McConney: A5358, A5384-A5385, A5448; *see also* Cohen: A6583-A6587, A7222).

Defendant's sons approved Cohen's invoice for the January and February payments, for a total of $70,000 (McConney: A5384-A5385; PX1: A8028). McConney sent the approved invoice to the Trump Organization's Accounts Payable department, with instructions to pay the invoice from defendant's trust account; to classify the

payment as a "legal expense"; and to put "retainer" in the description (McConney: A5386-A5387; PX1: A8028). Other Trump Organization employees recorded those descriptors in the general ledger for defendant's trust, and the company's accountants would later rely on that ledger information to prepare the company's tax returns and financial statements (McConney: A5387-A5389; PX2: A8033; PX3: A8034; PX43: A8114). For example, the general ledger described the February 2017 payment as "Retainer for 2/1 – 2/28/17" (PX3: A8034; PX43: A8114). These entries in the general ledger were also false business records: the payments were not legal expenses, and (again) they were not paid pursuant to any retainer with Cohen.

Upon receiving authorization, the Trump Organization issued a check to Cohen—which was attached to a check stub—from defendant's personal trust (PX4: A8035). This check and stub was an additional falsified business record because it falsely stated that the payment to Cohen was a "retainer for" a particular month (PX4: A8035; *see also* Cohen: A6589-A6591).

Cohen ultimately submitted 10 more invoices for the purported "retainer agreement"—once a month, for $35,000 each, up through December 2017—each of which was incorporated as a falsified business record of the Trump Organization (McConney A5389-A5414; PX1, 5, 8, 11, 14, 17, 20, 23, 26, 29, 32, 37A-37K: A8028-A8096; *see also* Cohen: A6587-A6609). Each invoice resulted in a corresponding false entry in the general ledger maintained by the Trump Organization (McConney: A5387-A5389; Tarasoff: A5505-A5554; PX2, 3, 6, 9, 12, 15, 18, 21, 24, 27, 30, 33: A8033-

33

A8065; PX43-45, 48-49, 54-55: A8114-A8150). And each invoice also generated a check and check stub containing additional false entries (Tarasoff: A5505-A5554; PX4, 7, 10, 13, 16, 19, 22, 25, 28, 31, 34: A8035-A8066; *see also* Cohen: A6589-A6609).

The initial checks (for the January, February, and March 2017 payments) all emanated from the bank account of defendant's trust (McConney: A5384-A5387, A5391; Tarasoff: A5504, A5512-A5526; PX1-7: A8028-A8039; PX37A-37B: A8069-A8075). Beginning with the April 2017 payment, and continuing until the last payment in December 2017, defendant began paying Cohen using his personal bank account, instead of the trust account; defendant was the sole signatory for that account (McConney: A5391-A5393, A5470-A5472; Tarasoff: A5527-A5554; PX8-34: A8040-A8066; PX37C-37K: A8076-A8098). The process for these payments was thus slightly different, but each nonetheless resulted in falsified business records—and confirmed defendant's direct involvement in creating these false records.

To process these payments, the Trump Organization's Accounts Payable department would prepare a check for defendant to sign, the stub for which would falsely indicate that it was for a "retainer" for that month; the check and invoice would travel to the White House; defendant would sign the check; the check would return to New York; and, finally, Trump Organization personnel would send the check to Cohen, who deposited it (Tarasoff: A5499-A5510, A5527-A5554; Manochio: A5992-A5998; Westerhout: A6078-A6081; PX8-34: A8040-A8066; PX37C-37K: A8076-A8098; PX42: A8104-A8113; PX44-45: A8115-A8117).

34

Although defendant was President at the time, the trial record showed that he personally reviewed and signed these checks—as he did for many of his personal expenses during his presidency. Defendant was proud about being a detailed-oriented micromanager who signed his own checks and read all his bills; when it came to money, defendant was "very cautious and very frugal" (Pecker: A4077; Random House Representative SALLY FRANKLIN: A5590-A5600; Westerhout: A6057-A6058; PX413B: A17517; PX414B: A17530-A17531). Both before and after defendant became president, he would review checks and invoices for his personal expenses—including relatively small purchases—before signing them (Pecker: A4076; Westerhout: A6058, A6080, A6085-A6089; PX71: A8203-A8204; PX75: A8207; PX414B: A17530-A17531). Sometimes, defendant declined to sign checks even after an invoice had been approved, or he would ask questions about expenses (Tarasoff: A5502-A5503; Manochio: A5998; Westerhout: A6080-A6081).

Here, defendant personally signed all nine of the $35,000 checks to Cohen that he paid using his personal bank account (Tarasoff: A5527-A5554; PX10, 13, 16, 19, 22, 25, 28, 31, 34: A8042-A8066). The check stubs all falsely indicated that the checks were for a "retainer" for a given month. In the end, Cohen received $105,000 from defendant's trust and $315,000 from defendant's personal bank account (McConney: A5420; PX93: A8341-A8342).

Altogether, these payments to Cohen generated 11 invoices, 11 checks and check stubs, and 12 entries in the Trump Organization's general ledger; these documents

35

falsely described the payments to Cohen as a "retainer" for that month for a "legal expense" or for "services rendered" "[p]ursuant to the retainer agreement" (PX1-34: A8028-A8066; PX43-45, 48-49, 54-55: A8114-A8150; PX350: A17420-A17421). In reality, these payments were the fulfillment of the scheme to provide Cohen with a "grossed up" reimbursement for his $130,000 payment to Daniels to prevent the publication of her account of a sexual encounter with defendant (in addition to another, smaller reimbursement, and a supplemental bonus) (McConney: A5358-A5375; PX35: A8067; PX36: A8068; *see also* Cohen: A6548).

### 5. The public revelation of the hush-money payment to Daniels

On January 10, 2018, Davidson received a request from the *Wall Street Journal* for Daniels to comment "on any interactions" she had with defendant (Davidson: A4925-A4926). Davidson contacted Cohen, who told Davidson that he should "write a strong denial" for Daniels (Davidson: A4929-A4930). Davidson drafted a statement for Daniels denying that she had had "a sexual and/or romantic affair" with defendant, despite knowing that Daniels had, in fact, had sex with defendant (Davidson: A4930-A4933; PX277: A17207). The statement also denied that Daniels had received "hush money" from defendant (Davidson: A4933). Daniels did not want to sign the statement because it was untrue, but she signed it anyway based on Davidson's advice (Daniels: A5764).

On January 12, 2018, the *Journal* published the article, which reported that Cohen had paid Daniels $130,000 to prevent her from discussing her sexual relationship with

36

defendant (Pecker: A4301-A4302; Daniels: A5869; PX181: A8435-A8438). The article included a statement from an unnamed White House official (who Hicks later stated was likely a deputy press secretary) saying that the allegations of a sexual encounter between defendant and Daniels were "old, recycled reports, which were published and strongly denied prior to the election"; the official declined to "respond to questions about an agreement with [Daniels]" (Hicks: A5286; PX181: A8436). Defendant was "very upset" about the story (Westerhout: A6089). Hope Hicks—who by that time was the White House's Director of Communications—asked Cohen about the story; Cohen said the story was false, "that no payment had been made," and that he "had a statement" from Daniels denying any relationship with defendant (Hicks: A5285).

In the days that followed, Daniels began receiving a tremendous amount of press attention (Daniels: A5765-A5766). Daniels's manager, Gina Rodriguez, booked an interview for Daniels on *Jimmy Kimmel Live!* for January 30, 2018 (Davidson: A4939-A4942; Daniels: A5767-A5769). After Cohen learned about the interview, he asked Davidson to have Daniels issue another denial, so Davidson prepared another statement for Daniels to sign before her appearance that denied any "sexual relationship" with defendant and any "hush money" payment (Davidson: A4940-A4945; PX278: A17208). Daniels initially refused to sign the statement because it was false; but based on Davidson's advice, she relented and signed it anyway (Davidson: A4942-A4948; Daniels: A5769, A5872-A5873). During her interview with Jimmy Kimmel, Daniels suggested that the signature was not hers (Davidson: A4947-A4948;

37

*see also* Daniels: A5769). Cohen became upset and threatened to sue her (Davidson: A4949-A4950).

In February 2018, Cohen sought a temporary restraining order against Daniels to prevent her from making public statements that violated the NDA (Daniels: A5771). Cohen also gave a statement to the *New York Times*, claiming that he paid Daniels "without [defendant's] knowledge" (Hicks: A5287).

After the publication of this *Times* article, defendant relayed to Hope Hicks a conversation he claimed to have had with Cohen. As defendant told Hicks, Cohen said he had "paid this woman to protect [defendant] from a false allegation"; that he "did it out of the kindness of his own heart"; and that he "never told anybody about it" (Hicks: A5287-A5288). Hicks thought that Cohen's claim to have made the payment for altruistic reasons seemed "out of character" because Cohen was not "charitable" or "selfless" (Hicks: A5288). Defendant told Hicks that, in his view, "it was better to be dealing with" the story about the Daniels payment after the election, and "that it would have been bad to have that story come out before the election" (Hicks: A5289).

Meanwhile, Daniels was upset about the fact that Cohen was making public statements about her when the NDA prevented her from responding (Daniels: A5770-A5771). Daniels hired a new lawyer who filed a lawsuit against defendant and Essential Consultants, in hopes of obtaining Daniels's release from the NDA (Daniels: A5771-A5772; *see also* Cohen: A6647-A6648).

38

In March 2018, Daniels appeared on *60 Minutes* for an interview with Anderson Cooper (Pecker: A4303, A4307-A4308; Daniels: A5772, A5875). Daniels knew there was a risk that she would be held responsible for breaching the NDA, but she did the interview anyway to "get [her] story out" (Daniels: A5772). After the interview aired, defendant called David Pecker and told him that Daniels could not "mention [his] name or do anything like this," and he claimed that Daniels now owed him "$24 million" for violating the NDA (Pecker: A4308). Ultimately, however, defendant and Cohen agreed not to enforce the NDA (Daniels: A5772; *see also* Cohen: A6647-A6648).

### 6. AMI's and Cohen's admissions about making illegal campaign contributions, and defendant's efforts to prevent Cohen from cooperating with law enforcement

On September 21, 2018, AMI entered into a non-prosecution agreement with the U.S. Attorney's Office for the Southern District of New York, in which it admitted that its $150,000 payment to McDougal constituted a campaign finance violation (Pecker: A4309-A4323; PX182: A8439-A8443). AMI formally admitted, in an attached statement of facts, to the facts surrounding its payment to McDougal, consistent with Pecker's trial testimony, as described above (*supra* Statement A.2).[9] AMI also entered into a conciliation agreement with the FEC in which AMI did not contest that it had violated federal campaign finance law, specifically 52 U.S.C. § 30118(a) (Pecker: A4329-

---

[9] The trial court admitted evidence regarding AMI's non-prosecution agreement, and evidence regarding the FEC investigation of AMI, only to assist the jury in assessing Pecker's credibility and to provide context for surrounding events (A4312-A4313).

A4331, A4527-A4531).[10] In connection with that agreement, AMI paid a $180,000 fine (Pecker: A4330).

In February 2018, the FEC sent a "complaint letter" to Cohen about his $130,000 payment to Daniels (Cohen: A6630). The Trump Organization paid for an attorney to help Cohen prepare a response (Cohen: A6630-A6631). Cohen's response letter stated that he had "used his own personal funds to facilitate a payment of $130,000 to [Daniels]"; that neither "the Trump Organization nor the Trump campaign was a party to the transaction with [Daniels]"; and that neither entity had "reimbursed Mr. Cohen for the payment" (Cohen: A6631-A6633; PX201: A8448). This letter was intentionally misleading: defendant had, in fact, repaid Cohen (Cohen: A6632, A7206-A7208). Cohen spoke to defendant about the FEC complaint after receiving it, and defendant approved of Cohen omitting defendant's involvement in the matter and sending the aforementioned response letter to the press (Cohen: A6633).

Cohen prepared a similar statement for the press regarding the FEC complaint, which was misleading in the same way as his response letter, in that it denied the involvement of either the Trump Organization or the Trump campaign while omitting

---

[10] Earlier, after AMI had first received an FEC complaint regarding the Daniels payment, Cohen spoke to Pecker, who was "very concerned" about the FEC matter (Cohen: A6642). Cohen told Pecker that he had spoken to defendant; that "[w]e have this thing under control"; and that Jeff Sessions, the Attorney General at the time, would "take[] care" of the matter (Cohen: A6642-A6645). The court instructed the jury to consider that testimony solely to assess Pecker's credibility and understand the context for surrounding events (A6644).

40

defendant's involvement; additionally, this press statement falsely said the payment was not a campaign contribution or expenditure (Cohen: A6634-A6639, A7214-A7215; PX202: A8449). Defendant approved the substance of Cohen's false statements (Cohen: A7215), and through his attorney, defendant thanked Cohen for making them (Cohen: A6639-A6641, A7215-A7216; PX217: A8479).

On April 9, 2018, the FBI executed search warrants at Cohen's home, office, and safety deposit box; they seized Cohen's cell phones, records, and other electronic devices (Cohen: A6650-A6652). Cohen learned that prosecutors in the U.S. Attorney's Office for the Southern District of New York were investigating him (Cohen: A6652). Afterward, Cohen spoke with defendant, who told him, "Don't worry. I am the President of the United States. There is … nothing here. Everything is going to be okay. Stay tough" (Cohen: A6653).

On April 21, 2018, defendant posted a message on Twitter defending Cohen and accusing a *New York Times* reporter of attempting to "destroy" Cohen and his relationship with defendant "in the hope that [Cohen] will flip" (Cohen: A6655; PX407F: A17501). On May 3, defendant posted another message on Twitter, saying that Cohen, "an attorney, received a monthly retainer, not from the campaign and having nothing to do with the campaign, from which he entered into, through reimbursement, a private contract between two parties, known as a non-disclosure agreement, or NDA" (PX407G: A17502). Later in the same message, defendant promised to seek damages against Daniels, and he concluded by writing, "Money from

41

the campaign, or campaign contributions, played no roll [sic] in this transaction" (PX407G: A17503-A17504).[11]

Cohen ultimately pleaded guilty in the U.S. District Court for the Southern District of New York to several crimes (Cohen: A6679-A6686). In connection with his $130,000 payment to Daniels, Cohen pleaded guilty to one count of making an excessive individual campaign contribution in violation of FECA (Cohen: A6679-A6682). In connection with AMI's $150,000 payment to McDougal, Cohen pleaded guilty to one count of causing an unlawful corporate contribution in violation of FECA (Cohen: A6682-A6683).[12] Cohen's efforts with respect to those payments were at defendant's direction; on defendant's behalf; and were intended to influence the election (Cohen: A6680-A6683).

On August 22, 2018—one day after Cohen pleaded guilty to committing federal campaign-finance violations at defendant's direction and on his behalf—defendant posted messages on Twitter attacking him, writing, "If anyone is looking for a good lawyer, I would strongly suggest that you don't retain the services of Michael Cohen"

---

[11] These statements contradicted a financial disclosure form that defendant had personally signed and certified in May 2018 and submitted to the Office of Governmental Ethics (OGE Form 278e) (PX81: A8254). The form admitted that "in 2016 expenses were incurred by" Cohen and that defendant "fully reimbursed Mr. Cohen in 2017" (PX81: A8254; *see* McConney: A5441-5444).

[12] The proof about the FEC investigation, and Cohen's guilty plea, was admitted only to help the jury assess Cohen's credibility and provide context for surrounding events (A6636-A6637, A6683-A6684, A7213).

(Cohen: A6685; PX407H: A17505). Defendant continued by comparing Cohen unfavorably to another of his confederates who had not pleaded guilty in the course of a different federal prosecution: "I feel very badly for Paul Manafort and his wonderful family. 'Justice' took a 12 year old tax case, among other things, applied tremendous pressure on him, and unlike Michael Cohen, he refused to 'break'—make up stories in order to get a 'deal.' Such respect for a brave man!" (Cohen: A6685-A6686; PX407I: A17506).

On December 12, 2018, the federal court sentenced Cohen to 36 months in prison and 36 months of supervised release (Cohen: A6687).

### 7.  Testimony regarding Robert Costello

In April 2018, not long after the FBI executed search warrants on his home and office, Cohen met with ROBERT COSTELLO, a criminal defense attorney with close ties to Rudy Giuliani (Cohen: A6659-A6661). Costello argued that Cohen should retain him and said he could provide a "back channel" for communicating with defendant (Cohen: A6660-A6663). Costello also said it would be a bad idea for Cohen to communicate with defendant directly (Cohen: A6663).

Cohen did not tell Costello about defendant's role in the Daniels or McDougal payoffs (Costello: A7304-A7305). Cohen did not trust Costello, and Cohen was concerned that anything he told Costello would be immediately passed on to Giuliani (Cohen: A6677-A6678). Costello had brought a retainer agreement to their meeting,

43

but Cohen declined to sign it or retain Costello, telling him that he was "still speaking to other lawyers" (Cohen: A6662, A6678).

Costello barraged Cohen with phone calls and emails, pressuring Cohen to retain him (Cohen: A6663-A6673; PX203-208: A8450-A8464). Costello continually emphasized that defendant still supported Cohen, who should not "flip" or cooperate with investigators (Cohen: A6677).

When Cohen reminded Costello that he had not retained him and that he was speaking to other attorneys, Costello became angry and accused Cohen of "play[ing]" him (Cohen: A6671-A6674; PX207: A8459-8460). Later, Costello told Cohen, "It seems clear to me that you are under the impression that [defendant] and Giuliani are trying to discredit you and throw you under the bus. I think you are wrong" (Cohen: A6675; PX208: A8462). Cohen understood Costello to be suggesting that defendant still supported him and that he should not cooperate with investigators (Cohen: A6677). Cohen ultimately retained other attorneys (Cohen: A6678).

In this criminal trial, Costello testified for defendant and recounted his conversations with Cohen (Blanche Law Paralegal DANIEL SITKO: A7273-A7277; Costello: A7306-A7310, A7319-A7325; DXB1018: A17585-A17587). Costello repeatedly contradicted himself during his testimony and confirmed that Cohen was right to be suspicious of his motives. Most prominently, Costello claimed during his direct examination (as he had represented to Cohen during their discussions) that he treated Cohen as a "client"; that he had "[e]xclusively" Cohen's interests in mind; and

44

that he did not "care about" defendant's interests (Costello: A7325-A7326). But in an email on May 15, 2018, to his law partner Jeffrey Citron, Costello wrote that defendant "wanted more aggressive lawyers representing Cohen [us]" (amendment in original), and that "[o]ur issue is to get Cohen on the right page without giving him the appearance that we are following instructions from Giuliani or the President" (PX512G: A17555; *see* Costello: A7375-A7377).

Costello contradicted himself in several other ways as well. At trial, Costello denied telling Cohen at the April 17, 2018, meeting that Costello's relationship with Giuliani "would be useful to [Cohen]" (Costello: A7368-A7369). But two days after the meeting, Costello emailed Cohen: "I am sure you saw the news that Rudy is joining the Trump legal team. I told you my relationship with Rudy which could be very very useful for you" (Costello: A7369-A7370; PX203: A8450). That same day, Costello sent his law partner Citron a link to a story about Giuliani joining defendant's legal team and wrote, "All the more reason for Cohen to hire me because of my connection to Giuliani, which I mentioned to him in our meeting" (Costello: A7370-A7371; PX512E: A17554).

Similarly, at trial, Costello testified that Cohen had authorized him to tell Giuliani that Costello's firm was "on the team," but that it should not be announced publicly (Costello: A7309-A7310). However, on August 8, 2018, Cohen emailed Costello and Citron, telling them, "Please cease contacting me as [y]ou do not and have never represented me in this or any matter. Your interest and offers to become a part of the

45

team and to serve as a contact was subject to existing counsel, Guy Petrillo's (cc'd) approval; which was denied" (PX512Q: A17562).

## B. Procedural Background

By New York Country Indictment Number 71543/2023, filed on March 30, 2023, a grand jury indicted defendant on 34 counts of Falsifying Business Records in the First Degree. Penal Law § 175.10. With the Indictment, the People filed a Statement of Facts outlining the allegations that formed the basis for the charges against defendant (A75-A87).

### 1. The first federal removal proceeding

On May 4, 2023, defendant filed a notice of removal in the U.S. District Court for the Southern District of New York, arguing that he was entitled to remove his prosecution to federal court on federal-officer grounds (A142-A150). After an evidentiary hearing, the district court issued an order remanding the case to state court. *New York v. Trump*, 683 F. Supp. 3d 334, 338 (S.D.N.Y. 2023). That order addressed several legal issues that are relevant here.

First, the district court concluded that the charges against defendant were not "for or relat[ed] to" any act defendant had taken under color of the office of the President. *Id.* at 342-46. The court credited the hearing evidence "strongly supporting" the People's allegation that the payments to Cohen were reimbursements for the payments he had made to Daniels rather than attorneys' fees for legal services rendered. *Id.* at 344. That evidence included testimony from Alan Garten, the Trump

46

Organization's Chief Legal Officer, admitting that the twelve $35,000 payments were reimbursements to Cohen for the Daniels payoff, that he was "not aware of any retainer agreement with Cohen," and that the process of recording and making the payments bore no similarity to defendant's or the Trump Organization's procedures for making other legal expenses. *Id.* at 341-44.

The court further found that the evidence "overwhelmingly suggests that the matter was a purely … personal item of the President—a cover-up of an embarrassing event." *Id.* at 345. "Hush money paid to an adult film star is not related to a President's official acts" and "does not reflect in any way the color of the President's official duties." *Id.* Indeed, the court found that the payments would amount to private and unofficial conduct even if they were attorneys' fees. As the hearing evidence established, defendant hired Cohen to "attend to his private matters"; the payments to Cohen were made from "private funds" that did not "depend on any Presidential power for their authorization"; and the documents recording those payments were maintained by "a private enterprise." *Id.* Thus, the court concluded that the charges were based on defendant's "private acts," not "acts under the color of his office." *Id.*

Second, the district court concluded that defendant had failed to identify a colorable federal defense. On presidential immunity, the court explained that defendant had "expressly waived" any defense of "absolute presidential immunity," and that defendant had instead asserted that he was immune because the charges were based on the official acts he took as President of the United States. *Id.* at 346-47. This defense

47

was not colorable as a factual matter, the court ruled, because there was "[n]o evidence" that the reimbursements to Cohen constituted an official presidential act. *Id.* There was also no colorable preemption defense: defendant conceded that FECA did not directly preempt Penal Law § 175.10, and the court rejected defendant's claim that FECA indirectly preempted Penal Law § 175.10 by preempting the crimes that defendant sought to commit or conceal by making the false business records. *Id.* at 347-50.

Defendant filed a notice of appeal from the district court's remand decision but later moved to dismiss his appeal; the Second Circuit granted that motion and dismissed the appeal. *People v. Trump*, No. 23-1085, 2023 WL 9380793 (2d Cir. Nov. 15, 2023).

### 2. Pre-trial motion practice

The parties engaged in extensive pre-trial motion practice before the trial court. As relevant here, in his omnibus motion, defendant argued that Election Law § 17-152 was preempted by federal law to the extent that the People sought to use it "to prohibit conspiracies to violate FECA" (A446). The People opposed that branch of defendant's omnibus motion (A1639-A1642).

On February 15, 2024, the trial court rejected defendant's federal preemption claim (A1969). The court agreed with the federal district court's finding in the first removal proceeding that Election Law § 17-152 did "not fit into any of the three categories of state law that FECA preempts" (A1969). The trial court explained that because FECA did not affect "states' rights to pass laws concerning voter fraud and ballot theft, there is no preemption by FECA in this matter" (A1969).

48

On March 7, 2024—several weeks before the scheduled trial—defendant filed a motion seeking "to preclude evidence of President Trump's official acts at trial based on presidential immunity" (A2721-A2771). The prospective evidence discussed in the motion included Hope Hicks's and Michael Cohen's conversations with defendant while he was President; and defendant's "social media posts and public statements" while in the White House, including his Twitter posts (A2751, A2769-A2770, A20160 n.9). Defendant's motion identified the then-pending Supreme Court case of *Trump v. United States* as relevant to his evidentiary claims and asked the state court to adjourn the trial until after the Supreme Court issued a decision (A2765-A2766). The trial court denied defendant's motion as untimely—thus "declin[ing] to consider whether the doctrine of presidential immunity precludes the introduction of evidence of purported official presidential acts in a criminal proceeding" (A2893-A2898)—but instructed defendant to "wait until trial" to "make [his] objections" and informed him that the court would "decide [the issue] at the time of trial when the objection is made" (A3870).

### 3. The jury trial

On April 15, 2024, defendant's trial commenced with jury selection (A3172-A3227). The evidence at trial is summarized in the Factual Background section, *supra*.

### a. Defendant's objections on grounds of presidential immunity

During trial, defendant objected to testimony about purportedly official acts only twice. First, prior to Hope Hicks's testimony, defendant raised an "objection on Presidential immunity grounds" to "testimony from Ms. Hicks related to statements by

49

[defendant] while he was President of the United States" (A5189-A5190). Second, defendant objected to the introduction of OGE Form 278e (PX81: A8210) as "an official act" (A5437-A5438).[13] The state court overruled those objections (A5190, A5439). By contrast, defendant raised no objection based on official-acts immunity to testimony from Madeleine Westerhout or from Michael Cohen.

### b. The jury charge

In advance of the charge conference, defendant asked the court to instruct the jury that it needed to unanimously agree on the particular "unlawful means" through which defendant sought to influence the election, in connection with the Election Law offense that defendant was charged with intending to conceal or commit for all 34 counts of first-degree falsification of business records (A17684). In support of his claim, defendant cited (in a footnote) only to *Ring v. Arizona*, 536 U.S. 584, 602 (2002), which held that the Sixth Amendment requires the jury to find beyond a reasonable doubt any fact that increases a defendant's authorized sentence (A17684 n.29). Defendant made no argument under the statute itself or under federal or state due process. The People opposed that request in writing (A17690.10).

At the charge conference, the People reiterated that the jury did not need to unanimously agree on the specific unlawful means of the uncharged election conspiracy. In response, defense counsel acknowledged "the law that's been cited here," but

---

[13] Defendant no longer objects to the introduction of OGE Form 278e or its admission that the payments to Cohen were reimbursements (*see supra* n.11).

nonetheless argued that the court "has some discretion." Counsel elaborated, "This is, obviously, an extraordinarily important case," and the jury "should be required to make very specific findings, as specific as your Honor's discretion would permit, so it's very clear what happened at this trial." The court asked counsel if he agreed that "that's not ordinarily required," and counsel replied, "Certainly." The court said that it would not "change the law" for defendant (A7470-A7472).

The court instructed the jury that Penal Law § 175.10 required the People to prove that defendant falsified business records "with intent to defraud that includes an intent to commit another crime or to aid or conceal the commission thereof" (A7907). The court clarified that the People "need not prove that the other crime was in fact, committed, aided, or concealed" (A7909). It further instructed that the underlying crime in this case was Election Law § 17-152, and that the jury did not need to be "unanimous as to what [the] unlawful means were" (A7909-A7912).

### c. The verdict

On May 30, 2024, the jury unanimously found defendant guilty of all 34 counts (A8014-A8021).

### 4. Relevant post-trial proceedings

### a. *Trump v. United States*

On July 1, 2024, the Supreme Court decided *Trump v. United States*, which addressed the scope of presidential immunity from criminal prosecution for a President's official acts committed during his tenure as President. 603 U.S. at 601-02.

51

The Supreme Court held that the President is at least presumptively immune for "acts within the outer perimeter of his official responsibility," and that he "is absolutely immune from criminal prosecution for conduct within his exclusive sphere of constitutional authority." *Id.* at 606, 614-15. However, the Court confirmed that the "President enjoys no immunity for his unofficial acts, and not everything the President does is official." *Id.* at 642.

Separately, the Supreme Court held that certain evidence relating to a President's official acts may be inadmissible at trial, even as to charges based on unofficial conduct. *Id.* at 630-32. In particular, the Court concluded that prosecutors could "point to the public record to show the fact that the President performed [an] official act," but they could not "admit testimony or private records of the President or his advisers probing the official act itself" because allowing "that sort of evidence would invite the jury to inspect the President's motivations for his official actions and to second-guess their propriety." *Id.* at 632 n.3.

### b. Defendant's post-trial motion to vacate

On July 10, 2024, defendant moved to vacate his conviction pursuant to CPL 330.30(1) (A17866-A17920). In that motion, defendant argued that the People had improperly introduced evidence of official presidential acts in violation of *Trump v. United States*. As relevant here, defendant's claim pertained to certain testimony by three witnesses: Hope Hicks, Michael Cohen, and Madeleine Westerhout. His claim also

52

related to his postings on Twitter (A17866-A17920, A18034-A18058). The People opposed the motion (A17921-A17989).

On December 16, 2024, the trial court denied defendant's CPL 330.30(1) motion (A20150-A20190). As an initial matter, the court found that defendant had failed to preserve his objections based on official acts to any of the challenged evidence except for testimony about certain conversations between Hope Hicks and defendant and four Twitter posts from defendant referencing Michael Cohen (A20158-A20165). In any event, on the merits, the court found that none of the disputed proof constituted a "core official act," nor did any of it "fall within the outer perimeter" of defendant's "official duties" under *Trump v. United States* (A20165-A20184). In the alternative, the court found that even if defendant's Tweets or communications fell within the "outer perimeter" of defendant's presidential authority, "other, non-privileged trial testimony provided ample non-motive related context and support to rebut a presumption of privilege" and to demonstrate "that Defendant was acting in his personal capacity and not pursuant to his authority as President" (*id.*). Similarly, this evidence posed "no danger of intrusion on the authority and function of the Executive Branch" (A20190).

Finally, the court ruled that even if any of the disputed evidence amounted to proof of "official acts under the auspices of the *Trump* decision," the court would still deny defendant's motion because any error was "harmless in light of the overwhelming evidence of guilt" from the extensive "evidence the jury heard and considered, separate

53

and apart from that evidence and select testimony which Defendant challenges on Presidential immunity grounds" (A20184-A20187).

### c. Defendant's motion to file a second, untimely notice of removal in federal court

On September 3, 2024, defendant filed a motion in the U.S. District Court for the Southern District of New York for leave to file a second notice of removal to federal court (A18075-A18077). In his motion, defendant argued that the Supreme Court's intervening decision in *Trump v. United States* and events that occurred at trial were changed circumstances that supplied good cause for defendant's late filing (A18076; *see also* A19263-A19326).

The district court denied the motion (A18078). The court found that *Trump v. United States* had not altered or affected the court's "previous conclusion that the hush money payments were private, unofficial acts, outside the bounds of executive authority" (A18080). The court thus concluded that "[g]ood cause has not been shown, and leave to remove the case is not granted" (A18081).

### d. Defendant unsuccessfully seeks to stay sentencing, and the trial court sentences him on January 10, 2025

On November 5, 2024, defendant was reelected as President of the United States. In the week leading up to his sentencing on January 10, 2025, defendant filed applications to stay his sentencing with the Appellate Division, First Department; the New York Court of Appeals; and the U.S. Supreme Court. All those courts rejected defendant's stay applications. *Trump v. New York*, 145 S. Ct. 1038 (2025). When the

Supreme Court denied defendant's stay request, it noted that "the alleged evidentiary violations … can be addressed in the ordinary course on appeal." *Id.*

On January 10, 2025, the trial court sentenced defendant to an unconditional discharge (A4-A26).

### e. Defendant's appeal to the Second Circuit in the second removal matter

On November 6, 2025, the Second Circuit vacated the district court's order denying leave to file a second notice of removal and remanded for reconsideration of the motion consistent with its opinion. *New York v. Trump*, 158 F.4th 458, 461 (2d Cir. 2025). Defendant's motion for leave to file a second notice of removal remains pending before the district court.

## ARGUMENT

## POINT I

## PRESIDENTIAL IMMUNITY FOR OFFICIAL ACTS DOES NOT SHIELD DEFENDANT FROM CRIMINAL LIABILITY FOR HIS WHOLLY UNOFFICIAL MISCONDUCT

Defendant asserts that the trial court improperly admitted evidence of his official presidential acts "in violation of the evidentiary immunity" later recognized in *Trump v. United States*, 603 U.S. at 631 (DB: 44). In invoking "evidentiary immunity," defendant relies on an ancillary ruling in *Trump v. United States* rather than that decision's principal holding. The principal holding concerned whether a former President could be held criminally liable "for official acts taken during his Presidency." 603 U.S. at 641. That

55

holding has no bearing here because, as the U.S. District Court for the Southern District of New York has found and defendant does not dispute, the charges in this case all arose from purely personal conduct, rather than official presidential acts. *See Trump*, 683 F. Supp. 3d at 345.

Instead, defendant's current claim relies exclusively on a separate holding in *Trump v. United States* that certain evidence about "official conduct for which the President is immune" may not be introduced at trial "even on charges that purport to be based only on his unofficial conduct." 603 U.S. at 631. That separate holding is itself limited. First, by its own terms, this holding applies only when the evidence in question concerns "official acts for which the President is immune" from criminal liability; there is no evidentiary bar with respect to unofficial acts by the President. 603 U.S. at 631. Second, as for official acts, there is only a narrow category of acts where the President has absolute immunity (and where the evidentiary bar would thus automatically apply)—specifically, acts by the President to carry out an explicit constitutional commitment of exclusive authority. *Id.* at 607-09. For all other official acts, the President is entitled only to presumptive immunity, which can be rebutted (thereby lifting any evidentiary bar) by showing that "applying a criminal prohibition to that act would pose no dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 615 (quotation marks omitted). Third, even as to official acts for which the President is immune, "of course the prosecutor may point to the public record to show the fact that the President performed the official act." *Id.* at 632 n.3.

56

Here, defendant's claim based on the evidentiary ruling in *Trump v. United States* does not warrant reversal, for several independent reasons. First, defendant failed to preserve an immunity-based objection to several of the pieces of evidence that are the subject of his current arguments. Second, defendant's arguments are meritless, since the evidence at issue either (a) concerned unofficial conduct that was not subject to any immunity, (b) involved official conduct for which any presumption of immunity was rebutted, or (c) was a matter of public record that was not subject to preclusion. Finally, even if some of this evidence were improperly admitted, any error would be harmless given the other overwhelming evidence of defendant's guilt.

### A. Many of Defendant's Immunity Challenges Are Unpreserved.

Defendant asserts that *Trump v. United States* precluded the admission of four categories of evidence: (1) testimony from Hope Hicks about certain conversations she had with defendant in early 2018, while she was serving as White House Communications Director (*supra* at 36-39); (2) four statements that defendant posted on Twitter commenting on Michael Cohen and his NDA with Stormy Daniels (*supra* at 41-43); (3) testimony from Cohen about a conversation with AMI's David Pecker, in which Cohen reported that defendant had purportedly promised that then-Attorney General Jeff Sessions would "take[] care of" an FEC complaint (*supra* at 40 n.10); and (4) testimony from Madeleine Westerhout, former Director of Oval Office Operations, about defendant's work practices while in the White House (*supra* at 34-35).

The trial court correctly held that defendant failed to preserve any challenge to the last two categories of evidence—the testimony from Cohen and Westerhout (A20162-A20165). Before trial, defendant sought an advance ruling on the admissibility of purportedly official-acts evidence and identified defendant's Twitter posts and the anticipated testimony from Hicks (A2750-A2751); during trial, defendant raised an objection based on official-acts immunity to Hicks's testimony (A5189). But defendant did not raise immunity-based objections to Westerhout's and Cohen's testimony, either in motion papers or at trial (A6040-A6193, A6325-A7271).[14] Defendant has thus failed to preserve any such objections to this testimony. *See People v. Cabus*, 40 A.D.3d 540, 540 (1st Dep't 2007).

Defendant's counterarguments are unpersuasive. First, he contends that he *did* "fully preserve[] his objections to the challenged testimony of Cohen and Westerhout" by raising a general objection based on official-acts immunity before trial and then a few selective objections to other evidence during the trial itself (DB: 56-57). As the trial court correctly found, "[t]his is simply not the law" (A20164). For one thing, an overall objection to a class of purportedly inadmissible evidence is "not sufficient to preserve the [allegedly inadmissible] statements for appellate review" because it does "not alert

---

[14] The defense motion referred, without elaboration, to Cohen's grand-jury testimony to certain conversations with defendant "in February 2017 and in 2018" (A2751), but the referenced conversations did not involve the subject of Cohen's later trial testimony that is the basis for his current claim of official-acts immunity.

the [trial] court to any of the [testimony] now in issue." *People v. Balls*, 69 N.Y.2d 641, 642 (1986). More fundamentally, defendant is just wrong to say that Supreme Court "definitively rejected" his evidentiary claims before trial (DB: 56); to the contrary, the court expressly noted that it *was not ruling* on defendant's pre-trial challenge because it was untimely, and instead directed defendant to raise that objection as the testimony came out at trial (A2898, A3870). A defendant does not preserve an argument by filing an untimely pre-trial motion that the trial court declines to address.

Defendant is also wrong to assert that his immunity-based objection at trial to the testimony of Hicks was sufficient to preserve such an objection to the separate testimony of Cohen and Westerhout (DB: 57). Even as to the same witness, a general pre-testimony objection to potentially inadmissible statements is insufficient when the defendant fails to contemporaneously object "to the specific testimony" at issue. *People v. Eades*, 198 A.D.2d 905, 905 (4th Dep't 1993). That principle applies all the more powerfully here, where the trial objection that defendant relies upon was made for a different witness who testified many days before Westerhout and Cohen.

Defendant mischaracterizes the record in asserting that his failure to raise an official-immunity objection during Cohen's and Westerhout's testimony was an attempt to comply with the trial court's direction that he need not "object as to each question" (DB: 57). The court made that statement during Hicks's testimony, when defense counsel said that he "prefer[red] not to lodge the objections question by question" as to that witness (A5189-A5190). The court's decision to allow Hicks specifically to testify

without interruption cannot reasonably be understood as excusing defendant from raising *any* further evidentiary objections to *any* witness on immunity grounds.

Second, defendant makes the sweeping argument that preservation is not required because "violations of Presidential evidentiary immunity" are "structural or 'mode of proceedings' errors" (DB: 56). Neither of these "very narrow exception[s]" to preservation is implicated here. *People v. Patterson*, 39 N.Y.2d 288, 295 (1976), *aff'd sub nom. Patterson v. New York*, 432 U.S. 197 (1977). And this Court should refuse to recognize any new exception given the Court of Appeals' repeated warnings against "erosion of the preservation rule," which serves important public purposes. *People v. Mack*, 27 N.Y.3d 534, 540 (2016).

"Mode of proceedings" errors "go to the essential validity of the process and are so fundamental that the entire trial is irreparably tainted." *People v. Kelly*, 5 N.Y.3d 116, 119-20 (2005). By contrast, errors that merely "affect the substance" of the trial— including errors regarding the evidence presented at trial—do require preservation (and, as explained below, are further amenable to harmless-error review). *People v. Hawkins*, 11 N.Y.3d 484, 492 n.2 (2008); *see, e.g., People v. Gray*, 86 N.Y.2d 10, 22 (1995) ("[A]n assertion that an element is missing from the proof required goes to substance and not to the mode of proceedings."). Similarly, under federal law, a "structural defect affect[s] the framework within which the trial proceeds, rather than simply an error in the trial process itself," but any "error which occurred during the presentation of the case to the

jury," including an evidentiary error, is not structural and thus requires preservation. *Arizona v. Fulminante*, 499 U.S. 279, 307-08, 310 (1991).

Defendant's failure to object here undermined many of the core purposes of the preservation requirement. Because defendant did not flag official-acts immunity for the trial court with respect to Cohen's and Westerhout's testimony, the court could not "correct [any] errors in a timely fashion." *Mack*, 27 N.Y.3d at 540. Defendant's silence also "stymied the development of a record that would allow for careful and deliberate adjudication on the merits of [this] constitutional challenge[]." *People v. Cabrera*, 41 N.Y.3d 35, 50 (2023). The absence of such a record is particularly problematic because a claim of official-acts immunity "requires a close" and "fact specific" analysis. *Trump v. United States*, 603 U.S. at 628. "The nature of that complex inquiry only underscores the importance of preservation." *Cabrera*, 41 N.Y.3d at 50.[15]

## B. The Challenged Testimony Was Admissible.

### 1. Defendant's statements on Twitter

Defendant objects to the admission of four statements (Tweets) from his Twitter account (DB: 49-52; *see* A17501-A17506). Three Tweets reflected defendant's opinion about Cohen, his personal attorney both before and during his presidency; the fourth contained defendant's observations about the NDA with Daniels, which was (in his

---

[15] That defendant's evidentiary arguments are also subject to harmless-error review (*see infra* Point I.C.1) further supports the need for preservation. *See Mack*, 27 N.Y.3d at 540.

own words) "a private contract between two parties" (A17502). The trial court correctly concluded that *Trump v. United States* did not preclude admission of these Tweets (A20182-A20184).

First, the subject matter of these Tweets consisted solely of "unofficial acts" for which "there is no immunity" and thus no bar to admission of evidence. *Trump v. United States*, 603 U.S. at 615. The Supreme Court specifically recognized that defendant, even while serving as President, could make public statements—including Tweets—"in an unofficial capacity." *Id.* at 629. Here, as the trial court correctly found, the four Tweets objected to by defendant were all "entirely personal in nature" (A20183) because they were issued in defendant's "unofficial, private capacity," rather than as part of "carrying out the official duties of the presidency." *Blassingame v. Trump*, 87 F.4th 1, 4 (D.C. Cir. 2023); *see also Lindke v. Freed*, 601 U.S. 187, 203 (2024) (speech by public official is private if it did not "purport[] to discharge an official duty").

All four of the challenged Tweets referred to Cohen. The trial record established (and the federal district court found) that, at the time the Tweets were published, Cohen was not acting in any official capacity connected to defendant's duties as President. *See Trump*, 683 F. Supp. 3d at 345. Defendant's Tweets conveying his personal opinion about a private attorney did not bear any conceivable relationship to any official duty of the presidency. One of the Tweets also provided defendant's opinion about—in his own words—"a private contract" between Cohen and Daniels (A17502) that was part of the catch-and-kill scheme. No official act of the presidency was involved in a

62

comment about a "private contract" that (a) was signed by two non-government officials, (b) was executed before defendant's presidency, and (c) was part of a scheme that did "not reflect in any way the color of the President's official duties," *Trump*, 683 F. Supp. 3d at 344-45.

Defendant's main response is that these Tweets constituted official conduct because he *personally believed* that he was speaking to Americans on a matter of public concern, and "[i]t is up to the President" rather than "the trial court" to decide this question (DB: 50-51). The Supreme Court rejected any such extreme deference to the President. Far from leaving the issue to the President's unilateral and post hoc assertion, the Court instead "remand[ed] to the District Court to determine in the first instance" whether various Tweets and other public statements constituted official conduct, based on an "objective analysis of 'content, form, and context.'" 603 U.S. at 629-30. The trial court here appropriately conducted such an analysis.

Defendant further asserts that his Tweets constituted official conduct because a government employee, Madeleine Westerhout, assisted in posting them (DB: 51). As an initial matter, the record does not support this claim, since Westerhout testified that defendant often posted Tweets himself (A6058-A6059). In any event, it is "the nature of the function performed, not the identity of the actor who perform[s] it, that inform[s] [the] immunity analysis." 603 U.S. at 615-16. Here, Westerhout's purported involvement in posting the Tweets was not dispositive because, as explained in more detail below, she admitted that part of her responsibility at the White House was to help

defendant handle his "personal affairs" (A6104). And "[a]s for a President's unofficial acts, there is no immunity." *Id.* at 615. Because defendant was "not us[ing] his speech in furtherance of his official responsibilities, he [was] speaking in his own voice," regardless of whether a government employee was involved. *Lindke*, 601 U.S. at 201.

Second, even assuming that the Tweets constituted official conduct, they at most gave rise to a presumption of immunity that was easily rebutted here (A20183). The Court described "most of a President's public communications" as being "within the outer perimeter of his official responsibilities," *Trump v. United States*, 603 U.S. at 629—a characterization that gives rise only to "a *presumptive* immunity from criminal prosecution," not absolute immunity, *id.* at 614. That presumption can be rebutted if consideration of these Tweets would not "pose any dangers of intrusion on the authority and functions of the Executive Branch." *Id.* at 624-25.

Here, there was no such danger because the subject matter of the Tweets bore no relationship to any official duty of the presidency. Defendant was not performing, or even describing, any official presidential act in conveying his personal opinions about his personal attorney and a private NDA signed before his presidency. Consideration of these Tweets posed no danger of "distort[ing] Presidential decisionmaking," *id.* at 613, because no such decisionmaking was involved.

Third, even if the Tweets were official acts for which defendant would be immune, they were admissible because the People admitted nothing more than the "public record" of those Tweets "to show the fact that the President performed the

64

official act"—i.e., that he made those statements on Twitter. *Trump v. United States*, 603 U.S. at 632 n.3. As the trial court rightly observed, defendant "Tweeted out to millions of people voluntarily" (A3123). There was no barrier to relying on this public record.

### 2. Testimony by Hope Hicks

Defendant objects to testimony by Hope Hicks about "certain conversations" she had with defendant "in the Oval Office in early 2018" while she was acting as the White House Communications Director (DB: 46). As defendant does not contest, Hicks's position alone is not dispositive to the immunity analysis. Indeed, not even all of a President's discussions with the Vice President or Attorney General would be inadmissible. *See Trump v. United States*, 603 U.S. at 623-24. And if, as the Supreme Court held, the President can communicate to the public "in an unofficial capacity," *id.* at 629, then White House personnel who help to facilitate such unofficial communications must necessarily be acting in an unofficial capacity as well. Under this framework, Hicks's testimony was admissible for several reasons.

First, the subject matter of the discussions between defendant and Hicks did not involve any exercise of the President's "conclusive and preclusive constitutional authority." *Id.* at 609 (quotation marks omitted). The trial court correctly found that the conversations at issue "manifestly pertain[ed] to unofficial or private conduct"—the catch-and-kill scheme that was then being reported in the press—and were "inextricably intertwined with private discussions and events which began before Defendant's Presidency" (A20169). As defendant no longer contests, that scheme was entirely

65

personal and bore no relationship to any official duty of the President. *See Trump*, 683 F. Supp. 3d at 345. A President's discussions about a purely private matter, even with a White House advisor, do not constitute "official acts for which the President is immune," *Trump v. United States*, 603 U.S. at 631, because neither the internal discussions nor the subject matter of those discussions has any "connection with the general matters committed by law to [the President's] control or supervision," *Blassingame*, 87 F.4th at 13 (quotation marks omitted).

Defendant argues to the contrary by asserting that all of his discussions with Hicks involved "press strategy" or "the content of on-the-record statements," and that *any* public communications by the President are "undoubtedly official," even if they involve private matters (DB: 47). As an initial matter, the factual premise of this argument is incorrect since, as explained further below, some of Hicks's discussions with defendant had no connection whatsoever to any planned public communication. In any event, defendant's legal claim is also wrong, since both the Supreme Court and the D.C. Circuit have expressly rejected a categorical rule deeming all of a President's public communications to be official conduct (*contra* U.S. Amicus: 11). *See Trump v. United States*, 603 U.S. at 629; *Blassingame*, 87 F.4th at 15.

Defendant is wrong to suggest (DB: 48) that *Clinton v. Jones*, 520 U.S. 681 (1997), held that a President engages in official conduct any time he directs White House officials to make public statements about a private sexual affair. In fact, the courts in the *Clinton* case expressly *declined* to resolve that issue: the Eighth Circuit found the

66

argument unpreserved, *Jones v. Clinton*, 72 F.3d 1354, 1359 n.7 (8th Cir. 1996); and the Supreme Court accordingly "d[id] not address the question," *Clinton*, 520 U.S. at 686 n.3. Defendant's quotation from *Clinton* (DB: 48) is thus misleading: the Court was merely describing the argument that it was refusing to resolve, not deciding it.

Defendant also misplaces his reliance on *Council on American Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006) (DB: 48; *see also* U.S. Amicus: 11). The question in that case was whether a congressman (the defendant in a defamation action) was acting "within the scope of employment" for purposes of the Westfall Act "when he discussed his marital status in his office, during regular business hours, in response to a reporter's inquiries"; if so, then the United States would be substituted as the defendant in the action. *Id.* at 661. The Westfall Act question in turn depended on "D.C. scope-of-employment law"; relying on its own interpretation of D.C. law, the federal court held that the congressman was acting within the scope of his employment because "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Id.* at 664.

As the D.C. Court of Appeals subsequently clarified, however, *Ballenger* did not adopt—and D.C. law does not support—any "categorical" rule that "the conduct of elected officials speaking to the press is always within the scope of that official's employment." *Trump v. Carroll*, 292 A.3d 220, 239 (D.C. 2023). Moreover, *Ballenger*'s holding "rested on undisputed, affirmative evidence in the record that his purpose behind making the allegedly defamatory statements was to serve his constituents and

67

otherwise carry out his legislative responsibilities." *Id.* No such evidence exists here—to the contrary, the trial court made the opposite finding that defendant's discussions with Hicks concerned "unofficial or private conduct" rather than official responsibilities (A20169).

Second, even assuming that a President's statements to the White House Communications Director about public communications automatically constituted official conduct subject to absolute immunity, defendant's attempt to preclude Hicks's testimony would still fail as an evidentiary matter. As described below, to the extent that Hicks's testimony concerned public-facing statements, she never testified in detail about anything that *defendant* said. And in the one instance where Hicks did describe defendant's own words, the record establishes that the conversation was *not* about preparing for "the White House's official response" (DB: 47).

The challenged portions of Hicks's testimony (DB: 46) described three different incidents. The first involved a conversation she had with defendant after Karen McDougal was interviewed by Anderson Cooper on CNN in March 2018. Although Hicks acknowledged that she "sp[oke] to Mr. Trump," she provided no details about that conversation—and, in particular, no descriptions of any statement from defendant—that would be subject to any official-immunity claim (A5282-A5283).

The second incident involved the *Wall Street Journal* article from January 2018 that reported on Stormy Daniels (A5283). Hicks explained that she discussed with defendant "how to respond to the story, how he would like a team to respond to the

story" (A5285), but there are again no details about defendant's actual statements or the substance of those conversations. Later, Hicks quoted a statement from a White House official that was included in the article (A5286), but that statement did not come from defendant and was in any event no more than a "public record" that the statement had been made. *Trump v. United States*, 603 U.S. at 632 n.3. Although Hicks noted that she had also discussed this statement with defendant "before it was issued" (A5286-A5287), she again was describing her own conduct, rather than providing testimony about anything that defendant said.

The third incident—the only one where Hicks described defendant's own words—did not involve any discussion about public-facing communications. The impetus for this final conversation was a statement that Michael Cohen had given to the *New York Times* in February 2018, which led defendant to have a private conversation with Cohen (who, again, was acting as his personal attorney at the time) (A5287). Hicks's testimony concerned defendant's subsequent recounting of this private conversation to her (A5287-A5289). It was during this recounting that defendant told Hicks that he thought "it was better to be dealing with [the Daniels story] now, and that it would have been bad to have that story come out before the election" (A5289).

Completely absent from this testimony is any evidence that, for this particular incident, Hicks and defendant were discussing "the White House's official response" (DB: 47). To the contrary, defendant was recounting a wholly private conversation and

offering his views on the timing of a story about a purely private payoff that did "not reflect in any way the color of the President's official duties." *Trump*, 683 F. Supp. 3d at 345. No official-acts immunity attaches to such discussions.[16]

Third, even assuming that Hicks's testimony concerned official acts by the President, any presumption of immunity would be rebutted because there is no danger that consideration of this testimony would interfere with the authority and functions of the Executive Branch. *Trump v. United States*, 603 U.S. at 623-24. Defendant makes the sweeping claim that a President must be able to discuss *any* subject confidentially with his White House Communications Director (DB: 46-47). But that argument goes too far—the Supreme Court's decision instead sought to protect only "the President's official decisionmaking." *Trump v. United States*, 603 U.S. at 631. There is no risk of interference with such official decisionmaking when, as here, the President's discussions concerned a purely private matter, and when the testimony did not describe either the President's statements or any official acts to be done in response to the private matter.

### 3. Testimony by Michael Cohen

Cohen gave extensive testimony at trial. Defendant's challenge to his testimony on official-immunity grounds is limited to just one narrow exchange. Specifically,

---

[16] Tellingly, the federal government's amicus brief focuses only on Hicks's conversations with defendant in relation to the *Wall Street Journal* article in January 2018 (U.S. Amicus: 11-12). The amicus does not make any claim of immunity arising from conversations concerning Cohen's *New York Times* statement in February 2018 or the Anderson Cooper interview in March 2018.

Cohen testified that, in a conversation with AMI's David Pecker, he told Pecker that an FEC complaint against AMI would "be taken care of" because the President had told him that then-Attorney General Jeff Sessions was "going to be able to do it" (A6642, A6645). Defendant claims that Cohen should have been prohibited from testifying about this portion of his conversation with Pecker (DB: 52-53). He is wrong.

First, aside from being unpreserved, this argument mistakenly assumes that the purpose of this testimony was to establish that defendant *in fact* had a discussion with the Attorney General. But defendant has consistently "denie[d] any such interaction with then-Attorney General Sessions about a pending FEC complaint" (DB: 52). And whether such a conversation actually happened was immaterial to this testimony. Rather, the purpose of this testimony was to explain Cohen's conduct and Pecker's reaction at a time when the co-conspirators were feeling troubled about their role in the catch-and-kill scheme. The People thus used this conversation in summation to show that "Cohen was cool as a cucumber" in telling Pecker not to worry about the FEC complaint and that he was willing to "lie for the Defendant, to fall on the sword to protect the President" (A7817-A7818). Confirming the testimony's limited purpose, the trial court instructed the jury—at the defense's request—that it was to consider this testimony only "in assessing David Pecker's credibility and to help provide context for some other surrounding events," and the jury could "not consider" it "in determining whether the Defendant is guilty or not guilty of the charged crimes" (A6637, A6644).

71

In other words, it did not matter whether defendant actually had spoken with the Attorney General about the FEC complaint. The only relevant conduct at issue here was Cohen's recounting of a (perhaps empty) promise from defendant to reassure a private third party (Pecker) not to panic about an independent agency's investigation into private affairs. That conduct reflected no exercise of actual presidential responsibilities—rather, it was yet another "cover-up of an embarrassing event" that "was purely a personal item of the President." *Trump*, 683 F. Supp. 3d at 345.

Second, even assuming that defendant did in fact speak to then-Attorney General Sessions, official-acts immunity still would not apply. For one thing, each of the FEC investigations at issue arose out of conduct that defendant concedes was entirely personal and that involved no official act—i.e., the pre-election hush-money payments to McDougal and Daniels (A4329-A4331, A4527-A4530, A6631-A6632). In addition, Cohen's testimony described a conversation between himself and Pecker, another purely private actor; in *Trump v. United States*, defendant "appeared to concede" that acts only "involving 'private actors' . . . entail 'private' conduct." *Trump*, 603 U.S. at 626; *see also* Tr. of Oral Argument at 29, *Trump v. United States*, No. 23-939 (Apr. 25, 2024) ("Justice Barrett: Petitioner turned to a private attorney who was willing to spread knowingly false claims of election fraud to spearhead his challenges to the election results. Private? . . . . [Defense Counsel]: —that sounds private to me."). Finally, as the trial court found (A20181), the President has no clear statutory or constitutional authority to interfere with an administrative investigation by the FEC, which "is an

72

independent administrative agency vested with exclusive jurisdiction over civil enforcement of [FECA]," *Fed. Election Comm'n v. Nat'l Right to Work Comm.*, 459 U.S. 197, 199 n.2 (1982); *see also* 52 U.SC. § 30106(b)(1), and which is not "subject to control of the Attorney General," *Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 92 n.1 (1994).[17]

These factors thus support the conclusion that defendant was not exercising any official presidential duty in becoming involved with a private person's response to the FEC's civil inquiry. At minimum, even if there were some official duty to which presumptive immunity attached, that presumptive immunity would be rebutted here. Official presidential decisionmaking is unlikely to be affected by judicial scrutiny of a President's gratuitous involvement in an independent federal agency's exclusive civil enforcement over a campaign matter that did not itself involve any official acts.

### 4.  Testimony by Madeleine Westerhout

Defendant objects to testimony from Madeleine Westerhout about certain White House procedures and defendant's work habits as President (DB: 54-55). This wholly unpreserved claim fails for several reasons.

First, Westerhout's testimony was overwhelmingly directed at defendant's handling of his *private* affairs—unofficial conduct that is not subject to any claim of

---

[17] The federal government's assertion that the Department of Justice can criminally prosecute FECA violations (U.S. Amicus: 10) is immaterial given the FEC's independence on civil investigations, which was the only pending matter at issue here.

immunity. *See Trump v. United States*, 603 U.S. at 642. For example, Westerhout testified that she worked with Trump Organization personnel to handle defendant's "personal affairs" (A6104), that she received FedEx deliveries from the Trump Organization containing personal checks for him to sign (A6078-A6081), and that she worked with Rhona Graff and other Trump Organization employees to handle defendant's personal obligations, such as renewing a golf club membership (A6084-A6087) and purchasing a Tiffany frame (A6087-A6089). Likewise, contrary to defendant's characterization (DB: 54), Westerhout's testimony about how defendant composed Tweets (A6059-A6060) did not necessarily involve any official conduct because, as already discussed, defendant can and did speak in an unofficial capacity while President—and the only Tweets at issue in this case were done in his private capacity. *See supra* Point I.B.1.

The other testimony from Westerhout about which defendant complains contained no description of defendant's conduct and thus triggered no concerns about official-acts immunity. For example, defendant references Westerhout's testimony about "calls made by the situation room" (DB: 54). But her testimony was not about calls made by the President; instead, the calls were by other people (including from the situation room) who could be "patched through either to [Westerhout] or other members of the President's staff" rather than the President (A6055). That testimony described no conduct by the President himself.

Second, to the extremely limited extent that Westerhout's testimony may have overlapped with any official acts, any presumption of immunity would be rebutted

74

because considering such evidence in the context of this criminal prosecution "would pose no dangers of intrusion on the authority and functions of the Executive Branch." 603 U.S. at 615. Much of Westerhout's testimony consisted of general descriptions of White House operations, unconnected to any particular decisionmaking by defendant or anybody else—such as her description of papers being "brought . . . back and forth to his residence or Air Force One or Marine One" (A6057) (DB: 54). Such testimony about general practices does not pose the risk of "diversion of the President's attention" that is created by "the possibility of [criminal liability] stemming from any *particular* official decision." *Id.* at 611 (emphasis added) (quoting *Clinton*, 520 U.S. at 694 n.19).

More fundamentally, the purpose of Westerhout's testimony about general practices was only to lay a foundation for establishing that defendant received *personal* papers directed to his attention and responded to them personally while he was President. The specific manner or location in which he received and responded to these papers was immaterial. In other words, nothing in this case turned on the precise way in which defendant received and handled his personal papers, so long as he in fact did receive and handle them—which presumably every President does. The introduction of evidence about those general practices is thus unlikely to influence any decision that defendant (or a future President) makes.

### C. Any Error in Admitting Official-Acts Evidence Was Harmless.

To the extent the Court concludes that any evidence of official presidential acts was improperly admitted at trial, it should still affirm the conviction below because the

trial record contains overwhelming evidence of defendant's guilt that is not even colorably subject to the Supreme Court's recent immunity ruling. *See People v. Lee*, 214 A.D.3d 457, 458 (1st Dep't 2023).

### 1. Harmless-error review is available.

Defendant is wrong to claim that *any* admission of purportedly official acts "requires automatic reversal, without resort to harmless-error review" (DB: 58). The Supreme Court "repeatedly has held" that "errors such as mistaken admission of evidence" are not "immune from harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 582 n.11 (1986) (citing cases). And the Court of Appeals has applied harmless-error analysis even when evidence is admitted in violation of an important evidentiary privilege, *e.g.*, *People v. Rivera*, 25 N.Y.3d 256, 265 (2015) (physician-patient privilege), or a critical constitutional right, *e.g.*, *People v. Ventimiglia*, 52 N.Y.2d 350, 356 n.1 (1981) (privilege against self-incrimination). Indeed, harmless-error review is available even when the improperly admitted evidence involved noncriminal acts and there was a "risk that the jury would convict [the defendant] solely on the basis of conduct that was not criminal when the defendant engaged in that conduct." *United States v. Marcus*, 560 U.S. 258, 263 (2010). If harmless-error review applies to evidence that could not support a conviction because it did not involve a crime at all, then the same must be true for evidence of conduct that would be immune from criminal liability.

The Supreme Court did not hold otherwise in *Trump v. United States*. To the contrary, the Court expressly endorsed a form of harmless-error analysis regarding the

indictment in that case. After finding that some of the federal indictment's allegations concerned official acts for which defendant was immune from prosecution, the Court remanded so that the parties and the lower court could "ensure that sufficient allegations support the indictment's charges without such conduct." 603 U.S. at 630. Such a review parallels the harmless-error inquiry.

Defendant's arguments against harmless-error review are meritless. First, defendant asserts that harmless-error review is unavailable because official-acts immunity protects institutional as well as personal interests (DB: 59). But harmless-error analysis applies even when there has been a breach of evidentiary privileges that serve broader institutional purposes.[18] On this front, defendant's reference to legislative immunity under the Speech or Debate Clause (DB: 60-61) undermines rather than supports his arguments. Contrary to defendant's assertion, federal courts have considered harmless error in assessing whether to reverse a conviction based on the improper introduction of legislative-act evidence. *See, e.g.*, *United States v. Johnson*, 383 U.S. 169, 185-186 (1966) (improper legislative-act evidence "was prejudicial" regarding certain "other counts"); *United States v. Dowdy*, 479 F.2d 213, 227-28 (4th Cir. 1973) (reversing certain convictions when "the erroneously admitted evidence of legislative acts fatally infected the convictions," but affirming others when the convictions

---

[18] *See, e.g.*, *Rivera*, 25 N.Y.3d at 262-63 (physician-patient privilege); *People v. Carmona*, 82 N.Y.2d 603, 608-09 (1993) (cleric-congregant privilege); *People v. Edney*, 39 N.Y.2d 620, 626 (1976) (attorney-client privilege).

"depended in no part upon" such evidence and the other evidence of defendant's guilt "was overwhelming"). Indeed, one of the cases cited by defendant expressly holds that a charge should not be dismissed "[i]f reference to a legislative act is irrelevant to the decision to indict." *United States v. Swindall*, 971 F.2d 1531, 1548 (11th Cir. 1992).[19] And despite supporting defendant in other ways, the United States' amicus brief acknowledges that "the erroneous introduction of legislative-act evidence is susceptible to harmless error review" (U.S. Amicus: 16).

Second, defendant asserts that his evidentiary claim is structural because, under *Trump v. United States*, it "must be addressed at the outset of the proceeding," not "in the course of the trial" (DB: 59). Defendant is wrong. The Supreme Court held that "[q]uestions about whether the President may be held *liable* for particular actions . . . must be addressed at the outset of a proceeding." 603 U.S. at 636 (emphasis added). But here, defendant has not (and could not) raise a claim of immunity from *liability*; to the contrary, his evidentiary objections would lead only to exclusion of particular evidence. Mere evidentiary challenges are subject to harmless-error review, even if the

---

[19] *Swindall* did observe that its conclusion was "not a harmless error argument." *Id.* at 1548 n.21. But it was not disclaiming a prejudice analysis; rather, the court was making the more fundamental point that, if "the grand jury's consideration of improper evidence" did not influence its decision to indict, then there was "not a Speech or Debate violation at all." *Id.* Thus, far from ignoring prejudice, the court there instead found that the absence of prejudice was fatal to the constitutional claim.

trial court could also have addressed them before trial. *See, e.g.*, *People v. Johnson*, 31 N.Y.3d 942, 943 (2018); *United States v. Ponds*, 454 F.3d 313, 329 (D.C. Cir. 2006).

Defendant is also wrong to suggest (DB: 59; *see* U.S. Amicus: 14-15) that the Supreme Court implicitly foreclosed harmless-error review by rejecting the federal government's contention in *Trump v. United States* that "'evidentiary rulings' and 'jury instructions'" would suffice to avoid separation-of-powers concerns, 603 U.S. at 631. The Supreme Court was not talking about harmless-error review in that portion of the decision, but rather explaining why official-acts evidence was not admissible in the first place. The federal government had argued in its brief that such evidence should be admissible because any prejudice could be alleviated by limiting instructions asking the jury to consider official-acts evidence only for certain limited purposes and not for others; such limiting instructions (and the rulings implementing them) were the "instructions" and "rulings" referenced in the Supreme Court's opinion. *See* Br. for United States, *Trump v. United States*, 2024 WL 1592669, at *48 (Apr. 8, 2024). Neither the federal government's brief nor the Supreme Court's decision mentions, let alone dispenses with, harmless-error review.

Third, defendant is wrong to assert that, as a practical matter, harmless-error review cannot be applied for claims of official-acts immunity because the risk of prejudice is too high (DB: 60; *see also* U.S. Amicus: 14-15). To the contrary, prejudice from improperly admitted evidence can be "quantitatively assessed in the context of other evidence presented." *Fulminante*, 499 U.S. at 307-08. And reviewing courts

routinely consider such prejudice in assessing whether a trial error was harmless overall. *See, e.g.*, *Hamlin*, 71 N.Y.2d at 758; *see also Brecht*, 507 U.S. at 636 ("State courts are fully qualified to identify constitutional error and evaluate its prejudicial effect on the trial process"). Although the Supreme Court referred to the "unique risk that the *jurors'* deliberations will be prejudiced by their views of the President's policies and performance while in office," *Trump v. United States*, 603 U.S. at 631 (emphasis added), harmless-error review is conducted by courts rather than juries and thus does not implicate that "unique risk." And any concerns are further mitigated by the high standard to establish harmlessness under New York law, which requires not only a showing that any error is harmless beyond a reasonable doubt, but also demonstration that "the proof of the defendant's guilt, without reference to the error, is overwhelming." *People v. Crimmins*, 36 N.Y.2d 230, 241 (1975).

### 2. Defendant does not dispute that there was overwhelming evidence that he made or caused false entries in the business records of an enterprise.

On appeal, defendant makes no argument concerning the first element of falsifying business records in the first degree—that defendant made or caused false entries in the business records of an enterprise. Nor could he: that element was overwhelmingly established by the trial record without reference to any of the evidence defendant objects to on immunity grounds. There is no serious dispute that all of the charges were based on the business records of an enterprise (the Trump Organization). And defendant made or caused the false entries in those business records by personally

80

signing every one of the nine checks from his personal account and by authorizing all the other payments that led to the other entries. *See People v. Park*, 163 A.D.3d 1060, 1063 (3d Dep't 2018).

Westerhout's testimony about defendant's work habits in the White House was not remotely necessary to establish that defendant caused the creation of these false business records, and defendant does not argue otherwise on appeal. The trial record included defendant's own admission (before becoming President) that his general practice was to review and sign checks carefully (A17536). And there was a parade of other evidence proving both that defendant paid careful attention to his finances and that he was a micromanager of his personal expenditures even after becoming President (*see, e.g.*, A4077-A4078, A4184-A4185, A5498-A5499, A5504-A5505, A5509-A5510).

As to falsity, the evidence overwhelmingly established that the business records in question contained false entries that misrepresented the nature and purpose of the payments to Michael Cohen. Proof of this falsity relied on none of the evidence that is the basis for defendant's evidentiary immunity claim.

### 3. Independent evidence likewise overwhelmingly established that defendant acted with intent to defraud, which included an intent to commit or conceal the commission of another crime.

On appeal, defendant focuses exclusively on the second element of falsifying business records in the first degree—whether he acted with an intent to defraud that included the intent to commit or conceal the commission of another crime. Specifically, defendant asserts that there was "exceedingly weak" evidence that he "knew about or

81

intended to conceal any supposed illegality associated with the [Stormy Daniels] NDA" (DB: 62). And he claims that several pieces of purported "official-acts evidence" might have contributed to the jury's verdict because the People relied on such evidence during summation (DB: 64). Defendant vastly overstates the impact of the challenged testimony and understates the independent evidence of his culpable intent.

The evidence that defendant intended the false business records to obscure the repayment to Cohen for the Daniels payoff was far from "weak" (DB: 62). The trial record contained abundant and damning evidence that defendant was motivated to conceal the sexual encounter with Daniels (and thus the associated payoff) because he was concerned that its public disclosure at a vulnerable point in his campaign— immediately after the release of the *Access Hollywood* tape—would damage his standing with female voters and harm his chances for election (*see supra* Statement A.2.c). As already discussed, there was also abundant evidence that defendant was an inveterate micromanager of his personal finances, even after becoming President. And there was unambiguous documentary proof—in People's Exhibits 35 and 36 (A8067-A8068) and OGE Form 278e (PX81: A8254), among others—that the monthly $35,000 payments to Cohen were in fact reimbursements for his payment to Daniels, contrary to the representations in the Trump Organization's business records (*see supra* Statement A.4.a). There was thus overwhelming evidence that defendant was fully aware of the purpose behind the monthly payments to Cohen, and that he was not blithely approving massive sums for legal services that he knew had never been provided.

Defendant attempts to minimize the evidence of his fraudulent intent by claiming that "the word of one man: Michael Cohen" provided the only "direct evidence that [defendant] was contemporaneously aware of Cohen's dealings with [Daniels]" and "Cohen and Weisselberg's reimbursement arrangement" (DB: 62). As a threshold matter, there is no reason that this Court should decline to consider Cohen's testimony here, since defendant's arguments based on official-acts immunity do not affect the vast majority of that testimony—including his account of a meeting with Weisselberg and defendant where defendant personally reviewed and approved the $420,000 repayment plan (A6559-A6561). Defendant asserts that Cohen's "'credibility was impugned'" at trial (DB: 63), but the record does not support that characterization. From the start, the People were open about Cohen's faults, including his criminal record and past lies to Congress and the public (A3953-A3954). The jury heard about all of this checkered history—but they also heard evidence that much of Cohen's past misconduct was at defendant's behest and for defendant's benefit; that Cohen "came to [a] day of reckoning" in 2019, shortly before he was sent to prison for the payments at issue in this case; and that he had since apologized for his past conduct and provided consistent accounts of the hush-money scheme (*e.g.*, A6688-A6692, A7690). There was thus more than ample basis for the jury to credit Cohen despite his history.[20]

---

[20] In the second federal removal proceeding, upon remand to the district court, defendant attempted to bolster his attacks on Cohen's credibility by raising certain public statements that Cohen made long after defendant's sentencing here. ECF Dkt.

(Continued…)

In any event, defendant is just wrong to claim that Cohen's testimony alone established defendant's awareness of the payout to Daniels and the reimbursement scheme to Cohen. To the contrary, the trial court specifically instructed the jury that it could *not* rely on Cohen's testimony alone because he qualified as an accomplice, and "a defendant may not be convicted of any crime upon the testimony of an accomplice" alone unless the jury found "that it was corroborated by other evidence tending to connect the Defendant with the commission of the crime" (A7903-A7904). Here, the corroborating evidence was overwhelming. In addition to all of the evidence already discussed, the jury heard Pecker's testimony about how defendant set in motion the catch-and-kill scheme to purchase and then bury negative stories—the precise transaction that Cohen carried out for Daniels. The jury saw the NDA with Daniels and understood that defendant, in the immediate aftermath of the *Access Hollywood* tape, would have been desperate to hide this story from the public (A17188-A17206). The jury heard that Allen Weisselberg, defendant's close and loyal confederate, made a point of running every major financial decision by defendant (*e.g.*, A5336-A5337). And Hope Hicks told the jury, in testimony that is not subject to any claim of official-acts immunity, that she found it implausible that Cohen would have made the payment to Daniels on his own initiative (A5288). Thus, even without Cohen, there was

---

No. 73, *People v. Trump*, No. 23-CV-03773 (S.D.N.Y. Jan. 21, 2026). To the extent that defendant plans to raise those statements on reply in this appeal, this Court should disregard any reliance on unsworn statements outside of the appellate record.

overwhelming evidence of defendant's awareness of the payout and the nature of the reimbursement to Cohen.

Regarding the intent to conceal another crime, the admissible evidence overwhelmingly established that defendant intended to conceal the conspiracy to promote his election by unlawful means. The existence and purpose of the conspiracy was proven by testimony from Pecker and Cohen and by documentary and testimonial evidence of the Sajudin, McDougal, and Daniels transactions (*see supra* Statement A.1-A.2). Multiple witnesses testified—and extensive documentation confirmed—that hiding information and concealing the underlying conspiracy was the entire point of the scheme (*see, e.g.*, A4093 (catch-and-kill scheme was "highly, highly confidential"), A4266-A4267 (defendant was "very upset" and " very agitated" about the public revelation of the scheme)*,* A17188-A17189 (NDA with Daniels using pseudonyms)).

There was also overwhelming evidence—none of it affected by defendant's claim of official-acts immunity—that the nature of the agreement between defendant and his co-conspirators was to use unlawful rather than lawful means to promote his election. For example, the conspirators committed multiple violations of FECA by making campaign contributions that exceeded the strict limitations of federal law. The conspirators also falsified other business records, including banking documents by Cohen (*see supra* Statement A.2.c). And the conspirators committed tax violations by mischaracterizing the payments to Cohen as income rather than reimbursement—a characterization that had concrete tax consequences (*see, e.g.*, A5430-A5433, A8341-

85

A8342). None of this evidence relied on the documents and testimony that defendant now claims were erroneously admitted under official-acts immunity.

Entirely ignoring this evidence, defendant asserts that the purported official-acts evidence *might* have contributed to the jury's guilty verdict because the People "emphasized" that evidence during the summation—and, in particular, described Hicks's testimony as "devastating" (DB: 65-66). But evidence can be powerful, even devastating, while still being cumulative. For example, even the erroneous admission of an unconstitutionally obtained confession—which has been described as "the most probative and damaging evidence that can be admitted against" a defendant, *Fulminante*, 499 U.S. at 296 (quotation marks omitted)—can be harmless where other properly admitted evidence overwhelmingly establishes a defendant's guilt. *See, e.g.*, *People v. Krom*, 61 N.Y.2d 187, 201 (1984); *People v. Sanders*, 56 N.Y.2d 51, 66-67 (1982).

In any event, defendant vastly overstates the degree to which, even in summation, the People relied on the testimony and evidence that he now claims is subject to immunity. Over the course of more than five hours, the prosecutor emphasized numerous other pieces of evidence. For example, the prosecutor described the testimony from Pecker as "utterly devastating," and stressed that "[t]he same thing may be said of several of the [other] witnesses here," including Rhona Graff, Jeff McConney, and Deb Tarasoff (A7666-A7667). All of this evidence as a whole, the prosecutor explained, "provide[d] critical pieces of the puzzle, building blocks that help to establish the defendant's guilt" (A7667). There is simply no reasonable reading of

86

the summation in which the People's case turned solely on the narrow categories of evidence in dispute here, rather than the "mountain of evidence of corroborating testimony that tends to connect the Defendant to this crime" (A7689).

Indeed, although defendant tries to play up the prosecutor's characterization of Hicks's testimony in particular, in fact the prosecutor's strongest language did not concern Hicks, but rather the handwritten notes showing that the payments at issue here were to cover up the hush-money scheme rather than for legal services (A8067-A8068). Those documents were "the smoking guns"; they "completely blow out of the water" defendant's attempt to claim an innocent intent; and they were utterly "damning" (A7777, A7784, A7790). By contrast, although the prosecutor did describe the testimony from Hicks as "devastating," he also made it clear that this testimony only "put[] the nail in [defendant's] coffin" (A7815)—in other words, that it was only one piece of a torrent of corroborating evidence that had already buried defendant. As the prosecutor had earlier told the jury, "It's difficult to conceive of a case with more corroboration than this one" (A7689). That overwhelming evidence, which was entirely independent of the claimed official-acts evidence, means that there was "no reasonable possibility that [any] error might have contributed to defendant's conviction." *Crimmins*, 36 N.Y.2d at 237.

## POINT II

## FEDERAL PREEMPTION POSES NO BARRIER TO DEFENDANT'S CONVICTIONS

Defendant asserts that his convictions must be overturned because FECA forbids any "application of New York criminal law to federal electoral campaigns" (DB: 32). Defendant relies solely on express preemption, citing FECA's preemption provision. 52 U.S.C. § 30143(a); *see also* 11 C.F.R. § 108.7 (federal regulation defining the scope of preemption).[21] The federal district court that considered defendant's attempt to remove this prosecution to federal court has already found defendant's preemption claim to have "no colorable basis," in a ruling that defendant declined to appeal. *See Trump*, 683 F. Supp. 3d at 347-50. The trial court here also rejected this claim (A1969). This Court should affirm.[22]

---

[21] Defendant has accordingly waived any claim of conflict preemption or field preemption, and this Court need not consider the federal government's arguments on those grounds (U.S. Amicus: 21-22). *See Matter of Petralia v. New York State Dep't of Lab.*, 191 A.D.3d 1466 (4th Dep't 2021) (considering only express preemption and finding unpreserved "any other basis for preemption in this case"). Any such claims would be meritless in any event, since courts have squarely rejected such bases for finding state law preempted under FECA. *See WinRed, Inc. v. Ellison*, 59 F.4th 934, 944-46 (8th Cir. 2023); *Stern v. Gen. Elec. Co.*, 924 F.2d 472, 475-76 (2d Cir. 1991).

[22] Defendant is wrong to assert that the federal district court did not squarely address preemption because the People had "obscured [the] ultimate theory of liability" by suggesting that FECA violations might not be essential to the allegations of violations of Election Law § 17-152 (DB: 41). Although the People did (correctly) argue to the district court that defendant's preemption claim was speculative, the People also directly opposed defendant's claim of preemption based on the People's anticipated reliance on FECA violations (A383, A19068-A19070). The district court in turn rejected defendant's preemption argument without reliance on the People's arguments about

(Continued…)

88

Defendant faces a heavy burden in claiming that FECA preempts his state convictions. The Supreme Court has long "enjoin[ed] seeking out conflicts between state and federal regulation where none clearly exists." *Huron Portland Cement Co. v. City of Detroit, Mich.*, 362 U.S. 440, 446 (1960). For claims of express preemption, a court's "sole task is to ascertain the intent of Congress." *California Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280 (1987). "[T]he starting presumption" is always "that Congress does not intend to supplant state law"—a presumption that can only be overcome if federal legislation displays a "clear and manifest purpose" to supersede "the historic police powers of the States." *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654-55 (1995) (quotation marks omitted). The mere fact that a state prosecution may be based on federal law violations "does not even begin to make a case for" preemption, since "in the vast majority of cases where federal and state laws overlap, allowing the States to prosecute is entirely consistent with federal interests." *Kansas v. Garcia*, 589 U.S. 191, 211-12 (2020).

Defendant has failed to meet the high standard for establishing preemption here. To the contrary, given FECA's narrow focus on limiting political spending and the states' historic and constitutionally protected role in regulating elections, courts have long given FECA's preemption provision a correspondingly "narrow preemptive

---

speculation. Specifically, the court squarely held that the indictment did not "intrude on FECA's domain" because FECA preempted neither the first-degree falsifying business records statute nor Election Law § 17-152. *Trump*, 683 F. Supp. 3d at 349-50.

effect." *Stern*, 924 F.2d at 475 n.3. Courts have thus uniformly upheld state anti-fraud laws like Penal Law § 175.10, even as applied to "election-related activities." *Id.* Under these precedents, defendant's preemption claim fails. Defendant's claim fundamentally misunderstands the basis for his convictions. He was not convicted of violating federal election laws, but rather of falsifying the business records of a New York enterprise—activity that FECA does not directly address, let alone preempt. Defendant's misconduct in his then-pending presidential campaign was relevant only for purposes of establishing the intent element for the Penal Law § 175.10 charges. But federal preemption did not preclude the People here from proving the fact of defendant's intent in this manner.

### A. Federal Law Does Not Preempt Penal Law § 175.10, the Statute Under Which Defendant Was Actually Convicted.

Defendant's principal claim on appeal is that FECA preempts Election Law § 17-152 (DB: 34-39). But defendant was not convicted under that statute. Rather, he was convicted of falsifying business records under Penal Law § 175.10. The relevant question here is thus whether *that* statute is expressly preempted by FECA.

Defendant now raises that claim on appeal (DB: 42-44). But this particular argument is unreviewable because defendant failed to preserve it below. Defendant's omnibus motion attacked only Election Law § 17-152 as preempted; it asserted that Penal Law § 175.10 was a "nullity" only because the charges relied on Election Law violations (A446-A447). In response, the People noted that "defendant does not

90

contest" that "federal law does not preempt Penal Law § 175.10 itself" (A1639)—a characterization that defendant never denied in his reply (A1729-A1740). And in the first federal removal proceeding, defendant outright "concede[d] that FECA does not preempt § 175.10 on its face." *Trump*, 683 F. Supp. 3d at 349. Defendant's failure to raise a preemption challenge to Penal Law § 175.10 below thus precludes him from raising that claim for the first time on appeal. *See American Intl. Specialty Lines Ins. Co. v. Allied Capital Corp.*, 35 N.Y.3d 64, 73 n.7 (2020).

In any event, defendant has no viable argument that FECA preempts New York's criminal laws against falsifying business records. FECA is not a business-records statute, nor does it purport to generally regulate elections. To the contrary, FECA is narrowly focused on "limit[ing] *quid pro quo* corruption and its appearance," *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 197 (2014), a goal that it accomplishes with detailed rules limiting the amount, nature, and purpose of various political contributions. Consistent with the statute's limited scope, courts and the FEC itself have long narrowly interpreted FECA's express preemption provision, which applies to "any provision of State law with respect to election to Federal office," 52 U.S.C. § 30143(a), as reaching only state laws that *directly* regulate FECA's subject matter: namely, "the conduct and financing of campaigns for Federal elective office," *Matter of Holtzman v. Oliensis*, 91 N.Y.2d 488, 495 (1998); *see also Stern*, 924 F.2d at 475 n.3.

By contrast, courts have routinely upheld general state laws that target fraud, deception, and the like—but do not specifically regulate campaigns or campaign

91

finance—even when those laws are applied in the context of a federal election. Thus, courts have concluded that FECA does not prevent the enforcement of state consumer-deception laws against a political action committee raising money for federal elections, *WinRed*, 59 F.4th at 942-44; state criminal laws prohibiting fraud as applied to solicitations for a presidential campaign, *see Dewald v. Wriggelsworth*, 748 F.3d 295, 302-03 (6th Cir. 2014); state fraudulent-transfer claims brought to recover funds transferred to political action committees, *see Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 200-01 (5th Cir. 2013); and state laws prohibiting the waste of corporate assets as applied to political contributions, *see Stern*, 924 F.2d at 474-75.[23] Under these precedents, New York's criminal laws prohibiting falsification of business records do not directly target federal campaign finance and thus survive preemption.

This conclusion is supported by the FEC's regulation defining the scope of FECA preemption. *See WinRed*, 59 F.4th at 942. Under that regulation, express preemption is limited to "[t]hree specific categories of state law," none of which apply to anti-fraud statutes like Penal Law § 175.10. *Trump*, 683 F. Supp. 3d at 347. The three preempted categories are state laws concerning (a) the "[o]rganization and registration

---

[23] Courts have likewise found no FECA preemption even beyond the context of state anti-fraud laws. *See Priorities USA v. Nessel*, 978 F.3d 976, 984 (6th Cir. 2020) (FECA likely does not preempt state ban on paid voter transportation); *Karl Rove & Co. v. Thornburgh*, 39 F.3d 1273, 1280-81 (5th Cir. 1994) (FECA does not preempt state corporations law); *Reeder v. Kansas City Bd. of Police Comm'rs*, 733 F.2d 543, 546 (8th Cir. 1984) (FECA does not preempt state law prohibiting police officers from making political contributions).

of political committees supporting federal candidates"; (b) the "[d]isclosure of receipts and expenditures by Federal candidates and political committees"; and (c) the "[l]imitation on contributions and expenditures regarding Federal candidates and political committees." 11 C.F.R. § 108.7(b). Only state laws that "specifically regulate[]" these activities are preempted by FECA, *Janvey*, 712 F.3d at 201, such as laws that directly prohibit federal candidates from accepting contributions or making expenditures, *see, e.g.*, *Teper v. Miller*, 82 F.3d 989, 991–92 (11th Cir. 1996); *Bunning v. Kentucky*, 42 F.3d 1008, 1012 (6th Cir. 1994); *Weber v. Heaney*, 995 F.2d 872, 873 (8th Cir. 1993). Here, by contrast, Penal Law § 175.10 does not directly regulate any of these narrowly defined categories of federal campaign activity.

The FEC's regulation further establishes the absence of preemption here under its "savings clause," which exempts from preemption state laws that prohibit "false registration, voting fraud, theft of ballots, *and similar offenses*." 11 C.F.R. § 108.7(c)(4) (emphasis added). Courts have construed the "similar offenses" language "broadly" to hold that preemption does not apply to state "anti-deceptive-practices laws," *WinRed*, 59 F.4th at 943, or state laws prohibiting "obtaining money under false pretenses, common-law fraud, and larceny by conversion," *Dewald*, 748 F.3d at 303, even as applied to federal campaigns. That same reasoning would extend to New York's general prohibition on falsifying the business records of a New York enterprise.

In short, FECA does not preempt "generally applicable state laws," *WinRed*, 59 F.4th at 943, even when they "happen[] to apply" in the context of a federal campaign,

93

*Janvey*, 712 F.3d at 200. This result makes sense because such state laws and FECA target different conduct and serve different interests. Penal Law § 175.10 enforces a general obligation for all New York enterprises—including but not limited to those involved in federal campaigns—to engage in honest record-keeping. *See, e.g.*, *People v. Bloomfield*, 6 N.Y.3d 165, 171 (2006). Such a requirement serves New York's compelling interest in "protecting the integrity of the marketplace," *People ex rel. Spitzer v. Grasso*, 11 N.Y.3d 64, 69 n.4 (2008). But "[t]he law does not target, or make an exception for, election-related activities," nor does it mention "disclosures of campaign contributions or spending, elections, or election laws, state or federal." *Trump*, 683 F. Supp. 3d at 349.

By contrast, FECA is more narrowly focused on limiting the size, nature, and source of federal campaign contributions. *See* 52 U.S.C. § 30116 *et seq.* FECA does not otherwise regulate the accuracy of business records like the ones at issue in this case. Indeed, one could easily comply with FECA but violate Penal Law § 175.10 (for instance, by making an individual contribution below the federal limit but falsely recording that political contribution as a vendor payment), or vice versa (for instance, by making a prohibited corporate contribution but accurately recording the amount and purpose of that payment). The narrow requirements of FECA accordingly do not supplant New York's distinct and more general requirement that businesses "refrain

94

from fraud" in their business records, *People ex rel. Spitzer v. Applied Card Sys., Inc.*, 11 N.Y.3d 105, 115 (2008).[24]

Defendant's appellate brief does not mention, let alone distinguish, *any* of these directly applicable precedents, despite the fact that they were cited by the federal district court when it rejected his identical preemption claim and were extensively briefed before the trial court here. Instead, ignoring these cases, defendant asserts that preemption applies here because FECA "comprehensively addresses the matter of public disclosure of the ways in which federal candidates finance their electoral campaigns" (DB: 43). But the Court of Appeals has already rejected the argument that federal disclosure requirements preempt the state's general anti-fraud laws. In *Applied Card*, a credit-card issuer claimed that the New York Attorney General's state-law fraud

---

[24] These sharp differences between Penal Law § 175.10 and FECA distinguish the cases cited by the federal government's amicus (U.S. Amicus: 19). In all of those cases, the courts found preemption because the state was in effect seeking to *directly* enforce federal standards. *See, e.g., Matter of Off. of Att'y Gen. of State of New York*, 269 A.D.2d 1, 11 (1st Dep't 2000) ("the Attorney General is attempting to enforce those [federal] standards"); *Rose v. Chase Bank USA, N.A.*, 513 F.3d 1032, 1038 (9th Cir. 2008) (plaintiffs' state-law claims arise from "the same purported duties to disclose" governed by federal law). But even these cases acknowledge that a state-law claim would not be preempted if it were "qualitatively different" from federal law, *OpenRisk, LLC, v. Microstrategy Servs. Corp.*, 876 F.3d 518, 525 (4th Cir. 2017) (quotation marks omitted)—a test that is satisfied here given Penal Law § 175.10's distinctive focus on business records rather than campaign finance. In addition, the examples cited by the amicus involve far more sweeping express-preemption provisions than the one at issue here. *See, e.g., Watters v. Wachovia Bank, N.A.*, 550 U.S. 1, 10 (2007) (describing two centuries of precedent recognizing federal supremacy over national banks); *U.S. ex rel. Berge v. Bd. of Trs. of the Univ. of Alabama*, 104 F.3d 1453, 1464 (4th Cir. 1997) (federal copyright preemption is "broad and absolute").

claims were preempted by the disclosure requirements of the federal Truth in Lending Act, which included an express provision preempting state laws "relating to the disclosure of information" in credit card applications and solicitations. 11 N.Y.3d at 113-14. The Court disagreed, upholding New York's general prohibitions against "fraudulent and deceptive misinformation" because those laws did not interfere with the specific disclosures mandated by federal law. *Id.* at 114, 117. As the Court explained, preemption under the federal statute was "limited . . . to [state] laws that purport to alter the format, content, and manner" of federally mandated disclosures. *Id.* at 114. But New York's anti-fraud statutes "do not require [regulated parties] to disclose anything"; rather, the "statutes simply require that they refrain from fraud, deception, and false advertising." *Id.* at 114-15.

So too here. FECA might preempt state laws that directly regulate the "[d]isclosure of receipts and expenditures by Federal candidates," 11 C.F.R. § 108.7(b)(2). But Penal Law § 175.10 does not regulate or purport to alter the specific disclosures mandated by FECA; instead, its sole effect is to "require that [private enterprises] refrain from fraud" in conducting their business. *Applied Card*, 11 N.Y.3d at 115. Consistent with the state law's scope, defendant was convicted of causing false entries to be entered into the records of a New York enterprise, not of failing to make certain FECA-required disclosures. There was no barrier to enforcing New York's general provisions for honest record-keeping here. *See also Dewald*, 748 F.3d at 302-03 (allowing claim against an individual who solicited money by fraudulently purporting to

96

represent a federally registered political action committee); *Stern*, 924 F.2d at 475 (FECA "does not preclude New York from pursuing its independent interest in ensuring that corporate directors exercise sound judgment in the expenditure of corporate funds").

### B. Defendant's Preemption Challenge to Election Law § 17-152 Is Both Meritless and Immaterial to His Convictions Under Penal Law § 175.10.

As noted, defendant's principal claim is not that FECA preempts Penal Law § 175.10, but rather that FECA preempts Election Law § 17-152 because in this case that law was purportedly applied "to regulate federal campaign contributions" (DB: 36). This argument not only misapplies federal preemption but also fundamentally misunderstands the role that unlawful campaign contributions played in the charges here. As explained below, the existence of unlawful contributions was merely one of several relevant facts that established defendant's culpable intent in falsifying business records. FECA may prevent states from *directly* enforcing federal limits on campaign contributions. But preemption does not disable a state from merely *referencing* federal campaign contributions (among other facts) to establish a defendant's mental state for conduct that is squarely within the state's authority to regulate.

### 1. FECA preemption did not prevent the jury from finding facts relevant to defendant's culpable intent for a state-law crime.

The mistaken premise of defendant's preemption claim is that the charges here, by invoking Election Law § 17-152 and potential FECA violations, sought "to regulate

97

federal campaign contributions" (DB: 36). There was no such direct regulation here, for several interrelated reasons.

First, Election Law § 17-152 and FECA were relevant only for purposes of establishing defendant's *intent* in falsifying business records, and federal preemption does not generally bar the evidence that a state jury may consider in assessing a defendant's culpable intent. When a criminal statute like Penal Law § 175.10 requires proof of intent to commit or conceal another crime, there is "no requirement that the People allege or establish . . . that the intended crime actually be committed." *People v. Mahboubian*, 74 N.Y.2d 174, 193 (1989). First-degree falsification of business records includes only "an enhanced intent requirement . . . not any additional actus reus element" over the second-degree offense. *People v. Taveras*, 12 N.Y.3d 21, 27 (2009); *see also People v. Thompson*, 124 A.D.3d 448, 449 (1st Dep't 2015). For this reason, courts have upheld convictions under Penal Law § 175.10 even when the defendant was *acquitted* of the crimes that he intended to commit or conceal, so long as the evidence showed that, notwithstanding the acquittal, defendant falsified business records with the requisite general intent. *See, e.g.*, *People v. Houghtaling*, 79 A.D.3d 1155, 1157-58 (3d Dep't 2010); *People v. McCumiskey*, 12 A.D.3d 1145, 1145 (4th Dep't 2004).

Thus, for the charges here, the jury needed only to find that defendant had the intent to commit or conceal an illicit agreement that could have been a violation of Election Law § 17-152, whether or not such a violation actually occurred. And to determine whether there might have been such an illicit agreement, the jury could take

98

into account the fact that defendant and his co-conspirators had engaged in a wide range of illegal behavior, including but not limited to campaign contributions that violated FECA.

Preemption did not preclude the People from establishing, as a matter of fact, defendant's general intent to commit or conceal another crime. *Cf. Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."). Federal preemption is not a rule of evidence; rather, it "creates a rule of decision," requiring courts to follow federal law rather than state law when the two conflict. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015). Where, as here, the state does not seek to enforce federal law directly but rather uses a federal violation as relevant evidence of a defendant's criminal intent, preemption poses no barrier to fact-finding by the jury. *See Close v. Sotheby's, Inc.*, 909 F.3d 1204, 1209 (9th Cir. 2018) (preemption does not "render the law null and void in some ultimate sense, such as a presidential veto," but rather "renders the law unenforceable in the case before us"); *see, e.g.*, *State v. Chappell*, 939 N.E.2d 1234, 1238 (Ohio 2010) (upholding state conviction for possessing criminal tools to commit federal copyright violations).

Second, even setting aside that Election Law § 17-152 was relevant only for purposes of establishing defendant's intent, defendant is wrong to assert that the application of Election Law § 17-152 here directly "regulate[d] federal campaign contributions" (DB: 36). The People pointed to unlawful campaign contributions as

99

just one of several circumstances that collectively established that defendant was part of a conspiracy to promote his election "by unlawful means." As explained in more detail below (*see infra* Point III.C.1), the Legislature did not require the People to identify, let alone prove beyond a reasonable doubt, any *particular* "unlawful means" in pursuing an Election Law § 17-152 charge. *See People v. Mateo*, 2 N.Y.3d 383, 407-08 (2004). Rather, what the statute requires is that the jury find that there was an agreement to use "unlawful means" *in general* to promote an election. And the jury here was correctly instructed that it could infer an agreement of this nature from multiple possible violations, including not just unlawful campaign contributions in violation of FECA, but also tax violations or other falsified business records.

Unlawful campaign contributions were thus not the sole or ultimate basis for finding a violation of Election Law § 17-152. Rather, they served as one of many pieces of evidence from which the jury could make the finding actually required by law: namely, that defendant entered into an agreement with others to promote his election through unlawful rather than lawful methods. Preemption did not prohibit the jury from considering federal campaign-finance violations as one of several factors that could support an inference about the nature of a state-law conspiracy.[25]

---

[25] Under rare circumstances, a federal law might *directly* limit the use of certain evidence (such as those contained in federal forms), and that restriction might have preemptive effect. *See Garcia*, 589 U.S. at 204. But FECA contains no provision restricting the use of evidence in this way.

Third, even if the state-law charges here had required the jury to find that defendant had *in fact* committed FECA violations, there would still be no preemption. Under analogous circumstances, courts have recognized that federal prosecutors may pursue mail or wire fraud claims that are predicated on state-law violations, even when Congress would lack the power to directly regulate those violations. *See United States v. Sawyer*, 85 F.3d 713, 722-23 (1st Cir. 1996). It is sufficient for federal jurisdiction that the actual conduct that is the basis of the federal charges—the use of interstate mails or communications—is subject to federal criminal law. *See United States v. Morrison*, 529 U.S. 598, 609 (2000). The mere fact that Congress could not independently regulate the underlying crimes does not prevent federal prosecutors from using the fact of a (federally unenforceable) state-law crime to prove that a defendant committed a (federally enforceable) federal-law crime. *Id.*

So too here. New York's ability to regulate the business records of a New York enterprise should be the end of the matter. Preemption does not preclude the People from pursuing charges related to the falsification of business records simply because one predicate fact may be a violation of federal law. *See People v. Pymm*, 76 N.Y.2d 511, 522 (1990) (no preemption of criminal charges even though prosecution "will necessarily touch upon conduct that is already subject to Federal regulation"); *People v. Caridi*, 47 A.D.3d 944, 945 (2d Dep't 2008) (upholding conviction for offering a false instrument for filing when underlying misrepresentation was violation of federal prevailing-wage rate); *see also In re Jose C.*, 198 P.3d 1087, 1093-96 (Cal. 2009) (upholding

state wardship determinations predicated on findings of federal immigration violations). And that conclusion applies all the more powerfully here, when the People did not even have to prove an actual violation of federal law.

Defendant barely acknowledges the actual way that FECA violations factored into the charges here. Instead, he makes two other arguments, but both are meritless.

First, defendant asserts that, if FECA preempts Election Law § 17-152, then that statute is "null and void" and thus cannot be a crime that defendant intended to conceal or commit (DB: 34). But defendant does not claim that FECA preempts Election Law § 17-152 facially—i.e., in all of its applications. *Cf. Clarke v. Town of Newburgh*, No. 84, 2025 WL 3235042, at *3 (N.Y. Nov. 20, 2025). Rather, his claim is only that the Election Law is preempted to the extent that it "duplicates FECA's restrictions" (DB: 38)—i.e., to the extent that the Election Law violation here was *synonymous* with a FECA violation. As already noted, however, the trial court instructed the jury that it could find "unlawful means" under the Election Law based upon multiple facts, only one of which was a violation of FECA. Preemption did not prevent the jury from finding that defendant intended to conceal or commit an Election Law violation predicated on these other non-FECA grounds.

More fundamentally, even as a facial matter, Election Law § 17-152 is not FECA in disguise. The Election Law provision targets conspiracies to influence an election, not campaign-finance violations; and FECA violations, like other forms of illegality, were relevant only for one aspect of § 17-152 (the "unlawful means" prong).

102

Conversely, FECA does not directly regulate conspiracies,[26] and the statute is narrowly focused on campaign-finance contributions, disclosures, and the like, rather than the broader illegal activities of an election conspiracy. Because Election Law § 17-152 and FECA are thus not simply two sides of the same coin, defendant has no basis to assert that federal preemption renders the statute a nullity, either in this case or generally.

Second, and relatedly, defendant contends that so long as it is "possible" that the jury considered FECA violations, its verdict must be overturned under *People v. Martinez*, 83 N.Y.2d 26 (1993) (DB: 39-41). This argument has no relevance because, as discussed above, the jury was entitled to consider FECA violations here. But even if it were not, defendant's argument would fail. *Martinez* applies only when a jury is presented with "alternative *legal* ground[s] and there is no way of knowing which ground they chose." *Id.* at 32 (emphasis added). In *Martinez*, for example, the jury was instructed that it could find that the defendant possessed drugs through two alternative and mutually exclusive legal theories: "the erroneous 'drug factory' presumption or . . . the lawful alternative theory of constructive possession." *Id.* at 34.

Here, however, evidence of FECA violations did not constitute an alternative *legal* ground; rather, those violations were facts that, alongside other unlawful activities, could support the jury's finding of defendant's intent to conceal or commit an Election

---

[26] Conspiracies to violate FECA are federally prosecuted under the general conspiracy statute, 18 U.S.C. § 371. *See, e.g.*, *United States v. Kukushkin*, 61 F.4th 327, 331 (2d Cir. 2023). Defendant makes no preemption argument based on that statute.

Law conspiracy pursued by unlawful means. In contrast to *Martinez*, there is no rule requiring a general jury verdict to be reversed simply because of doubts about one of several alternative *factual* theories that underlie a criminal charge. *See Griffin v. United States*, 502 U.S. 46, 49 (1991) ("a general jury verdict was valid so long as it was legally supportable on one of the submitted grounds"); *Turner v. United States*, 396 U.S. 398, 420 (1970) ("[W]hen a jury returns a guilty verdict on an indictment charging several acts in the conjunctive . . . the verdict stands if the evidence is sufficient with respect to any one of the acts charged."). Defendant's argument thus fails to understand the particular way in which FECA violations factored into his convictions.

### 2. Election Law § 17-152 is not preempted in any event.

In any event, as both the trial court (A1969) and the federal district court have now held, *see Trump*, 683 F. Supp. 3d at 349-50, FECA would not preempt Election Law § 17-152 even if defendant were directly charged and convicted under that statute.

As the federal court concluded, Election Law § 17-152 "does not fit into any of the three categories of state law that FECA preempts" by regulation. *Id.*; *see supra* Point II.A. Defendant's assertion that "Section 17-152 duplicates FECA's restrictions and embeds them into New York law" (DB: 38) simply ignores the plain statutory text. As discussed, rather than "directly target[ting] campaign contributions and expenditures," *Trump*, 683 F. Supp. 3d at 350, Election Law § 17-152 prohibits conspiracies to promote or prevent elections—and conspiracies to pursue a substantive offense are a distinct crime from the substantive offense itself. *See Iannelli v. United States*, 420 U.S. 770, 777

104

(1975); *People v. Arroyo*, 93 N.Y.2d 990, 992 (1999). Moreover, as also discussed, the Election Law does not require proof that conspirators utilized any particular unlawful means. Rather, the jury needed to find that the nature of the illicit agreement was to pursue illegal rather than legal methods generally in promoting an election.

Section 17-152's prohibition on conspiracies to promote or prevent an election by unlawful means writ large thus does not duplicate FECA's narrower regulation of three specific categories of campaign activities. *See* 11 C.F.R. § 108.7(b). Instead, Election Law § 17-152 is more analogous to other general state laws prohibiting fraud and abuse that courts have held may be applied to federal campaigns notwithstanding FECA. *See, e.g.*, *WinRed*, 59 F.4th at 942-44 (state consumer-deception law); *Dewald*, 748 F.3d at 302-03 (state laws prohibiting fraud); *Janvey*, 712 F.3d at 200-01 (state fraudulent-transfer claim); *Stern*, 924 F.2d at 474-75 (state corporate-waste laws). By the same token, the Election Law's anti-conspiracy provision fits comfortably within the broad category of "similar offense[s]" that the FEC's own regulations exempt from preemption. *See* 11 C.F.R. § 108.7(c)(4). Indeed, even more so than falsifying business records, the type of misconduct targeted by Election Law § 17-152 is more "similar" to the examples of electoral interference ("false registration, voting fraud, theft of ballots") that the FEC identified as being within the states' power to regulate, since all such misconduct directly impairs the integrity of the electoral process.

Defendant's contrary argument rests on the mistaken premise that the federal government is the primary regulator of "federal electoral campaigns" (DB: 32). The

105

Constitution says otherwise: "[b]y default," states have the principal responsibility for regulating both congressional and presidential elections. *Watson v. Republican Nat'l Comm.*, 2026 WL 1855462, at *3 (U.S. June 29, 2026); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892) (describing Presidential Electors Clause as vesting states with the "broadest power of determination"). That state regulatory power extends to the "prevention of fraud and corrupt practices" in federal elections, *Cook v. Gralike*, 531 U.S. 510, 523-24 (2001) (quotation marks omitted), including through criminal prohibitions, *see Smiley v. Holm*, 285 U.S. 355, 366 (1932) (states' constitutional role in regulating federal elections "would be nugatory if they did not have appropriate sanctions in the definition of offenses and punishments").

The Supreme Court has thus observed that, "as a practical matter, there must be a substantial [state] regulation of elections if they are to be fair and honest." *Storer v. Brown*, 415 U.S. 724, 730 (1974). Election Law § 17-152 fits comfortably within this long tradition of state regulation. The Legislature added the original version of this prohibition to the Penal Law in 1894, alongside a slate of other measures to protect the integrity of the electoral process. See L. 1894, ch. 714, § 7. Section 17-152 has thus operated for more than 130 years to vindicate the state's compelling interest in protecting "the right to cast a ballot in an election free from the taint of . . . fraud." *Burson v. Freeman*, 504 U.S. 191, 211 (1992) (plurality). Defendant's attempt to disable this scheme based on FECA's narrow prohibitions on campaign finance improperly ignores the states' broad authority to protect election integrity.

106

## POINT III

### THE TRIAL COURT CORRECTLY INSTRUCTED THE JURY THAT IT DID NOT NEED TO UNANIMOUSLY AGREE ON THE PARTICULAR "UNLAWFUL MEANS" OF THE UNCHARGED ELECTION LAW CONSPIRACY

As previously explained, Election Law § 17-152 was relevant only for purposes of establishing defendant's intent in falsifying business records. Accordingly, the trial court instructed the jury that, to satisfy the mens rea element of Penal Law § 175.10, the People did not need to prove that an Election Law violation actually occurred (A7909, A7924, A8004). The court further stated that the jury did not need to unanimously agree on the particular "unlawful means" of the uncharged conspiracy, and instead could "consider" several categories of illegality, including FECA violations, violations of tax laws, and falsification of other business records, to determine whether the nature of the conspiracy was to pursue unlawful rather than lawful means (A7912).

Defendant now challenges this instruction from the trial court on two grounds (DB: 67-78). He initially makes the statutory argument that jury unanimity was required because the "particular unlawful means to be deployed" was the "object" of the election conspiracy (DB: 70). Defendant also asserts that due process required a unanimous finding on the particular unlawful means employed here (DB: 76).

This Court can reject defendant's claims as a threshold matter because both arguments were not only unpreserved but were affirmatively waived below. In any event, defendant's arguments are meritless. His unanimity claims fundamentally

107

misunderstand both the elements of Election Law § 17-152 and the particular manner in which a potential violation of that statute was considered by the jury here.

## A. Defendant's Unanimity Claim Is Unpreserved and Waived.

Defendant did not raise either his statutory or his due process argument before the trial court. In his written proposal for a unanimity charge, defendant relied only on the Supreme Court's holding in *Ring v. Arizona*, 536 U.S. 584 (2002), that, under the Sixth Amendment, a jury must find beyond a reasonable doubt any fact that can increase a defendant's authorized sentence (A17684 n.29). At the charge conference, defense counsel backed away from even that argument, acknowledged that the law did not require unanimity under these circumstances, and appealed instead to the court's discretionary power, stating, "We understand the law that's been cited here. We think your Honor has some discretion" (A7471).

At no point in either the written submissions or the oral discussion did counsel make the statutory or constitutional arguments that he raises here. Because defendant "failed to raise [these] specific objections to the court's . . . jury instructions on the grounds he now raises on appeal, his current claims are unpreserved." *People v. Carpio*, 39 A.D.3d 433, 433 (1st Dep't 2007); *see also People v. Fontanez*, 241 A.D.3d 1169, 1170 (1st Dep't 2025).

Not only has defendant failed to preserve any aspect of his unanimity claim, he also has affirmatively waived it. As noted, at the charge conference, defense counsel acknowledged that "the law" did not require the court to instruct the jury on unanimity

108

with respect to unlawful means, but he nonetheless urged the court to do so as a matter of "discretion" (A7471). Counsel explained that since "[t]his is, obviously, an extraordinarily important case," "the jury *should* be required to make very specific findings, *as specific as Your Honor's discretion would permit*, so it's very clear what happened at this trial" (A7471) (emphases added). The court asked defense counsel if he agreed that such a unanimity instruction is "not ordinarily required," to which counsel replied, "Certainly" (A7471). The court then stated that "[w]hat you're asking me to do is change the law, and I'm not going to do that" (A7472). Defendant thus conceded below—and the court agreed—that the law did not require the court to instruct the jury that it must unanimously agree on the specific unlawful means.[27] Defendant's appellate arguments to the contrary are waived. *See People v. Muhammad*, 34 N.Y.3d 1152, 1153-54 (2020); *see also People v. Williams*, 237 A.D.3d 548, 549 (1st Dep't 2025) (waiver where counsel "ultimately conceded that the affirmative defense charge was unwarranted").

Defendant misstates the record in claiming that he did not waive his present unanimity claim. Defendant asserts that he preserved the claim by telling the court that his proposed unanimity instruction "was 'an accurate statement of the law'" (DB: 68

---

[27] Given the limited nature of defendant's arguments below, the trial court's response was more than adequate to "provid[e] its reasoning for giving that non-unanimity instruction" (DB: 68). The trial court did not give a more fulsome ruling because defendant did not make the more specific arguments he now raises on appeal—further confirming the lack of preservation. *See People v. Moore*, 246 A.D.3d 528, 530 (1st Dep't 2026) ("the court did not rule on the *Erlinger* issue at all because the People declined to argue it").

n.6) (quoting A7474). But merely "alert[ing] the court to the existence of [a legal] issue and set[ting] forth the reasoning supporting [this] view" is not sufficient for preservation. *Moore*, 246 A.D.3d at 529. In any event, counsel's "accurate statement of the law" comment did not, in fact, have anything to do with unanimity. Instead, counsel made that remark as part of his subsequent, separate argument that the court's instructions should state that the People needed to show "proof" that the goal of the conspiracy was to promote the election by unlawful means (A7472-A7473; *see* A17684). In support of that request, defense counsel stated, "[W]e think that our language is an accurate statement of the law, *and proof is required* that there were criminal objects of this conspiracy" (A7474) (emphasis added). Thus, far from making "two alternative arguments" about unanimity (DB: 68 n.6), counsel's only claim was that the court should exercise its discretion to provide a unanimity instruction, despite no legal obligation to do so.[28]

Defendant also wrongly argues that this Court should consider his claim in the interest of justice because the unanimity issue was "briefed and argued at length before the trial court" (DB: 68 n.6). Defendant's argument below consisted only of a citation

---

[28] Counsel also discussed the "unlawful means" element in connection with yet another unrelated claim. Counsel asserted that the object of the election law conspiracy must be a criminal offense rather than a civil violation and accordingly asked the court to instruct the jury on the criminal rather than civil definition of a FECA violation (A7413-A7420, A17689). But counsel never claimed during this exchange that the jury needed to unanimously agree on the particular unlawful means.

110

to *Ring* in a footnote and his concession at the charge conference (*see* A17684 n.29, A7471-A7472). Defendant did not discuss *at all* either of the specific arguments that he now advances. Defendant has therefore frustrated the "chief purpose" of the preservation rule, *Gray*, 86 N.Y.2d at 20, which requires specific objections "so that errors of law which might otherwise necessitate a retrial can be avoided or promptly cured," *People v. Martin*, 50 N.Y.2d 1029, 1031 (1980). This Court should decline to reach defendant's unpreserved and waived claim in the interest of justice.

**B. The Particular "Unlawful Means" of the Uncharged Election Law Conspiracy Was Not an Element of Penal Law § 175.10 and Thus Did Not Require Juror Unanimity.**

Preservation and waiver aside, the trial court correctly instructed the jury that unanimity was not required on the "unlawful means" component of Election Law § 17-152. A jury need only unanimously agree on the elements "of the charged offense." *United States v. Requena*, 980 F.3d 29, 49 (2d Cir. 2020). Here, the actual commission of an Election Law § 17-152 violation was not an element of first-degree falsifying business records. Rather, the Election Law was relevant only for determining whether defendant had acted with intent to defraud that "include[d] an intent to commit another crime or to aid or conceal the commission thereof." Penal Law § 175.10 (A7907). As explained above (*see supra* at 98), this intent element did "not require the actual commission of the crime the defendant intended to conceal," *People v. Taveras*, 46 A.D.3d 399, 400 (1st Dep't 2007), *aff'd*, 12 N.Y.3d 21 (2009); *see also* William C.

111

Donnino, Prac. Commentaries, McKinney's Cons. Laws of N.Y., Penal Law § 175.05.[29]

For this reason, an actual violation of Election Law § 17-152 was not an "element[] of

the crime charged," *Trump*, 683 F. Supp. 3d at 349. The jury thus did not have to be

unanimous about the elements of Election Law § 17-152, including the "unlawful

means" prong, so long as they agreed on defendant's intent to commit or conceal an

Election Law violation. *See People v. Barnes*, 50 N.Y.2d 375, 379 n.3 (1980).

This conclusion is consistent with the Court of Appeals' treatment of the

similarly worded burglary statute in *People v. Mackey*, 49 N.Y.2d 274 (1980). There, the

Court held that the elements of burglary are satisfied upon the intruder's knowing entry

"'with intent to commit *a* crime therein.'" *Mackey*, 49 N.Y.2d at 278 (quoting Penal Law

§ 140.25). It is not "necessary that the intended crime in fact be committed." *Id.* at 279.

Defendant argues that *Mackey* is inapposite because burglary is "clearly distinguishable

from" Election Law § 17-152 (DB: 75). But the apt comparison is between burglary and

Penal Law § 175.10—the statute under which defendant was convicted—not between

burglary and Election Law § 17-152. And as to that comparison, the burglary statute

and Penal Law § 175.10 are nearly identically worded.

---

[29] Unanimity is not required even when the allegation is that the defendant intended to conceal a completed crime. In *Taveras*, for instance, the defendant falsified business records to conceal past sexual abuse of underage boys. 12 N.Y.3d at 23-24. The Court of Appeals expressly rejected the defense argument that the People's reliance on an "intent to conceal" theory "presupposes a prior completed crime" that "automatically" becomes an element of Penal Law § 175.10. *Id.* at 27.

112

Because the jury needed to be unanimous only as to defendant's intent to commit or conceal a violation of Election Law § 17-152, it did not need to unanimously agree on the specific "unlawful means" planned or employed by the conspiracy (A7912). That point is true even if the Election Law charge itself would require identifying particular unlawful means (which it does not, *see infra* Point III.C). When a Penal Law § 175.10 charge specifies a particular crime in the intent element, the jury need only unanimously find that the defendant had the intent to conceal or commit a crime *of the specified kind*, not any *particular* violation. In *Barnes*, for example, the defendant was charged with burglary, and the prosecution specified that he had trespassed "with the intent to commit a larceny therein." 50 N.Y.2d at 381. Although the prosecution was thus required to prove that defendant had the "intent to appropriate property," *id.* at 379 n.3, there was no requirement for the prosecution to prove (or for the jury to find) that the defendant there intended to steal any *particular* property—a fact that would have been impossible to establish since defendant was caught without being "in actual possession of any of the store's merchandise," *id.* at 378. Likewise, in *Taveras*, the defendant pleaded guilty to first-degree falsifying business records with the intent to conceal "sexual activity" with underage boys, without specifying which particular sexual acts or even which sex crimes he was concealing.[30] 12 N.Y.3d at 24.

---

[30] The relevant portion of the plea allocution in *Taveras* is set forth on p. 18 of the People's brief to the Court of Appeals, which will be provided upon request.

Here, by analogous reasoning, there was no need for the jury to agree on the particular unlawful means pursued by the Election Law conspiracy that defendant sought to conceal or commit. Rather, the jury was entitled to rely on *any* of the unlawful means identified by the trial court to unanimously conclude that defendant possessed the requisite intent to conceal or commit a crime of this nature. By contrast, to require the People to show that defendant intended to conceal a particular violation of the Election Law, as defendant requests, would create an "exercise in hairsplitting," *Mackey*, N.Y.2d at 279. Such a rule would be especially unworkable in the falsifying-business-records context, since a defendant could readily falsify a single business record to conceal multiple actual or potential crimes.

Defendant's arguments improperly disregard the fact that he was charged only under Penal Law § 175.10, and not under Election Law § 17-152. In his statutory argument, defendant argues that unanimity is required because the specific unlawful means "is an *element* of the Section 17-152 offense" (DB: 70). But defendant was not charged with or convicted of violating the Election Law, so case law requiring jury unanimity to find an element of a charged offense is therefore inapposite (DB: 69-75).

Defendant's constitutional argument also assumes that he was convicted of violating Election Law § 17-152. Relying primarily on *Schad v. Arizona*, 501 U.S. 624 (1991), defendant argues that due process requires juror unanimity on the particular unlawful means (DB: 78). But the jury here was correctly instructed that they had to be unanimous only about the elements of Penal Law § 175.10—including the finding that

114

defendant acted with intent to conceal or commit a violation of Election Law § 17-152. And, as discussed, the jury could be unanimous about defendant's intent without agreeing (or even finding) that an Election Law conspiracy was effectuated through any particular unlawful means. This case thus does not present the situation in *Schad*, where a plurality of the Supreme Court recognized due process limitations "on a State's capacity to define different courses of conduct, or states of mind, as . . . alternative means of committing a single offense." 501 U.S. at 632. Here, the three unlawful means presented to the jury were not alternative means of carrying out the charged Penal Law § 175.10 violation. Rather, they were simply underlying facts from which the jury could unanimously find that defendant possessed the requisite culpable intent. *See Mackey*, 49 N.Y.2d at 280 (because "intent to commit a specific crime is not an element" of burglary, "the due process question[] disappears").

Nothing in the court's instructions supports defendant's attempt to contort this case into one about the Election Law rather than Penal Law § 175.10. Although an isolated aspect of the trial court's charge indicated that the jury "must conclude unanimously" that defendant violated Election Law § 17-152 (A7912), the instructions as a whole made clear that the election conspiracy was not an element of Penal Law § 175.10. The court charged that the jury "must" convict defendant if it found that the People proved beyond a reasonable doubt the two elements of first-degree falsifying business records, neither of which included a violation of Election Law § 17-152 (*e.g.*, A7915-A7916). The court further clarified that the People needed to prove that

115

defendant intended to commit, aid or conceal another crime, but "they need not prove that the other crime was, in fact, committed, aided, or concealed" (*e.g.*, A7909).

The record thus establishes that the court's instruction on what the jury needed to find to convict defendant of Penal Law § 175.10 was consistent with settled law. But even if the instruction required the jury to unanimously conclude that defendant violated Election Law § 17-152, the court *still* would have been correct in instructing the jury that it did not need to make an additional, unanimous finding on the particular unlawful means of the uncharged offense, for the reasons already discussed. *See People v. Conroy*, 53 A.D.3d 438, 442-43 (1st Dep't 2008) (rejecting claim that unanimity instruction was "confusing" and required reversal, where "it is clear that the charge as a whole conferred a benefit upon defendant to which he was not entitled").

### C. In Any Event, the Particular "Unlawful Means" Is Not a Separate Element of Election Law § 17-152 Requiring Juror Unanimity.

Even assuming that the People needed to prove the elements of Election Law § 17-152 directly, the non-unanimity instruction on unlawful means still would have been correct. Section 17-152 does not create separate elements for each "unlawful means," and there are no due process considerations that would warrant this Court overriding the Legislature's presumptively valid definition of the offense.

#### 1. Defendant's unpreserved statutory argument is meritless.

Although a jury must unanimously agree that the People proved every element, it need not unanimously decide "which of several possible means the defendant used

116

to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999). For example, to convict a defendant of murder, a jury does not need to unanimously agree whether the defendant personally fired the fatal shot or commanded another to do so. *See Mateo*, 2 N.Y.3d at 407-08; *see also Schad*, 501 U.S. at 639 (no unanimity required as to whether defendant committed premeditated murder or felony murder because both satisfy mens rea element of first-degree murder). Similarly, "juror unanimity is not required as to the particular method by which [a] larceny was committed." *People v. Watson*, 284 A.D.2d 212, 213 (1st Dep't 2001).

By its plain terms, Election Law § 17-152 defines an election conspiracy as an agreement to influence an election through "unlawful means." Nothing in the statute evinces a legislative intent to create a "separate offense[] subject to separate jury findings" based on the *particular* unlawful means to be employed, *Schad*, 501 U.S. at 633. Rather, the plain language of the statute indicates that the Legislature intended only for the jury to find that the conspiracy pursued unlawful means in general. "If the Legislature had wanted to set forth" each agreed-upon unlawful means "as a separate element" of Election Law § 17-152, "it would have done so." *Mateo*, 2 N.Y.3d at 406. Indeed, many of the provisions in New York's Election Law proscribe very specific types of illegal conduct. *See, e.g.*, Election Law §§ 17-114, 17-118, 17-150. The absence of any such specific limitation in Election Law § 17-152 shows that the Legislature instead chose to broadly forbid conspiracies that sought to influence elections through unlawful rather than lawful means writ large.

117

Despite this straightforward reading of the statute, defendant argues that a jury must unanimously agree on the particular unlawful means because those means are purportedly the "object of the conspiracy" (DB: 70). The plain language of the statute says otherwise. The "object" of a conspiracy is "the goal or end" of the agreement.[31] Here, the statute provides that the "goal" of the proscribed conspiracy is to "promote or prevent the election of any person to a public office." Election Law § 17-152. Thus, the object of the Election Law conspiracy here was to promote defendant's candidacy in the 2016 presidential election, not to commit a FECA or tax violation or to falsify other business records. For the Election Law conspiracy to constitute a criminal offense, the conspirators needed to agree to use "unlawful means." But those unlawful means were merely means "to a common end": helping defendant win the election. *Schad*, 501 U.S. at 633. And under *Mateo* and similar cases, there was no need for the jury to be unanimous about the particular means by which defendant and his co-conspirators sought to achieve the shared objective of promoting his candidacy.

Defendant's contrary claim appears to rest on the erroneous premise that the object of a criminal conspiracy must involve "illegal" conduct, so that it is somehow incomplete to define the object of the conspiracy here as merely the promotion of defendant's election (DB: 70). The Supreme Court has squarely rejected that

---

[31]    *See Object*, Merriam-Webster Dictionary, Online Edition, https://www.merriam-webster.com/dictionary/object.

118

proposition, holding that "[i]t is perfectly possible and even may be rational to enact that a conspiracy to accomplish what an individual is free to do shall be a crime." *Drew v. Thaw*, 235 U.S. 432, 438 (1914). Whether otherwise legal conduct constitutes the object of a criminal conspiracy "depends on the statute." *Id.* Under antitrust law, for example, restraints on trade are not inherently unlawful, but can become so if they are the product of an illicit agreement. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553 (2007); *United States v. Aiyer*, 33 F.4th 97, 114 (2d Cir. 2022).

For this reason, New York and federal authorities that have discussed the elements of other conspiracy statutes are inapplicable here (DB: 71-73). Other statutes may explicitly require that the object of the conspiracy be the performance of some particular predicate crime. *See, e.g.*, Penal Law § 105.00 (requiring "intent that conduct constituting a crime be performed"); 18 U.S.C. § 371 ("If two or more persons conspire either to commit any offense against the United States . . ."). By contrast, under Election Law § 17-152, the performance of illegal conduct is not the object of the conspiracy. The particular "unlawful means" of an Election Law § 17-152 conspiracy is therefore not an element of the offense requiring juror unanimity.

Defendant's assertion that *Richardson* compels a different result (DB: 73-74) is unavailing. The Court in *Richardson* did not analyze a conspiracy provision but rather a continuing-criminal-enterprise statute that defined the relevant enterprise as involving a "continuing series of violations" of federal drug laws. 526 U.S. at 815. The Supreme Court held that each "violation" was a separate element because a jury "must act

119

unanimously" when "determining whether alleged conduct 'violates' the law." *Id.* at 818.

That reasoning is consistent with the People's interpretation of Election Law § 17-152.

The criminal conduct at issue here is the *agreement* to influence an election by unlawful

means. *See* William C. Donnino, Prac. Commentaries, McKinney's Cons. Laws of N.Y.,

Penal Law § 105.00 ("The core of conspiracy is the illicit agreement."); *see also United*

*States v. Shabani*, 513 U.S. 10, 16 (1994) ("the criminal agreement itself is the actus reus").

Particular unlawful means are proof of the nature of that agreement, not separate

violations of the statute.

### 2. Defendant's unpreserved due process argument is meritless.

Although a plurality of the Court acknowledged in *Schad* that due process

considerations limit a state's capacity to define a single offense, it emphasized that there

is a "presumption of legislative competence to determine the appropriate relationship

between means and ends in defining the elements of a crime." 501 U.S. at 638. Given

the inherent difficulty in determining "what elements an offense must comprise," the

Court has repeatedly "'stressed that the state legislature's definition of the elements of

the offense is usually dispositive.'" *Id.* at 639 (quoting *McMillan v. Pennsylvania*, 477 U.S.

79, 85 (1986)); *see People v. Stuart*, 100 N.Y.2d 412, 422 (2003).

Here, as discussed, the Legislature declined to create a separate element for each

agreed-upon unlawful means under Election Law § 17-152. Defendant fails to establish

any due process concerns that would justify "judicial second-guessing" of that legislative

definition. *Schad*, 501 U.S. at 638. Defendant's argument that there is no "'history or

120

tradition'" of enforcing a conspiracy statute without requiring unanimity on the object of the conspiracy (DB: 78) begs the question since, as noted, the object of an Election Law § 17-152 conspiracy is to influence an election, not to pursue unlawful means. Moreover, contrary to defendant's claim, there is a well-established tradition of juries finding that a defendant pursued criminal means generally in pursuit of a particular objective. For instance, a jury may convict a defendant of criminal possession of a weapon in the second degree, which requires proof that the defendant intended to use a weapon "unlawfully" against another, Penal Law § 265.03(1), without unanimously agreeing on the specific unlawful use. *See People v. Hemmings*, 304 A.D.2d 502, 502 (1st Dep't 2003) (upholding weapon-possession conviction even though jury acquitted the defendant of homicide). And, as discussed, a burglary conviction may be based on a defendant's intent to commit crimes generally, rather than an intent to commit a particular crime. *See Mackey*, 49 N.Y.2d at 278-79.

Defendant also argues that Election Law § 17-152 "could easily stretch to match" the hypothetical "Crime" described in *Schad* (DB: 78), which improperly permitted a conviction based on "any combination of jury findings of embezzlement, reckless driving, murder, burglary, tax evasion, or littering." *Schad*, 501 U.S. at 633. But this Court need not consider the permissible outer boundaries of Election Law § 17-152, because the legislative definition of that offense as applied to defendant passes constitutional muster. *See Stuart*, 100 N.Y.2d at 422 ("The court will not strain to imagine marginal situations in which the application of the statute is not" constitutional.). Here, the three

121

unlawful means at issue were not so disparate that due process "bars treating them as alternative means" to satisfy a single element of an election conspiracy. *See Schad*, 501 U.S. at 644. The unlawful means alleged by the People all involved acts of dishonesty in the pursuit of promoting a particular objective—defendant's presidential candidacy—and thus "reasonably reflect notions of equivalent blameworthiness or culpability." *Id.* at 643. Further, the risk of any potential unfairness to defendant is non-existent here because the jury could have found that the conspirators agreed to promote defendant's candidacy through *all* of the alleged unlawful means. *Cf. Mateo*, 2 N.Y.3d at 407-08 (no due process violation even though alternative means of committing first-degree murder presented to jury were mutually exclusive). Accordingly, the court's non-unanimity instruction on the particular unlawful means did not violate defendant's due process rights.

**POINT IV**

**THE EVIDENCE AMPLY ESTABLISHED DEFENDANT'S INTENT TO DEFRAUD**

Defendant raises a sufficiency challenge as to only one element of his convictions: his intent to defraud. The court instructed the jury that the requisite intent to defraud is "not constricted to an intent to deprive another of property or money and can extend beyond economic concerns" (A7909, A7924, A8004). Defendant insists that the People were obliged to prove that he "intended to cheat or deprive another person or entity out of something of pecuniary value" (DB: 79). Alternatively, he asserts that

122

the People did not adduce sufficient proof to establish his intent to deceive under the trial court's instruction; on the same basis, he contends that the jury's verdict was against the weight of the evidence (DB: 79-86). Defendant is wrong on both fronts.

### A. The Intent to Defraud Under Penal Law § 175.10 Is Not Limited to an Intent to Deprive Another of Property or Money.

Defendant asserts that "intent to defraud" under Penal Law § 175.10 required proof of "an intent to cheat or deprive another person out of property or a thing of value" (DB: 80). This Court has squarely—not merely "arguably" (DB: 81)—rejected that interpretation of the statute, concluding that "[i]n order to prove intent to defraud" under Penal Law § 175.10, "the People did not need to make a showing of an intent to cause financial harm." *People v. Sosa-Campana*, 167 A.D.3d 464, 464 (1st Dep't 2018); *see also Morgenthau v. Khalil*, 73 A.D.3d 509, 510 (1st Dep't 2010) (intent to defraud under Penal Law § 175.10 did not require "intent to defraud a particular person or business entity . . . out of money, property, or something of pecuniary value"). Thus, in *Sosa-Campana*, this Court found that the defendant there had the requisite intent to defraud when he "presented a fraudulent driver's license" to a government official (a police officer) "to escape responsibility for" his traffic violation and "to conceal his additional offense of unlicensed driving." 167 A.D.3d at 434.

In an attempt to invoke the rule of lenity, defendant asserts that courts have "split" on this interpretation of the intent-to-defraud element (DB: 82). He is wrong. In fact, other courts and commentators have uniformly agreed with this Court's view

123

that an intent to defraud need not consist of any pecuniary intent.[32] And the Court of Appeals has specifically recognized that fraudulent intent can include acts of dishonesty directed at the voting public or government regulators. Thus, the Court has held that fraud could encompass any "deliberate deception (to be committed upon the electorate) and a corrupt act to prevent a free and open election." *People v. Lang*, 36 N.Y.2d 366, 371 (1975). Likewise, in *People v. Kase*, where the defendant was convicted of filing a false instrument, the Court of Appeals affirmed this Court's holding that intent to defraud could be established by a defendant's "purpose of frustrating the state's power to fulfill" its responsibility "faithfully to carry out its own law" and rejected the argument that "only instruments from which flow pecuniary or potential pecuniary loss to the State or political subdivisions thereof fall within the prohibition of the statute." 76 A.D.2d 532, 537-38 (1st Dep't 1980), *aff'd*, 53 N.Y.2d 989, 991 (1981).

The statutory text also supports the trial court's rejection of any pecuniary limitation on fraudulent intent here. The reference to "another crime" in Penal Law § 175.10's intent-to-defraud element is not limited to a crime involving pecuniary harm

---

[32] *See, e.g.*, *People v. Sinclair*, 208 A.D.2d 573, 573 (2d Dep't 1994); *People v. Headley*, 37 Misc.3d 815, 829-30 (Sup. Ct. Kings County 2012); *People v. Elliassen*, 20 Misc.3d 1143(A), at *2-*3 (Sup. Ct. Richmond County 2008); *People v. Schrag*, 147 Misc.2d 517, 518-19 (County Ct. Rockland County 1990); *People v. Coe*, 131 Misc.2d 807, 812-13 (Sup. Ct. N.Y. County 1986), *aff'd*, 126 A.D.2d 436 (1st Dep't 1987), *aff'd*, 71 N.Y.2d 852 (1988); *see also* William C. Donnino, Prac. Commentaries, McKinney's Cons. Laws of N.Y., Penal Law § 15.00 ("While an 'intent to defraud' is often directed at gaining property or a pecuniary benefit, it need not be so limited").

124

or benefit, and there is no basis to read into the statute a restriction that the Legislature declined to include. *See Diegelman v. City of Buffalo*, 28 N.Y.3d 231, 237 (2016). Moreover, nothing in the statute requires that there be an additional intent to defraud beyond the intent to commit, aid, or conceal another crime. Indeed, when, as here, a defendant intends to conceal a crime, a jury could reasonably infer his intent to defraud solely from the inherently furtive nature of concealment. *See People v. Reyes*, 69 A.D.3d 537, 538 (1st Dep't 2010) (upholding Penal Law § 175.10 charge when theory of "intent to defraud" depended solely on defendant's "intent to conceal the alleged rape").

Limiting intent to defraud to financial matters alone would also be inconsistent with the purposes animating the prohibition against falsifying business records. A vast array of entities qualify as the sort of enterprises to which the prohibition applies, *see* Penal Law § 175.00(1), and "[t]he interest of these various entities in keeping accurate business records goes far beyond their economic concerns and certainly extends to the rights of the entities and others which may be infringed by false records," *People v. Schrag*, 147 Misc.2d 517, 519 (County Ct. Rockland County 1990); *see People v. Elliassen*, 20 Misc.3d 1143(A), at *2-*3 (Sup. Ct. Richmond County 2008) (intent to defraud established for falsified police reports without property or pecuniary loss, because falsification "deprived the Police Department of valuable information and knowledge that were critical to its public safety mission"). Moreover, the Court of Appeals has long interpreted "fraud" broadly to "include[] all deceitful practices contrary to the plain

125

rules of common honesty," rejecting attempts to narrow fraud prohibitions to particular dishonest acts. *People v. Federated Radio Corp.*, 244 N.Y. 33, 38 (1926).

Defendant's reliance on the 1979 version of the Criminal Jury Instructions ("CJI") (DB: 81) is misplaced. That model charge does not limit the intent to defraud to pecuniary matters, for it defines "defraud" as to cheat or deprive another of property or a thing of value "*or* a right." 2 CJI N.Y. Penal Law § 175.05(1) at 1177 (1979) (emphasis in original). And the current—and thus controlling—version of the CJI no longer mentions deprivation of property. *See* CJI 2d [N.Y.] Penal Law § 175.10, Falsifying Business Records in the First Degree, https://www.nycourts.gov/judges/cji/2-PenalLaw/175/175.10.pdf (accessed July 27, 2026).

Defendant's use of case law to manufacture a dispute fares no better. *People v. Wilson*, 238 A.D.3d 909, 910 (2d Dep't 2025), cites to a Black's Law Dictionary definition of "defraud" as "to cause injury or loss to (a person or organization) by deceit"; on its face, that definition does not require a pecuniary injury or loss. *See also People v. Tyler*, 62 A.D.2d 146, 152 (2d Dep't 1978) ("'Defraud' means to cheat or wrongfully deprive another person of some right"), *aff'd*, 46 N.Y.2d 264 (1978) (quoted at DB: 80). *Wilson* found the evidence in that case insufficient not because of the lack of a financial angle, but rather because the People failed to show that the defendant

126

sought to deceive or trick the victim.[33] And in other cases, the Second Department has upheld fraud convictions—including under Penal Law § 175.10—even when there was no apparent pecuniary motive. *See, e.g., People v. Lappe*, 169 A.D.3d 927, 928 (2d Dep't 2019) (intent to defraud in connection with investigation into death of nursing home resident); *People v. Sinclair*, 208 A.D.2d 573, 573 (2d Dep't 1994) (defendant gave parole officer a document falsely stating that new criminal charges against him had been dismissed).[34]

Finally, defendant misplaces his reliance on "federal fraud statutes" that purportedly "reach only traditional property interests" (DB: 80 (quoting *Kousisis v. United States*, 605 U.S. 114, 121-22 (2025)). Although some federal statutes may have such a limitation, others do not: for example, it has been well-established for at least a century that under 18 U.S.C. § 371, the federal statute criminalizing a conspiracy to "defraud the United States," the defendant need not intend to cause financial harm to the government. *See, e.g., Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (fraud can "also mean[] to interfere with or obstruct one of [the federal government's] lawful

---

[33] The same is true of the trial court decision in *People v. Keller*, 176 Misc.2d 466 (Sup. Ct. N.Y. County 1998), which dismissed charges not because of a lack of intent to cause pecuniary loss to the company receiving the false documents, but because there was no intent to deceive the company. *Id.* at 469.

[34] The Second Department did not hold otherwise in *People v. Saporita*, 132 A.D.2d 713 (2d Dep't 1987) (DB: 81). Rather, in that case, the People failed to object to the trial court's imposition of a pecuniary limitation on intent to defraud, and so the Second Department found the People to be "bound" by the charge. *Id.* at 715.

governmental functions by deceit, craft or trickery, or at least by means that are dishonest"). Indeed, in *Trump v. United States*, the Supreme Court characterized § 371 as a statute "that can cover any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." 603 U.S. at 640 (citation and internal marks omitted). That characterization mirrors the People's contention here that one of the targets of defendant's deception was the government.

## B. The Evidence Overwhelmingly Established Defendant's Intent to Defraud.

Defendant claims that the proof was legally insufficient or that the weight of the evidence did not support the jury's verdict even under this Court's settled understanding of "intent to defraud" (DB: 83). When conducting legal-sufficiency review, this Court must view the evidence in the light most favorable to the prosecution, assume that the jury credited the People's witnesses, and give the prosecution's evidence the full weight it might reasonably be accorded. *People v. Allen*, 36 N.Y.3d 1033, 1034 (2021). In conducting weight-of-the-evidence review, this Court does not "substitute [itself] for the jury, whose determinations are entitled to [g]reat deference, based on its opportunity to view the witnesses, hear the testimony, and observe demeanor," *People v. Green*, 104 A.D.3d 126, 129 (1st Dep't 2013) (internal quotation marks omitted). Deference is particularly important in resolving intent, which "is quintessentially a question for the jury," *People v. Fernandez*, 64 A.D.3d 307, 310 (1st Dep't 2009).

128

Defendant's challenge to the jury verdict ignores the overwhelming evidence supporting the jury's finding of his intent to defraud. As an initial matter, defendant's argument wrongly assumes that the People were required to prove that he *specifically* intended to defraud the voting public or government regulators (DB: 79-80). "[T]he law is clear that the statutory element of intent to defraud does not require an intent to defraud any particular person; a general intent to defraud any person suffices." *People v. Dallas*, 46 A.D.3d 489, 491 (1st Dep't 2007). Supreme Court correctly instructed the jury on this standard (A7909, A7924, A8004). To be sure, the People argued in summation that defendant intended to defraud government regulators and the voting public (A7868-A7869), but the prosecutor also highlighted that the records in question were reviewed by tax professionals and were important for companies and vendors considering doing business with the Trump Organization (A7821). Ultimately, all of this evidence was relevant only to support an inference by the jury that defendant acted with a "general intent to defraud" (A7868).

Here, there is no basis to second-guess the jury's determination that defendant acted with the requisite intent to defraud. As explained above (*see supra* Point I.C.3), there is overwhelming evidence that defendant intended that the false business records deceive others by misrepresenting that the reimbursement to Cohen for the Daniels payoff was instead payment for Cohen's legal services. Indeed, there was no reason for defendant to falsify all these records other than to mislead those who were not part of the Trump Tower conspiracy.

Defendant's arguments to the contrary are meritless. First, defendant asserts that there was supposedly no evidence that the Trump Organization's records "were intended to be seen, or had any reasonable prospect of ever being seen, by any governmental entity" (DB: 83). Again, as a threshold matter, the People were not obliged to prove that governmental regulators in particular were the target audience for the falsified records. In any event, the trial record establishes overwhelmingly that the prospect of governmental scrutiny was quite real. For example, Pecker was contemporaneously concerned that the payments to McDougal ran afoul of campaign expenditure limits; he thus included language having McDougal provide various services to AMI in order to evade such limitations, and, even with that safeguard, ultimately deemed the arrangement risky enough that he did not demand reimbursement from defendant (A4191-A4194, A4444).

Likewise, the jury could infer that defendant was concerned that election regulators might learn of the Daniels payments and subject him to liability. That concern was the reason that defendant and Cohen sought to conceal the true source and nature of the payments by funneling them through Cohen and a shell company (A6486-A6488, A6498-A6500, A6515-A6517). And, as it turns out, the FEC in fact investigated this precise payment in early 2018, thus confirming that regulatory scrutiny was a realistic concern. In responding to that investigation, Cohen made public statements (with defendant's approval) falsely denying that defendant was the ultimate source of the payments and that they were related to defendant's presidential

130

campaign—statements that would have been unnecessary if the prospect of government regulation was illusory (A6630-A6642, A8435-A8438, A8848, A8449, A8479). Taken together, this evidence entitled the jury to conclude that defendant falsified the business records in question with the intent to defraud the government by undermining—and avoiding liability for violating—campaign contribution limits. *See People v. Pymm*, 151 A.D.2d 133, 135, 141 (2d Dep't 1989) (intent to defraud established where corporation acted to prevent federal inspectors from learning of mercury reclamation project), *aff'd*, 76 N.Y.2d 511 (1990).

Second, the trial record contradicts defendant's assertion that the Trump Organization's records were "purely internal bookkeeping record[s]" (DB: 83). McConney testified that outside accountants were provided with the general ledger "for tax purposes, to prepare a tax return or a financial statement" (A5343, A5388-A5389). Indeed, he agreed that one reason that the payments to Cohen were logged as "legal fees" was to provide "information that the accountants would need" to prepare those returns and statements (A5389). Thus, the jury could have reasonably concluded that defendant falsified the records with the intent to defraud tax professionals regarding the nature of the payments, as well as the governmental entities that would review the returns or statements in the course of enforcing the tax laws and other corporate regulations. *See generally People v. Barto*, 144 A.D.3d 1641, 1643 (4th Dep't 2016).

Finally, because the whole point of the conspiracy was to conceal information that could lead voters to reject him, defendant also plainly intended to defraud the

131

voting public. Defendant counters that he could not have had such an intent because the records here were falsified in 2017, after the election (DB: 84-85). This argument wrongly considers defendant's 2017 conduct in isolation, rather than as the intended continuation of a scheme that was hatched and implemented starting in August 2015. An essential part of that scheme was to disguise the true nature of the payments made to purchase the silence of individuals like Daniels. And defendant's intent to shield from public scrutiny the actual purpose of these payments necessarily extended to his actions in 2017 to reimburse Cohen for making the Daniels payoff. The jury could reasonably conclude from this evidence that defendant's 2017 actions to complete the execution of the scheme were done with the same intent to defraud that was the animating purpose of the scheme from its inception. Indeed, the intent-to-defraud element in Penal Law § 175.10 encompasses an intent to "conceal the commission" of another crime. Often, a crime is concealed only after its commission, so the statute itself contemplates that a defendant's falsification of business records may occur only after the initial criminal activity.

Even focusing solely on the period starting in January 2017, defendant is wrong to suggest that there is no proof that he acted with intent to defraud the electorate after his 2016 election. Having already concealed damaging information from the public before the election, defendant could—and did—intend to continue his cover-up after his inauguration as well. There were concrete reasons that defendant would have wished to continue to conceal the true nature of the 2016 payoff and 2017 reimbursements.

132

After all, public opinion continues to influence a President's mandate and ability to focus on policy priorities. And there was ample evidence that defendant was strongly motivated to conceal the truth about the payoffs even after his election: Pecker testified that defendant was angry that AMI released McDougal from her non-disclosure agreement after the election (A4303-A4305); and, as noted, defendant directed Cohen to make statements denying the Daniels payoff in 2018 after reports of the payoff first emerged. The jury was entitled to conclude from such evidence that defendant continued to be concerned about public perception even after becoming President and thus wished to continue defrauding the voting public and others about the true nature of his payments to Cohen.

## POINT V

### THE TRIAL JUDGE PROVIDENTLY EXERCISED HIS DISCRETION WHEN HE DECLINED TO RECUSE HIMSELF

Defendant contends that the trial judge, Justice Juan Merchan, abused his discretion when he declined to recuse himself. Defendant relies on three purported bases for recusal. None have merit, and two have already been rejected by the Advisory Committee on Judicial Ethics and by this Court in earlier proceedings.

First, years before defendant's indictment, Justice Merchan made personal donations totaling $35 to organizations that support Democrats: $15 to Joseph Biden's presidential campaign, and $20 to organizations that supported other Democratic candidates. Those de minimis contributions to entities that were neither parties nor

participants in this criminal proceeding did not constitute the kind of extraordinary circumstance that would require recusal. Second, Justice Merchan's daughter was an executive at a digital marketing agency—Authentic Campaigns—that created marketing content for dozens of clients, including Democratic politicians. Defendant utterly fails to support his speculation that Justice Merchan's rulings would affect the revenues of his daughter's company. Third, in a separate criminal case involving the Trump Corporation, Justice Merchan participated in plea negotiations regarding a co-defendant, Allen Weisselberg. Defendant's claims on this score are based on misrepresentations of the relevant facts; more fundamentally, recusal is simply not warranted by the unremarkable fact that a judge was involved in plea negotiations.

### A. The Relevant Record

On May 31, 2023, defendant filed his first motion seeking the trial court's recusal, raising the three grounds described above (A237-A294). On August 11, 2023, the trial court denied defendant's recusal motion (A396-A401). The court relied on a formal opinion from the Advisory Committee on Judicial Ethics, which had concluded that, on the facts of this case, "[a] judge's impartiality cannot reasonably be questioned based on (a) de minimis political contributions made more than two years ago or (b) the business and/or political activities of the judge's first-degree relative, where the relative has no direct or indirect involvement in the proceeding and no interests that could be substantially affected by the proceeding" (A402-A404; *see* A398, A400-A401). The court also rejected defendant's claim with respect to Weisselberg's plea negotiations "for the

134

same reasons it was denied the first time"—that is, when defendant had earlier moved to recuse Justice Merchan from presiding over the separate criminal case involving the Trump Organization (A398-A399).

On April 3, 2024, defendant filed a second recusal motion based on Judiciary Law § 14 (A2899-A3038), which prohibits a judge from presiding over a matter "in which he is interested." On April 10, 2024—while defendant's second recusal motion was still pending before the trial court—defendant filed a C.P.L.R. article 78 petition in this Court. Defendant also moved for a stay of trial proceedings; on the same day, a single justice of this Court denied defendant's request for an emergency stay. NYSCEF Dkt. No. 10, *Matter of Trump v. Merchan*, No. 2024-02413 (1st Dep't Apr. 11, 2024).

On April 15, 2024, the trial court denied defendant's second recusal motion. The court deemed the motion "essentially, a motion to reargue or renew" that failed because it raised no new arguments or facts (A3070-A3075). The court also found Judiciary Law § 14 "inapplicable to the facts here" (A3075). On May 23, 2024, this Court denied defendant's article 78 petition as time-barred regarding his first recusal motion and as unripe with respect to the second. *Matter of Trump v. Merchan*, 227 A.D.3d 569, 570 (1st Dep't 2024). This Court also held that defendant had failed to establish that he had a "clear right to recusal" pursuant to Judiciary Law § 14. *Id.*

135

### B. The Trial Court's De Minimis Political Contributions Years Before the Indictment Did Not Provide Any Basis for Recusal.

On appeal, defendant first contends that Justice Merchan abused his discretion when he declined to recuse himself on the basis of $35 in contributions that he had made in 2020 to organizations that supported Democratic candidates or causes (DB: 88). His claim is meritless.

Recusal is required "only where there exists a direct, personal, substantial or pecuniary interest in reaching a particular conclusion." *People v. Alomar*, 93 N.Y.2d 239, 246 (1999). There must be concrete proof of such a direct interest; "speculative" claims are insufficient. *Rumsey v. Niebel*, 286 A.D.2d 564, 565 (4th Dep't 2001). A trial judge's recusal ruling is reversible only upon an abuse of discretion. *People v. Moreno*, 70 N.Y.2d 403, 405-06 (1987).

The trial court's $15 contribution to Joseph Biden's presidential campaign was a de minimis donation that did not warrant recusal under any interpretation of the relevant law. That tiny donation, made long before the indictment in this case, went to support an individual who was not involved in defendant's criminal case—either the underlying charges or the litigation itself. These circumstances do not come close to establishing the "exceptional case," *Anderson v. Belke*, 80 A.D.3d 483, 483 (1st Dep't 2011), where political contributions create the probability of bias requiring recusal.

Indeed, this Court has held that there was no "serious risk of actual bias" even when a presiding judge *received* contributions from the attorney of a party *actually before*

*the court* when the contribution "was only a small percentage of the total contributions to the [judge's] campaign." *Id.* Defendant contends that "political contributions *by* judges are different" (DB: 88-89), but any difference only further minimizes the risk of bias. A contribution by a judge does not raise the same concerns about a quid pro quo that are implicated when a judge receives a significant contribution. *See Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 882-84 (2009). And any concerns here were further diminished because the trial judge's contribution was minimal, went to a non-party, and was made years before the initiation of this criminal case. *See, e.g., Arkansas State Conference NAACP v. Arkansas Bd. of Apportionment*, 578 F. Supp. 3d 1011, 1017-19 (E.D. Ark. 2022) (recusal not required in lawsuit against state defendant when presiding judge had, before becoming judge, donated $500 to campaign of governor who was involved in current lawsuit).

By the same token, the trial court's equally de minimis $20 contribution to political action committees supporting Democrats generally did not warrant recusal. "Judges generally have political backgrounds to one degree or another." *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 138 F.3d 33, 38 (2d Cir. 1998). But a judge's identification with a political party is not an indication that the judge is incapable of acting impartially. *See id.; see also Dekom v. New York*, No. 12-CV-1318, 2013 WL 3095010, at *7-*8 (E.D.N.Y. June 18, 2013), *aff'd*, 583 F. App'x 15 (2d Cir. 2014) (rejecting argument that, because the judge was elected as a member of the Republican Party, she could "be expected to be particularly loyal to the machine which made her"); Opinion of the

137

Advisory Committee on Judicial Ethics, Op. 91-146 (1991) ("A judge need not disqualify himself or herself from hearing a matter where one of the litigants was the judge's opponent in the last election").[35]

Based on these principles, the Advisory Committee on Judicial Ethics has already concluded that Justice Merchan's aggregate political contributions did not warrant recusal where one contribution "was made to the person who opposed the defendant in an election [but] none was made to the defendant or the prosecutor or anyone else involved in the case before the judge" (A405). The Committee properly found that "these modest political contributions made more than two years ago cannot reasonably create an impression of bias or favoritism in the case before the judge" (A405).[36]

### C. The Employment of the Trial Judge's Daughter Provided No Grounds Upon Which to Reasonably Question the Court's Impartiality.

Defendant next argues that the employment of Justice Merchan's daughter—as Chief Operating Officer and Partner of Authentic, a digital marketing agency whose

---

[35] Defendant's reliance on *In re Raab*, 100 N.Y.2d 305 (2003) (DB: 87), is misplaced. The judge there conceded that he had made an improper contribution of $10,000 to a local party committee in violation of explicit provisions of the Rules Governing Judicial Conduct. *Id.* at 309-12. Neither the facts nor the holding of *Raab* bears any similarity to this case.

[36] The Advisory Committee's opinion also rebuts defendant's assertion that Justice Merchan's contributions violated the New York Rules Governing Judicial Conduct (DB: 87). Any action a judge takes "in accordance with findings or recommendations contained in an advisory opinion issued by the" Advisory Committee "shall be presumed proper" in any investigation by the Commission on Judicial Conduct. Judiciary Law § 212(2)(*l*)(iv).

clients included Democratic candidates—called the court's impartiality into question (DB: 90-92). Defendant claims that by virtue of her position, the court's daughter had "an interest that could be substantially affected by the proceeding" (DB: 90). His speculative argument is insufficient to establish any abuse of discretion.

As an initial matter, this Court has already held that the daughter's employment did not create a "clear right to recusal" under Judiciary Law § 14. *Matter of Trump v. Merchan*, 227 A.D.3d at 570. This Court should adhere to that conclusion here.

Defendant has identified no "direct, personal, substantial or pecuniary interest in reaching a particular conclusion," *Alomar*, 93 N.Y.2d at 246, arising from the employment of the judge's daughter. As defendant does not now dispute, neither the trial court's daughter nor Authentic had any personal or business relationship with the People or defendant (A398). Neither Authentic nor any of its clients was a party or attorney in this proceeding (A398). And many of Authentic's clients had nothing to do with defendant or presidential politics (A305-A306).

There was thus no evidence whatsoever that Authentic's fortunes would be directly affected by any rulings made by the trial judge here. Although defendant asserts that some Authentic clients made statements in their advertisements that referenced the instant case, the only concrete example that defendant has identified is an advertisement mentioning the indictment here (DB: 90-91). But it was the grand jury, not the trial judge, that indicted defendant. In any event, nothing would have prevented Authentic (or others) from mentioning this criminal proceeding, no matter what the trial judge

139

ruled at particular moments. And the record is barren of any evidence that Authentic's contracts with its clients were based on the judge's particular rulings. Accordingly, defendant has failed to provide concrete, non-speculative evidence that the trial judge's daughter "stood to financially benefit from [the court]'s decisions" in this case (DB: 91). *See Brody v. President & Fellows of Harvard Coll.*, 664 F.2d 10, 12 (1st Cir. 1981).

More fundamentally, defendant errs in assuming that the commercial or even political work of a judge's family member necessarily predisposes a judge in a way that mandates his recusal. The family members of judges—and even judges themselves— routinely participate in industries that may be affected by the outcome of a case involving other members of that industry. But it is well settled that such a potential impact is too attenuated as a matter of law to warrant recusal. *See, e.g., Langdon v. Town of Webster*, 270 A.D.2d 896, 896 (4th Dep't 2000) (no recusal when judge, as a town property owner, could possibly receive a refund from the water fund if plaintiffs prevailed); *Gas Utils. Co. of Alabama v. S. Nat. Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993) (no recusal in dispute over oil and gas leases when trial judge's family had "proprietary interests in land leased to oil and gas interests but not to companies involved in the present action"); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986) (recusal not required "in every case in which a judge owns stock of a company in the same industry as one of the parties to the case.").

Here, too, the propriety of the court's decision was confirmed by the Advisory Committee on Judicial Ethics, which explained that "[a] judge's impartiality cannot

140

reasonably be questioned based on . . . the business and/or political activities of the judge's first-degree relative, where the relative has no direct or indirect involvement in the proceeding and no interests that could be substantially affected by the proceeding" (A404). Defendant now makes the baseless claim that the Advisory Committee's opinion is "irrelevant" and "based on incomplete information" because the opinion referred to the trial court's daughter as a "high-ranking officer" of her business rather than a "part-owner" (DB: 93-94). This trivial distinction makes no difference here. Regardless of the nature of the daughter's relationship with Authentic, the fact remains that any arguable connection between this criminal prosecution and Authentic's work is too attenuated to give rise to concerns about judicial bias.[37]

### D. The Trial Court's Proper Conduct During Allen Weisselberg's Plea Negotiations in a Different Case Did Not Provide a Basis for Recusal.

Finally, defendant questions the trial court's objectivity because of its involvement in Allen Weisselberg's plea negotiations during a separate criminal case, *People v. Trump Corp.*, Ind. No. 1473/2021, in 2022 (DB: 92). Defendant contends that the court "induced Weisselberg to cooperate and testify against The Trump

---

[37] Defendant further attempts to discredit the Advisory Committee's opinion by claiming that "the Committee was under the misimpression that Authentic would not do 'any work referencing or affected by the criminal charges at issue here'" (DB: 95). But defendant's quotation is not from the opinion itself, but rather from the People's memorandum opposing recusal, which pointed out—correctly—that *defendant* had not yet identified any work from Authentic that referenced this criminal case (A306).

141

Corporation," which "reasonably suggested a . . . lack of 'objective neutrality' toward" defendant (DB: 92-93). This argument is both factually incorrect and legally meritless.

The true facts are explained at length in the briefing on recusal in *People v. Trump Corp.*, which is part of the record here. That briefing makes clear that plea negotiations were driven by the defense and the People, not by any improper interference from the court. It was Weisselberg's counsel—not the trial court—who initiated plea discussions with the People (A264-A266). At a subsequent meeting with the court in chambers, it was the People—not the court—who conveyed that the People would only recommend a non-custodial sentence if Weisselberg cooperated by providing information that he had previously refused to provide (A268-A269). The trial court indicated that it was not inclined to impose a non-custodial sentence without the People's recommendation, but it emphasized that it would not require guilty pleas from the corporate defendants as a condition of Weisselberg's plea (A267-A268). After further negotiations between the parties, the People recommended a six-month split sentence in exchange for Weisselberg's guilty plea (A274-A275). At the request of Weisselberg's attorney, the court agreed to impose a five-month split sentence instead (*id.*).

As this timeline shows, plea negotiations in *People v. Trump Corp.* were driven by the parties, not by the court. At no point did the court seek to "induce" Weisselberg to cooperate against defendant (DB: 92); indeed, "there was no statement by the People or the court that Weisselberg had to cooperate against Donald J. Trump" (A268). The factual predicate of defendant's current recusal claim is thus patently false.

142

Defendant's legal argument is also meritless. The trial court's ordinary and proper involvement in the plea negotiations of the former Chief Financial Officer of the Trump Organization in a different prosecution simply has no bearing on the court's impartiality in this case. *See United States v. Diaz*, 176 F.3d 52, 112 (2d Cir. 1999). The court displayed no favoritism or antagonism toward any party. And the very limited factual overlap between the prior prosecution and this case did not require recusal either. Courts have rejected recusal claims even when the same judge presides over two different prosecutions that arise from the same crimes, and the judge previously accepted a guilty plea from the defendant's accomplice who then testified at the defendant's trial. *See United States v. Mason*, 118 F. App'x 544, 546 (2d Cir. 2004). Those holdings apply even more forcefully here, where Weisselberg and defendant are not codefendants and the criminal charges in the two cases arose from different facts.

## POINT VI

### DEFENDANT RAISES MULTIPLE OTHER BASELESS COMPLAINTS BUT DOES NOT SEEK REVERSAL ON ANY OF THESE GROUNDS

Throughout his brief, defendant makes various comments expressing dissatisfaction with the proceedings below, without actually seeking reversal on any of those complaints. This Court need not address any of these claims. For the Court's benefit, however, the People briefly address several of defendant's perceived grievances.

## A. Defendant's Perfunctory Complaints about Various Pre-Trial Rulings Are Not Properly Presented Here and Are Meritless in Any Event.

Defendant suggests that the lower court erred in denying various pre-trial motions (DB: 21). This Court has already rejected defendant's arguments on each front.

First, with respect to defendant's motion for a change of venue, defendant pressed that claim before this Court in two separate petitions under C.P.L.R. article 78. Both times, a justice of this Court denied defendant any interim relief. Defendant then withdrew his first petition; this Court denied the second petition; and defendant did not pursue any further appeal. NYSCEF Dkt. No. 9, *People v. Trump*, No. 2024-02646 (1st Dep't May 23, 2024); NYSCEF Dkt. No. 15, *People v. Trump*, No. 2024-02365 (1st Dep't May 2, 2024). There is no reason for this Court to revisit its prior rulings on that matter (*contra* DB: 21).

Second, this Court has also already rejected defendant's complaints about the trial court's order limiting extrajudicial speech. *Matter of Trump v. Merchan*, 227 A.D.3d 518, 520-21 (1st Dep't 2024). Defendant's intimation that the trial court's order on that point was improper (DB: 21) is flatly inconsistent with this Court's prior ruling.

## B. The People Gave Adequate Notice of the Charges against Defendant.

Defendant asserts that the People "improperly obscured" the nature of the charges against him "until the charge conference" (DB: 1), but he does not actually seek reversal on any claim of inadequate notice. Nor could he, because his assertion of unfair surprise is meritless. The indictment informed him that he was being charged with 34

144

counts of falsifying business records with "intent to commit another crime and aid and conceal the commission thereof" (A27-A41). Defendant complains that he was not told at the time "what '[]other crime' [defendant] had allegedly intended to commit or conceal" (DB: 18), but he is wrong. A statement of facts filed with the indictment described in detail both the catch-and-kill conspiracy and the three payouts made in service of the conspiracy, including Cohen's payment to Daniels (A77-A81). A bill of particulars filed just weeks later then identified "the crimes defendant intended to commit or to aid or conceal" as including violations of Election Law § 17-152, New York's Tax Law, the falsifying-business-records statutes, and FECA (A220).

There was nothing "improper[]" with the People at trial relying "*exclusively* on Election Law § 17-152" (DB: 3) as the crime that defendant intended to conceal or commit (while still presenting the other crimes as potential "unlawful means" for the Election Law conspiracy). New York law prohibits the People from *expanding* their theory of the charged crime; there is no similar prohibition on the prosecution "*restrict[ing]* their theory of the crime," including during "their presentation of the case" at trial, so long as the jury ultimately addresses the People's narrower theory. *People v. Seignious*, 41 N.Y.3d 505, 511 (2024) (emphasis added); *see id.* at 512 n.2 (citing with approval a case where the People had limited their theory at summation).

145

**C. Defendant's Allegations of Improper Prosecutorial Motivation Are Specious.**

At the outset of his appellate brief, defendant voices perfunctory and conclusory complaints that the People brought this case for improper reasons (DB: 1). Despite this hyperbole, defendant makes no claim of selective prosecution (DB: 7-8). The absence of such a claim is reason enough for this Court to disregard defendant's complaints.

Any such claim would be meritless in any event. To overcome the presumption of regularity that supports prosecutorial decisions, defendant must prove "both the 'unequal hand' and the 'evil eye' requirements"—that is, "there must be not only a showing that the law was not applied to others similarly situated but also that the selective application of the law was deliberately based upon an impermissible standard such as race, religion or some other arbitrary classification." *Matter of 303 W. 42nd St. Corp. v. Klein*, 46 N.Y.2d 686, 693 (1979). Neither factor exists here.

First, defendant has not shown "that others similarly situated have not been prosecuted." *United States v. Moon*, 718 F.2d 1210, 1230 (2d Cir. 1983). To the contrary, in the ten years preceding the indictment here, this Office alone brought 437 cases charging violations of Penal Law § 175.10 (A597-A601). And the case law reveals a wide variety of underlying criminal activities that have supported such charges.[38]

---

[38] *See, e.g.*, *Taveras*, 12 N.Y.3d at 23-24 (concealing sexual activity with young boys); *Sosa-Campana*, 167 A.D.3d at 464 (avoiding traffic summons); *Thompson*, 124 A.D.3d at 448-49 (disguising unlawful possession of firearm); *People v. Myles*, 58 A.D.3d 889, 892 (3d Dep't 2009) (hiding electricity usage).

146

Defendant suggests that the Penal Law § 175.10 charges here were somehow suspicious because the People "concocted a felony by combining two separate layers of misdemeanor predicates" (DB: 28), but he makes no argument for reversal on this basis. Nor could he, because the plain language of the statute authorizes the People's charging theory. The felony offense of falsifying business records in the first degree is *defined* as the commission of second-degree falsification (a misdemeanor) with "an intent to commit another crime or to aid or conceal the commission thereof," Penal Law § 175.10, and a "[c]rime" can include both "a misdemeanor or a felony," Penal Law § 10.00(6). Moreover, there is nothing unusual about the Legislature "stacking" (DB: 1) multiple minor crimes to constitute a more serious crime. The felony of third-degree burglary, for instance, can involve trespass (a violation, Penal Law § 140.05) with intent to commit a misdemeanor such as petit larceny. *See* Penal Law § 140.20; *People v. Lesson*, 241 A.D.3d 1051, 1054 (3d Dep't 2025).

Second, defendant also fails to show any impermissible motivation in this prosecution. This investigation was initiated after widely publicized evidence of potential criminal conduct in New York (A584-A585), including Michael Cohen's August 2018 guilty plea to, among other crimes, making unlawful campaign contributions "in coordination with, and at the direction of" defendant "for the principal purpose of influencing the election" (A615-A622, A649-A654). Federal prosecutors further alleged that Cohen had used a shell corporation to make one of the unlawful payments and had sent invoices to defendant through the Trump

147

Organization's New York offices (A618-A623). Such public evidence of misconduct would have led any reasonable prosecutor to suspect that defendant or others may have violated New York law as well (A584-A585). *See, e.g.*, *People v. Trump Org.*, 205 A.D.3d 625, 626-27 (1st Dep't 2022) (rejecting selective-prosecution claim where investigation was initiated after congressional testimony about "fraudulent financial statements"); *People by James v. Nat'l Rifle Ass'n of Am., Inc.*, 75 Misc. 3d 1000, 1002, 1005, 1007-09 (Sup. Ct. N.Y. County 2022) (rejecting selective-prosecution claim where "investigation followed reports of serious misconduct"), *aff'd*, 223 A.D.3d 84 (1st Dep't 2023). Indeed, for the District Attorney "not to have investigated" in light of these facts "would have been a blatant dereliction of duty." *People v. The Trump Org., Inc.*, No. 451685/2020, 2022 WL 489625, at *5 (Sup. Ct. N.Y. County Feb. 17, 2022), *aff'd in part*, 205 A.D.3d 625 (1st Dep't), *appeal dismissed*, 38 N.Y.3d 1053 (2022).

Defendant's arguments to the contrary are meritless. First, defendant's assertion that the District Attorney campaigned on a "platform of investigating" him (DB: 16) grossly distorts the public record. During the campaign, the District Attorney highlighted that his history of public service included a management role in bringing a successful civil-enforcement action by the state against a New York non-profit (the Trump Foundation) that led to a $2 million penalty for breach of fiduciary duty and waste (A1670). But representing the state in unrelated civil litigation that was upheld by the courts says nothing about the People's reasons for charging this criminal case and does not plausibly reflect animus against defendant personally. Moreover, the District

148

Attorney's public promise that he knew "how to follow the facts and hold people in power accountable" (A1670), far from being suspicious (DB: 16), is "standard fare" that is "neither partisan (in the political sense) nor personal" (A1558-A1559).

Second, defendant also distorts the record in suggesting that a book by former prosecutor Mark Pomerantz created pressure to indict this case (DB: 13-17). But prosecutors were already presenting this case to the grand jury a month before the publication of that book in February 2023. And the People's basis for bringing this case was straightforward, given the public record of wrongdoing described above and the facts elicited throughout this trial. Indeed, other participants in the scheme at issue here (including Cohen, Pecker, and AMI) also faced consequences (A1456-A1474, A1561-A1569). Defendant thus fails to establish that this investigation was based on any impermissible motivation.

Ultimately, defendant's accusation of selective prosecution here is a retread of nearly identical claims he has raised when he has been sued. Courts have repeatedly and forcefully rejected such complaints. *See, e.g.*, *Trump Org., Inc.*, 205 A.D.3d at 626-27 (1st Dep't), *appeal dismissed*, 38 N.Y.3d 1053 (2022); *Trump v. James*, No. 1:21-CV-1352, 2022 WL 1718951, at *20 (N.D.N.Y. May 27, 2022); *Trump v. Vance*, 977 F.3d 198, 213-15 (2d Cir. 2020), *stay denied*, 141 S. Ct. 1364 (2021); *see also Trump v. Clinton*, 161 F.4th 671, 682 (11th Cir. 2025) (upholding sanction for defendant's frivolous selective-prosecution claim). This Court should also disregard his objections here.

149

## CONCLUSION

The judgment of conviction should be affirmed.


Respectfully submitted,


ALVIN L. BRAGG, JR.
  *District Attorney*
  *New York County*
danyappeals@dany.nyc.gov


STEVEN C. WU
  *Chief, Appeals Division*
JOHN T. HUGHES
  *Deputy Chief, Appeals Division*
DAVID GAGNE
  *Assistant District Attorney*
    Of Counsel

July 29, 2026

**PRINTING SPECIFICATIONS STATEMENT**

The word count for this brief is 38,162, excluding the Table of Contents and Table of Authorities. The word processing system used to prepare this brief and to calculate the word count was Microsoft Word for Microsoft 365. The brief is printed in Garamond, a serifed, proportionally spaced typeface. The type size is 14 points in the text and headings, and 14 points in the footnotes.